# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | |
|---|---|
| Priority | ___ |
| Send | ___ |
| Enter | ___ |
| Closed | ___ |
| JS-5/JS-6 | ___ |
| Scan Only | ___ |

**CASE NO.:** CV 2:17-7639 SJO (RAOx)        **DATE:** September 27, 2019

**TITLE:** Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.
========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Victor Paul Cruz | Not Present |
| Courtroom Clerk | Court Reporter |

**COUNSEL PRESENT FOR PLAINTIFFS:**     **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                                Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER (1) GRANTING-IN-PART AND DENYING-IN-PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT** [Docket No. 121]**; (2) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON KITE'S INVALIDITY DEFENSE UNDER § 102(F)** [Docket No. 225]

These matters are before the Court on: (1) Defendant Kite Pharma, Inc.'s ("Kite" or "Defendant") Motion for Summary Judgment of Noninfringement ("Kite MSJ"), and (2) Plaintiffs and Counter-defendants Juno Therapeutics, Inc. ("Juno"), Memorial Sloan Kettering Cancer Center, and Sloan Kettering Institute for Cancer Research's (together, "MSKCC") (collectively, "Plaintiffs") Motion for Summary Judgment on Kite's Invalidity Defense Under § 102(f) ("Juno MSJ"), filed June 24, 2019. The parties filed timely oppositions ("Kite Opp'n"; "Juno Opp'n") and replies ("Kite Reply"; "Juno Reply"). The Court found these matters suitable for disposition without oral argument and vacated the hearing set for August 12, 2019. *See* Fed. R. Civ. P. 78(b). For the following reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendant's Motion and **GRANTS** Plaintiffs' Motion.

    I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

This is a patent infringement action involving U.S. Patent No. 7,446,190 (the "'190 Patent"), titled "Nucleic Acids Encoding Chimeric T Cell Receptors." The '190 Patent issued on November 4, 2008 and incorporates a provisional application filed on May 28, 2002. ('190 Patent Caption.) The claimed invention provides "nucleic acid polymer encoding [] chimeric TCR's [T Cell Receptors] . . . ." ('190 Patent, col. 2:11-14.) The chimeric TCRs encoded by the claimed invention "combine, in a single chimeric species, the intracellular domain of CD3 ζ-chain ("zeta chain portion"), a signaling region from a costimulatory protein such as CD28 with a binding element that specifically interacts with a selected target." ('190 Patent, col. 2:14-18.) These TCRs are designed to "specifically interact[] with a cellular marker associated with target cells," resulting in the stimulation of a T cell immune response to the target cells. ('190 Patent, col. 2:30-36.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: CV 2:17-7639 SJO (RAOx)**　　　　　　　**DATE: September 27, 2019**

Plaintiffs initiated this action on October 18, 2017, alleging that Defendant infringes the '190 Patent through the use, sale, offer for sale, or importation of one of Kite's immunotherapy treatments, Yescarta. Yescarta is described as a "therapy in which a patient's T cells are engineered to express a chimeric antigen receptor (CAR) to target the antigen CD19, a protein expressed on the cell surface of B-cell lymphomas and leukemias, and redirect the T cells to kill cancer cells." (Compl. ¶ 18, ECF No. 1.) Plaintiffs assert that Yescarta infringes on the '190 Patent by utilizing nucleic acid polymers encoding chimeric TCRs within the scope of the '190 Patent claims. (Compl. ¶ 24.) Defendant, in turn, filed counterclaims seeking declaratory judgments of non-infringement and invalidity of the '190 Patent. (*See generally*, Amended Answer and Counterclaims, ECF No. 66.)

On March 2, 2018, the Court held a scheduling conference in which it ordered that the Northern District of California's Patent Local Rules will govern the case and set a claim construction ("Markman") hearing for September 17, 2018. (Minutes of Sched. Conf., ECF No. 71.) The Markman hearing was held on September 18, 2018 and, on October 9, 2018, the Court issued a Claim Construction Order construing two terms:

| Claim Term | Court's Construction |
|---|---|
| "the amino acid sequence encoded by SEQ ID NO:6" | **Before the Certificate of Correction:** Amino Acids 113-220 of CD28 (starting with lysine (K))<br><br>**After the Certificate of Correction:** Amino Acids 114-220 of CD28 (starting with isoleucine (I)) |
| "nucleic acid polymer encoding . . . a binding element that specifically interacts with a selected target" | Plain and ordinary meaning |

(*See* Claim Construction Order, ECF No. 100.) The parties' cross-motions for summary judgment followed.

　　II. LEGAL FRAMEWORK

　　　　A. Overview of the Parties' Arguments

Defendant moves for summary judgment of noninfringement based on two grounds. First, it claims that the United States Patent and Trademark Office ("PTO") should never have issued a certificate of correction ("CoC") for the '190 Patent because the alteration impermissibly broadened the claim scope and was not based on a mere clerical error. (Kite MSJ 6-12.) Next, it argues that Juno is not entitled to argue infringement under the doctrine of equivalents because it elected to narrow the scope of the "costimulatory signaling region" claim limitation during prosecution. (Kite MSJ 6-20.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: CV 2:17-7639 SJO (RAOx)**          **DATE: September 27, 2019**

Plaintiffs separately seek a finding that Kite's invalidity defense under § 102(f) is improper. Section 102(f) applies where a patent improperly issues to a person who did not herself invent the subject matter.  Kite intends to allege that the patent leaves off a co-inventor, Dr. Krause, and is therefore invalid.  Plaintiffs seek summary judgment, arguing that Kite's position is based solely upon a single publication and that there is no evidence that Dr. Krause collaborated on, or was involved in the conception of, the invention claimed in the '190 Patent.  (Juno MSJ 7-11.) Alternatively, they argue that, should Dr. Krause have indeed been included as a co-inventor, this deficiency is curable under 35 U.S.C. § 256.  (Juno MSJ 12-13.)

  B. <u>Relevant Legal Standards</u>

    1. <u>Summary Judgment</u>

Federal Rule of Civil Procedure 56(a) mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 325.  Rather, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*  "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and f]actual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248.  At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence.  *See id.* at 249.  A court is required to draw all inferences in a light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587.

### 2. Invalidation of a Certificate of Correction

"A patentee who has made 'a mistake of a clerical or typographical nature, or of minor character' may apply to the PTO for a 'certificate of correction, if the correction does not involve such changes in the patent as would constitute new matter or would require re-examination.'" *Central Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 483 F.3d 1347, 1353 (Fed. Cir. 2007) (quoting 35 U.S.C. § 2255). "[I]f a certificate of correction broadens a claim, it is only valid if it corrects a 'clerical or typographical' error that would have been clearly evident to one of skill in the art reading the intrinsic evidence." *Id.* (quoting *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1373 (Fed. Cir. 2001)).

"Invalidating a certificate of correction for impermissible broadening therefore requires proof of two elements: (1) the corrected claims are broader than the original claims; and (2) the presence of the clerical or typographical error, or how to correct that error, is not clearly evident to one of skill in the art." *Id.* The first of these elements is viewed as a question of law to be decided by a court, whereas the second is a factual inquiry ordinarily left to a jury. *Id.* The moving party must establish these elements by "clear and convincing evidence." *Id.* (citing *Superior Fireplace*, 270 F.3d at 1367).

### 3. Infringement Under the "Doctrine of Equivalents"

A process that does not literally infringe a patent claim may nevertheless be found to infringe under the "doctrine of equivalents" ("DoE"). *See Duramed Pharm., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011). "To find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product must be insubstantial." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1346 (Fed. Cir. 2013) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). "One way of proving infringement under the doctrine of equivalents is to show, for each claim limitation, that the accused product 'performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product.'" *Id.* at 1347 (quoting *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009)). This is a question of fact. *Id.* (citations omitted).

The DoE contains a number of inherent limitations. For example, "[i]f the claimed and accused elements are recognized by those of skill in the art to be opposing ways of doing something, they are likely not insubstantially different." *Id.* at 1347-48. Moreover, "the doctrine of prosecution history estoppel prevents a patent owner from recapturing through the doctrine of equivalents subject matter surrendered to acquire the patent." *Duramed*, 644 F.3d at 1380. If the patentee narrowed the scope of the asserted patent's claims in response to a prior art rejection, a presumption of prosecution history estoppel applies, which may be rebutted by showing, *inter alia*, the "alleged equivalent would have been 'unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered.'" *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.* ("*Festo IX*"), 344 F.3d 1359, 1369 (Fed. Cir. 2003) (quoting *Festo Corp. v. Shoketsu Kinzoky Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 738 (2002)).

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.:** <u>CV 2:17-7639 SJO (RAOx)</u>　　　　　　　　　　**DATE:** <u>September 27, 2019</u>

This is commonly referred to as "argument-based estoppel." *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006). Similarly, a patentee's argument to the patent examiner distinguishing a claim from the prior art—referred to as "amendment-based estoppel"—can curtail the application of the DoE. *Id.*

  III. <u>DISCUSSION</u>

    A. <u>The Certificate of Correction</u>

      1. <u>Amendment History</u>

On May 28, 2002, applicants filed Provisional Application No. 60/383,872. Applicants incorporated by reference a journal article written by the inventors of the '190 Patent that described the invention claimed in their Provisional Application. The journal article identifies the set of PCR primers used to isolate and amplify the portion of CD28 used to construct the costimulatory region of the claimed T-Cell Receptor. Specifically, the article states that "nucleotides 336-660 of CD28 were amplified using primers 1 (5'-GGCGGCCGCAATTGAAGTTATGTATC-3') and 2 (5'-TGCGCTCTCCTGCTGAACTTCACTCTGGAGCGATAGGCTGCGAAGTCGCG-3')." (Provisional Appl., at 7.) Applicants filed the non-provisional patent application a year later on May 8, 2003 and incorporated this same language, identifying the sequence as "nucleotides 336-660 of CD28" and defining SEQ ID NO:6 in accordance with this description. (Decl. of Adam R. Lawton ("Lawton Decl."), Exh. 6, ECF No. 121-8.)

On September 4, 2007, after approval of the patent by the examiner, the applicants filed a Request for Continued Examination, claiming that:

> In preparing to pay the issue fee for this application, it was determined that an error occurred in the presentation of Seq. ID No. 6, which is recited in the previously allowed claims. In addition, a discrepancy was noted between the bases of Seq ID No. 4 in the specification [] and the sequence listing. Finally, it was noted that the Seq ID No. 10 was not referenced in the specification and that the amino acids of the CD28 Sequence (144-220 contained a typographical error and should have been 114-220). This RCE application and amendment are filed to correct these errors.

(Declaration of Alan J. Heinrich ("Heinrich Decl."), Exh. 1 ("RCE"), ECF No. 130-4.)

Along with this request, the applicants submitted a sequence listing which amended (1) SEQ ID NO:4—the nucleotide sequence of the upstream primer—to add a single Thymine, bringing it into agreement with the primer sequence disclosed in column 7 of the specification, and (2) SEQ ID NO:6, removing the first four nucleotides, such that the first codon corresponds to isoleucine,

amino acid 114 of CD28, rather than lysine, amino acid 113. (*See* RCE.) The PTO rejected the amended listing as "damaged and/or unreadable." The applicants provided a new copy, which again reflected the amendments requested in the RCE. The PTO again rejected the filing, this time for failure to comply with the PTO formatting requirements. The applicants reformatted the listing and, for the third time, filed an amended sequence listing with the PTO. This time, however, they included the original sequence listing that did not reflect the amendments originally requested in the RCE. It was this unaltered listing that was ultimately included in the patent when it issued. (Juno GDMF ¶ 6.)

In mid-2013, the patentees requested, and the PTO granted, a CoC to the '190 Patent. (Juno GDMF ¶¶ 18-20.) The CoC alters the definition of SEQ ID NO:6 from the sequence beginning with nucleotide 336 of the CD28 protein to the sequence beginning with nucleotide 340 of the CD28 protein. (Juno GDMF ¶¶ 18-19.) During claim construction, the Court determined that the scope of the claim differed before and after the issuance of this CoC. (*See generally*, Claim Construction Order, ECF No. 100.)

       2. <u>Analysis</u>

In order to prevail on its summary judgment motion, Kite must establish, by clear and convincing evidence, that no reasonable jury could find that the PTO's decision to grant the CoC was valid. To do so, it must show (1) that the corrected claims are broader than the original claims and (2) that the presence of a clerical or typographic error is not clearly evidence to a POSITA examining the intrinsic record. *Central Admixture*, 482 F.3d at 1353. The first of these is not at issue, given the Court's previous determination that the CoC altered the definition of "the amino acid sequence encoded by SED ID NO:6." (*See generally*, Claim Construction Order.) The Court's analysis will therefore focus on the second of these issues—whether Defendant has shown that no reasonable jury could conclude that a POSITA would have recognized a "clearly evident" clerical error in the patent as it originally issued.

Kite argues that the CoC impermissibly broadens the scope of the patent claims and that correction is therefore only available to address a "clerical or typographical" mistake. It observes that "[b]efore the CoC, a construct having amino acids 114-120 of CD28, but not having amino acid 113, would not fall within the literal claim scope. After the CoC, it would." (Kite MSJ 8.) The Court agrees, as the claim utilizes the open-ended transitional phrase "comprising," meaning that shortening the length of a claimed sequence constitutes a broadening of the claim scope. ('190 Patent, Claim 1.)

Courts generally approach such broadening corrections with skepticism. "The public is entitled to rely upon the public record of a patent in determining the scope of the patent's claims." *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1371 (Fed. Cir. 2001) (quoting *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1384 (Fed. Cir. 1998)). "Placing due weight on the public notice function of patent claims suggests that we should interpret § 255 to allow a

broadening correction of a typographical error only where it is clearly evident from the specification, drawings, and prosecution history how the error should appropriately be corrected." *Id.* at 1372. Plaintiffs must therefore establish that the correct definition of SEQ ID NO:6 was "clearly evident" to a POSITA, based on the intrinsic record.

Plaintiffs argue stringently that the Court's construction does not necessitate invalidation of the CoC. They note that while the question of claim scope is legal in nature and is for the Court to decide, "[t]he second element, whether the error and its correction would both be clearly evident to one of skill in the art, has been treated as a factual question." *Central Admixture*, 482 F.3d 1354. Because this second element is at issue in the present Motion, based on the evidence presented by the parties, the Court must find in favor of Plaintiffs.

While the Claim Construction Order did discuss whether a POSITA would have understood the proper scope of the claim term, this determination was based on the Court's own findings, as "'the construction of a patent, including terms of art within its claim,' is not for a jury, but 'exclusively' for 'the court' to determine." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1966)). "This is so even where the construction of a term of art has 'evidentiary underpinnings.'" *Id.* As Plaintiffs correctly observe, the same is not true of the determination as to whether a patent, as issued, contained an error that would be clear to a POSITA. *See Central Admixture*, 482 F.3d at 1354; *Superior Fireplace*, 270 F.3d at 1373.

Here, both parties have provided testimony from persons skilled in the relevant art. Plaintiffs' expert argues that the error and correction would have been clearly evident to a POSITA examining the record, whereas Defendant's expert argues the opposite. (*Compare* Decl. of Prof. John Quackenbush, ECF No. 133, *with* Declaration of Dr. Richard P. Junghans, ECF No. 87-1.) Because neither party has presented evidence undermining the credibility of the opposing expert or questioning the opposing expert's qualifications as a POSITA, this presents a clear and genuine dispute of fact and precludes a grant of summary judgment. In the Claim Construction Order, the Court expressed its own misgivings regarding the clarity of the purported error, but at this stage, based on the evidence presented, it cannot state with certainty whether a jury would necessarily reach the same conclusion. Accordingly, Defendants' MSJ must be denied as to the validity of the CoC.

### B. Kite Does Not Infringe Under the Doctrine of Equivalents

The Court will not address literal infringement as the parties have stipulated that if the CoC is valid, Kite literally infringes the claims of the '190 Patent. It will, however, consider the issue of infringement under DoE, which may apply should the jury find the CoC invalid.

"The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial

changes."  *Festo*, 535 U.S. at 733.  "When, however, the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent."  *Id.* at 734.

Defendant argues that the patentees surrendered any potential DoE argument when they narrowed the scope of Claim 1 during prosecution.  (Kite MSJ 13.)  The initial patent application filed with the PTO claimed:

> A nucleic acid polymer encoding a chimeric T cell receptor . . . comprising [1] a zeta chain portion comprising the intracellular domain of human CD3 ζ chain, [2] a costimulatory signaling region, and [3] a binding element that specifically interacts with a selected target.

(Plaintiffs' Statement of Genuine Disputes of Material Fact ("Juno GDMF") ¶ 22, ECF No. 130-2.)  In an office action dated February 3, 2006, this claim was rejected by the PTO for lack of enablement, inadequate written description, and anticipation by prior art.  (Juno GDMF ¶¶ 23-25.)  With respect to enablement, the examiner determined that:

> [T]he specification, while being enabling for a nucleic acid encoding a costimulatory signaling region comprising the intracellular domain of CD28, or consisting of SEQ ID NO: 7, and a binding element which is an antibody, does not reasonably provide enablement for a nucleic acid encoding a generically recited "costimulatory signaling region" or a generically recited "binding element."

(Juno GDMF ¶ 23.)  In the same vein, he found a lack of written description because "[a]pplicant is not in possession of a nucleic acid encoding a generically recited 'costimulatory signaling region' and a generically recited 'binding element.'"  (Juno GDMF ¶ 24.)

The patentees responded by cancelling several claims and "combin[ing] the limitation of claim 2 into claim 1, which defines the binding element as a member of a [sic] immunological binding pair and [] add[ing] the limitation from claim 9 that the costimulatory region has the sequence of SEQ ID NO:7."  (Juno GDMF ¶ 28.)  Claim 1 went from merely disclosing "a binding element that specifically interacts with a selected target" to requiring that binding element to be "a member of an immunological binding pair."  (Juno GDMF ¶ 27.)  Similarly, it altered the generic "costimulatory signaling region" to specify that it "consist[] of a sequence encoded by the sequence of SEQ ID NO:7 [later changed to SEQ ID NO:6]."  (Juno GDMF ¶ 27.)

It is clear from the prosecution history that this change in claim scope was in direct response to a non-final rejection from the PTO—"a substantial reason related to patentability." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 33 (1997); *Festo*, 535 U.S. at 734.  The comments provided with the amendment acknowledged the examiner's stated reasons for

rejecting the application and that "[w]ithout conceding the correctness of the Examiner's position and without prejudice" they made the changes in response. (Juno GDMF ¶ 28.) This is a textbook example of prosecution history estoppel. *See Warner-Jenkinson*, 520 U.S. at 33; *Festo,* 535 U.S. at 733-34. The examiner rejected a claim for being "generically cited" and the patentees responded by narrowing the claim scope to a specific subspecies of "costimulatory signaling region." In so doing, they knowingly and intentionally surrendered their claim to all other species and cannot now simply reclaim their lost patent scope.

Plaintiffs do not dispute that the amendment narrowed the claim scope and that prosecution history estoppel applies, but instead focus on the proper scope of the claim as amended. They argue that the claim should not be limited to the (incorrect) SEQ ID NO:6 disclosed in the application, but instead to the (correct) SEQ ID NO:6 that they intended to file in the first instance. This is based on a purported standard that prosecution history estoppel applies only when a patent applicant "knowingly and intentionally" relinquish subject matter. But the citation provided in support of this standard is inapposite. Nowhere in *Festo* does the Court state that the relinquishment must be "knowing and intentional." Quite the contrary, the Federal Circuit has expressly determined that it "do[es] not look to the subjective intent of the applicant and what the applicant subjectively believed or intended that he or she was giving up to the public. Rather, the standard for determining what subject matter was surrendered is objective and depends on what a competitor, reading the prosecution history, would reasonably conclude was given up by the applicant." *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1107-08 (Fed. Cir. 1996) (citing *Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed. Cir. 1995)); *see also Festo*, 535 U.S. at 736 (rejecting an argument based on intent as "conflat[ing] the patentees['] reason for making the amendment with the impact the amendment has on the subject matter.").

Because the operable question focuses on a POSITA's perception and understanding, it directly mirrors the issue presented above. It is clear that the patentee did surrender claim scope during prosecution, precluding the application of the DoE. The sole remaining question is what a POSITA, reading the prosecution history, would understand to be claimed by the patent as it issued—precisely the same question posed by the Court's analysis of the CoC. DoE is therefore unnecessary; a determination that a POSITA would have understood the patent to contain a clear error results in direct infringement, as stipulated by the parties. Conversely, a determination that the patent's error was not clearly evident to a POSITA would result in prosecution history estoppel and block the application of the DoE. Because there is no situation where the DoE is relevant, the Court **GRANTS** Defendant's MSJ as to this issue.

### C. <u>Plaintiffs' Motion to Preclude § 102(f) Invalidity</u>

In their Motion for Summary Judgment, Plaintiffs seek to preclude Defendant from raising an invalidity defense based on improper inventorship under 35 U.S.C. § 102(f). Defendant has expressed its intent to argue at trial that Dr. Anja Krause made significant contributions to the

invention claimed by the '190 Patent, but was not named as an inventor. Plaintiffs characterize this as an end-run around IPR estoppel, based on the Patent Trial and Appeal Board's ("PTAB") previous determination that the '190 Patent was not obvious in light of Dr. Krause's work.

It is undisputed that in the late 1990's, Dr. Krause worked in a research laboratory headed by Dr. Michel Sadelain, one of the named inventors of the '190 Patent. (Plaintiffs' Response to Additional Material Facts ("RAMF") ¶¶ 4-7, ECF No. 236-1.) Dr. Sadelain has testified that it was his work with Dr. Krause that led to the identification of the costimulatory signaling region that would ultimately be identified in the patent as the nucleic acid sequence encoded by SEQ ID NO:6. (RAMF ¶ 5.) Dr. Krause was then named as an inventor on a patent application that claimed a two-part chimeric T-cell receptor which comprised a binding domain and the same costimulatory signaling region encoded by SEQ ID NO:6. (RAMF ¶ 7.) Based on these facts, Kite argues that a reasonable jury could conclude that Dr. Krause was a significant contributor to the '190 Patent and should have been named.

1. Effect of IPR Determination on Inventorship

This litigation began in August 2015, when Kite filed an IPR petition that challenged the '190 Patent as obvious in light of a combination of three prior art references, including an article published in 1998 by Dr. Krause, along with Dr. Sadelain and others. The PTAB rejected this challenge, determining that the prior art taught away from modifying the disclosure of the Krause article to arrive at the claimed CAR-T. (Declaration of Elizabeth C. Tuan ("Tuan Decl."), Ex. 3 ("Final Written Decision"), at 28, ECF No. 225-6.) It found that "[t]o avoid risking off-target binding, we are persuaded that the ordinarily skilled artisan would have been dissuaded from including [the protein encoded by SEQ ID NO:6] in designing a dual-signaling chimeric TCR." (Final Written Decision, at 27.) As a result of this decision and the Federal Circuit's subsequent affirmance, Defendant is estopped from raising its obviousness defense at trial. (35 U.S.C. § 315(e)(2); Tuan Decl., Ex. 4 ("Federal Circuit Affirmance"), ECF No. 225-7.) The question before the Court today is whether the estoppel effect of these decisions should extend beyond the PTAB's obviousness determination to bar Defendant from challenging the patent's validity based on inventorship.

Section 315(e)(2) of the Patent Act states that an unsuccessful petitioner in an inter partes review is barred from asserting that a claim is invalid "on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2). Many courts have interpreted this to bar all invalidity claims that are raiseable in an IPR. *See e.g.*, *Milwaukee Elec. Tool Corp. v. Snap-On-, Inc.*, 271 F. Supp. 3d 990 (E.D. Wis. 2017), *appeal pending*, No. 18-1516 (Fed. Cir. Feb. 5, 2018). Such an understanding would include defenses grounded in §§ 102 and 103 that are based on prior art consisting of patents and printed publications, but would not include an attack on inventorship under § 102(f)—which does not rely solely on published prior art. 35 U.S.C. § 311(b). Thus, IPR estoppel does not directly bar Defendant's intended challenge.

**CASE NO.:** CV 2:17-7639 SJO (RAOx)                    **DATE:** September 27, 2019

Plaintiffs argue, however, that even if Defendant's § 102(f) claim is not directly precluded by estoppel, it should nevertheless be precluded in this instance because it arises from the same set of facts as Defendant's rejected obviousness defense. (Juno MSJ 7.) Plaintiffs characterize Defendant's position as "premised *solely* on the fact that [Dr. Krause] (along with others) co-authored a prior art article that discloses an element of the claimed inventions." (Juno MSJ 7.) Because this article was the primary basis of Defendant's obviousness challenge, Plaintiffs contend that this is an "end-run" around the IPR estoppel bar. The Court disagrees.

Regardless of whether it is true that the sole support for Dr. Krause's contribution to the invention is the 1998 prior art article, obviousness and inventorship constitute unique legal theories and require unique showings. A determination of obviousness asks whether "the improvement is more than the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex, Inc.,* 550 U.S. 398, 417 (2007). Inventorship, on the other hand, does not focus on whether all the necessary information was readily available to the public, but whether a purported inventor substantially contributed to the conception of the invention, i.e., the "'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). Thus, while a particular article itself may be insufficient to support obviousness, it may nevertheless serve the purpose of an inventor's notebook to memorialize the contribution of a joint inventor to conception of a later inventor.

Moreover, a jury—unlike the PTAB—is not confined solely to the information disclosed in the 1998 article, but may also consider other evidence, such as Dr. Krause's unpublished body of work in the Sandelain lab from 1995 to 2000, documents and testimony regarding the development of the invention behind the '190 Patent, and the testimony of Dr. Sandelain—evidence offered by Defendant in support of its claim. (Kite Opp'n 11-12.) Thus, not only does Defendant's § 102(f) defense address a separate legal issue than the PTAB's obviousness determination, a factfinder considering the case would utilize a different body of evidence. For these reasons, the Court declines to extend IPR estoppel to preclude Defendant's inventorship challenge.

2. Sufficiency of the Evidence

Plaintiffs also argue that, aside from the effect of IPR estoppel, there is insufficient evidence for a jury to find that Dr. Krause contributed to the conception of the invention claimed by the '190 Patent. They purport that Dr. Krause's work was in support of an earlier invention, captured by the 1998 journal article and the patent application filed in 1997. These publications are directed to a two-part construct which included (1) an extracellular binding element, and (2) a sequence of CD28, but do not include the third component—CD3ζ—that first appears in the '190 Patent. Plaintiffs contend that "Kite's evidence begins and ends with the work that led to the filing of the

**CIVIL MINUTES – GENERAL**

**CASE NO.: <u>CV 2:17-7639 SJO (RAOx)</u>**  **DATE: <u>September 27, 2019</u>**

'544 application and publication of the Krause article . . . which became public years before work began on the inventions of the '190 Patent."  (Juno Reply 4.)

The evidence before the Court substantiates this view.  The only supporting evidence identified by Defendant for the proposition that Dr. Krause made a substantial contribution to the '190 Patent's conception consists of: (1) the 1998 Krause article describing a two-part chimeric molecule including the identified portion of CD28, (2) the '544 Patent that claims that same two-part molecule, and (3) documents and testimony showing that the named inventors of the '190 Patent created their construct by starting with the Krause protein and adding a known component.  (*See* RAMF ¶¶ 4-14, 19-22, 30-34; Decl. of Dr. Richard P. Junghans ¶¶ 73-84, ECF No. 233-3.)  While this does demonstrate that Dr. Krause's work was important to the invention of the '190 Patent, it does not follow that she contributed to the conception of the invention.  Rather, her work amounts to no more contribution than if the '190 inventors had discovered Dr. Krause's article independently and used her publicly-disclosed concept.  "Once [a discovery] becomes public knowledge, it is then assimilated into the store-house of knowledge that comprises ordinary skill in the art."  *Falana v. Kent State Univ.,* 669 F.3d 1349, 1358 (Fed. Cir. 2012).  "Additionally, joint inventorship arises only 'when collaboration or concerted effort occurs—that is when the inventors have some open line of communication during or in temporal proximity to their inventive efforts.'"  *Id.* (quoting *Eli Lilly & Co. v. Aridigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004)).   There is no evidence in the record that the named '190 inventors had any such open line of communication with Dr. Krause when they conceived of the three-part T-Cell receptor that is the subject of the '190 Patent.

The Federal Circuit considered a similar scenario in *Board of Education ex rel. Florida State University v. American Bioscience, Inc.*  333 F.3d 1330 (Fed. Cir. 2003).  There, a prior inventor had developed a method of making a particular class of compounds and, on that basis alone, claimed to be a co-inventor of a specific set of compounds developed and patented by a later group of persons.  The Court held that this did not rise to the level of joint inventorship:

> [D]espite the fact that [a person] may have developed a method of making [similar compounds], . . . he did not conceive the claimed compounds; only [the later] inventors were in possession of both the structure of the claimed compound and an operative method of making those compounds . . . .  [The prior inventor] neither made the claimed compounds nor attempted to make them, and he did not have "'firm and definite idea' of the claimed combination as a whole."  Although [the later inventors] may have learned about the [] method from [the prior inventor], teaching skills or general methods that somehow facilitate a later invention, without more, does not render one a coinventor.

*Id.* at 1341-42.

///

CIVIL MINUTES – GENERAL

**CASE NO.:** <u>CV 2:17-7639 SJO (RAOx)</u>  **DATE:** <u>September 27, 2019</u>

"For persons to be joint inventors under Section 116, there must be some element of joint behavior, such as collaboration or working under common direction, one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting." *Kimberly-Clark Corp. v. Proctor & Gamble Distrib. Co., Inc.*, 973 F.2d 911, 916 (Fed. Cir. 1992). While it is true that there is no bright-line rule requiring each co-inventor to "have an independent mental picture of the complete compound claimed," there must nevertheless be some evidence that the "group of co-inventors . . . collaborate[d] and work[ed] together to collectively have a definite and permanent idea of the complete invention." *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1308 (Fed. Cir. 2010). Here, there is no evidence of any collaboration following the publication—and surrender to the public domain—of the 1998 Krause article. Absent any such evidence, Defendant cannot meet its burden of establishing by clear and convincing evidence that Dr. Krause was a joint inventor of the '190 Patent. For this reason, Plaintiffs' Motion for Summary Judgment is **GRANTED** and Defendant will be precluded from pursuing a 102(f) defense at trial.

    IV. <u>RULING</u>

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendant's Motion for Summary Judgment and **GRANTS** Plaintiffs' Motion for Summary Judgment.

IT IS SO ORDERED.