1   IRELL & MANELLA LLP
    Morgan Chu (SBN 70446)
2   mchu@irell.com
    Alan J. Heinrich (SBN 212782)
3   aheinrich@irell.com
    C. Maclain Wells (SBN 221609)
4   mwells@irell.com
    Elizabeth C. Tuan (SBN 295020)
5   etuan@irell.com
    1800 Avenue of the Stars, Suite 900
6   Los Angeles, California 90067-4276
    Telephone:    (310) 277-1010
7   Facsimile:    (310) 203-7199

8   Rebecca Carson (SBN 254105)
    rcarson@irell.com
9   840 Newport Center Drive, Suite 400
    Newport Beach, CA 92660
10  Telephone    (949) 760-0991
    Facsimile:    (949) 760-5200

11
    Attorneys for Plaintiffs
12  JUNO THERAPEUTICS, INC., MEMORIAL
    SLOAN KETTERING CANCER CENTER,
13  and SLOAN KETTERING INSTITUTE FOR
    CANCER RESEARCH

14
    [List of counsel continued to next page]

15

16                  UNITED STATES DISTRICT COURT

17                  CENTRAL DISTRICT OF CALIFORNIA

18  JUNO THERAPEUTICS, INC., et al.,      Case No. 2:17-cv-07639-SJO-KSx

19            Plaintiffs,                 **PLAINTIFFS' MEMORANDUM
                                          OF POINTS AND AUTHORITIES
20       v.                               IN SUPPORT OF MOTION TO
                                          EXCLUDE DR. MOHAN RAO'S
21  KITE PHARMA, INC.,                    TESTIMONY REGARDING
                                          DAMAGES**
22            Defendant.
                                          <span style="color:red">**REDACTED VERSION OF
23                                        DOCUMENT PROPOSED TO BE
                                          FILED UNDER SEAL**</span>
24  AND RELATED COUNTERCLAIMS

25

26

27

28

10752137

1
JONES DAY
Andrea Weiss Jeffries (SBN 183408)
2
ajeffries@jonesday.com
555 South Flower Street, Fiftieth Floor
3
Los Angeles, CA 90071
Telephone:   (213) 489-3939
4
Facsimile:    (213) 243-2539

5
Christopher J. Harnett (*Pro Hac Vice*)
Sarah A. Geers (*Pro Hac Vice*)
6
Kevin V. McCarthy (*Pro Hac Vice*)
250 Vesey Street
7
New York, NY 10281
Telephone:   (212) 326-3939
8
Facsimile:    (212) 755-7306

9
Attorneys for Plaintiffs
JUNO THERAPEUTICS, INC., MEMORIAL
10
SLOAN KETTERING CANCER CENTER,
and SLOAN KETTERING INSTITUTE FOR
11
CANCER RESEARCH

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs Juno Therapeutics, Inc. ("Juno"), Memorial Sloan Kettering Cancer

2  Center ("MSK"), and Sloan Kettering Institute for Cancer Research (collectively,

3  "Plaintiffs") move the Court to exclude the testimony of Dr. Mohan Rao, Defendant

4  Kite Pharma, Inc.'s ("Kite") damages expert.

5  **I.    INTRODUCTION**

6    The Court should exclude Dr. Rao's damages opinion for three independent

7  reasons. First, Dr. Rao opines that, at the hypothetical negotiation, Juno would have

8  agreed to sublicense U.S. Patent No. 7,446,190 (the "'190 patent") to Kite at a rate

9  that is less than what Juno itself must pay MSK for Juno's sublicensees' sales. Dr. Rao

10  thus posits a "reasonable royalty" rate under which Juno would *lose money* on every

11  sale that its competitor, Kite, makes and in violation of its agreement with MSK.

12  Dr. Rao's opinion defies basic economic principles and is inadmissible under Federal

13  Rule of Evidence 702. Second, contrary to Federal Circuit law, Dr. Rao's hypothetical

14  negotiation analysis is not based on the parties' bargaining positions at the time of first

15  infringement in October 2017. Third, Dr. Rao relies on estimates of possible

16  settlement ranges for this lawsuit prepared in connection with Celgene's acquisition

17  of Juno, which bear no relationship to the hypothetical negotiation analysis and thus

18  are irrelevant, confusing to the jury, and prejudicial. The Court should exclude any

19  reference to these estimates at trial. Because Dr. Rao's opinion is legally improper,

20  irrelevant, confusing to the jury, and unduly prejudicial, the Court should exclude his

21  opinion under Rule 702, as interpreted by *Daubert* and its progeny.

22  **II.    OVERVIEW OF DR. RAO'S DAMAGES OPINION**

23    Juno obtained an exclusive license to the '190 patent from MSK in

24  November 21, 2013 (the "Juno Exclusive License Agreement"). The Juno Exclusive

25  License Agreement provides that Juno "shall pay to [MSK] a running royalty equal to

26  . . . ▇ *% of worldwide, annual Net Sales* of Licensed Products . . . by [Juno] or its

27  Affiliates or *Sublicensees*." Ex. A § 4.2.1 (Emphasis Added). "Licensed Products"

28  include products that a valid claim of the '190 patent covers. *Id.* § 1.10; Ex. B at 117:8-

MOTION TO EXCLUDE DR. MOHAN RAO'S TESTIMONY
REGARDING DAMAGES

10752137                              - 1 -

1    23. Thus, in a hypothetical negotiation between Juno and Kite, the parties would have

2    understood that Juno would pay MSK a royalty of ██ % on Kite's net sales when

3    Juno sublicensed the patent to Kite. Ex. B at 116:10-21, 129:16-130:8.

4         In his reasonable royalty analysis, Dr. Rao ignores this ██ % royalty rate and

5    instead uses a starting point of ██ %, which is set out in section 4.2.2 of the Juno

6    Exclusive License Agreement. Ex. A § 4.2.2. But the ██ % rate applies only to

7    products that include MSK know-how ████████████████████████████████

8    ████████████████████████████ *Id.* The ██ % rate of section 4.2.1, in

9    contrast, applies to Licensed Products that are covered by a valid patent claim. As

10   such, the ██ % rate is irrelevant here because essential premises of the hypothetical

11   negotiation are that the asserted claims of the '190 patent are valid and that Kite has

12   infringed. Dr. Rao then takes this inapplicable ██ % rate and adjusts it based on a

13   litigation settlement agreement where Novartis agreed to pay Juno a royalty of ██ %

14   for a license to a different patent. From this, Dr. Rao concludes that "the royalty rate

15   for the '190 Patent . . . is no more than ██ percent." Ex. C ¶ 31.

16        Dr. Rao's misreading of the Juno Exclusive License Agreement leads him to an

17   absurd result: under his analysis, Juno would have agreed to sublicense the '190 patent

18   to Kite at a net negative running royalty rate. For each sale of Yescarta, Juno would

19   have to pay MSK ██ % of Kite's revenues from that sale (section 4.2.1), yet Juno

20   would receive only ██ % on Kite's sales in return. Rather than receiving a royalty,

21   Juno would literally be paying its competitor to sell its infringing product.

22        Moreover, Dr. Rao admits that the hypothetical negotiation would occur on

23   October 18, 2017, which is the date of the first commercial sale of Yescarta. Ex. C

24   ¶ 195. In application, however, Dr. Rao sidesteps that date and evaluates the parties'

25   bargaining positions as they would have existed years prior to 2017, before Kite had

26   invested in the development and FDA approval of Yescarta. In particular, Dr. Rao

27   argues that it would be inappropriate to consider the actual circumstances of the parties

28   in 2017 because doing so would allegedly include "hold up" value. *Id.* ¶ 95. Dr. Rao

MOTION TO EXCLUDE DR. MOHAN RAO'S TESTIMONY
REGARDING DAMAGES

10752137                                    - 2 -

claims that "both parties would recognize that Kite/Gilead would face added regulatory costs and timing delays if implemented at the time of the negotiation," but that "the construct of the hypothetical negotiation would be to 'strip out' such hold-up costs." *Id.* ¶ 95. Thus, while Dr. Rao acknowledges that the Juno-Novartis sublicense he uses as the primary basis for his analysis was a litigation settlement and "executed approximately two years prior to Novartis' Kymriah obtaining FDA approval, whereas the hypothetical negotiation would occur on or around the date of Kite/Gilead's Yescarta FDA approval," he makes zero adjustments to account for these differences, dismissing them as alleged "hold-up value." *Id.* ¶¶ 94-95.

To bolster his opinion, Dr. Rao argues that his proposed royalty is consistent with settlement estimates for this action between Juno and Kite that Juno and Celgene prepared during the Celgene acquisition—which value this litigation (not the patents) and did not include the required assumptions of infringement and validity. Ex. B at 95:1-7 ([redacted]); Ex. C at 15 n.14. Dr. Rao contends his royalty rate "[redacted]." Ex. B at 95:8-10.

## III. LEGAL STANDARD

Expert testimony is admissible if it will assist "the trier of fact to understand the evidence or to determine a fact in issue." FRE 702. Expert testimony must "be the product of reliable principles and methods applied to sufficient facts or data." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013). When an expert opinion is contrary to law, it is per se unreliable and unduly prejudicial. *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012). In addition, courts should apply common sense and consider whether the expert's testimony holds together logically, or if there are inconsistencies, important questions left unanswered, or insufficient consideration of alternative explanations. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153-55 (1999). If

1   expert testimony will confuse or mislead the jury, it may be excluded under Rule 403.

2   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).

3   **IV.   ARGUMENT**

4          **A.     Dr. Rao's Proposed Royalty Defies Basic Economic Principles**

5          The Court should exclude Dr. Rao's damages analysis because it is

6   economically nonsensical. As noted above, Dr. Rao asserts that Juno would have

7   licensed the '190 patent to Kite for a ███ % royalty, which is less than the ███ %

8   royalty that Juno would have to pay MSK on Kite's sales. Ex. C at 96-97. Dr. Rao's

9   proposal thus results in a negative royalty—Juno would lose money on each and every

10  sale by its competitor, Kite. Dr. Rao's proposal would also violate the Juno-MSK

11  license, which states that Juno may not sublicense at a royalty rate less than the rates

12  required under the license. Ex. A § 2.3(b). Obviously, it would be irrational for Juno

13  to agree to a sublicense that would cause it to breach the Juno Exclusive License

14  Agreement. Because Dr. Rao's negative royalty is economically nonsensical, the

15  Court should exclude it. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp.,*

16  *LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018) (district court erred by not excluding

17  damages expert who failed to support her opinion with "sound economic reasoning").

18          Moreover, Dr. Rao assumes, as he must, that at the time of the hypothetical

19  negotiation, Juno was the exclusive licensee to the '190 patent. Ex. C ¶ 169. Under

20  well-settled law, where there is an exclusive licensee during the period of

21  infringement, that licensee is entitled to collect damages for the infringement.

22  *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1343 (Fed. Cir. 2000).

23  As a result, Dr. Rao's opinion—which results in no economic recovery for Juno—is

24  contrary to the well-established principle that, where infringement is found, the patent

25  claimant is entitled to a damages award. 35 U.S.C. § 284 ("***the court shall award the***

26  ***claimant damages*** adequate to compensate for the infringement, ***but in no event less***

27  ***than a reasonable royalty***") (emphasis added). The "conclusion that no damages

28  [should] be awarded, in light of the presumption of damages when infringement is

1    proven, [is an] error." *Dow Chem. Co. v. Mee Indus., Inc.,* 341 F.3d 1370, 1382 (Fed.

2    Cir. 2003); *DuPuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1334

3    (Fed. Cir. 2009) (holding that a "0% royalty rate c[ould not] be squared with . . . the

4    jury's finding that the [defendant's acts] constituted acts of infringement"). Indeed,

5    "opinions relating to a 0% royalty are inherently unreliable." *Tinnus Enter.v. Tele.*

6    *Corp.*, 6:17-CV-00170-RWS, Dkt. 462 at *6 (E.D. Tex. Oct. 31, 2018) (excluding

7    damages expert who opined that a non-infringing alternative meant no damages).

8    Here, Dr. Rao's opinion is even more flawed because it results in a negative royalty—

9    Juno would pay for Kite's infringement instead of receiving a royalty on Kite's sales.

10          While it is true that there are Federal Circuit cases holding that there is no

11   requirement that the ***accused infringer*** be left with an actual profit after paying the

12   proposed reasonable royalty, *see, e.g.*, *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d

13   1221, 1238 (Fed. Cir. 2011), that line of cases is not applicable when the licensor at

14   that hypothetical negotiation would lose money. Indeed, the underlying basis for those

15   decisions is that the hypothetical negotiation "is to be determined not on the basis of

16   a hindsight evaluation of what actually happened, but on the basis of what the parties

17   to the hypothetical negotiation would have considered at the time of the negotiation."

18   *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983). Thus,

19   a royalty that exceeds the accused infringer's revenues or profits may be warranted

20   where the patented technology confers a non-economic benefit, where the accused

21   infringer had expected profits to be higher than they were, or where an accused

22   infringer could have increased the price of the patented article to account for the

23   reasonable royalty. *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346

24   (Fed. Cir. 2013) ("The infringer's selling price can be raised if necessary to

25   accommodate a higher royalty rate"); *Interactive Pictures Corp. v. Infinite Pictures,*

26   *Inc.*, 274 F.3d 1371, 1384–85 (Fed. Cir. 2001) (affirming royalty based on optimistic

27   projections even though the infringer ultimately did not meet those expectations).

28          In contrast, at the time of the hypothetical negotiation, the parties would have

MOTION TO EXCLUDE DR. MOHAN RAO'S TESTIMONY
REGARDING DAMAGES

1  been well-aware of the royalty that Juno was required to pay MSK on the sales of

2  Juno's sublicensees. Dr. Rao's assumption that Juno would be willing to lose money

3  by sublicensing the '190 patent, much less to a competitor, is economically irrational

4  and flunks the "reliable principles" test. *See Power Integrations*, 711 F.3d at 1373.

5  **B.     Dr. Rao Relies On A Legally Erroneous "Hold-Up" Theory**

6  The Court should exclude Dr. Rao's opinion for the independent reason that he

7  applies a legally erroneous "hold-up" theory to ignore the parties' bargaining positions

8  at the time of the hypothetical negotiation in 2017 in order to rely on their positions

9  years before infringement began. Dr. Rao's "hold-up" theory is "contrary to law, and

10  his resulting opinion is unreliable under FRE 702 and *Daubert* and unduly prejudicial

11  under FRE 403."  *See Apple, Inc.*, 2012 WL 2571332, at *6.

12  The Federal Circuit has long held that "a reasonable royalty determination for

13  purposes of making a damages evaluation must relate to the time infringement

14  occurred." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed.

15  Cir. 2006); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869 (Fed. Cir.

16  2003) (vacating damages verdict due to erroneous hypothetical negotiation date),

17  *vacated on other grounds,* 545 U.S. 193 (2005); *Hanson*, 718 F.2d at 1079 ("The key

18  element in setting a reasonable royalty . . . is . . . the date when infringement began.").

19  Dr. Rao admits that the date of first infringement was October 18, 2017, and

20  that the hypothetical negotiation would have taken place just prior. Ex. B at

21  57:17-58:5. His analysis, however, reduces the upfront royalty payment by improperly

22  pro-rating the payment to a period from the hypothetical negotiation in October 2017

23  through the first quarter of 2019. *See Transocean Offshore Deepwater Drilling, Inc.*

24  *v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357-59 (Fed. Cir. 2012) (holding

25  substantial evidence supported, at the start of infringement, the lump-sum figure plus

26  a running royalty even though the infringer did not use an infringing product).

27  Additionally, he seeks to determine what agreement the parties would have struck if

28  the negotiation had taken place several years earlier, before Kite had invested time

MOTION TO EXCLUDE DR. MOHAN RAO'S TESTIMONY
REGARDING DAMAGES

10752137                                    - 6 -

1  and money in the patented construct. Ex. C at 94-95. In particular, Dr. Rao argues that,

2  during the hypothetical negotiation, "both parties would recognize that Kite/Gilead

3  would face added regulatory costs and timing delays if implemented at the time of the

4  negotiation." *Id.* at 95. Dr. Rao admits that Kite did not have a non-infringing

5  alternative ready at that time, so it could not have launched Yescarta in October 2017

6  without a license to the '190 patent. Ex. B at 159:9-13. This would have resulted in

7  considerable negotiating leverage for Juno, and must be taken into careful account in

8  a sound damages analysis. *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334–35

9  (Fed. Cir. 2015) (patentee's significant negotiating leverage properly considered in

10  reasonable royalty analysis). Dr. Rao, however, explicitly strips this leverage out

11  because of so-called "hold-up" value. Ex. C at 95.

12      Dr. Rao's approach is contrary to the law: the concept of "hold up" value is

13  simply irrelevant here. *Astrazeneca AB v. Apotex Corp.*, 985 F. Supp. 2d 452, 501

14  (S.D.N.Y. 2013), *aff'd in part, rev'd in part on other grounds*, 782 F.3d 1324 (Fed.

15  Cir. 2015). Indeed, when a patent does not cover technology adopted as part of an

16  industry standards-setting process, then the concept of "hold up" value is inapplicable.

17  *Id.* Rather, "hold up" value applies only in "the special situation in which a technical

18  standard is set for an industry that puts one patent holder 'in a position to "hold up"

19  industry participants from implementing the standard.'" *Id.* at 501 (quoting *Qualcomm*

20  *Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1010 (Fed. Cir. 2008)).

21      This case has nothing to do with the industry standards-setting process. Rather,

22  the facts here are similar to the facts in *Astrazeneca v. Apotex*. There, Apotex argued

23  that "reference to the cost and delay associated with developing a non-infringing

24  alternative formulation is improper" because it "leads to a royalty rate that is unfairly

25  based on the 'hold-up' value of patents rather than their actual economic advantage

26  over alternative, non-infringing approaches." *Astrazeneca*, 985 F. Supp. 2d at 501.

27  Just like Dr. Rao, Apotex argued that "it should be assumed that Apotex would have

28  begun developing a non-infringing alternative formulation in 2000, when it filed its

1   ANDA." *Id*. The court found that this argument "contradicts settled law," noting:

2       The hypothetical negotiation is hypothetical in the sense that the negotiation

3       itself is imaginary, not in that it allows the parties to construct an entirely

4       imaginary world that ignores the facts as they existed at the date of

5       infringement. Those facts show that Apotex did not have a non-infringing

6       alternative formulation ready and waiting. That this was the situation in

7       which Apotex found itself in November 2003 is one of the most salient

8       features of the negotiating dynamic in this case and may not now be ignored.

9   *Id*. Thus, the *AstraZeneca* court explicitly found that a proper analysis "does not

10  require ignoring the time and money Apotex invested in the patented formulation, or

11  the time and money it would have spent in any effort to develop an alternative." *Id.* at

12  502. It is undisputed that Kite did not have a non-infringing alternative that would

13  have allowed it to launch in 2017 without a license, which brings the facts here in

14  direct alignment with *AstraZeneca*. Ex. B at 159:9-13 ("Q.·But for purposes of your

15  analysis, you assumed that Kite had a noninfringing alternative? . . . [Dr. Rao]: No.").

16      Affirming, the Federal Circuit held that it is proper to consider obstacles that

17  would have "ke[pt] a competitor off the market" in determining a royalty, because

18  "[w]hen an infringer can easily design around a patent and replace its infringing goods

19  with non-infringing goods, the hypothetical royalty rate for the product is typically

20  low." *AstraZeneca*, 782 F.3d at 1334-35. However, "if avoiding the patent would be

21  difficult, expensive, and time-consuming, the amount the infringer would be willing

22  to pay for a license is likely to be greater." *Id*. That is, a proper damages analysis must

23  consider regulatory delays and other obstacles that the defendant would experience

24  without a license ***at the time of the hypothetical negotiation***. *Id.* ("it was proper for

25  the court to hold that the difficulties Apotex would have encountered upon attempting

26  to enter the omeprazole market with a non-infringing product are relevant to the

27  royalty rate a party in Apotex's position would have been willing to pay").

28      The court in *Orexo AB v. Actavis Elizabeth, LLC*, No. 1:17-00205-CFC, Dkt.

1    260 at 4-5 (D. Del. Mar. 19, 2019), came to the same conclusion, holding that an

2    expert's exclusion of alleged "hold up" value was legally incorrect. Just like Dr. Rao,

3    the expert in *Orexo* "equate[d] the time it would take for Actavis to design an

4    alternative formulation and gain FDA approval with excludable 'hold up' value

5    because . . . Defendants were 'locked into' using Plaintiffs' patent." *Id.* at 4. The court

6    held that this was improper, noting that "hold up" value "is a concept limited to the

7    narrow situation where a patentee could demand a royalty in excess of a reasonable

8    royalty because a standard setting organization requires an entire industry to use

9    patented technology to foster compatibility among devices." *Id.* at 4–5. In *Orexo*—

10   just as is the case here—"there [was] no standard setting authority that require[d]

11   Defendants to infringe." *Id.* at 5. Because the expert's "'hold up' opinion ignore[d]

12   the facts at the time of the hypothetical negotiation and incorrectly applie[d] Federal

13   Circuit law," the *Orexo* court excluded the expert's approach. *Id.*

14          Dr. Rao's opinions are unreliable because he ignores the parties' bargaining

15   positions as of the time of the hypothetical negotiation and rejects the reality that Kite

16   had already invested in the patented construct. Indeed, "[t]he correct determination of

17   this date is ***essential*** for properly assessing damages." *Integra*, 331 F.3d at 870

18   (emphasis added) ("The value of a hypothetical license negotiated in 1994 could be

19   drastically different from one undertaken in 1995"). Furthermore, by ignoring the

20   circumstances in 2017, Dr. Rao's opinion is "so divorced from the economic realities

21   of the situation as to be speculative" and fundamentally flawed. *DSU Med. Corp. v.

22   JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1156-57 (N.D. Cal. 2003); *Oracle Am., Inc. v.

23   Google Inc.*, 798 F. Supp. 2d 1111, 1117 (N.D. Cal. 2011) (rejecting damages theory

24   that "resort[ed] to wishful thinking" in setting hypothetical negotiation date).

25   Dr. Rao's attempt to apply a legally inapplicable "hold up" concept infects the

26   integrity of his entire opinion and warrants the complete exclusion of his testimony.

27   At a minimum, the Court should exclude testimony concerning alleged "hold up."

28          **C.     Dr. Rao Relies On Irrelevant, Prejudicial Settlement Estimates**

MOTION TO EXCLUDE DR. MOHAN RAO'S TESTIMONY
REGARDING DAMAGES

10752137                                    - 9 -

1    Dr. Rao notes that "███████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████" in connection with the Celgene

4  acquisition. Ex. C at 15 n.14; Ex. B at 95:1-7 (discussing separate settlement estimates

5  ranging from ████████████ Dr. Rao cannot use these estimates—nor should they be

6  admitted at all—because they are irrelevant, confusing, and prejudicial.

7    The Juno/Celgene estimates are irrelevant because Dr. Rao has not established

8  that they constitute anything close to a comparable licensing situation. They do not.

9  Rather, the estimates differ from the hypothetical negotiation in important respects.

10  Indeed, they were performed to estimate a possible settlement of the Juno-Kite

11  litigation in connection with Celgene's decision to purchase Juno, not because

12  Celgene intended to release a competing product that practiced the '190 patent or

13  wanted to sub-license to the '190 patent. Nor is there evidence that the estimates were

14  calculated with the assumption that the '190 patent was both valid and infringed by

15  Kite. Courts have excluded similar valuations because they are irrelevant. *Mformation*

16  *Techs., Inc. v. Research in Motion Ltd.*, 2012 WL 2339762, *4 (N.D. Cal. 2012)

17  (excluding third party valuations because they would "confuse the jury by introducing

18  a basis for evaluating damages that differs entirely from that the jury is being asked to

19  apply" where they did not "assume[] that the Patent was both valid and infringed").

20    Even if the Court concluded that Juno's and Celgene's settlement estimates are

21  potentially relevant, the dangers of prejudice, confusion, and waste of time

22  substantially outweigh any relevance. *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-

23  01846-LHK, Dkt. 1774, at 7–8 (N.D. Cal. Aug. 15, 2012) (excluding settlement

24  presentation due to the risk that the jury will use it to value the disputed claim). Thus,

25  the Court should exclude any testimony regarding and relying on such estimates.

26  **V.    CONCLUSION**

27    The Court should exclude Dr. Rao's opinion because it defies basic economic

28  principles, is contrary to well-settled law, and is based on improper evidence.

MOTION TO EXCLUDE DR. MOHAN RAO'S TESTIMONY
REGARDING DAMAGES

10752137                          - 10 -

1    Dated:  October 29, 2019                          IRELL & MANELLA LLP

2

3                                                      By: */s/ Alan J. Heinrich*
                                                          Alan J. Heinrich
4                                                         *Attorneys for Plaintiffs*
                                                          JUNO THERAPEUTICS, INC.,
5                                                         MEMORIAL SLOAN KETTERING
                                                          CANCER CENTER, and SLOAN
6                                                         KETTERING INSTITUTE FOR
                                                          CANCER RESEARCH

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

A copy of the foregoing document was electronically filed with the Court this 29th day of October, 2019.  Notice of this filing will be sent by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Alan J. Heinrich*
Alan J. Heinrich

10752137