# EXHIBIT 1



# Demonstratives

*Juno and Sloan-Kettering v. Kite*

**Prepared by**
**Ryan Sullivan**, Ph.D.

$$H_0: \max_{k=1,\ldots,l} \{E(f_k)\} \leq 0$$

$$\overline{V}_l = \max_{k=1,\ldots,l} \{\sqrt{n}(\bar{f}_k)\}$$

$$\overline{V}_{l,i} = \max_{k=1,\ldots,l} \{\sqrt{n}(\bar{f}^*_{k,i} - \bar{f}_k)\}$$

$$H_0: \max_{k=1,\ldots,l} \{g(E(h_k))\} \leq g(E(h_0))$$

$$h^1_{k,t+1} = y_{t+1} S_k(\chi_t, \beta_k)$$

$$h^2_{k,t+1} = (y_{t+1} S_k(\chi_t, \beta_k))^2$$

$$h^3_{k,t+1} = r^f_{t+1}$$

$$g(E(h_{k,t+1})) = \frac{E(h^1_{k,t+1}) - E(h^3_{k,t+1})}{\sqrt{E(h^2_{k,t+1}) - (E(h^1_{k,t+1}))^2}}$$

$$\bar{f}_k = g(\bar{h}_k) - g(\bar{h}_0)$$

$$\bar{h}_k = n^{-1} \sum_{t=R}^{T} h_{k,t+1} \qquad k = 0,\ldots,l$$

$$\bar{f}^*_{k,i} = g(\bar{h}^*_{k,i}) - g(\bar{h}^*_{0,i}) \qquad i = 1,\ldots,B$$

$$\bar{h}^*_{k,i} = n^{-1} \sum_{t=R}^{T} h^*_{k,t+1,i} \qquad i = 1,\ldots,B$$



# Ryan Sullivan, Ph.D.



**Intensity**

- President



**University of California, San Diego**

- B.A., M.A., and Ph.D. in economics
- Economics Leadership Council



**Professional Economist**

- 25+ years experience
- Published in leading peer-reviewed journals
- Extensive experience in intellectual property
- IAM Patent 1000 top economic expert (2014 – 2019)

PDX9.2



# Materials Considered

✓ Company documents

✓ Financial data

✓ Market research

✓ Witness testimony

✓ Expert interviews

✓ Company financial models

PDX9.3



# Topics

## Framework

Importance of Sadelain patent

Competitive relationship

First mover advantage

Market approach

Running royalty calculation



# Reasonable Royalties



§ 284. Damages

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

PDX9.5



# Hypothetical Negotiation

✓ Patent is valid

✓ Patent is infringed

✓ Willing licensor/licensee

PDX9.6



# Hypothetical Negotiation
## October 18, 2017



PDX9.7

# *Georgia-Pacific* Factors

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales

7. The duration of the patent and the term of the license

8. The established profitability of the product made under the patent; its commercial success; and its current popularity

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risk, or significant features or improvements added by the infringer

14. The opinion testimony of qualified experts

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time of the infringement began) if both had been reasonably and voluntarily trying to reach and agreement; that is, the amount which a prudent licensee –who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license

PDX9.8



# Key Factors

**Importance of Sadelain patent**   9, 10, 11

**Financial benefits to Kite**   8, 12, 13

**Competitive relationship**   5

**License agreements**   1, 2

PDX9.9



# Topics

Framework

## Importance of Sadelain patent

Competitive relationship

First mover advantage

Market approach

Running royalty calculation



*GP* Factors 9, 10, 11





**Active Ingredient**

$373,000

PDX9.12

*GP* Factors 9, 10, 11



# Shawn Tomasello, Kite CCO



Q. Is it fair to say that having a construct on which to base your product is an important aspect from a commercial point of view?

A. Sure.

\*\*\*

THE WITNESS: Without that, there isn't anything. So, yeah, that's fair.

3/18/19 Tomasello Depo at 50:19-25

PDX9.13



*GP* Factors 9, 10, 11

# Kite tried but failed…



License



Design around



Develop alternative

PDX9.14



# Sadelain CAR

| | |
|---|---|
| **Zuma-1** | **Lymphoma (3L DLBCL)** |
| Zuma-2 | Mantel Cell Lymphoma |
| Zuma-3 | Adult ALL |
| Zuma-4 | Pediatric ALL |
| Zuma-5 | Indolent NHL |
| Zuma-6 | DLBCL + Tecentriq |
| Zuma-7 | 2nd line DLBCL |
| Zuma-8 | CLL |
| Zuma-9 | Expanded access DLCBL |
| Zuma-11 | DLBCL + Utolmuilumab |
| Zuma-12 | 1st line DLBCL |



# $6.2 Billion

PDX9.15



# Topics

Framework

Importance of Sadelain patent

**Competitive relationship**

First mover advantage

Market approach

Running royalty calculation

PDX9.17



*GP* Factor 5

# Kite is Primary Competitor

## Compete for

Technology rights

Investor funding

Employees

Clinical trial sites

Investigators

Opinion leaders

## Overlapping Indications

DLBCL (1L, 2L, 3L+)

CLL

MCL

Adult ALL

Pediatric ALL

PDX9.18



# Topics

Framework

Importance of Sadelain patent

Competitive relationship

**First mover advantage**

Market approach

Running royalty calculation

PDX9.19



GP Factors 8, 12, 13

# First Mover Advantage

✓ Increased share and sales

✓ Physician & facility loyalty

✓ Shape beliefs

✓ Payor relationships

✓ Future indications



# Topics

Framework

Importance of Sadelain patent

Competitive relationship

First mover advantage

**Market approach**

Running royalty calculation



# **Agreed License Structure**

**1** Upfront payment

**2** Running royalty rate

PDX9.22

# Start with

## Juno 2013 Exclusive License Agreement

 # Adjust to

## Hypothetical Negotiation



# Adjustments

GP Factors 1, 2, 5, 9, 10, 11



PDX9.24



# Topics

Framework

Importance of Sadelain patent

Competitive relationship

First mover advantage

Market approach

**Running royalty calculation**



# Running Royalty

**EXCLUSIVE LICENSE AGREEMENT**

This Exclusive License Agreement ("Agreement") is effective as of November 21, 2013 ("Effective Date"), and is by and between Memorial Sloan-Kettering Cancer Center ("MSKCC"), a New York corporation with principal offices at 1275 York Avenue, NY 10065, and Juno Therapeutics, Inc., a Delaware corporation with offices at 8725 W. Higgins Road, Suite 290, Chicago, IL 60631 ("LICENSEE").

WHEREAS, MSKCC is the owner of certain Licensed Rights (defined below);

WHEREAS, LICENSEE desires to obtain an exclusive license on the terms set forth herein under Licensed Rights to develop and commercialize Licensed Products and perform Licensed Services (both defined below); and

WHEREAS, MSKCC is willing to grant an exclusive license to LICENSEE on the terms set forth herein;

NOW THEREFORE, for and in consideration of the foregoing premises and the following covenants, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I - DEFINITIONS

For the purpose of this Agreement, the following words and phrases shall have the following meanings:

1.1    "**Affiliate**" as used herein in either singular or plural means, with respect to a party, any corporation, company, partnership, joint venture or other entity, which directly or indirectly: (a) Controls, is Controlled by or is under common Control with the specified entity; or (b) both (i) owns, is owned by, or is under common ownership with the specified entity, in whole or in part, and (ii) conducts business under a trade identifier of the specified entity, with the authorization of the specified entity. For purposes of this definition, "Control" of an entity means the direct or indirect ownership or control of at least fifty percent (50%) of the right to direct or cause the direction of the policies and management of such person or entity, whether by the ownership of stock, by contract or otherwise. In any jurisdiction where 50% control is not permitted by applicable law, the "greater than 50%" threshold shall be deemed satisfied by the possession of substantially the maximum percentage allowable in such jurisdiction. With regard to MSKCC, "Affiliate" shall include, without limitation, the Memorial Sloan-Kettering Cancer Center and the Memorial Hospital for Cancer and Allied Diseases.

1.2    "**Combination Product**" means a finished pharmaceutical product that comprises Licensed Product and a second active pharmaceutical ingredient, but only if (a) such finished pharmaceutical product has received regulatory approval and is sold in a country as a single product, and (b) the Licensed Product and/or such other active

26509775

Plaintiffs' Trial Exhibit

**PX0924**

Case No. 2:17-cv-07639 SJO-KS

1

PX0924.1

HIGHLY CONFIDENTIAL INFORMATION: OUTSIDE COUNSEL ONLY          JUNO00000915

---

4.2.1    Running Royalty.  Subject to the provisions in this Section 4.2, LICENSEE shall pay to MSKCC a running royalty equal to ==seven and one-quarter percent (7.25%)== of worldwide, annual Net Sales of Licensed Products or the performance of Licensed

---

2.3    Sublicensing.    LICENSEE may grant sublicenses to third parties (each, a "Sublicensee"), provided that each sublicense is in writing and:

(a)    LICENSEE, within thirty (30) days of the granting of each sublicense, notifying MSKCC of such grant and the name and address of each such Sublicensee;

(b)    ==the sublicense being at royalty rates not less than those required to be paid to MSKCC under this Agreement;==

(c)    the sublicense agreement (i) providing that the rights and/or obligations to MSKCC under ARTICLE IX (entitled *Confidentiality*), 7.6 (entitled *Patent*

# Adjustment #1



# Adjustment #1



PDX9.28



*GP* Factor 5

# Novartis in 2015

**Years away from launch**

**No overlap with lead product candidates**

**Settlement**

**Questionable commitment to CAR-T**

PDX9.29





# Market Share Impact on Juno



PDX9.32



# Annual Revenue Impact

## Adjustment #2



**192% increase**

PDX9.33



GP Factors 1, 2, 5, 9, 10, 11

# Juno 2013 Exclusive License

**7.25%**



GP Factors 1, 2, 5, 9, 10, 11

**Juno 2013 Exclusive License**

7.25%

**Adjustment #1 (2015)**
90% × 7.25%

+  6.5%

**Running royalty rate**  =  13.8%

PDX9.35



GR Factors 1, 2, 5, 9, 10, 11

**Juno 2013 Exclusive License**          7.25%

**Adjustment #1 (2015)**
90% × 7.25%                          +    6.5%

**Adjustment #2 (2017)**
192% × 7.25%                         +    13.9%

---

**Running royalty rate**    =    27.6%



PDX9.36

GP Factors 1, 2, 5, 9, 10, 11



# Running Royalties
## 2017-Q4 to 2019-Q3

**Rate**

**Base** (Undisputed)

**Running Royalties**

27.6%  ×  $604 Million  =  $167 Million

PDX9.37