UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
Scan Only ___

**CASE NO.:** 2:17-cv-07639 SJO-KS      **DATE:** December 3, 2019

**TITLE:**   Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.
========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                Not Present
Courtroom Clerk                                 Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**     **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                     Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER RE: DAUBERT MOTIONS** [ECF Nos. 270, 271, and 274]; **DEFENDANT'S EX PARTE APPLICATION TO STRIKE SUPPLEMENTAL COMPLAINT** [ECF No. 395]; **DEFENDANT'S EX PARTE APPLICATION TO STRIKE UNTIMELY AND UNRELIABLE OPINIONS OF DR. SULLIVAN** [ECF No. 428]

This matter comes before the Court on the following motions:

(1) Defendant Kite Pharma, Inc.'s ("Kite" or "Defendant") Motion in Limine (No. 1) to Exclude Damages Opinions of Ryan Sullivan, Ph.D. ("Sullivan Motion") filed October 29, 2019 (ECF No. 309; Opposition at ECF No. 321; Reply at ECF No. 363-1; Defendant's Supplemental Memorandum at ECF No. 378; Plaintiffs' Supplemental Memorandum at ECF No. 388; Plaintiffs' Second Supplemental Opposition at ECF No. 433; Defendant's Objection to Unauthorized Surreply at ECF No. 435);

(2) Defendant's Motion in Limine (No. 2) to Exclude Expert Testimony of Mark Gilbert, M.D. ("Gilbert Motion") filed October 29, 2019 (ECF No. 271; Opposition at ECF No. 322; Reply at ECF No. 453);

(3) Plaintiffs Juno Therapeutics, Inc.'s ("Juno") and Sloan Kettering Institute for Cancer Research's ("SKI") (collectively, "Plaintiffs") Motion to Exclude Dr. Mohan Rao's Testimony Regarding Damages ("Rao Motion") filed October 29, 2019 (ECF No. 274; Opposition at ECF No. 377; Reply at ECF No. 368-1);

(4) Defendant's Ex Parte Application to Strike Supplemental Complaint ("Motion to Strike Complaint") filed November 22, 2019 (ECF No. 395; Opposition at ECF No. 408; Reply at ECF No. 420); and

(5) Defendant's Ex Parte Application to Strike Untimely and Unreliable Opinions of Dr. Sullivan ("Motion to Strike Sullivan's Amended Report") filed on November 29, 2019 (ECF No. 428; Opposition at ECF No. 440).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

**CASE NO.: 2:17-cv-07639 SJO-KS**     **DATE: December 3, 2019**

Regarding the Daubert motions, the parties filed respective Oppositions on November 12, 2019 and respective Replies on November 19, 2019. Additionally, the Court permitted each party to submit a supplemental filing on the Sullivan Motion. Plaintiffs filed a second supplemental response regarding the same, and Defendant responded thereto. For the following reasons, the Court:

(1) **GRANTS-IN-PART** and **DENIES-IN-PART** the Sullivan Motion;
(2) **GRANTS-IN-PART** and **DENIES-IN-PART** the Gilbert Motion;
(3) **GRANTS-IN-PART** and **DENIES-IN-PART** the Rao Motion;
(4) **GRANTS** the Motion to Strike Complaint. Plaintiffs are ordered to file a supplemental Complaint within 24 hours of entry of this Order; and
(5) **GRANTS** the Motion to Strike Sullivan's Amended Report.

   I. BACKGROUND

      A. General Overview

This is a patent infringement action involving U.S. Patent No. 7,446,190 (the "'190 Patent"), titled "Nucleic Acids Encoding Chimeric T Cell Receptors." The '190 Patent issued on November 4, 2008 and incorporates a provisional application filed on May 28, 2002. ('190 Patent Caption.) The claimed invention provides "nucleic acid polymer encoding [] chimeric TCR's [T Cell Receptors] . . . ." ('190 Patent, col. 2:11-14.) The chimeric TCRs encoded by the claimed invention "combine, in a single chimeric species, the intracellular domain of CD3 ζ-chain ("zeta chain portion"), a signaling region from a costimulatory protein such as CD28 with a binding element that specifically interacts with a selected target." ('190 Patent, col. 2:14-18.) These TCRs are designed to "specifically interact[] with a cellular marker associated with target cells," resulting in the stimulation of a T cell immune response to the target cells. ('190 Patent, col. 2:30-36.)

Plaintiffs initiated this action on October 18, 2017, alleging that Defendant infringes the '190 Patent through the use, sale, offer for sale, or importation of one of Kite's immunotherapy treatments, Yescarta. Yescarta is described as a "therapy in which a patient's T cells are engineered to express a chimeric antigen receptor (CAR) to target the antigen CD19, a protein expressed on the cell surface of B-cell lymphomas and leukemias, and redirect the T cells to kill cancer cells." (Compl. ¶ 18, ECF No. 1.) Plaintiffs assert that Yescarta infringes on the '190 Patent by utilizing nucleic acid polymers encoding chimeric TCRs within the scope of the '190 Patent claims. (Compl. ¶ 24.) Defendant, in turn, filed counterclaims seeking declaratory judgments of non-infringement and invalidity of the '190 Patent. (*See generally*, Amended Answer and Counterclaims, ECF No. 66.)

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                                     **DATE: December 3, 2019**

      B.  Expert Opinions

          1.  Plaintiffs' Expert, Ryan Sullivan

Dr. Sullivan opines that the parties would have agreed to a license totaling $1.245 billion, based on three components. First, Dr. Sullivan calculates a royalty rate, for use in determining the running royalties on Yescarta's sales through August 2019.  He begins with the parties' 2013 Exclusive License Agreement, under which he opines Juno would have owed a 7.25% running royalty on Kite's net sales to SKI.  (Sullivan Opp. 3.)  Dr. Sullivan then makes two adjustments to the 7.25% royalty rate, one to adjust for Kite being a commercial competitor (for this, Dr. Sullivan references a Juno-Novartis settlement for a different patent), the second to adjust for the hypothetical negotiation in 2017, during which he opines Juno would have viewed Kite as a greater competitive threat than Novartis.  (Sullivan Opp. 3.)  From these adjustments, Dr. Sullivan presents a 27.6% royalty rate, amounting to $155.6 million on Yescarta's sales through August 2019.

Second, Dr. Sullivan opines that the parties would have agreed to a $930 million upfront payment.  (Sullivan Opp. 4.)  The 2013 Exclusive License Agreement transferred 500,000 shares of Juno stock, with a $150 million bonus if Juno's stock increased thirtyfold.  Dr. Sullivan substituted 500,000 shares of Juno's stock in 2013, with 500,000 shares of Kite's stock in 2017, and added the $150 million bonus for stock increase, to reach $240 million.  Dr. Sullivan then applied the same two adjustments that he applied to his royalty rate, to opine that the parties would have agreed to a $930 million upfront payment.

Third, Dr. Sullivan calculates a $159.7 million launch delay consideration.  Dr. Sullivan opines that Kite's first-to-market entry would cause regulatory delay and hurdles for Juno's CAR-T therapy.  (Sullivan Opp. 4.)

          2.  Plaintiffs' Expert, Mark Gilbert

Dr. Gilbert, Juno's Chief Medical Officer, opines on technical issues relating to damages. Specifically, he: (1) rebuts Defendant's contention that its manufacturing process and lymphodepletion regime add value to Yescarta by making it safer and more effective, and (2) compares Yescarta to JCAR017, to opine JCAR017 is safer/more effective.  Dr. Sullivan then relies on Dr. Gilbert's opinion to compare the parties' relative bargaining strengths.

//

//

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: <u>2:17-cv-07639 SJO-KS</u>                                        DATE:  <u>December 3, 2019</u>

   3. Defendant's Expert, Mohan Rao

Dr. Rao opines that the parties would have agreed to a 6.715% running royalty, with an $88M upfront payment, prorated to the term of the hypothetical license here.  He starts with the MSKCC/Juno license, apportions as it covers 5 patents and know-how, and adjusts the 7.25% rate to 3.625% by opining half the value transferred by the agreement comprises know-how, and the other half of value transferred comprises the '190 patent.  Then based on a separate agreement with Novartis, he adjusts the royalty rate to 6.715%.  He then considers another license between St. Jude and Juno and opines that the parties here would have adopted the same $88M upfront payment in that agreement, prorated for the licensing term of the hypothetical negotiation here.

  C. Order re Standing

On November 6, 2019, the Court granted-in-part and denied-in-part Defendant's Motion to Dismiss Memorial Sloan Kettering Cancer Center and Juno Therapeutics, Inc. as Plaintiffs for Lack of Standing ("Order re Standing").  (Order re Standing, ECF No. 304.)  The Court held that the 2013 Exclusive License Agreement executed between MSK and Juno did not confer upon Juno constitutional rights to enforce the '190 patent against third parties, because SKI, not MSK, was the owner of the '190 patent.  The Court noted that no evidence was presented by either party to undermine the rational purpose of the Exclusive License Agreement as transferring rights to the '190 patent.  The Court also noted that this rational purpose would be relevant in the context of a breach of contract claim between the parties.  The Court directed Plaintiffs to file an amended Complaint by November 20, 2019 and plead allegations regarding the October 2018 agreement's subsequent conferral of standing upon Juno, for the purpose of conducting a proper hypothetical negotiation.

On November 20, 2019 and November 21, 2019, Plaintiffs filed their application to seal Supplemental Complaint. (Application to Seal, ECF Nos. 384, 392-1.)

 II. <u>DISCUSSION</u>

  A. Legal Standards

   1. Motions in limine

Motions in limine are "important tool[s] available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings."  *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (9th Cir. 1997).  "A party may use a motion in limine to exclude inadmissible or prejudicial evidence before it is actually introduced at trial."  *Barnett v. Gamboa,* No. CV 05-01022 BAM, 2013 WL 174077, at *1 (E.D. Cal. Jan. 16, 2013) (citing *Luce v. United States*, 469

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

CASE NO.: <u>2:17-cv-07639 SJO-KS</u>         DATE: <u>December 3, 2019</u>

U.S. 38, 40 n.2 (1984)). Regardless of a court's initial decision on a motion in limine, however, it may revisit the issue at trial. *See Luce*, 469 U.S. at 41-42 ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."). "The Supreme Court has recognized that a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court." *United States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing *Luce*, 469 U.S. at 41-42).

   2. Relevance and unfair prejudice

Under the Federal Rules of Evidence ("FRE"), all relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make a fact [that is of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence that cannot meet this standard is inadmissible. *See* Fed. R. Evid. 402.

Even if relevant, evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). Nevertheless, "[i]n making a determination under [FRE] 403, the balance in close cases is struck in favor of admission" of the evidence. *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (quoting *United States v. Payne*, 805 F.2d 1062, 1066 (D.C. Cir. 1986)) (internal quotation marks omitted).

   3. Expert testimony

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation, and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). In serving this "gatekeeper" function, a district court performs a two-part analysis. *Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). First, a district court "must determine nothing less than whether the experts' testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharms.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995) (internal quotations and citations omitted). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999). Second, the court "must ensure that the proposed expert testimony is relevant to the task at hand . . . *i.e.*, that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315.

When considering whether expert testimony is reliable, a trial court should consider the factors laid out by the United States Supreme Court in *Daubert*, 509 U.S. at 593-95, including:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: 2:17-cv-07639 SJO-KS               DATE: December 3, 2019

(1) "whether the theory or technique employed by the expert is generally accepted in the scientific community;" (2) whether "it's been subjected to peer review and publication;" (3) "whether it can be and has been tested;" and (4) "whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316-17 (citing *Daubert*, 509 U.S. at 593-595).  The Supreme Court acknowledged in *Daubert* that the trial judge's reliability inquiry is "flexible," and therefore trial courts are encouraged to consider other factors not specifically mentioned by the Supreme Court in *Daubert*.  *Daubert*, 509 U.S. at 594.  To that end, trial courts have also considered other potentially relevant factors, including (1) "whether the expert is proposing to testify about matters growing directly out of independent research he or she has conducted or whether the opinion was developed expressly for the purposes of testifying;" (2) whether the expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion;" (3) "whether the expert has adequately accounted for obvious alternative explanations;" (4) "whether the expert is being as careful as he would be in his regular professional work;" and (5) "whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered."  *In re Silicone Gel Breast Implants Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (citing Fed. R. Evid. 702 Advisory Committee's Notes).

    B. Dauberts

        1. Dr. Sullivan

            a. 27.6% license rate

Both damages experts use the Exclusive License Agreement as a starting point, as it is the only license agreement covering the '190 patent.  Dr. Sullivan then makes two adjustments to the 7.25% royalty rate from the Exclusive License Agreement, one in reliance on the 2015 Novartis license agreement (to account for the hypothetical agreement being between competitors), and the second to adjust for Kite's status as a competitive threat in 2017.  While the Court notes that Dr. Sullivan's royalty rate of 27.6% is significantly higher than the comparable licenses relied upon by either expert, Dr. Sullivan's adjustments to account for the circumstances of the hypothetical negotiation are sufficiently reliable to be admitted.  Defendants' arguments can be addressed through the testimony of Dr. Rao and through vigorous cross-examination of Dr. Sullivan.  The Court **DENIES** this part of Defendant's Sullivan Motion.

//

//

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

CASE NO.: <u>2:17-cv-07639 SJO-KS</u>                              DATE:  <u>December 3, 2019</u>

        b.  $930 million up-front payment

The Court is troubled by the obviously large amount of the $930 million up-front payment.[1]  As an initial matter, this award exceeds Defendant's projected and actual revenues through trial, and other courts have excluded opinions not presenting reasonable conclusions about that to which the parties to the hypothetical negotiation would have agreed.  (Sullivan Motion 3.)  Dr. Sullivan relies on two agreements to reach his large figure—the Exclusive License Agreement and Novartis license—but both provide royalty rates between 4.75% - 7.25%, with $8.9 million cash and stock initial payments, and up to $150 million extra in potential milestone payments.  (Sullivan Motion 4.)  Conversely here, Dr. Sullivan provides an up-front payment of $930 million.  Defendant objects to several factors leading to Dr. Sullivan's up-front payment.

<u>Improper term</u>.  Dr. Sullivan's report clearly states that the term covered by his upfront payment is compensation for harms "realized at the hypothetical negotiation." (Sullivan Reply 1; *id.* (also stating Dr. Sullivan's opinion that his upfront payment "does not include compensation for any type of future anticipated harm").)  He testified at deposition that Plaintiffs would not be seeking double recovery if they sought both his upfront fee, *and* future equitable relief (or lost profits). (Sullivan Reply 1.)  However, Defendant states that Plaintiffs, for the first time, argued otherwise in their Opposition to Defendant's Sullivan Motion.  There, Plaintiffs asserted the term for Dr. Sullivan's upfront payment was through the life of the patent, i.e., 2024.  At the parties' December 2, 2019 hearing, when asked where Dr. Sullivan disclosed in his report that the term of the patent was through 2024, Plaintiffs' counsel asserted that the term was "built into" Dr. Sullivan's analysis, by virtue of having relied on the MSK/Juno Exclusive License Agreement, which provided a license for the duration of the patent term.  But such an assumption cannot stand, in light of Dr. Sullivan's express disclosures to the otherwise (Sullivan Reply 1 (nothing Dr. Sullivan's statement that his upfront payment "does not include compensation for any type of future anticipated harm.")  Plaintiffs' late attempt to rewrite Dr. Sullivan's report on the eve of trial is prejudicial to Defendant.  Dr. Sullivan's upfront payment is thus limited to his disclosure of the term in his expert report, i.e., for harms realized at the hypothetical negotiation, not compensation for any type of future anticipated harm.

<u>Adjustments</u>.  Dr. Sullivan utilizes the same two adjustments that he did in reaching his 27.6% royalty rate.  For the reasons discussed above, the adjustments—while high—are sufficiently reliable to be presented to a jury.

//

---

[1] The Court has read and considered Plaintiffs' Second Supplemental Brief (ECF No. 433), which provides the testifying history of Dr. Sullivan.  However, the Court draws its own conclusions regarding Dr. Sullivan based solely on the merits of his opinion in this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: **2:17-cv-07639 SJO-KS**                    DATE:  **December 3, 2019**

Stock swap.  Dr. Sullivan carries over Juno's grant of 500,000 shares of Juno stock in 2013 to 500,000 shares of Kite in 2017.  (Sullivan Motion 5.)  In 2013, Juno's stock was valued at $2 million, whereas Kite's stock in 2017 was valued at $90 million.  Dr. Sullivan then adds $150 million, because Kite's stock increased over 30 times its initial price (a provision of the Exclusive License Agreement).  Thus, Dr. Sullivan opines the upfront equivalent stock grant should be $240 million.  With the two adjustments, this figure becomes $930 million.

At the December 2, 2019 hearing, Plaintiffs' counsel argued that the stock swap was valid because of the similarities between Juno and Kite.  He stated both were CAR-T companies, had similar valuations when going public, focused on CAR-T technology, and sold for reasonably similar amounts.  Be that as it may, Dr. Sullivan's report did not disclose this reasoning.  Instead, Dr. Sullivan broadly opined that the '190 patent's benefits to Defendant would result in an increase in company value and stock price.  (Sullivan Report ¶ 162.)  Dr. Sullivan also states that Yescarta contributed significant value to Gilead's acquisition price of Kite (Sullivan Report ¶ 76); states that he accounts for differences in marketplace risk and uncertainty associated with CAR-T technology by using stock price (Sullivan Report ¶ 204); and opines that the MSKCC-Juno agreement uses a royalty rate reasonably reflecting apportionment (Sullivan Report ¶ 264).

In fact, Dr. Sullivan's cited documents show that uncertainty surrounding CAR-T technology can result in volatile stock prices:  "[Kite's] stock can and may be highly volatile."  (Sullivan Report ¶ 203 (as of May 2015).)  Dr. Sullivan's report does not account for this volatility.  While the stock price of a company *may* be used in a comparable license analysis, a company's stock price must be shown to have some tie to the accused product, in order to be reliable enough to be admitted.  Here, Dr. Sullivan draws inference upon inference to reach an unreliable conclusion.  He infers Yescarta drives Kite's stock price, infers marketplace risk can be reflected in a stock price without having made any adjustments, and based on these inferences (without any further reasoning), simply substitutes the stock price of a de-risked, late-stage cancer company in 2017 in place of a different cancer company's stock price in 2013.  Such wholesale adoption of a stock price, without accounting for other factors such as business decisions (for example, issuing double the number of shares at half the price), effect of other offerings of a company independent of those relating to accused technology, stage of the company, and comparability of the company, does not merit inclusion of a damages figure for the jury to consider.  On the first point alone, because Dr. Sullivan's analysis does not account for business decisions, Kite's decision to issue half the number of shares at double the price would have doubled Dr. Sullivan's $240 million payment to $480 million, without any difference in the parties' bargaining positions.  Such an outcome is not reliable.

The fact that Dr. Sullivan's $930 million upfront payment (not meant to compensate for future infringing acts) exceeds Defendant's revenues through trial does not comport with the common

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: 2:17-cv-07639 SJO-KS           DATE: December 3, 2019

sense approach required for a hypothetical negotiation. Moreover, Plaintiffs' counsel's statements at the December 2, 2019 hearing likewise demonstrate the ambiguity of Dr. Sullivan's upfront award. When asked whether Plaintiffs would seek injunctive relief if awarded only a portion of Dr. Sullivan's upfront payment, counsel could not definitively provide a response without knowing how much of the payment was awarded. This uncertainty further illustrates Dr. Sullivan's upfront payment is not sufficiently reliable for the jury to hear.

For these reasons, the Sullivan Motion as to Dr. Sullivan's upfront payment depending on the stock swap is **GRANTED**. If Plaintiffs can identify a different disclosed initial amount in Dr. Sullivan's report, the alternative amount may be introduced with Dr. Sullivan's enhancement factors.

         c. $159.7 million launch consideration

Dr. Sullivan calculates launch consideration as the royalty percentage multiplied by six months projected profits, to account for an estimated six-month delay to Juno due to Kite's Yescarta therapy. Given Plaintiffs' representation at the December 2, 2019 hearing that they withdraw this portion of Dr. Sullivan's report, the Court **DENIES AS MOOT**.

         d. Other figures referenced by Dr. Sullivan

Dr. Sullivan does not use any of these figures in his damages calculations, but claims they validate his conclusions.

- Gilead's acquisition price of Kite ($11.9 billion): The Court **GRANTS** as irrelevant and confusing, given the lack of nexus to the accused product.

- Gilead's values assigned to CAR-T therapies ($8.13 billion): The Court **GRANTS** as irrelevant and confusing, given the minimal nexus to the accused product.

- Gilead's values assigned to Yescarta ($6.2 billion): The Court **DENIES**, because the amount has a nexus to the accused product. Defendant may cross-examine to the extent the revenue extends beyond the term of the hypothetical license or patent term.

- [redacted]

- [redacted]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

**CASE NO.: 2:17-cv-07639 SJO-KS**                                                              **DATE:  December 3, 2019**

- Value of first-mover advantage to Kite ($620 million): The Court **GRANTS**, as the value of a first-mover is self-evident, and the prejudice of introducing this number outweighs any probative value.

      2. Dr. Gilbert

Defendant moves to exclude Dr. Gilbert's opinions as irrelevant, because Juno's JCAR017 therapy is not FDA approved and does not utilize the '190 patent. Defendant further argues that Dr. Gilbert's comparison is unreliable (single arm study, no adjustment for known differences in the study populations, no adjustment for known differences in how trial measure safety events).

Plaintiffs respond that Dr. Gilbert's opinion is relevant because he responds to Kite's expert opining that Kite's manufacturing and lymphodepletion regimes contributed to the success of Yescarta, that despite no FDA approval of JCAR017, the parties would have been aware of its development and safety profile, and Defendant would have been even more motivated to get a license from Plaintiffs and be first to market (with its alleged inferior product). Plaintiffs further respond that Defendant's complaints merit cross-examination, not exclusion (especially because no head-to-head studies exist for this treatment—that would be inhumane).

There is no dispute that Dr. Gilbert is qualified as an expert on CAR-T therapies, as he has treated cancer patients for decades. However, the Court strains to follow Plaintiffs' theories of relevance as to Dr. Gilbert's safety/efficacy comparison of JCAR017 to Yescarta. JCAR017 does not utilize the '190 patent. It is neither FDA approved nor available on the market. Plaintiffs contend the comparison between JCAR017 and Yescarta would have been considered during the hypothetical negotiation, but the safety and efficacy test results for JCAR017 were not released until March 2019, a year and a half after the hypothetical negation. At the December 2, 2019 hearing, counsel for Plaintiffs stated that the 2019 test results showed testing occurred during 2017, but Dr. Gilbert's deposition testimony does not indicate that in 2017, the test results were reliable, or that the 2017 test results were known to Defendant at that time. Plaintiffs have thus not shown how they could have known they had an allegedly safer product, or that Defendant would be motivated get a license to get first to market status with an allegedly inferior product. Dr. Gilbert may thus present his rebuttal opinion as to why Kite's manufacturing and lymphodepletion regimes did not contribute substantially to the success of Yescarta. He may not present any expert opinion comparing Yescarta and JCAR017, but may provide lay witness testimony regarding JCAR017 to the extent he has personal knowledge.[2] The Court **DENIES-IN-PART**.

---

[2] At the December 2, 2019 hearing, counsel for Defendant alleged that Plaintiffs have not complied with discovery obligations regarding their BLA submissions to the FDA, and that Dr. Gilbert should not be permitted to testify at all.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

CASE NO.: <u>2:17-cv-07639 SJO-KS</u>                              DATE:  <u>December 3, 2019</u>

       3. <u>Dr. Rao</u>

Plaintiffs argue Dr. Rao's opinion should be excluded for three independent reasons: (1) Dr. Rao opines that Juno would have sublicensed the '190 patent to Kite for less than the rate Juno must pay to MSK, (2) Dr. Rao's hypothetical negotiation is not based on the parties' bargaining positions as of October 2017, and (3) Dr. Rao relies on settlement ranges prepared in connection with Celgene's acquisition of Juno, which bear no relationship to the hypothetical negotiation.

Defendant responds that: (1) Dr. Rao's licensing rate is properly apportioned to the value of the '190 patent itself (with half the royalty rate attributed to know-how); (2) Dr. Rao did account for the parties' respective bargaining positions because he opined Plaintiffs could not ask for the entire value of Yescarta simply because the hypothetical negotiation occurred on the eve of launch; and (3) Celgene's and Juno's financial models projecting '190 patent royalties are data points that reflect the perceived value of the '190 patent at the time of the hypothetical negotiation.

*As to the first point* (Juno's sublicense rate), Juno pays to MSK a running royalty of 7.25% of worldwide, annual net sales sold by Juno, its affiliates, and sublicensees.  Dr. Rao argues the royalty covers five patents and knowhow.  He adjusts for the fact that only the '190 patent is at issue here, and that valuable know-how would also have been transferred.  He thus adjusts to 3.625%, then based on the Novartis agreement, adjusts to 6.715%.  Plaintiffs argue it is improper to set a royalty below what Juno would have to pay to MSKCC (7.25%), because this leads to the absurd result that Juno would be losing money by licensing to a competitor.  Defendant disagrees because it asserts the Exclusive License Agreement is invalid based on the Court's Order re Standing.  But the Court's Order re Standing clarified that while MSK and Juno did not have *constitutional standing* to enforce patent rights against a third party under the Exclusive License Agreement, there was no evidence that as of October 2017, the parties did not intend the '190 patent to be included in the Exclusive License Agreement, that the parties did not intend to be bound by the Excusive License Agreement, or that the Exclusive License Agreement was a sham.  (*See also infra*, Section II.C.)  The hypothetical negotiation must be evaluated on the basis of what the parties to the hypothetical negotiation would have considered at the time of the negotiation.  Based on the parties' knowledge as of October 2017, there is no evidence that the parties would have acted to negotiate with SKI, not Juno.  Thus, Dr. Rao's 6.715% license rate does lead to the illogical conclusion that Juno would lose money every time Kite made a sale.  The Court **GRANTS**.[3]

---

Because the BLA submissions relate to the now-withdrawn launch delay portion of Dr. Sullivan's opinion, and because Dr. Gilbert may not present an expert opinion comparing JCAR017 and Yescarta, the Court deems the issue resolved.

[3] At the parties' December 2, 2019 hearing, Defendant stated Dr. Rao has provided an alternative 10.34% licensing rate.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: **2:17-cv-07639 SJO-KS**  DATE: **December 3, 2019**

*As to the second point* (bargaining positions), Plaintiffs argue that Dr. Rao does not consider the actual circumstances of the parties, *i.e.*, that Yescarta was on the eve of launch without a noninfringing alternative. Plaintiffs further argue that Dr. Rao improperly prorates the upfront payment for the hypothetical negotiation, rather than running through the expiration of the '190 patent. Defendant rebuts that accounting for the entire value of Yescarta would not properly apportion for the '190 patent, and that any failure to weigh more heavily bargaining leverage is appropriate for cross-examination, not exclusion. The Court agrees with Defendant and finds that Dr. Rao's adjustments for the actual circumstances (including Plaintiffs' complaints about Dr. Rao's decision not to make certain adjustments) weigh in favor of cross-examination, not exclusion. The Court **DENIES**.

*As to the third point* (settlement ranges), the parties dispute [REDACTED] the Court finds that the maximum contemplated [REDACTED] is not probative. Neither expert relies on the figure in calculating his upfront payment award. It is unclear whether the amount was contemplated assuming the '190 patent was valid and infringed. The other circumstances surrounding the estimate are likewise uncertain (whether they accounted for factors irrelevant to damages, including propensity to avoid litigation, mitigate risk, and/or divert resources elsewhere). Given the low probative value in light of neither expert's reliance, and the high 403 concerns given the circumstances surrounding the estimate, the Court **GRANTS**.

### C. Motion to Strike Complaint

Defendant argues the Supplemental Complaint exceeds the scope of the Court's Order re Standing. Specifically, instead of pleading allegations specific to the October 2018 Agreement, Plaintiffs allege a new 2013 verbal license agreement, and SKI's hypothetical contract liabilities under that verbal agreement. (Motion to Strike Complaint 1.) Plaintiffs' only allegation regarding the October 2018 agreement is that it "reaffirmed" the parties' Exclusive License Agreement. (Motion to Strike Complaint 1.) The new 2013 verbal license agreement allegations contradict the Order re Standing, are irrelevant, and highly prejudicial at this stage. (Motion to Strike Complaint 2.) Moreover, Plaintiffs did not allege the oral agreement in response to interrogatories. (Motion to Strike Complaint 4.)

Plaintiffs respond that the Supplemental Complaint is proper. First, their re-pleading of allegations regarding Juno's constitutional standing prior to 2018 was to preserve their rights for appeal. (Opp. to Motion to Strike Complaint 1.) Second, the new allegations regarding the 2013 verbal or implied agreement "naturally follow[]" from the Order re Standing, given the facts of this case. (Opp. to Motion to Strike Complaint 2.) The Supplemental Complaint requires no new discovery, because Plaintiffs have maintained that the 2017 hypothetical negotiation would take Juno's interests into account. (Opp. to Motion to Strike Complaint 4.)

| | |
|---|---|
| **CASE NO.: 2:17-cv-07639 SJO-KS** | **DATE: December 3, 2019** |

Defendant replies that the Supplemental Complaint exceeds the scope of the Order re Standing. (Reply in Support of Motion to Strike Complaint 1-2.)  Defendant further replies that although the oral license theory was not previously disclosed, the theory cannot stand, given the 2013 Exclusive License Agreement does not grant rights to the '190 patent to Juno, and even if it did, the integration clause expressly states it supersedes prior oral arguments.  (Reply in Support of Motion to Strike Complaint 2-3.)

The Court finds that the new allegations regarding the alleged 2013 oral or implied license are improper.  These allegations pose a new legal theory, and is improper to be disclosed in the month before trial.

The Court also finds that Plaintiffs' allegation that the October 2018 agreement "reaffirmed" Juno's exclusive rights to the '190 patent is improper.  The Court's Order re Standing clearly found that the October 2018 agreement conferred standing upon Juno in the first instance—not that it affirmed any prior rights.

For these reasons, the Court **GRANTS** Defendant's Motion to Strike Complaint.  Given that trial has started, Plaintiffs are re-instructed to file an amended Complaint within 24 hours of entry of this Order with allegations directed to the October 2018 agreement, consistent with the Court's Order re Standing.  The Court clarifies that granting this motion does not preclude either party's damages expert from opining that Juno's interests would have been represented at the hypothetical negotiation, as neither party has provided evidence that Plaintiffs were not acting as if the Exclusive License Agreement conveyed rights to the '190 patent, or that the Exclusive License Agreement was a sham executed in an attempt to drive up sublicensing royalty rates.

D.  Motion to Strike Dr. Sullivan's Amended Report

Defendant moves to strike the second supplemental Sullivan report, served one court day before trial.  Dr. Sullivan provides two supplemental opinions.  First, he opines that even if SKI is the sole licensor, economic evidence (*i.e.*, $149 million of consideration provided from Juno to SKI) supports Juno's interests being represented at the hypothetical negotiation. (Motion to Strike Sullivan's Amended Report 4.)   Second, Dr. Sullivan opines that SKI would have sought to resolve issues with Juno's rights with regard to the '190 patent prior to the hypothetical negotiation. (Motion to Strike Sullivan's Amended Report 4.)  Third, Dr. Sullivan offers a prorated calculation of his upfront payment through trial, *i.e.*, $243 million rather than $930 million.  Dr. Sullivan does so for the purpose of opining that his total damages award, now prorated through the end of trial to $230 million, is comparable in magnitude to Dr. Rao's $70 million. (Motion to Strike Sullivan's Amended Report 8.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: <u>2:17-cv-07639 SJO-KS</u>　　　　　　　　　　DATE: <u>December 3, 2019</u>

Plaintiffs respond that Dr. Sullivan has not served any new opinions. First, Dr. Sullivan has already opined that if SKI, rather than Juno, was the hypothetical negotiator, his opinion would remain unchanged. (Opp. to Motion to Strike Sullivan's Amended Report i.) Dr. Sullivan's approach is consistent with Dr. Rao's approach, in that Dr. Rao similarly supplemented his hypothetical negotiation in light of the Court's Order re standing.[4] (Opp. to Motion to Strike Sullivan's Amended Report ii.) Second, it would be irrational to determine that SKI, without Juno, would enter into a hypothetical agreement given the Exclusive License Agreement and the parties' behavior surrounding the agreement. (Opp. to Motion to Strike Sullivan's Amended Report iii.) Third, although Dr. Sullivan maintains pro-rating is improper, he provides a pro-rated number for purposes of comparing the magnitude of his damages calculation with Dr. Rao.

The Court finds Defendant's arguments persuasive. First, Dr. Sullivan has already opined that his position would not change if SKI, not Juno, was the hypothetical negotiator. The Court sees no reason for him to supplement his opinion on this point. Second, Dr. Sullivan's new opinion that SKI would have sought to resolve standing issues with Juno prior to the hypothetical negotiation is likewise improper. Third, Dr. Sullivan presents no reason why he could not have pro-rated his damages opinion in the first instance, or sought to supplement to pro-rate his opinion any time after service. Dr. Sullivan's supplementation is further improper because of the Court's determination as to the appropriate time period for his original opinion. *See supra*, Section II.B.1.b. For these reasons, the Court **GRANTS** the Motion to Strike Sullivan's Amended Report.

　　III. <u>RULING</u>

For the foregoing reasons, the Court:

(1) **GRANTS-IN-PART** and **DENIES-IN-PART** the Sullivan Motion;
(2) **GRANTS-IN-PART** and **DENIES-IN-PART** the Gilbert Motion;
(3) **GRANTS-IN-PART** and **DENIES-IN-PART** the Rao Motion;
(4) **GRANTS** the Motion to Strike Complaint. Plaintiffs are ordered to file a supplemental Complaint within 24 hours; and
(5) **GRANTS** the Motion to Strike Sullivan's Amended Report.

IT IS SO ORDERED.

---

[4] In light of its ruling on Plaintiffs' Motion in Limine No. 3, the Court granted Plaintiffs' ex parte application to exclude Dr. Rao's supplemental report. (Text Order, ECF No. 424.)