1                       UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3                HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5

6     JUNO THERAPEUTICS, INC., et al., )
                                       )
7              Plaintiffs,             )
                                       )
8                   vs.                )
                                       )   2:17-CV-6496-SJO
9     KITE PHARMA, INC.,               )
                                       )
10             Defendant.              )
      _____)

11

12

13                    REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                         Los Angeles, California

15                       Monday, December 2, 2019

16

17

18              _____

19

20

21

22                      AMY DIAZ, RPR, CRR, FCRR
                        Federal Official Reporter
23                      350 West 1st Street, #4455
                        Los Angeles, CA 90012

24

25        *Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1        APPEARANCES OF COUNSEL:

 2

          For the Plaintiffs:
 3

 4                      IRELL & MANELLA LLP
                        By:  Morgan Chu, Attorney at Law
 5                           Alan Heinrich, Attorney at Law
                             Crawford Maclain Wells, Attorney at Law
 6                           Elizabeth Tuan, Attorney at Law
                        1800 Avenue of the Stars, Suite 900
 7                      Los Angeles, California 90067

 8                      JONES DAY
                        By:  Andrea Weiss Jeffries, Attorney at Law
 9                      555 South Flower Street, 50th Floor
                        Los Angeles, California 90071
10
                        JONES DAY
11                      By:  Sarah Geers, Attorney at Law
                        250 Vesey Street
12                      New York, New York 10281

13

14        For Defendant:

15                      MUNGER TOLLES & OLSON LLP
                        By:  Garth Vincent, Attorney at Law
16                           Edward Dane, Attorney at Law
                             Jeffrey Weinberger, Attorney at Law
17                           Peter Gratzinger, Attorney at Law
                             Blanca Young, Attorney at Law
18                      355 South Grand Avenue, 35th Floor
                        Los Angeles, California 90071
19

20

21

22

23

24

25
```

```
 1                    THE CLERK:  Calling Item Number 4, Case Number
 2       CV-17-7639, Juno Therapeutic versus Kite Pharma, Inc.
 3                    Counsel, please state your appearance.
 4                    Everybody in the audience can be seated, please.
 5                    MR. CHU:  Good morning, Your Honor.  On behalf of
 6       Sloan Kettering Institute and Juno, Morgan Chu.  And I'll
 7       start with counsel who are closest to you, Elizabeth Tuan,
 8       Sarah Geers, Andrea Jeffries, Maclain Wells and Alan
 9       Heinrich.
10                    THE COURT:  Good morning.
11                    MR. DANE:  Good morning, Your Honor.  Ted Dane on
12       behalf of Kite Pharma, and beginning closest to you, also
13       here in court is Blanca Young, Jeff Weinberger, Garth Vincent
14       and Peter Gratzinger.
15                    THE COURT:  Good morning and welcome.  Have a seat.
16       I think we are about ready to start.
17                    So again, welcome, everyone.  As I understand it,
18       there is some pleadings that have been filed over the weekend
19       which I have not yet had an opportunity to review.  So let's
20       start with the three motions that are scheduled for hearing
21       today.
22                    So we have Kite's motion to exclude the opinions of
23       Dr. Sullivan, we have Kite's motion to exclude the testimony
24       of Dr. Gilbert, and then we have Juno's motion to exclude
25       opinions of Dr. Rao.
```

1          So let me just inquire, who will be arguing the

2     motion to exclude Sullivan on behalf of Juno?

3          MR. HEINRICH:  I will, Your Honor, Alan Heinrich.

4          THE COURT:  One moment.  And then on behalf of Juno,

5     the motion to exclude Dr. Gilbert?

6          MR. HEINRICH:  That is me, as well, and I'll be

7     arguing for the Dr. Rao motion.

8          THE COURT:  Okay.  You have your hands full today.

9          MR. HEINRICH:  Yes.

10         THE COURT:  And then on behalf of Kite, who will be

11    arguing the three motions?

12         MR. DANE:  Your Honor, I will be arguing the motion

13    with regard to Dr. Gilbert, Mr. Vincent will be arguing the

14    motion with regard to Dr. Sullivan, and Mr. Gratzinger will

15    be arguing the motion with regard to Dr. Rao.  So we are

16    ganging up on Mr. Heinrich today.

17         THE COURT:  Okay.

18         MR. DANE:  Your Honor, there is one other motion

19    that was filed earlier than this weekend, which I think is

20    relevant to some of these other *Daubert*s with regard to Dr.

21    Sullivan, which is our motion to strike the Supplemental

22    Complaint that was filed by Juno.

23         THE COURT:  Okay.  So let's start with

24    Dr. Sullivan's damage opinions.

25         So Dr. Sullivan, as I understand it, bases his

1    opinion on what he calls the comparative license approach.

2    And against the backdrop of the MSK agreement and the

3    Novartis license, Dr. Sullivan opines that the parties would

4    have negotiated a license totaling 1.2 billion and change

5    consisting of three components.

6         First is a $930 million upfront payment, and then we

7    have $159.7 million launch delay consideration.  And then he

8    opines a running royalty on YESCARTA sales of 27.6 percent.

9    And as I understand it, that 27.6 percent comes out to about

10   $101 million through the first quarter of 2000 -- of 2019.

11        So the upfront payment I think by anyone's standard

12   is significant and seemingly high.  So what I would like

13   counsel to do is to walk me through the first component of

14   the $1.2 billion figure.  What exactly does that cover, the

15   $930 million upfront payment?  What assumptions and

16   adjustments did Dr. Sullivan make in support of the

17   $930 million figure?

18        I have other questions that I would like the lawyers

19   to address on both sides.  I'm interested in hearing about

20   the term of Dr. Sullivan's hypothetical license.  The

21   question is, is it limited to an 18-month period or does it

22   cover the duration of the '190, which I think ends in 2024?

23        In reviewing Juno's pleadings, Juno claims that

24   Kite's contention that Dr. Sullivan's royalty is for a

25   limited 18-month period is wrong.  However, in reviewing

1     Dr. Sullivan's report, he seems to opine that the payment

2     compensates for harms realized at the hypothetical

3     negotiation but does not include compensation for future

4     harm.  And that is in his report, I think in paragraph 169

5     and 350.  So it's not clear to me what the case is.  Does the

6     term cover the duration of the license or is it limited to --

7     or is it limited, more limited?

8         And I would also like to hear from the parties

9     regarding what Kite refers to as the Sullivan stock swap.  So

10     as I understand what Dr. Sullivan has done is Dr. Sullivan

11     has -- Dr. Sullivan carries over Juno's grant of 500,000

12     shares of Juno stock in the 2013 MSK agreement to 500,000

13     shares of Kite stock in 2017.  And Juno stock in 2013 was

14     valued at approximately $2 million, whereas Kite stock in

15     2017 was over $90 million.

16         And then Dr. Sullivan adds -- seems to add an extra

17     payment because Kite stock increased over 30 times its

18     initial price, and Dr. Sullivan then opines that Kite would

19     be willing to pay 240 million when Juno only paid 2 million.

20     So I would like to hear more about what adjustments

21     Dr. Sullivan made to take into consideration that the 500,000

22     shares of Juno stock was only 2 million in 2013 but Kite

23     stock in 2017 was 90 million.  It appears that some

24     adjustments would have to be made to account for the

25     differences in value.

1          The -- I would like to hear more about Sullivan's

2     use of the -- of his -- what he terms as the comparable

3     license methodology and whether Dr. Sullivan has

4     apportioned -- has included an apportionment for the

5     incremental value of the '190.

6          And so those are the general areas regarding

7     Dr. Sullivan's report, and I'll turn it over to Mr. Heinrich.

8     It's plaintiffs' obligation to establish that the opinions of

9     Dr. Sullivan are fundamentally sound, and so I'll turn it

10    over to Mr. Heinrich.

11         MR. HEINRICH:  Good morning, Your Honor.

12         First question, the term of the hypothetical license

13    that Dr. Sullivan posits, and the term is for the duration of

14    the patent's life.  So from 2017, the date of the

15    hypothetical negotiation, through 2024, the expiration of the

16    '190 patent.  So that is the relevant time period to assess

17    Dr. Sullivan's upfront payment.

18         Now, an upfront payment is by definition a payment

19    that is not tied to sales.  And in this case Juno itself has

20    paid approximately $150 million.  That is how much --

21         THE COURT:  I'm sorry, let me stop you there.  So

22    the -- so the term runs through 2024?

23         MR. HEINRICH:  That is the -- exactly.

24         THE COURT:  And was that disclosed in Dr. Sullivan's

25    report?

1          MR. HEINRICH:  It was, Your Honor.  And he

2     emphasized it in his deposition where he explained that for

3     the hypothetical licensee's positing, Kite would still be

4     making under its own projections in 2017 billions of dollars.

5          THE COURT:  So where in the report, if you could

6     point me to the precise portions of his report and deposition

7     where he discloses clearly that the term runs through 2024?

8          MR. HEINRICH:  What he does, Your Honor, is he bases

9     his --

10          THE COURT:  Well, if you could just point me to the

11     sections that you are relying on.

12          MR. HEINRICH:  So what I would direct Your Honor to

13     is his approach for his comparable license agreement by

14     relying on the MSK/Juno agreement itself, page 107, he

15     discusses the MSK/Juno agreement.  That is his starting

16     point.  And that license is for the duration of the patent

17     term.  So we would submit that the term of the license is

18     built into his analysis by relying on the MSK/Juno agreement

19     as his starting point.

20          And if I may, Your Honor, talk a little bit more

21     about the upfront payment?

22          THE COURT:  Yes.  And in reference to that, if the

23     jury awards the entire upfront payment that is requested by

24     Juno, will the plaintiffs be seeking any form of damages

25     post-trial?

1          MR. HEINRICH:  Well, so we will be seeking a running

2     royalty post-trial.  These are two separate components.  Just

3     as in the comparable license there is the payments that are

4     not based on sales, that is what Dr. Sullivan is using for

5     his upfront calculations, and then there is, of course, the

6     payment on sales, the running royalty component.  But we

7     certainly won't ask for another upfront, and we won't be

8     seeking equitable relief under Dr. Sullivan's opinion.

9          THE COURT:  Okay.  So -- and I think you made it

10     clear in the pretrial conference order that you would be

11     seeking ongoing royalties.

12          So -- but let me -- let me just see if I can phrase

13     this.  If Juno -- so as I understand it, in your pleadings,

14     in Juno's pleadings, Juno has taken the position that if the

15     jury adopts Dr. Sullivan's upfront payment, plaintiff cannot

16     receive a permanent injunction; that is true?

17          MR. HEINRICH:  Yes.

18          THE COURT:  So what if the jury awards a sum less

19     than the amount requested by Juno in terms of the upfront

20     payment, what is Juno's position regarding equitable relief?

21          MR. HEINRICH:  Well, if the jury takes Dr. Rao's

22     damages award, which is expressly apportioned -- or I should

23     say prorated, it's expressly prorated for just the period of

24     time to trial, I think that that, you know, under their

25     theory leaves open the possibility of equitable relief.  But

1    we don't think that is appropriate.  We think that is an

2    inappropriate methodology, and -- but that is sort of the

3    other option that is on the table.

4            THE COURT:  How is one to know whether the jury

5    adopted Juno's number or Dr. Rao's number if the jury --

6    hypothetically, if the jury awards -- and the juries

7    sometimes do this.  They think that numbers are too high so

8    they make their own calculations and deductions.  But

9    assuming that Juno -- that the jury awards Juno upfront 600

10   million, what happens then?

11           MR. HEINRICH:  So that would be certainly within the

12   Court's discretion to say the Court finds that a hundred

13   million dollars upfront does not provide us with an

14   opportunity to get equitable relief.  That is --

15           THE COURT:  So as you stand here today, if the jury

16   awards 400 million, will Juno be moving for an injunction?

17           MR. HEINRICH:  So that would again be up to the

18   Court's discretion to say 400 million, but if the Court is

19   concerned about this, I'm prepared to say no, we won't be.

20           THE COURT:  At 400 million?  Can I get you lower

21   than that?

22           MR. HEINRICH:  But I do believe, Your Honor, that

23   questions of equitable relief are really -- they have to be

24   disentangled from the question here, which is the

25   admissibility of Dr. Sullivan's opinion.  And we would cite

1      the *Innogenetics v. Abbott* case where the plaintiff's expert

2      proposed an upfront payment as well as a running royalty.

3      The jury awarded that upfront payment.  The plaintiff then

4      actually moved for a permanent injunction as well.  It was

5      granted.  And the federal circuit on appeal said your damages

6      case defeated your right to a permanent injunction.

7              It didn't address that in the context of whether the

8      damages case was appropriate.  It said, as a matter of

9      post-trial motions on equitable relief, your permanent

10     injunction request was not appropriate as a result of the

11     damages award.

12             THE COURT:  Okay.  And then going back to

13     Dr. Sullivan's disclosures, so you indicated that

14     Dr. Sullivan disclosed that the royalties for a limited -- is

15     for a limited 18-month period, yes?

16             MR. HEINRICH:  No.  No.

17             THE COURT:  Okay.

18             MR. HEINRICH:  I said the opposite.  By using the

19     MSK/Juno agreement as his starting point, which is the

20     license for the term of the patent, it was built into his

21     analysis that his proposal would cover the life of the

22     patent.

23             THE COURT:  And the pages again? You pointed to 107,

24     and what other pages?

25             MR. HEINRICH:  Well, really, Your Honor, the

entirety of his methodology, but he does discuss starting on

page 107 the MSK/Juno agreement, and he uses that as his

starting point for his analysis.  He doesn't do a proration

like Dr. Rao does for the term of the damages period.  So

that is why it's built in.

THE COURT:  So let's go back to the -- what the 930

million number covers and then the assumptions and

adjustments made by Dr. Sullivan in order to -- he arrived at

to support that.

MR. HEINRICH:  Sure.  So he takes the upfront

consideration, so, in other words, the obligations that Juno

made upfront, not tied to sales in the MSK agreement, which

included an execution, the cash execution fee, it included

the grant of 500,000 shares of its stock, and it included an

agreement to pay success fees based on the increase in its

stock value.

Under those payment obligations, Juno has already

provided $150 million to Sloan Kettering before a single

sale.  So what Dr. Sullivan does is he translates that to the

value that Kite would be paying if Kite stepped into the

shoes of Juno but if it did so in October of 2017 rather than

2013.

So he basically says when you make those

adjustments, instead of having $150 million paid to Sloan

Kettering, that would be $243 million because of Kite's

1    higher stock price in 2017 and because the success payments,

2    many of which Juno itself paid, would also be triggered by

3    Kite.  So Kite would be paying an additional $150 million

4    just on the terms of the MSK agreement itself.

5         So two issues there that opposing counsel raise in

6    their papers.  One is whether the correct valuation of the

7    stock should be the equivalent cash value in 2013, that is,

8    the $2 million, or should it be the value in 2017?  And we've

9    cited a few cases in our briefing where that specific issue

10   was raised.

11        In other words, in the context of valuing a license

12   agreement in a comparable license analysis, what -- how do

13   you treat equity?  Do you treat it based on the equivalent

14   cash value at the time that the license was entered into?  Or

15   do you treat it based on its value at the time that you are

16   analyzing it?  And both cases upheld an expert's use of the

17   same methodology as Dr. Sullivan.

18        THE COURT:  And would you cite those cases again,

19   please.

20        MR. HEINRICH:  Yes, Your Honor.

21        So one is the *Sentrix v. Illumina* case, and the

22   other is *Function Media v. Google* case; both cases

23   applying the comparative license methodology, both addressing

24   this specific issue of when do you value equity in doing that

25   analysis.

1       THE COURT:  So I think in Kite's pleadings, Kite

2   cleverly points out that if one adopts Dr. Sullivan's stock

3   swap methodology and then assuming that Berkshire has

4   infringed the upfront fee, which would be $330,000 price per

5   share times 500,000 shares, which would come out to

6   1.65 billion.  I think the point is to show that maybe the

7   methodology is not sound.

8       MR. HEINRICH:  Well, Your Honor, we would

9   respectfully submit that that is a straw man argument.  They

10  are comparing two companies in completely different fields.

11  That is not the case here.  Juno and Kite are both CAR-T

12  companies.  They had a similar valuation when they went

13  public.  They were both focused on CAR-T technology.  And

14  they were both sold for reasonably similar amounts.  In the

15  case of Juno it was 9 billion, in the case of Kite it was

16  11.9 billion, which factored in the fact that Kite was first

17  to market in this field due to its infringement.  But we are

18  not talking about widely disparate companies in disparate

19  fields like their example, their straw man example in their

20  brief.

21      So given those similarities, including the fact that

22  they went public at similar times, it was appropriate to use

23  the Kite stock price.

24      Additionally, the hypothetical negotiation framework

25  requires substituting Kite in place of Juno as the licensee.

1    So just as we are using Kite sales to apply the royalty to,

2    it was appropriate for Dr. Sullivan to use Kite's stock price

3    as the metric because that is what MSK would be looking at if

4    it was doing a deal with Kite in 2017.

5           THE COURT:  So Kite's stock in 2017 is valued at --

6    in 2017 is valued at 90 million, then Dr. Sullivan adds

7    another 150 million because of the increase of 30 times over

8    the initial price, which comes out to 240 million, which is a

9    12,000 -- as pointed out by Kite, which is a 12,000 percent

10   inflation.

11          MR. HEINRICH:  Well, so I agree with everything

12   except the last statement.  It's not a 12,000 percent

13   inflation.

14          THE COURT:  And then Dr. Sullivan takes that 240

15   million and makes two additional adjustments upwards.

16          MR. HEINRICH:  That's correct.  But just as a

17   reminder, Juno itself paid about 150 million just for the

18   obligations under the 2013 agreement, not tied to sales,

19   including $100 million in success payments.  So Kite's

20   argument about inflation is just absolutely wrong.  So we

21   have to compare 150 million paid by Juno to 243 million that

22   Dr. Sullivan posits for Kite.

23          And getting to your next point, you are right, he

24   does then apply two adjustments, because he accounts for two

25   important differences between the 2013 agreement between Juno

1    and Sloan Kettering, and the hypothetical negotiation in 2017

2    between Kite and Gilead on the one hand and Juno and Sloan

3    Kettering on the other.

4          So first he has to account for the fact that the

5    Juno/Sloan Kettering agreement in 2013 was not between

6    competitors.  So that is an important adjustment that is

7    built into the comparative -- comparable license agreement.

8    You have to account for that key difference.

9          Dr. Rao does the same adjustment, and they both use

10   the same agreement to do that adjustment, the Novartis

11   settlement with Juno in 2015.  So that is the basis for

12   Dr. Sullivan's first adjustment.  But adjusting just on the

13   basis of the Novartis/Juno settlement in 2015 doesn't fully

14   account for the differences between the 2013 comparable

15   license and the 2017 hypothetical negotiation.

16         Importantly, the Novartis settlement was entered

17   into years before a commercial therapy.  Novartis was years

18   from approval at the time of the agreement.  They didn't even

19   have any data in DLBCL, the type of lymphoma that is at issue

20   here.  And that matters when you are valuing an agreement.

21         Because what witnesses on both sides of this case

22   have testified to is that a license agreement, a patent

23   license agreement becomes more valuable the closer you get to

24   commercialization.  So unlike Dr. Rao, Dr. Sullivan accounts

25   for and adjusts for the fact that the Novartis agreement was

still years from commercialization; whereas the hypothetical

negotiation by definition is posited to occur right as Kite

is about to commercially launch YESCARTA.

So Dr. Sullivan looks at the comparative harm that

Juno faced from Novartis in 2015 to what it faced from Kite

in 2017 using the financial models that were prepared in the

ordinary course of business by these companies.  And he made

an adjustment -- a second adjustment to account for that

second important difference for the hypothetical license as

compared to the 2013 Juno license.

So applying each of those adjustments, in turn, to

account for the differences between the 2013 comparable

agreement and the 2017 hypothetical license, Dr. Sullivan

comes up with his $930 million upfront payment, which covers

the life of the patent, and which still leaves Kite with over

$3 billion in profits, even accounting for all of

Dr. Sullivan's royalties based on Kite's own projections at

the time of the hypothetical negotiation.

And if I --

THE COURT:  It seems pretty high.

MR. HEINRICH:  So it's high, Your Honor, because of

two things:  One is the extraordinary value of the patent to

Kite, and the second is the extraordinary value of YESCARTA

itself, the infringing product.

So at the time of the hypothetical negotiation, at

 1          precisely that time, Gilead, who is at the table at this

 2          hypothetical negotiation, valued YESCARTA at $6.2 billion

 3          just for that one indication.

 4                  And I should point out that Kite is using the patent

 5          up and down its clinical pipeline, not just for YESCARTA but

 6          for over 10 other indications for cancer, the same patented

 7          construct that infringes the '190 patent.  And we can tell

 8          the importance of the patent to Kite by Kite's own actions.

 9                  In 2013, Kite approached MSK to try to obtain a

10          license to this patent.  This was before Kite even started

11          its own clinical trials.  MSK decided to license Juno instead

12          to the '190 patent.  That was six years ago.  Six years ago

13          Kite was turned away for a license.

14                  To this day, Kite does not have an alternative core

15          construct to use in a CAR therapy.  They have no alternative

16          construct for YESCARTA.  They have 10 other trials that are

17          ongoing using the same construct, not with an alternative.

18          They actually tried to come up with a noninfringing CAR

19          construct, it failed.  And this is why they tried to

20          invalidate the patent a few years before they launched,

21          because they knew it was a significant risk to their

22          business.  But that failed, as well.

23                  So when you consider the negotiating position of the

24          parties in 2017 at the hypothetical negotiation, Kite's real

25          world actions tell us that they come to that bargaining table

1    without an option for a CAR construct that doesn't infringe

2    this patent.  This CAR is the active ingredient of their

3    therapy.  So without a license, they have no $6.2 billion

4    therapy -- and that is the value according to Gilead's own

5    10K in its SEC filing -- they have no $6.2 billion therapy.

6    The value of their injunctive processes for the therapy, it's

7    zero, because there is no therapy to provide.  And still,

8    Dr. Sullivan leaves Kite with a hefty profit after all of

9    that.

10           THE COURT:  Let's see.  So, again, going back on

11   this stock swap issue, in 2017, Kite's stock was valued at --

12   the value the shares was 90 million; is that correct?

13           MR. HEINRICH:  That's correct.

14           THE COURT:  So the question -- let me see if I can

15   phrase this.  But the question is whether using that share

16   price takes into consideration the incremental value of the

17   '190 patent, the YESCARTA, the Kite stock is -- the value of

18   the Kite stock is based more -- it seemingly is based on more

19   than just the '190 patent.  There is other value there.  And

20   so did -- how did Sullivan take that into consideration?

21           MR. HEINRICH:  Well, so first we are talking about

22   500,000 shares of equity, which is what Juno --

23           THE COURT:  I understand that.

24           MR. HEINRICH:  So Dr. Sullivan took into account the

25   value of the other aspects of the Kite therapy through his

1    comparable license analysis itself.

2         The federal circuit in the *Commonwealth Scientific*

3    *v. Cisco* case that we cite has ruled that a comparable

4    license approach has apportionment built in.  And that is

5    what Dr. Sullivan did.  By making reasonable adjustments to a

6    comparable license -- there is no dispute that the MSK/Juno

7    agreement is comparable, because Dr. Rao uses the same

8    agreement.  He takes into account the value of the other

9    components of YESCARTA through that methodology itself.

10        And Kite obviously disagrees with the amount of his

11   adjustments.  That is a classic example of an issue that goes

12   to the weight, not to the admissibility of Dr. Sullivan's

13   opinion.  Because it's a -- it's a well-established

14   methodology.  And because the Court expressed some concerns

15   about Dr. Sullivan last Tuesday --

16        THE COURT:  I recognize you filed a brief.

17        MR. HEINRICH:  Okay.

18        THE COURT:  But, again, utilizing Kite's share price

19   as a company, as an entire company doesn't seem to take into

20   consideration the incremental value of the '190.  There is

21   other -- there is other factors that are driving this share

22   separate and apart from the '190, and how -- again, how does

23   Dr. Sullivan account for all of that?

24        MR. HEINRICH:  So first, we, for sure --

25   Dr. Sullivan does not take into account the entire company

1    value of Kite.  He nowhere uses Kite's market capitalization

2    anywhere in his analysis.  He is simply applying Kite's stock

3    price to the 500,000 shares that Kite would have paid MSK if

4    it was doing the same deal in 2017.

5             So it's not the whole value of Kite as a company.

6    It's just saying, let's suppose Kite were doing this deal

7    with MSK in 2017.  Juno paid 500,000 shares, so Kite would

8    pay 500,000 shares.  What is the value of that?  That's not

9    taking into account Kite's entire company value.

10            That is why the federal circuit has said that doing

11   a comparable license approach takes into account

12   apportionment.  It's built in, as the Court said, in

13   *Commonwealth Scientific*.

14            And then I should also note that Juno's stock also

15   has increased.  At the time that MSK sold it, it was worth 25

16   million.  And unlike Kite, Juno had other programs based on a

17   variety of technologies.

18            THE COURT:  So just -- if you could just kind of

19   maybe repeat, but walk me through again how Dr. Sullivan has

20   properly apportioned for the incremental value of the '190 in

21   this -- in the methodology that he's used.

22            MR. HEINRICH:  So he properly apportioned -- you can

23   think of it in two ways:  One is just by the methodology

24   itself.  The federal circuit has said if you are doing a

25   comparable license approach, you don't have to go through

1    some separate steps of apportionment.  But we know that he

2    properly apportioned because he leaves Kite with still the

3    wide share.

4         THE COURT:  That is one panel in the federal

5    circuit.

6         MR. HEINRICH:  Well, it's --

7         THE COURT:  Apportionment is -- is part and parcel

8    of patent economic damages.  It has to be taken into

9    consideration.

10         MR. HEINRICH:  And Dr. Sullivan absolutely did.

11         So that is why when you look at his damages opinion

12    compared to Kite's own projections, he leaves the lion's

13    share of profits with Kite.

14         But the cases that Kite has cited on apportionment,

15    these are cases that are dealing with consumer electronics

16    involving multi-component products, like smart phones or

17    computers where there was just one feature that was the

18    accused feature and there are many, many other features that

19    are noninfringing.

20         And the Court -- the federal circuit in those cases

21    has said that you can't take the entire revenue base of the

22    product and apply a royalty rate to it.  You have to

23    apportion the revenue base because it's a multi-component

24    product.

25         Well, one of the things that both experts here agree

1    on is that the proper revenue base for the application of the

2    royalty rate is the entire revenues of YESCARTA.  There

3    really -- this is not an apportionment issue.  They are

4    trying to dress up a complaint that Dr. Sullivan's damages

5    are too high under the language of apportionment, and it just

6    doesn't apply.

7            This is not a multi-component product with a lot of

8    noninfringing features.  This is a therapy.  This is a

9    therapy to try to cure people of cancer, and the active

10   ingredient is the CAR that is the CAR of the settling patent.

11   It's the only CAR that Kite has ever been able to use in a

12   clinically effective way.  It's the CAR that they are using

13   up and down their clinical program.  They have had six years

14   to design around it.  They failed.

15           This is the core of their product, and that is why

16   Dr. Sullivan's damages are high.  But he still accounts for

17   the value of other features they have added, other

18   adjudicave (sic) parts of the therapy, and that is why he

19   leaves them with the lion's share of profits.

20           THE COURT:  So getting back to the adjustments, so

21   Dr. Sullivan doubles the upfront payment because Kite is a

22   potential -- is a competitor.

23           MR. HEINRICH:  So he --

24           THE COURT:  Yes?

25           MR. HEINRICH:  Yes.  He comes up with an adjustment

1      factor based on the Novartis agreement.  And it's, I believe,

2      a .9X adjustment.  So about double.

3              THE COURT:  About double.  And then he doubles that

4      again because he thinks that Kite is an especially harmful

5      competitor.

6              MR. HEINRICH:  Well, what he does is he says that

7      the Novartis settlement in 2015 doesn't fully account for the

8      differences between the 2013 Juno/Sloan Kettering agreement

9      and the 2017 agreement, the hypothetical agreement in which

10     Juno and Kite would be the negotiators.

11             THE COURT:  But it's about double again.

12             MR. HEINRICH:  That is what his calculation comes

13     out to by looking at --

14             THE COURT:  Well, why didn't he triple it?

15             MR. HEINRICH:  Because he was applying a principled

16     methodology.  And he went to Juno's own financial projections

17     in the regular course of business that Juno relied on, and he

18     looked at the relative market impact Juno anticipated it

19     would receive from Novartis and compared it -- that was back

20     in 2015 -- and compared it to the economic impact Juno

21     anticipated from Kite in 2017.

22             And he did a careful analysis of the difference

23     between the competitive harm that Kite posed to Juno in 2017,

24     to the competitive harm that Novartis posed to Juno in 2015,

25     and apportioned -- the adjustment he made was based on that

```
1    calculation.  He didn't pick a number out of the air.  He

2    didn't say, I might as well triple or quadruple it.  He said,

3    These are the facts, and from these facts, I can make

4    principled, economic decisions and calculations, and that is

5    what he used.

6          And all of these complaints go to the weight of his

7    testimony, not admissibility, because he's applying a

8    well-established methodology.

9          Now, complaining about the amount of damages, the

10   Apple v. Motorola case from the federal circuit makes clear

11   that that is not a proper basis to exclude a damages expert.

12         THE COURT:  So we have the -- we have the 27.6

13   running royalty and then the $159.7 million launch delay

14   issue.

15         But before we get there, is there anything you want

16   to add on this upfront payment?

17         MR. HEINRICH:  No, Your Honor.

18         THE COURT:  Okay.  Then let me hear from --

19         MR. HEINRICH:  Could I just make one short circuit

20   comment here?

21         THE COURT:  Yes.

22         MR. HEINRICH:  In the interest of streamlining the

23   trial, each side with limited time, we have withdrawn our

24   launch delay damages claim, so that is off the table now.

25         THE COURT:  Which it probably should have been
```

1    withdrawn already prior to.

2         Okay.  Go ahead.  You agree launch delay was an

3    attempt to pursue profits?

4         MR. HEINRICH:  No, Your Honor, it was not.

5         THE COURT:  Just to streamline the trial?

6         MR. HEINRICH:  So I can explain why it wasn't an

7    attempt to pursue profits.

8         THE COURT:  Okay.  We'll come back to that.

9         MR. VINCENT:  Good morning, Your Honor.  Garth

10   Vincent.

11        I could take this in the order I think might be most

12   logical for Your Honor, but if you have a particular order

13   you would like me to go, I'm happy to address --

14        THE COURT:  I'll just follow along.  Go ahead.

15        MR. VINCENT:  Let me start with the stock swap,

16   because I think there was a question about why is the damage

17   number so high, and Mr. Heinrich said it was because of the

18   value of the '190 patent.  It's actually largely because of

19   this stock swap and phony success payment.

20        Juno paid MSK compensation partly in stock, 500,000

21   shares valued at 2 million, with a promise to make up to 150

22   million in success payments in Juno's stock, increased

23   30-fold.  What Dr. Sullivan did is he swapped out the value

24   of 500,000 shares of Juno stock for 500,000 shares of Kite

25   stock in 2017.

1          Now, by swapping in the price of Kite stock for

2     Juno's, he increases the value of those 500,000 shares from 2

3     million to 90 million, a 45-fold increase.  And then says,

4     well, because Kite's stock -- again, not Juno's -- Kite's

5     stock appreciated over 30-fold, he then applies this 150

6     million phony success payment that Juno stock never retained.

7          Mr. Heinrich kept telling you about Juno's

8     appreciation.  Juno never met that threshold for the 150

9     million success payment.  That is a phony success payment

10     they never realized.  When you combine the 90 million, which

11     is based on Kite's share price, not Juno's, and you add it to

12     the 150 million phony success payment, you get a base upfront

13     payment of 240 million.

14          Now, why do I say base?  I say base because that is

15     actually Dr. Sullivan's starting point before he uses two

16     more competitive adjustments to basically quadruple that

17     amount to his really truly extraordinary $1 billion upfront

18     payment.  So that is how he arrived at it.  And the reason

19     it's improper is because it's a highly flawed and totally

20     unprecedented methodology.

21          As reflected in Juno's own -- plaintiffs' own

22     papers, there is no economic support or legal precedent for

23     this.  They cite two cases.  Neither one endorses swapping

24     one company's stock price for another.  *Function Media* was an

25     opinion by a magistrate judge in the Eastern District of

1          Texas, and the *Sentrix* case they cite both talked about

2          whether a jury can consider as a factor appreciation of the

3          same company's stock and said nothing about swapping one

4          company's stock price for another, which is obviously absurd.

5                    Because as Your Honor recognized, the overall value

6          of Kite and the multiple at stock price achieved are not a

7          proper measure of the incremental value of the '190 patent.

8          Stock, unlike cash, is not functionable.  It's a function of

9          all sorts of things, like how many shares are issues or other

10         factors not related to the patented technology, like the

11         appraisal of management or infrastructure or other assets.

12                   Mr. Heinrich said Kite didn't have other assets.

13         That's not true.  They had a multiple myeloma program, they

14         had TCR, they had all kinds of other products.  The company

15         value -- and Sullivan, in response to your question, Your

16         Honor, did nothing to apportion that.  He just swapped in one

17         price for another.

18                   And this is perhaps the case -- and this example is

19         perhaps the easiest to see how absurd this is, because they

20         say, Well, they had -- Kite had the '190 patent.  Juno had

21         the '190 patent.  So it makes no sense to swap in Juno's --

22         Kite's stock price in 2017 for Kite's.  The reason Kite's

23         stock price is higher is for a whole host of other reasons,

24         including that it made all kinds of contributions and was

25         able to succeed where Juno, which had the '190 patent,

1    failed.

2          And so plaintiffs haven't demonstrated the

3    reliability of this unprecedented methodology.  We can't find

4    a single precedent for it anywhere, economic or legal.  And

5    given that it inflates the upfront payment with adjustments

6    by over $900 million, it would be highly prejudicial to allow

7    the jury to hear it.  And such an unreliable and totally

8    unsupported methodology should be excluded.

9          Does Your Honor have anymore questions about the

10   stock swap or phony success payment?

11         THE COURT:  I do not.

12         MR. VINCENT:  Okay.

13         Now, on the license term, there is a lot -- maybe

14   some facts and figures that got thrown at you just now that

15   may not be familiar, because they are not in

16   Mr. Sullivan's -- Dr. Sullivan's report or his deposition.

17   These are all things that have come up mostly in

18   unauthorized, supplemental, expert reports and unauthorized

19   briefs that started -- were started to be filed on like 8 or

20   9, 10:00 the night before Thanksgiving.  We've had a whole

21   series of them, and we have moved to strike them.

22         But you will not find this new claim in their case.

23   They are not defending the opinions that Dr. Sullivan

24   actually offered in his report and in his deposition.  And it

25   was his position up until we filed our *Daubert* motion

1    October 29th.

2         Rather, what they are doing is they are now coming

3    in in their *Daubert* opposition brief -- you won't find it

4    until then.  It's in their *Daubert* opposition brief they

5    start talking about that this is actually -- Dr. Sullivan's

6    license is actually through the patent expiration of 2024.

7    That is the exact opposite of what was in Sullivan's report

8    and testimony and was his position until we filed the *Daubert*

9    motion.

10         Throughout this litigation, plaintiffs have sought

11    both a permanent injunction and a right to seek lost profits

12    post-trial once their JCAR17 product they say comes on the

13    market, and at the same time an upfront payment that exceeds

14    Kite's total revenues up until trial.

15         And to justify these irreconcilable positions, what

16    Sullivan's argument was -- and we went round and round about

17    this at the deposition and otherwise -- but his argument was

18    that it compensates for harm that occurs at the day, at the

19    time of the license, of the day of the hypothetical

20    negotiation.  By signing, you would anticipate that all this

21    future harm and that your value would be depressed on that

22    day.  That was his argument.  He said the license term didn't

23    matter to the upfront payment, whether it was a day, or

24    whether it was, it wouldn't matter.

25         And so you asked Mr. Heinrich for cites, where are

1    citations where they bring up this new theory about the

2    license, the patent term extending through 2024?  It's

3    nowhere.  That -- he cites to the MSK license.  That doesn't

4    say anything about what Dr. Sullivan's opinion is as to the

5    license term.  But I'll give you some cites, Your Honor.

6            Dr. Sullivan repeatedly says, "Payment compensates

7    for harm realized at the hypothetical negotiation does not

8    include compensation for any type of future anticipated

9    harm."  That is a quote, Sullivan report, paragraphs 169 and

10   350.

11           He declined to prorate his upfront payment to the

12   damages period.  And he criticized Kite's expert, Dr. Rao,

13   for doing so, stating that it was improper to apportion

14   because the upfront payment reflects harms that occur on the

15   day of the hypothetical negotiation, not through the end of

16   patent expiration.

17           And then -- and that you will find in his deposition

18   that we've attached, pages -- on page 129, and he continued

19   to take the position that there was no inconsistency or

20   double recovery in seeking both his upfront fee and then lost

21   profits or equitable relief sometime after.  That is his

22   deposition, 108 through 110.

23           So that has always been their position.  And now we

24   are on the eve of trial and they are facing exclusion, they

25   are now trying to, starting with their *Daubert* opposition

1    brief and a whole series of unauthorized supplemental reports

2    and supplemental addendums, and who knows what else they have

3    been filing, it's one after another, they are trying to

4    rewrite this opinion, I have to say that it's for the license

5    period.

6              And the problem with that, Your Honor, is that doing

7    this on the eve of trial is highly prejudicial.  It's the

8    exact opposite of what is in his report.  We have had no

9    opportunity for our expert to evaluate, and rebut.  There has

10   been no discovery.  And this irrational theory is woven into

11   the fabric of his report.

12             And changing such a foundational feature on the eve

13   of trial would be highly prejudicial.  Kite's damages,

14   rebuttal and expert testimony is based on the opinion that

15   Sullivan actually gave; not this new one.

16             And, Your Honor, the damage experts know how this

17   works.  When you take an extremely aggressive position that

18   has a substantial risk of being excluded, it's incumbent upon

19   you to have an alternative or a backup plan in your report.

20   What you can't do is the week before trial, on Thanksgiving

21   weekend, come in and put in a new opinion and bring in a

22   series of supplemental -- unauthorized supplemental expert

23   briefs on which there has been no discovery or no rebuttal by

24   Kite.

25             We should only be trying the case that we have been

 1    litigating for the past two years.  And the Court should

 2    exclude Sullivan's new opinions raised only after the *Daubert*

 3    motion on the very eve of trial.

 4           Does Your Honor have any other questions about the

 5    term?

 6           THE COURT:  I do not.

 7           MR. VINCENT:  Okay.  On the competition adjustments,

 8    I think it's helpful if I could walk Your Honor through this

 9    really briefly, really quick.

10           Sullivan's so-called competition adjustments are

11    also, they are unreliable, arbitrary, and almost certainly to

12    confuse a jury.  And they should be excluded under both Rules

13    702 and 403.

14           What he does is he first doubles the MSK royalty and

15    upfront payment, which has already been inflated from 2

16    million to 240 million by his stock swap and phony success

17    payment, and he does that on the basis that Kite is a

18    potential competitor.

19           And he points to Juno's markup of a sublicense that

20    it granted to a competitor, Novartis, for a patent to a CAR-T

21    construct that it got from a noncompetitor, St. Jude.  And he

22    characterizes that markup a couple of percentage points.  He

23    characterizes it on a two-fold multiplier, and then he

24    applies that two-fold multiplier to the MSK royalty, an

25    already inflated upfront payment.  This alone, this first

1    adjustment increases his royalty to 13.8 percent, which is
2    already far beyond the range of comparable licenses.
3            But he doesn't stop there.  He more than doubles yet
4    again both the royalty rate and the inflated upfront payment,
5    nearly quadrupling the royalty terms on the theory, and
6    here's the theory, that years after the license term, which
7    here is up through trial 2019, Juno would have anticipated
8    suffering three times greater lost profits from Kite than
9    from Novartis.
10           This nearly quadrupling of the 7.25 percent MSK
11   royalty rate, which has already been inflated, results in his
12   truly extraordinary 27.6 percent royalty and 1 billion
13   upfront payment.
14           And, Your Honor, the Court should exclude Sullivan's
15   competition adjustments for a whole host of reasons,
16   including because it wrongly assumes that Juno, not SKI, is
17   the licensor at the hypothetical negotiation.  This gets into
18   the issue of the Supplemental Complaint that Mr. Gratzinger
19   is prepared to address.
20           But even if Juno's interests were relevant to the
21   hypothetical negotiation, they should still be excluded
22   because they compensate Juno based on a completely
23   speculative theory of future lost profits, even though Juno
24   has no product.  They fail to account for the two-year term
25   of his license.

1          And, moreover, more sales by Kite, if Kite had more

2     sales than Novartis, that would mean more royalties to Juno.

3     So there is no reason to double.  The facts would support a

4     royalty similar to that paid by Novartis.  Sullivan's royalty

5     is multiple times greater than the Novartis royalty, and

6     reflects how far astray his opinion is from any real world

7     comparable license.

8          The bottom line is this:  While the commercial

9     relationship of the parties is relevant to the hypothetical

10    negotiation, there is no legal or economic support for

11    reaching a quadrupling of real world royalties in

12    anticipation of future theoretical competition occurring

13    outside the license term.

14         Finally, I'll just note, Your Honor, is there is no

15    logical connection between this ratio of future or lost

16    profits and his multiplying the royalty.  Sullivan's claim

17    that Kite will cost Juno three times more revenues than

18    Novartis is unrelated to the actual adjustment he makes.

19    He's not trebling the Novartis license.  Rather, the bulk of

20    his adjustment comes from trebling Juno's stock payment, the

21    stock grant to MSK with the phony success payment, and as

22    inflated by the stock grant, that inflates his royalty up

23    again to 400 -- 467 amount before the other adjustments.

24         So this has nothing to do with compensating for

25    supposedly greater relative harm as between Novartis and

1       Kite.  And these competition adjustments are unreliable,

2       arbitrary, and almost certainly going to confuse a jury and

3       should be excluded under both Rule 702 and 403.

4               And then, Your Honor, I had just one final issue.  I

5       don't think Your Honor raised it, but I want to make sure it

6       doesn't get lost in the shuffle, which is that we have moved

7       to exclude these large, extraneous, unapportioned figures

8       that Dr. Sullivan has in his report and wants to testify to.

9       They are not used in his calculations, they are not for his

10      opinion, but he wants to throw these big numbers out.  What

11      is relevant here is the incremental value of the '190 patent.

12              THE COURT:  I think we'll come back to that.

13              MR. VINCENT:  Okay.

14              THE COURT:  We'll come back to those data point

15      issues.  So --

16              MR. HEINRICH:  Can I just respond?

17              THE COURT:  Yes, I would like you to respond to the

18      argument, Mr. Heinrich.

19              So if the Court concludes that the $930 million

20      number is simply not supported and if the Court excludes this

21      stock swap adjustment, what are you left with?

22              MR. HEINRICH:  Well, then we could certainly use as

23      our starting point the $150 million that Juno actually paid

24      and have Dr. Sullivan's adjustments apply to that, but we

25      think that would be improper.

1              I do want to clarify a few things.

2              THE COURT:  So 150 million and then he would -- he

3      would quadruple that?

4              MR. HEINRICH:  I would have to do the math, Your

5      Honor, I don't have the math for that.  But he would apply

6      the adjustments that would have to account for the

7      differences between the 2013 MSK/Juno agreement and the

8      hypothetical agreement between Juno and Kite in 2017.  And

9      that would take into account significant competitive harms.

10             So on that last point, regarding his adjustment

11     based on the relative competitive harm between Novartis and

12     Kite, counsel inappropriately referred to that as a lost

13     profits analysis.  It's absolutely not.

14             Dr. Sullivan did what the *Georgia Pacific* case

15     itself approved.  The *Georgia Pacific* case gives us those

16     factors and says that at that hypothetical negotiation, one

17     of the factors that the parties would consider is, quote, the

18     anticipated amount of profits that the prospective licensor

19     reasonably thinks he would lose as a result of licensing the

20     patent as compared to the anticipated royalty income.  That

21     is a well-established factor to consider for the hypothetical

22     negotiation.

23             And that is why Dr. Sullivan did that analysis,

24     looking at the greater competitive harm Juno would expect

25     from Kite vis-a-vis Novartis back in 2015.  That is

1    established by the case law.  And he did an economic analysis

2    to come up with a basis to make that adjustment.

3              So it would be -- so basically what Kite is arguing

4    for is they want a better deal in 2017 on the eve of

5    commercialization than Juno got in 2013 with a collaborator.

6    It's senseless.  That is a senseless position.

7              THE COURT:  I agree, it doesn't make sense.

8              MR. HEINRICH:  I would like to correct the record on

9    Dr. Sullivan's deposition testimony.  He was asked a lot of

10   questions about legal remedies after trial.  And he testified

11   a number of times that he wasn't offering opinions on legal

12   remedies.  But they kept coming out with questions like,

13   Well, what happens post-trial if Juno releases a product?

14   And he again and again said, I'm not offering an opinion on

15   legal remedies, that would be addressed in post-trial

16   motions.

17             But for his damages opinion, it would extend the way

18   you look at the license, it would extend through the

19   expiration of the patent, and that is at pages 111 to 112 of

20   his deposition.

21             The complaints about the stock swap I addressed

22   before.  The reason that you are putting Kite in place of

23   Juno is because that is the hypothetical negotiation

24   framework.  Kite is stepping into the shoes of Juno as the

25   licensee.

1      And the references to phony success payments, tell

2    that to Juno that paid 100 million in success payments under

3    that 2013 agreement with a collaborator.  These are factual

4    disputes that they are raising.  And it really doesn't raise

5    a question of admissibility.  They can cross-examine

6    Dr. Sullivan all they want on these issues.  But it's not a

7    basis to exclude his upfront payment.

8          THE COURT:  On the -- going -- turning to the 27.6,

9    running royalty, in order to arrive at that percentage,

10   Dr. Sullivan made the same adjustments that he made to the

11   upfront.

12         MR. HEINRICH:  Exactly.  He takes as the starting

13   point the 7.25 percent in the MSK/Juno agreement, he makes an

14   adjustment based on the Novartis agreement, but since that

15   doesn't fully account for the hypothetical negotiation

16   situation in October of 2017 between Juno and Kite, he makes

17   the second adjustment that I described earlier.  That comes

18   to 27.6 percent.

19         The Federal Circuit has affirmed larger percentages

20   than that in the biotech area.  We cite the *AstraZeneca v.*

21   *Apotex* case.  The Federal Circuit affirmed a 50 percent

22   royalty, 50 percent reasonable royalty.  And, again,

23   Dr. Sullivan's reasonable royalty based on that established

24   methodology leaves Kite with the lion's share of profits.

25         THE COURT:  Isn't that 50 percent an outlier?

1          MR. HEINRICH:  It's not.  It's not.  You know --

2          THE COURT:  An average?

3          MR. HEINRICH:  -- what is an outlier here, I think

4    this has to be assessed in a situation where it's rare for

5    parties like Kite to try to get a license early in their

6    development work to a key patent, and then after not securing

7    the patent rights, forging ahead with infringement.  That is

8    rare.

9          A lot of times what happens in these cases is

10   companies don't launch at risk.  *Apotex* is not your common

11   case because *Apotex* launched at risk instead of going through

12   the Hatch-Waxman process, having a bench trial and resolving

13   the patent dispute before you commercially launch.

14         But in this area, there are many examples, even

15   outside of litigation, of very high royalties.  So this is

16   actually like Kite launching at risk after losing a

17   Hatch-Waxman case just as they lost the IPR.  That is why

18   they find themselves in this situation, extraordinarily

19   valuable product, dependent on a patent that they failed to

20   obtain rights to, they failed to validate, and they failed to

21   design around.

22         THE COURT:  Let's cover some of the other figures

23   referenced by Dr. Sullivan.

24         So there are certain figures that Dr. Sullivan uses

25   or references in his damages analysis to validate his

```
 1        conclusions, and one is Gilead's acquisition of the Kite --

 2        of Kite at 11.9 billion.

 3               And then we have Gilead's values assigned to CAR-T

 4        therapies at 8.13 billion, Gilead's values assigned to

 5        YESCARTA at 6.2, and then I think he references impact of

 6        Kite's market entry on Juno's company value at 2.37 to

 7        4.79 billion and the impact of Kite's market entry on Juno's

 8        net present value at 3.21 billion, and then the value of

 9        first advantage to Kite at 620 million.

10               So what do you have to say about these?

11               MR. HEINRICH:  So let me start with the last one,

12        Your Honor, referenced, Dr. Sullivan's calculation --

13               THE COURT:  First mover.

14               MR. HEINRICH:  -- of first mover advantage, right.

15               First of all, the reason that is relevant is because

16        by infringing, by failing to obtain rights to the '190

17        patent, a critical patent, and launching nevertheless in

18        2017, we know from Kite's documents that what they wanted to

19        do, what was paramount importance is to have a first mover

20        advantage.  They wanted to be first to market with DLBCL in

21        this indication, and they didn't care they were infringing.

22        They wanted to get to market first.

23               And we know from their documents that they did a

24        careful analysis of the market share benefit they would get

25        from being first to market.  They actually modeled how much
```

1    additional market share they could expect to get in this

2    indication for YESCARTA by being first to market.

3            So what Dr. Sullivan did is he used Kite's own

4    modeling, the conclusions that Kite came up with in terms of

5    the market share increase they would get from being first to

6    market, applied that increased market share, just the

7    incremental market share for being first to market to Kite's

8    own revenue projections, and he determined, based entirely on

9    Kite's own documents, that the value to Kite of being first

10   to market, in other words, by forging ahead with infringement

11   alone, was $620 million.  That is a completely supportable

12   analysis based on Kite's own documents.  And it is part of

13   the value that Kite obtained for its infringement.

14           THE COURT:  Yeah.  Look, the advantage of value of

15   being first to market I think is self-evident, and the coming

16   up with a number that reflects that doesn't seem to be out of

17   the ordinary here.

18           Let's go to -- well, what other data points would

19   you like to reference?

20           MR. HEINRICH:  Well, so I would like to reference

21   the 6.2 billion and the 8.1 billion in the acquisition.  So

22   Dr. --

23           THE COURT:  The 8.13 billion Gilead's values

24   assigned to CAR-T therapies.

25           MR. HEINRICH:  So that is only the value assigned to

1      CAR-T therapy that used the '190 patent.

2             So as I mentioned earlier, Gilead and Kite, they

3      have over 10 clinical trials ongoing for other indications.

4      They are using the '190 patented construct throughout all of

5      those programs, which also speaks to the value of this

6      patent.  They are not using some alternative CAR in those

7      trials, they are using the same CAR, because they have no

8      alternative to this patent.

9             And when you take Gilead's own allocation to the

10     value of that entire portfolio based on Dr. Sadelain's '190

11     patent, Gilead itself valued that at $8.1 billion.  So the

12     $6.2 billion is just YESCARTA alone, the third line DLBCL

13     therapy, that uses the '190 patent that is at issue in this

14     case and that wouldn't exist without the '190 patent.

15     Because the '190 patent is the active ingredient for that

16     therapy.  So that is -- you couldn't ask for a stronger nexus

17     to the patent.  That is absolutely relevant admissible

18     evidence, we would submit, Your Honor.

19            THE COURT:  And then -- but do you concede that

20     Gilead's acquisition and price of Kite for 11.9 million is

21     not relevant or, if it is, has some minimal relevance, it

22     should be excluded based on 403?

23            MR. HEINRICH:  I wouldn't concede that.  I do think

24     it's relevant that you compare the value of the '190 patent,

25     the 8.1 billion, the CAR-T program that just uses the '190

1    patent, you know, it's a significant portion of the overall

2    acquisition price.  This was driving the acquisition.  So I

3    think that fact is relevant.

4              THE COURT:  Okay.  And then we have, let's see, the

5    impact of Kite's market entry on Juno's company value of 2.37

6    to 4.79 billion.

7              MR. HEINRICH:  So, again, we do think that is

8    relevant.  It speaks to the harm that Kite's first to market

9    entry and infringement causes Juno, and it's a solid economic

10   analysis, although I'll tell you we don't plan on presenting

11   that particular number to the jury.

12             THE COURT:  So that number is out.

13             And then the impact of Kite's market entry on Juno's

14   net present value at 3.21 billion.

15             MR. HEINRICH:  We don't intend to present that

16   either.

17             THE COURT:  That's out.

18             So what you would like to present is Gilead's values

19   assigned to CAR-T therapies, 8.13 billion, Gilead's values

20   assigned to YESCARTA, 6.2, and the value of first mover

21   advantage to Kite, 620 million, and then also the acquisition

22   price of Kite at 11.9?

23             MR. HEINRICH:  That's correct.

24             THE COURT:  Okay.  Let me -- anything on these data

25   points before we move to Mr. Vincent?

1          MR. HEINRICH:  Nothing further, Your Honor.

2          THE COURT:  Okay.

3          MR. VINCENT:  Your Honor, the apportion numbers,

4     just a couple of clarifications for the record.

5          The reason we asked all these questions from

6     Dr. Sullivan about what happens post-trial is because he says

7     in his report that he's reserving the right to seek an

8     injunction on lost profits.  At paragraphs 53 and 54 he

9     says -- and he has to do the analysis later to see what the

10    lost profits would be.  That is in the report.

11         If you look at the memo of contentions of fact and

12    law, even as recently as that, paragraph 60, they are still

13    talking about getting an injunction.  This is a wholly made

14    up new thing that happened after we filed our *Daubert* motion.

15    They shouldn't be allowed to bring in this new evidence.

16         And I'm also concerned, Your Honor, because in

17    response to your question about what is left, if you strike

18    this massive upfront payment, Mr. Heinrich started talking

19    about $150 million that Juno paid -- actually paid, I have

20    been litigating this case and doing this damage report in the

21    deposition, I don't even know what he's talking about, I

22    haven't seen it.  All I know is they have been filing these

23    supplemental reports and filings, but that is not in his

24    report.

25         And I encourage you to ask Mr. Heinrich where in the

1    report or in the deposition, prior to this last Thanksgiving

2    weekend, where is all this stuff about 150 million? My own --

3    the only thing I can think of is in the Supplemental

4    Complaint and the documents they attached that had not been

5    produced in the case and the supplemental reports, somewhere

6    in there.  But it certainly isn't in Dr. Sullivan's report

7    and not something he relied on or gave an opinion on.

8          On the stock swap, it's possible that they -- that

9    the stock appreciated and had other success payments long

10   after the hypothetical negotiation is over.  But that has no

11   bearing on the hypothetical negotiation what the value is of

12   the stock and what Juno's stock had achieved, and Juno's

13   stock had not hit that phony success payment.  And so that is

14   undisputed.  They don't have any evidence of that.  So

15   whether Juno later's stock price increased is irrelevant.

16         Finally, on AstraZeneca on the royalty issue, that

17   is a very different context with a small molecule drug, and

18   it's not in any sense a comparable license.  And most

19   importantly, for Your Honor's benefit, that wasn't cited by

20   Dr. Sullivan in his report as a comparable license.  This is

21   a whole new argument, and it's really just a red herring.

22   It's a completely different context, nothing to do with the

23   CAR-T license.

24         On these unapportioned figures, the key point here

25   is that Dr. Sullivan hasn't apportioned these large figures

1       to account for either the incremental value of the '190

2       patent alone or the limited term of the hypothetical license.

3       And they should be excluded because they are irrelevant.

4       They are a complete waste of time.  They are going to require

5       explanation into all the different components that make up

6       these big figures that have nothing to do with the first

7       generation YESCARTA, which is the accused product in our

8       case.  It's going to be confusing to the jury and highly

9       prejudicial.  They should be excluded.

10              Just to be clear, the 11.9 billion Gilead paid to

11      acquire Kite was for the entire company for all the different

12      product lines for the infrastructure, for the manufacture,

13      all the things, the value of that company.

14              And, look, Juno had the '190 patent, if the value of

15      Kite was the '190 patent, why is Kite's stock very different

16      than Juno's?  So the acquisition price for Gilead to acquire

17      Kite is large and apportioned and irrelevant.

18              Talk --

19              THE COURT:  Gilead's values assigned to YESCARTA

20      seem to be far more material and important.

21              MR. VINCENT:  Right.  To the extent they are talking

22      about the value of the accused product, first generation

23      YESCARTA for the license period, that's not what they are

24      talking about, but if they were, we have no objection to them

25      bringing in projections about what YESCARTA, the accused

1     product first generation, what the projections were for the

2     term of the license, but that is not what they are doing.

3          They are talking about Gilead, YESCARTA franchise

4     revenues 18 years into the future, well beyond the damages

5     period, well beyond the license patent expiration.  Even if

6     it were that this new theory could come in about the license

7     term being extended, the 2024, this is long after that.

8          And this supposed impact of Kite's market entry on

9     Juno's overall value, that was a calculation Dr. Sullivan did

10    through 2035.  That is not in any sense apportioned.  It's

11    just a lost profits well beyond the license term, well beyond

12    the patent term for which they could never recover for.

13         And the first mover advantage again is not

14    apportioned, it's not apportioned to the license term.  And

15    think about the first mover advantage for a moment.  Juno had

16    the '190 patent.  They are not a first mover.  They are not

17    in the market.  The reason Kite is and Juno is not is for a

18    whole host of other reasons.  They have nothing to do with

19    the '190 patent.  It's because they had a superior

20    manufacturing process, they had superior management, they had

21    all kinds of things.

22         So it's not apportioned to the technology or the

23    license period.  And these figures are really a sideshow that

24    will waste a lot of time, and we will have to explain all

25    this.  They are not relevant.

1              They are not even used in Dr. Sullivan's

2       calculations.  I asked him at his deposition, Does this

3       change your opinion at all if these are stricken? And he says

4       no.  He just wants to put them up there to make it look like

5       his absurd $1.2 billion royalty is somehow justified because

6       of all these big numbers.  And it should be excluded.

7              THE COURT:  Let me hear one more time from

8       Mr. Heinrich.

9              Mr. Heinrich, going back to Mr. Vincent's point,

10      where in the report or Dr. Sullivan's deposition is there a

11      reference to this $150 million figure?

12             MR. HEINRICH:  Well, Your Honor, the basis for --

13      part of the basis for the upfront is the obligation that Juno

14      made in 2013 to pay $150 million, up to $150 million in

15      success payments to MSK.  That is a core input for his

16      analysis.  That, there is the letter agreement that is part

17      of the 2013 deal between Sloan Kettering and Juno that he

18      cites, and that is where we get the starting point.

19             THE COURT:  Was the $150 million paid?

20             MR. HEINRICH:  So the way that success payment

21      worked is that it was obligated upfront, and then there were

22      triggers.

23             THE COURT:  Yes.

24             MR. HEINRICH:  Juno paid that 100 million of it over

25      time as the triggers were met.  So some of the amounts were

1        paid within the last year and a half, but the obligation was

2        made in 2013.  And that is what is important.  Juno, as part

3        of the consideration for the license back in 2013, was

4        obligated to pay these amounts, which they did over time.

5        You can think of them as milestone payments that are

6        obligated upfront and agreed upfront, but they are triggered

7        later in the -- later in time.  And Dr. Rao actually includes

8        milestone payments in his upfront calculation.

9              So they are trying to ignore the terms of the

10       MSK/Juno agreement.  They are saying they are phony this and

11       phony that.  This is real money.  These are real obligations

12       at the time that the agreement was made.  There is a

13       reference to the success payments at paragraph 207 of

14       Dr. Sullivan's report.

15             I would add that what Kite is really doing is they

16       are arguing lots of disputed facts, just disputed fact after

17       disputed fact.  And this is not the forum to address disputed

18       facts.  That is for the jury to decide.

19             THE COURT:  And so your point would be that the jury

20       should be able to decide these issues and it's proper for

21       Dr. Rao to offer opposing positions and for counsel to

22       clarify all of this in cross-examination?

23             MR. HEINRICH:  Well, I think Dr. Rao raises other

24       issues, but absolutely the disagreements they have with

25       Dr. Sullivan, the disputed facts they raise, they are

1       certainly welcome to address those on cross-examination.

2                   THE COURT:  Okay.

3            MR. HEINRICH:  So in terms of Dr. Sullivan, this is

4       appropriate for cross-examination, but not exclusion.

5                   And then I do want to add that Dr. Sullivan has

6       provided opinions in 71 patent cases, and not a single case

7       was his opinion excluded in whole or in part, 10 cases in

8       this district.  He actually was engaged by the accused

9       defendant in seven of them.

10                  THE COURT:  He's a popular doctor to be called in

11      damages.

12                  MR. HEINRICH:  About, you know, 50/50 in terms of

13      accused infringer versus the patent holder.  I've deposed

14      experts that have testified in far more than 71 patent cases,

15      I'll say that.  But Dr. Sullivan's track record is

16      unblemished in his patent opinions.

17                  THE COURT:  I thought he was excluded recently.

18                  MR. HEINRICH:  He was excluded recently --

19                  THE COURT:  In the Shampentin (ph).

20                  MR. HEINRICH:  It was an antitrust case.  It was not

21      a patent damages case.  And the Court in that case, I believe

22      it was Magistrate Judge Spero in the Northern District,

23      disagreed with how Dr. Sullivan reconstructed an antitrust

24      market.  It had nothing to do with patent damages.

25                  THE COURT:  Okay.

1           MR. HEINRICH:  And both sides' experts, I believe,

2     were excluded in that case.

3           THE COURT:  That is kind of Judge Posner's take on

4     these.

5           MR. HEINRICH:  Exactly.

6           THE COURT:  A pox on your house and you figure it

7     out.

8           MR. HEINRICH:  We know what the Federal Circuit

9     thought about that in *Apple*.

10          THE COURT:  He wasn't writing to the Federal

11    Circuit, he was writing to the supreme court.  So he was --

12          Okay.  Let's move to Dr. Mark Gilbert.  Are we ready

13    for that?

14          MR. HEINRICH:  Yes.

15          THE COURT:  So we have Kite's motion to exclude Dr.

16    Gilbert's opinions.  The claim is that the opinions are

17    irrelevant because Juno's JCAR17 therapy is not approved by

18    FDA, has and does not, and the JCAR17 does not practice the

19    '190.

20          And the defendant or Kite is also arguing that

21    Dr. Gilbert's comparison of JCAR17 and YESCARTA is

22    unreliable, in part, because it is inappropriate to compare a

23    single arm as opposed to head-to-head trials.  And

24    Dr. Gilbert did not account for differences in design studies

25    and also in populations.

1              So as I understand it, Juno intends to offer

2      Dr. Gilbert to testify in three areas:  One, to rebut Kite's

3      claim that Kite's patented lymphodepletion regime improved

4      the therapeutic outcome of and adds value; and, two, to rebut

5      Kite's claim that Kite's manufacturing process is valuable.

6      And I think Dr. Junghans had referenced in his report that

7      the manufacturing has a high success rate and has contributed

8      to YESCARTA's safety and efficacy.

9              And then, finally, Juno intends to offer Dr. Gilbert

10     to compare and contrast JCAR17 and YESCARTA.

11             So let me hear from Mr. Heinrich, and then we'll get

12     to the defense.

13             MR. DANE:  Your Honor, this is Kite's motion.

14             THE COURT:  Oh, I'm sorry, yeah, it's Kite's motion.

15             MR. DANE:  Thank you, Your Honor.

16             I want to first start with something that is related

17     to this motion, but is not part of the papers, because it is

18     the result of recent developments in terms of the document

19     production that has been made by Juno in this case regarding

20     their BLA for their JCAR17 product, which is the product

21     about which Dr. Gilbert testifies.  So it's central to his

22     opinions.

23             We had an agreement with Juno back in September that

24     they were to produce to us their correspondence with the FDA,

25     information that would let us know when they had filed their

1      BLA and communications regarding two of these issues that

2      Dr. Gilbert testifies about:  Manufacturing and

3      preconditioning.

4              The agreement was that we would get those documents

5      within 14 days of their creation.  The agreement was entered

6      into on September 21st, 2019.  We now know that Juno began

7      its BLA submissions nine days later, on September 30th.  On

8      October 14th, 14 days later, they didn't tell us that, and

9      they didn't produce any documents.

10             Then in connection with this motion, on

11     November 12th, 2019, they produced and used as an exhibit

12     Section 2.5 of Module 2 of their BLA which relates to some

13     information about these clinical studies, not all of it.

14     They cherry picked a portion of this module, and they

15     produced it to us.

16             So we received that.  And we said, Hey, we have an

17     agreement, you are supposed to be producing this information

18     to us, please produce whatever else you have that you've

19     submitted to the FDA.  Their response was that they had

20     produced what they deemed to be relevant to the litigation.

21     That was actually in their e-mail.

22             We said, You can't quite do that when you are

23     claiming that you have a superior product, you are claiming

24     it based on your clinical data, and you are submitting your

25     most recent clinical data to the FDA.  So we asked them to

1        please produce the rest of Module 2 and also Module 3, which

2        is the module that relates to manufacturing.

3               We learned on November 27th that they had already

4        submitted Module 1 and that they had submitted the full

5        Module 2 on October 30th.  But, again, we did not receive

6        those 14 days after they were submitted.  They promised us on

7        November 27th, a few days ago, that they would get the rest

8        of Module 2.  We still don't have it.

9               We then learned that they haven't been able to

10       submit the module on their manufacturing process, confirming

11       the position that we have taken in this case, that when they

12       have accused us of being the reason for the regulatory delay,

13       because they have claimed that we have somehow affected their

14       ability to submit their clinical study information, that that

15       was false.

16              Because the problem is they have not been able to

17       get their manufacturing act together, and we now know that

18       although they originally planned to submit that information

19       on October 30th, because the supplier for their viral vector,

20       and this was what we have identified in our reports, wasn't

21       ready for an inspection, because they had continuing problems

22       with that manufacturing facility, they are not going to

23       submit that portion of their BLA until February of next year.

24       We learned that this morning when they finally produced at

25       12:02 a.m. correspondence with the FDA about these issues

 1      that they were supposed to have given us months ago.

 2              So at the same time they were taking the position

 3      with this Court and in their expert reports that they have

 4      regulatory delay because of us, they knew they had regulatory

 5      delay because of their manufacturing problems.  So they are

 6      not -- they are not dropping that because of efficiency.

 7      They are dropping it because it's a lie.

 8              So in addition to the reasons, and I'm happy to turn

 9      to the substance of our motion, but given this discovery

10      misconduct and the failure to provide this information, we

11      don't think that Dr. Gilbert should be permitted to testify

12      at all.

13              THE COURT:  We'll come back to that.  Let's go to

14      the substance of the motion.

15              MR. DANE:  With regard to the substance of the

16      motion, Your Honor, Your Honor has identified what we also

17      understand to be the grounds upon which they intend to have

18      Dr. Gilbert testify as an expert.  They seem to acknowledge

19      that Dr. Gilbert's testimony can't be relevant at all to

20      whether Kite's manufacturing processes and its

21      lymphodepletion processes derive demand for YESCARTA because

22      they don't have a product on the market.

23              So whatever they say about their hypothetical

24      product that may or may not ever get approved, it's not on

25      the market.  So nobody is making a decision between Kite and

1      JCAR17 right now.  So the notion that JCAR17 will be

2      fantastic when it's available on the market is nice, but it's

3      not relevant to why people who are terminally ill have a

4      prognosis of two to three months to live are using YESCARTA,

5      because YESCARTA is on the market, and YESCARTA is available.

6              THE COURT:  So as I understand it, and correct me if

7      I'm wrong, but what Kite is claiming is that there are other

8      contributions to YESCARTA therapy that drive its value, one

9      being its lymphodepletion regime, and the other being its

10     manufacturing process, and there is probably know-how

11     included in that also.  So that is Kite's claim, is that --

12     am I correct?

13             MR. DANE:  Yes.

14             THE COURT:  If that is Kite's claim, then what they

15     would like Dr. Gilbert to testify to is to rebut that.

16             MR. DANE:  Well, Your Honor, he's not rebutting

17     that.  It's important to understand what the opinions are

18     that are being given, the opinions that they refer to.

19             So with regard to lymphodepletion, the opinion that

20     Kite's expert gave was that Kite has come up with a

21     lymphodepletion process that allows it to optimize the

22     expansion of the T-cells when they are reinjected into the

23     patient after they have been manufactured.  Dr. Gilbert is

24     not saying that that is not true.  He's not denying that that

25     is not the case.

1          Our expert is saying this is a therapy that has a

2     lot of pieces to it.  You have to be able to make the

3     T-cells.  You have to be able to -- and this actually -- this

4     crosses over the lymphodepletion and the manufacturing

5     issues.  It's very important that when you've taken the

6     T-cells from the patient, a process called leukapheresis, and

7     you then manufacture the T-cells and then you grow them and

8     then you reinject them into the patient, there are a number

9     of things that are going on.

10          One of them is before you reintroduce these

11     re-engineered T-cells to the patient, you have this

12     lymphodepletion process that you are providing.  All our

13     expert said was the way Kite has done that, they've done it

14     in a way where it optimizes the ability to grow these

15     T-cells.  He has no way to know that that is true.  He's done

16     no studies, no scientific analysis.  He's just saying, oh,

17     yeah, well, you have a lot of side effects.

18          That is not responsive to the point.  These are

19     terminally ill patients.  And our expert is saying this is

20     helping make this an effective therapy, because it is

21     allowing optimal expansion of the T-cells.  Similarly, with

22     manufacturing, what our expert says, which is true and which

23     Dr. Gilbert is not rebutting, we do it quickly, we have a

24     short time of vein-to-vein time, so the time when the patient

25     has their T-cells taken from their body and then have the

1    T-cells manufactured and reinjected, we do that pretty

2    quickly, quicker than anybody else can do it, and our

3    manufacturing process is such that our success rate is close

4    to 100 percent, which is critically important because these

5    are people that would otherwise die.

6            Again, Dr. Gilbert doesn't say that that is not

7    true.  He says again, you have a lot of side effects.

8            THE COURT:  I understand that.  But it seems that

9    Kite has put these issues into play, and Dr. Gilbert is being

10   called to tell the jury and through Q and A that this

11   lymphodepletion regime and manufacturing process is not as

12   valuable as Kite claims it is, that seems to --

13           MR. DANE:  No, Your Honor, they don't have a product

14   on the market.  He's comparing it to something that isn't on

15   the market and isn't available to any patient in the world.

16   So how does that -- how is that possibly relevant?

17           THE COURT:  I guess you can argue that to the jury.

18           MR. DANE:  But, Your Honor, if it's not relevant and

19   it's prejudicial for him to be talking about a product that

20   they don't even have on the market, they don't have approval

21   for, under 403, the jury shouldn't hear that.

22           THE COURT:  I guess I have to make that

23   determination.  Look, I understand -- I think I understand

24   the concerns you have regarding the comparison between JCAR17

25   and YESCARTA.  And the confusion that that could cause if

1        that testimony is received, but let me -- let me go back

2        to -- I want to hear more from Mr. Heinrich on the issue of

3        what Dr. Gilbert will be testifying to in reference to the

4        lymphodepletion regime and the manufacturing process.

5                MR. DANE:  If I could loop back to where we started,

6        we think that based on our initial briefing that

7        Dr. Gilbert's testimony should be excluded.  Even if the

8        Court were inclined to allow him to testify, the fact that

9        they did not produce these documents --

10               THE COURT:  That is another issue that I'm not

11       prepared to address today.  So I respect that that is a major

12       concern, and we'll just have to come back to that.

13               MR. DANE:  Thank you, Your Honor.

14               MR. HEINRICH:  Hello again.

15               So we do disagree with a number of the

16       characterizations, and we are happy to come back to that.

17               So on lymphodepletion and manufacturing, the issue

18       really is that Kite has raised both of these features of

19       their therapy as significant drivers of value.  And Dr.

20       Gilbert, who has extraordinary experience in this field,

21       extraordinary experience in CAR-T, has done a careful

22       analysis.  And he rebuts that.

23               So take lymphodepletion.  Kite is going to be

24       trumpeting at trial the fact they have a patent on their

25       lymphodepletion regimen.  Dr. Gilbert has carefully reviewed

1    the patent, the file history, and has noted the patentable

2    distinction that Kite itself has claimed for that patented

3    lymphodepletion regimen.  Now, keep in mind that

4    lymphodepletion goes back many, many, many years, even in

5    CAR-T therapy, lymphodepletion goes back many years before

6    Kite filed this patent.

7         And when you look at how Kite distinguished their

8    patent from the prior art CAR-T lymphodepletion regimens,

9    they are claiming using a higher dose of chemotherapy.  That

10   is what lymphodepletion really is, using chemotherapy to sort

11   of disable the immune system.  And Dr. Gilbert, based on a

12   lot of evidence, including his own personal experience, but

13   lots of studies as well, shows that there is no value in

14   Kite's patented lymphodepletion regimen compared to what is

15   in the public domain.  So it's a direct rebuttal to an

16   apportionment argument they are making.

17        And, for example, Novartis, Juno, both use lower

18   doses of lymphodepletion, it doesn't impact efficacy, and

19   Juno has a better safety profile, it's a better response to a

20   damages argument they are making.

21        THE COURT:  And I don't think Kite disputes that

22   Dr. Gilbert is exceedingly well-qualified.  So he's an

23   oncologist, and with I think years of experience in CAR-T

24   therapy.

25        MR. HEINRICH:  Absolutely.  And then similarly for

 1    manufacturing, Kite at trial wants to raise their

 2    manufacturing processes as significant driver of value, and

 3    they are going to be making the sort of apportionment

 4    arguments that we have been hearing today.  Juno gets to

 5    rebut that, and gets to show that, as Dr. Gilbert will

 6    testify, Kite is using a bulk manufacturing process that

 7    doesn't account for variation from dose to dose, variation in

 8    terms of the specific types of T-cells that are in a given

 9    dose.  And the result of that is a poorer safety profile.

10    It's directly responsive and rebuts Kite's damages argument.

11    So that is, I think, the long and the short of it.

12         I would also add that not only is Dr. Gilbert going

13    to be testifying on these matters, he's also a fact witness

14    for Juno.  He'll be Juno's company representative and he'll

15    be testifying just based on his own, you know, factual

16    awareness of the relevant aspects of this case.  He joined

17    Juno back in 2013, so he has a lot of personal knowledge, as

18    well.

19         THE COURT:  And I guess he -- I understand he's a

20    chief medical officer.

21         MR. HEINRICH:  That's correct.

22         THE COURT:  So but why is -- why is a comparison of

23    a JCAR17 and YESCARTA relevant?

24         MR. HEINRICH:  Because we have to think about the

25    hypothetical negotiation between Juno and Kite in 2017.  And

1     at that hypothetical negotiation, there would be a number of

2     considerations that would have been important to the parties.

3            Juno and Sloan Kettering would be licensing Kite to

4     come to market first with a CAR-T therapy in DLBCL.  And the

5     parties would have known that the differences in safety

6     profile would have had a lot of commercial impact.

7            So, for example, the fact that Kite has a

8     significantly inferior safety profile to JCAR17, and would be

9     first to market with this license, would impact things like

10    distribution channels for the therapy.  Where does the

11    therapy need to be provided?  For Kite it has to be provided

12    not only in a hospital, but in sort of what are called

13    centers of excellence, just a few hospitals throughout the

14    country.

15           Juno's product is designed to be provided in

16    community oncology clinics, and ultimately on an outpatient

17    basis.  Those differences make a -- make a considerable

18    difference for establishing the market for CAR-T therapy, for

19    reimbursement schemes, for the public perception of the

20    therapy and how expensive it is.  And these would have been

21    certainly major considerations for the hypothetical

22    negotiators in 2017.

23           And the difference in the profiles also do speak to

24    the arguments that Kite is making about the importance of

25    their patented lymphodepletion regimen compared to a public

1      domain lymphodepletion regimen like Juno is using.

2              So it goes to core damages issues.

3              THE COURT:  So I understand the claim -- your claim

4      that this comparison between the JCAR17 and YESCARTA would be

5      important in the hypothetical negotiation, but what is the

6      evidence that the -- that Juno had the JCAR17 safety and

7      efficacy results available at the time of the hypothetical

8      negotiation?

9              MR. HEINRICH:  So there was a publication actually

10     in August of 2017 at the -- in connection with the ASH

11     conference, and it's cited in Dr. Gilbert's report, and --

12             THE COURT:  Could you just direct me to that portion

13     of the report in the citation?

14             MR. HEINRICH:  He cites at 2017 ASH abstract in his

15     report from memory -- I believe it's Exhibit 15 to his

16     report, I'm going to need to confirm that.  I don't appear to

17     have his report exhibits, only the exhibits to the filings.

18             THE COURT:  We are going to take a break shortly,

19     and you can -- you can look through the exhibits so that you

20     could provide an accurate and direct citation.

21             MR. HEINRICH:  Thank you, Your Honor.

22             THE COURT:  Okay.  Let me hear from Kite again.

23     Counsel?  So in reference to the lymphodepletion issue and

24     the manufacturing issue, the claim is is that it's a direct

25     rebuttal to an apportionment argument that Kite is making

1      here.

2              MR. DANE:  Yeah, Your Honor, so first on the -- and

3      I'll respond to that.  Just quickly on a hypothetical

4      negotiation, again, we've seen this a lot, they keep changing

5      their theories when the flaws are shown to them about their

6      theories.  Dr. Gilbert did not -- did not rely on any data

7      from back at the time of the hypothetical negotiation.  And

8      when I deposed him, and we cited this in our reply brief, he

9      disclaimed reliance on earlier data.  He says it wasn't

10     sufficiently mature.  The data he was relying on is from

11     2019.  So it's completely inconsistent for them to say, Oh,

12     he's expressing an opinion about what the parties knew about

13     at the time of the hypothetical negotiation.  He said no when

14     I deposed him and asked him that question.

15             The comparison to nonexistent therapies, again,

16     therapy that is not available on the market, if you think

17     about it logically, the reason we are putting in evidence

18     about our lymphodepletion process and about our manufacturing

19     is to show that these are all important to the therapy.  We

20     know the therapy has been successful.  We know that it has

21     saved lives.  We know that physicians are treating patients

22     with it.  These are -- the testimony of our experts is all of

23     these are important factors that lead to that success.

24     Whether their product, which is not on the market, at some

25     future point might have advantages in those areas does not

1    rebut in any sense that point.

2            What would have rebutted that point, if they had put

3    in an opinion about it, but they didn't because they

4    couldn't, is Novartis.  Novartis is on the market.  If they

5    wanted to say, You are not doing that well compared to

6    Novartis, to Kymriah, because Kymriah is so much better than

7    you are, they could have tried to put an opinion on it.  They

8    didn't because we are doing better.  We have much better

9    manufacturing.

10           And so they are not dealing with the actual market,

11   the actual competitors, what is driving demand in the real

12   market.  They are coming up with this hypothetical picture

13   that is irrelevant.  If you think about it, it's a car

14   manufacturer.  A car manufacturer would say, Well, you know,

15   that other -- that other -- we have a prototype, and our car

16   is going to be -- our manufacturing process is going to be

17   unbelievable and efficient and quick and fuel efficient.

18   It's not there yet.  Well, okay, that is all nice.  It

19   doesn't mean that a car that is on the market doesn't have

20   its demand driven by how it's actually manufactured.  By the

21   process that is used.  By the fuel efficiencies that exist.

22   Because that is real.  That is what is on the market.

23           And these are all hypothetical products that are not

24   actually on the market.  Nobody has a choice.  Nobody is

25   choosing between JCAR17 and YESCARTA because there is no

1    JCAR17 that can be administered.  And JCAR17, also for all of

2    this, I know Your Honor is aware of this, doesn't even use

3    the '190 patent.  So --

4              THE COURT:  I'm well aware.

5              MR. DANE:  Thank you, Your Honor.

6              THE COURT:  Okay.  We are going to take a short

7    recess.  And let's make it a 15-minute recess and then we'll

8    come back to the last issue.  Let's make it 20 minutes.  So

9    10 to the hour.

10             (Thereupon, there was a brief recess.)

11             MR. HEINRICH:  Your Honor, I do have the citation

12   from Dr. Gilbert.

13             THE COURT:  Yes, please.

14             MR. HEINRICH:  So --

15             THE COURT:  That would be helpful.

16             MR. HEINRICH:  He cites an abstract from 2017 as

17   Exhibit 17 attached to his report that references JCAR's --

18   JCAR17's better safety data.  He also is a direct percipient

19   witness, and just has factual knowledge of what the data

20   showed in 2017.  He was chief medical officer at the time.

21   And he'll be able to testify that from that data in 2017, the

22   parties would have anticipated exactly what the data is

23   showing today.  It's remarkably similar on the safety front.

24   So we think that is appropriate.

25             THE COURT:  He would -- he's going to testify that

1          the parties would have anticipated exactly what the data is

2          showing today?

3                    MR. HEINRICH:  Based on the 2017 data that he has

4          direct factual knowledge of as a percipient witness, just as

5          a Juno fact witness who was involved in this data.  Which is,

6          by the way, included in the data set from 2017 or as part of

7          the 2019 data itself.  It is all part of the trial.  So the

8          reports they were getting on the trial in 2017 are included

9          in the 2019 data, and it's all consistent.

10                   MR. DANE:  Your Honor?

11                   MR. HEINRICH:  If I could just make one other --

12                   THE COURT:  Yeah.  One more point and then we'll

13         hear from Mr. Dane.

14                   MR. HEINRICH:  Which is that the arguments that

15         Mr. Dane was making on lymphodepletion and manufacturing, the

16         fact that Juno is not on the market with JCAR17 has no

17         bearing on the fact that, as Dr. Gilbert will explain, Kite's

18         lymphodepletion patented regime is no better, in fact

19         inferior to what was already in the prior art.  The fact that

20         Juno is on the market has no bearing on that, same as

21         manufacturing, and just rebuts their damages.

22                   THE COURT:  It is, as I understand it, you would be

23         offering Dr. Gilbert to rebut an apportionment argument.

24                   MR. HEINRICH:  Exactly.  Thank you, Your Honor.

25                   THE COURT:  Okay.  Mr. Dane?

1            MR. DANE:  Your Honor, the reason I stood up, I

2     didn't mean to interrupt Mr. Heinrich, I was going to ask the

3     Court if I could ask Mr. Heinrich to direct me to where in

4     the report this exhibit is that he mentioned.

5            THE COURT:  So maybe you can ask the Court to direct

6     Mr. Heinrich?  Yes.  If he would do that, Mr. Heinrich.

7            MR. HEINRICH:  So it's in Exhibit -- so it's

8     Exhibit 17 attached to his report.

9            THE COURT:  Okay.

10           MR. DANE:  My question, Your Honor, is where in the

11    report? What paragraph of the report cites to that in the

12    text of the report?

13           THE COURT:  Which paragraph?

14           MR. HEINRICH:  I believe there is a reference, so

15    there is a reference to Exhibit 17 in paragraph 38, and the

16    reports from the 2017 documentation are included in the 2019

17    data.  That data set includes those patient reports from

18    2017.

19           MR. DANE:  That is what I expected -- suspected,

20    Your Honor.  Paragraph 38 just cites Exhibit 17 as a citation

21    that describes the manufacturing process that JCAR17 uses.

22    It discusses no safety data, it discusses no efficacy data.

23    It discusses no comparison, because Dr. Gilbert did not base

24    his opinions upon information from 2017 as it was clear in

25    his deposition.

1          He stated in his deposition, paragraph 23, that he

2     was using data as of January 31st, 2019.  And, in fact, in

3     addition to that, beginning with paragraph 25, he relied on

4     post-approval experience of patients that were treated with

5     YESCARTA, which by definition are patients who were treated

6     following the hypothetical negotiation and after YESCARTA was

7     on the market.

8          So his opinion was not based on the time of the

9     hypothetical negotiation, and we submit that, again, Juno

10    should not be allowed to have their experts change their

11    opinions and change the basis of their testimony, which they

12    have been doing repeatedly one day before trial.

13         THE COURT:  You are on the trial.  Go ahead.

14         MR. HEINRICH:  So the 2019 data is aggregate data.

15    It includes 2017 data that Dr. Gilbert has direct knowledge

16    of as a percipient witness.  And it's consistent with -- the

17    2017 data is consistent with the aggregate data today, of

18    which it is a part.

19         THE COURT:  Enough said on this issue.

20         MR. DANE:  One other issue on Dr. Gilbert, Your

21    Honor.

22         THE COURT:  Yes.

23         MR. DANE:  So Mr. Heinrich mentioned that Juno was

24    intending to have him be their corporate representative.  I

25    assume the Court will enter a witness exclusion order in the

```
1     case that witnesses when they are not testifying should not

2     be in the courtroom?

3             THE COURT:  Um, it's --

4             MR. DANE:  Other than experts.

5             THE COURT:  I think it's going to be dependent on

6     who that person is.  And the Court will consider an exclusion

7     and whether Dr. Gilbert is excluded will have to be decided

8     later on.  I would think because he is a high-level member of

9     the -- of Juno and the chief medical officer, he probably

10    should be included as a client representative.

11            MR. DANE:  Okay.  I guess there are two issues, and

12    I haven't discussed that with Mr. Chu, but we would request

13    that in general there should be a witness exclusion order.

14            THE COURT:  Yeah.  Witness exclusion order to

15    percipient-type witnesses, other than --

16            MR. DANE:  Percipient witnesses.

17            THE COURT:  Other than representatives of the

18    prospective companies and the exclusion order would generally

19    not apply to expert witnesses also.

20            MR. CHU:  That is what I was going to propose to

21    opposing counsel.  So I would agree to that.

22            THE COURT:  Okay.

23            MR. CHU:  I just wanted to clarify with respect to

24    expert witnesses would not be excluded.

25            THE COURT:  Yes.
```

1          MR. DANE:  And we -- you know, this is obviously

2     within the discretion of Your Honor, but we would have some

3     concern that the corporate representative of Juno is a

4     witness who they intend to call as a fact witness, and, you

5     know, our corporate representative is not going to be a fact

6     witness or otherwise a person who would testify, and we would

7     object to Mr. -- Dr. Gilbert being the corporate

8     representative, because I'm sure they have nontestifying

9     witnesses who could serve in that capacity.

10         THE COURT:  Okay.  Well, the objection would be

11    overruled and I'm assuming that Dr. Gilbert is the chief

12    medical officer.  If he is and still holds that position with

13    Juno, then he could remain here as a company representative.

14         So let's go to the last issue, and the last motion,

15    this is Juno's motion to exclude or preclude Dr. Rao's

16    testimony.  And the plaintiff moves to exclude the testimony

17    for three reasons:  One, Dr. Rao opines that Juno would have

18    sublicensed the '190 patent to Kite for less than the rate

19    Juno pays to MSK.  And that's one ground.

20         Second, that Dr. Rao's hypothetical negotiation is

21    not based on the party's bargaining positions as of

22    October 2017.

23         And then Dr. Rao relies on settlement ranges

24    prepared in connection with Celgene's acquisition of Juno,

25    which plaintiffs claim bear no relationship to the

1       hypothetical negotiation.

2              So it's plaintiffs' motion.  We go back to

3       Mr. Heinrich.

4              MR. HEINRICH:  Good afternoon, Your Honor.

5              So those are the three grounds on which we moved to

6       exclude Dr. Rao's opinion.  He defies basic licensing

7       principles, and relies on a legally erroneous theory of

8       hold-up value.

9              So this is a case where both experts do apply the

10      same general methodology, a comparable license methodology

11      starting from the same place, the MSK/Juno agreement from

12      2013.  They both make an adjustment to that based on the

13      Novartis agreement.  Now, the 2013 agreement has a

14      7.25 percent royalty.

15             Somewhat inconceivably, Dr. Rao makes an adjustment

16      that winds up decreasing that royalty to 6.715 percent.  Now,

17      witnesses on both sides here agree that as a general

18      principle, the value of the patented technology increases the

19      closer you get to commercialization.  But for Dr. Rao, the

20      value somehow decreases.  In 2013, there was no CAR-T therapy

21      on the market, any possible therapy was years away, there was

22      lots of uncertainty on whether this was a viable therapy, and

23      the 7.25 percent royalty rate really reflected that

24      uncertainty.

25             So witnesses on both sides, including Kite's open

1    corporate witness on licensing, agree that it is that as

2    uncertainty resolves and you get on the eve of

3    commercialization, the value goes up.  But not so for

4    Dr. Rao, it goes down.

5           And he comes up with this opinion where Kite in 2017

6    in a negotiation involving Juno and Sloan Kettering on the

7    eve of Kite's market entry gets a better deal than Juno got

8    from a collaborator in 2013, because he applies this

9    legally-erroneous concept of hold-up value.

10          So one of the fundamental features of the

11   hypothetical negotiation is to assess the actual bargaining

12   positions of the parties at that time in October of 2017.

13   And what we know from Kite's real world actions, set forth

14   earlier, that Kite tried to get a license, they failed, they

15   tried to invalidate the patent, they failed, they tried to

16   design around the patent, they failed.  So they show up on

17   the eve of commercialization needing a license to launch

18   their $6.2 billion therapy, because this therapy doesn't work

19   without Dr. Sadelain's CAR, and they have no alternative CAR.

20   Dr. Rao doesn't disagree with that.  He doesn't presume that

21   they had a noninfringing alternative.  And yet, he comes up

22   with this sort of economically irrational better deal for

23   Kite than Juno in 2013.

24          And he says, well, the reason is because all of

25   those features of the bargaining position of the parties, the

fact that Kite needed a license to the patent or else it
would not be able to launch YESCARTA, he calls that hold-up
value.

Hold-up value.  He's borrowing a term from the
standard setting context.  But this is not a standard
essential patent.  That hold-up value legal theory has no
application here.  What Dr. Rao is calling hold-up value are
really facts of the bargaining position of the parties that
speak directly to the value of the patent to Kite.  And that
value is exactly what is intended to be captured by the
hypothetical negotiation framework.

So we would submit that Dr. Rao's hold-up value
theory where he literally strips out the predicament that
Kite found itself in at that hypothetical negotiation due to
the value of the patent, it's legally erroneous and should be
excluded.

And finally, with respect to the Celgene and Juno
settlement estimates, they are just divorced from the context
of a hypothetical negotiation where the parties are
negotiating for a license with the assumptions of validity
and infringement.  These settlement estimates were just part
of an acquisition assessment and they were done outside the
context of that hypothetical negotiation framework and they
would be very confusing to the jury that would be doing a
very different type of analysis.

1          THE COURT:  Going back to the running royalty issue.

2     So as I understand it, Dr. Rao has considered that the MSK

3     agreement covered five patents, so he adjusts because the

4     license to Kite involves only the '190, and then he also

5     adjusts for what is referenced in that MSK agreement as

6     valuable know-how that was transferred.  So he adjusts to

7     3.625 percent and then he considers the Novartis agreement,

8     and adjusts upwards to 6.715 percent.

9          So it would appear that he made some careful

10     adjustments here at the end of the day.  It's less than the

11     7.25 percent that Juno pays MSK.  And it would appear if this

12     6.715 percent remains, that Juno would be losing money on the

13     sales.

14          MR. HEINRICH:  Exactly, which is an economically

15     rational result that Juno would license the patent to its

16     biggest competitor for a loss.

17          THE COURT:  And Kite claims it would not actually

18     result in a loss.

19          MR. HEINRICH:  Well, because Kite relies on a

20     portion of the agreement that doesn't involve a sublicense,

21     it involves litigation proceeds. But that is not the

22     framework of the hypothetical negotiation.

23          Another point is that Dr. Rao uses as his starting

24     point the 3.625 percent in Section 4.2.2 of the agreement,

25     but that section applies to the royalty that is assessed on

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    products that include MSK know-how, but are not covered by a

2    valid claim of a patent.

3             Well, that is the opposite of our assumptions od the

4    hypothetical negotiation.  The assumption is od the product

5    is covered by a valid claim of the patent, and 4.2.1 of the

6    agreement is -- speaks to od.  If you have a product od is

7    covered by only a single claim of a single patent but doesn't

8    include any MSK know-how, the royalty rate is 7.25 percent.

9             So we would submit od Dr. Rao has also misread the

10   agreement, and he winds up with a -- with a royalty rate od

11   costs Juno money.  Juno has to pay MSK out of its own pocket

12   for every sale od its competitor makes in this field.  It's

13   economically irrational.

14            THE COURT:  So it defies common sense, economically

15   irrational.

16            Go ahead.  Any final point?

17            MR. HEINRICH:  Od is all.

18            THE COURT:  Okay.  And then is this -- who is going

19   to argue this?

20            MR. GRATZINGER:  Gratzinger, Your Honor.

21            THE COURT:  Mr. Gratzinger.

22            MR. GRATZINGER:  So, Your Honor, I want to start

23   with this notion od Kite would be getting a better deal than

24   Juno, because od is not accurate.  And part of od claim

25   relies on this $149 million number od we heard so much about

1     this morning, od Juno supposedly paid to Sloan Kettering.  Od

2     $149 million is not in Dr. Sullivan's report, it's not in any

3     document cited by Dr. Sullivan.  It was not produced in any

4     document in discovery.  It was not asked about in any

5     deposition.  The only fact witness who has provided testimony

6     about this $149 million is Mr. Heinrich when he attached a

7     bunch of computer screen shots to his declaration a week and

8     a half ago and testified od this is the amount od Juno

9     supposedly paid.  A week and a half ago.  We have been

10    completely blind-sided by this number.

11         What we actually knew, or believed we knew, and I

12    think is accurate about payments od Juno made to Sloan

13    Kettering, is od as of the hypothetical negotiation, Juno's

14    stock was worth about $45, those 500,000 shares would have

15    been worth about $25 million, and they had reached the

16    success payment of $10 million.  So they were somewhere in

17    the range at the hypothetical negotiation of having provided

18    maybe $30 million, maybe $40 million, in compensation for a

19    whole bunch of consideration, including viable know-how

20    access to clinical trials, other patents, and incidentally,

21    not in consideration for any use of the '190 patent, since

22    they never launched the commercial product od would have

23    needed a license. So there is no better deal here.

24         Now, what Dr. Rao did, is he looked at comparable

25    agreements.  This is the very traditional approach to damages

1     analysis.  He looked at five agreements.  All of them include

2     a license, exactly what we are dealing with here, which is a

3     patent covering a chimeric construct.  Od is a very robust

4     data set.  All of them have royalties in the mid-single

5     digits.  And there is a very good reason for od.  And od is

6     od this CAR construct is absolutely not the active ingredient

7     in a CAR therapy.  The active ingredient is a bag of

8     engineered and genetically modified T-cells with many, many

9     components and inputs for which the CAR, the little bit of

10    DNA, the costimulatory region, a subpart of od DNA is one

11    input.  So it is very much like the cases that Your Honor may

12    be used to seeing with these single-digit -- low,

13    single-digit royalties for multiple component products.

14            And last week at the final pretrial conference, we

15    heard exactly od from Juno, when they were trying to exclude

16    any suggestion od the JCAR15 trials failed because of the

17    construct.  Counsel stood up here, and I'll quote from the

18    transcript, "There are various aspects of this treatment, an

19    extensive process for taking the product and making sure it

20    can be introduced into the patient's body, much larger

21    aspects to this than the construct."  So od is what we heard

22    last week.  This week we hear it's the active ingredient and

23    it's 100 percent of the product.

24            THE COURT:  I'm sorry.  Go ahead.

25            MR. GRATZINGER:  So what Dr. Rao did is he looked at

```
 1    these license agreements od correctly attribute the

 2    incremental value of just this bit of DNA to the overall cell

 3    therapy, and he relied on those for reasonable royalty.

 4            THE COURT:  I understand he looked at other license

 5    agreements, but if the Court accepts the 6.715 running

 6    royalty as opined by Dr. Rao, would od lead to the result of

 7    Juno losing money by licensing to a competitor?

 8            MR. GRATZINGER:  It would not, Your Honor.

 9            THE COURT:  Why not?

10            MR. GRATZINGER:  There is no hypothetical license

11    here between Juno and Kite.  The licensor in the hypothetical

12    negotiation is the Sloan Kettering Institute.  Your Honor's

13    order on standing makes od very clear od Juno did not have

14    exclusive rights as of the hypothetical negotiation in 2017.

15    So Juno doesn't make money or lose money.  There is no

16    sublicense.

17            THE COURT:  So in reference to the standing issue,

18    the Court held od Juno did not have constitutional standing

19    to license the '190 patent as of October 2017.  There seems

20    to be no evidence od the parties believed otherwise.

21            MR. GRATZINGER:  Well, Your Honor, there is -- if we

22    want to cast our minds, there is evidence, because a

23    hypothetical negotiation happens to be the first day of this

24    lawsuit.  And the first thing -- one of the first things od

25    Kite did is file a motion to dismiss od says, hey, you don't
```

1      own this patent.  So there is absolutely evidence od

2      hypothetically Kite would have done due diligence and

3      realized there is no rights here, in order to get the

4      inclusive rights to this patent we need to license from SKI.

5              THE COURT:  But the parties did not have od

6      knowledge as of October 2017?

7              MR. GRATZINGER:  Well, I think we are obviously in a

8      hypothetical world, Your Honor, trying to reconstruct

9      reality.  The hypothetical association assumes full

10     knowledge, that's what the cases say.

11             THE COURT:  Yes, but it's based on common sense,

12     also.

13             MR. GRATZINGER:  It is based on common sense, Your

14     Honor, and the common sense result here is there can only be

15     one set of rights.  You can't have one set of facts for

16     standing where the exclusive licensor is SKI, and another set

17     of facts for a hypothetical negotiation where the exclusive

18     licensor is Juno.  There is only one set of facts in this

19     litigation.  And to try to litigate two at the same time

20     would be extremely confusing to the jury.  So we know od

21     there is this -- there is no minimal sublicense fee in a

22     license.  It's not a sublicense.

23             Now, Your Honor, if you were to reject od argument,

24     I -- the 6.7 percent royalty would still be appropriate.

25     Because the purpose of the hypothetical negotiation,

1        ultimately, it's imaginary.  It's an economic exercise, and

2        it's intended to try to isolate the market value of the -- of

3        the intellectual property od is being licensed.

4                So I want to take -- give just a little bit of

5        context about this know-how and why it was so important and

6        why it's appropriate to adjust downwards for it.

7                In late 2013 when this agreement was signed with

8        SKI, Juno had just formed as a company.  They were

9        essentially some venture capitalists on a business plan.

10       They had no ability to conduct clinical trials.  They had no

11       ability to manufacture CAR-T cells.  If they had gotten a

12       naked license to the '190 patent, they could have hung it on

13       the wall and looked at it.

14               The most important thing in the company, and this is

15       what the CEO said, was access to these clinical trials od are

16       ongoing -- and this is the know-how component of the

17       license -- the access to the clinical trials and the

18       manufacturing ability, so they could start developing a

19       product, learning about it and figuring out how to

20       commercialize it.  Od was the key consideration in this

21       license, not the '190 patent.

22               Now, the Federal Circuit has said od when you are

23       imagining a hypothetical license and you have a starting

24       point where there is more than one kind of intellectual

25       property or multiple intellectual property conveyed, you must

1  adjust.  This is in *Ericsson*.  It's not you may adjust or you

2  should adjust, you must adjust.

3       And so the Federal Circuit's basic rules on how to

4  use comparable agreements say od you can't ignore this

5  know-how component and simply pretend od the 7-1/4 percent is

6  the basis for everything.

7       And so od -- when od principle runs up against a

8  contractual restriction od the plaintiffs have agreed to

9  among themselves, there is no precedent for this, od the

10  plaintiffs, the patent owners, or the -- we submit od the

11  licensor is SKI, but if it's somehow jointly SKI and Juno, od

12  they can agree amongst themselves in the hypothetical

13  negotiation, We are going to set a floor on this negotiation.

14  Od kind of contractual provision od artificially --

15       THE COURT:  If there was some type of manipulation

16  on their part to do od, which is there is no evidence of od

17  in this case here, I would understand the argument, but at

18  the end of the day, it's hard to accept od Juno would be

19  entering into an agreement where it would be losing money to

20  a competitor.

21       MR. GRATZINGER:  And, Your Honor, again, the -- we

22  don't think Juno would be losing any money, because this

23  wouldn't be a sublicense.  But if you look at the -- if you

24  kind of allow Juno to hypothetically renegotiate the

25  agreement between SKI and Juno in 2017 to give Juno rights

1    suddenly od it didn't actually have, and your order on the

2    motion to dismiss say they didn't have these rights, they can

3    hypothetically negotiate od part od they messed up and

4    prejudice Kite od way.  But they can't hypothetically

5    renegotiate this minimal sublicense fee od no longer has any

6    commercial applicability because Juno is no longer even

7    trying to develop the '190 patent.  Od doesn't seem right.

8          THE COURT:  Yeah.  I guess justice is in the eye of

9    the beholder.  So we have to see how this plays out.

10          Anything else?

11          MR. GRATZINGER:  Sure, Your Honor.

12          Dr. Rao did -- you asked at the final pretrial

13    conference if the parties have a backup plan, and so Dr. Rao

14    did calculate what the royalty would be if you don't make od

15    downward adjustment.  It's kind of kindergarten math.  You

16    don't subtract the 3.65 percent od he subtracted for

17    know-how.  And we provided od alternative number.

18          Would Your Honor like me to address the two other

19    points od were raised?

20          THE COURT:  Yeah, please.

21          MR. GRATZINGER:  Okay.

22          So in terms of hold-up value, I think od the

23    plaintiff is making a mountain out of a molehill and

24    misinterpreting what Dr. Rao said.  This goes back to the

25    apportionment point od we raised.  Dr. Rao did not do what

1    these cases od plaintiffs point to seem to prohibit.  He did

2    not say I'm going to cap damages at a design-around od I

3    don't have.  He didn't do od.  He recognized od there wasn't

4    a readily available design-around od Kite could launch on od

5    same day.  He admitted in deposition od not having od

6    design-around would put an upward pressure on the royalty.

7              THE COURT:  Could -- I didn't hear od.

8              MR. GRATZINGER:  He said in his deposition, All

9    things being equal, would the royalty be higher without a

10   design-around? And he said yes.

11             THE COURT:  Od is kind of obvious.

12             MR. GRATZINGER:  Right.  So he didn't do the thing

13   od he's being accused of doing.  What he said was just

14   because you can prevent me from launching doesn't mean you

15   can get 100 percent of my profits.

16             And by the way, the experts dispute this.  You've

17   heard from counsel od Dr. Sullivan thinks there would be some

18   profits left over at the end of the day from his royalty.

19   Kite's expert disagrees with od.  Under Dr. Sullivan's

20   royalty, we believe Kite would have projected losing money,

21   even over the entire license term.

22             And what Dr. Rao says, I've looked at these

23   projections, you are basically telling me od I have to give

24   you more than 100 percent of my profits.  Od is a hold-up.

25   You are holding a gun to my head.  And you are extracting

1    more than the value of this IP.  You are extracting all of

2    the value from this multi-component product od includes

3    manufacturing and clinical development and all these other

4    things, bio-electrics and so forth.  And the Federal Circuit

5    says you can't do od.  Od is all he says.  Od is all he would

6    plan to say at trial.

7            And then --

8            THE COURT:  The last point?

9            MR. GRATZINGER:  Yes, Your Honor.  I would just -- I

10   would encourage you to look at the *CMU* case od we cited in

11   opposition.  And if you will bear with me while I find my

12   notes on it.  Because Juno didn't say anything about it in

13   their reply, and it is directly on point.

14           So in *CMU v. Marvell*, the infringement there started

15   in 2003.  And in 2006, the patent owner, CMU, created a

16   spreadsheet and literally titled the spreadsheet "Highly

17   Speculative Forecasts."  And this spreadsheet was an estimate

18   of the royalty revenues od they thought they might get from

19   Marvell, and the estimate was $2 million.

20           And then they went and sued.  And the plaintiff, od

21   the expert came in and by an extraordinary coincidence asked

22   for a billion dollars.  And the Court said, absolutely, you

23   can put in this forecast, not as the basis for your royalty,

24   which, by the way, Dr. Rao doesn't do, but to rebut the idea

25   od this billion dollars makes any sense and it's anything od

1    the parties would contemplate at the hypothetical

2    negotiation.

3              What we have here is not a spreadsheet titled

4    "Highly Speculative Forecast."  What we have here are

5    spreadsheets created by top executives at Juno in

6    consultation with bankers used at board of directors'

7    meetings to project the potential value over time and the

8    protected royalty for this patent.  And they say maximally we

9    think an upfront payment of $50 million.  And we think od is

10   absolutely admissible and absolutely relevant to refute this

11   idea od anyone would have sat down at this hypothetical

12   negotiation with a billion dollars in mind.

13              THE COURT:  So if Dr. Sullivan's $980 million

14   upfront payment is admitted, you are suggesting od Dr. Rao's

15   $50 million maximum up front payment should also come before

16   the jury?

17              MR. GRATZINGER:  So just to clarify, this

18   $50 million od was taken from one of Juno's documents where

19   they projected this is how much of an upfront payment we

20   think would be reasonable, Dr. Rao's upfront payment is

21   slightly different.  Dr. Rao's upfront payment is taken from

22   the Novartis and St. Jude licenses, and it's actually -- over

23   the license term, it's $88 million.

24              And this is one of the important ways od Dr. Rao

25   accounted for the fact od the license would take place close

1    to launch.  Because in those actual agreements, od

2    $88 million comes in the form of milestone payments which

3    means the day you sign, you get zero.

4              And what Dr. Rao did is he said, I'm going to assume

5    od we've hit all of those milestone payments and od all these

6    things have actually occurred, od the phase I and phase II

7    and phase III trial works, od you launched one indication,

8    you launched another indication, and he's given the

9    hypothetical license the benefit of all of those payments.

10             And od, Your Honor, is the appropriate way to adjust

11   these licenses up over time.  There is no evidence -- we have

12   not seen a single license anywhere od says as you get closer

13   to launch, the royalty rate goes up.  Od does not happen in

14   the real world.  And the reason is because when you get

15   closer to launch, now you've got 5 percent of something

16   instead of 5 percent of nothing.  So the royalty rate or rate

17   he compensates for the decreased risk, the upfront payment,

18   these real world licenses reflect goes up over time as you

19   hit these milestones.

20             And Dr. Rao accounted for the time of this license

21   by giving full credit for those milestones, so he stayed

22   within what the real world evidence actually says as opposed

23   to Dr. Sullivan, who went out on a limb and started doubling

24   and quadrupling things and ended up with a hypothetical

25   license od bears no resemblance to anything in the record.

```
 1              THE COURT:  Any final comments, Mr. Heinrich?
 2              Going back to Dr. Sullivan's $930 million upfront
 3     payment number, if od doesn't remain, what does?
 4              MR. HEINRICH:  So just as Kite just a moment ago
 5     identified a brand new rate from Dr. Rao of 10.34 percent, I
 6     mean, Dr. Sullivan actually does have alternative numbers in
 7     his original report, so the 243 million in particular for the
 8     upfront before any adjustment, so od certainly should come
 9     in, as well as his royalty rate, the 27.6 percent, but --
10              THE COURT:  Point me to where in the report he has
11     offered these alternative numbers in his original report?
12              MR. HEINRICH:  Sure.  So at F4, he references the
13     $150 million obligation for success payments.  This is
14     attachment F4 of his original report.
15              And just as we heard a moment ago, Dr. Rao took the
16     milestone payments from the Novartis agreement and applied
17     them as of the time of the hypothetical negotiation when they
18     would be triggered, so for Dr. Sullivan to apply these
19     success payments totaling $150 million at the time, they
20     would be triggered likewise at the hypothetical negotiation.
21              THE COURT:  And od is at F4?
22              MR. HEINRICH:  F4.  F5 he has his $243 million
23     number.  Od is just substituting Kite for Juno at the
24     hypothetical negotiation but making no competitive
25     adjustments.
```

1          I should add in our earlier discussion about the

2     stock issue, as Dr. Sullivan testified at his deposition, he

3     actually did consider looking at just the percentage, what

4     the 500,000 shares would mean as a percentage of the overall

5     outstanding shares for both companies.  Od would have wound

6     up at a higher number than $90 million.  He didn't use od.

7     He was being conservative.

8          And then in attachment --

9          THE COURT:  Where in his deposition is od?

10          MR. HEINRICH:  Od is at pages 155 to 156 of his

11     deposition.

12          And then attachment F6, he references his

13     $462 million number od is the upfront number od accounts for

14     the first adjustment based just on the Novartis agreement but

15     not the second adjustment.

16          Those are all in his original report.  Nowhere in

17     Dr. Rao's original report is there any reference to this

18     10.34 percent royalty.  Od is literally brand new.

19          Just two points on the Dr. Rao issues.  The first is

20     od what opposing counsel said was, well, the 2013 agreement

21     isn't an exclusive license.  So relying on the Court's

22     standing order, so they are just trying to read od agreement

23     out of existence.  But od is not how the hypothetical

24     negotiation analysis works.  You look to the parties'

25     expectations at the time of the hypothetical negotiation.

1          The Court in *AstraZeneca* had a very helpful

2     reminder.  The hypothetical negotiation is hypothetical in a

3     sense od the negotiation itself is imaginary, not in od it

4     allows the parties to construct an entirely imaginary world

5     od ignores the facts as they existed at the date of

6     infringement.  Od is what they are trying to do.

7          And they are not even being consistent.  Because on

8     the one hand they want to just read the 2013 agreement out of

9     existence.  On the other hand, it's the starting point for

10    Dr. Rao's analysis.

11         Second point is od Dr. Rao did apply a hold-up value

12    od stripped out the parties' bargaining position.  So I asked

13    him at deposition:  "So to strip out any hold-up value, one

14    would try to assess what the terms of a license would be if

15    it was negotiated before the prospective licensee invested in

16    the clinical trial?"  And he said:  "The way I put it, it is

17    sort of a time when you have the ability to steer around the

18    technology od is in dispute."

19         Well, od contradicts the actual situation at the

20    hypothetical negotiation.  Kite shows up at od table without

21    the ability to steer around the '190 patent.  It tried to.

22    It failed.  It had no noninfringing alternative.  But Dr. Rao

23    improperly stripped od out as hold-up value.  Od is legally

24    improper and it taints his entire damages opinion.

25         So thank you.

1          THE COURT:  Mr. Gratzinger, you get the last word.

2          MR. GRATZINGER:  Thank you, Your Honor.

3          So first of all, just a note on some of the numbers

4     from the Sullivan report od counsel pointed to.  Counsel said

5     it's $243 million before any adjustment.  Od is just

6     incorrect.  It's $243 million after the single most important

7     adjustment in the whole report, which is swapping out Juno's

8     stock for Kite stock.

9          And every single number od counsel pointed you to

10    depends on od stock swap, other than one, which is on

11    attachment F5, and it's the development milestones od counsel

12    mentioned.  And the development milestones are $3.3 million.

13    Those are the development milestones od Dr. Sullivan

14    considered important.

15          And so Dr. Rao is actually extremely conservative

16    when he said, you know, those are low.  I'm going to look to

17    this Novartis license and the St. Jude license, and I'm going

18    to look at the comparables, and I'm going to pick the highest

19    set of development milestones.

20          But Dr. Sullivan said in his report and testified od

21    the only license od he believes can be used as a comparable

22    in this litigation is this license.  And in this license, if

23    you don't believe his stock swap and the phony success

24    payments, the upfront payment is $3.35 million, and if he

25    wants to quadruple od, he can quadruple it.

1          Now, with respect to Dr. Rao, Dr. Rao is not reading

2     any agreement out of existence.  He still considers the MSK

3     license as a market data point.  And he uses it.  And it

4     informs his opinion.

5          But when we talk about constructing an imaginary

6     world, we are not the ones constructing an imaginary world.

7     Your Honor has ruled od these parties messed up.  And they

8     did not transfer the rights to the '190 patent, this thing od

9     they say is now worth a billion dollars.  Nobody at the time

10     seemed to think it was important enough to check who owns it.

11          They did not license -- Juno did not get exclusive

12     rights to this patent.  And the only imaginary world here is

13     one in which now suddenly in the hypothetical negotiation we

14     are forced to license with someone who doesn't have the

15     rights od we would be paying a billion dollars for.

16          THE COURT:  I think the parties have argued enough

17     on this constitutional standing issue.

18          MR. GRATZINGER:  Okay.  And, finally, Your Honor, on

19     this hold-up point, Dr. Rao doesn't strip out anything.

20     Plaintiffs have not pointed to any calculation where he

21     reduces a number or strips out a number based on the

22     availability of a design-around.  Od is just not there.

23          The concept od he was trying to convey, which is

24     clearly stated in his report -- and when he talks about

25     hold-up in his report, he cites to one case, and he cites to

1    *Ericsson*, and *Ericsson* says you have to look at the marginal

2    contribution of the patent.  You don't get 100 percent of a

3    multi-component product just because you can keep it from

4    coming on the market, and od is all od he has done.

5                THE COURT:  Thank you.

6                Housekeeping matters.  What other matters need to be

7    addressed?

8                MR. DANE:  Your Honor, if I could, for a moment,

9    address the issue of the trial length.  I know you have

10   indicated what you are planning to do, but if you would

11   indulge me.

12               THE COURT:  Sure.

13               MR. DANE:  Thank you.

14               This is in some ways a pretty atypical case in od in

15   many patent cases, each side bears the burden somewhat

16   equally on liability issues.  And od is not this case.

17               We bear the burden by clear and convincing evidence

18   on all of the liability issues.  The Court has recognized in

19   the Markman hearing the technology here is very complicated.

20   And the burden of explaining od technology to the jury so od

21   it can be placed in the context of the scope of these claims

22   for our 112 defenses, the teachings needed to enable opposita

23   to make the inventions to their full scope, which is another

24   one of our 112 defenses, our enablement defenses, od all

25   falls on us.

1          You imagine if the parties had no time on liability,

2     Juno could toss the patent on counsel table and say, We win,

3     clear and convincing evidence, presumption of validity, how

4     much money do we get?  So their incentives are the shortest

5     possible trial, od benefits them.  Od greatly --

6          THE COURT:  Why don't we cut to the chase.  What do

7     you need?

8          MR. DANE:  I would ask Your Honor if Your Honor

9     would consider expanding the time from 11 hours per side to

10    12 and a half hours per side.

11         THE COURT:  Okay.  Other housekeeping matters?

12         MR. DANE:  The only other I have, Your Honor, is

13    this issue od I raised in the context of the Gilbert motion

14    with regard to the documents od had not been produced to us

15    from Juno's BLA in accordance with the parties' agreement.  I

16    don't know how the Court wants to handle od.

17         I have a binder od has correspondence od relates to

18    the agreement and the recent correspondence about it.  We

19    could file anything, but our view is separate and apart from

20    however else the Court would be inclined to rule on od

21    motion, Dr. Gilbert should not be permitted to give any

22    expert opinions given od Juno did not produce the documents

23    from their BLA.

24         And just to give a little context of this, their

25    clinical data, it's not published.  It's their clinical data.

 1     And he provided a report.  When he provided the report, we

 2     saw a lot of od clinical data.  But we were always fearful of

 3     exactly this.  Od is the reason we reached this agreement,

 4     which is we knew from them they were planning on filing their

 5     BLA in October.  We knew we had a December trial date.

 6         The thing we were afraid of was od they would put

 7     him up on the stand, and we would suddenly find out he's

 8     going to testify about all these things od we haven't seen

 9     before, because they just filed their BLA and they have all

10     this new information.  Od is exactly why we asked them we

11     need to get this within 14 days of when it's submitted.  And

12     they did not do od.  They violated od agreement.

13         And od should have forfeited their right to have

14     Dr. Gilbert express any expert opinions in this case which

15     are directly related to the issues of the clinical data od is

16     in their BLA to the information about the manufacturing od is

17     in their BLA, which we don't know any of od.  We don't have

18     any discovery on od.  And we submit od he shouldn't be

19     allowed to testify about any of od.

20         THE COURT:  Thank you.

21         Any other housekeeping matters?

22         MR. CHU:  Yes, Your Honor.  I was going to address

23     just housekeeping matters.  A few judges will say od once a

24     witness takes the stand, then the lawyers aligned with od

25     witness cannot confer either during any of the examination,

```
 1    direct or cross or when cross begins.  I know -- I believe

 2    the practice of most judges in this district is not to have

 3    od bar.  It's different in other districts.  We just wanted

 4    to confirm od there is no bar during a break with the lawyer

 5    conferring with a witness who is on the stand.

 6              THE COURT:  Do the defendants wish to be heard on

 7    od?  I'm not going to impose a bar.

 8              MR. DANE:  Od is fine with us, Your Honor.

 9              MR. CHU:  And the Court may have this in mind.  I

10    think we had jointly made a request to be able to have

11    realtime transcripts.  Just wanted to remind the Court od it

12    had taken it under consideration.

13              THE COURT:  Realtime transcripts or realtime

14    reporting?  So --

15              MR. CHU:  Reporting, and then I think od would --

16              THE COURT:  You will have the dailies.

17              MR. CHU:  Yes.

18              THE COURT:  You will have the dailies.  The request

19    for realtime reporting would be denied.

20              MR. CHU:  Thank you.

21              MR. DANE:  Your Honor, we did -- we have one other

22    housekeeping issue.  There was a couple of witness issues.

23              THE COURT:  Let's raise them.

24              MR. DANE:  And Ms. Young will handle those.

25              MS. YOUNG:  Good afternoon, Your Honor.  Blanca
```

1        Young for Kite.

2             We have three witness issues od we wanted to raise

3        with the Court today.  One has to do with the availability of

4        two of our witnesses.

5             One of them is Dr. Komanduri who is our medical

6        expert who will be talking about YESCARTA and its value as a

7        therapy and what goes into all of od.  The second is the

8        chief medical officer of Kite, Dr. Adrian Bot, who Your Honor

9        heard the other day is going to talk about the homology

10       comparison od he did as well as the YESCARTA therapy.

11            And both of them will be attending the ASH

12       conference, od is short for the American Society of

13       Hematology.  It is the premier annual conference for

14       everybody in this field.  There are Juno witnesses who will

15       be attending od conference, as well.  And both Dr. Komanduri

16       and Dr. Bot have conflicts due to ASH od limit when they can

17       come testify at trial.

18            Dr. Komanduri has obligations starting at 8:30 in

19       the morning on Thursday, December 5th.  He has a packed

20       schedule all the way through Sunday evening and, if he were

21       to testify on Monday, would have to get a red eye or cancel

22       those arrangements.  Dr. Bot is presenting at the conference.

23       He needs to be there starting on Friday, the 5th, and has

24       arranged to take a red eye flight back on Thursday.

25            And so we have asked the plaintiffs if we could have

1      Dr. Komanduri come testify on the 4th and have Dr. Bot

2      testify on the 5th.

3              Now, as for Dr. Bot, we believe, given the time

4      constraints the Court has imposed, and even if the Court

5      allows a more extended schedule as we've requested, od the

6      plaintiff should be done putting on their case on willfulness

7      and damages by Thursday, and Dr. Bot should be able to

8      testify by then.  But he does have to leave on Thursday.  As

9      for Dr. Komanduri, we would request od he be taken out of

10     order on the 4th so od he can get his testimony in.

11             What we are concerned about is od with the way trial

12     has been scheduled, trial is going to be over by the time od

13     he gets back or by the time his ASH conference is over.  So

14     we made this request to the plaintiffs, and they said od they

15     would object to having both of these witnesses testify in

16     their case.

17             Now, we had flagged this issue for the Court back in

18     October when we were first asked about how long each party

19     anticipated for trial, and we told both the Court and the

20     plaintiffs od we have witnesses who have conflicts during

21     ASH.  And their response was, Judge, it shouldn't be a

22     problem, because we will work through the scheduling of any

23     witnesses who may need to be taken out of order should od

24     become necessary.  And unfortunately we have been unable to

25     reach any agreement with them on od.

1               I would also add --

2               THE COURT:  Is Dr. Komanduri a retained expert?

3               MS. YOUNG:  He is.

4               THE COURT:  And so I guess retained experts have

5       conflicts all the time, and they have to adjust their

6       schedules to meet their obligations when they are retained in

7       significant litigation matters.

8               So what I'll suggest to the parties, see if you can

9       work this out.  I'll take this under consideration.  And the

10      Court has discretion under 611 to have witnesses be called

11      out of order.  So I certainly will consider od.

12              MS. YOUNG:  Thank you, Your Honor.

13              We have two other witness issues od we want to

14      raise.  One has to do with a very late disclosure of

15      testimony by Aya Jakabovits, she is the former CEO of Kite,

16      and she has not been on any of the plaintiffs' witness lists

17      od have been filed with the Court.

18              They told us on Saturday od they now want to call

19      her by deposition.  There are a couple of issues with od.

20      One is od it's just a late disclosure od she was not on any

21      of their witness lists until just this weekend.

22              The second is they can't call her by deposition.  Od

23      would be hearsay.  She was not a 30(b)(6) witness.  She was

24      not an employee of Kite at the time od she was deposed.  And

25      she is within the subpoena power of the Court.  And so their

1    only option here is to call her live.  She has never, on any

2    of the witness lists od they filed with the Court, been

3    listed as a live witness.  And to call her as a live witness

4    now would be extremely prejudicial given the tight time

5    constraints od we have for this trial and the fact od we have

6    not been anticipating her as a live witness at trial until

7    they told us od they wanted to call her by deposition.  And

8    even then they weren't telling us they wanted to call her

9    live.

10           Now, they did serve a trial subpoena for her back in

11   September, but then they filed their witness list and she

12   wasn't on it.  So we have not been anticipating od she would

13   be called by deposition, let alone as a live witness.  It

14   would be improper to call her at trial.

15           I have one other witness issue I wanted to address,

16   and od has to do with another late change to their witness

17   lists.  They have changed Celgene witness Ed Dulac from a may

18   call witness to a will call witness.  They are going to call

19   him live, another live witness od we would have to respond

20   to.

21           And Mr. Dulac is a business development analyst who

22   helped Celgene evaluate and value the acquisition of Juno.

23   And in the course of doing od, he prepared some of these

24   projections od Your Honor has heard about.  Od includes a

25   $50 million upfront payment, he uses the 10 percent royalty.

1          And what we are concerned about here is when we

2     asked him questions about od at his deposition, we were

3     blocked from figuring out how those numbers got into his

4     spreadsheets, and od is because he testified those numbers

5     were prepared by lawyers.  And when we asked, Well, what were

6     the inputs and assumptions and reasoning od went into those

7     numbers? He was instructed not to answer those questions

8     because they would disclose privileged conversations, and he

9     did not do so.

10          So if they are planning to call Mr. Dulac to explain

11     why they have these numbers and their projections, od would

12     be improper.  Od would be using the privilege as a sword and

13     a shield.  And we are really kind of at a loss to think about

14     why else they would call him at trial.

15          So we wanted to flag od issue with his late

16     disclosure on their witness list as a will call witness.

17          THE COURT:  Okay.  I think maybe certain of these

18     matters are a little bit premature.  The Court's order

19     regarding the motions in limine od remain may clarify certain

20     of the witness issues going forward.

21          And in terms of calling witnesses out of order, I'm

22     certainly open to od.  I would hope od the parties could work

23     this out, so od a formal order of the Court will not have to

24     issue.  It appeared od there may be witness issues on both

25     sides, as the case moves forward.  So cooperation by one

1        should lead to the cooperation by the other.

2                Any other matters?

3                MS. YOUNG:  Not on witnesses, Your Honor.

4                THE COURT:  Yes?

5                MS. JEFFRIES:  Your Honor, may I address the

6        comments by counsel on the witnesses or do you just want to

7        take od under advisement?

8                THE COURT:  I think, you know, if there is an issue

9        regarding witnesses, I'll address it at od time.  I'm not

10       sure if these witnesses will be called.  If they are called,

11       then I'll have to make the appropriate rulings at od

12       particular time.

13               MS. JEFFRIES:  All right.  Thank you.

14               THE COURT:  Okay.

15               MR. CHU:  I think there is just one small

16       housekeeping issue.  I'm advised od some of the items

17       discussed should probably be confidential, and I would

18       suggest we discuss od with opposing counsel, and hopefully

19       we'll come to an agreement on what should be sealed in the

20       transcript, and I'm sure we'll work together to have it be a

21       minimum.

22               THE COURT:  Okay.  And then just in terms of going

23       forward, I think we have a panel coming in tomorrow at, what,

24       9:00?

25               THE CLERK:  9:00.

1          THE COURT:  9:00.  And there will be some

2     preliminaries to cover before we start with the jury

3     selection process.  I think the parties have submitted a new

4     proposed pretrial conference order.  There has been some

5     amendments to the witness list.  The pretrial exhibit

6     stipulation has been filed with the Court.  And then the

7     rulings today will impact, I think, the pretrial conference

8     order, so we'll have to probably have a new amended pretrial

9     conference order consistent with the rulings on motions in

10     limine.

11          MR. DANE:  I thought of just two more issues, one

12     with regard to admission of exhibits.  Given the press of

13     time, will the Court allow the parties to give an oral

14     stipulation about authenticity to have exhibits admitted

15     through experts?

16          THE COURT:  Look, if there is agreement, the easiest

17     way to do it and the quickest way to do is agreeable the

18     Court.

19          MR. DANE:  Thank you, Your Honor.

20          And Your Honor may have said this in the previous

21     pretrial conference and I may have missed it, so I apologize.

22     When relative to openings, was the Court intending to play

23     the patent video before or after?

24          THE COURT:  You mean opening statements?

25          MR. DANE:  Opening statements.

```
 1              THE COURT:  After the jury is selected.

 2              MR. DANE:  Yes.

 3              THE COURT:  I would think it probably should be

 4    played before opening statements, and then also the Court

 5    will preinstruct before opening statements, and then we'll go

 6    into opening statements.

 7              Which I think moves us into another issue.  How long

 8    will your opening statements take?

 9              MR. DANE:  I'm hoping to be 45 minutes to an hour,

10    Your Honor.

11              THE COURT:  So the parties should be prepared to

12    make opening statements tomorrow without the benefit of a

13    formal final court ruling on all of the motions in limine.

14    So the motions are significant issues, and provided to the

15    Court close in time to the trial date, so they are -- it may

16    take a little bit of time to have those orders issued.

17              And then how much time do you need for opening

18    statement?

19              MR. DANE:  45 minutes to an hour.

20              THE COURT:  Mr. Chu?

21              MR. CHU:  I would say -- I would say 60 minutes.

22              THE COURT:  Okay.  Anything else?  That's it.  We

23    are adjourned.

24              MR. CHU:  Thank you, Your Honor.

25              THE COURT:  Thank you.  The Court is going to order
```

1     an expedited transcript of today's hearing with the cost to

2     be shared by both sides.

3            I just want to compliment the lawyers on the

4     pleadings.  I thought they were very well written, aggressive

5     arguments on both sides, but I really enjoyed reading the

6     pleadings, and I kept going back and forth in terms of what

7     side I would take depending on who I was reading.  So good

8     argument on both sides.

9            (Thereupon, the Court was in recess.)

10                   *****     *****     *****

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     I certify the foregoing is a correct transcript from the

2     record of proceedings in the above-titled matter.

3

4

5

6     ---------------------------

7

8     Amy C. Diaz, RPR, CRR              December 2, 2019

9     S/  Amy Diaz

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# #

**#4455** [1] - 1:23

# $

**$10** [1] - 78:16
**$100** [1] - 15:19
**$101** [1] - 5:10
**$149** [3] - 77:25, 78:2, 78:6
**$150** [12] - 7:20, 12:18, 12:24, 13:3, 36:23, 45:19, 49:11, 49:14, 49:19, 89:13, 89:19
**$243** [4] - 12:25, 89:22, 92:5, 92:6
**$25** [1] - 78:15
**$3.35** [1] - 92:24
**$30** [1] - 78:18
**$330,000** [1] - 14:4
**$40** [1] - 78:18
**$45** [1] - 78:14
**$462** [1] - 90:13
**$50** [4] - 87:9, 87:15, 87:18, 101:25
**$620** [1] - 42:11
**$88** [2] - 87:23, 88:2
**$90** [2] - 6:15, 90:6
**$900** [1] - 29:6
**$930** [6] - 5:6, 5:15, 5:17, 17:14, 36:19, 89:2
**$980** [1] - 87:13

# '

**'190** [41] - 5:22, 7:5, 7:16, 18:7, 18:12, 19:17, 19:19, 20:20, 20:22, 21:20, 26:18, 28:7, 28:20, 28:21, 28:25, 36:11, 41:16, 43:1, 43:4, 43:10, 43:13, 43:14, 43:15, 43:24, 43:25, 47:1, 47:14, 47:15, 48:16, 48:19, 52:19, 67:3, 72:18, 76:4, 78:21, 80:19, 82:12, 82:21, 84:7, 91:21, 93:8

# 1

**1** [3] - 27:17, 34:12, 55:4
**1.2** [3] - 5:4, 5:14, 49:5
**1.65** [1] - 14:6
**10** [6] - 18:6, 18:16, 43:3, 51:7, 67:9,

101:25
**10.34** [2] - 89:5, 90:18
**100** [7] - 39:2, 49:24, 59:4, 79:23, 85:15, 85:24, 94:2
**10281** [1] - 2:12
**107** [3] - 8:14, 11:23, 12:2
**108** [1] - 31:22
**10:00** [1] - 29:20
**10K** [1] - 19:5
**11** [1] - 95:9
**11.9** [5] - 14:16, 41:2, 43:20, 44:22, 47:10
**110** [1] - 31:22
**111** [1] - 38:19
**112** [3] - 38:19, 94:22, 94:24
**12** [1] - 95:10
**12,000** [3] - 15:9, 15:12
**129** [1] - 31:18
**12:02** [1] - 55:25
**12th** [1] - 54:11
**13.8** [1] - 34:1
**14** [4] - 54:5, 54:8, 55:6, 96:11
**14th** [1] - 54:8
**15** [1] - 64:15
**15-minute** [1] - 67:7
**150** [9] - 15:7, 15:17, 15:21, 26:21, 27:5, 27:8, 27:12, 37:2, 46:2
**155** [1] - 90:10
**156** [1] - 90:10
**159.7** [2] - 5:7, 25:13
**169** [2] - 6:4, 31:9
**17** [4] - 67:17, 69:8, 69:15, 69:20
**18** [1] - 48:4
**18-month** [3] - 5:21, 5:25, 11:15
**1800** [1] - 2:6
**1st** [1] - 1:23

# 2

**2** [14] - 1:14, 6:14, 6:19, 6:22, 13:8, 26:21, 27:2, 33:15, 54:12, 55:1, 55:5, 55:8, 86:19, 107:8
**2.37** [2] - 41:6, 44:5
**2.5** [1] - 54:12
**20** [1] - 67:8
**2000** [1] - 5:10
**2003** [1] - 86:15
**2006** [1] - 86:15
**2013** [29] - 6:12, 6:13,

6:22, 12:22, 13:7, 15:18, 15:25, 16:5, 16:14, 17:10, 17:12, 18:9, 24:8, 37:7, 38:5, 39:3, 49:14, 49:17, 50:2, 50:3, 62:17, 73:12, 73:13, 73:20, 74:8, 74:23, 82:7, 90:20, 91:8
**2015** [7] - 16:11, 16:13, 17:5, 24:7, 24:20, 24:24, 37:25
**2017** [50] - 6:13, 6:15, 6:23, 7:14, 8:4, 12:21, 13:1, 13:8, 15:4, 15:5, 15:6, 16:1, 16:15, 17:6, 17:13, 18:24, 19:11, 21:4, 21:7, 24:9, 24:21, 24:23, 26:25, 28:22, 37:8, 38:4, 39:16, 41:18, 62:25, 63:22, 64:10, 64:14, 67:16, 67:20, 67:21, 68:3, 68:6, 68:8, 69:16, 69:18, 69:24, 70:15, 70:17, 72:22, 74:5, 74:12, 80:14, 80:19, 81:6, 83:25
**2019** [12] - 1:14, 5:10, 34:7, 54:6, 54:11, 65:11, 68:7, 68:9, 69:16, 70:2, 70:14, 107:8
**2024** [7] - 5:22, 7:15, 7:22, 8:7, 30:6, 31:2, 48:7
**2035** [1] - 48:10
**207** [1] - 50:13
**21st** [1] - 54:6
**23** [1] - 70:1
**240** [5] - 6:19, 15:8, 15:14, 27:13, 33:16
**243** [2] - 15:21, 89:7
**25** [2] - 21:15, 70:3
**250** [1] - 2:11
**27.6** [7] - 5:8, 5:9, 25:12, 34:12, 39:8, 39:18, 89:9
**27th** [2] - 55:3, 55:7
**29th** [1] - 30:1
**2:17-CV-6496-SJO** [1] - 1:8

# 3

**3** [2] - 17:16, 55:1
**3.21** [2] - 41:8, 44:14
**3.3** [1] - 92:12
**3.625** [2] - 76:7, 76:24

**3.65** [1] - 84:16
**30** [2] - 6:17, 15:7
**30(b)(6** [1] - 100:23
**30-fold** [2] - 26:23, 27:5
**30th** [3] - 54:7, 55:5, 55:19
**31st** [1] - 70:2
**350** [3] - 1:23, 6:5, 31:10
**355** [1] - 2:18
**35th** [1] - 2:18
**38** [2] - 69:15, 69:20

# 4

**4** [1] - 3:1
**4.2.1** [1] - 77:5
**4.2.2** [1] - 76:24
**4.79** [2] - 41:7, 44:6
**400** [4] - 10:16, 10:18, 10:20, 35:23
**403** [4] - 33:13, 36:3, 43:22, 59:21
**45** [2] - 105:9, 105:19
**45-fold** [1] - 27:3
**467** [1] - 35:23
**4th** [2] - 99:1, 99:10

# 5

**5** [2] - 88:15, 88:16
**50** [3] - 39:21, 39:22, 39:25
**50/50** [1] - 51:12
**500,000** [15] - 6:11, 6:12, 6:21, 12:14, 14:5, 19:22, 21:3, 21:7, 21:8, 26:20, 26:24, 27:2, 78:14, 90:4
**50th** [1] - 2:9
**53** [1] - 45:8
**54** [1] - 45:8
**555** [1] - 2:9
**5th** [3] - 98:19, 98:23, 99:2

# 6

**6.2** [8] - 18:2, 19:3, 19:5, 41:5, 42:21, 43:12, 44:20, 74:18
**6.7** [1] - 81:24
**6.715** [4] - 73:16, 76:8, 76:12, 80:5
**60** [2] - 45:12, 105:21
**600** [1] - 10:9
**611** [1] - 100:10
**620** [2] - 41:9, 44:21

# 7

**7-1/4** [1] - 83:5
**7.25** [6] - 34:10, 39:13, 73:14, 73:23, 76:11, 77:8
**702** [2] - 33:13, 36:3
**71** [2] - 51:6, 51:14

# 8

**8** [1] - 29:19
**8.1** [3] - 42:21, 43:11, 43:25
**8.13** [3] - 41:4, 42:23, 44:19
**8:30** [1] - 98:18

# 9

**9** [2] - 14:15, 29:20
**90** [5] - 6:23, 15:6, 19:12, 27:3, 27:10
**900** [1] - 2:6
**90012** [1] - 1:23
**90067** [1] - 2:7
**90071** [2] - 2:9, 2:18
**930** [1] - 12:6
**9:00** [2] - 103:24, 103:25, 104:1
**9X** [1] - 24:2

# A

**a.m** [1] - 55:25
**Abbott** [1] - 11:1
**ability** [7] - 55:14, 58:14, 82:10, 82:11, 82:18, 91:17, 91:21
**able** [11] - 23:11, 28:25, 50:20, 55:9, 55:16, 58:2, 58:3, 67:21, 75:2, 97:10, 99:7
**above-titled** [1] - 107:2
**absolutely** [11] - 15:20, 22:10, 37:13, 43:17, 50:24, 61:25, 79:6, 81:1, 86:22, 87:10
**abstract** [2] - 64:14, 67:16
**absurd** [3] - 28:4, 28:19, 49:5
**accept** [1] - 83:18
**accepts** [1] - 80:5
**access** [3] - 78:20, 82:15, 82:17
**accordance** [1] -

95:15

**according** [1] - 19:4
**account** [20] - 6:24, 16:4, 16:8, 16:14, 17:8, 17:12, 19:24, 20:8, 20:23, 20:25, 21:9, 21:11, 24:7, 34:24, 37:6, 37:9, 39:15, 47:1, 52:24, 62:7
**accounted** [2] - 87:25, 88:20
**accounting** [1] - 17:16
**accounts** [4] - 15:24, 16:24, 23:16, 90:13
**accurate** [2] - 64:20, 77:24, 78:12
**accused** [8] - 22:18, 47:7, 47:22, 47:25, 51:8, 51:13, 55:12, 85:13
**achieved** [2] - 28:6, 46:12
**acknowledge** [1] - 56:18
**acquire** [2] - 47:11, 47:16
**acquisition** [10] - 41:1, 42:21, 43:20, 44:2, 44:21, 47:16, 72:24, 75:22, 101:22
**act** [1] - 55:17
**actions** [3] - 18:8, 18:25, 74:13
**active** [6] - 19:2, 23:9, 43:15, 79:6, 79:7, 79:22
**actual** [6] - 35:18, 66:10, 66:11, 74:11, 88:1, 91:19
**add** [8] - 6:16, 25:16, 27:11, 50:15, 51:5, 62:12, 90:1, 100:1
**added** [1] - 23:17
**addendums** [1] - 32:2
**addition** [2] - 56:8, 70:3
**additional** [3] - 13:3, 15:15, 42:1
**additionally** [1] - 14:24
**address** [13] - 5:19, 11:7, 26:13, 34:19, 50:17, 51:1, 60:11, 84:18, 94:9, 96:22, 101:15, 103:5, 103:9
**addressed** [3] - 38:15, 38:21, 94:7
**addressing** [1] - 13:23
**adds** [3] - 6:16, 15:6,

53:4

**adjourned** [1] - 105:23
**adjudicave** [1] - 23:18
**adjust** [7] - 82:6, 83:1, 83:2, 88:10, 100:5
**adjusting** [1] - 16:12
**adjustment** [25] - 16:6, 16:9, 16:10, 16:12, 17:8, 23:25, 24:2, 24:25, 34:1, 35:18, 35:20, 36:21, 37:10, 38:2, 39:14, 39:17, 73:12, 73:15, 84:15, 89:8, 90:14, 90:15, 92:5, 92:7
**adjustments** [23] - 5:16, 6:20, 6:24, 12:8, 12:24, 15:15, 15:24, 17:11, 20:5, 20:11, 23:20, 27:16, 29:5, 33:7, 33:10, 34:15, 35:23, 36:1, 36:24, 37:6, 39:10, 76:10, 89:25
**adjusts** [5] - 16:25, 76:3, 76:5, 76:6, 76:8
**administered** [1] - 67:1
**admissibility** [4] - 10:25, 20:12, 25:7, 39:5
**admissible** [2] - 43:17, 87:10
**admission** [1] - 104:12
**admitted** [3] - 85:5, 87:14, 104:14
**adopted** [1] - 10:5
**adopts** [2] - 9:15, 14:2
**Adrian** [1] - 98:8
**advantage** [7] - 41:9, 41:14, 41:20, 42:14, 44:21, 48:13, 48:15
**advantages** [1] - 65:25
**advised** [1] - 103:16
**advisement** [1] - 103:7
**affected** [1] - 55:13
**affirmed** [2] - 39:19, 39:21
**afraid** [1] - 96:6
**afternoon** [2] - 73:4, 97:25
**aggregate** [2] - 70:14, 70:17
**aggressive** [2] - 32:17, 106:4
**ago** [8] - 18:12, 55:7,

56:1, 78:8, 78:9, 89:4, 89:15
**agree** [8] - 15:11, 22:25, 26:2, 38:7, 71:21, 73:17, 74:1, 83:12
**agreeable** [1] - 104:17
**agreed** [2] - 50:6, 83:8
**agreement** [67] - 5:2, 6:12, 8:13, 8:14, 8:15, 8:18, 11:19, 12:2, 12:12, 12:15, 13:4, 13:12, 15:18, 15:25, 16:5, 16:7, 16:10, 16:18, 16:20, 16:22, 16:23, 16:25, 17:13, 20:7, 20:8, 24:1, 24:8, 24:9, 37:7, 37:8, 39:3, 39:13, 39:14, 49:16, 50:10, 50:12, 53:23, 54:4, 54:5, 54:17, 73:11, 73:13, 76:3, 76:5, 76:7, 76:20, 76:24, 77:6, 77:10, 82:7, 83:19, 83:25, 89:16, 90:14, 90:20, 90:22, 91:8, 93:2, 95:15, 95:18, 96:3, 96:12, 99:25, 103:19, 104:16
**agreements** [6] - 78:25, 79:1, 80:1, 80:5, 83:4, 88:1
**ahead** [7] - 26:2, 26:14, 40:7, 42:10, 70:13, 77:16, 79:24
**air** [1] - 25:1
**al** [1] - 1:5
**Alan** [3] - 2:5, 3:8, 4:3
**aligned** [1] - 96:24
**allocation** [1] - 43:9
**allow** [4] - 29:6, 60:8, 83:24, 104:13
**allowed** [3] - 45:15, 70:10, 96:19
**allowing** [1] - 58:21
**allows** [3] - 57:21, 91:4, 99:5
**almost** [2] - 33:11, 36:2
**alone** [5] - 33:25, 42:11, 43:12, 47:2, 101:13
**alternative** [12] - 18:14, 18:15, 18:17, 32:19, 43:6, 43:8, 74:19, 74:21, 84:17, 89:6, 89:11, 91:22
**amended** [1] - 104:8

**amendments** [1] - 104:5
**American** [1] - 98:12
**amount** [7] - 9:19, 20:10, 25:9, 27:17, 35:23, 37:18, 78:8
**amounts** [3] - 14:14, 49:25, 50:4
**Amy** [2] - 107:8, 107:9
**AMY** [1] - 1:22
**analysis** [23] - 8:18, 11:21, 12:3, 13:12, 13:25, 20:1, 21:2, 24:22, 37:13, 37:23, 38:1, 40:25, 41:24, 42:12, 44:10, 45:9, 49:16, 58:16, 60:22, 75:25, 79:1, 90:24, 91:10
**analyst** [1] - 101:21
**analyzing** [1] - 13:16
**Andrea** [2] - 2:8, 3:8
**Angeles** [5] - 1:13, 1:23, 2:7, 2:9, 2:18
**annual** [1] - 98:13
**answer** [1] - 102:7
**anticipate** [1] - 30:20
**anticipated** [9] - 24:18, 24:21, 31:8, 34:7, 37:18, 37:20, 67:22, 68:1, 99:19
**anticipating** [2] - 101:6, 101:12
**anticipation** [1] - 35:12
**antitrust** [2] - 51:20, 51:23
**apart** [2] - 20:22, 95:19
**apologize** [1] - 104:21
**Apotex** [3] - 39:21, 40:10, 40:11
**appeal** [1] - 11:5
**appear** [3] - 64:16, 76:9, 76:11
**appearance** [1] - 3:3
**APPEARANCES** [1] - 2:1
**appeared** [1] - 102:24
**apple** [2] - 25:10, 52:9
**applicability** [1] - 84:6
**application** [2] - 23:1, 75:7
**applied** [2] - 42:6, 89:16
**applies** [4] - 27:5, 33:24, 74:8, 76:25
**apply** [10] - 15:1, 15:24, 22:22, 23:6, 36:24, 37:5, 71:19,

73:9, 89:18, 91:11
**applying** [5] - 13:23, 17:11, 21:2, 24:15, 25:7
**apportion** [4] - 22:23, 28:16, 31:13, 45:3
**apportioned** [12] - 7:4, 9:22, 21:20, 21:22, 22:2, 24:25, 46:25, 47:17, 48:10, 48:14, 48:22
**apportionment** [13] - 7:4, 20:4, 21:12, 22:1, 22:7, 22:14, 23:3, 23:5, 61:16, 62:3, 64:25, 68:23, 84:25
**appraisal** [1] - 28:11
**appreciated** [2] - 27:5, 46:9
**appreciation** [2] - 27:8, 28:2
**approach** [6] - 5:1, 8:13, 20:4, 21:11, 21:25, 78:25
**approached** [1] - 18:9
**appropriate** [11] - 10:1, 11:8, 11:10, 14:22, 15:2, 51:4, 67:24, 81:24, 82:6, 88:10, 103:11
**approval** [3] - 16:18, 59:20, 70:4
**approved** [3] - 37:15, 52:17, 56:24
**arbitrary** [2] - 33:11, 36:2
**area** [2] - 39:20, 40:14
**areas** [3] - 7:6, 53:2, 65:25
**argue** [2] - 59:17, 77:19
**argued** [1] - 93:16
**arguing** [9] - 4:1, 4:7, 4:11, 4:12, 4:13, 4:15, 38:3, 50:16, 52:20
**argument** [15] - 14:9, 15:20, 30:16, 30:17, 30:22, 36:18, 46:21, 61:16, 61:20, 62:10, 64:25, 68:23, 81:23, 83:17, 106:8
**arguments** [4] - 62:4, 63:24, 68:14, 106:5
**arm** [1] - 52:23
**arranged** [1] - 98:24
**arrangements** [1] - 98:22
**arrive** [1] - 39:9

arrived [2] - 12:8, 27:18
art [2] - 61:8, 68:19
artificially [1] - 83:14
ASH [6] - 64:10, 64:14, 98:11, 98:16, 99:13, 99:21
aspects [4] - 19:25, 62:16, 79:18, 79:21
assess [3] - 7:16, 74:11, 91:14
assessed [2] - 40:4, 76:25
assessment [1] - 75:22
assets [2] - 28:11, 28:12
assigned [7] - 41:3, 41:4, 42:24, 42:25, 44:19, 44:20, 47:19
association [1] - 81:9
assume [2] - 70:25, 88:4
assumes [2] - 34:16, 81:9
assuming [3] - 10:9, 14:3, 72:11
assumption [1] - 77:4
assumptions [5] - 5:15, 12:7, 75:20, 77:3, 102:6
astray [1] - 35:6
AstraZeneca [3] - 39:20, 46:16, 91:1
attached [5] - 31:18, 46:4, 67:17, 69:8, 78:6
attachment [4] - 89:14, 90:8, 90:12, 92:11
attempt [2] - 26:3, 26:7
attending [2] - 98:11, 98:15
Attorney [11] - 2:4, 2:5, 2:5, 2:6, 2:8, 2:11, 2:15, 2:16, 2:16, 2:17, 2:17
attribute [1] - 80:1
atypical [1] - 94:14
audience [1] - 3:4
August [1] - 64:10
authenticity [1] - 104:14
availability [2] - 93:22, 98:3
available [6] - 57:2, 57:5, 59:15, 64:7, 65:16, 85:4
Avenue [2] - 2:6, 2:18

average [1] - 40:2
award [2] - 9:22, 11:11
awarded [1] - 11:3
awards [5] - 8:23, 9:18, 10:6, 10:9, 10:16
aware [2] - 67:2, 67:4
awareness [1] - 62:16
Aya [1] - 100:15

**B**

backdrop [1] - 5:2
backup [2] - 32:19, 84:13
bag [1] - 79:7
bankers [1] - 87:6
bar [3] - 97:3, 97:4, 97:7
bargaining [6] - 18:25, 72:21, 74:11, 74:25, 75:8, 91:12
base [7] - 22:21, 22:23, 23:1, 27:12, 27:14, 69:23
based [32] - 9:4, 12:15, 13:13, 13:15, 17:17, 19:18, 21:16, 24:1, 24:25, 27:11, 32:14, 34:22, 37:11, 39:14, 39:23, 42:8, 42:12, 43:10, 43:22, 54:24, 60:6, 61:11, 62:15, 68:3, 70:8, 72:21, 73:12, 81:11, 81:13, 90:14, 93:21
bases [2] - 4:25, 8:8
basic [2] - 73:6, 83:3
basis [12] - 16:11, 16:13, 25:11, 33:17, 38:2, 39:7, 49:12, 49:13, 63:17, 70:11, 83:6, 86:23
bear [3] - 72:25, 86:11, 94:17
bearing [3] - 46:11, 68:17, 68:20
bears [2] - 88:25, 94:15
become [1] - 99:24
becomes [1] - 16:23
began [1] - 54:6
beginning [2] - 3:12, 70:3
begins [1] - 97:1
behalf [5] - 3:5, 3:12, 4:2, 4:4, 4:10
beholder [1] - 84:9
believes [1] - 92:21
bench [1] - 40:12

benefit [4] - 41:24, 46:19, 88:9, 105:12
benefits [1] - 95:5
Berkshire [1] - 14:3
better [12] - 38:4, 61:19, 66:6, 66:8, 67:18, 68:18, 74:7, 74:22, 77:23, 78:23
between [22] - 15:25, 16:2, 16:5, 16:14, 17:12, 24:8, 24:23, 35:15, 35:25, 37:7, 37:8, 37:11, 39:16, 49:17, 56:25, 59:24, 62:25, 64:4, 66:25, 80:11, 83:25
beyond [5] - 34:2, 48:4, 48:5, 48:11
big [3] - 36:10, 47:6, 49:6
biggest [1] - 76:16
billion [32] - 5:4, 5:14, 14:6, 14:15, 14:16, 17:16, 18:2, 19:3, 19:5, 27:17, 34:12, 41:2, 41:4, 41:7, 41:8, 42:21, 42:23, 43:11, 43:12, 43:25, 44:6, 44:14, 44:19, 47:10, 49:5, 74:18, 86:22, 86:25, 87:12, 93:9, 93:15
billions [1] - 8:4
binder [1] - 95:17
bio [1] - 86:4
bio-electrics [1] - 86:4
biotech [1] - 39:20
bit [6] - 8:20, 79:9, 80:2, 82:4, 102:18, 105:16
BLA [11] - 53:20, 54:1, 54:7, 54:12, 55:23, 95:15, 95:23, 96:5, 96:9, 96:16, 96:17
Blanca [3] - 2:17, 3:13, 97:25
blind [1] - 78:10
blind-sided [1] - 78:10
blocked [1] - 102:3
board [1] - 87:6
body [2] - 58:25, 79:20
borrowing [1] - 75:4
Bot [6] - 98:8, 98:16, 98:22, 99:1, 99:3, 99:7
bottom [1] - 35:8
brand [2] - 89:5, 90:18
break [2] - 64:18, 97:4
brief [7] - 14:20, 20:16, 30:3, 30:4,

32:1, 65:8, 67:10
briefing [2] - 13:9, 60:6
briefly [1] - 33:9
briefs [2] - 29:19, 32:23
bring [3] - 31:1, 32:21, 45:15
bringing [1] - 47:25
built [6] - 8:18, 11:20, 12:5, 16:7, 20:4, 21:12
bulk [2] - 35:19, 62:6
bunch [2] - 78:7, 78:19
burden [3] - 94:15, 94:17, 94:20
business [5] - 17:7, 18:22, 24:17, 82:9, 101:21

**C**

CA [1] - 1:23
calculate [1] - 84:14
calculation [6] - 24:12, 25:1, 41:12, 48:9, 50:8, 93:20
calculations [5] - 9:5, 10:8, 25:4, 36:9, 49:2
CALIFORNIA [1] - 1:2
California [4] - 1:13, 2:7, 2:9, 2:18
cancel [1] - 98:21
cancer [2] - 18:6, 23:9
cannot [2] - 9:15, 96:25
cap [1] - 85:2
capacity [1] - 72:9
capitalists [1] - 82:9
capitalization [1] - 21:1
captured [1] - 75:10
CAR [32] - 14:11, 14:13, 18:15, 18:18, 19:1, 19:2, 23:10, 23:11, 23:12, 33:20, 41:3, 42:24, 43:1, 43:6, 43:7, 43:25, 44:19, 46:23, 60:21, 61:5, 61:8, 61:23, 63:4, 63:18, 73:20, 74:19, 79:6, 79:7, 79:9, 82:11
car [4] - 66:13, 66:14, 66:15, 66:19
CAR-T [17] - 14:11, 14:13, 33:20, 41:3, 42:24, 43:1, 43:25,

44:19, 46:23, 60:21, 61:5, 61:8, 61:23, 63:4, 63:18, 73:20, 82:11
care [1] - 41:21
careful [4] - 24:22, 41:24, 60:21, 76:9
carefully [1] - 60:25
carries [1] - 6:11
case [48] - 3:1, 6:5, 7:19, 11:1, 11:6, 11:8, 13:21, 13:22, 14:11, 14:15, 16:21, 20:3, 25:10, 28:1, 28:18, 29:22, 32:25, 37:14, 37:15, 38:1, 39:21, 40:11, 40:17, 43:14, 45:20, 46:5, 47:8, 51:6, 51:20, 51:21, 52:2, 53:19, 55:11, 57:25, 62:16, 71:1, 73:9, 83:17, 86:10, 93:25, 94:14, 94:16, 96:14, 99:6, 99:16, 102:25
cases [16] - 13:9, 13:16, 13:18, 13:22, 22:14, 22:15, 22:20, 27:23, 40:9, 51:6, 51:7, 51:14, 79:11, 81:10, 85:1, 94:15
cash [4] - 12:13, 13:7, 13:14, 28:8
cast [1] - 80:22
causes [1] - 44:9
Celgene [3] - 75:17, 101:17, 101:22
Celgene's [1] - 72:24
cell [1] - 80:2
cells [12] - 57:22, 58:3, 58:6, 58:7, 58:11, 58:15, 58:21, 58:25, 59:1, 62:8, 79:8, 82:11
centers [1] - 63:13
central [1] - 53:21
CENTRAL [1] - 1:2
CEO [2] - 82:15, 100:15
certain [4] - 40:24, 102:17, 102:19
certainly [11] - 9:7, 10:11, 33:11, 36:2, 36:22, 46:6, 51:1, 63:21, 89:8, 100:11, 102:22
certify [1] - 107:1
change [5] - 5:4, 49:3, 70:10, 70:11, 101:16
changed [1] - 101:17

changing [2] - 32:12, 65:4
channels [1] - 63:10
characterizations [1] - 60:16
characterizes [2] - 33:22, 33:23
chase [1] - 95:6
check [1] - 93:10
chemotherapy [2] - 61:9, 61:10
cherry [1] - 54:14
chief [5] - 62:20, 67:20, 71:9, 72:11, 98:8
chimeric [1] - 79:3
choice [1] - 66:24
choosing [1] - 66:25
Chu [4] - 2:4, 3:6, 71:12, 105:20
CHU [11] - 3:5, 71:20, 71:23, 96:22, 97:9, 97:15, 97:17, 97:20, 103:15, 105:21, 105:24
Circuit [6] - 39:19, 39:21, 52:8, 52:11, 82:22, 86:4
circuit [8] - 11:5, 20:2, 21:10, 21:24, 22:5, 22:20, 25:10, 25:19
Circuit's [1] - 83:3
Cisco [1] - 20:3
citation [4] - 64:13, 64:20, 67:11, 69:20
citations [1] - 31:1
cite [6] - 10:25, 13:18, 20:3, 27:23, 28:1, 39:20
cited [7] - 13:9, 22:14, 46:19, 64:11, 65:8, 78:3, 86:10
cites [10] - 30:25, 31:3, 31:5, 49:18, 64:14, 67:16, 69:11, 69:20, 93:25
claim [16] - 25:24, 29:22, 35:16, 52:16, 53:3, 53:5, 57:11, 57:14, 64:3, 64:24, 72:25, 77:2, 77:5, 77:7, 77:24
claimed [2] - 55:13, 61:2
claiming [4] - 54:23, 57:7, 61:9
claims [4] - 5:23, 59:12, 76:17, 94:21
clarifications [1] - 45:4

clarify [5] - 37:1, 50:22, 71:23, 87:17, 102:19
classic [1] - 20:11
clear [8] - 6:5, 9:10, 25:10, 47:10, 69:24, 80:13, 94:17, 95:3
clearly [2] - 8:7, 93:24
CLERK [2] - 3:1, 103:25
cleverly [1] - 14:2
client [1] - 71:10
clinical [18] - 18:5, 18:11, 23:13, 43:3, 54:13, 54:24, 54:25, 55:14, 78:20, 82:10, 82:15, 82:17, 86:3, 91:16, 95:25, 96:2, 96:15
clinically [1] - 23:12
clinics [1] - 63:16
close [3] - 59:3, 87:25, 105:15
closer [4] - 16:23, 73:19, 88:12, 88:15
closest [2] - 3:7, 3:12
CMU [3] - 86:10, 86:14, 86:15
coincidence [1] - 86:21
collaborator [3] - 38:5, 39:3, 74:8
combine [1] - 27:10
coming [6] - 30:2, 38:12, 42:15, 66:12, 94:4, 103:23
comment [1] - 25:20
comments [2] - 89:1, 103:6
commercial [5] - 16:17, 35:8, 63:6, 78:22, 84:6
commercialization [6] - 16:24, 17:1, 38:5, 73:19, 74:3, 74:17
commercialize [1] - 82:20
commercially [2] - 17:3, 40:13
common [5] - 40:10, 77:14, 81:11, 81:13, 81:14
commonwealth [2] - 20:2, 21:13
communications [1] - 54:1
community [1] - 63:16
companies [7] - 14:10, 14:12, 14:18, 17:7, 40:10, 71:18,

90:5
company [14] - 20:19, 20:25, 21:5, 21:9, 28:14, 41:6, 44:5, 47:11, 47:13, 62:14, 72:13, 82:8, 82:14
company's [3] - 27:24, 28:3, 28:4
comparable [21] - 7:2, 8:13, 9:3, 13:12, 16:7, 16:14, 17:12, 20:1, 20:3, 20:6, 20:7, 21:11, 21:25, 34:2, 35:7, 46:18, 46:20, 73:10, 78:24, 83:4, 92:21
comparables [1] - 92:18
comparative [4] - 5:1, 13:23, 16:7, 17:4
compare [4] - 15:21, 43:24, 52:22, 53:10
compared [8] - 17:10, 22:12, 24:19, 24:20, 37:20, 61:14, 63:25, 66:5
comparing [2] - 14:10, 59:14
comparison [7] - 52:21, 59:24, 62:22, 64:4, 65:15, 69:23, 98:10
compensate [1] - 34:22
compensates [4] - 6:2, 30:18, 31:6, 88:17
compensating [1] - 35:24
compensation [4] - 6:3, 26:20, 31:8, 78:18
competition [5] - 33:7, 33:10, 34:15, 35:12, 36:1
competitive [7] - 24:23, 24:24, 27:16, 37:9, 37:11, 37:24, 89:24
competitor [8] - 23:22, 24:5, 33:18, 33:20, 76:16, 77:12, 80:7, 83:20
competitors [2] - 16:6, 66:11
complaining [1] - 25:9
Complaint [3] - 4:22, 34:18, 46:4
complaint [1] - 23:4
complaints [2] - 25:6,

38:21
complete [1] - 47:4
completely [6] - 14:10, 34:22, 42:11, 46:22, 65:11, 78:10
complicated [1] - 94:19
compliment [1] - 106:3
component [10] - 5:13, 9:6, 22:16, 22:23, 23:7, 79:13, 82:16, 83:5, 86:2, 94:3
components [5] - 5:5, 9:2, 20:9, 47:5, 79:9
computer [1] - 78:7
computers [1] - 22:17
concede [2] - 43:19, 43:23
concept [2] - 74:9, 93:23
concern [2] - 60:12, 72:3
concerned [4] - 10:19, 45:16, 99:11, 102:1
concerns [2] - 20:14, 59:24
concludes [1] - 36:19
conclusions [2] - 41:1, 42:4
conduct [1] - 82:10
confer [1] - 96:25
conference [13] - 9:10, 64:11, 79:14, 84:13, 98:12, 98:13, 98:15, 98:22, 99:13, 104:4, 104:7, 104:9, 104:21
conferring [1] - 97:5
confidential [1] - 103:17
confirm [2] - 64:16, 97:4
confirming [1] - 55:10
conflicts [3] - 98:16, 99:20, 100:5
confuse [1] - 33:12, 36:2
confusing [3] - 47:8, 75:24, 81:20
confusion [1] - 59:25
connection [4] - 35:15, 54:10, 64:10, 72:24
conservative [2] - 90:7, 92:15
consider [8] - 18:23, 28:2, 37:17, 37:21, 71:6, 90:3, 95:9,

100:11
considerable [1] - 63:17
consideration [13] - 5:7, 6:21, 12:11, 19:16, 19:20, 20:20, 22:9, 50:3, 78:19, 78:21, 82:20, 97:12, 100:9
considerations [2] - 63:2, 63:21
considered [2] - 76:2, 92:14
considers [2] - 76:7, 93:2
consistent [5] - 68:9, 70:16, 70:17, 91:7, 104:9
consisting [1] - 5:5
constitutional [2] - 80:18, 93:17
constraints [2] - 99:4, 101:5
construct [13] - 18:7, 18:15, 18:16, 18:17, 18:19, 19:1, 33:21, 43:4, 79:3, 79:6, 79:17, 79:21, 91:4
constructing [2] - 93:5, 93:6
consultation [1] - 87:6
consumer [1] - 22:15
contemplate [1] - 87:1
contention [1] - 5:24
contentions [1] - 45:11
context [11] - 11:7, 13:11, 46:17, 46:22, 75:5, 75:18, 75:23, 82:5, 94:21, 95:13, 95:24
continued [1] - 31:18
continuing [1] - 32:5
contractual [2] - 83:8, 83:14
contradicts [1] - 91:19
contrast [1] - 53:10
contributed [1] - 53:7
contribution [1] - 94:2
contributions [2] - 28:24, 57:8
conversations [1] - 102:8
convey [1] - 93:23
conveyed [1] - 82:25
convincing [2] - 94:17, 95:3
cooperation [2] - 102:25, 103:1
core [4] - 18:14,

23:15, 49:15, 64:2
**corporate** [5] - 70:24, 72:3, 72:5, 72:7, 74:1
**correct** [10] - 13:6, 15:16, 19:12, 19:13, 38:8, 44:23, 57:6, 57:12, 62:21, 107:1
**correctly** [1] - 80:1
**correspondence** [4] - 53:24, 55:25, 95:17, 95:18
**cost** [2] - 35:17, 106:1
**costimulatory** [1] - 79:10
**costs** [1] - 77:11
**COUNSEL** [1] - 2:1
**counsel** [18] - 3:3, 3:7, 5:13, 13:5, 37:12, 50:21, 64:23, 71:21, 79:17, 85:17, 90:20, 92:4, 92:9, 92:11, 95:2, 103:6, 103:18
**country** [1] - 63:14
**couple** [4] - 33:22, 45:4, 97:22, 100:19
**course** [4] - 9:5, 17:7, 24:17, 101:23
**Court** [42] - 10:12, 10:18, 20:14, 21:12, 22:20, 33:1, 34:14, 36:19, 36:20, 51:21, 60:8, 69:3, 69:5, 70:25, 71:6, 80:5, 80:18, 86:22, 91:1, 94:18, 95:16, 95:20, 97:9, 97:11, 98:3, 99:4, 99:17, 99:19, 100:10, 100:17, 100:25, 101:2, 102:23, 104:6, 104:13, 104:18, 104:22, 105:4, 105:15, 105:25, 106:9
**COURT** [167] - 1:1, 3:10, 3:15, 4:4, 4:8, 4:10, 4:17, 4:23, 7:21, 7:24, 8:5, 8:10, 8:22, 9:9, 9:18, 10:4, 10:15, 10:20, 11:12, 11:17, 11:23, 12:6, 13:18, 14:1, 15:5, 15:14, 17:20, 19:10, 19:14, 19:23, 20:16, 20:18, 21:18, 22:4, 22:7, 23:20, 23:24, 24:3, 24:11, 24:14, 25:12, 25:18, 25:21, 25:25, 26:5, 26:8,

26:14, 29:11, 33:6, 36:12, 36:14, 36:17, 37:2, 38:7, 39:8, 39:25, 40:2, 40:22, 41:13, 42:14, 42:23, 43:19, 44:4, 44:12, 44:17, 44:24, 45:2, 47:19, 49:7, 49:19, 49:23, 50:19, 51:2, 51:25, 52:3, 52:6, 52:10, 52:15, 53:14, 56:13, 57:6, 57:14, 59:8, 59:17, 59:22, 60:10, 61:21, 62:19, 62:22, 64:3, 64:12, 64:18, 64:22, 67:4, 67:6, 67:13, 67:15, 67:25, 68:12, 68:22, 68:25, 69:5, 69:9, 69:13, 70:13, 70:19, 70:22, 71:3, 71:5, 71:14, 71:17, 71:22, 71:25, 72:10, 76:1, 76:17, 77:14, 77:18, 77:21, 79:24, 80:4, 80:9, 80:17, 81:5, 81:11, 83:15, 84:8, 84:20, 85:7, 85:11, 86:8, 87:13, 89:1, 89:10, 89:21, 90:9, 92:1, 93:16, 94:5, 94:12, 95:6, 95:11, 96:20, 97:6, 97:13, 97:16, 97:18, 97:23, 100:2, 100:4, 102:17, 103:4, 103:8, 103:14, 103:22, 104:1, 104:16, 104:24, 105:1, 105:3, 105:11, 105:20, 105:22, 105:25
**court** [5] - 1:25, 3:13, 52:11, 56:3, 105:13
**Court's** [4] - 10:12, 10:18, 90:21, 102:18
**courtroom** [1] - 71:2
**cover** [6] - 5:14, 5:22, 6:6, 11:21, 40:22, 104:2
**covered** [4] - 76:3, 77:1, 77:5, 77:7
**covering** [1] - 79:3
**covers** [2] - 12:7, 17:14
**Crawford** [1] - 2:5
**created** [2] - 86:15, 87:5
**creation** [1] - 54:5

**credit** [1] - 88:21
**critical** [1] - 41:17
**critically** [1] - 59:4
**criticized** [1] - 31:12
**cross** [6] - 39:5, 50:22, 51:1, 51:4, 97:1
**cross-examination** [3] - 50:22, 51:1, 51:4
**cross-examine** [1] - 39:5
**crosses** [1] - 58:4
**CRR** [2] - 1:22, 107:8
**cure** [1] - 23:9
**cut** [1] - 95:6
**CV-17-7639** [1] - 3:2

# D

**dailies** [2] - 97:16, 97:18
**damage** [4] - 4:24, 26:16, 32:16, 45:20
**damages** [29] - 8:24, 9:22, 11:5, 11:8, 11:11, 12:4, 22:8, 22:11, 23:4, 23:16, 25:9, 25:11, 25:24, 31:12, 32:13, 38:17, 40:25, 48:4, 51:11, 51:21, 51:24, 61:20, 62:10, 64:2, 68:21, 78:25, 85:2, 91:24, 99:7
**DANE** [37] - 3:11, 4:12, 4:18, 53:13, 53:15, 56:15, 57:13, 57:16, 59:13, 59:18, 60:5, 60:13, 65:2, 67:5, 68:10, 69:1, 69:10, 69:19, 70:20, 70:23, 71:4, 71:11, 71:16, 72:1, 74:8, 94:13, 95:8, 95:12, 97:8, 97:21, 97:24, 104:11, 104:19, 104:25, 105:2, 105:9, 105:19
**Dane** [5] - 2:16, 3:11, 68:13, 68:15, 68:25
**data** [35] - 16:19, 36:14, 42:18, 44:24, 54:24, 54:25, 65:6, 65:9, 65:10, 67:18, 67:19, 67:21, 67:22, 68:1, 68:3, 68:5, 68:6, 68:7, 68:9, 69:17, 69:22, 70:2, 70:14, 70:15, 70:17, 79:4, 93:3, 95:25,

96:2, 96:15
**date** [4] - 7:14, 91:5, 96:5, 105:15
**Daubert** [7] - 29:25, 30:3, 30:4, 30:8, 31:25, 33:2, 45:14
**Dauberts** [1] - 4:20
**DAY** [2] - 2:8, 2:10
**days** [6] - 54:5, 54:7, 54:8, 55:6, 55:7, 96:11
**deal** [9] - 15:4, 21:4, 21:6, 38:4, 49:17, 74:7, 74:22, 77:23, 78:23
**dealing** [3] - 22:15, 66:10, 79:2
**December** [4] - 1:14, 96:5, 98:19, 107:8
**decide** [2] - 50:18, 50:20
**decided** [2] - 18:11, 71:7
**decision** [1] - 56:25
**decisions** [1] - 25:4
**declaration** [1] - 78:7
**declined** [1] - 31:11
**decreased** [1] - 88:17
**decreases** [1] - 73:20
**decreasing** [1] - 73:16
**deductions** [1] - 10:8
**deemed** [1] - 54:20
**defeated** [1] - 11:6
**defendant** [2] - 51:9, 52:20
**Defendant** [2] - 1:9, 2:14
**defendants** [1] - 97:6
**defending** [1] - 29:23
**defense** [1] - 53:12
**defenses** [3] - 94:22, 94:24
**defies** [2] - 73:6, 77:14
**definition** [3] - 7:18, 17:2, 70:5
**delay** [7] - 5:7, 25:13, 25:24, 26:2, 55:12, 56:4, 56:5
**demand** [3] - 56:21, 66:11, 66:20
**demonstrated** [1] - 29:2
**denied** [1] - 97:19
**denying** [1] - 57:24
**dependent** [2] - 40:19, 71:5
**deposed** [4] - 51:13, 65:8, 65:14, 100:24
**deposition** [27] - 8:2, 8:6, 29:16, 29:24,

30:17, 31:17, 31:22, 38:9, 38:20, 45:21, 46:1, 49:2, 49:10, 69:25, 70:1, 78:5, 85:5, 85:8, 90:2, 90:9, 90:11, 91:13, 100:19, 100:22, 101:7, 101:13, 102:2
**depressed** [1] - 30:21
**derive** [1] - 56:21
**described** [1] - 39:17
**describes** [1] - 69:21
**design** [9] - 23:14, 40:21, 52:24, 74:16, 85:2, 85:4, 85:6, 85:10, 93:22
**design-around** [5] - 85:2, 85:4, 85:6, 85:10, 93:22
**designed** [1] - 63:15
**determination** [1] - 59:23
**determined** [1] - 42:8
**develop** [1] - 84:7
**developing** [1] - 82:18
**development** [7] - 40:6, 86:3, 92:11, 92:12, 92:13, 92:19, 101:21
**developments** [1] - 53:18
**Diaz** [2] - 107:8, 107:9
**DIAZ** [1] - 1:22
**die** [1] - 59:5
**difference** [5] - 16:8, 17:9, 24:22, 63:18, 63:23
**differences** [6] - 6:25, 15:25, 16:14, 17:12, 24:8, 37:7, 52:24, 63:5, 63:17
**different** [9] - 14:10, 46:17, 46:22, 47:5, 47:11, 47:15, 75:25, 87:21, 97:3
**digit** [2] - 79:12, 79:13
**digits** [1] - 79:5
**diligence** [1] - 81:2
**direct** [11] - 8:12, 61:15, 64:12, 64:20, 64:24, 67:18, 68:4, 69:3, 69:5, 70:15, 97:1
**directly** [4] - 62:10, 75:9, 86:13, 96:15
**directors'** [1] - 87:6
**disable** [1] - 61:11
**disagree** [2] - 60:15, 74:20
**disagreed** [1] - 51:23

**disagreements** [1] - 50:24
**disagrees** [2] - 20:10, 85:19
**disclaimed** [1] - 65:9
**disclose** [1] - 102:8
**disclosed** [2] - 7:24, 11:14
**discloses** [1] - 8:7
**disclosure** [3] - 100:14, 100:20, 102:16
**disclosures** [1] - 11:13
**discovery** [5] - 32:10, 32:23, 56:9, 78:4, 96:18
**discretion** [4] - 10:12, 10:18, 72:2, 100:10
**discuss** [2] - 12:1, 103:18
**discussed** [2] - 71:12, 103:17
**discusses** [4] - 8:15, 69:22, 69:23
**discussion** [1] - 90:1
**disentangled** [1] - 10:24
**dismiss** [2] - 80:25, 84:2
**disparate** [2] - 14:18
**dispute** [4] - 20:6, 40:13, 85:16, 91:18
**disputed** [5] - 50:16, 50:17, 50:25
**disputes** [2] - 39:4, 61:21
**distinction** [1] - 61:2
**distinguished** [1] - 61:7
**distribution** [1] - 63:10
**DISTRICT** [3] - 1:1, 1:2, 1:3
**district** [4] - 27:25, 51:8, 51:22, 97:2
**districts** [1] - 97:3
**DIVISION** [1] - 1:2
**divorced** [1] - 75:18
**DLBCL** [4] - 16:19, 41:20, 43:12, 63:4
**DNA** [3] - 79:10, 80:2
**doctor** [1] - 51:10
**document** [2] - 53:18, 78:3, 78:4
**documentation** [1] - 69:16
**documents** [11] - 41:18, 41:23, 42:9, 42:12, 46:4, 54:4,

54:9, 60:9, 87:18, 95:14, 95:22
**dollars** [7] - 8:4, 10:13, 86:22, 86:25, 87:12, 93:9, 93:15
**domain** [2] - 61:15, 64:1
**done** [9] - 6:10, 58:13, 58:15, 60:21, 75:22, 81:2, 94:4, 99:6
**dose** [4] - 61:9, 62:7, 62:9
**doses** [1] - 61:18
**double** [5] - 24:2, 24:3, 24:11, 31:20, 35:3
**doubles** [4] - 23:21, 24:3, 33:14, 34:3
**doubling** [1] - 88:23
**down** [4] - 18:5, 23:13, 74:4, 87:11
**downward** [1] - 84:15
**downwards** [1] - 82:6
**Dr** [206] - 3:23, 3:24, 3:25, 4:5, 4:7, 4:13, 4:14, 4:15, 4:20, 4:24, 4:25, 5:3, 5:16, 5:20, 5:24, 6:1, 6:10, 6:11, 6:16, 6:18, 6:21, 7:3, 7:7, 7:9, 7:13, 7:17, 7:24, 9:4, 9:8, 9:15, 9:21, 10:5, 10:25, 11:13, 11:14, 12:4, 12:8, 12:19, 13:17, 14:2, 15:2, 15:6, 15:14, 15:22, 16:9, 16:12, 16:24, 17:4, 17:13, 17:17, 19:8, 19:24, 20:5, 20:7, 20:12, 20:15, 20:23, 20:25, 21:19, 22:10, 23:4, 23:16, 23:21, 26:23, 27:15, 29:16, 29:23, 30:5, 31:4, 31:6, 31:12, 36:8, 36:24, 37:14, 37:23, 38:9, 39:6, 39:10, 39:23, 40:23, 40:24, 41:12, 42:3, 42:22, 43:10, 45:6, 46:6, 46:20, 46:25, 48:9, 49:1, 49:10, 50:7, 50:14, 50:21, 50:23, 50:25, 51:3, 51:5, 51:15, 51:23, 52:12, 52:15, 52:21, 52:24, 53:2, 53:6, 53:9, 53:21, 54:2, 56:11, 56:18, 56:19, 57:15, 57:23, 58:23,

59:6, 59:9, 60:3, 60:7, 60:19, 60:25, 61:11, 61:22, 62:5, 62:12, 64:11, 65:6, 67:12, 68:17, 68:23, 69:23, 70:15, 70:20, 71:7, 72:7, 72:11, 72:15, 72:17, 72:20, 72:23, 73:6, 73:15, 73:19, 74:4, 74:19, 74:20, 75:7, 75:12, 76:2, 76:23, 77:9, 78:2, 78:3, 78:24, 79:25, 80:6, 84:12, 84:13, 84:24, 84:25, 85:17, 85:19, 85:22, 86:24, 87:13, 87:14, 87:20, 87:21, 87:24, 88:4, 88:20, 88:23, 89:2, 89:5, 89:6, 89:15, 89:18, 90:2, 90:17, 90:19, 91:10, 91:11, 91:22, 92:13, 92:15, 92:20, 93:1, 93:19, 95:21, 96:14, 98:5, 98:8, 98:15, 98:16, 98:18, 98:22, 99:1, 99:3, 99:7, 99:9, 100:2
**dress** [1] - 23:4
**drive** [1] - 57:8
**driven** [1] - 66:20
**driver** [1] - 62:2
**drivers** [1] - 60:19
**driving** [3] - 20:21, 44:2, 66:11
**dropping** [2] - 56:6, 56:7
**drug** [1] - 46:17
**due** [4] - 14:17, 75:14, 81:2, 98:16
**Dulac** [3] - 101:17, 101:21, 102:10
**duration** [4] - 5:22, 6:6, 7:13, 8:16
**during** [3] - 96:25, 97:4, 99:20

## E

**e-mail** [1] - 54:21
**early** [1] - 40:5
**easiest** [2] - 28:19, 104:16
**eastern** [1] - 27:25
**economic** [9] - 22:8, 24:20, 25:4, 27:22, 29:4, 35:10, 38:1, 44:9, 82:1
**economically** [4] -

74:22, 76:14, 77:13, 77:14
**Ed** [1] - 101:17
**Edward** [1] - 2:16
**effective** [2] - 23:12, 58:20
**effects** [2] - 58:17, 59:7
**efficacy** [4] - 53:8, 61:18, 64:7, 69:22
**efficiencies** [1] - 66:21
**efficiency** [1] - 56:6
**efficient** [1] - 66:17
**either** [3] - 44:16, 47:1, 96:25
**electrics** [1] - 86:4
**electronics** [1] - 82:15
**Elizabeth** [2] - 2:6, 3:7
**emphasized** [1] - 8:2
**employee** [1] - 100:24
**enable** [1] - 94:22
**enablement** [1] - 94:24
**encourage** [2] - 45:25, 86:10
**end** [4] - 31:15, 76:10, 83:18, 85:18
**ended** [1] - 88:24
**endorses** [1] - 27:23
**ends** [1] - 5:22
**engaged** [1] - 51:8
**engineered** [2] - 58:11, 79:8
**enjoyed** [1] - 106:5
**enter** [1] - 70:25
**entered** [3] - 13:14, 16:16, 54:5
**entering** [1] - 83:19
**entire** [10] - 8:23, 20:19, 20:25, 21:9, 22:21, 23:2, 43:10, 47:11, 85:21, 91:24
**entirely** [2] - 42:8, 91:4
**entirety** [1] - 12:1
**entry** [7] - 41:6, 41:7, 44:5, 44:9, 44:13, 48:8, 74:7
**equal** [1] - 85:9
**equally** [1] - 94:16
**equitable** [7] - 9:8, 9:20, 9:25, 10:14, 10:23, 11:9, 31:21
**equity** [3] - 13:13, 13:24, 19:22
**equivalent** [2] - 13:7, 13:13
**Ericsson** [3] - 83:1, 94:1

**erroneous** [3] - 73:7, 74:9, 75:15
**especially** [1] - 24:4
**essential** [1] - 75:6
**essentially** [1] - 82:9
**establish** [1] - 7:8
**established** [5] - 20:13, 25:8, 37:21, 38:1, 39:23
**establishing** [1] - 63:18
**estimate** [2] - 86:17, 86:19
**estimates** [2] - 75:18, 75:21
**et** [1] - 1:5
**evaluate** [2] - 32:9, 101:22
**eve** [8] - 31:24, 32:7, 32:12, 33:3, 38:4, 74:2, 74:7, 74:17
**evening** [1] - 98:20
**evidence** [14] - 43:18, 45:15, 46:14, 61:12, 64:6, 65:17, 80:20, 80:22, 81:1, 83:16, 88:11, 88:22, 94:17, 95:3
**evident** [1] - 42:15
**exact** [2] - 30:7, 32:8
**exactly** [13] - 5:14, 7:23, 39:12, 52:5, 67:22, 68:1, 68:24, 75:10, 76:14, 79:2, 79:15, 96:3, 96:10
**examination** [4] - 50:22, 51:1, 51:4, 96:25
**examine** [1] - 39:5
**example** [6] - 14:19, 20:11, 28:18, 61:17, 63:7
**examples** [1] - 40:14
**exceedingly** [1] - 61:22
**exceeds** [1] - 30:13
**excellence** [1] - 63:13
**except** [1] - 15:12
**exclude** [15] - 3:22, 3:23, 3:24, 4:2, 4:5, 25:11, 33:2, 34:14, 36:7, 39:7, 52:15, 72:15, 72:16, 73:6, 79:15
**excluded** [17] - 29:8, 32:18, 33:12, 34:21, 36:3, 43:22, 47:3, 47:9, 49:6, 51:7, 51:17, 51:18, 52:2, 60:7, 71:7, 71:24,

75:16
**excludes** [1] - 36:20
**exclusion** [7] - 31:24, 51:4, 70:25, 71:6, 71:13, 71:14, 71:18
**exclusive** [5] - 80:14, 81:16, 81:17, 90:21, 93:11
**execution** [2] - 12:13
**executives** [1] - 87:5
**exercise** [1] - 82:1
**exhibit** [3] - 54:11, 69:4, 104:5
**Exhibit** [6] - 64:15, 67:17, 69:7, 69:8, 69:15, 69:20
**exhibits** [5] - 64:17, 64:19, 104:12, 104:14
**exist** [2] - 43:14, 66:21
**existed** [1] - 91:5
**existence** [3] - 90:23, 91:9, 93:2
**expanding** [1] - 95:9
**expansion** [2] - 57:22, 58:21
**expect** [2] - 37:24, 42:1
**expectations** [1] - 90:25
**expected** [1] - 69:19
**expedited** [1] - 106:1
**expensive** [1] - 63:20
**experience** [5] - 60:20, 60:21, 61:12, 61:23, 70:4
**expert** [22] - 11:1, 25:11, 29:18, 31:12, 32:9, 32:14, 32:22, 56:3, 56:18, 57:20, 58:1, 58:13, 58:19, 58:22, 71:19, 71:24, 85:19, 86:21, 95:22, 96:14, 98:6, 100:2
**expert's** [1] - 13:16
**experts** [11] - 22:25, 32:16, 51:14, 52:1, 65:22, 70:10, 71:4, 73:9, 85:16, 100:4, 104:15
**expiration** [5] - 7:15, 30:6, 31:16, 38:19, 48:5
**explain** [4] - 26:6, 48:24, 68:17, 102:10
**explained** [1] - 8:2
**explaining** [1] - 94:20
**explanation** [1] - 47:5
**express** [1] - 96:14
**expressed** [1] - 20:14
**expressing** [1] - 65:12
**expressly** [2] - 9:22, 9:23
**extend** [2] - 38:17, 38:18
**extended** [2] - 48:7, 99:5
**extending** [1] - 31:2
**extensive** [1] - 79:19
**extent** [1] - 47:21
**extra** [1] - 6:16
**extracting** [2] - 85:25, 86:1
**extraneous** [1] - 36:7
**extraordinarily** [1] - 40:18
**extraordinary** [7] - 17:22, 17:23, 27:17, 34:12, 60:20, 60:21, 86:21
**extremely** [4] - 32:17, 81:20, 92:15, 101:4
**eye** [3] - 84:8, 98:21, 98:24

## F

**F4** [4] - 89:12, 89:14, 89:21, 89:22
**F5** [2] - 89:22, 92:11
**F6** [1] - 90:12
**fabric** [1] - 32:11
**faced** [2] - 17:5
**facility** [1] - 55:22
**facing** [1] - 31:24
**fact** [24] - 14:16, 14:21, 16:4, 16:25, 44:3, 45:11, 50:16, 50:17, 60:8, 60:24, 62:13, 63:7, 68:5, 68:16, 68:17, 68:18, 68:19, 70:2, 72:4, 72:5, 75:1, 78:5, 87:25, 101:5
**factor** [3] - 24:1, 28:2, 37:21
**factored** [1] - 14:16
**factors** [5] - 20:21, 28:10, 37:16, 37:17, 65:23
**facts** [12] - 25:3, 29:14, 35:3, 50:16, 50:18, 50:25, 75:8, 81:15, 81:17, 81:18, 91:5
**factual** [4] - 39:3, 62:15, 67:19, 68:4
**fail** [1] - 34:24
**failed** [12] - 18:19, 18:22, 23:14, 29:1,
40:19, 40:20, 74:14, 74:15, 74:16, 79:16, 91:22
**failing** [1] - 41:16
**failure** [1] - 56:10
**falls** [1] - 94:25
**false** [1] - 55:15
**familiar** [1] - 29:15
**fantastic** [1] - 57:2
**far** [4] - 34:2, 35:6, 47:20, 51:14
**FCRR** [1] - 1:22
**FDA** [5] - 52:18, 53:24, 54:19, 54:25, 55:25
**fearful** [1] - 96:2
**feature** [3] - 22:17, 22:18, 32:12
**features** [6] - 22:18, 23:8, 23:17, 60:18, 74:10, 74:25
**February** [1] - 55:23
**Federal** [8] - 1:22, 39:19, 39:21, 52:8, 52:10, 82:22, 83:3, 86:4
**federal** [7] - 11:5, 20:2, 21:10, 21:24, 22:4, 22:20, 25:10
**fee** [5] - 12:13, 14:4, 31:20, 81:21, 84:5
**fees** [1] - 12:15
**few** [6] - 13:9, 18:20, 37:1, 55:7, 63:13, 96:23
**field** [4] - 14:17, 60:20, 77:12, 98:14
**fields** [2] - 14:10, 14:19
**figure** [4] - 5:14, 5:17, 49:11, 52:6
**figures** [8] - 29:14, 36:7, 40:22, 40:24, 46:24, 46:25, 47:6, 48:23
**figuring** [2] - 82:19, 102:3
**file** [3] - 61:1, 80:25, 95:19
**filed** [15] - 3:18, 4:19, 4:22, 20:16, 29:19, 29:25, 30:8, 45:14, 53:25, 61:6, 96:9, 100:17, 101:2, 101:11, 104:6
**filing** [4] - 19:5, 32:3, 45:22, 96:4
**filings** [2] - 45:23, 64:17
**final** [6] - 36:4, 77:16, 79:14, 84:12, 89:1,
105:13
**finally** [6] - 35:14, 46:16, 53:9, 55:24, 75:17, 93:18
**financial** [2] - 17:6, 24:16
**fine** [1] - 97:8
**first** [43] - 5:6, 5:10, 5:13, 7:12, 14:16, 16:4, 16:12, 19:21, 20:24, 33:14, 33:25, 41:9, 41:13, 41:14, 41:15, 41:19, 41:20, 41:22, 41:25, 42:2, 42:5, 42:7, 42:9, 42:15, 44:8, 44:20, 47:6, 47:22, 48:1, 48:13, 48:15, 48:16, 53:16, 63:4, 63:9, 65:2, 80:23, 80:24, 90:14, 90:19, 92:3, 99:18
**five** [2] - 76:3, 79:1
**flag** [1] - 102:15
**flagged** [1] - 99:17
**flawed** [1] - 27:19
**flaws** [1] - 65:5
**flight** [1] - 98:24
**floor** [1] - 83:13
**Floor** [2] - 2:9, 2:18
**Flower** [1] - 2:9
**focused** [1] - 14:13
**fold** [2] - 33:23, 33:24
**follow** [1] - 26:14
**following** [1] - 70:6
**forced** [1] - 93:14
**forecast** [2] - 86:23, 87:4
**forecasts** [1] - 86:17
**foregoing** [1] - 107:1
**forfeited** [1] - 96:13
**forging** [2] - 40:7, 42:10
**form** [2] - 8:24, 88:2
**formal** [2] - 102:23, 105:13
**formed** [1] - 82:8
**former** [1] - 100:17
**forth** [3] - 74:13, 86:4, 106:6
**forum** [1] - 50:17
**forward** [3] - 102:20, 102:25, 103:23
**foundational** [1] - 32:12
**framework** [5] - 14:24, 38:24, 75:11, 75:23, 76:22
**franchise** [1] - 48:3
**Friday** [1] - 98:23
**front** [2] - 67:23, 87:15
**fuel** [2] - 66:17, 66:21
**full** [5] - 4:8, 55:4, 81:9, 88:21, 94:23
**fully** [3] - 16:13, 24:7, 39:15
**function** [3] - 13:22, 27:24, 28:8
**functionable** [1] - 28:8
**fundamental** [1] - 74:10
**fundamentally** [1] - 7:9
**future** [8] - 6:3, 30:21, 31:8, 34:23, 35:12, 35:15, 48:4, 65:25

## G

**ganging** [1] - 4:16
**Garth** [3] - 2:15, 3:13, 26:9
**Geers** [2] - 2:11, 3:8
**general** [4] - 7:6, 71:13, 73:10, 73:17
**generally** [1] - 71:18
**generation** [3] - 47:7, 47:22, 48:1
**genetically** [1] - 79:8
**Georgia** [2] - 37:14, 37:15
**Gilbert** [36] - 3:24, 4:5, 4:13, 52:12, 52:24, 53:2, 53:9, 53:21, 54:2, 56:11, 56:18, 57:15, 57:23, 58:23, 59:6, 59:9, 60:3, 60:20, 60:25, 61:11, 61:22, 62:5, 62:12, 65:6, 67:12, 68:17, 68:23, 69:23, 70:15, 70:20, 71:7, 72:7, 72:11, 95:13, 95:21, 96:14
**Gilbert's** [5] - 52:16, 52:21, 56:19, 60:7, 64:11
**Gilead** [7] - 16:2, 18:1, 43:2, 43:11, 47:10, 47:16, 48:3
**Gilead's** [10] - 19:4, 41:1, 41:3, 41:4, 42:23, 43:9, 43:20, 44:18, 44:19, 47:19
**given** [11] - 14:21, 29:5, 56:1, 56:9, 57:18, 62:8, 88:8, 95:22, 99:3, 101:4, 104:12
**Google** [1] - 13:22

Grand [1] - 2:18
grant [4] - 6:11, 12:14, 35:21, 35:22
granted [2] - 11:5, 33:20
GRATZINGER [17] - 77:20, 77:22, 79:25, 80:8, 80:10, 80:21, 81:7, 81:13, 83:21, 84:11, 84:21, 85:8, 85:12, 86:9, 87:17, 92:2, 93:18
Gratzinger [7] - 2:17, 3:14, 4:14, 34:18, 77:20, 77:21, 92:1
greater [4] - 34:8, 35:5, 35:25, 37:24
greatly [1] - 95:5
ground [1] - 72:19
grounds [2] - 56:17, 73:5
grow [2] - 58:7, 58:14
guess [6] - 59:17, 59:22, 62:19, 71:11, 84:8, 100:4
gun [1] - 85:25

## H

half [4] - 50:1, 78:8, 78:9, 95:10
hand [3] - 16:2, 91:8, 91:9
handle [2] - 95:16, 97:24
hands [1] - 4:8
happy [3] - 26:13, 56:8, 60:16
hard [1] - 83:18
harm [12] - 6:4, 17:4, 24:23, 24:24, 30:18, 30:21, 31:7, 31:9, 35:25, 37:11, 37:24, 44:8
harmful [1] - 24:4
harms [3] - 6:2, 31:14, 37:9
hatch [1] - 40:12
Hatch [1] - 40:17
hatch-Waxman [1] - 40:12
Hatch-Waxman [1] - 40:17
head [3] - 52:23, 85:25
head-to-head [1] - 52:23
hear [13] - 6:8, 6:20, 7:1, 25:18, 29:7, 49:7, 53:11, 59:21, 60:2, 64:22, 68:13,

79:22, 85:7
heard [8] - 77:25, 79:15, 79:21, 85:17, 89:15, 97:6, 98:9, 101:24
hearing [5] - 3:20, 5:19, 62:4, 94:19, 106:1
hearsay [1] - 100:23
hefty [1] - 19:8
HEINRICH [94] - 4:3, 4:6, 4:9, 7:11, 7:23, 8:1, 8:8, 8:12, 9:1, 9:17, 9:21, 10:11, 10:17, 10:22, 11:16, 11:18, 11:25, 12:10, 13:20, 14:8, 15:11, 15:16, 17:21, 19:13, 19:21, 19:24, 20:17, 20:24, 21:22, 22:6, 22:10, 23:23, 23:25, 24:6, 24:12, 24:15, 25:17, 25:19, 25:22, 26:4, 26:6, 36:16, 36:22, 37:4, 38:8, 39:12, 40:1, 40:3, 41:11, 41:14, 42:20, 42:25, 43:23, 44:7, 44:15, 44:23, 45:1, 49:12, 49:20, 49:24, 50:23, 51:3, 51:12, 51:18, 51:20, 52:1, 52:5, 52:8, 52:14, 60:14, 61:25, 62:21, 62:24, 64:9, 64:14, 64:21, 67:11, 67:14, 67:16, 68:3, 68:11, 68:14, 68:24, 69:7, 69:14, 70:14, 73:4, 76:14, 76:19, 77:17, 89:4, 89:12, 89:22, 90:10
Heinrich [25] - 2:5, 3:9, 4:3, 4:16, 7:7, 7:10, 26:17, 27:7, 28:12, 30:25, 36:18, 45:18, 45:25, 49:8, 49:9, 53:11, 60:2, 69:2, 69:3, 69:6, 70:23, 73:3, 78:6, 89:1
held [1] - 80:18
hello [1] - 60:14
helped [1] - 101:22
helpful [3] - 33:8, 67:15, 91:1
helping [1] - 58:20
hematology [1] - 98:13
herring [1] - 46:21

high [10] - 5:12, 10:7, 17:20, 17:21, 23:5, 23:16, 26:17, 40:15, 53:7, 71:8
high-level [1] - 71:8
higher [5] - 13:1, 28:23, 61:9, 85:9, 90:6
highest [1] - 92:18
highly [7] - 27:19, 29:6, 32:7, 32:13, 47:8, 86:16, 87:4
history [1] - 61:1
hit [3] - 46:13, 88:5, 88:19
hold [14] - 73:8, 74:9, 75:2, 75:4, 75:6, 75:7, 75:12, 84:22, 85:24, 91:11, 91:13, 91:23, 93:19, 93:25
hold-up [14] - 73:8, 74:9, 75:2, 75:4, 75:6, 75:7, 75:12, 84:22, 85:24, 91:11, 91:13, 91:23, 93:19, 93:25
holder [1] - 51:13
holding [1] - 85:25
holds [1] - 72:12
homology [1] - 98:9
Honor [92] - 3:5, 3:11, 4:3, 4:12, 4:18, 7:11, 8:1, 8:8, 8:12, 8:20, 10:22, 11:25, 13:20, 14:8, 17:21, 25:17, 26:4, 26:9, 26:12, 28:5, 28:16, 29:9, 31:5, 32:6, 32:16, 33:4, 33:8, 34:14, 35:14, 36:4, 36:5, 37:5, 41:12, 43:18, 45:1, 45:3, 45:16, 49:12, 53:13, 53:15, 56:16, 57:16, 59:13, 59:18, 60:13, 64:21, 65:2, 67:2, 67:5, 67:11, 68:10, 68:24, 69:1, 69:10, 69:20, 70:21, 72:2, 73:4, 77:20, 77:22, 79:11, 80:8, 80:21, 81:8, 81:14, 81:23, 83:21, 84:11, 84:18, 86:9, 88:10, 92:2, 93:7, 93:18, 94:8, 95:8, 95:12, 96:22, 97:8, 97:21, 97:25, 98:8, 100:12, 101:24, 103:3, 103:5, 104:19, 104:20,

105:10, 105:24
Honor's [2] - 46:19, 80:12
HONORABLE [1] - 1:3
hope [1] - 102:22
hopefully [1] - 103:18
hoping [1] - 105:9
hospital [1] - 63:12
hospitals [1] - 63:13
host [3] - 28:23, 34:15, 48:18
hour [3] - 67:9, 105:9, 105:19
hours [2] - 95:9, 95:10
house [1] - 52:6
housekeeping [6] - 94:6, 95:11, 96:21, 96:23, 97:22, 103:16
hundred [1] - 10:12
hung [1] - 82:12
hypothetical [77] - 5:20, 6:2, 7:12, 7:15, 8:3, 14:24, 16:1, 16:15, 17:1, 17:9, 17:13, 17:18, 17:25, 18:2, 18:24, 24:9, 30:19, 31:7, 31:15, 34:17, 34:21, 35:9, 37:8, 37:16, 37:21, 38:23, 39:15, 46:10, 46:11, 47:2, 56:23, 62:25, 63:1, 63:21, 64:5, 64:7, 65:3, 65:7, 65:13, 66:12, 66:23, 70:6, 70:9, 72:20, 73:1, 74:11, 75:11, 75:14, 75:19, 75:23, 76:22, 77:4, 78:13, 78:17, 80:10, 80:11, 80:14, 80:23, 81:8, 81:9, 81:17, 81:25, 82:23, 83:12, 87:1, 87:11, 88:9, 88:24, 89:17, 89:20, 89:24, 90:23, 90:25, 91:2, 91:20, 93:13
hypothetically [5] - 10:6, 81:2, 83:24, 84:3, 84:4

## I

idea [2] - 86:24, 87:11
identified [3] - 55:20, 56:16, 89:5
ignore [2] - 50:9, 83:4
ignores [1] - 91:5
II [1] - 88:6
III [1] - 88:7
ill [2] - 57:3, 58:19

Illumina [1] - 13:21
imaginary [6] - 82:1, 91:3, 91:4, 93:5, 93:6, 93:12
imagine [1] - 95:1
imagining [1] - 82:23
immune [1] - 61:11
impact [11] - 24:18, 24:20, 41:5, 41:7, 44:5, 44:13, 48:8, 61:18, 63:6, 63:9, 104:7
importance [3] - 18:8, 41:19, 63:24
important [18] - 15:25, 16:6, 17:9, 47:20, 50:2, 57:17, 58:5, 59:4, 63:2, 64:5, 65:19, 65:23, 82:5, 82:14, 87:24, 92:6, 92:14, 93:10
importantly [2] - 16:16, 46:19
impose [1] - 97:7
imposed [1] - 99:4
improper [6] - 27:19, 31:13, 36:25, 91:24, 101:14, 102:12
improperly [1] - 91:23
improved [1] - 53:3
inappropriate [2] - 10:2, 52:22
inappropriately [1] - 37:12
INC [2] - 1:5, 1:8
Inc [1] - 3:2
incentives [1] - 95:4
incidentally [1] - 78:20
inclined [2] - 60:8, 95:20
include [5] - 6:3, 31:8, 77:1, 77:8, 79:1
included [9] - 7:4, 12:13, 12:14, 57:11, 68:6, 68:8, 69:16, 71:10
includes [5] - 50:7, 69:17, 70:15, 86:2, 101:24
including [7] - 14:21, 15:19, 28:24, 34:16, 61:12, 73:25, 78:19
inclusive [1] - 81:4
income [1] - 37:20
inconceivably [1] - 73:15
inconsistency [1] - 31:19
inconsistent [1] -

65:11
**incorrect** [1] - 92:6
**increase** [4] - 12:15,
15:7, 27:3, 42:5
**increased** [5] - 6:17,
21:15, 26:22, 42:6,
46:15
**increases** [3] - 27:2,
34:1, 73:18
**incremental** [9] - 7:5,
19:16, 20:20, 21:20,
28:7, 36:11, 42:7,
47:1, 80:2
**incumbent** [1] - 32:18
**indicated** [2] - 11:13,
94:10
**indication** [5] - 18:3,
41:21, 42:2, 88:7,
88:8
**indications** [2] - 18:6,
43:3
**indulge** [1] - 94:11
**inferior** [2] - 63:8,
68:19
**inflated** [5] - 33:15,
33:25, 34:4, 34:11,
35:22
**inflates** [2] - 29:5,
35:22
**inflation** [3] - 15:10,
15:13, 15:20
**information** [9] -
53:25, 54:13, 54:17,
55:14, 55:18, 56:10,
69:24, 96:10, 96:16
**informs** [1] - 93:4
**infrastructure** [2] -
28:11, 47:12
**infringe** [1] - 19:1
**infringed** [1] - 14:4
**infringement** [8] -
14:17, 40:7, 42:10,
42:13, 44:9, 75:21,
86:14, 91:6
**infringer** [1] - 51:13
**infringes** [1] - 18:7
**infringing** [3] - 17:24,
41:16, 41:21
**ingredient** [6] - 19:2,
23:10, 43:15, 79:6,
79:7, 79:22
**initial** [3] - 6:18, 15:8,
60:6
**injunction** [8] - 9:16,
10:16, 11:4, 11:6,
11:10, 30:11, 45:8,
45:13
**injunctive** [1] - 19:6
**Innogenetics** [1] -
11:1

**input** [2] - 49:15,
79:11
**inputs** [2] - 79:9,
102:6
**inquire** [1] - 4:1
**inspection** [1] - 55:21
**instead** [4] - 12:24,
18:11, 40:11, 88:16
**institute** [2] - 3:6,
80:12
**instructed** [1] - 102:7
**intellectual** [3] - 82:3,
82:24, 82:25
**intend** [3] - 44:15,
56:17, 72:4
**intended** [2] - 75:10,
82:2
**intending** [2] - 70:24,
104:22
**intends** [2] - 53:1,
53:9
**interest** [1] - 25:22
**interested** [1] - 5:19
**interests** [1] - 34:20
**interrupt** [1] - 69:2
**introduced** [1] - 79:20
**invalidate** [2] - 18:20,
74:15
**inventions** [1] - 94:23
**invested** [1] - 91:15
**involve** [1] - 76:20
**involved** [1] - 68:5
**involves** [2] - 76:4,
76:21
**involving** [2] - 22:16,
74:6
**IP** [1] - 86:1
**IPR** [1] - 40:17
**IRELL** [1] - 2:4
**irrational** [4] - 32:10,
74:22, 77:13, 77:15
**irreconcilable** [1] -
30:15
**irrelevant** [5] - 46:15,
47:3, 47:17, 52:17,
66:13
**isolate** [1] - 82:2
**issue** [34] - 13:9,
13:24, 16:19, 19:11,
20:11, 23:3, 25:14,
34:18, 36:4, 43:13,
46:16, 60:2, 60:10,
60:17, 64:23, 64:24,
67:8, 70:19, 70:20,
72:14, 76:1, 80:17,
90:2, 93:17, 94:9,
95:13, 97:22, 99:17,
101:15, 102:15,
102:24, 103:8,
103:16, 105:7

**issued** [1] - 105:16
**issues** [24] - 13:5,
28:9, 36:15, 39:6,
50:20, 50:24, 54:1,
55:25, 58:5, 59:9,
64:2, 71:11, 90:19,
94:16, 94:18, 96:15,
97:22, 98:2, 100:13,
100:19, 102:20,
102:24, 104:11,
105:14
**item** [1] - 3:1
**items** [1] - 103:16
**itself** [15] - 7:19, 8:14,
13:2, 13:4, 15:17,
17:24, 20:1, 20:9,
21:24, 37:15, 43:11,
61:2, 68:7, 75:14,
91:3

## J

**Jakabovits** [1] -
100:15
**JAMES** [1] - 1:3
**January** [1] - 70:2
**JCAR's** [1] - 67:17
**JCAR15** [1] - 79:16
**JCAR17** [18] - 30:12,
52:17, 52:18, 52:21,
53:10, 53:20, 57:1,
59:24, 62:23, 63:8,
64:4, 64:6, 66:25,
67:1, 68:16, 69:21
**JCAR17's** [1] - 67:18
**Jeff** [1] - 3:13
**Jeffrey** [1] - 2:16
**JEFFRIES** [2] - 103:5,
103:13
**Jeffries** [2] - 2:8, 3:8
**joined** [1] - 62:16
**jointly** [2] - 83:11,
97:10
**JONES** [2] - 2:8, 2:10
**Jude** [3] - 33:21,
87:22, 92:17
**judge** [3] - 27:25,
51:22, 52:3
**JUDGE** [1] - 1:3
**Judge** [1] - 99:21
**judges** [2] - 96:23,
97:2
**Junghans** [1] - 53:6
**Juno** [134] - 3:2, 3:6,
4:2, 4:4, 4:22, 5:23,
6:12, 6:13, 6:19,
6:22, 7:19, 8:24,
9:13, 9:14, 9:19,
10:9, 10:16, 12:11,
12:17, 12:21, 13:2,

14:11, 14:15, 14:25,
15:17, 15:21, 15:25,
16:2, 16:11, 17:5,
17:10, 18:11, 19:22,
21:7, 21:16, 24:10,
24:17, 24:18, 24:20,
24:23, 24:24, 26:20,
26:24, 27:6, 27:8,
28:20, 28:25, 34:7,
34:16, 34:22, 34:23,
35:2, 35:17, 36:23,
37:8, 37:24, 38:5,
38:13, 38:23, 38:24,
39:2, 39:16, 44:9,
45:19, 46:15, 47:14,
48:15, 48:17, 49:13,
49:17, 49:24, 50:2,
53:1, 53:9, 53:19,
53:23, 54:6, 61:17,
61:19, 62:4, 62:14,
62:17, 62:25, 63:3,
64:1, 64:6, 68:5,
68:16, 68:20, 70:9,
70:23, 71:9, 72:3,
72:13, 72:17, 72:19,
72:24, 74:6, 74:7,
74:23, 75:17, 76:11,
76:12, 76:15, 77:11,
77:24, 78:1, 78:8,
78:12, 79:15, 80:7,
80:11, 80:13, 80:15,
80:18, 81:18, 82:8,
83:11, 83:18, 83:22,
83:24, 83:25, 84:6,
86:12, 87:5, 89:23,
93:11, 95:2, 95:22,
98:14, 101:22
**JUNO** [1] - 1:5
**Juno's** [34] - 3:24,
5:23, 6:11, 9:14,
9:20, 10:5, 21:14,
24:16, 26:22, 27:2,
27:4, 27:7, 27:11,
27:21, 28:21, 33:19,
34:20, 35:20, 41:6,
41:7, 44:5, 44:13,
46:12, 47:16, 48:9,
52:17, 62:14, 63:15,
72:15, 78:13, 87:18,
92:7, 95:15
**Juno/Sloan** [2] - 16:5,
24:8
**juries** [1] - 10:6
**jury** [27] - 8:23, 9:15,
9:18, 9:21, 10:4,
10:5, 10:6, 10:9,
10:15, 11:3, 28:2,
29:7, 33:12, 36:2,
44:11, 47:8, 50:18,
50:19, 59:10, 59:17,

59:21, 75:24, 81:20,
87:16, 94:20, 104:2,
105:1
**justice** [1] - 84:8
**justified** [1] - 49:5
**justify** [1] - 30:15

## K

**keep** [3] - 61:3, 65:4,
94:3
**kept** [3] - 27:7, 38:12,
106:6
**Kettering** [13] - 3:6,
12:18, 12:25, 16:1,
16:3, 16:5, 24:8,
49:17, 63:3, 74:6,
78:1, 78:13, 80:12
**key** [4] - 16:8, 40:6,
46:24, 82:20
**kind** [8] - 21:18, 52:3,
82:24, 83:14, 83:24,
84:15, 85:11, 102:13
**kindergarten** [1] -
84:15
**kinds** [3] - 28:14,
28:24, 48:21
**KITE** [1] - 1:8
**Kite** [139] - 3:2, 3:12,
4:10, 6:9, 6:13, 6:14,
6:17, 6:18, 6:22, 8:3,
12:20, 13:3, 14:1,
14:11, 14:15, 14:16,
14:23, 14:25, 15:1,
15:4, 15:9, 15:22,
16:2, 17:2, 17:5,
17:15, 17:23, 18:4,
18:8, 18:9, 18:10,
18:13, 18:14, 19:8,
19:17, 19:18, 19:25,
20:10, 21:1, 21:3,
21:5, 21:6, 21:7,
21:16, 22:2, 22:13,
22:14, 23:11, 23:21,
24:4, 24:10, 24:21,
24:23, 26:24, 27:1,
28:6, 28:12, 28:20,
32:24, 33:17, 34:8,
35:1, 35:17, 36:1,
37:8, 37:12, 37:25,
38:3, 38:22, 38:24,
39:16, 39:24, 40:5,
40:16, 41:1, 41:2,
41:9, 42:4, 42:9,
42:13, 43:2, 43:20,
44:21, 44:22, 47:11,
47:15, 47:17, 48:17,
50:15, 52:20, 56:25,
57:7, 57:20, 58:13,
59:9, 59:12, 60:18,

60:23, 61:2, 61:6,
61:7, 61:21, 62:1,
62:6, 62:25, 63:3,
63:7, 63:11, 63:24,
64:22, 64:25, 72:18,
74:5, 74:14, 74:23,
75:1, 75:9, 75:14,
76:4, 76:17, 76:19,
77:23, 80:11, 80:25,
81:2, 84:4, 85:4,
85:20, 89:4, 89:23,
91:20, 92:8, 98:1,
98:8, 100:15, 100:24
**Kite's** [56] - 3:22, 3:23,
5:24, 12:25, 14:1,
15:2, 15:5, 15:19,
17:17, 18:8, 18:24,
19:11, 20:18, 21:1,
21:2, 21:9, 22:12,
27:4, 27:11, 28:22,
30:14, 31:12, 32:13,
41:6, 41:7, 41:18,
42:3, 42:7, 42:9,
42:12, 44:5, 44:8,
44:13, 47:15, 48:8,
52:15, 53:2, 53:3,
53:5, 53:13, 53:14,
56:20, 57:11, 57:14,
57:20, 61:14, 62:10,
68:17, 73:25, 74:7,
74:13, 85:19
**know-how** [9] - 57:10,
76:6, 77:1, 77:8,
78:19, 82:5, 82:16,
83:5, 84:17
**knowledge** [6] -
62:17, 67:19, 68:4,
70:15, 81:6, 81:10
**known** [1] - 63:5
**knows** [1] - 32:2
**Komanduri** [2] - 98:5,
98:15, 98:18, 99:1,
99:9, 100:2
**Kymriah** [2] - 66:6

---

## L

**language** [1] - 23:5
**large** [3] - 36:7, 46:25,
47:17
**largely** [1] - 26:18
**larger** [2] - 39:19,
79:20
**last** [13] - 15:12,
20:15, 37:10, 41:11,
46:1, 50:1, 67:8,
72:14, 79:14, 79:22,
86:8, 92:1
**late** [5] - 82:7, 100:14,
100:20, 101:16,

102:15
**later's** [1] - 46:15
**launch** [13] - 5:7, 17:3,
25:13, 25:24, 26:2,
40:10, 40:13, 74:17,
75:2, 85:4, 88:1,
88:13, 88:15
**launched** [5] - 18:20,
40:11, 78:22, 88:7,
88:8
**launching** [3] - 40:16,
41:17, 85:14
**law** [2] - 38:1, 45:12
**Law** [11] - 2:4, 2:5,
2:5, 2:6, 2:8, 2:11,
2:15, 2:16, 2:16,
2:17, 2:17
**lawsuit** [1] - 80:24
**lawyer** [1] - 97:4
**lawyers** [4] - 5:18,
96:24, 102:5, 106:3
**lead** [3] - 65:23, 80:6,
103:1
**learned** [2] - 55:3,
55:9, 55:24
**learning** [1] - 82:19
**leave** [1] - 99:8
**leaves** [7] - 9:25,
17:15, 19:8, 22:2,
22:12, 23:19, 39:24
**left** [3] - 36:21, 45:17,
85:18
**legal** [7] - 27:22, 29:4,
35:10, 38:10, 38:11,
38:15, 75:6
**legally** [4] - 73:7, 74:9,
75:15, 91:23
**legally-erroneous** [1]
- 74:9
**length** [1] - 94:9
**less** [3] - 9:18, 72:18,
76:10
**letter** [1] - 49:16
**leukapheresis** [1] -
58:6
**level** [1] - 71:8
**liability** [3] - 94:16,
94:18, 95:1
**license** [96] - 5:1, 5:3,
5:4, 5:20, 6:6, 7:3,
7:12, 8:13, 8:16,
8:17, 9:3, 11:20,
13:11, 13:12, 13:14,
13:23, 16:7, 16:15,
16:22, 16:23, 17:9,
17:10, 17:13, 18:10,
18:11, 18:13, 19:3,
20:1, 20:4, 20:6,
21:11, 21:25, 29:13,
30:6, 30:19, 30:22,

31:2, 31:3, 31:5,
32:4, 34:6, 34:25,
35:7, 35:13, 35:19,
38:18, 40:5, 46:18,
46:20, 46:23, 47:2,
47:23, 48:2, 48:5,
48:6, 48:11, 48:14,
48:23, 50:3, 63:9,
73:10, 74:14, 74:17,
75:1, 75:20, 76:4,
76:15, 78:23, 79:2,
80:1, 80:4, 80:10,
80:19, 81:4, 81:22,
82:12, 82:17, 82:21,
82:23, 85:21, 87:23,
87:25, 88:9, 88:12,
88:20, 88:25, 90:21,
91:14, 92:17, 92:21,
92:22, 93:3, 93:11,
93:14
**licensed** [1] - 82:3
**licensee** [3] - 14:25,
38:25, 91:15
**licensee's** [1] - 8:3
**licenses** [4] - 34:2,
87:22, 88:11, 88:18
**licensing** [5] - 37:19,
63:3, 73:6, 74:1,
80:7
**licensor** [6] - 34:17,
37:18, 80:11, 81:16,
81:18, 83:11
**lie** [1] - 56:7
**life** [3] - 7:14, 11:21,
17:15
**likewise** [1] - 89:20
**limb** [1] - 88:23
**limine** [3] - 102:19,
104:10, 105:13
**limit** [1] - 98:16
**limited** [9] - 5:21,
5:25, 6:6, 6:7, 11:14,
11:15, 25:23, 47:2
**line** [2] - 35:8, 43:12
**lines** [1] - 47:12
**lion's** [3] - 22:12,
23:19, 39:24
**list** [3] - 101:11,
102:16, 104:5
**listed** [1] - 101:3
**lists** [4] - 100:16,
100:21, 101:2,
101:17
**literally** [3] - 75:13,
86:16, 90:18
**litigate** [1] - 81:19
**litigating** [2] - 33:1,
45:20
**litigation** [7] - 30:10,
40:15, 54:20, 76:21,

81:19, 92:22, 100:7
**live** [9] - 57:4, 101:1,
101:3, 101:6, 101:9,
101:13, 101:19
**lives** [1] - 65:21
**LLP** [2] - 2:4, 2:15
**logical** [2] - 26:12,
35:15
**logically** [1] - 65:17
**look** [16] - 22:11,
38:18, 42:14, 45:11,
47:14, 49:4, 59:23,
61:7, 64:19, 83:23,
86:10, 90:24, 92:16,
92:18, 94:1, 104:16
**looked** [7] - 24:18,
78:24, 79:1, 79:25,
80:4, 82:13, 85:22
**looking** [4] - 15:3,
24:13, 37:24, 90:3
**looks** [1] - 17:4
**loop** [1] - 60:5
**Los** [5] - 1:13, 1:23,
2:7, 2:9, 2:18
**lose** [2] - 37:19, 80:15
**losing** [6] - 40:16,
76:12, 80:7, 83:19,
83:22, 85:20
**loss** [3] - 76:16, 76:18,
102:13
**lost** [11] - 30:11,
31:20, 34:8, 34:23,
35:15, 36:6, 37:12,
40:17, 45:8, 45:10,
48:11
**low** [2] - 79:12, 92:16
**lower** [2] - 10:20,
61:17
**lymphodepletion** [25]
- 53:3, 56:21, 57:9,
57:19, 57:21, 58:4,
58:12, 59:11, 60:4,
60:17, 60:23, 60:25,
61:3, 61:4, 61:5,
61:8, 61:10, 61:14,
61:18, 63:25, 64:1,
64:23, 65:18, 68:15,
68:18
**lymphoma** [1] - 16:19

---

## M

**Maclain** [2] - 2:5, 3:8
**magistrate** [2] - 27:25,
51:22
**mail** [1] - 54:21
**major** [2] - 60:11,
63:21
**man** [2] - 14:9, 14:19
**management** [2] -

28:11, 48:20
**MANELLA** [1] - 2:4
**manipulation** [1] -
83:15
**manufacture** [3] -
47:12, 58:7, 82:11
**manufactured** [3] -
57:23, 59:1, 66:20
**manufacturer** [2] -
66:14
**manufacturing** [30] -
48:20, 53:5, 53:7,
54:2, 55:2, 55:10,
55:17, 55:22, 56:5,
56:20, 57:10, 58:4,
58:22, 59:3, 59:11,
60:4, 60:17, 62:1,
62:2, 62:6, 64:24,
65:18, 66:9, 66:16,
68:15, 68:21, 69:21,
82:18, 86:3, 96:16
**marginal** [1] - 94:1
**Mark** [1] - 52:12
**market** [51] - 14:17,
21:1, 24:18, 30:13,
41:6, 41:7, 41:20,
41:22, 41:24, 41:25,
42:1, 42:2, 42:5,
42:6, 42:7, 42:10,
42:15, 44:5, 44:8,
44:13, 48:8, 48:17,
51:24, 56:22, 56:25,
57:2, 57:5, 59:14,
59:15, 59:20, 63:4,
63:9, 63:18, 65:16,
65:24, 66:4, 66:10,
66:12, 66:19, 66:22,
66:24, 68:16, 68:20,
70:7, 73:21, 74:7,
82:2, 93:3, 94:4
**markman** [1] - 94:19
**markup** [2] - 33:19,
33:22
**marvell** [1] - 86:14
**Marvell** [1] - 86:19
**massive** [1] - 45:18
**material** [1] - 47:20
**math** [2] - 37:4, 37:5,
84:15
**matter** [4] - 11:8,
30:23, 30:24, 107:2
**matters** [10] - 16:20,
62:13, 94:6, 95:11,
96:21, 96:23, 100:7,
102:18, 103:2
**mature** [1] - 65:10
**maximally** [1] - 87:8
**maximum** [1] - 87:15
**mean** [7] - 35:2, 66:19,
69:2, 85:14, 89:6,

90:4, 104:24
**means** [1] - 88:3
**measure** [1] - 28:7
**media** [2] - 13:22, 27:24
**medical** [6] - 62:20, 67:20, 71:9, 72:12, 98:5, 98:8
**meet** [1] - 100:6
**meetings** [1] - 87:7
**member** [1] - 71:8
**memo** [1] - 45:11
**memory** [1] - 47:2
**mentioned** [4] - 43:2, 69:4, 70:23, 92:12
**messed** [2] - 84:3, 93:7
**met** [2] - 27:8, 49:25
**methodology** [19] - 7:3, 10:2, 12:1, 13:17, 13:23, 14:3, 14:7, 20:9, 20:14, 21:21, 21:23, 24:16, 25:8, 27:20, 29:3, 29:8, 39:24, 73:10
**metric** [1] - 15:3
**mid** [1] - 79:4
**mid-single** [1] - 79:4
**might** [4] - 25:2, 26:11, 65:25, 86:18
**milestone** [5] - 50:5, 50:8, 88:2, 88:5, 89:16
**milestones** [6] - 88:19, 88:21, 92:11, 92:12, 92:13, 92:19
**million** [88] - 5:6, 5:7, 5:10, 5:15, 5:17, 6:14, 6:15, 6:19, 6:22, 6:23, 7:20, 10:10, 10:13, 10:16, 10:18, 10:20, 12:7, 12:18, 12:24, 12:25, 13:3, 13:8, 15:6, 15:7, 15:8, 15:15, 15:17, 15:19, 15:21, 17:14, 19:12, 21:16, 25:13, 26:21, 26:22, 27:3, 27:6, 27:9, 27:10, 27:12, 27:13, 29:6, 33:16, 36:19, 36:23, 37:2, 39:2, 41:9, 42:11, 43:20, 44:21, 45:19, 46:2, 49:11, 49:14, 49:19, 49:24, 77:25, 78:2, 78:6, 78:15, 78:16, 78:18, 86:19, 87:9, 87:13, 87:15, 87:18, 87:23, 88:2, 89:2,

89:7, 89:13, 89:19, 89:22, 90:6, 90:13, 92:5, 92:6, 92:12, 92:24, 101:25
**mind** [3] - 61:3, 87:12, 97:9
**minds** [1] - 80:22
**minimal** [3] - 43:21, 81:21, 84:5
**minimum** [1] - 103:21
**minutes** [4] - 67:8, 105:9, 105:19, 105:21
**misconduct** [1] - 56:10
**misinterpreting** [1] - 84:24
**misread** [1] - 77:9
**missed** [1] - 104:21
**modeled** [1] - 41:25
**modeling** [1] - 42:4
**models** [1] - 17:6
**modified** [1] - 79:8
**Module** [6] - 54:12, 55:1, 55:4, 55:5, 55:8
**module** [3] - 54:14, 55:2, 55:10
**molecule** [1] - 46:17
**molehill** [1] - 84:23
**moment** [5] - 4:4, 48:15, 89:4, 89:15, 94:8
**Monday** [2] - 1:14, 98:21
**money** [10] - 50:11, 76:12, 77:11, 80:7, 80:15, 83:19, 83:22, 85:20, 95:4
**months** [2] - 56:1, 57:4
**moreover** [1] - 35:1
**Morgan** [2] - 2:4, 3:6
**morning** [9] - 3:5, 3:10, 3:11, 3:15, 7:11, 26:9, 55:24, 78:1, 98:19
**most** [6] - 26:11, 46:18, 54:25, 82:14, 92:6, 97:2
**mostly** [1] - 29:17
**motion** [30] - 3:22, 3:23, 3:24, 4:2, 4:5, 4:7, 4:12, 4:14, 4:15, 4:18, 4:21, 29:25, 30:9, 33:3, 45:14, 52:15, 53:13, 53:14, 53:17, 54:10, 56:9, 56:14, 56:16, 72:14, 72:15, 73:2, 80:25,

84:2, 95:13, 95:21
**motions** [8] - 3:20, 4:11, 11:9, 38:16, 102:19, 104:9, 105:13, 105:14
**Motorola** [1] - 25:10
**mountain** [1] - 84:23
**move** [2] - 44:25, 52:12
**moved** [4] - 11:4, 29:21, 36:6, 73:5
**mover** [7] - 41:13, 41:14, 41:19, 44:20, 48:13, 48:15, 48:16
**moves** [3] - 72:16, 102:25, 105:7
**moving** [1] - 10:16
**MR** [166] - 3:5, 3:11, 4:3, 4:6, 4:9, 4:12, 4:18, 7:11, 7:23, 8:1, 8:8, 8:12, 9:1, 9:17, 9:21, 10:11, 10:17, 10:22, 11:16, 11:18, 11:25, 12:10, 13:20, 14:8, 15:11, 15:16, 17:21, 19:13, 19:21, 19:24, 20:17, 20:24, 21:22, 22:6, 22:10, 23:23, 23:25, 24:6, 24:12, 24:15, 25:17, 25:19, 25:22, 26:4, 26:6, 26:9, 26:15, 29:12, 33:7, 36:13, 36:16, 36:22, 37:4, 38:8, 39:12, 40:1, 40:3, 41:11, 41:14, 42:20, 42:25, 43:23, 44:7, 44:15, 44:23, 45:1, 45:3, 47:21, 49:12, 49:20, 49:24, 50:23, 51:3, 51:12, 51:18, 51:20, 52:1, 52:5, 52:8, 52:14, 53:13, 53:15, 56:15, 57:13, 57:16, 59:13, 59:18, 60:5, 60:13, 60:14, 61:25, 62:21, 62:24, 64:9, 64:14, 64:21, 65:2, 67:5, 67:11, 67:14, 67:16, 68:3, 68:10, 68:11, 68:14, 68:24, 69:1, 69:7, 69:10, 69:14, 69:19, 70:14, 70:20, 70:23, 71:4, 71:11, 71:16, 71:20, 71:23, 72:1, 73:4, 76:14, 76:19, 77:17, 77:20, 77:22, 79:25, 80:8, 80:10, 80:21, 81:7,

81:13, 83:21, 84:11, 84:21, 85:8, 85:12, 86:9, 87:17, 89:4, 89:12, 89:22, 90:10, 92:2, 93:18, 94:8, 94:13, 95:8, 95:12, 96:22, 97:8, 97:9, 97:15, 97:17, 97:20, 97:21, 97:24, 103:15, 104:11, 104:19, 104:25, 105:2, 105:9, 105:19, 105:21, 105:24
**MS** [6] - 97:25, 100:3, 100:12, 103:3, 103:5, 103:13
**MSK** [25] - 5:2, 6:12, 12:12, 13:4, 15:3, 18:9, 18:11, 21:3, 21:7, 21:15, 26:20, 31:3, 33:14, 33:24, 34:10, 35:21, 49:15, 72:19, 76:2, 76:5, 76:11, 77:1, 77:8, 77:11, 93:2
**MSK/Juno** [10] - 8:14, 8:15, 8:18, 11:19, 12:2, 20:6, 37:7, 39:13, 50:10, 73:11
**multi** [5] - 22:16, 22:23, 23:7, 86:2, 94:3
**multi-component** [5] - 22:16, 22:23, 23:7, 86:2, 94:3
**multiple** [5] - 28:6, 28:13, 35:5, 79:13, 82:25
**multiplier** [2] - 33:23, 33:24
**multiplying** [1] - 35:16
**MUNGER** [1] - 2:15
**must** [2] - 82:25, 83:2
**myeloma** [1] - 28:13

# N

**naked** [1] - 82:12
**nearly** [2] - 34:5, 34:10
**necessary** [1] - 99:24
**need** [6] - 63:11, 64:16, 81:4, 94:6, 95:7, 96:11, 99:23, 105:17
**needed** [3] - 75:1, 78:23, 94:22
**needing** [1] - 74:17
**needs** [1] - 98:23
**negotiate** [1] - 84:3

**negotiated** [2] - 5:4, 91:15
**negotiating** [2] - 18:23, 75:20
**negotiation** [61] - 6:3, 7:15, 14:24, 16:1, 16:15, 17:2, 17:18, 17:25, 18:2, 18:24, 30:20, 31:7, 31:15, 34:17, 34:21, 35:10, 37:16, 37:22, 38:23, 39:15, 46:10, 46:11, 62:25, 63:1, 64:5, 64:8, 65:4, 65:7, 65:13, 70:6, 70:9, 72:20, 73:1, 74:6, 74:11, 75:11, 75:14, 75:19, 75:23, 76:22, 77:4, 78:13, 78:17, 80:12, 80:14, 80:23, 81:17, 81:25, 83:13, 87:2, 87:12, 89:17, 89:20, 89:24, 90:24, 90:25, 91:2, 91:3, 91:20, 93:13
**negotiators** [2] - 24:10, 63:22
**net** [2] - 41:8, 44:14
**never** [6] - 27:6, 27:8, 27:10, 48:12, 78:22, 101:1
**nevertheless** [1] - 41:17
**new** [14] - 29:22, 31:1, 32:15, 32:21, 33:2, 45:14, 45:15, 46:21, 48:6, 89:5, 90:18, 96:10, 104:3, 104:8
**New** [2] - 2:12
**next** [2] - 15:23, 55:23
**nexus** [1] - 43:16
**nice** [2] - 57:2, 66:18
**night** [1] - 29:20
**nine** [1] - 54:7
**nobody** [4] - 56:25, 66:24, 93:9
**noncompetitor** [1] - 33:21
**nonexistent** [1] - 65:15
**noninfringing** [5] - 18:18, 22:19, 23:8, 74:21, 91:22
**nontestifying** [1] - 72:8
**northern** [1] - 51:22
**note** [3] - 21:14, 35:14, 92:3
**noted** [1] - 61:1
**notes** [1] - 86:12

**nothing** [9] - 28:3,
28:16, 35:24, 45:1,
46:22, 47:6, 48:18,
51:24, 88:16
**notion** [2] - 57:1,
77:23
**Novartis** [31] - 5:3,
16:10, 16:16, 16:17,
16:25, 17:5, 24:1,
24:7, 24:19, 24:24,
33:20, 34:9, 35:2,
35:4, 35:5, 35:18,
35:19, 35:25, 37:11,
37:25, 39:14, 61:17,
66:4, 66:6, 73:13,
76:7, 87:22, 89:16,
90:14, 92:17
**Novartis/Juno** [1] -
16:13
**November** [3] - 54:11,
55:3, 55:7
**nowhere** [3] - 21:1,
31:3, 90:16
**number** [26] - 3:1,
10:5, 12:7, 25:1,
26:17, 36:20, 38:11,
42:16, 44:11, 44:12,
58:8, 60:15, 63:1,
77:25, 78:10, 84:17,
89:3, 89:23, 90:6,
90:13, 92:9, 93:21
**numbers** [11] - 10:7,
36:10, 45:3, 49:6,
89:6, 89:11, 92:3,
102:3, 102:4, 102:7,
102:11

## O

**object** [2] - 72:7,
99:15
**objection** [2] - 47:24,
72:10
**obligated** [3] - 49:21,
50:4, 50:6
**obligation** [4] - 7:8,
49:13, 50:1, 89:13
**obligations** [6] -
12:11, 12:17, 15:18,
50:11, 98:18, 100:6
**obtain** [3] - 18:9,
40:20, 41:16
**obtained** [1] - 42:13
**obvious** [1] - 85:11
**obviously** [4] - 20:10,
28:4, 72:1, 81:7
**occur** [2] - 17:2, 31:14
**occurred** [1] - 88:6
**occurring** [1] - 35:12
**occurs** [1] - 30:18

**October** [12] - 12:21,
30:1, 39:16, 54:8,
55:5, 55:19, 72:22,
74:12, 82:19, 81:6,
96:5, 99:18
**od** [234] - 77:3, 77:4,
77:6, 77:9, 77:10,
77:12, 77:17, 77:23,
77:24, 77:25, 78:1,
78:8, 78:12, 78:13,
78:22, 79:3, 79:5,
79:6, 79:10, 79:15,
79:16, 79:21, 80:1,
80:6, 80:13, 80:18,
80:20, 80:24, 80:25,
81:1, 81:5, 81:20,
81:23, 82:3, 82:15,
82:20, 82:22, 83:4,
83:5, 83:7, 83:8,
83:9, 83:10, 83:11,
83:14, 83:16, 83:18,
84:1, 84:3, 84:4,
84:5, 84:7, 84:14,
84:16, 84:17, 84:19,
84:22, 84:25, 85:1,
85:2, 85:3, 85:4,
85:5, 85:7, 85:11,
85:13, 85:17, 85:19,
85:23, 85:24, 86:2,
86:5, 86:10, 86:18,
86:20, 86:25, 87:9,
87:11, 87:14, 87:18,
87:24, 87:25, 88:1,
88:5, 88:6, 88:7,
88:10, 88:12, 88:13,
88:25, 89:3, 89:8,
89:21, 89:23, 90:5,
90:6, 90:9, 90:10,
90:13, 90:18, 90:20,
90:22, 90:23, 91:3,
91:5, 91:6, 91:11,
91:12, 91:18, 91:19,
91:20, 91:23, 92:4,
92:5, 92:9, 92:10,
92:11, 92:13, 92:20,
92:21, 92:25, 93:7,
93:8, 93:15, 93:22,
93:23, 94:4, 94:14,
94:16, 94:20, 94:24,
95:5, 95:13, 95:14,
95:16, 95:17, 95:20,
95:22, 96:2, 96:3,
96:6, 96:8, 96:10,
96:12, 96:13, 96:15,
96:16, 96:17, 96:18,
96:19, 96:23, 96:24,
97:3, 97:4, 97:7,
97:8, 97:11, 97:15,
98:2, 98:7, 98:10,
98:12, 98:15, 98:16,
99:5, 99:9, 99:10,

99:11, 99:12, 99:14,
99:20, 99:23, 99:25,
100:11, 100:13,
100:17, 100:18,
100:19, 100:20,
100:22, 100:24,
101:2, 101:5, 101:7,
101:12, 101:16,
101:19, 101:23,
101:24, 102:2,
102:4, 102:6,
102:11, 102:12,
102:15, 102:19,
102:22, 102:23,
102:24, 103:7,
103:9, 103:11,
103:16, 103:18
**OF** [3] - 1:2, 1:12, 2:1
**offer** [3] - 50:21, 53:1,
53:9
**offered** [2] - 29:24,
89:11
**offering** [3] - 38:11,
38:14, 68:23
**officer** [5] - 62:20,
67:20, 71:9, 72:12,
98:8
**Official** [1] - 1:22
**OLSON** [1] - 2:15
**once** [2] - 30:12, 96:23
**oncologist** [1] - 61:23
**oncology** [1] - 63:16
**one** [59] - 4:4, 4:18,
10:4, 13:6, 13:21,
14:2, 16:2, 17:22,
18:3, 21:23, 22:4,
22:17, 22:25, 25:19,
27:23, 27:24, 28:3,
28:16, 32:3, 32:15,
36:4, 37:16, 41:1,
41:11, 49:7, 53:2,
57:8, 58:10, 68:11,
68:12, 70:12, 70:20,
72:17, 72:19, 74:10,
79:10, 80:24, 81:15,
81:18, 82:24, 87:18,
87:24, 88:7, 91:8,
91:13, 92:10, 93:13,
93:25, 94:24, 97:21,
98:3, 98:5, 100:14,
100:20, 101:15,
102:25, 103:15,
104:11
**ones** [1] - 93:6
**ongoing** [4] - 9:11,
18:17, 43:3, 82:16
**open** [3] - 9:25, 73:25,
102:22
**opening** [8] - 104:24,
104:25, 105:4,

105:5, 105:6, 105:8,
105:12, 105:17
**openings** [1] - 104:22
**opine** [1] - 6:1
**opined** [1] - 80:6
**opines** [4] - 5:3, 5:8,
6:18, 72:17
**opinion** [26] - 5:1, 9:8,
10:25, 20:13, 22:11,
27:25, 31:4, 32:4,
32:14, 32:21, 35:6,
36:10, 38:14, 38:17,
46:7, 49:3, 51:7,
57:19, 65:12, 66:3,
66:7, 70:8, 73:6,
74:5, 91:24, 93:4
**opinions** [18] - 3:22,
3:25, 4:24, 7:8,
29:23, 33:2, 38:11,
51:6, 51:16, 52:16,
53:22, 57:17, 57:18,
69:24, 70:11, 95:22,
96:14
**opportunity** [3] - 3:19,
10:14, 32:9
**opposed** [2] - 52:23,
88:22
**opposing** [5] - 13:5,
50:21, 71:21, 90:20,
103:18
**opposita** [1] - 94:22
**opposite** [4] - 11:18,
30:7, 32:8, 77:3
**opposition** [4] - 30:3,
30:4, 31:25, 86:11
**optimal** [1] - 58:21
**optimize** [1] - 57:21
**optimizes** [1] - 58:14
**option** [3] - 10:3, 19:1,
101:1
**oral** [1] - 104:13
**order** [24] - 1:25, 9:10,
12:8, 26:11, 26:12,
39:9, 70:25, 71:13,
71:14, 71:18, 80:13,
81:3, 84:1, 90:22,
99:10, 99:23,
100:11, 102:18,
102:21, 102:23,
104:4, 104:8, 104:9,
105:25
**orders** [1] - 105:16
**ordinary** [2] - 17:7,
42:17
**original** [5] - 89:7,
89:11, 89:14, 90:16,
90:17
**originally** [1] - 55:18
**OTERO** [1] - 1:3
**otherwise** [4] - 30:17,

59:5, 72:6, 80:20
**outcome** [1] - 53:4
**outlier** [2] - 39:25,
40:3
**outpatient** [1] - 63:16
**outside** [3] - 35:13,
40:15, 75:22
**outstanding** [1] - 90:5
**overall** [5] - 28:5,
44:1, 48:9, 80:2,
90:4
**overruled** [1] - 72:11
**own** [20] - 8:4, 10:8,
17:17, 18:8, 18:11,
19:4, 22:12, 24:16,
27:21, 42:3, 42:8,
42:9, 42:12, 43:9,
46:2, 61:12, 62:15,
77:11, 81:1
**owner** [1] - 86:15
**owners** [1] - 83:10
**owns** [1] - 93:10

## P

**Pacific** [2] - 37:14,
37:15
**packed** [1] - 98:19
**page** [3] - 8:14, 12:2,
31:18
**pages** [5] - 11:23,
11:24, 31:18, 38:19,
90:10
**paid** [20] - 6:19, 7:20,
12:24, 13:2, 15:17,
15:21, 21:3, 21:7,
26:20, 35:4, 36:23,
39:2, 45:19, 47:10,
49:19, 49:24, 50:1,
78:1, 78:9
**panel** [2] - 22:4,
103:23
**papers** [3] - 13:6,
27:22, 53:17
**paragraph** [9] - 6:4,
45:12, 50:13, 69:11,
69:13, 69:15, 69:20,
70:1, 70:3
**paragraphs** [2] - 31:9,
45:8
**paramount** [1] - 41:19
**parcel** [1] - 22:7
**part** [15] - 22:7, 42:12,
49:13, 49:16, 50:2,
51:7, 52:22, 53:17,
68:6, 68:7, 70:18,
75:21, 77:24, 83:16,
84:3
**particular** [4] - 26:12,
44:11, 89:7, 103:12

**parties** [28] - 5:3, 6:8, 18:24, 35:9, 37:17, 40:5, 63:2, 63:5, 65:12, 67:22, 68:1, 74:12, 74:25, 75:8, 75:19, 80:20, 81:5, 84:13, 87:1, 91:4, 93:7, 93:16, 95:1, 100:8, 102:22, 104:3, 104:13, 105:11

**parties'** [3] - 90:24, 91:12, 95:15

**partly** [1] - 26:20

**parts** [1] - 23:18

**party** [1] - 99:18

**party's** [1] - 72:21

**past** [1] - 33:1

**patent** [93] - 7:16, 8:16, 11:20, 11:22, 16:22, 17:15, 17:22, 18:4, 18:7, 18:8, 18:10, 18:12, 18:20, 19:2, 19:17, 19:19, 22:8, 23:10, 26:18, 28:7, 28:20, 28:21, 28:25, 30:6, 31:2, 31:16, 33:20, 36:11, 37:20, 38:19, 40:6, 40:7, 40:13, 40:19, 41:17, 43:1, 43:6, 43:8, 43:11, 43:13, 43:14, 43:15, 43:17, 43:24, 44:1, 47:2, 47:14, 47:15, 48:5, 48:12, 48:16, 48:19, 51:6, 51:13, 51:14, 51:16, 51:21, 51:24, 60:24, 61:1, 61:6, 61:8, 67:3, 72:18, 74:15, 74:16, 75:1, 75:6, 75:9, 75:15, 76:15, 77:2, 77:5, 77:7, 78:21, 79:3, 80:19, 81:1, 81:4, 82:12, 82:21, 83:10, 84:7, 86:15, 87:8, 91:21, 93:8, 93:12, 94:2, 94:15, 95:2, 104:23

**patent's** [1] - 7:14

**patentable** [1] - 61:1

**patented** [9] - 18:6, 28:10, 43:4, 53:3, 61:2, 61:14, 63:25, 68:18, 73:18

**patents** [2] - 76:3, 78:20

**patient** [7] - 57:23, 58:6, 58:8, 58:11,

58:24, 59:15, 69:17

**patient's** [1] - 79:20

**patients** [4] - 58:19, 65:21, 70:4, 70:5

**pay** [6] - 6:19, 12:15, 21:8, 49:14, 50:4, 77:11

**paying** [3] - 12:20, 13:3, 93:15

**payment** [55] - 5:6, 5:11, 5:15, 6:1, 6:17, 7:17, 7:18, 8:21, 8:23, 9:6, 9:15, 9:20, 11:2, 11:3, 12:17, 17:14, 23:21, 25:16, 26:19, 27:6, 27:9, 27:12, 27:13, 27:18, 29:5, 29:10, 30:13, 30:23, 31:6, 31:11, 31:14, 33:15, 33:17, 33:25, 34:4, 34:13, 35:20, 35:21, 39:7, 45:18, 46:13, 49:20, 78:16, 87:9, 87:14, 87:15, 87:19, 87:20, 87:21, 88:17, 89:3, 92:24, 101:25

**payments** [19] - 9:3, 13:1, 15:19, 26:22, 39:1, 39:2, 46:9, 49:15, 50:5, 50:8, 50:13, 78:12, 88:2, 88:5, 88:9, 89:13, 89:16, 89:19, 92:24

**pays** [2] - 72:19, 76:11

**people** [3] - 23:9, 57:3, 59:5

**per** [3] - 14:4, 95:9, 95:10

**percent** [35] - 5:8, 5:9, 15:9, 15:12, 34:1, 34:10, 34:12, 39:13, 39:18, 39:21, 39:22, 39:25, 59:4, 73:14, 73:16, 73:23, 76:7, 76:8, 76:11, 76:12, 76:24, 77:8, 79:23, 81:24, 83:5, 84:16, 85:15, 85:24, 88:15, 88:16, 89:5, 89:9, 90:18, 94:2, 101:25

**percentage** [4] - 33:22, 39:9, 90:3, 90:4

**percentages** [1] - 39:19

**perception** [1] - 63:19

**percipient** [5] - 67:18, 68:4, 70:16, 71:15, 71:16

**percipient-type** [1] - 71:15

**perhaps** [2] - 28:18, 28:19

**period** [11] - 5:21, 5:25, 7:16, 9:23, 11:15, 12:4, 31:12, 32:5, 47:23, 48:5, 48:23

**permanent** [5] - 9:16, 11:4, 11:6, 11:9, 30:11

**permitted** [2] - 56:11, 95:21

**person** [2] - 71:6, 72:6

**personal** [2] - 61:12, 62:17

**Peter** [2] - 2:17, 3:14

**ph)** [1] - 51:19

**PHARMA** [1] - 1:8

**Pharma** [3] - 3:2, 3:12

**phase** [3] - 88:6, 88:7

**phones** [1] - 22:16

**phony** [12] - 26:19, 27:6, 27:9, 27:12, 29:10, 33:16, 35:21, 39:1, 46:13, 50:10, 50:11, 92:23

**phrase** [2] - 9:12, 19:15

**physicians** [1] - 65:21

**pick** [2] - 25:1, 92:18

**picked** [1] - 54:14

**picture** [1] - 66:12

**pieces** [1] - 58:2

**pipeline** [1] - 18:5

**place** [4] - 14:25, 38:22, 73:11, 87:25

**placed** [1] - 94:21

**plaintiff** [6] - 9:15, 11:3, 72:16, 84:23, 86:20, 99:6

**plaintiff's** [1] - 11:1

**plaintiffs** [11] - 8:24, 29:2, 30:10, 72:25, 83:8, 83:10, 85:1, 93:20, 98:25, 99:14, 99:20

**Plaintiffs** [2] - 1:6, 2:2

**plaintiffs'** [4] - 7:8, 27:21, 73:2, 100:16

**plan** [3] - 32:19, 44:10, 82:9, 84:13, 86:6

**planned** [1] - 55:18

**planning** [3] - 94:10, 96:4, 102:10

**play** [2] - 59:9, 104:22

**played** [1] - 105:4

**plays** [1] - 84:9

**pleadings** [7] - 3:18,

5:23, 9:13, 9:14, 14:1, 106:4, 106:6

**pocket** [1] - 77:11

**point** [36] - 8:6, 8:10, 8:16, 8:19, 11:19, 12:3, 14:6, 15:23, 18:4, 27:15, 36:14, 36:23, 37:10, 39:13, 46:24, 49:9, 49:18, 50:19, 58:18, 65:25, 66:1, 66:2, 68:12, 76:23, 76:24, 77:16, 82:24, 84:25, 85:1, 86:8, 86:13, 89:10, 91:9, 91:11, 93:3, 93:19

**pointed** [5] - 11:23, 15:9, 92:4, 92:9, 93:20

**points** [7] - 14:2, 33:19, 33:22, 42:18, 44:25, 84:19, 90:19

**poorer** [1] - 62:9

**popular** [1] - 51:10

**populations** [1] - 52:25

**portfolio** [1] - 43:10

**portion** [5] - 44:1, 54:14, 55:23, 64:12, 76:20

**portions** [1] - 8:6

**posed** [2] - 24:23, 24:24

**posited** [1] - 17:2

**positing** [1] - 8:3

**position** [15] - 9:14, 9:20, 18:23, 29:25, 30:8, 31:19, 31:23, 32:17, 38:6, 55:11, 56:2, 72:12, 74:25, 75:8, 91:12

**positions** [4] - 30:15, 50:21, 72:21, 74:12

**posits** [2] - 7:13, 15:22

**Posner's** [1] - 52:3

**possibility** [1] - 9:25

**possible** [5] - 46:8, 73:21, 95:5

**possibly** [1] - 59:16

**post** [8] - 8:25, 9:2, 11:9, 30:12, 38:13, 38:15, 45:6, 70:4

**post-approval** [1] - 70:4

**post-trial** [7] - 8:25, 9:2, 11:9, 30:12, 38:13, 38:15, 45:6

**potential** [3] - 23:22, 33:18, 87:7

**power** [1] - 100:25

**pox** [1] - 52:6

**practice** [2] - 52:18, 97:2

**precedent** [3] - 27:22, 29:4, 83:9

**precise** [1] - 8:6

**precisely** [1] - 18:1

**preclude** [1] - 72:15

**preconditioning** [1] - 54:3

**predicament** [1] - 75:13

**preinstruct** [1] - 105:5

**prejudice** [1] - 84:4

**prejudicial** [6] - 29:6, 32:7, 32:13, 47:9, 59:19, 101:4

**preliminaries** [1] - 104:2

**premature** [1] - 102:18

**premier** [1] - 98:13

**prepared** [8] - 10:19, 17:6, 34:19, 60:11, 72:24, 101:23, 102:5, 105:11

**present** [4] - 41:8, 44:14, 44:15, 44:18

**presenting** [2] - 44:10, 98:22

**press** [1] - 104:12

**pressure** [1] - 85:6

**presume** [1] - 74:20

**presumption** [1] - 95:3

**pretend** [1] - 83:5

**pretrial** [8] - 9:10, 79:14, 84:12, 104:4, 104:5, 104:7, 104:8, 104:21

**pretty** [3] - 17:20, 59:1, 94:14

**prevent** [1] - 85:14

**previous** [1] - 104:20

**price** [22] - 6:18, 13:1, 14:4, 14:23, 15:2, 15:8, 19:16, 20:18, 21:3, 27:1, 27:11, 27:24, 28:4, 28:6, 28:17, 28:22, 28:23, 43:20, 44:2, 44:22, 46:15, 47:16

**principle** [2] - 73:18, 83:7

**principled** [2] - 24:15, 25:4

**principles** [1] - 73:7

**privilege** [1] - 102:12

**privileged** [1] - 102:8

**problem** [3] - 32:6,

55:16, 99:22
**problems** [2] - 55:21, 56:5
**PROCEEDINGS** [1] - 1:12
**proceedings** [1] - 107:2
**proceeds** [1] - 76:21
**process** [18] - 40:12, 48:20, 53:5, 55:10, 57:10, 57:21, 58:6, 58:12, 59:3, 59:11, 60:4, 62:6, 65:18, 66:16, 66:21, 69:21, 79:19, 104:3
**processes** [4] - 19:6, 56:20, 56:21, 62:2
**produce** [6] - 53:24, 54:9, 54:18, 55:1, 60:9, 95:22
**produced** [7] - 46:5, 54:11, 54:15, 54:20, 55:24, 78:3, 95:14
**producing** [1] - 54:17
**product** [30] - 17:24, 22:22, 22:24, 23:7, 23:15, 30:12, 34:24, 38:13, 40:19, 47:7, 47:12, 47:22, 48:1, 53:20, 54:23, 56:22, 56:24, 59:13, 59:19, 63:15, 65:24, 77:4, 77:6, 78:22, 79:19, 79:23, 82:19, 86:2, 94:3
**production** [1] - 53:19
**products** [5] - 22:16, 28:14, 66:23, 77:1, 79:13
**profile** [4] - 61:19, 62:9, 63:6, 63:8
**profiles** [1] - 63:23
**profit** [1] - 19:8
**profits** [19] - 17:16, 22:13, 23:19, 26:3, 26:7, 30:11, 31:21, 34:8, 34:23, 35:16, 37:13, 37:18, 39:24, 45:8, 45:10, 48:11, 85:15, 85:18, 85:24
**prognosis** [1] - 57:4
**program** [3] - 23:13, 28:13, 43:25
**programs** [2] - 21:16, 43:5
**prohibit** [1] - 85:1
**project** [1] - 87:7
**projected** [2] - 85:20, 87:19
**projections** [10] - 8:4,

17:17, 22:12, 24:16, 42:8, 47:25, 48:1, 85:23, 101:24, 102:11
**promise** [1] - 26:21
**promised** [1] - 55:6
**proper** [4] - 23:1, 25:11, 28:7, 50:20
**properly** [3] - 21:20, 21:22, 22:2
**property** [3] - 82:3, 82:25
**proposal** [1] - 11:21
**propose** [1] - 71:20
**proposed** [2] - 11:2, 104:4
**prorate** [1] - 31:11
**prorated** [2] - 9:23
**proration** [1] - 12:3
**prospective** [3] - 37:18, 71:18, 91:15
**protected** [1] - 87:8
**prototype** [1] - 66:15
**provide** [4] - 10:13, 19:7, 56:10, 64:20
**provided** [11] - 12:18, 51:6, 63:11, 63:15, 78:5, 78:17, 84:17, 96:1, 105:14
**providing** [1] - 58:12
**provision** [1] - 83:14
**public** [5] - 14:13, 14:22, 61:15, 63:19, 63:25
**publication** [1] - 64:9
**published** [1] - 95:25
**purpose** [1] - 81:25
**pursue** [2] - 26:3, 26:7
**put** [9] - 32:21, 49:4, 59:9, 66:2, 66:7, 85:6, 86:23, 91:16, 96:6
**putting** [3] - 38:22, 65:17, 99:6

## Q

**quadruple** [5] - 25:2, 27:16, 37:3, 92:25
**quadrupling** [4] - 34:5, 34:10, 35:11, 88:24
**qualified** [1] - 61:22
**quarter** [1] - 5:10
**questions** [9] - 5:18, 10:23, 29:9, 33:4, 38:10, 38:12, 45:5, 102:2, 102:7
**quick** [2] - 33:9, 66:17
**quicker** [1] - 59:2

**quickest** [1] - 104:17
**quickly** [3] - 58:23, 59:2, 65:3
**quite** [1] - 54:22
**quote** [3] - 31:9, 37:17, 79:17

## R

**raise** [7] - 13:5, 39:4, 50:25, 62:1, 97:23, 98:2, 100:14
**raised** [7] - 13:10, 33:2, 36:5, 60:18, 84:19, 84:25, 95:13
**raises** [1] - 50:23
**raising** [1] - 39:4
**range** [2] - 34:2, 78:17
**ranges** [1] - 72:23
**Rao** [42] - 3:25, 4:7, 4:15, 12:4, 16:9, 16:24, 20:7, 31:12, 50:7, 50:21, 50:23, 72:17, 72:23, 73:15, 73:19, 74:4, 74:20, 75:7, 76:2, 76:23, 77:9, 78:24, 79:25, 80:6, 84:12, 84:13, 84:24, 84:25, 85:22, 86:24, 87:24, 88:4, 88:20, 89:5, 89:15, 90:19, 91:11, 91:22, 92:15, 93:1, 93:19
**Rao's** [11] - 9:21, 10:5, 72:15, 72:20, 73:6, 75:12, 87:14, 87:20, 87:21, 90:17, 91:10
**rare** [2] - 40:4, 40:8
**rate** [15] - 22:22, 23:2, 34:4, 34:11, 53:7, 59:3, 72:18, 73:23, 77:8, 77:10, 88:13, 88:16, 89:5, 89:9
**rather** [3] - 12:21, 30:2, 35:19
**ratio** [1] - 35:15
**rational** [1] - 76:15
**re** [1] - 58:11
**re-engineered** [1] - 58:11
**reach** [1] - 99:25
**reached** [2] - 78:15, 96:3
**reaching** [1] - 35:11
**read** [2] - 90:22, 91:8
**readily** [1] - 85:4
**reading** [3] - 93:1, 106:5, 106:7
**ready** [3] - 3:16, 52:12, 55:21

**real** [11] - 18:24, 35:6, 35:11, 50:11, 66:11, 66:22, 74:13, 88:14, 88:18, 88:22
**reality** [1] - 81:9
**realized** [4] - 6:2, 27:10, 31:7, 81:3
**really** [16] - 10:23, 11:25, 23:3, 27:17, 33:9, 39:4, 46:21, 48:23, 50:15, 60:18, 61:10, 73:23, 75:8, 102:13, 106:5
**realtime** [4] - 97:11, 97:13, 97:19
**reason** [14] - 27:18, 28:22, 35:3, 38:22, 41:15, 45:5, 48:17, 55:12, 65:17, 69:1, 74:24, 79:5, 88:14, 96:3
**reasonable** [5] - 20:5, 39:22, 39:23, 80:3, 87:20
**reasonably** [2] - 14:14, 37:19
**reasoning** [1] - 102:6
**reasons** [5] - 28:23, 34:15, 48:18, 56:8, 72:17
**rebut** [8] - 32:9, 53:2, 53:4, 57:15, 62:5, 66:1, 68:23, 86:24
**rebuts** [3] - 60:22, 62:10, 68:21
**rebuttal** [4] - 32:14, 32:23, 61:15, 64:25
**rebutted** [1] - 66:2
**rebutting** [2] - 57:16, 58:23
**receive** [3] - 9:16, 24:19, 55:5
**received** [2] - 54:16, 60:1
**recent** [3] - 53:18, 54:25, 95:18
**recently** [3] - 45:12, 51:17, 51:18
**recess** [4] - 67:7, 67:10, 106:9
**recognize** [1] - 20:16
**recognized** [3] - 28:5, 85:3, 94:18
**reconstruct** [1] - 81:8
**reconstructed** [1] - 51:23
**record** [5] - 38:8, 45:4, 51:15, 88:25, 107:2
**recover** [1] - 48:12
**recovery** [1] - 31:20

**red** [3] - 46:21, 98:21, 98:24
**reduces** [1] - 93:21
**refer** [1] - 57:18
**reference** [11] - 8:22, 42:19, 42:20, 49:11, 50:13, 60:3, 64:23, 69:14, 69:15, 80:17, 90:17
**referenced** [4] - 40:23, 41:12, 53:6, 76:5
**references** [6] - 39:1, 40:25, 41:5, 67:17, 89:12, 90:12
**referred** [1] - 37:12
**refers** [1] - 6:9
**reflect** [1] - 88:18
**reflected** [2] - 27:21, 73:23
**reflects** [3] - 31:14, 35:6, 42:16
**refute** [1] - 87:10
**regard** [8] - 4:13, 4:14, 4:15, 4:20, 56:15, 57:19, 95:14, 104:12
**regarding** [6] - 6:9, 7:6, 9:20, 37:10, 53:19, 54:1, 59:24, 102:19, 103:9
**regime** [5] - 53:3, 57:9, 59:11, 60:4, 68:18
**regimen** [5] - 60:25, 61:3, 61:14, 63:25, 64:1
**regimens** [1] - 61:8
**region** [1] - 79:10
**regular** [1] - 24:17
**regulatory** [1] - 55:12, 56:4
**reimbursement** [1] - 63:19
**reinject** [1] - 58:8
**reinjected** [1] - 57:22, 59:1
**reintroduce** [1] - 58:10
**reject** [1] - 81:23
**related** [3] - 28:10, 53:16, 96:15
**relates** [3] - 54:12, 55:2, 95:17
**relationship** [2] - 35:9, 72:25
**relative** [4] - 24:18, 35:25, 37:11, 104:22
**releases** [1] - 38:13
**relevance** [1] - 43:21
**relevant** [20] - 4:20, 7:16, 34:20, 35:9,

36:11, 41:15, 43:17, 43:21, 43:24, 44:3, 44:8, 48:25, 54:20, 56:19, 57:3, 59:16, 59:18, 62:16, 62:23, 87:10

**reliability** [1] - 29:3

**reliance** [1] - 65:9

**relied** [4] - 24:17, 46:7, 70:3, 80:3

**relief** [7] - 9:8, 9:20, 9:25, 10:14, 10:23, 11:9, 31:21

**relies** [4] - 72:23, 73:7, 76:19, 77:25

**rely** [1] - 65:6

**relying** [5] - 8:11, 8:14, 8:18, 65:10, 90:21

**remain** [3] - 72:13, 89:3, 102:19

**remains** [1] - 76:12

**remarkably** [1] - 67:23

**remedies** [3] - 38:10, 38:12, 38:15

**remind** [1] - 97:11

**reminder** [2] - 15:17, 91:2

**renegotiate** [2] - 83:24, 84:5

**repeat** [1] - 21:19

**repeatedly** [2] - 31:6, 70:12

**reply** [2] - 65:8, 86:13

**report** [49] - 6:1, 6:4, 7:7, 7:25, 8:5, 8:6, 29:16, 29:24, 30:7, 31:9, 32:8, 32:11, 32:19, 36:8, 45:7, 45:10, 45:20, 45:24, 46:1, 46:6, 46:20, 49:10, 50:14, 53:6, 64:11, 64:13, 64:15, 64:16, 64:17, 67:17, 69:4, 69:8, 69:11, 69:12, 78:2, 89:7, 89:10, 89:11, 89:14, 90:16, 90:17, 92:4, 92:7, 92:20, 93:24, 93:25, 96:1

**Reporter** [1] - 1:22

**REPORTER'S** [1] - 1:12

**reporting** [3] - 97:14, 97:15, 97:19

**reports** [9] - 29:18, 32:1, 45:23, 46:5, 55:20, 56:3, 68:8, 69:16, 69:17

**representative** [7] -

62:14, 70:24, 71:10, 72:3, 72:5, 72:8, 72:13

**representatives** [1] - 71:17

**request** [6] - 11:10, 71:12, 97:10, 97:18, 99:9, 99:14

**requested** [3] - 8:23, 9:19, 99:5

**require** [1] - 47:4

**requires** [1] - 14:25

**resemblance** [1] - 88:25

**reserving** [1] - 45:7

**resolves** [1] - 74:2

**resolving** [1] - 40:12

**respect** [4] - 60:11, 71:23, 75:17, 93:1

**respectfully** [1] - 14:9

**respond** [4] - 36:16, 36:17, 65:3, 101:19

**response** [5] - 28:15, 45:17, 54:19, 61:19, 99:21

**responsive** [2] - 58:18, 62:10

**rest** [2] - 55:1, 55:7

**restriction** [1] - 83:8

**result** [8] - 11:10, 37:19, 53:18, 62:9, 76:15, 76:18, 80:6, 81:14

**results** [2] - 34:11, 64:7

**retained** [4] - 27:6, 100:2, 100:4, 100:6

**revenue** [4] - 22:21, 22:23, 23:1, 42:8

**revenues** [5] - 23:2, 30:14, 35:17, 48:4, 86:18

**review** [1] - 3:19

**reviewed** [1] - 60:25

**reviewing** [2] - 5:23, 5:25

**rewrite** [1] - 32:4

**rights** [12] - 40:7, 40:20, 41:16, 80:14, 81:3, 81:4, 81:15, 83:25, 84:2, 93:8, 93:12, 93:15

**risk** [6] - 18:21, 32:18, 40:10, 40:11, 40:16, 88:17

**robust** [1] - 79:3

**round** [2] - 30:16

**royalties** [8] - 9:11, 11:14, 17:17, 35:2, 35:11, 40:15, 79:4,

79:13

**royalty** [51] - 5:8, 5:24, 9:2, 9:6, 11:2, 15:1, 22:22, 23:2, 25:13, 33:14, 33:24, 34:1, 34:4, 34:5, 34:11, 34:12, 35:4, 35:5, 35:16, 35:22, 37:20, 39:9, 39:22, 39:23, 46:16, 49:5, 73:14, 73:16, 73:23, 76:1, 76:25, 77:8, 77:10, 80:3, 80:6, 81:24, 84:14, 85:6, 85:9, 85:18, 85:20, 86:18, 86:23, 87:8, 88:13, 88:16, 89:9, 90:18, 101:25

**RPR** [2] - 1:22, 107:8

**rule** [1] - 95:20

**Rule** [1] - 36:3

**ruled** [2] - 20:3, 93:7

**Rules** [1] - 33:12

**rules** [1] - 83:3

**ruling** [1] - 105:13

**rulings** [3] - 103:11, 104:7, 104:9

**running** [8] - 5:8, 9:1, 9:6, 11:2, 25:13, 39:9, 76:1, 80:5

**runs** [3] - 7:22, 8:7, 83:7

# S

**Sadelain's** [2] - 43:10, 74:19

**safety** [9] - 53:8, 61:19, 62:9, 63:5, 63:8, 64:6, 67:18, 67:23, 69:22

**sale** [2] - 12:19, 77:12

**sales** [10] - 5:8, 7:19, 9:4, 9:6, 12:12, 15:1, 15:18, 35:1, 35:2, 76:13

**Sarah** [2] - 2:11, 3:8

**sat** [1] - 87:11

**Saturday** [1] - 100:18

**saved** [1] - 65:21

**saw** [1] - 96:2

**schedule** [2] - 98:20, 99:5

**scheduled** [2] - 3:20, 99:12

**schedules** [1] - 100:6

**scheduling** [1] - 99:22

**schemes** [1] - 63:19

**scientific** [3] - 20:2, 21:13, 58:16

**scope** [2] - 94:21, 94:23

**screen** [1] - 78:7

**sealed** [1] - 103:19

**seat** [1] - 3:15

**seated** [1] - 3:4

**SEC** [1] - 19:5

**second** [9] - 17:8, 17:9, 17:23, 39:17, 72:20, 90:15, 91:11, 98:7, 100:22

**Section** [2] - 54:12, 76:24

**section** [1] - 76:25

**sections** [1] - 8:11

**securing** [1] - 40:6

**see** [8] - 9:12, 19:10, 19:14, 28:19, 44:4, 45:9, 84:9, 100:8

**seeing** [1] - 79:12

**seek** [2] - 30:11, 45:7

**seeking** [5] - 8:24, 9:1, 9:8, 9:11, 31:20

**seem** [6] - 20:19, 42:16, 47:20, 56:18, 84:7, 85:1

**seemingly** [2] - 5:12, 19:18

**selected** [1] - 105:1

**selection** [1] - 104:3

**self** [1] - 42:15

**self-evident** [1] - 42:15

**sense** [11] - 28:21, 38:7, 46:18, 48:10, 66:1, 77:14, 81:11, 81:13, 81:14, 86:25, 91:3

**senseless** [2] - 38:6

**Sentrix** [2] - 13:21, 28:1

**separate** [4] - 9:2, 20:22, 22:1, 95:19

**September** [4] - 53:23, 54:6, 54:7, 101:11

**series** [3] - 29:21, 32:1, 32:22

**serve** [2] - 72:9, 101:10

**set** [10] - 68:6, 69:17, 74:13, 79:4, 81:15, 81:16, 81:18, 83:13, 92:19

**setting** [1] - 75:5

**settlement** [7] - 16:11, 16:13, 16:16, 24:7, 72:23, 75:18, 75:21

**settling** [1] - 23:10

**seven** [1] - 51:9

**Shampentin** [1] -

51:19

**share** [14] - 14:5, 19:15, 20:18, 20:21, 22:3, 22:13, 23:19, 27:11, 39:24, 41:24, 42:1, 42:5, 42:6, 42:7

**shared** [1] - 106:2

**shares** [18] - 6:12, 6:13, 6:22, 12:14, 14:5, 19:12, 19:22, 21:3, 21:7, 21:8, 26:21, 26:24, 27:2, 28:9, 78:14, 90:4, 90:5

**shield** [1] - 102:13

**shoes** [2] - 12:21, 38:24

**short** [5] - 25:19, 58:24, 62:11, 67:6, 98:12

**shortest** [1] - 95:4

**shortly** [1] - 64:18

**shots** [1] - 78:7

**show** [4] - 14:6, 62:5, 65:19, 74:16

**showed** [1] - 67:20

**showing** [2] - 67:23, 68:2

**shown** [1] - 65:5

**shows** [2] - 61:13, 91:20

**shuffle** [1] - 36:6

**sic** [1] - 23:18

**side** [7] - 25:23, 58:17, 59:7, 94:15, 95:9, 95:10, 106:7

**sided** [1] - 78:10

**sides** [8] - 5:19, 16:21, 73:17, 73:25, 102:25, 106:2, 106:5, 106:8

**sides'** [1] - 52:1

**sideshow** [1] - 48:23

**sign** [1] - 88:3

**signed** [1] - 82:7

**significant** [8] - 5:12, 18:21, 37:9, 44:1, 60:19, 62:2, 100:7, 105:14

**significantly** [1] - 63:8

**signing** [1] - 30:20

**similar** [5] - 14:12, 14:14, 14:22, 35:4, 67:23

**similarities** [1] - 14:21

**similarly** [2] - 58:21, 61:25

**simply** [3] - 21:2, 36:20, 83:5

**single** [12] - 12:18, 29:4, 51:6, 52:23, 77:7, 79:4, 79:12, 79:13, 88:12, 92:6, 92:9

**single-digit** [2] - 79:12, 79:13

**situation** [4] - 39:16, 40:4, 40:18, 91:19

**six** [3] - 18:12, 23:13

**SKI** [7] - 34:16, 81:4, 81:16, 82:8, 83:11, 83:25

**slightly** [1] - 87:21

**Sloan** [11] - 3:6, 12:18, 12:24, 16:1, 16:2, 49:17, 63:3, 74:6, 78:1, 78:12, 80:12

**small** [2] - 46:17, 103:15

**smart** [1] - 22:16

**so-called** [1] - 33:10

**society** [1] - 98:12

**sold** [2] - 14:14, 21:15

**solid** [1] - 44:9

**someone** [1] - 93:14

**sometime** [1] - 31:21

**sometimes** [1] - 10:7

**somewhat** [2] - 73:15, 94:15

**somewhere** [2] - 46:5, 78:16

**sorry** [3] - 7:21, 53:14, 79:24

**sort** [6] - 10:2, 61:10, 62:3, 63:12, 74:22, 91:17

**sorts** [1] - 28:9

**sought** [1] - 30:10

**sound** [2] - 7:9, 14:7

**South** [2] - 2:9, 2:18

**speaks** [3] - 43:5, 44:8, 77:6

**specific** [3] - 13:9, 13:24, 62:8

**speculative** [3] - 34:23, 86:17, 87:4

**Spero** [1] - 51:22

**spreadsheet** [4] - 86:16, 86:17, 87:3

**spreadsheets** [2] - 87:5, 102:4

**St** [3] - 33:21, 87:22, 92:17

**stand** [4] - 10:15, 96:7, 96:24, 97:5

**standard** [3] - 5:11, 75:5

**standing** [6] - 80:13, 80:17, 80:18, 81:16,

---

90:22, 93:17

**Stars** [1] - 2:6

**start** [11] - 3:7, 3:16, 3:20, 4:23, 26:15, 30:5, 41:11, 53:16, 77:22, 82:18, 104:2

**started** [7] - 18:10, 29:19, 45:18, 60:5, 86:14, 88:23

**starting** [16] - 8:15, 8:19, 11:19, 12:1, 12:3, 27:15, 31:25, 36:23, 39:12, 49:18, 73:11, 76:23, 82:23, 91:9, 98:18, 98:23

**state** [1] - 3:3

**statement** [2] - 15:12, 105:18

**statements** [7] - 104:24, 104:25, 105:4, 105:5, 105:6, 105:8, 105:12

**STATES** [1] - 1:1

**stating** [1] - 31:13

**stayed** [1] - 88:21

**steer** [2] - 91:17, 91:21

**stepped** [1] - 12:20

**stepping** [1] - 38:24

**steps** [1] - 22:1

**still** [12] - 8:3, 17:1, 17:15, 19:7, 22:2, 23:16, 34:21, 45:12, 55:8, 72:12, 81:24, 93:2

**stipulation** [2] - 104:6, 104:14

**stock** [59] - 6:9, 6:12, 6:13, 6:14, 6:17, 6:22, 6:23, 12:14, 12:16, 13:1, 13:7, 14:2, 14:23, 15:2, 15:5, 19:11, 19:17, 19:18, 21:2, 21:14, 26:15, 26:19, 26:20, 26:22, 26:24, 26:25, 27:1, 27:4, 27:5, 27:6, 27:24, 28:3, 28:4, 28:6, 28:8, 28:22, 28:23, 29:10, 33:16, 35:20, 35:21, 35:22, 36:21, 38:21, 46:8, 46:9, 46:12, 46:13, 46:15, 47:15, 78:14, 90:2, 92:8, 92:10, 92:23

**stood** [2] - 69:1, 79:17

**stop** [2] - 7:21, 34:3

**straw** [2] - 14:9, 14:19

**streamline** [1] - 26:5

**streamlining** [1] -

---

25:22

**Street** [3] - 1:23, 2:9, 2:11

**stricken** [1] - 49:3

**strike** [3] - 4:21, 29:21, 45:17

**strip** [2] - 91:13, 93:19

**stripped** [2] - 91:12, 91:23

**strips** [2] - 75:13, 93:21

**stronger** [1] - 43:16

**studies** [4] - 52:24, 54:13, 58:16, 61:13

**study** [1] - 55:14

**stuff** [1] - 46:2

**sublicense** [7] - 33:19, 76:20, 80:16, 81:21, 81:22, 83:23, 84:5

**sublicensed** [1] - 72:18

**submissions** [1] - 54:7

**submit** [12] - 8:17, 14:9, 43:18, 55:10, 55:14, 55:18, 55:23, 70:9, 75:12, 77:9, 83:10, 96:18

**submitted** [6] - 54:19, 55:4, 55:6, 96:11, 104:3

**submitting** [1] - 54:24

**subpart** [1] - 79:10

**subpoena** [2] - 100:25, 101:10

**substance** [3] - 56:9, 56:14, 56:15

**substantial** [1] - 32:18

**substituting** [2] - 14:25, 89:23

**subtract** [1] - 84:16

**subtracted** [1] - 84:16

**succeed** [1] - 28:25

**success** [26] - 12:15, 13:1, 15:19, 26:19, 26:22, 27:6, 27:9, 27:12, 29:10, 33:16, 35:21, 39:1, 39:2, 46:9, 46:13, 49:15, 49:20, 50:13, 53:7, 59:3, 65:23, 78:16, 89:13, 89:19, 92:23

**successful** [1] - 65:20

**suddenly** [3] - 84:1, 93:13, 96:7

**sued** [1] - 86:20

**suffering** [1] - 34:8

**sufficiently** [1] - 65:10

**suggest** [2] - 100:8,

---

103:18

**suggesting** [1] - 87:14

**suggestion** [1] - 79:16

**Suite** [1] - 2:6

**Sullivan** [70] - 3:23, 4:2, 4:14, 4:24, 4:25, 5:3, 5:16, 6:9, 6:10, 6:11, 6:16, 6:18, 6:21, 7:3, 7:9, 7:13, 9:4, 11:14, 12:8, 12:19, 13:17, 15:2, 15:6, 15:14, 15:22, 16:24, 17:4, 17:13, 19:8, 19:20, 19:24, 20:5, 20:15, 20:23, 20:25, 21:19, 22:10, 23:21, 26:23, 28:15, 29:23, 31:6, 31:9, 32:15, 36:8, 37:14, 37:23, 39:6, 39:10, 40:23, 40:24, 42:3, 45:6, 46:20, 46:25, 48:9, 50:25, 51:3, 51:5, 51:23, 78:3, 85:17, 88:23, 89:6, 89:18, 90:2, 92:4, 92:13, 92:20

**Sullivan's** [43] - 4:24, 5:20, 5:24, 6:1, 7:1, 7:7, 7:17, 7:24, 9:8, 9:15, 10:25, 11:13, 14:2, 16:12, 17:17, 20:12, 23:4, 23:16, 27:15, 29:16, 30:5, 30:7, 30:16, 31:4, 33:2, 33:10, 34:14, 35:4, 35:16, 36:24, 38:9, 39:23, 41:12, 46:6, 49:1, 49:10, 50:14, 51:15, 78:2, 85:19, 87:13, 89:2

**sum** [1] - 9:18

**Sunday** [1] - 98:20

**superior** [3] - 48:19, 48:20, 54:23

**Supplemental** [3] - 4:21, 34:18, 46:3

**supplemental** [7] - 29:18, 32:1, 32:2, 32:22, 45:23, 46:5

**supplier** [1] - 55:19

**support** [5] - 5:16, 12:9, 27:22, 35:3, 35:10

**supportable** [1] - 42:11

**supported** [1] - 36:20

**suppose** [1] - 21:6

**supposed** [2] - 48:8, 54:17, 56:1

---

**supposedly** [3] - 35:25, 78:1, 78:9

**supreme** [1] - 52:11

**suspected** [1] - 69:19

**swap** [13] - 6:9, 14:3, 19:11, 26:15, 26:19, 28:21, 29:10, 33:16, 36:21, 38:21, 46:8, 92:10, 92:23

**swapped** [2] - 26:23, 28:16

**swapping** [4] - 27:1, 27:23, 28:3, 92:7

**sword** [1] - 102:12

**system** [1] - 61:11

## T

**T-cells** [11] - 57:22, 58:3, 58:6, 58:7, 58:11, 58:15, 58:21, 58:25, 59:1, 62:8, 79:8

**table** [6] - 10:3, 18:1, 18:25, 25:24, 91:20, 95:2

**taints** [1] - 91:24

**talks** [1] - 93:24

**TCR** [1] - 28:14

**teachings** [1] - 94:22

**technologies** [1] - 21:17

**technology** [7] - 14:13, 28:10, 48:22, 73:18, 91:18, 94:19, 94:20

**Ted** [1] - 3:11

**term** [27] - 5:20, 6:6, 7:12, 7:13, 7:22, 8:7, 8:17, 11:20, 12:4, 29:13, 30:22, 31:2, 31:5, 33:5, 34:6, 34:24, 35:13, 47:2, 48:2, 48:7, 48:11, 48:12, 48:14, 75:4, 85:21, 87:23

**terminally** [2] - 57:3, 58:19

**terms** [15] - 7:2, 9:19, 13:4, 34:5, 42:4, 50:9, 51:3, 51:12, 53:18, 62:8, 84:22, 91:14, 102:21, 103:22, 106:6

**testified** [7] - 16:22, 38:10, 51:14, 78:8, 90:2, 92:20, 102:4

**testifies** [1] - 53:21, 54:2

**testify** [18] - 36:8,

53:2, 56:11, 56:18,
57:15, 60:8, 62:6,
67:21, 67:25, 72:6,
96:8, 96:19, 98:17,
98:21, 99:1, 99:2,
99:8, 99:15
**testifying** [4] - 60:3,
62:13, 62:15, 71:1
**testimony** [15] - 3:23,
25:7, 30:8, 32:14,
38:9, 56:19, 60:1,
60:7, 65:22, 70:11,
72:16, 78:5, 99:10,
100:15
**Texas** [1] - 28:1
**text** [1] - 69:12
**Thanksgiving** [2] -
29:20, 32:20
**thanksgiving** [1] -
46:1
**THE** [168] - 3:1, 3:10,
3:15, 4:4, 4:8, 4:10,
4:17, 4:23, 7:21,
7:24, 8:5, 8:10, 8:22,
9:9, 9:18, 10:4,
10:15, 10:20, 11:12,
11:17, 11:23, 12:6,
13:18, 14:1, 15:5,
15:14, 17:20, 19:10,
19:14, 19:23, 20:16,
20:18, 21:18, 22:4,
22:7, 23:20, 23:24,
24:3, 24:11, 24:14,
25:12, 25:18, 25:21,
25:25, 26:5, 26:8,
26:14, 29:11, 33:6,
36:12, 36:14, 36:17,
37:2, 38:7, 39:8,
39:25, 40:2, 40:22,
41:13, 42:14, 42:23,
43:19, 44:4, 44:12,
44:17, 44:24, 45:2,
47:19, 49:7, 49:19,
49:23, 50:19, 51:2,
51:10, 51:17, 51:19,
51:25, 52:3, 52:6,
52:10, 52:15, 53:14,
56:13, 57:6, 57:14,
59:8, 59:17, 59:22,
60:10, 61:21, 62:19,
62:22, 64:3, 64:12,
64:18, 64:22, 67:4,
67:6, 67:13, 67:15,
67:25, 68:12, 68:22,
68:25, 69:5, 69:9,
69:13, 70:13, 70:19,
70:22, 71:3, 71:5,
71:14, 71:17, 71:22,
71:25, 72:10, 76:1,
76:17, 77:14, 77:18,

77:21, 79:24, 80:4,
80:9, 80:17, 81:5,
81:11, 83:15, 84:8,
84:20, 85:7, 85:11,
86:8, 87:13, 89:1,
89:10, 89:21, 90:9,
92:1, 93:16, 94:5,
94:12, 95:6, 95:11,
96:20, 97:6, 97:13,
97:16, 97:18, 97:23,
100:2, 100:4,
102:17, 103:4,
103:8, 103:14,
103:22, 103:25,
104:1, 104:16,
104:24, 105:1,
105:3, 105:11,
105:20, 105:22,
105:25
**themselves** [3] -
40:18, 83:9, 83:12
**theoretical** [1] - 35:12
**theories** [2] - 65:5,
65:6
**theory** [10] - 9:25,
31:1, 32:10, 34:5,
34:6, 34:23, 48:6,
73:7, 75:6, 75:13
**therapeutic** [2] - 3:2,
53:4
**THERAPEUTICS** [1] -
1:5
**therapies** [4] - 41:4,
42:24, 44:19, 65:15
**therapy** [38] - 16:17,
18:15, 19:3, 19:4,
19:5, 19:6, 19:7,
19:25, 23:8, 23:9,
23:18, 43:1, 43:13,
43:16, 52:17, 57:8,
58:1, 58:20, 60:19,
61:5, 61:24, 63:4,
63:10, 63:11, 63:18,
63:20, 65:16, 65:19,
65:20, 73:20, 73:21,
73:22, 74:18, 79:7,
80:3, 98:7, 98:10
**Thereupon** [2] -
67:10, 106:9
**they've** [1] - 58:13
**thinks** [3] - 24:4,
37:19, 85:17
**third** [1] - 43:12
**three** [10] - 3:20, 4:11,
5:5, 34:8, 35:17,
53:2, 57:4, 72:17,
73:5, 98:2
**threshold** [1] - 27:8
**throughout** [3] -
30:10, 43:4, 63:13

**throw** [1] - 36:10
**thrown** [1] - 29:14
**Thursday** [4] - 98:19,
98:24, 99:7, 99:8
**tied** [3] - 7:19, 12:12,
15:18
**tight** [1] - 101:4
**titled** [3] - 86:16, 87:3,
107:2
**today** [11] - 3:21, 4:8,
4:16, 10:15, 60:11,
62:4, 67:23, 68:2,
70:17, 98:3, 104:7
**today's** [1] - 106:1
**together** [2] - 55:17,
103:20
**TOLLES** [1] - 2:15
**tomorrow** [2] -
103:23, 105:12
**took** [2] - 19:24, 89:15
**top** [1] - 87:5
**toss** [1] - 95:2
**total** [1] - 30:14
**totaling** [2] - 5:4,
89:19
**totally** [2] - 27:19, 29:7
**track** [1] - 51:15
**traditional** [1] - 78:25
**transcript** [4] - 79:18,
103:20, 106:1, 107:1
**TRANSCRIPT** [1] -
1:12
**transcripts** [3] - 1:25,
97:11, 97:13
**transfer** [1] - 93:8
**transferred** [1] - 76:6
**translates** [1] - 12:19
**treat** [3] - 13:13, 13:15
**treated** [2] - 70:4, 70:5
**treating** [1] - 65:21
**treatment** [1] - 79:18
**trebling** [2] - 35:19,
35:20
**trial** [41] - 8:25, 9:2,
9:24, 11:9, 25:23,
26:5, 30:12, 30:14,
31:24, 32:7, 32:13,
32:20, 33:3, 34:7,
38:10, 38:13, 38:15,
40:12, 45:6, 60:24,
62:1, 68:7, 68:8,
70:12, 70:13, 86:6,
88:7, 91:16, 94:9,
95:5, 96:5, 98:17,
99:11, 99:12, 99:19,
101:5, 101:6,
101:10, 101:14,
102:14, 105:15
**trials** [10] - 18:11,
18:16, 43:3, 43:7,

52:23, 78:20, 79:16,
82:10, 82:15, 82:17
**tried** [7] - 18:18,
18:19, 66:7, 74:14,
74:15, 91:21
**triggered** [2] - 13:2,
50:6, 89:18, 89:20
**triggers** [2] - 49:22,
49:25
**triple** [2] - 24:14, 25:2
**true** [6] - 9:16, 28:13,
57:24, 58:15, 58:22,
59:7
**truly** [2] - 27:17, 34:12
**trumpeting** [1] - 60:24
**try** [6] - 18:9, 23:9,
40:5, 81:19, 82:2,
91:14
**trying** [11] - 23:4,
31:25, 32:3, 32:25,
50:9, 79:15, 81:8,
84:7, 90:22, 91:6,
93:23
**Tuan** [2] - 2:6, 3:7
**Tuesday** [1] - 20:15
**turn** [4] - 7:7, 7:9,
17:11, 56:8
**turned** [1] - 18:13
**turning** [1] - 39:8
**two** [24] - 9:2, 13:5,
14:10, 15:15, 15:24,
17:22, 21:23, 27:15,
27:23, 33:1, 33:23,
33:24, 34:24, 53:4,
54:1, 57:4, 71:11,
81:19, 84:18, 90:19,
98:4, 100:13, 104:11
**two-fold** [2] - 33:23,
33:24
**two-year** [1] - 34:24
**type** [5] - 16:19, 31:8,
71:15, 75:25, 83:15
**types** [1] - 62:8

# U

**U.S** [1] - 1:3
**ultimately** [2] - 63:16,
82:1
**unable** [1] - 99:24
**unapportioned** [2] -
36:7, 46:24
**unauthorized** [4] -
29:18, 32:1, 32:22
**unbelievable** [1] -
66:17
**unblemished** [1] -
51:16
**uncertainty** [3] -
73:22, 73:24, 74:2

**under** [15] - 8:4, 9:8,
9:24, 12:17, 15:18,
23:5, 33:12, 36:3,
39:2, 59:21, 85:19,
97:12, 100:9,
100:10, 103:7
**undisputed** [1] - 46:14
**unfortunately** [1] -
99:24
**UNITED** [1] - 1:1
**unlike** [3] - 16:24,
21:16, 28:8
**unprecedented** [2] -
27:20, 29:3
**unrelated** [1] - 35:18
**unreliable** [4] - 29:7,
33:11, 36:1, 52:22
**unsupported** [1] -
29:8
**up** [57] - 4:16, 10:17,
17:14, 18:5, 18:18,
23:4, 23:13, 23:25,
26:21, 29:17, 29:25,
30:14, 31:1, 34:7,
35:22, 38:2, 42:4,
42:16, 45:14, 47:5,
49:4, 49:14, 57:20,
66:12, 69:1, 73:8,
73:16, 74:3, 74:5,
74:9, 74:16, 74:21,
75:2, 75:4, 75:6,
75:7, 75:12, 77:10,
79:17, 83:7, 84:3,
84:22, 85:24, 87:15,
88:11, 88:13, 88:18,
88:24, 90:6, 91:11,
91:13, 91:20, 91:23,
93:7, 93:19, 93:25,
96:7
**upfront** [52] - 5:6,
5:11, 5:15, 7:17,
7:18, 8:21, 8:23, 9:5,
9:7, 9:15, 9:19, 10:9,
10:13, 11:2, 11:3,
12:10, 12:12, 14:4,
17:14, 23:21, 25:16,
27:12, 27:17, 29:5,
30:13, 30:23, 31:11,
31:14, 31:20, 33:15,
33:25, 34:4, 34:13,
39:7, 39:11, 45:18,
49:13, 49:21, 50:6,
50:8, 87:9, 87:14,
87:19, 87:20, 87:21,
88:17, 89:2, 89:8,
90:13, 92:24, 101:25
**upheld** [1] - 13:16
**upward** [1] - 85:6
**upwards** [2] - 15:15,
76:8

**uses** [11] - 12:2, 20:7, 21:7, 27:15, 40:24, 43:13, 43:25, 69:21, 76:23, 93:3, 101:25
**utilizing** [1] - 20:18

# V

**valid** [2] - 77:2, 77:5
**validate** [2] - 40:20, 40:25
**validity** [2] - 75:20, 95:3
**valuable** [5] - 16:23, 40:19, 53:5, 59:12, 76:6
**valuation** [2] - 13:6, 14:12
**value** [82] - 6:25, 7:5, 12:16, 12:20, 13:7, 13:8, 13:14, 13:15, 13:24, 17:22, 17:23, 19:4, 19:6, 19:12, 19:16, 19:17, 19:19, 19:25, 20:8, 20:20, 21:1, 21:5, 21:8, 21:9, 21:20, 23:17, 26:18, 26:23, 27:2, 28:5, 28:7, 28:15, 30:21, 36:11, 41:6, 41:8, 42:9, 42:13, 42:14, 42:25, 43:5, 43:10, 43:24, 44:5, 44:14, 44:20, 46:11, 47:1, 47:13, 47:14, 47:22, 48:9, 53:4, 57:8, 60:19, 61:13, 62:2, 73:8, 73:18, 73:20, 74:3, 74:9, 75:3, 75:4, 75:6, 75:7, 75:9, 75:10, 75:12, 75:15, 80:2, 82:2, 84:22, 86:1, 86:2, 87:7, 91:11, 91:13, 91:23, 98:6, 101:22
**valued** [7] - 6:14, 15:5, 15:6, 18:2, 19:11, 26:21, 43:11
**values** [6] - 41:3, 41:4, 42:23, 44:18, 44:19, 47:19
**valuing** [2] - 13:11, 16:20
**variation** [2] - 62:7
**variety** [1] - 21:17
**various** [1] - 79:18
**vector** [1] - 55:19
**vein** [2] - 58:24
**vein-to-vein** [1] -

58:24
**venture** [1] - 82:9
**versus** [2] - 3:2, 51:13
**Vesey** [1] - 2:11
**viable** [2] - 73:22, 78:19
**video** [1] - 104:23
**view** [1] - 95:19
**VINCENT** [7] - 26:9, 26:15, 29:12, 33:7, 36:13, 45:3, 47:21
**Vincent** [5] - 2:15, 3:13, 4:13, 26:10, 44:25
**Vincent's** [1] - 49:9
**violated** [1] - 96:12
**viral** [1] - 55:19
**vis** [2] - 37:25
**vis-a-vis** [1] - 37:25
**vs** [1] - 1:7

# W

**walk** [3] - 5:13, 21:19, 33:8
**wall** [1] - 82:13
**wants** [6] - 36:8, 36:10, 49:4, 62:1, 92:25, 95:16
**waste** [2] - 47:4, 48:24
**Waxman** [2] - 40:12, 40:17
**ways** [3] - 21:23, 87:24, 94:14
**week** [6] - 32:20, 78:7, 78:9, 79:14, 79:22
**weekend** [5] - 3:18, 4:19, 32:21, 46:2, 100:21
**weight** [2] - 20:12, 25:6
**Weinberger** [2] - 2:16, 3:13
**Weiss** [1] - 2:8
**welcome** [3] - 3:15, 3:17, 51:1
**well-established** [3] - 20:13, 25:8, 37:21
**well-qualified** [1] - 61:22
**Wells** [1] - 2:5
**wells** [1] - 3:8
**West** [1] - 1:23
**WESTERN** [1] - 1:2
**whereas** [2] - 6:14, 17:1
**whole** [10] - 21:5, 28:23, 29:20, 32:1, 34:15, 46:21, 48:18, 51:7, 78:19, 92:7

**wholly** [1] - 45:13
**wide** [1] - 22:3
**widely** [1] - 14:18
**willfulness** [1] - 99:6
**willing** [1] - 6:19
**win** [1] - 95:2
**winds** [2] - 73:16, 77:10
**wish** [1] - 97:6
**withdrawn** [2] - 25:23, 26:1
**witness** [39] - 62:13, 67:19, 68:4, 68:5, 70:16, 70:25, 71:13, 71:14, 72:4, 72:6, 74:1, 78:5, 96:24, 96:25, 97:5, 97:22, 98:2, 100:13, 100:16, 100:21, 100:23, 101:2, 101:3, 101:6, 101:11, 101:13, 101:15, 101:16, 101:17, 101:18, 101:19, 102:16, 102:20, 102:24, 104:5
**witnesses** [20] - 16:21, 71:1, 71:15, 71:16, 71:19, 71:24, 72:9, 73:17, 73:25, 98:4, 98:14, 99:15, 99:20, 99:23, 100:10, 102:21, 103:3, 103:6, 103:9, 103:10
**word** [1] - 92:1
**words** [3] - 12:11, 13:11, 42:10
**works** [3] - 32:17, 88:7, 90:24
**world** [13] - 18:25, 35:6, 35:11, 59:15, 74:13, 81:8, 88:14, 88:18, 88:22, 91:4, 93:6, 93:12
**worth** [4] - 21:15, 78:14, 78:15, 93:9
**wound** [1] - 90:5
**woven** [1] - 32:10
**writing** [2] - 52:10, 52:11
**written** [1] - 106:4
**wrongly** [1] - 34:16
**www.
amydiazfedreporter
.com** [1] - 1:25

# Y

**year** [3] - 34:24, 50:1, 55:23
**years** [14] - 16:17, 17:1, 18:12, 18:20, 23:13, 33:1, 34:6, 48:4, 61:4, 61:5, 61:23, 73:21
**YESCARTA** [34] - 5:8, 17:3, 17:23, 18:2, 18:5, 18:16, 19:17, 20:9, 23:2, 41:5, 42:2, 43:12, 44:20, 47:7, 47:19, 47:23, 47:25, 48:3, 52:21, 53:10, 56:21, 57:4, 57:5, 57:8, 59:25, 62:23, 64:4, 66:25, 70:5, 70:6, 75:2, 98:6, 98:10
**YESCARTA's** [1] - 53:8
**York** [2] - 2:12
**YOUNG** [4] - 97:25, 100:3, 100:12, 103:3
**young** [2] - 3:13, 97:24, 98:1
**Young** [1] - 2:17

# Z

**zero** [2] - 19:7, 88:3