1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5

6    JUNO THERAPEUTICS, INC., et al., )
                                      )
7              Plaintiffs,            )
                                      )
8                   vs.               )
                                      )   2:17-CV-7639-SJO
9    KITE PHARMA, INC.,               )
                                      )
10             Defendant.             )
     _____)

11

12

13               REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                      JURY TRIAL VOLUME I

15                    Los Angeles, California

16                   Tuesday, December 3, 2019

17

18

19        _____

20

21

22                  AMY DIAZ, RPR, CRR, FCRR
                    Federal Official Reporter
23                  350 West 1st Street, #4455
                     Los Angeles, CA 90012

24

25               Please order court transcripts here:
                     www.amydiazfedreporter.com

1        APPEARANCES OF COUNSEL:

2
         For the Plaintiffs:
3

4                      IRELL & MANELLA LLP
                       By:  Morgan Chu, Attorney at Law
5                           Alan Heinrich, Attorney at Law
                            Crawford Maclain Wells, Attorney at Law
6                           Elizabeth Tuan, Attorney at Law
                       1800 Avenue of the Stars, Suite 900
7                      Los Angeles, California 90067

8                      JONES DAY
                       By:  Andrea Weiss Jeffries, Attorney at Law
9                      555 South Flower Street, 50th Floor
                       Los Angeles, California 90071
10
                       JONES DAY
11                     By:  Sarah Geers, Attorney at Law
                       250 Vesey Street
12                     New York, New York 10281

13

14       For Defendant:

15                     MUNGER TOLLES & OLSON LLP
                       By:  Garth Vincent, Attorney at Law
16                          Edward Dane, Attorney at Law
                            Jeffrey Weinberger, Attorney at Law
17                          Peter Gratzinger, Attorney at Law
                            Blanca Young, Attorney at Law
18                     355 South Grand Avenue, 35th Floor
                       Los Angeles, California 90071
19

20

21

22

23

24

25

1          THE CLERK:  Calling Item Number 1, 07639-SJO, Juno

2     Therapeutics, Inc. vs. Kite Pharma, Inc.

3          Counsel, would you state your appearance.

4          Everyone in the audience can be seated, please.

5          MR. CHU:  Good morning, Your Honor, on behalf of

6     Sloan Kettering and Juno, Morgan Chu, and our table, starting

7     with counsel who is closest to you, Sarah Geers, Alan

8     Heinrich, and Andrea Jeffries.

9          MR. DANE:  Ted Dane, and at counsel table is Blanca

10    Young, Mr. Weinberger, and our jury consultant.

11         THE COURT:  Have a seat.  The matter is here for the

12    commencement of trial.  Let me direct the clerk to order the

13    jury up, the panel up.  And I understand there is some

14    preliminary matters to handle.

15         MR. CHU:  Yes, Your Honor.  And I think we agree

16    that there are three areas of matters to handle.  One has to

17    do with objections that both sides have to opening slides;

18    another has to do with four witnesses, each side has two

19    witness issues; and another has to do with a proposal by Kite

20    to put a glossary into the jury notebook.  So these are the

21    three issues.

22         THE COURT:  Okay.  Go ahead.  Let's start with the

23    glossary.

24         MR. CHU:  Yes, Your Honor.

25         I'm not sure of the exact time, but I searched my

1  e-mail early this morning, and the first time I saw the word

2  glossary was 11:54.  There could have been some

3  communications with some junior people earlier.  But for a

4  week or more, we have been talking about the details of the

5  jury notebook, and it was sometime last night, may have been

6  quite late last night, there was a proposal to put the

7  defendant's proposed glossary into the juror notebook.  There

8  are a lot of problems with their proposal, the particular

9  definitions and terms that they have, and so we find it very

10 objectionable.

11      Now, I should point out in the proposed preliminary

12 instructions, there are competing glossaries.  They have,

13 incidentally, 20 proposed terms for the Court to read.  Ours

14 is less than half that length.  It's nine terms.  To our

15 knowledge, they have no objections to any of our terms.

16      For the disputed terms, they include information

17 that we think is an incorrect statement of law or irrelevant

18 to this case or misleading, and taken together some of their

19 instructions might suggest that they have a noninfringement

20 argument to put before the jury.  It would take on undue

21 importance if it is put into the jurors' notebooks.  It's

22 less important, of course, if there are issues that either

23 side is complaining about if they are simply preliminary

24 instructions that are being read to the jury, and those

25 preliminary instructions, to the extent a correction is

1       necessary, it could be done in the final instructions.

2              There are other issues, but that is a summary of the

3       key issues.

4              THE COURT:  Well, very quickly, who is going to

5       address this on behalf of the defendants?

6              MS. YOUNG:  Blanca Young, Your Honor.  The request

7       for a glossary is a simple request to assist juror

8       comprehension.  Our glossary was taken from the Northern

9       District of California's form instructions.  It includes

10      terms like application, amendment, assignment, claim, request

11      for continued examination, requirements, specification, and

12      those --

13             THE COURT:  I have it in front of me.

14             MS. YOUNG:  -- and the like.  So we -- you know, we

15      would like to save time, actually, from having Your Honor

16      have to read all of that to the jurors, but we would like

17      them to have some frame of reference when they are in the

18      jury room and they are wondering, well, gee, what was the

19      specification, they can just quickly refer to the glossary

20      and see what it says.  And this should not be a controversial

21      issue.

22             THE COURT:  So the definitions included in the

23      defendant's proposed glossary regarding the various terms,

24      where do those definitions come from?

25             MS. YOUNG:  So the Northern District of California's

1      form jury instructions has a proposed glossary, and we picked

2      the forms that fit the fact of this case.  There is some

3      terms that probably are not going to come up, but we included

4      the ones that we thought did come up.

5              And I think there were a couple that we included,

6      you can actually see it, Your Honor, that are I believe they

7      are ones that are underlined that we added to the

8      instructions because they were relevant to this case.

9              THE COURT:  So in reference to the ones that are not

10     underlined, all of those were taken verbatim from the

11     Northern District?

12             MS. YOUNG:  I believe that is --

13             THE COURT:  The definition of each item is verbatim

14     from the Northern District?

15             MS. YOUNG:  Yes, that's right.

16             THE COURT:  So the Court intends to include in the

17     jurors' notebook a glossary of terms.  I think it's going to

18     assist the jury.  The precise glossary that will be included

19     is -- will have to be determined later.

20             Next issue.

21             MS. YOUNG:  While I'm up here, Your Honor, one of

22     the issues on the list was witnesses -- and this is a simple

23     scheduling issue that we were hoping to resolve.  I was up

24     here, I think it was yesterday, explaining some conflicts

25     that two of our witnesses have with a very important

1          conference that is happening later this week.  And we have

2          tried to work that out.  Dr. Komonaduri, who I was requesting

3          be taken on Wednesday out of order, has rearranged his

4          schedule so that he can be here on either Monday or Tuesday,

5          whenever the Court restarts trial after the weekend.

6                     And Dr. Bot, who is our other witness who has a

7          conflict at ASH, he has a conflict because he's actually

8          presenting.  He's our chief medical officer at Kite.  He's

9          presenting at the conference some very important data from

10         the ongoing studies of Kite's products, and he does need to

11         be at that conference.

12                    So we need to have him on and off the stand on

13         Thursday.  We don't think it's going to be an issue,

14         hopefully, because the way the timing has worked out and the

15         way witness disclosures have come around, we believe that the

16         plaintiffs will rest their case sometime on Thursday, and we

17         are hoping to get him on and off the stand so that he can

18         then take a red eye back to Orlando for this conference.

19                    And what we are simply asking is if we end up in the

20         middle of the day Thursday and it's getting to the afternoon

21         and we are worried about him getting on and off the stand and

22         the plaintiffs have not yet rested, we would request the

23         Court's permission to take him out of order.

24                    The other thing that we would request, and similarly

25         with Dr. Komonaduri, we expect we will still be putting on

1    our case by Monday or Tuesday when he has rearranged his

2    schedule to be available.  But if we end up resting before

3    then, we would like the flexibility to call him on Tuesday or

4    Monday and not be precluded from putting on one of our very

5    important witnesses.

6              THE COURT:  So Dr. Komonaduri is a retained expert?

7              MS. YOUNG:  He is.

8              THE COURT:  So the request to call him out of order

9    is going to be denied.  He's a retained expert.  His

10   responsibilities are to his client, which is the defendant in

11   this case.  I understand he has a conflict, but it's

12   important for him to resolve those conflicts.  So as to

13   Dr. Komonaduri, the request is denied.

14             As to Dr. Bot, he is not a retained expert; is that

15   correct?

16             MS. YOUNG:  He is not.

17             THE COURT:  Then in reference to Dr. Bot, the Court

18   will endeavor to try to accommodate Dr. Bot's schedule.

19             MS. YOUNG:  Thank you.

20             THE COURT:  Do you wish to be heard on Dr. Bot?

21             MS. JEFFRIES:  Your Honor, I just wanted to clarify

22   that when -- what you've ruled is certainly fine with us.  We

23   had tried to work out these issues with counsel.  There were

24   two other witnesses that they had objected to on the

25   plaintiff's side, and we had told them that we would be

1    certainly willing to work around their scheduling issues if

2    they would meet and confer in good faith with respect to

3    ours.

4             THE COURT:  Cooperation is important to both sides.

5    To the extent that you are not able to cooperate, the Court

6    is going to make rulings, and the rulings may cause certain

7    issues with your respective presentation of your case and the

8    defense.  So I have encouraged you to work it out.  If you

9    are not able to work it out, the Court is going to rule.  If

10   I'm not going to accommodate the defendants, I'm not going to

11   accommodate the plaintiffs.

12            MS. JEFFRIES:  Understood.  I just wanted to request

13   of the Court if you wanted to hear about the other two

14   witnesses now or just leave that to another day.

15            THE COURT:  Leave it to another day.

16            MS. JEFFRIES:  All right.  Very good.

17            THE COURT:  Next issue.

18            MS. JEFFRIES:  The next issue relates to the

19   demonstratives that have been proposed by defense counsel for

20   their opening also relate to the Bot homology exhibit, which

21   we filed a separate objection to, but which also appear in

22   the defendant's demonstrative -- proposed demonstratives for

23   opening statement.

24            The biggest -- we did file objections last night,

25   yesterday afternoon and last night, as I said, two separate

1    sets, one with respect to the Dr. Bot homology and related

2    exhibits and one with respect to the defendant's opening

3    demonstratives.

4         There are a number of issues, the main issues that

5    we see are really just a few.  One significant issue that we

6    have with respect to the Dr. Bot homology analysis, which

7    again is the demonstratives, is that it conflicts with the

8    Court's ruling on the motion in limine with respect to

9    Dr. Bot, motion in limine number 1 of plaintiff's.

10        As the Court will recall, you said that his

11   testimony could come in only on the issue of the validity of

12   the certificate of correction.  He was not to be used at all

13   for nonwillfulness for the reasons we discussed relating to

14   opinions of counsel that have been relied on by Kite.

15        Nevertheless, Kite intends to use a comparison that

16   Dr. Bot did between the certificate -- the '190 SEQ ID NO:6

17   in 2012 before the certificate of correction and before the

18   reliance of counsel -- reliance on counsel, and use that

19   comparison where he compared SEQ ID NO:6 before the

20   certificate of correction to the sequence that became

21   YESCARTA.

22        There is absolutely no reason to show that

23   comparison to the jury, to talk about that comparison to the

24   jury in order for Dr. Bot to give the testimony that this

25   Court has allowed, which is whether he found SEQ ID NO:6 to

1        have an error or not when he first looked at it.

2                Raising that exhibit, making arguments about having

3        done a comparison, raises this specter of a noninfringement

4        argument and nonwillfulness, which is exactly the purpose for

5        which the Court said Dr. Bot could not testify because of all

6        of the problems associated with that potential nonwillfulness

7        argument.

8                So we've moved to exclude that exhibit, exclude the

9        demonstrative in opening statement that references the

10       exhibit, and exclude any argument, any suggestion about a

11       comparison in 2012 that Dr. Bot did comparing SEQ ID NO:6

12       from the original patent to the sequence that later became

13       YESCARTA.

14               There are other issues in the demonstratives which I

15       can go on to unless you would like to hear on that one

16       further.

17               THE COURT:  Please continue.

18               MS. JEFFRIES:  Two other main issues in the

19       demonstratives, one relates to a series of slides in

20       plaintiffs' -- excuse me -- defendant's opening

21       demonstratives that show the NCI on the left, the National

22       Cancer Institute, and the fence with the '190 patent on the

23       other side.  Put it up here on the Elmo so you can see it.

24               So there is a series of slides that build showing

25       the NCI and activities that the NCI is doing with respect to

1    its work in 2009, in 2012, all the while what is on the

2    right-hand portion of the slide, it says '190 patent issues,

3    CD28 amino acids 132 to 220.

4           The implication of this building timeline on the

5    slides clearly is that the NCI was engaged in work relating

6    to developing a CAR construct in this timeframe and all the

7    while it had interpreted the patent to be -- to be limited to

8    SEQ ID NO:6 -- excuse me, to be limited to amino acids 113 to

9    220.

10          There is absolutely no evidence that is going to

11   come into this case that the NCI reviewed the '190 patent in

12   that timeframe and believed that SEQ ID NO:6 was limited to

13   amino acids 113 to 220.  And so that -- there is no evidence

14   to support the sort of implication that is being drawn here

15   in this side-by-side comparison.

16          The only evidence that is going to come into this

17   case with respect to what the NCI was doing is that

18   Dr. Rosenberg at the NCI copied Dr. Sadelain's CAR construct.

19   But there is nothing about what the NCI was doing, no

20   evidence that they viewed the patent at all as limited to 113

21   to 220.

22          THE COURT:  So by demonstratives, I'm assuming these

23   are to be displayed to the jury on opening statements, not

24   received into evidence during the course of the trial?

25          MS. JEFFRIES:  That would be correct.  But

1    nevertheless, it's an argument that we feel is inappropriate

2    because there is no evidence to support it.

3         THE COURT:  I understand.

4         MS. JEFFRIES:  And then our final real concern with

5    the demonstratives -- yes, and let me just -- to go back to

6    that point, Your Honor.

7         THE COURT:  So you are going to have to move on,

8    because our jury is lining up.

9         MS. JEFFRIES:  Sure.  I'm sorry.  So the last point

10   is there is a claim -- a partial claim construction slide

11   that has been proposed by the defendant which displays a

12   portion of the Court's claim construction order and is only

13   the portion that relates to amino acids 113 to 220, the

14   portion of the claim construction order prior to the

15   certificate of correction.

16        That, of course, is highly misleading and

17   inappropriate to put before the jury, a partial claim

18   construction suggesting that the Court has determined that

19   the claims are limited to sequence ID 113 to 220.  All of

20   these slides, the claim construction slide, which is

21   misleading and it's being incomplete, as well as the slides

22   with the fence all suggest that the plaintiffs -- excuse

23   me -- that Kite has a noninfringement argument.  And we have

24   been over this a number of times, but they seek to change the

25   burden to shift the burden to the plaintiffs to prove

1    infringement when they have stipulated to infringement in

2    this case.

3         Their certificate of correction argument is an

4    invalidity argument, and they should not be permitted to

5    suggest or argue a noninfringement argument such that the

6    plaintiffs have the burden to prove infringement.

7         THE COURT:  Is our jury here?

8         THE CLERK:  They are here, but I don't have the

9    charts yet, Your Honor.

10        THE COURT:  Okay.  Anything further on

11   demonstratives?

12        MS. JEFFRIES:  Those are the main issues on

13   demonstratives for us, Your Honor.

14        THE COURT:  Mr. Dane?

15        MR. DANE:  Your Honor, I'll respond to Ms. Jeffries'

16   points, and then we have some issues with their

17   demonstratives.

18        With regard to the Bot document, Your Honor has

19   already ruled on this.  Your Honor has ruled that his

20   testimony can come in for the purposes of someone of skill in

21   the art at the time doing analysis and looking at the patent

22   and determining what the patent covered.  This is all this

23   document is is it's the report that he did.  It's the

24   document that shows the analysis that he did.  So we've

25   already been over this, and that document should come in.

1           With regard to the documents about the property

2      line, the plaintiffs are incorrectly assuming that we are

3      going to argue reliance by the NCI.  We have no intent of

4      arguing reliance on the part of NCI.  The slide is just

5      showing the state of play as it was.

6           This Court has determined what the meaning of the

7      patent was prior to the certificate of correction.  It is

8      undisputed that prior to the certificate of correction, what

9      NCI was doing was not infringing.  There is no question about

10     that.  That is all that that slide is showing.  So there is

11     no reason for that to come out.

12          And if I can go get, Your Honor, the --

13          THE COURT:  And I think the parties have filed a

14     written -- a pleading regarding the objections to the

15     demonstratives; is that correct?

16          MR. DANE:  They have, Your Honor.

17          MS. JEFFRIES:  Correct.

18          MR. DANE:  I'm sorry, I was forgetting for the

19     moment the third issue with regard to the claim construction.

20     It's just a slide that shows the Court's claim construction.

21     There is -- they are saying that in our slide in my opening,

22     I have to put in the post certificate of correction, meaning

23     of the patent.  It's the opening, and the point I'm making is

24     just about the state of play prior to the certificate of

25     correction, and I should be permitted to do that.

1          On that issue, that segues nicely into our

2     objections to their slides.  Just late last night, they

3     provided us with a supplemental slide, which again raises an

4     issue this Court has addressed.  They are rearguing things

5     the Court has already decided.

6          They have a slide that puts up the stipulation that

7     Kite entered into with regard to the infringement issue.

8     They can do that.  It's a stipulation.  But their heading is

9     just what Ms. Jeffries said, which is incorrect.  The heading

10    is Kite admits YESCARTA infringes, only challenges validity.

11         That is absolutely not true, and the Court

12    recognized that in the statement of the case in adopting the

13    language that the Court adopted.  This is inconsistent with

14    the language that the Court adopted in the statement of the

15    case.  And that heading should not be shown to the jury.

16         Very quickly on our other objections, they have a

17    slide that they have submitted that refers to the

18    $6.1 billion value that was purportedly attributed to the

19    YESCARTA franchise.  That is a subject of the in limines that

20    were addressed yesterday.  So they are pretty much raising

21    the issue right now as to how the Court will rule on that

22    because if it's shown to the jury, then that evidence is

23    before the jury.  So on that, we would submit that that

24    should not come in for the reasons that we argued yesterday.

25         And relatedly on slides 40 to 41, they have slides

1    relating to the testimony of Dr. Gilbert who the Court knows

2    is subject to our motion to exclude as an expert witness.

3    And in their slide 40 --

4              If we can put that up, Shannon.

5              So now they have a slide from Mr. Dr. Gilbert that

6    is going even beyond the opinions that he gave in his report.

7    Now this product that is not even on the market *** does not

8    just have a better safety profile, but now they are saying

9    that it's much safer than YESCARTA.

10             For the reasons we argued yesterday, we don't think

11   Dr. Gilbert should be permitted to offer an opinion on these

12   issues.  Regardless of that, we don't think he should be able

13   to put up a slide that says "much safer than YESCARTA."

14             And this does implicate an issue that I raised

15   yesterday, and I don't know how the Court wants to handle it,

16   but there is this discovery misconduct.  They did not produce

17   to us the documents relating to their BLA filing that they

18   had agreed to.  And they are now planning to come in tomorrow

19   with an expert who is going to testify about all their

20   results when we still don't have all the --

21             THE COURT:  I think this is a little bit premature.

22   So the Court needs to issue its order regarding the motions

23   taken under consideration yesterday and under submission.  So

24   until that order comes out, I think this is premature.

25             MR. DANE:  And, Your Honor, does that mean that they

1    can use the slide?

2              THE COURT:  Well, we are not there yet, so we have

3    to select the jury.

4              MR. DANE:  Sure.

5              THE COURT:  There is much to be done before we get

6    to the opening statements by the parties.

7              MR. DANE:  Thank you, Your Honor.

8              MS. JEFFRIES:  With respect to the pleadings, Your

9    Honor, that were filed, I just want to mention it's document

10   number 458 and document 461 if you are looking for the

11   written objections that we filed.

12             THE COURT:  Thank you.  Anything else before we

13   start with the calling of the jury?  Do we have the jury

14   sheet?

15             THE CLERK:  I just got them now.  I'm going to need

16   at least 10 minutes now.

17             THE COURT:  It looks like about 10 minutes before we

18   are going to be able to summon the jury in, so it's probably

19   a good time for a bathroom/restroom break.  The jurors are

20   outside.  So make sure any of the persons in the galley,

21   please, no contact with any of the jurors outside.  If you

22   need to use the restroom, feel free, but no contact.

23             And we are in recess.

24             (Thereupon, there was a brief recess.)

25             MS. JEFFRIES:  Your Honor, when we were talking

1    about the demonstratives, I neglected to raise one issue.  It

2    is in our papers, but I did want to call your attention to

3    it.  I think it's one you might be concerned about.  It's a

4    slide in the plaintiffs' -- excuse me, I keep doing that --

5    defendant's, Kite's demonstratives that has the image of

6    Judge Fogel from the patent video and purports to undermine

7    the presumption of validity with his photo image on that

8    slide talking about how the patent office can make mistakes

9    and can be wrong and that sort of thing.

10            And there is clear case law that does not allow

11   speculation or generalized arguments to undermine the

12   presumption of validity.  I can cite those cases to you.

13   They are in our papers.  But I did want to make sure that you

14   took a look at that demonstrative as well.

15            THE COURT:  Thank you.

16            So we are about to call the panel in.  The panel

17   will be called.  I'll have all of the lawyers and counsel for

18   both sides introduce themselves when the case is called.  And

19   then the Court intends to read the statement of the case,

20   explain a little bit about the trial process, and then turn

21   it over to counsel for opening statements.  Are you prepared

22   on your mini opening statements?

23            MR. CHU:  Yes, Your Honor.

24            MR. DANE:  Yes, Your Honor.

25            THE COURT:  Then we'll call 18 prospective jurors,

1    and we'll start with the jury selection process.  Each side

2    has three preemptories.

3            Do the parties intend to introduce their jury

4    consultants?

5            MR. CHU:  I'm happy to introduce them just as

6    colleagues and allow opposing counsel to do the same.

7            THE COURT:  Agreed?  They will not be referred to as

8    jury consultants?

9            MR. CHU:  Correct.

10            THE COURT:  Thank you.

11            THE CLERK:  I'll call the case.

12            THE COURT:  Yes.  Do we have seats for the persons

13    that are standing?

14            THE CLERK:  Yes, there are seats.

15            THE COURT:  Okay.

16            (Potential jurors in.)

17            THE CLERK:  Calling Item Number 1, Case Number

18    CV17-07639SJO, Juno Therapeutics, Inc., et al versus Kite

19    Pharma, Inc.

20            Counsel, would you state your appearance.

21            And everybody in the audience can be seated now.

22            MR. CHU:  Good morning, Your Honor.  On behalf of

23    the Sloan Kettering Institute and Juno Therapeutics, the

24    plaintiffs in this case, Morgan Chu.  And my colleagues to my

25    right, the Court's left, I'll start with the lawyer closest

1    to Your Honor, Alan Heinrich, Sarah Geers, Andrea Jeffries,

2    and colleagues Carrie Mason and Dave Weinberg.  Thank you,

3    Your Honor.  Good morning.

4         THE COURT:  Good morning and thank you.

5         MR. DANE:  Thank you, Your Honor.  Ted Dane

6    representing Kite Pharma, and with me at counsel table Blanca

7    Young and Jeff Weinberger, my colleague, Christine Monakas.

8         THE COURT:  Good morning.  Please have a seat.

9         Let me take the opportunity to welcome all of the

10   prospective jurors to this courtroom.  My name is Judge S.

11   James Otero, and you have been summoned here this morning to

12   potentially be a juror in a case.  This is a civil

13   proceeding.  There is probably a few issues on your mind as

14   we start.  One is how long will the case last.  So it will

15   take about six to seven days to try this case, six to seven

16   days to try the case, which means that the case should

17   conclude with the presentation of all of the evidence,

18   argument of counsel, sometime next week.  The six to seven

19   days does not include the deliberation time, that is, the

20   time it's going to take to -- for the jury to decide the

21   issues in this matter.

22        In terms of what the case is about, I have a

23   statement of the case.  The -- this is a patent litigation

24   matter.  There is a lot of detail to the patent litigation

25   matter.  A lot of the complexity and the terms of the case

1    will be explained to you in more detail as the case goes

2    forward, but I have a short statement of the case to read to

3    you at this point.

4           This case involves a dispute relating to the United

5    States patent -- a United States patent.  Patents are granted

6    by the United States Patent and Trademark Office.  A patent

7    is a right granted to an inventor or group of inventors by

8    the federal government that permits the inventor or inventors

9    to exclude others from making, using, selling, or offering

10   for sale the patented invention for a period of time.

11          The plaintiffs in this case, the parties to my left,

12   the plaintiffs in this case are Juno Therapeutics, or Juno

13   and Sloan Kettering Institute for Cancer Research, also

14   called Sloan Kettering.  Juno, the plaintiff, is a

15   biotechnical company based in Seattle, Washington.  Sloan

16   Kettering is a research institution based in New York, New

17   York.  Sloan Kettering owns the patent, the '190.  The '190

18   is exclusively licensed to Juno.

19          The defendant in this case, the parties to my right

20   here, the defendant in this case is Kite Pharma, a

21   biopharmaceutical company based in Santa Monica, California.

22   Since October 2017 Kite has marketed a product called

23   YESCARTA, which is a treatment for certain types of blood

24   cancers.  Juno and Sloan Kettering filed this suit in this

25   court alleging that the defendants, Kite, infringes the '190

1    patent as corrected by a certificate of correction by making,

2    using, selling, and offering for sale YESCARTA.  Juno and

3    Sloan Kettering are seeking money damages for Kite's alleged

4    infringement, and they allege that Kite's infringement is

5    also willful.

6         Kite, the defendant in this case, contends that the

7    certificate of correction to the '190 is invalid.  The

8    parties have agreed that if the certificate of correction is

9    not found to be invalid, then the defendants' YESCARTA

10   therapy infringes the asserted claims of the '190 patent.

11   Kite denies its alleged infringement was willful.

12        Kite also contends the asserted claims of the '190

13   patent are invalid.  Juno and Sloan Kettering deny that the

14   certificate of correction is invalid and also deny the claims

15   of the '190 are invalid.

16        So that is a short statement of the case.  It sounds

17   very complicated.  And again, the case and all of the terms

18   here will be explained to you in far more detail as the case

19   goes forward.

20        Before we continue, may I have the panel sworn,

21   please.  Mr. Cruz?

22             THE CLERK:  Yes.

23             THE CLERK:  Ladies and gentlemen, would you all rise

24   to be sworn.

25             (Thereupon, the jury panel was sworn.)

1          THE COURT:  So the first part of the trial is jury

2     selection.  I think we are ready to start.  We have several

3     other persons in the courtroom.  The case is obviously

4     important to the plaintiffs, and the case is obviously

5     important to the defendants.  So persons in the galley area

6     are persons associated with either the plaintiffs or with the

7     defendants.

8          So again, the plaintiffs are represented by a number

9     of lawyers.  We have Mr. Chu.  Would you again stand up, Mr.

10     Chu?  And then this is not in the order that they have seats,

11     we have Mr. Heinrich.  Mr. Heinrich.  We have Ms. Geers,

12     Ms. Jeffries.  Thank you.  And then the other -- please have

13     a seat.  The other persons at counsel table are persons

14     associated with the plaintiffs in this case.

15          And then in reference to the defendants here, Kite,

16     we have several other lawyers representing the defendant.  We

17     have Mr. Dane, Jeffrey Weinberger, Blanca young, and then the

18     other lady at counsel table is a person associated with the

19     defendants.

20          And at this point in time, the parties or counsel

21     for the parties are going to make a mini opening statement to

22     advise you as to what the case is about.

23          And with that, I'll turn it over to Mr. Chu.

24          MR. CHU:  As you know, my name is Morgan Chu.  I

25     represent the scientists and the people at Sloan Kettering

1    Institute and Juno Therapeutics.  This is an exciting case

2    about a new way to treat cancer.  Dr. Sadelain and his

3    colleagues at the Sloan Kettering Institute came up with the

4    first living drug to attack cancer.  They applied for a

5    patent and were duly granted a patent by the United States

6    Patent and Trademark Office.

7         As you heard from the Court, this case involves

8    willful infringement or an allegation of willful infringement

9    by the defendant, Kite Pharma.  Now what is a living drug?

10   It's a way to harness a patient's own natural immune system

11   to accept and create specially trained white blood cells that

12   will be targeted for that individual patient's cancer.  And

13   it's a living drug because the patient's own system will then

14   make millions and millions and millions more of those

15   specially trained white blood cells to go after that nasty

16   cancer.  This is a very important case about an amazing

17   invention.  Thank you.

18        THE COURT:  Thank you.

19        Mr. Dane?

20        MR. DANE:  Thank you, Your Honor.

21        Ladies and gentlemen, I agree with Mr. Chu that this

22   is an exciting case, and it is about an extremely exciting

23   therapy, a breakthrough therapy that is saving lives for

24   patients that have terminal blood cancer and without this

25   therapy would not be alive today.  This case is an attack on

1     that therapy that is being provided by my client, Kite

2     Pharma.  Kite Pharma developed YESCARTA which was the first

3     therapy on the market to treat lymphoma for patients that had

4     no other options, and Kite did a significant amount of work,

5     its own work to develop that therapy.

6          And now Juno is suing Kite based upon this patent

7     that it has rights to.  And one of the issues in this case is

8     going to be whether it's fair for them to do that, whether

9     the patent covers what Kite was doing, and whether when they

10    filed their patent they actually had invented everything they

11    said they invented.

12         And it's going to be a very interesting case.  It is

13    remarkable technology.  When I first learned about it, I was

14    amazed.  So I think if you do get to be a juror in this case,

15    I think it will be a very interesting experience.  And I

16    thank you all for being here and thank you for your service.

17         THE COURT:  Thank you, Mr. Dane.  That is a little

18    bit of a preview of what the case is about.  We start the

19    trial process with jury selection.  The object here is to

20    make sure that we have a jury that is going to be fair and

21    objective and impartial to the plaintiffs, also a jury that

22    is going to be fair, objective, and impartial to the

23    defendants.

24         So the clerk is going to call 18 prospective jurors,

25    first nine top row, second nine bottom row.  Just because

1    your name is called and just because you take a seat doesn't

2    mean you are going to be a juror in the case.  There are many

3    questions that I will be asking you.  And at the conclusion

4    of all the questioning of the prospective panel, I'm going to

5    call counsel to sidebar, have some additional discussions,

6    and then we'll start the selection process.

7         And with that, let me turn it over to the clerk.

8    Before we start with that, we have the clerk here, the clerk

9    of the Court, and then we have the reporter.  Everything that

10   is being said in open court today is being transcribed by the

11   reporter.  To my right are two young ladies.  Those are

12   lawyers associated with the Court.  They are here to assist

13   me on the various matters that apply to this case and then in

14   the many other cases that we handle.

15        And with that, let's call 18 prospective jurors.

16        THE CLERK:  As I call your name, please come forward

17   and I'll seat you in the appropriate chair.

18        Calling Juror Number 1, Kathy Seifert, will you

19   please come forward.  Good morning.  Please -- would you

20   please take the first seat in the top row down there?

21        Juror Number 2, Crescencio Ancheta.

22        THE COURT:  Top row, please.

23        THE CLERK:  Juror Number 3, Jeffrey Pheffer.  Good

24   morning, sir.  Would you take the next seat over.

25        Juror Number 4, Shungchin Lin.

1              Juror Number 5, Judy Diep.

2              Juror number 6, Antonius Thijssen.  Good morning,

3      sir.

4              A PROSPECTIVE JUROR:  Good morning.

5              THE CLERK:  Juror Number 7, Brooke McCoy.

6              Juror Number 8, Chi-Wei Liu.

7              Juror Number 9, Selena Wesley Johnson.

8              Good morning.  Would you take the last seat at the

9      top row.

10             Juror Number 10, Michael Barman.  Good morning, sir.

11     Would you take the first seat, bottom row.  Walk around this

12     way if you want.

13             Juror Number 11, Emily Contreras.

14             Juror Number 12, Breanna Bennett.  Good morning.

15     Next seat over.

16             Juror Number 13, Alexander Kupelian.

17             Juror Number 14, Margoth Barrera.

18             Juror Number 15, Lynn Stanton-Rigg.  Good morning.

19     Next seat over, please.

20             Juror Number 16, Benjamin Horwitz.  Next seat over.

21             Juror Number 17, Concepcion Delos Santos.

22             And Juror Number 18, Kimberly Johnson.

23             THE COURT:  Mr. Cruz, would you adjust the monitor.

24     I can't see any of the jurors in the back.  If you could just

25     maybe turn it.

1          THE CLERK:  I'm sorry.  There are several boxes

2     here.  There is not a lot of room.  Maybe I could ask the

3     jurors to scoot over.

4          THE COURT:  Again, let me take the opportunity to

5     welcome the 18 prospective jurors.  The fact that you have

6     taken seats in the jury box again does not mean you are going

7     to be jurors in the case.

8          There is a number of questions to ask the jury.  I

9     would encourage you not to be intimidated by the subject

10    matter in this proceeding.  Very good lawyers on both sides.

11    Their goal is to simplify all the issues for you so that all

12    of the issues and the terms that are going to be referenced

13    in the case are made understandable for your benefit.

14         We start the jury process by having each of the

15    prospective jurors respond to the questions on the monitor.

16    I want to make sure, are all your monitors active?  Okay.

17    They are all working?  I see nods yes.

18         So let's start with Prospective Juror Number 1, Ms.

19    Seifert.

20         A PROSPECTIVE JUROR:  Kathy Seifert.  I live in

21    Valencia.  I'm married.  I'm an operations program manager.

22    My husband is a film -- he does film restoration.  I have two

23    boys.  My oldest one works at Magic Mountain as an AV tech.

24    My younger one goes to school plus works at Scorpion.  And I

25    last served on a jury about -- maybe about 14 years ago.

```
 1                    THE COURT:  Okay.  Was that a civil case or a
 2         criminal proceeding, if you recall?
 3                    A PROSPECTIVE JUROR:  I think it was criminal.
 4                    THE COURT:  Okay.  And without disclosing what the
 5         verdict was, did the jury reach a verdict in the case?
 6                    A PROSPECTIVE JUROR:  Yes.
 7                    THE COURT:  Okay.  And then your occupation again?
 8                    A PROSPECTIVE JUROR:  Operations program manager.
 9                    THE COURT:  What precisely do you do?
10                    A PROSPECTIVE JUROR:  I work at Raytheon Company, a
11         defense contractor.
12                    THE COURT:  Can you provide a little more detail as
13         to what you do there?
14                    A PROSPECTIVE JUROR:  I work on a specific program,
15         and I make sure the product moves on the floor through
16         integration and test, keep track of the hours charged,
17         on-schedule deliveries.
18                    THE COURT:  Do you have a technical background or
19         degree?
20                    A PROSPECTIVE JUROR:  No.
21                    THE COURT:  And then you said your -- the occupation
22         of your husband?
23                    A PROSPECTIVE JUROR:  He does film restoration.
24                    THE COURT:  What does that mean?
25                    A PROSPECTIVE JUROR:  He, um, you know, with the
```

```
1    films going to digital now, he -- like all these old films

2    that are coming out of the vault, he tries to restore them to

3    get them into the condition so they could be transferred

4    digitally.

5              THE COURT:  Is he employed by a company or does he

6    have his own business?

7              A PROSPECTIVE JUROR:  He's employed by Deluxe.

8              THE COURT:  And then you said you had a son who

9    works for Scorpion?

10             A PROSPECTIVE JUROR:  Yes.

11             THE COURT:  I'm not familiar with that.

12             A PROSPECTIVE JUROR:  It's Internet marketing.

13             THE COURT:  Okay.  And based on what you have heard

14   so far, do you believe that you could be a juror in this

15   matter?

16             A PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Okay.  And participate?

18             A PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Okay.  Let's go to the next prospective

20   juror, Number 2, Mr. Ancheta.

21             A PROSPECTIVE JUROR:  My name is Crescencio Ancheta,

22   Jr.  I live in Lancaster, California.  Married.  I'm senior

23   environmental safety technician, and my wife's occupation is

24   produce manager, Walmart.  I have two kids.  One works as

25   assistant project manager at Lynnet *** Corporation, and one
```

1    is a captain in the Army.  My prior jury service was in

2    Lancaster, and it's about a DUI, and what I recall it was

3    about assault.

4          THE COURT:  And did the jury -- without disclosing

5    what the verdict was, did the jury reach a verdict in the

6    case?

7          A PROSPECTIVE JUROR:  Yes, they do, but I was the

8    alternate then, too.

9          THE COURT:  You were an alternate?

10         A PROSPECTIVE JUROR:  Yeah.

11         THE COURT:  Okay.  And then your occupation again,

12   your --

13         A PROSPECTIVE JUROR:  Senior safety environmental

14   technician.

15         THE COURT:  What do you do?

16         A PROSPECTIVE JUROR:  As an environmental

17   technician, because we -- I work at the mine, and we have to

18   have issued by regulatory agency to operate, a permit to

19   operate.  So we have to comply with those conditions that was

20   in the permit.

21         THE COURT:  And do you have a technical training or

22   background?

23         A PROSPECTIVE JUROR:  Yes, I do.  I graduated

24   biology in Price University in Manila.

25         THE COURT:  And you were -- and your role, do you

```
 1    have regular contact with government regulators?

 2              A PROSPECTIVE JUROR:  Um, yes, we do, but I'm not --

 3    pretty much the management does that, but I knew them, so

 4    yes, I do.

 5              THE COURT:  And can you be fair to both sides in

 6    this case based on what you've heard so far?

 7              A PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  And can you participate?

 9              A PROSPECTIVE JUROR:  Yes, I can.

10              THE COURT:  So one of the -- one of your duties as a

11    juror in this case is to assess the credibility of the

12    witnesses who are going to be called, and you are going to

13    hear a number of witnesses who are going to be called, and

14    shortly I'm going to have the parties read or identify the

15    witnesses who will be called, and there are many witnesses.

16    Don't -- do not be intimidated by the number.  Again, the

17    case is going to take about six to seven days to try.

18              But one of your duties -- my point here is one of

19    your duties is to assess the credibility of witnesses, so you

20    are going to hear from plaintiffs' witnesses, percipient

21    witnesses, who are going to tell you about certain events and

22    occurrences.  You are going to hear from experts who are

23    going to talk about the patent in the case, the technology

24    behind the patent, the science behind the patent.  They are

25    going to talk about various cells, T-cells, B-cells, and they
```

1        are going to offer opinions.  These experts will be offering

2        opinions.  They are going to be experts offering opinions on

3        damages, also.

4               And my point in all of this is that just because

5        somebody comes to the witness stand, raises her hand, and

6        swears to tell the truth doesn't mean they will, in fact,

7        tell the truth.  But credibility determination, which is what

8        the jury has to do, is more complicated than simply that.

9               Sometimes a person believes certain events took

10       place but there is not enough foundation to support it.  If a

11       party has a stake in the outcome of this trial, you can take

12       that into consideration in terms of assessing credibility.

13       My point here is I do not assess credibility.  The jury --

14       all the power in this case is provided to the jury.  The jury

15       has the role of assessing the credibility of witnesses and

16       each of the witnesses.  Some people are comfortable with that

17       process.  Some people are not comfortable with that process.

18              Do you feel that you would be comfortable assessing

19       credibility of the witnesses who will be called?

20              A PROSPECTIVE JUROR:  Yes, I do.

21              THE COURT:  Okay.  Of the 18 prospective jurors

22       here, is there anyone who feels I'm just not the type of

23       person who feels comfortable assessing credibility of

24       witnesses who will be testifying?

25              We have one person with his hand, and let's see,

1    that's Mr. Kupelian.  So we'll come back to you, sir.  You

2    had your hand raised.

3             Is there anyone -- the 18 prospective jurors, is

4    there anyone who has a philosophical conviction or a

5    religious conviction that would make it difficult for you to

6    assess the credibility of witnesses in the case?  One of the

7    primary functions of a jury is credibility assessment.

8             Okay.  No other hands are raised.  Thank you, sir.

9             And we'll pass the microphone to Mr. Pheffer.

10            A PROSPECTIVE JUROR:  Good morning, Your Honor.  My

11   name is Jeffrey Pheffer.  Good morning.  I live in Los

12   Angeles.  I'm married.  I'm a lawyer.  My wife, she takes

13   care of me and our house and my kid.  I've got two kids.  One

14   is a law student, and the other one is a tax preparer.

15            THE COURT:  Well, welcome.

16            A PROSPECTIVE JUROR:  Thank you.

17            THE COURT:  And your area of practice, sir?

18            A PROSPECTIVE JUROR:  I do plaintiffs' personal

19   injury.  I take care of people that are injured in accidents.

20            THE COURT:  And do you -- and this is -- this is a

21   question that applies to everybody in the courtroom, but do

22   you know any of the lawyers or the parties that are at

23   counsel table?

24            A PROSPECTIVE JUROR:  Um --

25            THE COURT:  Do you recognize anyone?

1          A PROSPECTIVE JUROR:  I've never met anyone.  Being

2     a lawyer 37 years, I have definitely heard of Mr. Chu and

3     Mr. Dane, both great lawyers, but I've never met anybody

4     here.

5          THE COURT:  Okay.  And then of the prospective panel

6     members in the galley, is there anyone who knows or

7     recognizes any of the lawyers here?

8          Okay.  There are no hands.

9          So could you discuss, tell us a little bit more

10    about your practice, plaintiff's personal injury.

11         A PROSPECTIVE JUROR:  I have my own practice.  I

12    have been on my own about 26 years, just me.  I take care of

13    people, mostly car crashes and motorcycle accidents, and I do

14    all the cases myself.  I have tried a couple of dozen cases.

15    I have been on -- once in jury service, but I wasn't picked,

16    I got bounced.

17         THE COURT:  Okay.  So any cases that you've ever

18    been involved in with a science or a technology component to

19    it?

20         A PROSPECTIVE JUROR:  Never.

21         THE COURT:  Do you feel that you could be fair to

22    both sides in this case?

23         A PROSPECTIVE JUROR:  Definitely.

24         THE COURT:  And do you feel that you can participate

25    in this case?

```
 1              A PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Is there any additional information --

 3    I'm not able to -- this applies to everyone.  I'm not able to

 4    ask all the questions that the parties would like me to ask

 5    in the case because of time constraints.  So err on the side

 6    of caution by volunteering any information you believe the

 7    lawyers and the parties would like to know if you were

 8    selected to be a juror in this case.

 9              So is there any information, sir, that you believe

10    the lawyers should know about in determining whether you

11    should be a juror in this case?

12              A PROSPECTIVE JUROR:  Information, the only thing

13    that goes through my head is immediately when I hear about a

14    patent case, you know, I start to think about technical

15    stuff, but when I listen to people and I hear somebody tell a

16    story, you know, that is what really I listen to is the

17    facts, the interesting part of what is going on, and even the

18    mini opening was interesting.

19              THE COURT:  Okay.  Yeah.  And just to underscore

20    that again, it's a technical, science-based case.  At the

21    same time, I do not have a degree in science.  The district

22    court judges are generalists.  We handle various types of

23    cases.  So it's up to the lawyers and the parties to break

24    the case down to explain it to -- not only to the judge but

25    also to the jury.  You feel comfortable doing that?
```

```
 1                    A PROSPECTIVE JUROR:  Definitely.

 2                    THE COURT:  Thank you, sir.

 3                    A PROSPECTIVE JUROR:  Thank you, Judge.

 4                    THE COURT:  Mr. Lin?

 5                    A PROSPECTIVE JUROR:  My name is Lin, Shungchin Lin.

 6          I live in San Gabriel.  I'm married.  My occupation is

 7          company management.  My wife is the housemaker.  I have two

 8          daughters.  Oldest one is the cancer doctor.  Youngest one is

 9          a commercial lawyer.  I don't have a jury service before.

10                    THE COURT:  And your company, you are manager or in

11          company management, what precisely do you do?

12                    A PROSPECTIVE JUROR:  I'm a CEO.

13                    THE COURT:  You are the CEO of a food company?

14                    A PROSPECTIVE JUROR:  Yeah, food company.

15                    THE COURT:  Do you have any -- yourself personally,

16          do you have any training or background in any technical or

17          scientific area?

18                    A PROSPECTIVE JUROR:  I don't have.

19                    THE COURT:  Okay.  And then you said -- I think you

20          said your daughter is an oncologist?

21                    A PROSPECTIVE JUROR:  Yeah, oncology.

22                    THE COURT:  And do you know where she practices?

23          What institutions, if you know?

24                    A PROSPECTIVE JUROR:  Kaiser.

25                    THE COURT:  And then you have a son who is a
```

1      commercial lawyer?

2              A PROSPECTIVE JUROR:  Um, my youngest daughter.

3              THE COURT:  Daughter is a commercial lawyer.

4              A PROSPECTIVE JUROR:  Yeah, law firm.

5              THE COURT:  And do you know the name of the law

6      firm?

7              A PROSPECTIVE JUROR:  Um, now, I don't know the

8      name.

9              THE COURT:  If your memory is refreshed later on,

10     feel free to just tell us the name of the firm, if you know.

11             So do you feel that you could be a juror in this

12     case?

13             A PROSPECTIVE JUROR:  Um, I think that I cannot

14     completely understand.

15             THE COURT:  So you are concerned about your

16     understanding of what is being said?

17             A PROSPECTIVE JUROR:  Right.

18             THE COURT:  Okay.  And so let me just ask you this:

19     Have you been able to understand everything I've -- I've said

20     so far and what the parties have said so far?

21             A PROSPECTIVE JUROR:  Um, some I can catch, some I

22     miss.

23             THE COURT:  Okay.  You are not able -- so just so

24     that I am clear on this, you are saying that there were

25     certain things said in the courtroom today that you are not

1      able to understand; is that true?

2                  A PROSPECTIVE JUROR:  Yeah, cannot completely.

3                  THE COURT:  Okay.  So your native language is what?

4                  A PROSPECTIVE JUROR:  Chinese.

5                  THE COURT:  Is it Mandarin?

6                  A PROSPECTIVE JUROR:  Um, I have Chinese and

7      Mandarin.

8                  THE COURT:  Okay.

9                  A PROSPECTIVE JUROR:  Yeah.

10                 THE COURT:  And how long have you been proficient in

11     English?

12                 A PROSPECTIVE JUROR:  Um, because I work in a

13     Chinese company, we don't use the English too much.

14                 THE COURT:  So your primary language and the

15     language you are most comfortable with is Cantonese or

16     Mandarin?

17                 A PROSPECTIVE JUROR:  Mandarin, yeah.

18                 THE COURT:  So, again, I don't want to put words in

19     your mouth, but you are concerned about -- are you concerned

20     about your ability to understand what would be said during

21     the course of the trial?

22                 A PROSPECTIVE JUROR:  Yeah.

23                 THE COURT:  Okay.  We'll come back.  Think about

24     that, and I want to make sure that -- I'm going to come back

25     and find out if you are able to understand what is said from

1  here after.  But is there any other information that you

2  believe the lawyers should know about in determining whether

3  you should be a juror in the case?

4              A PROSPECTIVE JUROR:  You said lawyer?

5              THE COURT:  The lawyers for both sides.

6              A PROSPECTIVE JUROR:  Um, they have the patent, the

7  company they sell.

8              THE COURT:  Are you familiar with patents?

9              A PROSPECTIVE JUROR:  Um, patent, this area I know,

10  yeah.

11              THE COURT:  Do you -- are you a patent holder

12  yourself?

13              A PROSPECTIVE JUROR:  Yeah.

14              THE COURT:  You are?

15              A PROSPECTIVE JUROR:  My company.

16              THE COURT:  Your company is.  And how many patents

17  does your company have?

18              A PROSPECTIVE JUROR:  I think local company name, I

19  think it made it, yeah.

20              THE COURT:  Okay.  Thank you, sir.  And we are going

21  to go to Ms. Diep.

22              A PROSPECTIVE JUROR:  Good morning, everyone.  My

23  name is Judy Diep.  I live in El Monte.  I am currently

24  married.  I am a registered nurse.  My husband is a financial

25  aid advisor.  I have no children.  And I have served once on

1    a jury about five or six years ago.  Can't quite recall if it

2    was a civil or criminal.  It was involving like a car

3    accident.

4         THE COURT:  Okay.  Did the jury reach a verdict in

5    that case?

6         A PROSPECTIVE JUROR:  Yes.

7         THE COURT:  Any aspect of that case that you believe

8    would influence your decision making in this case?

9         A PROSPECTIVE JUROR:  No.

10         THE COURT:  Can you be fair to both sides?

11         A PROSPECTIVE JUROR:  Yes.

12         THE COURT:  The -- you are a nurse, so what is your

13    area of practice?

14         A PROSPECTIVE JUROR:  Currently I work in student

15    health.  I'm at the student health clinic at UCLA.

16         THE COURT:  Okay.  And prior to that?

17         A PROSPECTIVE JUROR:  Prior to that I was a nurse

18    educator at the VA in West LA.  And prior to that, I was also

19    in student health at Cal State LA.  And prior to that I was a

20    registered nurse at Methodist Hospital in Arcadia.

21         THE COURT:  And do you have an area of specialty in

22    nursing?

23         A PROSPECTIVE JUROR:  Not really.  General.

24         THE COURT:  Any background or experience in terms of

25    oncology?

1          A PROSPECTIVE JUROR:  No.

2          THE COURT:  You can participate and be fair?

3          A PROSPECTIVE JUROR:  Yes, absolutely.

4          THE COURT:  So one of the duties that you have in

5     the case is to follow the law that the Court instructs.  We

6     live in a very complex world, we have federal laws and rules

7     and regulations, we have state rules and regulations, local

8     laws and regulations.  I think we can all find laws that we

9     agree with and laws that we do not agree with.

10          That being said, when I became a judge, I had -- I

11     took an oath to follow the law irrespective of my personal

12     views.  The jury has the same obligation to follow the law

13     irrespective of personal views.  Do you feel that you can

14     accomplish that?

15          A PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Is there any one of the 18 prospective

17     jurors who feels that, based on personal conviction or

18     philosophical conviction or otherwise, you would not be able

19     to follow the law as the Court instructs?  Any concerns?  No

20     hands are raised.

21          Is there any additional information that you believe

22     the lawyers should know about in terms of being a juror in

23     this proceeding?

24          A PROSPECTIVE JUROR:  No.

25          THE COURT:  Okay.  Thank you very much.

```
1              A PROSPECTIVE JUROR:  Thank you.

2              THE COURT:  Next?

3              A PROSPECTIVE JUROR:  My name is Antonius Thijssen.

4    I live in Palmdale, California.  My marital status is I'm a

5    widower.  I'm retired.  My spouse's occupation, she was a

6    jewelry maker.  We have no children.  And the only time I was

7    on jury duty was back in '78, and it was for DUI.

8              THE COURT:  And did the jury reach a verdict in the

9    case?

10             A PROSPECTIVE JUROR:  Yes.

11             THE COURT:  And then you indicated that you are

12   retired.  What was your occupation?

13             A PROSPECTIVE JUROR:  Research and development.

14             THE COURT:  And could you tell us a little bit more

15   about that?

16             A PROSPECTIVE JUROR:  It was in electronics and

17   electronics and electrical.  So they would send me out to

18   different countries to fix basically.

19             THE COURT:  And do you have a formal degree in --

20             A PROSPECTIVE JUROR:  No.

21             THE COURT:  -- in engineering?

22             A PROSPECTIVE JUROR:  No.

23             THE COURT:  You learned it on the job?

24             A PROSPECTIVE JUROR:  Yeah.

25             THE COURT:  Okay.  And could you kind of provide a
```

```
1    little bit more detail as to the type of work that you did

2    and the repair that you accomplished?

3              A PROSPECTIVE JUROR:  Well, the last thing I worked

4    on was a project that lasted about four years, and it had to

5    do with transportation, electromagnetic, and it was -- we put

6    it out in Mojave, California.  So I'm a little bit aware of

7    patents, but I don't know enough about it, I guess.

8              THE COURT:  Okay.  And so what you did sounds

9    complicated.

10             A PROSPECTIVE JUROR:  Yeah, it was.

11             THE COURT:  And do you feel that you could be a

12   juror in this case here?

13             A PROSPECTIVE JUROR:  Yes.

14             THE COURT:  And then also fair to both sides, based

15   on what you heard so far?

16             A PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Now, so you came in, you drove in from

18   Palmdale, a little bit of a drive.

19             A PROSPECTIVE JUROR:  Um-hum.

20             THE COURT:  And then Mr. Ancheta also came in from I

21   think Lancaster.  How were the road conditions coming in?

22             A PROSPECTIVE JUROR:  Well, I took the Metro.

23             THE COURT:  Okay.  Good.  Probably smart.

24             If you are selected as a juror in the case, do you

25   feel that you could be here on a daily basis?
```

1          A PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  And then for those who are -- who

3   come in from a distance, there are accommodations that could

4   be made that -- made by the Court to allow you to be close

5   by --

6          A PROSPECTIVE JUROR:  Okay.

7          THE COURT:  -- if you are selected as a juror.

8          A PROSPECTIVE JUROR:  All right.

9          THE COURT:  Is there any other information that you

10  believe the lawyers should know about?

11         A PROSPECTIVE JUROR:  Um, about the patent, um, I

12  once had to -- we filed for a patent for this transportation

13  system we were working on, but the patent was rejected.  And

14  they gave it to me and says, what can you do to fix this?

15  Since I'm the one that basically invented the system.  I said

16  all you have to do is change the wording.  And I changed the

17  wording, and the patent was accepted.  So...

18         THE COURT:  How long ago was that?

19         A PROSPECTIVE JUROR:  About 2002.

20         THE COURT:  Did you have any personal contact with

21  any of the examiners or -- contact with the examiners at the

22  patent office?

23         A PROSPECTIVE JUROR:  No.

24         THE COURT:  Other than changing the wording, were

25  you involved in any other aspect in terms of the patent

1    application itself?

2              A PROSPECTIVE JUROR:  No.  That was handled by a

3    patent attorney.

4              THE COURT:  Did you work with a patent attorney in

5    terms of the patent prosecution and application?

6              A PROSPECTIVE JUROR:  Um, very limited.

7              THE COURT:  I'm sorry?

8              A PROSPECTIVE JUROR:  It was very limited.

9              THE COURT:  Is there anything about that experience

10   with that patent that you believe the lawyers should know

11   about in determining whether you should be a juror in this

12   proceeding here?

13             A PROSPECTIVE JUROR:  No.

14             THE COURT:  Do you have any general opinions, good

15   or bad, regarding the patent office itself?

16             A PROSPECTIVE JUROR:  No, not at all.

17             THE COURT:  And that was the only occasion?

18             A PROSPECTIVE JUROR:  Yes.

19             THE COURT:  So the patent issued?

20             A PROSPECTIVE JUROR:  It is issued, yes.

21             THE COURT:  And were you included as a named

22   inventor on that patent?

23             A PROSPECTIVE JUROR:  No.

24             THE COURT:  And do you know why you were not?

25             A PROSPECTIVE JUROR:  Um, no, I don't know why.

1              THE COURT:  Okay.  Did you think that you should

2      have been --

3              A PROSPECTIVE JUROR:  Oh, yeah.

4              THE COURT:  -- a named inventor?

5              A PROSPECTIVE JUROR:  Absolutely, yes.

6              THE COURT:  Did you make any complaints about that?

7              A PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Okay.  Could you tell us what you did?

9              A PROSPECTIVE JUROR:  Well, basically what they told

10     me was because I'm working for a company that works -- and

11     basically I guess what they asked me to do was to work on

12     this project, everything that I came up with belonged to the

13     company, and that is where it ended up.

14             THE COURT:  Okay.  Do you know who eventually were

15     included as named inventors?

16             A PROSPECTIVE JUROR:  Yes.

17             THE COURT:  And did those persons contribute to the

18     invention?

19             A PROSPECTIVE JUROR:  Oh, yes, yes.

20             THE COURT:  Do you feel that you were treated fairly

21     by your company in reference to this patent application?

22             A PROSPECTIVE JUROR:  No.  No.

23             THE COURT:  And do you feel that that is going to be

24     an issue that may influence your decision making in this

25     proceeding here?

1           A PROSPECTIVE JUROR:  No.

2           THE COURT:  Okay.  Thank you, sir.

3           Next?

4           A PROSPECTIVE JUROR:  My name is Brooke McCoy, and

5   I'm from Santa Clarita.  I'm married, and I'm a homemaker.

6   And I have five children, ages 8 to 16.  And my husband --

7   oh, I skipped that one, sorry.  My husband is in website

8   marketing for Disney, currently in Florida.  I've never been

9   selected for a jury.

10          THE COURT:  Well, welcome to Federal Court here.

11  I've asked a number of questions so far.  Same questions.

12  Can you be fair to both sides, and can you participate?

13          A PROSPECTIVE JUROR:  I can be fair.  I'm just a

14  little worried about logistics since I'm the primary

15  emergency contact for five children.

16          THE COURT:  Yes.  And you live in Santa Clarita?

17          A PROSPECTIVE JUROR:  Um-hum.

18          THE COURT:  What is your concern about logistics?

19          A PROSPECTIVE JUROR:  Just if any of them get sick,

20  it's that kind of season of the year.

21          THE COURT:  Okay.  So are all of them healthy?

22          A PROSPECTIVE JUROR:  Yeah, they are.  And just no

23  family close, so not too much -- I'm it.

24          THE COURT:  So other than that concern, if you were

25  selected as a juror in this case, if we could accommodate

1          that, if something significant came up and we could

2          accommodate that, do you feel you could be a juror in this

3          matter?

4                    A PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  So one of your duties -- another duty of

6          the jurors -- of the jury in the case is to resolve

7          conflicts.  And you are going to hear from several witnesses

8          from the plaintiffs and several witnesses from the

9          defendants.  You are going to hear from experts from both

10         sides, doctors and Ph.D.s and persons who have significant

11         experiences in various areas in technical and scientific

12         fields.

13                   And I can almost assure you that certain of the

14         opinions that you are going to hear from these experts is

15         going to be very different.  You are going to hear opinions

16         from plaintiffs' experts who are going to offer opinions, you

17         are going to hear opinions from the defendant's experts, the

18         opinions are going to be very different or could be very

19         different.  And what we require of the jury is to resolve

20         these conflicts.

21                   Sometimes when a person hears two different versions

22         of the same story or two different opinions, they simply

23         throw up their hands and say, I can't make a decision.  The

24         jury and trial process requires jurors to listen carefully,

25         analyze carefully all of the evidence in the case, resolve

```
 1    those conflicts -- and there is going to be conflicts, that

 2    is why we have trials -- conflicts, and reach a verdict if

 3    you can reach a verdict.

 4              Do you feel that you can accomplish that to the best

 5    of your ability?

 6              A PROSPECTIVE JUROR:  I think so.

 7              THE COURT:  Is there anyone of the 18 prospective

 8    jurors who feels I'm not the type of person who can resolve

 9    these types of conflicts if they occur?  Any additional

10    hands?

11              Okay.  No hands are raised.

12              Any additional information to offer?

13              A PROSPECTIVE JUROR:  I come from a -- my medical

14    family, all my extended family, so...

15              THE COURT:  So why don't you tell us about that.

16              A PROSPECTIVE JUROR:  Just my father is a physician,

17    and my brother, and my mom is a nurse, and I have sister that

18    is a nurse.

19              THE COURT:  Okay.  And the area of practice of your

20    father?

21              A PROSPECTIVE JUROR:  None of them oncology, but

22    anesthesia, and my brother is radiology.

23              THE COURT:  And so are they physicians in Southern

24    California?

25              A PROSPECTIVE JUROR:  No.
```

```
 1                THE COURT:  Okay.  In other states?

 2                A PROSPECTIVE JUROR:  Yes.

 3                THE COURT:  Are you familiar with the parties that

 4      have been identified so far?

 5                A PROSPECTIVE JUROR:  No.  I do have an uncle that

 6      works at the Huntsman Center in Utah, so I have heard some

 7      things about oncology, but --

 8                THE COURT:  Okay.  So one of the obligations of a

 9      jury and the juror, if you are selected, is not to have

10      conversations outside of what occurs here about the case.

11                A PROSPECTIVE JUROR:  Yes.

12                THE COURT:  So if you are selected as a juror in the

13      case, you are not -- and if there is a technical issue that

14      comes up or a scientific term that comes up or any other

15      issues that comes up, you are not able to call a family

16      member and ask for advice or ask for additional information.

17      Do you promise to follow that rule?

18                A PROSPECTIVE JUROR:  Yes.

19                THE COURT:  Okay.  Thank you very much.

20                Next.

21                A PROSPECTIVE JUROR:  My name is Chi-Wei Liu.  I

22      live in Arcadia.  I'm married.  I'm the office manager for a

23      noodle manufacturer.  My wife is an insurance agent.  I have

24      an older daughter back in school taking his -- her master's

25      degree.  My younger son works in the medical transportation,
```

1    and I have never been selected as a juror.

2              THE COURT:  Your older daughter who is pursuing her

3    master's, in what area?

4              A PROSPECTIVE JUROR:  MBA.

5              THE COURT:  And based on what you've heard so far,

6    do you feel that you could be a juror in the case and

7    participate?

8              A PROSPECTIVE JUROR:  Yeah.

9              THE COURT:  And be fair to both sides?

10             A PROSPECTIVE JUROR:  Yes.

11             THE COURT:  You are a manager in a company that

12   manufactures noodles?

13             A PROSPECTIVE JUROR:  Correct.

14             THE COURT:  What do you do on a daily basis?  What

15   is your function?

16             A PROSPECTIVE JUROR:  Taking orders and make sure

17   office run smoothly.

18             THE COURT:  Are you -- are you a supervisor of any

19   persons at the plant?

20             A PROSPECTIVE JUROR:  Um --

21             THE COURT:  Do you supervise?

22             A PROSPECTIVE JUROR:  Yes.

23             THE COURT:  How many are you in charge of?

24             A PROSPECTIVE JUROR:  I have 10 people working in

25   the factory.

```
1              THE COURT:  And your educational and training

2    background is in what?

3              A PROSPECTIVE JUROR:  Um, actually in the Navy

4    navigation, not related to food at all.

5              THE COURT:  Okay.  And you said Naval navigation?

6              A PROSPECTIVE JUROR:  Correct.

7              THE COURT:  So could you tell us a little bit about

8    that?

9              A PROSPECTIVE JUROR:  Just become a sailor, and I

10   have work only couple of years actually on a ship.  After

11   that came to U.S. and work in an IT industry selling

12   computers, equipment for almost 20 years.

13             THE COURT:  Okay.  So were you in the military at

14   all?

15             A PROSPECTIVE JUROR:  In Taiwan, yes, Navy.

16             THE COURT:  In the Taiwanese Navy.  And then

17   separate and apart, did you work on cargo ships?

18             A PROSPECTIVE JUROR:  Yes.  Correct.

19             THE COURT:  Okay.  So you were in military, and then

20   also separate from that you worked on cargo ships?

21             A PROSPECTIVE JUROR:  Correct.

22             THE COURT:  What type of work did you do on cargo

23   ships?

24             A PROSPECTIVE JUROR:  Just learn how to navigate and

25   doing maintenance for that ship.
```

```
 1              THE COURT:  And then you moved into the IT world?

 2              A PROSPECTIVE JUROR:  Correct.

 3              THE COURT:  Okay.  And could you tell us a little

 4    bit about that?

 5              A PROSPECTIVE JUROR:  Um, doing retail sales,

 6    selling personal computers, um, printers, um, you know,

 7    manufacture, including HP, Apple, Compac, those kind.

 8              THE COURT:  Were you employed by a company?

 9              A PROSPECTIVE JUROR:  Yes.

10              THE COURT:  And what company was that?

11              A PROSPECTIVE JUROR:  It's called PC Systems.

12              THE COURT:  And then you moved into a -- your

13    current position?

14              A PROSPECTIVE JUROR:  Correct.

15              THE COURT:  And any other information to offer?

16              A PROSPECTIVE JUROR:  Um, nothing.

17              THE COURT:  Thank you.

18              Next?  Ms. Wesley Johnson.

19              A PROSPECTIVE JUROR:  Yes.  My name is Selena Wesley

20    Johnson.  I live in Inglewood, California.  I am married.  I

21    work for Kaiser Permanente as a business service

22    representative and financial counselor.  My husband is on the

23    lift team at Ronald Reagan UCLA in Westwood.  I have a

24    stepdaughter, she's 29, and she's a phlebotomist in the state

25    of Iowa.  I have been on a high profile jury in 1993, and we
```

 1     did reach a verdict.

 2                THE COURT:  And what case was that?

 3                A PROSPECTIVE JUROR:  That was the Reginald Denny

 4     trial.

 5                THE COURT:  Okay.  So that was a, you know,

 6     significant matter, I think, in the history of Los Angeles

 7     here.

 8                A PROSPECTIVE JUROR:  Yes, sir.

 9                THE COURT:  And is there aspects of your jury

10     service in that case that you believe may influence your

11     decision in this matter here?

12                A PROSPECTIVE JUROR:  Not at all.

13                THE COURT:  Can you set all of that aside and base

14     your verdict based on the law?

15                A PROSPECTIVE JUROR:  Yes, sir.

16                THE COURT:  In that case you know that part of the

17     jury experience is working with 11 -- in a federal civil

18     trial we have less than 12 -- but working with other jurors

19     to reach a verdict in the case, and this requires being open

20     minded, listening carefully to others, if they convince you

21     that your view is wrong, you have a duty to change your view.

22     If they do not convince you through logic and pointing to the

23     evidence, then you have a duty to stand by your conviction.

24     It requires somebody who is comfortable working with other

25     people.  And some people are simply not comfortable with

1     working with others.

2              Do you feel you can accomplish that?

3              A PROSPECTIVE JUROR:  I have been in healthcare for

4     29 years, and you have to be comfortable, you have to be able

5     to communicate, and you have to assess, and you have to not

6     bring in your personal opinion on whatever takes place at the

7     time.

8              THE COURT:  So you work at Kaiser on the -- is it

9     the business side?

10             A PROSPECTIVE JUROR:  I work in healthcare, in the

11    admissions and the financial counseling.

12             THE COURT:  So do you have regular contact with

13    doctors?

14             A PROSPECTIVE JUROR:  Yes, I do.

15             THE COURT:  Okay.  And based on your view -- your

16    work with doctors, do you have any general opinions, good or

17    bad, regarding physicians generally?

18             A PROSPECTIVE JUROR:  No.  No, sir.

19             THE COURT:  Okay.  And I identified certain of the

20    parties.  I'm going to do that again.  But was there any

21    party here that you recognized based on your experience with

22    Kaiser?

23             A PROSPECTIVE JUROR:  No, sir.

24             THE COURT:  And then you said your husband is on the

25    lift team?

1           A PROSPECTIVE JUROR:  Yes, at Ronald Reagan UCLA.

2           THE COURT:  What does that mean?

3           A PROSPECTIVE JUROR:  He does patient care where

4      they are transporting patients from either gurney to bed or

5      transport to hospital room for admissions.

6           THE COURT:  Is he assigned to a particular ward?

7           A PROSPECTIVE JUROR:  No, sir.

8           THE COURT:  The entire hospital?

9           A PROSPECTIVE JUROR:  Yes, entire hospital.

10          THE COURT:  Okay.  And I read the statement of the

11     case a while ago.  Any additional information that you

12     believe the lawyers should know about in determining whether

13     you should be a juror in this case?

14          A PROSPECTIVE JUROR:  No additional information.

15          THE COURT:  Can you participate again in a trial?

16          A PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  And you could be fair?

18          A PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  Thank you.  Let's pass the microphone

20     all the way down, if you would, to Mr. Barman.  Pass it all

21     the way down.

22          A PROSPECTIVE JUROR:  Good morning.  My name is

23     Michael Barman.  I live in Long Beach.  I'm married.  I'm

24     retired.  Prior to my retirement I worked 34 years at

25     Southern California Edison.  I upgraded fossil fuel power

1      plants and nuclear.  My wife is retired.  Prior to that she

2      was office manager for DeVry University.  I have one

3      daughter, she's 41.  She's a project manager for Southern

4      California Edison.  I have been on, I believe, seven Superior

5      Court cases, and I have been on the grand jury prior.

6                THE COURT:  Okay.  A lot of jury experience.

7                A PROSPECTIVE JUROR:  Yeah.  I was jury foreman

8      twice, also.

9                THE COURT:  Okay.  So your jury experience, all of

10     it in State Court, I'm assuming?

11               A PROSPECTIVE JUROR:  Well, Superior Court.  And one

12     was here in the grand jury.

13               THE COURT:  And the federal grand jury?

14               A PROSPECTIVE JUROR:  Yes.

15               THE COURT:  So in reference to your Superior Court

16     experience, did you participate in civil cases and criminal

17     cases?

18               A PROSPECTIVE JUROR:  I believe -- it's been a

19     while.  I believe they were all criminal cases.

20               THE COURT:  Okay.  So one of -- there are some

21     fundamental differences between criminal and civil as you

22     know.  But just to emphasize, one is the burden of proof in a

23     criminal proceeding.  It's proof beyond a reasonable doubt,

24     which is the highest standard applied anywhere in any court

25     in the United States.

```
1              This is a civil proceeding.  It's preponderance of

2    the evidence.  There may be other standards that are going to

3    apply.  I'll instruct you on those standards.  But the point

4    is that they are different standards.

5              Will you hold the parties to the standard as the

6    Court instructs in this case here?

7              A PROSPECTIVE JUROR:  Yeah, I understand.

8              THE COURT:  Any part of that jury experience, you

9    have a lot of jury experience, that would influence your

10   decision making here?

11             A PROSPECTIVE JUROR:  No.  It was, um -- no, I

12   don't.  No.  I think everyone should be on a jury.

13             THE COURT:  Everyone should participate.

14             A PROSPECTIVE JUROR:  Yeah.

15             THE COURT:  Well, I would embrace your comment.  The

16   judicial process and system is very dependent on

17   participation by citizens here.

18             You work at -- you worked at Southern California

19   Edison?

20             A PROSPECTIVE JUROR:  Yeah, about 34 years.

21             THE COURT:  And you said nuclear and fossil fuels?

22             A PROSPECTIVE JUROR:  Gas-fired power plants, and

23   then I worked San Onofre for about eight years.

24             THE COURT:  And could you describe your experience

25   in the nuclear field area?
```

 1                    A PROSPECTIVE JUROR:  I was an operator, and once I

 2        got out of that, I was a project manager on refueling.

 3                    THE COURT:  Do you have formal training in these

 4        areas?

 5                    A PROSPECTIVE JUROR:  Edison has their own training.

 6        Prior to that I have a degree in geology.  That is my former

 7        training.

 8                    THE COURT:  And in your capacity with Edison, did

 9        you work regularly with scientists and engineers?

10                    A PROSPECTIVE JUROR:  Yes, I did.  Yeah, on a daily

11        basis, but I was more in the operational side of it, okay?

12        When issues came up, sometimes I was a go-between the

13        operations side and the maintenance side.  Yeah, I worked

14        with engineers pretty much on a daily basis.

15                    THE COURT:  So did you ever become involved in the

16        patent area with Edison at all?

17                    A PROSPECTIVE JUROR:  No, no.

18                    THE COURT:  Nothing.  And did you ever work with any

19        of the lawyers at Edison?

20                    A PROSPECTIVE JUROR:  Yeah, I did on certain cases

21        but not involving patents.

22                    THE COURT:  Sure.  So tell us about your

23        relationship with the lawyers at Edison.  What type of cases?

24                    A PROSPECTIVE JUROR:  Well, I -- if there was some

25        trips on the plant, we were trying to figure out whether or

1    not it was a mechanical issue or a man issue, maybe somebody

2    pushed the wrong switch or a transformer is bad or just a bad

3    relay.  I was the go-between.  We were trying to figure that

4    out.

5              THE COURT:  Sure.  Were you ever called to testify

6    in any of those matters?

7              A PROSPECTIVE JUROR:  No.  No.

8              THE COURT:  And have you ever testified as an expert

9    witness?

10             A PROSPECTIVE JUROR:  No.

11             THE COURT:  You could be fair and participate, I

12   assume?

13             A PROSPECTIVE JUROR:  Yes.

14             THE COURT:  And tell us about your grand jury

15   experience.

16             A PROSPECTIVE JUROR:  It was a -- it was a cocaine

17   case involved with bad DEA agents, and --

18             THE COURT:  How long did you serve on the grand

19   jury?

20             A PROSPECTIVE JUROR:  I -- um, I think it was about

21   a month case, 1984.

22             THE COURT:  And any part of that experience that you

23   feel would influence your decision making here?

24             A PROSPECTIVE JUROR:  No.  We -- um, we just

25   gathered the testimony and we -- there was enough information

```
 1          to warrant a trial.

 2                  THE COURT:  So you had -- I'm assuming you had

 3          regular contact with the U.S. Attorney's Office?

 4                  A PROSPECTIVE JUROR:  Just on the grand jury, yes.

 5                  THE COURT:  Yes.  Any part of that experience that

 6          would influence your decision making here?

 7                  A PROSPECTIVE JUROR:  No.

 8                  THE COURT:  Okay.  Thank you, sir.

 9                  A PROSPECTIVE JUROR:  There is one more item.

10          Recently I just had cancer, I have been clean for about eight

11          months, and I was involved with a lot of oncology doctors and

12          treatment and all that, so I'm somewhat familiar with cancer

13          treatment, okay?

14                  THE COURT:  Yes.  And there are certain questions

15          I'm going to come back regarding other issues.  Do you feel

16          comfortable answering these health questions here in open

17          court or would you prefer doing it at sidebar?

18                  A PROSPECTIVE JUROR:  No, I'm okay.

19                  THE COURT:  So could you describe a little bit or

20          tell us a little bit about --

21                  A PROSPECTIVE JUROR:  About my treatment?

22                  THE COURT:  About your treatment, yes.

23                  A PROSPECTIVE JUROR:  It was actually skin cancer.

24          It was on the neck.  And I had chemo to shrink the tumor,

25          then I had surgery to remove the tumor, and then I had
```

```
 1    radiation and chemo at the same time.  My last blood work I'm

 2    clean.  So I have been clean for about nine months.

 3              THE COURT:  Okay.  Well, that is good to hear.  Do

 4    you feel that health-wise you are able to sit in this case?

 5              A PROSPECTIVE JUROR:  Oh, yeah, I'm okay, no

 6    problem.

 7              THE COURT:  And what hospitals were you treated at?

 8              A PROSPECTIVE JUROR:  Um, surgery was done at UCLA

 9    Medical Center.  The -- my main oncology doctor was out of

10    the pavilion.  It was the cancer Todd Cancer Pavilion at Long

11    Beach Memorial Hospital.

12              THE COURT:  And do you feel that you were treated

13    well by the physicians?

14              A PROSPECTIVE JUROR:  Very well, both.  I praised

15    the oncology doctors and the surgeon at UCI.  They did a

16    really good job.

17              THE COURT:  Are you scheduled for any other

18    follow-up exams?

19              A PROSPECTIVE JUROR:  Well, it's just they, um,

20    every three months, you know, they take blood, and they just,

21    you know, ask me how I'm doing, and that is all.  So far I

22    have been clean.

23              THE COURT:  Okay.  Any other information, sir?

24              A PROSPECTIVE JUROR:  No, that is it.  That is

25    pretty much it.
```

1          THE COURT:  Thank you.  We'll go to Ms. Contreras.

2          A PROSPECTIVE JUROR:  Thank you.  Hello.  My name is

3     Emily Contreras.  I'm still on my address in El Monte,

4     California, but I just recently moved to Alhambra,

5     California.  I am not married.  My occupation, I have two

6     jobs right now, so I'm working at the El Monte City School

7     District.  I am an instructional support specialist with the

8     kindergarten through third grade.  I also work part-time at

9     Target as a guest service advocate and cashier.  I moved in

10    with a partner, but I am not married.  He works for the U.S.

11    Postal Service in Baldwin Park, California.  I don't have any

12    children.  And my only jury service I did was in West

13    Covina's courthouse.  I was just in the jury pool.  I was not

14    picked.

15         THE COURT:  And you are here today to possibly serve

16    as a juror.  Do you feel that you can do that?

17         A PROSPECTIVE JUROR:  I don't drive or have a

18    license, but Alhambra is not too far, so I could do a Lyft.

19    I feel transportation is not too much of an issue considering

20    there are people coming from farther.

21         THE COURT:  You are working two jobs.  You are a

22    very hard worker.  And this is the holiday season as we go --

23    you know, move closer to Christmas.  This is a big -- I would

24    imagine a busy time at Target.

25         A PROSPECTIVE JUROR:  Yeah.  I just worked last

1    night.  It was pretty busy.

2            THE COURT:  So do you feel that you could

3    participate in this case considering that you have two jobs

4    and this is the busy time at one of your work sites?

5            A PROSPECTIVE JUROR:  Um, I'm not too worried with

6    Target.  They don't cover me for jury duty because I'm

7    technically part-time.  I'm not a lead there.  But I'm not

8    too worried about it because my other job does cover me, and

9    I'm more in tune with that job.  I'm kind of already figuring

10   not really staying at Target for too long, so it's not really

11   going to be a bother for me.

12           THE COURT:  Okay.  And then your future plans in

13   terms of career?

14           A PROSPECTIVE JUROR:  I'm planning to go back to

15   school in a couple of months.  I'm still working to get my

16   associate's for elementary teaching.  Right now I'm just an

17   instructional support specialist, but I'm moving forward to

18   get there.  I'm hoping to go up to a bachelor's or a master's

19   in that.

20           THE COURT:  You can be fair and participate?

21           A PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Thank you.

23           A PROSPECTIVE JUROR:  I do want to just mention one

24   thing.  It's not the same type of cancer, but I did just lose

25   a grandfather to stage 4 lung cancer recently on

 1     November 2nd, so I don't know if that is worth mentioning,

 2     but I just wanted to let them know.

 3              THE COURT:  Yes, please.  And, again, I'm going to

 4     ask some specific questions about this, but could you tell us

 5     about that experience?  So is this somebody you were close

 6     with, your grandfather?

 7              A PROSPECTIVE JUROR:  Um, he lived with me the last

 8     year and a half, so we were a little closer, not super close,

 9     but we were closer just because he was in my home for about a

10     year.  I didn't really see the last stages because he decided

11     to move with my aunt, so I didn't have him around that time

12     period, but he was with me for about a year and a half.

13              THE COURT:  And did you become involved in his

14     treatment at all?  Did you work with him and his doctors in

15     terms of the treatment?

16              A PROSPECTIVE JUROR:  No, my aunt took it upon

17     herself to, like, take him to the visits.  I just know he did

18     chemo.  I know when he got diagnosed he was at the Methodist

19     Hospital in Arcadia because he had pneumonia as well.  So

20     that is when we discovered it.  But I wasn't like personally

21     taking him to appointments knowing what medication he was

22     taking or any of that.

23              THE COURT:  Do you have any -- based on what you

24     know personally or secondhand or thirdhand, do you have any

25     opinions as to the -- whether he was treated well by the

1        doctors?

2               A PROSPECTIVE JUROR:  I think he was given the best

3        treatment that he could have been given considering his

4        status.  He wasn't a citizen of the United States, so they

5        did give him some program that helped him out.  So I think

6        based upon that, he did get the best treatment he could get.

7               THE COURT:  Any other information?

8               A PROSPECTIVE JUROR:  Um, nothing that comes to mind

9        besides that.  Thank you.

10              THE COURT:  Thank you.

11              A PROSPECTIVE JUROR:  Good morning.  My name is

12       Breanna Bennett.  I'm from Redondo Beach.  I am newly

13       married.  I'm a registered behavior technician.  My husband

14       is a store manager.  No children.  And no prior jury service.

15              THE COURT:  Okay.  And could you tell us about your

16       occupation?

17              A PROSPECTIVE JUROR:  Yes.  I work at a local school

18       district at a clinic which is basically special education, so

19       I work with children with special needs, mostly autism, to

20       manage their behaviors to get them back in their general

21       classrooms.

22              THE COURT:  Okay.  And then what are your -- what is

23       your training that qualifies you for that position?

24              A PROSPECTIVE JUROR:  I got my degree as in

25       applied -- my bachelor's in applied behavioral science and

1    specialized in early childhood education and intervention.

2              THE COURT:  Okay.  Can you participate in this case

3    and be fair to both sides?

4              A PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Any additional information to volunteer

6    here?

7              A PROSPECTIVE JUROR:  No.

8              THE COURT:  Okay.  Thank you.  Would you pass the

9    microphone.

10             A PROSPECTIVE JUROR:  Hi.  My name is Alexander

11   Kupelian.  I live in Los Angeles.  I work in wireless retail

12   sales.  I sell like cellphones for the Samsung Experience

13   store.  I haven't served on a jury before.

14             THE COURT:  And you had your hand raised previously

15   on the question of whether you could assess the credibility

16   of witnesses.

17             A PROSPECTIVE JUROR:  Um-hum.

18             THE COURT:  And I think you were concerned about

19   doing that.  Is that true?

20             A PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Okay.  Could you tell us about your

22   concern?

23             A PROSPECTIVE JUROR:  Well, my concern is, like, I

24   feel as though if someone is, like, a really good story

25   teller, I probably would have, like, more of a tendency to

```
1    believe them based on, like, emotional response than being,

2    like, more fair and more discerning, yeah.

3         THE COURT:  In your -- in your work environment, do

4    you have to assess the credibility of a person, is that

5    required?

6         A PROSPECTIVE JUROR:  Yeah.  Yeah.  Once in a while,

7    yeah.  I mean, you do, there are -- like, yeah, there are

8    scenarios where you have to, I guess, do that.

9         THE COURT:  And are you comfortable doing that?

10        A PROSPECTIVE JUROR:  Um, yeah.  I mean, usually I

11   am, but you know, at moments when I don't feel comfortable, I

12   do kind of like redirect people to like a leadership person

13   to kind of -- yeah.

14        THE COURT:  Okay.  And separate and apart from that

15   concern, do you feel that you could be a juror in this case

16   and be fair to both sides?

17        A PROSPECTIVE JUROR:  Um, I do.  I don't know if

18   it's, like, important information, but I have a cousin who I

19   think he, like, develops some biomedical app, I don't know

20   what company for, or, like, he helps work on it.  I had a

21   grandpa who I'm pretty sure he died of leukemia, another who

22   died of lung cancer who I never met.  Yeah.

23        THE COURT:  So a relative who has -- who is in --

24   gets involved in a biomedical application?

25        A PROSPECTIVE JUROR:  Um-hum.
```

```
 1                    THE COURT:  Is this somebody that you are close

 2         with?

 3                    A PROSPECTIVE JUROR:  He's my first cousin.

 4                    THE COURT:  Well, do you have regular contact with

 5         this person?

 6                    A PROSPECTIVE JUROR:  Um, not really, I mean, once

 7         in a while like at family gatherings.

 8                    THE COURT:  And do you -- is it a man or woman?

 9                    A PROSPECTIVE JUROR:  Man.

10                    THE COURT:  Is it -- do you know his -- that

11         person's training or background?

12                    A PROSPECTIVE JUROR:  Computer science, I think.

13                    THE COURT:  Okay.  And this application, have you

14         used it yourself?

15                    A PROSPECTIVE JUROR:  No.

16                    THE COURT:  And were you involved in its development

17         at all?

18                    A PROSPECTIVE JUROR:  No.

19                    THE COURT:  And then you said you had a relative who

20         passed away with leukemia?

21                    A PROSPECTIVE JUROR:  Um-hum.  I think that is what

22         it was.  I was like young at the time, but...

23                    THE COURT:  How long ago was that?

24                    A PROSPECTIVE JUROR:  Um, maybe when was that?  Like

25         14 years ago.
```

```
 1                    THE COURT:  Okay.  And were you at all present when
 2          that person was being treated for the cancer?
 3                    A PROSPECTIVE JUROR:  Um, well, yeah, like, I
 4          visited them in the hospital.
 5                    THE COURT:  Any general impressions one way or the
 6          other as to the nature of the treatment?
 7                    A PROSPECTIVE JUROR:  No.
 8                    THE COURT:  And do you feel that those experiences
 9          would influence your decision making here?
10                    A PROSPECTIVE JUROR:  Um, no.
11                    THE COURT:  Okay.  And, again, you could participate
12          in this case?  Can you participate?
13                    A PROSPECTIVE JUROR:  Oh, can I?  Yeah.
14                    THE COURT:  And you feel that you could be fair to
15          the best of your ability?
16                    A PROSPECTIVE JUROR:  Yeah.
17                    THE COURT:  Thank you very much, sir.
18                    A PROSPECTIVE JUROR:  Thanks.
19                    A PROSPECTIVE JUROR:  Good morning.  My name is
20          Margoth Barrera.  I live in Los Angeles.  I am -- I work in
21          TV and film as freelance.  I do coordinating, managing,
22          producing.  My husband is a product manager for a payroll
23          company.  And no children.  And I have not served on a jury
24          before.
25                    THE COURT:  Can you be fair and participate?
```

```
 1                    A PROSPECTIVE JUROR:  Yes.

 2                    THE COURT:  And then you are in TV and film

 3       management and production?

 4                    A PROSPECTIVE JUROR:  Correct.

 5                    THE COURT:  And could you tell us a little bit more

 6       about what you do?

 7                    A PROSPECTIVE JUROR:  It really depends on the

 8       project that I'm on.  Depending on commercials, it's

 9       basically hiring people, making sure that the film shoot

10       happens, just a lot of logistics, and then sometimes the

11       casting portion of things.

12                    THE COURT:  Is this a busy time of year for you in

13       that business?

14                    A PROSPECTIVE JUROR:  Right now, no, I'm on hiatus.

15                    THE COURT:  Okay.  So no conflicts with work?

16                    A PROSPECTIVE JUROR:  No.

17                    THE COURT:  I've asked a number of questions so far.

18       I'm not going to repeat all the questions.  Are there any

19       questions that stand out in your mind that you would like to

20       offer a response to?

21                    A PROSPECTIVE JUROR:  No, no questions in my mind.

22                    THE COURT:  Would you follow the law as the Court

23       instructs?

24                    A PROSPECTIVE JUROR:  Yes.

25                    THE COURT:  And you understand one of your roles as
```

1    a juror, if you are selected, is to assess credibility of

2    witnesses?

3              A PROSPECTIVE JUROR:  Yes.

4              THE COURT:  You feel comfortable doing that?

5              A PROSPECTIVE JUROR:  Yes.

6              THE COURT:  A big issue is resolving conflicts.

7    There is going to be some significant differences of opinion

8    here, and you are going to be called upon to resolve it.  You

9    feel comfortable doing that?

10             A PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Thank you.

12             A PROSPECTIVE JUROR:  Thank you.

13             A PROSPECTIVE JUROR:  Good morning.  My name is Lynn

14   Stanton-Rigg.  I live in Claremont, California.  I'm married.

15   I am an associate provost faculty of affairs at the

16   University of La Verne.  My husband is a firefighter in the

17   City of Alhambra.  I have four adult children.  Two are

18   teachers, one sixth grade, one junior high.  And I have a

19   daughter who is in physician assistant school and a son who

20   is a manager at UPS.  I have been on three juries, two

21   criminal and one civil, and all came to a decision.

22             THE COURT:  Okay.  Any matters similar to this one

23   here, any of the cases that you participated in?

24             A PROSPECTIVE JUROR:  No, hum-um.

25             THE COURT:  Can you tell us what a -- what you do as

1    an associate provost at the faculty affairs?

2              A PROSPECTIVE JUROR:  A provost is a chief academic

3    officer of a university.  And as associate provost of faculty

4    affairs, I deal with quality of teaching, curriculum,

5    research, hiring of faculty and administrators, and I'm also

6    a professor of child development.

7              THE COURT:  Okay.  And your degrees?

8              A PROSPECTIVE JUROR:  I have a Ph.D. in human

9    development, a master's degree in counseling, and a

10   bachelor's degree in philosophy.

11             THE COURT:  And then you have been on the academic

12   side for how long?

13             A PROSPECTIVE JUROR:  32 years.

14             THE COURT:  Again, the same types of questions.  Do

15   you feel that you could participate in this case here?

16             A PROSPECTIVE JUROR:  Yes.

17             THE COURT:  And then be fair to all of the parties

18   here?

19             A PROSPECTIVE JUROR:  Yes.

20             THE COURT:  In your role as an associate provost, do

21   you have a regular contact with any of the professors on the

22   technical or science side?

23             A PROSPECTIVE JUROR:  Um, contact, yes, but more

24   along the lines of social and just chatting.  I do have

25   contact with the general counsel for the university.  Those

```
 1    are usually related in my area to students who have brought a

 2    case against the university.

 3              THE COURT:  Okay.  Is the university at all involved

 4    in any type of patent work, patent applications, if you know?

 5              A PROSPECTIVE JUROR:  I don't know.  I don't believe

 6    so.

 7              THE COURT:  Thank you.

 8              Next.

 9              A PROSPECTIVE JUROR:  My name is Ben Horwitz.  I

10    live in Van Nuys, California.  I'm not married.  I work in

11    the restaurant industry, Sherman Oaks.  I'm also in theater,

12    do theater and, you know, film, TV, but not really.  And I

13    have never done jury service before.

14              THE COURT:  Welcome to Federal Court and possible

15    jury service.  Can you participate in this case?  You -- and

16    be fair to the parties?

17              A PROSPECTIVE JUROR:  Yeah.  Yeah.

18              THE COURT:  So you are in the -- right now your

19    primary work is in?

20              A PROSPECTIVE JUROR:  I work at a restaurant in

21    Sherman Oaks.

22              THE COURT:  And this may be a busy time of the year

23    for restaurant business.  Do you feel that you are able to --

24              A PROSPECTIVE JUROR:  They are open at night only,

25    so it's kind of like -- if this is during the day, that is at
```

1        night.  So that is not that big of a deal.  I do -- I -- um,

2        sometimes I trade options in the morning, but doesn't matter

3        that much for this.

4                THE COURT:  Okay.  Well, tell us about your option

5        trading.

6                A PROSPECTIVE JUROR:  Well, it's -- I just look for

7        surges in markets, but nothing specific related to anything

8        or any company, just indexes and mostly bank indexes.

9                THE COURT:  Okay.  And then how did you become

10       involved in that type of trading?

11               A PROSPECTIVE JUROR:  Um, I learned about it from my

12       brother and my dad.

13               THE COURT:  And what do they do?

14               A PROSPECTIVE JUROR:  He's in the computer

15       marketing, my brother is in computer marketing, and my dad

16       used to work as an options trader.

17               THE COURT:  And when you say you trade, do you trade

18       on a daily basis?

19               A PROSPECTIVE JUROR:  I trade -- I look for surges,

20       sometimes daily, sometimes weekly, sometimes trading for

21       weeks, but right now I actually -- there is an SEC rule

22       called the wash rule, so I actually can't trade in December,

23       because I have to take losses for the year.  And you have to

24       wait 30 days until the end of the year.  So I have to wait

25       30 days until January, so I have to not do certain things in

1    December so it works out.

2            THE COURT:  So you mentioned that you work at night.

3    Is that correct?

4            A PROSPECTIVE JUROR:  Yeah.

5            THE COURT:  And what time do you start?

6            A PROSPECTIVE JUROR:  Um, I start around 4:30, but

7    the restaurant opens at 5:30.

8            THE COURT:  Okay.  So if -- once we have a jury

9    selected, we are going to have a structure in terms of the

10   calendar going forward, and then the time the jury is going

11   to be here, and the jury will be here from approximately --

12   each day, it's going to vary, but up to about 4:30 each day.

13   Are you able to --

14           A PROSPECTIVE JUROR:  Mostly I work on the weekends,

15   Friday, Saturday, Sunday, and Wednesdays, but if I have to

16   get off for -- if I have to be late, they are okay with that,

17   because it usually doesn't get busy until 6:30.

18           THE COURT:  Just to be clear, you know, once you are

19   selected as a juror in the case, you are part of the case

20   until the case is resolved or the jury reaches a verdict in

21   the case.  So your responsibilities are here.  If there is a

22   conflict between your responsibilities here and work, you

23   have to be here.  So I just want you to understand that.

24           A PROSPECTIVE JUROR:  Oh, yeah.

25           THE COURT:  You feel you can accomplish that?

1            A PROSPECTIVE JUROR:  Yeah, definitely, December is

2    a better time than other months.

3            THE COURT:  And any part of the -- any additional

4    information that you believe the lawyers should know about?

5            A PROSPECTIVE JUROR:  No.

6            THE COURT:  And just again to make sure, you feel

7    comfortable being on the case and being fair to the parties?

8            A PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Okay.  Thank you.

10            A PROSPECTIVE JUROR:  Hello.  My name is Concepcion

11    Delos Santos.  I live in Northridge, California.  I'm not

12    married.  I'm a forensic accountant for a local school

13    district.  No children.  And I have not served as a juror

14    before.

15            THE COURT:  Can you be fair to the parties?

16            A PROSPECTIVE JUROR:  Yes.

17            THE COURT:  And participate?

18            A PROSPECTIVE JUROR:  Yes.

19            THE COURT:  And the questions I've asked, any

20    questions stand out in your mind that you would like to

21    respond to?

22            A PROSPECTIVE JUROR:  No.

23            THE COURT:  And then what is your occupation again?

24            A PROSPECTIVE JUROR:  Forensic accountant.

25            THE COURT:  And could you tell us a little bit about

1    what you do?

2              A PROSPECTIVE JUROR:  I work for a local school

3    district and I do -- analyze financial records for.  If there

4    is an allegation of fraud, I get involved, I look at the

5    financial records, and I do analysis.  And I mostly work with

6    the prosecution.

7              THE COURT:  When you say you mostly work with the

8    prosecution, what does that mean?

9              A PROSPECTIVE JUROR:  I did -- just recently, we

10   just finished a case, a fraud case for the federal -- it's a

11   federal case, two weeks ago.

12             THE COURT:  Okay.  So you -- when you say you just

13   finished a case, were you called as a witness in that case?

14             A PROSPECTIVE JUROR:  I was a summary witness.

15             THE COURT:  A summary witness.  And this was in this

16   building here?

17             A PROSPECTIVE JUROR:  At Roybal.

18             THE COURT:  At Roybal.  Which is a federal building

19   that has courtrooms in it?

20             A PROSPECTIVE JUROR:  Correct.

21             THE COURT:  And so did you work with the U.S.

22   Attorneys in that matter?

23             A PROSPECTIVE JUROR:  I did.

24             THE COURT:  And how many times have you participated

25   in criminal prosecutions as a forensic accountant?

1                     A PROSPECTIVE JUROR:  Um, four.

2                     THE COURT:  All federal?

3                     A PROSPECTIVE JUROR:  Three of them local.

4                     THE COURT:  In State Court?

5                     A PROSPECTIVE JUROR:  Correct.

6                     THE COURT:  And that was with the District

7       Attorney's office?

8                     A PROSPECTIVE JUROR:  Correct.

9                     THE COURT:  And so how long have you been doing

10      this?

11                    A PROSPECTIVE JUROR:  I have been doing it for

12      about -- about 12 years now.

13                    THE COURT:  So, again, your employer is who?

14                    A PROSPECTIVE JUROR:  LAUSD.

15                    THE COURT:  So you work with LAUSD.  If you conclude

16      that there is fraudulent activity, what happens after that?

17      Who do you report it to?

18                    A PROSPECTIVE JUROR:  Um, we actually -- I work for

19      the Office of the Inspector General, and if we -- the case

20      that I work on, if you find that there is enough evidence to

21      move forward, we present the case to the prosecutors, and

22      then they decide whether to pursue it, whether to file a case

23      against the defendants.

24                    THE COURT:  Okay.  Separate and apart from the

25      criminal proceedings, have you been involved in civil

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
1       proceedings?

2                    A PROSPECTIVE JUROR:  No.

3                    THE COURT:  None.  Has your deposition ever been

4       taken?

5                    A PROSPECTIVE JUROR:  No.

6                    THE COURT:  And again, how many times have you been

7       called to testify as a witness?

8                    A PROSPECTIVE JUROR:  Four.

9                    THE COURT:  And were you cross-examined in those

10      proceedings?

11                   A PROSPECTIVE JUROR:  I was, the whole time.

12                   THE COURT:  And do you feel that you were treated

13      fairly by the lawyers who were cross-examining you?

14                   A PROSPECTIVE JUROR:  Yes.

15                   THE COURT:  Any part of that experience here that

16      would influence your decision making in this case?

17                   A PROSPECTIVE JUROR:  No.

18                   THE COURT:  And could you tell us about your

19      training and experience that qualifies you to be a forensic

20      accountant?

21                   A PROSPECTIVE JUROR:  Um, I went to Cal State

22      Northridge, I got my bachelor's in accountancy, I'm a CPA,

23      and also I'm a certified fraud examiner.

24                   THE COURT:  Any other information?

25                   A PROSPECTIVE JUROR:  No.
```

```
 1                    THE COURT:  Thank you very much.

 2                    A PROSPECTIVE JUROR:  Hi, my name is Kimberly

 3     Johnson.  I live in Ventura.  I am not married.  I am a

 4     registered nurse in a GI lab of a hospital.  No children.

 5     And I have never been on a jury.

 6                    THE COURT:  And can you be fair in this case and

 7     participate?

 8                    A PROSPECTIVE JUROR:  Yes.

 9                    THE COURT:  Any additional information to offer here

10     in terms of disclosing information so that the lawyers can

11     assess that and determine whether you should be a juror in

12     this proceeding here?

13                    A PROSPECTIVE JUROR:  No.

14                    THE COURT:  The questions I've asked so far, any

15     questions that stand out in your mind that you would like to

16     respond to?

17                    A PROSPECTIVE JUROR:  No.

18                    THE COURT:  Just to repeat, for purposes of

19     emphasis, one of the duties is to assess the credibility of

20     witnesses.  You feel comfortable doing that?

21                    A PROSPECTIVE JUROR:  Yes.

22                    THE COURT:  And resolving conflicts in the evidence,

23     you are comfortable doing that?

24                    A PROSPECTIVE JUROR:  Yes.

25                    THE COURT:  Okay.  Thank you.  Okay.  So I have some
```

1      questions to ask the panel as a whole, and the group as a

2      whole, but before we do that, I think shortly I would like to

3      have counsel read the names of the witnesses that they will

4      be calling on the case -- in this case.

5              So I have some questions.  We had -- we had a couple

6      of the jurors reference either personal issues involving

7      cancer or family issues involving cancer, so these questions

8      apply to yourself, family members, and close friends.  Is

9      there any one of you that if you have not otherwise disclosed

10     who has direct or -- direct experience with cancer itself?

11             So we go start in the back.  Okay.  No hands.  We

12     have a few hands that are raised.  And we start with -- would

13     you pass the microphone to Ms. Seifert all the way down,

14     please.  We are going to go in order.  Go ahead.

15             A PROSPECTIVE JUROR:  My father-in-law passed away

16     about two years ago from cancer.

17             THE COURT:  And do you know the type or nature of

18     it?

19             A PROSPECTIVE JUROR:  Well, I know he had prostate

20     cancer before and then he was in remission.  And then he

21     started having like stomach pains and back pains, and then he

22     was back in the hospital, and then they found out that his

23     cancer was back, and then he passed away like within just a

24     few days.

25             THE COURT:  Do you know the type of treatment he

```
 1              received --

 2                          A PROSPECTIVE JUROR:  Um --

 3                          THE COURT:  -- for his cancer therapy?

 4                          A PROSPECTIVE JUROR:  No, I don't.

 5                          THE COURT:  Were you involved in working with him

 6              and the doctors?

 7                          A PROSPECTIVE JUROR:  No.

 8                          THE COURT:  Where was he treated at?

 9                          A PROSPECTIVE JUROR:  I'm sorry?

10                          THE COURT:  Where was he treated?

11                          A PROSPECTIVE JUROR:  Um --

12                          THE COURT:  If you know.

13                          A PROSPECTIVE JUROR:  I don't know.  He was living

14              in Culver City at the time.  I'm not sure where he was going,

15              though.

16                          THE COURT:  Any general impressions one way or the

17              other regarding the nature of his treatment and the quality

18              of treatment?

19                          A PROSPECTIVE JUROR:  No.

20                          THE COURT:  Any part of that experience that would

21              influence you here?

22                          A PROSPECTIVE JUROR:  No.

23                          THE COURT:  Anyone else in the back row involving

24              yourself, family members, or close friends who have been

25              treated for cancer?
```

1          We have a couple of persons with their hands -- if

2     you pass the microphone next in order, Mr. -- is it Thijssen?

3     Go ahead, Mr. Thijssen.

4          A PROSPECTIVE JUROR:  I have a very close friend who

5     had cancer of the lymph node, so she was completely covered

6     in cancer, and they treated her with just chemotherapy and

7     Chinese medical herbs.  And now after a year and a half,

8     she's clean.  That's all I have.

9          THE COURT:  Do you have any impressions yourself as

10    to which treatment worked better?

11         A PROSPECTIVE JUROR:  I think this helped her out a

12    lot, her positive attitude, and just to keep going.

13         THE COURT:  And were you present at any of the

14    treatments?

15         A PROSPECTIVE JUROR:  No.

16         THE COURT:  And any general impressions one way or

17    the other or conclusions regarding the quality of the

18    treatment she received?

19         A PROSPECTIVE JUROR:  No.

20         THE COURT:  Any part of that experience that would

21    influence you here?

22         A PROSPECTIVE JUROR:  No.

23         THE COURT:  Thank you.  Pass the microphone, please.

24         A PROSPECTIVE JUROR:  I just remembered one.

25         THE COURT:  Ms. McCoy.

1           A PROSPECTIVE JUROR:  I just was with our good

2      friend at Thanksgiving, and he has stage 4 lung cancer, and

3      then it's in his brain and neck, and so I did hear about his

4      treatment quite a lot.  It was, you know, done really well,

5      but looking for a new cutting edge thing to go to the next

6      step to keep it under bay.

7           THE COURT:  Okay.  And any discussions there that

8      would influence your decision making here?

9           A PROSPECTIVE JUROR:  I don't think so.

10          THE COURT:  Is this somebody you are close with?

11          A PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Yes?

13          A PROSPECTIVE JUROR:  Yes.  Well, it's my husband's

14     really good friend.

15          THE COURT:  Any discussions by that person regarding

16     the nature of the treatment or the quality of care provided

17     by the physicians?

18          A PROSPECTIVE JUROR:  Yeah.  I mean, we talked about

19     that, yes.

20          THE COURT:  And what was discussed?

21          A PROSPECTIVE JUROR:  Just what he was having done

22     and just the doctors, he liked the doctors, a little upset,

23     you know, it wasn't caught as early as they liked, and I

24     mean, this has been an ongoing thing, so we just retalked

25     about it again.

     1                    THE COURT:  Thank you.  Next.

     2                    A PROSPECTIVE JUROR:  My father passed away because

     3        of a brain tumor.  It was about 19 years ago.

     4                    THE COURT:  And where was he -- where was your

     5        father treated at?

     6                    A PROSPECTIVE JUROR:  City of Hope.

     7                    THE COURT:  City of Hope?

     8                    A PROSPECTIVE JUROR:  Correct.

     9                    THE COURT:  And any impressions one way or the other

    10        as to the quality of care?

    11                    A PROSPECTIVE JUROR:  No, I think she -- I mean he's

    12        being treated really good in City of Hope, doing really

    13        wonderful job.

    14                    THE COURT:  Do you know the type of treatment that

    15        he received?

    16                    A PROSPECTIVE JUROR:  Radiation.

    17                    THE COURT:  Thank you.  Next.

    18                    A PROSPECTIVE JUROR:  Just recently, January of this

    19        year, my brother-in-law succumbed to stage 4 kidney cancer

    20        that metastasized to the bone and he was first diagnosed

    21        2013.

    22                    THE COURT:  Nature of treatment, if you know.

    23                    A PROSPECTIVE JUROR:  He had infusion and also

    24        chemo, and at the later stage, I want to say maybe four

    25        months prior to his passing, they inserted the port, and they

1    did the IV chemo.

2            THE COURT:  And where was he treated at?

3            A PROSPECTIVE JUROR:  Kaiser Harvard City.

4            THE COURT:  Any impressions on your part regarding

5    the quality of the care and the nature of the treatment?

6            A PROSPECTIVE JUROR:  Given that he did not -- it

7    was undetected, and how we found out is he fell over one of

8    the cement slabs at the bank and broke his arm.  That is how

9    we knew.  Prior to that, he was healthy, he was fine, did his

10   physicals, no prior indication of any sign of cancer.  Given

11   that he was given stage 4 that had metastasized at the time

12   of surgery to repair the arm, he did fairly well, you know,

13   given the circumstances.

14           THE COURT:  Thank you.  Anyone -- let's go to the

15   bottom row.  Next in order.  Let's go all the way over to

16   Ms. Barrera, is it?

17           A PROSPECTIVE JUROR:  Um, my grandmother passed away

18   like 10 years ago.  She was first diagnosed with breast

19   cancer, and then she beat that, but a few years later she

20   ended up with stomach cancer, and that is how -- that is the

21   reason for her passing.  I have an aunt who has leukemia.

22   And my mother-in-law is currently battling cancer.  I believe

23   it started in her reproductive system.  And she did chemo for

24   that, and she did well, but it came back.  And they just

25   removed a tumor in her large intestine.  And yeah, she's

1    actually needing to get tested for leukemia as well.

2              THE COURT:  So a grandmother who passed away with

3    breast cancer.  Do you know the nature of the treatment?

4              A PROSPECTIVE JUROR:  She had a mastectomy, and then

5    she had chemo and pills.

6              THE COURT:  And do you know where she was treated

7    at?

8              A PROSPECTIVE JUROR:  In Arizona.

9              THE COURT:  Do you know the name of the hospital or

10   institution?

11             A PROSPECTIVE JUROR:  I think it might have been --

12             THE COURT:  If you recall.

13             A PROSPECTIVE JUROR:  I don't remember.

14             THE COURT:  And then the aunt who has leukemia?

15             A PROSPECTIVE JUROR:  She's in Mexico, and she has

16   been treated in Mexico.

17             THE COURT:  Any impressions regarding the nature of

18   the treatment there?

19             A PROSPECTIVE JUROR:  Um, no.

20             THE COURT:  And you have a mother-in-law who has

21   cancer?

22             A PROSPECTIVE JUROR:  Yes.

23             THE COURT:  And the nature of the cancer?

24             A PROSPECTIVE JUROR:  Like I said, it started in her

25   reproductive system, and now it was in her intestines.  They

1    removed a tumor.

2              THE COURT:  And where is she?

3              A PROSPECTIVE JUROR:  She is in Pennsylvania.

4              THE COURT:  And do you know the institution or

5    hospital?

6              A PROSPECTIVE JUROR:  I don't remember it.

7              THE COURT:  Any part of those experiences that would

8    influence you here?

9              A PROSPECTIVE JUROR:  Um, not that I can think of.

10             THE COURT:  Okay.  Anyone else?

11             Bottom row there.  Let's go all the way to Ms. Delos

12   Santos.

13             A PROSPECTIVE JUROR:  Yes.  My mother had breast

14   cancer.  She is currently in remission.  And two of her

15   sisters had breast cancers as well, and they are both okay.

16             THE COURT:  And where have they been treated?

17             A PROSPECTIVE JUROR:  Um, my mother and my aunt,

18   they were treated here in Southern California, my mother, I

19   believe, in Tarzana Medical Center, Tarzana Hospital, my aunt

20   somewhere up north, and my other aunt in the Philippines.

21             THE COURT:  The ones that have been treated in

22   Southern California, any, do you know what type of treatment

23   they received?

24             A PROSPECTIVE JUROR:  I believe it was radiation.

25             THE COURT:  And do you have any other information

1    regarding where they were treated?

2              A PROSPECTIVE JUROR:  I just heard they were both

3    very happy with how the treatment went.

4              THE COURT:  But do you know where, what institution?

5              A PROSPECTIVE JUROR:  Oh, um, in Northern

6    California.  I don't -- until -- I don't know.

7              THE COURT:  Thank you.

8              Anyone else?  Ms. Johnson?

9              A PROSPECTIVE JUROR:  I have a good friend with

10   stage 4 cancer right now.  It started in her breast and is

11   now in her liver and bones.  Treated with multiple rounds of

12   chemo, radiation, mastectomy.  And now it's at the point they

13   just keep giving her new medication, I guess until it stops

14   working, and then they try to put her on a new one.

15             THE COURT:  This is somebody you are very close to?

16             A PROSPECTIVE JUROR:  Yeah.

17             THE COURT:  And have you gone with her to when she

18   has been treated?

19             A PROSPECTIVE JUROR:  No.

20             THE COURT:  And what hospital or institution is she

21   being treated at?

22             A PROSPECTIVE JUROR:  She goes to Community Memorial

23   in Ventura.

24             THE COURT:  And then do you have any general

25   impressions regarding the nature of the treatment itself?

1              A PROSPECTIVE JUROR:  Um, no, other than I think

2        it's been very helpful for her overall.

3              THE COURT:  And any part of that matter -- that

4        experience that will influence your decision making here?

5              A PROSPECTIVE JUROR:  I don't think so.

6              THE COURT:  Okay.  So let me just expand the

7        question a little bit.  We talked about persons who have --

8        family members or close friends or yourself who have been

9        impacted by cancer.  Is there anyone who has any specialized

10       training yourself, close family members or close friends in

11       oncology or in the treatment of cancers?  If you have not

12       otherwise disclosed it.

13             In the back row, no hands.

14             Do we have a hand -- we have one hand, and we go to

15       Ms. Wesley Johnson.  Would you pass the microphone, please.

16             A PROSPECTIVE JUROR:  Speaking of as working with my

17       brother-in-law as far as his treatment?

18             THE COURT:  So I'm --

19             A PROSPECTIVE JUROR:  I don't understand the

20       question clearly.

21             THE COURT:  This applies to yourself or members or

22       close friends, anyone who has any specialized training in

23       oncology or in cancer treatment.

24             A PROSPECTIVE JUROR:  Oh, just other than being a

25       caregiver, that is it.

```
 1                    THE COURT:  Of your --

 2               A PROSPECTIVE JUROR:  Of my brother-in-law, yes.

 3                    THE COURT:  And in that role as a caregiver, did you

 4     do any independent type of research yourself?

 5               A PROSPECTIVE JUROR:  On his particular cancer, yes.

 6                    THE COURT:  What did you do?

 7               A PROSPECTIVE JUROR:  I just read.  I did a lot of

 8     reading.  I actually was in personal contact with his

 9     oncologist to explain the details.  I researched through

10     American Cancer Society to kind of get an understanding of

11     his type of cancer that he had.

12                    THE COURT:  And what type of cancer is it?

13               A PROSPECTIVE JUROR:  It was kidney cancer.

14                    THE COURT:  And in terms of that research, did you

15     form any impressions as to where one would go to for -- to

16     treat that type of cancer?

17               A PROSPECTIVE JUROR:  No.  Actually, the oncologist

18     doctor that he had was one of the tops at Kaiser of Harvard

19     City, and so I was -- she was very, very, very informative

20     and pretty much precise on what would take place, what

21     medications, what worked at the time, and given that he

22     almost survived six years, he did fairly well.  He did very

23     well.

24                    THE COURT:  Thank you.  So I think we had a hand --

25     there was a hand.  Ms. Delos Santos had her hand up.
```

```
 1                    A PROSPECTIVE JUROR:  One of my aunts, she's an

 2        oncologist.

 3                    THE COURT:  And where does -- where does she

 4        practice?

 5                    A PROSPECTIVE JUROR:  In the Philippines.

 6                    THE COURT:  And was she trained in the Philippines

 7        also?

 8                    A PROSPECTIVE JUROR:  Yes.

 9                    THE COURT:  Is this somebody you have regular

10        contact with?

11                    A PROSPECTIVE JUROR:  Um, not very often, maybe

12        twice, three times a year.

13                    THE COURT:  And is there an area of specialty in

14        oncology that your aunt has, if you know?

15                    A PROSPECTIVE JUROR:  I'm not aware.

16                    THE COURT:  Thank you.

17                    So there are -- during the course of the

18        proceedings, there may be references to certain institutions

19        or companies, I should say, associated with various parties

20        in the case.  We have Sloan Kettering, Juno has already been

21        mentioned, Celgene, Bristol-Myers Squibb, Kite, and Gilead.

22        Are any of those names familiar to any of the persons here?

23                    Okay.  We have one person with his hand raised,

24        Mr. Pheffer.  Would you pass the microphone to Mr. Pheffer.

25                    A PROSPECTIVE JUROR:  I grew up on the East Coast,
```

1      so I know of Sloan Kettering.  My dad was a patient there,

2      diagnostic testing.  And I had two really good friends that

3      were Ph.D. students.

4              THE COURT:  I think the microphone is off.

5              A PROSPECTIVE JUROR:  Is that --

6              THE COURT:  That is better, I think.  Thank you.

7              A PROSPECTIVE JUROR:  I'm familiar with Sloan

8      Kettering.  And my dad was a patient there, maybe 30 years

9      ago, diagnostic testing, didn't have any surgery.

10             THE COURT:  A patient to treat what illness?

11             A PROSPECTIVE JUROR:  Had a -- they diagnosed a

12     carcinoid tumor in his lung, but, you know, I never really

13     felt that he had cancer.  He never had surgery.  They didn't

14     treat it.  But that was my experience at the facility.

15             THE COURT:  Any general impressions regarding the

16     quality of care there?

17             A PROSPECTIVE JUROR:  Top notch.

18             THE COURT:  And --

19             A PROSPECTIVE JUROR:  I had two friends, two guys I

20     went to high school with, both really brilliant scientists,

21     they graduated from medical school, and they went to Sloan

22     Kettering.  And they were in the -- well, they did the ND

23     Ph.D. program.  They were residents or internists there.  One

24     is an internist now, and the other one works for a research

25     company.  He's a scientist for a drug company.

1            THE COURT:  Are these people that you continue to

2    keep in contact with?

3            A PROSPECTIVE JUROR:  Good friends.

4            THE COURT:  And are they still with Sloan Kettering?

5            A PROSPECTIVE JUROR:  No.  That was their training

6    maybe five years after medical school.

7            THE COURT:  Okay.  So we all come to court with

8    certain life experiences, work experiences, and these

9    experiences influence our decision making.  I think we have

10   to just recognize that.  So the point here is the fact that

11   you have had very positive experiences with Sloan Kettering

12   involving your father -- was it your father?

13           A PROSPECTIVE JUROR:  Correct.

14           THE COURT:  And then you have had two friends who

15   are -- had relationships with that institution.  You have to

16   set that aside to the best of your ability, decide this case

17   based on the evidence received, the law as the Court

18   instructs, and not let those relationships influence you

19   here.  Can you do that to the best of your ability?

20           A PROSPECTIVE JUROR:  Yeah, absolutely.  I mean, to

21   the extent that we are all trying to find a cure, I say, you

22   know that is great.

23           THE COURT:  Okay.  Thank you.  Any other hands?

24           Okay.  No additional hands.

25           So is there anyone who owns stock in any of those

1       companies that I mentioned that we have, Sloan Kettering,

2       Juno, Celgene, Bristol-Myers, Kite, and Gilead.  No stock.

3       Okay.

4               There are certain law firms associated with the

5       litigation in this case.  Those firm names may be referenced

6       at various times during the course of the trial.  And the

7       firms involved would be Irell & Manella.  Anyone familiar

8       with the Irell & Manella firm?

9               Okay.  No particular hands raised.

10              And we have Jones Day.  Anyone familiar with the

11      Jones Day firm?

12              And then we have the Munger Tolles firm.  Anyone

13      familiar with Munger Tolles?

14              And then Fish & Richardson.  No hands are raised.

15              So we have Mr. Pheffer who has indicated that he is

16      a lawyer, trained in law.  Is there anyone else who has any

17      specialized training in the legal arena at all?

18              Okay.  No hands are raised.

19              This applies to yourself, close family members, or

20      close friends.  Is there anyone based on philosophical or

21      religious convictions who would not seek the advice of a

22      doctor or someone in the medical field to treat an illness?

23      Anyone who would not seek the advice of a doctor to treat an

24      illness?

25              Okay.  No hands.

1              Is there anyone who, again, yourself, family

2     members, or close friends, who's ever had a negative

3     experience with a physician or a medical institution?

4     Negative experience, you can decide what a negative

5     experience is, whether it's someone who didn't treat you

6     fairly or professionally or whether it's something more

7     serious than that.  A negative experience with a physician or

8     medical institution of any type?

9              Okay.  No one in the back row.

10             We go to the front row.  And we go to Mr. Horwitz,

11    yes, sir.

12             A PROSPECTIVE JUROR:  I was diagnosed with asthma as

13    a kid, and the doctor had an Advair clipboard and an Advair

14    pen and was basically pushing Advair on me from the time that

15    I was like 9 to like 15, and I don't really think it did me

16    any good.  Because once I got off of it, my asthma got

17    better.  I don't take any asthma medicine.  I have perfectly

18    healthy lungs.  But that is really it.

19             THE COURT:  That was a few years ago?

20             A PROSPECTIVE JUROR:  That was when I was like 9 to

21    15, 14, 15.

22             THE COURT:  And can you set that aside and not

23    let --

24             A PROSPECTIVE JUROR:  Oh, yeah, yeah, it's

25    different.

```
 1              THE COURT:  Okay.  So let's talk about patents for a
 2     little bit of time.  I think there is -- we'll come back.  We
 3     have the issue of patents.  So is there anyone who has ever
 4     been involved in the patent application process or has
 5     pursued a patent prosecution or application involving
 6     yourself, close family members, or friends?  And let's go --
 7     if you have not otherwise disclosed -- the back row.
 8              And the front row, and then no one in the front row.
 9              And then we had Mr. Barman, you had your hand --
10          A PROSPECTIVE JUROR:  Yeah.
11          THE COURT:  You had your hand raised.
12              If you can pass the microphone to Mr. Barman.
13          A PROSPECTIVE JUROR:  On the previous question about
14     negatives about the medical profession.
15          THE COURT:  Yes.
16          A PROSPECTIVE JUROR:  Yeah.  I was born in Vietnam,
17     and I did one of my follow-up assessments at the VA hospital
18     in Long Beach.  This was many, many years ago.  And I got
19     some kind of like negative vibes from them.  I really never
20     went back.  When I got the skin cancer, some of the oncology
21     doctors told me that I probably should file a claim with the
22     VA.  They -- there could be a relation between this and Agent
23     Orange.  They are really not sure.  But I never did, because
24     I had some bad vibes with the VA, but I have a lot of friends
25     who use the VA and they like the VA, and I guess they have
```

1    come a long ways in their medical help for the veterans, but

2    I just had some bad feelings with them.

3              THE COURT:  Okay.  Were you in the military?

4              A PROSPECTIVE JUROR:  I was a Marine in Vietnam.

5              THE COURT:  And your experience with the Veterans

6    Administration, were you treated there as a patient?

7              A PROSPECTIVE JUROR:  Yeah, it was a follow-up.  I

8    got wounded, and I got some shrapnel in my leg, and many

9    years ago I had some issues with it, the moveability of the

10   leg, and I went back and did follow-up, and, you know, they

11   took an x-ray, an MRI.  They didn't think it was a big deal.

12   They kind of brushed me off the side.  But this is 1971,

13   okay?  So, you know, I'm sure they have come a long ways.

14             THE COURT:  Okay.  Do you feel that that experience

15   with the Veterans Administration would have any influence

16   involving this matter here?

17             A PROSPECTIVE JUROR:  No, I don't.  I think this

18   case here is totally different.  I think this cancer formula,

19   the anticancer I think is a good idea, I really do, and I'm

20   for this.  I don't think it would have any bearing on my

21   issues I have with the VA.

22             THE COURT:  Okay.  We talked about the patent

23   prosecution or involving a patent.  Anyone who has had any

24   experience with the patent office itself, patent or trademark

25   office?  Okay.  No hands.

```
 1            Is there anyone who has had any negative experience

 2     with any other Federal Government department or institution?

 3     Any negative experiences of any type with any Federal

 4     Government department or institution?  Back row?  Front row?

 5     No hands.

 6            Is there anyone who is concerned -- we've -- I think

 7     Mr. Lin has already expressed some concern about his ability

 8     to understand English.  Am I correct, sir?

 9            A PROSPECTIVE JUROR:  Yeah.

10            THE COURT:  I've done a lot of talking so far.  Have

11     you been able to understand everything I've said from our

12     last conversation?  Would you pass the microphone to Mr. Lin?

13            A PROSPECTIVE JUROR:  Some I understand, but I

14     missed most of the part.

15            THE COURT:  Okay.  So you missed most of it is what

16     you are saying?

17            A PROSPECTIVE JUROR:  Yeah.

18            THE COURT:  Is there anyone else who has -- who is

19     concerned about their ability to understand everything that

20     is going to be, you know, placed before you in English, any

21     other concerns?

22            Is there anyone who has any health issues or of any

23     type that would interfere with your ability to be a juror in

24     the case?  If you have not otherwise disclosed.  Any hands?

25     Okay.  No hands.
```

1            Is there anyone who needs a restroom break at this

2       time?  So we have several.  So let's -- let me have you

3       return at -- let's do it -- we have several people, so make

4       it a 15-minute recess.  Please come back about five to the

5       hour.

6            During your absence, do not discuss the case amongst

7       yourself or any other person.  Please do not do any type of

8       research on the case, Google the case or anything to do with

9       the case.  These rules are very strict, and they could

10      preclude you from being a juror or prospective juror in the

11      case.

12           Direction by the clerk, please.  Go ahead.

13           THE CLERK:  I'll take it from here, Judge.  Would

14      you all rise for the jury, please.

15           THE COURT:  Do not leave the floor.  Stay on the

16      floor, please.

17           (Thereupon, there was a brief recess.)

18           THE COURT:  So we are getting close to my

19      questioning of the jury.  Just some follow-up matters.  Let's

20      see.  It just -- some general questions involving the

21      pharmaceutical industry.  We talked about the medical sector,

22      but is there anyone who has any strong opinions one way or

23      the other regarding the pharmaceutical industry itself?  Back

24      row?  Front row?  No hands are raised.

25           The Kite's cancer therapy, and that is going to be

1    referenced during the course of the trial, is YESCARTA.

2    YESCARTA, is that name familiar to anyone on the jury?

3         We talked about experience in patent matters, or

4    trademark matters.  Is there anyone who has been involved at

5    all, yourself, close family members, or close friends in,

6    generally in intellectual property rights, intellectual

7    property rights?  Okay.  No hands.

8         Is there anyone who recognizes anyone else in -- who

9    is a potential juror in the case?  Okay.  No hands are

10   raised.

11        I just want to -- I emphasize again this:  The fact

12   that you've taken a seat doesn't mean you are going to be a

13   juror in the proceedings, but once a jury is selected, you

14   will be the jury throughout the process from beginning to end

15   until the case concludes.  So if there is any final issues

16   regarding conflicts or other matters that are important to

17   you that you have to attend to, make sure please that you

18   disclose it so that we could address those issues up front.

19        I would like to have -- if counsel is ready to read

20   their witness lists, we'll start with Mr. Chu.

21        MR. CHU:  Thank you very much, Your Honor.

22        THE COURT:  And do not be intimidated by the number

23   of witnesses who will be identified.  These are potential

24   witnesses.  And again, it's going to take about six to seven

25   days to try the case.

1             MR. CHU:  Dr. Michel Sadelain will be the first

2     witness.  Dr. Yashodhara Dash will be the second witness.

3     Dr. Mark Gilbert, Dr. Arie Belldegrun, Dr. Wayne Marasco,

4     Dr. Mark Robbins, Dr. Steve Harr, Hans Bishop, David Chang,

5     Ed Dulac, Aya Jakabovits, Shawn Tomasello, Jeffrey Wiezorek,

6     Ted Wiltzius (sic), Dr. John Quackenbush, Dr. Thomas Brocker,

7     and Dr. Ryan Sullivan.

8             THE COURT:  Thank you.  Mr. Dane?

9             MR. DANE:  Thank you, Your Honor.  And just to

10    correct one of the names that Mr. Chu mentioned, I believe

11    the name is Jed Wiltzius.

12            For our witness list, we have Michael Amoroso, Dr.

13    Arie Belldegrun, Dr. Adrian Bot, and Dr. Reiner Brentjens,

14    Andrew Dickinson, Dr. K. Christopher Garcia, Dr. Richard P.

15    Junghans, Dr. Krishna Komanduri, Mohan Rao, Dr. Margo

16    Roberts, Dr. Thomas Schuetz, Edward Dulac, Marina Larson, and

17    Mark Frohlich.

18            THE COURT:  Thank you.  Just one final question.  Is

19    there any other information that you have not otherwise

20    disclosed that you believe the Court and the lawyers should

21    know about in determining whether you should be a juror in

22    this case?  Any other information?  Okay.  No hands are

23    raised.

24                And with that, let's have counsel at sidebar.

25                (At the bench.)

1            THE CLERK:  There is a microphone here, you have to

2      speak into this.

3            THE COURT:  So let's start with any general

4      questions or follow-up questions?

5            MR. CHU:  Yes.  You asked the individual prospective

6      jurors about whether they were pleased or unhappy about their

7      own treatment, and the one follow-up question would be any

8      other family member or friend unhappy with cancer treatment

9      of yourself or relative.  And I put it into a Post-it note,

10     if you can read my handwriting.

11           THE COURT:  Thank you.  I thought I had covered

12     that, but I'll ask it again.

13           MR. CHU:  Okay.  Thank you.

14           (In open court.)

15           THE COURT:  Just another question regarding cancer

16     treatment.  Is there any -- yourself, this applies to

17     yourself again, family members, close family members or close

18     friends, is there anyone, and if you haven't otherwise

19     disclosed, anyone who has had a negative or bad experience

20     with the -- with cancer treatment or a physician or

21     institution treating cancer?  Any bad experiences at all?

22     Okay.

23           (At the bench.)

24           MR. CHU:  I meant to ask whether the juror may not

25     have been unhappy, but maybe their mother, father, brother

1    was unhappy.

2              (In open court.)

3              THE COURT:  Okay.  Let me expand it.  Is there

4    anyone who has had another family member who was unhappy with

5    cancer treatment?  Not necessarily yourself, but another

6    family member who was unhappy?  Okay.

7              (At the bench.)

8              THE COURT: Anything else, any other follow-ups?

9              MR. DANE:  None for us, Your Honor.

10             THE COURT:  We will do motions, motion to excuse for

11   cause.  We'll start with the plaintiff.

12             MR. CHU:  We don't have any.

13             THE COURT:  You don't have any?

14             MR. DANE:  Number 4, Your Honor.

15             THE COURT:  We have Mr. Lin.

16             MR. CHU:  Would you like me to respond?

17             THE COURT:  Yes.

18             MR. CHU:  Subject matter I'm very familiar with.

19   His English is better than my parents' English.  They grew up

20   in China.  He's a very -- appears to be a very successful

21   business person.  He does have an accent, but by my years and

22   the way he responded, I believe he understands English very

23   well, and probably wants to get off the jury.

24             THE COURT:  I'm not sensing that.  I grew up in a

25   bilingual household and my grandparents only spoke Spanish.

1    I'm familiar with the issue.  And people that express concern

2    are far more competent than what they believe they are, I

3    recognize that.  I suspect he has some issues involving his

4    ability to understand.  I will ask him some follow-up

5    questions.

6                MR. CHU:  Okay.

7                (In open court:)

8                THE COURT:  So we go back to Mr. Lin.  Mr. Lin, you

9    have family members who are -- you have family members very

10   well-educated, you have an executive position.  The question

11   that I want to focus in on is your ability to understand what

12   has been said so far in court.  You have expressed some

13   concerns about your ability to understand.  Do you feel

14   uncomfortable being a juror in this case, having to have

15   everything presented to you in English?

16               A PROSPECTIVE JUROR:  Because of my ability very

17   well.

18               THE COURT:  Let me ask you this:  Do you have -- do

19   you have a driver's license, California driver's license?

20               A PROSPECTIVE JUROR:  Yeah.

21               THE COURT:  When you took your driver's license,

22   written test, did you take that test in English?

23               A PROSPECTIVE JUROR:  Yeah.

24               THE COURT:  You took it in English?

25               A PROSPECTIVE JUROR:  Right.

1              THE COURT:  And when you read magazines or

2    newspapers, do you regularly read magazines and newspapers in

3    English?

4              A PROSPECTIVE JUROR:  Most Chinese.

5              THE COURT:  Mostly Mandarin?

6              A PROSPECTIVE JUROR:  Yeah.

7              THE COURT:  And the movies or television that you

8    watch, what language?

9              A PROSPECTIVE JUROR:  Chinese, Mandarin.

10             THE COURT:  And then you are obviously proficient,

11   you have a proficiency in English.  How long have you been

12   proficient in English?

13             A PROSPECTIVE JUROR:  How long?

14             THE COURT:  Yes, have you been able to speak

15   English?

16             A PROSPECTIVE JUROR:  Oh, a long time, but because

17   my job, Chinese food company, so most of the colleague is

18   Chinese, so we speak the language of the Mandarin with each

19   other.

20             THE COURT:  Have you attended any school in the

21   United States?

22             A PROSPECTIVE JUROR:  Yeah.

23             THE COURT:  And the classes were taught in what

24   language?

25             A PROSPECTIVE JUROR:  English.

1                    THE COURT:  In English?

2                    A PROSPECTIVE JUROR:  Yeah.

3                    THE COURT:  What type of classes?

4                    A PROSPECTIVE JUROR:  Um, business.

5                    THE COURT:  Business?

6                    A PROSPECTIVE JUROR:  Yeah.

7                    THE COURT:  And where did you attend business

8      school?

9                    A PROSPECTIVE JUROR:  In Texas.

10                   THE COURT:  Where at?  I didn't get that.

11                   A PROSPECTIVE JUROR:  Business administration.

12                   THE COURT:  Okay.  But what school did you attend?

13     What institution?

14                   A PROSPECTIVE JUROR:  Lamar University in Texas.

15                   THE COURT:  Okay.  And that -- was that a semester

16     or was that a year or how long was that?

17                   A PROSPECTIVE JUROR:  Semester.

18                   THE COURT:  And were all the textbooks in English?

19                   A PROSPECTIVE JUROR:  Yeah.

20                   THE COURT:  And all of the lectures in English?

21                   A PROSPECTIVE JUROR:  Yeah.

22                   THE COURT:  And you were able to understand

23     everything?

24                   A PROSPECTIVE JUROR:  Not really.

25                   THE COURT:  Okay.  Thank you, sir.

1          A PROSPECTIVE JUROR:  Okay.  Thank you.

2          (At the bench.)

3          THE COURT:  So is there a motion?

4          MR. DANE:  Yes, we would move to excuse for cause.

5          THE COURT:  The Court would have to agree that he's

6    expressed some concerns about his ability to understand

7    English, and so I would find him not competent to be able to

8    remain.  So he'll be excused.

9          Any other motions for cause?

10         MR. DANE:  We have one other, Your Honor, which is

11   Juror Number 3.  That was the juror who had close

12   associations with Sloan Kettering, having his father treated

13   there, and having two, as he said, very, very close friends

14   who were brilliant people who were employees of Sloan

15   Kettering.  Given those associations, we think he should be

16   excused for cause.

17         THE COURT:  Mr. Chu?

18         MR. CHU:  We would oppose.  The treatment of the

19   father was so long ago, he said he could be fair.  Yes, he

20   had friends who attended the institution, and he respects his

21   friends, but even with that, he said he could be fair.

22         THE COURT:  I agree.  So he's indicated that he

23   could set all of that aside and be fair, and decide the case

24   based on the law and the evidence, so the motion to excuse

25   him for cause will be denied.

1                Any others?

2                MR. DANE:  None for cause, Your Honor.

3                MR. CHU:  Not for cause.

4                THE COURT:  Okay.  The concern I have, and I'll

5       raise it with both sides, is Juror Number 13 has indicated

6       that he is concerned about the assessing the credibility of

7       witnesses, and the last thing we need is someone in there who

8       can't decide.

9                MR. CHU:  I would agree to allow him to be excused.

10               MR. DANE:  We would also, Your Honor.

11               THE COURT:  Okay.  Then we'll excuse.  And then what

12      we'll do is I think we'll probably take the noon recess, you

13      can consult with your consultant, and then we'll come back in

14      an hour, and start exercising challenges.

15                MR. WEINBERG:  That means Juror Number 18 is not --

16      in other words, we would only, if you take two out.

17               THE COURT:  I'm sorry, the presumptive jury -- the

18      presumptive jury is always the first nine.  So when you come

19      back, you will exercise peremptory challenges only against

20      the first nine, and they will be filled next in order.

21               MR. WEINBERG:  Thank you.

22               MR. CHU:  Thank you, Your Honor.

23               (In open court:)

24               THE COURT:  Mr. Lin, thank you very much for your

25      responses and your candor.  You have been excused from the

1    case.  So thank you.

2                    A PROSPECTIVE JUROR:  Thank you.

3                    THE COURT:  And then Mr. Kupelian, also thank you

4    very much for your candor, and you have been excused from the

5    case.

6                    So what we are going to do now is we are going to

7    take the noon lunch break.  So everybody will be excused, and

8    then you will return back into the courtroom in an hour.

9    Let's make it, let's see, quarter to 1:00.  Return back into

10   the courtroom at 1:15.

11                   Just to emphasize during your absence, and this

12   applies to everybody in the galley also, all the prospective

13   jurors, and the prospective jurors in the jury box, no

14   independent research, no type of investigation, no contact

15   with the parties or lawyers.  Very strict rules about this.

16   If you have any type of research, if you do any type of

17   research on the case, you could be disqualified.

18                   Second and apart from that, if it becomes -- if it

19   comes to the attention of the Court that you did research and

20   you happen to be selected, it can cause the whole case to be

21   mistried and we have to start again.  So make sure that you

22   comply with that rule and regulation.

23                   And with that, please return back to the court at

24   1:15.  And we are going to have a jury selected this

25   afternoon.

1          THE CLERK:  Would you rise for the jury, please.

2          (Thereupon, the jury retired from the courtroom.)

3          THE COURT:  Okay.  Please have a seat.  Just

4     quickly, I'm trying to do some final revisions on the order

5     regarding the motions in limine that were argued yesterday,

6     involving the various experts.

7          Separate and apart from that, I have been trying to

8     synthesize and consolidate into a working set the jury

9     instructions that have been proposed, the preliminary

10    instructions that have been offered by the parties, and then

11    the ones that are disputed.  I don't think we are ever going

12    to have agreement on that, so the Court is going to take it

13    on its own to fashion a set of instructions that I believe

14    fairly state the law and also would be consistent with the

15    Court's -- with the party's stipulation in the case, and also

16    with the Court's statement of the case.

17         And then separate and apart from that, there has to

18    be a little bit of work regarding the objections to the

19    demonstratives that have been lodged today, so I'll try to

20    accomplish that.  Anything further?

21         Please return at 1:15, and we will continue with the

22    trial.  At 1:15, you will start to exercise your peremptory

23    challenges, three each side, and we should have a jury

24    selected soon thereafter.  We will go into -- we'll start

25    with hopefully the Court doing preinstruction to the jury,

1    and then we'll go into opening statements.  And then the

2    calling of your first witness if we get there.  Thank you.

3              (Thereupon, there was a lunch recess.)

4              THE COURT:  Okay.  We are back on the record on Juno

5    vs. Kite.  We have all counsel present with the parties, and

6    we have all prospective jurors present.

7              And let me have counsel at sidebar now again.

8              (Sidebar.)

9              THE COURT:  Okay.  So we'll put Mr. Barman in Seat

10   Number 4.

11             MR. CHU:  Okay.

12             THE COURT:  And, again, the presumptive jury is the

13   first nine.

14             MR. CHU:  Um-hum.

15             THE COURT:  So the plaintiff has first preemptory.

16             MR. CHU:  Okay.  We are going to pass, Your Honor.

17             THE COURT:  Defense?

18             MR. DANE:  We would thank and excuse Juror Number 3.

19             THE COURT:  Mr. Pheffer?

20             MR. DANE:  Yes.

21             THE COURT:  I'm sorry, Juror Number 3, Mr. Pheffer.

22             MR. DANE:  Yes.

23             (In open court.)

24             THE COURT:  Mr. Pheffer is excused, and -- yes,

25   Mr. Pheffer is excused.  So Mr. Barman is in that other seat.

```
 1                    THE CLERK:  I'm going to move your seats now.
 2     Mr. Barman, would you please take Seat Number 4.  And
 3     Mr. Contreras, take Seat Number 4 at the top.
 4                    (At the bench.)
 5                    THE COURT:  Okay.  Next preemptory is with the
 6     plaintiff.
 7                    MR. CHU:  Mr. Barman, Number 4.
 8                    THE COURT:  Strike him?
 9                    MR. CHU:  Yes.
10                    (In open court.)
11                    THE COURT:  Mr. Barman is excused.  Thank you very
12     much.
13                    And, Ms. Bennett, would you take that seat, please.
14                    (At the bench.)
15                    THE COURT: Do we have defense?
16                    MR. DANE:  I'm going to ask, I'm not sure where she
17     is now.  Our next was Ms. Contreras.
18                    THE CLERK:  She's Number 3.
19                    (In open court.)
20                    THE COURT:  Ms. Contreras is excused.  And
21     Ms. Barrera, would you take that seat, please.
22                    (At the bench.)
23                    Next is with the plaintiff.
24                    MR. CHU:  We will pass.
25                    THE COURT:  Pass?  If we get two passes, we have a
```

1    jury.

2            Defense?

3            MR. DANE:  Um, Mr. Thijssen.

4            THE COURT:  I'm sorry, who?

5            MR. DANE:  Mr. Thijssen.

6            (In open court.)

7            THE COURT:  Mr. Thijssen is excused.  And

8    Ms. Stanton-Rigg, would you take that seat, please.

9            (At the bench.)

10           MR. CHU:  We will pass.

11           THE COURT:  Pass?  So the defense has used all

12   three, the plaintiff has passed, so we have a jury.

13           (In open court.)

14           THE COURT:  Okay.  We have a jury that is to be

15   selected.  It's the gentleman and all the ladies in the first

16   row.  Are there any last issues to bring to the attention of

17   the Court before you are sworn?  Once you are sworn, you are

18   the jury in the case until the case concludes.

19           With that, let me have the jury sworn, please.

20           THE CLERK:  Yes, Your Honor.

21           Ladies and gentlemen, would you all stand and raise

22   your right hands to be sworn.

23           THE COURT:  Just the back row, please.

24           THE CLERK:  Yes, thank you.

25           (Thereupon, the jury panel was sworn.)

1           THE CLERK:  Thank you very much.  Please be seated.

2           THE COURT:  Okay.  This is the opportunity --

3           And if counsel would return to counsel table,

4    please.

5           So we have selected a jury in the case.  We have the

6    first nine.  I want to thank all of the other prospective

7    jurors for being present today to participate in this

8    proceeding.  Please -- you are now excused.  Please return

9    down to the jury room for additional possible assignment.

10   Thank you very much.  And that includes the first three in

11   the bottom row.  Okay.

12          We are going to take a -- we have selected the jury,

13   and now we are going to move to the other parts of the case.

14   I'm going to read an instruction to you at this time, and

15   then I'm going to give counsel enough time to set up, so we

16   are going to take another short recess soon.

17          So this applies throughout the course of the trial

18   until the jury is excused from the case.  Do not -- because

19   you must decide the case based solely on the evidence

20   received in the case and on my instruction as the law

21   applies, you must not be exposed to any other information

22   about the case or to issues it involves during the course of

23   your jury duty.

24          So thus, until the end of the case or until

25   otherwise, you are excused, do not communicate with anyone in

1      any way, and do not let anyone else communicate with you in

2      any way about the merits of the case or anything to do with

3      it.  This includes discussing the case in person, in writing,

4      by phone or electronic means, via e-mail, text messaging, or

5      any Internet chat room, blog, website, or application,

6      including but not limited to Facebook, YouTube, Twitter,

7      Instagram, LinkedIn, Snapchat, or any other forms of social

8      media.

9              This applies to communicating with your fellow

10     jurors until I give you the case for deliberation.  And it

11     applies to communicating with anyone else, including family

12     members, your employer, the media, press, people involved in

13     the trial, although you may notify your family and your

14     employer that you have been seated as a juror in the case,

15     and how long you expect the case to last.  But if you are

16     asked or approached in any way about your jury service or

17     anything to do with the case, you must respond that you have

18     been ordered not to discuss it and then report any contact to

19     the Court.

20             Because you will receive all the evidence and legal

21     instruction you properly may consider to return a verdict, do

22     not read, watch, or listen to any news or media accounts or

23     commentary about the case or anything to do with it.  Do not

24     do any research, such as consulting dictionaries, searching

25     the Internet, using other reference materials.  And do not

1    make any investigation or in any other way try to learn about

2    the case on your own.

3            Do not visit or view any place discussed in the

4    case.  Do not use Internet programs or other devices to

5    search for or view any place discussed during the trial.  Do

6    not do any research about the case, the law, or the people

7    involved, including the parties, the witnesses, or the

8    lawyers until you have been excused as jurors.

9            If you happen to read or hear anything touching on

10   the case in the media, turn away and report that matter back

11   to the Court.

12           Also, the attorneys representing the parties in this

13   case are not allowed to communicate with you directly during

14   the trial.  So please excuse them and do not take it

15   personally if they seem to ignore you or if you see them

16   outside the -- when you see them outside the courtroom or in

17   the hallway or elsewhere.

18           These rules protect each party's rights to have the

19   case decided only on the evidence that has been presented.

20   Witnesses here in court take an oath to tell the truth, and

21   the accuracy of their testimony is tested through the trial

22   process.  If you do any research or investigation outside the

23   courtroom or gain any information through improper

24   communications, then your verdict may be influenced by

25   inaccurate, incomplete, or misleading information that has

1    not been tested by the trial process.

2            Each of the parties is entitled to a fair trial by

3    an impartial jury, and if you decide the case based on

4    information not presented in court, you will have denied the

5    parties a fair trial.

6            Remember, you have taken an oath to follow the

7    rules, and it is very important that you follow the rules.  A

8    juror who violates the rules jeopardizes the fairness of the

9    proceedings, and a mistrial could occur which would require

10   the entire trial process to start over.  If a juror is

11   exposed to any outside information, please notify the Court.

12           With that, we are going to take a break or a recess

13   at this time to allow counsel to set up for further

14   proceedings.  The clerk of the court, Mr. Cruz, will now take

15   charge of the jury.

16           Just in terms of housekeeping matters going forward,

17   first of all, you are the jury in the case so you are the

18   most important part of the case.  In terms of the hours we

19   are going to keep, we are going to go until approximately

20   4:15 today.

21           We are going to start tomorrow at 8:30, 8:30

22   tomorrow, so arrive a little bit early so we can start

23   precisely at 8:30.  Any time we are missing a juror, we

24   cannot proceed with a trial.  So when -- a juror who is not

25   here on time delays the entire process.  We live in a very

1    dense city with a lot of traffic, and there may be rain

2    that's coming tomorrow, so please make sure that you allow

3    additional time to be here.

4         So the hours today are going to be different from

5    the hours kept through the course of the trial.  Tomorrow

6    we'll start at 8:30.  We'll go to 11:30, stop at 11:30, start

7    lunch a little bit early, return at 12:30, and then we'll go

8    from 12:30 to approximately 4:15, possibly 4:30, depending on

9    how the case moves along.

10         We'll be in trial every day through Friday.  And

11    then we'll commence again next week on Monday.  On Monday of

12    next week I have another calendar to handle, so we'll start a

13    little bit later than 8:30 on Monday.  I'll give you more

14    information regarding that.

15         We have a jury room for the jury to use, and the

16    clerk will provide additional directions there.  And then

17    when you return shortly, I'm going to provide some additional

18    instructions for you, preliminary instructions.  The parties

19    or counsel will be able to make opening statements for you.

20    And then after opening statements, you will start hearing the

21    evidence in the case.

22         And with that, I'll turn it over to Mr. Cruz.

23         THE CLERK:  Would you all rise for the jury, please.

24         Ladies and gentlemen would you follow me.

25         (Thereupon, the jury retired from the courtroom.)

```
 1              THE COURT:  The break is going to be about a half
 2     hour, a half hour break.
 3              Okay.  Please have a seat.  So we have a lot to
 4     handle or cover before the jury returns for preinstruction
 5     and opening statements.
 6              So I'm going to have Mr. Cruz provide to you the
 7     preinstructions that the Court will be providing.  So what
 8     I've done is incorporated certain of the instructions -- in
 9     reference to the objected set, incorporated certain of the
10     instructions offered by the defendants and certain of the
11     instructions offered by the plaintiff.
12              The objections to the various instructions have been
13     already entered into the record through the filing of your --
14     through the filing of the instructions, so there is no need
15     for additional argument.  The -- you will have a copy of the
16     instructions to follow along as I read the preinstructions to
17     the jury.
18              The -- there are several -- there are several
19     demonstratives that have been objected to, and so it's a
20     concern to the Court that the process may be delayed by late
21     objections, which causes the Court to have to review the
22     objections, which may delay the trial proceedings.  So from
23     now going forward, all demonstratives that you are going to
24     use in the case regarding any witness must be disclosed by
25     tomorrow at noon.  If not disclosed, you are not going to be
```

1    able to use them.

2          It will not apply to demonstratives that you will be

3    able -- that you might want to use during the course of

4    argument.  We'll have to discuss that later in the day.  But

5    I cannot stop proceedings to entertain the number of

6    objections that have been filed just on the demonstratives

7    with -- that are going to be used in opening statements.

8          So in reference to the demonstratives that will be

9    used in opening statements, what I've tried to do is --

10   there's several issues that are going on in terms of managing

11   the case going forward.

12         First of all, I have tried to resolve the disputes

13   concerning the jury instructions which has taken some time.

14         Second, I have been working on the orders regarding

15   the motions in limine that we heard -- that the Court heard

16   yesterday, which hopefully will be issued shortly.

17         And then third, there is a whole set of objections

18   concerning demonstratives.

19         So in reference to Defendant Kite's demonstrative --

20   objections to plaintiffs' demonstratives, I have the

21   defendant's pleading, which is document number 463, so if you

22   follow along, the Court will rule.

23         We have -- we have Kite's objections to plaintiffs'

24   proposed opening demonstratives, slides number 9 and 10.  The

25   objection is overruled.  Slides 9 and 10 can be granted.

1          We have defendant's objection to slide 22, which

2     references the 370,000 per dose cost of YESCARTA, which is

3     apparently the list price.  The Court is going to sustain the

4     objection for the reasons articulated in defendant's

5     objection.

6          We have slide number 23.  Plaintiffs' opening slide

7     23 includes the text at 2013 followed by two bullet points:

8     One, an assertion regarding Kite's supposed licensing

9     attempts; and, two, Sloan Kettering exclusively licensed

10    Sadelain's patent to Juno.  The Court is going to grant as to

11    the second bullet point in slide 23, allow the first bullet

12    point.  It may be that the Court -- that the plaintiff would

13    want to remove slide 23 in light of the Court's ruling.

14         We go to slide number 27, which is use by the -- by

15    plaintiff of the term "excuses."  This is -- the term itself

16    is -- is argumentative, so the Court is going to grant that

17    objection to slide number 27.

18         We go to slide number 30, which is -- plaintiffs'

19    opening statement slide number 30 relates to the public

20    correction document.  The Court is going to deny the -- or

21    overrule the objection to slide number 30.

22         Slide number 32 is -- there is an objection to slide

23    number 32 because it references the -- or uses the phrase

24    "Kite cannot meet its burden to prove invalidity."  The

25    plaintiff can reference that the evidence will show that Kite

1    is not able to meet its burden, so the objection is overruled

2    as to slide number 30.

3           We have slide number 40 and 41, which has to do with

4    Dr. Gilbert's testimony.  The Court is going to issue the

5    order on the motion to exclude Dr. Barr.  It's granted in

6    part and denied in part.  However, the part that is granted

7    has to do with slides number 40 and 41, so the Court is going

8    to sustain that objection to slides 40 and 41, cannot be

9    used.

10          Slide number 48, which has to do with the -- with

11   the issue of Gilead's value of YESCARTA as 6.2 billion.  This

12   concerns -- this concerns one of the -- part of the motions

13   in limine that was addressed yesterday in reference to

14   Dr. Sullivan's testimony.  The Court is going to allow that

15   part to come into evidence so the Court is going to deny --

16   overrule the objection to slide number 48.

17          We have slide number 49, which is a reference --

18   references -- is a reference to slides number 10, 42, and 48,

19   so to the extent that the Court has already ruled on 10, 42

20   and 48, those objections remain.

21          And then we have slide -- additional slide regarding

22   infringement.  This is on page 6 of the objections.  And as I

23   understand it, there is an objection to the first part of the

24   slide which references that Kite admits that YESCARTA

25   infringes.  The rest of the slide appears to be consistent

1    with the statement of the case provided by the Court and also

2    the stipulation of the parties.

3          So the Court is going to strike -- order the

4    striking of the top portion that references that Kite admits

5    YESCARTA infringes.  The stipulation itself can be displayed

6    to the jury.

7          So hopefully that provides guidance to the

8    plaintiff.  I'm still reviewing the plaintiffs' objections to

9    the defendant's demonstratives.  So I think I would encourage

10   the parties to meet and confer and disclose your

11   demonstratives well in advance so we can avoid some late

12   objections.

13         Yes, sir?

14         MR. CHU:  One quick question.  On the slide that was

15   an organizing slide that said "Kite's excuses," could we put

16   "Kite's position" or "Kite's defenses" or something like

17   that?

18         THE COURT:  Yes, absolutely.

19         MR. CHU:  Thank you.

20         THE COURT:  And then I'm going to have, Mr. Cruz, if

21   you could provide the parties with the preliminary

22   instructions so they will have a set.

23         And then at some point in time -- let me ask counsel

24   as to when do you want the video played to the jury?

25         MR. CHU:  We are in agreement, Your Honor, that

1    before opening statements are made to have the Federal

2    Judicial Center video played.

3         THE COURT:  Let's see.

4         MR. CHU:  And just to be more specific, we would be

5    in favor of the video being played before you read the

6    preliminary instructions.

7         THE COURT:  I'm reviewing the instructions again.

8    Let's see.

9         MR. DANE:  Your Honor --

10        THE COURT:  One moment.  Let me just finish here.

11        (Pause in proceedings.)

12        THE COURT:  So Instruction -- Instruction Number 4

13   in the order that has been proposed by the Court references

14   the playing of the video, so what I'm going to do is I'm

15   going to remove that Instruction Number 4 and provide it at

16   the beginning.

17        MR. DANE:  That's fine.

18        THE COURT:  So the request is that the video should

19   be played before the reading of the preliminary instructions?

20        MR. CHU:  Yes, Your Honor.

21        THE COURT:  So I'll pull that out.  And I think

22   everything else is in order.  So you will have an opportunity

23   to review.

24        Is there anything else we need to discuss?  The jury

25   is going to come back soon.  So do you need to set up or are

 1    you ready to go?

 2              MR. CHU:  I think we are ready to go, and we have

 3    the video or maybe -- do you have the video?

 4              THE COURT:  Okay.  Let's take a short recess.  So

 5    let's -- I'll resume back at 2:00.

 6              MR. CHU:  Thank you.

 7              THE COURT:  Yes.  You can set up.

 8              (Thereupon, there was a brief recess.)

 9              THE COURT:  Okay.  So we have counsel again present

10    with several other persons in the galley portion of the

11    court.  So there has been one suggested correction to

12    Preliminary Instruction Number 10, and the suggestion is that

13    the word alleged -- let's see, I'll find it.  The word

14    alleged should be placed before the word infringement on line

15    9 of Instruction Number 10, which I have done.

16              And with that, are we ready for the jury?

17              MR. CHU:  Counsel together wanted to mention one

18    other item.  We were thinking that starting tomorrow,

19    depending on the Court's view, that the jurors would be in

20    rows of four and five so that they would be closer to the

21    witness box and they could all easily observe the witness,

22    but for opening statements, to just leave them in the single

23    line of nine now.  And we both agree to that.

24              THE COURT:  Sure.  That's a suggestion that the

25    Court will embrace.  It makes sense.

```
 1                    MR. CHU:  Thank you.

 2                    THE CLERK:  I'll have the TV monitor moved over

 3          here.

 4                    THE COURT:  After the break.  Yeah.

 5                    THE CLERK:  Okay.

 6                    THE COURT:  Okay.  Let's bring the jury back.

 7                    THE CLERK:  Would you all rise for the jury, please.

 8                    (Thereupon, the jury returned to the courtroom.)

 9                    THE COURT:  Okay.  We have the jury reassembled.

10          Please have a seat, everybody in the courtroom.  Again,

11          welcome.  Again, my name is Judge S. James Otero.  You are

12          now the jury in the case.  You are the most important part of

13          the trial proceedings.  As I mentioned, you make all the

14          credibility determinations, resolve all of the conflicts that

15          will be presented to you in the course of the trial

16          proceedings.

17                    I want to make sure that everybody is comfortable

18          throughout the proceedings.  So we have water and certain

19          refreshments in the jury room, so feel free if you want to

20          bring that out during the course of the trial proceedings,

21          feel free to bring your coffee or your water or other drinks.

22          Please, no food or gum.  If you need to eat for a medical

23          reason, just bring it to the attention of the clerk, and we

24          certainly can accommodate that.

25                    So just to refresh your memories, in terms of the
```

1    parties again, we have Juno Therapeutics, the plaintiffs in

2    the case represented by several lawyers.  And I think we have

3    one new counsel at the counsel table, Ms. Tuan has joined the

4    team at -- on the plaintiffs' side.  So we -- again, we have

5    Mr. Chu, Mr. Heinrich, we have Ms. Tuan, we have Ms. Geers,

6    and then Ms. Jeffries.  So that's the team of lawyers

7    representing the plaintiffs.

8            And then again, the defendants, Kite Pharma, and we

9    have Mr. Dane, Mr. Weinberger, and then Ms. Blanca Young all

10   present to represent the defendant in the case.

11           So we are going to start with a video to educate the

12   jury regarding certain of the issues in the proceedings here

13   and also what -- what a patent is.  There are some highly

14   technical terms that I'm going to read to you in the course

15   of some preliminary instructions.  I would not become

16   overwhelmed over those, some of the terms I'm going to

17   reference.  These terms are going to be explained to you in

18   far more detail so that a layperson can understand them

19   during the course of the trial proceedings.

20           But with that, since the case involves a patent, I'm

21   going to show a video that explains what a patent is, and how

22   one is obtained.  And with -- I think -- I want to make sure

23   all your screens are working in front of you.  Yes?  Okay.

24   Let's play the video.

25               (Thereupon, the video was played.)

1          THE COURT:  That concludes the playing of the video

2     for the jury.  I have now some preliminary instructions to

3     provide to you.  You are going to be given a final set of

4     instructions to -- prior to your deliberations.  And those

5     instructions will control your deliberations.

6          Members of the jury, you are now the jury in the

7     case.  It is my duty to instruct you on the law.  These

8     instructions are preliminary instructions to help you decide

9     the principles that apply to civil trials and to help you

10    understand the evidence as you listen to it.

11         You will be allowed to keep this set of instructions

12    to refer throughout -- to refer to throughout the trial.

13    These instructions are not to be taken home, and must remain

14    in the jury room when you leave in the evening.

15         At the end of the trial, these instructions will be

16    collected and I will give you a final set of instructions.

17    It is the final set of instructions that will govern your

18    deliberations.

19         It is your duty to find the facts from all of the

20    evidence in the case.  To those facts you will apply the law

21    as I give it to you.  You must follow the law as I give it to

22    you whether you agree with it or not.  And you must not be

23    influenced by any personal likes or dislikes, opinions,

24    prejudices, or sympathy.  That means that you must decide the

25    case solely on the evidence.  You will recall that you took

1      an oath to do so.

2            Please do not read into these instructions, anything

3      I may say or do, that I have an opinion regarding the

4      evidence or what your verdict should be.

5            I have already provided the instruction regarding

6      the conduct of the jury throughout the course of the trial,

7      so I am not going to re-read that instruction.

8            If there is any news, media account, or commentary

9      about the case or anything to do with it, you must ignore it.

10     You must not read, watch, or listen to any news, media

11     account, or commentary about the case or anything to do with

12     it.  The case must be decided by you solely and exclusively

13     on the evidence that will be received in the case and on my

14     instructions as to the law that applies.  If any juror is

15     exposed to any outside information, please notify the Court

16     immediately.

17            To help you follow the evidence, I will give you a

18     summary of the positions of the parties.  The plaintiffs in

19     this case are Juno Therapeutics and Sloan Kettering Institute

20     for Cancer Research.  The defendant in this case is Kite

21     Pharma.  For convenience, the parties and I will often refer

22     to the plaintiffs collectively as Juno, or Juno and Sloan

23     Kettering, or simply plaintiffs.  The parties and I will

24     refer to the defendant as Kite.

25            The plaintiff, Juno and Sloan Kettering, filed suit

1    in this court seeking money damages for -- from Kite for

2    infringing the '190 patent by making, importing, using,

3    selling, and offering for sale Kite's YESCARTA product that

4    Juno and Sloan Kettering argue are covered by claims 3, 5, 9,

5    and 11 of the '190 patent.

6         These are the asserted claims for the '190 patent.

7    Kite contends that the certificate of correction to the '190

8    patent is invalid.  The parties have agreed that if the

9    certificate of correction is not found to be invalid, then

10   defendant's YESCARTA therapy infringes the asserted claims of

11   the '190 patent.

12        In addition to Kite contending the certificate of

13   correction is invalid, Kite also argues that the asserted

14   claims of the '190 patent are invalid for reasons that you

15   will hear about.  Kite raises these invalidity issues as a

16   defense to infringement.  Your job will be to decide whether

17   Kite's infringement was willful.  Your job is also to decide

18   whether the certificate of correction is invalid, and whether

19   the asserted claims of the '190 patent are invalid.

20        If you decide that the certificate of correction is

21   invalid, and that at least one of the asserted claims is

22   valid, you will then need to decide any money damages to be

23   awarded to plaintiffs to compensate them for Kite's

24   infringement.

25        If you decide that any infringement was willful,

1     that decision should not affect any damage award you give.  I

2     will take willfulness into account later.

3            I will now explain how a claim defines what it

4     covers.  A claim sets forth in words a set of requirements.

5     Each claim sets forth its requirements in a single sentence.

6     If a device or a method satisfies each of these requirements,

7     then it is covered by the claim.  There can be several claims

8     in a patent.  Each claim may be narrower or broader than

9     another claim by setting forth more or fewer requirements.

10           The coverage of a patent is assessed claim by claim.

11    In patent law, the requirements of a claim are often referred

12    to as claim elements or claim limitations.  When a thing,

13    such as a product or process, meets all of the requirements

14    of a claim, the claim is said to cover that thing, and that

15    thing is said to fall within the scope of that claim.

16           In other words, a claim covers a product or process

17    where each of the claim elements or limitation is present in

18    that product or process.

19           Before you decide whether the claims of the '190 are

20    valid or not, you will need to understand the patent claims.

21    As I mentioned, the patent claims are numbered sentences at

22    the end of the patent that describe the boundaries of the

23    patent's protection.  It is my job as a judge to explain to

24    you the meaning of any language in the claims that needs

25    interpretation.

1           I have already determined the meaning of certain

2    terms of the claims of the '190 patent.  My interpretation is

3    as follows:  For the term the amino acid sequence encoded by

4    SEQ ID NO:6, as originally issued, this term is construed as

5    amino acids 113 to 220 of a CD starting with lysine.  And as

6    corrected by the certificate of correction, this term is

7    construed as amino acids 114-220 of CD28 starting with

8    isoleucine.  For the term nucleic acid polymer, encoding a

9    binding element that specifically interacts with a selected

10   target, you should apply its plain and ordinary meaning.

11          Further claim terms for which I have not provided a

12   definition, you should apply the plain and ordinary meaning.

13   You are to apply my definitions of these terms throughout the

14   case; however, my interpretation of a language of the claim

15   should not be taken as an indication that I have any view

16   regarding the issues, such as validity of the certificate of

17   correction or the validity of the asserted claims.

18          Those issues are yours to decide.  I will provide

19   you more detailed instructions on the meaning of the claims

20   before you retire to deliberate your verdict.

21          In these instructions, I will often refer to a

22   party's burden of proof.  I will be discussing two different

23   burdens of proof.  The first is burden -- the first is known

24   as a burden of proof by a preponderance of the evidence.

25   When a party has the burden of proving any claim or

1    affirmative defense by a preponderance of the evidence, it

2    means you must be persuaded by the evidence that the claim or

3    affirmative defense is more likely true than not true.

4              The second burden of proof I will discuss is known

5    as burden of proof by -- by clear and convincing evidence.

6    When a party has the burden of proving any claim or defense

7    by clear and convincing evidence, it means that the party

8    must present evidence that leaves you -- that leaves you with

9    a firm belief or conviction that it is highly likely that the

10   factual contentions of the claim or defense are true.

11             This is a higher standard of proof than proof by a

12   preponderance of the evidence, but it does not require proof

13   beyond a reasonable doubt.  You should base your decision on

14   all the evidence regardless of which party presented it.

15             In deciding the issues, you will be asked to

16   consider specific legal standards.  I will give you an

17   overview of those standards now, and I will review them in

18   more detail before the case is submitted to you for your

19   verdict.

20             Kite contends that the certificate of correction to

21   the '190 patent is invalid.  The parties have agreed that if

22   the certificate of correction is not found to be invalid,

23   then defendant's YESCARTA's therapy infringes the asserted

24   claims of the '190 patent.

25             You will be asked to decide whether Kite's alleged

1    infringement of the '190 patent was willful.  Juno and Sloan

2    Kettering must show willfulness by a preponderance of the

3    evidence.

4         You will also be asked to decide whether the

5    certificate of correction of the '190 patent is invalid.

6    Kite must prove by clear and convincing evidence that the

7    certificate of correction of the '190 patent is invalid.

8         You will also be asked to decide whether the

9    asserted claims of the '190 patent are invalid.  A patent may

10   be invalid for a number of reasons, each of which is asserted

11   on a claim-by-claim basis.  A patent claim may be invalid if

12   the patent's description in the specification does not meet

13   certain requirements.  To be valid, a patent must meet the

14   written description requirement.

15        In order to meet this written description

16   requirement, the description of the invention in the

17   specification portion of the patent must be detailed enough

18   to demonstrate that the applicant actually possessed the

19   invention as claimed.  Kite must show by clear and convincing

20   evidence that the patent does not meet the written

21   description requirement.

22        The disclosure of a patent must also meet the

23   enablement requirement.  To meet this requirement, the

24   description in the patent has to be sufficiently full and

25   clear to have allowed persons of ordinary skill in the field

1    of technology of the patent to make and use the invention

2    without undue experimentation at the time the patent

3    application was originally filed.  Kite must show by clear

4    and convincing evidence that the patent does not meet the

5    enablement requirement.

6         If you decide that Kite has failed to prove that the

7    certificate of correction is invalid, and that Kite has

8    failed to prove that any of the asserted claims of the '190

9    patent is invalid, you will then need to decide any damages

10   to be awarded to compensate Juno and Sloan Kettering for the

11   infringement.

12        Juno and Sloan Kettering have the burden to persuade

13   you of the amount of the damages by a preponderance of the

14   evidence.  A damage award should put Juno and Sloan Kettering

15   in approximately the same financial position that they would

16   have been in had the infringement not occurred.

17        But in no event may the damages awarded be less than

18   what Juno and Sloan Kettering would have received had they

19   had been paid a reasonable royalty.  I will instruct you

20   later on the meaning of reasonable royalty.  The damages you

21   are -- the damages you award are meant to compensate Juno and

22   Sloan Kettering and not to punish Kite.  You may not include

23   in your award any additional amount as a fine or penalty

24   above what is necessary to compensate Juno and Sloan

25   Kettering for the infringement in order to punish Kite.  I

1     will give you more detailed instructions on the calculation

2     of damages at the conclusion of the case.

3          The -- during the course of the trial, you will have

4     to consider the evidence in the case.  The evidence you are

5     to consider in deciding the facts of the case include the

6     sworn testimony of the witnesses who will be called to

7     testify here, the exhibits which would be received into

8     evidence, any facts which the lawyers and the parties would

9     have agreed to or stipulated to, and then any facts that I

10    may instruct you to accept as being proved.

11         In reaching your verdict, you may have -- you may

12    consider only the testimony and exhibits received in

13    evidence.  Certain things are not evidence, and you may not

14    consider them in deciding what the facts are.  I will

15    instruct you.  The arguments and statements by lawyers are

16    not evidence.  The lawyers are not witnesses.  What they may

17    say in opening statements, closing arguments, and at other

18    times is intended to help you interpret the evidence, but it

19    is not evidence.  If the facts as you remember them differ

20    from the way the lawyers have stated them, your memory of

21    them controls.

22         Questions and objections by lawyers are not

23    evidence.  Attorneys have a duty to their clients to object

24    when they believe a question is improper under the Rules of

25    Evidence.  You should not be influenced by the objection or

1    by the Court's ruling on it.

2            Testimony that is excluded or stricken or that you

3    are instructed to disregard is not evidence and must not be

4    considered.  In addition, some evidence may be received only

5    for a limited purpose.  When I instruct you to consider

6    certain evidence only for a limited purpose, you must do so,

7    and you may not consider that evidence for any other purpose.

8            Anything that you may see or hear when the Court is

9    not in session is not evidence.  You are to decide the case

10   solely on the evidence received in the course of the trial.

11           Some evidence may be admitted for a limited purpose.

12   When I instruct you that an item of evidence has been

13   admitted only for a limited purpose, you must consider it

14   only for that limited purpose and not for any other purpose.

15           There are two types of evidence:  Evidence may be

16   either direct or circumstantial.  Direct evidence is direct

17   proof of a fact, such as the testimony by a witness about

18   what that witness personally saw or heard or did.

19   Circumstantial evidence is proof of one or more facts from

20   which you could find another fact.  You should consider both

21   kinds of evidence.  The law makes no distinction between the

22   weight to be given to either direct or circumstantial

23   evidence.  It is for you to decide how much weight to give to

24   any of the evidence.

25           Certain charts, summaries, and demonstratives not

1    admitted into evidence may be shown to you in order to help

2    explain the contents of books, records, documents, or other

3    evidence in the case.  Charts, summaries, and demonstratives

4    are only as good as the underlying evidence that supports

5    them.  You should therefore give them only such weight as you

6    think the underlying evidence deserves.

7           Certain charts and summaries may be admitted into

8    evidence to illustrate information brought out in trial.

9    Charts and summaries are admitted into evidence -- charts and

10   summaries that are admitted into evidence are only as good as

11   the testimony or other admitted evidence that supports them.

12   You should therefore give them only the weight you think the

13   underlying evidence deserves.

14          So in deciding the facts in this case, you may have

15   to decide which testimony to believe and which testimony not

16   to believe.  You may believe everything a witness says or

17   part of it or none of it.  In considering the testimony of

18   the several witnesses who will be testifying in this case,

19   you may take into account the opportunity and the ability of

20   the witness to hear -- to see or hear or know the things

21   testified to, the witness' memory, the witness' manner while

22   testifying, the witness' interest in the outcome of the case,

23   if any, the witness' bias or prejudice, if any, whether other

24   evidence contradicted the witness' testimony, the

25   reasonableness of the witness' testimony in light of all of

1    the evidence, and any other facts -- any other factors that

2    bear on believability.  Sometimes a witness may say something

3    that is not consistent with something else he or she said.

4    Sometimes different witnesses will give different versions of

5    what happened.

6         People often forget things or make mistakes in what

7    they remember.  Also, two people may see the same event but

8    remember it differently.  You may consider these differences,

9    but do not decide the testimony is untrue just because it

10   differs from other testimony.  However, if you decide that a

11   witness has deliberately testified untruthfully about

12   something important, you may choose not to believe anything

13   that witness said.

14        On the other hand, if you think that the witness

15   testified untruthfully about some things, but told the truth

16   about others, you may accept the part you think is true and

17   ignore the rest.  The weight of the evidence as to fact does

18   not necessarily depend on the number of witnesses who

19   testify.  What is important is how believable the witnesses

20   were, and how much weight you think their testimony deserves.

21        There are Rules of Evidence that control what can be

22   received into evidence during the course of a trial.  When a

23   trial -- when a lawyer asks a question or offers an exhibit

24   into evidence, and a lawyer on the other side thinks that it

25   should not be permitted by the Rules of Evidence, that lawyer

1    may object.  If I overrule the objection, the question may be

2    answered or the exhibit received.  If I sustain the

3    objection, the question cannot be answered and the exhibit

4    cannot be received.

5            Whenever I sustain an objection to a question, you

6    must ignore the question and must not guess what the answer

7    might have been.  Sometimes I may order that evidence be

8    stricken from the record, and that you disregard it or ignore

9    the evidence.  This means you are -- this means when you are

10   deciding the case, you must not consider the stricken

11   evidence for any purpose.

12           You will hear during the course of the trial

13   testimony from several experts who will testify to opinions

14   and the reasons for their opinions.  This opinion testimony

15   is allowed because of the education or training or experience

16   of the witnesses.

17           Such opinion testimony should be judged just like

18   any other testimony.  You can accept it or reject it and give

19   it as much weight as you think it deserves considering the

20   witness' education and experience, the reasons given for the

21   opinion, and all of the other evidence in the case.

22           I urge you to pay close attention to the trial

23   testimony as it is given.  During deliberations you will not

24   have a transcript of the trial testimony.

25           You have been given tablets and pens and pencils.

1    If you wish to -- if you wish, you may take notes to help you

2    remember the evidence.  If you do take notes, please keep

3    them to yourself until you go to the jury room to decide the

4    case.  Do not let note taking distract you.  When you leave

5    your notes, you should leave the notes in the courtroom on

6    your chair each day.  No one will read your notes.

7           Whether or not you take notes, you should rely on

8    your own memory of the evidence.  Notes are only to assist

9    your memory.  You should not be overly influenced by the

10   notes of other jurors.

11          From time to time during the course of the trial, it

12   will be necessary for me to talk with the attorneys outside

13   the presence of the jury or by calling a witness.  Please

14   understand that while you are waiting, we are working.  The

15   purpose of these conferences is not to keep relevant

16   information from you but to decide how evidence is to be

17   treated under the Rules of Evidence and to avoid confusion

18   and error.

19          Of course, we will want -- of course, we will do

20   what we can do keep the number and length of these

21   conferences to a minimum.  I may not always grant an

22   attorney's request for a conference.  Do not consider my

23   granting or denying a request for a conference as any

24   indication of my opinion of the case or what your verdict

25   should be.

1          So my practice is generally not to hold conferences

2     at the bench here.  If I deny a request for a conference at

3     sidebar, I always give counsel the opportunity to make an

4     argument at another point during the course of the trial so

5     that it doesn't inconvenience the jury or delay proceedings.

6          The trial is -- the trial portion is about to begin.

7     First, each side may make an opening statement.  An opening

8     statement is not evidence in the case.  It is simply an

9     outline to help you decide what the party expects the

10    evidence will show.

11         The presentation of evidence will begin thereafter.

12    Witnesses will take the witness stand, and the documents will

13    be offered and admitted into evidence.  There are two

14    standards of proof that you will apply to the evidence

15    depending on the issue you are deciding.  On some issues, you

16    must decide whether something is more likely true than not.

17    On other issues you must use a higher standard and decide

18    whether it is highly probable that something is true.

19         Plaintiff will present their evidence of their

20    contention that some claims of the '190 patent have been

21    willfully infringed by Kite.  They will also present evidence

22    about the amount of damages they are seeking.  These

23    witnesses will be questioned by plaintiffs' counsel in what

24    is called direct examination.

25         After direct examination of a witness is completed,

1    Kite's counsel has an opportunity to cross-examine that

2    witness.  Finally, plaintiffs' counsel has an opportunity to

3    question the witness one more time in what is called

4    redirect.  To persuade you that any infringement was willful,

5    plaintiffs must prove that it is more likely true than not

6    that the infringement was willful.

7            After plaintiff have presented their witnesses on

8    willfulness and damages, Kite will call witnesses who will

9    also be examined and subject to cross-examination and

10   redirect.  Kite will present its evidence that it does not

11   infringe the '190 patent because a certificate of correction

12   is invalid and that the asserted claims of the '190 are

13   invalid.

14           To prove invalidity of the certificate of correction

15   or any claim, Kite must persuade you that it is highly

16   probable that the certificate of correction or claim is

17   invalid.  In addition to presenting its evidence of

18   invalidity, Kite will put on evidence responding to

19   plaintiffs' willfulness contention and to plaintiffs' damages

20   calculations.

21           Plaintiff will then return and will put on evidence

22   responding to Kite's contention that the certificate of

23   correction and claims of the '190 are invalid.  Plaintiffs

24   will have the option -- the option to put on what is

25   called -- referred to as rebuttal evidence to any evidence

1   offered by Kite of lack of willfulness and damages.

2          Finally, Kite will have the option to put on

3   rebuttal evidence to any evidence offered by plaintiffs on

4   validity of the certificate of correction and the asserted

5   claims of the '190 patent.

6          During the presentation of evidence, the lawyers

7   will be allowed brief opportunities to explain what they

8   believe the evidence will -- evidence has shown or what they

9   believe upcoming evidence will show.  Such comments are not

10  evidence and are being allowed solely for the purpose of

11  helping you, the jury, understand the evidence.

12         Because the evidence is introduced piecemeal, you

13  must -- you need to keep an open mind as the evidence comes

14  in and wait for all of the evidence before you make any

15  decisions.  In other words, you should keep an open mind

16  throughout the entire trial proceedings.

17         The parties may present the testimony of a witness

18  by reading from his or her deposition transcript or by

19  playing videotape of the witness' deposition testimony.  A

20  deposition is sworn testimony of a witness taken before trial

21  and is entitled to the same consideration as if the witness

22  testified here in open court.

23         After the evidence has been presented, I will give

24  you a final set of instructions on the law that applies to

25  the case, and the attorneys then will make closing arguments.

1    After closing arguments, the case will be presented to you to

2    decide.

3              And that concludes the Court's reading of the

4    preliminary instructions.  And I turn it over to the lawyers

5    for the plaintiff to make opening statements.

6              Who will be presenting opening statements on behalf

7    of the plaintiff?

8              MR. CHU:  I will, Your Honor.

9              THE COURT:  Mr. Chu.

10             MR. CHU:  Good afternoon, ladies and gentlemen.

11             First and foremost, thank you.  Thank you for

12   helping to make our justice system the best in the world.

13             I want to introduce a few people.  You have met my

14   colleagues.  Together we are representing both Sloan

15   Kettering and Juno Therapeutics.  You will meet other people

16   during the course of the trial, but someone else is going to

17   be in this courtroom every day, and that is Mr.  Josh

18   Swenson, and he is the master of the technology.  So he'll be

19   able to bring up documents and other things to make it easy

20   for you to see.

21             I also want to introduce other very important

22   people.  During the course of this case we will be talking

23   about the Sadelain patent, inventive work done by

24   Dr. Sadelain at Sloan Kettering with other colleagues.  And

25   the first witness you will hear from is Dr. Michel Sadelain.

 1                You will also hear from Dr. Yashodhara Dash.  She is

 2       the senior director of technology management for Sloan

 3       Kettering, and she will be our second witness.  And you will

 4       hear from Dr. Mark Gilbert who is the chief medical officer

 5       of Juno, and he will be our third witness.

 6                Now, with that, may it please the Court and the

 7       ladies and gentlemen of the jury.

 8                This is an important case that involves an

 9       extraordinary invention.  For many, many, many decades, for

10       longer than the lifetimes of all the people in this

11       courtroom, scientists and doctors have known about cancer.

12       And it's been stubborn.  It's been able to attack our skin,

13       our kidneys, our bone marrow, our blood.  And it's a stubborn

14       disease.  Doctors and scientists have done a good job over

15       the years attacking many other diseases, but cancer is

16       particularly difficult.  Why is that?

17                Well, we have immune systems.  We are born with

18       these wonderful immune systems.  We all, during the course of

19       our life, we get a cold, we get a virus or we cut ourselves,

20       maybe we get a little bit of infection, and our immune system

21       goes and it attacks the invading bacteria, the invading

22       viruses.  It recognizes them.  And maybe we are under the

23       weather for a little bit, but we live on for years and years

24       and years despite all of those attacks.

25                Because our immune system is pretty darn good at

1    recognizing who and what is a foreign invader, some bacterial

2    cells that might give us an infection, our immune system,

3    which include different kinds of white blood cells can say,

4    a-ha, that's a foreign invader, I'm going to go and attack

5    that bad bacteria and kill it.  That keeps us alive.  And it

6    works with so many, many, many diseases.

7            What cancer does is it tricks the immune system so

8    that many cancers cannot be recognized by our white blood

9    cells and other parts of our immune system, as enemies, as

10   foreign invaders.  They look like friendlies.  And so our

11   white blood cells may pass by the cancer cells and, instead

12   of attacking them, say these are friendlies, we leave them

13   alone, and the cancer grows and grows and grows.

14           And people have known this for decades, and they

15   have tried to find new ways to attack cancer.  And for many

16   decades, there were three principal ways:  One is surgery,

17   one is radiation, one is chemotherapy.  These three, either

18   individually, sometimes in combination with each other, they

19   sometimes worked.

20           We probably all have known friends, family, who have

21   had some cancer and then we think they are in remission and

22   that's good news.  But then maybe it's a year or two, maybe

23   it's five years later, the cancer is back, or maybe it's a

24   different kind of a cancer because the cancer has stayed

25   around.

1        So what did Dr. Sadelain and his colleagues do?

2    They said, can we do something to specially train a type of

3    white blood cell that we have -- they are called T-cells, the

4    letter T -- can we specially train them to recognize

5    particular cancers?  And they worked hard.  They built on the

6    work of others before them as all scientists do.

7        And they, after lots and lots of hard work, came up

8    with a way to reengineer the T-cells of an individual

9    patient, to take some blood from a patient, to just take the

10   T-cells, put the rest of the blood back into the patient, and

11   then to make some changes in the natural T-cells of that

12   patient and then allow those cells to grow and then to put

13   them back into the patient's body.

14       And now these T-cells going back in, first of all,

15   the rest of the body says these are friendlies, because it's

16   the patient's own T-cells coming back in.  Yes, they are

17   trained a little differently, but they are coming back in.

18   So the body -- the rest of the body says okay, those are

19   friendlies, those are friendly soldiers.

20       But they are not everyday soldiers.  They've been

21   reengineered to be like special forces, to recognize the

22   particular cancer that that patient has.  And then those

23   T-cells go throughout the body.  And when they see the cancer

24   cells, they attack and they attack, and they begin to kill

25   the cancer cells.

1           You heard the fact that I said earlier today that

2     Dr. Sadelain and his colleagues came up with the first living

3     drug to attack cancer.  And what is meant by that is what

4     I've said so far, but it's much more.  Because when the

5     T-cells are attacking foreign invaders, the foreign invader

6     cells will die, but the T-cells will die, too.

7           And the magic of this extraordinary invention is the

8     patient's own body will then begin to have a call to arms, to

9     bring on reinforcements, not just the T-cells that the

10    patient originally had but reengineered T-cells that the

11    patient never had.  And the body's own system will then begin

12    to make millions and millions of these specially trained

13    special forces T-cells to continue to go after the cancer,

14    look for it everywhere in the body, and to go after it and go

15    after it and go after it.

16          Scientists before said boy, if we can have a little

17    better treatment of cancer, the kind I talked about before,

18    surgery or radiation or chemotherapy, that would be pretty

19    neat.  But at least a few scientists and doctors now, once in

20    a while, they whispered the word cure or maybe it's a cure.

21          And so the folks at Sloan Kettering and some others

22    around the world, because the work became known, said can we

23    have some clinical trials?  And the numbers of patients in

24    the early clinical trials tend to be small, 10, 20.  They are

25    not thousands of patients.

1            With 20 patients in a clinical trial, it was one of

2       our loved ones, and we knew that their life was not going to

3       be long lived, we would say we hope that there will be

4       something that is a miracle for one of the 20, and we hope

5       it's our relative.

6            In fact, on average, for all of the patients in a

7       clinical trial, the physicians and scientists know from

8       thousands and thousands and thousands of similar patients

9       that have gone through every other kind of treatment for that

10      particular kind of cancer, that on average, when these early

11      patients enrolled in the early clinical trials, they will all

12      pass away, and their average life expectancy was just

13      12 weeks.

14           In some of the early trials, it would be marvelous

15      if it was one or two out of 20, or five, but depending on the

16      trials, it's 40 percent, 50 percent.  And some have survived

17      not just extra weeks but extra months and today some extra

18      years.  And all over the world scientists are finding better

19      and better ways to make these treatments better, to have

20      longer term survival because of the magic of Dr. Sadelain's

21      living drug.

22           A lot more work needs to be done.  And that work is

23      underway.  You probably know that throughout all of our

24      lifetimes untold billions of dollars have been spent.

25      Decades ago the United States declared war on cancer, and it

1          was announced as if it was a shot to the moon.  But since

2          then, of course, we did land people on the moon and brought

3          them safely back to earth.  And here now is this glimmer of

4          hope that for at least some cancers, these reengineered

5          T-cells, the living drug has more than just a little bit of

6          hope for the patients.

7                  Now, along the way, the people at Sloan Kettering

8          said if this is a good invention, let's apply to the United

9          States Patent Office.  And they have people, as you saw in

10         the video, who are specially trained in law, patent law, in

11         the particular area of technology.  So these are people who

12         really understand the science and the law.  And in this case

13         and in many cases they spend years from the date of the first

14         application until they decide to just reject the patent

15         application or maybe to grant it.  And in this case they

16         granted it.  They granted a United States patent.

17                 I brought with me here today, it's the actual

18         Sadelain patent that was granted by our United States Patent

19         and Trademark Office.

20                 Now, let me look a little bit with greater care at

21         the evidence you will hear during the course of this trial.

22         Sloan Kettering and its sister institutions, these are

23         photographs of their facilities, they are together the oldest

24         cancer institution in the United States.

25                 And what is the relationship with Juno?  Juno was

1    formed to find a way to carry this work farther.  And

2    sometimes a company would just form an alliance with one

3    research institution, but the people behind Juno said instead

4    of having different institutions competing with each other,

5    let's bring together leading cancer institutions, Sloan

6    Kettering, you've heard, I'm sure, of St. Jude Children's

7    Research Hospital, you've probably heard of City of Hope,

8    which is right here in Southern California, they and other

9    institutions, Seattle Children's, the Fred Hutchinson Center

10   and others in a sense were brought together, pooled their

11   research resources, and that became Juno.

12          Dr. Sadelain's patented living drug.  I've described

13   how tumor cells can hide from the immune system.  That is the

14   problem.  Here is a photograph of Dr. Sadelain.  He's also a

15   professor at Weill Cornell University.

16          In the early 1990s, some people came up with what is

17   called a CAR, CAR, and it's an abbreviation.  And you are

18   going to hear about CAR-T cells.  Here is a way to think

19   about it.  It is a chimeric antigen receptor.  I know those

20   are tough words, but all it means is this:  The scientists

21   and doctors were able to take bits of cellular material and

22   reengineer them and put them together in a way that the early

23   CARs were trying to do what Dr. Sadelain achieved:  Take some

24   material from here and over here and put them together.

25          And you may hear discussion about what is called the

1    first generation CARs.  It's a two-part CAR.  There are later

2    second generation CARs, three-part CARs.  We do not contend

3    that Juno or Sloan Kettering invented CARs, either the

4    two-part or the three-part CARs.  Lots of people were trying

5    to work on this.  But all of that CAR research at many, many

6    places failed until 2002 with Dr. Sadelain's CAR.

7            So here is a picture of a cancer cell.  Everything

8    you see in yellow is part of a cancer cell.  And what's

9    labeled as CD19, it's a little bit of material that sticks

10   out of this cell.  The scientists give it a name, CD19.  And

11   here is this immune cell, this T-cell that is coming up to

12   the cancer cell, and it's recognizing this cancer cell.

13           And how does it do it?  You see the green part

14   there?  That is called a receptor.  And it will bump into or

15   come close to other cells.  When it comes close to this

16   particular cancer cell, that receptor, think of it the way

17   I'm shaping my hand.

18           It will go up to the piece of CD19, and it's like a

19   jigsaw puzzle.  It will go up and say, huh, are you the kind

20   of cell that I'm looking for?  And if it fits like a jigsaw

21   puzzle, then the immune cell says, in this instance, I know

22   that is the cell that I want to kill, because it's a cancer

23   cell.

24           So that first part, the green part, actually is

25   pretty old.  In the 1980s scientists were able to create this

1    green part, the receptor part.  And it's really quite

2    well-known, going back to the 1980s.  And scientists also

3    knew how to make this receptor part for this CD19.  They also

4    knew over the decades how to make it for other kinds of

5    cells.  So that by itself is old, well-known.

6          I'm going to talk a little bit more about the next

7    two parts, but the next two parts, the blue part and the

8    orange part that look like they are stuck into the immune

9    cell, the way that scientists refer to both of them, they

10   call them the backbone.  So three parts:  The receptor, the

11   two parts that are the backbone, and the magic of the

12   invention is putting them together, but the real magic comes

13   from the backbone.

14         So here is a picture of the Sadelain patent.  People

15   refer to patents by the last three digits.  So we will also

16   call it the '190 patent.  And you can see here is part of the

17   information on the face page of the patent.

18         Okay.  So here is the scientific name.  On the top

19   you see some language from the actual patent, and we'll spend

20   some time looking at that later.

21         Now, the green part is called a single-chain

22   antibody, that is the part that is going to recognize the

23   cancer cell.  And then there is the blue part, we are going

24   to refer that to SEQ ID NO:6, and it's a particular string of

25   what are called amino acids.  And the original part, you are

1        going to hear it referred to as CD3 zeta.  That is a Greek

2        letter.  But don't worry, there are going to be some really

3        smart people who are going to describe this in greater detail

4        to you.

5               So here again we see the single-chain antibody and

6        the two parts of the backbone.

7               Now, what I'm going to show you is an animation as

8        to how this living drug actually works.  This is the CAR-T

9        cell.  That is part of the immune system, the reengineered

10       T-cells, and there is the tumor or cancer cell.  You see the

11       CD19 antigen, that little piece that sticks out.  And the CAR

12       cell comes by, it recognizes it, and kind of gloms on and

13       does just what you saw there.  It kills the bad cancer cell.

14              So then what happens is this living drug does

15       something magical.  It triggers the body to make more Special

16       Forces troops that are also specially trained.  And remember

17       these Special Forces troops never, never existed in the

18       patient's own body by themselves.

19              So the first Special Forces troops that were

20       reengineered or injected in, they begin to do their work, and

21       the body then sends signals around and says, we want and need

22       reinforcements.  It's a living drug.

23              And the way this is done, first, some blood is taken

24       out of a patient, and then the immune cells, the T-cells are

25       separated out.  Then Dr. Sadelain's CAR is inserted into the

1    cells.  The cells multiply outside the patient.  And then

2    those cells are put back into the patient.  That's the basic

3    process.

4           Now, there's an important agreement here, it's

5    between Sloan Kettering and Juno, that relates specifically

6    to the '190 or Sadelain patent.  And Juno is getting a

7    license, but it's also an exclusive license.  For lawyers,

8    licenses mean something very special, but you're all familiar

9    with licenses.

10          A way to think about it is usually the word license

11   means permission.  You go to the Department of Motor Vehicles

12   if you're unlucky to have to go to a local DMV, and let's say

13   you're applying for a license for the first time or a renewal

14   or you want to get your Real I.D. card, it's so much fun to

15   go to the DMV.  And then you will get a license, and that

16   gives you permission to drive on our roads.  Or if you have a

17   little restaurant and you want to serve wine or beer, you

18   will apply for a liquor license of some kind, and that will

19   give you permission.

20          So a license in patent law means just that.  If you

21   get a license from the patent owner, you have permission from

22   the patent owner to use the technology covered by the patent.

23   And if it's an exclusive license, then the patent owner is

24   promising, I'm only going to license it to you, I'm not going

25   to license it to everyone else.  And there is an important

1    reason why exclusive licenses are routinely granted.  It's

2    because the person receiving the license, in this case Juno,

3    is going to invest a lot of blood, sweat, tears, millions and

4    millions of dollars to try and develop new medicines, new

5    drugs, and if everyone else can do it equally, and they have

6    no advantage from the patent owner, then people won't make

7    that investment.

8            So it's a license, it's permission, and it's an

9    exclusive license from Sloan Kettering to Juno.

10           And here is the evidence, or some of it, about

11   Kite's willful infringement.  First of all, there is no

12   question about infringement.

13           Let me just stop there.  Because many patent cases,

14   most of us think about, huh, does the defendant infringe or

15   not?  If the defendant infringes, they are using the

16   technology.  But this is a case where there is a stipulation,

17   that means an agreement between the parties.  That's what the

18   word stipulation means:  The parties stipulate that

19   defendant's YESCARTA therapy meets each limitation of the

20   asserted claims, and that's legal language to mean that they

21   infringe.  So one focus of the evidence is less on whether

22   there is or isn't infringement, because of the agreement or

23   stipulation, it's going to be on willful infringement.

24           Dr. Sadelain back in 2002, when they found success

25   in the laboratories, they published their work.  This is a

1    common occurrence when there are advances of any kind, great

2    or more modest.  He published the paper, and that became the

3    basis for their patent application in 2003.

4         Then there is a Dr. Rosenberg.  Now, Dr. Rosenberg

5    became a collaborator with the Defendant Kite Pharma.

6    Dr. Rosenberg is a well-known scientist, and he contacts --

7    he calls Dr. Sadelain after this e-mail and says, Boy, I

8    really want to know more about the work that you're doing.

9    And Dr. Sadelain says, Okay, I'll tell you about my paper,

10   you can go there.  He's not giving him permission to use the

11   technology.  He's not saying, when we get a patent, you can

12   use it freely.  He's not saying that at all.  He's just

13   saying to another scientist who he believes just wants to

14   read about it.  And a lot of times a scientist will learn

15   about something new and then try to find a better way, a

16   different way to do the same thing.

17        So there is that sharing, but there is no license.

18   There's no actual permission or implied permission.

19        So some years later, now it's 2019, Dr. Rosenberg

20   and his colleagues, it appears, read the paper, and then

21   Dr. Rosenberg is now publishing his own paper.  And these

22   technical words here are referring to exactly what

23   Dr. Sadelain described in his paper and what later became the

24   '190 patent.  And how do we know that?  It's there in

25   writing.  This is just a common way of scientific citation

1    that refers to footnote 41, you go to the paper, footnote 41

2    is a citation to the Sadelain paper, describing that patented

3    CAR.

4            So 2002 paper, patent application filed in 2003, and

5    then some years later, by 2017, Kite comes out with YESCARTA.

6    And as you can see from the graphics at the bottom, that

7    three-part CAR with a lot of the details that you will hear

8    about in the case, that are Sadelain, Dr. Sadelain's

9    invention, are basically that three-part CAR that is the Kite

10   infringing product.

11           And again, this is the graphic where we're showing

12   that Dr. Sadelain's CAR causes immune cells to kill, and the

13   important point is and multiply as a living drug.

14           I introduce you to Dr. Dash.  Her -- she has a large

15   responsibility at Sloan Kettering as the senior director of

16   technology management.  And people will come to her, as they

17   did here, and say, Boy, we want to learn more about

18   Dr. Sadelain's work and his patent.  And Kite, in 2013, tried

19   to license Sadelain's patent and no license or permission was

20   ever granted.

21           Along the way, Sloan Kettering obtained an exclusive

22   license to the Sadelain patent from Juno.  So what does a

23   company do, a responsible company do, if they think there is

24   an infringement problem?  They can obtain a license

25   permission, that's the road on the left, they can avoid

1    infringement, make a different kind of product, do things

2    differently.  So what happened here?  They didn't obtain a

3    license from Sloan Kettering.  They didn't change their

4    product.  They didn't change the product that now they have

5    to admit infringes.  And the evidence will show that the

6    management of Kite at the highest level said, We're going

7    down this one road to infringe.

8         Now, why would they do that?  They wanted to be

9    first to market.  Because if they could get their CAR first

10   to market, get it approved first, then they knew that they

11   could be, as their internal document here shows, entrenched

12   in treatment centers.  And they call it being first to market

13   or the first mover advantage.  There are a lot of reasons why

14   that's a great advantage.  Sometimes people take some

15   shortcuts getting there.  It's got to work, the drug, it's

16   got to be reasonably safe, but maybe it's not as safe as it

17   could be.

18        They were able, instead of changing the design,

19   avoiding infringement, or even getting a license, to be the

20   first to market.

21        The evidence will show that's a huge incentive to

22   infringe willfully.  And that's what happened.

23        So here is what Kite might say during the course of

24   this case.  And I'll reference some of the evidence.  They're

25   going to say, Well, we can't say we don't infringe.  Now, we

1   think the patent is invalid because of something called a

2   certificate of correction.

3         The patent office has an official correction

4   process.  This has been around a long time.  It's a formal,

5   established correction process.  There are a lot of details

6   in a patent, and you'll see the details of the string of

7   amino acids here, as well as many other details.  And

8   sometimes there are clerical errors that are made.  There was

9   a clerical error made here.

10         In 2017, when the patent application was still

11   pending before the patent office, Sloan Kettering filed a

12   correction document and said there was a mistake.  And you

13   can see the yellow highlighting.  They were pointing out to

14   the patent office what the mistake was.  All that yellow

15   highlighting in all the material respects, and I think there

16   is agreement here, refers to a difference in one amino acid.

17   And you actually heard what -- the following numbers:  It's a

18   string of amino acids that are identified by number.  And the

19   mistake was to say the invention is using 113 to 220.  And it

20   should have said 114 to 220.  And this is part of the

21   documentation put by Sloan Kettering into the patent office

22   to make that correction.

23         And then what happened, the patent office goes

24   through their procedures, and a certificate of correction was

25   issued in July 16, 2013.  Here is the original of that

1    certificate of correction.  And as you can see, Teresa Stanek

2    Rea, who held the highest position as the acting director of

3    the United States Patent and Trademark Office at the time,

4    signed off on the certificate of correction.  Both the

5    correction document earlier in 2007 and this document, the

6    certificate of correction, were public documents -- are

7    public documents.  And you may say, well, gee, how come you

8    needed that certificate of correction when the correction

9    document had been filed?

10            As sometimes happens, the error crept back in for a

11   variety of reasons.  And you will hear some details about

12   formatting and how the information was transmitted and

13   handled between the patent applicant and the patent office.

14            Now, the evidence will show that Kite cannot meet

15   its burden to prove invalidity of Dr. Sadelain's patent.

16   What they're basically arguing is this clerical error means

17   that Dr. Sadelain's invention and the patent are completely

18   invalid, no matter how well it works.

19            So there was an error that crept in along the way,

20   and the value of that invention to the researchers at Sloan

21   Kettering and all of their hard labor is to take away, to

22   kill the patent.  But it -- the patent is presumed valid and

23   the patent challenger can only invalidate the claims by clear

24   and convincing evidence.  And the certificate of correction

25   is presumed valid.  So that's a much -- it's a heavier burden

1      of proof in comparison to the normal civil case where it's

2      just the preponderance of evidence often for the plaintiff to

3      win.  Here, the burden of proof is on the defendant by this

4      clear and convincing standard.

5             Now, here's some dates.  And this helps illustrate

6      what was going on.  The 2007, there was the Sloan Kettering

7      public correction document.  In 2008, the patent issues and

8      the clerical error reappears.  And later, in March 2013, Kite

9      tries to license from Sloan Kettering the Sadelain patent.

10     Then in July 2013, the patent and trademark office, the PTO,

11     grants the certificate of correction.  And in September of

12     that same year later, Kite still tries to license the '190

13     patent.

14            So if someone before this official certificate of

15     correction said, oh, the patent's not very valuable, we don't

16     need it, then, well, why would you try and license it?  They

17     tried to license it, and then there's the certificate of

18     correction, and they still try to license it.  Eventually,

19     Sloan Kettering grants Juno an exclusive license.  There will

20     be evidence of this, there will be some dispute about the

21     exact date perhaps, no dispute of the fact that Juno gets the

22     exclusive license.  And then Kite begins its clinical trials

23     two years later, 2015.

24            So let's see what Kite was doing up to and including

25     the certificate of correction and afterwards.  Throughout

1    this entire period of time, Kite conducted no clinical

2    trials, both before it tried to license it the first time, at

3    the time of the certificate of correction, after it had tried

4    to license it the second time, and after a couple more years

5    when the certificate of correction is well-known to the

6    public.  It takes a few key strokes, if you know how to go to

7    the patent office website, to find this document.  And then

8    they begin their clinical trials for their product, knowing

9    full well that the sequence begins at 114, not 113.

10           And they don't interrupt their efforts to be first

11   to market, and then they get approval from the government and

12   introduce the product in 2017.

13           So they'll say, well, no defense to say we don't

14   infringe.  Let's say they're saying, well, maybe we don't

15   convince anyone that the certificate of correction is

16   invalid.  Well, then we have these new defenses, they are

17   together called enablement in written description.  And the

18   way to think about them is one aspect has to do with whether

19   the patent teaches a person of skill in the art enough to

20   make and use the invention without undo experimentation.

21   That's a legal jumbo.  But does it teach the invention?

22           And the evidence here will show that there wasn't

23   any problem by Dr. Rosenberg, he was working at NCI, the

24   National Cancer Institute, that he and his colleagues had any

25   undue experimentation.  There will be no evidence of that, or

1     very little evidence of that.  And remember, Dr. Rosenberg

2     got the information originally from Dr. Sadelain who said go

3     read my paper.  So Dr. Rosenberg we know copied the Sadelain

4     paper, the technology, he knew Sadelain's exact sequence.

5     We'll explain how he could know that from reading the paper,

6     and then later the patent.  And Kite used the exact Sadelain

7     sequence starting at 114.

8          Then if you don't believe that, we believe that

9     Kite's lawyers will try its point to something about a

10    clinical trial.  Juno, they call their trials by an inside

11    name in the sense that JCAR, so it's Juno CAR15.  So they'll

12    have JCAR15, JCAR16, JCAR17, different projects that they are

13    working on at the same time.

14         This particular trial was called the ROCKET trial.

15    It was to treat acute lymphoblastic leukemia, ALL, and these

16    patients, like many others, had no other options, only weeks

17    to live.  Now, in one success -- in one sense, for some of

18    the patients, it was good, because 50 percent of these

19    patients were cancer-free.  But five patients died.  And for

20    the folks at Juno, they don't have unlimited resources, they

21    said, let's put this on hold.  Let's see what is going on,

22    try to understand it.  Because they want to put safety first

23    in all of their projects.  And they had another project that

24    was called JCAR17.  And then they began to put their limited

25    resources into JCAR17.  But as you can tell, whether there

1    was this number of patients who passed away, and of course

2    that's unfortunate, it doesn't mean that Dr. Sadelain's CAR

3    construct is wrong and doesn't work.  ALL affects blood and

4    bone marrow, and it's very hard to treat in comparison to

5    lymphoma, which is what Kite is treating.

6            So Juno licensed these two key patents.  We've

7    talked about Sloan Kettering, which was for 15, and St. Jude

8    Children's Research Hospital, which they are using for their

9    17 project.  So then if there's no infringement defense, if

10   the patent is valid, the certificate of correction is not

11   invalid, if the enablement or written description defense

12   doesn't work, then they may say, oh, the Sadelain CAR is not

13   important because you're going to be able to ask -- to answer

14   what would be a reasonable royalty and damages, so they're

15   going to say it's not important.  Even though they are using

16   it, it's not important.

17           But YESCARTA is the living drug because of

18   Dr. Sadelain's CAR.  Yes, there are other things that go into

19   bringing a product to market, you've got to make it, you've

20   got to make it well, you've got to do other things to treat

21   the human body to accept it, you have to market it, you have

22   to talk to physicians to prescribe it.  But the key here is

23   the living drug invention.

24           Here are a whole bunch more different projects at

25   Kite.  This is part of their clinical CAR pipeline.  If Dr.

1    Sadelain's technology is unimportant, why do all of these

2    projects, 1 through 12 use exactly Dr. Sadelain's technology?

3    Exactly.

4            And there will be evidence about damages.  Damage

5    awards should fully and adequately compensate the patent

6    owner for infringement.  You will hear about something called

7    the reasonable hypothetical negotiation between the parties

8    and the details that will help guide you in determining the

9    amount of damages.

10           But I'll tell you an interesting fact.  Both sides

11   can have witnesses take the stand in this case or any other

12   case and say, well, damages claimed by the plaintiff are too

13   high or the damages that the defendant is trying to argue was

14   too low.  But use your common sense.

15           And I'll share with you one important fact.  What

16   happened was Kite got the market, they got bought by another

17   company, and that other company had to do some valuation of

18   the YESCARTA product.  Just focusing on the YESCARTA product

19   itself, not all the other projects I showed you or anything

20   else that Kite was doing.  The other company that's buying

21   Kite had their accountants and lawyers doing a valuation, and

22   they have to file something with what's called the United

23   States Securities and Exchange Commission, and it's got to be

24   truthful.

25           Here's what they said:  YESCARTA is worth -- their

1    language is odd, it's 6,200 million, the way we would say it

2    more naturally is 6.2 billion, for that one product alone.

3    Now, the sales are ramping up.  This would be the total value

4    as they estimate for the life of the patent.

5           In summary, you've heard about this extraordinary

6    drug, evidence about Kite's willful infringement, some things

7    Kite might try to tell you during the course of this trial,

8    that's their position in this case, and finally, about

9    damages.

10          You are a terrific jury.  Thank you again for your

11   attention.

12          THE COURT:  Thank you.  And let me see counsel

13   quickly at sidebar.

14          (At the bench.)

15          THE COURT:  So this is in reference to the

16   objections to certain of the slides you will be using.  The

17   Court is going to sustain all of plaintiffs' objections --

18   the Court will sustain all of plaintiffs' objections to slide

19   16, 17, 18 through 24.  Overrule as to slide number 40.  And

20   then in reference to Dr. Bot, sustain the objection as to

21   slide number 22 in opening statement.

22          MS. JEFFRIES:  You are going to rule later on Bot?

23          THE COURT:  Pardon?

24          MS. JEFFRIES:  Will you rule later on the

25   evidentiary issues in Bot?

```
 1                    THE COURT:  Yes.

 2                    (In open court:)

 3                    THE COURT:  I need counsel at sidebar.

 4                    (At the bench.)

 5                    THE COURT:  Objection sustained as -- do you need

 6       anyone else?

 7                    MR. DANE:  No.

 8                    THE COURT:  Objection sustained as to slide 16, 17,

 9       18 through 24.  40 can be used.

10                    MR. DANE:  What was the other?  Is that --

11                    THE COURT:  Bot, slide number 22, in opening

12       statement.

13                    MS. JEFFRIES:  That's encompassed within 18 to 24.

14                    MR. DANE:  Your Honor, we need some time to set up

15       anyway.  They revised some of their slides based on the

16       Court's --

17                    THE COURT:  A short recess.

18                    MR. DANE:  Yeah.  And you had mentioned concluding

19       today at 4:15.

20                    THE COURT:  We can go until we finish opening

21       statements.

22                    MR. DANE:  We can all the way through.

23                    THE COURT:  How much time do you need to set up?

24                    MR. DANE:  Probably 10 minutes.

25                    (In Open Court:)
```

1              THE COURT:  We are going to take a very short recess

2       just to allow counsel to set up, and then you are going to

3       hear opening statement from the defense.  So it's a 10-minute

4       recess.  Please come back to the courtroom a little bit

5       before 4:00.

6              THE CLERK:  All rise for the jury, please.

7              (Thereupon, the jury retired from the courtroom.)

8              THE COURT:  Get the jury.

9              THE CLERK:  Yes.  All rise for the jury, please.

10             (Thereupon, the jury returned to the courtroom.)

11             THE COURT:  We have our jury reassembled.  Counsel

12      are present with the parties.  And please have a seat.

13             Now we move to the defense opening statement by

14      Mr. Dane.  And just to remind the jury that statements by

15      Mr. Chu or Mr. Dane are not evidence in the case.

16             Go ahead.

17             MR. DANE:  Thank you, Your Honor.

18             Well, I want to join Mr. Chu in thanking you for

19      your jury service and being willing to sit during the holiday

20      season.  I know it's an imposition with the holidays coming

21      up so close.  So we all very, very much appreciate it because

22      it does help the system we work in work smoothly and well,

23      and I thank you for that.

24             I did want to introduce you to the lawyers at

25      counsel table previously.  Shannon Bales is the person who

1    will be working with our slides and making sure everything

2    technically hopefully goes as smoothly as it can.  I would

3    also like to introduce to you Christi Shaw, who is the CEO of

4    Kite, she's there in the gallery, and Brian Sander, who is

5    the head of legal at Kite, and he will be here every day in

6    the trial as we go forward.

7           So you don't need me to tell you that there are

8    always two sides to every story.  And that is certainly the

9    case here.  There are two sides to the story here.  You heard

10   all these things about how fabulous Dr. Sadelain's patent is,

11   how fabulous the technology is.  And you might be wondering,

12   great, where is the therapy that Juno is putting out on the

13   market?  Where is the therapy that they are treating patients

14   with that technology?  The answer is there is none.

15          What this is is this is a case about a competitor,

16   Juno, that has failed to be able to bring to patients and get

17   approval for a CAR-T therapy against Kite, which has

18   succeeded where it has failed.

19          Kite, as you know, has the product YESCARTA.  And

20   YESCARTA is an incredible cancer therapy.  It has brought

21   hope to terminal patients who had only a few months to live

22   and who had no other options.  And it's been on the market

23   since October 2017, and in that time thousands of patients

24   have been treated with YESCARTA who otherwise would no longer

25   be around.

1          Juno does not have a CAR-T therapy that is approved

2     by the FDA.  They don't have a CAR-T therapy that they have

3     gotten approved based upon this patent that you heard about

4     from Dr. Sadelain.  They tried, and you heard a little bit

5     about that.

6          They tried to make a therapy based upon that

7     technology.  And they had a study called the ROCKET study.

8     And you heard that five people died.  You didn't hear out of

9     how many people who were treated that was.  It was five out

10    of only 38 people.  And they all died of the same thing.

11    They all died of something called cerebral edema, which is a

12    swelling of the brain.

13         And it wasn't that Juno said, Hey, let's just do

14    something else.  They were shut down by the FDA.  They were

15    put on a clinical hold and told by the FDA we will not allow

16    you to continue clinical studies unless you completely

17    revamped your whole program.

18         And only at that point did Juno decide, okay, we are

19    going to switch to something else.  And at that point they

20    abandoned their development of this supposedly fabulous

21    technology from Dr. Sadelain.  So the whole notion that

22    you've heard that this patent is a silver bullet that enables

23    people to come out with successful CAR-T therapy is simply

24    not true.  They had this property, they had this patented

25    technology, and they couldn't make it work.

1          And the product of therapy they are now trying to

2      bring to market, the therapy they are trying to get FDA

3      approval for, guess what?  It doesn't use this wonderful

4      Sadelain technology that they are talking about.  It uses a

5      completely different technology.  Because they couldn't make

6      that other technology work.

7          So instead of taking this patent that you heard so

8      much about and using it in some way to actually cure blood

9      cancer in patients, they decided to do, I guess, the next

10     best thing:  They decided to use it against their competitor

11     who had succeeded where they had failed, who had actually

12     been able to make a CAR-T therapy treating lymphoma for

13     terminal patients, therapy that has saved hundreds and

14     hundreds of lives.  And they don't like that.  So they sued

15     their competitor.

16         But they shouldn't be able to do that.  Because they

17     are trying to misuse this whole idea of a patent and to take

18     that what is supposed to be a limited period of rights, a

19     limited time when you have rights to the thing that you

20     actually invented, and expand that limited monopoly unfairly

21     against YESCARTA and against what Kite is doing.

22         So let me paint a picture for you to start out with

23     what cancer therapy for lymphoma looked like back in

24     September 2017 before YESCARTA came to market.  And I know

25     from the voir dire that many of you, many of us have had

1    experience through relatives and friends who have had cancer.

2    And for blood cancers, the first line of therapy was

3    chemotherapy.  And as many of you I know have experience

4    with, chemotherapy is debilitating.  It can make you

5    nauseous, you lose your hair, tired.  It's not a lot of fun.

6         If that didn't work, if the chemo didn't work, you

7    know what the second line of therapy was?  More chemotherapy,

8    high intensive chemotherapy, chemotherapy that was so

9    intensive with other chemicals that it was often accompanied

10   by a stem cell transplant where cells would be harvested from

11   the bone marrow of the patient and held so that after the

12   chemotherapy, which would just wipe out the patient's immune

13   system, those cells would then be reintroduced to try to make

14   sure the patient still had an immune system.

15        And if that didn't work, the alternative was -- it's

16   just called salvage therapy, which just means whatever else a

17   practitioner might try.  But the prognosis for these patients

18   that failed these first two lines of therapy was very poor,

19   6 percent with this salvage chemotherapy, and as Mr. Chu

20   mentioned, only 120 days or so when a patient has reached

21   this stage that typically they had left to live until

22   YESCARTA, until October 2017.

23        The clinical study that Kite did for YESCARTA, it's

24   called ZUMA-1, you see there is that 6 percent, that was what

25   was happening to these patients before, YESCARTA had

1    51 percent complete remission.  Complete remission is you are

2    eradicating all of the cancer cells.  All of the cancer cells

3    that can be detected are gone.  A difference between 6 and

4    51 percent.  It was an amazing and astounding breakthrough in

5    cancer therapy.

6            And there are hundreds and hundreds of patients

7    alive today because YESCARTA was brought to market by Gilead

8    in October 2017.  So let me now tell you a little bit about

9    how YESCARTA came to be.  And that is the story of Kite.

10           So Kite was founded by a man that you will hear

11   from, he's going to testify in this case, his name is Arie

12   Belldegrun, and he is a genitourinary oncologist.  It took me

13   a long time to be able to say that correctly.  He's a

14   surgeon.  He has been a surgeon for many, many years at UCLA,

15   just 20 miles or so west of here.  And he founded Kite.

16           Dr. Belldegrun has spent his entire lifetime trying

17   to develop new cancer therapies.  He was a cancer surgeon,

18   and he loved doing that, but there was a frustration in that.

19   Because as a cancer surgeon, there is a limited amount you

20   can do.  You can help your parents, which is great, but there

21   is limited capacity to how many patients you can treat.

22           What he wanted to do is he wanted to have more of an

23   impact on treating cancer in hundreds and thousands of

24   patients.  So he started up numerous companies that developed

25   innovative cancer therapies, an antibody against cancer.  He

1      founded another company that came up with the most popular

2      treatment for prostate cancer.  He is a member of the board

3      and a director of investment companies that look around for

4      promising biomedical opportunities and then invest in those

5      opportunities.

6              And he founded Kite because he, before anyone else

7      was thinking about trying to do this and actually invest the

8      money and bring a therapy to market, he thought about the

9      opportunities for this type of cell therapy, things like CAR

10     therapy that you've heard about.

11             And Dr. Belldegrun used to work years ago at the

12     National Cancer Institute.  And the National Cancer Institute

13     is a branch of the government, it's part of The National

14     Institute of Health, that is devoted to doing research and

15     trying to find and explore cancer therapies and get knowledge

16     about cancer.  And one of the towering figures at the

17     National Cancer Institute was a man named Steven Rosenberg.

18     And Dr. Belldegrun worked under Dr. Rosenberg at the NCI.

19             And Dr. Belldegrun knew that Dr. Rosenberg was

20     working in this area.  Dr. Rosenberg knew that Dr. Belldegrun

21     was thinking of trying to take this type of work that was

22     being done on a small scale at the government at the NCI and

23     was interested in expanding it, bringing it, possibilities of

24     being commercial therapy, possibly being able to do wide

25     scale clinical trials.

1           And the two of them decided, let's collaborate,

2     let's work together.  So the NCI and Kite entered into a

3     collaboration to try to develop a CAR therapy.  And

4     Dr. Rosenberg shared with Dr. Belldegrun this CAR that he had

5     been working on.

6           And you heard -- you heard from plaintiffs that this

7     was something that Dr. Rosenberg copied from Dr. Sadelain.

8     That's not -- that's not true.  First of all, what you didn't

9     hear, this is important, is you didn't hear any suggestion --

10    you saw that e-mail.  Dr. Rosenberg's talking to

11    Dr. Sadelain, and he is saying, Oh, do you have any ideas for

12    how to do this?  You didn't see in that e-mail any mention of

13    a patent, and you are not going to hear any mention about

14    there being a patent during that conversation.  Because

15    Dr. Sadelain had no patent at that time.  The '190 patent did

16    not issue until 2008.

17          What Dr. Sadelain has said, he told Dr. Rosenberg

18    was not, Oh, I have a patent, or, I'm trying to get a patent;

19    what he said was, he just told Dr. Rosenberg, Oh, if you want

20    to learn about the work I'm doing on my CARs, I wrote a

21    paper.  And he directed him to a publication, something that

22    was available to anybody in the library, any scientist.  It

23    was five years old.  It was from 2002.  And he said, look at

24    2002, and here is where I describe a CAR that I had worked

25    on.

1          And it is not true that Dr. Rosenberg's CAR is the

2     CAR that is described in that publication.  These CARs,

3     you've heard them described as three-part CARs with this zeta

4     chain, all that difficult-to-pronounce wording, the primary

5     signaling region, the costimulatory signaling region, the

6     CD28, and the binding element.  Well, the binding element he

7     used was different.  He changed one of the three main parts

8     of the CAR that he made, and it's not the one that is

9     described in the specification.  He made his own.

10          So Dr. Rosenberg developed his CAR.  And he came to

11     Kite.  Kite entered into a collaboration with him.  And Kite

12     and Dr. Rosenberg started to then work to try to take the

13     small-scale work that Dr. Rosenberg had done -- he had done

14     some clinical testing.  He got some of the very, very first

15     amazing results in actual patients, the first patients to be

16     injected with this CAR and to suddenly see that this

17     reengineered T-cell, you take the natural T-cell out of a

18     patient's body, you infuse it with this CAR, this chimeric

19     antigen receptor, which is sort of weaponized to go out and

20     detect and latch onto and kill the cancer, and he found

21     amazing results but in small numbers.

22          So Kite saw the promise of this technology, and they

23     expanded.  They went from a small company, they hired more

24     and more people.  And they hired some of the most prominent

25     people in this very young area of CAR-T therapy.  And you

1   will hear some of them.  They will testify as witnesses

2   during this trial.

3          One of them is Adrian Bot.  And Adrian Bot was one

4   of the very first employees at Kite.  He was their chief

5   scientific officer.  And Dr. Bot helped to design and develop

6   clinical studies.  Because one of the things that Kite was

7   able to do when you go from the government with working in

8   small facilities, when they are doing testing, they are doing

9   testing of patients, they tend to do it in one limited

10  physical location.

11         So this is a very unusual therapy.  And it's not a

12  pill, as you've heard.  You actually have to take a patient's

13  blood, you have to grow the blood, you have to infuse these

14  CARs into the T-cell to reengineer them, and then you have to

15  reinject it into the patient's bloodstream.  Well, that is

16  easier to do if you are doing it in a single clinic.

17         But if you want to do a large scale clinical study,

18  you have to be able to do it in greater volumes.  You have to

19  be able to think about how to transport the T-cells.  You

20  have to think about how to take the blood out of the

21  patients' veins, manufacture the T-cells, and get it back

22  quickly, because these are people that only have a few months

23  to live, and they desperately need to get this therapy as

24  quickly as they can.  And all of these challenges were ones

25  that Kite worked on together with NCI.

1          So Kite expanded.  And in addition to Dr. Bot,

2    another witness that you will hear from in this trial is

3    Dr. Margo Roberts.  And Dr. Margo Roberts is one of the

4    pioneers in this area of CAR-T therapy.  You heard that

5    plaintiffs' counsel acknowledged, and this is an important

6    thing to understand, Dr. Sadelain did not invent the

7    three-part CAR.  Not the first person to do it.  Dr. Roberts

8    did it before.  And you will hear Dr. Roberts testify about

9    the work that she had done.  And she has a patent on

10   three-part CARs that is an earlier patent than the one that

11   Dr. Sadelain got.

12         So Kite collaborated with NCI, expanded, hired

13   brilliant people in this field, figured out how to make this

14   therapy work, figured out how to manufacture these T-cells,

15   which is one of the most challenging things to do.  There is

16   a whole manufacturing process.  Because it is dealing with

17   living cells and needing to figure out how to get the CAR

18   into the natural T-cells, how to expand the T-cells, how to

19   make sure that the patient's body is receptive to those

20   T-cells and that when they are reinjected there are enough of

21   them and they can expand and they can kill the cancer.  And

22   all of these challenges Kite overcame.

23         And Kite began conducting clinical trials of its

24   own, large-scale clinical trials in 2015.  And in 2017, it

25   received FDA approval for its product, became the first type

1    of therapy of this kind to be available for this type of

2    lymphoma.  That was a fabulous advance in healthcare.

3                So what are we doing here?  Well, at a certain

4    point, Dr. Sadelain did get a patent on work that he had

5    done.  He received the '190 patent in 2008, near the end of

6    2008, November.  Now, this is after NCI started working on

7    developing their CAR.

8                And you've heard that patent rights are like

9    property rights.  You saw that in the video.  Patent is very

10   much like a deed of property.  It defines the exact scope of

11   the inventor's invention.  What's within the fence, what's

12   within the boundaries is covered by the patent, and what's

13   outside the boundaries is not covered by the patent.  And

14   that's an important public notice purpose of a patent, is

15   that it's supposed to give notice to the members of the

16   public of exactly what the inventors claim to own for some

17   limited period of time, and exactly what they don't.  That's

18   equally important.  Anything that falls outside of the patent

19   is free for other people to do.

20               So in order to get a patent, an applicant enters

21   into a bargain with the government and promises to disclose

22   to the public exactly what it has invented and exactly what

23   falls within the boundaries of the patent.  And you saw that

24   in the video.  That's the exchange.  The government offers

25   this time-limited period of exclusivity for the

1     properly-defined invention of the patentee in exchange for a

2     very clear and specific description of what that is.

3            Now, what we will show in this case is that Sloan

4     Kettering did not live up to that part of the bargain.  It

5     did not disclose the boundaries of its patent in the way that

6     it was supposed to, clearly and exactly, so that those who

7     would read the patent understood exactly what was included

8     and what was outside of it.  And it also claimed more than it

9     had actually invented and tried to monopolize future

10    inventions that other people would come up with, things that

11    it had not done.  And it's not entitled to do that.

12           You can only claim what you invented.  You can't

13    claim to own things that are invented later.

14           Because Sloan Kettering claimed more -- is claiming

15    here more than they properly claimed in the '190 patent, Kite

16    doesn't infringe that patent.  And because they claimed more

17    than they had actually invented, the claims of their patent

18    are invalid.  For both of those reasons, we shouldn't be

19    here, and YESCARTA doesn't owe anything to the '190 patent.

20           Now, let me explain to you why that is.  Now, you've

21    already heard that the '190 invention relates to something

22    called a CAR.  And a CAR, this chimeric antigen receptor,

23    it's a protein.  It's often called a fusion protein.  What

24    that means it's not a natural protein, it's pieces of

25    different proteins that are fused together.  And as you can

1    see, the thing that looks like a bunch of multi-colored

2    pasta, that's a depiction of the structure of a protein.

3            Proteins are made up of amino acids.  And amino

4    acids are encoded by our cell machinery, by DNA.  So those

5    colored letters, the CGTA you see, that's all DNA.  And

6    underneath that, the three-letter abbreviations are

7    abbreviations for amino acids.

8            Well, you didn't hear very much about the claims of

9    this patent in the plaintiffs' presentation.  But let me show

10   you what these claims actually talk about.  They talk about

11   DNA.  You see that in the very first sentence after the

12   invention claimed is, it refers to a nucleic acid polymer

13   encoding, and it goes on and describes what it's encoding.

14   That's DNA.  So this is a patent that is all about DNA.  And

15   it has three parts.  It has this zeta chain part, it has the

16   costimulatory signaling region part, and it has the binding

17   element.  Those are the three main parts that are described

18   in the claim.

19           And as I said, Sloan Kettering did not live up to

20   its end of the bargain when it submitted this patent and

21   sought to get the patent from the patent office.  It didn't

22   do that with regard to two of the three parts in this claim.

23           And as I've thought about this case and thought

24   about how to describe the problems with this patent, um, it's

25   always come back and reminded me of the story of *Goldilocks*

1    *and the Three Bears*.  And we all know the story, and we know

2    that in that story, Goldilocks goes into the three bears'

3    house, and first she tries to eat the porridge, and some of

4    the porridge is too hot, and some of the porridge is too

5    cold, and some of the porridge is just right, and then she

6    goes on to the chairs.  And one of the chairs that she sits

7    in is too small, too tight, one of them is too big, and then

8    one of them fits right.  Well, the three components of this

9    patent are sort of like that in terms of their description of

10   the DNA that makes up this invention.

11        And I'll talk about that, and I'm going to go in

12   reverse order of the Goldilocks story, because the one that

13   fits just right is not really all that interesting or

14   relevant to this case.  But that's the primary signaling

15   domain, the zeta chain portion that you heard about.  Well,

16   the patent for that portion of the claim, it discloses what

17   it's supposed to disclose.  I said the patent is supposed to

18   disclose the boundaries.  It's supposed to exactly describe

19   through someone of skill in the art what the invention

20   covers.  And the patent does that for this portion.  There is

21   no argument about that.

22        At the top there, that's the DNA.  The patent

23   identifies this is the DNA that encodes for that part of the

24   protein.  And underneath that is the amino acid sequence.  So

25   that tells you, okay, these are the amino acids that make up

1    this protein.  That's telling scientists, telling people of

2    skill in the art, we made a DNA invention, this is the DNA.

3           They did that right there.  But there are problems

4    with the other two parts.  And let me start with the part

5    that's too small, that was too small to cover what's in

6    YESCARTA.

7           Now, as I mentioned earlier, Dr. Sadelain did not

8    invent a CAR that has these three parts.  And plaintiffs'

9    counsel admitted that.

10          There were other CARs that had been made before

11   Dr. Sadelain's invention that had a primary signaling domain,

12   a costimulatory domain, and a binding element.  So to show

13   that his CAR was something new, something different, because

14   you can only get a patent if you've done something new and

15   different from what other people have done before, what he

16   focused on was that costimulatory domain, that middle part.

17   And for that, the patent disclosed a very, very specific

18   amino acid sequence.  There were other CARs that not only had

19   primary signaling domain, binding domain, costimulatory

20   domain, but they use the same protein for the costimulatory

21   domain, the CD28.  So to show that he did something new,

22   Dr. Sadelain specified, okay, I'm not just using CD28

23   generally, I'm using exactly these amino acids in CD28.

24          And the patent includes sequences for the CD28

25   portion that define the amino acids and the nucleotides in

1       the same way that they do for the primary signaling domain.

2       The very first amino acid in the costimulatory domain amino

3       acid sequence is an amino acid called lysine.  You heard

4       plaintiffs' counsel talk about the 114 to 220 versus the 113

5       to 220.

6              The patent, as it was submitted to the patent office

7       and as it was issued, required that this costimulatory

8       signaling sequence had to have amino acids 113 to 220.  It

9       had to start with lysine.  There is no question about that.

10      The Court has determined the meaning of that original patent

11      and has determined that that original patent, when it uses

12      that phrase, the amino acid sequence encoded by Sequence ID

13      NO:6, that that means amino acids 113 to 220.

14             And why is that important?  It is important because

15      Dr. Rosenberg's CAR did not use that amino acid sequence.

16      There is no question about that.  His amino acid sequence did

17      not begin with that lysine, which means that when the patent

18      issued, Dr. Rosenberg's CAR was not covered by it.  It fell

19      outside of the fence.  It was outside of the property that

20      was covered by the patent.  There is zero dispute about that

21      in this case.

22             Not withstanding what you will hear plaintiffs say,

23      when they say there is -- there is no question about

24      infringement, there absolutely is a question about

25      infringement in this case.  Because what --

1           MR. CHU:  Objection, Your Honor.

2           THE COURT:  Objection is overruled.

3           MR. DANE:  There absolutely is a question about

4    infringement in this case, because the originally-issued

5    patent did not cover what Dr. Rosenberg had done.  It did not

6    cover it in 2008, it did not cover it in 2009, it did not

7    cover it in 2010, it did not cover it in 2011 or 2012.  No

8    question about that.

9           It did not cover it when Kite entered into its

10   collaboration with NCI.  The sequences were different.  We

11   fell outside of the scope of their property.

12          So what happened?  Well, after Kite had entered into

13   this collaboration with NCI in 2012, after the parties were

14   working on developing this therapy, Sloan Kettering went back

15   to the patent office and filed this certificate of

16   correction, which they make it sound like it's no big deal.

17   It was a huge deal.  It broadened the scope of their

18   property.  We went from being outside of the fence to being

19   within the fence because they changed their patent.  Why did

20   they change their patent?  Well, you will hear from the

21   person who is responsible for that.

22          There was a scientist who worked for an investment

23   company that was interested in investing in Sloan Kettering's

24   intellectual property.  And when you do that, when you're

25   thinking about investing, you do your due diligence, and you

1    want to kick the tires a little bit and see, well, you know,

2    are their patents really worth something?  Is this worth an

3    investment?

4            You know what happened?  Well, because he was doing

5    this due diligence, he had access to confidential Sloan

6    Kettering information that the public would never have access

7    to.  So he contacted Dr. Sadelain and he said, I'm looking at

8    your patent.  I just want to -- you know, I want to make sure

9    your patent covers what you're telling me you're doing.

10   Could you send me the nucleotide sequence for your patent,

11   for your -- for the thing you're working on in the lab?

12           So Dr. Sadelain sent that.  And this Dr. Schuetz, he

13   looked at it, he said, Wait a second, you didn't patent this.

14   This isn't covered by your patent.  And then the next day,

15   Sloan Kettering files this document with the patent office.

16   Oh, error on the patent, change it.  We made a clerical

17   error, this is wrong, and we really meant amino acid sequence

18   114 to 220.  You know how long this was after the patent

19   issued?  Four and a half years.  Four and a half years.

20           Public notice is critical to a patent.  And when a

21   patent has been issued for years, the public is entitled to

22   rely on what the patent says.  And so the only circumstances

23   in which a patentee can broaden the scope of its patent years

24   after it has been out there in the public, years after the

25   public could look at it and say, okay, this falls within the

1        fence, this is outside the fence, so this is something that

2        people can do, the only time that that is permissible is if

3        the patent contains an error that is clearly evident to

4        someone skilled in the art.  That's like a typo, misspelling,

5        something like that.

6                And you will hear evidence in this case this was not

7        that type of an error.  This was simply a difference in what

8        was the first amino acid.

9                And Mr. Chu said, Well, it just doesn't matter, or

10       it's only one amino acid.  It's only one amino acid, but make

11       no mistake about this under the law, patent infringement is

12       not like horseshoes or hand grenades.  They are asserting

13       literal infringement against Kite.  There is only

14       infringement if Kite does everything that the patent

15       requires.  And if Kite does not, Kite does not infringe.

16               And we will introduce evidence to show you that this

17       supposed error that they corrected with their certificate of

18       correction was not this type of obvious misspelling or typo

19       or something like that that someone of skill in the art would

20       look at and readily understand.  We have evidence of what

21       Kite did in 2012.

22               In 2012, Kite's chief scientific officer, Dr. Adrian

23       Bot, learned about the '190 patent, and he compared it to --

24               MR. CHU:  Objection, Your Honor.  This was subject

25       of a Court ruling.

1           THE COURT:  Yeah, it's sustained.

2           MR. DANE:  We will have an expert, Dr. Junghans, who

3    will testify that the error was not something that will be

4    clearly evident to one skilled in the art.  And Dr. Junghans,

5    years before he ever knew Kite, years before he was ever

6    involved in this lawsuit, he had read the publication, that

7    publication that Dr. Sadelain told, said he told

8    Dr. Rosenberg about, and that was the basis for the ultimate

9    patent filing.  And that described the DNA sequence that you

10   would use to make these CARs.

11          And Dr. Junghans looked at it, and he wanted to work

12   on experimenting and making a CAR, so he made one using that

13   sequence for that costimulatory region.  And guess what the

14   first amino acid was in it?  It was lysine.  It was amino

15   acid 113.  He didn't think it was obvious that there was some

16   mistake there.  He didn't think that you should start with

17   something different.  He read it as it read in the

18   publication and as it read in the issued patent.

19          And so we will introduce evidence to you that this

20   is not a situation where Sloan Kettering should have been

21   able to expand their patent years after it had issued.  And

22   the consequence of that is the patent should read as it

23   originally read, meaning amino acids 113 to 220 are required

24   to practice the patent.  And there is no dispute that if that

25   is how the patent is read, if you agree with us that the

1    certificate of correction is invalid, there is no

2    infringement.

3           So for the plaintiffs to say that infringement is

4    not in dispute here or it is conceded, that is absolutely

5    100 percent wrong.  It is absolutely conceded.  Because our

6    position is they should not have been able to expand their

7    patent.  And if they couldn't expand their patent, there is

8    no question that we don't infringe because the CAR construct

9    does not contain this lysine that is required by the patent

10   as issued.

11          So okay.  So that is the -- that is the way that the

12   description and the patent is too narrow to cover what

13   YESCARTA does.  Let me tell you about the other part, which

14   is the way in which it's too broad.

15          Now, the component about which the patent is too

16   broad is the third part.  It's the binding element.  And the

17   binding element is really critical.  Because these CARs, they

18   have to latch on to the cancer cells and kill it.  And the

19   thing that latches onto the cancer cells is the binding

20   element.  And you heard Mr. Chu say, Well, you know, binding

21   elements, scFv's, they have been around for a while and

22   people knew about them.  ScFv's have been around, but that's

23   not the point.  ScFv is a form of antibody.  Antibodies have

24   been around forever.  We make antibodies.  We make millions

25   of antibodies in our body.

1          The important point is you have to make an scFv,

2     this particular embedded form of antibody that you make in a

3     lab, and you have to make one that is able to attach to the

4     cancer target.  That is what you need to do to make these

5     CARs work.

6          And if the binding element doesn't bind to the

7     cancer, the CAR is not going to do anything.  It can't kill

8     the cancer.  So this is a critical part of the invention.

9          In the claims that have been asserted against us in

10     this case, there are two categories that are sort of the

11     same -- or two of them that have things in common.  Two of

12     them would claim CARs that would bind -- have binding

13     elements that would bind any target, any target.  A binding

14     element specifically interacts with a selected target.

15          And what does the patent tell us what that means?

16     Well, it means basically at least any cancer you might

17     possibly want to treat, they mention any target of clinical

18     interest, including prostate cancer, breast cancer,

19     neuroblastomas, melanomas, small cell lung carcinomas,

20     sarcomas, brain tumors, anything in the world.  But if you

21     heard what Mr. Chu said, even today -- this is a patent that

22     issued in 2008.  It was filed in 2003.  We are here 16 years

23     later?

24          There aren't CARs that are treating all these

25     different cancers.  Solid tumor cancers are a different

1    category of cancers than the blood cancers that so far CARs

2    have been successful with.  Solid tumor cancers are very

3    difficult.  But this patent says, you know what?  We invented

4    something that works with all these different cancers.

5            Did they invent that?  Does the patent describe

6    that?  No.  The patent describes CARs that target two types

7    of cancers:  One is blood cells, one is the CD19, and the

8    other is one that targets a prostate cancer target.  That is

9    it, two.

10           So they disclose CARs that only treat two targets,

11   but they write this claim that says we invented it all.

12   Can't do that.  It's not part of the bargain.  The bargain

13   is, if you want to claim it all, you have to have invented it

14   all.  They didn't invent it all.

15           And in patent-speak, there is this notion -- I

16   talked about *Goldilocks and the Three Bears* before, that's

17   probably taking you back to grade school, and now I'll go

18   back to high school biology.  If you remember studying the

19   animal kingdom, they have all those classifications, and they

20   have -- two of the classifications are genus and species.

21           And until I got to this case, I actually didn't know

22   this, I thought this was interesting:  There is a genus of

23   big cats called panthera, and it includes lions and tigers,

24   not bears, but lions and tigers, leopards.  And patent law

25   uses the same terminology.

1          And what it gets at is the idea that a genus can be

2     this broad category that includes a multitude of individual

3     species.  And you can do that.  You can claim that.  But if

4     you claim the genus, you have to have a basis for it.  You

5     have to have invented the genus.  You can't claim genus if

6     you only invent the species.  If some explorer went out and

7     found some new breed of lion, that doesn't mean that they

8     found some new type of leopard.

9          So the other claims of the patent are also very,

10    very broad.  The first ones are broad because they claim that

11    Sloan Kettering invented this CAR to basically address any

12    cancer target.  They hadn't.  They hadn't.

13         The other sets of claims at least are limited to the

14    target.  These are the ones that are limited to CD19 which

15    would be the blood cancer target.  But these are still

16    incredibly broad because they refer to a single-chain

17    antibody defines the CD19.  They are referring to any

18    single-chain antibody that binds to CD19.

19         So what do they describe in the patent about that?

20    They describe -- this is the full disclosure in the patent of

21    this CD19 scFv they used.  They describe one of them.  They

22    describe a single scFv.  And for this one scFv that they

23    describe, they don't describe it adequately.

24         Because we talked earlier about the fact that this

25    is a DNA patent.  So for the primary signaling domain, it

1    gives you the DNA.  We saw that.  We saw the DNA and the

2    amino acids.  For the costimulatory domain, the second part,

3    this DNA patent gives you the DNA.  It gives you the DNA

4    sequence, and it gives you the amino acid sequence that DNA

5    encodes.

6           Makes sense.  It's a DNA patent.  If you want to

7    describe your invention to people of skill in the art, tell

8    them what the DNA is.  Tell them what the amino acids are so

9    they know what the proteins are.

10          But you know what the patent discloses about the

11   scFv?  Nothing about the amino acids.  Nothing about the DNA.

12   It doesn't disclose that at all.

13          And that is an inadequate disclosure.  Because if

14   you invent something like this, if you invent some new

15   biological entity, if you invent something that is part of a

16   DNA patent, you have to tell people what it is.  You have to

17   tell people the DNA.  And they didn't do that.

18          Now, that would be bad enough if they only claimed a

19   CAR based on this one scFv that they used, the one that they

20   described in that one paragraph.  But again, that is not what

21   they said their invention was.  They went far beyond that.

22   They said it's any scFv that binds to CD19.

23          Well, as you will hear from our experts in this

24   case, the potential number of SCFVs that could be made that

25   could bind to CD19 is in the millions, if not billions.  And

1    in order to determine which of those actually would bind to

2    CD19, the only way that you can do it is you have to test.

3    You have to figure it out.  It's difficult.  It's

4    time-consuming.

5            They don't describe these CD19 scFv's.  They don't

6    tell you how to get all of them.  They don't tell you how to

7    make them.  And, again, you can't do that.  You can't claim

8    this genus.  You can't say, I invented all of this, when you

9    only made that.  And, in fact, for the only one you made, you

10   didn't tell people what it was.  At least if you are going to

11   make one species, tell people what it is.  Give them the

12   amino acid sequence.  They didn't do that.  So there, too,

13   they did not keep up their end of the bargain.

14           And the consequence of that -- this is not

15   technicality, this is not trivialities.  The consequence of

16   when you overclaim, when you want to say, I want to

17   monopolize to myself all this stuff that I didn't do, your

18   patent is invalid.  You can't do that.  And that is what they

19   did here.

20           So there are two ways in which these claims are

21   overbroad and don't adequately describe their invention and

22   don't teach people of skill in the art how to make the full

23   scope of their invention, which claims this broad genus.

24           They claim all of these cancer targets.  They only

25   made CAR-Ts that target two.  And they claim any scFv that

1    binds to CD19.  They only describe one.  And the one they

2    describe they don't even give the amino acids for it.  The

3    consequence of that is these claims are invalid as we will

4    show.

5         And you've heard a little bit, and this is true in

6    every patent case, patentee will say the patent office

7    already thought about these things.  The patent office,

8    that's their job.  They are these highly trained specialists.

9         Well, patent office are people.  And you heard in

10   that video there are 600,000 patent applications that are

11   filed every year.  There aren't 600,000 patent examiners, a

12   lot less.  They sometimes make mistakes.  And they sometimes

13   don't have time to get things right.  And they don't have

14   anybody who is pointing out to them that maybe what the

15   patentee is saying or what the patentee is claiming is not

16   right.

17        Nobody from Kite was there in the patent office.

18   It's a one-way conversation between someone who wants to get

19   a patent and the patent examiner.  That is precisely why,

20   when we get to a situation where someone asserts a patent

21   against somebody else, charges them with infringement, tries

22   to get large sums of money from them for infringement, that

23   you get to decide the validity of the patent, and that we get

24   the opportunity to present the evidence that the patent is

25   invalid.

1          Now, and this is as I was saying, as you heard in

2     the video, these are the reasons that it's entirely within

3     your responsibilities to consider the validity of the patent,

4     even though the patent was issued by the patent office.

5          Now, you also heard arguments or you heard

6     statements that the evidence would show that Kite is a

7     willful infringer, and I want to address that briefly.  Being

8     a willful infringer means you know that you are doing

9     something wrong and you do it anyway.

10          A classic example is you think of the person

11     selling, you know, knockoff Louis Vuitton handbags or

12     something on the street.  They know they are not supposed to

13     sell Louis Vuitton handbags.  That is not this situation at

14     all.

15          For the reasons that I've explained, Kite has very,

16     very good reasons for believing that it does not infringe

17     these claims.  The certificate of correction should not have

18     been issued, and the patent claims are overly broad for the

19     reasons I've explained.

20          And where there is good faith grounds for asserting

21     invalidity and noninfringement, that is not a situation where

22     a party should be found to be willfully infringing.  And

23     obviously, if you agree with us on those issues, we don't

24     infringe at all.

25          Now, you also heard that Kite should have gone down

1       a different path, Kite chose a path that was the path of

2       willfully infringing.  And that is also not true.  I want you

3       to think about the timing in this case going back to the

4       launch of YESCARTA in October 2017.

5              In October 2017, Kite had recently been acquired by

6       Gilead.  So Gilead was making the decision in October 2017,

7       once the FDA told it that YESCARTA was approved to be

8       administered to patients, they had a choice.  They had this

9       life-saving therapy for these patients who had only a few

10      months to live.  They could bring it on the market.  They

11      could immediately start saving lives.

12             Juno wasn't out saving lives.  Juno didn't have

13      therapy available.  Kite could bring that to market and save

14      lives and stand in its -- stand on the defenses that it had

15      and demonstrate that it wasn't infringing the claims of the

16      patents because those claims had been expanded when they

17      should not have been through the certificate of correction

18      and the claims of the patent were invalid as being overbroad.

19             That's not willingly going down a willful

20      infringement path.  And to put perspective on that, again,

21      over the two years that YESCARTA has been in the market,

22      nearly 2,000 patients have been treated.  These are patients

23      that had two or three months prognosis to live.  Many of

24      these patients are alive today because Kite and Gilead made

25      the decision to come out with YESCARTA in October 2017.

1           Now, I want to finish up.  I thank you so much for

2      your patience.  I know it's very late in the day, and I

3      apologize for keeping you here so long.  I know you want to

4      go home.  I just very, very briefly want to touch on some of

5      the evidence that you are going to hear in the case.  I'll

6      have an opportunity to speak before or after some of the

7      witnesses' testimony, but just so you understand the context

8      of some of this testimony.

9           An important thing also to understand here is what I

10     said at the outset.  There is so much that goes into a

11     successful CAR-T therapy.  The idea that it is simply whether

12     the costimulatory sequence that is used in a particular CAR

13     has those exact amino acids, that is not the magic bullet.

14     That is not what causes these therapies to work or not work.

15     And we absolutely know that because of the instance with the

16     ROCKET trial where Juno tried to make this therapy work and

17     couldn't and five out of 38 patients died.

18          So this patent is not any magic bullet.  There is

19     the manufacturing that needs to be done, figuring out how to

20     make these engineered T-cells, figuring out how to do it

21     safely, figuring out how to make enough of them that they can

22     expand in the patient's system when they are reinfused, to do

23     it safely, to did it quickly, to do it with a high degree of

24     reliability, so that you know that at a very, very high

25     percentage, you're going to be able to make those cells and

1    reintroduce them to the patient, because this is not an

2    instance where it's okay to only be able to make the cells

3    80 percent of the time, because that other 20 percent of the

4    time, you may lose the patient for good.

5         These are all incredibly important things, and we

6    will present testimony about what Kite did for all of these

7    important aspects of the CAR-T therapy to show that the idea

8    that this is all attributable to what the amino acid sequence

9    is of a particular CAR construct is just not -- is just not

10   correct.

11        And I would also want you to keep that in mind when

12   you hear the damages presentation that you will hear from the

13   plaintiffs, I want you to think to yourself about does this

14   sound like someone who is asking -- we don't practice their

15   patent for the reasons that I said.  But even in instances

16   where a party does practice a patent for this type of CAR-T,

17   there are standard royalties that people pay.  There are low

18   single-digit percentages.  And you're going to hear much

19   different figures in this case.

20        And again, when you hear that, I want you to ask

21   yourself about -- what is this case really about?  Is it

22   about a company looking to be fairly compensated for the

23   things it did, or is it a disgruntled competitor that could

24   not make a successful therapy, taking it out on a company

25   that succeeded where it failed?

1          Thank you very much for your patience.

2          THE COURT:  Thank you, Mr. Dane.

3          That concludes it for today, ladies and gentlemen.

4    Again, no discussion about the case during your absence.

5    We'll resume tomorrow at 8:30.  Arrive a little bit early so

6    we get started at 8:30.  Have a good evening.  Thank you.

7          THE CLERK:  All rise for the jury.  Ladies and

8    gentlemen of the jury, please leave your notebooks on your

9    seat.

10          (Thereupon, the jury retired from the courtroom.)

11          (Thereupon, the Court was in recess.)

12                *****     *****     *****

13

14   I certify that the foregoing is a correct transcript from the

15   record of proceedings in the above-titled matter.

16

17

18

19   ---------------------------

20

21   Amy C. Diaz, RPR, CRR          December 3, 2019

22   S/  Amy Diaz

23

24

25

# #

**#4455** [1] - 1:23

# '

**'190** [42] - 10:16, 11:22, 12:2, 12:11, 22:17, 22:25, 23:7, 23:10, 23:12, 23:15, 134:2, 134:5, 134:6, 134:7, 134:11, 134:14, 134:19, 135:19, 136:2, 137:21, 137:24, 138:1, 138:5, 138:7, 138:9, 139:8, 146:20, 147:11, 147:12, 147:23, 148:5, 158:16, 160:6, 162:24, 167:12, 181:15, 185:5, 186:15, 186:19, 186:21, 193:23
**'78** [1] - 44:7

# 0

**07639-SJO** [1] - 3:1

# 1

**1** [6] - 3:1, 10:9, 20:17, 27:18, 29:18, 171:2
**10** [13] - 18:16, 18:17, 28:10, 53:24, 89:18, 124:24, 124:25, 126:18, 126:19, 129:12, 129:15, 153:24, 173:24
**10-minute** [1] - 174:3
**100** [1] - 195:5
**10281** [1] - 2:12
**11** [3] - 28:13, 56:17, 134:5
**113** [13] - 12:8, 12:13, 12:20, 13:13, 13:19, 136:5, 165:19, 168:9, 190:4, 190:8, 190:13, 194:15, 194:23
**114** [5] - 165:20, 168:9, 169:7, 190:4, 192:18
**114-220** [1] - 136:7
**11:30** [2] - 122:6
**11:54** [1] - 4:2
**12** [5] - 28:14, 56:18, 81:12, 154:13, 171:2

**120** [1] - 178:20
**12:30** [2] - 122:7, 122:8
**13** [2] - 28:16, 112:5
**132** [1] - 12:3
**14** [4] - 28:17, 29:25, 71:25, 99:21
**15** [5] - 28:18, 99:15, 99:21, 170:7
**15-minute** [1] - 103:4
**16** [6] - 28:20, 49:6, 165:25, 172:19, 173:8, 196:22
**17** [4] - 28:21, 170:9, 172:19, 173:8
**18** [13] - 19:25, 26:24, 27:15, 28:22, 29:5, 34:21, 35:3, 43:16, 51:7, 112:15, 172:19, 173:9, 173:13
**1800** [1] - 2:6
**19** [1] - 88:3
**1971** [1] - 101:12
**1980s** [2] - 157:25, 158:2
**1984** [1] - 62:21
**1990s** [1] - 156:16
**1993** [1] - 55:25
**1:00** [1] - 113:9
**1:15** [4] - 113:10, 113:24, 114:21, 114:22
**1st** [1] - 1:23

# 2

**2** [2] - 27:21, 31:20
**2,000** [1] - 203:22
**20** [8] - 4:13, 54:12, 153:24, 154:1, 154:4, 154:15, 179:15, 205:3
**2002** [6] - 46:19, 157:6, 161:24, 163:4, 181:23, 181:24
**2003** [3] - 162:3, 163:4, 196:22
**2007** [2] - 166:5, 167:6
**2008** [6] - 167:7, 181:16, 185:5, 185:6, 191:6, 196:22
**2009** [2] - 12:1, 191:6
**2010** [1] - 191:7
**2011** [1] - 191:7
**2012** [7] - 10:17, 11:11, 12:1, 191:7, 191:13, 193:21, 193:22

**2013** [6] - 88:21, 125:7, 163:18, 165:25, 167:8, 167:10
**2015** [2] - 167:23, 184:24
**2017** [13] - 22:22, 163:5, 165:10, 168:12, 175:23, 177:24, 178:22, 179:8, 184:24, 203:4, 203:5, 203:6, 203:25
**2019** [3] - 1:15, 162:19, 206:21
**22** [3] - 125:1, 172:21, 173:11
**220** [15] - 12:3, 12:9, 12:13, 12:21, 13:13, 13:19, 136:5, 165:19, 165:20, 190:4, 190:5, 190:8, 190:13, 192:18, 194:23
**23** [4] - 125:6, 125:7, 125:11, 125:13
**24** [3] - 172:19, 173:9, 173:13
**250** [1] - 2:11
**26** [1] - 36:12
**27** [2] - 125:14, 125:17
**29** [2] - 55:24, 57:4
**2:00** [1] - 129:5
**2:17-CV-6496-SJO** [1] - 1:8
**2nd** [1] - 67:1

# 3

**3** [8] - 1:15, 27:23, 111:11, 115:18, 115:21, 116:18, 134:4, 206:21
**30** [7] - 77:24, 77:25, 96:8, 125:18, 125:19, 125:21, 126:2
**32** [3] - 75:13, 125:22, 125:23
**34** [2] - 58:24, 60:20
**350** [1] - 1:23
**355** [1] - 2:18
**35th** [1] - 2:18
**37** [1] - 36:2
**370,000** [1] - 125:2
**38** [2] - 176:10, 204:17

# 4

**4** [13] - 27:25, 66:25,

87:2, 88:19, 89:11, 92:10, 107:14, 115:10, 116:2, 116:3, 116:7, 128:12, 128:15
**40** [8] - 16:25, 17:3, 126:3, 126:7, 126:8, 154:16, 172:19, 173:9
**41** [7] - 16:25, 59:3, 126:3, 126:7, 126:8, 163:1
**42** [2] - 126:18, 126:19
**458** [1] - 18:10
**461** [1] - 18:10
**463** [1] - 124:21
**48** [4] - 126:10, 126:16, 126:18, 126:20
**49** [1] - 126:17
**4:00** [1] - 174:5
**4:15** [3] - 121:20, 122:8, 173:19
**4:30** [2] - 78:6, 78:12, 122:8

# 5

**5** [2] - 28:1, 134:4
**50** [2] - 154:16, 169:18
**50th** [1] - 2:9
**51** [2] - 179:1, 179:4
**555** [1] - 2:9
**5:30** [1] - 78:7

# 6

**6** [5] - 28:2, 126:22, 178:19, 178:24, 179:3
**6,200** [1] - 172:1
**6.1** [1] - 16:18
**6.2** [2] - 126:11, 172:2
**600,000** [2] - 201:10, 201:11
**6:30** [1] - 78:17

# 7

**7** [1] - 28:5

# 8

**8** [2] - 28:6, 49:6
**80** [1] - 205:3
**8:30** [7] - 121:21, 121:23, 122:6, 122:13, 206:5, 206:6

# 9

**9** [7] - 28:7, 99:15, 99:20, 124:24, 124:25, 129:15, 134:4
**900** [1] - 2:6
**90012** [1] - 1:23
**90067** [1] - 2:7
**90071** [2] - 2:9, 2:18

# A

**a-ha** [1] - 151:4
**abandoned** [1] - 176:20
**abbreviation** [1] - 156:17
**abbreviations** [2] - 187:6, 187:7
**ability** [14] - 40:20, 51:5, 72:15, 97:16, 97:19, 102:7, 102:19, 102:23, 108:4, 108:11, 108:13, 108:16, 111:6, 142:19
**able** [43] - 9:5, 9:9, 17:12, 18:18, 37:3, 39:19, 39:23, 40:1, 40:25, 43:18, 52:15, 57:4, 64:4, 76:23, 78:13, 102:11, 109:14, 110:22, 111:7, 122:19, 124:1, 124:3, 126:1, 149:19, 150:12, 156:21, 157:25, 164:18, 170:13, 175:16, 177:12, 177:16, 179:13, 180:24, 183:7, 183:18, 183:19, 194:21, 195:6, 196:3, 204:25, 205:2
**above-titled** [1] - 206:15
**absence** [3] - 103:6, 113:11, 206:4
**absolutely** [12] - 10:22, 12:10, 16:11, 43:3, 48:5, 97:20, 127:18, 190:24, 191:3, 195:4, 195:5, 204:15
**academic** [2] - 75:2, 75:11
**accent** [1] - 107:21
**accept** [5] - 25:11, 140:10, 143:16,

144:18, 170:21
**accepted** [1] - 46:17
**access** [2] - 192:5, 192:6
**accident** [1] - 42:3
**accidents** [2] - 35:19, 36:13
**accommodate** [6] - 8:18, 9:10, 9:11, 49:25, 50:2, 130:24
**accommodations** [1] - 46:3
**accompanied** [1] - 178:9
**accomplish** [5] - 43:14, 51:4, 57:2, 78:25, 114:20
**accomplished** [1] - 45:2
**account** [4] - 133:8, 133:11, 135:2, 142:19
**accountancy** [1] - 82:22
**accountant** [4] - 79:12, 79:24, 80:25, 82:20
**accountants** [1] - 171:21
**accounts** [1] - 119:22
**accuracy** [1] - 120:21
**achieved** [1] - 156:23
**acid** [21] - 136:3, 136:8, 165:16, 187:12, 188:24, 189:18, 190:2, 190:3, 190:12, 190:15, 190:16, 192:17, 193:8, 193:10, 194:14, 194:15, 199:4, 200:12, 205:8
**acids** [23] - 12:3, 12:8, 12:13, 13:13, 136:5, 136:7, 158:25, 165:7, 165:18, 187:3, 187:4, 187:7, 188:25, 189:23, 189:25, 190:8, 190:13, 194:23, 199:2, 199:8, 199:11, 201:2, 204:13
**acknowledged** [1] - 184:5
**acquired** [1] - 203:5
**acting** [1] - 166:2
**active** [1] - 29:16
**activities** [1] - 11:25
**activity** [1] - 81:16

**actual** [4] - 155:17, 158:19, 162:18, 182:15
**acute** [1] - 169:15
**added** [1] - 6:7
**addition** [4] - 134:12, 141:4, 147:17, 184:1
**additional** [19] - 27:5, 37:2, 43:21, 51:9, 51:12, 52:16, 58:11, 58:14, 69:5, 79:3, 83:9, 97:24, 118:9, 122:3, 122:16, 122:17, 123:15, 126:21, 139:23
**address** [5] - 5:5, 65:3, 104:18, 198:11, 202:7
**addressed** [3] - 16:4, 16:20, 126:13
**adequately** [3] - 171:5, 198:23, 200:21
**adjust** [1] - 28:23
**administered** [1] - 203:8
**administration** [2] - 101:6, 110:11
**Administration** [1] - 101:15
**administrators** [1] - 75:5
**admissions** [2] - 57:11, 58:5
**admit** [1] - 164:5
**admits** [3] - 16:10, 126:24, 127:4
**admitted** [9] - 141:11, 141:13, 142:1, 142:7, 142:9, 142:10, 142:11, 146:13, 189:9
**adopted** [2] - 16:13, 16:14
**adopting** [1] - 16:12
**Adrian** [4] - 105:13, 183:3, 193:22
**adult** [1] - 74:17
**Advair** [3] - 99:13, 99:14
**advance** [2] - 127:11, 185:2
**advances** [1] - 162:1
**advantage** [3] - 161:6, 164:13, 164:14
**advice** [3] - 52:16, 98:21, 98:23
**advise** [1] - 24:22
**advisor** [1] - 41:25
**advocate** [1] - 65:9

**affairs** [3] - 74:15, 75:1, 75:4
**affect** [1] - 135:1
**affects** [1] - 170:3
**afternoon** [4] - 7:20, 9:25, 113:25, 149:10
**afterwards** [1] - 167:25
**agency** [1] - 32:18
**agent** [2] - 52:23, 100:22
**agents** [1] - 62:17
**ages** [1] - 49:6
**ago** [17] - 29:25, 42:1, 46:18, 58:11, 71:23, 71:25, 80:11, 84:16, 88:3, 89:18, 96:9, 99:19, 100:18, 101:9, 111:19, 154:25, 180:11
**agree** [11] - 3:15, 25:21, 43:9, 111:5, 111:22, 112:9, 129:23, 132:22, 194:25, 202:23
**agreed** [6] - 17:18, 20:7, 23:8, 134:8, 137:21, 140:9
**agreement** [6] - 114:12, 127:25, 160:4, 161:17, 161:22, 165:16
**ahead** [5] - 3:22, 84:14, 86:3, 103:12, 174:16
**aid** [1] - 41:25
**al** [2] - 1:5, 20:18
**Alan** [3] - 2:5, 3:7, 21:1
**Alexander** [2] - 28:16, 69:10
**Alhambra** [3] - 65:4, 65:18, 74:17
**alive** [4] - 25:25, 151:5, 179:7, 203:24
**ALL** [2] - 169:15, 170:3
**allegation** [2] - 25:8, 80:4
**allege** [1] - 23:4
**alleged** [5] - 23:3, 23:11, 129:13, 129:14, 137:25
**alleging** [1] - 22:25
**alliance** [1] - 156:2
**allow** [11] - 19:10, 20:6, 46:4, 112:9, 121:13, 122:2, 125:11, 126:14, 152:12, 174:2,

176:15
**allowed** [7] - 10:25, 120:13, 132:11, 138:25, 144:15, 148:7, 148:10
**almost** [3] - 50:13, 54:12, 94:22
**alone** [2] - 151:13, 172:2
**alternate** [2] - 32:8, 32:9
**alternative** [1] - 178:15
**amazed** [1] - 26:14
**amazing** [4] - 25:16, 179:4, 182:15, 182:21
**amendment** [1] - 5:10
**American** [1] - 94:10
**amino** [42] - 12:3, 12:8, 12:13, 13:13, 136:3, 136:5, 136:7, 158:25, 165:7, 165:16, 165:18, 187:3, 187:7, 188:24, 188:25, 189:18, 189:23, 189:25, 190:2, 190:3, 190:8, 190:12, 190:13, 190:15, 190:16, 192:17, 193:8, 193:10, 194:14, 194:23, 199:2, 199:4, 199:8, 199:11, 200:12, 201:2, 204:13, 205:8
**Amoroso** [1] - 105:12
**amount** [6] - 26:4, 139:13, 139:23, 146:22, 171:9, 179:19
**Amy** [2] - 206:21, 206:22
**AMY** [1] - 1:22
**analysis** [4] - 10:6, 14:21, 14:24, 80:5
**analyze** [2] - 50:25, 80:3
**ancheta** [2] - 31:20, 45:20
**Ancheta** [2] - 27:21, 31:21
**Andrea** [3] - 2:8, 3:8, 21:1
**Andrew** [1] - 105:14
**anesthesia** [1] - 51:22
**Angeles** [9] - 1:14, 1:23, 2:7, 2:9, 2:18, 35:12, 56:6, 69:11,

72:20
**animal** [1] - 197:19
**animation** [1] - 159:7
**announced** [1] - 155:1
**answer** [3] - 144:6, 170:13, 175:14
**answered** [2] - 144:2, 144:3
**answering** [1] - 63:16
**antibodies** [3] - 195:23, 195:24, 195:25
**antibody** [7] - 158:22, 159:5, 179:25, 195:23, 196:2, 198:17, 198:18
**anticancer** [1] - 101:19
**antigen** [4] - 156:19, 159:11, 182:19, 186:22
**Antonius** [2] - 28:2, 44:3
**anyway** [2] - 173:15, 202:9
**apart** [4] - 54:17, 70:14, 81:24, 113:18, 114:7, 114:17
**apologize** [1] - 204:3
**app** [1] - 70:19
**appear** [1] - 9:21
**appearance** [2] - 3:3, 20:20
**APPEARANCES** [1] - 2:1
**apple** [1] - 55:7
**applicant** [3] - 138:18, 166:13, 185:20
**application** [15] - 5:10, 47:1, 47:5, 48:21, 70:24, 71:13, 100:4, 100:5, 119:5, 139:3, 155:14, 155:15, 162:3, 163:4, 165:10
**applications** [2] - 76:4, 201:10
**applied** [4] - 25:4, 59:24, 68:25
**applies** [12] - 35:21, 37:3, 93:21, 98:19, 106:16, 113:12, 118:17, 118:21, 119:9, 119:11, 133:14, 148:24
**apply** [12] - 27:13, 60:3, 84:8, 124:2, 132:9, 132:20, 136:10, 136:12,

136:13, 146:14, 155:8, 160:18
**applying** [1] - 160:13
**appointments** [1] - 67:21
**appreciate** [1] - 174:21
**approached** [1] - 119:16
**appropriate** [1] - 27:17
**approval** [4] - 168:11, 175:17, 177:3, 184:25
**approved** [4] - 164:10, 176:1, 176:3, 203:7
**Arcadia** [3] - 42:20, 52:22, 67:19
**area** [16] - 24:5, 35:17, 38:17, 41:9, 42:13, 42:21, 51:19, 53:3, 60:25, 61:16, 76:1, 95:13, 155:11, 180:20, 182:25, 184:4
**areas** [3] - 3:16, 50:11, 61:4
**arena** [1] - 98:17
**argue** [4] - 14:5, 15:3, 134:4, 171:13
**argued** [3] - 16:24, 17:10, 114:5
**argues** [1] - 134:13
**arguing** [2] - 15:4, 166:16
**argument** [14] - 4:20, 11:4, 11:7, 11:10, 13:1, 13:23, 14:3, 14:4, 14:5, 21:18, 123:15, 124:4, 146:4, 188:21
**argumentative** [1] - 125:16
**arguments** [7] - 11:2, 19:11, 140:15, 140:17, 148:25, 149:1, 202:5
**Arie** [3] - 105:3, 105:13, 179:11
**Arizona** [1] - 90:8
**arm** [2] - 89:8, 89:12
**arms** [1] - 153:8
**Army** [1] - 32:1
**arrive** [2] - 121:22, 206:5
**art** [9] - 14:21, 168:19, 188:19, 189:2, 193:4, 193:19, 194:4, 199:7, 200:22
**articulated** [1] - 125:4

**ASH** [1] - 7:7
**aside** [4] - 56:13, 97:16, 99:22, 111:23
**aspect** [3] - 42:7, 46:25, 168:18
**aspects** [2] - 56:9, 205:7
**assault** [1] - 32:3
**asserted** [16] - 23:10, 23:12, 134:6, 134:10, 134:13, 134:19, 134:21, 136:17, 137:23, 138:9, 138:10, 139:8, 147:12, 148:4, 161:20, 196:9
**asserting** [2] - 193:12, 202:20
**assertion** [1] - 125:8
**asserts** [1] - 201:20
**assess** [10] - 33:11, 33:19, 34:13, 35:6, 57:5, 69:15, 70:4, 74:1, 83:11, 83:19
**assessed** [1] - 135:10
**assessing** [5] - 34:12, 34:15, 34:18, 34:23, 112:6
**assessment** [1] - 35:7
**assessments** [1] - 100:17
**assigned** [1] - 58:6
**assignment** [2] - 5:10, 118:9
**assist** [4] - 5:7, 6:18, 27:12, 145:8
**assistant** [2] - 31:25, 74:19
**associate** [4] - 74:15, 75:1, 75:3, 75:20
**associate's** [1] - 66:16
**associated** [7] - 11:6, 24:6, 24:14, 24:18, 27:12, 95:19, 98:4
**associations** [2] - 111:12, 111:15
**assume** [1] - 62:12
**assuming** [4] - 12:22, 15:2, 59:10, 63:2
**assure** [1] - 50:13
**asthma** [3] - 99:12, 99:16, 99:17
**astounding** [1] - 179:4
**attach** [1] - 196:3
**attack** [8] - 25:4, 25:25, 150:12, 151:4, 151:15, 152:24, 153:3
**attacking** [3] - 150:15, 151:12, 153:5

**attacks** [2] - 150:21, 150:24
**attempts** [1] - 125:9
**attend** [3] - 104:17, 110:7, 110:12
**attended** [2] - 109:20, 111:20
**attention** [6] - 19:2, 113:19, 117:16, 130:23, 144:22, 172:11
**attitude** [1] - 86:12
**attorney** [2] - 47:3, 47:4
**Attorney** [11] - 2:4, 2:5, 2:5, 2:6, 2:8, 2:11, 2:15, 2:16, 2:16, 2:17, 2:17
**attorney's** [1] - 145:22
**Attorney's** [2] - 63:3, 81:7
**attorneys** [1] - 120:12, 140:23, 145:12, 148:25
**Attorneys** [1] - 80:22
**attributable** [1] - 205:8
**attributed** [1] - 16:18
**audience** [2] - 3:4, 20:21
**aunt** [8] - 67:11, 67:16, 89:21, 90:14, 91:17, 91:19, 91:20, 95:14
**aunts** [1] - 95:1
**autism** [1] - 68:19
**AV** [1] - 29:23
**available** [4] - 8:2, 181:22, 185:1, 203:13
**Avenue** [2] - 2:6, 2:18
**average** [3] - 154:6, 154:10, 154:12
**avoid** [3] - 127:11, 145:17, 163:25
**avoiding** [1] - 164:19
**award** [4] - 135:1, 139:14, 139:21, 139:23
**awarded** [3] - 134:23, 139:10, 139:17
**awards** [1] - 171:5
**aware** [2] - 45:6, 95:15
**Aya** [1] - 105:5

## B

**B-cells** [1] - 33:25
**bachelor's** [4] - 66:18, 68:25, 75:10, 82:22

**backbone** [4] - 158:10, 158:11, 158:13, 159:6
**background** [6] - 30:18, 32:22, 38:16, 42:24, 54:2, 71:11
**bacteria** [2] - 150:21, 151:5
**bacterial** [1] - 151:1
**bad** [12] - 47:15, 57:17, 62:2, 62:17, 100:24, 101:2, 106:19, 106:21, 151:5, 159:13, 199:18
**Baldwin** [1] - 65:11
**Bales** [1] - 174:25
**bank** [2] - 77:8, 89:8
**bargain** [6] - 185:21, 186:4, 187:20, 197:12, 200:13
**Barman** [1] - 116:2
**barman** [9] - 28:10, 58:20, 58:23, 100:9, 100:12, 115:9, 115:25, 116:7, 116:11
**Barr** [1] - 126:5
**Barrera** [4] - 28:17, 72:20, 89:16, 116:21
**base** [2] - 56:13, 137:13
**based** [25] - 22:15, 22:16, 22:21, 26:6, 31:13, 33:6, 37:20, 43:17, 45:14, 53:5, 56:14, 57:15, 57:21, 67:23, 68:6, 70:1, 97:17, 98:20, 111:24, 118:19, 121:3, 173:15, 176:3, 176:6, 199:19
**basic** [1] - 160:2
**basis** [9] - 45:25, 53:14, 61:11, 61:14, 77:18, 138:11, 162:3, 194:8, 198:4
**bathroom/restroom** [1] - 18:19
**battling** [1] - 89:22
**bay** [1] - 87:6
**beach** [1] - 64:11
**Beach** [3] - 58:23, 68:12, 100:18
**bear** [1] - 143:2
**bearing** [1] - 101:20
**Bears** [1] - 188:1
**bears** [2] - 197:16, 197:24
**bears'** [1] - 188:2

**beat** [1] - 89:19
**became** [9] - 10:20, 11:12, 43:10, 153:22, 156:11, 162:2, 162:5, 162:23, 184:25
**become** [5] - 54:9, 61:15, 67:13, 77:9, 131:15
**becomes** [1] - 113:18
**bed** [1] - 58:4
**beer** [1] - 160:17
**began** [2] - 169:24, 184:23
**begin** [8] - 146:6, 146:11, 152:24, 153:8, 153:11, 159:20, 168:8, 190:17
**beginning** [2] - 104:14, 128:16
**begins** [2] - 167:22, 168:9
**behalf** [4] - 3:5, 5:5, 20:22, 149:6
**behavior** [1] - 68:13
**behavioral** [1] - 68:25
**behaviors** [1] - 68:13
**behind** [2] - 33:24, 156:3
**belief** [1] - 137:9
**believability** [1] - 143:2
**believable** [1] - 143:19
**believes** [2] - 34:9, 162:13
**Belldegrun** [9] - 105:3, 105:13, 179:12, 179:16, 180:11, 180:18, 180:19, 180:20, 181:4
**belonged** [1] - 48:12
**Ben** [1] - 76:9
**bench** [11] - 105:25, 106:23, 107:7, 111:2, 116:4, 116:14, 116:22, 117:9, 146:2, 172:14, 173:4
**benefit** [2] - 29:13
**Benjamin** [1] - 28:20
**Bennett** [3] - 28:14, 68:12, 116:13
**best** [8] - 51:4, 68:2, 68:6, 72:15, 97:16, 97:19, 149:12, 177:10
**better** [11] - 17:8, 79:2, 86:10, 96:6, 99:17,

107:19, 153:17, 154:18, 154:19, 162:15
**between** [13] - 10:16, 59:21, 61:12, 62:3, 78:22, 100:22, 141:21, 160:5, 161:17, 166:13, 171:7, 179:3, 201:18
**beyond** [4] - 17:6, 59:23, 137:13, 199:21
**bias** [1] - 142:23
**big** [7] - 65:23, 74:6, 77:1, 101:11, 188:7, 191:16, 197:23
**biggest** [1] - 9:24
**bilingual** [1] - 107:25
**billion** [3] - 16:18, 126:11, 172:2
**billions** [2] - 154:24, 199:25
**bind** [5] - 196:6, 196:12, 196:13, 199:25, 200:1
**binding** [13] - 136:9, 182:6, 187:16, 189:12, 189:19, 195:16, 195:17, 195:19, 195:20, 196:6, 196:12, 196:13
**binds** [3] - 198:18, 199:22, 201:1
**biological** [1] - 199:15
**biology** [2] - 32:24, 197:18
**biomedical** [3] - 70:19, 70:24, 180:4
**biopharmaceutical** [1] - 22:21
**biotechnical** [1] - 22:15
**Bishop** [1] - 105:4
**bit** [32] - 17:21, 19:20, 26:18, 36:9, 44:14, 45:1, 45:6, 45:18, 54:7, 55:4, 63:19, 63:20, 73:5, 79:25, 93:7, 100:2, 114:18, 121:22, 122:7, 122:13, 150:20, 150:23, 155:5, 155:20, 157:9, 158:6, 174:4, 176:4, 179:8, 192:1, 201:5, 206:5
**bits** [1] - 156:21
**BLA** [1] - 17:17
**Blanca** [6] - 2:17, 3:9,

5:6, 21:6, 24:17, 131:9
**blog** [1] - 119:5
**blood** [24] - 22:23, 25:11, 25:15, 25:24, 64:1, 64:20, 150:13, 151:3, 151:8, 151:11, 152:3, 152:9, 152:10, 159:23, 161:3, 170:3, 177:8, 178:2, 183:13, 183:20, 197:1, 197:7, 198:15
**bloodstream** [1] - 183:15
**blue** [2] - 158:7, 158:23
**board** [1] - 180:2
**body** [14] - 152:13, 152:15, 152:18, 152:23, 153:8, 153:14, 159:15, 159:18, 159:21, 170:21, 182:18, 184:19, 195:25
**body's** [1] - 153:11
**bone** [4] - 88:20, 150:13, 170:4, 178:11
**bones** [1] - 92:11
**books** [1] - 142:2
**born** [2] - 100:16, 150:17
**Bot** [23] - 7:6, 8:14, 8:17, 8:20, 9:20, 10:1, 10:6, 10:9, 10:16, 10:24, 11:5, 11:11, 14:18, 105:13, 172:20, 172:22, 172:25, 173:11, 183:3, 183:5, 184:1, 193:23
**Bot's** [1] - 8:18
**bother** [1] - 66:11
**bottom** [6] - 26:25, 28:11, 89:15, 91:11, 118:11, 163:6
**bought** [1] - 171:16
**bounced** [1] - 36:16
**boundaries** [6] - 135:22, 185:12, 185:13, 185:23, 186:5, 188:18
**box** [3] - 29:6, 113:13, 129:21
**boxes** [1] - 29:1
**boy** [1] - 153:16
**Boy** [2] - 162:7, 163:17
**boys** [1] - 29:23

**brain** [4] - 87:3, 88:3, 176:12, 196:20
**branch** [1] - 180:13
**break** [8] - 18:19, 37:23, 103:1, 113:7, 121:12, 123:1, 123:2, 130:4
**breakthrough** [2] - 25:23, 179:4
**Breanna** [2] - 28:14, 68:12
**breast** [6] - 89:18, 90:3, 91:13, 91:15, 92:10, 196:18
**breed** [1] - 198:7
**Brentjens** [1] - 105:13
**Brian** [1] - 175:4
**brief** [4] - 18:24, 103:17, 129:8, 148:7
**briefly** [2] - 202:7, 204:4
**brilliant** [3] - 96:20, 111:14, 184:13
**bring** [14] - 57:6, 117:16, 130:6, 130:20, 130:21, 130:23, 149:19, 153:9, 156:5, 175:16, 177:2, 180:8, 203:10, 203:13
**bringing** [2] - 170:19, 180:23
**Bristol** [2] - 95:21, 98:2
**Bristol-Myers** [2] - 95:21, 98:2
**broad** [8] - 195:14, 195:16, 198:2, 198:10, 198:16, 200:23, 202:18
**broaden** [1] - 192:23
**broadened** [1] - 191:17
**broader** [1] - 135:8
**Brocker** [1] - 105:6
**broke** [1] - 89:8
**Brooke** [2] - 28:5, 49:4
**brother** [8] - 51:17, 51:22, 77:12, 77:15, 88:19, 93:17, 94:2, 106:25
**brother-in-law** [3] - 88:19, 93:17, 94:2
**brought** [7] - 76:1, 142:8, 155:2, 155:17, 156:10, 175:20, 179:7
**brushed** [1] - 101:12
**build** [1] - 11:24

**building** [3] - 12:4, 80:16, 80:18
**built** [1] - 152:5
**bullet** [6] - 125:7, 125:11, 176:22, 204:13, 204:18
**bump** [1] - 157:14
**bunch** [2] - 170:24, 187:1
**burden** [17] - 13:25, 14:6, 59:22, 125:24, 126:1, 136:22, 136:23, 136:24, 136:25, 137:4, 137:5, 137:6, 139:12, 166:15, 166:25, 167:3
**burdens** [1] - 136:23
**business** [10] - 31:6, 55:21, 57:9, 73:13, 76:23, 107:21, 110:4, 110:5, 110:7, 110:11
**busy** [6] - 65:24, 66:1, 66:4, 73:12, 76:22, 78:17
**but..** [1] - 71:22
**buying** [1] - 171:20

## C

**CA** [1] - 1:23
**Cal** [2] - 42:19, 82:21
**calculation** [1] - 140:1
**calculations** [1] - 147:20
**calendar** [2] - 78:10, 122:12
**CALIFORNIA** [1] - 1:2
**California** [24] - 1:14, 2:7, 2:9, 2:18, 22:21, 31:22, 44:4, 45:6, 51:24, 55:20, 58:25, 59:4, 60:18, 65:4, 65:5, 65:11, 74:14, 76:10, 79:11, 91:18, 91:22, 92:6, 108:19, 156:8
**California's** [2] - 5:9, 5:25
**cancer** [113] - 22:13, 25:2, 25:4, 25:12, 25:16, 25:24, 38:8, 63:10, 63:12, 63:23, 64:10, 66:24, 66:25, 70:22, 72:2, 84:7, 84:10, 84:16, 84:20, 84:23, 85:3, 85:25, 86:5, 86:6, 87:2, 88:19, 89:10, 89:19,

89:20, 89:22, 90:3, 90:21, 90:23, 91:14, 92:10, 93:9, 93:23, 94:5, 94:11, 94:12, 94:13, 94:16, 96:13, 100:20, 101:18, 103:25, 106:8, 106:15, 106:20, 106:21, 107:5, 150:11, 150:15, 151:7, 151:11, 151:13, 151:15, 151:21, 151:23, 151:24, 152:22, 152:23, 152:25, 153:3, 153:13, 153:17, 154:10, 154:25, 155:24, 156:5, 157:7, 157:8, 157:12, 157:16, 157:22, 158:23, 159:10, 159:13, 169:19, 175:20, 177:9, 177:23, 178:1, 179:2, 179:5, 179:17, 179:19, 179:23, 179:25, 180:2, 180:15, 180:16, 182:20, 184:21, 195:18, 195:19, 196:4, 196:7, 196:8, 196:16, 196:18, 197:8, 198:12, 198:15, 200:24
**Cancer** [7] - 11:22, 94:10, 133:20, 168:24, 180:12, 180:17
**cancer-free** [1] - 169:19
**cancers** [14] - 22:24, 91:15, 93:11, 151:8, 152:5, 154:4, 178:2, 196:25, 197:1, 197:2, 197:4, 197:7
**candor** [2] - 112:25, 113:4
**cannot** [10] - 39:13, 40:2, 121:24, 124:5, 125:24, 126:8, 144:3, 144:4, 151:8, 166:14
**Cantonese** [1] - 40:15
**capacity** [2] - 61:8, 179:21
**captain** [1] - 32:1
**car** [2] - 36:13, 42:2
**CAR** [57] - 12:6, 12:18, 156:17, 156:18,

157:1, 157:5, 157:6,
159:8, 159:11,
159:25, 163:3,
163:7, 163:9,
163:12, 164:9,
170:2, 170:12,
170:18, 170:25,
175:17, 176:1,
176:2, 176:23,
177:12, 180:9,
181:3, 181:4,
181:24, 182:1,
182:2, 182:8,
182:10, 182:16,
182:18, 182:25,
184:4, 184:7,
184:17, 185:7,
186:22, 189:8,
189:13, 190:15,
190:18, 194:12,
195:8, 196:7,
198:11, 199:19,
200:25, 204:11,
204:12, 205:7,
205:9, 205:16
**CAR-T** [12] - 156:18,
159:8, 175:17,
176:1, 176:2,
176:23, 177:12,
182:25, 184:4,
204:11, 205:7,
205:16
**CAR-Ts** [1] - 200:25
**CAR15** [1] - 169:11
**carcinoid** [1] - 96:12
**carcinomas** [1] -
196:19
**card** [1] - 160:14
**care** [9] - 35:13, 35:19,
36:12, 58:3, 87:16,
88:10, 89:5, 96:16,
155:20
**career** [1] - 66:13
**carefully** [3] - 50:24,
50:25, 56:20
**caregiver** [2] - 93:25,
94:3
**cargo** [3] - 54:17,
54:20, 54:22
**Carrie** [1] - 21:2
**carry** [1] - 156:1
**CARs** [21] - 156:23,
157:1, 157:2, 157:3,
157:4, 181:20,
182:2, 182:3,
183:14, 184:10,
189:10, 189:18,
194:10, 195:17,
196:5, 196:12,
196:24, 197:1,

197:6, 197:10
**case** [234] - 4:18, 6:2,
6:8, 7:16, 8:1, 8:11,
9:7, 12:11, 12:17,
14:2, 16:12, 16:15,
19:10, 19:18, 19:19,
20:11, 20:17, 20:24,
21:12, 21:14, 21:15,
21:16, 21:22, 21:23,
21:25, 22:1, 22:2,
22:4, 22:11, 22:12,
22:19, 22:20, 23:6,
23:16, 23:17, 23:18,
24:3, 24:4, 24:14,
24:22, 25:1, 25:7,
25:16, 25:22, 25:25,
26:7, 26:12, 26:14,
26:18, 27:2, 27:13,
29:7, 29:13, 30:1,
30:5, 32:6, 33:6,
33:11, 33:17, 33:23,
34:14, 35:6, 36:22,
36:25, 37:5, 37:8,
37:11, 37:14, 37:20,
37:24, 39:12, 41:3,
42:5, 42:7, 42:8,
43:5, 44:9, 45:12,
45:24, 49:25, 50:6,
50:25, 52:10, 52:13,
53:6, 56:2, 56:10,
56:16, 56:19, 58:11,
58:13, 60:6, 62:17,
62:21, 64:4, 66:3,
69:2, 70:15, 72:12,
75:15, 76:2, 76:15,
78:19, 78:20, 78:21,
79:7, 80:10, 80:11,
80:13, 81:19, 81:21,
81:22, 82:16, 83:6,
84:4, 95:20, 97:16,
98:5, 101:18,
102:24, 103:6,
103:8, 103:9,
103:11, 104:9,
104:15, 104:25,
105:22, 108:14,
111:23, 113:1,
113:5, 113:17,
113:20, 114:15,
114:16, 117:18,
118:5, 118:13,
118:18, 118:19,
118:20, 118:22,
118:24, 119:2,
119:3, 119:10,
119:14, 119:15,
119:17, 119:23,
120:2, 120:4, 120:6,
120:10, 120:13,
120:19, 121:3,
121:17, 121:18,

122:9, 122:21,
123:24, 124:11,
127:1, 130:12,
131:2, 131:10,
131:20, 132:7,
132:20, 132:25,
133:9, 133:11,
133:12, 133:13,
133:19, 133:20,
136:14, 137:18,
140:2, 140:4, 140:5,
141:9, 142:3,
142:14, 142:18,
142:22, 144:10,
144:21, 145:4,
145:24, 146:8,
148:25, 149:1,
149:22, 150:8,
155:12, 155:15,
161:2, 161:16,
163:8, 164:24,
167:1, 171:11,
171:12, 172:8,
174:15, 175:9,
175:15, 179:11,
186:3, 187:23,
188:14, 190:21,
190:25, 191:4,
193:6, 196:10,
197:21, 199:24,
201:6, 203:3, 204:5,
205:19, 205:21,
206:4
**cases** [15] - 19:12,
27:14, 36:14, 36:17,
37:23, 59:5, 59:16,
59:17, 59:19, 61:20,
61:23, 74:23,
155:13, 161:13
**cashier** [1] - 65:9
**casting** [1] - 73:11
**catch** [1] - 39:21
**categories** [1] -
196:10
**category** [2] - 197:1,
198:2
**cats** [1] - 197:23
**caught** [1] - 87:23
**causes** [3] - 123:21,
163:12, 204:14
**caution** [1] - 37:6
**CD** [1] - 136:5
**CD19** [15] - 157:9,
157:10, 157:18,
158:3, 159:11,
197:7, 198:14,
198:17, 198:18,
198:21, 199:22,
199:25, 200:2,
200:5, 201:1

**CD28** [7] - 12:3, 136:7,
182:6, 189:21,
189:22, 189:23,
189:24
**CD3** [1] - 159:1
**Celgene** [2] - 95:21,
98:2
**cell** [26] - 152:3, 157:7,
157:8, 157:10,
157:11, 157:12,
157:16, 157:20,
157:21, 157:22,
157:23, 158:9,
158:23, 159:9,
159:10, 159:12,
159:13, 178:10,
180:9, 182:17,
183:14, 187:4,
196:19
**cellphones** [1] - 69:12
**cells** [55] - 25:11,
25:15, 33:25, 151:2,
151:3, 151:9,
151:11, 152:3,
152:8, 152:10,
152:11, 152:12,
152:14, 152:16,
152:23, 152:24,
152:25, 153:5,
153:6, 153:9,
153:10, 153:13,
155:5, 156:13,
156:18, 157:15,
158:5, 159:10,
159:24, 160:1,
160:2, 163:12,
178:10, 178:13,
179:2, 183:19,
183:21, 184:14,
184:17, 184:18,
184:20, 195:18,
195:19, 197:7,
204:20, 204:25,
205:2
**cellular** [1] - 156:21
**cement** [1] - 89:8
**center** [5] - 52:6, 64:9,
91:19, 128:2, 156:9
**centers** [1] - 164:12
**CENTRAL** [1] - 1:2
**CEO** [3] - 38:12,
38:13, 175:3
**cerebral** [1] - 176:11
**certain** [26] - 9:6,
22:23, 33:21, 34:9,
39:25, 50:13, 57:19,
61:20, 63:14, 77:25,
95:18, 97:8, 98:4,
123:8, 123:9,
123:10, 130:18,

131:12, 136:1,
138:13, 140:13,
141:6, 141:25,
142:7, 172:16, 185:3
**certainly** [4] - 8:22,
9:1, 130:24, 175:8
**certificate** [51] - 10:12,
10:16, 10:17, 10:20,
13:15, 14:3, 15:7,
15:8, 15:22, 15:24,
23:1, 23:7, 23:8,
23:14, 134:7, 134:9,
134:12, 134:18,
134:20, 136:6,
136:16, 137:20,
137:22, 138:5,
138:7, 139:7,
147:11, 147:14,
147:16, 147:22,
148:4, 165:2,
165:24, 166:1,
166:4, 166:6, 166:8,
166:24, 167:11,
167:14, 167:17,
167:25, 168:3,
168:5, 168:15,
170:10, 191:15,
193:17, 195:1,
202:17, 203:17
**certified** [1] - 82:23
**certify** [1] - 206:14
**CGTA** [1] - 187:5
**chain** [7] - 158:21,
159:5, 182:4,
187:15, 188:15,
198:16, 198:18
**chair** [2] - 27:17,
145:6
**chairs** [2] - 188:6
**challenger** [1] -
166:23
**challenges** [6] -
16:10, 112:14,
112:19, 114:23,
183:24, 184:22
**challenging** [1] -
184:15
**Chang** [1] - 105:4
**change** [7] - 13:24,
46:16, 56:21, 164:3,
164:4, 191:20,
192:16
**changed** [3] - 46:16,
182:7, 191:19
**changes** [1] - 152:11
**changing** [1] - 46:24,
164:18
**charge** [2] - 53:23,
121:15
**charged** [1] - 30:16

charges [1] - 201:21
charts [6] - 14:9, 141:25, 142:3, 142:7, 142:9
chat [1] - 119:5
chatting [1] - 75:24
chemicals [1] - 178:9
chemo - 63:24, 64:1, 67:18, 88:24, 89:1, 89:23, 90:5, 92:12, 178:6
chemotherapy [10] - 86:6, 151:17, 153:18, 178:3, 178:4, 178:7, 178:8, 178:12, 178:19
Chi [2] - 28:6, 52:21
Chi-Wei [2] - 28:6, 52:21
chief [5] - 7:8, 75:2, 150:4, 183:4, 193:22
child [1] - 75:6
childhood [1] - 69:1
children [11] - 41:25, 44:6, 49:6, 49:15, 65:12, 68:14, 68:19, 72:23, 74:17, 79:13, 83:4
children's [2] - 156:6, 156:9
Children's [1] - 170:8
chimeric [3] - 156:19, 182:18, 186:22
China [1] - 107:20
Chinese [8] - 40:4, 40:6, 40:13, 86:7, 109:4, 109:9, 109:17, 109:18
choice [1] - 203:8
choose [1] - 143:12
chose [1] - 203:1
Christi [1] - 175:3
Christine [1] - 21:7
Christmas [1] - 65:23
Christopher [1] - 105:14
CHU [41] - 3:5, 3:15, 3:24, 19:23, 20:5, 20:9, 20:22, 24:24, 104:21, 105:1, 106:5, 106:13, 106:24, 107:12, 107:16, 107:18, 108:6, 111:18, 112:3, 112:9, 112:22, 115:11, 115:14, 115:16, 116:7, 116:9, 116:24, 117:10, 127:14, 127:19,

127:25, 128:4, 128:20, 129:2, 129:6, 129:17, 130:1, 149:8, 149:10, 191:1, 193:24
Chu [20] - 2:4, 3:6, 20:24, 24:9, 24:10, 24:23, 24:24, 25:21, 36:2, 104:20, 105:10, 111:17, 131:5, 149:9, 174:15, 174:18, 178:19, 193:9, 195:20, 196:21
circumstances [2] - 89:13, 192:22
circumstantial [3] - 141:16, 141:19, 141:22
citation [2] - 162:25, 163:2
cite [1] - 19:12
citizen [1] - 68:4
citizens [1] - 60:17
City [5] - 74:17, 85:14, 88:6, 88:7, 88:12
city [5] - 65:6, 89:3, 94:19, 122:1, 156:7
civil [11] - 21:12, 30:1, 42:2, 56:17, 59:16, 59:21, 60:1, 74:21, 81:25, 132:9, 167:1
claim [53] - 5:10, 13:10, 13:12, 13:14, 13:17, 13:20, 15:19, 15:20, 100:21, 135:3, 135:4, 135:5, 135:7, 135:8, 135:9, 135:10, 135:11, 135:12, 135:14, 135:15, 135:16, 135:17, 136:11, 136:14, 136:25, 137:2, 137:6, 137:10, 138:11, 147:15, 147:16, 185:16, 186:12, 186:13, 187:18, 187:22, 188:16, 196:12, 197:11, 197:13, 198:3, 198:4, 198:5, 198:10, 200:7, 200:24, 200:25
claim-by-claim [1] - 138:11
claimed [8] - 138:19, 171:12, 186:8, 186:14, 186:15,

186:16, 187:12, 199:18
claiming [2] - 186:14, 201:15
claims [41] - 13:19, 23:10, 23:12, 23:14, 134:4, 134:6, 134:10, 134:14, 134:19, 134:21, 135:7, 135:19, 135:20, 135:21, 135:24, 136:2, 136:17, 136:19, 137:24, 138:9, 139:8, 146:20, 147:12, 147:23, 148:5, 161:20, 166:23, 186:17, 187:8, 187:10, 196:9, 198:9, 198:13, 200:20, 200:23, 201:3, 202:17, 202:18, 203:15, 203:16, 203:18
Claremont [1] - 74:14
clarify [1] - 8:21
Clarita [2] - 49:5, 49:16
classes [2] - 109:23, 110:3
classic [1] - 202:10
classifications [2] - 197:19, 197:20
classrooms [1] - 68:21
clean [5] - 63:10, 64:2, 64:22, 86:8
clear [12] - 19:10, 39:24, 78:18, 137:5, 137:7, 138:6, 138:19, 138:25, 139:3, 166:23, 167:4, 186:2
clearly [5] - 12:5, 93:20, 186:6, 193:3, 194:4
clerical [5] - 165:8, 165:9, 166:16, 167:8, 192:16
clerk [9] - 3:12, 26:24, 27:7, 27:8, 103:12, 121:14, 122:16, 130:23
CLERK [27] - 3:1, 14:8, 18:15, 20:11, 20:14, 20:17, 23:22, 23:23, 27:16, 27:23, 28:5, 29:1, 103:13, 106:1, 114:1, 116:1,

116:18, 117:20, 117:24, 118:1, 122:23, 130:2, 130:5, 130:7, 174:6, 174:9, 206:7
client [2] - 8:10, 26:1
clients [1] - 140:23
clinic [3] - 42:15, 68:18, 183:16
clinical [20] - 153:23, 153:24, 154:1, 154:7, 154:11, 167:22, 168:1, 168:8, 169:10, 170:25, 176:15, 176:16, 178:23, 180:25, 182:14, 183:6, 183:17, 184:23, 184:24, 196:17
clipboard [1] - 99:13
close [29] - 46:4, 49:23, 67:5, 67:8, 71:1, 84:8, 85:24, 86:4, 87:10, 92:15, 93:8, 93:10, 93:22, 98:19, 98:20, 99:2, 100:6, 103:18, 104:5, 106:17, 111:11, 111:13, 144:22, 157:15, 174:21
closer [2] - 65:23, 67:8, 67:9, 129:20
closest [3] - 3:7, 20:25
closing [3] - 140:17, 148:25, 149:1
Coast [1] - 95:25
cocaine [1] - 62:16
coffee [1] - 130:21
cold [2] - 150:19, 188:5
collaborate [1] - 181:1
collaborated [1] - 184:12
collaboration [4] - 181:3, 182:11, 191:10, 191:13
collaborator [1] - 162:5
colleague [2] - 21:7, 109:17
colleagues [10] - 20:6, 20:24, 21:2, 25:3, 149:14, 149:24, 152:1, 153:2, 162:20, 168:24
collected [1] - 132:16
collectively [1] - 133:22

colored [2] - 187:1, 187:5
combination [1] - 151:18
comfortable [18] - 34:16, 34:17, 34:18, 34:23, 37:25, 40:15, 56:24, 56:25, 57:4, 63:16, 70:9, 70:11, 74:4, 74:9, 79:7, 83:20, 83:23, 130:17
coming [8] - 31:2, 45:21, 65:20, 122:2, 152:16, 152:17, 157:11, 174:20
commence [1] - 122:11
commencement [1] - 3:12
comment [1] - 60:15
commentary [3] - 119:23, 133:8, 133:11
comments [1] - 148:9
commercial [4] - 38:9, 39:1, 39:3, 180:24
commercials [1] - 73:8
Commission [1] - 171:23
common [4] - 162:1, 162:25, 171:14, 196:11
communicate [4] - 57:5, 118:25, 119:1, 120:13
communicating [2] - 119:9, 119:11
communications [2] - 4:3, 120:24
community [1] - 92:22
compac [1] - 55:7
companies [4] - 95:19, 98:1, 179:24, 180:3
company [38] - 22:15, 22:21, 30:10, 31:5, 38:7, 38:10, 38:11, 38:13, 38:14, 40:13, 41:7, 41:15, 41:16, 41:17, 41:18, 48:10, 48:13, 48:21, 53:11, 55:8, 55:10, 70:20, 72:23, 77:8, 96:25, 109:17, 156:2, 163:23, 171:17, 171:20, 180:1, 182:23, 191:23, 205:22, 205:24
compared [2] - 10:19,

193:23
**comparing** [1] - 11:11
**comparison** [9] - 10:15, 10:19, 10:23, 11:3, 11:11, 12:15, 167:1, 170:4
**compensate** [5] - 134:23, 139:10, 139:21, 139:24, 171:5
**compensated** [1] - 205:22
**competent** [2] - 108:2, 111:7
**competing** [2] - 4:12, 156:4
**competitor** [4] - 175:15, 177:10, 177:15, 205:23
**complaining** [1] - 4:23
**complaints** [1] - 48:6
**complete** [2] - 179:1
**completed** [1] - 146:25
**completely** [6] - 39:14, 40:2, 86:5, 166:17, 176:16, 177:5
**complex** [1] - 43:6
**complexity** [1] - 21:25
**complicated** [3] - 23:17, 34:8, 45:9
**comply** [2] - 32:19, 113:22
**component** [2] - 36:18, 195:15
**components** [1] - 188:8
**comprehension** [1] - 5:8
**computer** [3] - 71:12, 77:14, 77:15
**computers** [2] - 54:12, 55:6
**conceded** [2] - 195:4, 195:5
**Concepcion** [2] - 28:21, 79:10
**concern** [10] - 13:4, 49:18, 49:24, 69:22, 69:23, 70:15, 102:7, 108:1, 112:4, 123:20
**concerned** [8] - 19:3, 39:15, 40:19, 69:18, 102:6, 102:19, 112:6
**concerning** [2] - 124:13, 124:18
**concerns** [6] - 43:19, 102:21, 108:13, 111:6, 126:12

**conclude** [2] - 21:17, 81:15
**concludes** [5] - 104:15, 117:18, 132:1, 149:3, 206:3
**concluding** [1] - 173:18
**conclusion** [2] - 27:3, 140:2
**conclusions** [1] - 86:17
**condition** [1] - 31:3
**conditions** [2] - 32:19, 45:21
**conduct** [1] - 133:6
**conducted** [1] - 168:1
**conducting** [1] - 184:23
**confer** [2] - 9:2, 127:10
**conference** [7] - 7:1, 7:9, 7:11, 7:18, 145:22, 145:23, 146:2
**conferences** [3] - 145:15, 145:21, 146:1
**confidential** [1] - 192:5
**conflict** [4] - 7:7, 8:11, 78:22
**conflicts** [14] - 6:24, 8:12, 10:7, 50:7, 50:20, 51:1, 51:2, 51:9, 73:15, 74:6, 83:22, 104:16, 130:14
**confusion** [1] - 145:17
**consequence** [4] - 194:22, 200:14, 200:15, 201:3
**consider** [14] - 119:21, 137:16, 140:4, 140:5, 140:12, 140:14, 141:5, 141:7, 141:13, 141:20, 143:8, 144:10, 145:22, 202:3
**consideration** [3] - 17:23, 34:12, 148:21
**considered** [1] - 141:4
**considering** [5] - 65:19, 66:3, 68:3, 142:17, 144:19
**consistent** [3] - 114:14, 126:25, 143:3
**consolidate** [1] - 114:8

**constraints** [1] - 37:5
**construct** [5] - 12:6, 12:18, 170:3, 195:8, 205:9
**construction** [7] - 13:10, 13:12, 13:14, 13:18, 13:20, 15:19, 15:20
**construed** [2] - 136:4, 136:7
**consult** [1] - 112:13
**consultant** [2] - 3:10, 112:13
**consultants** [2] - 20:4, 20:8
**consulting** [1] - 119:24
**consuming** [1] - 200:4
**contact** [17] - 18:21, 18:22, 33:1, 46:20, 46:21, 49:15, 57:12, 63:3, 71:4, 75:21, 75:23, 75:25, 94:8, 95:10, 97:2, 113:14, 119:18
**contacted** [1] - 192:7
**contacts** [1] - 162:6
**contain** [1] - 195:9
**contains** [1] - 193:3
**contend** [1] - 157:2
**contending** [1] - 134:12
**contends** [4] - 23:6, 23:12, 134:7, 137:20
**contention** [3] - 146:20, 147:19, 147:22
**contentions** [1] - 137:10
**contents** [1] - 142:2
**context** [1] - 204:7
**continue** [6] - 11:17, 23:20, 97:1, 114:21, 153:13, 176:16
**continued** [1] - 5:11
**contractor** [1] - 30:11
**contradicted** [1] - 142:24
**contreras** [1] - 116:3
**Contreras** [5] - 28:13, 65:1, 65:3, 116:17, 116:20
**contribute** [1] - 48:17
**control** [2] - 132:5, 143:21
**controls** [1] - 140:21
**controversial** [1] - 5:20
**convenience** [1] - 133:21

**conversation** [3] - 102:12, 181:14, 201:18
**conversations** [1] - 52:10
**conviction** [6] - 35:4, 35:5, 43:17, 43:18, 56:23, 137:9
**convictions** [1] - 98:21
**convince** [3] - 56:20, 56:22, 168:15
**convincing** [7] - 137:5, 137:7, 138:6, 138:19, 139:4, 166:24, 167:4
**cooperate** [1] - 9:5
**cooperation** [1] - 9:4
**coordinating** [1] - 72:21
**copied** [3] - 12:18, 169:3, 181:7
**copy** [1] - 123:15
**Cornell** [1] - 156:15
**corporation** [1] - 31:25
**correct** [22] - 8:15, 12:25, 15:15, 15:17, 20:9, 53:13, 54:6, 54:18, 54:21, 55:2, 55:14, 73:4, 78:3, 80:20, 81:5, 81:8, 88:8, 97:13, 102:8, 105:10, 205:10, 206:14
**corrected** [3] - 23:1, 136:6, 193:17
**correction** [60] - 4:25, 10:12, 10:17, 10:20, 13:15, 14:3, 15:7, 15:8, 15:22, 15:25, 23:1, 23:7, 23:8, 23:14, 125:20, 129:11, 134:7, 134:9, 134:13, 134:18, 134:20, 136:6, 136:17, 137:20, 137:22, 138:5, 138:7, 139:7, 147:11, 147:14, 147:16, 147:23, 148:4, 165:2, 165:3, 165:5, 165:12, 165:22, 165:24, 166:1, 166:4, 166:5, 166:6, 166:8, 166:24, 167:7, 167:11, 167:15, 167:18, 167:25, 168:3, 168:5,

168:15, 170:10, 191:16, 193:18, 195:1, 202:17, 203:17
**correctly** [1] - 179:13
**cost** [1] - 125:2
**costimulatory** [11] - 182:5, 187:16, 189:12, 189:16, 189:19, 189:20, 190:2, 190:7, 194:13, 199:2, 204:12
**counsel** [47] - 3:3, 3:7, 3:9, 8:23, 9:19, 10:14, 10:18, 19:17, 19:21, 20:6, 20:20, 21:6, 21:18, 24:13, 24:18, 24:20, 27:5, 35:23, 75:25, 84:3, 104:19, 105:24, 115:5, 115:7, 118:3, 118:15, 121:13, 122:19, 127:23, 129:9, 129:17, 131:3, 146:3, 146:23, 147:1, 147:2, 172:12, 173:3, 174:2, 174:11, 174:25, 184:5, 189:9, 190:4
**COUNSEL** [1] - 2:1
**counseling** [2] - 57:11, 75:9
**counselor** [1] - 55:22
**countries** [1] - 44:18
**couple** [7] - 6:5, 36:14, 54:10, 66:15, 84:5, 86:1, 168:4
**course** [32] - 4:22, 12:24, 13:16, 40:21, 95:17, 98:6, 104:1, 118:17, 118:22, 122:5, 124:3, 130:15, 130:20, 131:14, 131:19, 133:6, 140:3, 141:10, 143:22, 144:12, 145:11, 145:19, 146:4, 149:16, 149:22, 150:18, 155:2, 155:21, 164:23, 170:1, 172:7
**COURT** [534] - 1:1, 3:11, 3:22, 5:4, 5:13, 5:22, 6:9, 6:13, 6:16, 8:6, 8:8, 8:17, 8:20, 9:4, 9:15, 9:17, 11:17, 12:22, 13:3,

13:7, 14:7, 14:10, 14:14, 15:13, 17:21, 18:2, 18:5, 18:12, 18:17, 19:15, 19:25, 20:7, 20:10, 20:12, 20:15, 21:4, 21:8, 24:1, 25:18, 26:17, 27:22, 28:23, 29:4, 30:1, 30:4, 30:7, 30:9, 30:12, 30:18, 30:21, 30:24, 31:5, 31:8, 31:11, 31:13, 31:17, 31:19, 32:4, 32:9, 32:11, 32:15, 32:21, 32:25, 33:5, 33:8, 33:10, 34:21, 35:15, 35:17, 35:20, 35:25, 36:5, 36:17, 36:21, 36:24, 37:2, 37:19, 38:2, 38:4, 38:10, 38:13, 38:15, 38:19, 38:22, 38:25, 39:3, 39:5, 39:9, 39:15, 39:18, 39:23, 40:3, 40:5, 40:8, 40:10, 40:14, 40:18, 40:23, 41:5, 41:8, 41:11, 41:14, 41:16, 41:20, 42:4, 42:7, 42:10, 42:12, 42:16, 42:21, 42:24, 43:2, 43:4, 43:16, 43:25, 44:2, 44:8, 44:11, 44:14, 44:19, 44:21, 44:23, 44:25, 45:8, 45:11, 45:14, 45:17, 45:20, 45:23, 46:2, 46:7, 46:9, 46:18, 46:20, 46:24, 47:4, 47:7, 47:9, 47:14, 47:17, 47:19, 47:21, 47:24, 48:1, 48:4, 48:6, 48:8, 48:14, 48:17, 48:20, 48:23, 49:2, 49:10, 49:16, 49:18, 49:21, 49:24, 50:5, 51:7, 51:15, 51:19, 51:23, 52:1, 52:3, 52:8, 52:12, 52:19, 53:2, 53:5, 53:9, 53:11, 53:14, 53:18, 53:21, 53:23, 54:1, 54:5, 54:7, 54:13, 54:16, 54:19, 54:22, 55:1, 55:3, 55:8, 55:10, 55:12, 55:15, 55:17, 56:2, 56:5, 56:9, 56:13, 56:16, 57:8, 57:12, 57:15, 57:19, 57:24, 58:2, 58:6, 58:8,

58:10, 58:15, 58:17, 58:19, 59:6, 59:9, 59:13, 59:15, 59:20, 60:8, 60:13, 60:15, 60:21, 60:24, 61:3, 61:8, 61:15, 61:18, 61:22, 62:5, 62:8, 62:11, 62:14, 62:18, 62:22, 63:2, 63:5, 63:8, 63:14, 63:19, 63:22, 64:3, 64:7, 64:12, 64:17, 64:23, 65:1, 65:15, 65:21, 66:2, 66:12, 66:20, 66:22, 67:3, 67:13, 67:23, 68:7, 68:10, 68:15, 68:22, 69:2, 69:5, 69:8, 69:14, 69:18, 69:21, 70:3, 70:9, 70:14, 70:23, 71:1, 71:4, 71:8, 71:10, 71:13, 71:16, 71:19, 71:23, 72:1, 72:5, 72:8, 72:11, 72:14, 72:17, 72:25, 73:2, 73:5, 73:12, 73:15, 73:17, 73:22, 73:25, 74:4, 74:6, 74:11, 74:22, 74:25, 75:7, 75:11, 75:14, 75:17, 75:20, 76:3, 76:7, 76:14, 76:18, 76:22, 77:4, 77:9, 77:13, 77:17, 78:2, 78:5, 78:8, 78:18, 78:25, 79:3, 79:6, 79:9, 79:15, 79:17, 79:19, 79:23, 79:25, 80:7, 80:12, 80:15, 80:18, 80:21, 80:24, 81:2, 81:4, 81:6, 81:9, 81:13, 81:15, 81:24, 82:3, 82:6, 82:9, 82:12, 82:15, 82:18, 82:24, 83:1, 83:6, 83:9, 83:14, 83:18, 83:22, 83:25, 84:17, 84:25, 85:3, 85:5, 85:8, 85:10, 85:12, 85:16, 85:20, 85:23, 86:9, 86:13, 86:16, 86:20, 86:23, 86:25, 87:7, 87:10, 87:12, 87:15, 87:20, 88:1, 88:4, 88:7, 88:9, 88:14, 88:17, 88:22, 89:2, 89:4, 89:14, 90:2, 90:6, 90:9, 90:12, 90:14, 90:17, 90:20, 90:23, 91:2, 91:4, 91:7,

91:10, 91:16, 91:21, 91:25, 92:4, 92:7, 92:15, 92:17, 92:20, 92:24, 93:3, 93:6, 93:18, 93:21, 94:1, 94:3, 94:6, 94:12, 94:14, 94:24, 95:3, 95:6, 95:9, 95:13, 95:16, 96:4, 96:6, 96:10, 96:15, 96:18, 97:1, 97:4, 97:7, 97:14, 97:23, 99:19, 99:22, 100:1, 100:11, 100:15, 101:3, 101:5, 101:14, 101:22, 102:10, 102:15, 102:18, 103:15, 103:18, 104:22, 105:8, 105:18, 106:3, 106:11, 106:15, 107:3, 107:8, 107:10, 107:13, 107:15, 107:17, 107:24, 108:8, 108:18, 108:21, 108:24, 109:1, 109:5, 109:7, 109:10, 109:14, 109:20, 109:23, 110:1, 110:3, 110:5, 110:7, 110:10, 110:12, 110:15, 110:18, 110:20, 110:22, 110:25, 111:3, 111:5, 111:17, 111:22, 112:4, 112:11, 112:17, 112:24, 113:3, 114:3, 115:4, 115:9, 115:12, 115:15, 115:17, 115:19, 115:21, 115:24, 116:5, 116:8, 116:11, 116:15, 116:20, 116:25, 117:4, 117:7, 117:11, 117:14, 117:23, 118:2, 123:1, 127:18, 127:20, 128:3, 128:7, 128:10, 128:12, 128:18, 128:21, 129:4, 129:7, 129:9, 129:24, 130:4, 130:6, 130:9, 132:1, 149:9, 172:12, 172:15, 172:23, 173:1, 173:3, 173:5, 173:8, 173:11,

173:17, 173:20, 173:23, 174:1, 174:8, 174:11, 191:2, 194:1, 206:2
**Court** [71] - 4:13, 6:16, 7:5, 8:17, 9:5, 9:9, 9:13, 10:10, 11:5, 13:18, 16:5, 16:11, 16:13, 16:14, 16:21, 17:1, 17:15, 17:22, 19:19, 25:7, 27:9, 27:12, 43:5, 43:19, 46:4, 49:10, 59:5, 59:10, 59:11, 59:15, 60:6, 73:22, 76:14, 81:4, 97:17, 105:20, 111:5, 113:19, 114:12, 114:25, 117:17, 119:19, 120:11, 121:11, 123:7, 123:20, 123:21, 124:15, 124:22, 125:3, 125:10, 125:12, 125:16, 125:20, 126:4, 126:7, 126:14, 126:15, 126:19, 127:1, 127:3, 128:13, 129:25, 133:15, 141:8, 150:6, 172:17, 172:18, 173:25, 190:10, 206:11
**court** [29] - 1:25, 10:25, 15:6, 16:4, 22:25, 27:10, 37:22, 59:24, 63:17, 97:7, 106:14, 107:2, 108:7, 108:12, 112:23, 113:23, 115:23, 116:10, 116:19, 117:6, 117:13, 120:20, 121:4, 121:14, 129:11, 134:1, 148:22, 173:2, 193:25
**Court's** [12] - 7:23, 10:8, 13:12, 15:20, 20:25, 114:15, 114:16, 125:13, 129:19, 141:1, 149:3, 173:16
**courthouse** [1] - 65:13
**courtroom** [19] - 21:10, 24:3, 35:21, 39:25, 113:8, 113:10, 114:2,

120:16, 120:23, 122:25, 130:8, 130:10, 145:5, 149:17, 150:11, 174:4, 174:7, 174:10, 206:10
**courtrooms** [1] - 80:19
**cousin** [2] - 70:18, 71:3
**cover** [12] - 66:6, 66:8, 123:4, 135:14, 189:5, 191:5, 191:6, 191:7, 191:9, 195:12
**coverage** [1] - 135:10
**covered** [11] - 14:22, 86:5, 106:11, 134:4, 135:7, 160:22, 185:12, 185:13, 190:18, 190:20, 192:14
**covers** [5] - 26:9, 135:4, 135:16, 188:20, 192:9
**Covina's** [1] - 65:13
**CPA** [1] - 82:22
**crashes** [1] - 36:13
**Crawford** [1] - 2:5
**create** [2] - 25:11, 157:25
**credibility** [16] - 33:11, 33:19, 34:7, 34:12, 34:13, 34:15, 34:19, 34:23, 35:6, 35:7, 69:15, 70:4, 74:1, 83:19, 112:6, 130:14
**crept** [2] - 166:10, 166:19
**Crescencio** [2] - 27:21, 31:21
**criminal** [10] - 30:2, 30:3, 42:2, 59:16, 59:19, 59:21, 59:23, 74:21, 80:25, 81:25
**critical** [3] - 192:20, 195:17, 196:8
**cross** [4] - 82:9, 82:13, 147:1, 147:9
**cross-examination** [1] - 147:9
**cross-examine** [1] - 147:1
**cross-examined** [1] - 82:9
**cross-examining** [1] - 82:13
**CRR** [2] - 1:22, 206:21
**Cruz** [6] - 23:21, 28:23, 121:14, 122:22, 123:6,

127:20
**Culver** [1] - 85:14
**cure** [4] - 97:21, 153:20, 177:8
**current** [1] - 55:13
**curriculum** [1] - 75:4
**cut** [1] - 150:19
**cutting** [1] - 87:5
**CV17-07639SJO** [1] - 20:18

# D

**dad** [4] - 77:12, 77:15, 96:1, 96:8
**daily** [6] - 45:25, 53:14, 61:10, 61:14, 77:18, 77:20
**damage** [3] - 135:1, 139:14, 171:4
**damages** [21] - 23:3, 34:3, 134:1, 134:22, 139:9, 139:13, 139:17, 139:20, 139:21, 140:2, 146:22, 147:8, 147:19, 148:1, 170:14, 171:4, 171:9, 171:12, 171:13, 172:9, 205:12
**DANE** [34] - 3:9, 14:15, 15:16, 15:18, 17:25, 18:4, 18:7, 19:24, 21:5, 25:20, 105:9, 107:9, 107:14, 111:4, 111:10, 112:2, 112:10, 115:18, 115:20, 115:22, 116:16, 117:3, 117:5, 128:9, 128:17, 173:7, 173:10, 173:14, 173:18, 173:22, 173:24, 174:17, 191:3, 194:2
**Dane** [13] - 2:16, 3:9, 14:14, 21:5, 24:17, 25:19, 26:17, 36:3, 105:8, 131:9, 174:14, 174:15, 206:2
**darn** [1] - 150:25
**Dash** [3] - 105:2, 150:1, 163:14
**data** [1] - 7:9
**date** [2] - 155:13, 167:21
**dates** [1] - 167:5

**daughter** [7] - 38:20, 39:2, 39:3, 52:24, 53:2, 59:3, 74:19
**daughters** [1] - 38:8
**Dave** [1] - 21:2
**David** [1] - 105:4
**DAY** [2] - 2:8, 2:10
**days** [9] - 21:15, 21:16, 21:19, 33:17, 77:24, 77:25, 84:24, 104:25, 178:20
**DEA** [1] - 62:17
**deal** [5] - 75:4, 77:1, 101:11, 191:16, 191:17
**dealing** [1] - 184:16
**debilitating** [1] - 178:4
**decades** [5] - 150:9, 151:14, 151:16, 154:25, 158:4
**December** [5] - 1:15, 77:22, 78:1, 79:1, 206:21
**decide** [36] - 21:20, 81:22, 97:16, 99:4, 111:23, 112:8, 118:19, 121:3, 132:8, 132:24, 134:16, 134:17, 134:20, 134:22, 134:25, 135:19, 136:18, 137:25, 138:4, 138:8, 139:6, 139:9, 141:9, 141:23, 142:15, 143:9, 143:10, 145:3, 145:16, 146:9, 146:16, 146:17, 149:2, 155:14, 176:18, 201:23
**decided** [7] - 16:5, 67:10, 120:19, 133:12, 177:9, 177:10, 181:1
**deciding** [6] - 137:15, 140:5, 140:14, 142:14, 144:10, 146:15
**decision** [17] - 42:8, 48:24, 50:23, 56:11, 60:10, 62:23, 63:6, 72:9, 74:21, 82:16, 87:8, 93:4, 97:9, 135:1, 137:13, 203:6, 203:25
**decisions** [1] - 148:15
**declared** [1] - 154:25
**deed** [1] - 185:10
**defendant** [16] - 8:10,

13:11, 22:19, 22:20, 23:6, 24:16, 25:9, 124:19, 131:10, 133:20, 133:24, 161:14, 161:15, 162:5, 167:3, 171:13
**Defendant** [2] - 1:9, 2:14
**defendant's** [14] - 4:7, 5:23, 9:22, 10:2, 11:20, 19:5, 50:17, 124:21, 125:1, 125:4, 127:9, 134:10, 137:23, 161:19
**defendants** [12] - 5:5, 9:10, 22:25, 24:5, 24:7, 24:15, 24:19, 26:23, 50:9, 81:23, 123:10, 131:8
**defendants'** [1] - 23:9
**defense** [17] - 9:8, 9:19, 30:11, 115:17, 116:15, 117:2, 117:11, 134:16, 137:1, 137:3, 137:6, 137:10, 168:13, 170:9, 170:11, 174:3, 174:13
**defenses** [3] - 127:16, 168:16, 203:14
**define** [1] - 189:25
**defined** [1] - 186:1
**defines** [1] - 135:3, 185:10, 198:17
**definitely** [4] - 36:2, 36:23, 38:1, 79:1
**definition** [2] - 6:13, 136:12
**definitions** [4] - 4:9, 5:22, 5:24, 136:13
**degree** [9] - 30:19, 37:21, 44:19, 52:25, 61:6, 68:24, 75:9, 75:10, 204:23
**degrees** [1] - 75:7
**delay** [2] - 123:22, 146:5
**delayed** [1] - 123:20
**delays** [1] - 121:25
**deliberate** [1] - 136:20
**deliberately** [1] - 143:11
**deliberation** [2] - 21:19, 119:10
**deliberations** [4] - 132:4, 132:5, 132:18, 144:23
**deliveries** [1] - 30:17
**Delos** [4] - 28:21,

79:11, 91:11, 94:25
**Deluxe** [1] - 31:7
**demonstrate** [2] - 138:18, 203:15
**demonstrative** [4] - 9:22, 11:9, 19:14, 124:19
**demonstratives** [28] - 9:19, 9:22, 10:3, 10:7, 11:14, 11:19, 11:21, 12:22, 13:5, 14:11, 14:13, 14:17, 15:15, 19:1, 19:5, 114:19, 123:19, 123:23, 124:2, 124:6, 124:8, 124:18, 124:20, 124:24, 127:9, 127:11, 141:25, 142:3
**denied** [5] - 8:9, 8:13, 111:25, 121:4, 126:6
**denies** [1] - 23:11
**Denny** [1] - 56:3
**dense** [1] - 122:1
**deny** [5] - 23:13, 23:14, 125:20, 126:15, 146:2
**denying** [1] - 145:23
**department** [3] - 102:2, 102:4, 160:11
**dependent** [1] - 60:16
**depiction** [1] - 187:2
**deposition** [4] - 82:3, 148:18, 148:19, 148:20
**describe** [19] - 60:24, 63:19, 135:22, 159:3, 181:24, 187:24, 188:18, 197:5, 198:19, 198:20, 198:21, 198:22, 198:23, 199:7, 200:5, 200:21, 201:1, 201:2
**described** [8] - 156:12, 162:23, 182:2, 182:3, 182:9, 187:17, 194:9, 199:20
**describes** [2] - 187:13, 197:6
**describing** [1] - 163:2
**description** [11] - 138:12, 138:14, 138:15, 138:16, 138:21, 138:24, 168:17, 170:11, 186:2, 188:9, 195:12
**deserves** [4] - 142:6,

142:13, 143:20, 144:19
**design** [2] - 164:18, 183:5
**desperately** [1] - 183:23
**despite** [1] - 150:24
**detail** [8] - 21:24, 22:1, 23:18, 30:12, 45:1, 131:18, 137:18, 159:3
**detailed** [3] - 136:19, 138:17, 140:1
**details** [8] - 4:4, 94:9, 163:7, 165:5, 165:6, 165:7, 166:11, 171:8
**detect** [1] - 182:20
**detected** [1] - 179:3
**determination** [1] - 34:7
**determinations** [1] - 130:14
**determine** [2] - 83:11, 200:1
**determined** [6] - 6:19, 13:18, 15:6, 136:1, 190:10, 190:11
**determining** [7] - 14:22, 37:10, 41:2, 47:11, 58:12, 105:21, 171:8
**develop** [5] - 26:5, 161:4, 179:17, 181:3, 183:5
**developed** [3] - 26:2, 179:24, 182:10
**developing** [3] - 12:6, 185:7, 191:14
**development** [5] - 44:13, 71:16, 75:6, 75:9, 176:20
**develops** [1] - 70:19
**device** [1] - 135:6
**devices** [1] - 120:4
**devoted** [1] - 180:14
**deVry** [1] - 59:2
**diagnosed** [5] - 67:18, 88:20, 89:18, 96:11, 99:12
**diagnostic** [2] - 96:2, 96:9
**DIAZ** [1] - 1:22
**Diaz** [2] - 206:21, 206:22
**Dickinson** [1] - 105:14
**dictionaries** [1] - 119:24
**die** [2] - 153:6
**died** [7] - 70:21, 70:22, 169:19, 176:8,

176:10, 176:11, 204:17

**Diep** [3] - 28:1, 41:21, 41:23

**differ** [1] - 140:19

**difference** [3] - 165:16, 179:3, 193:7

**differences** [3] - 59:21, 74:7, 143:8

**different** [32] - 44:18, 50:15, 50:18, 50:19, 50:21, 50:22, 60:4, 99:25, 101:18, 122:4, 136:22, 143:4, 151:3, 151:24, 156:4, 162:16, 164:1, 169:12, 170:24, 177:5, 182:7, 186:25, 189:13, 189:15, 191:10, 194:17, 196:25, 197:4, 203:1, 205:19

**differently** [3] - 143:8, 152:17, 164:2

**differs** [1] - 143:10

**difficult** [5] - 35:5, 150:16, 182:4, 197:3, 200:3

**difficult-to-pronounce** [1] - 182:4

**digit** [1] - 205:18

**digital** [1] - 31:1

**digitally** [1] - 31:4

**digits** [1] - 158:15

**diligence** [2] - 191:25, 192:5

**dire** [1] - 177:25

**direct** [9] - 3:12, 84:10, 141:16, 141:22, 146:24, 146:25

**directed** [1] - 181:21

**direction** [1] - 103:12

**directions** [1] - 122:16

**directly** [1] - 120:13

**director** [4] - 150:2, 163:15, 166:2, 180:3

**discerning** [1] - 70:2

**disclose** [8] - 104:18, 127:10, 185:21, 186:5, 188:17, 188:18, 197:10, 199:12

**disclosed** [9] - 84:9, 93:12, 100:7, 102:24, 105:20, 106:19, 123:24, 123:25, 189:17

**discloses** [2] - 188:16, 199:10

**disclosing** [3] - 30:4, 32:4, 83:10

**disclosure** [3] - 138:22, 198:20, 199:13

**disclosures** [1] - 7:15

**discovered** [1] - 67:20

**discovery** [1] - 17:16

**discuss** [6] - 36:9, 103:6, 119:18, 124:4, 128:24, 137:4

**discussed** [4] - 10:13, 87:20, 120:3, 120:5

**discussing** [2] - 119:3, 136:22

**discussion** [2] - 156:25, 206:4

**discussions** [3] - 27:5, 87:7, 87:15

**disease** [1] - 150:14

**diseases** [2] - 150:15, 151:6

**disgruntled** [1] - 205:23

**dislikes** [1] - 132:23

**Disney** [1] - 49:8

**displayed** [2] - 12:23, 127:5

**displays** [1] - 13:11

**dispute** [6] - 22:4, 167:20, 167:21, 190:20, 194:24, 195:4

**disputed** [2] - 4:16, 114:11

**disputes** [1] - 124:12

**disqualified** [1] - 113:17

**disregard** [2] - 141:3, 144:8

**distance** [1] - 46:3

**distinction** [1] - 141:21

**distract** [1] - 145:4

**District** [1] - 81:6

**district** [9] - 5:9, 5:25, 6:11, 6:14, 37:21, 65:7, 68:18, 79:13, 80:3

**DISTRICT** [3] - 1:1, 1:2, 1:3

**DIVISION** [1] - 1:2

**DMV** [2] - 160:12, 160:15

**DNA** [23] - 187:4, 187:5, 187:11, 187:14, 188:10, 188:22, 188:23,

189:2, 194:9, 198:25, 199:1, 199:3, 199:4, 199:6, 199:8, 199:11, 199:16, 199:17

**doctor** [6] - 38:8, 64:9, 94:18, 98:22, 98:23, 99:13

**doctors** [15] - 50:10, 57:13, 57:16, 63:11, 64:15, 67:14, 68:1, 85:6, 87:22, 100:21, 150:11, 150:14, 153:19, 156:21

**document** [16] - 14:18, 14:23, 14:24, 14:25, 18:9, 18:10, 124:21, 125:20, 164:11, 165:12, 166:5, 166:9, 167:7, 168:7, 192:15

**documentation** [1] - 165:21

**documents** [7] - 15:1, 17:17, 142:2, 146:12, 149:19, 166:6, 166:7

**dollars** [2] - 154:24, 161:4

**domain** [12] - 188:15, 189:11, 189:12, 189:16, 189:19, 189:20, 189:21, 190:1, 190:2, 198:25, 199:2

**done** [24] - 5:1, 11:3, 18:5, 64:8, 76:13, 87:4, 87:21, 102:10, 123:8, 129:15, 149:23, 150:14, 154:22, 159:23, 180:22, 182:13, 184:9, 185:5, 186:11, 189:14, 189:15, 191:5, 204:19

**dose** [1] - 125:2

**doubt** [2] - 59:23, 137:13

**down** [10] - 27:20, 37:24, 58:20, 58:21, 84:13, 118:9, 164:7, 176:14, 202:25, 203:19

**dozen** [1] - 36:14

**Dr** [128] - 7:2, 7:6, 7:25, 8:6, 8:13, 8:14, 8:17, 8:18, 8:20, 10:1, 10:6, 10:9, 10:16, 10:24, 11:5,

11:11, 12:18, 17:1, 17:5, 17:11, 25:2, 105:1, 105:2, 105:3, 105:4, 105:6, 105:7, 105:12, 105:13, 105:14, 105:15, 105:16, 126:4, 126:5, 126:14, 149:24, 149:25, 150:1, 150:4, 152:1, 153:2, 154:20, 156:12, 156:14, 156:23, 157:6, 159:25, 161:24, 162:4, 162:6, 162:7, 162:9, 162:19, 162:21, 162:23, 163:8, 163:12, 163:14, 163:18, 166:15, 166:17, 168:23, 169:1, 169:2, 169:3, 170:2, 170:18, 170:25, 171:2, 172:20, 175:10, 176:4, 176:21, 179:16, 180:11, 180:18, 180:19, 180:20, 181:4, 181:7, 181:10, 181:11, 181:15, 181:17, 181:19, 182:1, 182:10, 182:12, 182:13, 183:5, 184:1, 184:3, 184:6, 184:7, 184:8, 184:11, 185:4, 189:7, 189:11, 189:22, 190:15, 190:18, 191:5, 192:7, 192:12, 193:22, 194:2, 194:4, 194:7, 194:8, 194:11

**drawn** [1] - 12:14

**drinks** [1] - 130:21

**drive** [3] - 45:18, 65:17, 160:16

**driver's** [3] - 108:19, 108:21

**drove** [1] - 45:17

**drug** [16] - 25:4, 25:9, 25:13, 96:25, 153:3, 154:21, 155:5, 156:12, 159:8, 159:14, 159:22, 163:13, 164:15, 170:17, 170:23, 172:6

**drugs** [1] - 161:5

**due** [2] - 191:25, 192:5

**DUI** [2] - 32:2, 44:7

**Dulac** [2] - 105:5, 105:16

**duly** [1] - 25:5

**during** [31] - 12:24, 40:20, 76:25, 95:17, 98:6, 103:6, 104:1, 113:11, 118:22, 120:5, 120:13, 124:3, 130:20, 131:19, 140:3, 143:22, 144:12, 144:23, 145:11, 146:4, 148:6, 149:16, 149:22, 150:18, 155:21, 164:23, 172:7, 174:19, 181:14, 183:2, 206:4

**duties** [6] - 33:10, 33:18, 33:19, 43:4, 50:5, 83:19

**duty** [9] - 44:7, 50:5, 56:21, 56:23, 66:6, 118:23, 132:7, 132:19, 140:23

---

**E**

**e-mail** [5] - 4:1, 119:4, 162:7, 181:10, 181:12

**early** [12] - 4:1, 69:1, 87:23, 121:22, 122:7, 153:24, 154:10, 154:11, 154:14, 156:16, 156:22, 206:5

**earth** [1] - 155:3

**easier** [1] - 183:16

**easily** [1] - 129:21

**East** [1] - 95:25

**easy** [1] - 149:19

**eat** [2] - 130:22, 188:3

**Ed** [1] - 105:5

**edema** [1] - 176:11

**edge** [1] - 87:5

**Edison** [8] - 58:25, 59:4, 60:19, 61:5, 61:8, 61:16, 61:19, 61:23

**educate** [1] - 131:11

**educated** [1] - 108:10

**education** [4] - 68:18, 69:1, 144:15, 144:20

**educational** [1] - 54:1

**educator** [1] - 42:18

**Edward** [2] - 2:16, 105:16

efforts [1] - 168:10
eight [2] - 60:23, 63:10
either [9] - 4:22, 7:4, 24:6, 58:4, 84:6, 141:16, 141:22, 151:17, 157:3
El [3] - 41:23, 65:3, 65:6
electrical [1] - 44:17
electromagnetic [1] - 45:5
electronic [1] - 119:4
electronics [2] - 44:16, 44:17
element [10] - 136:9, 182:6, 187:17, 189:12, 195:16, 195:17, 195:20, 196:6, 196:14
elementary [1] - 66:16
elements [4] - 135:12, 135:17, 195:21, 196:13
Elizabeth [1] - 2:6
Elmo [1] - 11:23
elsewhere [1] - 120:17
embedded [1] - 196:2
embrace [2] - 60:15, 129:25
emergency [1] - 49:15
Emily [2] - 28:13, 65:3
emotional [1] - 70:1
emphasis [1] - 83:19
emphasize [3] - 59:22, 104:11, 113:11
employed [3] - 31:5, 31:7, 55:8
employees [2] - 111:14, 183:4
employer [3] - 81:13, 119:12, 119:14
enablement [4] - 138:23, 139:5, 168:17, 170:11
enables [1] - 176:22
encoded [3] - 136:3, 187:4, 190:12
encodes [2] - 188:23, 199:5
encoding [3] - 136:8, 187:13
encompassed [1] - 173:13
encourage [2] - 29:9, 127:9
encouraged [1] - 9:8
end [10] - 7:19, 8:2, 77:24, 104:14, 118:24, 132:15,

135:22, 185:5, 187:20, 200:13
endeavor [1] - 8:18
ended [2] - 48:13, 89:20
enemies [1] - 151:19
engaged [1] - 12:5
engineered [1] - 204:20
engineering [1] - 44:21
engineers [2] - 61:9, 61:14
English [19] - 40:11, 40:13, 102:8, 102:20, 107:19, 107:22, 108:15, 108:22, 108:24, 109:3, 109:11, 109:12, 109:15, 109:25, 110:1, 110:18, 110:20, 111:7
enrolled [1] - 154:11
entered [6] - 16:7, 123:13, 181:2, 182:11, 191:9, 191:12
enters [1] - 185:20
entertain [1] - 124:5
entire [7] - 58:8, 58:9, 121:10, 121:25, 148:16, 168:1, 179:16
entirely [1] - 202:2
entitled [4] - 121:2, 148:21, 186:11, 192:21
entity [1] - 199:15
entrenched [1] - 164:11
environment [1] - 70:3
environmental [3] - 31:23, 32:13, 32:16
equally [2] - 161:5, 185:18
equipment [1] - 54:12
eradicating [1] - 179:2
err [1] - 37:5
error [13] - 11:1, 145:18, 165:9, 166:10, 166:16, 166:19, 167:8, 192:16, 192:17, 193:3, 193:7, 193:17, 194:3
errors [1] - 165:8
established [1] - 165:5
estimate [1] - 172:4

et [2] - 1:5, 20:18
evening [2] - 132:14, 206:6
event [2] - 139:17, 143:7
events [2] - 33:21, 34:9
eventually [2] - 48:14, 167:18
everyday [1] - 152:20
everywhere [1] - 153:14
Evidence [2] - 143:21, 145:17
evidence [135] - 12:10, 12:13, 12:16, 12:20, 12:24, 13:2, 16:22, 21:17, 50:25, 56:23, 60:2, 81:20, 83:22, 97:17, 111:24, 118:19, 119:20, 120:19, 122:21, 125:25, 126:15, 132:10, 132:20, 132:25, 133:4, 133:13, 133:17, 136:24, 137:1, 137:2, 137:5, 137:7, 137:8, 137:12, 137:14, 138:3, 138:6, 138:20, 139:4, 139:14, 140:4, 140:8, 140:13, 140:16, 140:18, 140:19, 140:23, 140:25, 141:3, 141:4, 141:6, 141:7, 141:9, 141:10, 141:11, 141:12, 141:15, 141:16, 141:19, 141:21, 141:23, 141:24, 142:1, 142:3, 142:4, 142:6, 142:8, 142:9, 142:10, 142:11, 142:13, 142:24, 143:1, 143:17, 143:22, 143:24, 143:25, 144:7, 144:9, 144:11, 144:21, 145:2, 145:8, 145:16, 146:8, 146:10, 146:11, 146:13, 146:14, 146:19, 146:21, 147:10, 147:17, 147:18, 147:21, 147:25, 148:3, 148:6, 148:8,

148:9, 148:10, 148:11, 148:12, 148:13, 148:14, 148:23, 155:21, 161:10, 161:21, 164:5, 164:21, 164:24, 166:14, 166:24, 167:2, 167:20, 168:22, 168:25, 169:1, 171:4, 172:6, 174:15, 193:6, 193:16, 193:20, 194:19, 201:24, 202:6, 204:5
evident [2] - 193:3, 194:4
evidentiary [1] - 172:25
exact [6] - 3:25, 167:21, 169:4, 169:6, 185:10, 204:13
exactly [12] - 11:4, 162:22, 171:2, 171:3, 185:16, 185:17, 185:22, 186:6, 186:7, 188:18, 189:23
examination [4] - 5:11, 146:24, 146:25, 147:9
examine [1] - 147:1
examined [2] - 82:9, 147:9
examiner [2] - 82:23, 201:19
examiners [2] - 46:21, 201:11
examining [1] - 82:13
example [1] - 202:10
exams [1] - 64:18
Exchange [1] - 171:23
exchange [2] - 185:24, 186:1
exciting [3] - 25:1, 25:22
exclude [6] - 11:8, 11:10, 17:2, 22:9, 126:5
excluded [1] - 141:2
exclusive [7] - 160:7, 160:23, 161:1, 161:9, 163:21, 167:19, 167:22
exclusively [3] - 22:18, 125:9, 133:12
exclusivity [1] - 185:25
excuse [10] - 11:20,

12:8, 13:22, 19:4, 107:10, 111:4, 111:24, 112:11, 115:18, 120:14
excused [15] - 111:8, 111:16, 112:9, 112:25, 113:4, 113:7, 115:24, 115:25, 116:11, 116:20, 117:7, 118:8, 118:18, 118:25, 120:8
excuses [2] - 125:15, 127:15
executive [1] - 108:10
exercise [2] - 112:19, 114:22
exercising [1] - 112:14
exhibit [7] - 9:20, 11:2, 11:8, 11:10, 143:23, 144:2, 144:3
exhibits [3] - 10:2, 140:7, 140:12
existed [1] - 159:17
expand [9] - 93:6, 107:3, 177:20, 184:18, 184:21, 194:21, 195:6, 195:7, 204:22
expanded [4] - 182:23, 184:1, 184:12, 203:16
expanding [1] - 180:23
expect [2] - 7:25, 119:15
expectancy [1] - 154:12
expects [1] - 146:9
experience [37] - 26:15, 42:24, 47:9, 56:17, 57:21, 59:6, 59:9, 59:16, 60:8, 60:9, 60:24, 62:15, 62:22, 63:5, 67:5, 69:12, 82:15, 82:19, 84:10, 85:20, 86:20, 93:4, 96:14, 99:3, 99:4, 99:5, 99:7, 101:5, 101:14, 101:24, 102:1, 104:3, 106:19, 144:15, 144:20, 178:1, 178:3
experiences [9] - 50:11, 72:8, 91:7, 97:8, 97:9, 97:11, 102:3, 106:21
experimentation [3] -

139:2, 168:20, 168:25
**experimenting** [1] - 194:12
**expert** [7] - 8:6, 8:9, 8:14, 17:2, 17:19, 62:8, 194:2
**experts** [10] - 33:22, 34:1, 34:2, 50:9, 50:14, 50:16, 50:17, 114:6, 144:13, 199:23
**explain** [9] - 19:20, 37:24, 94:9, 135:3, 135:23, 142:2, 148:7, 169:5, 186:20
**explained** [5] - 22:1, 23:18, 131:17, 202:15, 202:19
**explaining** [1] - 6:24
**explains** [1] - 131:21
**explore** [1] - 180:15
**explorer** [1] - 198:6
**exposed** [3] - 118:21, 121:11, 133:15
**express** [1] - 108:1
**expressed** [3] - 102:7, 108:12, 111:6
**extended** [1] - 51:14
**extent** [4] - 4:25, 9:5, 97:21, 126:19
**extra** [3] - 154:17
**extraordinary** [3] - 150:9, 153:7, 172:5
**extremely** [1] - 25:22
**eye** [1] - 7:18

**F**

**fabulous** [4] - 175:10, 175:11, 176:20, 185:2
**face** [1] - 158:17
**Facebook** [1] - 119:6
**facilities** [2] - 155:23, 183:8
**facility** [1] - 96:14
**fact** [15] - 6:2, 29:5, 34:6, 97:10, 104:11, 141:17, 141:20, 143:17, 153:1, 154:6, 167:21, 171:10, 171:15, 198:24, 200:9
**factors** [1] - 143:1
**factory** [1] - 53:25
**facts** [11] - 37:17, 132:19, 132:20, 140:5, 140:8, 140:9, 140:14, 140:19,

141:19, 142:14, 143:1
**factual** [1] - 137:10
**faculty** [4] - 74:15, 75:1, 75:3, 75:5
**failed** [8] - 139:6, 139:8, 157:6, 175:16, 175:18, 177:11, 178:18, 205:25
**fair** [29] - 26:8, 26:20, 26:22, 33:5, 36:21, 42:10, 43:2, 45:14, 49:12, 49:13, 53:9, 58:17, 62:11, 66:20, 69:3, 70:2, 70:16, 72:14, 72:25, 75:17, 76:16, 79:7, 79:15, 83:6, 111:19, 111:21, 111:23, 121:2, 121:5
**fairly** [7] - 48:20, 82:13, 89:12, 94:22, 99:6, 114:14, 205:22
**fairness** [1] - 121:8
**faith** [2] - 9:2, 202:20
**fall** [1] - 135:15
**falls** [3] - 185:18, 185:23, 192:25
**familiar** [13] - 31:11, 41:8, 52:3, 63:12, 95:22, 96:7, 98:7, 98:10, 98:13, 104:2, 107:18, 108:1, 160:8
**family** [24] - 49:23, 51:14, 52:15, 71:7, 84:7, 84:8, 85:24, 93:8, 93:10, 98:19, 99:1, 100:6, 104:5, 106:8, 106:17, 107:4, 107:6, 108:9, 119:11, 119:13, 151:20
**far** [21] - 23:18, 31:14, 33:6, 39:20, 45:15, 49:11, 52:4, 53:5, 64:21, 65:18, 73:17, 83:14, 93:17, 102:10, 108:2, 108:12, 131:18, 153:4, 197:1, 199:21
**fashion** [1] - 114:13
**father** [10] - 51:16, 51:20, 84:15, 88:2, 88:5, 97:12, 106:25, 111:12, 111:19
**father-in-law** [1] - 84:15
**favor** [1] - 128:5
**FCRR** [1] - 1:22

**FDA** [6] - 176:2, 176:14, 176:15, 177:2, 184:25, 203:7
**federal** [9] - 22:8, 43:6, 56:17, 59:13, 80:10, 80:11, 80:18, 81:2, 128:1
**Federal** [5] - 1:22, 49:10, 76:14, 102:2, 102:3
**feelings** [1] - 101:2
**fell** [3] - 89:7, 190:18, 191:11
**fellow** [1] - 119:9
**felt** [1] - 96:13
**fence** [8] - 11:22, 13:22, 185:11, 190:19, 191:18, 191:19, 193:1
**few** [12] - 10:5, 21:13, 84:12, 84:24, 89:19, 99:19, 149:13, 153:19, 168:6, 175:21, 183:22, 203:9
**fewer** [1] - 135:9
**field** [4] - 60:25, 98:22, 138:25, 184:13
**fields** [1] - 50:12
**figure** [4] - 61:25, 62:3, 184:17, 200:3
**figured** [2] - 184:13, 184:14
**figures** [2] - 180:16, 205:19
**figuring** [4] - 66:9, 204:19, 204:20, 204:21
**file** [4] - 9:24, 81:22, 100:21, 171:22
**filed** [16] - 9:21, 15:13, 18:9, 18:11, 22:24, 26:10, 46:12, 124:6, 133:25, 139:3, 163:4, 165:11, 166:9, 191:15, 196:22, 201:11
**files** [1] - 192:15
**filing** [4] - 17:17, 123:13, 123:14, 194:9
**filled** [1] - 112:20
**film** [7] - 29:22, 30:23, 72:21, 73:2, 73:9, 76:12
**films** [2] - 31:1
**final** [9] - 5:1, 13:4, 104:15, 105:18, 114:4, 132:3, 132:16, 132:17,

148:24
**finally** [3] - 147:2, 148:2, 172:8
**financial** [6] - 41:24, 55:22, 57:11, 80:3, 80:5, 139:15
**fine** [4] - 8:22, 89:9, 128:17, 139:23
**finish** [3] - 128:10, 173:20, 204:1
**finished** [2] - 80:10, 80:13
**fired** [1] - 60:22
**firefighter** [1] - 74:16
**firm** [8] - 39:4, 39:6, 39:10, 98:5, 98:8, 98:11, 98:12, 137:9
**firms** [2] - 98:4, 98:7
**first** [62] - 4:1, 11:1, 24:1, 25:4, 26:2, 26:13, 26:25, 27:20, 28:11, 71:3, 88:20, 89:18, 105:1, 112:18, 112:20, 115:2, 115:13, 115:15, 117:15, 118:6, 118:10, 121:17, 124:12, 125:11, 126:23, 136:23, 146:7, 149:11, 149:25, 152:14, 153:2, 155:13, 157:1, 157:24, 159:19, 159:23, 160:13, 161:11, 164:9, 164:10, 164:12, 164:13, 164:20, 168:2, 168:10, 169:22, 178:2, 178:18, 181:8, 182:14, 182:15, 183:4, 184:7, 184:25, 187:11, 188:3, 190:2, 193:8, 194:14, 198:10
**fish** [1] - 98:14
**fit** [1] - 6:2
**fits** [3] - 157:20, 188:8, 188:13
**five** [13] - 42:1, 49:6, 49:15, 97:6, 103:4, 129:20, 151:23, 154:15, 169:19, 176:8, 176:9, 181:23, 204:17
**fix** [2] - 44:18, 46:14
**flexibility** [1] - 8:3
**floor** [3] - 30:15, 103:15, 103:16

**Floor** [2] - 2:9, 2:18
**Florida** [1] - 49:8
**Flower** [1] - 2:9
**focus** [2] - 108:11, 161:21
**focused** [1] - 189:16
**focusing** [1] - 171:18
**Fogel** [1] - 19:6
**folks** [2] - 153:21, 169:20
**follow** [2] - 43:5, 43:11, 43:12, 43:19, 52:17, 64:18, 73:22, 100:17, 101:7, 101:10, 103:19, 106:4, 106:7, 107:8, 108:4, 121:6, 121:7, 122:24, 123:16, 124:22, 132:21, 133:17
**follow-up** [8] - 64:18, 100:17, 101:7, 101:10, 103:19, 106:4, 106:7, 108:4
**follow-ups** [1] - 107:8
**followed** [1] - 125:7
**following** [1] - 165:17
**follows** [1] - 136:3
**food** [5] - 38:13, 38:14, 54:4, 109:17, 130:22
**footnote** [2] - 163:1
**forces** [2] - 152:21, 153:13
**Forces** [3] - 159:16, 159:17, 159:19
**foregoing** [1] - 206:14
**foreign** [5] - 151:1, 151:4, 151:10, 153:5
**foreman** [1] - 59:7
**foremost** [1] - 149:11
**forensic** [4] - 79:12, 79:24, 80:25, 82:19
**forever** [1] - 195:24
**forget** [1] - 143:6
**forgetting** [1] - 15:18
**form** [6] - 5:9, 6:1, 94:15, 156:2, 195:23, 196:2
**formal** [3] - 44:19, 61:3, 165:4
**formatting** [1] - 166:12
**formed** [1] - 156:1
**former** [1] - 61:6
**forms** [2] - 6:2, 119:7
**formula** [1] - 101:18
**forth** [3] - 135:4, 135:5, 135:9
**forward** [1] - 22:2,

23:19, 27:16, 27:19, 66:17, 78:10, 81:21, 121:16, 123:23, 124:11, 175:6
**fossil** [2] - 58:25, 60:21
**foundation** [1] - 34:10
**founded** [4] - 179:10, 179:15, 180:1, 180:6
**four** [9] - 3:18, 45:4, 74:17, 81:1, 82:8, 88:24, 129:20, 192:19
**frame** [1] - 5:17
**franchise** [1] - 16:19
**fraud** [3] - 80:4, 80:10, 82:23
**fraudulent** [1] - 81:16
**Fred** [1] - 156:9
**free** [6] - 18:22, 39:10, 130:19, 130:21, 169:19, 185:19
**freelance** [1] - 72:21
**freely** [1] - 162:12
**Friday** [2] - 78:15, 122:10
**friend** [5] - 86:4, 87:2, 87:14, 92:9, 106:8
**friendlies** [4] - 151:10, 151:12, 152:15, 152:19
**friendly** [1] - 152:19
**friends** [20] - 84:8, 85:24, 93:8, 93:10, 93:22, 96:2, 96:19, 97:3, 97:14, 98:20, 99:2, 100:6, 100:24, 104:5, 106:18, 111:13, 111:20, 111:21, 151:20, 178:1
**Frohlich** [1] - 105:17
**front** [8] - 5:13, 99:10, 100:8, 102:4, 103:24, 104:18, 131:23
**frustration** [1] - 179:18
**fuel** [1] - 58:25
**fuels** [1] - 60:21
**full** [4] - 138:24, 168:9, 198:20, 200:22
**fully** [1] - 171:5
**fun** [2] - 160:14, 178:5
**function** [1] - 53:15
**functions** [1] - 35:7
**fundamental** [1] - 59:21
**fused** [1] - 186:25
**fusion** [1] - 186:23

**future** [2] - 66:12, 186:9

# G

**Gabriel** [1] - 38:6
**gain** [1] - 120:23
**gallery** [1] - 175:4
**galley** [5] - 18:20, 24:5, 36:6, 113:12, 129:10
**Garcia** [1] - 105:14
**Garth** [1] - 2:15
**gas** [1] - 60:22
**gas-fired** [1] - 60:22
**gathered** [1] - 62:25
**gatherings** [1] - 71:7
**gee** [2] - 5:18, 166:7
**Geers** [5] - 2:11, 3:7, 21:1, 24:11, 131:5
**general** [12] - 42:23, 47:14, 57:16, 68:20, 72:5, 75:25, 85:16, 86:16, 92:24, 96:15, 103:20, 106:3
**General** [1] - 81:19
**generalists** [1] - 37:22
**generalized** [1] - 19:11
**generally** [4] - 57:17, 104:6, 146:1, 189:23
**generation** [2] - 157:1, 157:2
**genitourinary** [1] - 179:12
**gentleman** [1] - 117:15
**gentlemen** [8] - 23:23, 25:21, 117:21, 122:24, 149:10, 150:7, 206:3, 206:8
**genus** [8] - 197:20, 197:22, 198:1, 198:4, 198:5, 200:8, 200:23
**geology** [1] - 61:6
**GI** [1] - 83:4
**Gilbert** [5] - 17:1, 17:5, 17:11, 105:3, 150:4
**Gilbert's** [1] - 126:4
**Gilead** [6] - 95:21, 98:2, 179:7, 203:6, 203:24
**Gilead's** [1] - 126:11
**given** [13] - 68:2, 68:3, 89:6, 89:10, 89:11, 89:13, 94:21, 111:15, 132:3, 141:22, 144:20,

144:23, 144:25
**glimmer** [1] - 155:3
**gloms** [1] - 159:12
**glossaries** [1] - 4:12
**glossary** [11] - 3:20, 3:23, 4:2, 4:7, 5:7, 5:8, 5:19, 5:23, 6:1, 6:17, 6:18
**go-between** [2] - 61:12, 62:3
**goal** [1] - 29:11
**Goldilocks** [4] - 187:25, 188:2, 188:12, 197:16
**Google** [1] - 103:8
**govern** [1] - 132:17
**Government** [2] - 102:2, 102:4
**government** [8] - 22:8, 33:1, 168:11, 180:13, 180:22, 183:7, 185:21, 185:24
**grade** [3] - 65:8, 74:18, 197:17
**graduated** [2] - 32:23, 96:21
**Grand** [1] - 2:18
**grand** [6] - 59:5, 59:12, 59:13, 62:14, 62:18, 63:4
**grandfather** [2] - 66:25, 67:6
**grandmother** [2] - 89:17, 90:2
**grandpa** [1] - 70:21
**grandparents** [1] - 107:25
**grant** [4] - 125:10, 125:16, 145:21, 155:15
**granted** [11] - 22:5, 22:7, 25:5, 124:25, 126:5, 126:6, 155:16, 155:18, 161:1, 163:20
**granting** [1] - 145:23
**grants** [2] - 167:11, 167:19
**graphic** [1] - 163:11
**graphics** [1] - 163:6
**Gratzinger** [1] - 2:17
**great** [6] - 36:3, 97:22, 162:1, 164:14, 175:12, 179:20
**greater** [3] - 155:20, 159:3, 183:18
**Greek** [1] - 159:1
**green** [4] - 157:13, 157:24, 158:1,

158:21
**grenades** [1] - 193:12
**grew** [3] - 95:25, 107:19, 107:24
**grounds** [1] - 202:20
**group** [2] - 22:7, 84:1
**grow** [2] - 152:12, 183:13
**grows** [1] - 151:13
**guess** [9] - 45:7, 48:11, 70:8, 92:13, 100:25, 146:6, 177:3, 177:9, 194:13
**guest** [1] - 65:9
**guidance** [1] - 127:7
**guide** [1] - 171:8
**gum** [1] - 130:22
**gurney** [1] - 58:4
**guys** [1] - 96:19

# H

**hair** [1] - 178:5
**half** [8] - 4:14, 67:8, 67:12, 86:7, 123:1, 123:2, 192:19
**hallway** [1] - 120:17
**hand** [16] - 12:2, 34:5, 34:25, 35:2, 69:14, 93:14, 94:24, 94:25, 95:23, 100:9, 100:11, 143:14, 157:17, 193:12
**handbags** [2] - 202:11, 202:13
**handle** [7] - 3:14, 3:16, 17:15, 27:14, 37:22, 122:12, 123:4
**handled** [2] - 47:2, 166:13
**hands** [35] - 35:8, 36:8, 43:20, 50:23, 51:10, 51:11, 84:11, 84:12, 86:1, 93:13, 97:23, 97:24, 98:9, 98:14, 98:18, 98:25, 101:25, 102:5, 102:24, 102:25, 103:24, 104:7, 104:9, 105:22, 117:22
**handwriting** [1] - 106:10
**Hans** [1] - 105:4
**happy** [2] - 20:5, 92:3
**hard** [5] - 65:22, 152:5, 152:7, 166:21, 170:4
**harness** [1] - 25:10
**Harr** [1] - 105:4

158:21
**Harvard** [2] - 89:3, 94:18
**harvested** [1] - 178:10
**head** [2] - 37:13, 175:5
**heading** [3] - 16:8, 16:9, 16:15
**Health** [1] - 180:14
**health** [6] - 42:15, 42:19, 63:16, 64:4, 102:22
**health-wise** [1] - 64:4
**healthcare** [3] - 57:3, 57:10, 185:2
**healthy** [3] - 49:21, 89:9, 99:18
**hear** [49] - 9:13, 11:15, 33:13, 33:20, 33:22, 37:13, 37:15, 50:7, 50:9, 50:14, 50:15, 50:17, 64:3, 87:3, 120:9, 134:15, 141:8, 142:20, 144:12, 149:25, 150:1, 150:4, 155:21, 156:18, 156:25, 159:1, 163:7, 166:11, 171:6, 174:3, 176:8, 179:10, 181:9, 181:13, 183:1, 184:2, 184:8, 187:8, 190:22, 191:20, 193:6, 199:23, 204:5, 205:12, 205:18, 205:20
**heard** [41] - 8:20, 25:7, 31:13, 33:6, 36:2, 45:15, 52:6, 53:5, 92:2, 124:15, 141:18, 153:1, 156:6, 156:7, 165:17, 172:5, 175:9, 176:3, 176:4, 176:8, 176:22, 177:7, 180:10, 181:6, 182:3, 183:12, 184:4, 185:8, 186:21, 188:15, 190:3, 195:20, 196:21, 201:5, 201:9, 202:1, 202:5, 202:25
**hearing** [1] - 122:20
**hears** [1] - 50:21
**heavier** [1] - 166:25
**Heinrich** [6] - 2:5, 3:8, 21:1, 24:11, 131:5
**held** [2] - 166:2, 178:11
**hello** [2] - 65:2, 79:10

**help** [11] - 101:1,
132:8, 132:9,
133:17, 140:18,
142:1, 145:1, 146:9,
171:8, 174:22,
179:20
**helped** [3] - 68:5,
86:11, 183:5
**helpful** [1] - 93:2
**helping** [2] - 148:11,
149:12
**helps** [2] - 70:20,
167:5
**herbs** [1] - 86:7
**herself** [1] - 67:17
**hi** [2] - 69:10, 83:2
**hiatus** [1] - 73:14
**hide** [1] - 156:13
**high** [8] - 55:25,
74:18, 96:20,
171:13, 178:8,
197:18, 204:23,
204:24
**higher** [2] - 137:11,
146:17
**highest** [3] - 59:24,
164:6, 166:2
**highlighting** [2] -
165:13, 165:15
**highly** [6] - 13:16,
131:13, 137:9,
146:18, 147:15,
201:8
**hired** [3] - 182:23,
182:24, 184:12
**hiring** [2] - 73:9, 75:5
**history** [1] - 56:6
**hold** [4] - 60:5, 146:1,
169:21, 176:15
**holder** [1] - 41:11
**holiday** [2] - 65:22,
174:19
**holidays** [1] - 174:20
**home** [3] - 67:9,
132:13, 204:4
**homemaker** [1] - 49:5
**homology** [3] - 9:20,
10:1, 10:6
**Honor** [46] - 3:5, 3:15,
3:24, 5:6, 5:15, 6:6,
6:21, 8:21, 13:6,
14:9, 14:13, 14:15,
14:18, 14:19, 15:12,
15:16, 17:25, 18:7,
18:9, 18:25, 19:23,
19:24, 20:22, 21:1,
21:3, 21:5, 25:20,
35:10, 104:21,
105:9, 107:9,
107:14, 111:10,

112:2, 112:10,
112:22, 115:16,
117:20, 127:25,
128:9, 128:20,
149:8, 173:14,
174:17, 191:1,
193:24
**HONORABLE** [1] - 1:3
**Hope** [3] - 88:6, 88:7,
88:12
**hope** [6] - 154:3,
154:4, 155:4, 155:6,
156:7, 175:21
**hopefully** [5] - 7:14,
114:25, 124:16,
127:7, 175:2
**hoping** [3] - 6:23,
7:17, 66:18
**horseshoes** [1] -
193:12
**Horwitz** [3] - 28:20,
76:9, 99:10
**Hospital** [1] - 170:8
**hospital** [15] - 42:20,
58:5, 58:8, 58:9,
64:11, 67:19, 72:4,
83:4, 84:22, 90:9,
91:5, 91:19, 92:20,
100:17, 156:7
**hospitals** [1] - 64:7
**hot** [1] - 188:4
**hour** [5] - 103:5,
112:14, 113:8, 123:2
**hours** [4] - 30:16,
121:18, 122:4, 122:5
**house** [2] - 35:13,
188:3
**household** [1] -
107:25
**housekeeping** [1] -
121:16
**housemaker** [1] - 38:7
**HP** [1] - 55:7
**huge** [2] - 164:21,
191:17
**hum** [7] - 45:19,
49:17, 69:17, 70:25,
71:21, 74:24, 115:14
**hum-um** [1] - 74:24
**human** [2] - 75:8,
170:21
**hundreds** [5] - 177:13,
177:14, 179:6,
179:23
**huntsman** [1] - 52:6
**husband** [10] - 29:22,
30:22, 41:24, 49:6,
49:7, 55:22, 57:24,
68:13, 72:22, 74:16
**husband's** [1] - 87:13

**Hutchinson** [1] -
156:9
**hypothetical** [1] -
171:7

# I

**I.D** [1] - 160:14
**ID** [10] - 10:16, 10:19,
10:25, 11:11, 12:8,
12:12, 13:19, 136:4,
158:24, 190:12
**idea** [5] - 101:19,
177:17, 198:1,
204:11, 205:7
**ideas** [1] - 181:11
**identified** [4] - 52:4,
57:19, 104:23,
165:18
**identifies** [1] - 188:23
**identify** [1] - 33:14
**ignore** [5] - 120:15,
133:9, 143:17,
144:6, 144:8
**illness** [3] - 96:10,
98:22, 98:24
**illustrate** [2] - 142:8,
167:5
**image** [2] - 19:5, 19:7
**imagine** [1] - 65:24
**immediately** [3] -
37:13, 133:16,
203:11
**immune** [17] - 25:10,
150:17, 150:18,
150:20, 150:25,
151:2, 151:7, 151:9,
156:13, 157:11,
157:21, 158:8,
159:9, 159:24,
163:12, 178:12,
178:14
**impact** [1] - 179:23
**impacted** [1] - 93:9
**impartial** [3] - 26:21,
26:22, 121:3
**implicate** [1] - 17:14
**implication** [2] - 12:4,
12:14
**implied** [1] - 162:18
**importance** [1] - 4:21
**important** [35] - 4:22,
6:25, 7:9, 8:5, 8:12,
9:4, 24:4, 24:5,
25:16, 70:18,
104:16, 121:7,
121:18, 130:12,
143:12, 143:19,
149:21, 150:8,
160:4, 160:25,

163:13, 170:13,
170:15, 170:16,
171:15, 181:9,
184:5, 185:14,
185:18, 190:14,
196:1, 204:9, 205:5,
205:7
**importing** [1] - 134:2
**imposition** [1] -
174:20
**impressions** [10] -
72:5, 85:16, 86:9,
86:16, 88:9, 89:4,
90:17, 92:25, 94:15,
96:15
**improper** [2] - 120:23,
140:24
**inaccurate** [1] -
120:25
**inadequate** [1] -
199:13
**inappropriate** [2] -
13:1, 13:17
**INC** [2] - 1:5, 1:8
**Inc** [4] - 3:2, 20:18,
20:19
**incentive** [1] - 164:21
**incidentally** [1] - 4:13
**include** [6] - 4:16,
6:16, 21:19, 139:22,
140:5, 151:3
**included** [7] - 5:22,
6:3, 6:5, 6:18, 47:21,
48:15, 186:7
**includes** [7] - 5:9,
118:10, 119:3,
125:7, 189:24,
197:23, 198:2
**including** [6] - 55:7,
119:6, 119:11,
120:7, 167:24,
196:18
**incomplete** [2] -
13:21, 120:25
**inconsistent** [1] -
16:13
**inconvenience** [1] -
146:5
**incorporated** [2] -
123:8, 123:9
**incorrect** [2] - 4:17,
16:9
**incorrectly** [1] - 15:2
**incredible** [1] - 175:20
**incredibly** [2] -
198:16, 205:5
**independent** [2] -
94:4, 113:14
**indexes** [1] - 77:8
**indicated** [4] - 44:11,

98:15, 111:22, 112:5
**indication** [3] - 89:10,
136:15, 145:24
**individual** [4] - 25:12,
106:5, 152:8, 198:2
**individually** [1] -
151:18
**industry** [4] - 54:11,
76:11, 103:21,
103:23
**infection** [2] - 150:20,
151:2
**influence** [16] - 42:8,
48:24, 56:10, 60:9,
62:23, 63:6, 72:9,
82:16, 85:21, 86:21,
87:8, 91:8, 93:4,
97:9, 97:18, 101:15
**influenced** [4] -
120:24, 132:23,
140:25, 145:9
**information** [38] -
4:16, 37:2, 37:6,
37:9, 37:12, 41:1,
43:21, 46:9, 51:12,
52:16, 55:15, 58:11,
58:14, 62:25, 64:23,
68:7, 69:5, 70:18,
79:4, 82:24, 83:9,
83:10, 91:25,
105:19, 105:22,
118:21, 120:23,
120:25, 121:4,
121:11, 122:14,
133:15, 142:8,
145:16, 158:17,
166:12, 169:2, 192:6
**informative** [1] - 94:19
**infringe** [12] - 147:11,
161:14, 161:21,
164:7, 164:22,
164:25, 168:14,
186:16, 193:15,
195:8, 202:16,
202:24
**infringed** [1] - 146:21
**infringement** [42] -
14:1, 14:6, 16:7,
23:4, 23:11, 25:8,
126:22, 129:14,
134:16, 134:17,
134:24, 134:25,
138:1, 139:11,
139:16, 139:25,
147:4, 147:6,
161:11, 161:12,
161:22, 161:23,
163:24, 164:1,
164:19, 170:9,
171:6, 172:6,

190:24, 190:25,
191:4, 193:11,
193:13, 193:14,
195:2, 195:3,
201:21, 201:22,
203:20
**infringer** [2] - 202:7,
202:8
**infringes** [9] - 16:10,
22:25, 23:10,
126:25, 127:5,
134:10, 137:23,
161:15, 164:5
**infringing** [6] - 15:9,
134:2, 163:10,
202:22, 203:2,
203:15
**infuse** [2] - 182:18,
183:13
**infusion** [1] - 88:23
**Inglewood** [1] - 55:12
**injected** [2] - 159:20,
182:16
**injured** [1] - 35:19
**injury** [2] - 35:19,
36:10
**innovative** [1] -
179:25
**inserted** [2] - 88:25,
159:25
**inside** [1] - 169:10
**Inspector** [1] - 81:19
**Instagram** [1] - 119:7
**instance** [3] - 157:21,
204:15, 205:2
**instances** [1] - 205:15
**instead** [4] - 151:11,
156:3, 164:18, 177:7
**institute** [4] - 20:23,
22:13, 25:1, 25:3
**Institute** [7] - 11:22,
133:19, 168:24,
180:12, 180:14,
180:17
**institution** [15] -
22:16, 90:10, 91:4,
92:4, 92:20, 97:15,
99:3, 99:8, 102:2,
102:4, 106:21,
110:13, 111:20,
155:24, 156:3
**institutions** [6] -
38:23, 95:18,
155:22, 156:4,
156:5, 156:9
**instruct** [7] - 60:3,
132:7, 139:19,
140:10, 140:15,
141:5, 141:12
**instructed** [1] - 141:3

**instruction** [10] -
118:14, 118:20,
119:21, 128:12,
128:15, 129:12,
129:15, 133:5, 133:7
**instructional** [2] -
65:7, 66:17
**instructions** [42] -
4:12, 4:19, 4:24,
4:25, 5:1, 5:9, 6:1,
6:8, 114:9, 114:10,
114:13, 122:18,
123:8, 123:10,
123:11, 123:12,
123:14, 123:16,
124:13, 127:22,
128:6, 128:7,
128:19, 131:15,
132:2, 132:4, 132:5,
132:8, 132:11,
132:13, 132:15,
132:16, 132:17,
133:2, 133:14,
136:19, 136:21,
140:1, 148:24, 149:4
**instructs** [5] - 43:5,
43:19, 60:6, 73:23,
97:18
**insurance** [1] - 52:23
**integration** [1] - 30:16
**intellectual** [2] -
104:6, 191:24
**intend** [1] - 20:3
**intended** [1] - 140:18
**intends** [3] - 6:16,
10:15, 19:19
**intensive** [2] - 178:8,
178:9
**intent** [1] - 15:3
**interacts** [2] - 136:9,
196:14
**interest** [2] - 142:22,
196:18
**interested** [2] -
180:23, 191:23
**interesting** [7] - 26:12,
26:15, 37:17, 37:18,
171:10, 188:13,
197:22
**interfere** [1] - 102:23
**internal** [1] - 164:11
**Internet** [4] - 31:12,
119:5, 119:25, 120:4
**internist** [1] - 96:24
**internists** [1] - 96:23
**interpret** [1] - 140:18
**interpretation** [3] -
135:25, 136:2,
136:14
**interpreted** [1] - 12:7

**interrupt** [1] - 168:10
**intervention** [1] - 69:1
**intestine** [1] - 89:25
**intestines** [1] - 90:25
**intimidated** [3] - 29:9,
33:16, 104:22
**introduce** [11] - 19:18,
20:3, 20:5, 149:13,
149:21, 163:14,
168:12, 174:24,
175:3, 193:16,
194:19
**introduced** [1] -
148:12
**invader** [3] - 151:1,
151:4, 153:5
**invaders** [2] - 151:10,
153:5
**invading** [2] - 150:21
**invalid** [35] - 23:7,
23:9, 23:13, 23:14,
23:15, 134:8, 134:9,
134:13, 134:14,
134:18, 134:19,
134:21, 137:21,
137:22, 138:5,
138:7, 138:9,
138:10, 138:11,
139:7, 139:9,
147:12, 147:13,
147:17, 147:23,
165:1, 166:18,
168:16, 170:11,
186:18, 195:1,
200:18, 201:3,
201:25, 203:18
**invalidate** [1] - 166:23
**invalidity** [7] - 14:4,
125:24, 134:15,
147:14, 147:18,
166:15, 202:21
**invent** [8] - 184:6,
189:8, 197:5,
197:14, 198:6,
199:14, 199:15
**invented** [26] - 26:10,
26:11, 46:15, 157:3,
177:20, 185:22,
186:9, 186:12,
186:13, 186:17,
197:3, 197:11,
197:13, 198:5,
198:11, 200:8
**invention** [30] - 22:10,
25:17, 48:18,
138:16, 138:19,
139:1, 150:9, 153:7,
155:8, 158:12,
163:9, 165:19,
166:17, 166:20,

168:20, 168:21,
170:23, 185:11,
186:1, 186:21,
187:12, 188:10,
188:19, 189:2,
189:11, 196:8,
199:7, 199:21,
200:21, 200:23
**inventions** [1] -
186:10
**inventive** [1] - 149:23
**inventor** [4] - 22:7,
22:8, 47:22, 48:4
**inventor's** [1] - 185:11
**inventors** [4] - 22:7,
22:8, 48:15, 185:16
**invest** [3] - 161:3,
180:4, 180:7
**investigation** [3] -
113:14, 120:1,
120:22
**investing** [2] - 191:23,
191:25
**investment** [4] -
161:7, 180:3,
191:22, 192:3
**involved** [19] - 36:18,
46:25, 61:15, 62:17,
63:11, 67:13, 70:24,
71:16, 76:3, 77:10,
80:4, 81:25, 85:5,
98:7, 100:4, 104:4,
119:12, 120:7, 194:6
**involves** [5] - 22:4,
25:7, 118:22,
131:20, 150:8
**involving** [12] - 42:2,
61:21, 84:6, 84:7,
85:23, 97:12, 100:5,
101:16, 101:23,
103:20, 108:3, 114:6
**Iowa** [1] - 55:25
**Irell** [2] - 98:7, 98:8
**IRELL** [1] - 2:4
**irrelevant** [1] - 4:17
**irrespective** [2] -
43:11, 43:13
**isoleucine** [1] - 136:8
**issue** [28] - 5:21, 6:20,
6:23, 7:13, 9:17,
9:18, 10:5, 10:11,
15:19, 16:1, 16:4,
16:7, 16:21, 17:14,
17:22, 19:1, 48:24,
52:13, 62:1, 65:19,
74:6, 100:3, 108:1,
126:4, 126:11,
146:15, 181:16
**issued** [17] - 32:18,
47:19, 47:20,

124:16, 136:4,
165:25, 190:7,
190:18, 191:4,
192:19, 192:21,
194:18, 194:21,
195:10, 196:22,
202:4, 202:18
**issues** [46] - 3:19,
3:21, 4:22, 5:2, 5:3,
6:22, 8:23, 9:1, 9:7,
10:4, 11:14, 11:18,
12:2, 14:12, 14:16,
17:12, 21:13, 21:21,
26:7, 29:11, 29:12,
52:15, 61:12, 63:15,
84:6, 84:7, 101:9,
101:21, 102:22,
104:15, 104:18,
108:3, 117:16,
118:22, 124:10,
131:12, 134:15,
136:16, 136:18,
137:15, 146:15,
146:17, 167:7,
172:25, 202:23
**IT** [2] - 54:11, 55:1
**item** [6] - 3:1, 6:13,
20:17, 63:9, 129:18,
141:12
**itself** [10] - 47:1,
47:15, 84:10, 92:25,
101:24, 103:23,
125:15, 127:5,
158:5, 171:19
**IV** [1] - 89:1

## J

**Jakabovits** [1] - 105:5
**James** [2] - 21:11,
130:11
**JAMES** [1] - 1:3
**January** [2] - 77:25,
88:18
**JCAR** [1] - 169:11
**JCAR15** [1] - 169:12
**JCAR16** [1] - 169:12
**JCAR17** [3] - 169:12,
169:24, 169:25
**Jed** [1] - 105:11
**Jeff** [1] - 21:7
**Jeffrey** [5] - 2:16,
24:17, 27:23, 35:11,
105:5
**JEFFRIES** [15] - 8:21,
9:12, 9:16, 9:18,
11:18, 12:25, 13:4,
13:9, 14:12, 15:17,
18:8, 18:25, 172:22,
172:24, 173:13

**Jeffries** [6] - 2:8, 3:8, 16:9, 21:1, 24:12, 131:6
**Jeffries'** [1] - 14:15
**jeopardizes** [1] - 121:8
**jewelry** [1] - 44:6
**jigsaw** [2] - 157:19, 157:20
**job** [11] - 44:23, 64:16, 66:8, 66:9, 88:13, 109:17, 134:16, 134:17, 135:23, 150:14, 201:8
**jobs** [3] - 65:6, 65:21, 66:3
**John** [1] - 105:6
**Johnson** [7] - 28:7, 28:22, 55:18, 55:20, 83:3, 92:8, 93:15
**join** [1] - 174:18
**joined** [1] - 131:3
**JONES** [2] - 2:8, 2:10
**Jones** [2] - 98:10, 98:11
**Josh** [1] - 149:17
**Jr** [1] - 31:22
**Jude** [2] - 156:6, 170:7
**Judge** [1] - 19:6
**judge** [7] - 21:10, 37:24, 38:3, 43:10, 103:13, 130:11, 135:23
**JUDGE** [1] - 1:3
**judged** [1] - 144:17
**judges** [1] - 37:22
**judicial** [2] - 60:16, 128:2
**Judy** [2] - 28:1, 41:23
**July** [2] - 165:25, 167:10
**jumbo** [1] - 168:21
**Junghans** [4] - 105:15, 194:2, 194:4, 194:11
**junior** [2] - 4:3, 74:18
**JUNO** [1] - 1:5
**Juno** [56] - 3:1, 3:6, 20:18, 20:23, 22:12, 22:14, 22:18, 22:24, 23:2, 23:13, 25:1, 26:6, 95:20, 98:2, 115:4, 125:10, 131:1, 133:19, 133:22, 133:25, 134:4, 138:1, 139:10, 139:12, 139:14, 139:18, 139:21, 139:24, 149:15, 150:5,

155:25, 156:3, 156:11, 157:3, 160:5, 160:6, 161:2, 161:9, 163:22, 167:19, 167:21, 169:10, 169:11, 169:20, 170:6, 175:12, 175:16, 176:1, 176:13, 176:18, 203:12, 204:16
**juries** [1] - 74:20
**JUROR** [415] - 28:4, 29:20, 30:3, 30:6, 30:8, 30:10, 30:14, 30:20, 30:23, 30:25, 31:7, 31:10, 31:12, 31:16, 31:18, 31:21, 32:7, 32:10, 32:13, 32:16, 32:23, 33:2, 33:7, 33:9, 34:20, 35:10, 35:16, 35:18, 35:24, 36:1, 36:11, 36:20, 36:23, 37:1, 37:12, 38:1, 38:3, 38:5, 38:12, 38:14, 38:18, 38:21, 38:24, 39:2, 39:4, 39:7, 39:13, 39:17, 39:21, 40:2, 40:4, 40:6, 40:9, 40:12, 40:17, 40:22, 41:4, 41:6, 41:9, 41:13, 41:15, 41:18, 41:22, 42:6, 42:9, 42:11, 42:14, 42:17, 42:23, 43:1, 43:3, 43:15, 43:24, 44:1, 44:3, 44:10, 44:13, 44:16, 44:20, 44:22, 44:24, 45:3, 45:10, 45:13, 45:16, 45:19, 45:22, 46:1, 46:6, 46:8, 46:11, 46:19, 46:23, 47:2, 47:6, 47:8, 47:13, 47:16, 47:18, 47:20, 47:23, 47:25, 48:3, 48:5, 48:7, 48:9, 48:16, 48:19, 48:22, 49:1, 49:4, 49:13, 49:17, 49:19, 49:22, 50:4, 51:6, 51:13, 51:16, 51:21, 51:25, 52:2, 52:5, 52:11, 52:18, 52:21, 53:4, 53:8, 53:10, 53:13, 53:16, 53:20, 53:22, 53:24, 54:3, 54:6, 54:9, 54:15, 54:18, 54:21, 54:24, 55:2, 55:5, 55:9, 55:11,

55:14, 55:16, 55:19, 56:3, 56:8, 56:12, 56:15, 57:3, 57:10, 57:14, 57:18, 57:23, 58:1, 58:3, 58:7, 58:9, 58:14, 58:16, 58:18, 58:22, 59:7, 59:11, 59:14, 59:18, 60:7, 60:11, 60:14, 60:20, 60:22, 61:1, 61:5, 61:10, 61:17, 61:20, 61:24, 62:7, 62:10, 62:13, 62:16, 62:20, 62:24, 63:4, 63:7, 63:9, 63:18, 63:21, 63:23, 64:5, 64:8, 64:14, 64:19, 64:24, 65:2, 65:17, 65:25, 66:5, 66:14, 66:21, 66:23, 67:7, 67:16, 68:2, 68:8, 68:11, 68:17, 68:24, 69:4, 69:7, 69:10, 69:17, 69:20, 69:23, 70:6, 70:10, 70:17, 70:25, 71:3, 71:6, 71:9, 71:12, 71:15, 71:18, 71:21, 71:24, 72:3, 72:7, 72:10, 72:13, 72:16, 72:18, 72:19, 73:1, 73:4, 73:7, 73:14, 73:16, 73:21, 73:24, 74:3, 74:5, 74:10, 74:12, 74:13, 74:24, 75:2, 75:8, 75:13, 75:16, 75:19, 75:23, 76:5, 76:9, 76:17, 76:20, 76:24, 77:6, 77:11, 77:14, 77:19, 78:4, 78:6, 78:14, 78:24, 79:1, 79:5, 79:8, 79:10, 79:16, 79:18, 79:22, 79:24, 80:2, 80:9, 80:14, 80:17, 80:20, 80:23, 81:1, 81:3, 81:5, 81:8, 81:11, 81:14, 81:18, 82:2, 82:5, 82:8, 82:11, 82:14, 82:17, 82:21, 82:25, 83:2, 83:8, 83:13, 83:17, 83:21, 83:24, 84:15, 84:19, 85:2, 85:4, 85:7, 85:9, 85:11, 85:13, 85:19, 85:22, 86:4, 86:11, 86:15, 86:19, 86:22, 86:24, 87:1, 87:9, 87:11, 87:13, 87:18, 87:21, 88:2, 88:6, 88:8,

88:11, 88:16, 88:18, 88:23, 89:3, 89:6, 89:17, 90:4, 90:8, 90:11, 90:13, 90:15, 90:19, 90:22, 90:24, 91:3, 91:6, 91:9, 91:13, 91:17, 91:24, 92:2, 92:5, 92:9, 92:16, 92:19, 92:22, 93:1, 93:5, 93:16, 93:19, 93:24, 94:2, 94:5, 94:7, 94:13, 94:17, 95:1, 95:5, 95:8, 95:11, 95:15, 95:25, 96:5, 96:7, 96:11, 96:17, 96:19, 97:3, 97:5, 97:13, 97:20, 99:12, 99:20, 99:24, 100:10, 100:13, 100:16, 101:4, 101:7, 101:17, 102:9, 102:13, 102:17, 108:16, 108:20, 108:23, 108:25, 109:4, 109:6, 109:9, 109:13, 109:16, 109:22, 109:25, 110:2, 110:4, 110:6, 110:9, 110:11, 110:14, 110:17, 110:19, 110:21, 110:24, 111:1, 111:3, 113:2
**juror** [69] - 4:7, 5:7, 21:12, 26:14, 27:2, 27:18, 27:21, 27:23, 27:25, 28:1, 28:2, 28:5, 28:6, 28:7, 28:10, 28:13, 28:14, 28:16, 28:17, 28:18, 28:20, 28:21, 28:22, 29:18, 31:14, 31:20, 33:11, 37:8, 37:11, 39:11, 41:3, 43:22, 45:12, 45:24, 46:7, 47:11, 49:25, 50:2, 52:9, 52:12, 53:1, 53:6, 58:13, 65:16, 70:15, 74:1, 78:19, 79:13, 83:11, 102:23, 103:10, 104:9, 104:13, 105:21, 106:24, 108:14, 111:11, 112:5, 112:15, 115:18, 115:21, 119:14, 121:8, 121:10, 121:23, 121:24, 133:14
**jurors** [30] - 5:16, 18:19, 18:21, 19:25,

20:16, 21:10, 26:24, 27:15, 28:24, 29:3, 29:5, 29:7, 29:15, 34:21, 35:3, 43:17, 50:6, 50:24, 51:8, 56:18, 84:6, 106:6, 113:13, 115:6, 118:7, 119:10, 120:8, 129:19, 145:10
**jurors'** [2] - 4:21, 6:17
**jury** [156] - 3:10, 3:13, 3:20, 4:5, 4:20, 4:24, 5:18, 6:1, 6:18, 10:23, 10:24, 12:23, 13:8, 13:17, 14:7, 16:15, 16:22, 16:23, 18:3, 18:13, 18:18, 20:1, 20:3, 20:8, 21:20, 23:25, 24:1, 26:19, 26:20, 26:21, 29:6, 29:8, 29:14, 29:25, 30:5, 32:1, 32:4, 32:5, 34:8, 34:13, 34:14, 35:7, 36:15, 37:25, 38:9, 42:1, 42:4, 43:12, 44:7, 44:8, 49:9, 50:6, 50:19, 50:24, 52:9, 55:25, 56:9, 56:17, 59:5, 59:6, 59:7, 59:9, 59:12, 59:13, 60:8, 60:9, 60:12, 62:14, 62:19, 63:4, 65:12, 65:13, 66:6, 68:14, 69:13, 72:23, 76:13, 76:15, 78:8, 78:10, 78:11, 78:20, 83:5, 103:14, 103:19, 104:2, 104:13, 104:14, 107:23, 112:17, 112:18, 113:13, 113:24, 114:1, 114:2, 114:8, 114:23, 114:25, 115:12, 117:1, 117:12, 117:14, 117:18, 117:19, 117:25, 118:5, 118:9, 118:12, 118:18, 118:23, 119:16, 121:3, 121:15, 121:17, 122:15, 122:23, 122:25, 123:4, 123:17, 124:13, 127:6, 127:24, 128:24, 129:16, 130:6, 130:7, 130:8, 130:9, 130:12,

130:19, 131:12, 132:2, 132:6, 132:14, 133:6, 145:3, 145:13, 146:5, 148:11, 150:7, 172:10, 174:6, 174:7, 174:8, 174:9, 174:10, 174:11, 174:14, 174:19, 206:7, 206:8, 206:10
**JURY** [1] - 1:13
**justice** [1] - 149:12

## K

**Kaiser** [6] - 38:24, 55:21, 57:8, 57:22, 89:3, 94:18
**Kathy** [2] - 27:18, 29:20
**keep** [15] - 19:4, 30:16, 86:12, 87:6, 92:13, 97:2, 121:19, 132:11, 145:2, 145:15, 145:20, 148:13, 148:15, 200:13, 205:11
**keeping** [1] - 204:3
**keeps** [1] - 151:5
**kept** [1] - 122:5
**Kettering** [60] - 3:6, 20:23, 22:13, 22:14, 22:16, 22:17, 22:24, 23:3, 23:13, 24:25, 25:3, 95:20, 96:1, 96:8, 96:22, 97:4, 97:11, 98:1, 111:12, 111:15, 125:9, 133:19, 133:23, 133:25, 134:4, 138:2, 139:10, 139:12, 139:14, 139:18, 139:22, 139:25, 149:15, 149:24, 150:3, 153:21, 155:7, 155:22, 156:6, 157:3, 160:5, 161:9, 163:15, 163:21, 164:3, 165:11, 165:21, 166:21, 167:6, 167:9, 167:19, 170:7, 186:4, 186:14, 187:19, 191:14, 192:6, 192:15, 194:20, 198:11
**Kettering's** [1] - 191:23

**key** [4] - 5:3, 168:6, 170:6, 170:22
**kick** [1] - 192:1
**kid** [2] - 35:13, 99:13
**kidney** [2] - 88:19, 94:13
**kidneys** [1] - 150:13
**kids** [2] - 31:24, 35:13
**kill** [9] - 151:5, 152:24, 157:22, 163:12, 166:22, 182:20, 184:21, 195:18, 196:7
**kills** [1] - 159:13
**Kimberly** [2] - 28:22, 83:2
**kind** [20] - 44:25, 49:20, 55:7, 66:9, 70:12, 70:13, 76:25, 94:10, 100:19, 101:12, 151:24, 153:17, 154:9, 154:10, 157:19, 159:12, 160:18, 162:1, 164:1, 185:1
**kindergarten** [1] - 65:8
**kinds** [3] - 141:21, 151:3, 158:4
**kingdom** [1] - 197:19
**Kite** [112] - 3:2, 3:19, 7:8, 10:14, 10:15, 13:23, 16:7, 16:10, 20:18, 21:6, 22:20, 22:22, 22:25, 23:6, 23:11, 23:12, 24:15, 25:9, 26:1, 26:2, 26:4, 26:6, 26:9, 95:21, 98:2, 115:5, 125:24, 125:25, 126:24, 127:4, 131:8, 133:20, 133:24, 134:1, 134:7, 134:12, 134:13, 134:15, 137:20, 138:6, 138:19, 139:3, 139:6, 139:7, 139:22, 139:25, 146:21, 147:8, 147:10, 147:15, 147:18, 148:1, 148:2, 162:5, 163:5, 163:9, 163:18, 164:6, 164:23, 166:14, 167:8, 167:12, 167:22, 167:24, 168:1, 169:6, 170:5, 170:25, 171:16,

171:20, 171:21, 172:7, 175:4, 175:5, 175:17, 175:19, 177:21, 178:23, 179:9, 179:10, 179:15, 180:6, 181:2, 182:11, 182:22, 183:4, 183:6, 183:25, 184:1, 184:12, 184:22, 184:23, 186:15, 191:9, 191:12, 193:13, 193:14, 193:15, 193:21, 194:5, 201:17, 202:6, 202:15, 202:25, 203:1, 203:5, 203:13, 203:24, 205:6
**KITE** [1] - 1:8
**Kite's** [21] - 7:10, 19:5, 23:3, 23:4, 103:25, 124:19, 124:23, 125:8, 127:15, 127:16, 134:3, 134:17, 134:23, 137:25, 147:1, 147:22, 161:11, 169:9, 172:6, 193:22
**knockoff** [1] - 202:11
**knowing** [2] - 67:21, 168:8
**knowledge** [2] - 4:15, 180:15
**known** [10] - 136:23, 137:4, 150:11, 151:14, 151:20, 153:22, 158:2, 158:5, 162:6, 168:5
**knows** [2] - 17:1, 36:6
**Komanduri** [1] - 105:15
**Komonaduri** [4] - 7:2, 7:25, 8:6, 8:13
**Krishna** [1] - 105:15
**Kupelian** [4] - 28:16, 35:1, 69:11, 113:3

## L

**LA** [2] - 42:18, 42:19
**lab** [3] - 83:4, 192:11, 196:3
**labeled** [1] - 157:9
**labor** [1] - 166:21
**laboratories** [1] - 161:25
**lack** [1] - 148:1
**ladies** [10] - 23:23,

25:21, 27:11, 117:15, 117:21, 122:24, 149:10, 150:7, 206:3, 206:7
**lady** [1] - 24:18
**Lamar** [1] - 110:14
**Lancaster** [3] - 31:22, 32:2, 45:21
**land** [1] - 155:2
**language** [13] - 16:13, 16:14, 40:3, 40:14, 40:15, 109:8, 109:18, 109:24, 135:24, 136:14, 158:19, 161:20, 172:1
**large** [5] - 89:25, 163:14, 183:17, 184:24, 201:22
**large-scale** [1] - 184:24
**Larson** [1] - 105:16
**last** [19] - 4:5, 4:6, 9:24, 9:25, 13:9, 16:2, 21:14, 28:8, 29:25, 45:3, 64:1, 65:25, 67:7, 67:10, 102:12, 112:7, 117:16, 119:15, 158:15
**lasted** [1] - 45:4
**latch** [2] - 182:20, 195:18
**latches** [1] - 195:19
**late** [6] - 4:6, 16:2, 78:16, 123:20, 127:11, 204:2
**launch** [1] - 203:4
**LAUSD** [2] - 81:14, 81:15
**Law** [11] - 2:4, 2:5, 2:5, 2:6, 2:8, 2:11, 2:15, 2:16, 2:16, 2:17, 2:17
**law** [37] - 4:17, 19:10, 35:14, 39:4, 39:5, 43:5, 43:11, 43:12, 43:19, 56:14, 73:22, 84:15, 88:19, 89:22, 90:20, 93:17, 94:2, 97:17, 98:4, 98:16, 111:24, 114:14, 118:20, 120:6, 132:7, 132:20, 132:21, 133:14, 135:11, 141:21, 148:24, 155:10, 155:12, 160:20, 193:11, 197:24
**laws** [4] - 43:6, 43:8,

43:9
**lawsuit** [1] - 194:6
**lawyer** [7] - 20:25, 35:12, 36:2, 38:9, 39:1, 39:3, 41:4, 98:16, 143:23, 143:24, 143:25
**lawyers** [38] - 19:17, 24:9, 24:16, 27:12, 29:10, 35:22, 36:3, 36:7, 37:7, 37:10, 37:23, 41:2, 41:5, 43:22, 46:10, 47:10, 58:12, 61:19, 61:23, 79:4, 82:13, 83:10, 105:20, 113:15, 120:8, 131:2, 131:6, 140:8, 140:15, 140:16, 140:20, 140:22, 148:6, 149:4, 160:7, 169:9, 171:21, 174:24
**layperson** [1] - 131:18
**lead** [1] - 66:7
**leadership** [1] - 70:12
**leading** [1] - 156:5
**learn** [5] - 54:24, 120:1, 162:14, 163:17, 181:20
**learned** [4] - 26:13, 44:23, 77:11, 193:23
**least** [7] - 18:16, 134:21, 153:19, 155:4, 196:16, 198:13, 200:10
**leave** [9] - 9:14, 9:15, 103:15, 129:22, 132:14, 145:4, 145:5, 151:12, 206:8
**leaves** [2] - 137:8
**lectures** [1] - 110:20
**left** [5] - 11:21, 20:25, 22:11, 163:25, 178:21
**leg** [2] - 101:8, 101:10
**legal** [6] - 98:17, 119:20, 137:16, 161:20, 168:21, 175:5
**length** [2] - 4:14, 145:20
**leopard** [1] - 198:8
**leopards** [1] - 197:24
**less** [6] - 4:14, 4:22, 56:18, 139:17, 161:21, 201:12
**letter** [3] - 152:4, 159:2, 187:6
**letters** [1] - 187:5
**leukemia** [6] - 70:21,

71:20, 89:21, 90:1, 90:14, 169:15
**level** [1] - 164:6
**library** [1] - 181:22
**license** [34] - 65:18, 108:19, 108:21, 160:7, 160:10, 160:13, 160:15, 160:18, 160:20, 160:21, 160:23, 160:24, 160:25, 161:2, 161:8, 161:9, 162:17, 163:19, 163:22, 163:24, 164:3, 164:19, 167:9, 167:12, 167:16, 167:17, 167:18, 167:19, 167:22, 168:2, 168:4
**licensed** [3] - 22:18, 125:9, 170:6
**licenses** [3] - 160:8, 160:9, 161:1
**licensing** [1] - 125:8
**life** [6] - 97:8, 150:19, 154:2, 154:12, 172:4, 203:9
**life-saving** [1] - 203:9
**lifetime** [1] - 179:16
**lifetimes** [2] - 150:10, 154:24
**lift** [2] - 55:23, 57:25
**light** [2] - 125:13, 142:25
**likely** [4] - 137:3, 137:9, 146:16, 147:5
**limine** [5] - 10:8, 10:9, 114:5, 124:15, 126:13
**limines** [1] - 16:19
**limitation** [2] - 135:17, 161:19
**limitations** [1] - 135:12
**limited** [24] - 12:7, 12:8, 12:12, 12:20, 13:19, 47:6, 47:8, 119:6, 141:5, 141:6, 141:11, 141:13, 141:14, 169:24, 177:18, 177:19, 177:20, 179:19, 179:21, 183:9, 185:17, 185:25, 198:13, 198:14
**Lin** [10] - 27:25, 38:4, 38:5, 102:7, 102:12, 107:15, 108:8, 112:24
**line** [5] - 15:2, 129:14,

129:23, 178:2, 178:7
**lines** [2] - 75:24, 178:18
**lining** [1] - 13:8
**linkedin** [1] - 119:7
**lion** [1] - 198:7
**lions** [2] - 197:23, 197:24
**liquor** [1] - 160:18
**list** [3] - 6:22, 105:12, 125:3
**listen** [6] - 37:15, 37:16, 50:24, 119:22, 132:10, 133:10
**listening** [1] - 56:20
**lists** [1] - 104:20
**literal** [1] - 193:13
**litigation** [3] - 21:23, 21:24, 98:5
**Liu** [2] - 28:6, 52:21
**live** [27] - 29:20, 31:22, 35:11, 38:6, 41:23, 43:6, 44:4, 49:16, 52:22, 55:20, 58:23, 69:11, 72:20, 74:14, 76:10, 79:11, 83:3, 121:25, 150:23, 169:17, 175:21, 178:21, 183:23, 186:4, 187:19, 203:10, 203:23
**lived** [2] - 67:7, 154:3
**liver** [1] - 92:11
**lives** [5] - 25:23, 177:14, 203:11, 203:12, 203:14
**living** [15] - 25:4, 25:9, 25:13, 85:13, 153:2, 154:21, 155:5, 156:12, 159:8, 159:14, 159:22, 163:13, 170:17, 170:23, 184:17
**LLP** [2] - 2:4, 2:15
**local** [7] - 41:18, 43:7, 68:17, 79:12, 80:2, 81:3, 160:12
**location** [1] - 183:10
**lodged** [1] - 114:19
**logic** [1] - 56:22
**logistics** [3] - 49:14, 49:18, 73:10
**look** [12] - 19:14, 77:6, 77:19, 80:4, 151:10, 153:14, 155:20, 158:8, 180:3, 181:23, 192:25, 193:20
**looked** [4] - 11:1,

177:23, 192:13, 194:11
**looking** [7] - 14:21, 18:10, 87:5, 157:20, 158:20, 192:7, 205:22
**looks** [2] - 18:17, 187:1
**Los** [9] - 1:14, 1:23, 2:7, 2:9, 2:18, 35:11, 56:6, 69:11, 72:20
**lose** [3] - 66:24, 178:5, 205:4
**losses** [1] - 77:23
**Louis** [2] - 202:11, 202:13
**loved** [2] - 154:2, 179:18
**low** [2] - 171:14, 205:17
**lunch** [3] - 113:7, 115:3, 122:7
**lung** [5] - 66:25, 70:22, 87:2, 96:12, 196:19
**lungs** [1] - 99:18
**Lyft** [1] - 65:18
**lymph** [1] - 86:5
**lymphoblastic** [1] - 169:15
**lymphoma** [5] - 26:3, 170:5, 177:12, 177:23, 185:2
**Lynn** [2] - 28:18, 74:13
**Lynnet** [1] - 31:25
**lysine** [6] - 136:5, 190:3, 190:9, 190:17, 194:14, 195:9

---

# M

**machinery** [1] - 187:4
**Maclain** [1] - 2:5
**magazines** [2] - 109:1, 109:2
**magic** [7] - 29:23, 153:7, 154:20, 158:11, 158:12, 204:13, 204:18
**magical** [1] - 159:15
**mail** [5] - 4:1, 119:4, 162:7, 181:10, 181:12
**main** [6] - 10:4, 11:18, 14:12, 64:9, 182:7, 187:17
**maintenance** [2] - 54:25, 61:13
**maker** [1] - 44:6

**man** [5] - 62:1, 71:8, 71:9, 179:10, 180:17
**manage** [1] - 68:20
**management** [7] - 33:3, 38:7, 38:11, 73:3, 150:2, 163:16, 164:6
**manager** [13] - 29:21, 30:8, 31:24, 31:25, 38:10, 52:22, 53:11, 59:2, 59:3, 61:2, 68:14, 72:22, 74:20
**managing** [2] - 72:21, 124:10
**Mandarin** [7] - 40:5, 40:7, 40:16, 40:17, 109:5, 109:9, 109:18
**Manella** [2] - 98:7, 98:8
**MANELLA** [1] - 2:4
**manila** [1] - 20:8
**manner** [1] - 142:21
**manufacture** [3] - 55:7, 183:21, 184:14
**manufacturer** [1] - 52:23
**manufactures** [1] - 53:12
**manufacturing** [2] - 184:16, 204:19
**Marasco** [1] - 105:3
**March** [1] - 167:8
**Margo** [2] - 105:15, 184:3
**Margoth** [2] - 28:17, 72:20
**Marina** [1] - 105:16
**Marine** [1] - 101:4
**marital** [1] - 44:4
**Mark** [4] - 105:3, 105:4, 105:17, 150:4
**market** [19] - 17:7, 26:3, 164:9, 164:10, 164:12, 164:20, 168:11, 170:19, 170:21, 171:16, 175:13, 175:22, 177:2, 177:24, 179:7, 180:8, 203:10, 203:13, 203:21
**marketed** [1] - 22:22
**marketing** [4] - 31:12, 49:8, 77:15
**markets** [1] - 77:7
**married** [16] - 29:21, 31:22, 35:12, 38:6, 41:24, 49:5, 52:22, 55:20, 58:23, 65:5, 65:10, 68:13, 74:14,

76:10, 79:12, 83:3
**marrow** [3] - 150:13, 170:4, 178:11
**marvelous** [1] - 154:14
**mason** [1] - 21:2
**mastectomy** [2] - 90:4, 92:12
**master** [1] - 149:18
**master's** [4] - 52:24, 53:3, 66:18, 75:9
**material** [4] - 156:21, 156:24, 157:9, 165:15
**materials** [1] - 119:25
**matter** [18] - 3:11, 21:21, 21:24, 21:25, 29:10, 31:15, 50:3, 56:6, 56:11, 77:2, 80:22, 93:3, 101:16, 107:18, 120:10, 166:18, 193:9, 206:15
**matters** [10] - 3:14, 3:16, 27:13, 62:6, 74:22, 103:19, 104:3, 104:4, 104:16, 121:16
**MBA** [1] - 53:4
**Mccoy** [3] - 28:5, 49:4, 86:25
**mean** [19] - 17:25, 27:2, 29:6, 30:24, 34:6, 58:2, 70:7, 70:10, 71:6, 80:8, 87:18, 87:24, 88:11, 97:20, 104:12, 160:8, 161:20, 170:2, 198:7
**meaning** [10] - 15:6, 15:22, 135:24, 136:1, 136:10, 136:12, 136:19, 139:20, 190:10, 194:23
**means** [21] - 21:16, 112:15, 119:4, 132:24, 137:2, 137:7, 144:9, 156:20, 160:11, 160:20, 161:17, 161:18, 166:16, 178:16, 186:24, 190:13, 190:17, 196:15, 196:16, 202:8
**meant** [4] - 106:24, 139:21, 153:3, 192:17
**mechanical** [1] - 62:1

media [6] - 119:8,
119:12, 119:22,
120:10, 133:8,
133:10
medical [16] - 7:8,
51:13, 52:25, 64:9,
86:7, 91:19, 96:21,
97:6, 98:22, 99:3,
99:8, 100:14, 101:1,
103:21, 130:22,
150:4
medication [2] -
67:21, 92:13
medications [1] -
94:21
medicine [1] - 99:17
medicines [1] - 161:4
meet [13] - 9:2,
125:24, 126:1,
127:10, 138:12,
138:13, 138:15,
138:20, 138:22,
138:23, 139:4,
149:15, 166:14
meets [2] - 135:13,
161:19
melanomas [1] -
196:19
member [5] - 52:16,
106:8, 107:4, 107:6,
180:2
members [17] - 36:6,
84:8, 85:24, 93:8,
93:10, 93:21, 98:19,
99:2, 100:6, 104:5,
106:17, 108:9,
119:12, 132:6,
185:15
Memorial [2] - 64:11,
92:22
memories [1] - 130:25
memory [5] - 39:9,
140:20, 142:21,
145:8, 145:9
mention [6] - 18:9,
66:23, 129:17,
181:12, 181:13,
196:17
mentioned [9] - 78:2,
95:21, 98:1, 105:10,
130:13, 135:21,
173:18, 178:20,
189:7
mentioning [1] - 67:1
merits [1] - 119:2
messaging [1] - 119:4
met [4] - 36:1, 36:3,
70:22, 149:13
metastasized [2] -
88:20, 89:11

method [1] - 135:6
Methodist [2] - 42:20,
67:18
Metro [1] - 45:22
Mexico [2] - 90:15,
90:16
Michael [3] - 28:10,
58:23, 105:12
Michel [2] - 105:1,
149:25
microphone [12] -
35:9, 58:19, 69:9,
84:13, 86:2, 86:23,
93:15, 95:24, 96:4,
100:12, 102:12,
106:1
middle [2] - 7:20,
189:16
might [11] - 4:19, 19:3,
90:11, 124:3, 144:7,
151:2, 164:23,
172:7, 175:11,
178:17, 196:16
miles [1] - 179:15
military [3] - 54:13,
54:19, 101:3
million [1] - 172:1
millions [9] - 25:14,
153:12, 161:3,
161:4, 195:24,
199:25
mind [9] - 21:13, 68:8,
73:19, 73:21, 79:20,
83:15, 148:13,
148:15, 205:11
minded [1] - 56:20
mine [1] - 32:17
mini [3] - 19:22, 24:21,
37:18
minimum [1] - 145:21
minutes [3] - 18:16,
18:17, 173:24
miracle [1] - 154:4
misconduct [1] -
17:16
misleading [4] - 4:18,
13:16, 13:21, 120:25
miss [1] - 39:22
missed [2] - 102:14,
102:15
missing [1] - 121:23
misspelling [2] -
193:4, 193:18
mistake [5] - 165:12,
165:14, 165:19,
193:11, 194:16
mistakes [3] - 19:8,
143:6, 201:12
mistrial [1] - 121:9
mistried [1] - 113:21

misuse [1] - 177:17
modest [1] - 162:2
Mohan [1] - 105:15
Mojave [1] - 45:6
mom [1] - 51:17
moment [2] - 15:19,
128:10
moments [1] - 70:11
Monakas [1] - 21:7
Monday [6] - 7:4, 8:1,
8:4, 122:11, 122:13
money [5] - 23:3,
134:1, 134:22,
180:8, 201:22
Monica [1] - 22:21
monitor [3] - 28:23,
29:15, 130:2
monitors [1] - 29:16
monopolize [2] -
186:9, 200:17
monopoly [1] - 177:20
Monte [3] - 41:23,
65:3, 65:6
month [1] - 62:21
months [11] - 63:11,
64:2, 64:20, 66:15,
79:2, 88:25, 154:17,
175:21, 183:22,
203:10, 203:23
moon [2] - 155:1,
155:2
Morgan [4] - 2:4, 3:6,
20:24, 24:24
morning [23] - 3:5,
4:1, 20:22, 21:3,
21:4, 21:8, 21:11,
27:19, 27:24, 28:2,
28:4, 28:8, 28:10,
28:14, 28:18, 35:10,
35:11, 41:22, 58:22,
68:11, 72:19, 74:13,
77:2
most [11] - 40:15,
102:14, 102:15,
109:4, 109:17,
121:18, 130:12,
161:14, 180:1,
182:24, 184:15
Mostly [1] - 109:5
mostly [6] - 36:13,
68:19, 77:8, 78:14,
80:5, 80:7
mother [6] - 89:22,
90:20, 91:13, 91:17,
91:18, 106:25
mother-in-law [2] -
89:22, 90:20
motion [7] - 10:8,
10:9, 17:2, 107:10,
111:3, 111:24, 126:5

motions [6] - 17:22,
107:10, 111:9,
114:5, 124:15,
126:12
motor [1] - 160:11
motorcycle [1] - 36:13
mountain [1] - 29:23
mouth [1] - 40:19
move [8] - 13:7, 65:23,
67:11, 81:21, 111:4,
116:1, 118:13,
174:13
moveability [1] -
101:9
moved [6] - 11:8,
55:1, 55:12, 65:4,
65:9, 130:2
mover [1] - 164:13
moves [2] - 30:15,
122:9
movies [1] - 109:7
moving [1] - 66:17
MR [77] - 3:5, 3:9,
3:15, 3:24, 14:15,
15:16, 15:18, 17:25,
18:4, 18:7, 19:23,
19:24, 20:5, 20:9,
20:22, 21:5, 24:24,
25:20, 104:21,
105:1, 105:9, 106:5,
106:13, 106:24,
107:9, 107:12,
107:14, 107:16,
107:18, 108:6,
111:4, 111:10,
111:18, 112:2,
112:3, 112:9,
112:10, 112:15,
112:21, 112:22,
115:11, 115:14,
115:16, 115:18,
115:20, 115:22,
116:7, 116:9,
116:16, 116:24,
117:3, 117:5,
117:10, 127:14,
127:19, 127:25,
128:4, 128:9,
128:17, 128:20,
129:2, 129:6,
129:17, 130:1,
149:8, 149:10,
173:7, 173:10,
173:14, 173:18,
173:22, 173:24,
174:17, 191:1,
191:3, 193:24, 194:2
MRI [1] - 101:11
MS [24] - 5:6, 5:14,
5:25, 6:12, 6:15,

6:21, 8:7, 8:16, 8:19,
8:21, 9:12, 9:16,
9:18, 11:18, 12:25,
13:4, 13:9, 14:12,
15:17, 18:8, 18:25,
172:22, 172:24,
173:13
multi [1] - 187:1
multi-colored [1] -
187:1
multiple [1] - 92:11
multiply [2] - 160:1,
163:13
multitude [1] - 198:2
MUNGER [1] - 2:15
Munger [2] - 98:12,
98:13
must [31] - 118:19,
118:21, 119:17,
123:24, 132:13,
132:21, 132:22,
132:24, 133:9,
133:10, 133:12,
137:2, 137:8, 138:2,
138:6, 138:13,
138:17, 138:19,
138:22, 139:3,
141:3, 141:6,
141:13, 144:6,
144:10, 146:16,
146:17, 147:5,
147:15, 148:13
Myers [2] - 95:21, 98:2

## N

name [33] - 21:10,
24:24, 27:1, 27:16,
31:21, 35:11, 38:5,
39:5, 39:8, 39:10,
41:18, 41:23, 44:3,
49:4, 52:21, 55:19,
58:22, 65:2, 68:11,
69:10, 72:19, 74:13,
76:9, 79:10, 83:2,
90:9, 104:2, 105:11,
130:11, 157:10,
158:18, 169:11,
179:11
named [4] - 47:21,
48:4, 48:15, 180:17
names [4] - 84:3,
95:22, 98:5, 105:10
narrow [1] - 195:12
narrower [1] - 135:8
nasty [1] - 25:15
National [6] - 11:21,
168:24, 180:12,
180:13, 180:17
native [1] - 40:3

**natural** [5] - 25:10,
152:11, 182:17,
184:18, 186:24
**naturally** [1] - 172:2
**nature** [10] - 72:6,
84:17, 85:17, 87:16,
88:22, 89:5, 90:3,
90:17, 90:23, 92:25
**nauseous** [1] - 178:5
**Naval** [1] - 54:5
**navigate** [1] - 54:24
**navigation** [2] - 54:4,
54:5
**Navy** [3] - 54:3, 54:15,
54:16
**NCI** [20] - 11:21,
11:25, 12:5, 12:11,
12:17, 12:18, 12:19,
15:3, 15:4, 15:9,
168:23, 180:18,
180:22, 181:2,
183:25, 184:12,
185:6, 191:10,
191:13
**ND** [1] - 96:22
**near** [1] - 185:5
**nearly** [1] - 203:22
**neat** [1] - 153:19
**necessarily** [2] -
107:5, 143:18
**necessary** [3] - 5:1,
139:24, 145:12
**neck** [2] - 63:24, 87:3
**need** [22] - 7:10, 7:12,
18:15, 18:22, 112:7,
123:14, 128:24,
128:25, 130:22,
134:22, 135:20,
139:9, 148:13,
159:21, 167:16,
173:3, 173:5,
173:14, 173:23,
175:7, 183:23, 196:4
**needed** [1] - 166:8
**needing** [2] - 90:1,
184:17
**needs** [6] - 17:22,
68:19, 103:1,
135:24, 154:22,
204:19
**negative** [8] - 99:2,
99:4, 99:7, 100:19,
102:1, 102:3, 106:19
**negatives** [1] - 100:14
**neglected** [1] - 19:1
**negotiation** [1] - 171:7
**neuroblastomas** [1] -
196:19
**never** [16] - 36:1, 36:3,
36:20, 49:8, 53:1,

70:22, 76:13, 83:5,
96:12, 96:13,
100:19, 100:23,
153:11, 159:17,
192:6
**nevertheless** [2] -
10:15, 13:1
**new** [17] - 25:2, 87:5,
92:13, 92:14, 131:3,
151:15, 161:4,
162:15, 168:16,
179:17, 189:13,
189:14, 189:21,
198:7, 198:8, 199:14
**New** [4] - 2:12, 22:16
**newly** [1] - 68:12
**news** [4] - 119:22,
133:8, 133:10,
151:22
**newspapers** [2] -
109:2
**next** [29] - 6:20, 9:17,
9:18, 21:18, 27:24,
28:15, 28:19, 28:20,
31:19, 44:2, 49:3,
52:20, 55:18, 76:8,
86:2, 87:5, 88:1,
88:17, 89:15,
112:20, 116:5,
116:17, 116:23,
122:11, 122:12,
158:6, 158:7, 177:9,
192:4
**nicely** [1] - 16:1
**night** [9] - 4:5, 4:6,
9:24, 9:25, 16:2,
66:1, 76:24, 77:1,
78:2
**nine** [9] - 4:14, 26:25,
64:2, 112:18,
112:20, 115:13,
118:6, 129:23
**NO:6** [9] - 10:16,
10:19, 10:25, 11:11,
12:8, 12:12, 136:4,
158:24, 190:13
**nobody** [1] - 201:17
**node** [1] - 86:5
**none** [6] - 51:21, 82:3,
107:9, 112:2,
142:17, 175:14
**noninfringement** [5] -
4:19, 11:3, 13:23,
14:5, 202:21
**nonwillfulness** [3] -
10:13, 11:4, 11:6
**noodle** [1] - 52:23
**noodles** [1] - 53:12
**noon** [3] - 112:12,
113:7, 123:25

**normal** [1] - 167:1
**north** [1] - 91:20
**northern** [5] - 5:8,
5:25, 6:11, 6:14,
92:5
**Northridge** [2] - 79:11,
82:22
**notch** [1] - 96:17
**note** [2] - 106:9, 145:4
**notebook** [4] - 3:20,
4:5, 4:7, 6:17
**notebooks** [2] - 4:21,
206:8
**notes** [8] - 145:1,
145:2, 145:5, 145:6,
145:7, 145:8, 145:10
**nothing** [7] - 12:19,
55:16, 61:18, 68:8,
77:7, 199:11
**notice** [3] - 185:14,
185:15, 192:20
**notify** [3] - 119:13,
121:11, 133:15
**notion** [2] - 176:21,
197:15
**November** [2] - 67:1,
185:6
**nuclear** [3] - 59:1,
60:21, 60:25
**nucleic** [2] - 136:8,
187:12
**nucleotide** [1] -
192:10
**nucleotides** [1] -
189:25
**number** [76] - 3:1,
10:4, 10:9, 13:24,
18:10, 20:17, 24:8,
27:18, 27:21, 27:23,
27:25, 28:1, 28:2,
28:5, 28:6, 28:7,
28:10, 28:13, 28:14,
28:16, 28:17, 28:18,
28:20, 28:21, 28:22,
29:8, 29:18, 31:20,
33:13, 33:16, 49:11,
73:17, 104:22,
107:14, 111:11,
112:5, 112:15,
115:10, 115:18,
115:21, 116:2,
116:3, 116:7,
116:18, 124:5,
124:21, 124:24,
125:6, 125:14,
125:17, 125:18,
125:19, 125:21,
125:22, 125:23,
126:2, 126:3, 126:7,
126:10, 126:16,

126:17, 126:18,
128:12, 128:15,
129:12, 129:15,
138:10, 143:18,
145:20, 165:18,
170:1, 172:19,
172:21, 173:11,
199:24
**numbered** [1] - 135:21
**numbers** [3] - 153:23,
165:17, 182:21
**numerous** [1] - 179:24
**nurse** [7] - 41:24,
42:12, 42:17, 42:20,
51:17, 51:18, 83:4
**nursing** [1] - 42:22
**Nuys** [1] - 76:10

## O

**Oaks** [2] - 76:11,
76:21
**oath** [4] - 43:11,
120:20, 121:6, 133:1
**object** [3] - 26:19,
140:23, 144:1
**objected** [3] - 8:24,
123:9, 123:19
**objection** [22] - 9:21,
124:25, 125:1,
125:4, 125:5,
125:17, 125:21,
125:22, 126:1,
126:8, 126:16,
126:23, 140:25,
144:1, 144:3, 144:5,
172:20, 173:5,
173:8, 191:1, 191:2,
193:24
**objectionable** [1] -
4:10
**objections** [23] - 3:17,
4:15, 9:24, 15:14,
16:2, 16:16, 18:11,
114:18, 123:12,
123:21, 123:22,
124:6, 124:17,
124:20, 124:23,
126:20, 126:22,
127:8, 127:12,
140:22, 172:16,
172:17, 172:18
**objective** [2] - 26:21,
26:22
**obligation** [1] - 43:12
**obligations** [1] - 52:8
**observe** [1] - 129:21
**obtain** [2] - 163:24,
164:2
**obtained** [2] - 131:22,

163:21
**obvious** [2] - 193:18,
194:15
**obviously** [4] - 24:3,
24:4, 109:10, 202:23
**occasion** [1] - 47:17
**occupation** [10] -
30:7, 30:21, 31:23,
32:11, 38:6, 44:5,
44:12, 65:5, 68:16,
79:23
**occur** [2] - 51:9, 121:9
**occurred** [1] - 139:16
**occurrence** [1] - 162:1
**occurrences** [1] -
33:22
**occurs** [1] - 52:10
**October** [8] - 22:22,
175:23, 178:22,
179:8, 203:4, 203:5,
203:6, 203:25
**odd** [1] - 172:1
**OF** [3] - 1:2, 1:12, 2:1
**offer** [7] - 17:11, 34:1,
50:16, 51:12, 55:15,
73:20, 83:9
**offered** [6] - 114:10,
123:10, 123:11,
146:13, 148:1, 148:3
**offering** [5] - 22:9,
23:2, 34:1, 34:2,
134:3
**offers** [2] - 143:23,
185:24
**Office** [3] - 63:3,
81:19, 166:3
**office** [30] - 19:8, 22:6,
25:6, 46:22, 47:15,
52:22, 53:17, 59:2,
81:7, 101:24,
101:25, 155:9,
155:19, 165:3,
165:11, 165:14,
165:21, 165:23,
166:13, 167:10,
168:7, 187:21,
190:6, 191:15,
192:15, 201:6,
201:7, 201:9,
201:17, 202:4
**officer** [5] - 7:8, 75:3,
150:4, 183:5, 193:22
**Official** [1] - 1:22
**official** [2] - 165:3,
167:14
**often** [8] - 95:11,
133:21, 135:11,
136:21, 143:6,
167:2, 178:9, 186:23
**old** [4] - 31:1, 157:25,

158:5, 181:23
**older** [2] - 52:24, 53:2
**oldest** [3] - 29:23, 38:8, 155:23
**OLSON** [1] - 2:15
**on-schedule** [1] - 30:17
**once** [13] - 36:15, 41:25, 46:12, 61:1, 70:6, 71:6, 78:8, 78:18, 99:16, 104:13, 117:17, 153:19, 203:7
**oncologist** [5] - 38:20, 94:9, 94:17, 95:2, 179:12
**oncology** [11] - 38:21, 42:25, 51:21, 52:7, 63:11, 64:9, 64:15, 93:11, 93:23, 95:14, 100:20
**one** [127] - 3:16, 6:21, 8:4, 10:1, 10:2, 10:5, 11:15, 11:19, 19:1, 19:3, 21:14, 26:7, 29:23, 29:24, 31:24, 31:25, 33:10, 33:18, 34:25, 35:6, 35:13, 35:14, 38:8, 43:4, 43:16, 46:15, 49:7, 50:5, 52:8, 59:2, 59:11, 59:20, 59:22, 63:9, 66:4, 66:23, 72:5, 73:25, 74:18, 74:21, 74:22, 83:19, 84:9, 85:16, 86:16, 86:24, 88:9, 89:7, 92:14, 93:14, 94:15, 94:18, 95:1, 95:23, 96:23, 96:24, 99:9, 100:8, 100:17, 103:22, 105:10, 105:18, 106:7, 111:10, 125:8, 126:12, 127:14, 128:10, 129:11, 129:17, 131:3, 131:22, 134:21, 141:19, 145:6, 147:3, 151:16, 151:17, 154:1, 154:4, 154:15, 156:2, 161:21, 164:7, 165:16, 168:18, 169:17, 171:15, 172:2, 180:16, 182:7, 182:8, 183:3, 183:6, 183:9, 184:3, 184:10, 184:15,

188:6, 188:7, 188:8, 188:12, 193:10, 194:4, 194:12, 196:3, 197:7, 197:8, 198:21, 198:22, 199:19, 199:20, 200:9, 200:11, 201:1, 201:18
**one-way** [1] - 201:18
**ones** [9] - 6:4, 6:7, 6:9, 91:21, 114:11, 154:2, 183:24, 198:10, 198:14
**ongoing** [2] - 7:10, 87:24
**Onofre** [1] - 60:23
**open** [17] - 27:10, 56:19, 63:16, 76:24, 106:14, 107:2, 108:7, 112:23, 115:23, 116:10, 116:19, 117:6, 117:13, 148:13, 148:15, 148:22, 173:2
**Open** [1] - 173:25
**opening** [35] - 3:17, 9:20, 9:23, 10:2, 11:9, 11:20, 12:23, 15:21, 15:23, 18:6, 19:21, 19:22, 24:21, 37:18, 115:1, 122:19, 122:20, 123:5, 124:7, 124:9, 124:24, 125:6, 125:19, 128:1, 129:22, 140:17, 146:7, 149:5, 149:6, 172:21, 173:11, 173:20, 174:3, 174:13
**opens** [1] - 78:7
**operate** [2] - 32:18, 32:19
**operational** [1] - 61:11
**operations** [3] - 29:21, 30:8, 61:13
**operator** [1] - 61:1
**opinion** [8] - 17:11, 57:6, 74:7, 133:3, 144:14, 144:17, 144:21, 145:24
**opinions** [18] - 10:14, 17:6, 34:1, 34:2, 47:14, 50:14, 50:15, 50:16, 50:17, 50:18, 50:22, 57:16, 67:25, 103:22, 132:23, 144:13, 144:14
**opportunities** [4] -

148:7, 180:4, 180:5, 180:9
**opportunity** [10] - 21:9, 29:4, 118:2, 128:22, 142:19, 146:3, 147:1, 147:2, 201:24, 204:6
**oppose** [1] - 111:18
**opposing** [1] - 20:6
**option** [4] - 77:4, 147:24, 148:2
**options** [5] - 26:4, 77:2, 77:16, 169:16, 175:22
**orange** [2] - 100:23, 158:8
**order** [27] - 1:25, 3:12, 7:3, 7:23, 8:8, 10:24, 13:12, 13:14, 17:22, 17:24, 24:10, 84:14, 86:2, 89:15, 112:20, 114:4, 126:5, 127:3, 128:13, 128:22, 138:15, 139:25, 142:1, 144:7, 185:20, 188:12, 200:1
**ordered** [1] - 119:18
**orders** [2] - 53:16, 124:14
**ordinary** [3] - 136:10, 136:12, 138:25
**organizing** [1] - 127:15
**original** [5] - 11:12, 158:25, 165:25, 190:10, 190:11
**originally** [6] - 136:4, 139:3, 153:10, 169:2, 191:4, 194:23
**originally-issued** [1] - 191:4
**Orlando** [1] - 7:18
**OTERO** [1] - 1:3
**Otero** [2] - 21:11, 130:11
**otherwise** [9] - 43:18, 84:9, 93:12, 100:7, 102:24, 105:19, 106:18, 118:25, 175:24
**ourselves** [1] - 150:19
**outcome** [2] - 34:11, 142:22
**outline** [1] - 146:9
**outset** [1] - 204:10
**outside** [18] - 18:20, 18:21, 52:10, 120:16, 120:22, 121:11, 133:15,

145:12, 160:1, 185:13, 185:18, 186:8, 190:19, 191:11, 191:18, 193:1
**overall** [1] - 93:2
**overbroad** [2] - 200:21, 203:18
**overcame** [1] - 184:22
**overclaim** [1] - 200:16
**overly** [2] - 145:9, 202:18
**overrule** [4] - 125:21, 126:16, 144:1, 172:19
**overruled** [3] - 124:25, 126:1, 191:2
**overview** [1] - 137:17
**overwhelmed** [1] - 131:16
**owe** [1] - 186:19
**own** [20] - 25:10, 25:13, 26:5, 31:6, 36:11, 36:12, 61:5, 106:7, 114:13, 120:2, 145:8, 152:16, 153:8, 153:11, 159:18, 162:21, 182:9, 184:24, 185:16, 186:13
**owner** [5] - 160:21, 160:22, 160:23, 161:6, 171:6
**owns** [2] - 22:17, 97:25

## P

**page** [2] - 126:22, 158:17
**paid** [1] - 139:19
**pains** [2] - 84:21
**paint** [1] - 177:22
**Palmdale** [2] - 44:4, 45:18
**panel** [9] - 3:13, 19:16, 23:20, 23:25, 27:4, 36:5, 84:1, 117:25
**panthera** [1] - 197:23
**paper** [12] - 162:2, 162:9, 162:20, 162:21, 162:23, 163:1, 163:2, 163:4, 169:3, 169:4, 169:5, 181:21
**papers** [2] - 19:2, 19:13
**paragraph** [1] - 199:20
**pardon** [1] - 172:23

**parents** [1] - 179:20
**parents'** [1] - 107:19
**park** [1] - 65:11
**part** [67] - 15:4, 24:1, 37:17, 56:16, 60:8, 62:22, 63:5, 65:8, 66:7, 78:19, 79:3, 82:15, 85:20, 86:20, 89:4, 91:7, 93:3, 102:14, 121:18, 126:6, 126:12, 126:15, 126:23, 130:12, 142:17, 143:16, 157:1, 157:2, 157:4, 157:8, 157:13, 157:24, 158:1, 158:3, 158:7, 158:8, 158:16, 158:21, 158:22, 158:23, 158:25, 159:9, 163:7, 163:9, 165:20, 170:25, 180:13, 182:3, 184:7, 184:10, 186:4, 187:15, 187:16, 188:23, 189:4, 189:16, 195:13, 195:16, 196:8, 197:12, 199:2, 199:15
**part-time** [2] - 65:8, 66:7
**partial** [2] - 13:10, 13:17
**participate** [21] - 31:17, 33:8, 36:24, 43:2, 49:12, 53:7, 58:15, 59:16, 60:13, 62:11, 66:3, 66:20, 69:2, 72:11, 72:12, 72:25, 75:15, 76:15, 79:17, 83:7, 118:7
**participated** [2] - 74:23, 80:24
**participation** [1] - 60:17
**particular** [14] - 4:8, 58:6, 94:5, 98:9, 152:5, 152:22, 154:10, 155:11, 157:16, 158:24, 169:14, 196:2, 204:12, 205:9
**particularly** [1] - 150:16
**parties** [46] - 15:13, 18:6, 20:3, 22:11, 22:19, 23:8, 24:20, 24:21, 33:14, 35:22, 37:4, 37:7, 37:23,

39:20, 52:3, 57:20,
60:5, 75:17, 76:16,
79:7, 79:15, 95:19,
113:15, 114:10,
115:5, 120:7,
120:12, 121:2,
121:5, 122:18,
127:2, 127:10,
127:21, 131:1,
133:18, 133:21,
133:23, 134:8,
137:21, 140:8,
148:17, 161:17,
161:18, 171:7,
174:12, 191:13

**partner** [1] - 65:10

**parts** [13] - 118:13,
151:9, 158:7,
158:10, 158:11,
159:6, 182:7,
187:15, 187:17,
187:22, 189:4, 189:8

**party** [9] - 34:11,
57:21, 136:25,
137:6, 137:7,
137:14, 146:9,
202:22, 205:16

**party's** [3] - 114:15,
120:18, 136:22

**pass** [18] - 35:9,
58:19, 58:20, 69:8,
84:13, 86:2, 86:23,
93:15, 95:24,
100:12, 102:12,
115:16, 116:24,
116:25, 117:10,
117:11, 151:11,
154:12

**passed** [8] - 71:20,
84:15, 84:23, 88:2,
89:17, 90:2, 117:12,
170:1

**passes** [1] - 116:25

**passing** [2] - 88:25,
89:21

**pasta** [1] - 187:2

**Patent** [1] - 166:3

**patent** [264] - 11:12,
11:22, 12:2, 12:7,
12:11, 12:20, 14:21,
14:22, 15:7, 15:23,
19:6, 19:8, 21:23,
21:24, 22:5, 22:6,
22:17, 23:1, 23:10,
23:13, 25:5, 25:6,
26:6, 26:9, 26:10,
33:23, 33:24, 37:14,
41:6, 41:9, 41:11,
46:11, 46:12, 46:13,
46:17, 46:22, 46:25,

47:3, 47:4, 47:5,
47:10, 47:15, 47:19,
47:22, 48:21, 61:16,
76:4, 100:4, 100:5,
101:22, 101:23,
101:24, 104:3,
125:10, 131:13,
131:20, 131:21,
134:2, 134:5, 134:6,
134:8, 134:11,
134:14, 134:19,
135:8, 135:10,
135:11, 135:20,
135:21, 135:22,
136:2, 137:21,
137:24, 138:1,
138:5, 138:7, 138:9,
138:11, 138:13,
138:17, 138:20,
138:22, 138:24,
139:1, 139:2, 139:4,
139:9, 146:20,
147:11, 148:5,
149:23, 155:9,
155:10, 155:14,
155:16, 155:18,
158:14, 158:16,
158:17, 158:19,
160:6, 160:20,
160:21, 160:22,
160:23, 161:6,
161:13, 162:3,
162:11, 162:24,
163:4, 163:18,
163:19, 163:22,
165:1, 165:3, 165:6,
165:10, 165:11,
165:14, 165:21,
165:23, 166:13,
166:15, 166:17,
166:22, 166:23,
167:7, 167:9,
167:10, 167:13,
168:7, 168:19,
169:6, 170:10,
171:5, 172:4,
175:10, 176:3,
176:22, 177:7,
177:17, 181:13,
181:14, 181:15,
181:18, 184:9,
184:10, 185:4,
185:5, 185:8, 185:9,
185:12, 185:13,
185:14, 185:18,
185:20, 185:23,
186:5, 186:7,
186:15, 186:16,
186:17, 186:19,
187:9, 187:14,
187:20, 187:21,

187:24, 188:9,
188:16, 188:17,
188:20, 188:22,
189:14, 189:17,
189:24, 190:6,
190:10, 190:11,
190:17, 190:20,
191:5, 191:15,
191:19, 191:20,
192:8, 192:9,
192:10, 192:13,
192:14, 192:15,
192:16, 192:18,
192:20, 192:21,
192:22, 192:23,
193:3, 193:11,
193:14, 193:23,
194:9, 194:18,
194:21, 194:22,
194:24, 194:25,
195:7, 195:9,
195:12, 195:15,
196:15, 196:21,
197:3, 197:5, 197:6,
197:15, 197:24,
198:9, 198:19,
198:20, 198:25,
199:3, 199:6,
199:10, 199:16,
200:18, 201:6,
201:7, 201:9,
201:10, 201:11,
201:17, 201:19,
201:20, 201:23,
201:24, 202:3,
202:4, 202:18,
203:18, 204:18,
205:15, 205:16

**patent's** [3] - 135:23,
138:12, 167:15

**patent-speak** [1] -
197:15

**patented** [4] - 22:10,
156:12, 163:2,
176:24

**patentee** [5] - 186:1,
192:23, 201:6,
201:15

**patents** [11] - 22:5,
41:8, 41:16, 45:7,
61:21, 100:1, 100:3,
158:15, 170:6,
192:2, 203:16

**path** [4] - 203:1,
203:20

**patience** [2] - 204:2,
206:1

**patient** [20] - 58:3,
96:1, 96:8, 96:10,
101:6, 152:9,

152:10, 152:12,
152:22, 153:10,
153:11, 159:24,
160:1, 160:2,
178:11, 178:14,
178:20, 205:1, 205:4

**patient's** [13] - 25:10,
25:12, 25:13,
152:13, 152:16,
153:8, 159:18,
178:12, 182:18,
183:12, 183:15,
184:19, 204:22

**patients** [35] - 25:24,
26:3, 58:4, 153:23,
153:25, 154:1,
154:6, 154:8,
154:11, 155:6,
169:16, 169:18,
169:19, 170:1,
175:13, 175:16,
175:21, 175:23,
177:9, 177:13,
178:17, 178:25,
179:6, 179:21,
179:24, 182:15,
183:9, 203:8, 203:9,
203:22, 203:24,
204:17

**patients'** [1] - 183:21

**Pause** [1] - 128:11

**pavilion** [1] - 64:10

**Pavilion** [1] - 64:10

**pay** [2] - 144:22,
205:17

**payroll** [1] - 72:22

**PC** [1] - 55:11

**pen** [1] - 99:14

**penalty** [1] - 139:23

**pencils** [1] - 144:25

**pending** [1] - 165:11

**Pennsylvania** [1] -
91:3

**pens** [1] - 144:25

**people** [60] - 4:3,
24:25, 34:16, 34:17,
35:19, 36:13, 37:15,
53:24, 56:25, 65:20,
70:12, 73:9, 97:1,
103:3, 108:1,
111:14, 119:12,
120:6, 143:6, 143:7,
149:13, 149:15,
149:22, 150:10,
151:14, 155:2,
155:7, 155:9,
155:11, 156:3,
156:16, 157:4,
158:14, 159:3,
161:6, 163:16,

164:14, 176:8,
176:9, 176:10,
176:23, 182:24,
182:25, 183:22,
184:13, 185:19,
186:10, 189:1,
189:15, 193:2,
195:22, 199:7,
199:16, 199:17,
200:10, 200:11,
200:22, 201:9,
205:17

**per** [1] - 125:2

**percent** [10] - 154:16,
169:18, 178:19,
178:24, 179:1,
179:4, 195:5, 205:3

**percentage** [1] -
204:25

**percentages** [1] -
205:18

**percipient** [1] - 33:20

**peremptory** [2] -
112:19, 114:22

**perfectly** [1] - 99:17

**perhaps** [1] - 167:21

**period** [6] - 22:10,
67:12, 168:1,
177:18, 185:17,
185:25

**Permanente** [1] -
55:21

**permissible** [1] -
193:2

**permission** [11] -
7:23, 160:11,
160:16, 160:19,
160:21, 161:8,
162:10, 162:18,
163:19, 163:25

**permit** [2] - 32:18,
32:20

**permits** [1] - 22:8

**permitted** [4] - 14:4,
15:25, 17:11, 143:25

**person** [21] - 24:18,
34:9, 34:23, 34:25,
50:21, 51:8, 70:4,
70:12, 71:5, 72:2,
87:15, 95:23, 103:7,
107:21, 119:3,
161:2, 168:19,
174:25, 184:7,
191:21, 202:10

**person's** [1] - 71:11

**personal** [11] - 35:18,
36:10, 43:11, 43:13,
43:17, 46:20, 55:6,
57:6, 84:6, 94:8,
132:23

personally [5] - 38:15, 67:20, 67:24, 120:15, 141:18
persons [15] - 18:20, 20:12, 24:3, 24:5, 24:6, 24:13, 48:17, 50:10, 53:19, 86:1, 93:7, 95:22, 129:10, 138:25
perspective [1] - 203:20
persuade [3] - 139:12, 147:4, 147:15
persuaded [1] - 137:2
Peter [1] - 2:17
Ph.D [3] - 75:8, 96:3, 96:23
Ph.D.s [1] - 50:10
Pharma [10] - 3:2, 20:19, 21:6, 22:20, 25:9, 26:2, 131:8, 133:21, 162:5
PHARMA [1] - 1:8
pharmaceutical [2] - 103:21, 103:23
Pheffer [10] - 27:23, 35:9, 35:11, 95:24, 98:15, 115:19, 115:21, 115:24, 115:25
Philippines [3] - 91:20, 95:5, 95:6
philosophical [3] - 35:4, 43:18, 98:20
philosophy [1] - 75:10
phlebotomist [1] - 55:24
phone [1] - 119:4
photo [1] - 19:7
photograph [1] - 156:14
photographs [1] - 155:23
phrase [2] - 125:23, 190:12
physical [1] - 183:10
physicals [1] - 89:10
physician [5] - 51:16, 74:19, 99:3, 99:7, 106:20
physicians [6] - 51:23, 57:17, 64:13, 87:17, 154:7, 170:22
picked [3] - 6:1, 36:15, 65:14
picture [3] - 157:7, 158:14, 177:22
piece [2] - 157:18, 159:11
piecemeal [1] - 148:12

pieces [1] - 186:24
pill [1] - 183:12
pills [1] - 90:5
pioneers [1] - 184:4
pipeline [1] - 170:25
place [5] - 34:10, 57:6, 94:20, 120:3, 120:5
placed [2] - 102:20, 129:14
places [1] - 157:6
plain [2] - 136:10, 136:12
plaintiff [19] - 22:14, 107:11, 115:15, 116:6, 116:23, 117:12, 123:11, 125:12, 125:15, 125:25, 127:8, 133:25, 146:19, 147:7, 147:21, 149:5, 149:7, 167:2, 171:12
plaintiff's [3] - 8:25, 10:9, 36:10
Plaintiffs [2] - 1:6, 2:2
plaintiffs [29] - 7:16, 7:22, 9:11, 13:22, 13:25, 14:6, 15:2, 20:24, 22:11, 22:12, 24:4, 24:6, 24:8, 24:14, 26:21, 50:8, 131:1, 131:7, 133:18, 133:22, 133:23, 134:23, 147:5, 147:23, 148:3, 181:6, 190:22, 195:3, 205:13
plaintiffs' [21] - 11:20, 19:4, 33:20, 35:18, 50:16, 124:20, 124:23, 125:6, 125:18, 127:8, 131:4, 146:23, 147:2, 147:19, 172:17, 172:18, 184:5, 187:9, 189:8, 190:4
planning [2] - 17:18, 66:14
plans [1] - 66:12
plant [2] - 53:19, 61:25
plants [2] - 59:1, 60:22
play [3] - 15:5, 15:24, 131:24
played [5] - 127:24, 128:2, 128:5, 128:19, 131:25

playing [3] - 128:14, 132:1, 148:19
pleading [2] - 15:14, 124:21
pleadings [1] - 18:8
pleased [1] - 106:6
plus [1] - 29:24
pneumonia [1] - 67:19
point [23] - 4:11, 13:6, 13:9, 15:23, 22:3, 24:20, 33:18, 34:4, 34:13, 60:3, 92:12, 97:10, 125:11, 125:12, 127:23, 146:4, 163:13, 169:9, 176:18, 176:19, 185:4, 195:23, 196:1
pointing [3] - 56:22, 165:13, 201:14
points [2] - 14:16, 125:7
polymer [2] - 136:8, 187:12
pool [1] - 65:13
pooled [1] - 156:10
poor [1] - 178:18
popular [1] - 180:1
porridge [4] - 188:3, 188:4, 188:5
port [1] - 88:25
portion [13] - 12:2, 13:12, 13:13, 13:14, 73:11, 127:4, 129:10, 138:17, 146:6, 188:15, 188:16, 188:20, 189:25
position [8] - 55:13, 68:23, 108:10, 127:16, 139:15, 166:2, 172:8, 195:6
positions [1] - 133:18
positive [2] - 86:12, 97:11
possessed [1] - 138:18
possibilities [1] - 180:23
possible [2] - 76:14, 118:9
possibly [4] - 65:15, 122:8, 180:24, 196:17
post [1] - 15:22
Post [1] - 106:9
Post-it [1] - 106:9
postal [1] - 65:11
potential [4] - 11:6, 104:9, 104:23,

199:24
Potential [1] - 20:16
potentially [1] - 21:12
power [3] - 34:14, 58:25, 60:22
practice [7] - 35:17, 36:10, 36:11, 42:13, 51:19, 95:4, 146:1, 194:24, 205:14, 205:16
practices [1] - 38:22
practitioner [1] - 178:17
praised [1] - 64:14
precise [2] - 6:18, 94:20
precisely [4] - 30:9, 38:11, 121:23, 201:19
preclude [1] - 103:10
precluded [1] - 8:4
preemptories [1] - 20:2
preemptory [2] - 115:15, 116:5
prefer [1] - 63:17
preinstruction [2] - 114:25, 123:4
preinstructions [2] - 123:7, 123:16
prejudice [1] - 142:23
prejudices [1] - 132:24
preliminary [14] - 3:14, 4:11, 4:23, 4:25, 114:9, 122:18, 127:21, 128:6, 128:19, 129:12, 131:15, 132:2, 132:8, 149:4
premature [2] - 17:21, 17:24
prepared [1] - 19:21
preparer [1] - 35:14
preponderance [7] - 60:1, 136:24, 137:1, 137:12, 138:2, 139:13, 167:2
prescribe [1] - 170:22
presence [1] - 145:13
present [17] - 72:1, 81:21, 86:13, 115:5, 115:6, 118:7, 129:9, 131:10, 135:17, 137:8, 146:19, 146:21, 147:10, 148:17, 174:12, 201:24, 205:6
presentation [6] - 9:7, 21:17, 146:11,

148:6, 187:9, 205:12
presented [8] - 108:15, 120:19, 121:4, 130:15, 137:14, 147:7, 148:23, 149:1
presenting [4] - 7:8, 7:9, 147:17, 149:6
press [1] - 119:12
presumed [2] - 166:22, 166:25
presumption [2] - 19:7, 19:12
presumptive [3] - 112:17, 112:18, 115:12
pretty [10] - 16:20, 33:3, 61:14, 64:25, 66:1, 70:21, 94:20, 150:25, 153:18, 157:25
preview [1] - 26:18
previous [1] - 100:13
previously [2] - 69:14, 174:25
price [2] - 32:24, 125:3
primary [10] - 35:7, 40:14, 49:14, 76:19, 182:4, 188:14, 189:11, 189:19, 190:1, 198:25
principal [1] - 151:16
principles [1] - 132:9
printers [1] - 55:6
probable [2] - 146:18, 147:16
problem [4] - 64:6, 156:14, 163:24, 168:23
problems [4] - 4:8, 11:6, 187:24, 189:3
procedures [1] - 165:24
proceed [1] - 121:24
proceeding [10] - 21:13, 29:10, 30:2, 43:23, 47:12, 48:25, 59:23, 60:1, 83:12, 118:8
proceedings [19] - 81:25, 82:1, 82:10, 95:18, 104:13, 121:9, 121:14, 123:22, 124:5, 128:11, 130:13, 130:16, 130:18, 130:20, 131:12, 131:19, 146:5, 148:16, 206:15

**PROCEEDINGS** [1] - 1:12
**process** [23] - 19:20, 20:1, 26:19, 27:6, 29:14, 34:17, 50:24, 60:16, 100:4, 104:14, 120:22, 121:1, 121:10, 121:25, 123:20, 135:13, 135:16, 135:18, 160:3, 165:4, 165:5, 184:16
**produce** [2] - 17:16, 31:24
**producing** [1] - 72:22
**product** [21] - 17:7, 22:22, 30:15, 72:22, 134:3, 135:13, 135:16, 135:18, 163:10, 164:1, 164:4, 168:8, 168:12, 170:19, 171:18, 172:2, 175:19, 177:1, 184:25
**production** [1] - 73:3
**products** [1] - 7:10
**profession** [1] - 100:14
**professionally** [1] - 99:6
**professor** [2] - 75:6, 156:15
**professors** [1] - 75:21
**proficiency** [1] - 109:11
**proficient** [3] - 40:10, 109:10, 109:12
**profile** [2] - 17:8, 55:25
**prognosis** [2] - 178:17, 203:23
**program** [6] - 29:21, 30:8, 30:14, 68:5, 96:23, 176:17
**programs** [1] - 120:4
**project** [8] - 31:25, 45:4, 48:12, 59:3, 61:2, 73:8, 169:23, 170:9
**projects** [5] - 169:12, 169:23, 170:24, 171:2, 171:19
**prominent** [1] - 182:24
**promise** [2] - 52:17, 182:22
**promises** [1] - 185:21
**promising** [2] - 160:24, 180:4

**pronounce** [1] - 182:4
**proof** [15] - 59:22, 59:23, 136:22, 136:23, 136:24, 137:4, 137:5, 137:11, 137:12, 141:17, 141:19, 146:14, 167:1, 167:3
**properly** [3] - 119:21, 186:1, 186:15
**properly-defined** [1] - 186:1
**property** [10] - 15:1, 104:6, 104:7, 176:24, 185:9, 185:10, 190:19, 191:11, 191:18, 191:24
**proposal** [3] - 3:19, 4:6, 4:8
**proposed** [11] - 4:7, 4:11, 4:13, 5:23, 6:1, 9:19, 9:22, 13:11, 114:9, 124:24, 128:13
**prosecution** [5] - 47:5, 80:6, 80:8, 100:5, 101:23
**prosecutions** [1] - 80:25
**prosecutors** [1] - 81:21
**prospective** [20] - 19:25, 21:10, 26:24, 27:4, 27:15, 29:5, 29:15, 29:18, 31:19, 34:21, 35:3, 36:5, 43:16, 51:7, 103:10, 106:5, 113:12, 113:13, 115:6, 118:6
**PROSPECTIVE** [415] - 28:4, 29:20, 30:3, 30:6, 30:8, 30:10, 30:14, 30:20, 30:23, 30:25, 31:7, 31:10, 31:12, 31:16, 31:18, 31:21, 32:7, 32:10, 32:13, 32:16, 32:23, 33:2, 33:7, 33:9, 34:20, 35:10, 35:16, 35:18, 35:24, 36:1, 36:11, 36:20, 36:23, 37:1, 37:12, 38:1, 38:3, 38:5, 38:12, 38:14, 38:18, 38:21, 38:24, 39:2, 39:4, 39:7, 39:13, 39:17, 39:21, 40:2, 40:4, 40:6, 40:9, 40:12, 40:17, 40:22, 41:4,

41:6, 41:9, 41:13, 41:15, 41:18, 41:22, 42:6, 42:9, 42:11, 42:14, 42:17, 42:23, 43:1, 43:3, 43:15, 43:24, 44:1, 44:3, 44:10, 44:13, 44:16, 44:20, 44:22, 44:24, 45:3, 45:10, 45:13, 45:16, 45:19, 45:22, 46:1, 46:6, 46:8, 46:11, 46:19, 46:23, 47:2, 47:6, 47:8, 47:13, 47:16, 47:18, 47:20, 47:23, 47:25, 48:3, 48:5, 48:7, 48:9, 48:16, 48:19, 48:22, 49:1, 49:4, 49:13, 49:17, 49:19, 49:22, 50:4, 51:6, 51:13, 51:16, 51:21, 51:25, 52:2, 52:5, 52:11, 52:18, 52:21, 53:4, 53:8, 53:10, 53:13, 53:16, 53:20, 53:22, 53:24, 54:3, 54:6, 54:9, 54:15, 54:18, 54:21, 54:24, 55:2, 55:5, 55:9, 55:11, 55:14, 55:16, 55:19, 56:3, 56:8, 56:12, 56:15, 57:3, 57:10, 57:14, 57:18, 57:23, 58:1, 58:3, 58:7, 58:9, 58:14, 58:16, 58:18, 58:22, 59:7, 59:11, 59:14, 59:18, 60:7, 60:11, 60:14, 60:20, 60:22, 61:1, 61:5, 61:10, 61:17, 61:20, 61:24, 62:7, 62:10, 62:13, 62:16, 62:20, 62:24, 63:4, 63:7, 63:9, 63:18, 63:21, 63:23, 64:5, 64:8, 64:14, 64:19, 64:24, 65:2, 65:17, 65:25, 66:5, 66:14, 66:21, 66:23, 67:7, 67:16, 68:2, 68:8, 68:11, 68:17, 68:24, 69:4, 69:7, 69:10, 69:17, 69:20, 69:23, 70:6, 70:10, 70:17, 70:25, 71:3, 71:6, 71:9, 71:12, 71:15, 71:18, 71:21, 71:24, 72:3, 72:7, 72:10, 72:13, 72:16, 72:18, 72:19, 73:1, 73:4, 73:7, 73:14,

73:16, 73:21, 73:24, 74:3, 74:5, 74:10, 74:12, 74:13, 74:24, 75:2, 75:8, 75:13, 75:16, 75:19, 75:23, 76:5, 76:9, 76:17, 76:20, 76:24, 77:6, 77:11, 77:14, 77:19, 78:4, 78:6, 78:14, 78:24, 79:1, 79:5, 79:8, 79:10, 79:16, 79:18, 79:22, 79:24, 80:2, 80:9, 80:14, 80:17, 80:20, 80:23, 81:1, 81:3, 81:5, 81:8, 81:11, 81:14, 81:18, 82:2, 82:5, 82:8, 82:11, 82:14, 82:17, 82:21, 82:25, 83:2, 83:8, 83:13, 83:17, 83:21, 83:24, 84:15, 84:19, 85:2, 85:4, 85:7, 85:9, 85:11, 85:13, 85:19, 85:22, 86:4, 86:11, 86:15, 86:19, 86:22, 86:24, 87:1, 87:9, 87:11, 87:13, 87:18, 87:21, 88:2, 88:6, 88:8, 88:11, 88:16, 88:18, 88:23, 89:3, 89:6, 89:17, 90:4, 90:8, 90:11, 90:13, 90:15, 90:19, 90:22, 90:24, 91:3, 91:6, 91:9, 91:13, 91:17, 91:24, 92:2, 92:5, 92:9, 92:16, 92:19, 92:22, 93:1, 93:5, 93:16, 93:19, 93:24, 94:2, 94:5, 94:7, 94:13, 94:17, 95:1, 95:5, 95:8, 95:11, 95:15, 95:25, 96:5, 96:7, 96:11, 96:17, 96:19, 97:3, 97:5, 97:13, 97:20, 99:12, 99:20, 99:24, 100:10, 100:13, 100:16, 101:4, 101:7, 101:17, 102:9, 102:13, 102:17, 108:16, 108:20, 108:23, 108:25, 109:4, 109:6, 109:9, 109:13, 109:16, 109:22, 109:25, 110:2, 110:4, 110:6, 110:9, 110:11, 110:14, 110:17,

110:19, 110:21, 110:24, 111:1, 113:2
**prostate** [4] - 84:19, 180:2, 196:18, 197:8
**protect** [1] - 120:18
**protection** [1] - 135:23
**protein** [7] - 186:23, 186:24, 187:2, 188:24, 189:1, 189:20
**proteins** [3] - 186:25, 187:3, 199:9
**prove** [9] - 13:25, 14:6, 125:24, 138:6, 139:6, 139:8, 147:5, 147:14, 166:15
**proved** [1] - 140:10
**provide** [9] - 30:12, 44:25, 122:16, 122:17, 123:6, 127:21, 128:15, 132:3, 136:18
**provided** [7] - 16:3, 26:1, 34:14, 87:16, 127:1, 133:5, 136:11
**provides** [1] - 127:7
**providing** [1] - 123:7
**proving** [2] - 136:25, 137:6
**provost** [5] - 74:15, 75:1, 75:2, 75:3, 75:20
**PTO** [1] - 167:10
**public** [13] - 125:19, 166:6, 166:7, 167:7, 168:6, 185:14, 185:16, 185:22, 192:6, 192:20, 192:21, 192:24, 192:25
**publication** [5] - 181:21, 182:2, 194:6, 194:7, 194:18
**published** [2] - 161:25, 162:2
**publishing** [1] - 162:21
**pull** [1] - 128:21
**punish** [2] - 139:22, 139:25
**purportedly** [1] - 16:18
**purports** [1] - 19:6
**purpose** [12] - 11:4, 141:5, 141:6, 141:7, 141:11, 141:13, 141:14, 144:11, 145:15, 148:10, 185:14

**purposes** [2] - 14:20, 83:18
**pursue** [1] - 81:22
**pursued** [1] - 100:5
**pursuing** [1] - 53:2
**pushed** [1] - 62:2
**pushing** [1] - 99:14
**put** [31] - 3:20, 4:6, 4:20, 4:21, 11:23, 13:17, 15:22, 17:4, 17:13, 40:18, 45:5, 92:14, 106:9, 115:9, 127:15, 139:14, 147:18, 147:21, 147:24, 148:2, 152:10, 152:12, 156:22, 156:24, 160:2, 165:21, 169:21, 169:22, 169:24, 176:15, 203:20
**puts** [1] - 16:6
**putting** [4] - 7:25, 8:4, 158:12, 175:12
**puzzle** [2] - 157:19, 157:21

## Q

**Quackenbush** [1] - 105:6
**qualifies** [2] - 68:23, 82:19
**quality** [7] - 75:4, 85:17, 86:17, 87:16, 88:10, 89:5, 96:16
**quarter** [1] - 113:9
**questioned** [1] - 146:23
**questioning** [2] - 27:4, 103:19
**questions** [26] - 27:3, 29:8, 29:15, 37:4, 49:11, 63:14, 63:16, 67:4, 73:17, 73:18, 73:19, 73:21, 75:14, 79:19, 79:20, 83:14, 83:15, 84:1, 84:5, 84:7, 103:20, 106:4, 108:5, 140:22
**quick** [1] - 127:14
**quickly** [8] - 5:4, 5:19, 16:16, 114:4, 172:13, 183:22, 183:24, 204:23
**quite** [4] - 4:6, 42:1, 87:4, 158:1

## R

**radiation** [6] - 64:1, 88:16, 91:24, 92:12, 151:17, 153:18
**radiology** [1] - 51:22
**rain** [1] - 122:1
**raise** [3] - 19:1, 112:5, 117:21
**raised** [15] - 17:14, 35:2, 35:8, 43:20, 51:11, 69:14, 84:12, 95:23, 98:9, 98:14, 98:18, 100:11, 103:24, 104:10, 105:23
**raises** [4] - 11:3, 16:3, 34:5, 134:15
**raising** [2] - 11:2, 16:20
**ramping** [1] - 172:3
**Rao** [1] - 105:15
**ray** [1] - 101:11
**Raytheon** [1] - 30:10
**re** [1] - 133:7
**re-read** [1] - 133:7
**Rea** [1] - 166:2
**reach** [8] - 30:5, 32:5, 42:4, 44:8, 51:2, 51:3, 56:1, 56:19
**reached** [1] - 178:20
**reaches** [1] - 78:20
**reaching** [1] - 140:11
**read** [34] - 4:13, 4:24, 5:16, 19:19, 22:2, 33:14, 58:10, 84:3, 94:7, 104:19, 106:10, 109:1, 109:2, 118:14, 119:22, 120:9, 123:16, 128:5, 131:14, 133:2, 133:7, 133:10, 145:6, 162:14, 162:20, 169:3, 186:7, 194:6, 194:17, 194:18, 194:22, 194:23, 194:25
**readily** [1] - 193:20
**reading** [5] - 94:8, 128:19, 148:18, 149:3, 169:5
**ready** [5] - 24:2, 104:19, 129:1, 129:2, 129:16
**Reagan** [2] - 55:23, 58:1
**Real** [1] - 160:14
**real** [2] - 13:4, 158:12

**really** [33] - 10:5, 37:16, 42:23, 64:16, 66:10, 67:10, 69:24, 71:6, 73:7, 76:12, 87:4, 87:14, 88:12, 96:2, 96:12, 96:20, 99:15, 99:18, 100:19, 100:23, 101:19, 110:24, 155:12, 158:1, 159:2, 162:8, 188:13, 192:2, 192:17, 195:17, 205:21
**reappears** [1] - 167:8
**rearguing** [1] - 16:4
**rearranged** [2] - 7:3, 8:1
**reason** [5] - 10:22, 15:11, 89:21, 130:23, 161:1
**reasonable** [6] - 59:23, 137:13, 139:19, 139:20, 170:14, 171:7
**reasonableness** [1] - 142:25
**reasonably** [1] - 164:16
**reasons** [16] - 10:13, 16:24, 17:10, 125:4, 134:14, 138:10, 144:14, 144:20, 164:13, 166:11, 186:18, 202:2, 202:15, 202:16, 202:19, 205:15
**reassembled** [2] - 130:9, 174:11
**rebuttal** [2] - 147:25, 148:3
**receive** [1] - 119:20
**received** [18] - 12:24, 85:1, 86:18, 88:15, 91:23, 97:17, 118:20, 133:13, 139:18, 140:7, 140:12, 141:4, 141:10, 143:22, 144:2, 144:4, 184:25, 185:5
**receiving** [1] - 161:2
**recently** [6] - 63:10, 65:4, 66:25, 80:9, 88:18, 203:5
**receptive** [1] - 184:19
**receptor** [8] - 156:19, 157:14, 157:16, 158:1, 158:3, 158:10, 182:19,

186:22
**recess** [14] - 18:23, 18:24, 103:4, 103:17, 112:12, 115:3, 118:16, 121:12, 129:4, 129:8, 173:17, 174:1, 174:4, 206:11
**recognize** [6] - 35:25, 97:10, 108:3, 152:4, 152:21, 158:22
**recognized** [3] - 16:12, 57:21, 151:8
**recognizes** [4] - 36:7, 104:8, 150:22, 159:12
**recognizing** [2] - 151:1, 157:12
**record** [4] - 115:4, 123:13, 144:8, 206:15
**records** [3] - 80:3, 80:5, 142:2
**red** [1] - 7:18
**redirect** [3] - 70:12, 147:4, 147:10
**Redondo** [1] - 68:12
**reengineer** [2] - 152:8, 156:22, 183:14
**reengineered** [6] - 152:21, 153:10, 155:4, 159:9, 159:20, 182:17
**refer** [10] - 5:19, 132:12, 133:21, 133:24, 136:21, 158:9, 158:15, 158:24, 198:16
**reference** [19] - 5:17, 6:9, 8:17, 24:15, 48:21, 59:15, 84:6, 119:25, 123:9, 124:8, 124:19, 125:25, 126:13, 126:17, 126:18, 131:17, 164:24, 172:15, 172:20
**referenced** [3] - 29:12, 98:5, 104:1
**references** [4] - 11:9, 95:18, 125:2, 125:23, 126:18, 126:24, 127:4, 128:13
**referred** [4] - 20:7, 135:11, 147:25, 159:1
**referring** [2] - 162:22, 198:17
**refers** [4] - 16:17,

163:1, 165:16, 187:12
**refresh** [1] - 130:25
**refreshed** [1] - 39:9
**refreshments** [1] - 130:19
**refueling** [1] - 61:2
**regard** [5] - 14:18, 15:1, 15:19, 16:7, 187:22
**regarding** [28] - 5:23, 15:14, 17:22, 47:15, 57:17, 63:15, 85:17, 86:17, 87:15, 89:4, 90:17, 92:1, 92:25, 96:15, 103:23, 104:16, 106:15, 114:5, 114:18, 122:14, 123:24, 124:14, 125:8, 126:21, 131:12, 133:3, 133:5, 136:16
**regardless** [2] - 17:12, 137:14
**Reginald** [1] - 56:3
**region** [4] - 182:5, 187:16, 194:13
**registered** [4] - 41:24, 42:20, 68:13, 83:4
**regular** [6] - 33:1, 57:12, 63:3, 71:4, 75:21, 95:9
**regularly** [2] - 61:9, 109:2
**regulation** [1] - 113:22
**regulations** [3] - 43:7, 43:8
**regulators** [1] - 33:1
**regulatory** [1] - 32:18
**Reiner** [1] - 105:13
**reinforcements** [2] - 153:9, 159:22
**reinfused** [1] - 204:22
**reinject** [1] - 183:15
**reinjected** [1] - 184:20
**reintroduce** [1] - 205:1
**reintroduced** [1] - 178:13
**reject** [2] - 144:18, 155:14
**rejected** [1] - 46:13
**relate** [1] - 9:20
**related** [4] - 10:1, 54:4, 76:1, 77:7
**relatedly** [1] - 16:25
**relates** [6] - 9:18, 11:19, 13:13, 125:19, 160:5, 186:21

relating [5] - 10:13, 12:5, 17:1, 17:17, 22:4
relation [1] - 100:22
relationship [2] - 61:23, 155:25
relationships [2] - 97:15, 97:18
relative [4] - 70:23, 71:19, 106:9, 154:5
relatives [1] - 178:1
relay [1] - 62:3
relevant [3] - 6:8, 145:15, 188:14
reliability [1] - 204:24
reliance [4] - 10:18, 15:3, 15:4
relied [1] - 10:14
religious [2] - 35:5, 98:21
rely [2] - 145:7, 192:22
remain [3] - 111:8, 126:20, 132:13
remarkable [1] - 26:13
remember [10] - 90:13, 91:6, 121:6, 140:19, 143:7, 143:8, 145:2, 159:16, 169:1, 197:18
remembered [1] - 86:24
remind [1] - 174:14
reminded [1] - 187:25
remission [5] - 84:20, 91:14, 151:21, 179:1
remove [3] - 63:25, 125:13, 128:15
removed [2] - 89:25, 91:1
renewal [1] - 160:13
repair [2] - 45:2, 89:12
repeat [2] - 73:18, 83:18
report [5] - 14:23, 17:6, 81:17, 119:18, 120:10
reporter [2] - 27:9, 27:11
Reporter [1] - 1:22
REPORTER'S [1] - 1:12
represent [2] - 24:25, 131:10
representative [1] - 55:22
represented [2] - 24:8, 131:2
representing [5] - 21:6, 24:16, 120:12,

131:7, 149:14
reproductive [2] - 89:23, 90:25
request [12] - 5:6, 5:7, 5:10, 7:22, 7:24, 8:8, 8:13, 9:12, 128:18, 145:22, 145:23, 146:2
requesting [1] - 7:2
require [3] - 50:19, 121:9, 137:12
required [4] - 70:5, 190:7, 194:23, 195:9
requirement [6] - 138:14, 138:16, 138:21, 138:23, 139:5
requirements [8] - 5:11, 135:4, 135:5, 135:6, 135:9, 135:11, 135:13, 138:13
requires [4] - 50:24, 56:19, 56:24, 193:15
Research [2] - 133:20, 170:8
research [20] - 22:13, 22:16, 44:13, 75:5, 94:4, 94:14, 96:24, 103:8, 113:14, 113:16, 113:17, 113:19, 119:24, 120:6, 120:22, 156:3, 156:7, 156:11, 157:5, 180:14
researched [1] - 94:9
researchers [1] - 166:20
residents [1] - 96:23
resolve [9] - 6:23, 8:12, 50:6, 50:19, 50:25, 51:8, 74:8, 124:12, 130:14
resolved [1] - 78:20
resolving [2] - 74:6, 83:22
resources [3] - 156:11, 169:20, 169:25
respect [8] - 9:2, 10:1, 10:2, 10:6, 10:8, 11:25, 12:17, 18:8
respective [1] - 9:7
respects [2] - 111:20, 165:15
respond [6] - 14:15, 29:15, 79:21, 83:16, 107:16, 119:17
responded [1] -

107:22
responding [2] - 147:18, 147:22
response [2] - 70:1, 73:20
responses [1] - 112:25
responsibilities [4] - 8:10, 78:21, 78:22, 202:3
responsibility [1] - 163:15
responsible [2] - 163:23, 191:21
rest [6] - 7:16, 126:25, 143:17, 152:10, 152:15, 152:18
restarts [1] - 7:5
restaurant [5] - 76:11, 76:20, 76:23, 78:7, 160:17
rested [1] - 7:22
resting [1] - 8:2
restoration [1] - 29:22, 30:23
restore [1] - 31:2
restroom [2] - 18:22, 103:1
results [3] - 17:20, 182:15, 182:21
resume [2] - 129:5, 206:5
retail [2] - 55:5, 69:11
retained [3] - 8:6, 8:9, 8:14
retalked [1] - 87:24
retire [1] - 136:20
retired [8] - 44:5, 44:12, 58:24, 59:1, 114:2, 122:25, 174:7, 206:10
retirement [1] - 58:24
return [11] - 103:3, 113:8, 113:9, 113:23, 114:21, 118:3, 118:8, 119:21, 122:7, 122:17, 147:21
returned [2] - 130:8, 174:10
returns [1] - 123:4
revamped [1] - 176:17
reverse [1] - 188:12
review [3] - 123:21, 128:23, 137:17
reviewed [1] - 12:11
reviewing [1] - 127:8, 128:7
revised [1] - 173:15
revisions [1] - 114:4

Richard [1] - 105:14
Richardson [1] - 98:14
Rigg [3] - 28:18, 74:14, 117:8
right-hand [1] - 12:2
rights [5] - 26:7, 104:6, 104:7, 120:18, 177:18, 177:19, 185:8, 185:9
rise [3] - 23:23, 103:14, 114:1, 122:23, 130:7, 174:6, 174:9, 206:7
road [3] - 45:21, 163:25, 164:7
roads [1] - 160:16
Robbins [1] - 105:4
Roberts [5] - 105:16, 184:3, 184:7, 184:8
ROCKET [3] - 169:14, 176:7, 204:16
role [4] - 32:25, 34:15, 75:20, 94:3
roles [1] - 73:25
Ronald [2] - 55:23, 58:1
room [5] - 5:18, 29:2, 58:5, 118:9, 119:5, 122:15, 130:19, 132:14, 145:3
Rosenberg [22] - 12:18, 162:4, 162:6, 162:19, 162:21, 168:23, 169:1, 169:3, 180:17, 180:18, 180:19, 180:20, 181:4, 181:7, 181:17, 181:19, 182:10, 182:12, 182:13, 191:5, 194:8
Rosenberg's [4] - 181:10, 182:1, 190:15, 190:18
rounds [1] - 92:11
routinely [1] - 161:1
row [22] - 26:25, 27:20, 27:22, 28:9, 28:11, 85:23, 89:15, 91:11, 93:13, 99:9, 99:10, 100:7, 100:8, 102:4, 103:24, 117:16, 117:23, 118:11
rows [1] - 129:20
royalties [1] - 205:17
royalty [3] - 139:19, 139:20, 170:14
Roybal [2] - 80:17,

80:18
RPR [2] - 1:22, 206:21
rule [9] - 9:9, 16:21, 52:17, 77:21, 77:22, 113:22, 124:22, 172:22, 172:24
ruled [4] - 8:22, 14:19, 126:19
Rules [2] - 143:21, 145:17
rules [10] - 43:6, 43:7, 103:9, 113:15, 120:18, 121:7, 121:8, 140:24, 143:25
ruling [4] - 10:8, 125:13, 141:1, 193:25
rulings [2] - 9:6
run [1] - 53:17
Ryan [1] - 105:7

S

Sadelain [39] - 25:2, 105:1, 149:23, 149:24, 149:25, 152:1, 153:2, 155:18, 156:14, 156:23, 158:14, 160:6, 161:24, 162:7, 162:9, 162:23, 163:2, 163:8, 163:22, 167:9, 169:2, 169:3, 169:6, 170:12, 176:4, 176:21, 177:4, 181:7, 181:11, 181:15, 181:17, 184:6, 184:11, 185:4, 189:7, 189:22, 192:7, 192:12, 194:7
Sadelain's [19] - 12:18, 125:10, 154:20, 156:12, 157:6, 159:25, 163:8, 163:12, 163:18, 163:19, 166:15, 166:17, 169:4, 170:2, 170:18, 171:1, 171:2, 175:10, 189:11
safe [2] - 164:16
safely [3] - 155:3, 204:21, 204:23
safer [2] - 17:9, 17:13
safety [4] - 17:8, 31:23, 32:13, 169:22

**sailor** [1] - 54:9
**sale** [3] - 22:10, 23:2, 134:3
**sales** [3] - 55:5, 69:12, 172:3
**salvage** [2] - 178:16, 178:19
**Samsung** [1] - 69:12
**San** [2] - 38:6, 60:23
**sander** [1] - 175:4
**Santa** [3] - 22:21, 49:5, 49:16
**Santos** [4] - 28:21, 79:11, 91:12, 94:25
**Sarah** [3] - 2:11, 3:7, 21:1
**sarcomas** [1] - 196:20
**satisfies** [1] - 135:6
**Saturday** [1] - 78:15
**save** [2] - 5:15, 203:13
**saved** [1] - 177:13
**saving** [4] - 25:23, 203:9, 203:11, 203:12
**saw** [10] - 4:1, 141:18, 155:9, 159:13, 181:10, 182:22, 185:9, 185:23, 199:1
**scale** [5] - 180:22, 180:25, 182:13, 183:17, 184:24
**scenarios** [1] - 70:8
**scFv** [9] - 195:23, 196:1, 198:21, 198:22, 199:11, 199:19, 199:22, 200:25
**scFv's** [3] - 195:21, 195:22, 200:5
**SCFVs** [1] - 199:24
**schedule** [4] - 7:4, 8:2, 8:18, 30:17
**scheduled** [1] - 64:17
**scheduling** [2] - 6:23, 9:1
**school** [16] - 29:24, 52:24, 65:6, 66:15, 68:17, 74:19, 79:12, 80:2, 96:20, 96:21, 97:6, 109:20, 110:8, 110:12, 197:17, 197:18
**Schuetz** [2] - 105:16, 192:12
**science** [8] - 33:24, 36:18, 37:20, 37:21, 68:25, 71:12, 75:22, 155:12
**science-based** [1] - 37:20

**scientific** [7] - 38:17, 50:11, 52:14, 158:18, 162:25, 183:5, 193:22
**scientist** [6] - 96:25, 162:6, 162:13, 162:14, 181:22, 191:22
**scientists** [16] - 24:25, 61:9, 96:20, 150:11, 150:14, 152:6, 153:16, 153:19, 154:7, 154:18, 156:20, 157:10, 157:25, 158:2, 158:9, 189:1
**scoot** [1] - 29:3
**scope** [6] - 135:15, 185:10, 191:11, 191:17, 192:23, 200:23
**Scorpion** [2] - 29:24, 31:9
**screens** [1] - 131:23
**search** [1] - 120:5
**searched** [1] - 3:25
**searching** [1] - 119:24
**season** [3] - 49:20, 65:22, 174:20
**seat** [25] - 3:11, 21:8, 24:13, 27:1, 27:17, 27:20, 27:24, 28:8, 28:11, 28:15, 28:19, 28:20, 104:12, 114:3, 115:9, 115:25, 116:2, 116:3, 116:13, 116:21, 117:8, 123:3, 130:10, 174:12, 206:9
**seated** [4] - 3:4, 20:21, 118:1, 119:14
**seats** [5] - 20:12, 20:14, 24:10, 29:6, 116:1
**Seattle** [2] - 22:15, 156:9
**SEC** [1] - 77:21
**second** [12] - 26:25, 105:2, 113:18, 124:14, 125:11, 137:4, 150:3, 157:2, 168:4, 178:7, 192:13, 199:2
**secondhand** [1] - 67:24
**sector** [1] - 103:21
**Securities** [1] - 171:23
**see** [40] - 5:20, 6:6, 10:5, 11:23, 28:24,

29:17, 34:25, 67:10, 103:20, 113:9, 120:15, 120:16, 128:3, 128:8, 129:13, 141:8, 142:20, 143:7, 149:20, 152:23, 157:8, 157:13, 158:16, 158:19, 159:5, 159:10, 163:6, 165:6, 165:13, 166:1, 167:24, 169:21, 172:12, 178:24, 181:12, 182:16, 187:1, 187:5, 187:11, 192:1
**seek** [3] - 13:24, 98:21, 98:23
**seeking** [3] - 23:3, 134:1, 146:22
**seem** [1] - 120:15
**seeming** [1] - 16:1
**Seifert** [4] - 27:18, 29:19, 29:20, 84:13
**select** [1] - 18:3
**selected** [20] - 37:8, 45:24, 46:7, 49:9, 49:25, 52:9, 52:12, 53:1, 74:1, 78:9, 78:19, 104:13, 113:20, 113:24, 114:24, 117:15, 118:5, 118:12, 136:9, 196:14
**selection** [4] - 20:1, 24:2, 26:19, 27:6
**Selena** [2] - 28:7, 55:19
**sell** [3] - 41:7, 69:12, 202:13
**selling** [6] - 22:9, 23:2, 54:11, 55:6, 134:3, 202:11
**semester** [2] - 110:15, 110:17
**send** [2] - 44:17, 192:10
**sends** [1] - 159:21
**senior** [4] - 31:22, 32:13, 150:2, 163:15
**sense** [6] - 129:25, 156:10, 169:11, 169:17, 171:14, 199:6
**sensing** [1] - 107:24
**sent** [1] - 192:12
**sentence** [2] - 135:5, 187:11
**sentences** [1] - 135:21

**separate** [8] - 9:21, 9:25, 54:17, 54:20, 70:14, 81:24, 114:7, 114:17
**separated** [1] - 159:25
**September** [2] - 167:11, 177:24
**SEQ** [8] - 10:16, 10:19, 10:25, 11:11, 12:8, 12:12, 136:4, 158:24
**sequence** [24] - 10:20, 11:12, 13:19, 136:3, 168:9, 169:4, 169:7, 188:24, 189:18, 190:3, 190:8, 190:12, 190:15, 190:16, 192:10, 192:17, 194:9, 194:13, 199:4, 200:12, 204:12, 205:8
**sequences** [2] - 189:24, 191:10
**series** [2] - 11:19, 11:24
**serious** [1] - 99:7
**serve** [3] - 62:18, 65:15, 160:17
**served** [5] - 29:25, 41:25, 69:13, 72:23, 79:13
**service** [14] - 26:16, 32:1, 36:15, 38:9, 55:21, 56:10, 65:9, 65:11, 65:12, 68:14, 76:13, 76:15, 119:16, 174:19
**session** [1] - 141:9
**set** [22] - 56:13, 97:16, 99:22, 111:23, 114:8, 114:13, 118:15, 121:13, 123:9, 124:17, 127:22, 128:25, 129:7, 132:3, 132:11, 132:16, 132:17, 135:4, 148:24, 173:14, 173:23, 174:2
**sets** [4] - 10:1, 135:4, 135:5, 198:13
**setting** [1] - 135:9
**seven** [6] - 21:15, 21:18, 33:17, 59:4, 104:24
**several** [15] - 24:2, 24:16, 29:1, 50:7, 50:8, 103:2, 103:3, 123:18, 124:10,

129:10, 131:2, 135:7, 142:18, 144:13
**Shannon** [2] - 17:4, 174:25
**shaping** [1] - 157:17
**share** [1] - 171:15
**shared** [1] - 181:4
**sharing** [1] - 162:17
**shaw** [1] - 175:3
**Shawn** [1] - 105:5
**sheet** [1] - 18:14
**Sherman** [2] - 76:11, 76:21
**shift** [1] - 13:25
**ship** [2] - 54:10, 54:25
**ships** [3] - 54:17, 54:20, 54:23
**shoot** [1] - 73:9
**short** [6] - 22:2, 23:16, 118:16, 129:4, 173:17, 174:1
**shortcuts** [1] - 164:15
**shortly** [4] - 33:14, 84:2, 122:17, 124:16
**shot** [1] - 155:1
**show** [22] - 10:22, 11:21, 125:25, 131:21, 138:2, 138:19, 139:3, 146:10, 148:9, 159:7, 164:5, 164:21, 166:14, 168:22, 186:3, 187:9, 189:12, 189:21, 193:16, 201:4, 202:6, 205:7
**showed** [1] - 171:19
**showing** [4] - 11:24, 15:5, 15:10, 163:11
**shown** [4] - 16:15, 16:22, 142:1, 148:8
**shows** [3] - 14:24, 15:20, 164:11
**shrapnel** [1] - 101:8
**shrink** [1] - 63:24
**Shungchin** [2] - 27:25, 38:5
**shut** [1] - 176:14
**sic** [1] - 105:6
**sick** [1] - 49:19
**side** [19] - 3:18, 4:23, 8:25, 11:23, 12:15, 20:1, 37:5, 57:9, 61:11, 61:13, 75:12, 75:22, 101:12, 114:23, 131:4, 143:24, 146:7
**side-by-side** [1] - 12:15

**sidebar** [7] - 27:5,
63:17, 105:24,
115:7, 146:3,
172:13, 173:3
**Sidebar** [1] - 115:8
**sides** [18] - 3:17, 9:4,
19:18, 29:10, 33:5,
36:22, 41:5, 42:10,
45:14, 49:12, 50:10,
53:9, 69:3, 70:16,
112:5, 171:10,
175:8, 175:9
**sign** [1] - 89:10
**signaling** [9] - 182:5,
187:16, 188:14,
189:11, 189:19,
190:1, 190:8, 198:25
**signals** [1] - 159:21
**signed** [1] - 166:4
**significant** [6] - 10:5,
26:4, 50:1, 50:10,
56:6, 74:7
**silver** [1] - 176:22
**similar** [2] - 74:22,
154:8
**similarly** [1] - 7:24
**simple** [2] - 5:7, 6:22
**simplify** [1] - 29:11
**simply** [10] - 4:23,
7:19, 34:8, 50:22,
56:25, 133:23,
146:8, 176:23,
193:7, 204:11
**single** [9] - 129:22,
135:5, 158:21,
159:5, 183:16,
198:16, 198:18,
198:22, 205:18
**single-chain** [4] -
158:21, 159:5,
198:16, 198:18
**single-digit** [1] -
205:18
**sister** [2] - 51:17,
155:22
**sisters** [1] - 91:15
**sit** [2] - 64:4, 174:19
**sites** [1] - 66:4
**sits** [1] - 188:6
**situation** [4] - 194:20,
201:20, 202:13,
202:21
**six** [7] - 21:15, 21:18,
33:17, 42:1, 94:22,
104:24
**sixth** [1] - 74:18
**skill** [8] - 14:20,
138:25, 168:19,
188:19, 189:2,
193:19, 199:7,

200:22
**skilled** [2] - 193:4,
194:4
**skin** [3] - 63:23,
100:20, 150:12
**skipped** [1] - 49:7
**slabs** [1] - 89:8
**slide** [44] - 12:2,
13:10, 13:20, 15:4,
15:10, 15:20, 15:21,
16:3, 16:6, 16:17,
17:3, 17:5, 17:13,
18:1, 19:4, 19:8,
125:1, 125:6,
125:11, 125:13,
125:14, 125:17,
125:18, 125:19,
125:21, 125:22,
126:2, 126:3,
126:10, 126:16,
126:17, 126:21,
126:24, 126:25,
127:14, 127:15,
172:18, 172:19,
172:21, 173:8,
173:11
**slides** [17] - 3:17,
11:19, 11:24, 12:5,
13:20, 13:21, 16:2,
16:25, 124:24,
124:25, 126:7,
126:8, 126:18,
172:16, 173:15,
175:1
**Sloan** [61] - 3:6, 20:23,
22:13, 22:14, 22:15,
22:17, 22:24, 23:3,
23:13, 24:25, 25:3,
95:20, 96:1, 96:7,
96:21, 97:4, 97:11,
98:1, 111:12,
111:14, 125:9,
133:19, 133:22,
133:25, 134:4,
138:1, 139:10,
139:12, 139:14,
139:18, 139:22,
139:24, 149:14,
149:24, 150:2,
153:21, 155:7,
155:22, 156:5,
157:3, 160:5, 161:9,
163:15, 163:21,
164:3, 165:11,
165:21, 166:20,
167:6, 167:9,
167:19, 170:7,
186:3, 186:14,
187:19, 191:14,
191:23, 192:5,

192:15, 194:20,
198:11
**small** [10] - 153:24,
180:22, 182:13,
182:21, 182:23,
183:8, 188:7, 189:5,
196:19
**small-scale** [1] -
182:13
**smart** [2] - 45:23,
159:3
**smoothly** [3] - 53:17,
174:22, 175:2
**Snapchat** [1] - 119:7
**so..** [2] - 46:17, 51:14
**social** [2] - 75:24,
119:7
**Society** [1] - 94:10
**soldiers** [2] - 152:19,
152:20
**solely** [5] - 118:19,
132:25, 133:12,
141:10, 148:10
**solid** [2] - 196:25,
197:2
**someone** [13] - 14:20,
69:24, 98:22, 99:5,
112:7, 149:16,
167:14, 188:19,
193:4, 193:19,
201:18, 201:20,
205:14
**sometime** [3] - 4:5,
7:16, 21:18
**sometimes** [19] - 34:9,
50:21, 61:12, 73:10,
77:2, 77:20, 143:2,
143:4, 144:7,
151:18, 151:19,
156:2, 164:14,
165:8, 166:10,
201:12
**somewhat** [1] - 63:12
**somewhere** [1] -
91:20
**son** [4] - 31:8, 38:25,
52:25, 74:19
**soon** [3] - 114:24,
118:16, 128:25
**sorry** [9] - 13:9, 15:18,
29:1, 47:7, 49:7,
85:9, 112:17,
115:21, 117:4
**sort** [5] - 12:14, 19:9,
182:19, 188:9,
196:10
**sought** [1] - 187:21
**sound** [2] - 191:16,
205:14
**sounds** [2] - 23:16,

45:8
**South** [2] - 2:9, 2:18
**Southern** [7] - 51:23,
58:25, 59:3, 60:18,
91:18, 91:22, 156:8
**Spanish** [1] - 107:25
**speaking** [1] - 93:16
**special** [5] - 68:18,
68:19, 152:21,
153:13, 160:8
**Special** [3] - 159:15,
159:17, 159:19
**specialist** [2] - 65:7,
66:17
**specialists** [1] - 201:8
**specialized** [4] - 69:1,
93:9, 93:22, 98:17
**specially** [7] - 25:11,
25:15, 152:2, 152:4,
153:12, 155:10,
159:16
**specialty** [2] - 42:21,
95:13
**species** [4] - 197:20,
198:3, 198:6, 200:11
**specific** [7] - 30:14,
67:4, 77:7, 128:4,
137:16, 186:2,
189:17
**specifically** [3] -
136:9, 160:5, 196:14
**specification** [5] -
5:11, 5:19, 138:12,
138:17, 182:9
**specified** [1] - 189:22
**specter** [1] - 11:3
**speculation** [1] -
19:11
**spend** [2] - 155:13,
158:19
**spent** [2] - 154:24,
179:16
**spouse's** [1] - 44:5
**Squibb** [1] - 95:21
**St** [2] - 156:6, 170:7
**stage** [7] - 66:25, 87:2,
88:19, 88:24, 89:11,
92:10, 178:21
**stages** [1] - 67:10
**stake** [1] - 34:11
**stand** [14] - 7:12, 7:17,
7:21, 24:9, 34:5,
56:23, 73:19, 79:20,
83:15, 117:21,
146:12, 171:11,
203:14
**standard** [6] - 59:24,
60:5, 137:11,
146:17, 167:4,
205:17

**standards** [6] - 60:2,
60:3, 60:4, 137:16,
137:17, 146:14
**standing** [1] - 20:13
**Stanek** [1] - 166:1
**Stanton** [3] - 28:18,
74:14, 117:8
**Stanton-Rigg** [3] -
28:18, 74:14, 117:8
**Stars** [1] - 2:6
**start** [36] - 3:22, 18:13,
20:1, 20:25, 21:14,
24:2, 26:18, 27:6,
27:8, 29:14, 29:18,
37:14, 78:5, 78:6,
84:11, 84:12,
104:20, 106:3,
107:11, 112:14,
113:21, 114:22,
114:24, 121:10,
121:21, 121:22,
122:6, 122:12,
122:20, 131:11,
177:22, 189:4,
190:9, 194:16,
203:11
**started** [8] - 84:21,
89:23, 90:24, 92:10,
179:24, 182:12,
185:6, 206:6
**starting** [5] - 3:6,
129:18, 136:5,
136:7, 169:7
**state** [7] - 3:3, 15:5,
15:24, 20:20, 43:7,
55:24, 114:14
**State** [4] - 42:19,
59:10, 81:4, 82:21
**statement** [20] - 4:17,
9:23, 11:9, 16:12,
16:14, 19:19, 21:23,
22:2, 23:16, 24:21,
58:10, 114:16,
125:19, 127:1,
146:7, 146:8,
172:21, 173:12,
174:3, 174:13
**statements** [19] -
12:23, 18:6, 19:21,
19:22, 115:1,
122:19, 122:20,
123:5, 124:7, 124:9,
128:1, 129:22,
140:15, 140:17,
149:5, 149:6,
173:21, 174:14,
202:6
**STATES** [1] - 1:1
**states** [1] - 52:1
**States** [14] - 22:5,

22:6, 25:5, 59:25, 68:4, 109:21, 154:25, 155:9, 155:16, 155:18, 155:24, 166:3, 171:23
**status** [2] - 44:4, 68:4
**stay** [1] - 103:15
**stayed** [1] - 151:24
**staying** [1] - 66:10
**stem** [1] - 178:10
**step** [1] - 87:6
**stepdaughter** [1] - 55:24
**Steve** [1] - 105:4
**Steven** [1] - 180:17
**sticks** [2] - 157:9, 159:11
**still** [11] - 7:25, 17:20, 65:3, 66:15, 97:4, 127:8, 165:10, 167:12, 167:18, 178:14, 198:15
**stipulate** [1] - 161:18
**stipulated** [2] - 14:1, 140:9
**stipulation** [8] - 16:6, 16:8, 114:15, 127:2, 127:5, 161:16, 161:18, 161:23
**stock** [2] - 97:25, 98:2
**stomach** [2] - 84:21, 89:20
**stop** [3] - 122:6, 124:5, 161:13
**stops** [1] - 92:13
**store** [2] - 68:14, 69:13
**story** [10] - 37:16, 50:22, 69:24, 175:8, 175:9, 179:9, 187:25, 188:1, 188:2, 188:12
**street** [1] - 202:12
**Street** [3] - 1:23, 2:9, 2:11
**stricken** [3] - 141:2, 144:8, 144:10
**strict** [2] - 103:9, 113:15
**strike** [2] - 116:8, 127:3
**striking** [1] - 127:4
**string** [3] - 158:24, 165:6, 165:18
**strokes** [1] - 168:6
**strong** [1] - 103:22
**structure** [2] - 78:9, 187:2
**stubborn** [2] - 150:12,

150:13
**stuck** [1] - 158:8
**student** [4] - 35:14, 42:14, 42:15, 42:19
**students** [2] - 76:1, 96:3
**studies** [3] - 7:10, 176:16, 183:6
**study** [4] - 176:7, 178:23, 183:17
**studying** [1] - 197:18
**stuff** [2] - 37:15, 200:17
**subject** [6] - 16:19, 17:2, 29:9, 107:18, 147:9, 193:24
**submission** [1] - 17:23
**submit** [1] - 16:23
**submitted** [4] - 16:17, 137:18, 187:20, 190:6
**succeeded** [3] - 175:18, 177:11, 205:25
**success** [2] - 161:24, 169:17
**successful** [5] - 107:20, 176:23, 197:2, 204:11, 205:24
**succumbed** [1] - 88:19
**suddenly** [1] - 182:16
**sued** [1] - 177:14
**sufficiently** [1] - 138:24
**suggest** [3] - 4:19, 13:22, 14:5
**suggested** [1] - 129:11
**suggesting** [1] - 13:18
**suggestion** [4] - 11:10, 129:12, 129:24, 181:9
**suing** [1] - 26:6
**suit** [2] - 22:24, 133:25
**Suite** [1] - 2:6
**Sullivan** [1] - 105:7
**Sullivan's** [1] - 126:14
**summaries** [5] - 141:25, 142:3, 142:7, 142:9, 142:10
**summary** [5] - 5:2, 80:14, 80:15, 133:18, 172:5
**summon** [1] - 18:18
**summoned** [1] - 21:11
**sums** [1] - 201:22
**Sunday** [1] - 78:15

**super** [1] - 67:8
**Superior** [3] - 59:4, 59:11, 59:15
**supervise** [1] - 53:21
**supervisor** [1] - 53:18
**supplemental** [1] - 16:3
**support** [5] - 12:14, 13:2, 34:10, 65:7, 66:17
**supports** [2] - 142:4, 142:11
**supposed** [9] - 125:8, 177:18, 185:15, 186:6, 188:17, 188:18, 193:17, 202:12
**supposedly** [1] - 176:20
**surgeon** [5] - 64:15, 179:14, 179:17, 179:19
**surgery** [7] - 63:25, 64:8, 89:12, 96:9, 96:13, 151:16, 153:18
**surges** [2] - 77:7, 77:19
**survival** [1] - 154:20
**survived** [2] - 94:22, 154:16
**suspect** [1] - 108:3
**sustain** [7] - 125:3, 126:8, 144:2, 144:5, 172:17, 172:18, 172:20
**sustained** [3] - 173:5, 173:8, 194:1
**swears** [1] - 34:6
**sweat** [1] - 161:3
**swelling** [1] - 176:12
**Swenson** [1] - 149:18
**switch** [2] - 62:2, 176:19
**sworn** [10] - 23:20, 23:24, 23:25, 117:17, 117:19, 117:22, 117:25, 140:6, 148:20
**sympathy** [1] - 132:24
**synthesize** [1] - 114:8
**system** [20] - 25:10, 25:13, 46:13, 46:15, 60:16, 89:23, 90:25, 149:12, 150:20, 150:25, 151:2, 151:7, 151:9, 153:11, 156:13, 159:9, 174:22, 178:13, 178:14,

204:22
**systems** [3] - 55:11, 150:17, 150:18

# T

**T-cell** [4] - 157:11, 182:17, 183:14
**T-cells** [23] - 33:25, 152:3, 152:8, 152:10, 152:11, 152:14, 152:16, 152:23, 153:5, 153:6, 153:9, 153:10, 153:13, 155:5, 159:10, 159:24, 183:19, 183:21, 184:14, 184:18, 184:20, 204:20
**table** [9] - 3:6, 3:9, 21:6, 24:13, 24:18, 35:23, 118:3, 131:3, 174:25
**tablets** [1] - 144:25
**Taiwan** [1] - 54:15
**Taiwanese** [1] - 54:16
**target** [16] - 65:9, 65:24, 66:6, 66:10, 136:10, 196:4, 196:13, 196:14, 196:17, 197:6, 197:8, 198:12, 198:14, 198:15, 200:25
**targeted** [1] - 25:12
**targets** [3] - 197:8, 197:10, 200:24
**Tarzana** [1] - 91:19
**taught** [1] - 109:23
**tax** [1] - 35:14
**teach** [2] - 168:21, 200:22
**teachers** [1] - 74:18
**teaches** [1] - 168:19
**teaching** [2] - 66:16, 75:4
**team** [4] - 55:23, 57:25, 131:4, 131:6
**tears** [1] - 161:3
**tech** [1] - 29:23
**technical** [10] - 30:18, 32:21, 37:14, 37:20, 38:16, 50:11, 52:13, 75:22, 131:14, 162:22
**technicality** [1] - 200:15
**technically** [2] - 66:7, 175:2

**technician** [4] - 31:23, 32:14, 32:17, 68:13
**technology** [22] - 26:13, 33:23, 36:18, 139:1, 149:18, 150:2, 155:11, 160:22, 161:16, 162:11, 163:16, 169:4, 171:1, 171:2, 175:11, 175:14, 176:7, 176:21, 176:25, 177:4, 177:5, 177:6, 182:22
**Ted** [3] - 3:9, 21:5, 105:6
**television** [1] - 109:7
**teller** [1] - 69:25
**tend** [2] - 153:24, 183:9
**tendency** [1] - 69:25
**Teresa** [1] - 166:1
**term** [8] - 52:14, 125:15, 136:3, 136:4, 136:6, 136:8, 154:20
**terminal** [2] - 25:24, 175:21, 177:13
**terminology** [1] - 197:25
**terms** [34] - 4:9, 4:13, 4:14, 4:15, 4:16, 5:10, 5:23, 6:3, 6:17, 21:22, 21:25, 23:17, 29:12, 34:12, 42:24, 43:22, 46:25, 47:5, 66:13, 67:15, 78:9, 83:10, 94:14, 121:16, 121:18, 124:10, 130:25, 131:14, 131:16, 131:17, 136:2, 136:11, 136:13, 188:9
**terrific** [1] - 172:10
**test** [4] - 30:16, 108:22, 200:2
**tested** [3] - 90:1, 120:21, 121:1
**testified** [5] - 62:8, 142:21, 143:11, 143:15, 148:22
**testify** [11] - 11:5, 17:19, 62:5, 82:7, 140:7, 143:19, 144:13, 179:11, 183:1, 184:8, 194:3
**testifying** [3] - 34:24, 142:18, 142:22
**testimony** [33] - 10:11, 10:24, 14:20, 17:1,

62:25, 120:21,
126:4, 126:14,
140:6, 140:12,
141:2, 141:17,
142:11, 142:15,
142:17, 142:24,
142:25, 143:9,
143:10, 143:20,
144:13, 144:14,
144:17, 144:18,
144:23, 144:24,
148:17, 148:19,
148:20, 204:7,
204:8, 205:6
**testing** [5] - 96:2,
96:9, 182:14, 183:8,
183:9
**Texas** [2] - 110:9,
110:14
**text** [2] - 119:4, 125:7
**textbooks** [1] - 110:18
**thanking** [1] - 174:18
**Thanksgiving** [1] -
87:2
**THE** [560] - 3:1, 3:11,
3:22, 5:4, 5:13, 5:22,
6:9, 6:13, 6:16, 8:6,
8:8, 8:17, 8:20, 9:4,
9:15, 9:17, 11:17,
12:22, 13:3, 13:7,
14:7, 14:8, 14:10,
14:14, 15:13, 17:21,
18:2, 18:5, 18:12,
18:15, 18:17, 19:15,
19:25, 20:7, 20:10,
20:11, 20:12, 20:14,
20:15, 20:17, 21:4,
21:8, 23:22, 23:23,
24:1, 25:18, 26:17,
27:16, 27:22, 27:23,
28:5, 28:23, 29:1,
29:4, 30:1, 30:4,
30:7, 30:9, 30:12,
30:18, 30:21, 30:24,
31:5, 31:8, 31:11,
31:13, 31:17, 31:19,
32:4, 32:9, 32:11,
32:15, 32:21, 32:25,
33:5, 33:8, 33:10,
34:21, 35:15, 35:17,
35:20, 35:25, 36:5,
36:17, 36:21, 36:24,
37:2, 37:19, 38:2,
38:4, 38:10, 38:13,
38:15, 38:19, 38:22,
38:25, 39:3, 39:5,
39:9, 39:15, 39:18,
39:23, 40:3, 40:5,
40:8, 40:10, 40:14,
40:18, 40:23, 41:5,

41:8, 41:11, 41:14,
41:16, 41:20, 42:4,
42:7, 42:10, 42:12,
42:16, 42:21, 42:24,
43:2, 43:4, 43:16,
43:25, 44:2, 44:8,
44:11, 44:14, 44:19,
44:21, 44:23, 44:25,
45:8, 45:11, 45:14,
45:17, 45:20, 45:23,
46:2, 46:7, 46:9,
46:18, 46:20, 46:24,
47:4, 47:7, 47:9,
47:14, 47:17, 47:19,
47:21, 47:24, 48:1,
48:4, 48:6, 48:8,
48:14, 48:17, 48:20,
48:23, 49:2, 49:10,
49:16, 49:18, 49:21,
49:24, 50:5, 51:7,
51:15, 51:19, 51:23,
52:1, 52:3, 52:8,
52:12, 52:19, 53:2,
53:5, 53:9, 53:11,
53:14, 53:18, 53:21,
53:23, 54:1, 54:5,
54:7, 54:13, 54:16,
54:19, 54:22, 55:1,
55:3, 55:8, 55:10,
55:12, 55:15, 55:17,
56:2, 56:5, 56:9,
56:13, 56:16, 57:8,
57:12, 57:15, 57:19,
57:24, 58:2, 58:6,
58:8, 58:10, 58:15,
58:17, 58:19, 59:6,
59:9, 59:13, 59:15,
59:20, 60:8, 60:13,
60:15, 60:21, 60:24,
61:3, 61:8, 61:15,
61:18, 61:22, 62:5,
62:8, 62:11, 62:14,
62:18, 62:22, 63:2,
63:5, 63:8, 63:14,
63:19, 63:22, 64:3,
64:7, 64:12, 64:17,
64:23, 65:1, 65:15,
65:21, 66:2, 66:12,
66:20, 66:22, 67:3,
67:13, 67:23, 68:7,
68:10, 68:15, 68:22,
69:2, 69:5, 69:8,
69:14, 69:18, 69:21,
70:3, 70:9, 70:14,
70:23, 71:1, 71:4,
71:8, 71:10, 71:13,
71:16, 71:19, 71:23,
72:1, 72:5, 72:8,
72:11, 72:14, 72:17,
72:25, 73:2, 73:5,
73:12, 73:15, 73:17,

73:22, 73:25, 74:4,
74:6, 74:11, 74:22,
74:25, 75:7, 75:11,
75:14, 75:17, 75:20,
76:3, 76:7, 76:14,
76:18, 76:22, 77:4,
77:9, 77:13, 77:17,
78:2, 78:5, 78:8,
78:18, 78:25, 79:3,
79:6, 79:9, 79:15,
79:17, 79:19, 79:23,
79:25, 80:7, 80:12,
80:15, 80:18, 80:21,
80:24, 81:2, 81:4,
81:6, 81:9, 81:13,
81:15, 81:24, 82:3,
82:6, 82:9, 82:12,
82:15, 82:18, 82:24,
83:1, 83:6, 83:9,
83:14, 83:18, 83:22,
83:25, 84:17, 84:25,
85:3, 85:5, 85:8,
85:10, 85:12, 85:16,
85:20, 85:23, 86:9,
86:13, 86:16, 86:20,
86:23, 86:25, 87:7,
87:10, 87:12, 87:15,
87:20, 88:1, 88:4,
88:7, 88:9, 88:14,
88:17, 88:22, 89:2,
89:4, 89:14, 90:2,
90:6, 90:9, 90:12,
90:14, 90:17, 90:20,
90:23, 91:2, 91:4,
91:7, 91:10, 91:16,
91:21, 91:25, 92:4,
92:7, 92:15, 92:17,
92:20, 92:24, 93:3,
93:6, 93:18, 93:21,
94:1, 94:3, 94:6,
94:12, 94:14, 94:24,
95:3, 95:6, 95:9,
95:13, 95:16, 96:4,
96:6, 96:10, 96:15,
96:18, 97:1, 97:4,
97:7, 97:14, 97:23,
99:19, 99:22, 100:1,
100:11, 100:15,
101:3, 101:5,
101:14, 101:22,
102:10, 102:15,
102:18, 103:13,
103:15, 103:18,
104:22, 105:8,
105:18, 106:1,
106:3, 106:11,
106:15, 107:3,
107:8, 107:10,
107:13, 107:15,
107:17, 107:24,
108:8, 108:18,

108:21, 108:24,
109:1, 109:5, 109:7,
109:10, 109:14,
109:20, 109:23,
110:1, 110:3, 110:5,
110:7, 110:10,
110:12, 110:15,
110:18, 110:20,
110:22, 110:25,
111:3, 111:5,
111:17, 111:22,
112:4, 112:11,
112:17, 112:24,
113:3, 114:1, 114:3,
115:4, 115:9,
115:12, 115:15,
115:17, 115:19,
115:21, 115:24,
116:1, 116:5, 116:8,
116:11, 116:15,
116:18, 116:20,
116:25, 117:4,
117:7, 117:11,
117:14, 117:20,
117:23, 117:24,
118:1, 118:2,
122:23, 123:1,
127:18, 127:20,
128:3, 128:7,
128:10, 128:12,
128:18, 128:21,
129:4, 129:7, 129:9,
129:24, 130:2,
130:4, 130:5, 130:6,
130:7, 130:9, 132:1,
149:9, 172:12,
172:15, 172:23,
173:1, 173:3, 173:5,
173:8, 173:11,
173:17, 173:20,
173:23, 174:1,
174:6, 174:8, 174:9,
174:11, 191:2,
194:1, 206:2, 206:7
**theater** [2] - 76:11,
76:12
**themselves** [2] -
19:18, 159:18
**THERAPEUTICS** [1] -
1:5
**Therapeutics** [3] -
131:1, 133:19,
149:15
**therapeutics** [5] - 3:2,
20:18, 20:23, 22:12,
25:1
**therapies** [4] - 179:17,
179:25, 180:15,
204:14
**therapy** [48] - 23:10,

25:23, 25:25, 26:1,
26:3, 26:5, 85:3,
103:25, 134:10,
137:23, 161:19,
175:12, 175:13,
175:17, 175:20,
176:1, 176:2, 176:6,
176:23, 177:1,
177:2, 177:12,
177:13, 177:23,
178:2, 178:7,
178:16, 178:18,
179:5, 180:8, 180:9,
180:10, 180:24,
181:3, 182:25,
183:11, 183:23,
184:4, 184:14,
185:1, 191:14,
203:9, 203:13,
204:11, 204:16,
205:7, 205:24
**thereafter** [2] - 114:24,
146:11
**therefore** [2] - 142:5,
142:12
**Thereupon** [14] -
18:24, 23:25,
103:17, 114:2,
115:3, 117:25,
122:25, 129:8,
130:8, 131:25,
174:7, 174:10,
206:10, 206:11
**they've** [1] - 152:20
**Thijssen** [7] - 28:2,
44:3, 86:2, 86:3,
117:3, 117:5, 117:7
**thinking** [4] - 129:18,
180:7, 180:21,
191:25
**thinks** [1] - 143:24
**third** [5] - 15:19, 65:8,
124:17, 150:5,
195:16
**thirdhand** [1] - 67:24
**Thomas** [2] - 105:6,
105:16
**thousands** [6] -
153:25, 154:8,
175:23, 179:23
**Three** [1] - 188:1
**three** [31] - 3:16, 3:21,
20:2, 64:20, 74:20,
81:3, 95:12, 114:23,
117:12, 118:10,
151:16, 151:17,
157:2, 157:4,
158:10, 158:15,
163:7, 163:9, 182:3,
182:7, 184:7,

184:10, 187:6, 187:15, 187:17, 187:22, 188:2, 188:8, 189:8, 197:16, 203:23
**three-letter** [1] - 187:6
**three-part** [7] - 157:2, 157:4, 163:7, 163:9, 182:3, 184:7, 184:10
**throughout** [11] - 104:14, 118:17, 130:18, 132:12, 133:6, 136:13, 148:16, 152:23, 154:23, 167:25
**throw** [1] - 50:23
**Thursday** [3] - 7:13, 7:16, 7:20
**tigers** [2] - 197:23, 197:24
**tight** [1] - 188:7
**time-consuming** [1] - 200:4
**time-limited** [1] - 185:25
**timeframe** [2] - 12:6, 12:12
**timeline** [1] - 12:4
**timing** [2] - 7:14, 203:3
**tired** [1] - 178:5
**tires** [1] - 192:1
**titled** [1] - 206:15
**today** [16] - 25:25, 27:10, 39:25, 65:15, 114:19, 118:7, 121:20, 122:4, 153:1, 154:17, 155:17, 173:19, 179:7, 196:21, 203:24, 206:3
**Todd** [1] - 64:10
**together** [13] - 4:18, 129:17, 149:14, 155:23, 156:5, 156:10, 156:22, 156:24, 158:12, 168:17, 181:2, 183:25, 186:25
**TOLLES** [1] - 2:15
**Tolles** [2] - 98:12, 98:13
**Tomasello** [1] - 105:5
**tomorrow** [8] - 17:18, 121:21, 121:22, 122:2, 122:5, 123:25, 129:18, 206:5
**took** [10] - 19:14, 34:9, 43:11, 45:22, 67:16,

101:11, 108:21, 108:24, 132:25, 179:12
**top** [9] - 26:25, 27:20, 27:22, 28:9, 96:17, 116:3, 127:4, 158:18, 188:22
**tops** [1] - 94:18
**total** [1] - 172:3
**totally** [1] - 101:18
**touch** [1] - 204:4
**touching** [1] - 120:9
**tough** [1] - 156:20
**towering** [1] - 180:16
**track** [1] - 30:16
**trade** [5] - 77:2, 77:17, 77:19, 77:22
**trademark** [6] - 22:6, 25:6, 101:24, 104:4, 155:19, 167:10
**Trademark** [1] - 166:3
**trader** [1] - 77:16
**trading** [3] - 77:5, 77:10, 77:20
**traffic** [1] - 122:1
**train** [2] - 152:2, 152:4
**trained** [9] - 25:11, 25:15, 95:6, 98:16, 152:17, 153:12, 155:10, 159:16, 201:8
**training** [14] - 32:21, 38:16, 54:1, 61:3, 61:5, 61:7, 68:23, 71:11, 82:19, 93:10, 93:22, 97:5, 98:17, 144:15
**transcribed** [1] - 27:10
**transcript** [3] - 144:24, 148:18, 206:14
**TRANSCRIPT** [1] - 1:12
**transcripts** [1] - 1:25
**transferred** [1] - 31:3
**transformer** [1] - 62:2
**transmitted** [1] - 166:12
**transplant** [1] - 178:10
**transport** [2] - 58:5, 183:19
**transportation** [4] - 45:5, 46:12, 52:25, 65:19
**transporting** [1] - 58:4
**treat** [14] - 25:2, 26:3, 94:16, 96:10, 96:14, 98:22, 98:23, 99:5, 169:15, 170:4, 170:20, 179:21, 196:17, 197:10

**treated** [28] - 48:20, 64:7, 64:12, 67:25, 72:2, 82:12, 85:8, 85:10, 85:25, 86:6, 88:5, 88:12, 89:2, 90:6, 90:16, 91:16, 91:18, 91:21, 92:1, 92:11, 92:18, 92:21, 101:6, 111:12, 145:17, 175:24, 176:9, 203:22
**treating** [6] - 106:21, 170:5, 175:13, 177:12, 179:23, 196:24
**treatment** [38] - 22:23, 63:12, 63:13, 63:21, 63:22, 67:14, 67:15, 68:3, 68:6, 72:6, 84:25, 85:17, 85:18, 86:10, 86:18, 87:4, 87:16, 88:14, 88:22, 89:5, 90:3, 90:18, 91:22, 92:3, 92:25, 93:11, 93:17, 93:23, 106:7, 106:8, 106:16, 106:20, 107:5, 111:18, 153:17, 154:9, 164:12, 180:2
**treatments** [2] - 86:14, 154:19
**TRIAL** [1] - 1:13
**trial** [62] - 3:12, 7:5, 12:24, 19:20, 24:1, 26:19, 34:11, 40:21, 50:24, 56:4, 56:18, 58:15, 63:1, 98:6, 104:1, 114:22, 118:17, 119:13, 120:5, 120:14, 120:21, 121:1, 121:2, 121:5, 121:10, 121:24, 122:5, 122:10, 123:22, 130:13, 130:15, 130:20, 131:19, 132:12, 132:15, 133:6, 140:3, 141:10, 142:8, 143:22, 143:23, 144:12, 144:22, 144:24, 145:11, 146:4, 146:6, 148:16, 148:20, 149:16, 154:1, 154:7, 155:21, 169:10, 169:14, 172:7, 175:6, 183:2, 184:2,

204:16
**trials** [14] - 51:2, 132:9, 153:23, 153:24, 154:11, 154:14, 154:16, 167:22, 168:2, 168:8, 169:10, 180:25, 184:23, 184:24
**tricks** [1] - 151:7
**tried** [14] - 7:2, 8:23, 36:14, 124:9, 124:12, 151:15, 163:18, 167:17, 168:2, 168:3, 176:4, 176:6, 186:9, 204:16
**tries** [5] - 31:2, 167:9, 167:12, 188:3, 201:21
**triggers** [1] - 159:15
**trips** [1] - 61:25
**trivialities** [1] - 200:15
**troops** [3] - 159:16, 159:17, 159:19
**true** [15] - 16:11, 40:1, 69:19, 137:3, 137:10, 143:16, 146:16, 146:18, 147:5, 176:24, 181:8, 182:1, 201:5, 203:2
**truth** [4] - 34:6, 34:7, 120:20, 143:15
**truthful** [1] - 171:24
**try** [19] - 8:18, 21:15, 21:16, 33:17, 92:14, 104:25, 114:19, 120:1, 161:4, 162:15, 167:16, 167:18, 169:9, 169:22, 172:7, 178:13, 178:17, 181:3, 182:12
**trying** [16] - 61:25, 62:3, 97:21, 114:4, 114:7, 156:23, 157:4, 171:13, 177:1, 177:2, 177:17, 179:16, 180:7, 180:15, 180:21, 181:18
**Ts** [1] - 200:25
**Tuan** [3] - 2:6, 131:3, 131:5
**Tuesday** [4] - 1:15, 7:4, 8:1, 8:3
**tumor** [10] - 63:24, 63:25, 88:3, 89:25, 91:1, 96:12, 156:13, 159:10, 196:25,

197:2
**tumors** [1] - 196:20
**tune** [1] - 66:9
**turn** [7] - 19:20, 24:23, 27:7, 28:25, 120:10, 122:22, 149:4
**TV** [4] - 72:21, 73:2, 76:12, 130:2
**twice** [2] - 59:8, 95:12
**Twitter** [1] - 119:6
**two** [61] - 3:18, 6:25, 8:24, 9:13, 9:25, 11:18, 27:11, 29:22, 31:24, 35:13, 38:7, 50:21, 50:22, 65:5, 65:21, 66:3, 74:17, 74:20, 80:11, 84:16, 91:14, 96:2, 96:19, 97:14, 111:13, 112:16, 116:25, 125:7, 125:9, 136:22, 141:15, 143:7, 146:13, 151:22, 154:15, 157:1, 157:4, 158:7, 158:11, 159:6, 167:23, 170:6, 175:8, 175:9, 178:18, 181:1, 187:22, 189:4, 196:10, 196:11, 197:6, 197:9, 197:10, 197:20, 200:20, 200:25, 203:21, 203:23
**two-part** [2] - 157:1, 157:4
**type** [33] - 34:22, 45:1, 51:8, 54:22, 61:23, 66:24, 76:4, 77:10, 84:17, 84:25, 88:14, 91:22, 94:4, 94:11, 94:12, 94:16, 99:8, 102:3, 102:23, 103:7, 110:3, 113:14, 113:16, 152:2, 180:9, 180:21, 184:25, 185:1, 193:7, 193:18, 198:8, 205:16
**types** [6] - 22:23, 37:22, 51:9, 75:14, 141:15, 197:6
**typically** [1] - 178:21
**typo** [2] - 193:4, 193:18

## U

U.S [5] - 1:3, 54:11, 63:3, 65:10, 80:21
UCI [1] - 64:15
UCLA [5] - 42:15, 55:23, 58:1, 64:8, 179:14
ultimate [1] - 194:8
um-hum [6] - 45:19, 49:17, 69:17, 70:25, 71:21, 115:14
uncle [1] - 52:5
uncomfortable [1] - 108:14
under [8] - 17:23, 87:6, 140:24, 145:17, 150:22, 180:18, 193:11
underlined [2] - 6:7, 6:10
underlying [3] - 142:4, 142:6, 142:13
undermine [2] - 19:6, 19:11
underneath [2] - 187:6, 188:24
underscore [1] - 37:19
understandable [1] - 29:13
understood [2] - 9:12, 186:7
underway [1] - 154:23
undetected [1] - 89:7
undisputed [1] - 15:8
undo [1] - 168:20
undue [3] - 4:20, 139:2, 168:25
unfairly [1] - 177:20
unfortunate [1] - 170:2
unhappy [6] - 106:6, 106:8, 106:25, 107:1, 107:4, 107:6
unimportant [1] - 171:1
UNITED [1] - 1:1
United [14] - 22:4, 22:5, 22:6, 25:5, 59:25, 68:4, 109:21, 154:25, 155:8, 155:16, 155:18, 155:24, 166:3, 171:22
university [8] - 32:24, 59:2, 74:16, 75:3, 75:25, 76:2, 76:3, 156:15
University [1] - 110:14
unless [2] - 11:15,

176:16
unlimited [1] - 169:20
unlucky [1] - 160:12
untold [1] - 154:24
untrue [1] - 143:9
untruthfully [2] - 143:11, 143:15
unusual [1] - 183:11
up [68] - 3:13, 6:3, 6:4, 6:21, 6:23, 7:19, 8:2, 11:23, 13:8, 16:6, 17:4, 17:13, 24:9, 25:3, 37:23, 48:12, 48:13, 50:1, 50:23, 52:14, 52:15, 61:12, 64:18, 66:18, 78:12, 89:20, 91:20, 94:25, 95:25, 100:17, 101:7, 101:10, 103:19, 104:18, 106:4, 106:7, 107:19, 107:24, 108:4, 118:15, 121:13, 128:25, 129:7, 149:19, 152:7, 153:2, 156:16, 157:11, 157:18, 157:19, 167:24, 172:3, 173:14, 173:23, 174:2, 174:21, 179:24, 180:1, 186:4, 186:10, 187:3, 187:19, 188:10, 188:25, 200:13, 204:1
upcoming [1] - 148:9
upgraded [1] - 58:25
ups [1] - 107:8
UPS [1] - 74:20
upset [1] - 87:22
urge [1] - 144:22
uses [4] - 125:23, 177:4, 190:11, 197:25
Utah [1] - 52:6

## V

VA [7] - 42:18, 100:17, 100:22, 100:24, 100:25, 101:21
Valencia [1] - 29:21
valid [8] - 134:22, 135:20, 138:13, 166:22, 166:25, 170:10
validity [9] - 10:11, 16:10, 19:7, 19:12, 136:16, 136:17,

148:4, 201:23, 202:3
valuable [1] - 167:15
valuation [2] - 171:17, 171:21
value [4] - 16:18, 126:11, 166:20, 172:3
van [1] - 76:10
variety [1] - 166:11
various [9] - 5:23, 27:13, 33:25, 37:22, 50:11, 95:19, 98:6, 114:6, 123:12
vary [1] - 78:12
vault [1] - 31:2
vehicles [1] - 160:11
veins [1] - 183:21
Ventura [2] - 83:3, 92:23
verbatim [2] - 6:10, 6:13
verdict [19] - 30:5, 32:5, 42:4, 44:8, 51:2, 51:3, 56:1, 56:14, 56:19, 78:20, 119:21, 120:24, 133:4, 136:20, 137:19, 140:11, 145:24
verne [1] - 74:16
versions [2] - 50:21, 143:4
versus [2] - 20:18, 190:4
Vesey [1] - 2:11
veterans [2] - 101:1, 101:5
Veterans [1] - 101:15
via [1] - 119:4
vibes [2] - 100:19, 100:24
video [18] - 19:6, 127:24, 128:2, 128:5, 128:14, 128:18, 129:3, 131:11, 131:21, 131:24, 131:25, 132:1, 155:10, 185:9, 185:24, 201:10, 202:2
videotape [1] - 148:19
Vietnam [2] - 100:16, 101:4
view [7] - 56:21, 57:15, 120:3, 120:5, 129:19, 136:15
viewed [1] - 12:20
views [2] - 43:12, 43:13
Vincent [1] - 2:15

violates [1] - 121:8
virus [1] - 150:19
viruses [1] - 150:22
visit [1] - 120:3
visited [1] - 72:4
visits [1] - 67:17
voir [1] - 177:25
VOLUME [1] - 1:13
volumes [1] - 183:18
volunteer [1] - 69:5
volunteering [1] - 37:6
vs [3] - 1:7, 3:2, 115:5
Vuitton [2] - 202:11, 202:13

## W

wait [3] - 77:24, 148:14
Wait [1] - 192:13
waiting [1] - 145:14
walk [1] - 28:11
Walmart [1] - 31:24
wants [4] - 17:15, 107:23, 162:13, 201:18
war [1] - 154:25
ward [1] - 58:6
warrant [1] - 63:1
wash [1] - 77:22
Washington [1] - 22:15
watch [3] - 109:8, 119:22, 133:10
water [2] - 130:18, 130:21
Wayne [1] - 105:3
ways [6] - 101:1, 101:13, 151:15, 151:16, 154:19, 200:20
weaponized [1] - 182:19
weather [1] - 150:23
website [3] - 49:7, 119:5, 168:7
Wednesday [1] - 7:3
Wednesdays [1] - 78:15
week [5] - 4:4, 7:1, 21:18, 122:11, 122:12
weekend [1] - 7:5
weekends [1] - 78:14
weekly [1] - 77:2
weeks [5] - 77:21, 80:11, 154:13, 154:17, 169:16
Wei [2] - 28:6, 52:21

weight [7] - 141:22, 141:23, 142:5, 142:12, 143:17, 143:20, 144:19
Weill [1] - 156:15
Weinberg [1] - 21:2
WEINBERG [2] - 112:15, 112:21
Weinberger [5] - 2:16, 3:10, 21:7, 24:17, 131:9
Weiss [1] - 2:8
welcome [6] - 21:9, 29:5, 35:15, 49:10, 76:14, 130:11
well-educated [1] - 108:10
well-known [4] - 158:2, 158:5, 162:6, 168:5
Wells [1] - 2:5
Wesley [4] - 28:7, 55:18, 55:19, 93:15
west [2] - 42:18, 179:15
West [2] - 1:23, 65:12
WESTERN [1] - 1:2
Westwood [1] - 55:23
whispered [1] - 153:20
white [6] - 25:11, 25:15, 151:3, 151:8, 151:11, 152:3
whole [10] - 82:11, 84:1, 84:2, 113:20, 124:17, 170:24, 176:17, 176:21, 177:17, 184:16
wide [1] - 180:24
widower [1] - 44:5
Wiezorek [1] - 105:5
wife [4] - 35:12, 38:7, 52:23, 59:1
wife's [1] - 31:23
willful [15] - 23:5, 23:11, 25:8, 134:17, 134:25, 138:1, 147:4, 147:6, 161:11, 161:23, 172:6, 202:7, 202:8, 203:19
willfully [4] - 146:21, 164:22, 202:22, 203:2
willfulness [5] - 135:2, 138:2, 147:8, 147:19, 148:1
willing [2] - 9:1, 174:19
willingly [1] - 203:19

**Wiltzius** [2] - 105:6, 105:11
**win** [1] - 167:3
**wine** [1] - 160:17
**wipe** [1] - 178:12
**wireless** [1] - 69:11
**wise** [1] - 64:4
**wish** [3] - 8:20, 145:1
**withstanding** [1] - 190:22
**witness** [38] - 3:19, 7:6, 7:15, 17:2, 34:5, 62:9, 80:13, 80:14, 80:15, 82:7, 104:20, 105:2, 105:12, 115:2, 123:24, 129:21, 141:17, 141:18, 142:16, 142:20, 143:2, 143:11, 143:13, 143:14, 145:13, 146:12, 146:25, 147:2, 147:3, 148:17, 148:20, 148:21, 149:25, 150:3, 150:5, 184:2
**witness'** [8] - 142:21, 142:22, 142:23, 142:24, 142:25, 144:20, 148:19
**witnesses** [42] - 3:18, 6:22, 6:25, 8:5, 8:24, 9:14, 33:12, 33:13, 33:15, 33:19, 33:20, 33:21, 34:15, 34:16, 34:19, 34:24, 35:6, 50:7, 50:8, 69:16, 74:2, 83:20, 84:3, 104:23, 104:24, 112:7, 120:7, 120:20, 140:6, 140:16, 142:18, 143:4, 143:18, 143:19, 144:16, 146:12, 146:23, 147:7, 147:8, 171:11, 183:1
**witnesses'** [1] - 204:7
**woman** [1] - 71:8
**wonderful** [3] - 88:13, 150:18, 177:3
**wondering** [2] - 5:18, 175:11
**word** [7] - 4:1, 129:13, 129:14, 153:20, 160:10, 161:18
**wording** [4] - 46:16, 46:17, 46:24, 182:4
**words** [7] - 40:18, 112:16, 135:4,

135:16, 148:15, 156:20, 162:22
**worker** [1] - 65:22
**works** [14] - 29:23, 29:24, 31:9, 31:24, 48:10, 52:6, 52:25, 65:10, 78:1, 96:24, 151:6, 159:8, 166:18, 197:4
**world** [6] - 43:6, 55:1, 149:12, 153:22, 154:18, 196:20
**worried** [4] - 7:21, 49:14, 66:5, 66:8
**worry** [1] - 159:2
**worth** [4] - 67:1, 171:25, 192:2
**wounded** [1] - 101:8
**write** [1] - 197:11
**writing** [2] - 119:3, 162:25
**written** [8] - 15:14, 18:11, 108:22, 138:14, 138:15, 138:20, 168:17, 170:11
**wrote** [1] - 181:20
**www. amydiazfedreporter .com** [1] - 1:25

## X

**x-ray** [1] - 101:11

## Y

**Yashodhara** [2] - 105:2, 150:1
**year** [15] - 49:20, 67:8, 67:10, 67:12, 73:12, 76:22, 77:23, 77:24, 86:7, 88:19, 95:12, 110:16, 151:22, 167:12, 201:11
**years** [49] - 29:25, 36:2, 36:12, 42:1, 45:4, 54:10, 54:12, 57:4, 58:24, 60:20, 60:23, 71:25, 75:13, 81:12, 84:16, 88:3, 89:18, 89:19, 94:22, 96:8, 97:6, 99:19, 100:18, 101:9, 107:21, 150:15, 150:23, 150:24, 151:23, 154:18, 155:13, 162:19, 163:5, 167:23, 168:4, 179:14,

180:11, 181:23, 192:19, 192:21, 192:23, 192:24, 194:5, 194:21, 196:22, 203:21
**yellow** [3] - 157:8, 165:13, 165:14
**YESCARTA** [41] - 10:21, 11:13, 16:10, 16:19, 17:9, 17:13, 22:23, 23:2, 23:9, 26:2, 104:1, 104:2, 125:2, 126:11, 126:24, 127:5, 134:3, 134:10, 161:19, 163:5, 170:17, 171:18, 171:25, 175:19, 175:20, 175:24, 177:21, 177:24, 178:22, 178:23, 178:25, 179:7, 179:9, 186:19, 189:6, 195:13, 203:4, 203:7, 203:21, 203:25
**YESCARTA's** [1] - 137:23
**yesterday** [10] - 6:24, 9:25, 16:20, 16:24, 17:10, 17:15, 17:23, 114:5, 124:16, 126:13
**York** [4] - 2:12, 22:16, 22:17
**YOUNG** [9] - 5:6, 5:14, 5:25, 6:12, 6:15, 6:21, 8:7, 8:16, 8:19
**Young** [2] - 2:17, 131:9
**young** [7] - 3:10, 5:6, 21:7, 24:17, 27:11, 71:22, 182:25
**younger** [2] - 29:24, 52:25
**youngest** [2] - 38:8, 39:2
**yourself** [22] - 38:15, 41:12, 71:14, 84:8, 85:24, 86:9, 93:8, 93:10, 93:21, 94:4, 98:19, 99:1, 100:6, 103:7, 104:5, 106:9, 106:16, 106:17, 107:5, 145:3, 205:13, 205:21
**YouTube** [1] - 119:6

## Z

**zero** [1] - 190:20
**zeta** [4] - 159:1, 182:3, 187:15, 188:15
**ZUMA-1** [1] - 178:24