1              UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5

   JUNO THERAPEUTICS, INC., et al., )
6                                    )
              Plaintiffs,            )
7                                    )
                   vs.               )
8                                    )  2:17-CV-7639-SJO
   KITE PHARMA, INC.,                )
9                                    )
              Defendant.             )
10    _____)

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                   JURY TRIAL VOLUME IV

15                 Los Angeles, California

16                 Friday, December 6, 2019

17

18

19         _____

20

21

22                 AMY DIAZ, RPR, CRR, FCRR
                   Federal Official Reporter
23                 350 West 1st Street, #4455
                   Los Angeles, CA 90012
24

25            Please order court transcripts here:
                 www.amydiazfedreporter.com

             AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1        APPEARANCES OF COUNSEL:

 2
          For the Plaintiffs:
 3

 4                    IRELL & MANELLA LLP
                      By:  Morgan Chu, Attorney at Law
 5                         Alan Heinrich, Attorney at Law
                           Crawford Maclain Wells, Attorney at Law
 6                         Elizabeth Tuan, Attorney at Law
                      1800 Avenue of the Stars, Suite 900
 7                    Los Angeles, California 90067

 8                    JONES DAY
                      By:  Andrea Weiss Jeffries, Attorney at Law
 9                    555 South Flower Street, 50th Floor
                      Los Angeles, California 90071
10
                      JONES DAY
11                    By:  Sarah Geers, Attorney at Law
                      250 Vesey Street
12                    New York, New York 10281

13

14        For Defendant:

15                    MUNGER TOLLES & OLSON LLP
                      By:  Garth Vincent, Attorney at Law
16                         Edward Dane, Attorney at Law
                           Jeffrey Weinberger, Attorney at Law
17                         Peter Gratzinger, Attorney at Law
                           Blanca Young, Attorney at Law
18                    355 South Grand Avenue, 35th Floor
                      Los Angeles, California 90071
19

20

21

22

23

24

25
```

1          THE COURT:  We have everyone present on Juno vs.

2     Kite except the jury.

3          And just on a couple of housekeeping matters, we are

4     going to do -- I'm going to provide you with more accurate

5     time estimates, but it looks like each side has expended

6     approximately five hours each side, and we will provide that

7     in more detail later on.

8          So I understand the next witness is Mr. Dulac; is

9     that correct?

10         MR. WELLS:  Yes, Your Honor.

11         THE COURT:  And let's see, there is several -- there

12    is some additional pleadings that have been filed.  There is

13    Defendant Kite's request for a curative instruction regarding

14    Dr. Dash's testimony on 12-4, and I'm going to put that aside

15    for the time being, allow the counsel for the plaintiffs an

16    opportunity to respond to that.  Do you need additional time?

17         MR. HEINRICH:  Yeah, we can respond by -- in writing

18    by this afternoon or tomorrow morning.

19         THE COURT:  Tomorrow morning?  Tomorrow is Saturday.

20         MR. HEINRICH:  Oh.

21         THE COURT:  So --

22         MR. CHU:  Monday morning.

23         THE COURT:  So you will file it over the weekend?

24         MR. HEINRICH:  Yes, Your Honor.

25         THE COURT:  Okay.  So we'll put that aside for the

1    time being.

2              And then we have defendant -- this is Defendant

3    Kite's motion to preclude certain testimony by Mr. Dulac, and

4    that was filed on 12-5.  The plaintiffs have responded to the

5    pleading.

6              So one of the issues raised in the defendant's

7    pleading was that there was -- there was a concern that the

8    plaintiffs would intend to introduce evidence through

9    Mr. Dulac regarding the 2015 AstraZeneca Celgene license.

10   And apparently that is not doing to occur; is that correct?

11             MR. WELLS:  Your Honor, we've tried to streamline

12   and remove that license to try to obviate any issues.

13             THE COURT:  Okay.  So as I understand it, plaintiff

14   will not rely on that license.  So that portion of the motion

15   would be granted.

16             So the -- Mr. Dulac will testify as to the Celgene

17   valuation of Juno; is that correct?

18             MR. WELLS:  Mr. Dulac will cover three areas.  He's

19   business development -- vice president of business

20   development at Celgene and was deposed in this matter.  And

21   he will talk about, one, the 2015 agreement between Juno and

22   Celgene that was in place during the ROCKET trial, which has

23   been the subject of so much testimony.

24             THE COURT:  If you can refresh my memory, when did

25   Celgene acquire Juno?

1           MR. WELLS:  That was in January of 2018, so right

2     after the hypothetical negotiation.

3           The second topic he will cover are the models that

4     are used -- that were used in the course of the acquisition

5     of Juno by Celgene and the reliability and use of those

6     models in the industry and his use -- firsthand use in

7     business development.  He actually developed the model on the

8     Celgene side used during that acquisition.

9           And then the third topic he will address is he's

10    head of business development at Celgene and has extensive

11    experience in licensing cancer therapies, 100 agreements and

12    whatnot.  So he will talk a little bit about his experience

13    at Celgene in licensing.

14          THE COURT:  And then how will Mr. Dulac's testimony

15    relate to Dr. Sullivan's testimony?

16          MR. WELLS:  He's providing fact testimony that

17    Mr. Sullivan could potentially rely upon.  To the extent it's

18    in his reports and whatnot, it would be appropriate.

19          For example, Mr. Sullivan relies on models in

20    rendering his second adjustment, which the Court has already

21    allowed.  And while it wasn't a Celgene model that

22    Mr. Sullivan relied upon, Mr. Dulac's testimony regarding the

23    models, their reliability and use in the industry certainly

24    supports that.

25          THE COURT:  So back to Mr. Dulac, Mr. Dulac will

1    offer testimony regarding Celgene valuation model for Juno,

2    acquisition, and that took place in 2018, and then Mr. Dulac

3    will offer testimony regarding the 2015 license between

4    Celgene and Juno for CAR-T technology outside the United

5    States?

6            MR. WELLS:  Yes, Celgene had rights outside of the

7    United States, Your Honor.

8            THE COURT:  And then also the third area is licensee

9    practices as Celgene for cancer therapies generally.

10           MR. WELLS:  Yes, Your Honor.  That is squarely

11   within his role in business development, and he was deposed

12   on these issues.

13           THE COURT:  So let's hear a little bit more from

14   Kite.

15           MR. FARRELL:  Good morning, Your Honor.  John

16   Farrell, Fish & Richardson, for Kite.  I understand the

17   Court's frustration over all the objections, so I --

18           THE COURT:  I'm not frustrated.

19           MR. FARRELL:  Consternation.  But I do want to talk

20   about this objection.

21           It is true in their motion they say we are not going

22   to introduce the exhibits.  They don't say they are not going

23   to talk about them.  Now, if they want to represent to the

24   Court there will be no discussion about them -- just

25   withdrawing the exhibits, I have been watching, and they may

1      still talk about them.  So as long as that is a confirmation

2      there will be no mention of the 278 million and the 172

3      million upfront, then I think we do have that at rest.

4           MR. WELLS:  Your Honor, we don't intend to talk

5      about the AstraZeneca agreement or the terms to the

6      AstraZeneca agreement.

7           THE COURT:  That is clear.

8           MR. FARRELL:  The second thing about this worksheet,

9      the Celgene worksheet, and it has all sorts of information

10     about what licensing could be, etcetera, the Court's order on

11     the issue of upfront damages was that if there was an

12     alternative amount disclosed in Dr. Sullivan's report, it is

13     true that this Celgene workshop, this spreadsheet is

14     mentioned in Dr. Sullivan's report, but only for purposes of

15     what was a company valuation, which this Court struck.  So he

16     has never used this math in his reports.

17          As a matter of fact, I'm going to represent to the

18     Court, I believe what is going to happen is Dr. Sullivan is

19     going to have a white board, and we are going to see this new

20     report live while they do math on the board.

21          And so my concern here is the Court said you can use

22     any amount disclosed in your report, not something that I

23     just heard in court and now use, which is just what I've

24     heard them say.  He may listen to this and then come up and

25     say something about it.  And I don't think that is consistent

 1    with your order, Your Honor.

 2              THE COURT:  Oh, okay.  Well -- yes.

 3              MR. HEINRICH:  Your Honor, so --

 4              THE COURT:  So I guess we have several lawyers now.

 5    Who is handling this witness?

 6              MR. HEINRICH:  So Mr. --

 7              MR. WELLS:  I'm handling this witness, but

 8    Mr. Heinrich is handling Dr. Sullivan and the relationship

 9    with this witness to that witness.

10              THE COURT:  Go ahead.

11              MR. HEINRICH:  I just wanted to address what

12    Dr. Sullivan will be doing.  And we are very upfront, we made

13    it clear in our filing this morning.  So Your Honor struck

14    Dr. Sullivan's stock swap.

15              THE COURT:  Yes.

16              MR. HEINRICH:  That was the $90 million component of

17    his initial starting point upfront that he then applied to --

18    the adjustments to.

19              In attachment F5 of Dr. Sullivan's report, the

20    $90 million is a line item.  So what we are going to be doing

21    is we are going to be literally crossing that out.  There are

22    additional components in his initial starting point upfront

23    that the Court did not strike.  So he will be starting from

24    153 million, applying the adjustments that the Court found

25    sufficiently reliable.  And that was all set out in his

```
 1     report, and it's just a matter of striking out that line

 2     item.

 3              THE COURT:  Okay.  So let's put Dr. Sullivan -- when

 4     is Dr. Sullivan going to testify?  After Mr. Dulac?

 5              MR. HEINRICH:  Yes, he'll be testifying after

 6     Mr. Bishop, and then we'll do a couple of depo plays, and

 7     then it will be Dr. Sullivan.

 8              THE COURT:  So we have Mr. Dulac next in order.

 9              MR. HEINRICH:  Right.

10              THE COURT:  And then --

11              MR. HEINRICH:  Mr. Bishop.

12              THE COURT:  -- Mr. Bishop, and then a couple of

13     depositions --

14              MR. HEINRICH:  Yes.

15              THE COURT:  -- to be played.

16              MR. FARRELL:  And, Your Honor, I'm not dealing with

17     Dr. Sullivan.  I agree, that's not my issue.  I'm just

18     Mr. Dulac.

19              THE COURT:  Yes.

20              MR. FARRELL:  I guess -- I heard what Mr. Sullivan

21     is going to do with respect to this figure.  I just need a

22     representation or I think the Court would that whatever

23     Mr. Dulac is saying Dr. Sullivan is not going to use, that

24     this math, whatever Dr. -- Mr. Dulac is coming up with, that

25     Dr. Sullivan is not using that.  Because --
```

1          THE COURT:  No, that is -- your concern is a little

2     bit premature.  So the Court is going to entertain the

3     testimony of Mr. Dulac, and then, if there is an issue

4     involving Dr. Sullivan, you can address that then.

5          MR. FARRELL:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          So let's bring the jury.

8          MR. DANE:  Your Honor, one other item.

9          THE COURT:  Yes.

10          MR. DANE:  You had mentioned that we had filed the

11     request for a curative instruction relating to Dr. Dash's

12     testimony.  We -- I believe we may already have filed it, but

13     I think we are going to file an amended curative instruction

14     relating to the testimony that came out yesterday involving

15     the IPR, which we consider to be very prejudicial and

16     irrelevant, and so we will file that today so the other side

17     will have it.

18          And if we could have the same agreement that they

19     file their response today or by morning, if the Court would

20     like to follow that procedure, then that is okay with us.

21          THE COURT:  You are going to file your request by

22     when?

23          MR. DANE:  I think we filed one version, but there

24     is something we need to change in it, so it should be filed

25     any minute.  It may be filed already.

1               THE COURT:  We haven't -- I haven't seen it yet,

2      so...

3               MR. DANE:  Okay.  It will be filed this morning.

4               THE COURT:  So back to the response regarding the

5      curative instruction concerning Dr. Dash, that will be

6      filed -- the response will be filed when?

7               MR. HEINRICH:  Over the weekend, Your Honor.

8               THE COURT:  Well, when?

9               MR. HEINRICH:  We can file it tomorrow, tomorrow by

10     noon.

11              THE COURT:  Noon tomorrow.  That's fine.

12              And then also in reference to the second curative

13     instruction?

14              MR. HEINRICH:  We haven't seen it yet.

15              MR. DANE:  You will have it before 10 a.m., so I

16     think noon tomorrow would make sense, Your Honor, if that's

17     okay with the Court.

18              THE COURT:  Yes.

19              MR. DANE:  Thank you.

20              THE COURT:  Mr. Heinrich?

21              MR. HEINRICH:  That will be fine, Your Honor.

22              THE COURT:  Okay.  Thank you.

23              Let's get the jury in, please.

24              How long will the testimony take in reference to

25     Mr. Dash?

```
 1              MR. WELLS:  Mr. Dulac?

 2              THE COURT:  I mean to Mr. Dulac.

 3              MR. WELLS:  I'm estimating 20 minutes, Your Honor,

 4    fairly straightforward.

 5              THE COURT:  Okay.  And when do you anticipate

 6    reaching the -- Dr. Sullivan?

 7              MR. WELLS:  My guess would be that that would be

 8    late in the morning after the depo play, so after the first

 9    break.

10              THE COURT:  On Monday we'll start at 9:45.

11              MR. DANE:  Your Honor, one other question.  I know

12    Your Honor said each side has used about five hours.

13              THE COURT:  It's approximately.

14              MR. DANE:  Yes.  And I had requested earlier if the

15    Court would consider extending us to 12 and a half hours a

16    piece.  Does the Court have a sense of when it intends the

17    evidence to close and when we would have closings next week?

18              THE COURT:  It really depends on -- I think we

19    have -- let's see, five hours each side, so we have another,

20    what -- another 10 hours of Q and A, and that is -- that is

21    probably if -- we probably get to Wednesday of next week, so

22    maybe Thursday.

23              MR. DANE:  Yeah.  And I think it's actually up to

24    another six hours, because Your Honor said that we could use

25    the extra hour either for the summations, which nobody has
```

1    given so far, or for evidence.

2              THE COURT:  Yes.

3              MR. DANE:  So do you anticipate that we would be

4    closing on Wednesday or Thursday morning?

5              THE COURT:  It's hard to tell.

6              MR. DANE:  Okay.  Thank you, Your Honor.

7              (Thereupon, the jury returned to the courtroom.)

8              THE COURT:  We have the jury reassembled with

9    counsel present and the parties, and we continue with Juno

10   versus Kite.

11             And the plaintiffs are going to call their next

12   witness.

13             MR. WELLS:  Yes, Your Honor.

14             Good morning, ladies and gentlemen.

15             Plaintiffs Juno and Sloan Kettering call Ed Dulac.

16             THE CLERK:  Please raise your right hand.

17   THEREUPON:

18                        EDWARD DULAC,

19   called in these proceedings and being first duly sworn,

20   testifies as follows:

21             THE CLERK:  Please have a seat at the witness stand.

22   Go around, and be careful with the wire.  Please take and

23   seat and state and spell your name for the record.

24             THE WITNESS:  Good morning.  My name is Edward

25   Dulac.  It's E-D-W-A-R-D, Dulac, D-U-L-A-C.

DULAC - DIRECT

1          THE COURT:  Your witness, Mr. Wells.

2                  DIRECT EXAMINATION

3     BY MR. WELLS:

4      Q. Good morning, Mr. Dulac.  Could you please introduce

5     yourself to the jury.

6      A. Yeah.  Hi.  Good morning.  I'm Edward Dulac.  I'm vice

7     president of business development and strategy for Celgene

8     Corporation.

9      Q. And what is Celgene Corporation?

10     A. Celgene is a biopharmaceutical company, and we are also

11     the corporate parent for Juno.

12     Q. And what are your responsibilities at Celgene?

13     A. I lead a team of 12 individuals, and we are responsible

14     for identifying and negotiating licensing and acquisition

15     agreements, and among my primary responsibilities is focus on

16     cancer therapeutics.

17     Q. And what types of licenses does Celgene do?

18     A. Typical looks for licensing opportunities with research

19     institutions, like academic centers, or other companies that

20     are in the biopharmaceutical industry.  And these licenses

21     often include patent rights.

22     Q. Now, how many licenses have you been involved with?

23     A. Celgene is very busy in the space.  I would say during my

24     tenure about 100 licenses.

25     Q. And out of that 100, how many are related to cancer

DULAC - DIRECT

1    therapies?

2     A. The foundation of Celgene is as a cancer company, and

3    most of the products and our growth are associated with drugs

4    that we sell to patients for cancer.  And so I would estimate

5    about 70 percent of the licenses we historically consider and

6    do today are focused on cancer.

7     Q. And how does Celgene decide how much to pay for a

8    license?

9     A. Well, there are a lot of factors that go into that

10   decision.  We typically think about the strength of the

11   patent rights that we would be obtaining from the other

12   company.  We also think about the stage of development, so is

13   it an early stage technology, or a late stage technology.

14   And then we think about the relationship that we have with

15   the other party.

16    Q. Now, you just mentioned stage of development.  How does

17   that impact how much Celgene would pay?

18    A. Yeah.  So we typically think about early stage as a

19   technology that has a lot of risk, takes several years to

20   develop, it is very expensive.  We would typically value that

21   and expect to pay less for an early stage technology compared

22   to a later stage technology which has a lot less risk

23   associated with it, has a lot of development, money already

24   invested in the product, and so we would typically value

25   those opportunities much higher and expect to pay more for a

DULAC - DIRECT

1    late stage license.

2     Q. Now, does Celgene ever license competitors?

3     A. Licensing discussions with a direct competitor would be

4    pretty rare.  If that were to be the case, that would prove

5    to be in likelihood a very expensive license to undertake.

6     Q. Now, does Celgene have any formal licensing policies?

7     A. No, we don't have any formal licensing policies.  Every

8    relationship is unique, and so we treat each license

9    opportunity individually, and we -- yeah, we typically just

10   look at things and do it on an individual basis.

11    Q. Are there any common terms that you see in your Celgene

12   licenses?

13    A. Sure.  Yeah.  Most licenses you would generally think

14   about some sort of an upfront payment, so this is either in

15   the form of a cash payment to a company and/or a purchase or

16   ownership stake, what we call equity in the company.  We

17   often consider success-based milestone payments where, as the

18   product gets developed, we pay additional cash payments to

19   the licensor.  And then we think about back-end royalties

20   that we would pay on net sales.

21    Q. And can you give us some examples of such terms from your

22   experience with cancer therapy licenses?

23    A. Yeah, they vary.  I mean, if you take an example of what

24   we would consider a later-stage technology, you are typically

25   talking, as I mentioned earlier, a much more significant

DULAC - DIRECT

1    upfront payment as well as a significant royalty on the back

2    end.  And it wouldn't be uncommon in my experience to see a

3    royalty rate in the range of 20, 30 percent.

4     Q. Now, do those licenses typically also include an upfront

5    payment?

6     A. Yeah, nearly all the licenses we undertake contain an

7    upfront payment.  And it's an important consideration in a

8    deal.  It takes some of the risk from the licensor as well

9    as -- although that payment is made upfront to the company,

10   it is intended to reflect the duration of the license that we

11   are getting.  And that often includes the length of the

12   patent associated with the technology as well.

13    Q. Now, I would like to turn to your involvement with Juno.

14   What was your first involvement with Juno?

15    A. So I have to go back about four and a half years.  In

16   2015, the middle of 2015, Juno and Celgene entered into a

17   strategic collaboration to develop CAR-T therapies.

18    Q. And did you have any role in that agreement?

19    A. I didn't negotiate that agreement but was responsible for

20   the ongoing review of the strategic collaboration.  It was a

21   very important opportunity for Celgene to collaborate with

22   Juno for CAR-T therapies.

23    Q. And what geographic region did that cover?

24    A. The deal on the license that Celgene received was limited

25   to rights outside of the United States only.

DULAC - DIRECT

1    Q. Why wasn't the U.S. included?

2    A. Well, we would love for the U.S. to be included.  It's

3    the world's most valuable market to sell pharmaceutical

4    products.  At the time back in 2015, Juno had different

5    ambitions, and they didn't have an interest in considering

6    licensing rights to the United States.

7    Q. Can you tell us about the terms of that agreement?

8    A. The terms, again, going back to 2015 was between Celgene

9    and Juno.  And as I referenced before, I would consider it

10   more of an early stage technology.  If you think about CAR-T

11   therapies in 2015, we were beginning to have some human data,

12   but they were still a few years away before they would be

13   considered for regulatory approval and ultimately for

14   commercialization.

15           And so that said, Celgene still had a very strategic

16   interest in cell therapy and CAR-Ts.  We had what we thought

17   was a very promising technology with Juno.  So we proceeded

18   to pay $1 billion approximately upfront to gain a license

19   outside of the U.S. only.

20           We also had additional opt-in fees or additional

21   cash payments for any products that we selected to develop

22   outside of the United States.  And we had an ongoing royalty

23   rate of 14 percent of any sales that we would have in those

24   territories outside of the United States.

25   Q. Now, at some point did Celgene acquire Juno?

DULAC - DIRECT

1    A. Yes, we acquired Juno in January of 2018.  And I had led

2    the financial modeling and the valuation of that acquisition

3    in 2017 and 2018.

4    Q. Now, what is financial modeling?

5    A. Financial modeling is a really long process, complicated.

6    It's complex financial math and models where we take a lot of

7    data inputs from a very large team of internal experts that

8    give us important information about the value of the

9    technology.  So it's a way for us to take a lot of facts from

10    the diligence findings of the assessment that we are doing

11    and make forecasts to help us understand what the value of

12    that technology might be, how much we might be willing to

13    pay, as well as just to help with our overall decision-making

14    process.

15    Q. And are these models reliable?

16    A. They are as reliable as we can make them.  We spend

17    months -- it's not uncommon to have two, three, four months

18    of work that would go into a financial model, both to

19    establish the model as well as to refine it over a period of

20    time.

21         And as I mentioned early, we do leverage a full team

22    of internal experts, and it would not be uncommon for

23    meaningful late stage in licensing or acquisitions to use

24    external consultants as well as investment bankers who help

25    us come up with different scenarios and help refine the model

DULAC - DIRECT

1    that we have built.

2     Q. And is this type of modeling common in the industry?

3     A. It's certainly standard with us.  And I would say most

4    companies would -- undertaking a meaningful acquisition or

5    license would run a model.  So it's pretty common in the

6    industry.  We wouldn't be making a decision at the management

7    committee or at the board level without a financial model.

8     Q. And you created a model -- did you create a model

9    regarding Juno and the DLBCL market as part of your work

10   related to the acquisition?

11    A. We did.  There is a lot of considerations for the

12   acquisition.  One of the primary drivers of value for Juno

13   was the commercial potential for JCAR17 in diffuse large BC

14   lymphoma or DLBCL, so we spent quite a bit of time thinking

15   about the competitive landscape and what the commercial

16   potential could be for JCAR17.

17    Q. And what did the competitive landscape look like at the

18   time?

19    A. At the time in 2017 when we are running the model, we had

20   Kite launch its YESCARTA product in the market at that time.

21   Novartis was also in the market in a different indication

22   called ALL but was also running a trial that could get them

23   into the market for DLBCL as well.  So we had to consider

24   very thoughtfully what would be the market share of JCAR17

25   coming in as the third participant into DLBCL.

DULAC - DIRECT

1   Q. And you just mentioned market share.  Can you explain

2   what that is?

3   A. Sure.  Market share is -- for cancer we typically think

4   about the size of the revenue opportunity or the size of the

5   revenue pie with a specific type of cancer.  And market share

6   is just trying to figure out how much of that pie, what is

7   the size, as large or small as it might be, of that pie.  And

8   so when we talk about market share, it's how much of that

9   overall revenue opportunity do you expect your product to

10  receive.

11  Q. And what market share do you typically see for first

12  movers in your experience in the CAR-T market?

13  A. We do have other CAR-T therapies beyond what we have

14  acquired from Juno, and we do have another CAR-T that is

15  anticipated to be first to market.  And we have modeled that

16  potential market share at about 50 to 60 percent in the

17  scenario analyses that we have run for that product.

18  Q. And what kind of market share did you model for Juno in

19  late 2017 about the time that YESCARTA came to market?

20  A. So considering the assessment that we did of both

21  Novartis and Kite with Kite being the primary competitor, we

22  thought with the profile we had, the maximum share, market

23  share or the maximum slice of the pie, if you will, would be

24  limited to 25 percent as a third to market product.

25  Q. And how did Novartis play into that?

DULAC - CROSS

1      A. As I mentioned, Novartis, you know, had the potential to

2   come to market third.  We felt like we had very distinct

3   performance advantages with JCAR17 relative to the Novartis

4   compound.  Had we run the assessment with just two companies,

5   Juno and Novartis, we would have felt very confident in

6   having at least 50 percent market share.  That may have

7   proved quite conservative.

8           When you think about the impact of Kite, that is how

9   we got to sort of the 25 percent market share, but if you

10  have a scenario where Kite is not in the marketplace and it's

11  just Juno or Celgene, we would have taken our model and

12  assumed that our market share would almost have doubled.  And

13  that would have given us an incremental $2 billion more

14  revenue by 2024 in DLBCL.

15          MR. WELLS:  Thank you, Mr. Dulac.  No further

16  questions.

17          THE COURT:  Your witness, Mr. Farrell.

18          MR. FARRELL:  May it please the Court.

19                        CROSS-EXAMINATION

20  BY MR. FARRELL:

21   Q. Good morning.

22   A. Good morning.

23   Q. A lot of factors go into what you decide to pay for a

24  license, correct?

25   A. Yes.

DULAC - CROSS

1    Q. There are no formal policies, everyone is unique,

2    correct?

3    A. Yes.

4    Q. One factor is how far along the development of the drug

5    is, correct?

6    A. Yes.

7    Q. Like how well the development is going would be a factor

8    you would look at, right?

9    A. We look at many factors, including the data, yes.

10   Q. Yeah.  Like how clinical studies are going, for example,

11   right?  You would look at that.

12   A. Yes, that's part of the process.

13   Q. Whether the FDA has approved manufacturing or has delayed

14   it, you would look at that, right?

15   A. You would look at all the factors.

16   Q. Including that one, whether the FDA has approved your

17   manufacturing process, right?

18   A. That would be part of the team's assessment.

19   Q. Sure.  And you talked about one license, and you said the

20   royalty rate there was 14 percent.  Did I have that right?

21   A. Part of the Juno collaboration required us to pay a

22   14 percent royalty, yes.

23   Q. So the royalty rate was 14 percent, correct?

24   A. For our Juno collaboration for rights outside the U.S.,

25   correct.

DULAC - CROSS

1      Q. So that's a yes, right?

2      A. Yes.

3      Q. Good.  Okay.  And you talked about how you did this

4   financial modeling at Celgene, and it's fairly complicated,

5   fair?

6      A. Yes.

7      Q. And all of those results, they end up in -- not like in a

8   report, but in like one of those spreadsheets, right?

9      A. That's part of the deliverable, yes, the spreadsheet.

10     Q. Has lots of tabs and lots of numbers and figures in it,

11  right?

12     A. Yes, can.

13     Q. Including projected royalty rates, right?

14          MR. WELLS:  Objection, Your Honor.  This is subject

15  to the 402, 403 and a potential MIL.

16          THE COURT:  The grounds?  I'm sorry.

17          MR. WELLS:  This is subject to a MIL, motion in

18  limine, Your Honor.

19          THE COURT:  The question is more of a statement,

20  including projected royalty rates.

21          MR. WELLS:  Understood, Your Honor.

22          THE COURT:  So ask a question, please.

23          MR. FARRELL:  Sure.

24  BY MR. FARRELL:

25     Q. And this Excel spreadsheet would have a lot of

DULAC - CROSS

1    information and numbers, included like projected royalty

2    rates, right?

3    A. To the extent there are those to consider, yes.

4    Q. And you guys did one for this JCAR17 one, correct?

5    A. Sorry.  Can you clarify?  Did what?

6    Q. You had a workbook or a spreadsheet for this JCAR17,

7    right?

8    A. It was part of the modeling, yes.

9    Q. And it was called the Javelin workbook, right?

10   A. Correct.

11   Q. And it had a lot of numbers in it, right?

12   A. Yes.

13             MR. FARRELL:  No further questions.

14             THE COURT:  Mr. Wells?

15             MR. WELLS:  No questions on redirect, Your Honor.

16             THE COURT:  Thank you very much for your testimony.

17   It was very short.

18             THE WITNESS:  Thank you.

19             THE COURT:  And who is next?

20             MR. HEINRICH:  Mr. Hans Bishop.

21             Good morning, ladies and gentlemen.  Juno calls as

22   its next witness Hans Bishop.

23             THE COURT:  Is it Dr. Bishop or --

24             MR. HEINRICH:  Mr. Bishop.

25             THE COURT:  Mr. Bishop, okay.

BISHOP - DIRECT

1          THE CLERK:  Please raise your right hand.

2     THEREUPON:

3                    HANS BISHOP,

4     called in these proceedings and being first duly sworn,

5     testifies as follows:

6          THE CLERK:  Please have a seat.  State and spell

7     your name for the record.

8          THE WITNESS:  Hans Bishop, H-A-N-S, B-I-S-H-O-P.

9          THE COURT:  Mr. Heinrich, your witness.

10                   DIRECT EXAMINATION

11    BY MR. HEINRICH:

12     Q. Good morning, Mr. Bishop.

13     A. Good morning.

14     Q. Could you please introduce yourself to the ladies and

15    gentlemen of the jury?

16     A. Yes.  My name is Hans Bishop.  I'm the CEO of a company

17    called Grail.

18     Q. And did you have a relationship with Juno?

19     A. Yes, I was the first in -- first employee of Juno.  I was

20    a cofounder of the company.  And I remained its CEO until

21    March of 2018.

22     Q. And when was Juno founded?

23     A. About five years before that.

24     Q. So how did you come to found Juno?

25     A. I was invited by a gentleman called Dr. Larry Corey, who

BISHOP - DIRECT

1    was the president of the Fred Hutchinson Cancer Research

2    Center in Seattle.  I was invited to meet him as he was

3    interested in starting a company based on technology from the

4    Fred Hutch (sic) Cancer Research Center.

5     Q. And what did you do following that meeting?

6     A. I met with some of the physicians that had treated

7    patients.  I was very, very interested in the technology and

8    asked Dr. Corey if he would give me a few months to really

9    think about how to do this successfully.

10    Q. And what did you conclude based on that review?

11    A. A number of things, I think the most important of which

12   was as compelling as the science was, it was very

13   complicated, and that our best chances for success were to

14   really try and form a scientific dream team by bringing

15   together a number of key institutions, academic medical

16   centers in partnership, which was actually something that had

17   been -- very rarely been done before, as well as also

18   understanding which patents we would need to license so the

19   company would have the right access to technology.

20    Q. And what role did patents play in Juno's formation?

21    A. Well, not just for Juno, but in my field, biomedical

22   research, starting companies, they are fundamental.  I mean,

23   first of all, our companies all rely on -- the majority of

24   the companies rely on inventions and medical researchers.

25   That is a difficult job.  You know, you can work your whole

BISHOP - DIRECT

1    career in that field and often not come up with something

2    significant.  And patents are important because it's the way

3    the inventors on which our companies are based get

4    recognized.

5         And the second reason they are important is, you

6    know, we have to spend billions of dollars developing these

7    medicines.  And without patent protection, another company

8    could come along that doesn't invest a dime in research and

9    just copy your invention.

10   Q. So what institutions did you bring together as part of

11   the formation of Juno?

12   A. The partner institutions were the Fred Hutch Cancer

13   Center, Memorial Sloan Kettering, and Seattle Children's

14   Hospital.

15   Q. Now, were you personally involved in a deal with Sloan

16   Kettering?

17   A. Yes, I was.

18   Q. And what was your role in that deal?

19   A. As the first employee, I worked with Memorial Sloan

20   Kettering on the various agreements that we struck with them,

21   including with their founders.

22   Q. Now, was there a primer -- primary driver technologically

23   for your interest in that deal?

24   A. The thing we were most interested in was a CAR-T cell

25   that Dr. Sadelain had invented.  We gave it the name, it has

BISHOP - DIRECT

1    different names, JCAR15.  And it had shown very promising

2    clinical results in a trial that had been run by Memorial

3    Sloan Kettering in adults with a particular form of leukemia.

4    Q. And what patent covered that CAR construct that

5    Dr. Sadelain invented?

6    A. I remember these things by their names, so the Sadelain

7    patent.  I can't remember the number.

8    Q. Was that the '190 patent?  Does that ring a bell?

9    A. Yes.

10   Q. Now, we've also heard in this trial about another Juno

11   CAR construct called JCAR17.  Did you do a deal with St. Jude

12   Children's Research Hospital relating to that CAR construct?

13   A. Yes, there was an invention by a doctor called

14   Dr. Campana around the construct that we used in JCAR17, and

15   that patent was -- at that time Dr. Campana was in Singapore,

16   but that patent was owned by St. Jude Children's Hospital.

17   Q. Now, turning back to the Sloan Kettering agreement, we've

18   already heard about its various financial components, and

19   there was one in particular that I wanted to call out.

20        There were -- well, do you recall certain success

21   payments as part of that deal?

22   A. Yes.

23   Q. And how did those success payments come to be included in

24   the Juno Sloan Kettering agreement?

25   A. When you start a company, particularly one that relies on

BISHOP - DIRECT

1    inventions and support from famous academic medical centers,

2    one of the things those centers want is a share ownership in

3    your new company.  And when you add those together,

4    particularly true when you have three, that ownership overall

5    can make it quite hard to finance the company.

6         So the idea was for these institutions to take less

7    direct ownership but to have these payments that meant, you

8    know, as the company was successful, they would get a

9    guaranteed and defined payment if the company was successful.

10   Q. Were those success payments an important part of the

11   MSK/Juno agreement?

12   A. Yes, I believe they were.

13   Q. Now, how did Juno handle patents that weren't available

14   for licensing?

15   A. Um, well, we would carefully look at those patents that

16   could potentially be inventions we needed access to.  We

17   would take expert advice from scientists and lawyers as to

18   whether those patents really were in the way of what we

19   planned to do.  And if the expert advice was that they were,

20   then we would have to come up with new inventions that didn't

21   contravene those patents.

22   Q. Now, was there a term that is used to refer to these

23   analyses you are referring to?

24   A. I believe it's called a freedom to operate analysis.

25   Q. And what is involved in doing a freedom to operate

BISHOP - DIRECT

1    analysis?

2     A. It's this technical assessment that looks at the

3    particular invention we have versus third-party patents and

4    primarily answers the question is what we are trying to do

5    covered by someone else's patent.  And then often the lawyers

6    will also have an opinion as to whether the patent is -- this

7    other patent is valid.

8     Q. Now, particularly in Juno's early days, were there ever

9    any challenges in working with some of these academic

10   researchers as you were going about this process?

11    A. What do you mean by "challenges"?

12    Q. Well, were the academic researchers sort of always aware

13   of how the freedom to operate analyses would go?

14    A. Oh, I see.  In my experience, these brilliant people are

15   often quite unfamiliar with some of the aspects of patents.

16   They rely on experts in their institutions to often write the

17   patents.  So they are not always aware of the disciplines

18   that go into these freedom to operate analyses.

19    Q. And you have to remind them of confidentiality issues

20   from time to time?

21    A. Yes.  Yes.

22    Q. Now, during your time as CEO, who did you regard as

23   Juno's main competitor?

24    A. We had two competitors, Novartis Pharmaceuticals and

25   Kite, and I would regard Kite as our main competitor.

BISHOP - DIRECT

1    Q. Why is that?

2    A. Um, Novartis' commitment to the space waxed and waned

3    whereas, you know, like Juno, success with CAR-T cells was

4    going to mean -- for Kite was exactly the same for us.  If we

5    weren't successful, there wouldn't be a company.

6    Q. How did Novartis' interest in CAR-T wax and wane?

7    A. Well, for example, there was a period of time they had a

8    big team in Boston, and there was a period in time where they

9    laid off most of the workforce they had working on CAR-Ts.

10   Q. Now, can you give us some examples and ways in which Kite

11   has competed with Juno during the time that you were Juno's

12   CEO?

13   A. Um, we compete in many ways or competed in many ways.  We

14   competed for investment dollars.  We competed for people, for

15   experts that we wanted to join the company.  We competed for

16   intellectual property and companies.  There was a company I

17   remember I was close to signing a deal with in the

18   Netherlands, and they offered a lot more money and were

19   successful in closing that deal.

20   Q. Now, you were still the CEO of Juno when Kite

21   commercially launched YESCARTA in October 2017?

22   A. Yes.

23   Q. And what was the indication that YESCARTA launched in?

24   A. It's called relapse refractory diffuse large B-cell

25   lymphoma.

BISHOP - DIRECT

1    Q. And at the time what was Juno's lead product candidate?

2    A. It was for the same indication.

3    Q. Now, at the time of Kite's launch, what impact on Juno

4    did you anticipate as a result of Kite's first to market

5    entry?

6    A. Well, the first thing I would say is we cheered it as

7    being good for patients, because there were still many people

8    dying of this disease, and it was good news that patients had

9    a better option.  But it presented a number of risks for

10   Juno.

11        First of all, they would get to set the pricing,

12   and, for example, if we chose to price below them, that would

13   be questioned.  Meaningfully, that would have been something

14   criticized by investors.

15        They had an opportunity to persuade reimbursers to

16   limit the reimbursement just to major academic institutions,

17   which would have made our launch much more difficult and

18   negated one of the benefits we felt the drug was going to

19   have.  So there was several potential factors.

20   Q. And can you explain a little bit more how that factor

21   worked in terms of how you saw JCAR17 relative to YESCARTA?

22   Were there any differences between JCAR17 and YESCARTA that

23   you thought were meaningful commercially?

24   A. The FDA will have to opine on this.  I can give you my

25   personal opinion, which is the safety profile of JCAR17

BISHOP - DIRECT

1    looked to be very favorable to YESCARTA.  And other than that

2    being a good thing for doctors and their patients, the really

3    important thing was it would allow this medicine, JCAR17, to

4    be used outside of academic medical centers.

5    Q. So we've heard a little bit about financial models in

6    this trial.  As CEO of Juno, did you rely on financial

7    models?

8    A. Yes.

9    Q. And did Juno prepare financial models as part of its

10   ordinary course of business?

11   A. Yes.

12   Q. And can you give us some examples on how you relied on

13   financial models at Juno?

14   A. Oh, they are important in many different ways.  I mean,

15   you've got to -- like we have to balance our checkbook.

16   You've got to look at how much money you are going to spend.

17   You've got to look at your prospective sales.  You use these

18   types of financial forecasts to figure out, for example, how

19   much manufacturing capacity you need.  So there are many ways

20   they use to run a business.

21   Q. Now, you mentioned that you currently work at a company

22   called Grail.  What does Grail do?

23   A. Grail is focusing on a blood test that can detect early

24   cancer.  As everyone knows, you know, late-stage cancer is

25   very, very difficult to cure.  The five-year survival rate is

BISHOP - CROSS

1    only about 20 percent.  But if you capture the disease early,

2    the five-year survival rate is over 80 percent and the

3    percentage of cancers you can cure is much, much higher.

4            So our hope is that with this blood test that people

5    over 50 can have every year we will dramatically shift the

6    diagnosis to earlier and so -- you know, reduce the deaths

7    from cancer.

8    Q. Well, it sounds like sort of a pipe dream.  How close are

9    you to releasing such a test?

10   A. Our goal is to make is commercially available towards the

11   end of next year.

12   Q. Very great.  So thank you very much, Mr. Bishop.

13   A. Thank you.

14           THE COURT:  Mr. Dane, your witness.

15           MR. DANE:  Thank you, Your Honor.  Let me get the

16   witness' binders.

17           May I proceed, Your Honor?

18           THE COURT:  Please.

19                        CROSS-EXAMINATION

20   BY MR. DANE:

21   Q. Good morning, Mr. Bishop.

22   A. Good morning, Mr. Dane.

23   Q. So as you've testified, you were the president and CEO of

24   Juno until Celgene acquired Juno in January of 2018; is that

25   right?

BISHOP - CROSS

 1    A. That's right.

 2    Q. And at the time of that acquisition, you owned

 3  approximately 2 million shares of Juno stock?

 4    A. I don't recall the number.

 5    Q. Okay.  And the value of those shares, based on the

 6  Celgene acquisition, was over $200 million; isn't that right?

 7    A. I think that is about right, yes.

 8    Q. Now, Mr. Bishop, as the CEO of a company like Juno, you

 9  would agree, wouldn't you, that it is generally best for

10  business people who are not patent attorneys not to put

11  opinions about patents in e-mails; would you agree with that?

12    A. I think business people put opinions in e-mails under the

13  appropriate organization with attorneys.

14    Q. Well, let me ask you if you would look in your binder at

15  DX559.

16    A. DX5 --

17           MR. DANE:  We would move DX559 into evidence, Your

18  Honor.

19           MR. HEINRICH:  No objection.

20           THE COURT:  559 is received.

21           (Exhibit DX559 received.)

22           MR. DANE:  If we could put that up.

23  BY MR. DANE:

24    Q. Okay.  So do you see that this is an e-mail at the top,

25  Mr. Bishop, from yourself to Michael Jensen dated

BISHOP - CROSS

 1    November 10, 2013?

 2     A. I see that.

 3     Q. And Mr. Jensen was one of the founders of Juno; is that

 4    right?

 5     A. Yes.  Dr. Jensen is a pediatric oncologist and a Juno

 6    founder.

 7     Q. And do you see where you are telling Dr. Jensen in this

 8    e-mail, "Best to never put opinions on patents in e-mails"?

 9     A. Yes.

10     Q. And you thought that was prudent advice to give to

11    Dr. Jensen, correct?

12     A. Yes.  As I mentioned, sir, the academic medical doctors

13    often don't understand the importance of having lawyers

14    involved in these communications, and that is what I was

15    getting across to him.

16     Q. And you certainly weren't -- by telling him not to put

17    opinions about patent matters in e-mails, you weren't

18    suggesting that -- anything nefarious, were you?

19     A. No, sir.

20     Q. You weren't suggesting that he was doing anything wrong

21    or improper?

22     A. No.

23     Q. Okay.  Now, at the time you left your position as CEO of

24    Juno in January of 2018, Juno was no longer funding any

25    clinical trials for CAR-T products that used the CD28 costim

BISHOP - CROSS

1    region; is that right?

2     A. I don't think Juno was.  I can't recall whether it was

3    making scientific runs to researchers that were looking at

4    it.  But certainly from a company-sponsored trial

5    perspective, that is right.

6     Q. Okay.  And the CD28 costim region, that's the region

7    that's used in Dr. Sadelain's technology; is that correct?

8     A. That's correct.

9     Q. Okay.  Let me ask you -- and actually, I realize this

10   isn't in your binder, so I'll need to get you a copy of this.

11            MR. DANE:  Your Honor, may I approach?

12            THE COURT:  Yes, please.

13   BY MR. DANE:

14    Q. You have been handed, Mr. Bishop, what has been marked as

15   Plaintiffs' PX343.  And do you recognize this presentation?

16    A. I don't have a copy of it in front of me.

17    Q. Oh, I'm sorry.

18            THE CLERK:  Only the Court has it.

19            MR. DANE:  Your Honor, this was on -- apologize.

20   This was on the direct.

21            THE COURT:  You wish the copy to be --

22            MR. DANE:  To be handed to the witness if we could.

23            THE COURT:  Yes.

24            MR. DANE:  Thank you.  I thought it was going to be

25   used in Mr. Bishop's direct, and I apologize, I didn't bring

BISHOP - CROSS

1    enough copies.

2            THE COURT:  343, any objection?  Are you offering

3    it?

4            MR. DANE:  Yes.

5            MR. HEINRICH:  Subject to foundation.

6            THE COURT:  Okay.  Lay some foundation.

7            MR. DANE:  Okay.

8    BY MR. DANE:

9     Q. Do you recognize this presentation, Mr. Bishop?

10     A. It's not familiar to me.  I don't recall it if that is

11    what you mean.

12     Q. If you review the -- I'll represent to you that this was

13    provided to us as an exhibit to be used with your

14    examination.  If you could flip through the slides and let me

15    know if you've seen this before.

16     A. Yes.  I don't recall seeing it before, but I've now

17    looked at it.

18     Q. Do you understand it to be a set of presentation

19    materials that was prepared by Juno?

20     A. Certainly --

21            MR. HEINRICH:  Objection, lack of foundation.

22            THE COURT:  State your objection.

23            MR. HEINRICH:  Foundation.

24            THE COURT:  And ask your question, please.

25            MR. DANE:  Yes.

BISHOP - CROSS

1    BY MR. DANE:

2     Q. Do you recognize this to be a set of presentation

3    materials that was prepared by employees of Juno?

4              THE COURT:  The objection is overruled.

5              THE WITNESS:  There appear to be two presentations.

6    The first one certainly looks like it was.  The second one is

7    less clear.

8    BY MR. DANE:

9     Q. Okay.  So let me just ask you about the first one.

10    A. Okay.

11              MR. DANE:  And, Your Honor, I would --

12    BY MR. DANE:

13    Q. Can you identify the page at which the presentation that

14    you understand to be a presentation by Juno ends?

15    A. Yes.  This one.

16    Q. For the record, sir, could you just note the --

17    A. P --

18    Q. 343 --

19    A. Yes, 343.7.

20              MR. DANE:  Okay.  So, Your Honor, can we -- I would

21    move to be admitted, at least provisionally, the portions of

22    this document from 343.1 through 343.7.

23              THE COURT:  I'm not sure that the foundation has

24    been established for all of those pages.  As I understand it,

25    he's recognized 343.7.

BISHOP - CROSS

1    BY MR. DANE:

2     Q. You recognize the pages up through 343.7; isn't that

3    correct, sir?

4     A. Yes, they look to be in the format that a Juno

5    presentation would be made.  Well, they are in the format

6    that a Juno presentation would be made.

7              MR. DANE:  So I think it's through 7.

8              THE COURT:  Any objection, Mr. Heinrich?

9              MR. HEINRICH:  Not up to those pages.

10             THE COURT:  Okay.  So 343, pages 1 through 7 are

11   received.

12             (Exhibit 343, page 1 through 7, received.)

13   BY MR. DANE:

14    Q. Okay.  Let me -- let's go to 343.4.  And this is a slide

15   that at the top says, "In order to prepare the markets" --

16   actually, let me go back a second.  I'm sorry.  I should have

17   put us in context of time.  Let's look at the first slide to

18   begin with.

19             So as reflected here, do you see the date of this

20   presentation called "Competitor Assessment" was June 19th,

21   2017?

22    A. I see that.

23    Q. Okay.  Now we can go to 343.4.  And this slide is headed,

24   "In order to prepare the markets for JCAR17, we must be clear

25   on points of differentiation."  Do you see that?

BISHOP - CROSS

1    A. I see that.

2    Q. And do you understand points of differentiation to be

3    referring to differences between CAR-T therapies?

4    A. That's how I understand it as well.

5    Q. And would points of differentiation be something that

6    Juno would consider important in potentially convincing

7    healthcare providers to pick one CAR-T over another?

8    A. Yes.

9    Q. Okay.  And if we look at the box below that shows the

10   differences exist within the class, do you understand that

11   KTEC19 was the designation at the time that was used to refer

12   to the construct that Kite was developing that became

13   YESCARTA?

14   A. Yes.

15   Q. And as reflected here, one of the points of

16   differentiation between YESCARTA and JCAR17, the CAR that

17   Juno was developing, was the costimulatory domain; is that

18   right?

19   A. Could you repeat your question?  One of the differences

20   is indeed that if that is what your question about the chart

21   was.

22   Q. JCAR17 uses the 4-1BB costimulatory domain rather than

23   CD28, correct?

24   A. That's correct.

25   Q. And that is the same costimulatory domain that is used by

BISHOP - CROSS

1    Novartis' KYMRIAH product; is that right?

2     A. That's correct.

3     Q. And Novartis is able to use that same costimulatory

4    domain as Juno is using in JCAR17 because Juno licensed the

5    Campana patent to Novartis; isn't that right?

6     A. That's correct.

7     Q. And Juno licensed that patent in -- to Novartis in mid

8    2015; isn't that right?

9     A. I think that's right.

10    Q. And you mentioned that Novartis' commitment to CAR-T

11    therapy waxed and waned over time?

12    A. Yes.

13    Q. At that time, Novartis' commitment was waxing; isn't that

14    true, sir?

15    A. Um, I'm not sure.  I remember meeting Dr. David Epstein,

16    who ran pharmacy schools, and in the negotiations about this

17    license, you know, he told me that they were -- he was

18    unconvinced that this would be financially successful enough

19    for Novartis to be really interested.

20    Q. Well, let me ask you to take a look at what you said

21    about this in your -- strike that.

22        Did you have an understanding of whether Novartis'

23    interest was waxing or waning at the end of 2014, just a few

24    months before the license?

25    A. Um, difficult to be so precise given all those years ago,

BISHOP - CROSS

1   but I got my understanding when I met Dr. Epstein in these

2   negotiations is when I think I got the best understanding for

3   the degree of their commitment.

4    Q. Okay.  Well, let me refer you to your deposition

5   testimony, if you have your transcript in front of you, and I

6   would refer you to page 183, and --

7           THE COURT:  Lines?

8           MR. DANE:  The portion that I'm going to read, Your

9   Honor, will be 183.  Question begins at line 12, and the

10   answer goes to 184, line 1.

11  BY MR. DANE:

12   Q. So at your deposition, Mr. Bishop, I had asked you,

13   showing you a document:  "Did this bullet point describing

14   Novartis as formidable reflect Juno's view of Novartis as a

15   competitor in the CAR-T space at the time that this was

16   prepared in November of 2014?"

17          And you answered:  "I don't know.  I certain -- I

18   can only represent my view rather than the author's view.

19   And, you know, I think it was clear then that Kite was a

20   formidable competitor.  And Novartis you would never

21   underestimate.  Because we are back in -- when are we?  We

22   are still in 2000 -- yeah, yeah.  So Pfizer, I think then I

23   was much less worried about, I mean.  So I think whilst there

24   were a number of competitors, the key ones were clearly Kite

25   and Novartis."

BISHOP - CROSS

1          And that was your testimony, correct?

2      A. Okay.  I don't have it in front of me, but I'm sure you

3      are right.

4      Q. Well, hearing me --

5      A. Yes.

6      Q. -- state that, that was, in fact, true at the time?  Late

7      2014, you considered Kite and Novartis clearly your key

8      competitors?

9      A. Yes.

10     Q. Okay.  Let's go to back to PX343.  Let's go to slide

11     34 -- slide 6, which is 343.6.

12     A. Okay.

13     Q. So this is a slide that at the top says "How to Win."

14     And it shows the 2018 market and the 2019 market in a couple

15     of tables below.  And you understand this is reflecting who

16     would be anticipated to be on the market with CAR-T therapy

17     in 2018 and 2019?

18     A. Yes.

19     Q. And so at this time in August of 2017, it reflects that

20     Juno was expecting that in 2018 both Kite and Novartis'

21     products would be available and Juno would not have a product

22     available, right?

23     A. That's what this contemplates, yes.

24     Q. And you were expecting that Juno would be able to have a

25     therapy available in 2019, correct?

BISHOP - REDIRECT

1     A. Um, I don't recall before I left what the latest date

2     was.

3            MR. DANE:  Thank you.  I have no further questions,

4     Mr. Bishop.  Thank you.

5            THE WITNESS:  Thank you, sir.

6            THE COURT:  Any redirect?  One moment.

7            MR. HEINRICH:  Briefly.

8                        REDIRECT EXAMINATION

9     BY MR. HEINRICH:

10    Q. If we can go back to Exhibit 343 and pull up slide 5.  So

11    343.5.  So this is the slide before the slide you were just

12    shown.

13           Now, in your direct testimony, Mr. Bishop, you

14    referred to the better safety data that you were seeing from

15    JCAR17 as compared to the Kite CAR-T, correct?

16    A. Both the Kite -- yes, the Kite CAR-T for sure.

17    Q. And if we go down to -- can we just pull up CRS greater

18    equal than grade 3, just pull up that whole column.

19           Can you just sort of explain to us what this is

20    referring to here with Kite on the left and Juno on the

21    right?

22    A. Yes.  CRS stands for severe cytokine release syndrome.

23    It's a serious side effect.  It can be fatal.  And the

24    grading, above grade 3, is the seriousness of that particular

25    side effect.  And above this grade, a patient needs to be

BISHOP - RECROSS

1     admitted to the intensive care unit.

2               And the chart shows the rate of that side effect for

3     the Kite product.  Number of patients that experienced it at

4     grade 3 or above is 13 percent, and in these data from Juno

5     it was 2 percent.

6     Q. And this is reflecting Juno's anticipated safety profile

7     as of 2017?

8     A. Yes.

9               MR. HEINRICH:  Thank you very much.

10              THE WITNESS:  Thank you.

11              MR. DANE:  Very quickly.

12                          RECROSS-EXAMINATION

13    BY MR. DANE:

14    Q. Mr. Bishop, I'm not quite done yet.  If we could go back

15    to that same slide.

16    A. Yes.

17    Q. .4.  Should have just kept it up there.

18    A. I've got it in front of me.

19    Q. You have it, yeah.  We just need to get it on the screen.

20    Problems with all this technology.

21              Slide 5.  Next slide, then.

22              So if we look at this slide, Mr. Bishop, you go a

23    little further down, there is a reference to turnaround time.

24    Do you see that?

25    A. I do.

BISHOP - RECROSS

1    Q. And turnaround time refers to the amount of time it takes

2    to manufacture the CAR-T cells after the blood cells have

3    been taken from the patient through a process that is called

4    apheresis, the CARs are manufactured, and then those

5    reengineered CAR-Ts can be reinfused into the patient; is

6    that right?

7    A. That's right.

8    Q. And as reflected here, Kite had the fastest turnaround

9    time --

10    A. That's right.

11    Q. -- at that time?

12    A. That's right.

13    Q. And Juno was trying -- it had a goal of getting below

14    21 days for its turnaround time; is that right?

15    A. It says in the chart that it was less than 21 days.

16    Q. Okay. But Kite was fastest?

17    A. That's right.

18    Q. And another very important part of a successful CAR-T

19    therapy is the success rate of manufacturing the cells; is

20    that right?

21    A. That's right.

22    Q. Because this is a one-time therapy, and the patients are

23    very, very ill, correct?

24    A. The patients -- you could, of course, make it a second

25    time. We had enough cells, if there was a manufacturing

BISHOP - RECROSS

1    failure, to do it again.  But it is an important factor, you

2    are absolutely right.  They are critically ill patients and

3    very important that we were all very reliable at getting the

4    medicine back to patients.

5    Q. Yes.  And at this point in time Kite was -- Juno, excuse

6    me, was still attempting to raise its success rate to

7    somewhere in the high 90 percent rate; is that correct?

8    A. I don't recall that.  I mean, we had a very high success

9    rate, I recall that.

10   Q. Do you recall that your success rate was not as high as

11   Kite's?

12   A. I don't recall that.

13           MR. DANE:  Okay.  Thank you.  Nothing further.

14           THE COURT:  That's it.  Thank you, Mr. Bishop.

15           Next witness.  There is some deposition to be

16   played?

17           MS. TUAN:  Your Honor, for their next witness,

18   Plaintiffs call Dr. Aya Jakabovits by deposition designation.

19           MS. YOUNG:  Your Honor, we have an objection to this

20   as hearsay.  We previously reviewed this with the Court.

21           THE COURT:  Yeah.  I didn't understand this to be

22   the next witness in order.  I thought there were other

23   witnesses to be called.

24           MR. HEINRICH:  No, Your Honor.  We have our three

25   depo designations now and then Dr. Sullivan.

```
 1              THE COURT:  Okay.  But I didn't understand that this
 2      would be the next one.
 3              MS. TUAN:  Our apologies, Your Honor.  I can address
 4      the objection if you would like.
 5              THE COURT:  Is there another deposition to be played
 6      at this time?
 7              MS. TUAN:  Yes, we can call Shawn Tomasello -- I'm
 8      sorry, Dr. Steven Harr, Juno's former chief financial
 9      officer.
10              THE COURT:  Go ahead.
11              (Thereupon, the video was played.)
12              MS. TUAN:  Your Honor, as their next witness,
13      plaintiffs call Shawn Tomasello, Kite Pharma's former chief
14      commercial officer, by deposition.
15              (Thereupon, the video was played.)
16              MS. TUAN:  Your Honor, I would like to note for the
17      record that Exhibit 4 in the Tomasello deposition is Exhibit
18      PX29.
19              THE COURT:  One moment.  And that has been received.
20              MS. TUAN:  Thank you.  The only other deposition
21      clip that we have is the one that is objected to.
22              THE COURT:  And then the witness after that?
23              MS. TUAN:  Dr. Ryan Sullivan.
24              THE COURT:  Okay.  So at this point, we'll take a
25      short recess.  Please return back to the court at 25 after
```

1     the hour.  During your absence, do not discuss the case

2     amongst yourself or any other persons.

3                    THE CLERK:  All rise for the jury, please.

4                    (Thereupon, the jury retired from the courtroom.)

5                    THE COURT:  Okay.  We are back on the record on the

6     Juno matter.  We have all counsel present.  The jury is not.

7     And we have the parties' representatives here.

8                    Let's see.  Let's start, I think, with Dr. -- we'll

9     start with Dr. Sullivan, that issue.

10                   MR. WEINBERGER:  Your Honor, may I be heard?

11                   THE COURT:  Regarding Dr. Sullivan?

12                   MR. WEINBERGER:  Yes, Your Honor.

13                   THE COURT:  Shortly.  But let me put this in

14    context, I think.

15                   So in the motion in limine that was filed by Kite

16    regarding Dr. Sullivan, at the hearing it was determined that

17    Dr. Sullivan's total license amount was $1.2 billion, and I

18    think I referenced that it was composed of three components;

19    the $93 million upfront payment, the $159.7 million launch

20    delay, and then the 27.6 running royalty on YESCARTA sales,

21    which I think came to about $101 million.

22                   And then in the order, the Court found that the

23    $930 million upfront payment was not reliable or supported by

24    reliable data and struck that.  And in the order, the Court

25    referenced that for these reasons, Dr. Sullivan's -- the

1      Sullivan motion as to Dr. Sullivan's upfront payment

2      depending on the stock swap is granted.  If plaintiff can

3      identify a different disclosed initial amount in

4      Dr. Sullivan's report, the alternative amount may be

5      introduced with Dr. Sullivan's enhancement factors.

6              So the parties have -- or Kite has filed a request

7      to require plaintiffs to identify the upfront amount to which

8      Dr. Sullivan will testify and then explain where the amount

9      is expressly disclosed in his 2019 report as a component of

10     the hypothetical license.

11             And so the Court has reviewed the -- Defendant

12     Kite's objections to Dr. Sullivan's revised sum that he will

13     place before the jury.  And then I have reviewed the

14     plaintiffs' response, and the response is in Document 501.

15             But in the response, plaintiffs indicate that

16     Dr. Sullivan's damage opinions are disclosed in his expert

17     reports, and it takes into account the Court's rejection of

18     his stock swap by excluding the associated 90 million portion

19     of his upfront payment that depended on the stock swap making

20     the starting point for his upfront payment $153 million.

21             So the plaintiffs have referenced certain portions

22     of Dr. Sullivan's report, and I'm looking at Document Number

23     311, which was cited in Document 51, the plaintiffs'

24     responses to Kite's objections, and Docket Number 311 is --

25     includes a portion of Dr. Sullivan's report at page -- at

1    paragraph 198.  The paragraph 198 references the development

2    milestones and then also references attachment F1.

3            Document 311-1 of Dr. Sullivan's report at paragraph

4    207 references the MSKCC Juno agreement providing a sum of

5    $150 million in success payments.  The attachment F1 to

6    Dr. Sullivan's report, again, identifies the development of

7    milestones of 3.35 mil.  That is attachment F1.

8            And then attachment F3 to the report identifies the

9    success payments of 150 million.  And attachment F4 also

10   identifies the value of the success payments of 150 million.

11   And then attachment F5, it appears that what the plaintiffs

12   have done is they are going to keep the development

13   milestones, keep the success payments, and then exclude the

14   90 million value of -- the value of the shares at Kite's

15   acquisition price of $90 million.

16           So there -- the sum that they are going to place

17   before the jury is going to be $153 million.

18           So, yes, if you wish to be heard.  It appears that

19   all of this has been disclosed.

20           MR. WEINBERGER:  Thank you, Your Honor.  I think the

21   one thing the Court omitted, understandable, because this

22   gets complicated, is that their upfront number originally was

23   not just the 90 and the 3.35, but it included the

24   $150 million, which was completely predicated on the price of

25   the Kite stock.  It was the success payment that was tied to

1    the Kite stock, which the Court -- and the Court cited that

2    in its opinion.  It said, "Dr. Sullivan then adds 150 million

3    because Kite's stock increased over 30 times in its initial

4    price."  And then the Court ruled that at his -- to the

5    extent his upfront payment depended on the stock swipe, which

6    includes the 150 million, that motion is granted.

7            Now, if the Court looks at the tables that Your

8    Honor just mentioned, and they are discussed in 208, it's

9    very clear that this $150 million that is in these tables is

10   the success payment for -- based on the Kite stock price.

11   Juno's stock price never got to these levels.

12           So if Your Honor looks at 208, it says, "Comparing

13   Kite's 180 per share acquisition price" -- this is the

14   Sullivan report -- "to its approximately $1.85 per share

15   price results in a multiple of about 97 times, indicating

16   that the aggregate $150 million in success payments would be

17   applicable to Kite at the hypothetical negotiation."

18           And then again, he says, "Considering" -- in

19   paragraph 209, "Considering the development milestone

20   payments, the equity grant, and the success payments, the

21   value of the initial licensed consideration is 243 million,"

22   which includes the 150.

23           There is no opinion in this report that says

24   anything about $150 million as being part of an upfront

25   payment except as a success payment for the price of Kite

1    stock.

2         So we submit that this is fully covered by the in

3    limine motion.  And to allow this number in front of the jury

4    in light of this motion would be highly prejudicial.

5         THE COURT:  I think both sides have claimed

6    prejudice at various portions of the trial.

7         So let me hear from Mr. Heinrich.

8         MR. HEINRICH:  Good morning.

9         The issue here is there is no swap.  This raises a

10   completely different issue than the one that the Court

11   addressed in the in limine order.  This analysis is not based

12   on translating between Juno and Kite share prices.  The

13   success payments here are just based on a multiple of initial

14   equity increase.

15        So Dr. Sullivan never uses the Juno stock price for

16   this analysis.  He starts with Kite's initial valuation and

17   then looks back in its Series A offering and then looks at it

18   at the time of the hypothetical negotiation.  So there is no

19   swap.  It's akin to an equity grant of sorts, except as

20   Mr. Bishop testified to this morning, it's capped.

21        But there is no mixing and matching of Juno and Kite

22   share prices.  And so we would submit that the Court simply

23   did not address that, and this is an important component of

24   the agreement that should be taken into account when you are

25   looking at the upfront portion of the consideration.

1            THE COURT:  Thank you.

2            And then let's go to -- well, any response?

3            MR. WEINBERGER:  Well, I think Mr. Heinrich is

4     basically saying Dr. Sullivan is going to give his third

5     amended report while he's on the witness stand.  He didn't

6     point to anything in this report that supports that

7     $150 million, other than what I pointed to, which was in

8     paragraph 208 and 209 where he's explicitly saying and

9     referencing the tables that the $150 million as success

10    payments is based upon the Kite stock price.  It's very

11    simple and very clear, and there is nothing else in this

12    report that could possibly justify him getting up and putting

13    on a new theory in front of the jury for the first time as

14    he's testifying at trial.

15            THE COURT:  And then we go to one final response.

16            MR. HEINRICH:  This is completely consistent with

17    what is in 208.  There is no stock swap in 208.  It's Kite's

18    share price in Series A and then at the time of the

19    negotiation.

20            THE COURT:  Okay.  And then we have -- there is one

21    other issue, and that is the issue of the next witness to be

22    called via deposition, and that was, let's see, Jakabovits

23    Aya Jakabovits, which is, has been identified as Kite's

24    former chief executive officer.  And so I'm not sure I

25    understand precisely the objection.  So the objection was

1    hearsay?

2           MS. YOUNG:  Well, it's an easy objection, Your

3    Honor.  She's within the subpoena power of the court, and

4    they are trying to play her deposition here in trial, and you

5    can't do that.

6           THE COURT:  Response?  Is she within the subpoena

7    power of the court, and, if so, why didn't you call her?

8           MS. TUAN:  So, Your Honor, she is within the

9    subpoena power of the court.  However, she was designated as

10   a 30(b)(6) designee on topic number 1, which is knowledge of

11   the '190 patent.  So we would submit that she's an exception

12   to rule 32.

13          MS. YOUNG:  May I, Your Honor?

14          THE COURT:  Yes.

15          MS. YOUNG:  She was submitted as a designee on very

16   specific page and line numbers of her deposition, none of

17   which are in the designations that they want to play today.

18   So that is not an exception that she falls within.  She's

19   within the subpoena power of the court.  If she's going to

20   testify, it's got to be here live.

21          THE COURT:  And what is the substance of that

22   witness' testimony?  What is the offer of proof?

23          MS. TUAN:  Your Honor, they designated her as a

24   topic -- as a designee for topic number 1, which is a broad

25   topic, knowledge of the '190 patent, after her actual at

1    deposition testimony.  So they are entitled to retroactively

2    designate her as a designee, but they are not entitled to

3    designate only certain portions of her deposition.

4         All of the deposition designations that we would

5    like to play today relate to knowledge of the '190 patent.

6    And as you heard yesterday from Dr. Belldegrun, she was

7    really the person who had knowledge of this patent and was

8    dealing with intellectual property matters.

9         THE COURT:  So this is a little bit of a complex

10   issue that the Court is going to have to take a closer look

11   at and not at this time.

12        So we are going to move to the -- to the next

13   witness, which would be Dr. Sullivan.  The Court would

14   overrule the objections of Kite, and Dr. Sullivan may testify

15   as to those numbers.

16        MS. YOUNG:  Your Honor, may we raise one other issue

17   regarding Dr. Jakabovits?

18        THE COURT:  We'll have to come back to -- and I

19   would suggest that the plaintiffs probably -- if you intend

20   to offer her, you may want to subpoena her.

21        MS. TUAN:  Thank you, Your Honor.

22        THE COURT:  Any witnesses after Dr. Sullivan?  What

23   is next in order?  So we have Jakabovits, it's under

24   consideration.

25        MR. HEINRICH:  And then subject to getting in the

1    remaining exhibits, I think there may be a few things to

2    clean up, some redactions, we'll be resting our case.  Yeah,

3    so -- and then to be clear, we had -- we have Mark Robbins, a

4    licensing expert, on our will call list.  We have agreed with

5    opposing counsel that he is being reserved for our rebuttal

6    case, but -- and his testimony does support our case in

7    chief.  So subject to that as well, we'll be resting.

8            THE COURT:  Okay.  So Dr. Sullivan is your last

9    witness?

10           MR. HEINRICH:  That's right.

11           THE COURT:  And then the defendants are prepared to

12    call witnesses thereafter; is that correct?

13           MR. DANE:  Yes, Your Honor.

14           THE COURT:  Who is --

15           MR. DANE:  Dr. Schuetz would be our first witness.

16           THE COURT:  Okay.  We are just waiting for our jury

17    now.  We are waiting for the jury.  They are probably in the

18    restroom.

19           (Thereupon, there was a brief recess.)

20           THE CLERK:  All rise for the jury, please.

21           (Thereupon, the jury returned to the courtroom.)

22           THE COURT:  Okay.  We have our jury reassembled, and

23    we have counsel present with the parties.  The plaintiff will

24    be calling their next witness, and this may be their last

25    witness.  We'll see.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1          And, you know, there has been some delays during the

2     course of the trial.  I just want to assure the jury that

3     there is many legal issues that have been presented, and we

4     are working on other matters.  So everybody is working on

5     these issues.

6          MR. HEINRICH:  Good morning again.  Plaintiffs call

7     as their next witness Dr. Ryan Sullivan.

8          THE CLERK:  Good morning, Doctor.  Would you please

9     come forward.  Would you please stop right there and raise

10    your right hand to be sworn.

11    THEREUPON:

12                          RYAN SULLIVAN,

13    called in these proceedings and being first duly sworn,

14    testifies as follows:

15         THE CLERK:  Thank you, sir.  Would you please walk

16    around and take a seat here.

17         MR. HEINRICH:  Your Honor, to streamline -- sorry.

18         THE CLERK:  Sir, for the record, would you please

19    state your name and spell your last name.

20         THE WITNESS:  Ryan Sullivan, S-U-L-L-I-V-A-N.

21         THE CLERK:  Thank you.

22         MR. HEINRICH:  Your Honor, we have a number of

23    unobjected-to exhibits we would like to move into evidence.

24         THE COURT:  Let me get my notebook here.  Okay.

25    Let's start.

SULLIVAN - DIRECT

1              MR. HEINRICH:  All right.  PX78, 155, 156, 240 --

2              MR. WEINBERGER:  240 has an objection, Your Honor.

3              THE COURT:  Okay.  240 is not in.

4              MR. HEINRICH:  So we may have different lists, so

5    I'll do the rest one at a time.

6              THE COURT:  So any -- so any objection to the 78,

7    155 and 156?

8              MR. WEINBERGER:  No, Your Honor.

9              THE COURT:  Okay.  Those exhibits are received.

10             (Exhibits PX78, PX155, and PX156 received.)

11                          DIRECT EXAMINATION

12   BY MR. HEINRICH:

13   Q. Good morning, Dr. Sullivan.

14   A. Good morning.

15   Q. Can you please introduce yourself to the jury.

16   A. Good morning.  I am Ryan Sullivan.  I work as an

17   economist.  And I serve as president of Intensity.

18   Q. And why are you here?

19   A. To share my expert analysis and opinions relating to

20   money damages that were incurred by Juno as a result of the

21   alleged infringement.

22   Q. And have you prepared anything to help illustrate your

23   testimony today?

24   A. Yes.  I prepared a set of demonstratives.

25   Q. All right.  So can you please summarize your educational

SULLIVAN - DIRECT

1   background briefly?

2    A. Yes.  I have a bachelor's degree, a master's degree and a

3   Ph.D.  They are all in economics and all from the University

4   of California in San Diego.

5    Q. Did you continue working with the University of San

6   Diego -- University of California San Diego?

7    A. Um, I did.  I served as an invited member of the

8   Economics Leadership Council for the Department of Economics

9   at UCSD, wherein I advised the faculty at UCSD on the

10  practice of economics and private industry.

11   Q. Have you published any work in economics or economic

12  damages?

13   A. Yes, I have.  I have a number of publications in

14  peer-reviewed journals, including the *Journal of Finance*, the

15  *Journal of Econometrics*, and the *International Journal of*

16  *Forecasting*.  I have also published my research in *les*

17  *Nouvelles*, which is the journal for the Licensing Executives

18  Society as well as other papers involving intellectual

19  property.

20   Q. And how long have you been providing professional

21  economic services?

22   A. Since April 1992.  So it has been just over 27 years now.

23   Q. You mentioned you are president of Intensity.  What is

24  Intensity?

25   A. We are an economics and data science firm with about 20

SULLIVAN - DIRECT

1    Ph.D. economists and business analysts.  We work with

2    companies to help them solve problems and strategic decision

3    making in the marketplace.

4     Q. What were you asked to do in this case?

5     A. I was asked to provide my expert research and analysis to

6    the Court to provide guidance in determining what the

7    appropriate reasonable royalty would be for the use of the

8    '190 Sadelain patent by Kite.

9     Q. And as part of that analysis, do you have to make any

10   assumptions in connection with that?

11    A. Yes.  The standard assumption for calculating damages is

12   to assume that the patent is both valid and infringed.

13    Q. Now, what materials have you considered in forming your

14   opinions?  And let's go to slide 3.

15    A. A great number of documents and data and information, so

16   this includes documents that were produced by the companies

17   to this litigation as well as filings that they have made,

18   for example, with the Securities and Exchange Commission.  I

19   have looked at financial data on sales and profitability,

20   market research reports and analysis that has been performed.

21        I've also reviewed extensive testimony from

22   witnesses within the litigation.  I've held interviews with

23   other experts.  And I have also analyzed and utilized company

24   financial models.

25    Q. Now, what is a reasonable royalty?

SULLIVAN - DIRECT

1      A. It is a form of damages in patent cases.  As an

2      economist, I perform my work in the context of the law.  And

3      the statute provides for damages adequate to compensate for

4      the infringement but in no event less than a reasonable

5      royalty.

6      Q. And how do you evaluate a reasonable royalty?

7      A. Yeah.  A standard way to do so is through what is known

8      as a hypothetical negotiation.  This would be a negotiation

9      that would happen between the licensor, parties with a

10     patent, and a licensee, parties that are seeking to obtain a

11     license or permission to use that patent.  It's hypothetical

12     in a couple of ways.

13            One, the negotiation did not actually happen.  So we

14     have to reconstruct what that negotiation would look like.

15     Also, we assume that the patent is valid and infringed, which

16     is different than a lot of real world negotiations.  And we

17     also look at all of the information that is available and

18     recognize that the parties to this hypothetical negotiation

19     would have access to the whole collection of information.

20     Q. Now, who would have participated in the hypothetical

21     negotiation that you analyzed?

22     A. Well, in the hypothetical negotiation in this case, that

23     would have occurred on October 18th, 2017, or right before

24     that.  And that's the date upon which Kite received FDA

25     approval to begin selling YESCARTA.

SULLIVAN - DIRECT

1              And so at that point in time, Kite Pharma would be

2      the entity that would be seeking a license.  And just two

3      weeks prior to that point in time, they had been acquired by

4      Gilead.  So Gilead would also be very interested in the

5      outcome of the negotiation as they would be seeking and

6      wanting to launch YESCARTA into the marketplace.

7              On the other side would be Memorial Sloan Kettering,

8      Sloan Kettering, and Juno as the ones that are interested in

9      the rights to the '190 Sadelain patent.

10     Q. Now, you mentioned that some of the materials you

11     considered were company financial models.  What role did they

12     play in your hypothetical negotiation analysis?

13     A. These are Excel spreadsheets and financials that are put

14     together by the companies in the ordinary course of business,

15     not for purposes of this litigation, but for making business

16     decisions, whether it be prioritizing products or evaluating

17     acquisitions.

18              And these are really informative in this case for

19     the hypothetical negotiation because it gives us direct

20     insight into how the parties would be thinking at the

21     hypothetical negotiation.  In other words, what their

22     expectations would be at that point in time.

23     Q. Are there factors that are typically considered in a

24     reasonable royalty analysis?  And this is slide 8.

25     A. Yes.  About 50 years ago there was a case, very

SULLIVAN - DIRECT

1    well-known case involving Georgia Pacific, and the Court

2    there set forth 15 different factors that may be informative

3    for determining a reasonable royalty.  And I considered and

4    evaluated all 15 of these factors in the course of my work.

5     Q. Did you find any of those factors particularly relevant

6    to this case?

7     A. Yes, I did.  In particular, factors 9, 10, and 11, those

8    inform upon the importance of the Sadelain patent.  Factors

9    8, 12, and 13 inform upon the financial benefits to Kite of

10   utilizing the patented technology.  Factor 5 addresses the

11   competitive relationship between Kite and Juno.  And factors

12   1 and 2 inform upon license agreements and licensing for

13   technology.

14    Q. All right.  Let's take a look at some of the evidence

15   here.

16        MR. HEINRICH:  So I would like to move into evidence

17   a redacted version of PX72 that just includes the cover page

18   and a paragraph on PX72.81.

19        THE COURT:  Let me find it first.

20        MR. WEINBERGER:  Excuse me, Your Honor.  We don't

21   have the plaintiffs' binder here.  I don't have the redacted

22   version.

23        THE COURT:  I think they are trying to secure it for

24   you.

25        MR. HEINRICH:  We do have the version on our

SULLIVAN - DIRECT

1     electronic equipment.  Can I pull up the unobjected-to

2     paragraph?

3              THE COURT:  Why don't you confer with counsel and

4     make sure it's agreeable.

5              MR. HEINRICH:  May I approach with redacted copies?

6              THE COURT:  Yes, please.  If you can hand it to

7     Mr. Cruz.

8              MR. WEINBERGER:  Subject to previous objection we

9     made about this.

10             THE COURT:  Yes.  The objections previously noted

11    will remain.

12             And so Exhibit 72, is this page 1?  What is it?

13             MR. HEINRICH:  Page 1 and redacted page 81 on the

14    second -- I apologize, that is double sided.

15             THE COURT:  On the 72.81, the redacted, there is

16    nothing there.

17             MR. HEINRICH:  There is the one paragraph that is

18    the paragraph that we wanted to use here.

19             THE COURT:  Okay.  Not on my copy, but go ahead.

20    There is no objection.

21    BY MR. HEINRICH:

22     Q. So what is Exhibit 72, Dr. Sullivan?

23     A. This is a form 10K that was filed by Gilead with the

24    Securities and Exchange Commission for the year ending 2017.

25    And a form 10K is an annual report that public companies file

SULLIVAN - DIRECT

1    with the Securities and Exchange Commission to provide

2    detailed information about the company to the SEC as well as

3    to investors and shareholders and provides detailed

4    information regarding the company.

5    Q. And what information did you find in this exhibit

6    regarding the value of the Sadelain patent to YESCARTA?

7    A. On page 81 there is information that I found to be very

8    informative in this regard.  So first I'll just read a

9    relevant piece here, and then I can explain what it means.

10              So starting on the second line, "In October 2017,

11   upon FDA approval of YESCARTA for the treatment of adult

12   patients with relapsed or refractory DLBCL after two or more

13   lines of systemic therapy, $6,200 million of the purchased IP

14   R and D was reclassified as a finite lived intangible asset."

15   Q. Can you help translate that for us?

16   A. Yes.  So what this is saying is that when Gilead acquired

17   Kite, that there was a portion of that purchase price that

18   they identified as being the value attributable to IP R and D

19   of YESCARTA.  IP R and D is intellectual property research

20   and development.  So think of that as the technology in

21   YESCARTA.

22              What they have done here is identified what the

23   value is of that item for YESCARTA, and that is the

24   $6,200 million.

25   Q. What is $6,200 million?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

SULLIVAN - DIRECT

1    A. That is an odd way of saying $6.2 billion.  Most all of

2    the numbers in the form 10K are rather large, so they are all

3    treated as millions.  Here, it is 6,200 million.  We would

4    more likely refer to that as just over $6 billion.

5         And the way to think about value here, somewhat of a

6    formal or structured way of thinking about it, is that value

7    is based upon the expectation of future profits.  That is

8    what gives an asset value.  And, naturally, the further out

9    in time into the future that one is projecting, one has to

10   account for that in the value.

11        In other words, there is two adjustments to kind of

12   think about here.  One is that you want to have your -- you

13   know, money today is worth more than money received a year

14   from now or five years from now.  But there is also a little

15   bit more uncertainty associated with the future.  And what

16   the value does is it looks at what is the present value

17   today, taking all of that into account.  And that is what

18   Gilead determined and reported as being $6.2 billion.

19   Q. So from an economics standpoint, what is your

20   understanding of how YESCARTA uses Dr. Sadelain's patented

21   CAR?

22   A. As I understand it, that patented CAR is what allows

23   YESCARTA to be a living drug with a single dose of therapy to

24   provide the efficacy and the therapeutic value of the

25   product.

SULLIVAN - DIRECT

1   Q. Now, have you seen any evidence from Kite about the role

2   of the Sadelain patent -- the Sadelain patented CAR in

3   YESCARTA?

4   A. Yes, I have.

5   Q. And let's pull up our next slide.

6       And can you explain this evidence to the jury?

7   A. Yes.  So this is testimony, and we heard this just a

8   little bit earlier this morning, from Shawn Tomasello who was

9   the former chief commercial officer at Kite, and she

10  explained that it's fair to say that having a construct on

11  which to base your product is an important aspect from a

12  commercial point of view and that, without that CAR

13  construct, there isn't anything.  In other words, it's that

14  CAR construct that is fundamental to the product and

15  ultimately, as we'll see, it really is fundamental to all of

16  the business for CAR-T for Kite.

17  Q. Did any of Kite's real world activities shed light on the

18  value of the Sadelain patent to Kite at the time of the

19  hypothetical negotiation?

20  A. Yes.  There are several key items in this regard.

21      The first is that Kite attempted historically to

22  obtain a license to the '190 Sadelain patent, but they were

23  unable to do so.  They did not secure a license that would

24  give them permission to use the '190 patent.

25      Subsequent to that point in time, they then sought

SULLIVAN - DIRECT

1     to invalidate the patent through what is known as an inter

2     partes review process.  That attempt to invalidate the patent

3     was --

4              MR. WEINBERGER:  Objection, Your Honor, I think this

5     is far afield.

6              THE COURT:  The objection is -- ask your next

7     question.  The objection is overruled.

8     BY MR. HEINRICH:

9      Q. Did you see any evidence that Kite tried anything else

10    with respect to the Sadelain patent?

11     A. Yes.  There were multiple attempts by Kite to develop

12    alternative constructs.  There is the Kite 585 construct,

13    which was an internally-developed construct.  But ultimately

14    they did not continue with that as they found it was not

15    efficacious.

16              There is another construct referred to as HU19.

17    That construct they brought through to phase I clinical

18    trials and then decided not to pursue that beyond phase I.

19              So there were two other attempts, and neither one

20    turned out to be successful for them and are focused in their

21    CAR-T program solely on the Sadelain construct.

22     Q. Well, do you have an understanding of the extent to which

23    Kite's CAR-T program pipeline uses the Sadelain patented CAR?

24     A. Yes.  The ZUMA-1 trial, which resulted in YESCARTA for 3L

25    DLBCL is one of the trials, and that's what we were

SULLIVAN - DIRECT

1    discussing earlier that was valued by Gilead at $6.2 billion.

2            But there are at least 10 other trials that are in

3    the pipeline for Kite that also are all using this very same

4    Sadelain CAR construct.

5    Q. Now, are there other aspects or factors related to

6    YESCARTA that -- or -- that are important, that you

7    considered?

8    A. There are other factors.  And there are other

9    contributors to YESCARTA beyond just the construct itself.

10   For example, there's manufacturing processes, and

11   administration, and lymphodepletion.  Yet, these other

12   factors do not drive the demand for the product.  Because

13   without the CAR construct, there isn't anything to

14   manufacture, there is no basis for lymphodepletion on a

15   patient.

16           So it really is that the CAR construct is that which

17   is fundamental in the driver of demand for sales of YESCARTA.

18   Q. But did you take those other factors into consideration

19   in your analysis?

20   A. I did.  And my analysis fully captures that value, and

21   separates out the value, contribution of the '190 patent

22   relative and separate from all of the other contributions.

23   Q. So let's turn to the relationship between Juno and Kite.

24   How would you characterize that relationship?

25   A. Juno and Kite are and have been direct competitors, and

SULLIVAN - DIRECT

1    the evidence shows that they have considered each other to be

2    primary competitors.

3     Q. And what are some of the ways in which they have competed

4    in the time period leading up to the hypothetical

5    negotiation?

6     A. On the next slide, I have a list of various items.  There

7    are -- there has been competition, for example, for

8    technology rights, and in particular with regards to rights

9    to the '190 patent.  There has also been competition with

10   regards to funding.  So obtaining investment, you know, both

11   companies were seeking to go public and did have their IPOs

12   right around the same time.  So they have been directly

13   competing in the space for investments.

14          Also, with respect to employees, they have competed.

15   And competing for clinical trial sites.  So the two entities

16   have had a relationship that is directly competitive.

17    Q. Now, at the time of the hypothetical negotiation in

18   October of 2017, was there an expectation of future

19   competition between Juno and Kite?

20    A. Yes.  All of the documents produced by the entities in

21   these company financial models that I mentioned earlier

22   recognize that there would be overlap in a number of

23   different indications for the two entities, such that the

24   competition would continue.

25    Q. Now, was there an advantage to Kite in getting a license

SULLIVAN - DIRECT

1    to the Sadelain patent at the specific time of the
2    hypothetical negotiation?
3    A. Yes.  And, in fact, having a license upon launch in
4    October 2017 provided Kite with a very significant
5    first-mover advantage.
6    Q. Let's turn to slide 20.  What is a first-mover advantage?
7    A. This is an advantage that on net results in a company
8    that is first to providing their product into the marketplace
9    with an advantage in terms of increased market share,
10   increased sales, being able to develop and shape the
11   marketplace so that there is increased physician loyalty and
12   loyalty from treatment centers, such that there can be a much
13   longer and entrenched advantage as a result of being first in
14   the marketplace.
15   Q. Let's pull up Exhibit 29.  It's in evidence.
16        And can you remind us what this is?
17   A. Yes.  This is a presentation that provides the results of
18   research that was conducted by Kite internally, just a bit
19   before the hypothetical negotiation, addressing the value of
20   a first-mover advantage.
21   Q. Let's turn to page 2.  What is Kite saying here?
22   A. Here they are saying that based upon their research that
23   they did, that on average first movers achieve a higher
24   market share.
25   Q. And if we turn now to page 3.

SULLIVAN - DIRECT

1    A. Here they are stating that based upon their research that

2    the market share advantage of first movers at year 10 is on

3    average 6 percentage points.  And as an economist, this is

4    really interesting, because one can think of a first mover

5    having an advantage early on, and that perhaps that advantage

6    would dissipate or start to diminish or go away perhaps

7    quickly.

8         But the facts actually show that the advantage

9    continues for a long period of time.  And what they're saying

10   here is that on average after 10 years, there is still a

11   benefit of 6 percentage points at the market share.

12   Q. And if we can turn to page 7.

13   A. These are the conclusions of the study based upon their

14   research that specifically to KTEC19, which is YESCARTA, that

15   that first-mover advantage was expected to be between 5 and

16   10 percentage points continuing after even 10 years.  And

17   that part of the reason is that the treatment centers would

18   gravitate towards one company's offerings across indications

19   to be able to simplify the treatment process.

20   Q. So let's pull up Exhibit 78.  And while we pull that up,

21   can you tell us whether you saw any evidence that Gilead

22   considered that there was a first-mover advantage for

23   YESCARTA?

24   A. Yes.

25   Q. So let's turn to page 5 of Exhibit 78.  Can you explain

SULLIVAN - DIRECT

1    what we see here?

2     A. Yes.  So this is a document that was prepared on the day

3    that Gilead announced to the marketplace that they are going

4    to be acquiring Kite.  And this is a document that was

5    circulated among the top executive team at Gilead to be able

6    to help answer questions that they might receive regarding

7    their decision to acquire Kite.

8           And what's interesting here is there is a question

9    of why Kite instead of Juno.  And what they are asking is,

10   why did Gilead decide to acquire Kite instead of Juno?  And

11   the response that the company put together is because of the

12   first-mover advantage.  That was the top reason that they

13   listed.

14    Q. Did you see any other evidence from Gilead relating to a

15   first-mover advantage and its position on that?

16    A. Yes, I did, there is what's referred to as earnings call

17   transcripts.  So for public companies, they will hold

18   earnings calls with investors, and these calls are public.

19   And there are transcripts made of what the executives

20   communicate into the marketplace regarding the company and

21   market developments.

22           MR. HEINRICH:  So we move PX240 into evidence, which

23   is a Gilead 2017 earnings call transcript.

24           THE COURT:  Any objection?

25           MR. WEINBERGER:  It's hearsay.  It's not a Gilead

SULLIVAN - DIRECT

1    document.

2              THE COURT:  240?

3              MR. HEINRICH:  Yes.

4              THE COURT:  And the objection is hearsay.  The claim

5    is it's not a Gilead document?

6              MR. WEINBERGER:  Correct, Your Honor.

7              THE COURT:  Then lay a foundation, please.  Lay a

8    foundation.

9    BY MR. HEINRICH:

10    Q. All right.  Well, does the call transcript reflect

11   expectations of the parties at the time of the hypothetical

12   negotiation?

13   A. Yes.  So during these calls, the executives and in

14   particular here, John Milligan, the chief executive officer

15   of Gilead, is in a public forum providing his input on the

16   marketplace and on Gilead, in this particular instance,

17   regarding a first-mover advantage associated with regards to

18   Kite.  And Thomson Reuters is the entity that actually

19   transcribes the call and then makes the transcript available

20   to all of us out in the public.

21   Q. And as a damages expert, do you rely regularly on

22   earnings call transcripts such as this?

23   A. Yes.  This is just part of our typical market research

24   that we would perform.

25              MR. HEINRICH:  With that, we --

SULLIVAN - DIRECT

1          THE COURT:  240 is now received.

2          (Exhibit PX240 received.)

3   BY MR. HEINRICH:

4    Q. So if we pull up page 12.  So can you tell us what -- so

5   first, who is John Milligan?

6    A. So the president, CEO, and director of Gilead.

7    Q. And what's reported here?

8    A. He states -- he states that he thinks the first mover is

9   very important with this area, because it allows them to

10  develop the rapport and relationship with the different

11  cancer centers.  And so he thinks a first-mover advantage is

12  important in this area.

13   Q. Dr. Sullivan, were you here in court yesterday for Arie

14  Belldegrun's testimony?

15   A. Yes, I was.

16   Q. And did you hear his testimony about first mover not

17  being important to Kite?

18   A. I did.

19          MR. WEINBERGER:  Objection, mischaracterizes his

20  testimony.

21          THE COURT:  Overruled.

22  BY MR. HEINRICH:

23   Q. And what is your -- what is your opinion on that based on

24  all of the documents that you have reviewed in this case?

25   A. I found the testimony to be odd.  All of the documents,

SULLIVAN - DIRECT

1    all of the analysis, all of the research all points to the

2    fact that there is indeed a first-mover advantage.

3          While certainly there may be certain aspects that

4    aren't as beneficial, I think it's very clear that on net,

5    overall, this was a very significant advantage for Kite.

6    Q. Now, did you consider whether Juno would have anticipated

7    how Kite's first-mover advantage would impact Juno's

8    business?

9    A. Yes.  Evidence demonstrates and even economics and basic

10   common sense that when Kite has the first-mover advantage and

11   they receive those benefits, there is a reciprocal harm to

12   Juno from being second or being behind Kite and further

13   behind.  Because if you can even think about it, if there are

14   two products coming to market and suppose they are very

15   similar, one of them gets there first, gets entrenched.  The

16   second one, when they are coming in, they no longer can be

17   equal or similar.  They have to be better in order to

18   overcome those hurdles.  So it puts them at a significant

19   disadvantage.  It slows down the process, slows down the

20   launch, and causes them to have lower market share and thus

21   less revenue and profitability over time.

22   Q. So let's go back to the slides and talk next about your

23   approach in evaluating reasonable royalties.  At the

24   hypothetical negotiation, what type of royalty structure

25   would the parties agree to?

SULLIVAN - DIRECT

1     A. The appropriate structure that the parties would agree to

2     is a reasonable royalty that would have two components to it.

3     One, an upfront payment, and two, a running royalty rate that

4     would be applied to sales of YESCARTA.

5             The second component sometimes is casually referred

6     to as royalties, yet it's the two components combined that

7     provides for the total reasonable royalty.

8     Q. And why do you believe the parties would have agreed to

9     this structure with both an upfront and a running royalty

10    rate on sales?

11    A. There's three good reasons for this.  One, nearly all of

12    the agreements that have been entered into by Kite and by

13    Juno have this type of structure.

14            Second, throughout the biotech industry, this

15    structure is very common and predominates.

16            And third, it's -- I label the title here agreed

17    license structure, and that's because both Kite's economics

18    expert, Dr. Rao, and I, we both agree that the reasonable

19    royalty would be of this structure and have both an upfront

20    payment and a running royalty on sales.

21    Q. Dr. Sullivan, what methodology did you use to quantify

22    these two components of your suggested royalty?

23    A. I used a standard approach that is referred to as the

24    market approach.  Sometimes it's also referred to as a

25    comparable license approach.

SULLIVAN - DIRECT

1             And that's wherein I identify a comparable license

2      agreement, and then make adjustments to that to have it be

3      consistent and reflect what would be the outcome of the

4      hypothetical negotiation.

5      Q. Did you make adjustments to both components of this

6      license?

7      A. Yes.  Both the upfront payment and the running royalty in

8      this case requires adjustment to be able to reflect the

9      differences between the agreement on the one hand and the

10     hypothetical negotiation on the other.  And I'll explain that

11     in more detail.

12     Q. Let's turn to slide 23.  So how did you apply the market

13     approach methodology?

14     A. So given all the context, the research that I did, and

15     the analysis that I've already been discussing, I determined

16     that the appropriate agreement to start with is the 2013

17     exclusive license agreement between Memorial Sloan Kettering

18     and Juno.

19             And then made adjustments to that to reflect what

20     would actually have occurred from the hypothetical

21     negotiation, because there's very significant differences

22     between that agreement being entered into in 2013, and the

23     hypothetical negotiation in 2017 with Kite.

24     Q. So what are those major differences between the Juno/MSK

25     2013 exclusive license and the hypothetical negotiation?

SULLIVAN - DIRECT

1    A. So in 2013, that agreement was between collaborators,

2    between Sloan Kettering and Juno.

3         It was also at a time when the CAR-T marketplace was

4    in very early stages.  In contrast, the hypothetical

5    negotiation doesn't occur until October 2017.

6         During this time, although Kite is undertaking

7    development of YESCARTA and seeking to get it launched, that

8    period of time, that is not considered infringement.  Rather,

9    the infringement begins in October 2017 upon FDA approval and

10   the launch of YESCARTA.

11        At that point in time, the market is far more

12   developed, there is a fully commercialized product that is

13   being launched in the marketplace, and the parties to the

14   hypothetical negotiation are primary competitors.

15        So there's significant differences between the

16   agreement on the one hand and the hypothetical negotiation

17   that we have to account for, yet that initial agreement from

18   2013 between Sloan Kettering and Juno is the right place to

19   begin, because it's for the very technology that's at issue

20   in this case.  And there really is no dispute that that's the

21   right place to begin.

22        Again, Kite's economics expert Dr. Rao and I both

23   agree on that point.

24   Q. Now, how do you account for the differences you just

25   identified between the MSK/Juno 2013 agreement and the

SULLIVAN - DIRECT

1    hypothetical negotiation?

2     A. I take it in two steps.  And that's because there is

3    information that helps us get a part of that difference

4    accounted for, and then another step that addresses the full

5    difference.

6           So you'll see on the next slide or as we progress

7    that there was an agreement in 2013, separate agreement

8    between St. Jude and Juno that licensed a different patent.

9    And then as part of a settlement in 2015, Juno then licensed

10   that patent to Novartis.

11          And so I used those two agreements to make one

12   adjustment, but that only gets us part of the way there.

13   Because that only gets us to 2015.  That's still relatively

14   early stage, we don't have a launched product.  And secondly,

15   that's with Novartis, not with Kite.  And Novartis was a

16   lesser competitor.  And I'll be able to quantify that for

17   you.  And so I make a second adjustment to get us to Kite and

18   Juno in 2017 at the hypothetical negotiation.

19          THE COURT:  Let's take the noon recess.  Please

20   return back to the courtroom at 12:30, and we'll continue

21   with the trial.  During your absence, do not discuss the case

22   amongst yourself or with any other person, please.

23          THE CLERK:  All rise, please.

24          (Thereupon, the jury retired from the courtroom.)

25          (Thereupon, there was a lunch recess.)

                          SULLIVAN - DIRECT

1              THE COURT:  We have everyone present on *Juno vs.*
2    *Kite*, I think everybody is present.  Mr. Chu is not here.
3    Does he intend to be here?
4              MR. HEINRICH:  He does, Your Honor.  Let's wait a
5    minute.
6              THE CLERK:  I'm going to line up the jury.
7              MR. DANE:  Kite is all here, Your Honor.
8              THE COURT:  How much additional on direct do you
9    think you have?
10             MR. HEINRICH:  I'd say a half an hour or less.
11             THE COURT:  And then Mr. Weinberger, how much cross
12   do you think you -- I'm not trying to rush you, I just want
13   to get a feel for whether we can let the jury go a little bit
14   earlier today.
15             MR. WEINBERGER:  I would say 45 minutes to an hour.
16             THE COURT:  Okay.  Thank you.
17             MR. DANE:  We did -- the next witness is Dr. Schuetz
18   who does need to get on today.
19             THE COURT:  Okay.  So how long will -- how long is
20   his direct?
21             MR. DANE:  Mr. Lawton is doing his direct.  He's not
22   here.  I think it should be on the order of 25 minutes,
23   something like that.
24             THE CLERK:  Your Honor, are we ready?
25             THE COURT:  Yes.

SULLIVAN - DIRECT

1      THE CLERK:  Would you all rise for the jury, please.

2           (Thereupon, the jury returned to the courtroom.)

3      THE COURT:  Okay.  We have our jury reassembled with

4  counsel present and the parties.  We are ready to proceed,

5  so...

6      MR. HEINRICH:  Good afternoon, ladies and gentlemen.

7  Welcome back.

8  BY MR. HEINRICH:

9   Q. Dr. Sullivan.

10  A. Thank you.

11  Q. So let's recap.  You were identifying at a high level the

12  two adjustments you make to account for differences between

13  the MSK/Juno 2013 agreement and the Juno/Kite 2017

14  hypothetical negotiation.  So why is the hypothetical

15  negotiation in October 2017?

16  A. That is when Kite obtained FDA approval to begin selling

17  YESCARTA.  Prior to that point in time, they were only

18  engaging in clinical trials.  And clinical trials in this

19  space does not give rise to infringement.  So companies can

20  undertake as many clinical trials as they wish, and that

21  would not be considered infringement.  Hence, the

22  infringement does not begin until October 18th, 2017, upon

23  FDA approval.

24  Q. All right.  So you start with the MSK/Juno 2013

25  agreement.  Let's talk about the terms of that agreement.

SULLIVAN - DIRECT

1    Let's pull up Exhibit 924.  All right.  And let's go to page

2    13.  What royalty rate is specified in this agreement?

3     A. The agreement specifies a running royalty rate of

4    7.25 percent payable on net sales.  And this is the royalty

5    rate that is payable by the licensee, which is Juno, as well

6    as any sublicensee, for example, Kite, in terms of what would

7    be payable to MSK under this agreement as it's specified.

8     Q. So if Juno were to sublicense Kite at the hypothetical

9    negotiation for 7.25 percent, how would that royalty be

10   divided between Juno and MSK?

11    A. All of that, all the 7.25 percent would go to MSK and

12   Juno would receive zero.

13    Q. All right.  Did you also evaluate other payment

14   obligations that Juno made upon entering the agreement that

15   are not tied to sales?

16    A. Yes.  There are milestone success payments as well.

17    Q. All right.  Let's discuss each of those.  Can we pull up

18   924, page 15, 924.15?  So can you walk us through these

19   milestone payments?

20    A. Yes.  So this is section 4.6 of the agreement, and this

21   is setting forth development milestone payments.  The first

22   one is $50,000 for completion of a phase I trial.  There is

23   also a payment of $300,000 for a completion of a phase III

24   trial, and a payment of $3 million for receiving regulatory

25   approval.  All three milestones which were achieved by Kite

SULLIVAN - DIRECT

1     as of the time of the hypothetical negotiation.

2      Q. So let's maybe unpack that a little bit.  At the time

3     Juno entered this agreement with MSK, did Juno pay these

4     amounts immediately?

5      A. No.  There was a payment obligation, yet the payments

6     were not made at that particular point in time, but rather

7     these get triggered across time.

8      Q. And so why did you consider them in your analysis of the

9     upfront payment obligations for your license structure?

10     A. As of the time of the hypothetical negotiation, these

11    milestones would have already been triggered.  You know, this

12    is -- you know, the same approach that Kite's expert Dr. Rao

13    takes in terms of looking at which milestone success payments

14    have been triggered as of the time of the hypothetical

15    negotiation.

16     Q. All right.  So let's discuss the success payments that

17    you mentioned.  Can we pull up PX241?  Which is another

18    co-agreement between Juno and MSK.  And if we turn to page

19    23, 241.23, what do we see here?

20     A. So this is part of the agreement between MSK and Juno.

21    And this is setting forth the success payments under that

22    agreement.  What it is showing is that the success payments

23    are based upon increases in equity value, such that the first

24    payment, it's showing here as $10, but as you can see, this

25    is in millions of dollars, so there is a payment of

SULLIVAN - DIRECT

1   $10 million when the equity value that the stock price

2   increases by a multiple of 10.  Then there is an additional

3   $70 million payment to get up to a total of $80 million that

4   the stock price increases 15-fold, and if the stock price

5   increases 30-fold, then the entire payment is $150 million

6   under the success payment.

7   Q. And why did you consider these success payments as part

8   of your upfront in your royalty calculation?

9   A. Well, for two reasons:  One, they are a fundamental

10  component of the agreement.  This is, you know, a basis for

11  why Sloan Kettering and Juno entered into this agreement.

12          Secondly, all of these payments -- similar to the

13  milestone payments I was mentioning a moment ago, all of

14  these payments were also triggered.  So when one takes a look

15  at the increasing value of Kite's Series A stock, that

16  increased well over 30-fold.  And --

17          MR. WEINBERGER:  Objection, Your Honor.

18          THE WITNESS:  -- as a result, those would be

19  triggered.

20          THE COURT:  Grounds?

21          MR. WEINBERGER:  Grounds on MIL.  This is stock swap

22  expressly.

23          THE COURT:  Overruled.

24  BY MR. HEINRICH:

25  Q. So in sum, how much of the upfront payment obligations

SULLIVAN - DIRECT

1      not tied to sales did you include as your starting point for

2      that component of the hypothetical license you proposed?

3       A. $153,350,000, so that consists of the milestone payments

4      of 3,350,000, plus the milestone success payments that are

5      listed here of $150 million.

6       Q. How does Kite's expert value these success payments in

7      his analysis?

8       A. Well, it's rather interesting, because while he takes a

9      similar approach in looking at milestone payments, he uses a

10     different agreement.  Rather than using the Memorial Sloan

11     Kettering/Juno agreement, he uses a different agreement that

12     is not for the patented technology.

13      Q. All right.  Let's turn to the adjustments you make and

14     getting to the details of those adjustments.  If we can go to

15     this slide, thank you, this is slide 27.  How do you make

16     your first adjustment?

17      A. The first adjustment is based upon two agreements that

18     were entered into by Juno; one of them with St. Jude, and the

19     other one with Novartis.  And by comparing those two

20     agreements, it allows us to make an adjustment that gets us

21     to early 2015 with Novartis as a party to the negotiation.

22     There's still differences at that point, but it takes us to

23     part of the adjustment.

24      Q. Okay.  So if --

25              MR. HEINRICH:  So I would like to move into evidence

SULLIVAN - DIRECT

1    Exhibit 401, the Juno/St. Jude agreement.

2              MR. WEINBERGER:  No objection, Your Honor.

3              THE COURT:  PX401 is received.

4              (Exhibit PX401 received.)

5    BY MR. HEINRICH:

6     Q. And is this Juno/St. Jude Children's Research Hospital

7    agreement one of the agreements you considered for your first

8    adjustment?

9     A. Yes.  This is the agreement I was just referring to.

10             MR. HEINRICH:  And then I'd move into evidence

11   PX928, the Juno/Novartis settlement sublicense.

12             THE COURT:  Any objection?

13             MR. WEINBERGER:  No objection, Your Honor.

14             THE COURT:  Thank you.  Received.

15             (Exhibit PX928 received.)

16   BY MR. HEINRICH:

17    Q. And is this the second agreement you considered for your

18   first adjustment?

19    A. Yes, it is.  This is the other agreement I just referred

20   to.

21    Q. And if we can now turn back to the slides, why don't you

22   walk us through how you calculate this first adjustment?

23    A. So the agreement that Juno entered into with St. Jude in

24   2013 specifies a running royalty rate of 2.5 percent.

25   Subsequently, in 2015, Juno entered into a settlement

SULLIVAN - DIRECT

1    agreement with Novartis that involved the very same patent,

2    and the running royalty rate in that agreement is

3    4.75 percent.  So you can see that what has occurred across

4    time, going from 2013 to early 2015, as well as the

5    difference in a fully -- thinking about entities that are

6    doing research versus those that are developing a CAR-T

7    product, there's a difference overall that goes from

8    2.5 percent up to 4.75 percent.

9           And that reflects a 90 percent increase relative to

10   the 2.5 percent.  So that provides us with effectively what

11   is the first adjustment.

12   Q. Now, the patent at issue in these agreements, is it the

13   same Sadelain patent we're here to discuss?

14   A. No.  It's a different patent.  It does relate to CAR-T

15   constructs, but it is a different patent.  And it has

16   different attributes, and different value in terms of

17   licensing.

18          And you can see that straight away because the

19   royalty rate in the St. Jude agreement is at 2.5 percent,

20   where as the royalty rate in the Memorial Sloan

21   Kettering/Juno agreement is higher at 7.25 percent.

22          So that tells us that there's a difference in the

23   patents that are being licensed, but it is something that

24   allows us to look at the relative ratio or the relationship.

25   Q. All right.  So you indicated that you did a second

1    adjustment.  And why did you feel the need to do a second

2    adjustment?  We're now at slide 29.

3     A. There are still fundamental differences between the

4    agreement with Novartis in 2015 and the agreement that would

5    result from the hypothetical negotiation in 2017 with Kite.

6    And in particular, back in 2015, Novartis was still years

7    away from being able to launch a product.  They were in --

8    still in development phase.  There was no overlap with the

9    lead product candidates between Juno and Novartis.  The

10   agreement is also a settlement agreement.  It settles

11   litigation.  And so it was resolving uncertainty, resolving

12   litigation costs, especially in light of the impending

13   intellectual public -- initial public offering, the IPO for

14   Juno.

15          And there's also considerable evidence that Novartis

16   had a questionable commitment across time to the CAR-T space.

17   And for all of these reasons, that's very different from

18   what's occurring at the hypothetical negotiation, which is in

19   2017, October of 2017, where we have Kite launching a product

20   into the marketplace that's fully commercialized, and is the

21   primary competitor of Juno.

22    Q. So how does -- so does Dr. Rao, Kite's expert, do some of

23   the same type of analysis?

24    A. Well, here again, Dr. Rao and I agree that a starting

25   point is the 2013 agreement with 7.25 percent as that rate.

SULLIVAN - DIRECT

1    And we both make our first adjustment, I make a first

2    adjustment.  Dr. Rao does that, too, although he does a

3    different approach to that adjustment so that he ultimately

4    ends up at a royalty rate of 10.34 percent.  However, he does

5    not account for any of the differences between Novartis in

6    2015 and Kite in 2017 as it relates to how it impacts Juno.

7    And that's what the second adjustment accounts for.

8      Q. So does Dr. Rao stop his adjustments at the Novartis/Juno

9    2015 settlement agreement?

10     A. Yes.  That's right.

11     Q. All right.  So can you first explain at a high level your

12   adjustment number 2?

13     A. Yes.  So there's two real distinctions.  In 2015, we have

14   Novartis versus at the hypothetical negotiation in 2017, we

15   have Kite.  And that -- they have different competitive

16   effects based upon what was being expected for competition in

17   the marketplace.

18           Second, the market had developed from 2015 to late

19   2017.  So I account for both of those items by looking at the

20   relative competitive effects on Juno.

21           So I first look at what would have been the

22   competitive effect on Juno in 2015 from Novartis and then I

23   look at the competitive effect of Kite in 2017 on Juno.  And

24   I look at that relative difference.

25     Q. And so can you explain to us how you do that calculation?

SULLIVAN - DIRECT

1    A. Yes.  So first off, I look at the market share effects on

2    Juno.  These are based upon the financial models that were

3    used by Juno for their business efforts, both for their

4    product pipeline, all their business decision making, as well

5    as for evaluating any sort of acquisition.

6          In those models, around the time of the Novartis

7    2015 agreement, Juno expected that Novartis would ultimately

8    have a market share effect on Juno of 4.4 percent.

9          In contrast, fast forward to 2017 around the

10   hypothetical negotiation, at that point in time, Juno

11   projected through their financial models that Kite would have

12   a market share effect of 12.5 percent, a greater market share

13   effect on Juno.

14   Q. How did you select the models that you used for this

15   analysis?

16   A. Based upon the use of those models by Juno in the

17   ordinary course of business, looking at the completeness of

18   the models, validating the work that was performed, as well

19   as looking at which models were closest in time to each of

20   these two events, the Novartis agreement in 2015, as well as

21   models that are closest in time to the hypothetical

22   negotiation in October 2017.

23          MR. HEINRICH:  So I move into evidence Exhibits 1247

24   and 1248, which are summaries of the models.

25          MR. WEINBERGER:  Your Honor, I don't believe they

SULLIVAN - DIRECT

1   are summaries of the models, and they are not evidence.  They

2   are just demonstratives that were prepared, I think, by

3   Dr. Sullivan.

4           MR. HEINRICH:  We offer them under section 1001 as

5   summaries of voluminous data.

6           THE COURT:  1247 and 1248, are they in the exhibit

7   binders here?

8           MR. HEINRICH:  Yes.  I'm sorry.  I meant to say

9   section 1006, rather than 1001.

10          THE COURT:  Lay some additional foundation.

11  BY MR. HEINRICH:

12   Q. Can you explain what Exhibit 1247 is, Dr. Sullivan?

13   A. Yes.  So the financial models that I was referring to are

14  large and complex Excel workbooks.  They have many different

15  tabs, many different tables.  There is a lot that goes into

16  these.  As you heard earlier, there can be several months'

17  worth of a team putting these together.  And what I have done

18  is I have pulled out the key information to summarize those

19  financial models in Exhibits 1247 and 1248.

20          MR. HEINRICH:  With that, we move them into evidence

21  under Federal Rule of Evidence 1006.

22          THE COURT:  Same objection?

23          MR. WEINBERGER:  Yes, Your Honor, they are

24  selective, they are not complete.

25          THE COURT:  Let me just -- okay.  These -- 1247 and

SULLIVAN - DIRECT

1     1248 are being received into evidence.  These are certain

2     charts and summaries.  Charts and summaries are only as good

3     as the underlying evidence that supports them.  You should

4     therefore give them only such weight as you think the

5     underlying evidence deserves.  And with that, they are

6     received.

7          (Exhibits 1247 and 1248 received.)

8     BY MR. HEINRICH:

9      Q. So how did you quantify the relative economic impact of

10    Novartis on Juno in 2015 and Kite on Juno in 2017?

11     A. So as you can see on the next slide, that I converted

12    those market share effects into dollar effects, looking at it

13    on a revenue basis.  And I do that by looking at this on an

14    indication basis, converting market share into number of

15    patients, looking at the price per therapy at the various

16    points in time, and performing an annual revenue impact

17    estimate.

18          And that's what you'll see here on slide 33.  So

19    that in 2015, Novartis was projected to have an annual

20    revenue impact of $445 million on Juno over the course of the

21    agreement.  And in contrast, in 2017, Kite was projected to

22    have an annual revenue impact of $1.3 billion.

23          And so there's a relative difference, a ratio of --

24    resulting in an increase of 192 percent.  In other words,

25    the -- starting at 445 million, going up to 1.3 billion,

SULLIVAN - DIRECT

1  that's a 192 percent increase, so that's the second

2  adjustment factor that I use.

3   Q. Can you help us understand, you know, whether this makes

4  sense at a high level?

5          MR. WEINBERGER:  Objection, Your Honor.

6          THE COURT:  Grounds?

7          MR. WEINBERGER:  Vague.

8          THE COURT:  Okay.  Sustained.

9  BY MR. HEINRICH:

10   Q. So as a matter of just basic economics, would one expect

11  or not expect to have this difference between market impacts

12  in these two periods of time between these two competitors?

13   A. Well, it makes sense as an economist, but I do think it's

14  common sense that back in 2015, Novartis was still years away

15  from a launch, and they were not the primary competitor.

16  They were seeking to launch in a different indication, versus

17  Kite in 2017 launching right at the lead product indication

18  for Juno, and they're actually launching the product.  So you

19  would expect there to be a larger effect in 2017 from Kite

20  than you would from Juno -- from Novartis in 2015.

21   Q. Now, to be clear, are you doing a lost profits analysis?

22   A. No.  This is not lost profits at all.  This is just

23  looking at the relative effect.  And I use this relative

24  effect, and I apply that to royalties.  So there is no

25  capture here of revenue, there is no capture of profits.

SULLIVAN - DIRECT

1    It's purely looking at the relative effects.  And I use that

2    relative difference to adjust the royalties in the Sloan

3    Kettering agreement as the basis.

4    Q. So let's talk about your calculations using these

5    adjustments.  So let's start with your royalty rate.  So can

6    you walk us through your calculation.  And this is slide 34.

7    A. Yes.  As noted, the 2013 agreement between Memorial Sloan

8    Kettering and Juno specifies a running royalty rate of

9    7.25 percent.  Adjustment number 1 is adding 6.5 percent to

10   that amount.

11         And how I get there is I take the 90 percent

12   adjustment factor from adjustment number 1, and I multiply

13   that by 7.25 percent, and that yields 6.5 percent.  So there

14   is an additional royalty for adjustment 1.

15         And then if we go to adjustment number 2, I take

16   that same base of 7.25 percent, I multiply it by the

17   adjustment factor of 192 percent, as I explained for

18   adjustment number 2, and that provides an incremental royalty

19   rate of 13.9 percent.  And so when I add these three

20   together, the 7.25, 6.5, and 13.9, that yields an ultimate

21   running royalty rate of 27.6 percent.

22   Q. And of that amount, how much -- so we imagine this

23   hypothetical sublicense between Juno and Kite.  How much of

24   that royalty rate would go to MSK?

25   A. 7.25 percent would go to MSK.  And the remainder, just

SULLIVAN - DIRECT

1    over 20 percent, would go to Juno.

2    Q. So how does your proposed rate compare to Kite's

3    anticipated profit margins at the time of the hypothetical

4    negotiation?

5    A. At the time, based upon the financial models prepared by

6    Kite for their Project Gold, that specifies profit margins

7    ranging from about 65 percent in the beginning going up to

8    over 80 percent profit margins by the time that the patent

9    would expire in 2024.

10   Q. So can we pull up Exhibit 156, and turn to page 25?  If

11   we can just highlight the gross profit margin up above.

12           And what is this document?

13   A. So this is the Project Gold report that was put together

14   by Kite based upon their financial models that they had put

15   in place just a bit before the hypothetical negotiation.

16           And here, as I was noting earlier, the gross profit

17   margins range in the beginning from about 66 percent and goes

18   up to over 80 percent by the time that the patent would

19   expire in 2024.  And in dollar terms, the gross profits

20   during this point -- during this time would be $8.6 billion

21   during the life of the patent up until it expires in August

22   of 2024.

23           Similarly, there is also a line here for operating

24   profits that deducts other operating expenses, you know,

25   selling expenses, executive salaries and the like.  And the

SULLIVAN - DIRECT

1    total during the life of the patent is 7.1 billion.  So the

2    profits that were projected were just over $7 billion on a

3    net operating basis.

4     Q. All right.  So let's take your royalty rate and come up

5    with the running royalty component of your damages opinion.

6    If we can go to our next slide.

7           So what -- what are you applying your royalty rate

8    to?

9     A. The base -- the royalty base of net sales of YESCARTA

10   from inception in 2017 through the third quarter of this

11   year, the third quarter of 2019.  Those sales are

12   $604 million.  And that amount of sales is not disputed in

13   the case.

14    Q. And are those worldwide sales?

15    A. Yes, they are.  It includes global sales because all of

16   the production is performed here in the United States.  So it

17   makes sense to include worldwide sales.

18          And applying the 27.6 percent rate to the sales of

19   $604 million provides for running royalties of 167 million.

20    Q. All right.  So we saw that you have a second component of

21   your proposed royalty, which is an upfront component or a

22   component not based on sales.  Can you walk us through the

23   calculation there.

24    A. Yes.  The calculation is parallel to this or what I have

25   done for the running royalty rate.  So as you'll recall, the

SULLIVAN - DIRECT

1    milestone success payments total $153.35 million.  That

2    results from the 3.35 million milestones and the $150 million

3    success payments.

4           So I apply the two adjustments to the 153.35 million

5    just the same.  So I apply a 90 percent factor --

6           MR. WEINBERGER:  Excuse me, Your Honor.  Before this

7    is published, I need to object for the record.

8           THE COURT:  Go ahead.

9           MR. WEINBERGER:  This is contrary to the MIL ruling

10   regarding the relationship between the upfront payment and

11   the revenues and profits.

12          THE COURT:  Thank you.

13          THE WITNESS:  So I apply the same two factors to the

14   $153.35 million milestone success payments.  I apply a

15   90 percent factor, and I apply a 192 percent factor.  And

16   when I do that math, just like I did for the running

17   royalties, the total amount is $585 million for the upfront

18   component of the reasonable royalty.

19   BY MR. HEINRICH:

20    Q. And what does that take into account?

21    A. So that is accounting for the financial harms and

22   benefits that are realized at the time of the hypothetical

23   negotiation.

24          For example, right at the hypothetical negotiation,

25   by allowing Kite to launch with the license, by providing a

SULLIVAN - DIRECT

1    license, providing them with permission to launch, that

2    provides the first mover advantage for Kite.  And it also

3    provides the reciprocal harms to Juno at that time.  And

4    those become enabled or realized at the time of the

5    hypothetical negotiation.

6     Q. So you mentioned a few disagreements you have with

7    Dr. Rao, Kite's damages expert.  Can you summarize those for

8    us here?

9     A. Yes.  While we both start for our running royalty with

10   the 7.25 percent, his adjustments only go up to 10.34,

11   because he's only making a partial adjustment, taking us to

12   Novartis in 2015.

13          And while I disagree with how he does his

14   adjustment, that part aside, he has not accounted for any of

15   the other differences between Novartis in 2015 and Kite in

16   2017.

17          He also ignores the bargaining position of the

18   parties in 2017.  So at the hypothetical negotiation, it

19   would be recognized that Kite no longer had options.  They

20   had tried to license the patent and did not have it.  They

21   had tried alternatives and design-arounds, and that did not

22   work.  And thus, at the point in time of the hypothetical

23   negotiation, there would be a very strong bargaining position

24   of Juno relative to Kite.

25    Q. And what are your total proposed damages in this case,

SULLIVAN - CROSS

1   sir?

2    A. So adding together the running royalty component of

3   $167 million to the upfront component of the reasonable

4   royalty, which is $585 million, those together provide a

5   total reasonable royalty of $752 million.

6    Q. And why do you think that that is reasonable in this

7   case?

8    A. Well, for a number of reasons.  But the technology

9   underlying the Sadelain '190 patent is fundamental to

10  YESCARTA, and at the hypothetical negotiation, that license

11  enables Kite to launch into the marketplace and obtain the

12  benefits financially of doing so.

13          MR. HEINRICH:  Thank you very much, Dr. Sullivan.

14          THE COURT:  Thank you.

15          Mr. Weinberger?

16          MR. WEINBERGER:  If I can just have a moment to set

17  up, please.

18                    CROSS-EXAMINATION

19  BY MR. WEINBERGER:

20   Q. Good afternoon, Dr. Sullivan.

21   A. Good afternoon.

22   Q. You testified that the starting point for your analysis

23  was the license agreement between Memorial Sloan Kettering

24  and Juno in 2013, correct?

25   A. That is the starting agreement.  My analysis really

SULLIVAN - CROSS

1    starts before then by looking at the marketplace, the role of

2    the technology, importance of the patents -- of the patent,

3    things of that nature.  But then once I turn to the market

4    approach, the starting point within that is indeed that

5    agreement.

6        Q. In fact, you concluded that the only agreement in this

7    case that could be appropriate to use as a comparable and

8    then adjust was the Memorial Sloan Kettering agreement,

9    correct?

10       A. That is right.  The other two agreements can be used as

11   relative amounts, but I do not think they would be

12   appropriate as a starting point.

13       Q. There are no other comparable licenses in this case

14   according to you, correct?

15       A. Not ones that could be reasonably and reliable adjusted

16   to account for the differences between those agreements and

17   the hypothetical negotiation.

18       Q. Now, you have testified that there is a set of two other

19   agreements involving related technology that you used to

20   establish and quantify certain adjustments, correct?

21       A. That is right, the St. Jude agreement and the Novartis

22   settlement.

23       Q. Right.  And the St. Jude agreement -- we can put up

24   demonstrative number 1, which I have given to counsel.  And

25   these are just your calculations, so there is nothing in here

SULLIVAN - CROSS

1    that you haven't said already.

2            The St. Jude license has a royalty of 2.5 percent,

3    correct?

4     A. That's right.

5     Q. And the Novartis license has a royalty rate of

6    4.75 percent, correct?

7     A. That's right.

8     Q. And as we discussed, the MSK/Juno agreement has a royalty

9    of 7.25 percent, correct?

10    A. Yes, that's right.

11    Q. And your royalty is 27.6 percent, correct?

12    A. Yes, correct.

13    Q. So that's almost four times higher than the MSKCC Juno

14    license, right?

15    A. Almost, yes.

16    Q. And it's about six times higher than the Novartis

17    license, correct?

18    A. Um, about that, yes.

19    Q. And it's about 11 times higher than the St. Jude license,

20    correct?

21    A. Yes, that's right.

22    Q. And there are no other agreements that you have opined

23    about in your report that are comparable in this field of

24    technology, correct?

25    A. No, not in the way that I have defined and used the term

SULLIVAN - CROSS

1  comparable, that's right.

2   Q. All right.  So you made two adjustments that you've

3  testified about, and I'm just going to put up another chart

4  summarizing the numbers on that.  And again, this is not

5  controversial.  It's the same numbers that you have given the

6  jury.

7       Could we post number 2?

8       So first you did what you called a CAR-T developer

9  adjustment, and that got you from 7.25 to 13.78 percent,

10  correct?

11   A. Yes, that's right.

12   Q. So you close to doubled the royalty rate in the MSKCC

13  agreement with your first adjustment, right?

14   A. It's a 90 percent increase, that's the 90 percent factor.

15   Q. And then you made a second adjustment which you called a

16  Kite competition adjustment, correct?

17   A. Yes, that's right.  So that reflects the second

18  adjustment, the 192 percent factor.

19   Q. And then that got you to 27.6 percent.  I actually think

20  these numbers are reversed.  It says 26.7, but I think it's

21  actually 27.6, correct?

22   A. The answer is 27.6.

23   Q. Right.  So you first -- so you basically took the highest

24  rate of the three licenses you looked at, and you basically

25  quadrupled it, correct?

SULLIVAN - CROSS

1      A. No, that is not quite right.  While in the end the

2     numbers are that, but I also examined a great number of

3     different license agreements, so I considered a large number,

4     but of these three, this has the largest royalty rate.

5      Q. I'm just asking about the math.  The math is that you

6     almost quadrupled the highest license in the three that you

7     examined closely, correct?

8      A. The exact factor is 3.82, so it's not quite four, but

9     close enough.

10      Q. All right.  Now, you also testified to an upfront

11     payment, correct?

12      A. Yes, that's right.

13      Q. And that was based upon the payments called for in the

14     MSKCC general license, correct?

15      A. Um, the agreements between Juno and Memorial Sloan

16     Kettering.

17      Q. Now, to be clear, you testified to two different types of

18     payments.  The first one were milestone payments that totaled

19     $3.5 million, correct?

20      A. 3.35 million.

21      Q. 3.35.  Thank you.

22           And the second one was what you called success

23     payments, correct?

24      A. Yes.  That is how they are termed in the agreement.

25      Q. And the success payments in the agreement basically

SULLIVAN - CROSS

1    provide that if Juno stock got to certain levels, 10 times

2    higher, 20 times higher, 50 times higher, then payments would

3    be made to Memorial Sloan Kettering, correct?

4     A. Um, it's 10 times, 15 times, and 30 times.  Under that

5    agreement, Juno is the licensee, whereas at the hypothetical

6    negotiation Kite is the licensee.

7     Q. Understood.  But what I want to just make sure is clear

8    is that the success payments in the Memorial Sloan Kettering

9    agreement were based upon the price of Juno stock, not Kite

10   stock, correct?

11    A. That's right, you know, similar to the running royalty

12   would be applied to Juno sales not Kite sales --

13    Q. Could you please just answer my question, sir.  You know

14   how this is done.  You are a professional witness.  So we

15   have a short time period.  We are trying to get the jury out

16   of here.  Just answer the question.

17         THE COURT:  That's argumentative.

18   BY MR. WEINBERGER:

19    Q. All right.  So Juno's stock did not reach the levels by

20   October 2017, which would have triggered the $150 million

21   payment you testified about, correct?

22    A. Yeah, I'd have to think about exactly when those were

23   triggered.  It probably didn't occur until early 2018.

24    Q. And in fact, by 2017, in October, the date of the

25   hypothetical negotiation, the only payment that would have

SULLIVAN - CROSS

1   been due to MSKCC under that stock provision was $10 million,

2   correct?

3   A. I don't recall the exact timing, that may be right, but I

4   actually was thinking there had been further triggers at that

5   point.  But I don't have that -- that level of precision in

6   my memory.

7   Q. So you can't dispute right now that the Juno stock had

8   reached the level where only $10 million was due to MSKCC,

9   not 150, correct?

10   A. That's right.

11   Q. So the way you got to 150 was that you substituted Kite's

12   stock price for Juno's stock price, correct?

13   A. No, not at all.

14   Q. Well, how did you get to $150 million based upon a Juno

15   stock success factor that was not reached?

16   A. You are confusing Juno and Kite.  So at the hypothetical

17   negotiation, we specify what would be the outcome of that

18   hypothetical negotiation.

19            Starting with an agreement between Sloan Kettering

20   as the licensor, Juno as the licensee.  But it's different at

21   the hypothetical negotiation, because there, Juno is the

22   licensor and Kite is the licensee.

23   Q. All right.  So but the question is, you calculated

24   $150 million based upon the Kite stock price in October 2017,

25   correct?

SULLIVAN - CROSS

1    A. It is based upon the triggers on the success payments.

2    Just like what was done by Kite's expert, Dr. Rao.

3    Q. Yes, but the trigger was the Kite stock price that you

4    used, correct, not the Juno stock price?

5    A. Applying the agreement and applying the terms, it applies

6    to Kite, it applies to Kite sales, and it applies to the

7    performance of YESCARTA.

8    Q. So the answer to my question is yes, you used the Kite

9    stock price to determine whether the success payments were

10   triggered, correct?

11   A. I would put it differently.

12   Q. Well, that's what you presented in your slide this

13   morning as to how the $150 million was triggered.  Right?

14   A. I put it differently.

15   Q. The Juno stock price -- I just want to make sure we're

16   clear on this.  The Juno stock price never got to the levels

17   that would have triggered that $150 million payment to

18   Memorial Sloan Kettering, correct?

19   A. Um, in effect, yes, given the acquisition.

20   Q. October 2017 the Juno stock price was nowhere near the

21   level that would have triggered $150 million payment to

22   Memorial Sloan Kettering; yes or no?

23   A. I would have to disagree with you.

24   Q. You think the Juno stock price did reach a level that

25   triggered $150 million success payment?

SULLIVAN - CROSS

1    A. Ultimately, as I understand it, there were payments and

2    there were monies received by Sloan Kettering of

3    approximately $150 million.

4    Q. Excuse me, but I'm asking as of October 2017, and I think

5    we have been through this already.

6    A. It --

7    Q. Let me finish the question.  As of October 2017, you

8    agree that the Juno stock price was nowhere close to the

9    multiple that would trigger $150 million success payment,

10   correct?

11   A. Well, in all fairness, some of your questions are

12   October 2017, others aren't.

13   Q. If I'm not clear, let me know.  I want to be clear.

14   A. Yeah.  And I just can't agree with this characterization

15   of nowhere near.  I don't have the precision of time of when

16   it hit, but it was getting darn close around that time, and I

17   just don't recall that.  So I can't say nowhere near.

18   Q. So if hypothetically that payment that would have been

19   earned at that time was only about $10 million and not

20   $150 million, you would agree that would be nowhere close,

21   right?

22   A. There is a significant difference between 10 and 150.

23   Q. Okay.  Now, so if that was true, then the real world

24   payment to Memorial Sloan Kettering is 10 million -- strike

25   that question.  Let's move on.

SULLIVAN - CROSS

1          Now, Juno contends that both companies were using

2     the '190 patent in their product development, correct?

3     A. Both Juno and Kite.

4     Q. And both companies -- Juno used the patent in the JCAR15

5     product that it tried to bring to market, correct?

6     A. Yes.  That's right.

7     Q. And there were patient deaths that the jury has heard

8     about, and the clinical trials were halted by the FDA,

9     correct?

10    A. There has been testimony along those lines.

11    Q. Kite figured out how to make a product that was approved

12    by the FDA as safe and effective, correct?

13    A. Well, Kite did launch a product.  I can't speak to

14    exactly the development process, given the relationship with

15    NCI.

16    Q. The question was it figured out how to make a product

17    that was approved by the FDA as safe and effective; is that

18    right?

19    A. It has made a product that is approved by FDA.

20    Q. So Kite's stock price would reflect the success that they

21    achieved that Juno never achieved, correct?

22    A. Close.  It reflects the successes of Kite, it does not --

23    and YESCARTA, but not with the -- what you were saying with

24    relative to Juno.

25    Q. Now, let me just ask you a few questions about the last

1      item you talked about, which is the profit.  And first, it's

2      correct that the numbers you've given the jury, the upfront

3      payment on the royalty rate are only through the time of

4      trial, correct?

5       A. The upfront payment is a single payment.  It doesn't get

6      made multiple times.  So that applies throughout the term.

7       Q. That's not what you said in your report, is it, sir?

8       A. Um, yes, I said it's a single, one-time upfront payment.

9      The definition of an upfront payment is that it's paid up

10     front and paid once.  It's not a multiple or recurring

11     payment.

12      Q. But you understand that Juno has reserved the right to

13     come back and ask Kite for --

14              MR. HEINRICH:  Objection.

15              THE COURT:  Let him -- let him finish his question.

16     And the question of counsel --

17              MR. WEINBERGER:  I'll withdraw it, Your Honor.  I'll

18     ask another question.

19              THE COURT:  All right.  Thank you.

20     BY MR. WEINBERGER:

21      Q. Would you look to paragraph 54 of your report, which

22     should be in your binders there.

23      A. Sure.  Give me just half a moment.

24      Q. Sure.

25      A. Yes, I'm there.

SULLIVAN - CROSS

1    Q. All right.  Now you're going to have to wait for me.

2    Sorry.

3              THE COURT:  What number is it?

4              MR. WEINBERGER:  Paragraph 54.

5              THE WITNESS:  Page 31.

6    BY MR. WEINBERGER:

7    Q. And in this paragraph 53, you state, "The reasonable

8    royalty discussed herein," which includes both the upfront

9    payment and the running royalty, correct?

10   A. Yes.  So this is referring to --

11   Q. Just -- that statement, "reasonable royalty," refers to

12   just the -- to both the upfront payment and the running

13   royalty, correct?

14   A. Ultimately, reasonable royalties do include both

15   components.

16   Q. And in your report, you stated, "The reasonable royalty

17   discussed herein provides a reasonable estimate of damages to

18   Juno caused by Kite's infringement for the period from 2017

19   to Q4 to 2019 Q1," and you updated that, sir, to this last

20   quarter, "Royalties discussed herein do not represent

21   compensation for any damages or harm beyond 2019 due to the

22   infringement by Kite."  Is that correct?

23   A. Yeah.  That's right.  So the one piece here that you

24   omitted is that's for the period for which Kite has provided

25   sales data.

SULLIVAN - CROSS

1       Q. Well, we can't provide sales data for 2020, it hasn't

2       happened yet.

3       A. Exactly.

4       Q. Okay.  But you also say in paragraph 54, "Royalties

5       herein only capture damages through 2019 Q1, and as such,

6       represent a period of time in which Juno does not have a

7       commercialized product in the market," correct?

8       A. That's true.

9       Q. And then you say at the bottom of that paragraph,

10      "Damages for the period after JCAR17's launch may include

11      lost profits on JCAR17 sales due to Kite's infringement, in

12      addition to a reasonable royalty," correct?

13      A. Yes.  That's right.  And as you will recall from earlier,

14      the statute provides for damages no less than a reasonable

15      royalty.  And the reasonable royalty is far less than what

16      lost profits would be.  So there's a potential, as a legal

17      matter, that subsequently perhaps there could be a situation

18      where lost profits could be in addition to reasonable

19      royalties.  In other words, there could be a difference

20      between the two, and the delta may be available later on if

21      that's ever determined in a separate court action.

22      Q. So the point I'm making is although you've talked a lot

23      in your testimony about the products that Juno wants to bring

24      to market, JCAR17, and the nature of competition that would

25      happen at that time, that is not -- the lost profits on such

SULLIVAN - CROSS

1   products are not included in the numbers you put before the

2   jury, correct?

3    A. There is a delta between lost profits and reasonable

4   royalties.  The royalties capture competitive effects, but

5   isolated to the value contribution of the technology separate

6   and apart from other items, lost profits is more expansive.

7   It's not apportioning to the contribution of the technology,

8   it's looking at the whole kit and caboodle, it's looking at

9   the entire profits across the entire product.

10          MR. WEINBERGER:  Your Honor, I move to strike

11   everything in the answer after yes.

12          THE COURT:  I don't think he said yes.

13          MR. WEINBERGER:  Well, then I'll ask it again.

14   BY MR. WEINBERGER:

15    Q. The royalty damages that you've put before the jury do

16   not include any damages that Juno might seek for lost profits

17   after it comes to the market with a competitive product,

18   correct?

19    A. For the reasons I just described, there could be a delta

20   between --

21    Q. Sir, please, is it correct or not?

22    A. For the reasons I described to you.

23    Q. So the answer is yes?

24    A. For the reasons I described, yes.

25    Q. So that means if you're Kite and Gilead sitting at the

SULLIVAN - CROSS

1    hypothetical negotiation, trying to determine what you might

2    be willing to pay for this license, you have no idea what

3    your exposure might be after 2019 if Juno comes back and says

4    now we are going to sue you for lost profits, correct?

5    A. No.  That is fundamentally wrong.  And the reason is that

6    at the hypothetical negotiation, if there's a license, that

7    means there is permission.  That would mean that Kite would

8    be granted permission to use the patent, and thus there would

9    not be a future legal proceeding.

10   Q. Oh, I understand that they have permission to use the

11   patent, but Juno can come back and claim that they need to

12   pay a lot more money for the license, correct?

13   A. No.  Again, you are fundamentally wrong, because you are

14   confusing an outcome of a hypothetical negotiation versus a

15   court action that might result in damages in the face of

16   Kite's actual infringement.

17   Q. So just to clarify, this upfront payment and the royalty

18   rate you've testified to, is that going to be what Kite will

19   have to pay until the end of the patent term, which is 2024?

20   A. I have not made a determination of post-judgment

21   royalties, and there is a distinction, as I understand it, in

22   the law.  I'm an economist.  But my understanding is the law

23   is that once there is a finding of infringement, and if that

24   infringement is willful, there can be other forms of

25   royalties that might be available.  And I have not been asked

SULLIVAN - CROSS

1    to do that.  I have been looking at what would be the royalty

2    rate resulting from the hypothetical negotiation.  So again,

3    it's apples and oranges between a court action versus a

4    hypothetical negotiation that's not a court action.

5    Q. All right.  So the bottom line is that Kite would not

6    know in 2017 at the hypothetical negotiation how much more it

7    might have to pay in lost profits after Juno comes to market

8    with a product, right?

9    A. That is incorrect.  At the time of the hypothetical

10   negotiation, there would be certainty and resolution in the

11   hypothetical.

12   Q. But Juno could still claim lost profits damages when

13   their product comes to market, right?

14   A. Not in the hypothetical world, but in the actual world,

15   in the face of the actions and activities undertaken by Kite.

16   Q. All right.  So let me move on to another subject.

17          Let's talk about a basic principle, patent damages.

18   You believe that a reasonable royalty should separate out the

19   value contribution of the patented technology from other

20   contributions, correct?

21   A. Yes.  I agree.

22   Q. And you've written articles that say that, correct?

23   A. I'm sure that I have.

24   Q. And you've said in those articles that the apportionment

25   between the patentees -- of the patentee's damages between

                           SULLIVAN - CROSS

1     the patented feature and the unpatented features must be

2     reliable and tangible, not conjectural or speculative,

3     correct?

4      A. I don't recall those exact words, yet I do agree with

5     them.

6      Q. Okay.  Now, you showed the jury a slide from

7     Ms. Tomasello who talked about the importance of the CAR

8     construct?

9      A. Yes, that's right.

10     Q. I think she said something like there would be no product

11    without the construct, correct?

12     A. That's right.

13     Q. And you relied on that in part for your opinion about the

14    value of the patent, right?

15     A. It's one element that goes towards why the patented

16    technology is fundamental.

17     Q. Now, she also said that there were other elements that

18    were important for this product, correct?

19     A. Yes.  There are other factors, things like manufacturing

20    and lymphodepletion and administration.

21     Q. And if you don't have clinical protocol and results for a

22    product like this, you don't have a product, do you?

23     A. Um, not a commercialized product.

24     Q. And if you don't have good manufacturing processes that

25    can safely and effectively manufacture the product, you don't

SULLIVAN - CROSS

1    have a product, correct?

2     A. You're not going to have a successful product.

3     Q. Right.  And if you don't have FDA approval, you're

4    certainly not going to have a product, correct?

5     A. Not a commercialized product.

6     Q. And the Juno product didn't have any of those things, did

7    it?  I'm talking about JCAR15 right now, the product that

8    utilizes the '190 patent construct.  Is that right?

9     A. Um, I think I'm going to have to disagree with you on

10    that.

11     Q. Well, you're not disputing that the FDA that Juno's stock

12    development of JCAR15 in 2017, right?  We kind of talked

13    about that already.

14     A. They did cease continuing trials of JCAR15.

15     Q. And is it true that Juno determined that it would have to

16    make protocol modifications and process improvements if it

17    wanted to pursue JCAR15 further, right?

18     A. Um, I believe those were items that Juno was considering

19    in its next course of action.

20     Q. Well, in your report, you state, "Although Juno believed

21    that it could have proceeded with JCAR15 in clinical testing

22    with certain protocol modifications and process improvements,

23    Juno would have first needed to conduct a phase I clinical

24    trial to establish preliminary safety and to select a

25    recommended phase II dose with those improvements;" is that

SULLIVAN - CROSS

1    right?

2     A. That sounds right.

3     Q. And protocol modifications means changes to the clinical

4    protocol, correct?

5     A. Yes.

6     Q. And process improvements means improvements to the

7    manufacturing process, right?

8     A. It's a broader term.  There's a lot of aspects to the

9    overall process.  It's not just manufacturing.  So there's

10   different elements that could have been altered.

11    Q. And you are not -- it's not your opinion that Kite did

12   not make contributions to the YESCARTA product, beyond the

13   patent, is it?

14    A. It is not my opinion that they did not make

15   contributions.

16    Q. And you agree that the construct under the patent is not

17   sufficient to get an approved product, correct?

18    A. Not in and of itself.  It's a fundamental basis, but it's

19   not sufficient.

20    Q. And we know it's not sufficient because Juno using it was

21   unable to complete the work necessary to get an approved

22   product, right?

23    A. Um, not quite right.  They did not continue to proceed

24   down that path, but as we just noted a moment ago, that

25   doesn't mean they were unable; rather, they chose.

SULLIVAN - CROSS

1    Q. And among the factors that go into providing a

2    commercialized product are the ones we talked about;

3    manufacturing process, clinical protocols.  So far is that

4    correct?

5    A. There is a variety of things that go in; manufacturing,

6    administration, lymphodepletion regimens.  There is even a

7    logistical platform called Kite Connect that helps with

8    scheduling of patients.  I mean, all of these things, you

9    know, go towards the sales of the product, but they are not

10   the demand drivers.

11   Q. When you say they are not the demand driver, you don't

12   think that a doctor knowing that a product has been safely

13   manufactured, that the genetic engineering has been done

14   correctly, that the FDA has approved the product, you don't

15   think that drives demand for doctors to prescribe it for

16   their patients?

17   A. While I think some of those items are factors, I don't

18   think they are the drivers of demand.  Now, you did throw in

19   there the FDA approval, and certainly FDA approval is

20   important, but that is also based upon the efficacy of the

21   product, which as I understand it is based upon the Sadelain

22   CAR construct.

23   Q. Well, the FDA approval encompasses all the things that I

24   have been talking about, doesn't it; the manufacturing the

25   lymphodepletion, the clinical protocols, all of it, correct?

SULLIVAN - CROSS

1    A. All of that would be submitted to FDA.

2    Q. And it's not your opinion that doctors care which

3    construct is used in the drug, do they?

4    A. It is kind of funny, because it's not the name of the

5    construct itself, it's whether the construct works.  And

6    here, the basis for why Kite's YESCARTA works is because of

7    the Sadelain CAR construct.

8    Q. Even though Juno couldn't make it work, correct?

9    A. Again, I'm going to have to disagree with you on that for

10   the reasons I described.

11   Q. That's what this is all about, disagreements.

12        So I want to turn now to your calculation of the

13   first adjustment you made, the CAR-T developer adjustment.

14   Can we put back the first demonstrative.

15        And, again, just to remind the -- is that up?  All

16   right.

17        And just to remind the jury, you multiplied the

18   royalty rate in here by almost double to adjust the MSK

19   license to make it look more like a license between two CAR-T

20   developers, right?

21   A. Um, I applied a 90 percent increase, which is a factor of

22   1.9, close to a factor of 2, to get to a point of the effect

23   of a CAR-T developer of Novartis in 2015.

24   Q. And you applied the CAR-T developer adjustment because

25   Memorial Sloan Kettering is not a CAR-T developer, right?

SULLIVAN - CROSS

1    A. That is part of the reason.

2    Q. But Novartis is a CAR-T developer, correct?

3    A. Yes, they were.

4    Q. And the Novartis license that was entered into, I think

5    in 2015, is closer in time to the hypothetical license than

6    the MSKCC agreement, right?

7    A. Yes, exactly.

8    Q. So you could have just looked at the Novartis license,

9    which already has a competitor as the licensee, and adjusted

10   that, right?

11   A. Well, one could do that, and that would be inappropriate.

12   Q. And one of the reasons you say it's inappropriate is

13   because it was a settlement; is that correct?

14   A. There is multiple reasons.  It's a different technology.

15   You can see that from the underlying rates with the St. Jude

16   Research Hospital of 2.5 percent versus 7.25.  It's also a

17   settlement of litigation.  And there are other reasons.

18   Q. All right.  Let's talk about the difference in

19   technology.  What was licensed by St. Jude to Juno and then

20   from Juno to Novartis was what's called a 4-1BB construct,

21   correct?

22   A. It's a patent that relates to a 4-1BB construct.

23   Q. And that is the construct that Novartis used in

24   developing its product, correct?

25   A. It is, as I understand it, the construct for KYMRIAH,

SULLIVAN - CROSS

1    which is the Novartis product.

2        Q. And that is also the construct that Juno is currently

3    using to try and get JCAR17 approved, correct?

4        A. Yes, that is right.  Let's be careful not to confuse in

5    this instance a patent with a construct, because the

6    underlying patent is different than the '190 Sadelain patent.

7        Q. But you understand that without a license Novartis could

8    not have used the 4-1BB construct, right?

9        A. I would think that's right.

10       Q. So --

11       A. I --

12       Q. That's fine.

13       A. No, I just need to qualify as I think it through.  I

14   would have to think about that.

15       Q. You don't know?

16       A. Not right this moment.

17       Q. But you really can't testify here as comparing the 4-1BB

18   to the '190 patent which one is more valuable, can you?

19       A. So there is two distinctions there.  Again, you are

20   confusing a construct with a patent.  The '190 patent is what

21   provides the CAR construct.  4-1BB is a different construct.

22   It's not a patent.

23       Q. Now, let me ask you about this settlement issue that you

24   raised.  You're -- you've written articles about cases from

25   the federal circuit numerous times, right?

SULLIVAN - CROSS

1    A. Multiple times anyway.

2    Q. And the federal circuit is the court of appeals that

3    specializes in patent cases, correct?

4    A. That's right.

5    Q. And in your report, you quote from a case called *ResQNet*

6    *vs. Lansa*.  It's footnote 481 of your report.

7    A. I'm familiar with the case.

8    Q. And it's correct in that case that the Court found the

9    most reliable license in the record arose out of a litigation

10   settlement, correct?

11   A. In that case, yes, that's right.

12   Q. They said there is no rule that you can't use a

13   litigation settlement agreement and adjust it to come up with

14   a comparable royalty, is there?

15   A. I'm not aware of a blanket rule in that regard.

16   Q. Okay.  Let's move to the second adjustment you made.  And

17   this second adjustment basically again doubled the amount of

18   the royalty from 13.78 to 27.06, correct?

19   A. It's a 192 percent increase, so a factor of 1.92.

20   Q. So starting from the beginning, we are now about four

21   times higher than the MSKCC license, right?

22   A. The factor -- overall factor is 3.82, so just under 4.

23   Q. Right.  And that adjustment is to account for competition

24   between Kite and Juno which you claim is more intense, more

25   important than the competition between Novartis and Juno,

SULLIVAN - CROSS

1    right?

2     A. It's the difference between the competitive effect of

3    Juno -- of Novartis in 2015, early 2015, relative to the

4    competitive effect of Kite in late 2017.

5     Q. But talking about competitive effects, Juno and Kite are

6    not actually competitors in the market for sale of CAR-T

7    products, correct?

8     A. They are competitors on multiple fronts.

9     Q. My question was they are not currently competitors in the

10   market currently for the sale of these products to doctors,

11   correct?

12    A. Maybe I misheard you.  Are you referring to Kite?

13    Q. Kite and Juno.

14    A. Kite and Juno.

15    Q. Correct.

16    A. Okay.

17    Q. Juno doesn't have a product.

18    A. They have a product.  It's not for sale in the

19   marketplace.  It's being used in clinical trials.  So yes,

20   there is a product out there.

21    Q. Fair enough.

22    A. And yes, they do compete.  They compete vigorously.  They

23   are competing for patients.  They are competing for clinical

24   trial sites.  They are competing for investment.  They are

25   competing on very -- on a myriad of dimensions.

SULLIVAN - CROSS

1  Q. The one thing they are not competing for, sir, is sales,

2  correct?

3  A. Juno is not selling, so they are not competing in terms

4  of dollars.  They are competing for the clinical trials.  So,

5  in other words, they are directly competing for providing

6  that therapy to a patient.

7  Q. You agree that they are not competing for sales, right?

8  A. Not for dollar sales.

9  Q. And there is no guarantee, sir, that JCAR17 will ever

10  come to the market, correct?

11  A. Not a guarantee.  I mean, the marketplace widely views it

12  as very, very likely.

13  Q. But there is no guarantee, correct?

14  A. Correct.

15  Q. So Novartis has been out there for the last year and a

16  half and is out there right now paying Juno less than

17  5 percent royalty for selling KYMRIAH to treat the DLBCL

18  indication, correct?

19  A. There are some sales of KYMRIAH for DLBCL as I recall.

20  Q. But in your opinion, Kite should have been paying Juno

21  during the same period approximately 27.6 percent for selling

22  YESCARTA to treat the same indication, correct?

23  A. Yes.  It's a different patent at a different point in

24  time.

25  Q. All right.  Let's talk about the nature of competition

SULLIVAN - CROSS

1    from Novartis in 2015.

2              One of the reasons you doubled -- almost doubled the

3    royalty rate from the first adjustment is because you believe

4    that Novartis was not a formidable competitor in 2015, right?

5    A. It's the relative competitive effects.  So I -- you know,

6    the analysis compares the relative effect of Novartis in 2015

7    to the effect of Kite in 2017.

8    Q. Okay.  So, in fact, in your slide we can put up -- it's

9    29, I think.

10             You said -- among the things you said to distinguish

11   Novartis from -- in 2015 from Kite in 2017 was questionable

12   commitment to CAR-T, correct?

13   A. That's right.

14   Q. All right.  Now, at this point in time Juno was a company

15   that was -- had a rough value of about $800 million, right?

16   A. I'll take your word for it on that.

17   Q. It's in your report.

18   A. Even better.

19   Q. Okay.  And you are aware that Novartis is one of the

20   biggest pharmaceutical companies in the world, right?

21   A. I am.

22   Q. It's more than 200 times bigger than Juno, correct?

23   A. At that time?

24   Q. Yeah.

25   A. Um, that's probably about right.  I think Novartis was

SULLIVAN - CROSS

1      over 200 billion.

2       Q. Right.  And your opinion is that Juno wasn't too worried

3      about competition from Novartis, right?

4       A. Um, no.  There are competitive effects.  In fact, if you

5      recall adjustment 2, it's comparing an annual effect of 445

6      million to 1.3 billion.  So I'm not saying Novartis had a

7      zero effect.  But I'm quantifying the distinction or the

8      difference between Novartis in 2015 and Kite in 2017.

9       Q. What you are saying -- you said that Novartis had a

10     questionable commitment to CAR-T, right?

11      A. Yes, that's right.

12      Q. And you testified that Juno was not as worried about

13     Novartis as they were about Kite in 2015, right?

14      A. Juno is not as worried about Novartis in 2015 as they

15     were about Kite in 2017.

16      Q. All right.  So could you turn in your binder to

17     Exhibit 253, please.

18              MR. HEINRICH:  I need a binder.

19              MR. WEINBERGER:  I'm sorry.

20              THE COURT:  This is DX253?

21              MR. WEINBERGER:  Yes, Your Honor.

22              THE COURT:  Thank you.

23              MR. WEINBERGER:  If this isn't in evidence, I'm not

24     sure, frankly, I move to admit it.

25              THE WITNESS:  Would you all mind providing me with a

SULLIVAN - CROSS

1    copy?

2                 MR. WEINBERGER:  Do you have --

3                 THE WITNESS:  I do not have a binder.

4                 MR. WEINBERGER:  It should be in one of your binders

5    there, an exhibit binder, 243.

6                 THE WITNESS:  No.

7                 MR. HEINRICH:  I don't believe he has defense

8    exhibits.

9                 MR. WEINBERGER:  My apologies.

10                 THE COURT:  Any objections to 253 being received?

11                 MR. HEINRICH:  No objections.

12                 THE COURT:  253 is received.

13                 (Exhibit DX253 was received.)

14   BY MR. WEINBERGER:

15    Q. And the cover of this document is an e-mail -- we can

16   publish that -- e-mail from Hans Bishop, who was the CEO of

17   Juno and who testified here this morning, in November 2014,

18   right?

19    A. That's what it looks like.

20    Q. And this was a presentation that was made to the CEO of

21   the company, correct?

22    A. I do not know.

23    Q. Now, over on the page that is the second page, which

24   bears the number 0002, it states, "Juno is in a very

25   competitive environment.  Novartis is formidable, two-year

SULLIVAN - CROSS

1    head start and is committed to this space."  Correct?

2     A. Yes.  Let me just get my bearings here real quick.  So

3    this was -- okay.  So this was back in 2014.  Yes, I see

4    that.

5     Q. And that accurately reflects Juno's mindset in 2015 right

6    around the time that it granted Novartis a license for the

7    patents that we talked about earlier, right?

8     A. Well, I can't speak to the mindset of Juno from this

9    document.  I don't recall it.  Yet it's not inconsistent with

10   how I have approached my analysis.

11    Q. So you agree that Juno believed that Novartis was a

12   formidable competitor with a two-year head start?

13    A. It's not inconsistent with my view and my analysis.

14   Again, just going back to the point that I'm looking --

15    Q. Could you just answer the question, please.

16    A. Fair enough.

17    Q. Appreciate it.

18    A. Fair enough.

19    Q. We would all appreciate it.

20         So you also said in your slide, talking about

21   Novartis in 2015, that there was no overlap with Juno's lead

22   profit candidates, right?

23    A. That's right.

24    Q. And by that you mean Juno thought that Novartis was

25   focused on pediatric leukemia which was not Juno's focus,

SULLIVAN - CROSS

1    correct?

2     A. No.  It was a simpler point that Novartis wasn't leading

3    with 3L DLBCL.

4     Q. That's what I meant.  If I didn't state it correctly,

5    your point was that Novartis was focused on pediatric

6    leukemia and Juno was focused on DLBCL indication, right?

7     A. No.  You're -- it may be a subtle difference for you, but

8    focusing versus what a lead product candidate can be a little

9    bit different.  I was just taking the simpler point of the

10   lead product candidate.

11    Q. Let me ask you this:  Juno was projecting in this time

12   period that Novartis would eventually enter into the DLBCL

13   space, right?

14    A. Yes.

15    Q. And, in fact, the license wasn't limited to the one

16   indication; they had the freedom to develop any indication

17   they pleased, right?

18    A. I do not recall any restrictions in the license agreement

19   for particular indications.

20    Q. I'm just trying to consolidate, so just give me one

21   second.

22          And in 2015, isn't it correct that Juno did not have

23   a belief that it was going to beat Novartis to market with

24   its JCAR17 product in third-line DLBCL?

25    A. I'm not sure I fully heard that right, yet -- my

SULLIVAN - CROSS

1   understanding is that Juno was not expecting to beat Novartis

2   to market for DLBCL.

3    Q. Right.  And you never even -- you never looked for any

4   evidence that suggested that at any time since the Novartis

5   license Juno thought it was going to beat Novartis to market

6   in third-line DLBCL, right?

7    A. Well, it depends upon the point in time.  So if we are

8   focused on the hypothetical negotiation, that's, you know, a

9   different point in time.

10   Q. Well, I'm talking about 2015.  From 2015 forward, there

11  wasn't any evidence that suggested that Juno thought it was

12  going to beat Novartis to market in third-line DLBCL, right?

13   A. Sorry.  Maybe I misheard you earlier.  I thought you were

14  focused on the hypothetical negotiation.

15   Q. No, starting in 2015.

16   A. Back in 2015, um, there were different views on exactly

17  how that would proceed.

18   Q. And you've seen Juno projections showing that they

19  expected to be approved in an indication well after Novartis,

20  right?

21   A. There are different projections that go different ways.

22  Depends again on the point in time and whether one is just

23  looking at company-announced information versus private

24  estimates.

25   Q. And I was actually going to come to that next, because

SULLIVAN - CROSS

1    when you are dealing with a company like this which has

2    people doing financial projections and modeling, there are a

3    lot of different projections that say a lot of different

4    things, right?

5     A. There are different projections at different points in

6    time.

7     Q. And the basis for your second adjustment, which almost

8    doubles from the first adjustment, it almost quadruples from

9    the first -- from the original MSKCC agreement, the basis was

10   a model that you used from Juno in 2016.  I think you

11   summarized that on an exhibit, correct?

12    A. There is two parallel models from Juno.

13    Q. Right.  So you looked at an earlier one in 2016 and you

14   compared it to a later one in 2017, right?

15    A. It's, um, you know, early 2016 to just after the

16   hypothetical negotiation, and it provides an apples-to-apples

17   comparison, because they are the two similar financial models

18   that were produced by Juno.

19    Q. That spreadsheet is what you summarized on the left side

20   of Exhibit 1247, correct?

21    A. I don't have that committed to memory, but if we could

22   pull it up, there is two general columns.  Well, there is a

23   first column that just lists the different labels, like what

24   each row represents, but there is two primary columns of

25   data, and those are reflects the early model versus the late

SULLIVAN - CROSS

1     model --

2      Q. All right.

3      A. -- for Juno.  And it reflects the differences in the

4     marketplace at that point in time.

5      Q. Yeah.  And you are relying on a note -- on a projection

6     in 2016 that indicated that Novartis had 10 percent of the

7     market, and you are comparing that to other projections a

8     year later, right?

9      A. There are different market shares for different

10    indications.  So if we look at the document, you will see it

11    breaks it down by indication, and it's, you know, more of a

12    roughly two-year difference.

13     Q. And you have -- you never talked to anyone at Juno about

14    the -- up until the time you were deposed in this case about

15    what the purpose of this model was, did you?

16     A. I don't have that degree of specificity in terms of the

17    timeline.

18     Q. You recall that at your deposition you were unable to

19    state what the purpose was of that model, right?

20     A. That doesn't immediately sound familiar.

21     Q. And you didn't speak to anyone at Juno about this model

22    before you relied upon it for your analysis, correct?

23     A. I do not recall speaking to folks at Juno about it.  It

24    was a subject of deposition testimony.  So I could see what

25    they said about it under oath.  But I do not recall offhand

SULLIVAN - CROSS

1    anyway discussions.

2     Q. Who testified about this model under oath, sir?

3     A. Um, I would have to take a look back at my report.  I can

4    do that.

5     Q. Let's go back to the agreement you started with, which

6    was the MSKCC/Juno agreement.  Under that agreement, am I

7    correct that Juno got not only patent rights but know-how?

8     A. Yes.

9     Q. And it got patent rights to more than the '190 patent,

10   correct?

11    A. That's right.

12    Q. And under the hypothetical negotiation, all Kite would

13   get is a bare license to the '190 patent, right?

14    A. That's right.

15    Q. And the know-how that Juno got but that Kite would not

16   get, you don't believe that was worthless, do you?

17    A. No, not worthless.  It does not affect the royalty rate

18   under that agreement, which is 7.25 percent for just the

19   patent involved.

20    Q. Could you just answer my question, please, so we can move

21   on?

22         MR. WEINBERGER:  I'm going to move to strike

23   everything after the first sentence, Your Honor.

24         THE COURT:  So everything after "no, not worthless"

25   is struck.  And the jury will be ordered to disregard it.

SULLIVAN - CROSS

1    BY MR. WEINBERGER:

2    Q. All right.  So were you in court when Dr. Sadelain

3    testified the other day?

4    A. Yes, I was.

5    Q. Did you hear him say that this know-how was very valuable

6    to Juno?

7    A. Yes, to that effect, or at least that was part of the

8    takeaway.

9    Q. And you don't disagree with that, do you?

10   A. No, I don't.

11   Q. In fact, under the license agreement that you just

12   referred to, there is a provision that states that if -- in

13   substance, that if there is no valid patent on what was

14   transferred for MSK -- from MSKCC to Juno, a license fee of

15   3.625 percent would still be due, correct?

16   A. That's right.

17   Q. And Juno wouldn't have agreed to pay that for the

18   know-how if it thought it was not valuable, right?

19   A. I would think that know-how would be considered to be

20   valuable.

21   Q. But you didn't make any adjustment for the licensed

22   technology in the MSKCC Juno agreement compared to the

23   licensed technology at the hypothetical negotiation, right?

24   A. It would be inappropriate to make an adjustment for

25   know-how based upon the --

SULLIVAN - CROSS

1    Q. Sir, did you make an adjustment or not?

2    A. No, I did not.

3    Q. Thank you.  Now, let's talk a little about the first

4    mover advantage.

5            Isn't it true that at the hypothetical negotiation

6    in October 2017, Juno expected to be third in the market

7    behind Novartis and behind Kite?

8    A. In effect, yes.

9    Q. You say that in your report in paragraph 113, right?

10   A. I would imagine that I do.  I don't recall the paragraph

11   number.

12   Q. Okay.  So at the hypothetical negotiation, Juno was not

13   giving up the right to be first to market, right?

14   A. They were granting a first mover advantage to Kite and

15   that --

16   Q. Sir, please, can you answer my question.  Juno was not

17   giving up the right to be first to market; it had already

18   given that away, correct?

19   A. In effect.

20   Q. And when I say given it away, I don't mean for free.

21   They gave it to Novartis in exchange for the license

22   agreement that we've talked about, right?

23   A. Yes, but KYMRIAH did not have --

24   Q. Sir, please.  Your counsel will have an opportunity.

25   Please just answer the question.

SULLIVAN - CROSS

1          And not only did Juno know that they would be third

2    to market, they knew they would be third to market in the

3    DLBCL indication that JCAR17 was supposed to target, right?

4     A. There was an expectation that Novartis would get 3L DBCL

5    (sic) approval shortly after the hypothetical negotiation in

6    2017.

7     Q. Now, the second model that you used, the one you compared

8    the 2016 model to to make this adjustment, that was a

9    document that was referred to as Maple Company model.  Do you

10    remember that?

11    A. I do.

12    Q. And a particular part of the tab of the spreadsheet

13    called JCAR17 assumptions was referenced in your attachment

14    D4 to your report, correct?

15    A. Possibly.  Let me just take a quick look.

16    Q. Take a look.

17    A. Which tab?

18    Q. This is a little difficult, because it's a -- it's a

19    spreadsheet document, but you relied on, it's referenced in

20    D4, row 359, and you got data from row 374 to 376.

21    A. I'm sorry.  I'm still not following your question.  So

22    I'm at D4, and I reference the Maple Company model, and I'm

23    looking at a particular tab on that model relating to JCAR17.

24    Q. Okay.  Well, I'm going to put up a screenshot of the tab

25    that you referenced, and I want to ask you a question about

                              SULLIVAN - CROSS

1         it.  Can we do that?

2                   MR. HEINRICH:  This is not in evidence.  We would

3         ask that it be taken down.

4                   MR. WEINBERGER:  All right.

5         BY MR. WEINBERGER:

6          Q. This is a spreadsheet that you relied on, which was a

7         Juno document, to make your adjustments, correct?  This was a

8         spreadsheet you relied on?

9                   MR. HEINRICH:  Are you going to move it into

10        evidence or --

11                  MR. WEINBERGER:  No, I'm trying to just lay a

12        foundation, and then I'll move it into evidence.

13        BY MR. WEINBERGER:

14         Q. You relied -- as we established in your report, D4, this

15        was the second set of projections that you relied on in

16        comparing -- when you compared the competitive impact from

17        2016 to 2017, right?

18         A. There is a particular financial model I rely upon, and

19        it's designated by what is called a Bates number on

20        attachment D4.  I don't know if that is what you are putting

21        up on the screen or not.

22         Q. All right.  So let me --

23                  THE COURT:  I'm sorry.  Can I see Mr. Chu and

24        Mr. Dane at sidebar very quickly, please.

25                  (At the bench.)

                          SULLIVAN - CROSS

1            THE COURT:  I'm just concerned about the time.  I

2     know we have to get Mr. Schuetz on.  And I don't want to

3     interrupt Mr. Weinberger.  But maybe if we're going to

4     continue for a longer period of time, you may want to call

5     Mr. Schuetz out of order, if that's agreeable.

6            MR. CHU:  That is agreeable to us.

7            MR. DANE:  To interrupt the cross and resume it

8     later?

9            MR. CHU:  Yes.

10           MR. DANE:  When is Your Honor hoping to adjourn?

11           THE COURT:  We have two jurors who are in -- one in

12    Lancaster, one juror in Lancaster, so that's a long drive to

13    go home.  So I don't want to go beyond 4:15, 4:30.

14           MR. DANE:  Okay.  Let me -- can I talk to

15    Mr. Weinberger and Mr. Lawton?

16           THE COURT:  Sure.

17           MR. CHU:  Judge, while we are here, my apologies,

18    Your Honor, to you and everyone in the courtroom.  I was

19    doing some work, and I didn't realize you anticipated --

20           THE COURT:  Don't worry about it.

21           MR. CHU:  Thank you.

22           (In open court:)

23           MR. DANE:  Your Honor, what Your Honor proposed we

24    are amenable to and -- to bring in Mr. Schuetz.

25           THE COURT:  Is this a good time to --

SULLIVAN - CROSS

1              MR. WEINBERGER:  Yes.  Absolutely, Your Honor.

2              THE COURT:  There is a witness that needs to be

3    called out of order, so we are going to stop with the

4    examination of Dr. Sullivan and move to the next witness.

5              Let's take a short recess before we do that,

6    10 minutes.  During your absence do not discuss the case

7    amongst yourselves or any other person.  I think we need some

8    air in here, I'm getting the impression.

9              (Thereupon, the jury retired from the courtroom.)

10             THE COURT:  Let's bring the jury in.

11             THE CLERK:  All rise for the jury, please.

12             (Thereupon, the jury returned to the courtroom.)

13             THE COURT:  Could we have all the jurors be

14   assembled with counsel.  And the defendants are going to call

15   a witness.  With the agreement of counsel for plaintiffs, a

16   witness is being called out of order.

17             MR. LAWTON:  Your Honor, Kite calls Dr. Thomas

18   Schuetz.

19             THE CLERK:  Please right here, doctor, come forward.

20   Would you please raise your right hand to be sworn.

21   THEREUPON:

22                          THOMAS SCHUETZ,

23   called in these proceedings and being first duly sworn,

24   testifies as follows:

25

SCHUETZ - DIRECT

1           THE CLERK:  Thank you, sir.  Would you please walk

2      around and have a seat here.

3           MR. LAWTON:  I have some binders that I would like

4      to pass out, please.

5           THE COURT:  Yes, please.

6           THE CLERK:  One moment, sir.  I'll come and get them

7      for you.

8           Good afternoon, sir.  Sir, for the record, would you

9      please state your name and spell your last name.

10          THE WITNESS:  My name is Thomas Schuetz.  My last

11     name is S-C-H-U-E-T-Z.

12          THE CLERK:  Thank you.

13          THE COURT:  Your witness, Mr. Lawton.

14                        DIRECT EXAMINATION

15     BY MR. LAWTON:

16      Q. Dr. Schuetz, can you please tell us what you do for a

17     living.

18      A. I'm the CEO of a small biotechnology company in

19     Cambridge, Massachusetts, called Compass Therapeutics.

20      Q. Can you look in your binder, please, at tab PX1.  The

21     document is U.S. Patent Number 7,446,190.

22      A. Okay.

23      Q. Can you tell us if you are familiar with that patent?

24      A. Yes.

25      Q. When did you first become familiar with that patent?

SCHUETZ - DIRECT

1    A. In the first half of 2013.

2    Q. Can you describe for us your educational background,

3    please.

4    A. I have a medical degree from Harvard Medical School, and

5    I also have a Ph.D. from Harvard University in genetics.

6    Q. Did you receive further medical training after receiving

7    your degrees?

8    A. Yes.  I did an internal medicine residency at

9    Massachusetts General Hospital in Boston where I also spent a

10   year as chief resident.  And I also did a medical oncology

11   fellowship at the Dana Farber Cancer Institute in Boston.

12   And I remain a board certified medical oncologist today.

13   Q. Do you have personal experience using a method called PCR

14   to make copies of DNA sequences?

15   A. Yes, I do.

16   Q. Can you briefly describe that experience, please.

17   A. I used PCR fairly frequently when I did my Ph.D.

18   Q. Dr. Schuetz, what part of the country do you live in?

19   A. I live just outside of Boston, Massachusetts.

20   Q. Are you appearing here today under any subpoena or order

21   from the Court?

22   A. No.

23   Q. So you are here voluntarily?

24   A. Yes.

25   Q. What made you decide to come here and testify today?

SCHUETZ - DIRECT

1    A. Um, you know, in 2013, I was doing a fair amount of work

2    evaluating this patent and other technologies associated with

3    it, and I thought we did some important work at that time,

4    and I thought it was important to describe that work.

5    Q. Are you an employee of Kite or Gilead?

6    A. No.

7    Q. Is Kite or Gilead paying for the time that you spend here

8    testifying today?

9    A. No.

10   Q. Is Kite paying for some of the time that you've spent

11   working on this case?

12   A. Yes.

13   Q. Can you describe the agreement that you have with Kite

14   related to this case?

15   A. For the time that I'm out of work, they are, you know,

16   paying me for the preparation time that I did in terms of,

17   you know, preparing for the deposition and this testimony.

18   Q. At what rate of payment?

19   A. They are paying me $500 an hour.

20   Q. Is that the standard rate you charge when you do

21   consulting work?

22   A. Yes.

23   Q. About how many hours have you spent preparing for your

24   testimony?

25   A. I don't know the exact number.  It's probably

SCHUETZ - DIRECT

1    approximately eight or ten hours.

2    Q. How were you first contacted about this case?

3    A. Um, attorneys for both Juno and Kite contacted me in the

4    beginning part of this year.

5    Q. Does your company, Compass, engage in discussions with

6    other biopharmaceutical companies from time to time about the

7    work you are doing at Compass?

8    A. Yes.  Periodically we have, you know, introductory calls

9    and meetings with pharmaceutical companies to talk about the

10   work that we do.

11   Q. Have you had conversations with Gilead?

12   A. Yes.

13   Q. Have you had conversations with Juno, Celgene, or

14   Bristol-Myers Squibb?

15   A. Yes, we've had introductory conversations with all three

16   of those companies, Juno, Celgene, and Bristol-Myers Squibb.

17   Q. Is Compass currently in discussions with Gilead?

18   A. No.

19   Q. Has Compass ever, in fact, had a collaboration or

20   partnership with Gilead?

21   A. No.

22   Q. Can you describe how you became familiar with the '190

23   patent in 2013?

24   A. So I was working with a venture capital firm called Atlas

25   Venture, and we were trying to put together a new

SCHUETZ - DIRECT

1    biotechnology company that would develop the CAR-T cell

2    technology from Memorial Sloan Kettering.

3      Q. Can you describe the questions you were trying to answer

4    during the work that you just mentioned that were specific to

5    the '190 patent?

6      A. So we were evaluating a large number of components of the

7    technology, but we were really mostly focused on whether or

8    not this patent covered the product that was being used in

9    the clinical trials at Memorial Sloan Kettering.

10     Q. Why was that question important to you?

11     A. Well, we believed that claim 1 of this patent was a very

12   important claim, and it describes a DNA sequence.  And we

13   wanted to just make sure as part of our diligence efforts

14   that the clinical trial construct was covered by this patent.

15     Q. How did you obtain the DNA sequence for the CAR-T cell

16   construct that Sloan Kettering was using in the clinic?

17     A. I sent an e-mail to Dr. Michel Sadelain at Memorial Sloan

18   Kettering asking him to send me the actual DNA sequence of

19   the entire product that was being used in the patients.

20     Q. Why did you need to ask Dr. Sadelain for that DNA

21   sequence?

22     A. Because I wanted to make sure that the DNA sequence in

23   the actual construct that was being given to the patients was

24   being covered by the DNA sequence that was described in this

25   patent.

SCHUETZ - DIRECT

1    Q. Could we turn in your binder to DX766, which I believe is
2    already in evidence.
3              THE COURT:  What number is it again?
4              MR. LAWTON:  DX766.
5              THE COURT:  Yes, please.  It's in evidence.
6    BY MR. LAWTON:
7    Q. That's your name that we see on the first page here; is
8    that right?
9    A. Yes.
10   Q. Now, Dr. Sadelain's e-mail to you is marked confidential.
11   Do you see that?
12   A. Yes.
13   Q. The information that Dr. Sadelain sent to you containing
14   the DNA sequence for the CAR-T construct in the clinic that
15   MSK was working with, did you have another way of finding out
16   that sequence aside from asking Dr. Sadelain for it?
17   A. Not that I know of.
18   Q. And he marked his e-mail as confidential, correct?
19   A. Yes.
20   Q. Attached to the e-mail that Dr. Sadelain sent you is the
21   document that starts on page 2 of DX766; is that right?
22   A. Yes.
23   Q. Let's turn to one of the pages within the document.
24   Let's go to page DX766-0071, to take an example.
25              At the bottom of the page, do you see a sequence of

SCHUETZ - DIRECT

1    letters that starts with AAACGG?

2     A. Yes, I see that.

3     Q. Can you tell us what that sequence of letters is?

4     A. So this is a small stretch of DNA in the construct.

5    There are many thousands of DNA letters in the construct, the

6    AGCTs, so this is a little small piece of a very big piece of

7    DNA.

8     Q. Can we turn back to page 4 of DX766?

9     A. Okay.

10    Q. Could you tell me what this page shows, please.

11    A. So this is a very complex page.  So it's describing many

12    different fragments of DNA, so there are fragments of some

13    natural genes.  There is a combination fragment of an

14    antibody, some regulatory sequences, etcetera.  So it's a

15    summary of the 7,800 pieces of DNA sequence.

16    Q. Could you look toward the bottom of page where it says

17    "CD28 transmembrane region."

18    A. Yes.

19    Q. Do you see the numbers 7141 through 7462?

20    A. Yes.

21    Q. What do those numbers signify?

22    A. So starting at the number 1, all of the letters of the

23    DNA are counted up to 7,812.  This is a region specified of

24    that 7,800 approximately nucleotides of DNA.

25    Q. How many nucleotides are in the range 7141 through 7462?

SCHUETZ - DIRECT

1      A. Um, 322.

2      Q. So am I correct, then, that according to this index -- or

3      let me ask the question a little bit differently.

4            According to this index, how many nucleotides were

5      in the CD28 portion of the DNA sequence for Sloan Kettering's

6      CAR that was being used in the clinic?

7      A. 322 nucleotides.

8      Q. Is that number divisible by three?

9      A. No.

10     Q. Let's turn back to PX1, and I'm going to direct you,

11     please, to page 23.  And in particular, could you please

12     direct your attention to claim 1 and the words, "The amino

13     acid sequence encoded by Sequence ID NO:6."

14     A. Okay.

15     Q. Could you explain to us why DNA was relevant to your

16     understanding of the amino acid sequence encoded by Sequence

17     ID NO:6?

18     A. So inside of a cell, the DNA is converted into a protein.

19     So when the large piece of DNA is put into the patient's

20     cells, the idea was to have the cells make the protein

21     encoded on the DNA, and then that would get expressed on the

22     surface of a cell in the patient's immune system.  And then

23     that protein would recognize the patient's tumor inside the

24     patient.

25     Q. Now, after you got the DNA sequence from Dr. Sadelain

SCHUETZ - DIRECT

1   that we looked at a minute or two ago, what did you do with

2   it?

3   A. I compared the portion of that sequence to SEQ ID NO:6

4   described in claim 1.

5   Q. Was the sequence for the construct that Dr. Sadelain had

6   in the clinic and sent to you different from what you

7   determined was the amino acid sequence encoded by Sequence ID

8   NO:6 in the '190 patent?

9   A. Yes.

10   Q. Could you explain to us how you reached that

11   determination?

12   A. So there are many publically-available computer programs

13   where you can figure out what the amino acid sequence is from

14   a stretch of DNA, and those programs also allow you to

15   compare two different sequences to each other if you wish.

16   Q. Did you use one of those programs?

17   A. I did.  I did.  I used a publicly available program.  I

18   don't remember which exact computer program I used.

19   Q. What was the first amino acid in the amino acid sequence

20   that you determined was encoded by Sequence ID NO:6 in the

21   '190 patent?

22   A. It was a lysine.

23   Q. Did the costimulatory signaling region in Dr. Sadelain's

24   confidential sequence that he sent to you begin with lysine?

25   A. No, it did not.

SCHUETZ - DIRECT

1      Q. Could you tell us whether or not you knew that the

2      costimulatory amino acid sequence in Sloan Kettering's CAR

3      did not start with lysine before you had received

4      Dr. Sadelain's actual sequence that he sent to you?

5      A. No.

6      Q. Meaning no, you could not tell?

7      A. No, I couldn't tell without having the actual DNA

8      sequence from Memorial Sloan Kettering whether or not it

9      was -- it matched SEQ ID:6.

10     Q. When you performed your comparison back in 2013, did you

11     notice that Sequence ID NO:6 in the '190 patent had a stop

12     codon at the end?

13     A. I didn't really focus too much on the stop codon.  I was

14     much more focused on the open reading frame.

15     Q. The stop codon is at the very end of the sequence?

16     A. Yes.  Yes.

17     Q. Did you consider the stop codon at the end to have

18     anything to do with which amino acid was at the beginning of

19     the sequence?

20     A. No.

21     Q. How did you figure out where the open reading frame in

22     Sequence ID NO:6 started?

23     A. It's pretty straightforward with -- when you have one of

24     these programs.  It just automatically helps you figure out

25     where the amino acid sequence would begin.

SCHUETZ - DIRECT

1    Q. At which nucleotide did you determine the open reading

2    frame to start?

3    A. I determined that it began at the second nucleotide of

4    SEQ ID:6, not the first.

5    Q. Now, did you fact that the open reading frame did not

6    start at the first nucleotide affect your ability to

7    determine the amino acid sequence encoded by Sequence ID

8    NO:6?

9    A. No.

10    Q. When you performed your comparison back in 2013, did you

11    notice that the number of nucleotides in Sequence ID NO:6 was

12    not divisible by three?

13    A. I did, yes.

14    Q. And did that fact affect your ability to determine the

15    amino acid sequence encoded by Sequence ID NO:6?

16    A. Oh, no.

17    Q. Did that fact affect which amino acid in CD28 was the

18    first in the sequence?

19    A. Not in SEQ ID:6, no.

20    Q. Let me direct your attention to column 7 of the patent.

21    It's PX1, page 14.

22    A. Okay.

23         MR. LAWTON:  Mr. Bales, page 14, please.

24         THE COURT:  It's up.

25    BY MR. LAWTON:

SCHUETZ - DIRECT

1    Q. Looking at column 7 toward the bottom, do you see a

2    reference at line 53 or beginning at line 53 to primers SEQ

3    ID NO:4 and SEQ ID NO:5?

4    A. I see that, yes.

5    Q. As part of your work back in 2013, did you figure out the

6    sequence that those primers would amplify?

7    A. No, I didn't.

8    Q. Why not?

9    A. Because I thought SEQ ID:4 and 5 were irrelevant because

10   they weren't mentioned as part of claim 1, only SEQ ID:6 is

11   mentioned.

12   Q. Now, did you also review the prosecution history of the

13   '190 patent as part of your work?

14   A. Yes.

15   Q. Why did you review the prosecution history?

16   A. After we discovered that the two sequences were

17   different, we couldn't understand why that would be the case.

18   So we had a call with the attorney who prosecuted the patent

19   who told us that it was a more or less a clerical error

20   effectively she was telling us.  So I went directly to the

21   prosecution history to see whether or not that was accurate.

22   Q. Did the prosecution history clarify things to you?

23   A. Um, not really.

24   Q. What do you remember thinking after reviewing --

25   A. I was -- I remember just being incredibly confused,

SCHUETZ - DIRECT

1    because the sequence was changed, said to be corrected in one

2    place, but then the sequence was then changed back to a

3    different sequence at the very end.  And when the patent

4    issued, it had the SEQ ID:6 which was changed and then

5    changed back.  So I just -- I couldn't -- I just couldn't

6    figure it out.

7     Q. After you reached the conclusion that we have been

8    discussing for the past few minutes, did you communicate with

9    people at Sloan Kettering about it?

10    A. Yes.

11    Q. Can you please pull up in your binder to PX1304?

12          MR. LAWTON:  And I believe there is no objection to

13    PX1304.  I offer it into evidence.

14          MS. JEFFRIES:  No objection.

15          THE COURT:  1304 is received.

16          (Exhibit 1304 received.)

17   BY MR. LAWTON:

18    Q. Was PX1304 one of the messages that you sent to Sloan

19   Kettering?

20    A. Yes.

21    Q. Now, you sent PX1304 to Dr. Raskin in MSK's technology

22   transfer office, correct?

23    A. Yes.

24    Q. Let's turn to the second page of the document.  Look at

25   the paragraph at the top.  And I want -- I want to direct you

SCHUETZ - DIRECT

1     in particular to the second and third sentences.  You wrote,

2     Our final review of the Sadelain patent, U.S. Number

3     7,446,190, has identified a possible problem.  Briefly, the

4     CD28 sequence described in the patent, Sequence ID NO:6 in

5     column 15 of the patent, is not identical to the sequence in

6     the current constructs that are being used in clinical trials

7     at MSKCC."  Do you see that?

8      A. Yes, I see that.

9      Q. Can you please tell us what you meant by that?

10      A. Well, the original reason that we were checking this was

11     to see whether or not the sequence in the actual product that

12     was being given to patients was covered by the issued patent.

13     Because we were going to do a licensing agreement for the

14     patent.  So we were going to pay an enormous amount of money

15     potentially to get rights to the patent.  And if the sequence

16     in the clinical construct was not covered by the patent,

17     that -- I didn't know what we would be paying money for then.

18     So the whole -- it was just so confusing.

19      Q. Continuing in the paragraph, you wrote, "This is a

20     critical issue."  Do you see that?

21      A. Yes.

22      Q. Why did you say that?

23      A. For the same reason, because, you know, the main claim in

24     our view was in claim 1, they -- the claim was around SEQ

25     ID:6 and the amino acid sequence encoded by SEQ ID:6, and it

SCHUETZ - DIRECT

1    was different from the sequence in the construct being used

2    in the patients.

3     Q. Can we turn now to PX1305.

4     A. Okay.

5     Q. This is another message that you wrote to people at Sloan

6    Kettering, correct?

7     A. Yes.

8              MR. LAWTON:  I believe there is no objection.  I

9    offer it into evidence.

10             THE COURT:  Any objection?

11             MS. JEFFRIES:  No objection.

12             THE COURT:  1305 received.

13             (Exhibit PX1305 received.)

14   BY MR. LAWTON:

15    Q. Looking at the top e-mail in the chain, and since this is

16   Gmail, the first one in time appears at the top, I believe.

17   Let me ask you about the third paragraph there.

18             Oh, before I ask that, you sent this e-mail to

19   Dr. Sadelain and someone else at Sloan Kettering, correct?

20    A. Yes.

21    Q. Looking at the third paragraph in the e-mail, it says,

22   "The nucleotide sequence from the patent, which is Sequence

23   ID NO:6, begins C" -- excuse me -- "CAAA, ATT, GAA, GTT,

24   which translates to KIEV."  Do you see that?

25    A. I see that, yes.

856

SCHUETZ - DIRECT

1    Q. What does KIEV mean?

2    A. KIEV are the single letter abbreviations for four amino

3    acids in the protein.  And in the DNA, in the first part of

4    that sentence, each set of three nucleotides encodes an amino

5    acid, so you need three of the pieces of DNA to make one

6    amino acid.  And the word "translate" here is a scientific

7    word, so the conversion of DNA to RNA and then RNA to protein

8    is called translation.

9    Q. What amino acid does K abbreviate?

10   A. K is lysine.

11   Q. What amino acid does I abbreviate?

12   A. I believe it's isoleucine.

13   Q. Going back to your e-mail, if we look at the last

14   paragraph, do you see that you asked Dr. Sadelain to give you

15   a call on your cellphone?

16   A. Yes.

17   Q. Did you, in fact, speak with Dr. Sadelain after sending

18   this e-mail?

19   A. I did.

20   Q. What did he tell you?

21   A. He was very upset when we talked.  And I have this

22   distinct memory that he said to me if I was right, then the

23   patent is worthless.  "Worthless" was his exact word that he

24   used.

25               MS. JEFFRIES:  Objection, Your Honor.  Hearsay.

SCHUETZ - DIRECT

1          THE COURT:  Overruled.

2     BY MR. LAWTON:

3      Q. Why do you remember that word so distinctly?

4      A. Well, in the e-mail that I sent to Dr. Raskin, I

5     summarized a whole bunch of different issues.  You know, at

6     this time the clock was ticking and everything was kind of

7     unraveling in the -- in the project.

8          We identified a manufacturing problem.  We had real

9     questions about the actual license agreement.  And then this

10    happened.  So it was this very intense kind of time.  So I

11    just have this ultra specific memory of that call with him.

12    And then shortly thereafter, you know, basically the project

13    did kind of unravel.

14     Q. Did Dr. Sadelain tell you on that call that you were

15    misreading the patent?

16     A. No.

17     Q. Did he tell you that the patent contained an obvious

18    error?

19     A. No.

20     Q. In PX1305, if we turn to the top of the second page, do

21    you see an e-mail that starts with, "Michael and I just got

22    off the phone with Marina Larson who prosecuted the patent"?

23     A. I see that, yes.

24     Q. Who is Michael?

25     A. That is Michael Gladstone, who was a junior member of the

SCHUETZ - DIRECT

1    team working at Atlas Venture.

2    Q. So you had a call with Marina Larson about the '190

3    patent on June 12th, 2013?

4    A. Um, yes.

5    Q. Did Ms. Larson tell you on that call that you were

6    misreading the patent?

7    A. No.

8    Q. Now, you go on to say in the next sentence, "She has just

9    informed us that she filed an RCE request for continued

10   examination to correct the sequence in the patent to remove

11   the first four and the last three nucleotides of Sequence ID

12   NO:6 in the patent.  Apparently this never made it into the

13   issued patent, and this is the first time this has been

14   discovered."  Do you see that?

15   A. Yes.

16   Q. Back in 2013, were -- was the request for continued

17   examination part of the prosecution history materials that

18   you saw?

19   A. Yes.

20   Q. Could you turn in your other binder that is marked PX2,

21   and can you go to page 603 using the page numbering that is

22   in the bottom middle of the document, please.

23   A. Sorry.  Okay.

24          MR. LAWTON:  And I believe this PX2 is in evidence,

25   Your Honor.

SCHUETZ - DIRECT

1          THE COURT:  Yes.  It's been received.

2     BY MR. LAWTON:

3      Q. Do you know if page 603 was one of the prosecution

4     history pages that you reviewed back in 2013?

5      A. Yes.

6      Q. Can you turn next to page 604.

7      A. Yes.

8      Q. Was that -- was page 604 part of the prosecution history

9     materials that you remember seeing back in 2013?

10     A. Yes.

11     Q. Can you turn to PX1306, please.

12     A. Is that in the other binder?

13     Q. Sorry.  It is in the other binder.

14     A. Sorry.

15     Q. PX1306 is an e-mail that you sent?

16     A. Yes.

17          MR. LAWTON:  I believe there is no objection.  I

18     offer 1306 into evidence.

19          THE COURT:  Any objection?

20          MS. JEFFRIES:  No objection.

21          THE COURT:  06 is received, 1306.

22          (Exhibit PX1306 received.)

23     BY MR. LAWTON:

24     Q. This is an e-mail that you wrote to your colleagues at

25     Atlas the morning following your call with Marina Larson

SCHUETZ - DIRECT

1  about the '190 patent; is that correct?

2   A. Yes.

3   Q. Does PX1306 report what she said to you?

4   A. Yes.

5   Q. I want to ask you about the top e-mail and in particular

6  beginning toward the end of the third line.  So it says,

7  "Then when the patent is issued, nobody checks to see if the

8  sequence is correct.  Oh, and the defense to all of this is

9  'I was not asked to proofread the patent.'  More than six

10  years later a couple guys at a venture firm figure out that

11  the patent is incorrect.  Now we are told this is a 'easy

12  fix,' and we are told to 'have a glass of wine.'  We'll see."

13  Do you see that?

14   A. I do.

15   Q. Why are the phrases "I was not asked to proofread the

16  patent" and "have a glass of wine" in quotation marks?

17   A. Those were her exact words on the call.

18   Q. And then I also see in your e-mail there are two

19  references to six years.

20   A. Yes.

21   Q. Can you tell us why you referred to six years?

22   A. So the six-year time period is a specific reference to

23  the document you just asked me about.  So the document that

24  you just asked me about was September 4th, 2007, and I'm

25  writing this e-mail on June 13th, 2013, so approximately six

SCHUETZ - DIRECT

1   years later. So it was a specific reference to my review of

2   the document dated September 4th, 2007.

3          So I assumed that somebody looked at the patent

4   while they were prosecuting it, and obviously sometime before

5   September they determined that this sequence needed to be

6   changed, so I assumed it was about six years later.

7   Q. Is the September 2007 document that you are referring to,

8   is that the request for continued examination?

9   A. Yes, the document we just reviewed.

10  Q. Now, after these conversations that we have been talking

11  about on -- around June 12th, June 13th, 2013, did you and

12  Atlas continue to negotiate with Sloan Kettering?

13  A. We did, yes.

14  Q. If this issue with the '190 patent was so critical, why

15  were you interested in continuing discussions with Sloan

16  Kettering?

17  A. Well, that's a complex question. I mean, there were a

18  couple of reasons.

19         So of all of the things we were reviewing, the

20  clinical trial data, etcetera, you know, it appeared that

21  this could be maybe a good product for the treatment of the

22  patients. So, you know, I felt like it was still worth

23  pursuing.

24         The other reason was there was all kinds of

25  different technology at Memorial Sloan Kettering, some new

SCHUETZ - DIRECT

1     and different CAR-T cell constructs that I thought, you know,

2     if there is some bad outcome with this patent, based on what

3     we discovered, we would have new technology that we could

4     patent.

5            And I also thought that the manufacturing of these

6     is super complicated, and we would have a fair amount of

7     know-how in the company that would -- that know-how would

8     maybe prevent people from just copying it, you know, if that

9     sequence was -- turned out to be not protected by the patent.

10    Q. Outside of the context of testifying in this case, have

11    you spoken with any of Juno's lawyers in the case?

12    A. Yes.

13    Q. When was the first conversation?

14    A. Um, sometime early this year I was contacted by the

15    lawyers for Juno.

16    Q. What did Juno's lawyers say to you?

17    A. We had a discussion about many of these issues, and they

18    asked me to sign an affidavit where I would attest that I had

19    not reviewed the prosecution history of this patent, and I

20    told them that I could not do that because that wasn't true.

21            MR. LAWTON:  I have no more questions.

22            THE COURT:  Thank you.

23            Ms. Jeffries?

24                        CROSS-EXAMINATION

25    BY MS. JEFFRIES:

SCHUETZ - CROSS

1    Q. Good afternoon, Dr. Schuetz.

2    A. Good afternoon.

3    Q. You want this jury to believe that you are an independent

4    third-party witness, don't you?

5    A. I am.

6    Q. Well, let's talk about that.

7    A. Okay.

8    Q. You testified on your direct examination that you are

9    presently cofounder and CEO of a company called Compass

10   Therapeutics, right?

11   A. Yes.

12   Q. You are on the board of directors of Compass

13   Therapeutics?

14   A. Yes.

15   Q. Compass Therapeutics is a company involved in drug

16   discovery, right?

17   A. Yes.

18   Q. Compass is a small biotech company as you described it?

19   A. Yes.

20   Q. Looking for and -- always looking for and meeting with

21   potential strategic partners?

22   A. We meet with potential strategic partners very

23   frequently.

24   Q. In fact, you are always meeting with potential strategic

25   partners, right?

SCHUETZ - CROSS

1    A. We meet very frequently.

2    Q. I took your deposition just this past Sunday morning,

3    didn't I, Dr. Schuetz?

4    A. You did.

5    Q. And didn't you tell me in your deposition:  "We are

6    always meeting with potential strategic partners"?

7    A. Yeah, I mean, we meet with strategic --

8    Q. Yes or no, Dr. Schuetz.

9    A. All the time, yes.

10   Q. All right.  In fact, you talked with Gilead

11   Pharmaceuticals for several years about a potential strategic

12   partnership, right?

13   A. We had --

14   Q. Yes or no, sir.  Did you speak with Gilead --

15   A. Yes.

16   Q. Thank you.

17          And in pursuit of that strategic partnership, you've

18   talked to a number of Gilead employees, including, for

19   example, Adrian Bot?

20   A. Yes.

21   Q. Now, Dr. Bot was here yesterday testifying as a Kite

22   employee, but, in fact, you know him as a Gilead employee,

23   because Gilead purchased Kite in October of 2017, right?

24   A. Yes.

25   Q. And as part of your pursuit --

SCHUETZ - CROSS

1    A. I did not talk directly to Dr. Bot.

2              MS. JEFFRIES:  Move to strike, Your Honor.

3              THE COURT:  The motion will be granted.

4    BY MS. JEFFRIES:

5    Q. As part of your pursuit of Gilead as a strategic partner,

6    you spoke with Dr. Bot and other Gilead employees on a

7    conference call as recently as this past September, correct?

8    A. Excuse me.

9              THE WITNESS:  Your Honor --

10             THE COURT:  If you can't -- listen to the question,

11   please.

12             THE WITNESS:  Okay.

13             THE COURT:  It's a question/answer format, and

14   Mr. Lawton will have an opportunity to add and clarify.

15             THE WITNESS:  Some of this is confidential

16   information.

17             THE COURT:  Are you represented by counsel?

18             THE WITNESS:  Yes.

19             MR. LAWTON:  Yes, Your Honor.

20             THE COURT:  Who is your counsel?

21             THE WITNESS:  Mr. Lawton.

22             MR. LAWTON:  Kite's counsel represents the witness

23   for testimony purposes.  And on behalf of Gilead/Kite, we

24   have no objection to Dr. Schuetz's answer to that question.

25             THE COURT:  Okay.

SCHUETZ - CROSS

1          THE WITNESS:  Sorry.  Thank you.

2          Yes.

3    BY MS. JEFFRIES:

4     Q. So just to remind the jury of the question with that

5    brief colloquy, as part of your pursuit of Gilead as a

6    strategic partner, you spoke with Dr. Bot and other Gilead

7    employees on a conference call as recently as this past

8    September, correct?

9     A. Yes.

10    Q. And the discussions with Gilead as a strategic partner

11   have also involved Gilead's current CFO, Mr. Andrew

12   Dickinson, correct?

13    A. I don't believe he was on the call.

14    Q. Not on that call, but the discussions over the two-year

15   period where Compass has been pursuing a strategic

16   partnership with Gilead, Kite's corporate parent, have

17   involved Mr. Andrew Dickinson, Gilead's current CFO, correct?

18    A. Yes.

19    Q. And CFO means chief financial officer; is that right?

20    A. Yes.

21    Q. He's one of the top executives at Gilead, correct?

22    A. Yes.

23    Q. Now, Gilead may invest in your company, Compass

24   Therapeutics at some point in the future, right?

25    A. I don't know that.

SCHUETZ - CROSS

1        Q. It's possible?

2        A. I -- I don't know.  I don't know that.

3        Q. They've never told you in this call in September or at

4    any other time this they would never invest in you, certainly

5    not after talking with you for two years?  They never told

6    you that, did they?

7        A. We are no longer talking to Gilead.

8        Q. They never told you, did they, Dr. Schuetz, that they

9    would never invest in your company?

10       A. So -- I'm sorry, they're --

11       Q. Yes or no, sir.

12       A. I'm sorry.  I don't understand the question.  There were

13   two negatives in that.  There's did they tell us that we --

14   did they tell us that we would -- they would never --

15       Q. Let me ask you a question, Dr. Schuetz.

16       A. Okay.  Sorry.

17       Q. Did anyone at Gilead ever tell you after speaking with

18   you for over two years about a strategic partnership with

19   your company that they would never invest in your company in

20   the future?

21       A. After that call, they told us that they were not going

22   to --

23       Q. The question is yes or no, Dr. Schuetz.  Did they tell

24   you they would never invest in you?

25       A. No, they didn't say never.

SCHUETZ - CROSS

1     Q. Thank you.

2          Now, in addition to talking to Gilead about a

3     strategic partnership with your company, you also have a

4     consulting agreement with the attorneys in this case

5     representing Kite Pharmaceuticals, Munger, Tolles & Olson,

6     correct?

7     A. Yes.

8     Q. And under that consulting agreement, Kite's law firm, and

9     you've just represented they are also your law firm, is

10    paying you $500 per hour for the time you have spent

11    consulting with them, right?

12    A. Yes.

13    Q. Under that consulting agreement, you are also being

14    paid -- excuse me, reimbursed for any expenses such as travel

15    as part of that consulting arrangement?

16    A. Yes.

17    Q. And just so we can confirm for the record, you have also

18    retained the same law firm, Munger, Tolles & Olson, as your

19    lawyers, right?

20    A. Yes.

21    Q. But you are not paying Munger, Tolles & Olson's legal

22    fees, right?

23    A. No.

24    Q. Those are being paid by Kite/Gilead, right?

25    A. Yes.

SCHUETZ - CROSS

1    Q. Now, you understand, Dr. Schuetz, that Kite is claiming

2    in this case that the certificate of correction of the '190

3    patent is invalid, right?

4    A. Yes.

5    Q. And you understand that the documents involved in

6    determining whether the certificate of correction is invalid

7    include the '190 patent itself as well as the prosecution

8    history of the '190 patent, right?

9    A. Yes.

10   Q. And in order for you to give truthful and unbiased

11   testimony about those documents, you would agree with me,

12   wouldn't you, that it's important for your testimony about

13   those documents to be untainted?

14   A. Yes.

15   Q. But over the course of the last nine months or so, you

16   have had a number of phone calls and meetings with the

17   lawyers representing Kite in this case, correct?

18   A. Yes.

19   Q. And at the time of your deposition just this past Sunday,

20   you told me you had spoken with them over the phone

21   approximately five or ten times over the last nine months,

22   right?

23   A. Approximately.

24   Q. And prior to your deposition, you told me you had met

25   with them for about four or five hours in person, right?

SCHUETZ - CROSS

1    A. Yes.

2    Q. And you testified during your direct examination, I

3    believe, that you spent ten hours preparing for your

4    testimony with Munger, Tolles & Olson lawyers, right?

5    A. I think I said approximately eight to ten hours.

6    Q. And in those meetings and phone calls with Kite's

7    attorneys -- and let me just back up for a moment.

8         In each of the in-person meetings, there were

9    multiple attorneys from Munger, Tolles & Olson, right?  You

10   met with Mr. Lawton, you met with Mr. Gratzinger, right?

11   A. Um, yes, but not in every meeting were there multiple

12   attorneys.

13   Q. Well, in some of those meetings, Kite's other law firm

14   representing it in this case, Fish & Richardson, also were

15   there, right?

16   A. Yes.

17   Q. So some of these meetings you had meetings from Munger,

18   Tolles & Olson and also lawyers from Fish & Richardson,

19   right?

20   A. Yes.

21   Q. And sometimes some of these lawyers were in person with

22   you in Boston, they flew to your office, right?

23   A. One lawyer visited me in my office once, and then other

24   lawyers from Fish & Richardson came to my office once.

25   Q. And when lawyers were with you in person in your office,

SCHUETZ - CROSS

1    there were also other lawyers over the phone, right?

2     A. Yes.

3     Q. And by other lawyers, just so we are clear, other lawyers

4    from Munger, Tolles & Olson and Fish & Richardson, right?

5     A. Yes.

6     Q. Both law firms representing Kite in this lawsuit?

7     A. Okay.  Yes.

8     Q. Now, in these five to ten phone calls and ten hours of

9    meetings with Kite's lawyers in this case, they showed you

10   and talked to you about the '190 patent, correct?

11    A. Yes.

12    Q. And in those five to ten phone calls and ten hours, eight

13   to ten hours of in-person meetings, they showed you and

14   talked to you about the prosecution history of the Sadelain

15   '190 patent, right?

16    A. They asked me questions about it, yes.

17    Q. So they showed it to you, and they talked with you about

18   it, right?

19    A. Yes.  Yes.

20    Q. Now, let's turn to the sequence comparison you discussed

21   in your direct examination that you say you did in 2013.  All

22   right?

23    A. Okay.

24    Q. But before we do, sir, isn't it possible that all of the

25   discussions about these documents, the '190 patent and the

SCHUETZ - CROSS

1   prosecution history, with Kite's lawyers who in this case are

2   trying to prove the certificate of correction invalid,

3   impacted your memory of what you thought about these very

4   same documents over six years ago?

5   A. No.

6   Q. It's not at all possible?

7   A. I don't think so, because I described all this in the

8   e-mails at the time.

9   Q. Well, you didn't describe all of this in the e-mails, and

10  we are going to get to that.

11  A. Okay.

12  Q. All right?  But you don't dispute that the very same

13  documents that you have talked about here in court are the

14  very same documents you have been talking about with Kite's

15  lawyers who are trying to prove the certificate of correction

16  invalid over the past nine months, right?  You've talked to

17  them about them over the past nine months?

18  A. That's correct.

19  Q. So let's go back to 2013 and see what we can find out.

20          Now, in 2013, you were a consultant for a venture

21  capital firm called Atlas Venture?

22  A. Yes.

23  Q. And the plan was for Atlas Venture to get an exclusive

24  license to the Sadelain '190 patent and to form a company to

25  develop Dr. Sadelain's CAR technology?

1        A. Yes.

2        Q. You were going to be the CEO of that new company, right?

3        A. Yes.

4        Q. And you were evaluating Dr. Sadelain's CAR construct as

5        part of that process?

6        A. Yes.

7        Q. And I believe you testified during your direct

8        examination that you were -- let me get an exact quote, if I

9        can, from my notes.  You testified that it was very important

10       to you that the DNA sequence of Dr. Sadelain's construct was

11       covered by the '190 patent, right?

12       A. Yes.

13       Q. And in order to go forward with the deal, it was very,

14       very important to you, right?

15       A. It was a component of the deal, of moving forward.

16       Q. It was -- let me make sure I -- because I have it in my

17       notes.  I want to make sure I got it accurately.  You said it

18       was -- in order to go forward with the deal, it was very

19       important to you that the DNA sequence of the construct was

20       covered by the patent?

21       A. Yes.

22       Q. Is that your testimony?

23       A. Yes.

24       Q. All right.  So as you were going through the process of

25       this very important task of determining whether the clinical

SCHUETZ - CROSS

1    construct of Dr. Sadelain's was covered by the '190 patent,

2    you noticed that SEQ ID NO:6 did not exactly match

3    Dr. Sadelain's clinical CAR construct, right?

4    A. Yes.

5    Q. And at the time you believed that SEQ ID NO:6 was

6    intended to cover the specific region of CD28 that was used

7    in Dr. Sadelain's construct?

8    A. Yes.

9    Q. And when you raised this with what you found, the error

10   that you found, Dr. Sadelain was surprised, right?

11   A. He was, yes.

12   Q. In fact, he was dumbfounded?

13   A. He was, yes.

14   Q. So when you discovered this error, you -- as you

15   testified in direct, you were focused on the sequence, right?

16   A. Yes.

17   Q. And if we could pull up PX1, please.

18        THE COURT:  It will come up on the monitor.

19        THE WITNESS:  Okay.

20   BY MS. JEFFRIES:

21   Q. And if we could go to the bottom of columns 13 and 14,

22   the sequence listing portion.

23        This is -- you were focused on this portion of the

24   documents, sir, called a sequence listing, right, if you can

25   highlight that and, in particular, SEQ ID NO:6 in that

SCHUETZ - CROSS

1    sequence listing, right?

2     A. Yes.

3     Q. All right.  Let's go to SEQ ID NO:6, if we could.

4           And so according to your direct testimony, you used

5    a software program when you were focused on this sequence and

6    felt that it did not exactly match Dr. Sadelain's construct,

7    right?

8     A. Yes.

9     Q. The computer program you used, you don't remember which

10   one?

11    A. I can't remember, I'm sorry.

12    Q. Computer programs require an alignment; is that correct?

13    A. Yes.

14    Q. And in this case you just allow the program to do that

15   alignment, and you do not intervene and do any sort of

16   alignment on your own?

17    A. No, I also confirmed it manually.

18    Q. Okay.  So you didn't -- withdrawn.

19          All right.  So after you focused on the sequence,

20   you used a computer program, you can't tell us which one, you

21   then talked to Memorial Sloan Kettering's patent lawyer,

22   right, Dr. Marina Larson?

23    A. Yes.

24    Q. And we saw this in the e-mails.  She explained to you

25   that during the prosecution of the '190 patent, she had filed

SCHUETZ - CROSS

1    something called a request for continued examination to

2    remove the first four and the last three nucleotides of SEQ

3    ID NO:6, but apparently that correction never made it into

4    the issued patent, right?

5     A. Yes.

6     Q. And when you talked to her, you were agitated, and she

7    told you "have a glass of wine," meaning calm down, it will

8    all be okay, there is a procedure for this in the U.S. Patent

9    and Trademark Office, right?

10    A. More or less, yes.

11    Q. Okay.  And then after you talked to Dr. Larson, Memorial

12   Sloan Kettering's patent attorney, you looked at the

13   prosecution history yourself and verified what she had told

14   you, right?

15    A. I verified one part of what she told us, yes.

16    Q. Let me take you to your deposition that I just took on

17   Sunday, Dr. Schuetz.

18    A. Okay.

19    Q. Page 123, lines 23, to 124, line 1.

20    A. Is that going to come up on the screen?

21    Q. No, no.

22         THE COURT:  Do you have the page, Mr. Lawton?

23         MR. LAWTON:  I do.

24         THE COURT:  Any objection?

25         MR. LAWTON:  I would ask to begin the reading at --

877

SCHUETZ - CROSS

1          THE COURT:  So complete question and a complete

2     answer.

3          MS. JEFFRIES:  Of course.

4          THE COURT:  And then if you want additional portions

5     read, you can do that.

6          MR. LAWTON:  Subject to that, no objection, Your

7     Honor.

8          THE COURT:  Okay.

9          THE WITNESS:  Will that come up on the screen?

10          THE COURT:  No.

11     Q.

12          "QUESTION:  So after she told you that on -- that on

13     June 13th, did you go back to this RCE that we just looked at

14     and verify what she had told you?

15          "ANSWER:  Yes."

16          Now, as we discussed, when you did the initial

17     review before you called her, you were focused on what we

18     just looked at, that SEQ ID NO:6 in the sequence listing,

19     right?

20     A. Yes.

21          MR. LAWTON:  I'm sorry, Your Honor.  I don't believe

22     that the witness has a copy of the deposition transcript to

23     follow along with.  I have extra copies if that would help.

24          THE COURT:  Mr. Cruz?

25          THE CLERK:  Yes.

SCHUETZ - CROSS

1              THE WITNESS:  Thank you.

2              THE CLERK:  You're welcome.

3              THE COURT:  Do you have a question?

4              MS. JEFFRIES:  Yes.

5       BY MS. JEFFRIES:

6        Q. And then when you did go back to that prosecution history

7       to verify what Dr. Larson had told you about filing the RCE,

8       the request for continued examination, you saw that something

9       had happened after Dr. Larson had filed that RCE, right, such

10      that the patent when it issued in 2008 had a sequence listing

11      that did not match the corrections in that request for

12      continued examination?

13       A. Correct.  Yes.

14       Q. But you testified on direct examination that although

15      something happened, you just couldn't figure it out?  You

16      just couldn't figure out what the correct sequence was,

17      right?

18       A. I couldn't -- I --

19       Q. Yes or no, sir.  Is that true?

20       A. Yes.  Yes, I couldn't figure out what the correct

21      sequence was.

22       Q. All right.  Now, you testified on direct, said that you

23      have done PCR many, many times, right?

24       A. Yes.

25       Q. And PCR involves the use of primers to amplify a target

SCHUETZ - CROSS

1   sequence, correct?

2    A. Yes.

3    Q. All right.  Now, you yourself, as you mentioned, have

4   done PCR and used primers many, many times to amplify target

5   sequences, right?

6    A. Yes.

7    Q. But you said that you just didn't look at the primers in

8   the specification of the '190 patent that would -- because to

9   you they weren't specifically mentioned within claim 1,

10   right?

11    A. That's correct.

12    Q. All right.  Let me ask you if you would take a look at

13   the portion of the patent counsel pulled up relating to the

14   primers, column 7 of PX1 at line 53 -- beginning at line 53

15   going to line 60.

16    A. I'm sorry, what page?

17    Q. PX1, column 7.

18          THE COURT:  Can we put that up on the screen?

19          MS. JEFFRIES:  Yes, please.

20          THE WITNESS:  Okay.

21          THE COURT:  It's up on the screen also.

22          THE WITNESS:  Oh, sorry.

23   BY MS. JEFFRIES:

24    Q. If you could highlight, please, the sentence beginning

25   "To construct P28z."

SCHUETZ - CROSS

1    A. Okay.

2    Q. Now, do you understand, Dr. Schuetz, that P28z is -- was

3    Dr. Sadelain's clinical construct?

4    A. I didn't know what the clinical construct was until he

5    sent me the sequence.

6    Q. Understood.  But once you had the sequence, you

7    understood that P28z was the clinical construct, right?

8    A. Yes.

9    Q. And, in fact, if we could take a look at the sequence

10   listing -- excuse me, not the sequence listing -- the

11   sequence Dr. Sadelain sent to you, which is DX766.  DX766 at

12   2, we can put it up on the screen quickly.

13   A. Okay.

14   Q. You see at the top of that it says "SFG 1928z plasmid"?

15   A. Yes.

16   Q. And you also see in that first sentence those there is

17   another reference to 1928z?

18   A. Yes.

19   Q. So you understood that Dr. Sadelain's clinical construct

20   corresponded to the P28z construct described in the Sadelain

21   patent, right, or at least you understand that now, right?

22   A. I -- I'm -- I understood that this was the clinical

23   construct.

24   Q. And P28z is described in that portion of the patent in

25   column 7 as being constructed by those primers, right, that

SCHUETZ - CROSS

1    are called out there?

2     A. I see that.  We are back on column 7.

3     Q. Correct.

4     A. Sorry.

5     Q. Okay.  And in addition to not looking at the primers in

6    the patent specification of the '190 patent, you also can't

7    review -- you also can't recall, excuse me, whether you

8    reviewed all of the text in the patent, so, for example,

9    other information in the '190 patent that could help you

10   figure that out?

11    A. I read the entire patent.

12    Q. Okay.  Let's go to your deposition.  Again, this was just

13   on Sunday.  And it was before about five of the hours -- five

14   of the ten hours that you met with Kite's lawyers Sunday,

15   right, because at that point you told me you had met with

16   Kite's lawyers for four or five hours, and you said it's been

17   a total of ten since?

18    A. Approximately eight to ten, I don't know the exact

19   number.

20    Q. Okay.  But you met with them since I took your

21   deposition, right?

22            THE COURT:  Can you slow it down, please.

23            MS. JEFFRIES:  Sorry.

24   BY MS. JEFFRIES:

25    Q. Is it correct, Dr. Schuetz, that you have met with,

SCHUETZ - CROSS

1    spoken with Kite's lawyers since I took your deposition on

2    Sunday?

3     A. Yes.

4     Q. And you did that under the consulting agreement, and you

5    were paid $500 an hour for your time, right?

6     A. Yes.

7     Q. Let's go to the deposition at page 130, if we could.

8     A. I'm sorry, where are the page numbers?  Upper right?

9         THE COURT:  Upper right.

10         THE WITNESS:  Okay.  Sorry.

11   BY MS. JEFFRIES:

12    Q. Lines 3 through 7.

13         "QUESTION:  Did you look at the examples and the

14   specification of the '190 patent when you reviewed it?

15         "ANSWER:  I don't remember reviewing all the

16   examples."

17         You understand that examples in a patent have

18   experimental data, right?

19    A. Yes.

20    Q. And they provide details and reasons for why the

21   construct was used and how it was created?

22    A. Yes.

23    Q. Now, you noticed that error in SEQ ID NO:6 around

24   June 12th of 2013, right?

25    A. Yes.

SCHUETZ - CROSS

1    Q. And as you testified on direct, after you noticed that

2    error, you talked to Sloan Kettering's patent lawyer,

3    verified what she had to say about that, and you continued to

4    be excited about moving forward on a deal with Sloan

5    Kettering, right?

6    A. I don't know if I would use the word "excited."  We were

7    confused by all of this new information, but we also

8    continued to work on the potential transaction.

9    Q. All right.  Let me go back to your deposition, if I

10   could, sir, again, just on Sunday, page 144, lines 13 to 16,

11   referencing one of these documents you looked at.

12            "QUESTION:  You were just -- you were trying to --

13   you were just expressing excitement to move forward along

14   with ROI to close the deal with MSK?

15            "ANSWER:  Yes."

16            Was that your testimony on Sunday, sir?

17   A. Yes.  But this is a different time period you are asking

18   me about.

19   Q. It's the same time period.  We're following.  Let me back

20   up --

21   A. I misunderstood your question as a different time period.

22   Q. Okay.  So knowing now that we are now after June -- we

23   are after June 12th, 2013, right?

24   A. But before June 30th.

25   Q. Okay.  Before June 30th.

SCHUETZ - CROSS

1     A. It was a narrow window.

2     Q. I'm just focused on after June 12th of 2013 when you

3     noticed the error, you expressed excitement about working --

4     continuing to work on a deal with MSK, right?

5     A. Yes, we still tried to get it done.

6     Q. Okay.  And you had a meeting on July 1st with -- there

7     was a meeting between MSK and Atlas Venture, right?

8     A. I believe so, yes.

9          MS. JEFFRIES:  Okay.  And I would like to move into

10    evidence PX1287.

11         MR. LAWTON:  No objection.

12         THE COURT:  1287 is received.

13         (Exhibit PX1287 received.)

14    BY MS. JEFFRIES:

15    Q. If we could pull up that exhibit.

16         So this was a meeting on July 1st, 2013, and you

17    were present at this meeting, correct?

18    A. Yes.

19    Q. All right.  Now, after this meeting, you had dinner with

20    Dr. Sadelain the night of July 1st, right?

21    A. I believe so, yes.

22    Q. Let's take a look, if we could, at 11, page 11.

23    A. On the middle page on the bottom?

24    Q. Sorry.  It will be pulled up on your screen.

25    A. I'm sorry.

SCHUETZ - CROSS

1   Q. Now, this was a strategic planning meeting between MSK

2   and Atlas Venture to continue to move forward with a deal

3   whereby there would be an exclusive license arrangement and

4   you would be the CEO of the new company that would

5   commercialize the Sadelain CAR patent and -- get an exclusive

6   license to the Sadelain CAR patent and commercialize it,

7   right?

8   A. And develop it, yes.

9   Q. And develop it, okay.

10          And one of the strategic planning items listed in

11   these slides on July 1st said, "Secure Sadelain, et al.

12   patent correction to DNA sequence."  Do you see that?

13   A. I do, yes.

14   Q. And, in fact, the certificate of correction issued on

15   July 16th of 2013, right?

16   A. Yes.

17   Q. Now, at the end of August of 2013 -- so you noticed the

18   error in July, around July 12th.  You have this meeting --

19   I'm sorry, June 12th?

20   A. June 12th, yes.

21   Q. June 12th.  The request for the certificate of correction

22   you understand was filed the very next day, right?

23   A. I didn't know that at the time.

24   Q. You know that now?

25   A. I know it now.

886

SCHUETZ - CROSS

1    Q. Okay.  And on July 1st, there was this meeting to move

2    forward with a deal with MSK, right, where you would be the

3    CEO of the new company, and the certificate of correction

4    issues on July 16th of 2013, right?

5    A. Okay.

6    Q. Now, at the end of August 2013 --

7         MS. JEFFRIES:  And I would like to move into

8    evidence PX1280.

9         THE COURT:  Any objection?

10        MR. LAWTON:  No objection.

11        THE COURT:  It's received.

12        (Exhibit 1280 received.)

13   BY MS. JEFFRIES:

14   Q. There is yet another meeting to continue to move forward

15   with this partnership between a new company -- excuse me,

16   between Atlas Venture and MSK to form a new company, right?

17   A. Yes.

18   Q. And this document that we are looking at is -- if you go

19   back to the first page of that.

20   A. Okay.

21   Q. Okay.  This is the first page.  All right.

22        So this was a presentation by Atlas Venture

23   presenting a summary of its vision for this new company that

24   it was proposing to form with you as the CEO, and there was a

25   license proposal presented to Sloan Kettering as part of this

SCHUETZ - CROSS

1    strategic vision, right?

2     A. Yes.  I don't recall if there was an actual meeting.

3     Q. Okay.  So this was a presentation that was made by Atlas

4    Venture to move forward again in August of 2013 after the

5    certificate of correction was issued, right?

6     A. A proposal.

7     Q. A proposal.

8           And it was -- as you testified on direct

9    examination, sir, it was very, very important for you to know

10   that the clinical construct being used by Dr. Sadelain was

11   covered by the '190 patent, right?  That was very important

12   to you at the time?  That's why you were so focused on it?

13    A. Yes.

14    Q. And nowhere in this document, there is nothing here that

15   says that you or Atlas Venture or anyone else believe that

16   the certificate of correction was invalid; is that right,

17   sir?

18    A. Are -- I'm sorry.

19    Q. It's a yes or no question.

20    A. I'm sorry.  I don't understand the question.  I'm not --

21    Q. Is there anything in this document from August of 2013

22   after you noticed the error, the error was corrected through

23   a certificate of correction, and you were moving forward with

24   a deal for an exclusive license to the '190 patent, is there

25   anything in this document, sir, that says that that

SCHUETZ - CROSS

1    certificate of correction is invalid or that you had a belief

2    that it was invalid?

3    A. I don't believe there is.

4              MS. JEFFRIES:  Thank you.  No further questions.

5              THE COURT:  Mr. Lawton?

6              MR. LAWTON:  Just one or two questions, Your Honor.

7

8                         REDIRECT EXAMINATION

9    BY MR. LAWTON:

10   Q. Dr. Schuetz, did any lawyers for Kite ask you to sign an

11   affidavit stating something that wasn't true?

12   A. No.

13             MR. LAWTON:  Your Honor, I would like to offer two

14   deposition designations for completeness.  The first one on

15   page 123, lines 11 through 22.

16             THE COURT:  Let me find it.  123, lines 11 through

17   22?

18             MR. LAWTON:  Right.

19             THE COURT:  Any objection?

20             MS. JEFFRIES:  No, Your Honor.

21             THE COURT:  You can read it into the record.

22   BY MR. LAWTON:

23   Q.

24             "QUESTION:  Now, this corresponds to what Marina

25   Larson told you and that you recounted in your June 12th

SCHUETZ - CROSS

1    e-mail at 6:13 p.m. in Schuetz 6 where you said 'Marina

2    Larson informed us that she filed an RCE to correct the

3    sequence in the patents to remove the first four and the last

4    three nucleotides of SEQ ID NO:6 in the patent,' right?

5            "ANSWER:  Okay.  That is the 6:13 p.m. June 12th in

6    NO:6, Document NO:6.

7            "QUESTION:  Correct.

8            "ANSWER:  Yes."

9            Did I read that correctly?

10    A. Yes.

11            MR. LAWTON:  Okay.  And one more for completeness,

12    Your Honor, on page 130, lines 8 through 12.

13            MS. JEFFRIES:  Just a moment, Your Honor.

14            THE COURT:  Any objection?

15            MS. JEFFRIES:  No objection.

16    BY MR. LAWTON:

17    Q.

18            "QUESTION:  Okay.  Do you remember reviewing any

19    example of -- in the '190 patent -- remember, you are under

20    oath, sir -- did you review any example in the '190 patent?

21            "ANSWER:  So I read the entire patent."

22            Did I read that correctly?

23    A. Yes.

24    Q. Last question.  In August 2013, did you know that there

25    had been a certificate of correction issued to the '190

SCHUETZ - CROSS

1    patent?

2     A. I'm sorry.  I can't remember when I actually looked up

3    the certificate of correction.  I'm sorry.  I just don't

4    remember.

5              MR. LAWTON:  I have nothing else.  Thank you.

6              THE COURT:  Any recross, Ms. Jeffries?

7              MS. JEFFRIES:  Briefly, Your Honor.

8

9                       RECROSS-EXAMINATION

10   BY MS. JEFFRIES:

11    Q. You said that -- something about an affidavit being

12   mentioned to you by one of Juno's lawyers; is that right?

13    A. It was --

14    Q. Just yes or no.

15    A. Yes, yes, yes.

16    Q. All right.  Thank you.

17              Now, it's a fact, sir, that you were never -- you

18   were never sent, never given any piece of paper that you were

19   asked to sign by any Juno lawyer; is that right?

20    A. No, that's correct.

21              MS. JEFFRIES:  All right.  Thank you, sir.

22              THE COURT:  That concludes it for today.  Please

23   return on Monday.  On Monday we are going to start a little

24   bit later on Monday because I have another calendar to

25   handle.  So on Monday at -- let's make it at 9:00, 9:00 on

SCHUETZ - CROSS

1    Monday.  I'm sorry.  I'm sorry.  I have another matter to
2    handle.  So it's going to be 9:45.  9:45 on Monday.
3              THE CLERK:  All rise for the jury, please.
4              (Thereupon, the jury retired from the courtroom.)
5              THE COURT:  Doctor, please feel free to step down.
6    It's more comfortable.
7              THE WITNESS:  Sorry.
8              THE COURT:  And I assume the doctor could be
9    excused, correct?  He's no longer needed?
10             MR. LAWTON:  Yes, Your Honor.
11             MS. JEFFRIES:  Yes, no objection.
12             THE COURT:  Thank you, Doctor.
13             And then in terms of the times, the plaintiffs have
14   used 8.2 hours, the defendant 6.8 hours.  And we'll resume on
15   Monday.
16             MR. DANE:  Your Honor, has the Court considered -- I
17   had made a request earlier --
18             THE COURT:  Yes.
19             MR. DANE:  -- for possibly extending us to
20   12.5 hours.
21             THE COURT:  I haven't seen or heard anything that
22   would cause me to reconsider at this point.  Thank you.
23             MR. DANE:  Thank you, Your Honor.
24             (Thereupon, the Court was in recess.)
25                      *****     *****     *****

SCHUETZ - CROSS

1

2       I certify that the foregoing is a correct transcript from the

3       record of proceedings in the above-titled matter.

4

5

6

7       ---------------------------

8

9       Amy C. Diaz, RPR, CRR              December 6, 2019

10      S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SCHUETZ - CROSS

# #

**#4455** [1] - 698:23

# $

**$1.85** [1] - 751:14
**$10** [5] - 784:24, 785:1, 806:1, 806:8, 808:19
**$101** [1] - 748:21
**$150** [20] - 750:5, 750:24, 751:9, 751:16, 751:24, 753:7, 753:9, 785:5, 786:5, 798:2, 805:20, 806:14, 806:24, 807:13, 807:17, 807:21, 807:25, 808:3, 808:9, 808:20
**$153** [2] - 749:20, 750:17
**$153,350,000** [1] - 786:3
**$153.35** [2] - 798:1, 798:14
**$167** [1] - 800:3
**$200** [1] - 733:6
**$300,000** [1] - 783:23
**$445** [1] - 793:20
**$50,000** [1] - 783:22
**$500** [3] - 843:19, 868:10, 882:5
**$585** [2] - 798:17, 800:4
**$6,200** [3] - 765:13, 765:24, 765:25
**$604** [2] - 797:12, 797:19
**$70** [1] - 785:3
**$752** [1] - 800:5
**$80** [1] - 785:3
**$800** [1] - 826:15
**$90** [3] - 705:16, 705:20, 750:15
**$93** [1] - 748:19
**$930** [1] - 748:23

# '

**'190** [46] - 726:8, 754:11, 754:25, 755:5, 760:8, 762:9, 767:22, 767:24, 769:21, 770:9, 800:9, 809:2, 817:8, 822:6, 822:18, 822:20, 834:9, 834:13, 844:22,

845:5, 849:8, 849:21, 850:11, 852:13, 858:2, 860:1, 861:14, 869:2, 869:7, 869:8, 871:10, 871:15, 871:25, 872:24, 873:11, 874:1, 875:25, 879:8, 881:6, 881:9, 882:14, 887:11, 887:24, 889:19, 889:20, 889:25
**'easy** [1] - 860:11
**'have** [1] - 860:12
**'Marina** [1] - 889:1

# 0

**0002** [1] - 828:24
**06** [1] - 859:21

# 1

**1** [21] - 715:18, 738:10, 738:12, 741:10, 754:10, 754:24, 763:12, 764:12, 764:13, 795:9, 795:12, 795:14, 801:24, 845:11, 847:22, 848:12, 849:4, 852:10, 854:24, 876:19, 879:9
**1.2** [1] - 748:17
**1.3** [3] - 793:22, 793:25, 827:6
**1.9** [1] - 820:22
**1.92** [1] - 823:19
**10** [16] - 708:15, 709:20, 734:1, 763:7, 769:2, 772:2, 772:10, 772:16, 785:2, 805:1, 805:4, 808:22, 808:24, 833:6, 840:6
**10.34** [2] - 790:4, 799:10
**100** [3] - 702:11, 711:24, 711:25
**1001** [2] - 792:4, 792:9
**1006** [2] - 792:9, 792:21
**10281** [1] - 699:12
**10K** [3] - 764:23, 764:25, 766:2
**11** [6] - 763:7, 802:19, 884:22, 888:15, 888:16

**113** [1] - 836:9
**12** [6] - 709:15, 711:13, 741:9, 763:9, 775:4, 889:12
**12-4** [1] - 700:14
**12-5** [1] - 701:4
**12.5** [2] - 791:12, 891:20
**123** [3] - 876:19, 888:15, 888:16
**124** [1] - 876:19
**1247** [7] - 791:23, 792:6, 792:12, 792:19, 792:25, 793:7, 832:20
**1248** [5] - 791:24, 792:6, 792:19, 793:1, 793:7
**1280** [1] - 886:12
**1287** [1] - 884:12
**12:30** [1] - 780:20
**12th** [11] - 858:3, 861:11, 882:24, 883:23, 884:2, 885:18, 885:19, 885:20, 885:21, 888:25, 889:5
**13** [5] - 744:4, 763:9, 783:2, 874:21, 883:10
**13.78** [2] - 803:9, 823:18
**13.9** [2] - 795:19, 795:20
**130** [2] - 882:7, 889:12
**1304** [2] - 853:15, 853:16
**1305** [1] - 855:12
**1306** [2] - 859:18, 859:21
**13th** [3] - 860:25, 861:11, 877:13
**14** [7] - 715:23, 720:20, 720:22, 720:23, 851:21, 851:23, 874:21
**144** [1] - 883:10
**15** [5] - 763:2, 763:4, 783:18, 805:4, 854:5
**15-fold** [1] - 785:4
**150** [8] - 750:9, 750:10, 751:2, 751:6, 751:22, 806:9, 806:11, 808:22
**153** [1] - 705:24
**153.35** [1] - 798:4
**155** [2] - 758:1, 758:7
**156** [3] - 758:1, 758:7, 796:10

**159.7** [1] - 748:19
**16** [1] - 883:10
**167** [1] - 797:19
**16th** [2] - 885:15, 886:4
**172** [1] - 704:2
**180** [1] - 751:13
**1800** [1] - 699:6
**183** [2] - 741:6, 741:9
**184** [1] - 741:10
**18th** [2] - 761:23, 782:22
**192** [6] - 793:24, 794:1, 795:17, 798:15, 803:18, 823:19
**1928z** [2] - 880:14, 880:17
**198** [2] - 750:1
**1992** [1] - 759:22
**19th** [1] - 738:20
**1st** [6] - 698:23, 884:6, 884:16, 884:20, 885:11, 886:1

# 2

**2** [13] - 719:13, 733:3, 744:5, 763:12, 771:21, 790:12, 795:15, 795:18, 803:7, 820:22, 827:5, 846:21, 880:12
**2.5** [6] - 787:24, 788:8, 788:10, 788:19, 802:2, 821:16
**20** [7] - 709:3, 714:3, 732:1, 759:25, 771:6, 796:1, 805:2
**200** [2] - 826:22, 827:1
**2000** [1] - 741:22
**2007** [3] - 860:24, 861:2, 861:7
**2008** [1] - 878:10
**2013** [41] - 734:1, 778:16, 778:22, 778:25, 779:1, 779:18, 779:25, 780:7, 782:13, 782:24, 787:24, 788:4, 789:25, 795:7, 800:24, 842:1, 843:1, 844:23, 850:10, 851:10, 852:5, 858:3, 858:16, 859:4, 859:9, 860:25, 861:11, 871:21, 872:19,

**872**:20, 882:24, 883:23, 884:2, 884:16, 885:15, 885:17, 886:4, 886:6, 887:4, 887:21, 889:24
**2014** [5] - 740:23, 741:16, 742:7, 828:17, 829:3
**2015** [47] - 701:9, 701:21, 703:3, 714:16, 715:4, 715:8, 715:11, 740:8, 780:9, 780:13, 786:21, 787:25, 788:4, 789:4, 789:6, 790:6, 790:9, 790:13, 790:18, 790:22, 791:7, 791:20, 793:10, 793:19, 794:14, 794:20, 799:12, 799:15, 820:23, 821:5, 824:3, 826:1, 826:4, 826:6, 826:11, 827:8, 827:13, 827:14, 829:5, 829:21, 830:22, 831:10, 831:15, 831:16
**2016** [6] - 832:10, 832:13, 832:15, 833:6, 837:8, 838:17
**2017** [56] - 716:3, 717:19, 718:19, 729:21, 738:21, 742:19, 744:7, 761:23, 764:24, 765:10, 770:18, 771:4, 773:23, 778:23, 779:5, 779:9, 780:18, 782:13, 782:15, 782:22, 789:5, 789:19, 790:6, 790:14, 790:19, 790:23, 791:9, 791:22, 793:10, 793:21, 794:17, 794:19, 797:10, 799:16, 799:18, 805:20, 805:24, 806:24, 807:20, 808:4, 808:7, 808:12, 811:18, 815:6, 817:12, 824:4, 826:7, 826:11, 827:8, 827:15, 832:14, 836:6, 837:6,

SCHUETZ - CROSS

838:17, 864:23
**2018** [11] - 702:1, 703:2, 716:1, 716:3, 723:21, 732:24, 734:24, 742:14, 742:17, 742:20, 805:23
**2019** [11] - 698:15, 742:14, 742:17, 742:25, 749:9, 797:11, 811:19, 811:21, 812:5, 814:3, 892:9
**2020** [1] - 812:1
**2024** [5] - 719:14, 796:9, 796:19, 796:22, 814:19
**207** [1] - 750:4
**208** [5] - 751:8, 751:12, 753:8, 753:17
**209** [2] - 751:19, 753:8
**21** [2] - 745:14, 745:15
**22** [2] - 888:15, 888:17
**23** [4] - 778:12, 784:19, 848:11, 876:19
**240** [5] - 758:1, 758:2, 758:3, 774:2, 775:1
**241.23** [1] - 784:19
**243** [2] - 751:21, 828:5
**25** [5] - 718:24, 719:9, 747:25, 781:22, 796:10
**250** [1] - 699:11
**253** [3] - 827:17, 828:10, 828:12
**26.7** [1] - 803:20
**27** [2] - 759:22, 786:15
**27.06** [1] - 823:18
**27.6** [8] - 748:20, 795:21, 797:18, 802:11, 803:19, 803:21, 803:22, 825:21
**278** [1] - 704:2
**29** [3] - 771:15, 789:2, 826:9
**2:17-CV-7639-SJO** [1] - 698:8

### 3

**3** [7] - 743:18, 743:24, 744:4, 760:14, 771:25, 783:24, 882:12
**3,350,000** [1] - 786:4
**3.35** [5] - 750:7, 750:23, 798:2,

804:20, 804:21
**3.5** [1] - 804:19
**3.625** [1] - 835:15
**3.82** [2] - 804:8, 823:22
**30** [3] - 714:3, 751:3, 805:4
**30(b)(6** [1] - 754:10
**30-fold** [2] - 785:5, 785:16
**30th** [2] - 883:24, 883:25
**31** [1] - 811:5
**311** [2] - 749:23, 749:24
**311-1** [1] - 750:3
**32** [1] - 754:12
**322** [2] - 848:1, 848:7
**33** [1] - 793:18
**34** [2] - 742:11, 795:6
**343** [5] - 736:2, 737:18, 738:10, 738:12, 743:10
**343.1** [1] - 737:22
**343.4** [2] - 738:14, 738:23
**343.5** [1] - 743:11
**343.6** [1] - 742:11
**343.7** [4] - 737:19, 737:22, 737:25, 738:2
**350** [1] - 698:23
**355** [1] - 699:18
**359** [1] - 837:20
**35th** [1] - 699:18
**374** [1] - 837:20
**376** [1] - 837:20
**3L** [3] - 768:24, 830:3, 837:4

### 4

**4** [4] - 744:17, 747:17, 823:22, 847:8
**4-1BB** [6] - 739:22, 821:20, 821:22, 822:8, 822:17, 822:21
**4.4** [1] - 791:8
**4.6** [1] - 783:20
**4.75** [3] - 788:3, 788:8, 802:6
**401** [1] - 787:1
**402** [1] - 721:15
**403** [1] - 721:15
**445** [2] - 793:25, 827:5
**45** [1] - 781:15
**481** [1] - 823:6
**4:15** [1] - 839:13
**4:30** [1] - 839:13

**4th** [2] - 860:24, 861:2

### 5

**5** [7] - 743:10, 744:21, 763:10, 772:15, 772:25, 825:17, 852:9
**50** [5] - 718:16, 719:6, 732:5, 762:25, 805:2
**501** [1] - 749:14
**50th** [1] - 699:9
**51** [1] - 749:23
**53** [5] - 811:7, 852:2, 879:14
**54** [3] - 810:21, 811:4, 812:4
**555** [1] - 699:9
**559** [1] - 733:20
**585** [1] - 768:12

### 6

**6** [7] - 698:15, 742:11, 766:4, 772:3, 772:11, 889:1, 892:9
**6,200** [1] - 766:3
**6.2** [3] - 766:1, 766:18, 769:1
**6.5** [3] - 795:9, 795:13, 795:20
**6.8** [1] - 891:14
**60** [2] - 718:16, 879:15
**603** [2] - 858:21, 859:3
**604** [2] - 859:6, 859:8
**65** [1] - 796:7
**66** [1] - 796:17
**6:13** [2] - 889:1, 889:5

### 7

**7** [12] - 738:7, 738:10, 738:12, 772:12, 797:2, 851:20, 852:1, 879:14, 879:17, 880:25, 881:2, 882:12
**7,446,190** [2] - 841:21, 854:3
**7,800** [2] - 847:15, 847:24
**7,812** [1] - 847:23
**7.1** [1] - 797:1
**7.25** [15] - 783:4, 783:9, 783:11, 788:21, 789:25, 795:9, 795:13, 795:16, 795:20, 795:25, 799:10, 802:9, 803:9,

821:16, 834:18
**70** [1] - 712:5
**7141** [2] - 847:19, 847:25
**72** [2] - 764:12, 764:22
**72.81** [1] - 764:15
**7462** [2] - 847:19, 847:25
**78** [3] - 758:6, 772:20, 772:25

### 8

**8** [3] - 762:24, 763:9, 889:12
**8.2** [1] - 891:14
**8.6** [1] - 796:20
**80** [3] - 732:2, 796:8, 796:18
**81** [2] - 764:13, 765:7

### 9

**9** [1] - 763:7
**90** [11] - 746:7, 749:18, 750:14, 750:23, 788:9, 795:11, 798:5, 798:15, 803:14, 820:21
**900** [1] - 699:6
**90012** [1] - 698:23
**90067** [1] - 699:7
**90071** [2] - 699:9, 699:18
**924** [2] - 783:1, 783:18
**924.15** [1] - 783:18
**97** [1] - 751:15
**9:00** [2] - 890:25
**9:45** [3] - 709:10, 891:2

### A

**a.m** [1] - 708:15
**AAACGG** [1] - 847:1
**abbreviate** [2] - 856:9, 856:11
**abbreviations** [1] - 856:2
**ability** [2] - 851:6, 851:14
**able** [8] - 740:3, 742:24, 771:10, 772:19, 773:5, 778:8, 780:16, 789:7
**above-titled** [1] - 892:3
**absence** [3] - 748:1, 780:21, 840:6
**absolutely** [2] - 746:2,

840:1
**academic** [8] - 711:19, 724:15, 727:1, 728:9, 728:12, 730:16, 731:4, 734:12
**access** [3] - 724:19, 727:16, 761:19
**according** [4] - 801:14, 848:2, 848:4, 875:4
**account** [12] - 749:17, 752:24, 766:10, 766:17, 779:17, 779:24, 782:12, 790:5, 790:19, 798:20, 801:16, 823:23
**accounted** [2] - 780:4, 799:14
**accounting** [1] - 798:21
**accounts** [1] - 790:7
**accurate** [2] - 700:4, 852:21
**accurately** [2] - 829:5, 873:17
**achieve** [1] - 771:23
**achieved** [3] - 783:25, 809:21
**acid** [17] - 848:13, 848:16, 849:7, 849:13, 849:19, 850:2, 850:18, 850:25, 851:7, 851:15, 851:17, 854:25, 856:5, 856:6, 856:9, 856:11
**acids** [1] - 856:3
**acquire** [4] - 701:25, 715:25, 773:7, 773:10
**acquired** [5] - 716:1, 718:14, 732:24, 762:3, 765:16
**acquiring** [1] - 773:4
**acquisition** [14] - 702:4, 702:8, 703:2, 711:14, 716:2, 717:4, 717:10, 717:12, 733:2, 733:6, 750:15, 751:13, 791:5, 807:19
**acquisitions** [2] - 716:23, 762:17
**action** [5] - 812:21, 814:15, 815:3, 815:4, 817:19
**actions** [1] - 815:15

SCHUETZ - CROSS

**activities** [2] - 767:17, 815:15
**actual** [10] - 754:25, 814:16, 815:14, 845:18, 845:23, 850:4, 850:7, 854:11, 857:9, 887:2
**add** [3] - 727:3, 795:19, 865:14
**adding** [2] - 795:9, 800:2
**addition** [4] - 812:12, 812:18, 868:2, 881:5
**additional** [11] - 700:12, 700:16, 705:22, 713:18, 715:20, 781:8, 785:2, 792:10, 795:14, 877:4
**address** [5] - 702:9, 705:11, 707:4, 747:3, 752:23
**addressed** [1] - 752:11
**addresses** [2] - 763:10, 780:4
**addressing** [1] - 771:19
**adds** [1] - 751:2
**adequate** [1] - 761:3
**adjourn** [1] - 839:10
**adjust** [4] - 795:2, 801:8, 820:18, 823:13
**adjusted** [2] - 801:15, 821:9
**adjustment** [48] - 702:20, 778:8, 780:12, 780:17, 786:16, 786:17, 786:20, 786:23, 787:8, 787:18, 787:22, 788:11, 789:1, 789:2, 790:1, 790:2, 790:3, 790:7, 790:12, 794:2, 795:9, 795:12, 795:14, 795:15, 795:17, 795:18, 799:11, 799:14, 803:9, 803:13, 803:15, 803:16, 803:18, 820:13, 820:24, 823:16, 823:17, 823:23, 826:3, 827:5, 832:7, 832:8, 835:21, 835:24, 836:1, 837:8
**adjustments** [16] - 705:18, 705:24,

766:11, 778:2, 778:5, 778:19, 782:12, 786:13, 786:14, 790:8, 795:5, 798:4, 799:10, 801:20, 803:2, 838:7
**administration** [3] - 769:11, 816:20, 819:6
**admit** [1] - 827:24
**admitted** [2] - 737:21, 744:1
**Adrian** [1] - 864:19
**adult** [1] - 765:11
**adults** [1] - 726:3
**advantage** [24] - 770:25, 771:5, 771:6, 771:7, 771:9, 771:13, 771:20, 772:2, 772:5, 772:8, 772:15, 772:22, 773:12, 773:15, 774:17, 775:11, 776:2, 776:5, 776:7, 776:10, 799:2, 836:4, 836:14
**advantages** [1] - 719:3
**advice** [3] - 727:17, 727:19, 734:10
**advised** [1] - 759:9
**affect** [4] - 834:17, 851:6, 851:14, 851:17
**affidavit** [3] - 862:18, 888:11, 890:11
**afield** [1] - 768:5
**afternoon** [7] - 700:18, 782:6, 800:20, 800:21, 841:8, 863:1, 863:2
**AGCTs** [1] - 847:6
**aggregate** [1] - 751:16
**agitated** [1] - 876:6
**ago** [6] - 740:25, 762:25, 785:13, 818:24, 849:1, 872:4
**agree** [17] - 706:17, 733:9, 733:11, 776:25, 777:1, 777:18, 779:23, 789:24, 808:8, 808:14, 808:20, 815:21, 816:4, 818:16, 825:7, 829:11, 869:11
**agreeable** [3] - 764:4, 839:5, 839:6
**agreed** [4] - 756:4,

777:8, 777:16, 835:17
**agreement** [95] - 701:21, 704:5, 704:6, 707:18, 714:18, 714:19, 715:7, 726:17, 726:24, 727:11, 750:4, 752:24, 778:2, 778:9, 778:16, 778:17, 778:22, 779:1, 779:16, 779:17, 779:25, 780:7, 782:13, 782:25, 783:2, 783:3, 783:7, 783:14, 783:20, 784:3, 784:18, 784:20, 784:22, 785:10, 785:11, 786:10, 786:11, 787:1, 787:7, 787:9, 787:17, 787:19, 787:23, 788:1, 788:2, 788:9, 788:21, 789:4, 789:10, 789:25, 790:9, 791:7, 791:20, 793:21, 795:3, 795:7, 800:23, 800:25, 801:5, 801:6, 801:8, 801:21, 801:23, 802:8, 803:13, 804:24, 804:25, 805:5, 805:9, 806:19, 807:5, 821:6, 823:13, 830:18, 832:9, 834:5, 834:6, 834:18, 835:11, 835:22, 836:22, 840:15, 843:13, 854:13, 857:9, 868:4, 868:8, 868:13, 882:4
**agreements** [16] - 702:11, 711:15, 725:20, 763:12, 777:12, 780:11, 786:17, 786:20, 787:7, 788:12, 801:10, 801:16, 801:19, 802:22, 804:3, 804:15
**ahead** [4] - 705:10, 747:10, 764:19, 798:8
**air** [1] - 840:8
**akin** [1] - 752:19

**al** [2] - 698:5, 885:11
**Alan** [1] - 699:5
**alignment** [3] - 875:12, 875:15, 875:16
**ALL** [1] - 717:22
**alleged** [1] - 758:21
**allow** [5] - 700:15, 731:3, 752:3, 849:14, 875:14
**allowed** [1] - 702:21
**allowing** [1] - 798:25
**allows** [4] - 766:22, 775:9, 786:20, 788:24
**almost** [8] - 719:12, 802:13, 802:15, 804:6, 820:18, 826:2, 832:7, 832:8
**altered** [1] - 818:10
**alternative** [3] - 704:12, 749:4, 768:12
**alternatives** [1] - 799:21
**ambitions** [1] - 715:5
**amenable** [1] - 839:24
**amended** [2] - 707:13, 753:5
**amino** [18] - 848:12, 848:16, 849:7, 849:13, 849:19, 850:2, 850:18, 850:25, 851:7, 851:15, 851:17, 854:25, 856:2, 856:4, 856:6, 856:9, 856:11
**amount** [16] - 704:12, 704:22, 745:1, 748:17, 749:3, 749:4, 749:7, 749:8, 795:10, 795:22, 797:12, 798:17, 823:17, 843:1, 854:14, 862:6
**amounts** [2] - 784:4, 801:11
**amplify** [3] - 852:6, 878:25, 879:4
**AMY** [1] - 698:22
**Amy** [2] - 892:9, 892:10
**analyses** [4] - 718:17, 727:23, 728:13, 728:18
**analysis** [25] - 727:24, 728:1, 752:11, 752:16, 758:19, 760:5, 760:9,

760:20, 762:12, 762:24, 769:19, 769:20, 776:1, 778:15, 784:8, 786:7, 789:23, 791:15, 794:21, 800:22, 800:25, 826:6, 829:10, 829:13, 833:22
**analysts** [1] - 760:1
**analyzed** [2] - 760:23, 761:21
**Andrea** [1] - 699:8
**Andrew** [2] - 866:11, 866:17
**Angeles** [5] - 698:14, 698:23, 699:7, 699:9, 699:18
**announced** [2] - 773:3, 831:23
**annual** [5] - 764:25, 793:16, 793:19, 793:22, 827:5
**answer** [15] - 741:10, 773:6, 803:22, 805:13, 805:16, 807:8, 813:11, 813:23, 829:15, 834:20, 836:16, 836:25, 845:3, 865:24, 877:2
**ANSWER** [6] - 877:15, 882:15, 883:15, 889:5, 889:8, 889:21
**answered** [1] - 741:17
**answers** [1] - 728:4
**antibody** [1] - 847:14
**anticipate** [3] - 709:5, 710:3, 730:4
**anticipated** [6] - 718:15, 742:16, 744:6, 776:6, 796:3, 839:19
**anyway** [2] - 823:1, 834:1
**apart** [1] - 813:6
**apheresis** [1] - 745:4
**apologies** [3] - 747:3, 828:9, 839:17
**apologize** [2] - 735:19, 735:25, 764:14
**appeals** [1] - 823:2
**appear** [1] - 737:5
**APPEARANCES** [1] - 699:1
**appeared** [1] - 861:20
**appearing** [1] - 842:20
**apples** [3] - 815:3, 832:16

SCHUETZ - CROSS

apples-to-apples [1] - 832:16
applicable [1] - 751:17
applied [5] - 705:17, 777:4, 805:12, 820:21, 820:24
applies [4] - 807:5, 807:6, 810:6
apply [7] - 778:12, 794:24, 798:4, 798:5, 798:13, 798:14, 798:15
applying [5] - 705:24, 797:7, 797:18, 807:5
apportioning [1] - 813:7
apportionment [1] - 815:24
appreciate [2] - 829:17, 829:19
approach [11] - 735:11, 764:5, 776:23, 777:23, 777:24, 777:25, 778:13, 784:12, 786:9, 790:3, 801:4
approached [1] - 829:10
appropriate [7] - 702:18, 733:13, 760:7, 777:1, 778:16, 801:7, 801:12
approval [12] - 715:13, 761:25, 765:11, 779:9, 782:16, 782:23, 783:25, 817:3, 819:19, 819:23, 837:5
approved [10] - 720:13, 720:16, 809:11, 809:17, 809:19, 818:17, 818:21, 819:14, 822:3, 831:19
April [1] - 759:22
area [3] - 703:8, 775:9, 775:12
areas [1] - 701:18
argumentative [1] - 805:17
Arie [1] - 775:13
arose [1] - 823:9
arounds [1] - 799:21
arrangement [2] - 868:15, 885:3
articles [3] - 815:22, 815:24, 822:24
aside [4] - 700:14,

700:25, 799:14, 846:16
aspect [1] - 767:11
aspects [4] - 728:15, 769:5, 776:3, 818:8
assembled [1] - 840:14
assessment [6] - 716:10, 718:20, 719:4, 720:18, 728:2, 738:20
asset [2] - 765:14, 766:8
associated [7] - 712:3, 712:23, 714:12, 749:18, 766:15, 774:17, 843:2
assume [3] - 760:12, 761:15, 891:8
assumed [3] - 719:12, 861:3, 861:6
assumption [1] - 760:11
assumptions [2] - 760:10, 837:13
assure [1] - 757:2
AstraZeneca [3] - 701:9, 704:5, 704:6
Atlas [12] - 844:24, 858:1, 859:25, 861:12, 872:21, 872:23, 884:7, 885:2, 886:16, 886:22, 887:3, 887:15
ATT [1] - 855:23
attached [1] - 846:20
attachment [9] - 705:19, 750:2, 750:5, 750:7, 750:8, 750:9, 750:11, 837:13, 838:20
attempt [1] - 768:2
attempted [1] - 767:21
attempting [1] - 746:6
attempts [2] - 768:11, 768:19
attention [2] - 848:12, 851:20
attest [1] - 862:18
Attorney [11] - 699:4, 699:5, 699:5, 699:6, 699:8, 699:11, 699:15, 699:16, 699:16, 699:17, 699:17
attorney [2] - 852:18, 876:12
attorneys [7] - 733:10,

733:13, 844:3, 868:4, 870:7, 870:9, 870:12
attributable [1] - 765:18
attributes [1] - 788:16
August [7] - 742:19, 796:21, 885:17, 886:6, 887:4, 887:21, 889:24
author's [1] - 741:18
automatically [1] - 850:24
available [11] - 727:13, 732:10, 742:21, 742:22, 742:25, 761:17, 774:19, 812:20, 814:25, 849:12, 849:17
Avenue [2] - 699:6, 699:18
average [3] - 771:23, 772:3, 772:10
aware [4] - 728:12, 728:17, 823:15, 826:19
Aya [2] - 746:18, 753:23

## B

B-cell [1] - 729:24
B-I-S-H-O-P [1] - 723:8
bachelor's [1] - 759:2
back-end [1] - 713:19
background [2] - 759:1, 842:2
bad [1] - 862:2
balance [1] - 731:15
bales [1] - 851:23
bankers [1] - 716:24
bare [1] - 834:13
bargaining [2] - 799:17, 799:23
base [4] - 767:11, 795:16, 799:7
based [31] - 713:17, 724:3, 724:10, 725:3, 733:5, 751:10, 752:11, 752:13, 753:10, 766:7, 771:22, 772:1, 772:13, 775:23, 784:23, 786:17, 790:16, 791:2, 791:16, 796:5, 796:14, 797:22, 804:13,

805:9, 806:14, 806:24, 807:1, 819:20, 819:21, 835:25, 862:2
basic [3] - 776:9, 794:10, 815:17
basis [11] - 713:10, 769:14, 785:10, 793:13, 793:14, 795:3, 797:3, 818:18, 820:6, 832:7, 832:9
Bates [1] - 838:19
BC [1] - 717:13
bearings [1] - 829:2
bears [1] - 828:24
beat [4] - 830:23, 831:1, 831:5, 831:12
became [2] - 739:12, 844:22
become [2] - 799:4, 841:25
began [1] - 851:3
begin [9] - 738:18, 761:25, 779:19, 779:21, 782:16, 782:22, 849:24, 850:25, 876:25
beginning [10] - 715:11, 796:7, 796:17, 823:20, 844:4, 850:18, 852:2, 860:6, 879:14, 879:24
begins [3] - 741:9, 779:9, 855:23
behalf [1] - 865:23
behind [4] - 776:12, 776:13, 836:7
belief [2] - 830:23, 888:1
bell [1] - 726:8
Belldegrun [1] - 755:6
Belldegrun's [1] - 775:14
below [4] - 730:12, 739:9, 742:15, 745:13
bench [1] - 838:25
beneficial [1] - 776:4
benefit [1] - 772:11
benefits [5] - 730:18, 763:9, 776:11, 798:22, 800:12
best [4] - 724:13, 733:9, 734:8, 741:2
better [4] - 730:9, 743:14, 776:17, 826:18
between [55] - 701:21,

703:3, 715:8, 730:22, 739:3, 739:16, 752:12, 761:9, 763:11, 769:23, 770:19, 772:15, 778:9, 778:17, 778:22, 778:24, 779:1, 779:2, 779:15, 779:18, 779:25, 780:8, 782:12, 783:10, 784:18, 784:20, 789:3, 789:9, 790:5, 794:11, 794:12, 795:7, 795:23, 798:10, 799:15, 800:23, 801:16, 804:15, 806:19, 808:22, 812:20, 813:3, 813:20, 815:3, 815:25, 820:19, 823:24, 823:25, 824:2, 827:8, 884:7, 885:1, 886:15, 886:16
beyond [6] - 718:13, 768:18, 769:9, 811:21, 818:12, 839:13
big [2] - 729:8, 847:6
bigger [1] - 826:22
biggest [1] - 826:20
billion [14] - 715:18, 719:13, 748:17, 766:1, 766:4, 766:18, 769:1, 793:22, 793:25, 796:20, 797:1, 797:2, 827:1, 827:6
billions [1] - 725:6
binder [13] - 733:14, 735:10, 763:21, 827:16, 827:18, 828:3, 828:5, 841:20, 846:1, 853:11, 858:20, 859:12, 859:13
binders [5] - 732:16, 792:7, 810:22, 828:4, 841:3
biomedical [1] - 724:21
biopharmaceutical [3] - 711:10, 711:20, 844:6
biotech [2] - 777:14, 863:18
biotechnology [2] - 841:18, 845:1

SCHUETZ - CROSS

**bishop** [16] - 706:6, 706:11, 706:12, 723:12, 732:12, 732:21, 733:8, 733:25, 735:14, 736:9, 741:12, 743:4, 743:13, 744:22, 746:14, 752:20
**Bishop** [9] - 722:20, 722:22, 722:23, 722:24, 722:25, 723:8, 723:16, 744:14, 828:16
**BISHOP** [1] - 723:3
**Bishop's** [1] - 735:25
**bit** [16] - 702:12, 703:13, 707:2, 717:14, 730:20, 731:5, 755:9, 766:15, 767:8, 771:18, 781:13, 784:2, 796:15, 830:9, 848:3, 890:24
**Blanca** [1] - 699:17
**blanket** [1] - 823:15
**blood** [3] - 731:23, 732:4, 745:2
**board** [5] - 704:19, 704:20, 717:7, 842:12, 863:12
**Boston** [5] - 729:8, 842:9, 842:11, 842:19, 870:22
**Bot** [5] - 864:19, 864:21, 865:1, 865:6, 866:6
**bottom** [8] - 812:9, 815:5, 846:25, 847:16, 852:1, 858:22, 874:21, 884:23
**box** [1] - 739:9
**break** [1] - 709:9
**breaks** [1] - 833:11
**brief** [2] - 756:19, 866:5
**briefly** [5] - 743:7, 759:1, 842:16, 854:3, 890:7
**brilliant** [1] - 728:14
**bring** [7] - 707:7, 725:10, 735:25, 809:5, 812:23, 839:24, 840:10
**bringing** [1] - 724:14
**Bristol** [2] - 844:14, 844:16
**Bristol-Myers** [2] - 844:14, 844:16

**broad** [1] - 754:24
**broader** [1] - 818:8
**brought** [1] - 768:17
**built** [1] - 717:1
**bullet** [1] - 741:13
**bunch** [1] - 857:5
**business** [18] - 701:19, 702:7, 702:10, 703:11, 711:7, 731:10, 731:20, 733:10, 733:12, 760:1, 762:14, 762:15, 767:16, 776:8, 791:3, 791:4, 791:17
**busy** [1] - 711:23
**BY** [61] - 711:3, 719:20, 721:24, 723:11, 732:20, 733:23, 735:13, 736:8, 737:1, 737:8, 737:12, 738:1, 738:13, 741:11, 743:9, 744:13, 758:12, 764:21, 768:8, 774:9, 775:3, 775:22, 782:8, 785:24, 787:5, 787:16, 792:11, 793:8, 794:9, 798:19, 800:19, 805:18, 810:20, 811:6, 813:14, 828:14, 835:1, 838:5, 838:13, 841:15, 846:6, 851:25, 853:17, 855:14, 857:2, 859:2, 859:23, 862:25, 865:4, 866:3, 874:20, 878:5, 879:23, 881:24, 882:11, 884:14, 886:13, 888:9, 888:22, 889:16, 890:10

## C

**CA** [1] - 698:23
**CAAA** [1] - 855:23
**caboodle** [1] - 813:8
**calculate** [1] - 787:22
**calculated** [1] - 806:23
**calculating** [1] - 760:11
**calculation** [6] - 785:8, 790:25, 795:6, 797:23,

797:24, 820:12
**calculations** [2] - 795:4, 801:25
**calendar** [1] - 890:24
**CALIFORNIA** [1] - 698:2
**California** [6] - 698:14, 699:7, 699:9, 699:18, 759:4, 759:6
**calm** [1] - 876:7
**Cambridge** [1] - 841:19
**Campana** [3] - 726:14, 726:15, 740:5
**cancer** [18] - 702:11, 703:9, 711:16, 711:25, 712:2, 712:4, 712:6, 713:22, 718:3, 718:5, 724:1, 724:4, 725:12, 731:24, 732:7, 775:11, 842:11
**cancers** [1] - 732:3
**candidate** [3] - 730:1, 830:8, 830:10
**candidates** [2] - 789:9, 829:22
**capacity** [1] - 731:19
**capital** [2] - 844:24, 872:21
**capped** [1] - 752:20
**capture** [5] - 732:1, 794:25, 812:5, 813:4
**captures** [1] - 769:20
**CAR** [68] - 703:4, 714:17, 714:22, 715:10, 715:16, 718:12, 718:13, 718:14, 725:24, 726:4, 726:11, 726:12, 729:3, 729:6, 729:9, 734:25, 739:3, 739:7, 739:16, 740:10, 741:15, 742:16, 743:15, 743:16, 745:2, 745:5, 745:18, 766:21, 766:22, 767:2, 767:12, 767:14, 767:16, 768:21, 768:23, 769:4, 769:13, 769:16, 779:3, 788:6, 788:14, 789:16, 803:8, 816:7, 819:22, 820:7, 820:13,

820:19, 820:23, 820:24, 820:25, 821:2, 822:21, 824:6, 826:12, 827:10, 845:1, 845:15, 846:14, 848:6, 850:2, 862:1, 872:25, 873:4, 874:3, 885:5, 885:6
**CAR-T** [41] - 703:4, 714:17, 714:22, 715:10, 718:12, 718:13, 718:14, 725:24, 729:3, 729:6, 734:25, 739:3, 739:7, 740:10, 741:15, 742:16, 743:15, 743:16, 745:2, 745:18, 767:16, 768:21, 768:23, 779:3, 788:6, 788:14, 789:16, 803:8, 820:13, 820:19, 820:23, 820:24, 820:25, 821:2, 824:6, 826:12, 827:10, 845:1, 845:15, 846:14, 862:1
**CAR-Ts** [3] - 715:16, 729:9, 745:5
**care** [2] - 744:1, 820:2
**career** [1] - 725:1
**careful** [2] - 710:22, 822:4
**carefully** [1] - 727:15
**CARs** [1] - 745:4
**case** [39] - 713:4, 748:1, 756:2, 756:6, 760:4, 761:22, 762:18, 762:25, 763:1, 763:6, 775:24, 778:8, 779:20, 780:21, 797:13, 799:25, 800:7, 801:7, 801:13, 823:5, 823:7, 823:8, 823:11, 833:14, 840:6, 843:11, 843:14, 844:2, 852:17, 862:10, 862:11, 868:4, 869:2, 869:17, 870:14, 871:9, 872:1, 875:14
**cases** [3] - 761:1, 822:24, 823:3
**cash** [3] - 713:15,

713:18, 715:21
**casually** [1] - 777:5
**caused** [1] - 811:18
**causes** [1] - 776:20
**CD28** [8] - 734:25, 735:6, 739:23, 847:17, 848:5, 851:17, 854:4, 874:6
**cease** [1] - 817:14
**Celgene** [40] - 701:9, 701:16, 701:20, 701:22, 701:25, 702:5, 702:8, 702:10, 702:13, 702:21, 703:1, 703:4, 703:6, 703:9, 704:9, 704:13, 711:7, 711:9, 711:10, 711:12, 711:17, 711:23, 712:2, 712:7, 712:17, 713:2, 713:6, 713:11, 714:16, 714:21, 714:24, 715:8, 715:15, 715:25, 719:11, 721:4, 732:24, 733:6, 844:13, 844:16
**cell** [8] - 715:16, 725:24, 729:24, 845:1, 845:15, 848:18, 848:22, 862:1
**cellphone** [1] - 856:15
**cells** [7] - 729:3, 745:2, 745:19, 745:25, 848:20
**center** [3] - 724:2, 724:4, 725:13
**centers** [8] - 711:19, 724:16, 727:1, 727:2, 731:4, 771:12, 772:17, 775:11
**CENTRAL** [1] - 698:2
**CEO** [18] - 723:16, 723:20, 728:22, 729:12, 729:20, 731:6, 732:23, 733:8, 734:23, 775:6, 828:16, 828:20, 841:18, 863:9, 873:2, 885:4, 886:3, 886:24
**certain** [10] - 701:3, 726:20, 741:17, 749:21, 755:3, 776:3, 793:1, 801:20, 805:1,

817:22
**certainly** [10] - 702:23, 717:3, 734:16, 735:4, 736:20, 737:6, 776:3, 817:4, 819:19, 867:4
**certainty** [1] - 815:10
**certificate** [13] - 869:2, 869:6, 872:2, 872:15, 885:14, 885:21, 886:3, 887:5, 887:16, 887:23, 888:1, 889:25, 890:3
**certified** [1] - 842:12
**certify** [1] - 892:2
**CFO** [3] - 866:11, 866:17, 866:19
**chain** [1] - 855:15
**challenges** [2] - 728:9, 728:11
**chances** [1] - 724:13
**change** [1] - 707:24
**changed** [5] - 853:1, 853:2, 853:4, 853:5, 861:6
**changes** [1] - 818:3
**characterization** [1] - 808:14
**characterize** [1] - 769:24
**charge** [1] - 843:20
**chart** [4] - 739:20, 744:2, 745:15, 803:3
**charts** [2] - 793:2
**checkbook** [1] - 731:15
**checking** [1] - 854:10
**checks** [1] - 860:7
**cheered** [1] - 730:6
**chief** [8] - 747:8, 747:13, 753:24, 756:7, 767:9, 774:14, 842:10, 866:19
**Children's** [2] - 725:13, 726:12
**children's** [2] - 726:16, 787:6
**chose** [2] - 730:12, 818:25
**Chu** [3] - 699:4, 781:2, 838:23
**CHU** [5] - 700:22, 839:6, 839:9, 839:17, 839:21
**circuit** [2] - 822:25, 823:2
**circulated** [1] - 773:5
**cited** [2] - 749:23,

751:1
**claim** [13] - 774:4, 814:11, 815:12, 823:24, 845:11, 845:12, 848:12, 849:4, 852:10, 854:23, 854:24, 879:9
**claimed** [1] - 752:5
**claiming** [1] - 869:1
**clarify** [4] - 722:5, 814:17, 852:22, 865:14
**class** [1] - 739:10
**clean** [1] - 756:2
**clear** [16] - 704:7, 705:13, 737:7, 738:24, 741:19, 751:9, 753:11, 756:3, 776:4, 794:21, 804:17, 805:7, 807:16, 808:13, 871:3
**clearly** [2] - 741:24, 742:7
**clerical** [1] - 852:19
**CLERK** [23] - 710:16, 710:21, 723:1, 723:6, 735:18, 748:3, 756:20, 757:8, 757:15, 757:18, 757:21, 780:23, 781:6, 781:24, 782:1, 840:11, 840:19, 841:1, 841:6, 841:12, 877:25, 878:2, 891:3
**clinic** [4] - 845:16, 846:14, 848:6, 849:6
**clinical** [31] - 720:10, 726:2, 734:25, 768:17, 770:15, 782:18, 782:20, 809:8, 816:21, 817:21, 817:23, 818:3, 819:3, 819:25, 824:19, 824:23, 825:4, 845:9, 845:14, 854:6, 854:16, 861:20, 873:25, 874:3, 880:3, 880:4, 880:7, 880:19, 880:22, 887:10
**clip** [1] - 747:21
**clock** [1] - 857:6
**close** [11] - 709:17, 729:17, 732:8, 803:12, 804:9,

808:8, 808:16, 808:20, 809:22, 820:22, 883:14
**closely** [1] - 804:7
**closer** [2] - 755:10, 821:5
**closest** [2] - 791:19, 791:21
**closing** [2] - 710:4, 729:19
**closings** [1] - 709:17
**co** [1] - 784:18
**co-agreement** [1] - 784:18
**codon** [4] - 850:12, 850:13, 850:15, 850:17
**cofounder** [2] - 723:20, 863:9
**collaborate** [1] - 714:21
**collaboration** [5] - 714:17, 714:20, 720:21, 720:24, 844:19
**collaborators** [1] - 779:1
**colleagues** [1] - 859:24
**collection** [1] - 761:19
**colloquy** [1] - 866:5
**column** [9] - 743:18, 832:23, 851:20, 852:1, 854:5, 879:14, 879:17, 880:25, 881:2
**columns** [3] - 832:22, 832:24, 874:21
**combination** [1] - 847:13
**combined** [1] - 777:6
**comfortable** [1] - 891:6
**coming** [4] - 706:24, 717:25, 776:14, 776:16
**commercial** [5] - 717:13, 717:15, 747:14, 767:9, 767:12
**commercialization** [1] - 715:14
**commercialize** [2] - 885:5, 885:6
**commercialized** [6] - 779:12, 789:20, 812:7, 816:23, 817:5, 819:12
**commercially** [3] - 729:21, 730:23,

732:10
**commission** [3] - 760:18, 764:24, 765:1
**commitment** [7] - 729:2, 740:10, 740:13, 741:3, 789:16, 826:12, 827:10
**committed** [2] - 829:1, 832:21
**committee** [1] - 717:7
**common** [6] - 713:11, 717:2, 717:5, 776:10, 777:15, 794:14
**communicate** [2] - 773:20, 853:8
**communications** [1] - 734:14
**companies** [21] - 711:19, 717:4, 719:4, 724:22, 724:23, 724:24, 725:3, 729:16, 760:2, 760:16, 762:14, 764:25, 770:11, 773:17, 782:19, 809:1, 809:4, 826:20, 844:6, 844:9, 844:16
**company** [56] - 704:15, 711:10, 712:2, 712:12, 713:15, 713:16, 714:9, 723:16, 723:20, 724:3, 724:19, 725:7, 726:25, 727:3, 727:5, 727:8, 727:9, 729:5, 729:15, 729:16, 731:21, 733:8, 735:4, 760:23, 762:11, 765:2, 765:4, 770:21, 771:7, 773:11, 773:20, 826:14, 828:21, 831:23, 832:1, 837:9, 837:22, 841:18, 844:5, 845:1, 862:7, 863:9, 863:15, 863:18, 866:23, 867:9, 867:19, 868:3, 872:24, 873:2, 885:4, 886:3, 886:15, 886:16, 886:23
**company's** [1] -

772:18
**company-announced** [1] - 831:23
**company-sponsored** [1] - 735:4
**comparable** [7] - 777:25, 778:1, 801:7, 801:13, 802:23, 803:1, 823:14
**compare** [2] - 796:2, 849:15
**compared** [7] - 712:21, 743:15, 832:14, 835:22, 837:7, 838:16, 849:3
**compares** [1] - 826:6
**comparing** [6] - 751:12, 786:19, 822:17, 827:5, 833:7, 838:16
**comparison** [4] - 832:17, 850:10, 851:10, 871:20
**compass** [1] - 841:19
**Compass** [10] - 844:5, 844:7, 844:17, 844:19, 863:9, 863:12, 863:15, 863:18, 866:15, 866:23
**compelling** [1] - 724:12
**compensate** [1] - 761:3
**compensation** [1] - 811:21
**compete** [3] - 729:13, 824:22
**competed** [7] - 729:11, 729:13, 729:14, 729:15, 770:3, 770:14
**competing** [11] - 770:13, 770:15, 824:23, 824:24, 824:25, 825:1, 825:3, 825:4, 825:5, 825:7
**competition** [11] - 770:7, 770:9, 770:19, 770:24, 790:16, 803:16, 812:24, 823:23, 823:25, 825:25, 827:3
**competitive** [17] - 717:15, 717:17, 763:11, 770:16,

SCHUETZ - CROSS

790:15, 790:20, 790:22, 790:23, 813:4, 813:17, 824:2, 824:4, 824:5, 826:5, 827:4, 828:25, 838:16
**competitor** [13] - 713:3, 718:21, 728:23, 728:25, 738:20, 741:15, 741:20, 780:16, 789:21, 794:15, 821:9, 826:4, 829:12
**competitors** [11] - 713:2, 728:24, 741:24, 742:8, 769:25, 770:2, 779:14, 794:12, 824:6, 824:8, 824:9
**complete** [4] - 792:24, 818:21, 877:1
**completely** [3] - 750:24, 752:10, 753:16
**completeness** [3] - 791:17, 888:14, 889:11
**completion** [2] - 783:22, 783:23
**complex** [5] - 716:6, 755:9, 792:14, 847:11, 861:17
**complicated** [5] - 716:5, 721:4, 724:13, 750:22, 862:6
**component** [14] - 705:16, 749:9, 752:23, 777:5, 785:10, 786:2, 797:5, 797:20, 797:21, 797:22, 798:18, 800:2, 800:3, 873:15
**components** [9] - 705:22, 726:18, 748:18, 777:2, 777:6, 777:22, 778:5, 811:15, 845:6
**composed** [1] - 748:18
**compound** [1] - 719:4
**computer** [5] - 849:12, 849:18, 875:9, 875:12, 875:20
**concern** [3] - 701:7, 704:21, 707:1
**concerned** [1] - 839:1
**concerning** [1] - 708:5
**conclude** [1] - 724:10

**concluded** [1] - 801:6
**concludes** [1] - 890:22
**conclusion** [1] - 853:7
**conclusions** [1] - 772:13
**conduct** [1] - 817:23
**conducted** [1] - 771:18
**confer** [1] - 764:3
**conference** [2] - 865:7, 866:7
**confident** [1] - 719:5
**confidential** [4] - 846:10, 846:18, 849:24, 865:15
**confidentiality** [1] - 728:19
**confirm** [1] - 868:17
**confirmation** [1] - 704:1
**confirmed** [1] - 875:17
**confuse** [1] - 822:4
**confused** [2] - 852:25, 883:7
**confusing** [4] - 806:16, 814:14, 822:20, 854:18
**conjectural** [1] - 816:2
**connect** [1] - 819:7
**connection** [1] - 760:10
**conservative** [1] - 719:7
**consider** [13] - 707:15, 709:15, 712:5, 713:17, 713:24, 715:9, 717:23, 722:3, 739:6, 776:6, 784:8, 785:7, 850:17
**considerable** [1] - 789:15
**consideration** [5] - 714:7, 751:21, 752:25, 755:24, 769:18
**considerations** [1] - 717:11
**considered** [16] - 715:13, 742:7, 760:13, 762:11, 762:23, 763:3, 769:7, 770:1, 772:22, 779:8, 782:21, 787:7, 787:17, 804:3, 835:19, 891:16
**considering** [5] - 715:5, 718:20, 751:18, 751:19,

817:18
**consistent** [3] - 704:25, 753:16, 778:3
**consists** [1] - 786:3
**consolidate** [1] - 830:20
**consternation** [1] - 703:19
**construct** [61] - 726:4, 726:11, 726:12, 726:14, 739:12, 767:10, 767:13, 767:14, 768:12, 768:13, 768:16, 768:17, 768:21, 769:4, 769:9, 769:13, 769:16, 816:8, 816:11, 817:8, 818:16, 819:22, 820:3, 820:5, 820:7, 821:20, 821:22, 821:23, 821:25, 822:2, 822:5, 822:8, 822:20, 822:21, 845:14, 845:16, 845:23, 846:14, 847:4, 847:5, 849:5, 854:16, 855:1, 873:4, 873:10, 873:19, 874:1, 874:3, 874:7, 875:6, 879:25, 880:3, 880:4, 880:7, 880:19, 880:20, 880:23, 882:21, 887:10
**constructed** [1] - 880:25
**constructs** [4] - 768:12, 788:15, 854:6, 862:1
**consultant** [1] - 872:20
**consultants** [1] - 716:24
**consulting** [7] - 843:21, 868:4, 868:8, 868:11, 868:13, 868:15, 882:4
**contacted** [3] - 844:2, 844:3, 862:14
**contain** [1] - 714:6
**contained** [1] - 857:17
**containing** [1] - 846:13
**contemplates** [1] - 742:23

**contends** [1] - 809:1
**context** [5] - 738:17, 748:14, 761:2, 778:14, 862:10
**continue** [10] - 710:9, 759:5, 768:14, 770:24, 780:20, 818:23, 839:4, 861:12, 885:2, 886:14
**continued** [8] - 858:9, 858:16, 861:8, 876:1, 878:8, 878:12, 883:3, 883:8
**continues** [1] - 772:9
**continuing** [5] - 772:16, 817:14, 854:19, 861:15, 884:4
**contrary** [1] - 798:9
**contrast** [3] - 779:4, 791:9, 793:21
**contravene** [1] - 727:21
**contribution** [4] - 769:21, 813:5, 813:7, 815:19
**contributions** [4] - 769:22, 815:20, 818:12, 818:15
**contributors** [1] - 769:9
**controversial** [1] - 803:5
**conversation** [1] - 862:13
**conversations** [4] - 844:11, 844:13, 844:15, 861:10
**conversion** [1] - 856:7
**converted** [2] - 793:11, 848:18
**converting** [1] - 793:14
**convincing** [1] - 739:6
**copies** [4] - 736:1, 764:5, 842:14, 877:23
**copy** [7] - 725:9, 735:10, 735:16, 735:21, 764:19, 828:1, 877:22
**copying** [1] - 862:8
**Corey** [2] - 723:25, 724:8
**corporate** [2] - 711:11, 866:16
**corporation** [2] - 711:8, 711:9
**correct** [150] - 700:9,

701:10, 701:17, 719:24, 720:2, 720:5, 720:23, 720:25, 722:4, 722:10, 734:11, 735:7, 735:8, 738:3, 739:23, 739:24, 740:2, 740:6, 742:1, 742:25, 743:15, 745:23, 746:7, 756:12, 774:6, 800:24, 801:9, 801:14, 801:20, 802:3, 802:6, 802:9, 802:11, 802:12, 802:17, 802:20, 802:24, 803:10, 803:16, 803:21, 803:25, 804:7, 804:11, 804:14, 804:19, 804:23, 805:3, 805:10, 805:21, 806:2, 806:9, 806:12, 806:25, 807:4, 807:10, 807:18, 808:10, 809:2, 809:5, 809:9, 809:12, 809:21, 810:2, 810:4, 811:9, 811:13, 811:22, 812:7, 812:12, 812:3, 813:18, 813:21, 814:4, 814:12, 815:20, 815:22, 816:3, 816:11, 816:18, 817:1, 817:4, 818:4, 818:17, 819:4, 819:25, 820:8, 821:2, 821:13, 821:21, 821:24, 822:3, 823:3, 823:8, 823:10, 823:18, 824:7, 824:11, 824:15, 825:2, 825:10, 825:13, 825:14, 825:18, 825:22, 826:12, 826:22, 828:21, 829:1, 830:1, 830:22, 832:11, 832:20, 833:22, 834:7, 834:10, 835:15, 836:18, 837:14, 838:7, 846:18, 848:2, 853:22, 855:6, 855:19, 858:10, 860:1, 860:8, 865:7, 866:8, 866:12,

SCHUETZ - CROSS

866:17, 866:21, 868:6, 869:17, 871:10, 872:18, 875:12, 878:13, 878:16, 878:20, 879:1, 879:11, 881:3, 881:25, 884:17, 889:2, 889:7, 890:20, 891:9, 892:2
**corrected** [2] - 853:1, 887:22
**correction** [15] - 869:2, 869:6, 872:2, 872:15, 876:3, 885:12, 885:14, 885:21, 886:3, 887:5, 887:16, 887:23, 888:1, 889:25, 890:3
**corrections** [1] - 878:11
**correctly** [4] - 819:14, 830:4, 889:9, 889:22
**corresponded** [1] - 880:20
**corresponds** [1] - 888:24
**costim** [2] - 734:25, 735:6
**costimulatory** [6] - 739:17, 739:22, 739:25, 740:3, 849:23, 850:2
**costs** [1] - 789:12
**council** [1] - 759:8
**COUNSEL** [1] - 699:1
**counsel** [16] - 700:15, 710:9, 748:6, 756:5, 756:23, 764:3, 782:4, 801:24, 810:16, 836:24, 840:14, 840:15, 865:17, 865:20, 865:22, 879:13
**counted** [1] - 847:23
**country** [1] - 842:18
**couple** [7] - 700:3, 706:6, 706:12, 742:14, 761:12, 860:10, 861:18
**course** [11] - 702:4, 731:10, 745:24, 757:2, 762:14, 763:4, 791:17, 793:20, 817:19, 869:15, 877:3
**COURT** [203] - 698:1, 700:1, 700:11, 700:19, 700:21,

700:23, 700:25, 701:13, 701:24, 702:14, 702:25, 703:8, 703:13, 703:18, 704:7, 705:2, 705:4, 705:10, 705:15, 706:3, 706:8, 706:10, 706:12, 706:15, 706:19, 707:1, 707:6, 707:9, 707:21, 708:1, 708:4, 708:8, 708:11, 708:18, 708:20, 708:22, 709:2, 709:5, 709:10, 709:13, 709:18, 710:2, 710:5, 710:8, 711:1, 719:17, 721:16, 721:19, 721:22, 722:14, 722:16, 722:19, 722:23, 722:25, 723:9, 732:14, 732:18, 733:20, 735:12, 735:21, 735:23, 736:2, 736:6, 736:22, 736:24, 737:4, 737:23, 738:8, 738:10, 741:7, 743:6, 746:14, 746:21, 747:1, 747:5, 747:10, 747:19, 747:22, 747:24, 748:5, 748:11, 748:13, 752:5, 753:1, 753:15, 753:20, 754:6, 754:14, 754:21, 755:9, 755:18, 755:22, 756:8, 756:11, 756:14, 756:16, 756:22, 757:24, 758:3, 758:6, 758:9, 763:19, 763:23, 764:3, 764:6, 764:10, 764:15, 764:19, 768:6, 773:24, 774:2, 774:4, 774:7, 775:1, 775:21, 780:19, 781:1, 781:8, 781:11, 781:16, 781:19, 781:25, 782:3, 785:20, 785:23, 787:3, 787:12, 787:14, 792:6, 792:10,

792:22, 792:25, 794:6, 794:8, 798:8, 798:12, 800:14, 805:17, 810:15, 810:19, 811:3, 813:12, 827:20, 827:22, 828:10, 828:12, 834:24, 838:23, 839:1, 839:11, 839:16, 839:20, 839:25, 840:2, 840:10, 840:13, 841:5, 841:13, 846:3, 846:5, 851:24, 853:15, 855:10, 855:12, 857:1, 859:1, 859:19, 859:21, 862:22, 865:3, 865:10, 865:13, 865:17, 865:20, 865:25, 874:18, 876:22, 876:24, 877:1, 877:4, 877:8, 877:10, 877:24, 878:3, 879:18, 879:21, 881:22, 882:9, 884:12, 886:9, 886:11, 888:5, 888:16, 888:19, 888:21, 889:14, 890:6, 890:22, 891:5, 891:8, 891:12, 891:18, 891:21
**Court** [33] - 702:20, 703:24, 704:18, 704:21, 705:23, 705:24, 706:22, 707:2, 707:19, 708:17, 709:15, 709:16, 719:18, 735:18, 746:20, 748:22, 748:24, 749:11, 750:21, 751:1, 751:4, 751:7, 752:10, 752:22, 755:10, 755:13, 760:6, 763:1, 823:8, 842:21, 891:16, 891:24
**court** [17] - 698:25, 704:15, 704:23, 747:25, 754:3, 754:7, 754:9, 754:19, 775:13, 812:21, 814:15, 815:3, 815:4, 823:2, 835:2, 839:22, 872:13

**Court's** [3] - 703:17, 704:10, 749:17
**courtroom** [10] - 710:7, 748:4, 756:21, 780:20, 780:24, 782:2, 839:18, 840:9, 840:12, 891:4
**cover** [6] - 701:18, 702:3, 714:23, 763:17, 828:15, 874:6
**covered** [12] - 726:4, 728:5, 752:2, 845:8, 845:14, 845:24, 854:12, 854:16, 873:11, 873:20, 874:1, 887:11
**Crawford** [1] - 699:5
**create** [1] - 717:8
**created** [2] - 717:8, 882:21
**critical** [2] - 854:20, 861:14
**critically** [1] - 746:2
**criticized** [1] - 730:14
**cross** [2] - 781:11, 839:7
**CROSS** [4] - 719:19, 732:19, 800:18, 862:24
**CROSS-EXAMINATION** [4] - 719:19, 732:19, 800:18, 862:24
**crossing** [1] - 705:21
**CRR** [2] - 698:22, 892:9
**CRS** [2] - 743:17, 743:22
**Cruz** [2] - 764:7, 877:24
**curative** [5] - 700:13, 707:11, 707:13, 708:5, 708:12
**cure** [2] - 731:25, 732:3
**current** [1] - 854:6, 866:11, 866:17
**cytokine** [1] - 743:22

# D

**D-U-L-A-C** [1] - 710:25
**D4** [5] - 837:14, 837:20, 837:22, 838:14, 838:20
**damage** [1] - 749:16
**damages** [21] - 704:11, 758:20,

759:12, 760:11, 761:1, 761:3, 774:21, 797:5, 799:7, 799:25, 811:17, 811:21, 812:5, 812:10, 812:14, 813:15, 813:16, 814:15, 815:12, 815:17, 815:25
**Dana** [1] - 842:11
**DANE** [51] - 707:8, 707:10, 707:23, 708:3, 708:15, 708:19, 709:11, 709:14, 709:23, 710:3, 710:6, 732:15, 732:20, 733:17, 733:22, 733:23, 735:11, 735:13, 735:19, 735:22, 735:24, 736:4, 736:7, 736:8, 736:25, 737:1, 737:8, 737:11, 737:12, 737:20, 738:1, 738:7, 738:13, 741:8, 741:11, 743:3, 744:11, 744:13, 746:13, 756:13, 756:15, 781:7, 781:17, 781:21, 839:7, 839:10, 839:14, 839:23, 891:16, 891:19, 891:23
**Dane** [4] - 699:16, 732:14, 732:22, 838:24
**darn** [1] - 808:16
**Dash** [1] - 708:5
**dash** [1] - 708:25
**Dash's** [2] - 700:14, 707:11
**data** [16] - 715:11, 716:7, 720:9, 743:14, 744:4, 748:24, 759:25, 760:15, 760:19, 792:5, 811:25, 812:1, 832:25, 837:20, 861:20, 882:18
**date** [4] - 738:19, 743:1, 761:24, 805:24
**dated** [2] - 733:25, 861:2
**David** [1] - 740:15

**DAY** [2] - 699:8, 699:10
**days** [3] - 728:8, 745:14, 745:15
**DBCL** [1] - 837:4
**deal** [18] - 714:8, 714:24, 725:15, 725:18, 725:23, 726:11, 726:21, 729:17, 729:19, 873:13, 873:15, 873:18, 883:4, 883:14, 884:4, 885:2, 886:2, 887:24
**dealing** [3] - 706:16, 755:8, 832:1
**deaths** [2] - 732:6, 809:7
**December** [2] - 698:15, 892:9
**decide** [4] - 712:7, 719:23, 773:10, 842:25
**decided** [1] - 768:18
**decision** [6] - 712:10, 716:13, 717:6, 760:2, 773:7, 791:4
**decision-making** [1] - 716:13
**decisions** [1] - 762:16
**deducts** [1] - 796:24
**Defendant** [2] - 698:9, 699:14
**defendant** [5] - 700:13, 701:2, 749:11, 891:14
**defendant's** [1] - 701:6
**defendants** [2] - 756:11, 840:14
**defense** [2] - 828:7, 860:8
**defined** [2] - 727:9, 802:25
**definition** [1] - 810:9
**degree** [5] - 741:3, 759:2, 833:16, 842:4
**degrees** [1] - 842:7
**delay** [1] - 748:20
**delayed** [1] - 720:13
**delays** [1] - 757:1
**deliverable** [1] - 721:9
**delta** [3] - 812:20, 813:3, 813:19
**demand** [6] - 769:12, 769:17, 819:10, 819:11, 819:15, 819:18
**demonstrates** [1] - 776:9

**demonstrative** [2] - 801:24, 820:14
**demonstratives** [2] - 758:24, 792:2
**department** [1] - 759:8
**depended** [2] - 749:19, 751:5
**depo** [3] - 706:6, 709:8, 746:25
**deposed** [3] - 701:20, 703:11, 833:14
**deposition** [29] - 741:4, 741:12, 746:15, 746:18, 747:5, 747:14, 747:17, 747:20, 753:22, 754:4, 754:16, 755:1, 755:3, 755:4, 833:18, 833:24, 843:17, 864:2, 864:5, 869:19, 869:24, 876:16, 877:22, 881:12, 881:21, 882:1, 882:7, 883:9, 888:14
**depositions** [1] - 706:13
**describe** [7] - 842:2, 842:16, 843:4, 843:13, 844:22, 845:3, 872:9
**described** [11] - 813:19, 813:22, 813:24, 820:10, 845:24, 849:4, 854:4, 863:18, 872:7, 880:20, 880:24
**describes** [1] - 845:12
**describing** [2] - 741:13, 847:11
**deserves** [1] - 793:5
**design** [1] - 799:21
**design-arounds** [1] - 799:21
**designate** [2] - 755:2, 755:3
**designated** [3] - 754:9, 754:23, 838:19
**designation** [2] - 739:11, 746:18
**designations** [4] - 746:25, 754:17, 755:4, 888:14
**designee** [4] - 754:10, 754:15, 754:24, 755:2
**detail** [2] - 700:7,

778:11
**detailed** [2] - 765:2, 765:3
**details** [2] - 786:14, 882:20
**detect** [1] - 731:23
**determination** [2] - 814:20, 849:11
**determine** [5] - 807:9, 814:1, 851:1, 851:7, 851:14
**determined** [9] - 748:16, 766:18, 778:15, 812:21, 817:15, 849:7, 849:20, 851:3, 861:5
**determining** [4] - 760:6, 763:3, 869:6, 873:25
**develop** [11] - 712:20, 714:17, 715:21, 768:11, 771:10, 775:10, 830:16, 845:1, 872:25, 885:8, 885:9
**developed** [5] - 702:7, 713:18, 768:13, 779:12, 790:18
**developer** [6] - 803:8, 820:13, 820:23, 820:24, 820:25, 821:2
**developers** [1] - 820:20
**developing** [5] - 725:6, 739:12, 739:17, 788:6, 821:24
**development** [22] - 701:19, 701:20, 702:7, 702:10, 703:11, 711:7, 712:12, 712:16, 712:23, 720:4, 720:7, 750:1, 750:6, 750:12, 751:19, 765:20, 779:7, 783:21, 789:8, 809:2, 809:14, 817:12
**developments** [1] - 773:21
**diagnosis** [1] - 732:6
**DIAZ** [1] - 698:22
**Diaz** [2] - 892:9, 892:10
**Dickinson** [2] - 866:12, 866:17
**Diego** [3] - 759:4, 759:6

**difference** [16] - 780:3, 780:5, 788:5, 788:7, 788:22, 790:24, 793:23, 794:11, 795:2, 808:22, 812:19, 821:18, 824:2, 827:8, 830:7, 833:12
**differences** [16] - 730:22, 739:3, 739:10, 739:19, 778:9, 778:21, 778:24, 779:15, 779:24, 782:12, 786:22, 789:3, 790:5, 799:15, 801:16, 833:3
**different** [57] - 715:4, 716:25, 717:21, 726:1, 731:14, 749:3, 752:10, 758:4, 761:16, 763:2, 770:23, 775:10, 780:8, 786:10, 786:11, 788:14, 788:15, 788:16, 789:17, 790:3, 790:15, 792:14, 792:15, 794:16, 804:3, 804:17, 806:20, 818:10, 821:14, 822:6, 822:21, 825:23, 830:9, 831:9, 831:16, 831:21, 832:3, 832:5, 832:23, 833:9, 847:12, 849:6, 849:15, 852:17, 853:3, 855:1, 857:5, 861:25, 862:1, 883:17, 883:21
**differentiation** [4] - 738:25, 739:2, 739:5, 739:16
**differently** [3] - 807:11, 807:14, 848:3
**difficult** [5] - 724:25, 730:17, 731:25, 740:25, 837:18
**diffuse** [2] - 717:13, 729:24
**diligence** [2] - 716:10, 845:13
**dime** [1] - 725:8
**dimensions** [1] - 824:25
**diminish** [1] - 772:6

**dinner** [1] - 884:19
**direct** [24] - 713:3, 727:7, 735:20, 735:25, 743:13, 762:19, 769:25, 781:8, 781:20, 781:21, 848:10, 848:12, 851:20, 853:25, 863:8, 870:2, 871:21, 873:7, 874:15, 875:4, 878:14, 878:22, 883:1, 887:8
**DIRECT** [4] - 711:2, 723:10, 758:11, 841:14
**directly** [5] - 770:12, 770:16, 825:5, 852:20, 865:1
**director** [1] - 775:6
**directors** [1] - 863:12
**disadvantage** [1] - 776:19
**disagree** [5] - 799:13, 807:23, 817:9, 820:9, 835:9
**disagreements** [2] - 799:6, 820:11
**disciplines** [1] - 728:17
**disclosed** [6] - 704:12, 704:22, 749:3, 749:9, 749:16, 750:19
**discovered** [4] - 852:16, 858:14, 862:3, 874:14
**discovery** [1] - 863:16
**discuss** [6] - 748:1, 780:21, 783:17, 784:16, 788:13, 840:6
**discussed** [7] - 751:8, 802:8, 811:8, 811:17, 811:20, 871:20, 877:16
**discussing** [3] - 769:1, 778:15, 853:8
**discussion** [2] - 703:24, 862:17
**discussions** [8] - 713:3, 834:1, 844:5, 844:17, 861:15, 866:10, 866:14, 871:25
**disease** [2] - 730:8, 732:1
**dispute** [3] - 779:20, 806:7, 872:12
**disputed** [1] - 797:12

**disputing** [1] - 817:11
**disregard** [1] - 834:25
**dissipate** [1] - 772:6
**distinct** [2] - 719:2, 856:22
**distinction** [2] - 814:21, 827:7
**distinctions** [2] - 790:13, 822:19
**distinctly** [1] - 857:3
**distinguish** [1] - 826:10
**DISTRICT** [3] - 698:1, 698:2, 698:3
**divided** [1] - 783:10
**divisible** [2] - 848:8, 851:12
**DIVISION** [1] - 698:2
**DLBCL** [17] - 717:9, 717:14, 717:23, 717:25, 719:14, 765:12, 768:25, 825:17, 825:19, 830:3, 830:6, 830:12, 830:24, 831:2, 831:6, 831:12, 837:3
**DNA** [29] - 842:14, 845:12, 845:15, 845:18, 845:20, 845:22, 845:24, 846:14, 847:4, 847:5, 847:7, 847:12, 847:15, 847:23, 847:24, 848:5, 848:15, 848:18, 848:19, 848:21, 848:25, 849:14, 850:7, 856:3, 856:5, 856:7, 873:10, 873:19, 885:12
**docket** [1] - 749:24
**doctor** [7] - 726:13, 757:8, 819:12, 840:19, 891:5, 891:8, 891:12
**doctors** [5] - 731:2, 734:12, 819:15, 820:2, 824:10
**document** [28] - 737:22, 741:13, 773:2, 773:4, 774:1, 774:5, 796:12, 828:15, 829:9, 833:10, 837:9, 837:19, 838:7, 841:21, 846:21, 846:23, 853:24, 858:22, 860:23,

861:2, 861:7, 861:9, 886:18, 887:14, 887:21, 887:25, 889:6
**Document** [4] - 749:14, 749:22, 749:23, 750:3
**documents** [14] - 760:15, 760:16, 770:20, 775:24, 775:25, 869:5, 869:11, 869:13, 871:25, 872:4, 872:13, 872:14, 874:24, 883:11
**dollar** [3] - 793:12, 796:19, 825:8
**dollars** [4] - 725:6, 729:14, 784:25, 825:4
**domain** [4] - 739:17, 739:22, 739:25, 740:4
**done** [12] - 724:17, 744:14, 750:12, 765:22, 792:17, 797:25, 805:14, 807:2, 819:13, 878:23, 879:4, 884:5
**dose** [2] - 766:23, 817:25
**double** [2] - 764:14, 820:18
**doubled** [5] - 719:12, 803:12, 823:17, 826:2
**doubles** [1] - 832:8
**down** [10] - 743:17, 744:23, 776:19, 818:24, 833:11, 838:3, 876:7, 881:22, 891:5
**Dr** [138] - 700:14, 702:15, 704:12, 704:14, 704:18, 705:8, 705:12, 705:14, 705:19, 706:3, 706:4, 706:7, 706:17, 706:23, 706:24, 706:25, 707:4, 707:11, 708:5, 709:6, 722:23, 723:25, 724:8, 725:25, 726:5, 726:14, 726:15, 734:5, 734:7, 734:11, 735:7, 740:15, 741:1, 746:18, 746:25, 747:8,

747:23, 748:8, 748:9, 748:11, 748:16, 748:17, 748:25, 749:1, 749:4, 749:5, 749:8, 749:12, 749:16, 749:22, 749:25, 750:3, 750:6, 751:2, 752:15, 753:4, 755:6, 755:13, 755:14, 755:17, 755:22, 756:8, 756:15, 757:7, 758:13, 764:22, 766:20, 775:13, 777:18, 777:21, 779:22, 781:17, 782:9, 784:12, 789:22, 789:24, 790:2, 790:8, 792:3, 792:12, 799:7, 800:13, 800:20, 807:2, 835:2, 840:4, 840:17, 841:16, 842:18, 845:17, 845:20, 846:10, 846:13, 846:16, 846:20, 848:25, 849:5, 849:23, 850:4, 853:21, 855:19, 856:14, 856:17, 857:4, 857:14, 863:1, 864:3, 864:8, 864:21, 865:1, 865:6, 865:24, 866:6, 867:8, 867:15, 867:23, 869:1, 872:25, 873:4, 873:10, 874:1, 874:3, 874:7, 874:10, 875:6, 875:22, 876:11, 876:17, 878:7, 878:9, 880:2, 880:3, 880:11, 880:19, 881:25, 884:20, 887:10, 888:10
**dramatically** [1] - 732:5
**dream** [2] - 724:14, 732:8
**drive** [2] - 769:12, 839:12
**driver** [3] - 725:22, 769:17, 819:11
**drivers** [3] - 717:12, 819:10, 819:18
**drives** [1] - 819:15
**drug** [5] - 720:4,

730:18, 766:23, 820:3, 863:15
**drugs** [1] - 712:3
**due** [5] - 806:1, 806:8, 811:21, 812:11, 835:15
**DULAC** [1] - 710:18
**Dulac** [22] - 700:8, 701:3, 701:9, 701:16, 701:18, 702:25, 703:2, 706:4, 706:8, 706:18, 706:23, 706:24, 707:3, 709:1, 709:2, 710:15, 710:25, 711:4, 711:6, 719:15
**Dulac's** [2] - 702:14, 702:22
**duly** [4] - 710:19, 723:4, 757:13, 840:23
**dumbfounded** [1] - 874:12
**duration** [1] - 714:10
**during** [20] - 701:22, 702:8, 711:23, 728:22, 729:11, 748:1, 757:1, 774:13, 779:6, 780:21, 796:20, 796:21, 797:1, 825:21, 840:6, 845:4, 870:2, 873:7, 875:25
**DX253** [2] - 827:20, 828:13
**DX5** [1] - 733:16
**DX559** [3] - 733:15, 733:17, 733:21
**DX766** [6] - 846:1, 846:4, 846:21, 847:8, 880:11
**DX766-0071** [1] - 846:24
**dying** [1] - 730:8

# E

**e-mail** [21] - 733:24, 734:8, 828:15, 828:16, 845:17, 846:10, 846:18, 846:20, 855:15, 855:18, 855:21, 856:13, 856:18, 857:4, 857:21, 859:15, 859:24, 860:5, 860:18, 860:25, 889:1

**e-mails** [7] - 733:11, 733:12, 734:8, 734:17, 872:8, 872:9, 875:24
**early** [18] - 712:13, 712:18, 712:21, 715:10, 716:21, 728:8, 731:23, 732:1, 772:5, 779:4, 780:14, 786:21, 788:4, 805:23, 824:3, 832:15, 832:25, 862:14
**earned** [1] - 808:19
**earnings** [4] - 773:16, 773:18, 773:23, 774:22
**easy** [1] - 754:2
**econometrics** [1] - 759:15
**economic** [3] - 759:11, 759:21, 793:9
**economics** [11] - 759:3, 759:8, 759:10, 759:11, 759:25, 766:19, 776:9, 777:17, 779:22, 794:10
**economist** [5] - 758:17, 761:2, 772:3, 794:13, 814:22
**economists** [1] - 760:1
**Ed** [1] - 710:15
**educational** [2] - 758:25, 842:2
**Edward** [3] - 699:16, 710:24, 711:6
**EDWARD** [2] - 710:18, 710:25
**effect** [22] - 743:23, 743:25, 744:2, 790:22, 790:23, 791:8, 791:12, 791:13, 794:19, 794:23, 794:24, 807:19, 820:22, 824:2, 824:4, 826:6, 826:7, 827:5, 827:7, 835:7, 836:8, 836:19
**effective** [2] - 809:12, 809:17
**effectively** [3] - 788:10, 816:25, 852:20
**effects** [10] - 790:16, 790:20, 791:1, 793:12, 795:1,

SCHUETZ - CROSS

813:4, 824:5, 826:5, 827:4

**efficacious** [1] - 768:15

**efficacy** [2] - 766:24, 819:20

**efforts** [2] - 791:3, 845:13

**eight** [4] - 844:1, 870:5, 871:12, 881:18

**either** [2] - 709:25, 713:14

**electronic** [1] - 764:1

**element** [1] - 816:15

**elements** [2] - 816:17, 818:10

**Elizabeth** [1] - 699:6

**employee** [5] - 723:19, 725:19, 843:5, 864:22

**employees** [5] - 737:3, 770:14, 864:18, 865:6, 866:7

**enabled** [1] - 799:4

**enables** [1] - 800:11

**encoded** [8] - 848:13, 848:16, 848:21, 849:7, 849:20, 851:7, 851:15, 854:25

**encodes** [1] - 856:4

**encompasses** [1] - 819:23

**end** [14] - 713:19, 714:2, 721:7, 732:11, 740:23, 804:1, 814:19, 850:12, 850:15, 850:17, 853:3, 860:6, 885:17, 886:6

**ending** [1] - 764:24

**ends** [2] - 737:14, 790:4

**engage** [1] - 844:5

**engaging** [1] - 782:18

**engineering** [1] - 819:13

**enhancement** [1] - 749:5

**enormous** [1] - 854:14

**enter** [1] - 830:12

**entered** [9] - 714:16, 777:12, 778:22, 784:3, 785:11, 786:18, 787:23, 787:25, 821:4

**entering** [1] - 783:14

**entertain** [1] - 707:2

**entire** [6] - 785:5,

813:9, 845:19, 881:11, 889:21

**entities** [4] - 770:15, 770:20, 770:23, 788:5

**entitled** [2] - 755:1, 755:2

**entity** [2] - 762:2, 774:18

**entrenched** [2] - 771:13, 776:15

**entry** [1] - 730:5

**environment** [1] - 828:25

**Epstein** [2] - 740:15, 741:1

**equal** [2] - 743:18, 776:17

**equipment** [1] - 764:1

**equity** [6] - 713:16, 751:20, 752:14, 752:19, 784:23, 785:1

**error** [10] - 852:19, 857:18, 874:9, 874:14, 882:23, 883:2, 884:3, 885:18, 887:22

**especially** [1] - 789:12

**establish** [3] - 716:19, 801:20, 817:24

**established** [2] - 737:24, 838:14

**estimate** [3] - 712:4, 793:17, 811:17

**estimates** [2] - 700:5, 831:24

**estimating** [1] - 709:3

**et** [2] - 698:5, 885:11

**etcetera** [3] - 704:10, 847:14, 861:20

**evaluate** [2] - 761:6, 783:13

**evaluated** [1] - 763:4

**evaluating** [6] - 762:16, 776:23, 791:5, 843:2, 845:6, 873:4

**event** [1] - 761:4

**events** [1] - 791:20

**eventually** [1] - 830:12

**evidence** [39] - 701:8, 709:17, 710:1, 733:17, 757:23, 763:14, 763:16, 767:1, 767:6, 768:9, 770:1, 771:15, 772:21, 773:14, 773:22, 776:9, 786:25, 787:10,

789:15, 791:23, 792:1, 792:20, 793:1, 793:3, 793:5, 827:23, 831:4, 831:11, 838:2, 838:10, 838:12, 846:2, 846:5, 853:13, 855:9, 858:24, 859:18, 884:10, 886:8

**Evidence** [1] - 792:21

**exact** [9] - 804:8, 806:3, 816:4, 843:25, 849:18, 856:23, 860:17, 873:8, 881:18

**exactly** [8] - 729:4, 805:22, 809:14, 812:3, 821:7, 831:16, 874:2, 875:6

**EXAMINATION** [12] - 711:2, 719:19, 723:10, 732:19, 743:8, 744:12, 758:11, 800:18, 841:14, 862:24, 888:8, 890:9

**examination** [14] - 736:14, 840:4, 858:10, 858:17, 861:8, 863:8, 870:2, 871:21, 873:8, 876:1, 878:8, 878:12, 878:14, 887:9

**examined** [2] - 804:2, 804:7

**example** [16] - 702:19, 713:23, 720:10, 729:7, 730:12, 731:18, 760:18, 769:10, 770:7, 783:6, 798:24, 846:24, 864:19, 881:8, 889:19, 889:20

**examples** [6] - 713:21, 729:10, 731:12, 882:13, 882:16, 882:17

**excel** [3] - 721:25, 762:13, 792:14

**except** [2] - 700:2, 751:25, 752:19

**exception** [2] - 754:11, 754:18

**exchange** [4] - 760:18, 764:24, 765:1, 836:21

**excited** [2] - 883:4,

883:6

**excitement** [2] - 883:13, 884:3

**exclude** [1] - 750:13

**excluding** [1] - 749:18

**exclusive** [6] - 778:17, 778:25, 872:23, 885:3, 885:5, 887:24

**excuse** [10] - 746:5, 763:20, 798:6, 808:4, 855:23, 865:8, 868:14, 880:10, 881:7, 886:15

**excused** [1] - 891:9

**executive** [4] - 753:24, 773:5, 774:14, 796:25

**executives** [4] - 759:17, 773:19, 774:13, 866:21

**exhibit** [7] - 736:13, 747:17, 765:5, 792:6, 828:5, 832:11, 884:15

**Exhibit** [24] - 733:21, 738:12, 743:10, 747:17, 764:12, 764:22, 771:15, 772:20, 772:25, 775:2, 783:1, 787:1, 787:4, 787:15, 792:12, 796:10, 827:17, 828:13, 832:20, 853:16, 855:13, 859:22, 884:13, 886:12

**exhibits** [8] - 703:22, 703:25, 756:1, 757:23, 758:9, 791:23, 792:19, 828:8

**Exhibits** [2] - 758:10, 793:7

**exist** [1] - 739:10

**expansive** [1] - 813:6

**expect** [6] - 712:21, 712:25, 718:9, 794:10, 794:11, 794:19

**expectation** [3] - 766:7, 770:18, 837:4

**expectations** [2] - 762:22, 774:11

**expected** [5] - 772:15, 790:16, 791:7, 831:19, 836:6

**expecting** [3] - 742:20, 742:24, 831:1

**expended** [1] - 700:5

**expenses** [3] - 796:24, 796:25, 868:14

**expensive** [2] - 712:20, 713:5

**experience** [8] - 702:11, 702:12, 713:22, 714:2, 718:12, 728:14, 842:13, 842:16

**experienced** [1] - 744:3

**experimental** [1] - 882:18

**expert** [14] - 727:17, 727:19, 749:16, 756:4, 758:19, 760:5, 774:21, 777:18, 779:22, 784:12, 786:6, 789:22, 799:7, 807:2

**experts** [5] - 716:7, 716:22, 728:16, 729:15, 760:23

**expire** [2] - 796:9, 796:19

**expires** [1] - 796:21

**explain** [13] - 718:1, 730:20, 743:19, 749:8, 765:9, 767:6, 772:25, 778:10, 790:11, 790:25, 792:12, 848:15, 849:10

**explained** [3] - 767:10, 795:17, 875:24

**explicitly** [1] - 753:8

**exposure** [1] - 814:3

**expressed** [2] - 848:21, 884:3

**expressing** [1] - 883:13

**expressly** [2] - 749:9, 785:22

**extending** [2] - 709:15, 891:19

**extensive** [2] - 702:10, 760:21

**extent** [4] - 702:17, 722:3, 751:5, 768:22

**external** [1] - 716:24

**extra** [2] - 709:25, 877:23

## F

**F1** [3] - 750:2, 750:5, 750:7

**F3** [1] - 750:8

SCHUETZ - CROSS

**F4** [1] - 750:9
**F5** [2] - 705:19, 750:11
**face** [2] - 814:15, 815:15
**fact** [23] - 702:16, 704:17, 742:6, 771:3, 776:2, 801:6, 805:24, 826:8, 827:4, 830:15, 835:11, 844:19, 851:5, 851:14, 851:17, 856:17, 863:24, 864:10, 864:22, 874:12, 880:9, 885:14, 890:17
**factor** [20] - 720:4, 720:7, 730:20, 746:1, 763:10, 794:2, 795:12, 795:17, 798:5, 798:15, 803:14, 803:18, 804:8, 806:15, 820:21, 820:22, 823:19, 823:22
**factors** [21] - 712:9, 719:23, 720:9, 720:15, 730:19, 749:5, 762:23, 763:2, 763:4, 763:5, 763:7, 763:8, 763:11, 769:5, 769:8, 769:12, 769:18, 798:13, 816:19, 819:1, 819:17
**facts** [2] - 716:9, 772:8
**faculty** [1] - 759:9
**failure** [1] - 746:1
**fair** [7] - 721:5, 767:10, 824:21, 829:16, 829:18, 843:1, 862:6
**fairly** [3] - 709:4, 721:4, 842:17
**fairness** [1] - 808:11
**falls** [1] - 754:18
**familiar** [6] - 736:10, 823:7, 833:20, 841:23, 841:25, 844:22
**famous** [1] - 727:1
**far** [6] - 710:1, 720:4, 768:5, 779:11, 812:15, 819:3
**Farber** [1] - 842:11
**FARRELL** [11] - 703:15, 703:19, 704:8, 706:16,

706:20, 707:5, 719:18, 719:20, 721:23, 721:24, 722:13
**Farrell** [2] - 703:16, 719:17
**fast** [1] - 791:9
**fastest** [2] - 745:8, 745:16
**fatal** [1] - 743:23
**favorable** [1] - 731:1
**FCRR** [1] - 698:22
**FDA** [19] - 720:13, 720:16, 730:24, 761:24, 765:11, 779:9, 782:16, 782:23, 809:8, 809:12, 809:17, 809:19, 817:3, 817:11, 819:14, 819:19, 819:23, 820:1
**feature** [1] - 816:1
**features** [1] - 816:1
**Federal** [2] - 698:22, 792:21
**federal** [2] - 822:25, 823:2
**fee** [1] - 835:14
**fees** [2] - 715:20, 868:22
**fellowship** [1] - 842:11
**felt** [5] - 719:2, 719:5, 730:18, 861:22, 875:6
**few** [7] - 715:12, 724:8, 740:23, 756:1, 799:6, 809:25, 853:8
**field** [3] - 724:21, 725:1, 802:23
**figure** [3] - 706:21, 718:6, 731:18, 849:13, 850:21, 850:24, 852:5, 853:6, 860:10, 878:15, 878:16, 878:20, 881:10
**figured** [2] - 809:11, 809:16
**figures** [1] - 721:10
**file** [7] - 700:23, 707:13, 707:16, 707:19, 707:21, 708:9, 764:25
**filed** [18] - 700:12, 701:4, 707:10, 707:12, 707:23, 707:24, 707:25,

708:3, 708:6, 748:15, 749:6, 764:23, 858:9, 875:25, 878:9, 885:22, 889:2
**filing** [2] - 705:13, 878:7
**filings** [1] - 760:17
**final** [2] - 753:15, 854:2
**finance** [2] - 727:5, 759:14
**financial** [30] - 716:2, 716:4, 716:5, 716:6, 716:18, 717:7, 721:4, 726:18, 731:5, 731:6, 731:9, 731:13, 731:18, 747:8, 760:19, 760:24, 762:11, 763:9, 770:21, 791:2, 791:11, 792:13, 792:19, 796:5, 796:14, 798:21, 832:2, 832:17, 838:18, 866:19
**financially** [2] - 740:18, 800:12
**financials** [1] - 762:13
**findings** [1] - 716:10
**fine** [3] - 708:11, 708:21, 822:12
**finish** [2] - 808:7, 810:15
**finite** [1] - 765:14
**firm** [8] - 759:25, 844:24, 860:10, 868:8, 868:9, 868:18, 870:13, 872:21
**firms** [1] - 871:6
**first** [94] - 709:8, 710:19, 714:14, 718:11, 718:15, 723:4, 723:19, 724:23, 725:19, 730:4, 730:6, 730:11, 737:6, 737:9, 738:17, 753:13, 756:15, 757:13, 763:19, 765:8, 767:21, 771:5, 771:6, 771:8, 771:13, 771:20, 771:23, 772:2, 772:4, 772:15, 772:22, 773:12, 773:15, 774:17, 775:5, 775:8,

775:11, 775:16, 776:2, 776:7, 776:10, 776:15, 783:21, 784:23, 786:16, 786:17, 787:7, 787:18, 787:22, 788:11, 790:1, 790:11, 790:21, 791:1, 799:2, 803:8, 803:13, 803:23, 804:18, 810:1, 817:23, 820:13, 820:14, 826:3, 832:8, 832:9, 832:23, 834:23, 836:3, 836:13, 836:14, 836:17, 840:23, 841:25, 842:1, 844:2, 846:7, 849:19, 851:4, 851:6, 851:18, 855:16, 856:3, 858:11, 858:13, 862:13, 876:2, 880:16, 886:19, 886:21, 888:14, 889:3
**first-mover** [12] - 771:5, 771:6, 771:20, 772:15, 772:22, 773:12, 773:15, 774:17, 775:11, 776:2, 776:7, 776:10
**firsthand** [1] - 702:6
**fish** [3] - 703:16, 870:14, 870:18
**Fish** [2] - 870:24, 871:4
**five** [14] - 700:6, 709:12, 709:19, 723:23, 731:25, 732:2, 766:14, 869:21, 869:25, 871:8, 871:12, 881:13, 881:16
**five-year** [2] - 731:25, 732:2
**fix** [1] - 860:12
**flew** [1] - 870:22
**flip** [1] - 736:14
**Floor** [2] - 699:9, 699:18
**Flower** [1] - 699:9
**focus** [3] - 711:15, 829:25, 850:13
**focused** [16] - 712:6, 768:20, 829:25, 830:5, 830:6, 831:8,

831:14, 845:7, 850:14, 874:15, 874:23, 875:5, 875:19, 877:17, 884:2, 887:12
**focusing** [2] - 731:23, 830:8
**folks** [1] - 833:23
**follow** [2] - 707:20, 877:23
**following** [4] - 724:5, 837:21, 859:25, 883:19
**follows** [4] - 710:20, 723:5, 757:14, 840:24
**footnote** [1] - 823:6
**forecasting** [1] - 759:16
**forecasts** [2] - 716:11, 731:18
**foregoing** [1] - 892:2
**form** [10] - 713:15, 724:14, 726:3, 761:1, 764:23, 764:25, 766:2, 872:24, 886:16, 886:24
**formal** [4] - 713:6, 713:7, 720:1, 766:6
**format** [2] - 738:4, 738:5, 865:13
**formation** [2] - 724:20, 725:11
**former** [4] - 747:8, 747:13, 753:24, 767:9
**formidable** [5] - 741:14, 741:20, 826:4, 828:25, 829:12
**forming** [1] - 760:13
**forms** [1] - 814:24
**forth** [3] - 763:2, 783:21, 784:21
**forum** [1] - 774:15
**forward** [14] - 757:9, 791:9, 831:10, 840:19, 873:13, 873:15, 873:18, 883:4, 883:13, 885:2, 886:2, 886:14, 887:4, 887:23
**foundation** [10] - 712:2, 736:5, 736:6, 736:21, 736:23, 737:23, 774:7, 774:8, 792:10, 838:12

SCHUETZ - CROSS

founded [1] - 723:22
founder [1] - 734:6
founders [2] - 725:21,
734:3
four [11] - 714:15,
716:17, 802:13,
804:8, 823:20,
856:2, 858:11,
869:25, 876:2,
881:16, 889:3
fragment [1] - 847:13
fragments [2] - 847:12
frame [4] - 850:14,
850:21, 851:2, 851:5
frankly [1] - 827:24
Fred [3] - 724:1,
724:4, 725:12
free [2] - 836:20, 891:5
freedom [5] - 727:24,
727:25, 728:13,
728:18, 830:16
frequently [3] -
842:17, 863:23,
864:1
Friday [1] - 698:15
front [7] - 735:16,
741:5, 742:2,
744:18, 752:3,
753:13, 810:10
fronts [1] - 824:8
frustrated [1] - 703:18
frustration [1] -
703:17
full [2] - 716:21, 780:4
fully [6] - 752:2,
769:20, 779:12,
788:5, 789:20,
830:25
fundamental [9] -
724:22, 767:14,
767:15, 769:17,
785:9, 789:3, 800:9,
816:16, 818:18
fundamentally [2] -
814:5, 814:13
funding [2] - 734:24,
770:10
funny [1] - 820:4
future [7] - 766:7,
766:9, 766:15,
770:18, 814:9,
866:24, 867:20

## G

GAA [1] - 855:23
gain [1] - 715:18
Garth [1] - 699:15
Geers [1] - 699:11
general [3] - 804:14,

832:22, 842:9
generally [3] - 703:9,
713:13, 733:9
genes [1] - 847:13
genetic [1] - 819:13
genetics [1] - 842:5
gentleman [1] -
723:25
gentlemen [4] -
710:14, 722:21,
723:15, 782:6
geographic [1] -
714:23
Georgia [1] - 763:1
Gilead [39] - 762:4,
764:23, 765:16,
766:18, 769:1,
772:21, 773:3,
773:5, 773:10,
773:14, 773:23,
773:25, 774:5,
774:15, 774:16,
775:6, 813:25,
843:5, 843:7,
844:11, 844:17,
844:20, 864:10,
864:14, 864:18,
864:22, 864:23,
865:5, 865:6, 866:5,
866:6, 866:10,
866:16, 866:21,
866:23, 867:7,
867:17, 868:2
Gilead's [2] - 866:11,
866:17
Gilead/Kite [1] -
865:23
given [14] - 710:1,
719:13, 740:25,
778:14, 801:24,
803:5, 807:19,
809:14, 810:2,
836:18, 836:20,
845:23, 854:12,
890:18
Gladstone [1] -
857:25
glass [3] - 860:12,
860:16, 876:7
global [1] - 797:15
Gmail [1] - 855:16
goal [2] - 732:10,
745:13
Gold [2] - 796:6,
796:13
grade [4] - 743:18,
743:24, 743:25,
744:4
grading [1] - 743:24
Grail [4] - 723:17,

731:22, 731:23
Grand [1] - 699:18
grant [2] - 751:20,
752:19
granted [6] - 701:15,
749:2, 751:6, 814:8,
829:6, 865:3
granting [1] - 836:14
Gratzinger [2] -
699:17, 870:10
gravitate [1] - 772:18
great [3] - 732:12,
760:15, 804:2
greater [2] - 743:17,
791:12
gross [3] - 796:11,
796:16, 796:19
grounds [4] - 721:16,
785:20, 785:21,
794:6
growth [1] - 712:3
GTT [1] - 855:23
guarantee [3] - 825:9,
825:11, 825:13
guaranteed [1] - 727:9
guess [3] - 705:4,
706:20, 709:7
guidance [1] - 760:6
guys [2] - 722:4,
860:10

## H

half [6] - 709:15,
714:15, 781:10,
810:23, 825:16,
842:1
halted [1] - 809:8
hand [7] - 710:16,
723:1, 757:10,
764:6, 778:9,
779:16, 840:20
handed [2] - 735:14,
735:22
handle [3] - 727:13,
890:25, 891:2
handling [3] - 705:5,
705:7, 705:8
Hans [5] - 722:20,
722:22, 723:8,
723:16, 828:16
HANS [2] - 723:3,
723:8
hard [2] - 710:5, 727:5
harm [2] - 776:11,
811:21
harms [2] - 798:21,
799:3
Harr [1] - 747:8
Harvard [2] - 842:4,

842:5
head [3] - 702:10,
829:1, 829:12
headed [1] - 738:23
healthcare [1] - 739:7
hear [4] - 703:13,
752:7, 775:16, 835:5
heard [14] - 704:23,
704:24, 706:20,
726:10, 726:18,
731:5, 748:10,
750:18, 755:6,
767:7, 792:16,
809:7, 830:25,
891:21
hearing [2] - 742:4,
748:16
hearsay [5] - 746:20,
754:1, 773:25,
774:4, 856:25
HEINRICH [74] -
700:17, 700:20,
700:24, 705:3,
705:6, 705:11,
705:16, 706:5,
706:9, 706:11,
706:14, 708:7,
708:9, 708:14,
708:21, 722:20,
722:24, 723:11,
733:19, 736:5,
736:21, 736:23,
738:9, 743:7, 743:9,
744:9, 746:24,
752:8, 753:16,
755:25, 756:10,
757:6, 757:17,
757:22, 758:1,
758:4, 758:12,
763:16, 763:25,
764:5, 764:13,
764:17, 764:21,
768:8, 773:22,
774:3, 774:9,
774:25, 775:3,
775:22, 781:4,
781:10, 782:6,
782:8, 785:24,
786:25, 787:5,
787:10, 787:16,
791:23, 792:4,
792:8, 792:11,
792:20, 793:8,
794:9, 798:19,
800:13, 810:14,
827:18, 828:7,
828:11, 838:2, 838:9
Heinrich [7] - 699:5,
705:8, 708:20,
723:9, 738:8, 752:7,

753:3
held [1] - 760:22
help [11] - 716:11,
716:13, 716:24,
716:25, 758:22,
760:2, 765:15,
773:6, 794:3,
877:23, 881:9
helps [3] - 780:3,
819:7, 850:24
hence [1] - 782:21
herein [4] - 811:8,
811:17, 811:20,
812:5
hi [1] - 711:6
high [6] - 746:7,
746:8, 746:10,
782:11, 790:11,
794:4
higher [11] - 712:25,
732:3, 771:23,
788:21, 802:13,
802:16, 802:19,
805:2, 823:21
highest [2] - 803:23,
804:6
highlight [3] - 796:11,
874:25, 879:24
highly [1] - 752:4
historically [2] -
712:5, 767:21
history [13] - 852:12,
852:15, 852:21,
852:22, 858:17,
859:4, 859:8,
862:19, 869:8,
871:14, 872:1,
876:13, 878:6
hit [1] - 808:16
hold [1] - 773:17
home [1] - 839:13
Honor [95] - 700:10,
700:24, 701:11,
703:7, 703:10,
703:15, 704:4,
705:1, 705:3,
705:13, 706:16,
707:5, 707:8, 708:7,
708:16, 708:21,
709:3, 709:11,
709:12, 709:24,
710:6, 710:13,
721:14, 721:18,
721:21, 722:15,
732:15, 732:17,
733:18, 735:11,
735:19, 737:11,
737:20, 741:9,
746:17, 746:19,
746:24, 747:3,

747:12, 747:16, 748:10, 748:12, 750:20, 751:8, 751:12, 754:3, 754:8, 754:13, 754:23, 755:16, 755:21, 756:13, 757:17, 757:22, 758:2, 758:8, 763:20, 768:4, 774:6, 781:4, 781:7, 781:24, 785:17, 787:2, 787:13, 791:25, 792:23, 794:5, 798:6, 810:17, 813:10, 827:21, 834:23, 839:10, 839:18, 839:23, 840:1, 840:17, 856:25, 858:25, 865:2, 865:9, 865:19, 877:7, 877:21, 888:6, 888:13, 888:20, 889:12, 889:13, 890:7, 891:10, 891:16, 891:23

**HONORABLE** [1] - 698:3

**hope** [1] - 732:4

**hoping** [1] - 839:10

**hospital** [4] - 726:16, 787:6, 821:16, 842:9

**Hospital** [2] - 725:14, 726:12

**hour** [7] - 709:25, 748:1, 781:10, 781:15, 843:19, 868:10, 882:5

**hours** [20] - 700:6, 709:12, 709:15, 709:19, 709:20, 709:24, 843:23, 844:1, 869:25, 870:3, 870:5, 871:8, 871:12, 871:13, 881:13, 881:14, 881:16, 891:14, 891:20

**housekeeping** [1] - 700:3

**HU19** [1] - 768:16

**human** [1] - 715:11

**hurdles** [1] - 776:18

**Hutch** [1] - 724:4, 725:12

**Hutchinson** [1] - 724:1

**hypothetical** [74] -

702:2, 749:10, 751:17, 752:18, 761:8, 761:11, 761:18, 761:20, 761:22, 762:12, 762:19, 762:21, 767:19, 770:4, 770:17, 771:2, 771:19, 774:11, 776:24, 778:4, 778:10, 778:20, 778:23, 778:25, 779:4, 779:14, 779:16, 780:1, 780:18, 782:14, 783:8, 784:1, 784:10, 784:14, 786:2, 789:5, 789:18, 790:14, 791:10, 791:21, 795:23, 796:3, 796:15, 798:22, 798:24, 799:5, 799:18, 799:22, 800:10, 801:17, 805:5, 805:25, 806:16, 806:18, 806:21, 814:1, 814:6, 814:14, 815:2, 815:4, 815:6, 815:9, 815:11, 815:14, 821:5, 831:8, 831:14, 832:16, 834:12, 835:23, 836:5, 836:12, 837:5

**hypothetically** [1] - 808:18

## I

**ID** [23] - 848:13, 848:17, 849:3, 849:7, 849:20, 850:11, 850:22, 851:7, 851:11, 851:15, 852:3, 854:4, 855:23, 858:11, 874:2, 874:5, 874:25, 875:3, 876:3, 877:18, 882:23, 889:4

**ID:4** [1] - 852:9

**ID:6** [7] - 850:9, 851:4, 851:19, 852:10, 853:4, 854:25

**idea** [3] - 727:6, 814:2, 848:20

**identical** [1] - 854:5

**identified** [6] - 753:23,

765:18, 765:22, 779:25, 854:3, 857:8

**identifies** [3] - 750:6, 750:8, 750:10

**identify** [4] - 737:13, 749:3, 749:7, 778:1

**identifying** [2] - 711:14, 782:11

**ignores** [1] - 799:17

**II** [1] - 817:25

**III** [1] - 783:23

**ill** [2] - 745:23, 746:2

**illustrate** [1] - 758:22

**imagine** [2] - 795:22, 836:10

**immediately** [2] - 784:4, 833:20

**immune** [1] - 848:22

**impact** [9] - 712:17, 719:8, 730:3, 776:7, 793:9, 793:16, 793:20, 793:22, 838:16

**impacted** [1] - 872:3

**impacts** [2] - 790:6, 794:11

**impending** [1] - 789:12

**importance** [4] - 734:13, 763:8, 801:2, 816:7

**important** [33] - 714:7, 714:21, 716:8, 724:11, 725:2, 725:5, 727:10, 731:3, 731:14, 739:6, 745:18, 746:1, 746:3, 752:23, 767:11, 769:6, 775:9, 775:12, 775:17, 816:18, 819:20, 823:25, 843:3, 843:4, 845:10, 845:12, 869:12, 873:9, 873:14, 873:19, 873:25, 887:9, 887:11

**impression** [1] - 840:8

**improper** [1] - 734:21

**improvements** [5] - 817:16, 817:22, 817:25, 818:6

**in-person** [2] - 870:8, 871:13

**inappropriate** [3] - 821:11, 821:12, 835:24

**INC** [2] - 698:5, 698:8

**inception** [1] - 797:10

include [8] - 711:21, 714:4, 786:1, 797:17, 811:14, 812:10, 813:16, 869:7

**included** [6] - 715:1, 715:2, 722:1, 726:23, 750:23, 813:1

**includes** [8] - 714:11, 749:25, 751:6, 751:22, 760:16, 763:17, 797:15, 811:8

**including** [7] - 720:9, 720:16, 721:13, 721:20, 725:21, 759:14, 864:18

**inconsistent** [2] - 829:9, 829:13

**incorrect** [2] - 815:9, 860:11

**increase** [7] - 752:14, 788:9, 793:24, 794:1, 803:14, 820:21, 823:19

**increased** [5] - 751:3, 771:9, 771:10, 771:11, 785:16

**increases** [4] - 784:23, 785:2, 785:4, 785:5

**increasing** [1] - 785:15

**incredibly** [1] - 852:25

**incremental** [2] - 719:13, 795:18

**incurred** [1] - 758:20

**indeed** [3] - 739:20, 776:2, 801:4

**independent** [1] - 863:3

**index** [2] - 848:2, 848:4

**indicate** [1] - 749:15

**indicated** [2] - 788:25, 833:6

**indicating** [1] - 751:15

**indication** [14] - 717:21, 729:23, 730:2, 793:14, 794:16, 794:17, 825:18, 825:22, 830:6, 830:16, 831:19, 833:11, 837:3

**indications** [4] - 770:23, 772:18, 830:19, 833:10

**individual** [1] - 713:10

**individually** [1] -

713:9

**individuals** [1] - 711:13

**industry** [7] - 702:6, 702:23, 711:20, 717:2, 717:6, 759:10, 777:14

**inform** [3] - 763:8, 763:9, 763:12

**information** [17] - 704:9, 716:8, 722:1, 760:15, 761:17, 761:19, 765:2, 765:4, 765:5, 765:7, 780:3, 792:18, 831:23, 846:13, 865:16, 881:9, 883:7

**informative** [3] - 762:18, 763:2, 765:8

**informed** [2] - 858:9, 889:2

**infringed** [2] - 760:12, 761:15

**infringement** [13] - 758:21, 761:4, 779:8, 779:9, 782:19, 782:21, 782:22, 811:18, 811:22, 812:11, 814:16, 814:23, 814:24

**initial** [10] - 705:17, 705:22, 749:3, 751:3, 751:21, 752:13, 752:16, 779:17, 789:13, 877:16

**input** [1] - 774:15

**inputs** [1] - 716:7

**inside** [2] - 848:18, 848:23

**insight** [1] - 762:20

**instance** [2] - 774:16, 822:5

**instead** [2] - 773:9, 773:10

**institute** [1] - 842:11

**institutions** [7] - 711:19, 724:15, 725:10, 725:12, 727:6, 728:16, 730:16

**instruction** [5] - 700:13, 707:11, 707:13, 708:5, 708:13

**intangible** [1] - 765:14

**intellectual** [5] - 729:16, 755:8, 759:18, 765:19,

SCHUETZ - CROSS

789:13
**intend** [4] - 701:8,
704:4, 755:19, 781:3
**intended** [2] - 714:10,
874:6
**intends** [1] - 709:16
**intense** [2] - 823:24,
857:10
**intensity** [3] - 758:17,
759:23, 759:24
**intensive** [1] - 744:1
**inter** [1] - 768:1
**interest** [6] - 715:5,
715:16, 725:23,
729:6, 740:23
**interested** [7] - 724:3,
724:7, 725:24,
740:19, 762:4,
762:8, 861:15
**interesting** [3] - 772:4,
773:8, 786:8
**internal** [3] - 716:7,
716:22, 842:8
**internally** [2] - 768:13,
771:18
**internally-developed**
[1] - 768:13
**international** [1] -
759:15
**interrupt** [2] - 839:3,
839:7
**intervene** [1] - 875:15
**interviews** [1] - 760:22
**introduce** [5] - 701:8,
703:22, 711:4,
723:14, 758:15
**introduced** [1] - 749:5
**introductory** [2] -
844:8, 844:15
**invalid** [7] - 869:3,
869:6, 872:2,
872:16, 887:16,
888:1, 888:2
**invalidate** [2] - 768:1,
768:2
**invented** [2] - 725:25,
726:5
**invention** [3] - 725:9,
726:13, 728:3
**inventions** [4] -
724:24, 727:1,
727:16, 727:20
**inventors** [1] - 725:3
**invest** [6] - 725:8,
866:23, 867:4,
867:9, 867:19,
867:24
**invested** [1] - 712:24
**investment** [4] -
716:24, 729:14,

770:10, 824:24
**investments** [1] -
770:13
**investors** [3] - 730:14,
765:3, 773:18
**invited** [3] - 723:25,
724:2, 759:7
**involved** [10] - 711:22,
725:15, 727:25,
734:14, 788:1,
834:19, 863:15,
866:11, 866:17,
869:5
**involvement** [2] -
714:13, 714:14
**involves** [1] - 878:25
**involving** [5] - 707:4,
707:14, 759:18,
763:1, 801:19
**IP** [3] - 765:13, 765:18,
765:19
**IPO** [1] - 789:13
**IPOs** [1] - 770:11
**IPR** [1] - 707:15
**IRELL** [1] - 699:4
**irrelevant** [2] - 707:16,
852:9
**isolated** [1] - 813:5
**isoleucine** [1] -
856:12
**issue** [15] - 704:11,
706:17, 707:3,
748:9, 752:9,
752:10, 753:21,
755:10, 755:16,
779:19, 788:12,
822:23, 854:20,
861:14
**issued** [9] - 853:4,
854:12, 858:13,
860:7, 876:4,
878:10, 885:14,
887:5, 889:25
**issues** [9] - 701:6,
701:12, 703:12,
728:19, 757:3,
757:5, 857:5,
862:17, 886:4
**item** [5] - 705:20,
706:2, 707:8,
765:23, 810:1
**items** [7] - 767:20,
770:6, 790:19,
813:6, 817:18,
819:17, 885:10
**itself** [4] - 769:9,
818:18, 820:5, 869:7
**IV** [1] - 698:13

**J**

**Jakabovits** [5] -
746:18, 753:22,
753:23, 755:17,
755:23
**JAMES** [1] - 698:3
**January** [4] - 702:1,
716:1, 732:24,
734:24
**javelin** [1] - 722:9
**JCAR15** [7] - 726:1,
809:4, 817:7,
817:12, 817:14,
817:17, 817:21
**JCAR17** [25] - 717:13,
717:16, 717:24,
719:3, 722:4, 722:6,
726:11, 726:14,
730:21, 730:22,
730:25, 731:3,
738:24, 739:16,
739:22, 740:4,
743:15, 812:11,
812:24, 822:3,
825:9, 830:24,
837:3, 837:13,
837:23
**JCAR17's** [1] - 812:10
**Jeffrey** [1] - 699:16
**JEFFRIES** [29] -
853:14, 855:11,
856:25, 859:20,
862:25, 865:2,
865:4, 866:3,
874:20, 877:3,
878:4, 878:5,
879:19, 879:23,
881:23, 881:24,
882:11, 884:9,
884:14, 886:7,
886:13, 888:4,
888:20, 889:13,
889:15, 890:7,
890:10, 890:21,
891:11
**Jeffries** [3] - 699:8,
862:23, 890:6
**Jensen** [5] - 733:25,
734:3, 734:5, 734:7,
734:11
**job** [1] - 724:25
**John** [3] - 703:15,
774:14, 775:5
**join** [1] - 729:15
**JONES** [2] - 699:8,
699:10
**journal** [4] - 759:14,
759:15, 759:17
**journals** [1] - 759:14

**Jude** [14] - 726:11,
726:16, 780:8,
786:18, 787:1,
787:6, 787:23,
788:19, 801:21,
801:23, 802:2,
802:19, 821:15,
821:19
**JUDGE** [1] - 698:3
**judge** [1] - 839:17
**judgment** [1] - 814:20
**July** [9] - 884:6,
884:16, 884:20,
885:11, 885:15,
885:18, 886:1, 886:4
**June** [17] - 738:20,
858:3, 860:25,
861:11, 877:13,
882:24, 883:22,
883:23, 883:24,
883:25, 884:2,
885:19, 885:20,
885:21, 888:25,
889:5
**junior** [1] - 857:25
**Juno** [223] - 700:1,
701:17, 701:21,
701:25, 702:5,
703:1, 703:4, 710:9,
710:15, 711:11,
714:13, 714:14,
714:16, 714:22,
715:4, 715:9,
715:17, 715:25,
716:1, 717:9,
717:12, 718:14,
718:18, 719:5,
719:11, 720:21,
720:24, 722:21,
723:18, 723:19,
723:22, 723:24,
724:21, 725:11,
726:10, 726:24,
727:13, 729:3,
729:11, 729:20,
730:3, 730:10,
731:6, 731:9,
731:13, 732:24,
733:3, 733:8, 734:3,
734:5, 734:24,
735:2, 736:19,
737:3, 737:14,
738:4, 738:6, 739:6,
739:17, 740:4,
740:7, 742:20,
742:21, 742:24,
743:20, 744:4,
745:13, 746:5,
748:6, 750:4,
752:12, 752:15,

752:21, 758:20,
762:8, 763:11,
769:23, 769:25,
770:19, 773:9,
773:10, 776:6,
776:12, 777:13,
778:18, 779:2,
779:18, 780:8,
780:9, 780:18,
781:1, 783:5, 783:8,
783:10, 783:12,
783:14, 784:3,
784:18, 784:20,
785:11, 786:18,
787:23, 787:25,
789:9, 789:14,
789:21, 790:6,
790:20, 790:22,
790:23, 791:2,
791:3, 791:7, 791:8,
791:10, 791:13,
791:16, 793:10,
793:20, 794:18,
794:20, 795:8,
795:23, 796:1,
799:3, 799:24,
800:24, 802:13,
804:15, 805:1,
805:5, 805:9,
805:12, 806:7,
806:14, 806:16,
806:20, 806:21,
807:4, 807:15,
807:16, 807:20,
807:24, 808:8,
809:1, 809:3, 809:4,
809:21, 809:24,
810:12, 811:18,
812:6, 812:23,
813:16, 814:3,
814:11, 815:7,
815:12, 817:6,
817:15, 817:18,
817:20, 817:23,
818:20, 820:8,
821:19, 821:20,
822:2, 823:24,
823:25, 824:3,
824:5, 824:13,
824:14, 824:17,
825:3, 825:16,
825:20, 826:14,
826:22, 827:2,
827:12, 827:14,
828:17, 828:24,
829:8, 829:11,
829:24, 830:6,
830:11, 830:22,
831:1, 831:5,
831:11, 831:18,
832:10, 832:12,

SCHUETZ - CROSS

832:18, 833:3,
833:13, 833:21,
833:23, 834:7,
834:15, 835:6,
835:14, 835:17,
835:22, 836:6,
836:12, 836:16,
837:1, 838:7, 844:3,
844:13, 844:16,
862:15, 890:19
**JUNO** [1] - 698:5
**Juno's** [19] - 724:20,
728:8, 728:23,
729:11, 730:1,
741:14, 744:6,
747:8, 751:11,
776:7, 805:19,
806:12, 817:11,
829:5, 829:21,
829:25, 862:11,
862:16, 890:12
**Juno/Kite** [1] - 782:13
**Juno/MSK** [1] -
778:24
**Juno/Novartis** [1] -
787:11
**Juno/St** [2] - 787:1,
787:6
**juror** [1] - 839:12
**jurors** [2] - 839:11,
840:13
**JURY** [1] - 698:13
**jury** [45] - 700:2,
707:7, 708:23,
710:7, 710:8, 711:5,
723:15, 748:3,
748:4, 748:6,
749:13, 750:17,
752:3, 753:13,
756:16, 756:17,
756:20, 756:21,
756:22, 757:2,
758:15, 767:6,
780:24, 781:6,
781:13, 782:1,
782:2, 782:3, 803:6,
805:15, 809:7,
810:2, 813:2,
813:15, 816:6,
820:17, 834:25,
840:9, 840:10,
840:11, 840:12,
863:3, 866:4, 891:3,
891:4
**justify** [1] - 753:12

## K

**keep** [2] - 750:12,
750:13

**kept** [1] - 744:17
**Kettering** [40] -
710:15, 725:13,
725:16, 725:20,
726:3, 726:17,
726:24, 762:7,
762:8, 778:17,
779:2, 779:18,
785:11, 795:3,
795:8, 800:23,
801:8, 804:16,
805:3, 805:8,
806:19, 807:18,
807:22, 808:2,
808:24, 820:25,
845:2, 845:9,
845:16, 845:18,
850:8, 853:9,
853:19, 855:6,
855:19, 861:12,
861:16, 861:25,
883:5, 886:25
**Kettering's** [5] -
848:5, 850:2,
875:21, 876:12,
883:2
**Kettering/Juno** [2] -
786:11, 788:21
**key** [5] - 724:15,
741:24, 742:7,
767:20, 792:18
**KIEV** [3] - 855:24,
856:1, 856:2
**kind** [7] - 718:18,
766:11, 817:12,
820:4, 857:6,
857:10, 857:13
**kinds** [1] - 861:24
**kit** [1] - 813:8
**Kite** [154] - 700:2,
703:14, 703:16,
710:10, 717:20,
718:21, 719:8,
719:10, 728:25,
729:4, 729:10,
729:20, 739:12,
741:19, 741:24,
742:7, 742:20,
743:15, 743:16,
743:20, 744:3,
745:8, 745:16,
746:5, 747:13,
748:15, 749:6,
750:25, 751:1,
751:10, 751:17,
751:25, 752:12,
752:21, 753:10,
755:14, 760:8,
761:24, 762:1,
763:9, 763:11,

765:17, 767:1,
767:9, 767:16,
767:18, 767:21,
768:9, 768:11,
768:12, 769:3,
769:23, 769:25,
770:19, 770:25,
771:4, 771:18,
771:21, 773:4,
773:7, 773:9,
773:10, 774:18,
775:17, 776:5,
776:10, 776:12,
777:12, 778:23,
779:6, 780:15,
780:17, 781:2,
781:7, 782:16,
783:6, 783:8,
783:25, 789:5,
789:19, 790:6,
790:15, 790:23,
791:11, 793:10,
793:21, 794:17,
794:19, 795:23,
796:6, 796:14,
798:25, 799:2,
799:15, 799:19,
799:24, 800:11,
803:16, 805:6,
805:9, 805:12,
806:16, 806:22,
806:24, 807:3,
807:6, 807:8, 809:3,
809:11, 809:13,
809:22, 810:13,
811:22, 811:24,
813:25, 814:7,
814:18, 815:5,
815:15, 818:11,
819:7, 823:24,
824:4, 824:5,
824:12, 824:13,
824:14, 825:20,
826:7, 826:11,
827:8, 827:13,
827:15, 834:12,
834:15, 836:7,
836:14, 840:17,
843:5, 843:7,
843:10, 843:13,
844:3, 864:21,
864:23, 868:5,
869:1, 869:17,
871:6, 888:10
**KITE** [1] - 698:8
**Kite's** [42] - 700:13,
701:3, 730:3, 730:4,
746:11, 749:12,
749:24, 750:14,
751:3, 751:13,
752:16, 753:17,

753:23, 767:17,
768:23, 776:7,
777:17, 779:22,
784:12, 785:15,
786:6, 789:22,
796:2, 799:7,
806:11, 807:2,
809:20, 811:18,
812:11, 814:16,
820:6, 865:22,
866:16, 868:8,
870:6, 870:13,
871:9, 872:1,
872:14, 881:14,
881:16, 882:1
**Kite/Gilead** [1] -
868:24
**know-how** [8] - 834:7,
834:15, 835:5,
835:18, 835:19,
835:25, 862:7
**knowing** [2] - 819:12,
883:22
**knowledge** [4] -
754:10, 754:25,
755:5, 755:7
**known** [3] - 761:7,
763:1, 768:1
**knows** [1] - 731:24
**KTEC19** [2] - 739:11,
772:14
**KYMRIAH** [5] - 740:1,
821:25, 825:17,
825:19, 836:23

## L

**label** [1] - 777:16
**labels** [1] - 832:23
**lack** [1] - 736:21
**ladies** [4] - 710:14,
722:21, 723:14,
782:6
**laid** [1] - 729:9
**Lancaster** [2] - 839:12
**landscape** [2] -
717:15, 717:17
**Lansa** [1] - 823:6
**large** [9] - 716:7,
717:13, 718:7,
729:24, 766:2,
792:14, 804:3,
845:6, 848:19
**larger** [1] - 794:19
**largest** [1] - 804:4
**Larry** [1] - 723:25
**Larson** [10] - 857:22,
858:2, 858:5,
859:25, 875:22,
876:11, 878:7,

878:9, 888:25, 889:2
**last** [15] - 756:8,
756:24, 757:19,
809:25, 811:19,
825:15, 841:9,
841:10, 856:13,
858:11, 869:15,
869:21, 876:2,
889:3, 889:24
**late** [10] - 709:8,
712:13, 713:1,
716:23, 718:19,
731:24, 742:6,
790:18, 824:4,
832:25
**late-stage** [1] - 731:24
**later-stage** [1] -
713:24
**latest** [1] - 743:1
**launch** [16] - 717:20,
730:3, 730:17,
748:19, 762:6,
771:3, 776:20,
779:10, 789:7,
794:15, 794:16,
798:25, 799:1,
800:11, 809:13,
812:10
**launched** [5] - 729:21,
729:23, 779:7,
779:13, 780:14
**launching** [3] -
789:19, 794:17,
794:18
**law** [8] - 761:2,
814:22, 868:8,
868:9, 868:18,
870:13, 871:6
**Law** [11] - 699:4,
699:5, 699:5, 699:6,
699:8, 699:11,
699:15, 699:16,
699:16, 699:17,
699:17
**lawsuit** [1] - 871:6
**Lawton** [8] - 781:21,
839:15, 841:13,
865:14, 865:21,
870:10, 876:22,
888:5
**LAWTON** [34] -
840:17, 841:3,
841:15, 846:4,
846:6, 851:23,
851:25, 853:12,
853:17, 855:8,
855:14, 857:2,
858:24, 859:2,
859:17, 859:23,
862:21, 865:19,

SCHUETZ - CROSS

865:22, 876:23, 876:25, 877:6, 877:21, 884:11, 886:10, 888:6, 888:9, 888:13, 888:18, 888:22, 889:11, 889:16, 890:5, 891:10
**lawyer** [4] - 870:23, 875:21, 883:2, 890:19
**lawyers** [25] - 705:4, 727:17, 728:5, 734:13, 862:11, 862:15, 862:16, 868:19, 869:17, 870:4, 870:18, 870:21, 870:24, 870:25, 871:1, 871:3, 871:9, 872:1, 872:15, 881:14, 881:16, 882:1, 888:10, 890:12
**lay** [5] - 736:6, 774:7, 792:10, 838:11
**lead** [7] - 711:13, 730:1, 789:9, 794:17, 829:21, 830:8, 830:10
**leadership** [1] - 759:8
**leading** [2] - 770:4, 830:2
**least** [5] - 719:6, 737:21, 769:2, 835:7, 880:21
**led** [1] - 716:1
**left** [4] - 734:23, 743:1, 743:20, 832:19
**legal** [4] - 757:3, 812:16, 814:9, 868:21
**length** [1] - 714:11
**les** [1] - 759:16
**less** [14] - 712:21, 712:22, 727:6, 737:7, 741:23, 745:15, 761:4, 776:21, 781:10, 812:14, 812:15, 825:16, 852:19, 876:10
**lesser** [1] - 780:16
**letter** [1] - 856:2
**letters** [4] - 847:1, 847:3, 847:5, 847:22
**leukemia** [3] - 726:3, 829:25, 830:6
**level** [8] - 717:7, 782:11, 790:11, 794:4, 806:5, 806:8,

807:21, 807:24
**levels** [4] - 751:11, 805:1, 805:19, 807:16
**leverage** [1] - 716:21
**license** [73] - 701:9, 701:12, 701:14, 703:3, 712:8, 713:1, 713:2, 713:5, 713:8, 714:10, 714:24, 715:18, 717:5, 719:24, 720:19, 724:18, 740:17, 740:24, 748:17, 749:10, 761:11, 762:2, 763:12, 767:22, 767:23, 770:25, 771:3, 777:17, 777:25, 778:1, 778:6, 778:17, 778:25, 784:9, 786:2, 798:25, 799:1, 799:20, 800:10, 800:23, 802:2, 802:5, 802:14, 802:17, 802:19, 804:3, 804:6, 804:14, 814:2, 814:6, 814:12, 820:19, 821:4, 821:5, 821:8, 822:7, 823:9, 823:21, 829:6, 830:15, 830:18, 831:5, 834:13, 835:11, 835:14, 836:21, 857:9, 872:24, 885:3, 885:6, 886:25, 887:24
**licensed** [9] - 740:4, 740:7, 751:21, 780:8, 780:9, 788:23, 821:19, 835:21, 835:23
**licensee** [8] - 703:8, 761:10, 783:5, 805:5, 805:6, 806:20, 806:22, 821:9
**licenses** [12] - 711:17, 711:20, 711:22, 711:24, 712:5, 713:12, 713:13, 713:22, 714:4, 714:6, 801:13, 803:24
**licensing** [16] - 702:11, 702:13, 704:10, 711:14,

711:18, 713:3, 713:6, 713:7, 715:6, 716:23, 727:14, 756:4, 759:17, 763:12, 788:17, 854:13
**licensor** [5] - 713:19, 714:8, 761:9, 806:20, 806:22
**life** [2] - 796:21, 797:1
**light** [3] - 752:4, 767:17, 789:12
**likelihood** [1] - 713:5
**likely** [2] - 766:4, 825:12
**limine** [4] - 721:18, 748:15, 752:3, 752:11
**limit** [1] - 730:16
**limited** [3] - 714:24, 718:24, 830:15
**line** [19] - 705:20, 706:1, 741:9, 741:10, 754:16, 765:10, 781:6, 796:23, 815:5, 830:24, 831:6, 831:12, 852:2, 860:6, 876:19, 879:14, 879:15
**lines** [9] - 741:7, 765:13, 809:10, 876:19, 882:12, 883:10, 888:15, 888:16, 889:12
**list** [2] - 756:4, 770:6
**listed** [3] - 773:13, 786:5, 885:10
**listen** [2] - 704:24, 865:10
**listing** [7] - 874:22, 874:24, 875:1, 877:18, 878:10, 880:10
**lists** [2] - 758:4, 832:23
**literally** [1] - 705:21
**litigation** [8] - 760:17, 760:22, 762:15, 789:11, 789:12, 821:17, 823:9, 823:13
**live** [4] - 704:20, 754:20, 842:18, 842:19
**lived** [1] - 765:14
**living** [2] - 766:23, 841:17
**LLP** [2] - 699:4, 699:15

**logistical** [1] - 819:7
**look** [41] - 713:10, 717:17, 720:8, 720:9, 720:11, 720:14, 720:15, 727:15, 731:16, 731:17, 733:14, 738:4, 738:17, 739:9, 740:20, 744:22, 755:10, 761:14, 761:17, 763:14, 785:14, 788:24, 790:21, 790:23, 790:24, 791:1, 810:21, 820:19, 833:10, 834:3, 837:15, 837:16, 841:20, 847:16, 853:24, 856:13, 879:7, 879:12, 880:9, 882:13, 884:22
**looked** [14] - 731:1, 736:17, 760:19, 803:24, 821:8, 831:3, 832:13, 849:1, 861:3, 876:12, 877:13, 877:18, 883:11, 890:2
**looking** [27] - 735:3, 749:22, 752:25, 784:13, 786:9, 790:19, 791:17, 791:19, 793:12, 793:13, 793:15, 794:23, 795:1, 801:1, 813:8, 815:1, 829:14, 831:23, 837:23, 852:1, 855:15, 855:21, 863:20, 881:5, 886:18
**looks** [10] - 700:5, 711:18, 728:2, 737:6, 751:7, 751:12, 752:17, 766:16, 828:19
**Los** [5] - 698:14, 698:23, 699:7, 699:9, 699:18
**lost** [12] - 794:21, 794:22, 812:11, 812:16, 812:18, 812:25, 813:3, 813:6, 813:16, 814:4, 815:7, 815:12
**love** [1] - 715:2
**lower** [1] - 776:20
**loyalty** [2] - 771:11,

771:12
**lunch** [1] - 780:25
**lymphodepletion** [5] - 769:11, 769:14, 816:20, 819:6, 819:25
**lymphoma** [2] - 717:14, 729:25
**lysine** [4] - 849:22, 849:24, 850:3, 856:10

---

**M**

**Maclain** [1] - 699:5
**mail** [21] - 733:24, 734:8, 828:15, 828:16, 845:17, 846:10, 846:18, 846:20, 855:15, 855:18, 855:21, 856:13, 856:18, 857:4, 857:21, 859:15, 859:24, 860:5, 860:18, 860:25, 889:1
**mails** [7] - 733:11, 733:12, 734:8, 734:17, 872:8, 872:9, 875:24
**main** [3] - 728:23, 728:25, 854:23
**major** [2] - 730:16, 778:24
**majority** [1] - 724:23
**management** [1] - 717:6
**MANELLA** [1] - 699:4
**manually** [1] - 875:17
**manufacture** [3] - 745:2, 769:14, 816:25
**manufactured** [2] - 745:4, 819:13
**manufacturing** [15] - 720:13, 720:17, 731:19, 745:19, 745:25, 769:10, 816:19, 816:24, 818:7, 818:9, 819:3, 819:5, 819:24, 857:8, 862:5
**maple** [2] - 837:9, 837:22
**March** [1] - 723:21
**margin** [1] - 796:11
**margins** [4] - 796:3, 796:6, 796:8, 796:17
**Marina** [5] - 857:22, 858:2, 859:25,

SCHUETZ - CROSS

875:22, 888:24
**Mark** [1] - 756:3
**marked** [4] - 735:14, 846:10, 846:18, 858:20
**market** [67] - 715:3, 717:9, 717:20, 717:21, 717:23, 717:24, 718:1, 718:3, 718:5, 718:8, 718:11, 718:12, 718:15, 718:16, 718:18, 718:19, 718:22, 718:24, 719:2, 719:6, 719:9, 719:12, 730:4, 742:14, 742:16, 760:20, 771:9, 771:24, 772:2, 772:11, 773:21, 774:23, 776:14, 776:20, 777:24, 778:12, 779:11, 790:18, 791:1, 791:8, 791:12, 793:12, 793:14, 794:11, 801:3, 809:5, 812:7, 812:24, 813:17, 815:7, 815:13, 824:6, 824:10, 825:10, 830:23, 831:2, 831:5, 831:12, 833:7, 833:9, 836:6, 836:13, 836:17, 837:2
**marketplace** [18] - 719:10, 760:3, 762:6, 771:8, 771:11, 771:14, 773:3, 773:20, 774:16, 779:3, 779:13, 789:20, 790:17, 800:11, 801:1, 824:19, 825:11, 833:4
**markets** [2] - 738:15, 738:24
**marks** [1] - 860:16
**Massachusetts** [3] - 841:19, 842:9, 842:19
**master's** [1] - 759:2
**match** [3] - 874:2, 875:6, 878:11
**matched** [1] - 850:9
**matching** [1] - 752:21
**materials** [6] - 736:19, 737:3, 760:13,

762:10, 858:17, 859:9
**math** [7] - 704:16, 704:20, 706:24, 716:6, 798:16, 804:5
**matter** [8] - 701:20, 704:17, 706:1, 748:6, 794:10, 812:17, 891:1, 892:3
**matters** [4] - 700:3, 734:17, 755:8, 757:4
**maximum** [2] - 718:22, 718:23
**mean** [18] - 709:2, 713:23, 724:22, 728:11, 729:4, 731:14, 736:11, 741:23, 746:8, 814:7, 818:25, 819:8, 825:11, 829:24, 836:20, 856:1, 861:17, 864:7
**meaning** [2] - 850:6, 876:7
**meaningful** [3] - 716:23, 717:4, 730:23
**meaningfully** [1] - 730:13
**means** [6] - 765:9, 813:25, 814:7, 818:3, 818:6, 866:19
**meant** [4] - 727:7, 792:8, 830:4, 854:9
**medical** [10] - 724:15, 724:24, 727:1, 731:4, 734:12, 842:4, 842:6, 842:10, 842:12
**medicine** [3] - 731:3, 746:4, 842:8
**medicines** [1] - 725:7
**meet** [4] - 724:2, 863:22, 864:1, 864:7
**meeting** [16] - 724:5, 740:15, 863:20, 863:24, 864:6, 870:11, 884:6, 884:7, 884:16, 884:18, 884:19, 885:1, 885:18, 886:1, 886:14, 887:2
**meetings** [9] - 844:9, 869:16, 870:6, 870:8, 870:13, 870:17, 871:9, 871:13
**member** [2] - 759:7, 857:25
**Memorial** [24] -

725:13, 725:19, 726:2, 762:7, 778:17, 786:10, 788:20, 795:7, 800:23, 801:8, 804:15, 805:3, 805:8, 807:18, 807:22, 808:24, 820:25, 845:2, 845:9, 845:17, 850:8, 861:25, 875:21, 876:11
**memory** [6] - 701:24, 806:6, 832:21, 856:22, 857:11, 872:3
**mention** [1] - 704:2
**mentioned** [22] - 704:14, 707:10, 712:16, 713:25, 716:21, 718:1, 719:1, 731:21, 734:12, 740:10, 751:8, 759:23, 762:10, 770:21, 784:17, 799:6, 845:4, 852:10, 852:11, 879:3, 879:9, 890:12
**mentioning** [1] - 785:13
**message** [1] - 855:5
**messages** [4] - 853:18
**met** [9] - 724:6, 741:1, 869:24, 870:10, 881:14, 881:15, 881:20, 881:25
**method** [1] - 842:13
**methodology** [2] - 777:21, 778:13
**Michael** [4] - 733:25, 857:21, 857:24, 857:25
**Michel** [1] - 845:17
**mid** [1] - 740:7
**middle** [3] - 714:16, 858:22, 884:23
**might** [10] - 716:12, 718:7, 773:6, 813:16, 814:1, 814:3, 814:15, 814:25, 815:7
**mil** [1] - 750:7
**MIL** [4] - 721:15, 721:17, 785:21, 798:9
**milestone** [13] - 713:17, 751:19, 783:16, 783:19, 783:21, 784:13,

785:13, 786:3, 786:4, 786:9, 798:1, 798:14, 804:18
**milestones** [6] - 750:2, 750:7, 750:13, 783:25, 784:11, 798:2
**Milligan** [2] - 774:14, 775:5
**million** [70] - 704:2, 704:3, 705:16, 705:20, 705:24, 733:3, 733:6, 748:19, 748:21, 748:23, 749:18, 749:20, 750:5, 750:9, 750:10, 750:14, 750:15, 750:17, 750:24, 751:2, 751:6, 751:9, 751:16, 751:21, 751:24, 753:7, 753:9, 765:13, 765:24, 765:25, 766:3, 783:24, 785:1, 785:3, 785:5, 786:5, 793:20, 793:25, 797:12, 797:19, 798:1, 798:2, 798:4, 798:14, 798:17, 800:3, 800:4, 800:5, 804:19, 804:20, 805:20, 806:1, 806:8, 806:14, 806:24, 807:13, 807:17, 807:21, 807:25, 808:3, 808:9, 808:19, 808:20, 808:24, 826:15, 827:6
**millions** [2] - 766:3, 784:25
**mind** [1] - 827:25
**mindset** [2] - 829:5, 829:8
**minute** [3] - 707:25, 781:5, 849:1
**minutes** [5] - 709:3, 781:15, 781:22, 840:6, 853:8
**mischaracterizes** [1] - 775:19
**misheard** [2] - 824:12, 831:13
**misreading** [2] - 857:15, 858:6
**misunderstood** [1] - 883:21
**mixing** [1] - 752:21

**model** [26] - 702:7, 702:21, 703:1, 716:18, 716:19, 716:25, 717:5, 717:7, 717:8, 717:19, 718:18, 719:11, 832:10, 832:25, 833:1, 833:15, 833:19, 833:21, 834:2, 837:7, 837:8, 837:9, 837:22, 837:23, 838:18
**modeled** [1] - 718:15
**modeling** [7] - 716:2, 716:4, 716:5, 717:2, 721:4, 722:8, 832:2
**models** [29] - 702:3, 702:6, 702:19, 702:23, 716:6, 716:15, 731:5, 731:7, 731:9, 731:13, 760:24, 762:11, 770:21, 791:2, 791:6, 791:11, 791:14, 791:16, 791:18, 791:19, 791:21, 791:24, 792:1, 792:13, 792:19, 796:5, 796:14, 832:12, 832:17
**modifications** [3] - 817:16, 817:22, 818:3
**moment** [10] - 743:6, 747:19, 785:13, 800:16, 810:23, 818:24, 822:16, 841:6, 870:7, 889:13
**Monday** [9] - 700:22, 709:10, 890:23, 890:24, 890:25, 891:1, 891:2, 891:15
**money** [9] - 712:23, 729:18, 731:16, 758:20, 766:13, 814:12, 854:14, 854:17
**monies** [1] - 808:2
**monitor** [1] - 874:18
**months** [8] - 716:17, 724:8, 740:24, 869:15, 869:21, 872:16, 872:17
**months'** [1] - 792:16
**Morgan** [1] - 699:4
**morning** [32] - 700:18, 700:19, 700:22, 703:15, 705:13,

SCHUETZ - CROSS

707:19, 708:3,
709:8, 710:4,
710:14, 710:24,
711:4, 711:6,
719:21, 719:22,
722:21, 723:12,
723:13, 732:21,
732:22, 752:8,
752:20, 757:6,
757:8, 758:13,
758:14, 758:16,
767:8, 807:13,
828:17, 859:25,
864:2
**most** [9] - 712:3,
713:13, 715:3,
717:3, 724:11,
725:24, 729:9,
766:1, 823:9
**mostly** [1] - 845:7
**motion** [10] - 701:3,
701:14, 703:21,
721:17, 748:15,
749:1, 751:6, 752:3,
752:4, 865:3
**move** [28] - 733:17,
737:21, 755:12,
757:23, 763:16,
773:22, 786:25,
787:10, 791:23,
792:20, 808:25,
813:10, 815:16,
823:16, 827:24,
834:20, 834:22,
838:9, 838:12,
840:4, 865:2,
883:13, 884:9,
885:2, 886:1, 886:7,
886:14, 887:4
**mover** [18] - 771:5,
771:6, 771:20,
772:4, 772:15,
772:22, 773:12,
773:15, 774:17,
775:8, 775:11,
775:16, 776:2,
776:7, 776:10,
799:2, 836:4, 836:14
**movers** [3] - 718:12,
771:23, 772:2
**moving** [3] - 873:15,
883:4, 887:23
**MR** [241] - 700:10,
700:17, 700:20,
700:22, 700:24,
701:11, 701:18,
702:1, 702:16,
703:6, 703:10,
703:15, 703:19,
704:4, 704:8, 705:3,

705:6, 705:7,
705:11, 705:16,
706:5, 706:9,
706:11, 706:14,
706:16, 706:20,
707:5, 707:8,
707:10, 707:23,
708:3, 708:7, 708:9,
708:14, 708:15,
708:19, 708:21,
709:1, 709:3, 709:7,
709:11, 709:14,
709:23, 710:3,
710:6, 710:13,
711:3, 719:15,
719:18, 719:20,
721:14, 721:17,
721:21, 721:23,
721:24, 722:13,
722:15, 722:20,
722:24, 723:11,
732:15, 732:20,
733:17, 733:19,
733:22, 733:23,
735:11, 735:13,
735:19, 735:22,
735:24, 736:4,
736:5, 736:7, 736:8,
736:21, 736:23,
736:25, 737:1,
737:8, 737:11,
737:12, 737:20,
738:1, 738:7, 738:9,
738:13, 741:8,
741:11, 743:3,
743:7, 743:9, 744:9,
744:11, 744:13,
746:13, 746:24,
748:10, 748:12,
750:20, 752:8,
753:3, 753:16,
755:25, 756:10,
756:13, 756:15,
757:6, 757:17,
757:22, 758:1,
758:2, 758:4, 758:8,
758:12, 763:16,
763:20, 763:25,
764:5, 764:8,
764:13, 764:17,
764:21, 768:4,
768:8, 773:22,
773:25, 774:3,
774:6, 774:9,
774:25, 775:3,
775:19, 775:22,
781:4, 781:7,
781:10, 781:15,
781:17, 781:21,
782:6, 782:8,
785:17, 785:21,

785:24, 786:25,
787:2, 787:5,
787:10, 787:13,
787:16, 791:23,
791:25, 792:4,
792:8, 792:11,
792:20, 792:23,
793:8, 794:5, 794:7,
794:9, 798:6, 798:9,
798:19, 800:13,
800:16, 800:19,
805:18, 810:14,
810:17, 810:20,
811:4, 811:6,
813:10, 813:13,
813:14, 827:18,
827:19, 827:21,
827:23, 828:2,
828:4, 828:7, 828:9,
828:11, 828:14,
834:22, 835:1,
838:2, 838:4, 838:5,
838:9, 838:11,
838:13, 839:6,
839:7, 839:9,
839:10, 839:14,
839:17, 839:21,
839:23, 840:1,
840:17, 841:3,
841:15, 846:4,
846:6, 851:23,
851:25, 853:12,
853:17, 855:8,
855:14, 857:2,
858:24, 859:2,
859:17, 859:23,
862:21, 865:19,
865:22, 876:23,
876:25, 877:6,
877:21, 884:11,
886:10, 888:6,
888:9, 888:13,
888:18, 888:22,
889:11, 889:16,
890:5, 891:10,
891:16, 891:19,
891:23
**MS** [44] - 746:17,
746:19, 747:3,
747:7, 747:12,
747:16, 747:20,
747:23, 754:2,
754:8, 754:13,
754:15, 754:23,
755:16, 755:21,
853:14, 855:11,
856:25, 859:20,
862:25, 865:2,
865:4, 866:3,
874:20, 877:3,
878:4, 878:5,

879:19, 879:23,
881:23, 881:24,
882:11, 884:9,
884:14, 886:7,
886:13, 888:4,
888:20, 889:13,
889:15, 890:7,
890:10, 890:21,
891:11
**MSK** [17] - 783:7,
783:10, 783:11,
784:3, 784:18,
784:20, 795:24,
795:25, 820:18,
835:14, 846:15,
883:14, 884:4,
884:7, 885:1, 886:2,
886:16
**MSK's** [1] - 853:21
**MSK/Juno** [5] -
727:11, 779:25,
782:13, 782:24,
802:8
**MSKCC** [12] - 750:4,
802:13, 803:12,
804:14, 806:1,
806:8, 821:6,
823:21, 832:9,
835:14, 835:22,
854:7
**MSKCC/Juno** [1] -
834:6
**multiple** [12] - 751:15,
752:13, 768:11,
785:2, 808:9, 810:6,
810:10, 821:14,
823:1, 824:8, 870:9,
870:11
**multiplied** [1] - 820:17
**multiply** [2] - 795:12,
795:16
**MUNGER** [1] - 699:15
**Munger** [7] - 868:5,
868:18, 868:21,
870:4, 870:9,
870:17, 871:4
**must** [2] - 738:24,
816:1
**Myers** [2] - 844:14,
844:16
**myriad** [1] - 824:25

# N

**name** [13] - 710:23,
710:24, 723:7,
723:16, 725:25,
757:19, 820:4,
841:9, 841:10,
841:11, 846:7

**names** [2] - 726:1,
726:6
**narrow** [1] - 884:1
**natural** [1] - 847:13
**naturally** [1] - 766:8
**nature** [3] - 801:3,
812:24, 825:25
**NCI** [1] - 809:15
**near** [3] - 807:20,
808:15, 808:17
**nearly** [2] - 714:6,
777:11
**necessary** [1] - 818:21
**need** [16] - 700:16,
706:21, 707:24,
724:18, 731:19,
735:10, 744:19,
781:18, 789:1,
798:7, 814:11,
822:13, 827:18,
840:7, 845:20, 856:5
**needed** [4] - 727:16,
817:23, 861:5, 891:9
**needs** [2] - 743:25,
840:2
**nefarious** [1] - 734:18
**negated** [1] - 730:18
**negatives** [1] - 867:13
**negotiate** [2] - 714:19,
861:12
**negotiating** [1] -
711:14
**negotiation** [73] -
702:2, 751:17,
752:18, 753:19,
761:8, 761:13,
761:14, 761:18,
761:21, 761:22,
762:5, 762:12,
762:19, 762:21,
767:19, 770:5,
770:17, 771:2,
771:19, 774:12,
776:24, 778:4,
778:10, 778:21,
778:23, 778:25,
779:5, 779:14,
779:16, 780:1,
780:18, 782:14,
782:15, 783:9,
784:1, 784:10,
784:15, 786:21,
789:5, 789:18,
790:14, 791:10,
791:22, 796:4,
796:15, 798:23,
798:24, 799:5,
799:18, 799:23,
800:10, 801:17,
805:6, 805:25,

SCHUETZ - CROSS

806:17, 806:18, 806:21, 814:1, 814:6, 814:14, 815:2, 815:4, 815:6, 815:10, 831:8, 831:14, 832:16, 834:12, 835:23, 836:5, 836:12, 837:5
**negotiations** [3] - 740:16, 741:2, 761:16
**net** [6] - 713:20, 771:7, 776:4, 783:4, 797:3, 797:9
**Netherlands** [1] - 729:18
**never** [24] - 704:16, 734:8, 741:20, 751:11, 752:15, 807:16, 809:21, 831:3, 833:13, 858:12, 867:3, 867:4, 867:5, 867:8, 867:9, 867:14, 867:19, 867:24, 867:25, 876:3, 890:17, 890:18
**New** [2] - 699:12
**new** [14] - 704:19, 727:3, 727:20, 753:13, 844:25, 861:25, 862:3, 873:2, 883:7, 885:4, 886:3, 886:15, 886:16, 886:23
**news** [1] - 730:8
**next** [33] - 700:8, 706:8, 709:17, 709:21, 710:11, 722:19, 722:22, 732:11, 744:21, 746:15, 746:17, 746:22, 747:2, 747:12, 753:21, 755:12, 755:23, 756:24, 757:7, 767:5, 768:6, 770:6, 776:22, 780:6, 781:17, 793:11, 797:6, 817:19, 831:25, 840:4, 858:8, 859:6, 885:22
**night** [1] - 884:20
**nine** [4] - 869:15, 869:21, 872:16, 872:17
**NO:4** [1] - 852:3
**NO:5** [1] - 852:3
**NO:6** [23] - 848:13, 848:17, 849:3,

849:8, 849:20, 850:11, 850:22, 851:8, 851:11, 851:15, 854:4, 855:23, 858:12, 874:2, 874:5, 874:25, 875:3, 876:3, 877:18, 882:23, 889:4, 889:6
**nobody** [2] - 709:25, 860:7
**none** [1] - 754:16
**noon** [4] - 708:10, 708:11, 708:16, 780:19
**note** [3] - 737:16, 747:16, 833:5
**notebook** [1] - 757:24
**noted** [3] - 764:10, 795:7, 818:24
**notes** [2] - 873:9, 873:17
**nothing** [6] - 746:13, 753:11, 764:16, 801:25, 887:14, 890:5
**notice** [2] - 850:11, 851:11
**noticed** [6] - 874:2, 882:23, 883:1, 884:3, 885:17, 887:22
**noting** [1] - 796:16
**Nouvelles** [1] - 759:17
**Novartis** [82] - 717:21, 718:21, 718:25, 719:1, 719:3, 719:5, 728:24, 740:3, 740:5, 740:7, 740:19, 741:14, 741:20, 741:25, 742:7, 780:10, 780:15, 786:19, 786:21, 788:1, 789:4, 789:6, 789:9, 789:15, 790:5, 790:14, 790:22, 791:6, 791:7, 791:20, 793:10, 793:19, 794:14, 794:20, 799:12, 799:15, 801:21, 802:5, 802:16, 820:23, 821:2, 821:4, 821:8, 821:20, 821:23, 822:1, 822:7, 823:25, 824:3, 825:15, 826:1, 826:4, 826:6,

826:11, 826:19, 826:25, 827:3, 827:6, 827:8, 827:9, 827:13, 827:14, 828:25, 829:6, 829:11, 829:21, 829:24, 830:2, 830:5, 830:12, 830:23, 831:1, 831:4, 831:5, 831:12, 831:19, 833:6, 836:7, 836:21, 837:4
**Novartis'** [7] - 729:2, 729:6, 740:1, 740:10, 740:13, 740:22, 742:20
**Novartis/Juno** [1] - 790:8
**November** [3] - 734:1, 741:16, 828:17
**nowhere** [6] - 807:20, 808:8, 808:15, 808:17, 808:20, 887:14
**nucleotide** [4] - 851:1, 851:3, 851:6, 855:22
**nucleotides** [9] - 847:24, 847:25, 848:4, 848:7, 851:11, 856:4, 858:11, 876:2, 889:4
**number** [42] - 724:11, 724:15, 726:7, 730:9, 733:4, 741:24, 744:3, 749:24, 750:22, 752:3, 754:10, 754:24, 757:22, 759:13, 760:15, 770:22, 790:12, 793:14, 795:9, 795:12, 795:15, 795:18, 800:8, 801:24, 803:7, 804:2, 804:3, 811:3, 828:24, 836:11, 838:19, 841:21, 843:25, 845:6, 846:3, 847:22, 848:8, 851:11, 854:2, 864:18, 869:16, 881:19
**Number** [1] - 749:22
**numbering** [1] - 858:21
**numbers** [15] - 721:10, 722:1, 722:11, 754:16, 755:15, 766:2,

803:4, 803:5, 803:20, 804:2, 810:2, 813:1, 847:19, 847:21, 882:8
**numerous** [1] - 822:25

---

## O

**oath** [3] - 833:25, 834:2, 889:20
**object** [1] - 798:7
**objected** [1] - 747:21
**objection** [49] - 703:20, 721:14, 733:19, 736:2, 736:21, 736:22, 737:4, 738:8, 746:19, 747:4, 753:25, 754:2, 758:2, 758:6, 764:8, 764:20, 768:4, 768:6, 768:7, 773:24, 774:4, 775:19, 785:17, 787:2, 787:12, 787:13, 792:22, 794:5, 810:14, 853:12, 853:14, 855:8, 855:10, 855:11, 856:25, 859:17, 859:19, 859:20, 865:24, 876:24, 877:6, 884:11, 886:9, 886:10, 888:19, 889:14, 889:15, 891:11
**objections** [7] - 703:17, 749:12, 749:24, 755:14, 764:10, 828:10, 828:11
**obligation** [1] - 784:5
**obligations** [3] - 783:14, 784:9, 785:25
**obtain** [4] - 761:10, 767:22, 800:11, 845:15
**obtained** [1] - 782:16
**obtaining** [2] - 712:11, 770:10
**obviate** [1] - 701:12
**obvious** [1] - 857:17
**obviously** [1] - 861:4
**occur** [3] - 701:10, 779:5, 805:23
**occurred** [3] - 761:23, 778:20, 788:3

**occurring** [1] - 789:18
**October** [20] - 729:21, 761:23, 765:10, 770:18, 771:4, 779:5, 779:9, 782:15, 782:22, 789:19, 791:22, 805:20, 805:24, 806:24, 807:20, 808:4, 808:7, 808:12, 836:6, 864:23
**odd** [2] - 766:1, 775:25
**OF** [3] - 698:2, 698:12, 699:1
**offer** [9] - 703:1, 703:3, 754:22, 755:20, 792:4, 853:13, 855:9, 859:18, 888:13
**offered** [1] - 729:18
**offering** [3] - 736:2, 752:17, 789:13
**offerings** [1] - 772:18
**offhand** [1] - 833:25
**office** [6] - 853:22, 870:22, 870:23, 870:24, 870:25, 876:9
**officer** [6] - 747:9, 747:14, 753:24, 767:9, 774:14, 866:19
**Official** [1] - 698:22
**often** [8] - 711:21, 713:17, 714:11, 725:1, 728:5, 728:15, 728:16, 734:13
**Olson** [6] - 868:5, 868:18, 870:4, 870:9, 870:18, 871:4
**OLSON** [1] - 699:15
**Olson's** [1] - 868:21
**omitted** [2] - 750:21, 811:24
**once** [6] - 801:3, 810:10, 814:23, 870:23, 870:24, 880:6
**oncologist** [2] - 734:5, 842:12
**oncology** [1] - 842:10
**one** [97] - 701:6, 701:21, 707:8, 707:23, 709:11, 717:12, 720:4, 720:16, 720:19, 721:8, 722:4,

SCHUETZ - CROSS

726:19, 726:25, 727:2, 730:18, 734:3, 737:6, 737:9, 737:15, 739:7, 739:15, 739:19, 743:6, 745:22, 747:2, 747:19, 747:21, 750:21, 752:10, 753:15, 753:20, 755:16, 758:5, 761:13, 764:17, 766:9, 766:12, 768:19, 768:25, 772:4, 772:18, 776:15, 776:16, 777:3, 777:11, 778:9, 779:16, 780:11, 783:22, 785:9, 785:14, 786:18, 786:19, 787:7, 794:10, 804:18, 804:22, 810:8, 811:23, 816:15, 821:11, 821:12, 822:18, 825:1, 826:19, 828:4, 830:15, 830:20, 831:22, 832:13, 832:14, 837:7, 839:11, 839:12, 841:6, 846:23, 849:16, 850:23, 853:1, 853:18, 855:16, 856:5, 859:3, 866:21, 870:23, 875:10, 875:20, 876:15, 883:11, 885:10, 888:6, 888:14, 889:11, 890:12

**One** [1] - 826:2

**one-time** [2] - 745:22, 810:8

**ones** [4] - 741:24, 762:8, 801:15, 819:2

**ongoing** [2] - 714:20, 715:22

**open** [5] - 839:22, 850:14, 850:21, 851:1, 851:5

**operate** [4] - 727:24, 727:25, 728:13, 728:18

**operating** [3] - 796:23, 796:24, 797:3

**opine** [1] - 730:24

**opined** [1] - 802:22

**opinion** [12] - 728:6, 730:25, 751:2,

751:23, 775:23, 797:5, 816:13, 818:11, 818:14, 820:2, 825:20, 827:2

**opinions** [7] - 733:11, 733:12, 734:8, 734:17, 749:16, 758:19, 760:14

**opportunities** [2] - 711:18, 712:25

**opportunity** [8] - 700:16, 713:9, 714:21, 718:4, 718:9, 730:15, 836:24, 865:14

**opposing** [1] - 756:5

**opt** [1] - 715:20

**opt-in** [1] - 715:20

**option** [1] - 730:9

**options** [1] - 799:19

**oranges** [1] - 815:3

**order** [20] - 698:25, 704:10, 705:1, 706:8, 738:15, 738:24, 746:22, 748:22, 748:24, 752:11, 755:23, 776:17, 781:22, 839:5, 840:3, 840:16, 842:20, 869:10, 873:13, 873:18

**ordered** [1] - 834:25

**ordinary** [3] - 731:10, 762:14, 791:17

**organization** [1] - 733:13

**original** [2] - 832:9, 854:10

**originally** [1] - 750:22

**OTERO** [1] - 698:3

**outcome** [5] - 762:5, 778:3, 806:17, 814:14, 862:2

**outside** [10] - 703:4, 703:6, 714:25, 715:19, 715:22, 715:24, 720:24, 731:4, 842:19, 862:10

**overall** [7] - 716:13, 718:9, 727:4, 776:5, 788:7, 818:9, 823:22

**overcome** [1] - 776:18

**overlap** [3] - 770:22, 789:8, 829:21

**overrule** [1] - 755:14

**overruled** [5] - 737:4, 768:7, 775:21, 785:23, 857:1

**own** [1] - 875:16

**owned** [2] - 726:16, 733:2

**ownership** [4] - 713:16, 727:2, 727:4, 727:7

## P

**p.m** [2] - 889:1, 889:5

**P28z** [5] - 879:25, 880:2, 880:7, 880:20, 880:24

**Pacific** [1] - 763:1

**page** [52] - 737:13, 738:12, 741:6, 749:25, 754:16, 763:17, 764:12, 764:13, 765:7, 771:21, 771:25, 772:12, 772:25, 775:4, 783:1, 783:18, 784:18, 796:10, 811:5, 828:23, 846:7, 846:21, 846:24, 846:25, 847:8, 847:10, 847:11, 847:16, 848:11, 851:21, 851:23, 853:24, 857:20, 858:21, 859:3, 859:6, 859:8, 876:19, 876:22, 879:16, 882:7, 882:8, 883:10, 884:22, 884:23, 886:19, 886:21, 888:15, 889:12

**pages** [6] - 737:24, 738:2, 738:9, 738:10, 846:23, 859:4

**paid** [5] - 810:9, 810:10, 868:14, 868:24, 882:5

**paper** [1] - 890:18

**papers** [1] - 759:18

**paragraph** [21] - 750:1, 750:3, 751:19, 753:8, 763:18, 764:2, 764:17, 764:18, 810:21, 811:4, 811:7, 812:4, 812:9, 836:9, 836:10, 853:25, 854:19, 855:17, 855:21, 856:14

**parallel** [2] - 797:24,

832:12

**parent** [2] - 711:11, 866:16

**part** [42] - 717:9, 720:12, 720:18, 720:21, 721:9, 722:8, 725:10, 726:21, 727:10, 731:9, 745:18, 751:24, 760:9, 772:17, 774:23, 780:3, 780:9, 780:12, 784:20, 785:7, 786:23, 799:14, 816:13, 821:1, 835:7, 837:12, 842:18, 844:4, 845:13, 852:5, 852:10, 852:13, 856:3, 858:17, 859:8, 864:25, 865:5, 866:5, 868:15, 873:5, 876:15, 886:25

**partes** [1] - 768:2

**partial** [1] - 799:11

**participant** [1] - 717:25

**participated** [1] - 761:20

**particular** [18] - 726:3, 726:19, 728:3, 743:24, 763:7, 770:8, 774:14, 774:16, 784:6, 789:6, 830:19, 837:12, 837:23, 838:18, 848:11, 854:1, 860:5, 874:25

**particularly** [4] - 726:25, 727:4, 728:8, 763:5

**parties** [14] - 710:9, 749:6, 756:23, 761:9, 761:10, 761:18, 762:20, 774:11, 776:25, 777:1, 777:8, 779:13, 782:4, 799:18

**parties'** [1] - 748:7

**partner** [4] - 725:12, 865:5, 866:6, 866:10

**partners** [4] - 863:21, 863:22, 863:25, 864:6

**partnership** [8] - 724:16, 844:20, 864:12, 864:17,

866:16, 867:18, 868:3, 886:15

**party** [4] - 712:15, 728:3, 786:21, 863:4

**pass** [1] - 841:4

**past** [7] - 853:8, 864:2, 865:7, 866:7, 869:19, 872:16, 872:17

**patent** [162] - 711:21, 712:11, 714:12, 725:7, 726:4, 726:7, 726:8, 726:15, 726:16, 728:5, 728:6, 728:7, 733:10, 734:17, 740:5, 740:7, 754:11, 754:25, 755:5, 755:7, 760:8, 760:12, 761:1, 761:10, 761:11, 761:15, 762:9, 763:8, 765:6, 767:2, 767:18, 767:22, 767:24, 768:1, 768:2, 768:10, 769:21, 770:9, 771:1, 780:8, 780:10, 788:1, 788:12, 788:13, 788:14, 788:15, 796:8, 796:18, 796:21, 797:1, 799:20, 800:9, 801:2, 809:2, 809:4, 814:8, 814:11, 814:19, 815:17, 816:14, 817:8, 818:13, 818:16, 821:22, 822:5, 822:6, 822:18, 822:20, 822:22, 823:3, 825:23, 834:7, 834:9, 834:13, 834:19, 835:13, 841:21, 841:23, 841:25, 843:2, 844:23, 845:5, 845:8, 845:11, 845:14, 845:25, 849:8, 849:21, 850:11, 851:20, 852:13, 852:18, 853:3, 854:2, 854:4, 854:5, 854:12, 854:14, 854:15, 854:16, 855:22, 856:23, 857:15, 857:17, 857:22, 858:3, 858:6, 858:10,

SCHUETZ - CROSS

858:12, 858:13,
860:1, 860:7, 860:9,
860:11, 860:16,
861:3, 861:14,
862:2, 862:4, 862:9,
862:19, 869:3,
869:7, 869:8,
871:10, 871:15,
871:25, 872:24,
873:11, 873:20,
874:1, 875:21,
875:25, 876:4,
876:8, 876:12,
878:10, 879:8,
879:13, 880:21,
880:24, 881:6,
881:8, 881:9,
881:11, 882:14,
882:17, 883:2,
885:5, 885:6,
885:12, 887:11,
887:24, 889:4,
889:19, 889:20,
889:21, 890:1
**patented** [9] - 763:10,
766:20, 766:22,
767:2, 768:23,
786:12, 815:19,
816:1, 816:15
**patentee's** [1] -
815:25
**patentees** [1] - 815:25
**patents** [16] - 724:18,
724:20, 725:2,
727:13, 727:15,
727:18, 727:21,
728:3, 728:15,
728:17, 733:11,
734:8, 788:23,
801:2, 829:7, 889:3
**path** [1] - 818:24
**patient** [7] - 743:25,
745:3, 745:5,
769:15, 809:7,
825:6, 848:24
**patient's** [3] - 848:19,
848:22, 848:23
**patients** [20] - 712:4,
724:7, 730:7, 730:8,
731:2, 744:3,
745:22, 745:24,
746:2, 746:4,
765:12, 793:15,
819:8, 819:16,
824:23, 845:19,
845:23, 854:12,
855:2, 861:22
**pay** [17] - 712:7,
712:17, 712:21,
712:25, 713:18,

713:20, 715:18,
716:13, 719:23,
720:21, 784:3,
814:2, 814:12,
814:19, 815:7,
835:17, 854:14
**payable** [3] - 783:4,
783:5, 783:7
**paying** [9] - 825:16,
825:20, 843:7,
843:10, 843:16,
843:19, 854:17,
868:10, 868:21
**payment** [51] - 713:14,
713:15, 714:1,
714:5, 714:7, 714:9,
727:9, 748:19,
748:23, 749:1,
749:19, 749:20,
750:25, 751:5,
751:10, 751:25,
777:3, 777:20,
778:7, 783:13,
783:23, 783:24,
784:5, 784:9,
784:24, 784:25,
785:3, 785:5, 785:6,
785:25, 798:10,
804:11, 805:21,
805:25, 807:17,
807:21, 807:25,
808:9, 808:18,
808:24, 810:3,
810:5, 810:8, 810:9,
810:11, 811:9,
811:12, 814:17,
843:18
**payments** [45] -
713:17, 713:18,
715:21, 726:21,
726:23, 727:7,
727:10, 750:5,
750:9, 750:10,
750:13, 751:16,
751:20, 752:13,
753:10, 783:16,
783:19, 783:21,
784:5, 784:13,
784:16, 784:21,
784:22, 785:7,
785:12, 785:13,
785:14, 786:3,
786:4, 786:6, 786:9,
798:1, 798:3,
798:14, 804:13,
804:18, 804:23,
804:25, 805:2,
805:8, 807:1, 807:9,
808:1
**PCR** [5] - 842:13,

842:17, 878:23,
878:25, 879:4
**pediatric** [3] - 734:5,
829:25, 830:5
**peer** [1] - 759:14
**peer-reviewed** [1] -
759:14
**people** [10] - 728:14,
729:14, 730:7,
732:4, 733:10,
733:12, 832:2,
853:9, 855:5, 862:8
**per** [4] - 751:13,
751:14, 793:15,
868:10
**percent** [69] - 712:5,
714:3, 715:23,
718:16, 718:24,
719:6, 719:9,
720:20, 720:22,
720:23, 732:1,
732:2, 744:4, 744:5,
746:7, 783:4, 783:9,
783:11, 787:24,
788:3, 788:8, 788:9,
788:10, 788:19,
788:21, 789:25,
790:4, 791:8,
791:12, 793:24,
794:1, 795:9,
795:11, 795:13,
795:16, 795:17,
795:19, 795:21,
795:25, 796:1,
796:7, 796:8,
796:17, 796:18,
797:18, 798:5,
798:15, 799:10,
802:2, 802:6, 802:9,
802:11, 803:9,
803:14, 803:18,
803:19, 820:21,
821:16, 823:19,
825:17, 825:21,
833:6, 834:18,
835:15
**percentage** [4] -
732:3, 772:3,
772:11, 772:16
**perform** [2] - 761:2,
774:24
**performance** [2] -
719:3, 807:7
**performed** [5] -
760:20, 791:18,
797:16, 850:10,
851:10
**performing** [1] -
793:16
**perhaps** [3] - 772:5,

772:6, 812:17
**period** [19] - 716:19,
729:7, 729:8, 770:4,
772:9, 779:8,
805:15, 811:18,
811:24, 812:6,
812:10, 825:21,
830:12, 839:4,
860:22, 866:15,
883:17, 883:19,
883:21
**periodically** [1] -
844:8
**periods** [1] - 794:12
**permission** [6] -
761:11, 767:24,
799:1, 814:7, 814:8,
814:10
**person** [8] - 755:7,
780:22, 840:7,
869:25, 870:8,
870:21, 870:25,
871:13
**personal** [2] - 730:25,
842:13
**personally** [1] -
725:15
**persons** [1] - 748:2
**perspective** [1] -
735:5
**persuade** [1] - 730:15
**Peter** [1] - 699:17
**Pfizer** [1] - 741:22
**Ph.D** [4] - 759:3,
760:1, 842:5, 842:17
**PHARMA** [1] - 698:8
**Pharma** [1] - 762:1
**Pharma's** [1] - 747:13
**pharmaceutical** [3] -
715:3, 826:20, 844:9
**pharmaceuticals** [3] -
728:24, 864:11,
868:5
**pharmacy** [1] - 740:16
**phase** [7] - 768:17,
768:18, 783:22,
783:23, 789:8,
817:23, 817:25
**phone** [7] - 857:22,
869:16, 869:20,
870:6, 871:1, 871:8,
871:12
**phrases** [1] - 860:15
**physician** [1] - 771:11
**physicians** [1] - 724:6
**pick** [1] - 739:7
**pie** [4] - 718:5, 718:6,
718:7, 718:23
**piece** [7] - 709:16,
765:9, 811:23,

847:6, 848:19,
890:18
**pieces** [2] - 847:15,
856:5
**pipe** [1] - 732:8
**pipeline** [3] - 768:23,
769:3, 791:4
**place** [8] - 701:22,
703:2, 749:13,
750:16, 779:18,
779:21, 796:15,
853:2
**plaintiff** [3] - 701:13,
749:2, 756:23
**Plaintiffs** [2] - 698:6,
699:2
**plaintiffs** [15] - 700:15,
701:4, 701:8,
710:11, 710:15,
746:18, 747:13,
749:7, 749:15,
749:21, 750:11,
755:19, 757:6,
840:15, 891:13
**plaintiffs'** [4] - 735:15,
749:14, 749:23,
763:21
**plan** [1] - 872:23
**planned** [1] - 727:19
**planning** [2] - 885:1,
885:10
**plasmid** [1] - 880:14
**platform** [1] - 819:7
**play** [7] - 709:8,
718:25, 724:20,
754:4, 754:17,
755:5, 762:12
**played** [5] - 706:15,
746:16, 747:5,
747:11, 747:15
**plays** [1] - 706:6
**pleading** [2] - 701:5,
701:7
**pleadings** [1] - 700:12
**pleased** [1] - 830:17
**plus** [1] - 786:4
**point** [42] - 705:17,
705:22, 715:25,
741:13, 746:5,
747:24, 749:20,
753:6, 762:1, 762:3,
762:22, 767:12,
767:25, 779:11,
779:23, 782:17,
786:1, 786:1,
786:22, 789:25,
791:10, 796:20,
799:22, 800:22,
801:4, 801:12,
806:5, 812:22,

SCHUETZ - CROSS

820:22, 825:23, 826:14, 829:14, 830:2, 830:5, 830:9, 831:7, 831:9, 831:22, 833:4, 866:24, 881:15, 891:22

**pointed** [1] - 753:7

**points** [10] - 738:25, 739:2, 739:5, 739:15, 772:3, 772:11, 772:16, 776:1, 793:16, 832:5

**policies** [3] - 713:6, 713:7, 720:1

**portion** [12] - 701:14, 741:8, 749:18, 749:25, 752:25, 765:17, 848:5, 849:3, 874:22, 874:23, 879:13, 880:24

**portions** [5] - 737:21, 749:21, 752:6, 755:3, 877:4

**position** [4] - 734:23, 773:15, 799:17, 799:23

**possible** [4] - 854:3, 867:1, 871:24, 872:6

**possibly** [3] - 753:12, 837:15, 891:19

**post** [2] - 803:7, 814:20

**post-judgment** [1] - 814:20

**potential** [13] - 717:13, 717:16, 718:16, 719:1, 721:15, 730:19, 812:16, 863:21, 863:22, 863:24, 864:6, 864:11, 883:8

**potentially** [4] - 702:17, 727:16, 739:6, 854:15

**power** [4] - 754:3, 754:7, 754:9, 754:19

**practice** [1] - 759:10

**practices** [1] - 703:9

**precise** [1] - 740:25

**precisely** [1] - 753:25

**precision** [2] - 806:5, 808:15

**preclude** [1] - 701:3

**predicated** [1] - 750:24

**predominates** [1] - 777:15

**prejudice** [1] - 752:6

**prejudicial** [2] - 707:15, 752:4

**preliminary** [1] - 817:24

**premature** [1] - 707:2

**preparation** [1] - 843:16

**prepare** [3] - 731:9, 738:15, 738:24

**prepared** [9] - 736:19, 737:3, 741:16, 756:11, 758:22, 758:24, 773:2, 792:2, 796:5

**preparing** [3] - 843:17, 843:23, 870:3

**prescribe** [1] - 819:15

**present** [9] - 700:1, 710:9, 748:6, 756:23, 766:16, 781:1, 781:2, 782:4, 884:17

**presentation** [13] - 735:15, 736:9, 736:18, 737:2, 737:13, 737:14, 738:5, 738:6, 738:20, 771:17, 828:20, 886:22, 887:3

**presentations** [1] - 737:5

**presented** [4] - 730:9, 757:3, 807:12, 886:25

**presenting** [1] - 886:23

**presently** [1] - 863:9

**president** [7] - 701:19, 711:7, 724:1, 732:23, 758:17, 759:23, 775:6

**pretty** [3] - 713:4, 717:5, 850:23

**prevent** [1] - 862:8

**previous** [1] - 764:8

**previously** [2] - 746:20, 764:10

**price** [30] - 730:12, 750:15, 750:24, 751:4, 751:10, 751:11, 751:13, 751:15, 751:25, 752:15, 753:10, 753:18, 765:17, 785:1, 785:4, 793:15, 805:9, 806:12, 806:24, 807:3, 807:4, 807:9,

807:15, 807:16, 807:20, 807:24, 808:8, 809:20

**prices** [2] - 752:12, 752:22

**pricing** [1] - 730:11

**primarily** [1] - 728:4

**primary** [9] - 711:15, 717:12, 718:21, 725:22, 770:2, 779:14, 789:21, 794:15, 832:24

**primer** [1] - 725:22

**primers** [8] - 852:2, 852:6, 878:25, 879:4, 879:7, 879:14, 880:25, 881:5

**principle** [1] - 815:17

**prioritizing** [1] - 762:16

**private** [2] - 759:10, 831:23

**problem** [2] - 854:3, 857:8

**problems** [2] - 744:20, 760:2

**procedure** [2] - 707:20, 876:8

**proceed** [4] - 732:17, 782:4, 818:23, 831:17

**proceeded** [2] - 715:17, 817:21

**proceeding** [1] - 814:9

**proceedings** [5] - 710:19, 723:4, 757:13, 840:23, 892:3

**PROCEEDINGS** [1] - 698:12

**process** [18] - 716:5, 716:14, 720:12, 720:17, 728:10, 745:3, 768:2, 772:19, 776:19, 809:14, 817:16, 817:22, 818:6, 818:7, 818:9, 819:3, 873:5, 873:24

**processes** [2] - 769:10, 816:24

**produced** [3] - 760:16, 770:20, 832:18

**product** [67] - 712:24, 713:18, 717:20, 718:9, 718:17, 718:24, 730:1, 740:1, 742:21, 744:3, 766:25,

767:11, 767:14, 769:12, 771:8, 779:12, 780:14, 788:7, 789:7, 789:9, 789:19, 791:4, 794:17, 794:18, 809:2, 809:5, 809:11, 809:13, 809:16, 809:19, 812:7, 813:9, 813:17, 815:8, 815:13, 816:10, 816:18, 816:22, 816:23, 816:25, 817:1, 817:2, 817:4, 817:5, 817:6, 817:7, 818:12, 818:17, 818:22, 819:2, 819:9, 819:12, 819:14, 819:21, 821:24, 822:1, 824:17, 824:18, 824:20, 830:8, 830:10, 830:24, 845:8, 845:19, 854:11, 861:21

**production** [1] - 797:16

**products** [11] - 712:3, 715:4, 715:21, 734:25, 742:21, 762:16, 776:14, 812:23, 813:1, 824:7, 824:10

**professional** [2] - 759:20, 805:14

**profile** [3] - 718:22, 730:25, 744:6

**profit** [7] - 796:3, 796:6, 796:8, 796:11, 796:16, 810:1, 829:22

**profitability** [2] - 760:19, 776:21

**profits** [19] - 766:7, 794:21, 794:22, 794:25, 796:19, 796:24, 797:2, 798:11, 812:11, 812:16, 812:18, 812:25, 813:3, 813:6, 813:9, 813:16, 814:4, 815:7, 815:12

**program** [8] - 768:21, 768:23, 849:17, 849:18, 875:5, 875:9, 875:14, 875:20

**programs** [5] - 849:12,

767:11, 767:14, 769:12, 771:8, 779:12, 780:6

**progress** [1] - 780:6

**project** [2] - 857:7, 857:12

**Project** [2] - 796:6, 796:13

**projected** [7] - 721:13, 721:20, 722:1, 791:11, 793:19, 793:21, 797:2

**projecting** [2] - 766:9, 830:11

**projection** [1] - 833:5

**projections** [7] - 831:18, 831:21, 832:2, 832:3, 832:5, 833:7, 838:15

**promising** [2] - 715:17, 726:1

**proof** [1] - 754:22

**proofread** [2] - 860:9, 860:15

**property** [4] - 729:16, 755:8, 759:19, 765:19

**proposal** [3] - 886:25, 887:6, 887:7

**proposed** [5] - 786:2, 796:2, 797:21, 799:25, 839:23

**proposing** [1] - 886:24

**prosecuted** [2] - 852:18, 857:22

**prosecuting** [1] - 861:4

**prosecution** [14] - 852:12, 852:15, 852:21, 852:22, 858:17, 859:3, 859:8, 862:19, 869:7, 871:14, 872:1, 875:25, 876:13, 878:6

**prospective** [1] - 731:17

**protected** [1] - 862:9

**protection** [1] - 725:7

**protein** [5] - 848:18, 848:20, 848:23, 856:3, 856:7

**protocol** [5] - 816:21, 817:16, 817:22, 818:3, 818:4

**protocols** [2] - 819:3, 819:25

**prove** [3] - 713:4, 872:2, 872:15

**proved** [1] - 719:7

SCHUETZ - CROSS

**provide** [10] - 700:4, 700:6, 760:5, 760:6, 765:1, 766:24, 800:4, 805:1, 812:1, 882:20
**provided** [3] - 736:13, 771:4, 811:24
**providers** [1] - 739:7
**provides** [13] - 761:3, 765:3, 771:17, 777:7, 788:10, 795:18, 797:19, 799:2, 799:3, 811:17, 812:14, 822:21, 832:16
**providing** [10] - 702:16, 750:4, 759:20, 771:8, 774:15, 798:25, 799:1, 819:1, 825:5, 827:25
**provision** [2] - 806:1, 835:12
**provisionally** [1] - 737:21
**prudent** [1] - 734:10
**public** [8] - 764:25, 770:11, 773:17, 773:18, 774:15, 774:20, 789:13
**publically** [1] - 849:12
**publically-available** [1] - 849:12
**publications** [1] - 759:13
**publicly** [1] - 849:17
**publish** [1] - 828:16
**published** [2] - 759:11, 759:16, 798:7
**pull** [17] - 743:10, 743:17, 743:18, 764:1, 767:5, 771:15, 772:20, 775:4, 783:1, 783:17, 784:17, 796:10, 832:22, 853:11, 874:17, 884:15
**pulled** [3] - 792:18, 879:13, 884:24
**purchase** [2] - 713:15, 765:17
**purchased** [2] - 765:13, 864:23
**purely** [1] - 795:1
**purpose** [2] - 833:15, 833:19
**purposes** [3] - 704:14, 762:15, 865:23

**pursue** [2] - 768:18, 817:17
**pursuing** [2] - 861:23, 866:15
**pursuit** [4] - 864:17, 864:25, 865:5, 866:5
**put** [27] - 700:14, 700:25, 706:3, 733:10, 733:12, 733:22, 734:8, 734:16, 738:17, 748:13, 762:13, 773:11, 796:13, 796:14, 801:23, 803:3, 807:11, 807:14, 813:1, 813:15, 820:14, 826:8, 837:24, 844:25, 848:19, 879:18, 880:12
**puts** [1] - 776:18
**putting** [3] - 753:12, 792:17, 838:20
**PX1** [6] - 841:20, 848:10, 851:21, 874:17, 879:14, 879:17
**PX1280** [1] - 886:8
**PX1287** [2] - 884:10, 884:13
**PX1304** [4] - 853:11, 853:13, 853:18, 853:21
**PX1305** [3] - 855:3, 855:13, 857:20
**PX1306** [4] - 859:11, 859:15, 859:22, 860:3
**PX155** [1] - 758:10
**PX156** [1] - 758:10
**PX2** [2] - 858:20, 858:24
**PX240** [2] - 773:22, 775:2
**PX241** [1] - 784:17
**PX29** [1] - 747:18
**PX343** [2] - 735:15, 742:10
**PX401** [2] - 787:3, 787:4
**PX72** [1] - 763:17
**PX72.81** [1] - 763:18
**PX78** [2] - 758:1, 758:10
**PX928** [2] - 787:11, 787:15

**Q**

**Q1** [2] - 811:19, 812:5

**Q4** [1] - 811:19
**quadrupled** [2] - 803:25, 804:6
**quadruples** [1] - 832:8
**qualify** [1] - 822:13
**quantify** [4] - 777:21, 780:16, 793:9, 801:20
**quantifying** [1] - 827:7
**quarter** [3] - 797:10, 797:11, 811:20
**QUESTION** [6] - 877:12, 882:13, 883:12, 888:24, 889:7, 889:18
**question/answer** [1] - 865:13
**questionable** [3] - 789:16, 826:11, 827:10
**questioned** [1] - 730:13
**questions** [13] - 719:16, 722:13, 722:15, 743:3, 773:6, 808:11, 809:25, 845:3, 857:9, 862:21, 871:16, 888:4, 888:6
**quick** [2] - 829:2, 837:15
**quickly** [4] - 744:11, 772:7, 838:24, 880:12
**quite** [8] - 717:14, 719:7, 727:5, 728:15, 744:14, 804:1, 804:8, 818:23
**quotation** [1] - 860:16
**quote** [2] - 823:5, 873:8

**R**

**raise** [6] - 710:16, 723:1, 746:6, 755:16, 757:9, 840:20
**raised** [3] - 701:6, 822:24, 874:9
**raises** [1] - 752:9
**ran** [1] - 740:16
**range** [3] - 714:3, 796:17, 847:25
**ranging** [1] - 796:7
**Rao** [9] - 777:18, 779:22, 784:12, 789:22, 789:24, 790:2, 790:8, 799:7, 807:2

**rapport** [1] - 775:10
**rare** [1] - 713:4
**rarely** [1] - 724:17
**Raskin** [2] - 853:21, 857:4
**rate** [45] - 714:3, 715:23, 720:20, 720:23, 731:25, 732:2, 744:2, 745:19, 746:6, 746:7, 746:9, 746:10, 777:3, 777:10, 783:2, 783:3, 783:5, 787:24, 788:2, 788:19, 788:20, 789:25, 790:4, 795:5, 795:8, 795:19, 795:21, 795:24, 796:2, 797:4, 797:7, 797:18, 797:25, 802:5, 803:12, 803:24, 804:4, 810:3, 814:18, 815:2, 820:18, 826:3, 834:17, 843:18, 843:20
**rates** [4] - 721:13, 721:20, 722:2, 821:15
**rather** [9] - 739:22, 741:18, 766:2, 779:8, 784:6, 786:8, 786:10, 792:9, 818:25
**ratio** [2] - 788:24, 793:23
**RCE** [5] - 858:9, 877:13, 878:7, 878:9, 889:2
**reach** [2] - 805:19, 807:24
**reached** [4] - 806:8, 806:15, 849:10, 853:7
**reaching** [1] - 709:6
**read** [8] - 741:8, 765:8, 877:5, 881:11, 888:21, 889:9, 889:21, 889:22
**reading** [5] - 850:14, 850:21, 851:1, 851:5, 876:25
**ready** [2] - 781:24, 782:4
**real** [6] - 761:16, 767:17, 790:13, 808:23, 829:2, 857:8

**realize** [2] - 735:9, 839:19
**realized** [2] - 798:22, 799:4
**really** [18] - 709:18, 716:5, 724:8, 724:14, 727:18, 731:2, 740:19, 755:7, 762:18, 767:15, 769:16, 772:4, 779:20, 800:25, 822:17, 845:7, 850:13, 852:23
**reason** [8] - 725:5, 772:17, 773:12, 814:5, 821:1, 854:10, 854:23, 861:24
**reasonable** [25] - 760:7, 760:25, 761:4, 761:6, 762:24, 763:3, 776:23, 777:2, 777:7, 777:18, 798:18, 800:3, 800:5, 800:6, 811:7, 811:11, 811:14, 811:16, 811:17, 812:12, 812:14, 812:15, 812:18, 813:3, 815:18
**reasonably** [1] - 801:15
**reasons** [15] - 748:25, 777:11, 785:9, 789:17, 800:8, 813:19, 813:22, 813:24, 820:10, 821:12, 821:14, 821:17, 826:2, 861:18, 882:20
**reassembled** [3] - 710:8, 756:22, 782:3
**rebuttal** [1] - 756:5
**recap** [1] - 782:11
**receive** [5] - 718:10, 773:6, 776:11, 783:12, 842:6
**received** [35] - 714:24, 733:20, 733:21, 738:11, 738:12, 747:19, 758:9, 758:10, 761:24, 766:13, 775:1, 775:2, 787:3, 787:4, 787:14, 787:15, 793:1, 793:6, 793:7, 808:2, 828:10, 828:12, 828:13,

SCHUETZ - CROSS

850:3, 853:15, 853:16, 855:12, 855:13, 859:1, 859:21, 859:22, 884:12, 884:13, 886:11, 886:12
**receiving** [2] - 783:24, 842:6
**recently** [2] - 865:7, 866:7
**recess** [6] - 747:25, 756:19, 780:19, 780:25, 840:5, 891:24
**reciprocal** [2] - 776:11, 799:3
**reclassified** [1] - 765:14
**recognize** [7] - 735:15, 736:9, 737:2, 738:2, 761:18, 770:22, 848:23
**recognized** [3] - 725:4, 737:25, 799:19
**recommended** [1] - 817:25
**reconsider** [1] - 891:22
**reconstruct** [1] - 761:14
**record** [12] - 710:23, 723:7, 737:16, 747:17, 748:5, 757:18, 798:7, 823:9, 841:8, 868:17, 888:21, 892:3
**recounted** [1] - 888:25
**RECROSS** [2] - 744:12, 890:9
**recross** [1] - 890:6
**RECROSS-EXAMINATION** [2] - 744:12, 890:9
**recurring** [1] - 810:10
**redacted** [5] - 763:17, 763:21, 764:5, 764:13, 764:15
**redactions** [1] - 756:2
**redirect** [2] - 722:15, 743:6
**REDIRECT** [2] - 743:8, 888:8
**reduce** [1] - 732:6
**reengineered** [1] - 745:5
**refer** [5] - 727:22, 739:11, 741:4,

741:6, 766:4
**reference** [8] - 708:12, 708:24, 744:23, 837:22, 852:2, 860:22, 861:1, 880:17
**referenced** [7] - 715:9, 748:18, 748:25, 749:21, 837:13, 837:19, 837:25
**references** [4] - 750:1, 750:2, 750:4, 860:19
**referencing** [2] - 753:9, 883:11
**referred** [10] - 743:14, 768:16, 773:16, 777:5, 777:23, 777:24, 787:19, 835:12, 837:9, 860:21
**referring** [8] - 727:23, 739:3, 743:20, 787:9, 792:13, 811:10, 824:12, 861:7
**refers** [2] - 745:1, 811:11
**refine** [2] - 716:19, 716:25
**reflect** [7] - 714:10, 741:14, 774:10, 778:3, 778:8, 778:19, 809:20
**reflected** [3] - 738:19, 739:15, 745:8
**reflecting** [2] - 742:15, 744:6
**reflects** [7] - 742:19, 788:9, 803:17, 809:22, 829:5, 832:25, 833:3
**refractory** [2] - 729:24, 765:12
**refresh** [1] - 701:24
**regard** [5] - 728:22, 728:25, 765:8, 767:20, 823:15
**regarding** [16] - 700:13, 701:9, 702:22, 703:1, 703:3, 708:4, 717:9, 748:11, 748:16, 755:17, 765:4, 765:6, 773:6, 773:20, 774:17, 798:10
**regards** [3] - 770:8, 770:10, 774:17
**regimens** [1] - 819:6
**region** [8] - 714:23,

735:1, 735:6, 847:17, 847:23, 849:23, 874:6
**regularly** [1] - 774:21
**regulatory** [3] - 715:13, 783:24, 847:14
**reimbursed** [1] - 868:14
**reimbursement** [1] - 730:16
**reimbursers** [1] - 730:15
**reinfused** [1] - 745:5
**rejection** [1] - 749:17
**relapse** [1] - 729:24
**relapsed** [1] - 765:12
**relate** [3] - 702:15, 755:5, 788:14
**related** [5] - 711:25, 717:10, 769:5, 801:19, 843:14
**relates** [2] - 790:6, 821:22
**relating** [7] - 707:11, 707:14, 726:12, 758:19, 773:14, 837:23, 879:13
**relationship** [12] - 705:8, 712:14, 713:8, 723:18, 763:11, 769:23, 769:24, 770:16, 775:10, 788:24, 798:10, 809:14
**relative** [19] - 719:3, 730:21, 769:22, 788:9, 788:24, 790:20, 790:24, 793:9, 793:23, 794:23, 795:1, 795:2, 799:24, 801:11, 809:24, 824:3, 826:5, 826:6
**relatively** [1] - 780:13
**release** [1] - 743:22
**releasing** [1] - 732:9
**relevant** [3] - 763:5, 765:9, 848:15
**reliability** [2] - 702:5, 702:23
**reliable** [9] - 705:25, 716:15, 716:16, 746:3, 748:23, 748:24, 801:15, 816:2, 823:9
**relied** [9] - 702:22, 731:12, 816:13, 833:22, 837:19, 838:6, 838:8,

838:14, 838:15
**relies** [2] - 702:19, 726:25
**rely** [8] - 701:14, 702:17, 724:23, 724:24, 728:16, 731:6, 774:21, 838:18
**relying** [1] - 833:5
**remain** [2] - 764:11, 842:12
**remainder** [1] - 795:25
**remained** [1] - 723:20
**remaining** [1] - 756:1
**remember** [17] - 726:6, 726:7, 729:17, 740:15, 837:10, 849:18, 852:24, 852:25, 857:3, 859:9, 875:9, 875:11, 882:15, 889:18, 889:19, 890:2, 890:4
**remind** [5] - 728:19, 771:16, 820:15, 820:17, 866:4
**remove** [4] - 701:12, 858:10, 876:2, 889:3
**rendering** [1] - 702:20
**repeat** [1] - 739:19
**report** [34] - 704:12, 704:14, 704:20, 704:22, 705:19, 706:1, 721:8, 749:4, 749:9, 749:22, 749:25, 750:3, 750:6, 750:8, 751:14, 751:23, 753:5, 753:6, 753:12, 764:25, 796:13, 802:23, 810:7, 810:21, 811:16, 817:20, 823:5, 823:6, 826:17, 834:3, 836:9, 837:14, 838:14, 860:3
**reported** [2] - 766:18, 775:7
**Reporter** [1] - 698:22
**REPORTER'S** [1] - 698:12
**reports** [4] - 702:18, 704:16, 749:17, 760:20
**represent** [6] - 703:23, 704:17, 736:12, 741:18, 811:20, 812:6
**representation** [1] -

706:22
**representatives** [1] - 748:7
**represented** [2] - 865:17, 868:9
**representing** [4] - 868:5, 869:17, 870:14, 871:6
**represents** [2] - 832:24, 865:22
**request** [12] - 700:13, 707:11, 707:21, 749:6, 858:9, 858:16, 861:8, 876:1, 878:8, 878:11, 885:21, 891:17
**requested** [1] - 709:14
**require** [2] - 749:7, 875:12
**required** [1] - 720:21
**requires** [1] - 778:8
**research** [18] - 711:18, 724:1, 724:4, 724:22, 725:8, 759:16, 760:5, 760:20, 765:19, 771:18, 771:22, 772:1, 772:14, 774:23, 776:1, 778:14, 788:6, 821:16
**Research** [2] - 726:12, 787:6
**researchers** [4] - 724:24, 728:10, 728:12, 735:3
**reserved** [2] - 756:5, 810:12
**residency** [1] - 842:8
**resident** [1] - 842:10
**resolution** [1] - 815:10
**resolving** [2] - 789:11
**respect** [3] - 706:21, 768:10, 770:14
**respond** [2] - 700:16, 700:17
**responded** [1] - 701:4
**response** [10] - 707:19, 708:4, 708:6, 749:14, 749:15, 753:2, 753:15, 754:6, 773:11
**responses** [1] - 749:24
**responsibilities** [2] - 711:12, 711:15
**responsible** [2] - 711:13, 714:19

SCHUETZ - CROSS

**ResQNet** [1] - 823:5
**rest** [2] - 704:3, 758:5
**resting** [2] - 756:2, 756:7
**restrictions** [1] - 830:18
**restroom** [1] - 756:18
**result** [6] - 730:4, 758:20, 771:13, 785:18, 789:5, 814:15
**resulted** [1] - 768:24
**resulting** [2] - 793:24, 815:2
**results** [7] - 721:7, 726:2, 751:15, 771:7, 771:17, 798:2, 816:21
**resume** [2] - 839:7, 891:14
**retained** [1] - 868:18
**retired** [4] - 748:4, 780:24, 840:9, 891:4
**retroactively** [1] - 755:1
**return** [3] - 747:25, 780:20, 890:23
**returned** [4] - 710:7, 756:21, 782:2, 840:12
**Reuters** [1] - 774:18
**revenue** [10] - 718:4, 718:5, 718:9, 719:14, 776:21, 793:13, 793:16, 793:20, 793:22, 794:25
**revenues** [1] - 798:11
**reversed** [1] - 803:20
**review** [11] - 714:20, 724:10, 736:12, 768:2, 852:12, 852:15, 854:2, 861:1, 877:17, 881:7, 889:20
**reviewed** [11] - 746:20, 749:11, 749:13, 759:14, 760:21, 775:24, 859:4, 861:9, 862:19, 881:8, 882:14
**reviewing** [4] - 852:24, 861:19, 882:15, 889:10
**revised** [1] - 749:12
**Richardson** [5] - 703:16, 870:14, 870:18, 870:24, 871:4

**rights** [12] - 703:6, 711:21, 712:11, 714:25, 715:6, 720:24, 762:9, 770:8, 834:7, 834:9, 854:15
**ring** [1] - 726:8
**rise** [7] - 748:3, 756:20, 780:23, 782:1, 782:19, 840:11, 891:3
**risk** [3] - 712:19, 712:22, 714:8
**risks** [1] - 730:9
**RNA** [2] - 856:7
**Robbins** [1] - 756:3
**ROCKET** [1] - 701:22
**ROI** [1] - 883:14
**role** [7] - 703:11, 714:18, 724:20, 725:18, 762:11, 767:1, 801:1
**rough** [1] - 826:15
**roughly** [1] - 833:12
**row** [3] - 832:24, 837:20
**royalties** [15] - 713:19, 776:23, 777:6, 794:24, 795:2, 797:19, 798:17, 811:14, 811:20, 812:4, 812:19, 813:4, 814:21, 814:25
**royalty** [78] - 714:1, 714:3, 715:22, 720:20, 720:22, 720:23, 721:13, 721:20, 722:1, 748:20, 760:7, 760:25, 761:5, 761:6, 762:24, 763:3, 776:24, 777:2, 777:3, 777:7, 777:9, 777:19, 777:20, 777:22, 778:7, 783:2, 783:3, 783:4, 783:9, 785:8, 787:24, 788:2, 788:19, 788:20, 790:4, 795:5, 795:8, 795:14, 795:18, 795:21, 795:24, 797:4, 797:5, 797:7, 797:9, 797:21, 797:25, 798:18, 799:9, 800:2, 800:4, 800:5, 802:2, 802:5, 802:8, 802:11, 803:12, 804:4,

805:11, 810:3, 811:8, 811:9, 811:11, 811:13, 811:16, 812:12, 812:15, 813:15, 814:17, 815:1, 815:18, 820:18, 823:14, 823:18, 825:17, 826:3, 834:17
**RPR** [2] - 698:22, 892:9
**Rule** [1] - 792:21
**rule** [3] - 754:12, 823:12, 823:15
**ruled** [1] - 751:4
**ruling** [1] - 798:9
**run** [5] - 717:5, 718:17, 719:4, 726:2, 731:20
**running** [21] - 717:19, 717:22, 748:20, 777:3, 777:9, 777:20, 778:7, 783:3, 787:24, 788:2, 795:21, 797:5, 797:19, 797:25, 798:16, 799:9, 800:2, 805:11, 811:9, 811:12
**runs** [1] - 735:3
**rush** [1] - 781:12
**RYAN** [1] - 757:12
**Ryan** [4] - 747:23, 757:7, 757:20, 758:16

---

## S

**S-C-H-U-E-T-Z** [1] - 841:11
**S-U-L-L-I-V-A-N** [1] - 757:20
**Sadelain** [44] - 725:25, 726:5, 726:6, 760:8, 762:9, 763:8, 765:6, 767:2, 767:18, 767:22, 768:10, 768:21, 768:23, 769:4, 771:1, 788:13, 800:9, 819:21, 820:7, 822:6, 835:2, 845:17, 845:20, 846:13, 846:16, 846:20, 848:25, 849:5, 854:2, 855:19, 856:14, 856:17, 857:14,

871:14, 872:24, 874:10, 880:11, 880:20, 884:20, 885:5, 885:6, 885:11, 887:10
**Sadelain's** [14] - 735:7, 766:20, 846:10, 849:23, 850:4, 872:25, 873:4, 873:10, 874:1, 874:3, 874:7, 875:6, 880:3, 880:19
**safe** [2] - 809:12, 809:17
**safely** [2] - 816:25, 819:12
**safety** [4] - 730:25, 743:14, 744:6, 817:24
**salaries** [1] - 796:25
**sale** [3] - 824:6, 824:10, 824:18
**sales** [32] - 713:20, 715:23, 731:17, 748:20, 760:19, 769:17, 771:10, 777:4, 777:10, 777:20, 783:4, 783:15, 786:1, 797:9, 797:11, 797:12, 797:14, 797:15, 797:17, 797:18, 797:22, 805:12, 807:6, 811:25, 812:1, 812:11, 819:9, 825:1, 825:7, 825:8, 825:19
**San** [3] - 759:4, 759:5, 759:6
**Sarah** [1] - 699:11
**Saturday** [1] - 700:19
**saw** [6] - 730:21, 772:21, 797:20, 858:18, 875:24, 878:8
**scenario** [2] - 718:17, 719:10
**scenarios** [1] - 716:25
**scheduling** [1] - 819:8
**school** [1] - 842:4
**schools** [1] - 740:16
**Schuetz** [21] - 756:15, 781:17, 839:2, 839:5, 839:24, 840:18, 841:10, 841:16, 842:18, 863:1, 864:3, 864:8, 867:8, 867:15, 867:23, 869:1,

876:17, 880:2, 881:25, 888:10, 889:1
**SCHUETZ** [1] - 840:22
**Schuetz's** [1] - 865:24
**science** [2] - 724:12, 759:25
**scientific** [3] - 724:14, 735:3, 856:6
**scientists** [1] - 727:17
**screen** [6] - 744:19, 838:21, 876:20, 877:9, 879:18, 879:21, 880:12, 884:24
**screenshot** [1] - 837:24
**seat** [3] - 710:21, 710:23, 723:6, 757:16, 841:2
**Seattle** [2] - 724:2, 725:13
**SEC** [1] - 765:2
**second** [36] - 702:3, 702:20, 704:8, 708:12, 725:5, 737:6, 738:16, 745:24, 744:14, 765:10, 776:12, 776:16, 777:5, 777:14, 780:17, 787:17, 788:25, 789:1, 790:7, 790:18, 794:1, 797:20, 803:15, 803:17, 804:22, 823:16, 823:17, 828:23, 830:21, 832:7, 837:7, 838:15, 851:3, 853:24, 854:1, 857:20
**secondly** [2] - 780:14, 785:12
**section** [3] - 783:20, 792:4, 792:9
**secure** [3] - 763:23, 767:23, 885:11
**securities** [3] - 760:18, 764:24, 765:1
**see** [61] - 700:11, 704:19, 709:19, 713:11, 714:2, 718:11, 728:14, 733:24, 734:2, 734:7, 738:19, 738:22, 738:25, 739:1, 744:24, 748:8, 753:22,

756:25, 767:15, 768:9, 773:1, 773:14, 780:6, 784:19, 784:24, 788:3, 788:18, 793:11, 793:18, 821:15, 829:3, 833:10, 833:24, 838:23, 846:7, 846:11, 846:25, 847:2, 847:19, 852:1, 852:4, 852:21, 854:7, 854:8, 854:11, 854:20, 855:24, 855:25, 856:14, 857:21, 857:23, 858:14, 860:7, 860:12, 860:13, 860:18, 872:19, 880:14, 880:16, 881:2, 885:12

**seeing** [3] - 736:16, 743:14, 859:9

**seek** [1] - 813:16

**seeking** [6] - 761:10, 762:2, 762:5, 770:11, 779:7, 794:16

**select** [2] - 791:14, 817:24

**selected** [1] - 715:21

**selective** [1] - 792:24

**sell** [2] - 712:4, 715:3

**selling** [6] - 761:25, 782:16, 796:25, 825:3, 825:17, 825:21

**send** [1] - 845:18

**sending** [1] - 856:17

**sense** [7] - 708:16, 709:16, 776:10, 794:4, 794:13, 794:14, 797:17

**sent** [14] - 845:17, 846:13, 846:20, 849:6, 849:24, 850:4, 853:18, 853:21, 855:18, 857:4, 859:15, 880:5, 880:11, 890:18

**sentence** [5] - 834:23, 856:4, 858:8, 879:24, 880:16

**sentences** [1] - 854:1

**separate** [5] - 769:22, 780:7, 812:21, 813:5, 815:18

**separates** [1] - 769:21

**September** [7] - 860:24, 861:2, 861:5, 861:7, 865:7, 866:8, 867:3

**SEQ** [19] - 849:3, 850:9, 851:4, 851:19, 852:2, 852:3, 852:9, 852:10, 853:4, 854:24, 854:25, 874:2, 874:5, 874:25, 875:3, 876:2, 877:18, 882:23, 889:4

**sequence** [66] - 845:12, 845:15, 845:18, 845:21, 845:22, 845:24, 846:14, 846:16, 846:25, 847:3, 847:15, 848:5, 848:13, 848:16, 848:25, 849:3, 849:5, 849:7, 849:13, 849:19, 849:24, 850:2, 850:4, 850:8, 850:15, 850:19, 850:25, 851:7, 851:15, 851:18, 852:6, 853:1, 853:2, 853:3, 854:4, 854:5, 854:11, 854:15, 854:25, 855:1, 855:22, 858:10, 860:8, 861:5, 862:9, 871:20, 873:10, 873:19, 874:15, 874:22, 874:24, 875:1, 875:5, 875:19, 877:18, 878:10, 878:16, 878:21, 879:1, 880:5, 880:6, 880:9, 880:10, 880:11, 885:12, 889:3

**Sequence** [12] - 848:13, 848:16, 849:7, 849:20, 850:11, 850:22, 851:7, 851:11, 851:15, 854:4, 855:22, 858:11

**sequences** [5] - 842:14, 847:14, 849:15, 852:16, 879:5

**Series** [2] - 752:17, 753:18

**series** [1] - 785:15

**serious** [1] - 743:23

**seriousness** [1] - 743:24

**serve** [1] - 758:17

**served** [1] - 759:7

**services** [1] - 759:21

**set** [10] - 705:25, 730:11, 736:18, 737:2, 758:24, 763:2, 800:16, 801:18, 838:15, 856:4

**setting** [2] - 783:21, 784:21

**settlement** [11] - 780:9, 787:11, 787:25, 789:10, 790:9, 801:22, 821:13, 821:17, 822:23, 823:10, 823:13

**settles** [1] - 789:10

**several** [7] - 700:11, 705:4, 712:19, 730:19, 767:20, 792:16, 864:11

**severe** [1] - 743:22

**SFG** [1] - 880:14

**shape** [1] - 771:10

**share** [31] - 717:24, 718:1, 718:3, 718:5, 718:8, 718:11, 718:16, 718:18, 718:22, 718:23, 719:6, 719:9, 719:12, 727:2, 751:13, 751:14, 752:12, 752:22, 753:18, 758:19, 771:9, 771:24, 772:2, 772:11, 776:20, 791:1, 791:8, 791:12, 793:12, 793:14

**shareholders** [1] - 765:3

**shares** [4] - 733:3, 733:5, 750:14, 833:9

**Shawn** [3] - 747:7, 747:13, 767:8

**shed** [1] - 767:17

**shift** [1] - 732:5

**short** [4] - 722:17, 747:25, 805:15, 840:5

**shortly** [3] - 748:13, 837:5, 857:12

**show** [1] - 772:8

**showed** [4] - 816:6, 871:9, 871:13,

871:17

**showing** [4] - 741:13, 784:22, 784:24, 831:18

**shown** [2] - 726:1, 743:12

**shows** [5] - 739:9, 742:14, 744:2, 770:1, 847:10

**sic** [2] - 724:4, 837:5

**side** [11] - 700:5, 700:6, 702:8, 707:16, 709:12, 709:19, 743:23, 743:25, 744:2, 762:7, 832:19

**sidebar** [1] - 838:24

**sided** [1] - 764:14

**sides** [1] - 752:5

**sign** [3] - 862:18, 888:10, 890:19

**signaling** [1] - 849:23

**significant** [9] - 713:25, 714:1, 725:2, 771:4, 776:5, 776:18, 778:21, 779:15, 808:22

**signify** [1] - 847:21

**signing** [1] - 729:17

**similar** [6] - 776:15, 776:17, 785:12, 786:9, 805:11, 832:17

**similarly** [1] - 796:23

**simple** [1] - 753:11

**simpler** [2] - 830:2, 830:9

**simplify** [1] - 772:19

**simply** [1] - 752:22

**Singapore** [1] - 726:15

**single** [4] - 766:23, 810:5, 810:8, 856:2

**sites** [2] - 770:15, 824:24

**sitting** [1] - 813:25

**situation** [1] - 812:17

**six** [9] - 709:24, 802:16, 860:9, 860:19, 860:21, 860:22, 860:25, 861:6, 872:4

**six-year** [1] - 860:22

**size** [3] - 718:4, 718:7

**slice** [1] - 718:23

**slide** [31] - 738:14, 738:17, 738:23, 742:10, 742:11, 742:13, 743:10, 743:11, 744:15,

**744:21**, 744:22, 760:14, 762:24, 767:5, 770:6, 771:6, 778:12, 780:6, 786:15, 789:2, 793:11, 793:18, 795:6, 797:6, 807:12, 816:6, 826:8, 829:20

**slides** [4] - 736:14, 776:22, 787:21, 885:11

**Sloan** [47] - 710:15, 725:13, 725:15, 725:19, 726:3, 726:17, 726:24, 762:7, 762:8, 778:17, 779:2, 779:18, 785:11, 786:10, 788:20, 795:2, 795:7, 800:23, 801:8, 804:15, 805:3, 805:8, 806:19, 807:18, 807:22, 808:2, 808:24, 820:25, 845:2, 845:9, 845:16, 845:17, 848:5, 850:2, 850:8, 853:9, 853:18, 855:5, 855:19, 861:12, 861:15, 861:25, 875:21, 876:12, 883:2, 883:4, 886:25

**slow** [1] - 881:22

**slows** [2] - 776:19

**small** [5] - 718:7, 841:18, 847:4, 847:6, 863:18

**so..** [2] - 708:2, 782:5

**society** [1] - 759:18

**software** [1] - 875:5

**solely** [1] - 768:21

**solve** [1] - 760:2

**someone** [2] - 728:5, 855:19

**sometime** [2] - 861:4, 862:14

**sometimes** [3] - 777:5, 777:24, 870:21

**somewhat** [1] - 766:5

**somewhere** [1] - 746:7

**sorry** [37] - 721:16, 722:5, 735:17, 736:16, 747:8, 757:17, 792:8, 811:2, 827:19,

SCHUETZ - CROSS

831:13, 837:21,
838:23, 858:23,
859:13, 859:14,
866:1, 867:10,
867:12, 867:16,
875:11, 877:21,
879:16, 879:22,
881:4, 881:23,
882:8, 882:10,
884:24, 884:25,
885:19, 887:18,
887:20, 890:2,
890:3, 891:1, 891:7
**sort** [7] - 713:14,
719:9, 728:12,
732:8, 743:19,
791:5, 875:15
**sorts** [2] - 704:9,
752:19
**sought** [1] - 767:25
**sound** [1] - 833:20
**sounds** [2] - 732:8,
818:2
**South** [2] - 699:9,
699:18
**space** [8] - 711:23,
729:2, 741:15,
770:13, 782:19,
789:16, 829:1,
830:13
**speaking** [2] - 833:23,
867:17
**specializes** [1] - 823:3
**specific** [8] - 718:5,
754:16, 771:1,
845:4, 857:11,
860:22, 861:1, 874:6
**specifically** [2] -
772:14, 879:9
**specification** [3] -
879:8, 881:6, 882:14
**specificity** [1] - 833:16
**specified** [3] - 783:2,
783:7, 847:23
**specifies** [4] - 783:3,
787:24, 795:8, 796:6
**specify** [1] - 806:17
**speculative** [1] - 816:2
**spell** [4] - 710:23,
723:6, 757:19, 841:9
**spend** [4] - 716:16,
725:6, 731:16, 843:7
**spent** [6] - 717:14,
842:9, 843:10,
843:23, 868:10,
870:3
**spoken** [3] - 862:11,
869:20, 882:1
**sponsored** [1] - 735:4
**spreadsheet** [9] -

704:13, 721:9,
721:25, 722:6,
832:19, 837:12,
837:19, 838:6, 838:8
**spreadsheets** [2] -
721:8, 762:13
**squarely** [1] - 703:10
**Squibb** [2] - 844:14,
844:16
**St** [12] - 726:11,
726:16, 780:8,
786:18, 787:23,
788:19, 801:21,
801:23, 802:2,
802:19, 821:15,
821:19
**stage** [13] - 712:12,
712:13, 712:16,
712:18, 712:21,
712:22, 713:1,
713:24, 715:10,
716:23, 731:24,
780:14
**stages** [1] - 779:4
**stake** [1] - 713:16
**stand** [2] - 710:21,
753:5
**standard** [5] - 717:3,
760:11, 761:7,
777:23, 843:20
**standpoint** [1] -
766:19
**stands** [1] - 743:22
**Stars** [1] - 699:6
**start** [16] - 709:10,
726:25, 748:8,
748:9, 757:25,
772:6, 778:16,
782:24, 795:5,
799:9, 829:1,
829:12, 850:3,
851:2, 851:6, 890:23
**started** [2] - 834:5,
850:22
**starting** [18] - 705:17,
705:22, 705:23,
724:3, 724:22,
749:20, 765:10,
786:1, 789:24,
793:25, 800:22,
800:25, 801:4,
801:12, 806:19,
823:20, 831:15,
847:22
**starts** [5] - 752:16,
801:1, 846:21,
847:1, 857:21
**state** [10] - 710:23,
723:6, 736:22,
742:6, 757:19,

811:7, 817:20,
830:4, 833:19, 841:9
**statement** [2] -
721:19, 811:11
**States** [7] - 703:5,
703:7, 714:25,
715:6, 715:22,
715:24, 797:16
**states** [4] - 775:8,
828:24, 835:12
**STATES** [1] - 698:1
**stating** [2] - 772:1,
888:11
**statute** [2] - 761:3,
812:14
**step** [2] - 780:4, 891:5
**steps** [1] - 780:2
**Steven** [1] - 747:8
**still** [19] - 704:1,
715:12, 715:15,
729:20, 730:7,
741:22, 746:6,
772:10, 780:13,
786:22, 789:3,
789:6, 789:8,
794:14, 815:12,
835:15, 837:21,
861:22, 884:5
**stock** [40] - 705:14,
733:3, 749:2,
749:18, 749:19,
750:25, 751:1,
751:3, 751:5,
751:10, 751:11,
752:1, 752:15,
753:10, 753:17,
785:1, 785:4,
785:15, 785:21,
805:1, 805:9,
805:10, 805:19,
806:1, 806:7,
806:12, 806:15,
806:24, 807:3,
807:4, 807:9,
807:15, 807:16,
807:20, 807:24,
808:8, 809:20,
817:11
**stop** [7] - 757:9,
790:8, 840:3,
850:11, 850:13,
850:15, 850:17
**straight** [1] - 788:18
**straightforward** [2] -
709:4, 850:23
**strategic** [20] - 714:17,
714:20, 715:15,
760:2, 863:21,
863:22, 863:24,
864:6, 864:7,

864:11, 864:17,
865:5, 866:6,
866:10, 866:15,
867:18, 868:3,
885:1, 885:10, 887:1
**strategy** [1] - 711:7
**streamline** [2] -
701:11, 757:17
**Street** [3] - 698:23,
699:9, 699:11
**strength** [1] - 712:10
**stretch** [2] - 847:4,
849:14
**strike** [6] - 705:23,
740:21, 808:24,
813:10, 834:22,
865:2
**striking** [1] - 706:1
**strong** [1] - 799:23
**struck** [5] - 704:15,
705:13, 725:20,
748:24, 834:25
**structure** [8] - 776:24,
777:1, 777:9,
777:13, 777:15,
777:17, 777:19,
784:9
**structured** [1] - 766:6
**studies** [1] - 720:10
**study** [1] - 772:13
**subject** [10] - 701:23,
721:14, 721:17,
736:5, 755:25,
756:7, 764:8,
815:16, 833:24,
877:6
**sublicense** [3] -
783:8, 787:11,
795:23
**sublicensee** [1] -
783:6
**submit** [3] - 752:2,
752:22, 754:11
**submitted** [2] -
754:15, 820:1
**subpoena** [6] - 754:3,
754:6, 754:9,
754:19, 755:20,
842:20
**subsequent** [1] -
767:25
**subsequently** [2] -
787:25, 812:17
**substance** [2] -
754:21, 835:13
**substituted** [1] -
806:11
**subtle** [1] - 830:7
**success** [42] - 713:17,
724:13, 726:20,

726:23, 727:10,
729:3, 745:19,
746:6, 746:8,
746:10, 750:5,
750:9, 750:10,
750:13, 750:25,
751:10, 751:16,
751:20, 751:25,
752:13, 753:9,
783:16, 784:13,
784:16, 784:21,
784:22, 785:6,
785:7, 786:4, 786:6,
798:1, 798:3,
798:14, 804:22,
804:25, 805:8,
806:15, 807:1,
807:9, 807:25,
808:9, 809:20
**success-based** [1] -
713:17
**successes** [1] -
809:22
**successful** [8] -
727:8, 727:9, 729:5,
729:19, 740:18,
745:18, 768:20,
817:2
**successfully** [1] -
724:9
**sue** [1] - 814:4
**sufficient** [3] - 818:17,
818:19, 818:20
**sufficiently** [1] -
705:25
**suggest** [1] - 755:19
**suggested** [3] -
777:22, 831:4,
831:11
**suggesting** [2] -
734:18, 734:20
**Suite** [1] - 699:6
**Sullivan** [43] - 702:17,
702:19, 702:22,
704:18, 705:8,
705:12, 706:3,
706:4, 706:7,
706:17, 706:20,
706:23, 706:25,
707:4, 709:6,
746:25, 747:23,
748:9, 748:11,
748:16, 749:1,
749:8, 751:2,
751:14, 752:15,
753:4, 755:13,
755:14, 755:22,
756:8, 757:7,
757:20, 758:13,
758:16, 764:22,

SCHUETZ - CROSS

775:13, 777:21, 782:9, 792:3, 792:12, 800:13, 800:20, 840:4
**SULLIVAN** [1] - 757:12
**Sullivan's** [16] - 702:15, 704:12, 704:14, 705:14, 705:19, 748:17, 748:25, 749:1, 749:4, 749:5, 749:12, 749:16, 749:22, 749:25, 750:3, 750:6
**sum** [4] - 749:12, 750:4, 750:16, 785:25
**summaries** [5] - 791:24, 792:1, 792:5, 793:2
**summarize** [3] - 758:25, 792:18, 799:7
**summarized** [3] - 832:11, 832:19, 857:5
**summarizing** [1] - 803:4
**summary** [2] - 847:15, 886:23
**summations** [1] - 709:25
**Sunday** [8] - 864:2, 869:19, 876:17, 881:13, 881:14, 882:2, 883:10, 883:16
**super** [1] - 862:6
**support** [2] - 727:1, 756:6
**supported** [1] - 748:23
**supports** [3] - 702:24, 753:6, 793:3
**suppose** [1] - 776:14
**supposed** [1] - 837:3
**surface** [1] - 848:22
**surprised** [1] - 874:10
**survival** [2] - 731:25, 732:2
**sustained** [1] - 794:8
**swap** [8] - 705:14, 749:2, 749:18, 749:19, 752:9, 752:19, 753:17, 785:21
**swipe** [1] - 751:5
**sworn** [6] - 710:19, 723:4, 757:10,

757:13, 840:20, 840:23
**syndrome** [1] - 743:22
**system** [1] - 848:22
**systemic** [1] - 765:13

**T**

**tab** [5] - 837:12, 837:17, 837:23, 837:24, 841:20
**tables** [5] - 742:15, 751:7, 751:9, 753:9, 792:15
**tabs** [2] - 721:10, 792:15
**takeaway** [1] - 835:8
**tangible** [1] - 816:2
**target** [3] - 837:3, 878:25, 879:4
**task** [1] - 873:25
**team** [8] - 711:13, 716:7, 716:21, 724:14, 729:8, 773:5, 792:17, 858:1
**team's** [1] - 720:18
**technical** [1] - 728:2
**technologically** [1] - 725:22
**technologies** [1] - 843:2
**technology** [41] - 703:4, 712:13, 712:19, 712:21, 712:22, 713:24, 714:12, 715:10, 715:17, 716:9, 716:12, 724:3, 724:7, 724:19, 735:7, 744:20, 763:10, 763:13, 765:20, 770:8, 779:19, 786:12, 800:8, 801:2, 801:19, 802:24, 813:5, 813:7, 815:19, 816:16, 821:14, 821:19, 835:22, 835:23, 845:2, 845:7, 853:21, 861:25, 862:3, 872:25
**ten** [12] - 844:1, 869:21, 870:3, 870:5, 871:8, 871:12, 871:13, 881:14, 881:17, 881:18
**tenure** [1] - 711:24
**term** [5] - 727:22,

802:25, 810:6, 814:19, 818:8
**termed** [1] - 804:24
**terms** [17] - 704:5, 713:11, 713:21, 715:7, 715:8, 730:21, 771:9, 782:25, 783:6, 784:13, 788:16, 796:19, 807:5, 825:3, 833:16, 843:16, 891:13
**territories** [1] - 715:24
**test** [3] - 731:23, 732:4, 732:9
**testified** [22] - 732:23, 752:20, 800:22, 801:18, 803:3, 804:10, 804:17, 805:21, 814:18, 827:12, 828:17, 834:2, 835:3, 863:8, 870:2, 873:7, 873:9, 874:15, 878:14, 878:22, 883:1, 887:8
**testifies** [4] - 710:20, 723:5, 757:14, 840:24
**testify** [7] - 701:16, 706:4, 749:8, 754:20, 755:14, 822:17, 842:25
**testifying** [5] - 706:5, 753:14, 843:8, 862:10, 864:21
**testimony** [39] - 700:14, 701:3, 701:23, 702:14, 702:15, 702:16, 702:22, 703:1, 703:3, 707:3, 707:12, 707:14, 708:24, 722:16, 741:5, 742:1, 743:13, 754:22, 755:1, 756:6, 758:23, 760:21, 767:7, 775:14, 775:16, 775:20, 775:25, 809:10, 812:23, 833:24, 843:17, 843:24, 865:23, 869:11, 869:12, 870:4, 873:22, 875:4, 883:16
**testing** [1] - 817:21
**text** [1] - 881:8
**THE** [252] - 700:1, 700:11, 700:19,

700:21, 700:23, 700:25, 701:13, 701:24, 702:14, 702:25, 703:8, 703:13, 703:18, 704:7, 705:2, 705:4, 705:10, 705:15, 706:3, 706:8, 706:10, 706:12, 706:15, 706:19, 707:1, 707:6, 707:9, 707:21, 708:1, 708:4, 708:8, 708:11, 708:18, 708:20, 708:22, 709:2, 709:5, 709:10, 709:13, 709:18, 710:2, 710:5, 710:8, 710:16, 710:21, 710:24, 711:1, 719:17, 721:16, 721:19, 721:22, 722:14, 722:16, 722:18, 722:19, 722:23, 722:25, 723:1, 723:6, 723:8, 723:9, 732:14, 732:18, 733:20, 735:12, 735:18, 735:21, 735:23, 736:2, 736:6, 736:22, 736:24, 737:4, 737:5, 737:23, 738:8, 738:10, 741:7, 743:5, 743:6, 744:10, 746:14, 746:21, 747:1, 747:5, 747:10, 747:19, 747:22, 747:24, 748:3, 748:5, 748:11, 748:13, 752:5, 753:1, 753:15, 753:20, 754:6, 754:14, 754:21, 755:9, 755:18, 755:22, 756:8, 756:11, 756:14, 756:16, 756:20, 756:22, 757:8, 757:15, 757:18, 757:20, 757:21, 757:24, 758:3, 758:6, 758:9, 763:19, 763:23, 764:3, 764:6, 764:10, 764:15, 764:19, 768:6, 773:24, 774:2,

774:4, 774:7, 775:1, 775:21, 780:19, 780:23, 781:1, 781:6, 781:8, 781:11, 781:16, 781:19, 781:24, 781:25, 782:1, 782:3, 785:18, 785:20, 785:23, 787:3, 787:12, 787:14, 792:6, 792:10, 792:22, 792:25, 794:6, 794:8, 798:8, 798:12, 798:13, 800:14, 805:17, 810:15, 810:19, 811:3, 811:5, 813:12, 827:20, 827:22, 827:25, 828:3, 828:6, 828:10, 828:12, 834:24, 838:23, 839:1, 839:11, 839:16, 839:20, 839:25, 840:2, 840:10, 840:11, 840:13, 840:19, 841:1, 841:5, 841:6, 841:10, 841:12, 841:13, 846:3, 846:5, 851:24, 853:15, 855:10, 855:12, 857:1, 859:1, 859:19, 859:21, 862:22, 865:3, 865:9, 865:10, 865:12, 865:13, 865:15, 865:17, 865:18, 865:20, 865:21, 865:25, 866:1, 874:18, 874:19, 876:22, 876:24, 877:1, 877:4, 877:8, 877:9, 877:10, 877:24, 877:25, 878:1, 878:2, 878:3, 879:18, 879:20, 879:21, 879:22, 881:22, 882:9, 882:10, 884:12, 886:9, 886:11, 888:5, 888:16, 888:19, 888:21, 889:14, 890:6, 890:22, 891:3, 891:5, 891:7, 891:8, 891:12, 891:18, 891:21
**theory** [1] - 753:13

SCHUETZ - CROSS

therapeutic [1] - 766:24
Therapeutics [2] - 863:15, 866:24
therapeutics [4] - 711:16, 841:19, 863:10, 863:13
THERAPEUTICS [1] - 698:5
therapies [8] - 702:11, 703:9, 712:1, 714:17, 714:22, 715:11, 718:13, 739:3
therapy [11] - 713:22, 715:16, 740:11, 742:16, 742:25, 745:19, 745:22, 765:13, 766:23, 793:15, 825:6
thereafter [2] - 756:12, 857:12
therefore [1] - 793:4
Thereupon [13] - 710:7, 747:11, 747:15, 748:4, 756:19, 756:21, 780:24, 780:25, 782:2, 840:9, 840:12, 891:4, 891:24
THEREUPON [4] - 710:17, 723:2, 757:11, 840:21
they've [1] - 867:3
thinking [6] - 717:14, 762:20, 766:6, 788:5, 806:4, 852:24
thinks [2] - 775:8, 775:11
third [21] - 702:9, 703:8, 717:25, 718:24, 719:2, 728:3, 753:4, 777:16, 797:10, 797:11, 830:24, 831:6, 831:12, 836:6, 837:1, 837:2, 854:1, 855:17, 855:21, 860:6, 863:4
third-line [3] - 830:24, 831:6, 831:12
third-party [2] - 728:3, 863:4
Thomas [2] - 840:17, 841:10
THOMAS [1] - 840:22
Thomson [1] - 774:18
thoughtfully [1] - 717:24

thousands [1] - 847:5
three [19] - 701:18, 716:17, 727:4, 746:24, 748:18, 777:11, 783:25, 795:19, 803:24, 804:4, 804:6, 844:15, 848:8, 851:12, 856:4, 856:5, 858:11, 876:2, 889:4
throughout [2] - 777:14, 810:6
throw [1] - 819:18
Thursday [2] - 709:22, 710:4
ticking [1] - 857:6
tied [3] - 750:25, 783:15, 786:1
timeline [1] - 833:17
timing [1] - 806:3
title [1] - 777:16
titled [1] - 892:3
today [15] - 707:16, 707:19, 712:6, 754:17, 755:5, 758:23, 766:13, 766:17, 781:14, 781:18, 842:12, 842:20, 842:25, 843:8, 890:22
together [11] - 724:15, 725:10, 727:3, 762:14, 773:11, 792:17, 795:20, 796:13, 800:2, 800:4, 844:25
Tolles [7] - 868:5, 868:18, 868:21, 870:4, 870:9, 870:18, 871:4
TOLLES [1] - 699:15
Tomasello [5] - 747:7, 747:13, 747:17, 767:8, 816:7
tomorrow [7] - 700:18, 700:19, 708:9, 708:11, 708:16
took [6] - 703:2, 803:23, 864:2, 876:16, 881:20, 882:1
top [12] - 733:24, 738:15, 742:13, 773:5, 773:12, 853:25, 855:15, 855:16, 857:20, 860:5, 866:21, 880:14

topic [6] - 702:3, 702:9, 754:10, 754:24, 754:25
total [9] - 748:17, 777:7, 785:3, 797:1, 798:1, 798:17, 799:25, 800:5, 881:17
totaled [1] - 804:18
toward [3] - 847:16, 852:1, 860:6
towards [4] - 732:10, 772:18, 816:15, 819:9
trademark [1] - 876:9
training [1] - 842:6
transaction [1] - 883:8
transcribes [1] - 774:19
TRANSCRIPT [1] - 698:12
transcript [6] - 741:5, 773:23, 774:10, 774:19, 877:22, 892:2
transcripts [4] - 698:25, 773:17, 773:19, 774:22
transfer [1] - 853:22
transferred [1] - 835:14
translate [2] - 765:15, 856:6
translates [1] - 855:24
translating [1] - 752:12
translation [1] - 856:8
transmembrane [1] - 847:17
travel [1] - 868:14
treat [3] - 713:8, 825:17, 825:22
treated [2] - 724:6, 766:3
treatment [5] - 765:11, 771:12, 772:17, 772:19, 861:21
trial [20] - 701:22, 717:22, 726:2, 726:10, 731:6, 735:4, 752:6, 753:14, 754:4, 757:2, 768:24, 770:15, 780:21, 783:22, 783:24, 810:4, 817:24, 824:24, 845:14, 861:20
TRIAL [1] - 698:13
trials [13] - 734:25,

768:18, 768:25, 769:2, 782:18, 782:20, 809:8, 817:14, 824:19, 825:4, 845:9, 854:6
tried [6] - 701:11, 768:9, 799:20, 799:21, 809:5, 884:5
trigger [2] - 807:3, 808:9
triggered [12] - 784:7, 784:11, 784:14, 785:14, 785:19, 805:20, 805:23, 807:10, 807:13, 807:17, 807:21, 807:25
triggers [2] - 806:4, 807:1
true [12] - 703:21, 704:13, 727:4, 740:14, 742:6, 808:23, 812:8, 817:15, 836:5, 862:20, 878:19, 888:11
truthful [1] - 869:10
try [3] - 701:12, 724:14, 822:3
trying [15] - 718:6, 728:4, 745:13, 754:4, 763:23, 781:12, 805:15, 814:1, 830:20, 838:11, 844:25, 845:3, 872:2, 872:15, 883:12
Ts [3] - 715:16, 729:9, 745:5
Tuan [1] - 699:6
TUAN [10] - 746:17, 747:3, 747:7, 747:12, 747:16, 747:20, 747:23, 754:8, 754:23, 755:21
tumor [1] - 848:23
turn [26] - 714:13, 769:23, 771:6, 771:21, 771:25, 772:12, 772:25, 778:12, 784:18, 786:13, 787:21, 796:10, 801:3, 820:12, 827:16, 846:1, 846:23, 847:8, 848:10, 853:24, 855:3, 857:20, 858:20, 859:6, 859:11,

871:20
turnaround [4] - 744:23, 745:1, 745:8, 745:14
turned [2] - 768:20, 862:9
turning [1] - 726:17
two [52] - 716:17, 719:4, 728:24, 737:5, 762:2, 765:12, 766:11, 768:19, 770:15, 770:23, 776:14, 777:2, 777:3, 777:6, 777:22, 780:2, 780:11, 782:12, 785:9, 786:17, 786:19, 790:13, 791:20, 794:12, 798:4, 798:13, 801:10, 801:18, 803:2, 804:17, 812:20, 820:19, 822:19, 828:25, 829:12, 832:12, 832:17, 832:22, 832:24, 833:12, 839:11, 849:1, 849:15, 852:16, 860:18, 866:14, 867:5, 867:13, 867:18, 888:6, 888:13
two-year [4] - 828:25, 829:12, 833:12, 866:14
type [5] - 717:2, 718:5, 776:24, 777:13, 789:23
types [3] - 711:17, 731:18, 804:17
typical [2] - 711:18, 774:23
typically [10] - 712:10, 712:18, 712:20, 712:24, 713:9, 713:24, 714:4, 718:3, 718:11, 762:23

## U

U.S [8] - 698:3, 715:1, 715:2, 715:19, 720:24, 841:21, 854:2, 876:8
UCSD [1] - 759:9
ultimate [1] - 795:20
ultimately [7] - 715:13, 767:15,

SCHUETZ - CROSS

768:13, 790:3, 791:7, 808:1, 811:14
**ultra** [1] - 857:11
**unable** [4] - 767:23, 818:21, 818:25, 833:18
**unbiased** [1] - 869:10
**uncertainty** [2] - 766:15, 789:11
**uncommon** [3] - 714:2, 716:17, 716:22
**unconvinced** [1] - 740:18
**under** [22] - 733:12, 755:23, 783:7, 784:21, 785:6, 792:4, 792:21, 805:4, 806:1, 818:16, 823:22, 833:25, 834:2, 834:6, 834:12, 834:18, 835:11, 842:20, 868:8, 868:13, 882:4, 889:19
**underestimate** [1] - 741:21
**underlying** [5] - 793:3, 793:5, 800:9, 821:15, 822:6
**understandable** [1] - 750:21
**understood** [6] - 721:21, 805:7, 880:6, 880:7, 880:19, 880:22
**undertake** [3] - 713:5, 714:6, 782:20
**undertaken** [1] - 815:15
**undertaking** [2] - 717:4, 779:6
**unfamiliar** [1] - 728:15
**unique** [2] - 713:8, 720:1
**unit** [1] - 744:1
**United** [7] - 703:4, 703:7, 714:25, 715:6, 715:22, 715:24, 797:16
**UNITED** [1] - 698:1
**university** [3] - 759:3, 759:5, 759:6
**University** [1] - 842:5
**unobjected** [2] - 757:23, 764:1
**unobjected-to** [2] - 757:23, 764:1
**unpack** [1] - 784:2

**unpatented** [1] - 816:1
**unravel** [1] - 857:13
**unraveling** [1] - 857:7
**untainted** [1] - 869:13
**up** [67] - 704:24, 706:24, 709:23, 716:25, 721:7, 725:1, 727:20, 733:22, 738:2, 738:9, 743:10, 743:17, 743:18, 744:17, 753:12, 756:2, 764:1, 767:5, 770:4, 771:15, 772:20, 775:4, 781:6, 783:1, 783:17, 784:17, 785:3, 788:8, 790:4, 793:25, 796:7, 796:10, 796:11, 796:18, 796:21, 797:4, 799:10, 800:17, 801:23, 803:3, 810:9, 820:15, 823:13, 826:8, 832:22, 833:14, 836:13, 836:17, 837:24, 838:21, 847:23, 851:24, 853:11, 870:7, 874:17, 874:18, 876:20, 877:9, 879:13, 879:18, 879:21, 880:12, 883:20, 884:15, 884:24, 890:2
**updated** [1] - 811:19
**upfront** [40] - 704:3, 704:11, 705:12, 705:17, 705:22, 713:14, 714:1, 714:4, 714:7, 714:9, 715:18, 748:19, 748:23, 749:1, 749:7, 749:19, 749:20, 750:22, 751:5, 751:24, 752:25, 777:3, 777:9, 777:19, 778:7, 784:9, 785:8, 785:25, 797:21, 798:10, 798:17, 800:3, 804:10, 810:2, 810:5, 810:8, 810:9, 811:8, 811:12, 814:17
**upper** [2] - 882:8, 882:9
**upset** [1] - 856:21

**uses** [6] - 739:22, 752:15, 766:20, 768:23, 786:9, 786:11
**utilized** [1] - 760:23
**utilizes** [1] - 817:8
**utilizing** [1] - 763:10

**V**

**vague** [1] - 794:7
**valid** [4] - 728:7, 760:12, 761:15, 835:13
**validating** [1] - 791:18
**valuable** [5] - 715:3, 822:18, 835:5, 835:18, 835:20
**valuation** [5] - 701:17, 703:1, 704:15, 716:2, 752:16
**value** [33] - 712:20, 712:24, 716:8, 716:11, 717:12, 733:5, 750:10, 750:14, 751:21, 765:6, 765:18, 765:23, 766:5, 766:6, 766:8, 766:10, 766:16, 766:24, 767:18, 769:20, 769:21, 771:19, 784:23, 785:1, 785:15, 786:6, 788:16, 813:5, 815:19, 816:14, 826:15
**valued** [1] - 769:1
**variety** [1] - 819:5
**various** [5] - 725:20, 726:18, 752:6, 770:6, 793:15
**vary** [1] - 713:23
**Venture** [7] - 872:23, 884:7, 885:2, 886:16, 886:22, 887:4, 887:15
**venture** [6] - 844:24, 844:25, 858:1, 860:10, 872:20, 872:21
**verified** [3] - 876:13, 876:15, 883:3
**verify** [2] - 877:14, 878:7
**version** [4] - 707:23, 763:17, 763:22, 763:25
**versus** [11] - 710:10, 728:3, 788:6,

790:14, 794:16, 814:14, 815:3, 821:16, 830:8, 831:23, 832:25
**Vesey** [1] - 699:11
**via** [1] - 753:22
**vice** [2] - 701:19, 711:6
**video** [2] - 747:11, 747:15
**view** [6] - 741:14, 741:18, 767:12, 829:13, 854:24
**views** [2] - 825:11, 831:16
**vigorously** [1] - 824:22
**Vincent** [1] - 699:15
**vision** [2] - 886:23, 887:1
**visited** [1] - 870:23
**VOLUME** [1] - 698:13
**voluminous** [1] - 792:5
**voluntarily** [1] - 842:23
**vs** [4] - 698:7, 700:1, 781:1, 823:6

**W**

**wait** [2] - 781:4, 811:1
**waiting** [2] - 756:16, 756:17
**walk** [6] - 757:15, 783:18, 787:22, 795:6, 797:22, 841:1
**wane** [1] - 729:6
**waned** [2] - 729:2, 740:11
**waning** [1] - 740:23
**wants** [1] - 812:23
**watching** [1] - 703:25
**wax** [1] - 729:6
**waxed** [2] - 729:2, 740:11
**waxing** [2] - 740:13, 740:23
**ways** [8] - 729:10, 729:13, 731:14, 731:19, 761:12, 770:3, 831:21
**Wednesday** [2] - 709:21, 710:4
**week** [2] - 709:17, 709:21
**weekend** [2] - 700:23, 708:7
**weeks** [1] - 762:3
**weight** [1] - 793:4

**WEINBERGER** [47] - 748:10, 748:12, 750:20, 753:3, 758:2, 758:8, 763:20, 764:8, 768:4, 773:25, 774:6, 775:19, 781:15, 785:17, 785:21, 787:2, 787:13, 791:25, 792:23, 794:5, 794:7, 798:6, 798:9, 800:16, 800:19, 805:18, 810:17, 810:20, 811:4, 811:6, 813:10, 813:13, 813:14, 827:19, 827:21, 827:23, 828:2, 828:4, 828:9, 828:14, 834:22, 835:1, 838:4, 838:5, 838:11, 838:13, 840:1
**Weinberger** [5] - 699:16, 781:11, 800:15, 839:3, 839:15
**Weiss** [1] - 699:8
**welcome** [2] - 782:7, 878:2
**well-known** [1] - 763:1
**Wells** [1] - 699:5
**wells** [2] - 711:1, 722:14
**WELLS** [19] - 700:10, 701:11, 701:18, 702:1, 702:16, 703:6, 703:10, 704:4, 705:7, 709:1, 709:3, 709:7, 710:13, 711:3, 719:15, 721:14, 721:17, 721:21, 722:15
**West** [1] - 698:23
**WESTERN** [1] - 698:2
**whatnot** [2] - 702:12, 702:18
**whereas** [2] - 729:3, 805:5
**whereby** [1] - 885:3
**wherein** [2] - 759:9, 778:1
**whilst** [1] - 741:23
**white** [1] - 704:19
**whole** [6] - 724:25, 743:18, 761:19, 813:8, 854:18, 857:5
**widely** [1] - 825:11

SCHUETZ - CROSS

**willful** [1] - 814:24
**willing** [2] - 716:12, 814:2
**win** [1] - 742:13
**window** [1] - 884:1
**wine** [3] - 860:12, 860:16, 876:7
**wire** [1] - 710:22
**wish** [4] - 735:21, 750:18, 782:20, 849:15
**withdraw** [1] - 810:17
**withdrawing** [1] - 703:25
**withdrawn** [1] - 875:18
**witness** [36] - 700:8, 705:5, 705:7, 705:9, 710:12, 710:21, 711:1, 719:17, 722:22, 723:9, 732:14, 735:22, 746:15, 746:17, 746:22, 747:12, 747:22, 753:5, 753:21, 755:13, 756:9, 756:15, 756:24, 756:25, 757:7, 781:17, 805:14, 840:2, 840:4, 840:15, 840:16, 841:13, 863:4, 865:22, 877:22
**WITNESS** [27] - 710:24, 722:18, 723:8, 737:5, 743:5, 744:10, 757:20, 785:18, 798:13, 811:5, 827:25, 828:3, 828:6, 841:10, 865:9, 865:12, 865:15, 865:18, 865:21, 866:1, 874:19, 877:9, 878:1, 879:20, 879:22, 882:10, 891:7
**witness'** [2] - 732:16, 754:22
**witnesses** [4] - 746:23, 755:22, 756:12, 760:22
**word** [6] - 826:16, 856:6, 856:7, 856:23, 857:3, 883:6
**words** [9] - 762:21, 766:11, 767:13, 793:24, 812:19, 816:4, 825:5,

848:12, 860:17
**workbook** [2] - 722:6, 722:9
**workbooks** [1] - 792:14
**workforce** [1] - 729:9
**works** [2] - 820:5, 820:6
**worksheet** [2] - 704:8, 704:9
**workshop** [1] - 704:13
**world** [6] - 761:16, 767:17, 808:23, 815:14, 826:20
**world's** [1] - 715:3
**worldwide** [2] - 797:14, 797:17
**worried** [4] - 741:23, 827:2, 827:12, 827:14
**worry** [1] - 839:20
**worth** [3] - 766:13, 792:17, 861:22
**worthless** [5] - 834:16, 834:17, 834:24, 856:23
**write** [1] - 728:16
**writing** [2] - 700:17, 860:25
**written** [2] - 815:22, 822:24
**wrote** [4] - 854:1, 854:19, 855:5, 859:24
**www. amydiazfedreporter .com** [1] - 698:25

---

## Y

**year** [18] - 731:25, 732:2, 732:5, 732:11, 764:24, 766:13, 772:2, 797:11, 825:15, 828:25, 829:12, 833:8, 833:12, 842:10, 844:4, 860:22, 862:14, 866:14
**years** [21] - 712:19, 714:15, 715:12, 723:23, 740:25, 759:22, 762:25, 766:14, 772:10, 772:16, 789:6, 794:14, 860:10, 860:19, 860:21, 861:1, 861:6, 864:11, 867:5,

867:18, 872:4
**YESCARTA** [37] - 717:20, 718:19, 729:21, 729:23, 730:21, 730:22, 731:1, 739:13, 739:16, 748:20, 761:25, 762:6, 765:6, 765:11, 765:19, 765:21, 765:23, 766:20, 766:23, 767:3, 768:24, 769:6, 769:9, 769:17, 772:14, 772:23, 777:4, 779:7, 779:10, 782:17, 797:9, 800:10, 807:7, 809:23, 818:12, 820:6, 825:22
**yesterday** [4] - 707:14, 755:6, 775:13, 864:21
**yields** [2] - 795:13, 795:20
**York** [2] - 699:12
**YOUNG** [5] - 746:19, 754:2, 754:13, 754:15, 755:16
**Young** [1] - 699:17
**yourself** [8] - 711:5, 723:14, 733:25, 748:2, 758:15, 780:22, 876:13, 879:3
**yourselves** [1] - 840:7

---

## Z

**zero** [2] - 783:12, 827:7
**ZUMA-1** [1] - 768:24

SCHUETZ - CROSS

1

2      DIRECT EXAMINATION                                    711

3      BY MR. WELLS

4      CROSS-EXAMINATION                                     719

5      BY MR. FARRELL

6      HANS BISHOP                                           723

7      direct examination                                    723

8      BY MR. HEINRICH

9      CROSS-EXAMINATION                                     732

10     BY MR. DANE

11     Exhibit DX559                                         733

12     Exhibit 343                                           738

13     REDIRECT EXAMINATION                                  743

14     BY MR. HEINRICH

15     RECROSS-EXAMINATION                                   744

16     BY MR. DANE

17     RYAN SULLIVAN                                         757

18     Exhibits PX78, PX155, and PX156                       758

19     DIRECT EXAMINATION                                    758

20     BY MR. HEINRICH

21     Exhibit PX240                                         775

22     Exhibit PX401                                         787

23     Exhibit PX928                                         787

24     Exhibits 1247 and 1248                                793

25               CROSS-EXAMINATION                           800