1          UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5

   JUNO THERAPEUTICS, INC., et al., )
6                                    )
            Plaintiffs,              )
7                                    )
                vs.                  )
8                                    )   2:17-CV-7639-SJO
   KITE PHARMA, INC.,                )
9                                    )
            Defendant.               )
10   _____)

11

12

13       REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            JURY TRIAL VOLUME VII

15          Los Angeles, California

16       Wednesday, December 11, 2019

17

18

19       _____

20

21

22            AMY DIAZ, RPR, CRR, FCRR
              Federal Official Reporter
23            350 West 1st Street, #4455
              Los Angeles, CA 90012
24

25       Please order court transcripts here:
            www.amydiazfedreporter.com

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1     APPEARANCES OF COUNSEL:

2

      For the Plaintiffs:
3

4                     IRELL & MANELLA LLP
                      By:  Morgan Chu, Attorney at Law
5                          Alan Heinrich, Attorney at Law
                           Crawford Maclain Wells, Attorney at Law
6                          Elizabeth Tuan, Attorney at Law
                      1800 Avenue of the Stars, Suite 900
7                     Los Angeles, California 90067

8                     JONES DAY
                      By:  Andrea Weiss Jeffries, Attorney at Law
9                     555 South Flower Street, 50th Floor
                      Los Angeles, California 90071
10

                      JONES DAY
11                    By:  Sarah Geers, Attorney at Law
                      250 Vesey Street
12                    New York, New York 10281

13                    JONES DAY
                      By:  John Michalik, Attorney at Law
14                    77 West Wacker
                      Chicago, Illinois 60601
15

16

      For Defendant:
17

                      MUNGER TOLLES & OLSON LLP
18                    By:  Garth Vincent, Attorney at Law
                           Edward Dane, Attorney at Law
19                         Jeffrey Weinberger, Attorney at Law
                           Peter Gratzinger, Attorney at Law
20                         Blanca Young, Attorney at Law
                      355 South Grand Avenue, 35th Floor
21                    Los Angeles, California 90071

22

23

24

25

1    Appearances continued:

2

3                    FISH & RICHARDSON
                     By:  William Shear, Attorney at Law
                     12390 El Camino Real
4                    San Diego, California 92130

5                    FISH & RICHARDSON
                     By:  John Farrell, Attorney at Law
6                    500 Arguello Street, Suite 500
                     Redwood City, California 94063
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We are back on the record on Juno vs.

2     Kite.  We have counsel present, party representatives are

3     here, and the jury is not.  So this is the last hearing and

4     discussion regarding jury instructions.  So I believe

5     Mr. Cruz has passed out or provided to each side a copy of

6     the instructions that will be given to the jury consistent

7     with the hearing we held yesterday evening regarding the

8     instructions.

9          The instructions that have been given to counsel do

10    not include the proposed changes requested by the parties in

11    filings submitted, I believe, last night.  And so we need to

12    discuss those proposed changes.

13         The first is plaintiffs have submitted an updated

14    jury verdict form.  And plaintiffs propose replacing

15    references to Juno with Sloan Kettering and Juno to avoid

16    confusion, and I don't think there is any objection.  Is

17    there any objection on the part of the defendants?

18         MR. DANE:  There is not, Your Honor.  There was one

19    other change, which I discussed with plaintiffs, which is

20    acceptable to them.

21         THE COURT:  Oh.

22         MR. DANE:  That is right now for Roman III, the jury

23    is being asked to decide willful infringement regardless of

24    what they've decided on the invalidity defenses and there

25    can't be infringement of an invalid patent.  So we have

agreed that the statement that appears below damages heading,

"If you answered no to all of questions 1, 2, and 3, then

answer this question," should be moved up to before Roman

III, and it would read, "If you answered no to all of

questions 1, 2, and 3, then proceed to answer the next two

questions, otherwise stop."

THE COURT:  And that's agreed?  Ms. Jeffries?

MS. JEFFRIES:  Yes, Your Honor.

THE COURT:  Okay.  So the plaintiffs' proposed

modification will be granted to include Sloan Kettering, and

the defendant's proposed modification would be granted.

So we have certain objections that have been filed

by the defendants.  The -- and the plaintiffs have responded.

So the defendant has requested the curative

instruction regarding the IPR that the Court read to the jury

yesterday be included in the instructions.  Plaintiffs do not

object.  And so that curative instruction would be included

and it would be added as Instruction 15A.  So we have

Instruction Number 15, which is invalidity, a perspective of

one of ordinary skill in the art, and then after that

instruction, this instruction would be added.

The second issue is defendants have requested

Instruction Number 20 be modified to expressly include the

numbered elements of the test.  The plaintiffs have objected

on the basis that the request is repetitive or includes

1    repetitive language and is unnecessary, and the Court is

2    going to grant defendant's request regarding Instruction

3    Number 20.  So Instruction 20 would be modified.

4         And then we have defendant's request regarding

5    Instruction Number 4 be modified to the original, deleting

6    the language, quote, "Which of the parties' interests would

7    have been represented at the hypothetical negotiation."

8    Plaintiffs do not oppose.  Is that -- that's correct?

9         MS. JEFFRIES:  That is correct.

10        THE COURT:  So the Court would grant defendant's

11   request regarding Instruction Number 24.

12        Then we go To instruction 27B.  Defendants request

13   Instruction 27B regarding apportionment be added to the

14   closing instructions, and the plaintiffs have objected.  The

15   objection is based on the claim that factor -- the Georgia

16   Pacific Factor 13 accounts for apportionment.

17        So apportionment I think is a requirement in terms

18   of the damages analysis.  It's been emphasized to be an

19   extremely important factor by the Federal Circuit in a number

20   of cases.  It doesn't hurt to include it.  So the Court is

21   going to grant the request and include defendant's 27B.  So

22   27B would come after 27.

23        Let's see.  Well, I guess it has to come at a

24   different -- be placed in a different order.  Let's see where

25   it should go.

1          MS. YOUNG:  Your Honor, perhaps after Instruction

2     Number 23?

3          THE COURT:  I'm -- let's see.  Yes.  Perfect.  It

4     will be placed after Instruction Number 23.

5          So I guess it would be now marked 23A, Instruction

6     23A.

7          So the defendants have requested also -- I'm

8     sorry -- the plaintiff has filed a proposal to modify the

9     Instruction Number 13.  So the plaintiffs have requested the

10    instruction for what is a patent, including language

11    regarding a request for continued examination be added back

12    in.  So the Court is inclined to grant that request.

13         MS. YOUNG:  Your Honor, may we be heard on that?

14         THE COURT:  Yes.

15         MS. YOUNG:  The -- this is just another way to get

16    another certificate of correction instruction in front of the

17    jury.  As the Court is aware, we have submitted a glossary.

18    We would like to submit the glossary along with juror

19    notebooks with the patent and the certificate of correction

20    to the jurors before closing arguments today.

21         THE COURT:  Speak into the microphone.

22         MS. YOUNG:  Oh, I'm sorry.  We would like to submit

23    juror notebooks with a glossary that will cover the RCE issue

24    to the jury along with the patent and certificate of

25    correction for closing arguments.  And the glossary will have

1    the definition in it that the plaintiffs have asked for.  And

2    there's already a certificate of correction instruction

3    that's quite lengthy.  The Court adopted the plaintiffs'

4    proposal, which we objected to, but that will be given to the

5    jury, and so we don't think that it's appropriate for them to

6    hear that instruction twice.

7            MS. JEFFRIES:  So, Your Honor, it's not correct that

8    the glossary will be given -- at least the Court hasn't

9    clarified.  There was a dispute, as you may recall, with

10   respect to the glossary.

11           THE COURT:  First of all, so I'm inclined to give

12   the jury the defendant's version of the glossary.

13           MS. JEFFRIES:  Even with respect to the defendant's

14   version, Your Honor, given that evidence has been entered,

15   there are problems with the defendant's version of the

16   glossary.  In particular, perhaps the most problematic aspect

17   is under the definition of patent, there is a reference to an

18   injunction, which we believe needs to be removed.  There's a

19   few lines there, "To prevent others from making, using,

20   offering to sell, or selling an invention within the United

21   States, or from importing it into the United States during

22   the term of the patent."  That would be highly prejudicial in

23   a jury trial.  There's also terms, even in the ones

24   defendants have proposed before trial, that don't match any

25   evidence.  So, for example, "office action," that's not a

1    relevant issue in the case, it just adds to confusion.  The

2    term "element" is not one that's been discussed.

3              THE COURT:  Let's -- well, the Court is going to

4    provide or give plaintiffs a modified jury instruction.

5              We can come back to the glossary issue later on so

6    that we can move on -- we can move forward with the case.

7              MS. JEFFRIES:  Very well, thank you.

8              MR. DANE:  Your Honor, just on that, we had hoped

9    that the jury would have the juror notebooks at the time of

10   closing.  So is it possible to resolve that issue now so that

11   would be possible?

12             THE COURT:  I don't want to delay the case.  If you

13   can quickly resolve it, feel free, otherwise we're going to

14   move on.  So you want to meet and confer with Ms. Jeffries?

15   Maybe you can reach --

16             MR. DANE:  Sure.  And if I could just address one --

17   there's one inconsistency in the instructions, Your Honor.

18             THE COURT:  Yes, please.

19             MR. DANE:  So looking at Jury Instruction Number 9,

20   which is the summary of contentions, the last paragraph

21   currently, I believe, is incorrect in how it's worded.  It

22   says, "If you decide that Kite has not proven by clear and

23   convincing evidence that the certificate of correction is

24   invalid and that at least one of the asserted claims is

25   invalid, you will then need to decide any money damages."

1          That is incorrect.  These are alternative defenses.  And if
2     the certificate of correction is invalid, there is no
3     infringement.
4               So it should be "or" and it should be "or that each
5     of the asserted claims is invalid," because we would infringe
6     as long as any of the claims is not proven invalid.  And that
7     is, in fact, the way that the willful infringement
8     instruction is currently written, which is "if you find that
9     neither the certificate of correction, nor Claims 3, 5, 9,
10    and 11 are invalid, Kite has infringed those claims."  That's
11    the correct statement of the situation.
12              THE COURT:  How about "and/or"?  "If you find that
13    the certificate of correction is invalid and/or that at
14    least"...
15              MR. DANE:  "Has not proven that the certificate of
16    correction is invalid" -- no, that's still not correct, Your
17    Honor, because we don't have to prove both, we only have to
18    prove in the alternative.  We either have to prove that the
19    certificate of correction is invalid or we have to prove that
20    each of the four claims is invalid.
21              THE COURT:  Okay.  Ms. Jeffries, do you wish to be
22    heard?  It appears to be a meritorious modification.
23              MS. JEFFRIES:  Yeah, I just need to take a closer
24    look at it.  There's so many negatives in that sentence.
25    It's hard to follow, frankly.  So if you could just give me a

1    moment to take a look at what counsel has proposed.

2              THE COURT:  Okay.  So maybe, Mr. Dane, you can just

3    cover it again.  So it would read, "If you decided Kite has

4    not proven by clear and convincing evidence that the" --

5              MR. DANE:  "Either," I would add the word "either"

6    there.

7              THE COURT:  -- "is invalid" --

8              MR. DANE:  "Or" --

9              THE COURT:  -- "or" --

10             MR. DANE:  -- "that each of the asserted claims is

11   invalid."  And the rest is fine.

12             MR. HEINRICH:  So we agree with that.  And I think

13   there's another little logical conundrum with "willful

14   infringement," because right now it reads "if you find that

15   neither the certificate of correction" --

16             THE COURT:  Where are you at?

17             MR. HEINRICH:  I'm sorry.  I'm at Closing

18   Instruction Number 13, "willful infringement."

19             THE COURT:  One second.  I have it.

20             MR. HEINRICH:  So it currently reads "if you find

21   that neither the certificate of correction, nor" --

22             THE COURT:  Again, direct me to the line.

23             MR. HEINRICH:  So it's the first line.

24             THE COURT:  Okay.  I have it.

25             MR. HEINRICH:  And so the issue here is that the

1      validity of Claims 3, 5, 9, and 11 don't all rise and fall

2      together.  So that if the certificate of correction is found

3      to be not invalid, then if any of these claims are found not

4      to be invalid, then the jury should reach willful

5      infringement.

6              THE COURT:  So you propose modifying Instruction

7      Number 13?

8              MR. HEINRICH:  Yes.

9              THE COURT:  Okay.  So do you want to discuss that

10     with Mr. Dane?

11             MR. HEINRICH:  Sure.

12             THE COURT:  Yeah, and then come up with a --

13     hopefully an agreed-upon instruction.

14             MR. DANE:  This may take us a couple of minutes,

15     Your Honor.

16             THE COURT:  Okay.  So we'll take -- are there any

17     others to discuss?

18             MS. JEFFRIES:  I think the only issue is with

19     respect to the juror notebooks.  We think it doesn't make

20     sense to give them notebooks at this point, because they're

21     getting notebooks of evidence, and then they'd be getting a

22     separate notebook today that -- we're closing, so it's a bit

23     late in the game.  So we would just request the Court's

24     guidance on that.  There are pages for witnesses that have

25     not appeared at trial for both sides, so that might be a

1    little confusing.

2              THE COURT:  Okay.

3              MS. YOUNG:  Maybe we can simplify this.

4              THE COURT:  Yes.

5              MS. YOUNG:  I think the parties, and actually this

6    was the plaintiffs' proposal at the outset of the case, was

7    to have the patent and the certificate of correction in a

8    notebook that the jury would have.  And so that should be

9    relatively easy and noncontroversial to put together.  We are

10   happy to do that and try to get it to the jury in time for

11   closings.

12             THE COURT:  Well, we are going to start very soon in

13   terms of argument, so if you can do it quickly, please do.

14   If not, then the notebooks will be provided after argument of

15   counsel.

16             MS. YOUNG:  Very good.  Thank you.

17             THE COURT:  Okay.  So we are in recess, we'll take a

18   short recess.  See if you can resolve this.

19             (Thereupon, there was a brief recess.)

20             THE COURT:  Back on Juno.  We have counsel present

21   and parties.  So the modifications as requested have been

22   made with the exception to Instruction Number 13.

23             MR. DANE:  Your Honor, the parties have reached

24   agreement as to how to modify that instruction.

25             THE COURT:  Okay.  And let's go -- let me just get

1    13.  Okay.  Please.  Go ahead.

2              MR. DANE:  Thanks.  So it would now read, "If you

3    find both," so we added the word "both."

4              THE COURT:  "If you find" --

5              MR. DANE:  "Both."

6              THE COURT:  "Both."

7              MR. DANE:  "That," and then paren, small Roman

8    Numeral i, "the certificate of correction is not invalid," so

9    we've added those words, "is not invalid," and, parenthesis,

10   small Roman Numeral ii, "that any of Claims 3, 5, 9, and 11

11   of the '190 patent is not invalid, Kite infringes those

12   claims."

13             THE COURT:  So just to cover it again, "If you find

14   that both," in parens Roman Numeral i, "the certificate of

15   correction is not invalid and," parens, Roman Numeral ii,

16   "that any of Claims 3, 5, 9 and 11 of the '190 patent is not

17   invalid, Kite has infringed those claims."

18             MR. DANE:  We changed "has infringed" to

19   "infringes."

20             THE COURT:  I'm sorry, "Kite infringes."

21             MR. DANE:  Yeah.  And the only very minor

22   syntactical changes, instead of "you find that both," I think

23   "if you find both that" might be --

24             THE COURT:  "If you find."

25             MR. DANE:  "Both that."

1              THE COURT:  "Both that."  Thank you.

2              MS. JEFFRIES:  And then, Your Honor --

3              THE COURT:  Agreed?

4              MS. JEFFRIES:  Oh, agreed, yes.

5              And then I believe Your Honor ruled that the

6     instruction we had proposed in Document 549-1, the revised

7     closing 13 would be given.  But we do not see it in the set

8     that was just provided to us by the Court.  Don't know if we

9     somehow missed it in our copy, but we don't see it there.

10             THE COURT:  Which instruction are you referring to?

11             MS. JEFFRIES:  It was the newly proposed one from

12    last night that was reflected in Document 549-1.  It was

13    closing Instruction Number 13, but they've all been

14    renumbered.  What is a patent and how one is obtained.

15             THE COURT:  You are talking about what we did last

16    night?

17             MS. JEFFRIES:  What we did last night and that we

18    just discussed this morning, and you said you would be giving

19    plaintiffs' proposed --

20             THE COURT:  Instruction Number 13.

21             MS. JEFFRIES:  Correct.

22             THE COURT:  Okay.  And it was supposed to be

23    included, I think, as 9A.  Okay.  That needs to be --

24             Any final modifications or agreements as to

25    Instruction Number 13?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1          MS. JEFFRIES:  Which 13 are we talking about?  I

2     think not, but I think there is two 13s at issue right now.

3          THE COURT:  So the -- in the revised set.

4          MS. JEFFRIES:  Got it.

5          THE COURT:  The most recent set.

6          MS. JEFFRIES:  No, I think we just -- we agreed.

7          MR. DANE:  We are fine with that.

8          THE COURT:  You are fine with 13 as --

9          MS. JEFFRIES:  As Mr. Dane was reading it.

10         THE COURT:  Okay.  And we are talking about the

11    second revised set that I just -- that we just provided to

12    both sides.  We had a set provided this morning and then a

13    new set based on our discussions this morning regarding

14    revisions.

15         MR. DANE:  Yeah, Your Honor, it is the same

16    instruction on willful infringement, and so the wording

17    appears to not have changed, other than as I read into the

18    record.

19         THE COURT:  Do you agree with the instruction?

20         MR. DANE:  Yes, Your Honor.

21         THE COURT:  Okay.  So all we need to add is the

22    instruction for what is a patent, agreed?

23         MS. JEFFRIES:  Correct.

24         THE COURT:  Okay.  So let's -- I want to stay with

25    the instructions.  We need to finalize the set.

1          And then so the request for -- plaintiffs' request

2     for the instruction of what is a patent will be provided, and

3     we should make that modification.  And then the parties would

4     be ordered to provide copies for each of the jurors once we

5     have a final agreed set.

6          MR. DANE:  Your Honor, I'm sorry, I just want to

7     make sure there isn't just any misunderstanding.  We agree to

8     closing Instruction Number 13 as I just a few moments ago

9     read the modification.  That modification is not reflected in

10    the second set because the Court had made those changes

11    before I and opposing counsel had agreed to that change.  So

12    that change still does need to be made.  And just --

13         THE COURT:  Well, one moment, please.

14         Okay.  Go ahead.

15         MR. DANE:  And just for clarity, because I realize

16    we have a little bit of overlapping numbers with the

17    different sets, so the closing instruction I'm referring to

18    is the one on willful infringement, and that was the one as

19    to which there was the change that I read into the record

20    just for the first sentence.  And that currently does not yet

21    appear in the most recent set the Court had handed to the

22    parties.

23         THE COURT:  Okay.  So we are going to provide both

24    parties with a third revised set, and hopefully there is

25    agreement.

```
1              MR. DANE:  Thank you, Your Honor.

2              THE COURT:  Yes?

3              MS. YOUNG:  We've also reached agreement on the

4    glossary, Your Honor.  I just handed it to counsel to review.

5    But I think we have reached agreement on that as well, and we

6    have copies for the jurors.

7              THE COURT:  Agreed?

8              MS. JEFFRIES:  I'm just proofreading it now, but I

9    believe it is agreed.

10             THE COURT:  Okay.  So we can come back to that

11   later, the glossaries.  Is the request to have the glossaries

12   provided to the jury with the notebooks during argument of

13   counsel or after?

14             MS. YOUNG:  During, Your Honor, or, rather --

15             THE COURT:  Ms. Jeffries, do you have a preference

16   on that?

17             MS. JEFFRIES:  Well, we would prefer after just

18   because we are still reading and proof -- not to delay, and

19   also it seems to be a distraction to have a set of terms

20   defined during closing arguments.

21             MS. YOUNG:  Your Honor, it would be fine to have the

22   glossary go after.  If the patents -- if the patent and

23   certificate of correction could be with the jury during

24   closings, that is what we would request.

25             MS. JEFFRIES:  That's fine with plaintiffs.
```

1          THE COURT:  So we have a new closing 9A.  Let me

2      just provide them to counsel and make sure everyone is on the

3      same page.

4          MS. JEFFRIES:  So, Your Honor, I think we may have

5      some confusion, because what we were just handed as 9A is not

6      the -- what I believe the Court granted to be given this

7      morning in Document 549-1.

8          THE COURT:  The instruction regarding what is a

9      patent?

10          MS. JEFFRIES:  Right.  So the -- in the conference

11      yesterday, the Court had said it would not be given what is

12      currently reflected as closing Instruction 9A.  We then

13      submitted this revised version last night in response because

14      certain items we felt needed to be in the instructions, and

15      the Court was not going to give that instruction that is

16      currently reflected as 9A.

17          And then this morning the Court agreed to grant --

18      ordered or decided to grant the newly-submitted -- what --

19      the numbering is confusing, but it was numbered 13, which is

20      in Document 549-1.

21          We don't necessarily object to what is given here as

22      9A today to us, but I would just need a moment to review it

23      if the Court is inclined to give that one instead.

24          THE COURT:  Okay.

25          MR. DANE:  Defendants have no objection to this

1    version of the instruction, Your Honor.

2            THE COURT:  Okay.  Let's -- I think it probably

3    makes sense to cover each of the instructions one final time

4    to make sure that everybody is in agreement.

5            The following instructions will be given, and maybe

6    you can follow along:  Instruction Number 1, duty of the

7    jury; Instruction Number 2, what is evidence; Instruction

8    Number 3, what is not evidence; Instruction Number 4,

9    credibility of witnesses; 5, charts and summaries not

10   received in evidence; 6, charts and summaries in evidence.

11           7, notes taken during trial; 8, burden of proof.

12   And if there is a request for modification, make sure that

13   you alert the Court, please.  9, summary of contentions.  And

14   I just want to make sure that you review 9, 9A, and to make

15   sure everyone is in agreement.

16           MS. JEFFRIES:  Your Honor, we do have a concern with

17   the new 9A, if I could address that.

18           THE COURT:  You have a concern, okay.

19           MS. JEFFRIES:  Right.  So what is now presented as

20   9A was what we had presented before the Court granted the

21   glossary.  So now it's very long and overlaps to a great

22   extent with what has now been agreed to in the glossary.

23           So for that reason, we would like to go back to what

24   we believe the Court agreed to give this morning, which was

25   the plaintiffs' proposed new instruction reflected in

1    Document 549-1 for what is a patent and how one is obtained.

2    It's much shorter, and it does -- it does not overlap -- it

3    doesn't have all that information which is now in the

4    glossary.

5              THE COURT:  Okay.  So your request is to remove 9A?

6              MS. JEFFRIES:  Remove 9A and replace it with what is

7    in Document 549-1, and that could be the 9A.

8              THE COURT:  And I assume there is no dispute?  So 9

9    remains, and then remove 9A, replace it with 541-1?

10             MS. JEFFRIES:  549-1.

11             THE COURT:  549-1.

12             MS. JEFFRIES:  Correct.  Thank you.

13             THE COURT:  Agreed?

14             MS. YOUNG:  We still have the same objections that

15   we stated before, Your Honor.

16             THE COURT:  But no additional objections?

17             MS. YOUNG:  No.

18             THE COURT:  Okay.  And I agree, 9A is a little bit

19   lengthy.

20             Instruction Number 10, interpretation of claims;

21   Instruction Number 11, how a claim -- how a claim defines

22   what it covers; 12, independent and dependent claims; 13,

23   willful infringement.  Any changes to 13?  I want to make

24   sure that the 13 that you have is the one that includes -- so

25   13 needs to be modified.

1          MR. DANE:  It still needs to be modified, Your

2     Honor, just the first sentence.

3          THE COURT:  Okay.  So the proposed modification.

4          MR. DANE:  Again, so it's -- it should read, "If you

5     find both that," paren, small Roman i, close paren, "the

6     certificate of correction is not invalid and," paren small

7     Roman ii, close paren, "that any of Claims 3, 5, 9, and 11 of

8     the '190 patent is not invalid, Kite infringes those claims."

9          THE COURT:  Okay.  Those changes should be made.

10          14, burden of proof; 15, perspective of one of

11     ordinary skill; 15A, reasonable royalty; 16, certificate of

12     correction; 17, written description; 18, enablement; 19,

13     burden of proof, damages; 20, a reasonable royalty

14     definition; 21, hypothetical negotiation, date of; 22, a

15     reasonable royalty form; 23, factors for reasonable royalty;

16     23A, apportionment; 24, comparability, reasonable royalty;

17     25, timing, royalty; and 26, consideration of the evidence;

18     27, communication with court; 28, return of verdict; and 29,

19     duty to deliberate.

20          MS. YOUNG:  Your Honor, one correction.  Closing

21     Instruction Number 15A is the curative instruction on the

22     inter partes review, and it's just the title says "reasonable

23     royalty/comparability," which is not what the instruction is

24     addressed to.

25          THE COURT:  Okay.  I'm sorry.  You are going back to

1    15?

2              MS. YOUNG:  15A.

3              THE COURT:  So the concern is the title?

4              MS. YOUNG:  Yes.

5              THE COURT:  So how should it read".

6              MS. YOUNG:  "Inter partes review."

7              THE COURT:  Just "Inter partes review"?

8              MS. YOUNG:  Yes.

9              MS. JEFFRIES:  No objection on our part.

10             THE COURT:  Okay.  Thank you for that correction.

11   That makes sense.

12             Okay.  We'll do one final revision and see if we

13   have a final agreement.  Okay.  We're back in recess.

14             (Thereupon, there was a brief recess.)

15             THE COURT:  We are back on the record on Juno.

16   Hopefully this is the final final set of instructions.  The

17   final final set has been provided to both sides.  I just want

18   to make sure that each side has an opportunity to review each

19   instruction and to make sure that it's consistent with all

20   the modifications, requested revisions that have been placed

21   on the record today and yesterday.

22             Are they in order?  Ms. Young?

23             MS. JEFFRIES:  Yes, Your Honor.

24             THE COURT:  Ms. Young?

25             MS. YOUNG:  Yes, Your Honor.

1       THE COURT:  Okay.  Are we ready to bring the jury

2  out so I can read instructions?  Yes?

3       MS. JEFFRIES:  Yes.

4       MR. DANE:  Defense is.

5       THE COURT:  And then in terms of argument, I

6  understand each side will have two hours to present argument;

7  is that correct?  Yes?

8       MR. CHU:  Yes, Your Honor.

9       MR. DANE:  Yes, Your Honor.

10      THE COURT:  So, Mr. Chu, you can reserve any portion

11 of the two hours for closing -- or rebuttal.

12      MR. CHU:  Thank you.

13      THE COURT:  On another note, I just want to make

14 sure that the demonstratives have been exchanged and everyone

15 is on the same page in terms of demonstratives.

16      MR. DANE:  We had not -- neither side exchanged

17 demonstratives, Your Honor.

18      THE COURT:  Okay.  Well --

19      MR. DANE:  Neither side is objecting.

20      THE COURT:  Okay.

21      MR. DANE:  And we understand that Mr. Cruz has the

22 juror notebooks?

23      THE COURT:  I believe he does.  You would like them

24 passed to the jury during argument; is that correct?

25      MR. DANE:  Yes, Your Honor.

1    THE CLERK:  Ready.

2            THE COURT:  I just want to make sure that the jury

3    is not distracted by the notebooks in argument.

4            MR. CHU:  We are happy either way, Your Honor.  I

5    think I agree with the Court that it would be better to give

6    the jurors the notebooks after argument.

7            MR. DANE:  Perhaps they could be given the notebooks

8    before the instructions?

9            THE COURT:  How will -- will it assist the jury if I

10   provide the notebooks early, and, if so --

11           MR. DANE:  It will for my closing, Your Honor,

12   because I will be referring to the patent, and if they have

13   the patent in front of them, it will make it easier for them

14   to follow along.

15           THE COURT:  Let's provide the jury with the

16   notebooks.  Let's bring the jury out.

17           THE CLERK:  Okay.  All rise for the jury, please.

18           (Thereupon, the jury returned to the courtroom.)

19           THE COURT:  We have the jury reassembled, and we

20   have counsel present and the parties present.

21           So please have a seat.  As the jury can imagine,

22   with the number of lawyers on the case and the importance of

23   the legal issues and other issues, there has been a final

24   flurry of legal issues that the Court had to address this

25   morning.  That is why there was a delay.  Everybody has been

1       working diligently to try to bring you here close to the hour

2       that you were ordered to be here, which was 8:30, and I don't

3       think we accomplished that today.

4             That being said, it's now my opportunity to read the

5       instructions to you.  You do not have to take notes.  Feel

6       free -- if you would like to take notes on the instructions,

7       feel free.  A copy of the instructions will be provided to

8       you in deliberations to guide you.  And then following the

9       instructions we'll have argument of counsel.

10            So members of the jury, now that you have heard all

11      of the evidence, it is my duty to instruct you on the law

12      that applies to the case.  A copy of these instructions will

13      be sent to you -- sent to the jury room for you to consult

14      during your deliberations.

15            It is your duty to find the facts from all the

16      evidence in the case.  To those facts you will apply the law

17      as I give it to you.  You must follow the law as I give it to

18      you whether you agree with it or not.  And you must not be

19      influenced by any personal likes or dislikes, prejudices, or

20      sympathy.  That means you must decide the case solely on the

21      evidence before you.  You will recall -- you will read that

22      you took an oath to do so.

23            Please do not read into these instructions or

24      anything that I may say or do or have said or done that I

25      have an opinion regarding the evidence or what your verdict

1      should be.

2              The evidence you are to consider in deciding the

3      facts consists of the sworn testimony of any witness, the

4      exhibits that are admitted into evidence, any facts which the

5      lawyers have agreed to, and any facts that I have instructed

6      you to accept as proved.

7              In reaching your verdict, you may consider only the

8      testimony and exhibits received in evidence.  Certain things

9      are not evidence, and you may not consider them in deciding

10     what the facts are.  I will list them for you.

11             Arguments and statements by lawyers are not

12     evidence.  The lawyers are not witnesses.  What they have

13     said in their opening statements, what they will say in

14     closing arguments and other times is intended to help you

15     interpret the evidence, but it is not evidence.  If the facts

16     as you remember them differ from the way the lawyers have

17     stated them, your memory of them controls.

18             Questions and objections by lawyers are not

19     evidence.  Attorneys have a duty to their clients to object

20     when they believe a question is improper under the Rules of

21     Evidence.  You should not be influenced by the objection or

22     by the Court's ruling on it.  Testimony that is excluded or

23     stricken or that you have been instructed to disregard is not

24     evidence and must not be considered.

25             In addition, some evidence was received only for a

1    limited purpose.  When I have instructed you to consider

2    certain evidence only for a limited purpose, you must do so

3    and you may not consider that evidence for any other purpose.

4            Anything that you have seen or heard when the Court

5    was not in session is not evidence.  You are to decide the

6    case solely on the evidence received at trial.

7            In deciding the facts in this case, you may have to

8    decide which testimony to believe and which testimony not to

9    believe.  You may believe everything a witness says or part

10   of it or none of it.

11           In considering the testimony of any witness, you may

12   take into account the opportunity and the ability of the

13   witness to see or hear or know the things testified to; the

14   witness' memory; the witness' manner while testifying; the

15   witness' interest in the outcome of the case, if any; the

16   witness' bias or prejudice, if any; whether other evidence

17   contradicted the witness' testimony; and the reasonableness

18   of the witness' testimony in light of all of the evidence and

19   any other factors that bear upon believability.

20           Sometimes a witness may say something that is not

21   consistent with something else he or she said.  Sometimes

22   different witnesses will give different versions of what

23   happened.  People often forget things or make mistakes in

24   what they remember.  Also, two people may see the same event

25   but remember it differently.  You may consider these

1    differences, but do not decide that testimony is untrue just

2    because it differs from other testimony.

3           However, if you decide that a witness has

4    deliberately testified untruthfully about something

5    important, you may choose not to believe anything that

6    witness said.  On the other hand, if you think the witness

7    testified untruthfully about some things but told the truth

8    about others, you may accept that -- the part you think is

9    true and ignore the rest.

10          The weight of the evidence as to a fact does not

11   necessarily depend on the number of witnesses who testify.

12   What is important is how believable the witnesses were and

13   how much weight you think their testimony deserves.

14          Certain charts, summaries, and demonstratives not

15   admitted into evidence have been shown to you in order to

16   help explain the contents of books, records, documents, or

17   other evidence in the case.  Charts, summaries and

18   demonstratives are only as good as the underlying evidence

19   that supports them.  You should, therefore, give them only

20   such weight as you think the underlying evidence deserves.

21          Certain charts and summaries have been admitted into

22   evidence to illustrate information brought out in trial.

23   Charts and summaries that have been admitted into evidence

24   are only as good as the testimony or other admitted evidence

25   that supports them.  You should, therefore, give them only

1       such weight as you think the underlying evidence deserves.

2               If you wish, you may review your notes to help you

3       remember the evidence.  Whether or not you took notes, you

4       should rely on your own memory of the evidence.  Notes are

5       only to assist your memory.  You should not be overly

6       influenced by your notes or those of other jurors.

7               In these instructions, I will often refer to a

8       party's burden of proof.  I will be discussing two different

9       burdens of proof.

10              The first is known as the burden of proof by a

11      preponderance of the evidence.  When a party has the burden

12      of proving a claim or defense by a preponderance of the

13      evidence, it means the party must persuade you that it is

14      more likely than not that the claim or defense is

15      established.

16              The second burden of proof I will discuss is known

17      as the burden of proof by clear and convincing evidence.

18      When a party has the burden of proving something by clear and

19      convincing evidence, it means the party must persuade you

20      that it is highly probable that the claim or defense is

21      established.

22              I will first give you a summary of each side's

23      contentions in this case.  I will then tell you that each

24      side must prove to win on each of its contentions.

25              As I previously told you, Juno and Sloan Kettering

1    seek money damages from Kite for infringing Claims 3, 5, 9,

2    and 11 of the '190 patent by making, importing, using,

3    selling, and offering for sale Kite's YESCARTA product.  Juno

4    and Sloan Kettering also argue that Kite's infringement has

5    been willful.

6            Kite contends that the certificate of correction to

7    the '190 patent is invalid.  The parties have agreed that if

8    the certificate of correction is not found to be invalid,

9    then defendant YESCARTA's therapy infringes the asserted

10   claims of the '190 patent.

11           In addition to Kite contending the certificate of

12   correction is invalid, Kite also argues that the asserted

13   claims are invalid.

14           Your job is to decide whether Juno and Sloan

15   Kettering have shown that Kite's infringement was willful.

16   Juno and Sloan Kettering must prove willfulness by a

17   preponderance of the evidence.

18           You will also decide -- you will also need to decide

19   whether Kite has shown that the certificate of correction is

20   invalid and the asserted claims of the '190 patent are

21   invalid.  Kite must prove invalidity of the certificate of

22   correction and invalidity of the asserted claims by clear and

23   convincing evidence.

24           If you find both that the certificate of correction

25   is invalid and that any of the Claims 3, 5, 9, and 11 of the

1      '190 is not invalid, Kite infringes those claims.  You will

2      then need to decide any money damages to be awarded to Juno

3      and Sloan Kettering to compensate them for Kite's

4      infringement.

5              Juno and Sloan Kettering have the burden to persuade

6      you of the amount of their damages by a preponderance of the

7      evidence.

8              Yes, sir?

9              MR. DANE:  Your Honor, in reading the first sentence

10     of the last paragraph, I believe the Court inadvertently did

11     not read the word "not" from small Roman i.

12             THE COURT:  Are you referring to line 21?

13             MR. DANE:  Yes, Your Honor.

14             THE COURT:  Let me start again.  If you find that

15     both -- if you find both that the certificate of correction

16     is not valid and that any of Claims 3, 5, 9, and 11 of the

17     '190 is not valid, Kite infringes those claims.  You will

18     then need to decide -- to decide any money damages to be

19     awarded to Juno and Sloan Kettering to compensate them for

20     Kite's infringement.

21             MR. DANE:  Apologize, Your Honor.  The phrase is

22     "not invalid."

23             THE COURT:  I'll start again.

24             If you find both that the certificate of correction

25     is not invalid and that any claims of 3, 5, 9, and 11 of the

1    '190 patent is not invalid, Kite infringes those claims.  You

2    will then need to decide any money damages to be awarded to

3    Juno and Sloan Kettering to compensate them for Kite's

4    infringement.

5              Juno and Sloan Kettering have the burden to persuade

6    you of the amount of their damages by a preponderance of the

7    evidence.  If you decide that any infringement was willful,

8    that decision should not affect any damage award you make.

9              I will take willfulness into account later.

10             This case involves a dispute relating to a United

11   States patent.  Patents are granted by the United States

12   Patent and Trademark Office, sometimes called the PTO.

13             To obtain a patent, one must file an application

14   with the PTO.  After the applicant files the application, a

15   PTO patent examiner reviews the patent application to

16   determine whether the claims are patentable and whether the

17   specification adequately describes the invention claimed and

18   how to make and use it.

19             After the examination of the application, the patent

20   examiner informs the applicant in writing whether any claim

21   is patentable and thus will be allowed.

22             The patent application may file a request for

23   continued examination, sometimes abbreviated as RCE.  An RCE

24   may be filed after the examiner finds that the application

25   and claims meet the requirements for a patent but before the

1    patent is actually issued in order for the applicant to

2    submit additional information to be considered by the

3    examiner.

4           The documents generated in the communications back

5    and forth between the patent examiner and the applicant make

6    up what is called the prosecution history.  The prosecution

7    history becomes available to the public no later than the

8    date when the patent issues.

9           Occasionally, patents are issued with errors.  The

10   patentee can request a certificate of correction to correct

11   such errors.  The request for a certificate of correction and

12   the PTO's decision on the request also becomes part of the

13   prosecution history of that patent.  If the PTO grants the

14   request for a certificate of correction, the certificate of

15   correction becomes part of the patent.

16          As I mentioned at the beginning of the case, the

17   patent claims are numbered -- are numbered sentences and at

18   the end of the patent that describes the boundaries of the

19   patent's prosecution.  It is my job as a judge to explain to

20   you the meaning of any language in the claims that needs

21   interpretation.

22          I have interpreted the following of some of the

23   language in the patent claims involved in this case.  My

24   constructions are as follows:

25          For the term "the amino acid sequence encoded by SEQ

1    ID NO:6 as follows as originally issued," this term is

2    construed as amino acids 113 through 220 of CD28 starting

3    with lysine.  And as corrected by the certificate of

4    correction, this term is considered as amino acids 114

5    through 220 of CD28, starting with isoleucine.

6         For the terms "nucleotide acid polymer encoding, a

7    binding element that specifically interacts with a selected

8    target," you should apply its plain and ordinary meaning.

9         For other terms for which I have not provided a

10   definition, you should apply the plain and ordinary meaning.

11        My interpretation of the language should not be

12   taken as an indication that I have a view regarding whether

13   the certificate of correction or any one of the asserted

14   claims is invalid.  The question involves issues for you, the

15   jury, to decide.  The decisions regarding invalidity of the

16   certificate of correction and the asserted patent claims are

17   yours to make.

18        I will now explain how a claim defines what it

19   covers.  A claim sets forth in words a set of requirements.

20   Each claim sets forth its requirements in a single sentence.

21   If a device or a method satisfies each of these requirements,

22   then it is covered by the claim.

23        There can be several claims in a patent.  Each claim

24   may be narrower or broader than another claim by setting

25   forth more or fewer requirements.

1          The coverage of a patent is assessed claim by claim.

2     In patent law, the requirements of a claim are often referred

3     to as claim elements or claim limitations.

4          When a thing, such as a product or process, meets

5     all of the requirements of a claim, the claim is said to

6     cover that thing, and that thing is said to fall within the

7     scope of that claim.  In other words, a claim covers a

8     product or process where each of the claim elements or

9     limitation is present in that product or process.

10         The '190 patent has two types of claims:

11    Independent and dependent claims.  An independent claim sets

12    forth all of the requirements that must be met in order to be

13    covered by the claim.  Thus, it is not necessary to look at

14    any other claim to determine what an independent claim

15    covers.  In this case, Claim 1 of the '190 patent is an

16    independent claim.

17         The remainder of the claims in the '190 are

18    dependent claims.  A dependent claim, a claim does not itself

19    recite all the requirements of the claim but refers to

20    another claim for some of its requirements.

21         In this way, the claim depends on another claim.  A

22    dependent claim incorporates all of the requirements of the

23    claims to which it refers.  The dependent claim then adds its

24    own additional requirements to determine what a dependent

25    claim covers.  It is necessary to look at both the dependent

```
 1        claim and all other claims to which it refers.  A product

 2        that meets all of the requirements of both the dependent

 3        claim and the claims to which it refers is covered by the

 4        dependent claim.

 5               If you find both that the certificate of correction

 6        is not invalid and any of Claims 3, 5, 9, and 11 of the '190

 7        patent is not invalid, Kite infringes those claims.  You must

 8        then determine whether or not Kite's infringement was

 9        willful.

10               To show that Kite's infringement was willful,

11        plaintiffs must prove by preponderance of the evidence that

12        Kite knew of plaintiffs' patent and intentionally infringed

13        at least one asserted claim of the patent.

14               For example, you may consider whether Kite's

15        behavior was deliberate, malicious, wanton, consciously

16        wrongful, flagrant, or in bad faith.  However, you may not

17        find that Kite's infringement was willful merely because Kite

18        knew about the patent without more.

19               In determining whether plaintiff has proven that

20        Kite's infringement was willful, you must consider all of the

21        circumstances and assess Kite's knowledge at the time -- at

22        the time the challenged conduct occurred.

23               If you determine that infringement was willful, you

24        may not allow that decision to affect the amount of any

25        damages award you give for infringement.
```

1          I will now instruct you on the rules you must follow

2     in deciding whether or not Kite has proven that the

3     certificate of correction in Claims 3, 5, 9, and 11 of the

4     '190 patent are invalid.  To prove the certificate of

5     correction and the claims of the '190 are invalid, Kite must

6     persuade you by clear and convincing evidence the certificate

7     of correction and the asserted claims are invalid.

8          In other words, to prove invalidity of the

9     certificate of correction or any claim of the '190 patent,

10    Kite must persuade you that it is highly likely that the

11    certificate of correction or the claim is invalid.

12         The question of invalidity of a certificate of

13    correction or a patent claim is determined from the

14    perspective of a person of ordinary skill in the art in the

15    field of the asserted invention as of May 28th, 2002.

16         A person of ordinary skill has the level of

17    experience, education, or training generally possessed by

18    those individuals who work in the area of the invention at

19    the time of the invention.

20         In this case, the person of ordinary skill has a

21    Ph.D., M.D., or a master's in science in immunology,

22    biochemistry, cell biology, molecular biology, or a related

23    discipline, and either, one, at least two years of experience

24    in conducting laboratory research on chimeric TCR therapies,

25    TCR T-cells, or other types of immune cells, chimeric TCRs or

1        related work, or knowledge of the scientific literature

2        related to T-cell biology, as well as laboratory techniques

3        and strategies in designing recombinant DNA.

4               You have heard evidence that Kite filed a separate

5        challenge to the '190 patent in the patent and trademark

6        office called the inter partes review or IPR.  And in an IPR,

7        a party has the right to provide the Patent and Trademark

8        Office with certain evidence of technology available before

9        the patent invention to prove that the invention would have

10       been anticipated or obvious to a person of skill in the art.

11              A patent can only be challenged during an IPR on

12       grounds of anticipation and obviousness, not for a

13       certificate of correction, inadequate written description, or

14       enablement defenses.

15              When a patent issues with errors, the patentee may

16       be allowed to have the errors corrected by obtaining a

17       certificate of correction from the patent office.  A

18       certificate of correction is one way to correct certain kinds

19       of errors in issued patents.  The patent office reviews the

20       application for a certificate of correction and may issue the

21       certificate if certain conditions are met.

22              When the patentee is the one who made the error, the

23       patentee may use a certificate of correction to correct

24       errors of clerical or typographical nature or of minor

25       character.

1          A certificate of correction may correct a clerical

2     or typographical error, even if the correction broadens the

3     scope of the claims as long as both the error and, two, how

4     to correct the error are clearly evident to a person of

5     ordinary skill in the art, reviewing the full patent record.

6          In other words, if a person of ordinary skill in the

7     art can clearly identify the error and tell how it should be

8     corrected from the re -- from the reviewing the full patent

9     record, including the patent claims, the specification and

10    prosecution history, then the certificate of correction is

11    valid.

12         Kite argues that the certificate of correction of

13    the '190 patent is invalid, and thus was wrongly issued.

14    Kite must prove by clear and convincing evidence that the

15    certificate of correction should not have been issued.

16         When the patent office issues a certificate of

17    correction, the patent owner may assert the corrected patent

18    only against acts of infringement thereafter arising, in

19    other words, acts of infringement that occur after the

20    certificate of correction issued.  A patent owner may apply

21    for a certificate of correction at any time before the patent

22    expires.

23         A patent claim is invalid if the patent does not

24    contain inadequate -- an adequate description -- written

25    description of the claimed invention.  The purpose of this

1    written description requirement is to demonstrate that the

2    inventor was in possession of the invention at the time the

3    application for the patent was filed, even though the claims

4    may have been changed or new claims added since that time.

5         The written description requirement is satisfied if

6    a person of ordinary skill in the field reading the original

7    patent application at the time it was filed would have

8    recognized that the patent application described in the

9    invention as claimed, even though the description may not use

10   the exact words found in the claim.

11        A requirement in a claim need not be specifically

12   disclosed in the patent application as originally filed if a

13   person of ordinary skill would understand that the missing

14   requirement is necessarily implied in the patent application

15   as originally filed.

16        Kite must prove by clear and convincing evidence

17   that the asserted claims are invalid because the '190 patent

18   does not have adequate written description of the claimed

19   invention.

20        A patent is invalid if the -- if the patent at the

21   time it was originally filed did not contain a description of

22   the claimed invention that is sufficiently full and clear to

23   enable a person of ordinary skill in the field at the time to

24   make and use the full scope of the invention without undue

25   experimentation.

1          This is known as the enablement requirement.  The

2     patent may be enabling even though it does not expressly

3     state some information if a person of ordinary skill in the

4     field could make and use the invention without having to do

5     excessive experimentation.  In determining whether excessive

6     experimentation is required, you may consider the following

7     factors:

8          The scope of the claimed invention, the amount of

9     guidance presented in the patent, the amount of

10    experimentation necessary, the time and cost of any necessary

11    experimentation, how routine any necessary experimentation is

12    in the field of the patent, whether the patent discloses

13    specific working examples of the claimed invention, the

14    nature and predictability of the field, and the level of

15    ordinary skill in the field of the patent.

16         The question of whether a patent is enabling is

17    judged as of the date of the original application for the

18    patent was -- for the patent was first filed.

19         Kite must prove by clear and convincing evidence

20    that the asserted claims are invalid because the '190 patent

21    fails to satisfy the enablement requirement.

22         I will now instruct you on the measure of damages.

23    By instructing you on damages, I am not suggesting which

24    party should win on any issue.  If you find that Kite has not

25    proven by clear and convincing evidence either that the

1    certificate of correction is invalid or that every asserted

2    claim of the '190 patent is invalid, you must then determine

3    the amount of money damages to be awarded to Juno and Sloan

4    Kettering to compensate them for infringement.

5            The amount of those damages must be adequate to

6    compensate Juno and Sloan Kettering for the infringement.  A

7    damages award should put Juno and Sloan Kettering in

8    approximately the financial position they would have been in

9    had the infringement not occurred, but in no event may the

10   damages award be less than a reasonable royalty.

11           You should keep in mind that damages you award are

12   meant to compensate Juno and Sloan Kettering and not to

13   punish an infringer.

14           Juno and Sloan Kettering have the burden to persuade

15   you of the amount of their damages.  You should award only

16   those damages that Juno and Sloan Kettering more likely than

17   not suffered.

18           While Juno and Sloan Kettering are not required to

19   prove their damages with mathematical precision, they must

20   prove them with reasonable certainty.  Juno and Sloan

21   Kettering are not entitled to damages that are remote or

22   speculative.

23           There are various mechanisms for calculating damages

24   for patent infringement.  But both sides are in agreement

25   that damages here should be in the form of a reasonable

1        royalty.

2               A reasonable royalty is a -- is a payment made to

3        the plaintiffs in exchange for the right to make, use, or

4        sell the claimed invention.  This right is called a license.

5        A reasonable royalty is the payment for the license that

6        would have resulted from a hypothetical negotiation between

7        the plaintiffs and Kite taking place at the time when the

8        infringing activity first began.

9               In considering the nature of this negotiation, you

10       must assume that both parties would have acted reasonably and

11       would have entered into a license agreement.  You must also

12       assume that both parties believe that patent was valid and

13       infringed.

14              Your role is to determine what the result of the

15       negotiation would have been.  The test for damages is what

16       royalty would have resulted from the hypothetical negotiation

17       and not something -- what either party would have preferred.

18              The date of the hypothetical negotiation is the time

19       that the alleged infringement began.  In this case the

20       parties agree that the date of the negotiation is

21       October 18th, 2017, when Kite received approval to begin

22       selling YESCARTA.

23              A reasonable royalty can be calculated in several

24       different ways.  Here both sides are in agreement that a

25       reasonable royalty in this case includes two components:

1       One, an upfront amount that Kite would have been paid upon

2       entering into a hypothetical license for the '190 patent; and

3       two, a running royalty -- running royalty rate applied to

4       Kite's sale -- sales revenues from YESCARTA.

5              In determining both the upfront payment and the

6       running royalty rate, you should consider all of the facts

7       known and available to the parties at the time the

8       infringement began.  Factors that you may consider in making

9       your determination include:

10             The royalties received by the plaintiffs for the

11      licensing of the patent-in-suit proving or tending to prove

12      an established royalty.

13             The rates paid by licensees for the use of other

14      patents comparable to the patent-in-suit.

15             The nature and scope of the license as exclusive or

16      nonexclusive or as restricted or nonrestricted in terms of

17      territory or with respect to whom the manufactured product

18      may be sold.

19             The licensor's established policy in marketing a

20      program to maintain his or her patent monopoly by not

21      licensing others to use the invention or by granting licenses

22      under special conditions designed to preserve that monopoly.

23             The commercial relationship between the licensor and

24      licensee such as whether they are competitors in the same

25      territory, in the same line of business, or whether they are

1    inventor and promoter.

2         The effect of selling the patented specialty and

3    promoting sales of other products of the licensee.

4         The existing value of the invention to the licensor

5    as a generator of sales of his nonpatented items, and the

6    extent of such derivative can void sales.

7         The duration of the patent and the term of the

8    license.

9         The established profitability of the product made

10   under the patents, its commercial success, and its current

11   popularity.

12        The utility and advantages of the patented property

13   over the old modes or devices, if any, that have -- that had

14   been used for working out similar results.

15        The nature of a patent invention.

16        The character of the commercial embodiment of it as

17   owned and produced by the licensor, and the benefits to which

18   those who have used the invention -- to those who have used

19   the invention.

20        The extent to which the infringer has made use of

21   the invention and any evidence probative of its value and

22   use.

23        The portion of the profit or of the selling price

24   that may be customary in the particular business or in

25   comparable business to allow for the use of the invention or

1    analogous inventions.

2            The portion of the realizable profits that should be

3    credited to the invention as distinguished from the

4    nonpatented elements.

5            The manufacturing process, business risks, or

6    significant features or improvements added by the infringer.

7            The opinion and testimony of qualified experts.

8            The amount that the licensor -- licensor, such as

9    plaintiffs, and a licensee, such as the infringer, should

10   have agreed upon at the time of the infringement began if

11   both have -- had been reasonably and voluntarily trying to

12   reach an agreement that is the amount which a prudent

13   licensee who desired as a business proposition to obtain a

14   license to manufacture and sell a particular article

15   embodying the patented invention would have been willing to

16   pay as a royalty, yet be able to make a reasonable profit and

17   which amount would have been acceptable by a prudent patentee

18   who was willing to grant the license.

19           No one factor is dispositive, and you can and should

20   consider the evidence that has been presented to you in this

21   case on each of these factors.

22           You may also consider any other factors which in

23   your mind would have increased or decreased the royalty that

24   Kite would have been willing to pay and that Juno and Sloan

25   Kettering would have been willing to accept, acting as

1      normally prudent business people.

2          The amount you find as damages must be based on the

3      value attributable to the patented technology as distinct

4      from other unpatented features of the accused products or

5      other factors such as marketing or advertising or defendant's

6      size or market position.

7          When determining the upfront amount and the running

8      royalty rate, you may consider evidence concerning the

9      amounts that other parties have paid for rights to the '190

10     patent or for rights to similar technologies.

11         A license agreement need not be perfectly comparable

12     to a hypothetical license that would be negotiated between

13     the plaintiffs and Kite in order for you to consider it.

14         However, if you choose to rely upon evidence from

15     any other license agreements, you must account for any

16     differences between those licenses and the hypothetically

17     negotiated license between the plaintiffs and Kite in terms

18     of the technologies and economic circumstances of the

19     contracting parties when you make your reasonable royalty

20     determination.

21         Damages are not based on hindsight evaluation of

22     what happened but on what the parties to a hypothetical

23     license negotiations would have agreed upon.  Nevertheless,

24     evidence relevant to the negotiation is not necessarily

25     limited to facts that occurred on or before the date of the

1    hypothetical negotiation.

2              You may also consider information the parties would

3    have received or estimated during the hypothetical

4    negotiation, which may under circumstances include evidence

5    of usage after infringement started, license agreements

6    entered into by the parties shortly after the date of the

7    hypothetical negotiation, profits earned by Kite, and

8    noninfringing alternatives.

9              Because you must base your verdict only on the

10   evidence received in the case and on the instructions as I --

11   as given, I remind you that you must not be exposed to any

12   other information about the case or to -- or to the issues it

13   involves, except for discussing the case with your fellow

14   jurors during your deliberations.

15             Do not communicate with anyone in any way, and do

16   not let anyone else communicate with you in any way about the

17   merits of the case or anything to do with it.  This includes

18   discussing the case in person, in writing, by phone or

19   electronic means, via e-mail, via text messaging, or any

20   Internet chat room, blog, website or application, including

21   but not limited to Facebook, YouTube, Twitter, Instagram,

22   LinkedIn, Snapchat, or any other form -- forms of social

23   media.

24             This applies to communicating with your family

25   members, your employer, the media or press, and people

1    involved in the trial.  If you are asked or approached in any

2    way about your jury service or anything about the case, you

3    must respond that you have been ordered not to discuss it and

4    to report the matter back to this court immediately.  Do not

5    read, watch or listen to any news or media accounts or

6    commentary about the case or anything to do with it.

7         Do not do any research, such as consulting

8    dictionaries, searching the Internet, using other reference

9    materials, and do not make any investigations or in any other

10   way try to learn about the case on your own.  Do not visit or

11   view any place discussed in the case.  Do not use Internet

12   programs or other devices to search for a view -- or to

13   search for or view any place discussed during the trial.

14        Also do not do any research about the case, the law

15   or the people involved, including the parties, the witnesses,

16   or the lawyers until you have been excused as jurors.  If you

17   happen to read or hear anything touching on this case in the

18   media, turn away and report it to the Court as soon as

19   possible.

20        The rules protect each party's right -- rights to

21   have this case decided only on the evidence that has been

22   presented here in court.  Witnesses here in court take an

23   oath to tell the truth, and the accuracy of their testimony

24   is tested through the trial process.  If you do any research

25   or investigation outside the courtroom or gain any

1    information through improper communications, then your

2    verdict may be influenced by inaccurate, incomplete, or

3    misleading information that has not been tested by the trial

4    process.

5         Each of the parties is entitled to a fair trial by

6    an impartial jury, and if you decide the case based on

7    information not presented in court, you will then -- you will

8    have denied the parties a fair trial.  Remember you have

9    taken an oath to follow the rules, and it is very important

10   for you to follow the rules.

11        A juror who violates these restrictions jeopardizes

12   the fairness of these proceedings, and a mistrial could

13   result that would require the entire trial process to start

14   over.  If any juror's exposed to any outside information,

15   please notify the Court immediately.

16        If it becomes necessary during your deliberations to

17   communicate with me, you may send a note through the United

18   States marshal or bailiff or clerk signed by any one of you.

19   No member of the jury should communicate -- attempt to

20   communicate with me except by a signed writing.  I will not

21   communicate with any member of the jury on anything

22   concerning the case except in writing or here in open court.

23        If you send out a question, I will consult with

24   counsel first or all the lawyers first before answering it,

25   which may take some time.  You may continue your

1    deliberations while waiting for the answer to any question.

2    Remember, you are not to tell anyone, including the Court,

3    how the jury stands, whether in terms of a vote count or

4    otherwise until you have reached a unanimous verdict or have

5    been discharged.

6        The verdict form has been prepared.  After argument

7    of counsel and after deliberation and after you have reached

8    a unanimous agreement on a verdict, your presiding juror

9    should complete the verdict form according to deliberations,

10   sign it and date it, and advise the marshal or clerk that you

11   have -- are ready to return to the courtroom.

12       After argument of counsel, when you start your

13   deliberations, you'll elect one member of the jury as your

14   presiding juror.  That presiding juror will preside over the

15   deliberations and serve as the spokesperson for the jury here

16   in court.

17       You shall diligently strive to reach agreement with

18   all of the other jurors if you can do so.  Your verdict must

19   be unanimous.

20       Each of you must decide the case for yourself, but

21   you should do so only after you have considered all the

22   evidence, discussed it fully with other -- your fellow

23   jurors, and listened to their views.  It is important that

24   you attempt to reach a unanimous verdict but, of course, only

25   if each of you can do so after having made your own

1       conscientious decision.

2               Do not be unwilling to change your opinion if the

3       discussion persuades you that you should, but do not come to

4       a decision simply because other jurors think it is right or

5       change an honest belief about the weight and effect of the

6       evidence simply to reach a verdict.

7               That concludes the reading of the jury instructions

8       to the jury.

9               Mr. Chu, do you need time to set up?

10              MR. CHU:  Thank you for the inquiry, but I'm fine,

11      Your Honor.

12              THE COURT:  Okay.  So we start with arguments of

13      counsel.  The plaintiff will start first, followed by Kite or

14      counsel for Kite.  The plaintiff has another opportunity to

15      address you -- a second opportunity to address you because

16      they have the burden.

17              Go ahead.

18              MR. CHU:  May it please the Court and ladies and

19      gentlemen of the jury.

20              Thank you.  Thank you for your service.  Thank you

21      very much.  At the beginning you heard me say this is an

22      important case about an amazing invention.  And as you have

23      sat here serving as jurors, you know it's an important case.

24      Just look around the courtroom.

25              You heard testimony about the fact that Gilead

1    bought Kite, and Gilead valued the single product YESCARTA,

2    not the entire company of Kite, but the single YESCARTA

3    product at 6.2 billion.

4              You heard that this is an important case.  You also

5    heard that Gilead and Kite paid incredible sums of money to

6    so-called independent expert witnesses.  And for the folks at

7    Sloan Kettering and Juno, it is also an important case.

8              You heard how much work has been done in cancer

9    research, many billions, hundreds of billions over the years.

10   And what scientists were able to do was to come up with three

11   lines of therapy, surgery, radiation, chemotherapy, but no

12   one did what Dr. Sadelain and his colleagues did, working

13   hard day and night, and they came up with the first living

14   drug, the first living drug with a single dose had the

15   possibility of not just treating cancer but having some

16   doctors and scientists begin to whisper about a cure for

17   cancer.

18             And when word got out, a Dr. Steven Rosenberg called

19   up Dr. Sadelain, scientist to scientist, and he asked him

20   questions.  He wanted to know more about the work of

21   Dr. Sadelain and his colleagues at Sloan Kettering.

22             And Dr. Sadelain did what scientists have done all

23   the time for many years.  He answered their questions.  We

24   are all benefited by the fact that that is how scientists

25   act.  If someone calls them and wants some information, they

1    share it because that other scientist might be able to propel

2    research even further over the horizon.

3             And he told him details.  He pointed him to a

4    particular paper.  He told him about the primers that gave

5    the details of the exact sequence of Dr. Sadelain's backbone

6    of his CAR.  He talked about different scFvs, which were

7    well-known.  And he pointed, Dr. Sadelain did, to some

8    alternative scFvs.  And then time went on, and some more time

9    passed.

10            And you heard Dr. Sadelain from the stand tell you

11   when he learned something, it was perhaps the greatest shock

12   of my life.  He was shocked to hear that Dr. Rosenberg and

13   NCI had gotten into a deal with Kite Pharma.  And they were

14   going to commercialize it, commercialize the Sloan Kettering

15   invention, not with any permission, not with any license.

16   Perhaps the greatest shock of Dr. Sadelain's life.

17            This is an important case for many reasons.  For

18   Sloan Kettering and for Juno, it will ultimately be up to you

19   at the end of the day to decide whether you are going to

20   recognize their invention which was granted full patent

21   rights by the United States Patent and Trademark Office.

22            You heard testimony about the three-part CAR that

23   worked -- that created the amazing invention, the living

24   drug.  You didn't hear any contrary testimony that this was

25   the first living drug.

1          The backbone is the key and causes T-cells to kill

2     cancer.  And the amazing part and why it's called the living

3     drug is that those T-cell soldiers are doing their job, and

4     eventually they will pass away.  But they have signaled the

5     patient's own body to make more such soldiers in this

6     reengineered fashion that don't exist naturally in any of our

7     bodies.  And not just some more, but millions and millions

8     and millions of these cells that will continue to attack the

9     cancers.

10          Dr. Sadelain's patent was the first demonstration of

11    the living drug.  You heard that from Dr. Thomas Brocker who

12    testified toward the end of trial.  And you heard a lot of

13    evidence about what Kite was doing in its willful

14    infringement.

15          Here is an example.  Antoni Ribas, after removing

16    Steve Rosenberg from the e-mail string, said, "It is a pity

17    that he," referring to Dr. Rosenberg, "goes on record at the

18    NYT," *New York Times*, "that the NCI CD19 CAR owes a lot to

19    Dr. Sadelain."

20          When in life have you ever heard a reasonable person

21    say, it's a pity for someone to tell the truth?  Why is it a

22    pity?

23          And Dr. Arie Belldegrun, we agree, and we discussed

24    it internally.  And, of course, you did hear Dr. Sadelain say

25    this was perhaps the biggest shock in his life.  And he

1    explained it never occurred to me that in providing

2    information to a member of the National Cancer Institute, who

3    works for the United States Government, that information that

4    I provided to him would be turned into a commercial product

5    with an entity I had nothing to do with.

6         At the time that Dr. Belldegrun on behalf of Kite

7    entered into an agreement with NCI, Kite had no product, no

8    CAR, no clinical trial resources whatsoever, only four or

9    five employees at the time.  And why is he entering into that

10   agreement with NCI?  He said from the stand, the purpose of

11   the deal was to dramatically accelerate Kite's attempt to get

12   into the marketplace as quickly as possible.

13        You heard testimony that Kite's CAR is the same as

14   the NCI CAR, that Kite made no changes to the CAR, that, in

15   fact, the backbone sequence is exactly the same.

16        You heard that Dr. Belldegrun had to admit that he

17   had what he called Project Gold.  Now, Gold can mean a lot of

18   things.  It can mean a gold medal to advanced science.  But

19   we do know what Dr. Belldegrun's gold meant.  It meant

20   cashing in, not only for Kite's shareholders but personally.

21   And then when he cashed in on his Project Gold, he personally

22   made $660 million.

23        Dr. Rosenberg copied Dr. Sadelain's CAR.  You see

24   this e-mail to Michel Sadelain.  And Dr. Rosenberg is saying,

25   "I'm glad to hear of your important work.  Do you have any

1    interest in having us use your chimeric CD19?"  That was

2    Dr. Sadelain's CAR.  And Dr. Rosenberg is, of course, we know

3    now -- we know now because we were able to get a lot of

4    testimony into evidence as a result of the litigation -- that

5    this looks like a polite little e-mail, but Dr. Rosenberg is

6    getting his nose under the tent.

7            And later in 2009, this is a couple years after the

8    phone call from Dr. Rosenberg to Dr. Sadelain, Dr. Rosenberg

9    publishes a paper, and as he's required to do, he cites to

10   Dr. Sadelain's paper.  And this is part of the description of

11   Dr. Sadelain's backbone.

12           And you heard Dr. Rosenberg -- you heard from

13   Dr. Sadelain that Dr. Rosenberg had copied Dr. Sadelain's

14   CAR.  It confirms that Dr. Rosenberg did what we discussed.

15   He used exactly our primers.

16           When Dr. Belldegrun was asked:  "And you agree that

17   Dr. Sadelain's work was very valuable for Kite Pharma's

18   plans, correct," he said "Yes," as well as his own plans.

19           Kite knew of Dr. Rosenberg's copying since at least

20   2012, or they at least had good reason to be concerned about

21   it.  And you see Dr. Ribas is communicating to

22   Drs. Jakabovits, the CEO of Kite, Dr. Bot, and

23   Dr. Belldegrun, saying he, Sadelain, sent his CD19 CAR

24   backbone to Steve Rosenberg.

25           And you would think if Dr. Belldegrun was a

1    responsible person, he would say, well, wait a minute, if

2    Dr. Rosenberg took this from someone else, I should ask.  I

3    don't want to take someone else's patent, intellectual

4    property rights.

5              He was asked:  "Did you ask Dr. Rosenberg if he used

6    Dr. Sadelain's backbone?  No."

7              Did Dr. Jakabovits ask?  No.  And you saw or heard

8    her yesterday where she couldn't remember a whole lot of

9    things, but it was very clear from what she did say that

10   there was a question about the origin of the NCI CAR and the

11   documentation said that she is interested in learning about

12   the genesis of the CAR from Dr. Rosenberg.  But she just

13   couldn't recall things, couldn't recall specifics or

14   generalities.

15             And Dr. Bot who was also close to the situation,

16   also who was at Kite, he didn't bother to ask the question.

17   And Dr. Belldegrun said when asked about the backbone, "Is it

18   Dr. Sadelain's three-part CAR?  He said, "Yes."

19             "And it's also the backbone of Kite Pharma's

20   three-part CAR, correct?"  And he knows it today, so he had

21   to answer "yes" under oath.

22             And here is another e-mail.  Let me tell you and

23   share with you something that may be self-evident.  Of

24   course, these e-mails are internal e-mails at Kite, so the

25   people at Sloan Kettering wouldn't know about them, but when

1    a lawsuit is filed, both sides get to make formal requests

2    for documents and formal requests to take the testimony of

3    witnesses under oath, which we call a deposition.

4         So think of it as being akin to subpoenaing

5    documents.  We didn't know this when the lawsuit was first

6    filed, but we found out.  And I'm only going to point to a

7    sample of what we learned.

8         This is from Dr. Belldegrun.  He's asking, "What is

9    the difference between Rosenberg and the MSK," Memorial Sloan

10   Kettering, "construct?"  "Very similar.  Same signaling

11   domains."  That's the backbone, the signal 1 and signal 2

12   domains.

13        And Dr. Belldegrun was asked:  "You were plenty

14   unhappy when you heard that Dr. Rosenberg was giving some

15   credit to fellow scientist Dr. Sadelain?"  What planet is he

16   living in?  We -- I think most of us grew up, we would give

17   credit to our friends, we give credit to our brothers and

18   sisters and our parents, we give credit freely, and I think

19   most human beings today as adults do so as well.  But not

20   Dr. Belldegrun.  He was plenty of unhappy that Dr. Rosenberg

21   gave any credit to Dr. Sadelain.

22        So we said at the outset, there are different

23   choices for a company like Kite Pharma that could be

24   responsible.  One way is to get a license.  And you heard

25   from Dr. Dash, who has been with us throughout trial, sitting

1    in the front row, that she remembers Dr. Belldegrun saying

2    that Kite, his company, needed a license to the patent.

3         But here is what Dr. Belldegrun tried to tell you

4    from the stand.  "I had no interest to talk with anyone in

5    technology transfer."  What he's trying to communicate is I

6    wasn't interested in the patent.  And time and time again he

7    was saying, "No, I wasn't talking about licensing the '190

8    patent.  I was just going to talk to people at Sloan

9    Kettering about our letting them participate in some of our

10   clinical trials."

11        But if that is true, why is he talking to Dr. Dash

12   who is in the technology transfer office or wanting to talk

13   to Dr. Greg Raskin who was also in the technology transfer

14   office or at an earlier point in time trying to talk to

15   Dr. Sadelain who doesn't treat patients, who doesn't himself

16   participate in clinical trials?  He's a scientist.  That is

17   how he focuses his attention.

18        And Dr. Dash addressed this very issue when she

19   said, "It was surprising because I had called him to tell him

20   that we wouldn't be able to meet, and actually there wasn't a

21   conference room available at the time, but he just came

22   anyway."  Shows up, pulls up a chair next to Dr. Dash, and

23   then he wants to discuss the Sadelain patent.

24        Those are direct contradictions between the

25   testimony of these two witnesses.  And it will be up to you

1       to decide who is more believable.

2               Dr. Belldegrun tried to license the Sadelain patent.

3       At the very end of testimony yesterday, I was asking

4       Dr. Jakabovits some questions.  You may remember she was

5       looking at a document, seeing if her recollection was

6       refreshed.  And along the way, she said that at some point in

7       time she understood that Dr. Belldegrun had contacted

8       Memorial Sloan Kettering to potentially license their

9       technology, referring to the patent.

10              And you've also seen this e-mail from Dr. Jakabovits

11      to a number of people, and she is advising, "Let's not look

12      too eager" -- and this is not look too eager to get a license

13      to the '190 patent -- "because it may send the wrong message

14      about the value of their IP for us."

15              So, again, Dr. Belldegrun was asked, "Did you talk

16      with Dr. Dash about IP licensing?  Absolutely not."  Pretty

17      strong statement.

18              Here is what Dr. Jakabovits at the very end of the

19      day yesterday said:  "There was a discussion between Arie

20      Belldegrun and Sloan Kettering office about a potential

21      license agreement."

22              So this is Dr. Belldegrun's position:  No Sadelain

23      patent licensing discussion.  You heard that -- him say that

24      from the stand.  We know that Dr. Dash has a distinctly

25      different memory, that there were such licensing discussions

1    brought up by Dr. Belldegrun.  We know from the documents

2    that it's directly contrary to what Dr. Belldegrun tried to

3    tell you.  And, finally, at the end of the day yesterday, we

4    know from Dr. Jakabovits that Kite did want to license the

5    Sloan Kettering patent.

6         Dr. Belldegrun was asked, "Did you talk with

7    Dr. Dash about IP licensing?  Absolutely not."  And then he

8    went on to say, "I was not a CEO within the company, so why

9    should I talk?"  And Dr. Dash plainly said, "I remember him

10   saying that Kite, his company, needed a license to the

11   Sadelain patent."

12        So they didn't get a license.  But there were other

13   alternatives to a responsible company.  They could try to

14   invalidate the patent.  At trial, Dr. Belldegrun said -- was

15   asked, "So at some point in time, you had a concern about the

16   Sloan Kettering '190 patent, correct?"  He said, "No."

17        But later at trial it came out that Kite filed for

18   what is called an inter partes review, a formal process in

19   the patent office to invalidate the patent because of

20   arguments about prior art and obviousness and anticipation

21   and the like.

22        And then you saw whether this was or wasn't

23   important to Dr. Belldegrun and Kite.  He is giving a

24   presentation for the year 2016, and he has three highlights

25   of the year.  One of them is the U.S. Patent Office grants

1    the IPR.  Now, that just starts the process.  Someone files a

2    petition, says to the patent office, will you hear the

3    petition and hear our arguments?  And that is what is meant

4    by granting the IPR.

5         And Dr. Belldegrun, he wasn't a bystander, because

6    he reviewed Kite's IPR petition before it was filed.  He's

7    the CEO.  He's reviewing the detailed legal documents.

8         In deposition, he was asked, "Did you review the IPR

9    petition before it was filed?"  And he had said, "Yes."  At

10   trial he said no.  In deposition earlier he said yes.

11        And he was asked, "And you understood that Sloan

12   Kettering and Juno took the position and expressed in detail

13   in the proceedings before the patent office through

14   Dr. Thomas Brocker's declaration that Kite infringes?"

15        You may recall some evidence that Dr. Brocker had

16   submitted a declaration in the IPR proceedings in the patent

17   office, and there was something called a claim chart.  It

18   took each of the limitations of the claims of the '190 patent

19   and matched it against item by item what Kite was doing.  And

20   Dr. Brocker had concluded that Kite was infringing.  And

21   Dr. Belldegrun had to admit that he read this declaration.

22        So in an unprovoked manner, because there was no

23   letter sent by Juno or Sloan Kettering at the time, Kite

24   files a petition to try and invalidate the '190 patent.  And

25   Dr. Belldegrun, who is closely following everything, reads

1    clearly that Dr. Brocker is saying there is infringement.

2    That is all part of willful infringement.

3          And what happens at the end of the day?  The United

4    States Patent Office decides all claims of the Sadelain

5    patent are affirmed; that is, that Kite lost on every

6    argument that they brought up before the patent office.  And

7    the Kite challenge was completely rejected.

8          So they tried to invalidate.  They failed.  There

9    are still some roads that they can travel responsibly.  Don't

10   infringe.  Change your product.  Use technology that is

11   different.  If you have stolen some technology, stop using

12   that technology, do something else.

13         So they tried, and they had a product called

14   internally Kite 585, and they terminated.  They couldn't get

15   it to work.  They were trying to find a way to build a CAR

16   that worked that didn't use the '190 patent, and they failed.

17   And there is another product that NCI had called HU19, and it

18   was dropped.

19         Kite did not change the construct.  Dr. Belldegrun

20   was asked about this.  "You never asked Dr. Rosenberg or

21   anyone else at NCI to change the construct?"  So this is the

22   time you can't get a license, you filed an official

23   proceeding in the patent office to invalidate the patent.

24   You tried and failed to what is called design-around, change

25   the product, and get it to work.  That's three strikes.  But

1      he still doesn't ask Dr. Rosenberg to change the construct.

2      And those first three roads are not a possibility.

3              Now, that fourth road is infringement, and it's

4      willful infringement.  Now, why would anyone do that?  Why

5      would Dr. Belldegrun, who has got this wonderful educational

6      background, why would he do that?

7              We know, we know because he was focused on first

8      mover advantage.  Because he had in his mind, even if he

9      hadn't named the project at the time Project Gold, and if you

10     are the first mover, you become entrenched, and KTEC19, which

11     became YESCARTA, was a product where they would have the

12     first mover advantage.

13             They had witnesses, Kite did, that tried to get up,

14     an expert or two, some other people who have worked at Kite

15     and say, oh, yeah, first-mover advantage, no big thing.

16     There's some disadvantages.  Did they show you a document

17     that said in their internal planning, they said something

18     like safety first?  No, their documents are littered with

19     statements about first-mover advantage, including this e-mail

20     where Dr. Belldegrun says, "So far, so good.  But being the

21     first is the name of the game for us."  And being first was a

22     way to cash in.  So Kite willfully infringes.

23             And here's a timeline.  Kite tries to license the

24     patent.  They first tried to license the patent before the

25     certificate of correction was issued.  So they tried to

1    suggest maybe to you that the '190 patent, before the

2    certificate of correction, had a different sequence.  You've

3    heard a lot of testimony about that.

4           But if it was a different sequence, then they didn't

5    use it, meaning they started at amino acid 113 instead of

6    114, then why are you trying to license a patent that you

7    don't use?  Or if you thought the patent was invalid, why are

8    you trying to license it?  Now there is this certificate of

9    correction.

10          So now the patent office has made clear that the

11   first numbered amino acid in sequence is 114.  And they still

12   try to license the patent.  And then Kite begins in April of

13   2015, clinical trials.  They file the attack in the United

14   States Patent Office for the IPR.  There's the final decision

15   in favor of Sloan Kettering in December 2016.  And then they

16   introduce in October of 2017 the YESCARTA product.  And that

17   same month, that same month is the month that Project Gold

18   came to fruition.

19          And look at that.  This wasn't a company that just

20   said, oh, we kind of made a mistake, and now we've thought

21   about it.  These dates go 2013, '14, '15, '16, '17.  They

22   could have taken another responsible path.  And throughout,

23   Kite doesn't change its CAR.

24          So you heard testimony from experts hired for this

25   case by Kite.  And one of their attacks is to invalidate --

1    to try and get you, convince you to invalidate the patent

2    because of the enablement requirement.  But here's what's

3    interesting.  When you're thinking about willful

4    infringement, ask yourself the question:  Did I hear any

5    witnesses say that in 2013 or '14, '15, or all those earlier

6    years, that they thought the patent was invalid because the

7    enablement requirement was not met?  And remember the

8    enablement requirement is to make and use the invention

9    without undue experimentation.

10            And remember also that Dr. Rosenberg had no problem

11    after Dr. Sadelain said, hey, go look at this paper, I'll

12    talk to you about primers, they had no problem, no evidence

13    whatsoever that they had any problem making and using the

14    invention.  Did you hear a single Kite witness say that in

15    those earlier years, we believed this was a good defense, so

16    we could go ahead and infringe?  You didn't.  We saw a lot of

17    e-mails.  Did you see a single e-mail or study or anything

18    else?  The only analysis you heard from were so-called expert

19    witnesses that were hired for this case just to testify

20    before you.

21            So there were no witnesses and no documents

22    supporting the enablement defense before this case.

23            What about written description of invalidity?  You

24    heard some testimony about that same thing.  No witnesses.

25    No documents.

1          What about the certificate of correction?  You did

2    hear some testimony that went to the question of, well,

3    looking at the '190 for the certificate of correction, where

4    does the amino acids begin?  But did anyone say, any fact

5    witness say, we think that patent is invalid, or particularly

6    after the certificate of correction was granted by the patent

7    office, did you hear from any Kite witness that they believed

8    the certificate of correction was invalid?  Because by the

9    time the certificate of correction issued, there's no

10   question what the sequence is.  You didn't hear a single such

11   witness say that.

12          The only thing you heard was from Kite experts paid

13   to testify before you.  So no witnesses.

14          Did you see any documents?  At Kite, they use

15   e-mails, we have seen a lot of their e-mails.  You would

16   think that someone with all the Ph.D.s running around Kite

17   would say, well, I think the certificate of correction is

18   invalid.  There were no such documents.

19          So here's more information about Kite's willful

20   infringement.  You can see 2013, the certificate of

21   correction is granted.  Kite's still trying to license the

22   patent.  And the dates march on.  And then YESCARTA is

23   introduced.

24          And during this period of time, there is no

25   evidence, fact witnesses at Kite, fact witnesses outside of

1    Kite, that the '190 patent is invalid for those three

2    defenses that they want you to believe in today.

3        You are, as His Honor said, you're the judges of

4    credibility.  And I've got to tell you something, I guess, we

5    all learn, we learn it as kids, we learn it as teenagers, and

6    we certainly learn it as adults talking to our own kids,

7    someone else's kids, whatever it is, talking to other adults,

8    it doesn't matter what your background is, the level of

9    education, walk of life, human beings have innate common

10   sense.  We have the ability to judge the credibility of

11   people we meet, we interact with.  And everyone's on equal

12   footing on that.

13       If you decide that a witness has deliberately

14   testified untruthfully about something important, you may

15   choose not to believe anything that the witness said.  That's

16   what His Honor said.

17       And on the other hand, if you think the witness

18   testified untruthfully about some things, but told the truth

19   about others, you may accept the part you think is true and

20   ignore the rest.

21       So let's address some points of credibility.

22   Dr. Belldegrun was asked at trial, "And you would say you

23   kept in close touch," this is with Dr. Rosenberg, "and it

24   involved everything academically, socially, business,

25   everything under the sun?  And that he was a mentor to you?"

1        Now at trial, he's got an incentive to say no.  Because he

2   hasn't asked Dr. Rosenberg where he got the construct from,

3   its genesis, how it originated, so he testifies under oath

4   "no."

5             Here's what he testified earlier in deposition:

6             "QUESTION:  In what ways did you keep in touch with

7   Dr. Rosenberg?"

8             This is going back to 1985.

9             "ANSWER:  Academically, socially, business,

10  everything, mentor."

11            He's directly contradicting himself.

12            Dr. Belldegrun at another point in the trial:

13            "Did you talk with Dr. Dash about IP licensing?

14            "Absolutely not."

15            Here's Dr. Dash's testimony, to the contrary.

16            Here is a statement by Kite's lawyer in opening

17  statement of this trial.  Quote, "YESCARTA doesn't owe

18  anything to the '190 patent."  But Dr. Arie Belldegrun at

19  trial had to say in responding to a question about the *New

20  York Times* article, and he was asked:  "Do you see that?"  He

21  says, "Yes," he was aware of that article.  Well, that is

22  pretty interesting.

23            Dr. Garcia, he's a paid expert for Kite on the scFv,

24  that's the green part of the construct.  And he wanted to say

25  the patent was very, very broad, because that would support

1    his opinion that the patent might be invalid.  "So you said

2    maybe half an hour ago the claims of the '190 patent are very

3    broad?"  "Yes."

4            But here's a Kite document.  This was in connection

5    with the IPR proceeding where Kite is saying to the world at

6    large in a press release that the '190 patent was narrow in

7    scope, directly contradicting their paid expert.

8            At trial, Dr. Garcia was asked, "You personally have

9    never even attempted to make an scFv-based CAR; is that

10   correct?"  "No, it's not."

11           But at deposition, he was asked, "You personally

12   have never even attempted to make an scFv-based CAR,

13   correct?"

14           "ANSWER:  Not specifically a CAR."

15           More with Dr. Garcia:  "Prior to 2018, you had never

16   constructed any kind of CAR at all, correct?"  "That's not

17   correct."

18           At deposition:  "And prior to 2018, you had never

19   constructed any CAR construct, right?"  "That's correct."

20           It's interesting what happens when someone who might

21   otherwise be a nice guy, but when they're paid well enough by

22   a defendant corporation how they can shift their views

23   180 degrees.

24           You heard from Kite's counsel in opening, Kite

25   doesn't infringe a patent.  There absolutely is a question

1    about infringement in the case.  And it was said multiple,

2    additional times.  They were saying no infringement, but then

3    midway through the trial, you saw this:  A stipulation, an

4    agreement of infringement in an official court filing that

5    said "YESCARTA therapy meets each limitation of the asserted

6    claims," which for people who are patent lawyers means

7    infringement.

8            This is Andy Dickinson, the Kite chief financial

9    officer.  He was asked, "So where does this 6.2 billion

10   valuation come from?"  Remember that is -- Gilead is doing a

11   valuation.  And he says in effect, "So there's a technical

12   accounting treatment where accountants come up with an

13   accounting value that's totally different from than an

14   intrinsic valuation model," and he went on.  I couldn't

15   understand anything he was saying.

16           But on cross-examination, when asked about a 10K

17   filing with the Securities and Exchange Commission of the

18   United States, it came out that it's required for

19   publically-traded companies like Gilead, and they must

20   contain truthful and accurate statements.  So maybe you can

21   believe the gobbledygook at trial or you can believe what

22   they had to file with the United States Securities and

23   Exchange Commission.

24           Dr. Richard Junghans was held out by Kite as an

25   independent expert.  Let's see if he was an independent

1     expert.  Kite or Gilead are paying for services, $1,900 an

2     hour.  You can make a pretty good living at $1,900 an hour

3     without any overtime.

4          At a 40-hour week, that works out to $76,000 a week.

5     If you work 50 weeks in a year, 40 hours a week no overtime,

6     that's 3.8 million a year.  And what else came out in the

7     testimony, he's been working on this case for about a year

8     and a half.  He's given a couple depositions, submitted

9     different declarations, submitted different expert reports.

10    I'm not saying he was working full-time for a year and a

11    half, but he's been working on the case for a year and a half

12    at this rate.  And there's no evidence about this being

13    reasonable.  If it was reasonable, if it was his customary

14    rate, you would have heard him say that, because the lawyers

15    for Kite would have said, and do you go to others and do they

16    pay you $1,900 an hour?  Is this your usual and customary

17    rate?  You heard none of that.

18         Dr. Rao, seventh case testified for Gilead.  By

19    itself, that's not a big deal.  But for this case alone going

20    back several months ago, he had already been paid or invoiced

21    over a million dollars for this one case, much less the other

22    six cases.

23         It's up to you to judge whether you think these

24    so-called experts are really independent and believable.

25         Oh, and Dr. Schuetz, he tried to hold himself out as

1    an independent third party, just had no dog in this hunt.

2    Well, he was represented by Kite's law firm.  In fact, more

3    than one law firm had meetings with him.  And there were

4    meetings with several lawyers at several of those meetings.

5    And he was paid $500 per hour by Kite.  And he also admitted

6    that over the years, he wanted to do a deal with Gilead to

7    get a source of funding.

8         Now, what does Kite say to all this?  Well, they

9    have their excuses for the purposes of this trial.  They say

10   that the patent is invalid because their certificate of

11   correction is invalid.  Kite argues there was a clerical

12   error, and that the jury should kill a valuable patent.

13        Now, let's think about that from a common sense

14   point of view.  This incredibly valuable patent for the first

15   living drug in cancer treatment ever.  It is not just

16   Dr. Sadelain and the named coinventors, but it's a lot of

17   other folks at Sloan Kettering who were working on this

18   project.  And they achieved something that we hope, and I

19   think everyone in this courtroom hopes, will be of benefit to

20   all of person kind.

21        And it seems that the main defense they're putting

22   forward is, well, some human being made a clerical mistake,

23   and sorry, we're going to exploit that.  And it's on that

24   basis that Defendant Kite wants you to take away the valuable

25   intellectual property rights of the folks at Sloan Kettering.

1    They're asking you to kill that valuable patent and

2    Dr. Sadelain didn't do anything wrong.  He didn't make a

3    clerical mistake.  No one else did.  But the law, the law

4    doesn't recognize what they're trying to argue to it.  Yes,

5    the law recognizes that if the certificate of correction is

6    invalid, the patent can be invalidated.  But you've heard the

7    jury instructions and you've heard evidence about it.  And,

8    in fact, as soon as it was discovered, it was discovered some

9    years later, the people for Sloan Kettering went back to the

10   patent office and said -- I think you heard testimony, they

11   heard about it one day and they went to the patent office the

12   next day and applied for the certificate of correction.

13         Keep in mind with this defense, first, that a patent

14   is presumed valid, a patent challenger can only invalidate

15   the claims of a patent by clear and convincing evidence.  In

16   most civil cases, to prove something, the plaintiff or

17   someone with the burden of proof on defense has to prove it

18   by a much lower standard.  It's called a preponderance of the

19   evidence.  So an example would be there's an automobile

20   accident, the plaintiff says the defendant bumped my car.

21   The plaintiff has to prove it by a preponderance of the

22   evidence.

23         And the way most people think about that is you have

24   a blindfolded lady justice, she's got the scales of justice

25   to put evidence on one side, evidence on the other.  If the

scale tips slightly in favor of the plaintiff, then the

plaintiff will win in that case.

But patent law in this area recognizes there's a

much heavier burden of proof, and it's called clear and

convincing.  And their certificate of correction is presumed

valid.  And to invalidate it, it must be by that clear and

convincing standard.

And here's what's part of the Court's instruction:

"A certificate of correction may correct a clerical or

typographical error, even if the correction broadens the

scope of the claims, as long as the error is clearly evident

to a person of ordinary skill in the art reviewing the full

record."

Here's another instruction that you've heard from

the Court:  "A patent owner may apply for a certificate of

correction at any time the patent expires."  So even though

there was a passage of some years, there's no disadvantage.

There shouldn't be any disadvantage to Sloan Kettering.

And as we've seen, Kite admits that there's an

infringement since YESCARTA's launch.  And the patent office

procedure is a formal established process for requests for

certificate of correction, because guess what?  In very

technical subject matters like this, human beings will make

clerical errors or typographical errors.  And then if it

meets the standards within the patent office, applied to the

1    petition for the certificate, the director will issue the

2    certificate of correction.

3            And here, there is evidence about the amino acids

4    114 through 220 that was intended to be the claimed

5    invention.  Notice it doesn't mention 113.  And you heard a

6    lot of evidence that while the patent was still in the patent

7    office originally, Sloan Kettering said, oh, we saw a

8    mistake, there was a mistake, and you saw this chart

9    referring to whether it should have started at amino acid 113

10   or 114.  And they officially tried to correct the mistake at

11   the time when it was first caught in 2007, I believe.

12           And after the United States Patent Office considered

13   all the evidence and whether the standard was met, the

14   certificate of correction was issued.  And it was signed by

15   Ms. Teresa Stanek Rea, who was the acting director of the

16   United States Patent and Trademark Office.

17           Now, what is the evidence that Defendant Kite

18   pointed to?  They referred to Dr. Bot.  But he didn't read or

19   understand the Sadelain patent.  Here is the testimony by

20   him:  "All you did is look at that SEQ ID NO:6 in the

21   sequence listing?"  "Correct."  "And no other parts of the

22   patent?"  "Correct."  So he didn't even read the entire

23   patent, the text of the patent.  Well, the rule is you've got

24   to do that.  And then you have to read the entire official

25   history, we call it the prosecution history or the file

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1        history, before the patent office.  He just went to a little

2        listing that had a long series of letters and said, a-ha, I

3        think that's what it is.  Didn't look at anything else.

4        Funny coincidence.  Didn't want to look at other evidence

5        that might differ from an opinion he wants to tell you about.

6                "QUESTION:  Now, the Sadelain patent is a patent

7        that covers an actual CAR construct, right?" he was asked.

8                "ANSWER:  I don't think so.  I think it covers a

9        specific sequence that is part of the CAR construct, but not

10       a CAR construct."

11               Now, Dr. Schuetz.  He came here, tried to be an

12       independent witness.  Well, if he was really independent, why

13       is he being paid $500 an hour by Kite?  Why is he flying here

14       from Boston if he's really independent?  Why did he have so

15       many meetings with two Kite law firms with multiple lawyers

16       at many of those meetings?  He testified here 15 minutes.

17       You have to have all those meetings with all those lawyers?

18       And think about this, he said not only did I meet with all

19       the Kite lawyers and Gilead lawyers, I hired a lawyer or law

20       firm for me, Dr. Schuetz.  It wasn't a mere coincidence that

21       the lawyers he hired are the exact same lawyers, the exact

22       same law firm that's representing Kite in this courtroom.

23       He's far from being an independent witness.

24               And as you know, he spent several years pursuing a

25       potential strategic partnership and no doubt has hopes.

1    Strategic partnership here means provide me with some money,

2    some financing for a project that I want.

3         Dr. Schuetz said, oh, I couldn't figure out the

4    sequence.  I couldn't figure out it was 114 to 220.  It was

5    just so confusing.  But here it is, the sequence, 114 to 220.

6    He didn't point to that.  And before the COC, he said, well,

7    we were going to pay an enormous amount of money, potentially

8    get the rights to the patent.  You might remember, he wanted

9    to form a company, get a license to the '190 patent, and

10   exploit it to be a Kite-like company.  So that's why he's

11   interested in reading about the patent.  That tells you

12   something about the value of it.  He's reading this patent

13   and says this is valuable.  And now he's reading it in

14   detail.

15        So both before the COC was actually issued and

16   after, he still wanted to pursue that license.  So if he

17   thought the patent was invalid before the COC, he still

18   wanted a license.  And after the COC, if he thought the COC

19   was invalid, he still wanted a license.  That doesn't make

20   sense in the real world.

21        THE COURT:  Mr. Chu, I remind you that we have a

22   program at 11:30.

23        MR. CHU:  My apologies to the ladies and gentlemen

24   of the jury, and to Your Honor.  And I'm happy to stop right

25   here.

1          THE COURT:  Thank you.  And with that, please return

2     back to the courtroom.  We'll make it at 1:15 -- 1:20, make

3     it 1:20.  During your absence, do not discuss the case

4     amongst yourselves or with any other person, please.

5          THE CLERK:  All rise for the jury, please.

6          (Thereupon, the jury retired from the courtroom.)

7          (Thereupon, there was a brief recess.)

8          THE COURT:  We are back on Juno versus Kite.  We

9     have all counsel present.  We are ready for -- to bring the

10    jury back in.  And I just want to alert counsel that I have

11    to leave at 3:30, so at 3:30 I have to make literally a

12    beeline out of here.

13         MR. DANE:  Your Honor, there are a couple of issues

14    that came up regarding the first half of Mr. Chu's closing.

15    Could we approach?

16         THE COURT:  The request at this time would be

17    denied.  If you have an objection to the -- I would encourage

18    both sides not to object, but you have to make a

19    determination as to whether you need to.  And then if you

20    need to object, just the Court will rule at the time.

21         MR. DANE:  I very much do not want to interrupt

22    Mr. Chu's closing.  He made a misrepresentation of fact.

23         THE COURT:  Again, you are going to have to make a

24    determination as to whether an objection should be entered

25    during the course of counsel's argument to the jury.

 1              (Pause in proceedings.)

 2              THE COURT:  I'm informed it will be about two

 3    minutes.

 4              And, Mr. Chu, I think we have the -- you used

 5    49 minutes of your two hours.

 6              MR. CHU:  Thank you, Your Honor.

 7              THE COURT:  Thank you.

 8              MR. CHU:  Could I ask for 40 minutes more?  I'm

 9    kidding.

10              THE CLERK:  All rise for the jury, please.

11              (Thereupon, the jury returned to the courtroom.)

12              THE COURT:  We have our jury reassembled with

13    counsel present and the parties are present.  We continue

14    with the -- please have a seat -- argument of counsel by

15    Mr. Chu.

16              MR. CHU:  Thank you very much, Your Honor.

17              Good afternoon, ladies and gentlemen.

18              Before we broke for lunch, we were talking about the

19    certificate of correction evidence.  And sometimes I have

20    been referring to it as COC.  And we were just about to

21    discuss the expert for Kite, Dr. Junghans.

22              He testified that he assumed a mistake was

23    intentional.  And here is his testimony.  You can see it in

24    quote marks.  And you may have noticed in the lower left-hand

25    corner, we actually put a specific citation to the trial

1   transcript, because we want to check the facts very

2   carefully.

3          If you think about that testimony on certificate of

4   correction, he assumed the conclusion because the certificate

5   of correction is for a clerical mistake, but he was assuming

6   there was no mistake, that they intentionally submitted the

7   incorrect sequence.  So he says that was intentional.  You

8   didn't hear that from Dr. Sadelain.  You heard the opposite.

9          Dr. Rosenberg didn't think it was intentional,

10  because he's always used 114 to 220 after his call with

11  Dr. Sadelain.  And Kite has always used 114 to 220.

12         The certificate of correction is valid.  You heard

13  from Dr. Quackenbush there was a clearly evident error, and

14  the amino acids 114 through 220 are clear from the patent

15  text and the entire prosecution history.

16         Now, let's go to the next defense.  It is the

17  contention of Kite that the patent is invalid because of

18  enablement and written description defenses.  Here is a way

19  to think about it in the real world:  Enablement is being

20  able to make and use the invention by a person of skill in

21  the art after she or he reads the patent.

22         And think about that.  Dr. Sadelain pointed to a

23  paper, told Dr. Rosenberg some information.  And then the

24  question is, did NCI and Dr. Rosenberg have any problem in

25  making and using Sadelain's '190 patent?  And did the patent

1    have a written description that informed one about the full

2    scope of the claims?

3         So here is Dr. Garcia's testimony:  "You would agree

4    that by 2002, a skilled person would have had a reasonable

5    expectation of success in using an scFv as a component of a

6    CAR, correct?  Answer:  I disagree."

7         That's interesting.  He is actually the second

8    expert that Kite hired for this.  Because you heard evidence

9    about a Dr. Abken.  He was an expert for Kite in connection

10   with that patent office proceeding.  And what he said is in

11   those quote marks at that particular exhibit number.

12        He said:  "A skilled person also would have had a

13   reasonable expectation of success in using a single-chain

14   antibody as a component in a chimeric TCR."  Ask yourself,

15   why do they have one expert, very well-qualified Dr. Abken,

16   rendering an opinion in writing in trying to be an expert for

17   Kite, and then they discard Dr. Abken, get someone else who

18   is going to come up with a completely different opinion?

19        Are scFvs old and routine technology?  Dr. Garcia

20   said no.

21        Dr. Sadelain said yes in testimony in this

22   courtroom.

23        Dr. Brocker you heard from yesterday, he said yes.

24        Now, Dr. Belldegrun also said yes.  He, in fact, was

25   asked:  "Look at the green part, which is the scFv.  Was that

old going back to the 1980s?"  And he said "yes" without

qualification.

     And Dr. Abken, you've already seen his signed

declaration in connection with the IPR.

     Now, who is telling the truth on this important

question?

     Dr. Rosenberg used Dr. Sadelain's backbone, and it

worked well with different scFvs.

     Dr. Garcia is saying that the information in the

Sadelain patent is not enabling.  Well, the patent examiner

during the original patent proceedings has to make a decision

for every patent application, is the disclosure enabling?

Does it teach a person of skill in the art how to use the

invention?

     And remember that the patent examiner is someone who

is trained in that particular area of technology and trained

in the law.  So she has to make a decision about whether the

patent is enabling and has to make a decision about whether

the patent meets the written description requirement.  And

the examiner here did that in the normal course of

examination.

     Dr. Sadelain is consistent with that from his

testimony here at trial, Dr. Brocker as well, and

Dr. Rosenberg is consistent in the sense that there is no

evidence from anyone that he had any problem or anyone had

1    any problem whether at NCI or Kite in understanding how to

2    make and use Dr. Sadelain's invention.

3         Dr. Brocker testified that the scFvs share common

4    structural features, that making them was routine, testing

5    them was routine, and it was easy for a lab technician to

6    make.  And you might recall he told a story about a fellow

7    who was a high school dropout, who was a dishwasher

8    initially, got a job in his lab, and just went ahead and

9    started making these scFvs on his own.

10        Dr. Brocker said that the scFvs share common

11   structural features.

12        And here is also testimony from Dr. Sadelain where

13   he was asked about using different scFvs for the anti-CD19.

14   And he said, "Probably up to 30 of them, and they all

15   worked."

16        So let's go to the next excuse or defense.  Kite

17   points its finger at Juno, basically saying Juno is a

18   failure.  But here is the basic evidence:  Kite got to market

19   first.  Juno with JCAR15 had problems.

20        And you heard testimony that we brought forward

21   about deaths, in one study 38 patients, five people passed

22   away.  And you heard, first of all, that unlike others who

23   came here to testify, the folks at Juno reported it

24   immediately to the National Institutes of Health.

25        That wasn't true with Dr. Junghans when he had three

1    deaths out of six patients.  And he tried to say, well, I

2    thought I just had to report the deaths once a year, make an

3    annual report.

4           So here is JCAR17.  And you see the overall response

5    rate is slightly better for the JCAR17 than YESCARTA and

6    equivalent for the complete response rate.  Now, you look at

7    the number of patients, 274 for JCAR17.  What Kite wants to

8    say is they are just great at manufacturing.

9           Well, for every one of those 274 patients, Juno has

10   to make the product.  Whether it takes the same amount of

11   time or a little bit more time in days, the end result is

12   that either Juno's overall response rate is a little bit

13   better or the same for the complete response rate.

14          But here is what is really telling:  This is the

15   comparison of safety.  Both of the items, cytokine release

16   syndrome and neurotoxicity events, are bad things.  You want

17   to have a much lower percentage.  And you heard testimony

18   about the folks at Juno that they are really focused on

19   safety, safety, safety, not in getting to market first to get

20   the first mover advantage.

21          And you could decide for yourself what is better for

22   a company to do, get to market first, have the first mover

23   advantage, and have your senior executives cash out, or to

24   have a group of people, hard-working, who say, okay, we may

25   give up something in terms of sales, but it's safety first.

1          And again, 291 patients, every one of those patients

2     has to have making Juno the product for them.  How does that

3     compare with the Kite number of the patients?  You heard

4     roughly over two years they had I think it was 1,700,

5     1,700-plus.  So they have more patients.

6          But it's a question of you saw the first number in

7     the 200s, this number 291.  Whether one way of manufacturing

8     is slightly faster, slightly slower, the proof is in the

9     pudding.  JCAR17 is significantly safer.

10          And YESCARTA wants to say, well, Juno had some

11     serious cases or fatal cases of cerebral edema, and we said

12     that right up front to you.  But the users of YESCARTA also

13     have that exact same problem.

14          This is the official label for YESCARTA.  And here,

15     from the internal Kite documentation:  "Safety and efficacy.

16     Safety and efficacy is voted as the highest competitive

17     threat."

18          And here is additional testimony about YESCARTA's

19     safety issues that come from Michael Amoroso who testified at

20     this trial.  He said, "Key disadvantages of YESCARTA include

21     the CRS and neurotoxicity problems."  And the concerns are so

22     great that they cannot use YESCARTA in an outpatient setting.

23     Physicians, of course, are concerned with safety.

24          Now I'm going to go on to damages.  You've heard

25     that there is a hypothetical negotiation between the parties.

1    And for purposes of the law and this case, they can't take

2    those other roads so now all we can do is ask you for a

3    reasonable royalty.

4            In summary, the upfront payment should be

5    $585 million.  You heard that from Dr. Ryan Sullivan.  And

6    the running royalty rate should be 27.6 percent.

7            So first major point:  These two witnesses for Kite,

8    both said without a CAR construct, there isn't anything.  The

9    other side is likely to say, well, there has got to be

10   apportionment.  And there can be apportionment, nothing wrong

11   with that.  But if you are looking at the value of the

12   product and the entire product that is really administered or

13   the key element of it is the CAR construct, without that

14   construct, in this case Dr. Sadelain's construct, Kite would

15   have no product.

16           You heard testimony earlier, ZUMA-1, 2 through 12,

17   they are all different projects at Kite.  Every single one of

18   them uses Dr. Sadelain's CAR construct.  You didn't hear any

19   evidence to the contrary.  It's only ZUMA-1 that is YESCARTA.

20   Everything else they have in the pipeline is using the same

21   construct.  And you would think because of the litigation, if

22   they had a reasonable alternative, they would pursue that.

23           So here is YESCARTA.  And Kite points to things like

24   preclinical work, clinical trials, manufacturing, and other

25   types of things.  But did you hear any evidence that any of

1    those other items were special enough to be patented by Kite

2    or Gilead?  You heard no such evidence.  But with respect to

3    the CAR-T, you certainly heard a lot of evidence about the

4    '190 patent.

5          You have heard, of course, that Gilead valued

6    YESCARTA according to accounting principles at $6.2 billion.

7          Now, here are Kite's 2017 Project Gold estimates.

8    So these were internal documents from Kite.  Kite estimated

9    8.6 billion in gross profits and 7.1 billion in operating

10   profits through patent expiration.

11         So the first years which have taken place are a

12   sales ramp-up so the total revenues are lower.  But they were

13   confident in estimating that the revenues go higher and

14   higher and higher, and these are the totals that they

15   estimated through the patent expiration.  And these are to be

16   compared against the number that is higher than 500 million

17   that is the request by Juno and Sloan Kettering for the

18   upfront payment.

19         Dr. Ryan Sullivan also looked at what the harm would

20   be from Kite for Juno.  Again, he provided you with evidence

21   that in 2017 alone, Kite was projected to have an annual

22   revenue impact of a negative 1.3 billion on Juno.  So for

23   that one year there is this huge $1.3 billion negative impact

24   on Juno.

25         You heard Ed Dulac take the stand.  He works with

1    Celgene.  And he's got a lot of experience in negotiating

2    patent licenses.  Now, Celgene today owns Juno.  But when

3    that wasn't the case, they had not a hypothetical

4    negotiation, a real negotiation.  And it was a real

5    negotiation about CAR-T technology, exactly what we are

6    talking about here.

7              So, of course, Celgene wants to pay as little as

8    possible in the upfront payment and Juno would like to get

9    the biggest possible payment.  When all was said and done,

10   you heard Mr. Dulac say that Celgene had a $1 billion upfront

11   payment for Juno, plus a 14 percent running royalty, and

12   this, including the upfront payment, was for sales only

13   outside the United States.  And you also heard evidence that

14   the most important market in the world is the United States.

15   So it's just the part of the world that's not the United

16   States, Celgene wanting to pay less in the real world agreed

17   to a $1 billion upfront payment.

18             So here are key data points.  6.2 billion, that's

19   how Gilead valued the single product YESCARTA.  7.1 billion,

20   I showed you just a few minutes ago, the net profits through

21   2024, which is the date of patent expiration from Kite.

22   1.3 billion annually, the projected negative impact to Juno.

23   And the 1 billion upfront payment Celgene to Juno only for

24   rights on CAR-T therapies outside the United States.  These

25   are real anchors in the real world with respect to what the

1    hypothetical negotiation outcome would have been.

2          So there is actually agreement between both experts

3    on damages.  They agree on the structure.  There should be an

4    upfront payment and a running royalty.  And they both had the

5    same starting point.  Look at the Sloan Kettering/Juno

6    agreement.  It's the only license to the '190 patent from

7    Sloan Kettering, and it's between collaborators, not

8    competitors, and it's at a very early stage.

9          So Dr. Sullivan commented on both the upfront

10   payment and the running royalty in this case requires

11   adjustments.  And indeed, Dr. Rao on the other side agreed

12   with the fact that there can and should be under certain

13   circumstances adjustments.

14         And that the differences between the agreement on

15   the one hand and the hypothetical negotiation on the other

16   should be reflected in making those adjustments.

17         You heard from Hans Bishop, who was the head of

18   Juno, he testified that he's now working, it's a company

19   called Grail that's trying to look at the early detection of

20   cancer.  And he mentioned a number of ways in which the two

21   companies are head-to-head competitors.  They compete for

22   investment dollars, they compete for the best people, the

23   best scientists, and they compete in terms of intellectual

24   property.

25         So I want to spend a moment to explain the

1      difference between early stage and late stage.  In 2013, when

2      Sloan Kettering or MSK and Juno entered into an agreement, I

3      think everyone would agree that is early stage.  Everyone

4      would say it's quite unclear whether they or anyone else will

5      be able to bring a product to market.  Why is that?  Maybe

6      the clinical trials don't work out, maybe there are

7      roadblocks of various kinds.  They are looking ahead at the

8      earliest possible date to four years down the line and an

9      uncertain amount of years.  So how much is someone going to

10     be willing to pay when the future is really quite uncertain

11     and might go awry for any reasons?  That's why there's

12     agreement that if the license is very early stage, the cost

13     of the license will be dramatically lower than when it's late

14     stage.

15          Here, the hypothetical negotiation is not just late

16     stage, it's right on the date when YESCARTA is being

17     introduced as a product in 2017, when all of the

18     uncertainties have been removed, when the FDA has approved

19     it, when all of the preclinical trials have been completed.

20     Phase I, phase II, phase III, whatever the regulations are,

21     all they have to do is go to physicians, tell them about the

22     product, encourage them to prescribe it for their patients.

23          So early stage, you never know that it's going to

24     work out four or five years down the line.  Late stage in

25     this case at the date of the hypothetical negotiation, both

1       sides know everything has worked out and Kite's ready to go.

2       And of course at the late stage, the cost of the license is

3       going to be much greater for the party in Kite's position.

4               So there were adjustments made to licenses.

5       Adjustment 1 had to do with the fact that there was a license

6       from Juno to Novartis in connection with litigation.  And

7       that Novartis was a company in the business.  So it's not

8       between two companies or two entities that are collaborators.

9       So there's -- that was the first adjustment.

10              And then there was Adjustment Number 2 for the stage

11      between the early years and the late years.

12              It ended up with that 27 percent royalty rate.  And

13      you might think, wow, that sounds high, 27 percent.  But

14      let's look at the profit margin for Kite.  It ranged -- and

15      this is a Kite internal document -- from 66 to an expected

16      83 percent.  So that is if the 27 percent was paid to Juno,

17      the rest, the 73 percent would stay in Kite's pocket.

18              So Kite wouldn't make a profit on the remaining

19      73 percent because they have expenses.  After all those

20      expenses are paid, if you take the projection of 83 percent,

21      they would be doing really well by having that gross profit

22      margin.

23              You might say you would expect a reasonable royalty

24      to come out 50/50.  That is, 50 percent of the 83 percent

25      profit margin perhaps should go to Juno, and the other half

1    should go to Kite.  It's not 50/50, because it would be more

2    than 40 percent, the request is about 27 percent.

3         Here is the way to think about it.  On the left in

4    the red bar, this is a profit margin -- by the way, that is

5    not intentionally blacked out.  So in any event, there's an

6    up to 83 percent profit margin and it's compared with the

7    running royalty rate that is requested by Sloan Kettering and

8    Juno.

9         So again, looking at the 27 percent royalty rate,

10   you heard from Ed Dulac, so he's not testifying as an expert.

11   He's negotiated over 100 licenses, over 70 for cancer

12   therapies.  And he testified that 20 to 30 percent royalty

13   rates are quite common for these late-stage therapies.  So

14   it's not just an expert witness taking the stand, it's a

15   gentleman who has been in this business a lot and has done a

16   lot of negotiations in the real world.  They're not just

17   hypothetical.

18        Here is another real world fact:  Juno has already

19   paid to Sloan Kettering $150 million.  It effectively is an

20   upfront payment and it's not tied to sales.  And that's early

21   stage with a collaborator, not a competitor.

22        So a summary would be the upfront payment we think

23   should be 585 million, the running royalty about 27 percent.

24   If you apply the 27 percent royalty rate to the sales to

25   date, and add it to the 585, it would come to 752 million.

1    Notice it's less than the key facts I pointed to earlier, the

2    6.2 billion, the 7.1 operating income that Kite and Gilead

3    expect to earn, and the billion dollars that Celgene agreed

4    to.

5            Here's another way to look at it:  That $752 million

6    request, which includes the running royalty and the upfront

7    is on the left in green.  The upfront payment Celgene to Juno

8    was over a billion, that's just the upfront payment, because

9    there was also a running royalty.  The harm to Juno was

10   1.3 billion a year, and the value of YESCARTA was

11   6.2 billion, and Project Gold from the internal documentation

12   of Kite was 7.1 billion.  If you compare those numbers to the

13   752 million, you would see that they're reasonable in terms

14   of proportionality, but I would agree that a number that's --

15   100 million may sound high, 150 million may sound high, to a

16   lot of us, a million or 5 million or 10 million may sound

17   high, but this is an area where companies like Celgene are

18   willing to pay a billion dollars upfront to get valuable

19   technology in an upfront payment, and that's the real world.

20           So now I'm going to go to the verdict form.  You're

21   going to be asked a small number of questions.  And I want to

22   show you the form and a way to fill it out if, on your review

23   of all the evidence, you agree with Juno.  But I don't mean

24   to suggest for a moment that somehow you should just fill it

25   out in favor of Sloan Kettering and Juno.  It will be up to

1    you.  But because of the way the form is worded and because

2    lawyers design the law with negatives and double negatives, I

3    want to make sure that you understand if you check a box a

4    certain way, what does it mean.

5         So one of the questions, it won't be the first

6    question, you can see it's Question 4, "Have plaintiffs

7    proven by a preponderance of the evidence that Kite's

8    infringement of the corrected claims of the '190 patent was

9    willful?"  Focus first on the preponderance of the evidence.

10   That's the evidence standard where you have the two sides of

11   lady justice balancing, and if they're just slightly in favor

12   of the plaintiffs after your evaluation of the evidence, we

13   hope that you will conclude to check that box "yes," and it

14   would be in favor of Sloan Kettering and Juno.

15        The actual first question on the form has to do with

16   the certificate of correction.  "Has Kite proven by clear and

17   convincing evidence that the certificate of correction is

18   invalid?"  We think the evidence supports writing an X in the

19   "no" box, but that will be up to you.  That's their first

20   argument about invalidity.

21        Their next argument is Question 2 about enablement.

22   Again, has Kite proven by that higher burden of proof, clear

23   and convincing evidence, that the following claims of the

24   '190 patent are invalid?  And again, we hope the form, if you

25   look at it carefully, will make it clear that if you think

1    the evidence is in favor of Sloan Kettering and Juno, then

2    writing Xs in the "no" box would make sense, but the

3    decision, of course, is yours.

4          And the third argument by the other side, another

5    ground of invalidity with that higher burden of proof by

6    clear and convincing evidence is the written description

7    defense.  And again, if you agreed that the evidence favored

8    Sloan Kettering and Juno, we hope that you will mark it "X."

9    If you find the evidence equal, if you find two experts

10   equal, then the burden of proof by a preponderance or clear

11   and convincing has not been met by Kite.  It has to be clear

12   and convincing.  So the scales are tipped in a way that to

13   you is clear and convincing, not just by a peppercorn or a

14   little bit, it must be clear and convincing.

15         We hope that when you have been evaluating the

16   competing experts and the fact witnesses that came to trial,

17   that you didn't find them to be equal at all, that the

18   witnesses, witness after witnesses from Sloan Kettering and

19   Juno were telling you the truth no matter what the subject

20   was, and that the expert opinions were giving you their best

21   expert view on the evidence.  And if you compare it against

22   the Kite witnesses, we believe that the burden of proof by

23   clear and convincing should not be met, cannot be met, has

24   not been met by the Defendant Kite.

25         Then there will be this item on the verdict form.

1    Again, it will be up to you to decide the amount.  I put the

2    numbers here, the 585 million, just as a reminder if you want

3    to make a note about it, as to what Sloan Kettering and Juno

4    are requesting.  And for the running royalty percentage, we

5    are requesting 27.6 percent.

6         Now, I want to mention a few other things.  This

7    case is in part, and in large part, a battle of credibility.

8    Who did you believe?  Did you believe Dr. Belldegrun or did

9    you believe Dr. Sadelain and Dr. Dash?  When Dr. Belldegrun

10   testified in a way that's directly contrary to what

11   Dr. Sadelain said and what Dr. Dash told you.

12        So, too, as an example when you are comparing

13   experts, Dr. Junghans testified on behalf of Kite.  You may

14   remember he said early on he had run that trial with a CAR

15   that had the three deaths.  I'm sure you recall what his

16   level of compensation was.  Was he equally credible?  Was he

17   more credible by clear and convincing evidence as opposed to,

18   and I'll mention their names, Dr. Quackenbush and Dr. Brocker

19   who are the experts on behalf of Sloan Kettering and Juno?

20        Ladies and gentlemen, this morning I started out by

21   saying thank you.  And I can tell you've been very attentive

22   throughout the trial and during this period of closing

23   argument.

24        So I thank you again.

25        THE COURT:  Thank you, Mr. Chu.  And we turn now to

1    Mr. Dane.

2            MR. DANE:  Thank you, Your Honor.  Do the jurors

3    have the notebooks?

4            THE COURT:  Do you have notebooks?

5            A JUROR:  No.

6            THE COURT:  Mr. Cruz is not here.

7            MR. DANE:  Is it possible to -- for them to get the

8    notebooks, Your Honor?

9            THE COURT:  I'm not sure where they're at.

10   Mr. Cruz?

11           THE CLERK:  Yes.

12           THE COURT:  We need the notebooks.  Thank you.

13           MR. DANE:  I can go ahead and start, Your Honor.

14           THE COURT:  Please.

15           MR. DANE:  Good afternoon, ladies and gentlemen.

16           I guess that's about as high as it goes.  First of

17   all, I want to thank you very much for your patience and your

18   attention throughout this trial.  I have been sitting over

19   there, so I have a good look at all of you and I've seen that

20   you have paid very, very close attention, and that's

21   extremely valuable because this whole system depends upon

22   your doing that.

23           This is a very strange process, as I'm sure you

24   appreciate for those of you who have not been on a jury

25   before.  It's not a normal conversation.  People who try to

1    explain things get interrupted quite a bit.  They have words

2    put in their mouth and it may seem a little bit unfair.  And

3    I agree with Mr. Chu about a lot of the issues in this case

4    depending on credibility.  By my count, it seems like almost

5    every single one of Kite's witnesses is supposed to have been

6    bought and paid for or is a liar or is incompetent.

7         You saw Dr. Bot, who was one of those witnesses who

8    was impugned by Mr. Chu.  You saw Dr. Schuetz, who is

9    somebody who has no stake in this game.  He's a third party

10   who came out here because he thought he had valuable

11   information.  You saw how he was treated on

12   cross-examination.  And he's now been attacked as though he's

13   in our pocket.

14        This is a witness who, as you heard, they asked to

15   sign a declaration that had false statements of fact.  So you

16   can make the determination about Mr. Schuetz, Dr. Schuetz

17   about whether you really think that he's somebody who was

18   paid off to come here to lie, or whether he was bullied by

19   attorneys.  That's a style of examination.  That's a style of

20   lawyering that some lawyers believe in.

21        And you might have at certain occasions in the case

22   when you looked at the witnesses on the stand probably

23   thought, wow, I wish I weren't up there.  Um, because in this

24   situation, the lawyer has an inordinate amount of control.

25   I'm the person standing up here, Mr. Chu is the person

1    standing up here.  We have control of the questioning.  You

2    can interrupt a witness.  You can get away with a lot of

3    stuff that you couldn't get away with in real life.  So when

4    you hear certain witnesses being accused of coming here and

5    saying things that aren't true, when you hear them being

6    asked exact questions from some deposition that they might

7    have given eight months ago, and then having someone jump

8    down their throat if they get one word wrong, think about

9    whether that's the credibility of the witness and whether you

10   think the witness is really not being honest or whether maybe

11   there's something else going on.

12         I'm going to try to spend most of my time talking

13   about the evidence and the facts because that's what really

14   matters in this case.  And I want to step back for a second

15   because there has been a lot of technical stuff in this case,

16   a lot of financial information.  And I want to make sure we

17   don't lose sight of one of the important things about this

18   case.  The case is about YESCARTA.

19         YESCARTA came on the market in October 2017 and it

20   has been saving people's lives who would be dead.  These are

21   terminal cancer patients who had no other option.  And if

22   there were no YESCARTA, there would be hundreds, thousands of

23   people who would no longer be alive because Juno wouldn't be

24   treating them.  Juno does not have a product.  And YESCARTA

25   is a fabulous therapy.

1              And I said at the beginning of the trial that when

2      you get behind all the dramatics, and charades, this is a

3      case about a greedy and disgruntled competitor that has not

4      been able to succeed in putting out a CAR-T therapy and wants

5      to take its pound of flesh out of Kite because Kite succeeded

6      where it failed.  And the evidence has shown that that's

7      true.

8              Now, we heard at the beginning of the case that it's

9      Dr. Sadelain's construct that is sort of the magic bullet,

10     the secret sauce that makes these CAR-T therapies work.  But

11     we know that that is not true after hearing all the evidence

12     come in.

13             We heard a lot about these three-part CARs.  You've

14     seen these types of images several times in the case.  In the

15     claims of the patent, there are three parts of the CAR:  The

16     primary signaling domain, the costimulatory domain, and the

17     scFv or the binding element.  And we know that Dr. Sadelain

18     did not invent that structure of a CAR.  He admitted that

19     himself.

20             I asked him, do you understand that there was

21     someone else who had come up with this sort of three-part

22     CAR, Finney, another scientist?  And he said yes, he knew

23     that.

24             And there is a patent -- there is an article that

25     Finney published which contains this three-part CAR.  And a

1       little bit of the terminology is a little bit different, but

2       you will see this in your admitted exhibits.  This is DX20.

3       And we see over on the right-hand side that zeta region, that

4       is the primary signaling region that we see in the '190

5       patent.  CD28, we see that that is the CD28 that is used as

6       part of the costim region in the '190 patent.  And then there

7       is an scFv.

8              So the three basic components.  It's not the exact

9       same CD28 sequence, and I'll come back to that, but the rest

10      of it is there.

11             And another of the pieces of evidence in the case is

12      Margo Roberts.  This is DX2061, and I'll be giving you these

13      exhibits so you can write them down if you want to go look at

14      these when you're back deliberating.  And Margo Roberts,

15      who -- and I apologize, because I mentioned her in my

16      opening, but because of time constraints she wasn't able to

17      come out and testify in the case.

18             Margo Roberts worked for Kite.  She was the chief

19      scientific officer.  She had a patent that predated Dr.

20      Sadelain's patents, and it also contained this structure of a

21      zeta -- you can see the zeta on the right, that is that

22      primary signaling region, CD28 as the costim region, and then

23      also an scFv.

24             So the thing that Dr. Sadelain did, the thing he did

25      that was different, because other people had put together

these three-part CARs, was that he came up with a new CAR-T
that used a very specific region of the CD28 molecule that he
used for his second part, for the costim element of his
claims.  And you see that this is the -- you've heard about
it many times already -- Sequence ID NO:6.

And this is the original Sequence ID NO:6, which
begins with nucleotide 336.  And if you -- if you want to for
purposes of following along, you can look in your notebook
where you have the patents, and that C there is a nucleotide
336, and the A that goes right after the CAAA is nucleotide
340.  And we've heard those numbers a lot, 336 and 340.  The
336 through 339 is what got deleted in the certificate of
correction.

But we know that this particular sequence is not the
secret sauce for a CAR-T therapy because there are CAR-T
therapies that don't use it.  JCAR17, which is Juno's current
therapy for which they are trying to get FDA approval, uses a
different costim region called 4-1BB.  KYMRIAH, which is
Novartis' therapy that is out on the market, uses 4-1BB.

And not only do we know that, but we know from
Juno's internal documents, a document dated June of 2017,
that Juno planned, in fact, to use the differences in its
costimulatory domain as a differentiator between other
products.  So the fact that they had 4-1BB was something that
differentiated them from YESCARTA, which is this KTEC19, and

1    they planned to use that as something in their favor.

2         We also know it because Dr. Gilbert, who has been

3    here throughout the trial, who is the chief medical officer

4    of Juno, he, quite frankly, said that the costim region,

5    whether it's CD28 or 4-1BB, whatever it is, that is not

6    something that he or many others at Kite consider to be a

7    major property that is responsible for the clinical outcomes

8    for these CAR-T therapies.

9         So here we have the one thing that Dr. Sadelain did

10   that was different than what other people had done was

11   specifically the costimulatory region, that middle part, and

12   you have Juno itself not developing its current blood cancer

13   therapy using that costim region, using another one, and

14   their chief medical officer saying, I don't think that really

15   makes much of a difference in terms of the medical outcomes.

16        Now, you've heard Juno say, well, if this is so

17   important, why is -- if this isn't so important, this CD28

18   region, why is Kite still using it?  Why is Kite using it in

19   all these different trials?

20        And Mr. Chu said well, the only one that involves

21   YESCARTA is the first one.  Well, that is technically

22   correct, because YESCARTA is the name of the branded product

23   that is being sold, that is approved.  But these are all what

24   are first generation therapies that have been developed by

25   Kite.

 1            And this is a highly regulated industry.  And when

 2     you make changes, you have to go to the FDA, you have to get

 3     them approved, and so everybody knows the expression "if it

 4     ain't broke, don't fix it."

 5            Well, the reason for these therapies that Kite is

 6     still using the original construct it used is because Kite

 7     believes that it is entirely legal and appropriate for it to

 8     use that construct rather than throw it out and go back and

 9     bring in a new one.

10            But you, in fact, heard from Dr. Bot that Dr. Bot is

11     about to commence clinical trials with regard to a second

12     generation CAR.  And Mr. Chu alluded to this when he put up a

13     slide that referred to HU19, described it as a project that

14     Kite had abandoned.  The HU stands for human.  So this is

15     human scFv.  The 19 is the CD19 target.

16            And that was when Dr. Bot testified about the second

17     generation CAR-T, he was talking about a dual targeting CAR-T

18     that targets both CD19 and CD20.  And the reason it's second

19     generation is because rather than only attacking one antigen

20     on the cancer cell, as he explained, it targets two.

21            And the reason for that is that cancer is a very

22     tricky disease, and sometimes the cancer cells can suppress

23     one antigen such as CD19.  And if that happens, as he

24     explained, the patient might relapse.  So if you are

25     targeting two of them instead of just one, it gives you a

1    better chance that when you give the therapy to a patient,

2    they won't suffer a relapse.

3          And as Dr. Bot testified, this -- the idea for this

4    type of a CAR is the same idea other than the second target.

5    It's the same idea as this HU19.  And Kite considered whether

6    it should switch over to HU19 but decided not to because

7    YESCARTA was so far in development that it didn't think it

8    needed to and it decided instead to develop this for its

9    second generation therapies.  So Kite has been developing

10   this.

11         And just so there is no confusion about this, this

12   is not a therapy, the second generation dual targeting

13   therapy, that uses the CD28 region, the amino acids, either

14   before the certificate of correction in the '190 patent or

15   after the certificate of correction in the '190 patent.  As

16   Dr. Bot testified, it neither uses amino acids 113 to 220 of

17   CD28 nor amino acids 114 to 220 of CD28.  So it's not

18   something that under any interpretation is covered by the

19   patent.

20         Now, we do know while the costim molecule is not a

21   particular differentiator among these therapies, we know what

22   is.  And that is manufacturing.  You've heard every witness

23   in this case talk about manufacturing of CAR-T therapies tell

24   you that this is not a simple pill.  Simple pills you can

25   manufacture them in bulk.  They are easy -- relatively easy

1    to manufacture for the most part.  This is a living therapy.

2    It's taking someone's T-cells, taking them out of their

3    blood, reengineering them, and then you have to grow them and

4    then reinfuse them, reinject them into the patient's body.

5         So that requires a lot of different procedures.  You

6    have to grow the cells.  You have to insert a virus into the

7    T-cells so that it can express the T-cell receptor.  You have

8    to have this lymphodepletion procedure, which is something

9    that you do to prepare the patient so that when the T-cells

10   are reinfused into their body, they will grow sufficiently

11   and so they won't compete with the patient's natural T-cells.

12   There is all this stuff going on.

13        Getting -- and Kite has figured out how to do all of

14   this at an extremely high rate of success and very, very

15   quickly.  Novartis figured out how to do it well enough to

16   get approval from the FDA.  But as you also heard in this

17   case, Novartis has had manufacturing problems.  Juno has not

18   figured out how to do this.  And that is why they don't yet

19   have any FDA approval for any CAR-T therapy.

20        And this just goes to show that the idea that

21   Dr. Sadelain's construct is the secret sauce, it's what makes

22   these CAR-T therapies work, just is not borne out by the

23   facts.  The manufacturing is hugely important for each of

24   these CAR-T therapies.

25        Now, we also know that this has to be the case

1    because of what happened when Juno tried to make a CAR-T

2    therapy using Dr. Sadelain's construct.  And that was the

3    ROCKET study where they had five deaths out of 38 patients.

4            And in Mr. Chu talking about how responsible Juno is

5    and suggesting that they are motivated by safety concerns,

6    that is really why they are so late coming to market and

7    coming to patients, I think it's important to think about

8    what Dr. Gilbert testified to when I asked him about this

9    study.

10           And there were two initial -- three initial deaths

11   in that study.  And the study was suspended, and it was put

12   on clinical hold by the FDA.  And Dr. Gilbert testified that

13   we determined there are likely a lot of factors that could be

14   contributing to this, we didn't have enough information to

15   conclusively figure out what it was, but we went ahead and we

16   resumed the studies.

17           He said there was one thing that we thought might

18   have something to do with it.  Could have had something to do

19   with the chemotherapy, and that was one of the easier changes

20   that we could make.  They made the easier change when they

21   didn't have enough information to conclusively figure out

22   what was causing these patients to suffer fatalities.  And

23   they resumed the study, and two more patients died.  And then

24   they got shut down for good.  So when they tell you that

25   their main focus is safety, think about that.

1        And look at this chronology where they had these

2    three deaths, the third was on June 30th, 2016.  They were

3    put on hold right after the third death.  They got the

4    clinical hold lifted just a couple of weeks later, July 12th.

5    And then a few months later they had more deaths.  And they

6    were then told their study was put on hold, and they were

7    told by this review board that is a review board to protect

8    patient safety that they would not be permitted to resume

9    clinical studies unless they changed what they were doing.

10        Now, despite all this, have these deaths, have a

11    clinical hold, say, hey, we don't really know what is going

12    on, but we think this change might work and then there were

13    more deaths, they get shut down again, well, Juno -- a lot of

14    people at Juno still wanted to keep going with this ROCKET

15    trial.

16        Juno remains today -- you saw some data about side

17    effects comparing JCAR17 to YESCARTA.  Well, you've heard

18    testimony about these side effects, cytokine release syndrome

19    and neurotoxicity.  They are not anything to sneeze about.

20    They are not anything anybody would want to have.

21        But you also heard, including by Dr. Sadelain, that

22    they are readily treatable.  The patients are given steroids

23    or antibodies, and in a few days these flu-like symptoms or

24    the confusion in the vast majority of cases resolve.

25        So absolutely Kite and everyone would like to try to

1    get the side effects down.  Kite is working on that as Dr.

2    Bot testified.  But these are terminal patients who only have

3    a few months to live, and having that side effect profile is

4    tolerable.  Kite has never had a study put on hold.  KYMRIAH

5    has not been put on hold.  The only company that has had its

6    clinical studies put on hold for CAR-T therapy is Juno.

7         So Juno realizes there is a major disconnect between

8    their real world experience with JCAR15 and the narrative

9    that they want to spin about how essential and critical

10   Dr. Sadelain's construct, which is the one they used in their

11   failed study, is to a successful CAR-T therapy.

12        So what they have argued here is that, well, we

13   treated patients in leukemia, and that is a tougher disease

14   to treat than lymphoma, which is what our YESCARTA is

15   approved for.  And if you remember what they said about that

16   in their testimony, they said, well, the -- there is no

17   approved CAR-T therapy for adult leukemia.

18        And I asked Dr. Sadelain, I said, well, isn't

19   KYMRIAH approved for adult leukemia?  And he said no, no,

20   it's only approved for pediatric.  And then Dr. Gilbert got

21   on the stand, and Dr. Gilbert said, yeah, yeah, it's

22   pediatric, there is this broad definition of pediatric.

23        But what Dr. Gilbert had said to explain the deaths

24   in the ROCKET trial was he said that the patients that were

25   particularly at risk of this cerebral edema, having the brain

1    swelling that causes fatalities, was patients in their early

2    20s.  That is what his testimony was.

3           And I showed him the KYMRIAH label, and it's not

4    approval just for pediatric patients.  Pediatric patients,

5    there is no different word for it in the FDA.  It's what you

6    would think it is.  Once you are over 18, you are not

7    pediatric.

8           And here it indicates in the label, it is approved

9    for pediatric.  But what neither Dr. Sadelain nor Dr. Gilbert

10   told you is that it's also approved for young adult.  It's

11   approved for patients who are in exactly the age range that

12   Dr. Gilbert said was the one that was susceptible to this

13   cerebral edema.

14           So they were trying to use that as the reason why

15   they had these deaths and why they failed when Novartis

16   didn't, and Novartis has been approved for that exact

17   population.

18           And you heard Dr. Bot testify that Kite itself has

19   been conducting clinical studies on leukemia and has

20   experienced very, very low incidences of fatalities.  There

21   has -- unfortunately in those tests, there has been one death

22   of cerebral edema in 50 patients, not five out of 38.  And

23   those studies are ongoing, and none of them have been put on

24   hold.

25           So we know it's not the type of the blood cancer or

1    the type of the patient.  It's Juno.  And we know that one of

2    the reasons that it's Juno is that Juno is having problems

3    with its manufacturing process.  And that is what they

4    concluded when they had to provide a report to the FDA.

5    After they suffered the deaths in the ROCKET trial, they

6    reported to the FDA that manufacturing was associated with

7    the increased risk of cerebral edema.

8         And you heard the videotape deposition testimony of

9    Dr. Brentjens who is a colleague of Dr. Sadelain and one of

10   the inventors of the '190 patent.  And he talked about the

11   disappointment and what he described as a by no means

12   pleasant discussion that the Sloan Kettering people had with

13   Juno when these fatalities happened in the ROCKET trial and

14   when the ROCKET trial was shut down.  And as he said, "We

15   felt" -- and he's talking here about Sloan Kettering -- "We

16   felt that there were differences in production that led to

17   differences in outcomes and differences in toxicities that

18   were observed."

19        Just because I do want to give you -- as I said, I

20   think this case is about the evidence, and it should be

21   decided on the evidence.  And so let me give you a couple of

22   exhibit numbers.  The label for the KYMRIAH product is PX274,

23   if you wanted to look at that.  The root cause investigation

24   report is PX1059 if you want to take a look at that.  And

25   page 102 is the one that I referred to as well as page 64.

1    64 has the chronology.

2         And you also heard that, well, it is true that

3    Dr. Sadelain and his lab is still working on clinical studies

4    for his construct in various areas.  That work is being led

5    by Sloan Kettering.  Juno is not the lead sponsor of any

6    clinical studies currently that involve Dr. Sadelain's

7    construct in the way that they were with the ROCKET trial.

8    And Juno has no current plans to file any applications with

9    the FDA for any constructs or CAR-T therapies that are based

10   on Dr. Sadelain's patent.

11        And this was something that Dr. Gilbert testified

12   about.  He said that the trials that are still involving

13   Dr. Sadelain's construct are very early, they're phase I,

14   phase II trials and there has been no determination because

15   it's a long way to go to determine whether or not there might

16   be an actual application for approval for a therapy for any

17   of those trials.

18        So let me turn now to Juno's current therapy that

19   it's seeking approval for.  This is the one that does not use

20   Dr. Sadelain's patents or Dr. Sadelain's construct.  This is

21   JCAR17.  And Juno has been having difficulties with getting

22   that through the regulatory process as well.

23        Back in May of 2017, Juno was planning on filing

24   this application by the third or fourth quarter of last year.

25   So over a year ago.  And this is only a year and a half ago

1    that they were planning on filing it within the next -- I'm

2    sorry, this is two and a half years ago -- they were thinking

3    of getting it filed in approximately somewhere between 14 to

4    18 months, something like that.

5           But that hasn't happened.  And we see that -- that

6    at the time they were planning on filing it in the third or

7    fourth quarter of 2018, because of the time it takes for the

8    FDA to review BLAs, Juno was anticipating that they might get

9    approval of that application sometime in mid-2019, sometime

10   mid this year in that previous document that I referred to,

11   that was DX573, at page 19.

12          But we know this didn't happen.  JCAR17 was not

13   approved in mid-2019.  Juno has not completed submitting its

14   application for JCAR17.  And I asked Dr. Gilbert about that,

15   too.  The reason -- Dr. Gilbert testified that Juno had begun

16   making what is called a rolling submission of its

17   application, where you submit certain parts of the

18   application at different times.

19          And he testified that they had started doing that at

20   the end of September of this year, and at the end of October

21   of this year, but one -- one module that they had not

22   submitted was, guess what?  The one on manufacturing.  The

23   one that they have problems with.

24          And I asked him about Lonza.  Lonza is a supplier

25   that makes this viral vector that is used for the CAR-T

1    therapies.  And he acknowledged that that facility, it needs

2    to be inspected by the FDA.  The FDA has to make sure that

3    all the procedures are okay, and that it's a safe facility,

4    and all of that.

5             And that that won't happen until at earliest

6    February of 2020.  And who knows when that inspection will

7    actually take place or when or if Juno will actually get

8    approval for JCAR17.

9             So we're now more than two years after YESCARTA came

10   out.  Two years after there has been a breakthrough therapy.

11   Again, remember you hear so much in this case about technical

12   issues and money, and people being yelled at.  It's been two

13   years now that these patients who had no hope, they had gone

14   through chemo, radiation, stem cell transplants, high-grade

15   chemo.  Patients who had a prognosis of four months or so to

16   live.  YESCARTA has been available to them.  And we saw the

17   statistics of 50 percent, over 50 percent complete remission,

18   all cancer gone.  That's incredible.

19            Juno doesn't have a product, and Juno doesn't like

20   the fact that YESCARTA is out there saving lives.  Somewhere

21   along the way, Juno lost their way by going after Kite and

22   YESCARTA for over $700 million for saving thousands of lives

23   of patients.  So think about that when you hear them talk

24   about this case and what this case is really about.

25            And even with the YESCARTA therapy that has been out

1    on the market, there isn't the capacity to treat all these

2    patients.  The patients who are relapsed and refractory, who

3    have no other options, unfortunately because of the

4    manufacturing capacities that exist in the CAR-T therapy

5    market right now, they can't all receive the therapy.  So

6    it's great that YESCARTA is out there, but even YESCARTA

7    can't treat all these patients.  And the available CAR-T

8    therapies can't treat all these patients.

9         And Dr. Komanduri, you heard him testify about this,

10   that there were 8,000 patients who would be eligible for this

11   type of a therapy, but Kite currently can only treat about

12   1800 or so over two years.

13        And remember that the -- this hypothetical

14   negotiation that you've heard so much about, this is supposed

15   to represent what the licensee would be willing to pay and

16   what the licensor would expect and demand for a license.  So

17   Juno is taking the position here in this case that unless

18   they got from Kite over $700 million, too bad for these

19   patients, they wouldn't be here.  Because Juno had no

20   therapy, we are not taking patients away from a JCAR17

21   therapy that's on the market.  They are not on the market.

22        As I said, I think that's a pretty callous position

23   for a healthcare company to take.  The reality of this is

24   that Juno is a disgruntled competitor that is using this '190

25   patent that they could not make work for their own therapy as

1   a weapon against a competitor.  To punish Kite for succeeding

2   where Juno failed.  And it's an attack under the guise of

3   patent rights.  So let me turn now to that issue.

4          Now, as I mentioned in the opening, patent rights

5   are important rights.  The patent system is a very important

6   system.  But there are rules.  If you want exclusivity for

7   what you're doing for a period of time, you have to obey the

8   rules.

9          And one of the rules is that you have to clearly

10  define the meets and the bounds of what you are claiming as

11  your intellectual property, so that the public knows if I'm

12  over here to the right side of the fence, that's yours, but

13  if I'm over here on the left side, outside the fence, I'm

14  okay.  That's what the system is based on.

15         So at the beginning of the case, I mentioned that in

16  some ways the parts of this patent reminded me of the story

17  of *Goldilocks and the Three Bears*, because there were three

18  parts.  There's a primary signaling region, the costimulatory

19  signaling region, and the binding element or the scFv.  And

20  the boring one, the primary signaling region, that fits just

21  right, because they give you the amino acid sequence and

22  that's fine.  And it was nothing new about that.

23         Costimulatory region, though, that's the one that

24  was too narrow to cover YESCARTA.  And the binding element,

25  the scFv, that's too broad to be a valid patent.  So I want

1       to go back to talking about those defenses again.

2              Starting again with the certificate of correction

3       issue.  And, first of all, I want to correct something that

4       Mr. Chu said.  He said that if you agree with us that the

5       certificate of correction is invalid, that the patent is

6       invalid, that's not correct.  If the certificate of

7       correction is invalid, what that means is that Sloan

8       Kettering then is held to what the patent said when it

9       issued.  And it's held to the scope of the patent that

10      existed in November 2008 and through all of 2009 and 2010 and

11      2011 and 2012, up through 2013 when they filed this

12      certificate of correction.

13             So they still have a patent.  It's just they can't

14      broaden the patent the way that they did four and a half

15      years after it issued.

16             Now, when the patent issued, this was how this

17      Sequence ID NO:6 read.  And again, highlighted these first

18      four nucleotides.  And I both sympathize with you and

19      apologize because you hear these numbers all the time and it

20      can get very confusing because we've got the nucleotide

21      numbers, and then we've got the amino acid numbers, and

22      they're different.  But that's I guess what happens when you

23      have to deal with nucleotide sequences.

24             So the first four here -- and just to remind

25      everybody, these are the four that in the certificate of

1    correction were deleted.  So these are nucleotides 336 to

2    339.  And those second, third, and fourth nucleotides, the

3    three As, those are the ones that encode the amino acid

4    lysine.  You've heard a lot about that.  And lysine in the

5    CD28 molecule is amino acid 113.  The next three nucleotides

6    there, ATT, those encode isoleucine, and that's amino acid

7    114.

8            And Mr. Chu said something that also wasn't correct.

9    He said something about how we were trying to suggest that

10   Kite's product used a different sequence in the original

11   patent.  We did use a different sequence than was in the

12   original patent.  There is absolutely no question about that.

13           This is the Court's claim construction.  And you

14   have this in your jury instructions.  The Court looked at

15   this sequence, and I won't put up the language of the claim,

16   but if you look at Claim 1 of the patent, the phrase at the

17   end of it is, "The amino acid sequence encoded by Sequence ID

18   NO:6."  So this is Sequence ID NO:6, and you heard this

19   testimony that these nucleotides, they encode for amino

20   acids.  So you're looking at this and trying to figure out,

21   okay, what's the amino acid sequence this encodes for.  And

22   the Court has told us that in the original patent with this

23   Sequence ID NO:6, it encoded for amino acids 113 to 220,

24   starting with lysine.  So those three As in positions 337

25   through 339, those encode for lysine.  YESCARTA does not have

1    that lysine.  No question about that.  I want it to be very

2    clear, because they have tried to make that very confusing.

3    I want to make it absolutely clear, we do not have the

4    lysine, which means we did not infringe the original patent.

5            And if the certificate of correction is invalid, we

6    do not infringe the patent today.  That's why this issue is

7    so important, because they specified, they specified what the

8    sequence is.  And it's got to begin with something.  And they

9    specified that the amino acid it began with was lysine.  We

10   don't use the lysine.  So if it has to begin with lysine, we

11   don't infringe.

12           And I want to put up a slide that Mr. Chu also

13   showed you, but he very selectively highlighted this slide to

14   suggest that we have agreed that we infringe, and that's just

15   absolutely not true.  So I want to show you what this

16   stipulation actually says.  It says, "If the certificate of

17   correction is not found to be invalid, then YESCARTA meets

18   each limitation of the asserted claims."  That is true.  But

19   conversely, if the certificate of correction is found to be

20   invalid, we do not infringe, because that's the difference

21   between what's the first amino acid.  If it's lysine, we

22   don't have that, we don't infringe.  If the certificate of

23   correction is valid, then the first amino acid is this ATT,

24   that's the isoleucine, we have that.  So just want you to be

25   clear, because I know it can be confusing.  Critical issue is

1    what's the first amino acid?

2           And it's also important to keep in mind that when

3    Dr. Rosenberg was first testing his construct in patients in

4    his first publications about the work that he was doing, the

5    construct he was using did not infringe the '190 patent,

6    because he did that testing before 2013.  He was doing

7    testing in patients at the time when the original patent

8    claimed amino acids 114 to 220 -- excuse me -- claimed amino

9    acids 113 to 220, and required each of those amino acids.

10   And he was not using that full range.  So he was not doing

11   anything that fell within the patent.

12          The construct that he provided to Kite when Kite and

13   Dr. Rosenberg entered into their collaboration in 2012 did

14   not fall within the scope of the '190 patent at that time

15   because again Sloan Kettering didn't say there was any

16   problem with the original scope of the claims, and the

17   original scope of the claims, as the Court has told us, was

18   that the amino acid sequence encoded by Sequence ID NO:6

19   started with lysine.  And that construct did not have lysine.

20          And we heard Dr. Bot, and I'll come back to that in

21   a minute, but we heard that Dr. Bot testified that he

22   examined the sequence listing in the '190 patent back around

23   that time in 2012 shortly before Kite entered into the

24   collaboration.  And he determined that it started with

25   lysine.  He understood that as well.

1           So at that time, 2009, 2010, 2011, 2012, axi-cel,

2      the construct that was being developed by NCI and by Kite,

3      fell outside the fence.  It was not covered by the '190

4      patent.

5           But then in the summer of 2013, they moved the

6      fence.  And now all of a sudden because they now said you

7      don't really need that lysine, now axi-cel fell within the

8      scope of the patent.  That is why this issue of should they

9      have been permitted to change the patent in that way is so

10     critical, because by changing the patent, they changed

11     axi-cel from being something that was outside of their

12     intellectual property, after it was already in the process of

13     being developed, into something that fell within the scope of

14     their patent.

15          And they did this through this procedure called a

16     certificate of correction.  And as you are instructed for a

17     certificate of correction to be permitted that broadens the

18     scope of patent claims, it has to contain an error that is of

19     minor character or clerical or typographical error that would

20     be clearly evident to somebody skilled in the art.  And not

21     just that, that is the first part.

22          The second part is not only does it have to have a

23     clearly evident error, but the fix for the error also has to

24     be clearly evident.  That is the requirement.

25          Now, the thing that makes this certificate of

1    correction so problematic, and they try to say it's no big

2    deal, it's just, you know, a file got sent in incorrectly, is

3    that it's an error to the very thing that the patent is all

4    about.

5            The CD3 zeta region, okay, that's -- that's old.

6    Nobody -- nobody needs to know about that.  It had been done

7    before.  It was in other constructs.  The binding element,

8    the scFv, that wasn't new.  It had been -- they didn't really

9    limit it very much.  They just said it could be almost any

10   scFv you want.

11           But Dr. Sadelain, he repeatedly emphasized what

12   makes all of the difference is this portion of the

13   costimulatory receptor, that's a costimulatory region, which

14   we decided to incorporate into our CARs.  And he said a

15   portion of this CD28 molecule, the very exact portion that we

16   decided to incorporate into our CARs is referred to as SEQ ID

17   NO:6.  And he said that cutting it precisely at this amino

18   acid 114, that was the special thing about the patent.

19           So you would sort of think if that is the thing that

20   is the most important thing about your patent, you might

21   notice if you file a patent that cuts it at 113, you might

22   notice that you don't have the beginning amino acid correct.

23           Again here, this is the Sequence ID NO:6, and we see

24   that where Dr. Sadelain said he intended his costimulatory

25   region to be cut was at that 114 amino acid, the ATT, which

1    is nucleotides 340 to 342.  And so I asked him, "The specific

2    amino acid sequence was very important, wasn't it?  Yes."

3         Now, I have a different view than Mr. Chu about the

4    witnesses in this case.  I don't think everybody that comes

5    in and testifies to something that is contrary to the other

6    side is a liar or paid off or a rascal or anything like that.

7    But -- and I would also say we are hearing from a lot of

8    witnesses in this case that have done a hell of a lot of good

9    in the world.  These are people that are trying to treat

10   cancer.  It's more important than anything I have ever done.

11        So I have respect for Dr. Sadelain, I have respect

12   for Dr. Belldegrun, I have respect for Dr. Brentjens, I have

13   respect for Dr. Bot, and I have respect for a lot of the

14   witnesses that testified in this case.

15        But with all respect to Dr. Sadelain, there was a

16   moment in the trial that I think is telling.  When I was

17   asking him about how this error could have gotten into his

18   nucleotide sequence when the exact nucleotide sequence was so

19   critical, it was the most important thing of his invention

20   and it got botched in the original filing?  And if you

21   remember what he said, he said, "I tried hard to figure out

22   how this could have happened, and I still have no clue to

23   this date."

24        Really?  No clue?  Well, I thought that was a very

25   odd answer, because the reason the nucleotide sequence begins

1    with 336 seems from the information we have to be pretty

2    obvious.  That is the same place where the nucleotide

3    sequence begins in the publication that the patent is based

4    on, that publication that you heard that Dr. Sadelain

5    referred Dr. Rosenberg to, the one that in 2007 when

6    Dr. Sadelain didn't even have a patent, didn't tell

7    Dr. Rosenberg that he had a patent or that he was applying

8    for a patent, and he just told Dr. Rosenberg you want to make

9    a CAR, go look at this thing that I wrote in 2002, well, that

10   publication was then used as the basis for something they

11   call a provisional patent application.  It's kind of a

12   placeholder.  You file it and put your stake in the ground,

13   and then you file this other thing called a utility

14   application, which is the one that then gets examined by the

15   patent office.

16          So this is -- this is the article that that

17   provisional application was based on.  It's PDX40.5.  And

18   it's an article by Dr. Sadelain and others.  The first

19   author's name is Marr.  And we see there that it gives this

20   beginning nucleotide of 336.

21          And I showed that to Dr. Sadelain.  And I said,

22   well, this is -- you know, this is the publication that your

23   patent is based on.  You see those numbers?  And so I asked

24   him -- and here what I'm showing you is -- so this is the

25   patent that was filed.  And the original patent that was

1    filed, and this is at PX2.10, and you can look this up in the

2    prosecution history, you will see that when it's describing

3    the portion of the CD28 region, that first nucleotide is 336.

4    And then we see that the article that was the basis for the

5    original filing also starts with 336.  So it seems pretty

6    obvious that is where the 336 came from.

7          And -- but I asked Dr. Sadelain, I said, well, you

8    know, if the evidence reflected those first four nucleotides,

9    CAAA, are, in fact, nucleotides 336 through 339, which we saw

10   they are, isn't it reasonable to conclude that they appear in

11   the originally-filed patent because that is what was in your

12   publication?  And he said I don't think so.

13         But the fact is Dr. Sadelain had been describing his

14   costim region as starting with nucleotide 336 for years by

15   the time he filed the patent application.

16         Now, he testified here in court that no, no, I

17   never -- I never meant to have a costim sequence that began

18   with amino acid 113.  In every case, he said we use the

19   segment from amino acid 114 to 220.  We used it originally.

20   We used it in subsequent CARs.  We have even used it in

21   multiple clinical trials.  That's what he said.

22         But here we have a timeline that we put together,

23   and you heard -- you heard Mr. Farrell go through this in

24   Dr. Quackenbush's cross-examination.  Whenever Dr. Sadelain

25   described his work prior to 2007, he described the nucleotide

1    sequence for his costim sequence as beginning with 336, which

2    is a sequence that will get you lysine as your first amino

3    acid.  So I want just to read these into the record so you

4    can go back in your deliberations if you want and can verify

5    this.

6            But he had a patent application from 1997, which is

7    DX2004, where he describes transmembrane and signaling domain

8    of CD28 that uses CD28 nucleotides 336 to 663.  Similarly, he

9    describes the nucleotide sequence in DX1054, which is a

10   peer-review article published in August 1998.

11           PX40, that is the -- that is the article that formed

12   the basis for the patent, has the same disclosure as we saw.

13   The provisional patent application, PX41, also includes 336

14   as the first nucleotide.

15           And then throughout the patent prosecution, 336, a

16   sequence that will encode for a first amino acid that is

17   lysine appears repeatedly, 2.14, 2.41, 2.56, 2.667, 2.679,

18   and then, of course, it's in the patent when it issued, 1.14.

19   336 is all over the place in Dr. Sadelain's work.

20           And yet he testified he had no idea how it got in

21   the patent when he had published this sequence as beginning

22   with 336 over and over and over again over a period of many,

23   many years.

24           Now, think to yourself, if there was something

25   obviously wrong with a sequence that begins with nucleotide

1    336 and starts out encoding lysine, why would he have

2    repeated that same mistake over and over and over again?  You

3    wouldn't keep putting that sequence in if it was obviously

4    wrong, somebody looked at it and thought that can't be right.

5    You wouldn't carry it over from publication to publication

6    and patent application to patent application.

7         And someone -- oh, and the other thing I should

8    mention is that every single one of these instances of this

9    336 is either part of the prosecution history or is an

10   article that is referenced or incorporated by reference in

11   the patent itself.  So these would all be available to

12   someone of skill in the art when we ultimately get to the

13   point of trying to figure out about what happened with the

14   issued patent, why does it still say 336, they could go back

15   and look and see, oh, Dr. Sadelain liked 336.  He said it a

16   lot.

17        But he still said he had no idea, no idea how that

18   got in the patent.

19        Now, that is not -- that is not the only significant

20   evidence that the supposed error in the patent having a

21   sequence that began with 336 and encoded an amino acid

22   sequence that started with lysine would not have been obvious

23   or clearly apparent to somebody of skill in the art.  There

24   is a lot more.

25        Now, in most cases, when you are trying to figure

1    out issues in patent cases, you typically have experts on

2    each side.  And the expert for one side gives an opinion that

3    is favorable to them, and the expert on the other side gives

4    an opinion that is favorable to them, and it can be very,

5    very challenging to try to figure out who is right.  They are

6    usually both very highly credentialed, and it's difficult to

7    make that determination.

8         And we've had two experts give their opinions on

9    whether this certificate of correction is valid and whether

10   this error, how that was claimed by Sloan Kettering, would

11   have been clearly apparent to somebody of skill in the art:

12   Dr. Quackenbush who says absolutely it would be clearly

13   evident, and Dr. Junghans says it would not be.

14        But this is one of those rare cases where that is

15   not all you have.  We have real world evidence of what people

16   thought before the certificate of correction was filed.  And

17   that's an important point.  I want to pause on that for a

18   second, because it's a little bit subtle, and it's kind of

19   hard sometimes for me to keep in my head.

20        When you determine whether this error was clearly

21   apparent to somebody of skill in the art, what you don't do,

22   you don't read the certificate of correction and say, okay,

23   the patentee is telling the patent office, I made a mistake.

24   Because the person of skill in the art doesn't have the

25   certificate of correction.  The threshold to get the

1    certificate of correction is the error must be obvious and

2    apparent.

3         So you can't sort of bootstrap getting the

4    certificate of correction by saying, okay, now I've explained

5    the error, so in hindsight the error is obvious.  That is

6    really important.  It's what would somebody who just picks up

7    the patent, what would they think?  Would they see the patent

8    and say, oh, there is this obvious error, and I know how to

9    fix it?

10        Because in that -- if you think about it, it makes

11   sense.  The patent is supposed to stand on its own and

12   provide to the public notice of the metes and bounds of the

13   invention.  And members of the public rely on what an issued

14   patent says and what it means and what it defines as being on

15   one side of the fence and what it defines as being on the

16   other side of the fence.

17        And just as an example, if you had an invention for

18   a chemical formulation, drug formulation, and it said that

19   you -- the formulation had to contain 5 to 10 percent alcohol

20   and there was nothing in the patent or the prosecution of the

21   patent that would make you think that the 5 to 10 percent

22   were wrong, you couldn't go in and file a certificate of

23   correction and say, you know what, we just kind of screwed

24   that up and it should be -- it should be 5 to 50 percent.  We

25   want to broaden off our claims.  Why should you do that?  You

1    can't do that.  You are broadening claims, and unless there

2    was some error that somebody would have understood you made,

3    you won't be allowed to do that.

4           As I said, here we have three examples, three

5    different examples of real world evidence that actual persons

6    of skill in the art, not retained experts like

7    Dr. Quackenbush, or Dr. Junghans, although I'm going to come

8    back to that because one of my examples is actually

9    Dr. Junghans, but not in his capacity as an expert in this

10   case.  Where they looked at the patent, and they understood

11   that it referred to a nucleotide sequence that began with

12   336, and then encoded for lysine, or in the case of

13   Dr. Junghans, as I'll explain, they didn't look at the

14   patent, but they looked at that publication that was the

15   basis for the patent.  So the first example is Dr. Junghans.

16          And I just want to touch on what -- something

17   Mr. Chu said.  He -- um, he disparaged Dr. Junghans as

18   suggesting that he had been dishonest or for not meeting a

19   reporting requirement to the NIH.  As you may have seen, if

20   you saw Dr. Junghans on the stand, he was not really

21   permitted to even explain that situation, but he did get to

22   testify that he reported the deaths, the unfortunate deaths

23   in the trial that he did immediately to the FDA.  So the

24   issue here was there were dual reporting requirements.  But

25   he -- as he testified, he immediately reported it to the FDA,

1          reported it to the government.

2                  And Dr. Junghans has -- he has been one of our

3          retained experts in this case.  But the evidence that I'm

4          about to speak about has nothing to do with his being -- that

5          the work that he's done in this litigation, it's from way

6          back in 2010, 2011.  And you heard him talk about this.  He

7          said that he was interested in making a CAR, and so he looked

8          at that article, the 2002 article that became the basis for

9          the '190 patent.  And when he looked at the article, he took

10         from that these primary signaling region and the costim

11         region, which the plaintiffs talk about as the backbone, he

12         looked at that and then he made his own CAR using that.

13                 And when he did that, guess what nucleotide he

14         started with?  336.  Because the article said 336.  He didn't

15         look at the primers that you've heard plaintiffs talk about.

16         He took the exact nucleotide sequence and he used it to make

17         his costim region.  And this is his patent, which is -- which

18         is in evidence as DX2149, and this is at pages --

19         page-0023-24.  So in this patent, he provided the amino acid

20         sequence of the CAR that he made.  And I'm going to come back

21         and talk about these sequence listings for amino acids in a

22         little bit.  But if you look there, using the nucleotides

23         from the article that began with 336, what's the first amino

24         acid he got?  Lysine.  And this is long before this case,

25         long before there was this dispute.  And this whole region

1    that is shaded here beginning with the lysine is the same

2    amino acid sequence that you get when you use the sequence

3    ID -- the nucleotides that are in the Sequence Identification

4    NO:6 in the original '190 patent.

5            So he didn't look at it and think, oh, there's

6    obviously an error here, I should ignore the lysine, it's got

7    to start with isoleucine, I should use the primers because

8    the primers are going to tell me what to do.  He just took

9    the sequence that was provided in the publication and he got

10   lysine as the first amino acid.

11           Now, one interesting thing, I'll pause on this for a

12   moment.  So you heard that Dr. Sadelain talked to

13   Dr. Rosenberg about Dr. Sadelain's article, the one from

14   2002.  That's the same article that Dr. Junghans looked at to

15   make his CAR.  So we know Dr. Junghans, when he made the CAR,

16   it began with lysine.  We know that Dr. Rosenberg, the CAR

17   that he made, which plaintiffs have said is based on the

18   article by Dr. Sadelain and he gives -- he cites to

19   Dr. Sadelain's work in his article, he starts with

20   isoleucine, not with lysine.  Two people looking at the same

21   publication, they make this costim region, and it starts with

22   different amino acids.

23           And you might quite fairly wonder, why?  Why don't

24   they get the same thing?  Well, we got the answer to that

25   from Dr. Sadelain here in trial.  We know now why that is.

 1        Because Dr. Sadelain told us when he talked to Dr. Rosenberg,

 2        he said, I pointed him to the primers that we were using to

 3        assemble that molecule.  And they are disclosed in full in

 4        the paper that we already discussed.

 5               So he said, I could not give him a molecule, you

 6        know, he couldn't actually give him the actual molecule that

 7        had the DNA in it because there were restrictions on it.

 8        We'll come back to that later when we talk about the other

 9        defenses.  But I told him about the paper and I said -- I

10        said, look at the primers.

11               And I also want to touch on this for a second.  You

12        heard Mr. Chu when he was impugning Kite and Kite's

13        management and their employees, showed an e-mail that we've

14        seen several times from a Toni Ribas about a conversation he

15        had with Dr. Sadelain.  If you recall, the e-mail said, oh, I

16        talked to Dr. Sadelain, and he said that he -- he gave his

17        construct to Dr. Rosenberg.  Well, we know that's not true.

18        Dr. Sadelain in trial today, and he's testified to this

19        before, he couldn't have given his construct to Dr. Rosenberg

20        because he had obtained it from another institution, so he

21        had certain restrictions on, you know, who he could give it

22        to.

23               So that statement that a lot of witnesses have been

24        shown, Dr. Ribas just had that wrong.  And Dr. Sadelain's

25        testimony makes that very clear.

1          And what we heard from Dr. Quackenbush is that the

2    primers that are in that article, they amplify -- primers

3    amplify nucleotide sequences.  And those primers amplify a

4    different set of amino acids than the ones that are amplified

5    by nucleotide sequence 336 to 660.

6          So there's an inconsistency in the article, which is

7    why two different people could read the article, come up with

8    different amino acid sequences.

9          And here's the critical point.  You look at the

10   article, the article gives you the range of nucleotides, it

11   gives you primers, and we have examples, different scientists

12   using one or the other to come up with their amino acids.  We

13   don't have that ambiguity with the patent.  There are claims

14   in the '190 patent that do define an amino acid sequence by

15   what you get when you use primers.  This is the primary

16   signaling region, this human zeta chain DNA, it is not the

17   CD28 costimulatory region.  The costimulatory region,

18   Dr. Sadelain decided not to define that by what you get when

19   you amplify primers.  He decided to define that by what you

20   get when you use the nucleotides of Sequence ID NO:6.

21         So all this discussion you've heard them make about

22   primers is completely irrelevant because that is not how the

23   patent defines the amino acid sequence.  Doesn't say this is

24   the amino acid sequence you get when you use primers 4 and 5,

25   which are the ones that Dr. Quackenbush testified about.  It

1   says this is the amino acid sequence you get from nucleotide

2   sequence number -- Number 6.

3            Okay.  So that's the first example.  Second example

4   is Adrian Bot.  And he's someone else that has been attacked

5   by plaintiffs.  You saw Dr. Bot.  I trust you to make your

6   own determination about how credible he is and what you think

7   of his integrity.  He was chief medical officer for the

8   beginning of Kite.  There was some suggestion that he might

9   have colluded with Dr. Schuetz.  I trust you to make your own

10  determination about how likely you think that is, having seen

11  Dr. Schuetz and having seen Dr. Bot.

12           Now, Dr. Bot testified that he learned about

13  Dr. Sadelain's '190 patent around the time Kite was thinking

14  of entering into its collaboration with NCI in 2012.  So this

15  is now three and a half years after the patent has been out

16  in the public record.

17           And he testified that he reviewed the claim of the

18  patent to understand what the amino acid sequence was that

19  was claimed for CD28.  So in other words, to understand what

20  that amino acid sequence encoded by Sequence ID NO:6 was.

21           And he looked at Sequence ID NO:6 and he saw that it

22  encodes a range that begins with lysine, because it does.

23  And the Court has also told us that it does.

24           The third piece of real world evidence that we have

25  is Dr. Schuetz.  Again, Mr. Chu suggested that he got paid

1    off, and that he's not a -- he's not a reliable witness, and

2    also criticized him for retaining counsel.  Well, if you had

3    lawyers who asked you to sign a false declaration, wouldn't

4    you think you would want some protection from them doing that

5    again or harassing you?  You can think to yourself about

6    whether you would want some protection, also seeing some of

7    the behavior of some of the attorneys who have examined

8    witnesses in this case.  And if you were on that witness

9    stand, if you would want somebody to at least be able to

10   protect you a little bit from that type of behavior.

11           And Dr. Schuetz, he mainly testified about things

12   that are in e-mails.  We didn't write the e-mails.  He's the

13   guy who told Sloan Kettering, you know what?  Your patent

14   doesn't cover what Dr. Sadelain is telling me is what he

15   worked on in the lab.  He asked Dr. Sadelain for the full

16   sequence.  Now, this is -- and this is also important.

17   Members of the public obviously would not have that.  It's

18   proprietary information from Dr. Sadelain.  He got that

19   information and he compared it to the patent and he said, you

20   know what, you don't -- you don't cover this.  Your patent

21   requires this lysine.  I don't see a lysine here.

22           Dr. Sadelain didn't notice that, nobody at Sloan

23   Kettering noticed that for four and a half years, the most

24   important part of his invention, as he testified to, and he

25   didn't notice that?  Nobody at Sloan Kettering checked the

1    patent after it issued to see if it was right?  They had to

2    get told this by a potential investor?

3           And you heard Dr. Schuetz testify.  And again, I

4    very much trust your ability to gauge the credibility of

5    Dr. Schuetz, whether he seemed like someone who was in the

6    bag for Kite or was testifying dishonestly, or whether he

7    seemed like someone who has felt -- seemed a little

8    uncomfortable at being attacked as a witness in a trial.

9           Now, Dr. Schuetz realized that the nucleotide

10   sequence that was claimed in the patent began with lysine.

11   And he's not an employee of Kite, he's not a former employee

12   of Kite, he's not a retained expert.  He's a third party.  He

13   didn't need to come out here.  He lives in Boston.  So I

14   think Dr. Schuetz is probably, out of all of the witnesses I

15   submit to you, is the one with the most credibility.  He has

16   no dog in this fight.  But he came out to testify to what he

17   did, not in the last six months, not in the last year, what

18   he did back in 2013, way before this case ever began.

19          So you have three people, three people skilled in

20   the art, under the Court's definition of skill in the art,

21   they all read the sequence, the beginning of the sequence in

22   the issued patent, nucleotide 336, as encoding an amino acid

23   sequence that begins with lysine.

24          And none of them thought, oh, this is obviously

25   wrong.  The claim must instead cover amino acids 114 to 220

1    instead of 113 to 220.  It must start with isoleucine, which

2    is amino acid 114, instead of starting with lysine, amino

3    acid 113.

4           And I want to point out another thing Mr. Chu said.

5    He said something interesting.  He said that no one testified

6    that the certificate of correction is invalid except experts.

7           Um, well, okay.  The question of whether something

8    is valid or invalid, that's something that experts testify

9    about.  Experts express an opinion.  The question in this

10   case that determines whether or not the certificate of

11   correction is invalid is a factual question.  It's whether

12   the error or supposed error in the patent that when corrected

13   broadened the claims, so that they used to not -- not require

14   lysine -- I'm sorry, they used to require lysine, now they

15   don't require lysine.  It's whether that error would have

16   been readily apparent to someone skilled in the art.

17          And Dr. Schuetz testified, as someone skilled in the

18   art, that error was not apparent to him, and the correction

19   of any supposed error was not apparent to him.  You can't get

20   more direct evidence than that on the issue that determines

21   whether or not the certificate of correction is invalid.

22          So we have these three instances of real world

23   evidence of what different witnesses thought when they looked

24   at the sequence that begins with 336 in the case of

25   Dr. Junghans, in the publication that was the basis for the

1    patent, or in the case of Dr. Schuetz and Dr. Bot in the

2    issued patent itself.  And they all looked at this before

3    there was any certificate of correction, which is the time

4    that you have to make the assessment of whether or not it

5    would be proper to correct the patent, whether just looking

6    at the patent on its face, patent, prosecution history of the

7    patent record, whether it would be apparent that there is any

8    error, and none of the three of them thought there to be an

9    error.

10          Oh, and I apologize, there is a -- there is an error

11   on the slide.  Dr. Schuetz was, of course, not a Juno

12   witness, so I apologize for that.  He was one of our

13   witnesses, and that should not indicate that he was a Juno

14   witness.

15          So we've seen that Dr. Sadelain himself, years

16   before he filed the '190 patent, kept referring to this super

17   important nucleotide sequence for his CD28 region, as

18   beginning with nucleotide 336, which was the beginning of the

19   sequence in the original patent, and which results in an

20   amino acid region that starts with lysine.

21          And there is no particular reason that anybody would

22   doubt that that would be where he wanted to make his cut.  He

23   said, you know, we were focused on where you make the cut.

24   It's 220 amino acids in the molecule.  We started -- he

25   testified we started at 114, but start at 114, 115, 116, 113,

112.   Somebody of skill in the art, there is nothing magical about the number that he picked to somebody else looking at it.   And if he says we are using a sequence that cuts at 113, there is no reason for them to doubt that.   Because this is all within the actual amino acid range of the molecule.

And it would be one thing if those previous nucleotides, if they didn't exist in the molecule, well, then you would say, oh, obviously this is wrong, because they are not there.   They are there.   They are there.   It's just where do you make the cut among the nucleotides that are there.

So what do the plaintiffs say?   They say that the inclusion of this range was an error, and they tried to correct the error, and through a clerical error of the patent attorney, the error just didn't get corrected.

Now, if you accept their view of things, that means there were actually a lot of errors that happened over time by interesting coincidence.   You accept Dr. Sadelain saying I never did anything other than use amino acid 114 to 220, all my work, that is what I did, well, okay, then his September 1997 patent application is wrong.   His August 1998 article is wrong, which is a peer-reviewed publication as you heard when Dr. Quackenbush was examined.   His January 2002 peer-reviewed article was wrong.   No one caught that error either.

And just to be clear, none of these would be

1    clerical errors.  This is something somebody wrote in a

2    manuscript or a patent application.  So they chose to write

3    that number.  The clerical error they claim is totally

4    different.  That's their reason why they say they didn't

5    submit the corrected sequence at the very end before the

6    patent issued when they claim there was a mix-up in the

7    files.

8            So they haven't really articulated what these errors

9    are, but they are not clerical errors.  They are -- if you

10   believe Dr. Sadelain, they are misidentification of the

11   sequence that is repeated over and over again in multiple

12   applications and publications.

13           And they repeat the supposed error when they filed

14   the '190 provisional patent application in May of 2002.  They

15   repeat it again in May 2003 when they file their utility

16   application.  And, of course, the reason that Sequence ID

17   NO:6 in the issued patent begins with 336 is because they put

18   it in again right before the patent gets published.  And so

19   the issued patent contains 336, too.  That is an awful lot of

20   supposed errors where you keep saying the same beginning

21   nucleotide over and over again.

22           Now, they say, well, the error was clearly evident

23   because Sloan Kettering identified it in this request for

24   continued examination.  They say we pulled the patent back

25   after it had been allowed and they said, oh, we caught the

1    error and we want to change the sequence listing.  And we

2    told the patent office we made a mistake.

3         And in that document, they talk about the sequence

4    not being divisible by three.  But Dr. Junghans has testified

5    about that, and he said it doesn't need to be divisible by

6    three.  It's part of a fusion protein so there were other

7    things that are attached to it.  So the whole thing needs to

8    be divisible by three, but any one part of it doesn't need to

9    be.

10        And they talk -- they talked about, well, at the end

11   it has this thing called a stop codon and the stop codon

12   doesn't encode for amino acid.  Who cares?  We are talking

13   about the beginning.  We are talking about what is the amino

14   acid at the beginning.  The one at the end doesn't have any

15   effect on what is the one at the beginning.  The one at the

16   beginning is lysine.

17        And the only thing that they said in this -- in

18   this, um, RCE to suggest that the first amino acid shouldn't

19   be lysine was a statement which I seem not to have here,

20   but -- so I will read it to you, but this is in PX002.  This

21   is the very end of the RCE.

22        So they go through and they talk about, well, look

23   at the primers, which, as I said, the claim is not defined by

24   the primers.  They talk about the stop codon.  Again, that is

25   the last -- that is the end of the sequence, that is not the

1     beginning.  They talk about the not divisible by three.  That

2     doesn't matter.

3          The only thing where they stay anything about why

4     the first amino acid might not be lysine is the very -- I

5     think it's the last sentence.  They say, "In the sequence

6     listing, Sequence ID NO:6 has been amended as follows to

7     correctly reflect the bases corresponding to the amino acid

8     used in the construct of the examples."

9          Okay.  So what that means, what they are saying is

10    the examples that we actually did, we started with 114, we

11    didn't start with 113, and so we are amending the patent to

12    reflect that in what we actually did, we started with a

13    different sequence.  That is what they are saying.

14         And let me pause on that for a second, because one

15    thing that Dr. Junghans was cross-examined about, this is a

16    subtle little point, but he was asked, "Do you understand

17    that Dr. Sadelain used the sequence 114 to 220 in every

18    example in the patent?"  And he said, "Yes."

19         The reason he said yes is not because of what the

20    patent says.  It's because Dr. Junghans has had access to

21    Dr. Sadelain's testimony where Dr. Sadelain has said that is

22    what I used for all those examples.  So just so you know,

23    it's not something that the public would have notice of.  It

24    is something Dr. Junghans knows because of this case where

25    Dr. Sadelain has said not withstanding what the patent says,

1    I always use the same amino acid sequence.

2         Because if we look at the patent right here on the

3    right, look at what we see again:  "To construct P28z,

4    nucleotides 336 to 660 of CD28 were amplified."  336 rears

5    its head again.

6         And this is describing how they made an example in

7    the patent.  And they didn't ask to change this in the RCE.

8    And they didn't ask to change this in the certificate of

9    correction.  This is still in the patent.  They are

10   representing to the patent office we want to change this

11   sequence to be consistent with what we used in all of our

12   examples.  And in another place in the patent, they do change

13   that 336 to 340 so that would begin with isoleucine, but then

14   they leave it at 336 in another place.

15        So a person looking at this, seeing they left the

16   336 in there, and also seeing that they never in the end

17   changed the sequence listing, how would they conclude that

18   the 336 was obviously wrong?  336 is all over the place, and

19   they eventually went back to it.

20        Now, they might see, as in the publication, they

21   might see, okay, I see inconsistencies here, but they are not

22   going to clearly assume, okay, even though the patent now

23   reads what the patent defines is an amino acid sequence that

24   begins with lysine -- and the Court has told us that is what

25   the patent defines -- a person of skill in the art is not

1    going to look at that patent and second guess it and say, oh,

2    you know what?  It defines lysine, lysine is all over

3    Dr. Sadelain's work all over the place, but I'm just going to

4    clearly understand that it's supposed to be isoleucine.  That

5    is not what a person of skill in the art would have

6    concluded, and it's not what the three real world scientists

7    who looked at this concluded.

8         THE COURT:  Mr. Dane, with that, we are going to

9    have to stop as discussed.

10        And the jury will be ordered back tomorrow at 8:30.

11   Again, during your absence, do not discuss the case amongst

12   yourself or with any other person.  And closing arguments or

13   the rest of arguments will be provided tomorrow.  Thank you.

14        THE CLERK:  All rise for the jury, please.

15        (Thereupon, the jury retired from the courtroom.)

16        (Thereupon, the Court was in recess.)

17               *****     *****     *****

18

19

20

21

22

23

24

25

1

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-titled matter.

4

5

6

7    ---------------------------

8

9    Amy C. Diaz, RPR, CRR              December 11, 2019

10   S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## #

**#4455** [1] - 1318:23

## $

**$1,900** [3] - 1391:1, 1391:2, 1391:16
**$150** [1] - 1412:19
**$500** [2] - 1392:5, 1396:13
**$585** [1] - 1406:5
**$660** [1] - 1374:22
**$700** [2] - 1434:22, 1435:18
**$752** [1] - 1413:5
**$76,000** [1] - 1391:4

## '

**'14** [2] - 1384:21, 1385:5
**'15** [2] - 1384:21, 1385:5
**'16** [1] - 1384:21
**'17** [1] - 1384:21
**'190** [58] - 1331:11, 1331:16, 1339:8, 1348:2, 1348:7, 1348:10, 1348:20, 1349:1, 1349:17, 1350:1, 1353:10, 1353:15, 1353:17, 1354:6, 1355:4, 1355:5, 1355:9, 1356:5, 1357:13, 1358:17, 1359:20, 1360:2, 1362:2, 1365:9, 1378:7, 1379:13, 1380:16, 1381:18, 1381:24, 1382:16, 1384:1, 1386:3, 1387:1, 1388:18, 1389:2, 1389:6, 1397:9, 1400:25, 1407:4, 1409:6, 1414:8, 1414:24, 1421:4, 1421:6, 1425:14, 1425:15, 1431:10, 1435:24, 1440:5, 1440:14, 1440:22, 1441:3, 1451:9, 1452:4, 1454:14, 1455:13, 1459:16, 1461:14

## 1

**1** [10] - 1322:2, 1322:5,

1337:6, 1353:15, 1377:11, 1408:10, 1408:17, 1408:23, 1411:5, 1438:16
**1,700** [1] - 1405:4
**1,700-plus** [1] - 1405:5
**1.14** [1] - 1446:18
**1.3** [4] - 1407:22, 1407:23, 1408:22, 1413:10
**10** [4] - 1338:20, 1413:16, 1449:19, 1449:21
**100** [2] - 1412:11, 1413:15
**102** [1] - 1431:25
**10281** [1] - 1319:12
**10K** [1] - 1390:16
**11** [14] - 1318:15, 1327:10, 1329:1, 1331:10, 1331:16, 1338:21, 1339:7, 1348:2, 1348:25, 1349:16, 1349:25, 1354:6, 1355:3, 1466:9
**112** [1] - 1460:1
**113** [15] - 1352:2, 1384:5, 1395:5, 1395:9, 1425:16, 1438:5, 1438:23, 1440:9, 1442:21, 1445:18, 1458:1, 1458:3, 1459:25, 1460:3, 1463:11
**114** [23] - 1352:4, 1384:6, 1384:11, 1395:4, 1395:10, 1397:4, 1397:5, 1400:10, 1400:11, 1400:14, 1425:17, 1438:7, 1440:8, 1442:18, 1442:25, 1445:19, 1457:25, 1458:2, 1459:25, 1460:18, 1463:10, 1463:17
**115** [1] - 1459:25
**116** [1] - 1459:25
**11:30** [1] - 1397:22
**12** [2] - 1338:22, 1406:16
**12390** [1] - 1320:3
**12th** [1] - 1428:4
**13** [18] - 1323:16, 1324:9, 1328:18, 1329:7, 1330:22, 1331:1, 1332:7, 1332:13, 1332:20,

1332:25, 1333:1, 1333:8, 1334:8, 1336:19, 1338:22, 1338:23, 1338:24, 1338:25
**13s** [1] - 1333:2
**14** [3] - 1339:10, 1408:11, 1433:3
**15** [4] - 1322:19, 1339:10, 1340:1, 1396:16
**150** [1] - 1413:15
**15A** [4] - 1322:18, 1339:11, 1339:21, 1340:2
**16** [1] - 1339:11
**17** [1] - 1339:12
**18** [3] - 1339:12, 1430:6, 1433:4
**180** [1] - 1389:23
**1800** [2] - 1319:6, 1435:12
**18th** [1] - 1361:21
**19** [3] - 1339:12, 1424:15, 1433:11
**1980s** [1] - 1402:1
**1985** [1] - 1388:8
**1997** [2] - 1446:6, 1460:20
**1998** [2] - 1446:10, 1460:20
**1:15** [1] - 1398:2
**1:20** [2] - 1398:2, 1398:3
**1st** [1] - 1318:23

## 2

**2** [7] - 1322:2, 1322:5, 1337:7, 1377:11, 1406:16, 1411:10, 1414:21
**2.14** [1] - 1446:17
**2.41** [1] - 1446:17
**2.56** [1] - 1446:17
**2.667** [1] - 1446:17
**2.679** [1] - 1446:17
**20** [5] - 1322:23, 1323:3, 1339:13, 1412:12
**2002** [7] - 1355:15, 1401:4, 1444:9, 1451:8, 1452:14, 1460:22, 1461:14
**2003** [1] - 1461:15
**2007** [3] - 1395:11, 1444:5, 1445:25
**2008** [1] - 1437:10
**2009** [3] - 1375:7, 1437:10, 1441:1

**200s** [1] - 1405:7
**2010** [3] - 1437:10, 1441:1, 1451:6
**2011** [3] - 1437:11, 1441:1, 1451:6
**2012** [6] - 1375:20, 1437:11, 1440:13, 1440:23, 1441:1, 1455:14
**2013** [8] - 1384:21, 1385:5, 1386:20, 1410:1, 1437:11, 1440:6, 1441:5, 1457:18
**2015** [1] - 1384:13
**2016** [3] - 1380:24, 1384:15, 1428:2
**2017** [8] - 1361:21, 1384:16, 1407:7, 1407:21, 1410:17, 1419:19, 1422:21, 1432:23
**2018** [3] - 1389:15, 1389:18, 1433:7
**2019** [3] - 1318:15, 1466:9
**2020** [1] - 1434:6
**2024** [1] - 1408:21
**20s** [1] - 1430:2
**21** [2] - 1339:14, 1349:12
**22** [1] - 1339:14
**220** [19] - 1352:2, 1352:5, 1395:4, 1397:4, 1397:5, 1400:10, 1400:11, 1400:14, 1425:16, 1425:17, 1438:23, 1440:8, 1440:9, 1445:19, 1457:25, 1458:1, 1459:24, 1460:18, 1463:17
**23** [3] - 1324:2, 1324:4, 1339:15
**23A** [3] - 1324:5, 1324:6, 1339:16
**24** [2] - 1323:11, 1339:16
**25** [1] - 1339:17
**250** [1] - 1319:11
**26** [1] - 1339:17
**27** [9] - 1323:22, 1339:18, 1411:12, 1411:13, 1411:16, 1412:2, 1412:9, 1412:23, 1412:24
**27.6** [2] - 1406:6, 1416:5
**274** [2] - 1404:7, 1404:9

**27B** [4] - 1323:12, 1323:13, 1323:21, 1323:22
**28** [1] - 1339:18
**28th** [1] - 1355:15
**29** [1] - 1339:18
**291** [2] - 1405:1, 1405:7
**2:17-CV-7639-SJO** [1] - 1318:8

## 3

**3** [14] - 1322:2, 1322:5, 1327:9, 1329:1, 1331:10, 1331:16, 1337:8, 1339:7, 1348:1, 1348:25, 1349:16, 1349:25, 1354:6, 1355:3
**3.8** [1] - 1391:6
**30** [2] - 1403:14, 1412:12
**30th** [1] - 1428:2
**336** [40] - 1422:7, 1422:10, 1422:11, 1422:12, 1438:1, 1444:1, 1444:20, 1445:3, 1445:5, 1445:6, 1445:9, 1445:14, 1446:1, 1446:8, 1446:13, 1446:15, 1446:19, 1446:22, 1447:1, 1447:9, 1447:14, 1447:15, 1447:21, 1450:12, 1451:14, 1451:23, 1454:5, 1457:22, 1458:24, 1459:18, 1461:17, 1461:19, 1464:4, 1464:13, 1464:14, 1464:16, 1464:18
**337** [1] - 1438:24
**339** [4] - 1422:12, 1438:2, 1438:25, 1445:9
**340** [4] - 1422:11, 1443:1, 1464:13
**342** [1] - 1443:1
**350** [1] - 1318:23
**355** [1] - 1319:20
**35th** [1] - 1319:20
**38** [3] - 1403:21, 1427:3, 1430:22
**3:30** [1] - 1398:11

## 4

**4** [4] - 1323:5, 1337:8,

1414:6, 1454:24
**4-1BB** [4] - 1422:18, 1422:19, 1422:24, 1423:5
**40** [3] - 1391:5, 1399:8, 1412:2
**40-hour** [1] - 1391:4
**49** [1] - 1399:5

## 5

**5** [17] - 1327:9, 1329:1, 1331:10, 1331:16, 1337:9, 1339:7, 1348:1, 1348:25, 1349:16, 1349:25, 1354:6, 1355:3, 1413:16, 1449:19, 1449:21, 1449:24, 1454:24
**50** [6] - 1391:5, 1411:24, 1430:22, 1434:17, 1449:24
**50/50** [2] - 1411:24, 1412:1
**500** [3] - 1320:6, 1407:16
**50th** [1] - 1319:9
**541-1** [1] - 1338:9
**549-1** [8] - 1332:6, 1332:12, 1336:7, 1336:20, 1338:1, 1338:7, 1338:10, 1338:11
**555** [1] - 1319:9
**585** [4] - 1382:14, 1412:23, 1412:25, 1416:2

## 6

**6** [2] - 1337:10, 1455:2
**6.2** [6] - 1371:3, 1390:9, 1407:6, 1408:18, 1413:2, 1413:11
**60601** [1] - 1319:14
**64** [2] - 1431:25, 1432:1
**66** [1] - 1411:15
**660** [2] - 1454:5, 1464:4
**663** [1] - 1446:8

## 7

**7** [1] - 1337:11
**7.1** [4] - 1407:9, 1408:19, 1413:2, 1413:12

**70** [1] - 1412:11
**73** [2] - 1411:17, 1411:19
**752** [2] - 1412:25, 1413:13
**77** [1] - 1319:14

## 8

**8** [1] - 1337:11
**8,000** [2] - 1435:10
**8.6** [1] - 1407:9
**83** [4] - 1411:16, 1411:20, 1411:24, 1412:6
**8:30** [2] - 1343:2, 1465:10

## 9

**9** [15] - 1326:19, 1327:9, 1329:1, 1331:10, 1331:16, 1337:13, 1337:14, 1338:8, 1339:7, 1348:1, 1348:25, 1349:16, 1349:25, 1354:6, 1355:3
**900** [1] - 1319:6
**90012** [1] - 1318:23
**90067** [1] - 1319:7
**90071** [2] - 1319:9, 1319:21
**92130** [1] - 1320:4
**94063** [1] - 1320:6
**9A** [14] - 1332:23, 1336:1, 1336:5, 1336:12, 1336:16, 1336:22, 1337:14, 1337:17, 1337:20, 1338:5, 1338:6, 1338:7, 1338:9, 1338:18

## A

**a-ha** [1] - 1396:2
**abandoned** [1] - 1424:14
**abbreviated** [1] - 1350:23
**ability** [3] - 1345:12, 1387:10, 1457:4
**Abken** [4] - 1401:9, 1401:15, 1401:17, 1402:3
**able** [10] - 1364:16, 1371:10, 1372:1, 1375:3, 1378:20, 1400:20, 1410:5,

1420:4, 1421:16, 1456:9
**above-titled** [1] - 1466:3
**absence** [2] - 1398:3, 1465:11
**absolutely** [9] - 1379:16, 1380:7, 1388:14, 1389:25, 1428:25, 1438:12, 1439:3, 1439:15, 1448:12
**academically** [2] - 1387:24, 1388:9
**accelerate** [1] - 1374:11
**accept** [6] - 1344:6, 1346:8, 1364:25, 1387:19, 1460:15, 1460:17
**acceptable** [2] - 1321:20, 1364:17
**access** [1] - 1463:20
**accident** [1] - 1393:20
**accomplished** [1] - 1343:3
**according** [2] - 1369:9, 1407:6
**account** [3] - 1345:12, 1350:9, 1365:15
**accountants** [1] - 1390:12
**accounting** [3] - 1390:12, 1390:13, 1407:6
**accounts** [2] - 1323:16, 1367:5
**accuracy** [1] - 1367:23
**accurate** [1] - 1390:20
**accused** [2] - 1365:4, 1419:4
**achieved** [1] - 1392:18
**acid** [50] - 1351:25, 1352:6, 1384:5, 1384:11, 1395:9, 1436:21, 1437:21, 1438:3, 1438:5, 1438:6, 1438:17, 1438:21, 1439:9, 1439:21, 1439:23, 1440:1, 1440:18, 1442:18, 1442:22, 1442:25, 1443:2, 1445:18, 1445:19, 1446:3, 1446:16, 1447:21, 1451:19, 1451:24, 1452:2, 1452:10, 1454:8, 1454:14, 1454:23, 1454:24, 1455:1,

1455:18, 1455:20, 1457:22, 1458:2, 1458:3, 1459:20, 1460:5, 1460:18, 1462:12, 1462:14, 1462:18, 1463:4, 1463:7, 1464:1, 1464:23
**acids** [19] - 1352:2, 1352:4, 1386:4, 1395:3, 1400:14, 1425:13, 1425:16, 1425:17, 1438:20, 1438:23, 1440:8, 1440:9, 1451:21, 1452:22, 1454:4, 1454:12, 1457:25, 1459:24
**acknowledged** [1] - 1434:1
**act** [1] - 1371:25
**acted** [1] - 1361:10
**acting** [2] - 1364:25, 1395:15
**action** [1] - 1325:25
**activity** [1] - 1361:8
**acts** [2] - 1357:18, 1357:19
**actual** [4] - 1396:7, 1414:15, 1432:16, 1450:5, 1453:6, 1460:5
**add** [3] - 1328:5, 1333:21, 1412:25
**added** [6] - 1322:18, 1322:21, 1323:13, 1324:11, 1331:3, 1331:9, 1358:4, 1364:6
**addition** [2] - 1344:25, 1348:11
**additional** [5] - 1338:16, 1351:2, 1353:24, 1390:2, 1405:18
**address** [6] - 1326:16, 1337:17, 1342:24, 1370:15, 1387:21
**addressed** [2] - 1339:24, 1378:18
**adds** [2] - 1326:1, 1353:23
**adequate** [3] - 1357:24, 1358:18, 1360:5
**adequately** [1] - 1350:17
**adjustment** [3] - 1411:5, 1411:9, 1411:10

**adjustments** [4] - 1409:11, 1409:13, 1409:16, 1411:4
**administered** [1] - 1406:12
**admit** [2] - 1374:16, 1381:21
**admits** [1] - 1394:19
**admitted** [8] - 1344:4, 1346:15, 1346:21, 1346:23, 1346:24, 1392:5, 1420:18, 1421:2
**adopted** [1] - 1325:3
**Adrian** [1] - 1455:4
**adult** [3] - 1429:17, 1429:19, 1430:10
**adults** [3] - 1377:19, 1387:6, 1387:7
**advanced** [1] - 1374:18
**advantage** [6] - 1383:8, 1383:12, 1383:15, 1383:19, 1404:20, 1404:23
**advantages** [1] - 1363:12
**advertising** [1] - 1365:5
**advise** [1] - 1369:10
**advising** [1] - 1379:11
**affect** [2] - 1350:8, 1354:24
**affirmed** [1] - 1382:5
**afternoon** [2] - 1399:17, 1417:15
**age** [1] - 1430:11
**ago** [8] - 1334:8, 1389:2, 1391:20, 1408:20, 1419:7, 1432:25, 1433:2
**agree** [16] - 1328:12, 1333:19, 1334:7, 1338:18, 1342:5, 1343:18, 1361:20, 1373:23, 1375:16, 1401:3, 1409:3, 1410:3, 1413:14, 1413:23, 1418:3, 1437:4
**agreed** [24] - 1322:1, 1322:7, 1329:13, 1332:3, 1332:4, 1333:6, 1333:22, 1334:5, 1334:11, 1335:7, 1335:9, 1336:17, 1337:22, 1337:24, 1338:13, 1344:5, 1348:7, 1364:10, 1365:23,

1408:16, 1409:11, 1413:3, 1415:7, 1439:14

**agreed-upon** [1] - 1329:13

**agreement** [23] - 1330:24, 1334:25, 1335:3, 1335:5, 1337:4, 1337:15, 1340:13, 1360:24, 1361:11, 1361:24, 1364:12, 1365:11, 1369:8, 1369:17, 1374:7, 1374:10, 1379:21, 1390:4, 1409:2, 1409:6, 1409:14, 1410:2, 1410:12

**agreements** [3] - 1332:24, 1365:15, 1366:5

**ahead** [8] - 1331:1, 1334:14, 1370:17, 1385:16, 1403:8, 1410:7, 1417:13, 1427:15

**ain't** [1] - 1424:4

**akin** [1] - 1377:4

**al** [1] - 1318:5

**Alan** [1] - 1319:5

**alcohol** [1] - 1449:19

**alert** [2] - 1337:13, 1398:10

**alive** [1] - 1419:23

**alleged** [1] - 1361:19

**allow** [2] - 1354:24, 1363:25

**allowed** [4] - 1350:21, 1356:16, 1450:3, 1461:25

**alluded** [1] - 1424:12

**almost** [2] - 1418:4, 1442:9

**alone** [2] - 1391:19, 1407:21

**alternative** [4] - 1327:1, 1327:18, 1372:8, 1406:22

**alternatives** [2] - 1366:8, 1380:13

**amazing** [3] - 1370:22, 1372:23, 1373:2

**ambiguity** [1] - 1454:13

**amended** [1] - 1463:6

**amending** [1] - 1463:11

**amino** [68] - 1351:25, 1352:2, 1352:4, 1384:5, 1384:11,

1386:4, 1395:3, 1395:9, 1400:14, 1425:13, 1425:16, 1425:17, 1436:21, 1437:21, 1438:3, 1438:5, 1438:6, 1438:17, 1438:19, 1438:21, 1438:23, 1439:9, 1439:21, 1439:23, 1440:1, 1440:8, 1440:9, 1440:18, 1442:17, 1442:22, 1442:25, 1443:2, 1445:18, 1445:19, 1446:2, 1446:16, 1447:21, 1451:19, 1451:21, 1451:23, 1452:2, 1452:10, 1452:22, 1454:4, 1454:8, 1454:12, 1454:14, 1454:23, 1454:24, 1455:1, 1455:18, 1455:20, 1457:22, 1457:25, 1458:2, 1459:20, 1459:24, 1460:5, 1460:18, 1462:12, 1462:13, 1462:18, 1463:4, 1463:7, 1464:1, 1464:23

**Amoroso** [1] - 1405:19

**amount** [19] - 1349:6, 1350:6, 1354:24, 1359:8, 1359:9, 1360:3, 1360:5, 1360:15, 1362:1, 1364:8, 1364:12, 1364:17, 1365:2, 1365:7, 1397:7, 1404:10, 1410:9, 1416:1, 1418:24

**amounts** [1] - 1365:9

**amplified** [2] - 1454:4, 1464:4

**amplify** [4] - 1454:2, 1454:3, 1454:19

**AMY** [1] - 1318:22

**Amy** [2] - 1466:9, 1466:10

**analogous** [1] - 1364:1

**analysis** [2] - 1323:18, 1385:18

**anchors** [1] - 1408:25

**Andrea** [1] - 1319:8

**Andy** [1] - 1390:8

**Angeles** [5] - 1318:14, 1318:23, 1319:7,

1319:9, 1319:21

**annual** [2] - 1404:3, 1407:21

**annually** [1] - 1408:22

**ANSWER** [3] - 1388:9, 1389:14, 1396:8

**answer** [7] - 1322:3, 1322:5, 1369:1, 1376:21, 1401:6, 1443:25, 1452:24

**answered** [3] - 1322:2, 1322:4, 1371:23

**answering** [1] - 1368:24

**anti** [1] - 1403:13

**anti-CD19** [1] - 1403:13

**antibodies** [1] - 1428:23

**antibody** [1] - 1401:14

**anticipated** [1] - 1356:10

**anticipating** [1] - 1433:8

**anticipation** [2] - 1356:12, 1380:20

**antigen** [2] - 1424:19, 1424:23

**Antoni** [1] - 1373:15

**anyway** [1] - 1378:22

**apologies** [1] - 1397:23

**apologize** [5] - 1349:21, 1421:15, 1437:19, 1459:10, 1459:12

**apparent** [8] - 1447:23, 1448:11, 1448:21, 1449:2, 1458:16, 1458:18, 1458:19, 1459:7

**appear** [2] - 1334:21, 1445:10

**APPEARANCES** [1] - 1319:1

**Appearances** [1] - 1320:1

**appeared** [1] - 1329:25

**applicant** [4] - 1350:14, 1350:20, 1351:1, 1351:5

**application** [33] - 1350:13, 1350:14, 1350:15, 1350:19, 1350:22, 1350:24, 1356:20, 1358:3, 1358:7, 1358:8, 1358:12, 1358:14,

1359:17, 1366:20, 1402:12, 1432:16, 1432:24, 1433:9, 1433:14, 1433:17, 1433:18, 1444:11, 1444:14, 1444:17, 1445:15, 1446:6, 1446:13, 1447:6, 1460:20, 1461:2, 1461:14, 1461:16

**applications** [2] - 1432:8, 1461:12

**applied** [3] - 1362:3, 1393:12, 1394:25

**applies** [2] - 1343:12, 1366:24

**apply** [6] - 1343:16, 1352:8, 1352:10, 1357:20, 1394:15, 1412:24

**applying** [1] - 1444:7

**apportionment** [6] - 1323:13, 1323:16, 1323:17, 1339:16, 1406:10

**appreciate** [1] - 1417:24

**approach** [1] - 1398:15

**approached** [1] - 1367:1

**appropriate** [2] - 1325:5, 1424:7

**approval** [9] - 1361:21, 1422:17, 1426:16, 1426:19, 1430:4, 1432:16, 1432:19, 1433:9, 1434:8

**approved** [12] - 1410:18, 1423:23, 1424:3, 1429:15, 1429:17, 1429:19, 1429:20, 1430:8, 1430:10, 1430:11, 1430:16, 1433:13

**April** [1] - 1384:12

**area** [4] - 1355:18, 1394:3, 1402:16, 1413:17

**areas** [1] - 1432:4

**argue** [2] - 1348:4, 1393:4

**argued** [1] - 1429:12

**Arguello** [1] - 1429:12

**argues** [3] - 1348:12, 1357:12, 1392:11

**argument** [18] - 1330:13, 1330:14, 1335:12, 1341:5,

1341:6, 1341:24, 1342:3, 1342:6, 1343:9, 1369:6, 1369:12, 1382:6, 1398:25, 1399:14, 1414:20, 1414:21, 1415:4, 1416:23

**arguments** [10] - 1324:20, 1324:25, 1335:20, 1344:11, 1344:14, 1370:12, 1380:20, 1381:3, 1465:12, 1465:13

**Arie** [3] - 1373:23, 1379:19, 1388:18

**arising** [1] - 1357:18

**art** [23] - 1322:20, 1355:14, 1356:10, 1357:5, 1357:7, 1380:20, 1394:12, 1400:21, 1402:13, 1441:20, 1447:12, 1447:23, 1448:11, 1448:21, 1448:24, 1450:6, 1457:20, 1458:16, 1458:18, 1460:1, 1464:25, 1465:5

**article** [26] - 1364:14, 1388:20, 1388:21, 1420:24, 1444:16, 1444:18, 1445:4, 1446:10, 1446:11, 1447:10, 1451:8, 1451:9, 1451:14, 1451:23, 1452:13, 1452:14, 1452:18, 1452:19, 1454:2, 1454:6, 1454:7, 1454:10, 1460:21, 1460:23

**articulated** [1] - 1461:8

**aspect** [1] - 1325:16

**assemble** [1] - 1453:3

**assert** [1] - 1357:17

**asserted** [17] - 1326:24, 1327:5, 1328:10, 1348:9, 1348:12, 1348:20, 1348:22, 1352:13, 1352:16, 1354:13, 1355:7, 1355:15, 1358:17, 1359:20, 1360:1, 1390:5, 1439:18

**assess** [1] - 1354:21

**assessed** [1] - 1353:1

**assessment** [1] - 1459:4

**assist** [2] - 1342:9, 1347:5
**associated** [1] - 1431:6
**assume** [4] - 1338:8, 1361:10, 1361:12, 1464:22
**assumed** [2] - 1399:22, 1400:4
**assuming** [1] - 1400:5
**ATT** [3] - 1438:6, 1439:23, 1442:25
**attached** [1] - 1462:7
**attack** [3] - 1373:8, 1384:13, 1436:2
**attacked** [3] - 1418:12, 1455:4, 1457:8
**attacking** [1] - 1424:19
**attacks** [1] - 1384:25
**attempt** [3] - 1368:19, 1369:24, 1374:11
**attempted** [2] - 1389:9, 1389:12
**attention** [3] - 1378:17, 1417:18, 1417:20
**attentive** [1] - 1416:21
**attorney** [1] - 1460:14
**Attorney** [14] - 1319:4, 1319:5, 1319:5, 1319:6, 1319:8, 1319:11, 1319:13, 1319:18, 1319:18, 1319:19, 1319:19, 1319:20, 1320:3, 1320:5
**attorneys** [2] - 1344:19, 1418:19, 1456:7
**attributable** [1] - 1365:3
**August** [2] - 1446:10, 1460:20
**author's** [1] - 1444:19
**automobile** [1] - 1393:19
**available** [7] - 1351:7, 1356:8, 1362:7, 1378:21, 1434:16, 1435:7, 1447:11
**Avenue** [2] - 1319:6, 1319:20
**avoid** [1] - 1321:15
**award** [6] - 1350:8, 1354:25, 1360:7, 1360:10, 1360:11, 1360:15
**awarded** [4] - 1349:2, 1349:19, 1350:2,

1360:3
**aware** [2] - 1324:17, 1388:21
**awful** [1] - 1461:19
**awry** [1] - 1410:11
**axi** [3] - 1441:1, 1441:7, 1441:11
**axi-cel** [3] - 1441:1, 1441:7, 1441:11

## B

**backbone** [11] - 1372:5, 1373:1, 1374:15, 1375:11, 1375:24, 1376:6, 1376:17, 1376:19, 1377:11, 1402:7, 1451:11
**background** [2] - 1383:6, 1387:8
**bad** [3] - 1354:16, 1404:16, 1435:18
**bag** [1] - 1457:6
**bailiff** [1] - 1368:18
**balancing** [1] - 1414:11
**bar** [1] - 1412:4
**base** [1] - 1366:9
**based** [13] - 1323:15, 1333:13, 1365:2, 1365:21, 1368:6, 1389:9, 1389:12, 1432:9, 1436:14, 1444:3, 1444:17, 1444:23, 1452:17
**bases** [1] - 1463:7
**basic** [2] - 1403:18, 1421:8
**basis** [8] - 1322:25, 1392:24, 1444:10, 1445:4, 1446:12, 1450:15, 1451:8, 1458:25
**battle** [1] - 1416:7
**bear** [1] - 1345:19
**bears** [1] - 1436:17
**became** [2] - 1383:11, 1451:8
**become** [1] - 1383:10
**becomes** [4] - 1351:7, 1351:12, 1351:15, 1368:16
**beeline** [1] - 1398:12
**began** [12] - 1361:8, 1361:19, 1362:8, 1364:10, 1439:9, 1445:17, 1447:21, 1450:11, 1451:23, 1452:16, 1457:10,

1457:18
**begin** [6] - 1361:21, 1371:16, 1386:4, 1439:8, 1439:10, 1464:13
**beginning** [20] - 1351:16, 1370:21, 1420:1, 1420:8, 1436:15, 1442:22, 1444:20, 1446:1, 1446:21, 1452:1, 1455:8, 1457:21, 1459:18, 1461:20, 1462:13, 1462:14, 1462:15, 1462:16, 1463:1
**begins** [10] - 1384:12, 1422:7, 1443:25, 1444:3, 1446:25, 1455:22, 1457:23, 1458:24, 1461:17, 1464:24
**begun** [1] - 1433:15
**behalf** [3] - 1374:6, 1416:13, 1416:19
**behavior** [3] - 1354:15, 1456:7, 1456:10
**behind** [1] - 1420:2
**beings** [3] - 1377:19, 1387:9, 1394:23
**belief** [1] - 1370:5
**believability** [1] - 1345:19
**believable** [3] - 1346:12, 1379:1, 1391:24
**believes** [1] - 1424:7
**Belldegrun** [34] - 1373:23, 1374:6, 1374:16, 1375:16, 1375:23, 1375:25, 1376:17, 1377:8, 1377:13, 1377:20, 1378:1, 1378:3, 1379:2, 1379:7, 1379:15, 1379:20, 1380:1, 1380:2, 1380:6, 1380:14, 1380:23, 1381:5, 1381:21, 1381:25, 1382:19, 1383:5, 1383:20, 1387:22, 1388:12, 1388:18, 1401:24, 1416:8, 1416:9, 1443:12
**Belldegrun's** [2] - 1374:19, 1379:22
**below** [1] - 1322:1
**benefit** [1] - 1392:19

**benefited** [1] - 1371:24
**benefits** [1] - 1363:17
**best** [3] - 1409:22, 1409:23, 1415:20
**better** [5] - 1342:5, 1404:5, 1404:13, 1404:21, 1425:1
**between** [20] - 1351:5, 1361:6, 1362:23, 1365:12, 1365:16, 1365:17, 1377:9, 1378:24, 1379:19, 1405:25, 1409:2, 1409:7, 1409:14, 1410:1, 1411:8, 1411:11, 1422:23, 1429:7, 1433:3, 1439:21
**bias** [1] - 1345:16
**big** [3] - 1383:15, 1391:19, 1442:1
**biggest** [2] - 1373:25, 1408:9
**billion** [20] - 1371:3, 1390:9, 1407:6, 1407:9, 1407:22, 1407:23, 1408:10, 1408:17, 1408:18, 1408:19, 1408:22, 1408:23, 1413:2, 1413:3, 1413:8, 1413:10, 1413:11, 1413:12, 1413:18
**billions** [2] - 1371:9
**binding** [5] - 1352:7, 1420:17, 1436:19, 1436:24, 1442:7
**biochemistry** [1] - 1355:22
**biology** [3] - 1355:22, 1356:2
**Bishop** [1] - 1409:17
**bit** [13] - 1329:22, 1334:16, 1338:18, 1404:11, 1404:12, 1415:14, 1418:1, 1418:2, 1421:1, 1448:18, 1451:22, 1456:10
**blacked** [1] - 1412:5
**Blanca** [1] - 1319:20
**BLAs** [1] - 1433:8
**blindfolded** [1] - 1393:24
**blog** [1] - 1366:20
**blood** [3] - 1423:12, 1426:3, 1430:25
**board** [1] - 1428:7
**bodies** [1] - 1373:7

**body** [3] - 1373:5, 1426:4, 1426:10
**books** [1] - 1346:16
**bootstrap** [1] - 1449:3
**boring** [1] - 1436:20
**borne** [1] - 1426:22
**Boston** [2] - 1396:14, 1457:13
**Bot** [19] - 1375:22, 1376:15, 1395:18, 1418:7, 1424:10, 1424:16, 1425:3, 1425:16, 1429:2, 1430:18, 1440:20, 1440:21, 1443:13, 1455:4, 1455:5, 1455:11, 1455:12, 1459:1
**botched** [1] - 1443:20
**bother** [1] - 1376:16
**bought** [2] - 1371:1, 1418:6
**boundaries** [1] - 1351:18
**bounds** [2] - 1436:10, 1449:12
**box** [4] - 1414:3, 1414:13, 1414:19, 1415:2
**brain** [1] - 1429:25
**branded** [1] - 1423:22
**breakthrough** [1] - 1434:10
**Brentjens** [1] - 1431:9, 1443:12
**brief** [3] - 1330:19, 1340:14, 1398:7
**bring** [6] - 1341:1, 1342:16, 1343:1, 1398:9, 1410:5, 1424:9
**broad** [4] - 1388:25, 1389:3, 1429:22, 1436:25
**broaden** [2] - 1437:14, 1449:25
**broadened** [1] - 1458:13
**broadening** [1] - 1450:1
**broadens** [3] - 1357:2, 1394:10, 1441:17
**broader** [1] - 1352:24
**Brocker** [9] - 1373:11, 1381:15, 1381:20, 1382:1, 1401:23, 1402:23, 1403:3, 1403:10, 1416:18
**Brocker's** [1] - 1381:14

broke [2] - 1399:18, 1424:4
brothers [1] - 1377:17
brought [4] - 1346:22, 1380:1, 1382:6, 1403:20
build [1] - 1382:15
bulk [1] - 1425:25
bullet [1] - 1420:9
bullied [1] - 1418:18
bumped [1] - 1393:20
burden [19] - 1337:11, 1339:10, 1339:13, 1347:8, 1347:10, 1347:11, 1347:16, 1347:17, 1347:18, 1349:5, 1350:5, 1360:14, 1370:16, 1393:17, 1394:4, 1414:22, 1415:5, 1415:10, 1415:22
burdens [1] - 1347:9
business [10] - 1362:25, 1363:24, 1363:25, 1364:5, 1364:13, 1365:1, 1387:24, 1388:9, 1411:7, 1412:15
bystander [1] - 1381:5

**C**

CA [1] - 1318:23
CAAA [2] - 1422:10, 1445:9
calculated [1] - 1361:23
calculating [1] - 1360:23
CALIFORNIA [1] - 1318:2
California [6] - 1318:14, 1319:7, 1319:9, 1319:21, 1320:4, 1320:6
callous [1] - 1435:22
Camino [1] - 1320:3
cancer [15] - 1371:8, 1371:15, 1371:17, 1373:2, 1392:15, 1409:20, 1412:11, 1419:21, 1423:12, 1424:20, 1424:21, 1424:22, 1430:25, 1434:18, 1443:10
Cancer [1] - 1374:2
cancers [1] - 1373:9
cannot [2] - 1405:22, 1415:23
capacities [1] - 1435:4

capacity [2] - 1435:1, 1450:9
car [1] - 1393:20
CAR [66] - 1372:6, 1372:22, 1373:18, 1374:8, 1374:13, 1374:14, 1374:23, 1375:2, 1375:14, 1375:23, 1376:10, 1376:12, 1376:18, 1376:20, 1382:15, 1384:23, 1389:9, 1389:12, 1389:14, 1389:16, 1389:19, 1396:7, 1396:9, 1396:10, 1401:6, 1406:8, 1406:13, 1406:18, 1407:3, 1408:5, 1408:24, 1416:14, 1420:4, 1420:10, 1420:15, 1420:18, 1420:22, 1420:25, 1422:1, 1422:15, 1423:8, 1424:12, 1424:17, 1425:4, 1425:23, 1426:19, 1426:22, 1426:24, 1427:1, 1429:6, 1429:11, 1429:17, 1432:9, 1433:25, 1435:4, 1435:7, 1444:9, 1451:7, 1451:12, 1451:20, 1452:15, 1452:16
CAR-T [23] - 1407:3, 1408:5, 1408:24, 1420:4, 1420:10, 1422:1, 1422:15, 1423:8, 1424:17, 1425:23, 1426:19, 1426:22, 1426:24, 1427:1, 1429:6, 1429:11, 1429:17, 1432:9, 1433:25, 1435:4, 1435:7
carefully [2] - 1400:2, 1414:25
cares [1] - 1462:12
carry [1] - 1447:5
CARs [5] - 1420:13, 1422:1, 1442:14, 1442:16, 1445:20
case [93] - 1326:1, 1326:6, 1326:12, 1330:6, 1342:22, 1343:12, 1343:16, 1343:20, 1345:6, 1345:7, 1345:15, 1346:17, 1347:23,

1350:10, 1351:16, 1351:23, 1353:15, 1355:20, 1361:19, 1361:25, 1364:21, 1366:10, 1366:12, 1366:13, 1366:17, 1366:18, 1367:2, 1367:6, 1367:10, 1367:11, 1367:14, 1367:17, 1367:21, 1368:6, 1368:22, 1369:20, 1370:22, 1370:23, 1371:4, 1371:7, 1372:17, 1384:25, 1385:19, 1385:22, 1390:1, 1391:7, 1391:11, 1391:18, 1391:19, 1391:21, 1394:2, 1398:3, 1406:1, 1406:14, 1408:3, 1409:10, 1410:25, 1416:7, 1418:3, 1418:21, 1419:14, 1419:15, 1419:18, 1420:3, 1420:8, 1420:14, 1421:11, 1421:17, 1425:23, 1426:17, 1426:25, 1431:20, 1434:11, 1434:24, 1435:17, 1436:15, 1443:4, 1443:8, 1443:14, 1445:18, 1450:10, 1450:12, 1451:3, 1451:24, 1456:8, 1457:18, 1458:10, 1458:24, 1459:1, 1463:24, 1465:11
cases [9] - 1323:20, 1391:22, 1393:16, 1405:11, 1428:24, 1447:25, 1448:1, 1448:14
cash [2] - 1383:22, 1404:23
cashed [1] - 1374:21
cashing [1] - 1374:20
caught [3] - 1395:11, 1460:23, 1461:25
causes [2] - 1373:1, 1430:1
causing [1] - 1427:22
CD19 [7] - 1373:18, 1375:1, 1375:23, 1403:13, 1424:15, 1424:18, 1424:23
CD20 [1] - 1424:18
CD28 [21] - 1352:2, 1352:5, 1421:5,

1421:9, 1421:22, 1422:2, 1423:5, 1423:17, 1425:13, 1425:17, 1438:5, 1442:15, 1445:3, 1446:8, 1454:17, 1455:19, 1459:17, 1464:4
CD3 [1] - 1442:5
cel [3] - 1441:1, 1441:7, 1441:11
Celgene [9] - 1408:1, 1408:2, 1408:7, 1408:10, 1408:16, 1408:23, 1413:3, 1413:7, 1413:17
cell [6] - 1355:22, 1356:2, 1373:3, 1424:20, 1426:7, 1434:14
cells [10] - 1355:25, 1373:1, 1373:8, 1424:22, 1426:2, 1426:6, 1426:7, 1426:9, 1426:11
CENTRAL [1] - 1318:2
CEO [3] - 1375:22, 1380:8, 1381:7
cerebral [5] - 1405:11, 1429:25, 1430:13, 1430:22, 1431:7
certain [15] - 1322:12, 1336:14, 1344:8, 1345:2, 1346:14, 1346:21, 1356:8, 1356:18, 1356:21, 1409:12, 1414:4, 1418:21, 1419:4, 1433:17, 1453:21
certainly [2] - 1387:6, 1407:3
certainty [1] - 1360:20
certificate [108] - 1324:16, 1324:19, 1324:24, 1325:2, 1326:23, 1327:2, 1327:9, 1327:13, 1327:15, 1327:19, 1328:15, 1328:21, 1329:2, 1330:7, 1331:8, 1331:14, 1335:23, 1339:6, 1339:11, 1348:6, 1348:8, 1348:11, 1348:19, 1348:21, 1348:24, 1349:15, 1349:24, 1351:10, 1351:11, 1351:14, 1352:3, 1352:13, 1352:16, 1354:5,

1355:3, 1355:4, 1355:6, 1355:9, 1355:11, 1355:12, 1356:13, 1356:17, 1356:18, 1356:20, 1356:21, 1356:23, 1357:1, 1357:10, 1357:12, 1357:15, 1357:16, 1357:20, 1357:21, 1360:1, 1383:25, 1384:2, 1384:8, 1386:1, 1386:3, 1386:6, 1386:8, 1386:9, 1386:17, 1386:20, 1392:10, 1393:5, 1393:12, 1394:5, 1394:9, 1394:15, 1394:22, 1395:1, 1395:2, 1395:14, 1399:19, 1400:3, 1400:4, 1400:12, 1414:16, 1414:17, 1422:12, 1425:14, 1425:15, 1437:2, 1437:5, 1437:6, 1437:12, 1437:25, 1439:16, 1439:19, 1439:22, 1441:16, 1441:17, 1441:25, 1448:9, 1448:16, 1448:22, 1448:25, 1449:1, 1449:4, 1449:22, 1458:6, 1458:10, 1458:21, 1459:3, 1464:8
certify [1] - 1466:2
chain [2] - 1401:13, 1454:16
chair [1] - 1378:22
challenge [2] - 1356:5, 1382:7
challenged [2] - 1354:22, 1356:11
challenger [1] - 1393:14
challenging [1] - 1448:5
chance [1] - 1425:1
change [20] - 1321:19, 1334:11, 1334:12, 1334:19, 1370:2, 1370:5, 1382:10, 1382:19, 1382:21, 1382:24, 1383:1, 1384:23, 1427:20, 1428:12, 1441:9, 1462:1, 1464:7, 1464:8, 1464:10,

1464:12
**changed** [6] - 1331:18, 1333:17, 1358:4, 1428:9, 1441:10, 1464:17
**changes** [9] - 1321:10, 1321:12, 1331:22, 1334:10, 1338:23, 1339:9, 1374:14, 1424:2, 1427:19
**changing** [1] - 1441:10
**character** [3] - 1356:25, 1363:16, 1441:19
**charades** [1] - 1420:2
**chart** [2] - 1381:17, 1395:8
**charts** [6] - 1337:9, 1337:10, 1346:14, 1346:17, 1346:21, 1346:23
**chat** [1] - 1366:20
**check** [3] - 1400:1, 1414:3, 1414:13
**checked** [1] - 1456:25
**chemical** [1] - 1449:18
**chemo** [2] - 1434:14, 1434:15
**chemotherapy** [2] - 1371:11, 1427:19
**Chicago** [1] - 1319:14
**chief** [5] - 1390:8, 1421:18, 1423:3, 1423:14, 1455:7
**chimeric** [4] - 1355:24, 1355:25, 1375:1, 1401:14
**choices** [1] - 1377:23
**choose** [3] - 1346:5, 1365:14, 1387:15
**chose** [1] - 1461:2
**chronology** [2] - 1428:1, 1432:1
**CHU** [9] - 1341:8, 1341:12, 1342:4, 1370:10, 1370:18, 1397:23, 1399:6, 1399:8, 1399:16
**Chu** [21] - 1319:4, 1341:10, 1370:9, 1397:21, 1399:4, 1399:15, 1416:25, 1418:3, 1418:8, 1418:25, 1423:20, 1424:12, 1427:4, 1437:4, 1438:8, 1439:12, 1443:3, 1450:17, 1453:12,

1455:25, 1458:4
**Chu's** [2] - 1398:14, 1398:22
**circuit** [1] - 1323:19
**circumstances** [4] - 1354:21, 1365:18, 1366:4, 1409:13
**citation** [1] - 1399:25
**cites** [2] - 1375:9, 1452:18
**City** [1] - 1320:6
**civil** [1] - 1393:16
**claim** [58] - 1323:15, 1338:21, 1347:12, 1347:14, 1347:20, 1350:20, 1352:18, 1352:19, 1352:20, 1352:22, 1352:23, 1352:24, 1353:1, 1353:2, 1353:3, 1353:5, 1353:7, 1353:8, 1353:11, 1353:13, 1353:14, 1353:15, 1353:16, 1353:18, 1353:19, 1353:20, 1353:21, 1353:22, 1353:23, 1353:25, 1354:1, 1354:3, 1354:4, 1354:13, 1355:9, 1355:11, 1355:13, 1357:23, 1358:10, 1358:11, 1360:2, 1381:17, 1438:13, 1438:15, 1438:16, 1455:17, 1457:25, 1461:3, 1461:6, 1462:23
**claimed** [14] - 1350:17, 1357:25, 1358:9, 1358:18, 1358:22, 1359:8, 1359:13, 1361:4, 1395:4, 1440:8, 1448:10, 1455:19, 1457:10
**claiming** [1] - 1436:10
**claims** [73] - 1326:24, 1327:5, 1327:6, 1327:9, 1327:10, 1327:20, 1328:10, 1329:1, 1329:3, 1331:10, 1331:12, 1331:16, 1331:17, 1338:20, 1338:22, 1339:7, 1339:8, 1348:1, 1348:10, 1348:13, 1348:20, 1348:22, 1348:25, 1349:1, 1349:16,

1349:17, 1349:25, 1350:1, 1350:16, 1350:25, 1351:17, 1351:20, 1351:23, 1352:14, 1352:16, 1352:23, 1353:10, 1353:11, 1353:17, 1353:18, 1353:23, 1354:1, 1354:3, 1354:6, 1354:7, 1355:3, 1355:5, 1355:7, 1357:3, 1357:9, 1358:3, 1358:4, 1358:17, 1359:20, 1381:18, 1382:4, 1389:2, 1390:6, 1393:15, 1394:11, 1401:2, 1414:8, 1414:23, 1420:15, 1422:4, 1439:18, 1440:16, 1440:17, 1441:18, 1449:25, 1450:1, 1454:13, 1458:13
**clarified** [1] - 1325:9
**clarity** [1] - 1334:15
**clear** [32] - 1326:22, 1328:4, 1347:17, 1347:18, 1348:22, 1355:6, 1357:14, 1358:16, 1358:22, 1359:19, 1359:25, 1376:9, 1384:10, 1393:15, 1394:4, 1394:6, 1400:14, 1414:16, 1414:22, 1414:25, 1415:6, 1415:10, 1415:11, 1415:13, 1415:14, 1415:23, 1416:17, 1439:2, 1439:3, 1439:25, 1453:25, 1460:25
**clearly** [16] - 1357:4, 1357:7, 1382:1, 1394:11, 1400:13, 1436:9, 1441:20, 1441:23, 1441:24, 1447:23, 1448:11, 1448:12, 1448:20, 1461:22, 1464:22, 1465:4
**clerical** [13] - 1356:24, 1357:1, 1392:11, 1392:22, 1393:3, 1394:9, 1394:24, 1400:5, 1441:19, 1460:13, 1461:1, 1461:3, 1461:9
**clerk** [2] - 1368:18,

1369:10
**CLERK** [6] - 1342:1, 1342:17, 1398:5, 1399:10, 1417:11, 1465:14
**clients** [1] - 1344:19
**clinical** [17] - 1374:8, 1378:10, 1378:16, 1384:13, 1406:24, 1410:6, 1423:7, 1424:11, 1427:12, 1428:4, 1428:9, 1428:11, 1429:6, 1430:19, 1432:3, 1432:6, 1445:21
**close** [6] - 1339:5, 1339:7, 1343:1, 1376:15, 1387:23, 1417:20
**closely** [1] - 1381:25
**closer** [1] - 1327:23
**closing** [21] - 1323:14, 1324:20, 1324:25, 1326:10, 1328:17, 1329:22, 1332:7, 1332:13, 1334:8, 1334:17, 1335:20, 1336:1, 1336:12, 1339:20, 1341:11, 1342:11, 1344:14, 1398:14, 1398:22, 1416:22, 1465:12
**closings** [2] - 1330:11, 1335:24
**clue** [2] - 1443:22, 1443:24
**COC** [6] - 1397:6, 1397:15, 1397:17, 1397:18, 1399:20
**codon** [3] - 1462:11, 1462:24
**coincidence** [3] - 1396:4, 1396:20, 1460:17
**coinventors** [1] - 1392:16
**collaboration** [3] - 1440:13, 1440:24, 1455:14
**collaborator** [1] - 1412:21
**collaborators** [2] - 1409:7, 1411:8
**colleague** [1] - 1431:9
**colleagues** [2] - 1371:12, 1371:21
**colluded** [1] - 1455:9
**coming** [3] - 1419:4, 1427:6, 1427:7
**commence** [1] -

1424:11
**commentary** [1] - 1367:6
**commented** [1] - 1409:9
**commercial** [4] - 1362:23, 1363:10, 1363:16, 1374:4
**commercialize** [1] - 1372:14
**Commission** [2] - 1390:17, 1390:23
**common** [5] - 1387:9, 1392:13, 1403:3, 1403:10, 1412:13
**communicate** [7] - 1366:15, 1366:16, 1368:17, 1368:19, 1368:20, 1368:21, 1378:5
**communicating** [2] - 1366:24, 1375:21
**communication** [1] - 1339:18
**communications** [2] - 1351:4, 1368:1
**companies** [4] - 1390:19, 1409:21, 1411:8, 1413:17
**company** [14] - 1371:2, 1377:23, 1378:2, 1380:8, 1380:10, 1380:13, 1384:19, 1397:9, 1397:10, 1404:22, 1409:18, 1411:7, 1429:5, 1435:23
**comparability** [1] - 1339:16
**comparable** [3] - 1362:14, 1363:25, 1365:11
**compare** [3] - 1405:3, 1413:12, 1415:21
**compared** [3] - 1407:16, 1412:6, 1456:19
**comparing** [2] - 1416:12, 1428:17
**comparison** [1] - 1404:15
**compensate** [6] - 1349:3, 1349:19, 1350:3, 1360:4, 1360:6, 1360:12
**compensation** [1] - 1416:16
**compete** [4] - 1409:21, 1409:22, 1409:23, 1426:11

competing [1] - 1415:16

competitive [1] - 1405:16

competitor [4] - 1412:21, 1420:3, 1435:24, 1436:1

competitors [3] - 1362:24, 1409:8, 1409:21

complete [4] - 1369:9, 1404:6, 1404:13, 1434:17

completed [2] - 1410:19, 1433:13

completely [3] - 1382:7, 1401:18, 1454:22

component [2] - 1401:5, 1401:14

components [2] - 1361:25, 1421:8

concern [4] - 1337:16, 1337:18, 1340:3, 1380:15

concerned [2] - 1375:20, 1405:23

concerning [2] - 1365:8, 1368:22

concerns [2] - 1405:21, 1427:5

conclude [3] - 1414:13, 1445:10, 1464:17

concluded [4] - 1381:20, 1431:4, 1465:6, 1465:7

concludes [1] - 1370:7

conclusion [1] - 1400:4

conclusively [2] - 1427:15, 1427:21

conditions [2] - 1356:21, 1362:22

conduct [1] - 1354:22

conducting [2] - 1355:24, 1430:19

confer [1] - 1326:14

conference [2] - 1336:10, 1378:21

confident [1] - 1407:13

confirms [1] - 1375:14

confusing [6] - 1330:1, 1336:19, 1397:5, 1437:20, 1439:2, 1439:25

confusion [5] - 1321:16, 1326:1,

1336:5, 1425:11, 1428:24

connection [4] - 1389:4, 1401:9, 1402:4, 1411:6

conscientious [1] - 1370:1

consciously [1] - 1354:15

consider [17] - 1344:2, 1344:7, 1344:9, 1345:1, 1345:3, 1345:25, 1354:14, 1354:20, 1359:6, 1362:6, 1362:8, 1364:20, 1364:22, 1365:8, 1365:13, 1366:2, 1423:6

consideration [1] - 1339:17

considered [6] - 1344:24, 1351:2, 1352:4, 1369:21, 1395:12, 1425:5

considering [2] - 1345:11, 1361:9

consistent [6] - 1321:6, 1340:19, 1345:21, 1402:22, 1402:24, 1464:11

consists [1] - 1344:3

constraints [1] - 1421:16

construct [35] - 1377:10, 1382:19, 1382:21, 1383:1, 1388:2, 1388:24, 1389:19, 1396:7, 1396:9, 1396:10, 1406:8, 1406:13, 1406:14, 1406:18, 1406:21, 1420:9, 1424:6, 1424:8, 1426:21, 1427:2, 1429:10, 1432:4, 1432:7, 1432:13, 1432:20, 1440:3, 1440:5, 1440:12, 1440:19, 1441:2, 1453:17, 1453:19, 1463:8, 1464:3

constructed [2] - 1389:16, 1389:19

construction [1] - 1438:13

constructions [1] - 1351:24

constructs [2] - 1432:9, 1442:7

construed [1] - 1352:2

consult [2] - 1343:13, 1368:23

consulting [1] - 1367:7

contacted [1] - 1379:7

contain [5] - 1357:24, 1358:21, 1390:20, 1441:18, 1449:19

contained [1] - 1421:20

contains [2] - 1420:25, 1461:19

contending [1] - 1348:11

contends [1] - 1348:6

contention [1] - 1400:17

contentions [4] - 1326:20, 1337:13, 1347:23, 1347:24

contents [1] - 1346:16

continue [3] - 1368:25, 1373:8, 1399:13

continued [4] - 1320:1, 1324:11, 1350:23, 1461:24

contracting [1] - 1365:19

contradicted [1] - 1345:17

contradicting [2] - 1388:11, 1389:7

contradictions [1] - 1378:24

contrary [6] - 1372:24, 1380:2, 1388:15, 1406:19, 1416:10, 1443:5

contributing [1] - 1427:14

control [2] - 1418:24, 1419:1

controls [1] - 1344:17

conundrum [1] - 1328:13

conversation [2] - 1417:25, 1453:14

conversely [1] - 1439:19

convince [1] - 1385:1

convincing [22] - 1326:23, 1328:4, 1347:17, 1347:19, 1348:23, 1355:6, 1357:14, 1358:16, 1359:19, 1359:25, 1393:15, 1394:5, 1394:7, 1414:17, 1414:23, 1415:6,

1415:11, 1415:12, 1415:13, 1415:14, 1415:23, 1416:17

copied [2] - 1374:23, 1375:13

copies [2] - 1334:4, 1335:6

copy [4] - 1321:5, 1332:9, 1343:7, 1343:12

copying [1] - 1375:19

corner [1] - 1399:25

corporation [1] - 1389:22

correct [36] - 1323:8, 1323:9, 1325:7, 1327:11, 1327:16, 1332:21, 1333:23, 1338:12, 1341:7, 1341:24, 1351:10, 1356:18, 1356:23, 1357:1, 1357:4, 1375:18, 1376:20, 1380:16, 1389:10, 1389:13, 1389:16, 1389:17, 1389:19, 1394:9, 1395:10, 1395:21, 1395:22, 1401:6, 1423:22, 1437:3, 1437:6, 1438:8, 1442:22, 1459:5, 1460:13, 1466:2

corrected [8] - 1352:3, 1356:16, 1357:8, 1357:17, 1414:8, 1458:12, 1460:14, 1461:5

correction [111] - 1324:16, 1324:19, 1324:25, 1325:2, 1326:23, 1327:2, 1327:9, 1327:13, 1327:16, 1327:19, 1328:15, 1328:21, 1329:2, 1330:7, 1331:8, 1331:15, 1335:23, 1339:6, 1339:12, 1339:20, 1340:10, 1348:6, 1348:8, 1348:12, 1348:19, 1348:22, 1348:24, 1349:15, 1349:24, 1351:10, 1351:11, 1351:14, 1351:15, 1352:4, 1352:13, 1352:16, 1354:5, 1355:3, 1355:5, 1355:7, 1355:9, 1355:11,

1355:13, 1356:13, 1356:17, 1356:18, 1356:20, 1356:23, 1357:1, 1357:2, 1357:10, 1357:12, 1357:15, 1357:17, 1357:20, 1357:21, 1360:1, 1383:25, 1384:2, 1384:9, 1386:1, 1386:3, 1386:6, 1386:8, 1386:9, 1386:17, 1386:21, 1392:11, 1393:5, 1393:12, 1394:5, 1394:9, 1394:10, 1394:16, 1394:22, 1395:2, 1395:14, 1399:19, 1400:4, 1400:5, 1400:12, 1414:16, 1414:17, 1422:13, 1425:14, 1425:15, 1437:2, 1437:5, 1437:7, 1437:12, 1438:1, 1439:5, 1439:17, 1439:19, 1439:23, 1441:16, 1441:17, 1442:1, 1448:9, 1448:16, 1448:22, 1448:25, 1449:1, 1449:4, 1449:23, 1458:6, 1458:11, 1458:18, 1458:21, 1459:3, 1464:9

correctly [1] - 1463:7

corresponding [1] - 1463:7

cost [3] - 1359:10, 1410:12, 1411:2

costim [13] - 1421:6, 1421:22, 1422:3, 1422:18, 1423:4, 1423:13, 1425:20, 1445:14, 1445:17, 1446:1, 1451:10, 1451:17, 1452:21

costimulatory [10] - 1420:16, 1422:23, 1423:11, 1436:18, 1436:23, 1442:13, 1442:24, 1454:17

counsel [22] - 1321:2, 1321:9, 1328:1, 1330:15, 1330:20, 1334:11, 1335:4, 1335:13, 1336:2, 1342:20, 1343:9, 1368:24, 1369:7, 1369:12, 1370:13,

1370:14, 1389:24, 1398:9, 1398:10, 1399:13, 1399:14, 1456:2
**COUNSEL** [1] - 1319:1
**counsel's** [1] - 1398:25
**count** [2] - 1369:3, 1418:4
**couple** [6] - 1329:14, 1375:7, 1391:8, 1398:13, 1428:4, 1431:21
**course** [14] - 1369:24, 1373:24, 1375:2, 1376:24, 1398:25, 1402:20, 1405:23, 1407:5, 1408:7, 1411:2, 1415:3, 1446:18, 1459:11, 1461:16
**COURT** [106] - 1318:1, 1321:1, 1321:21, 1322:7, 1322:9, 1323:10, 1324:3, 1324:14, 1324:21, 1325:11, 1326:3, 1326:12, 1326:18, 1327:12, 1327:21, 1328:2, 1328:7, 1328:9, 1328:16, 1328:19, 1328:22, 1328:24, 1329:6, 1329:9, 1329:12, 1329:16, 1330:2, 1330:4, 1330:12, 1330:17, 1330:20, 1330:25, 1331:4, 1331:6, 1331:13, 1331:20, 1331:24, 1332:1, 1332:3, 1332:10, 1332:15, 1332:20, 1332:22, 1333:3, 1333:5, 1333:8, 1333:10, 1333:19, 1333:21, 1333:24, 1334:13, 1334:23, 1335:2, 1335:7, 1335:10, 1335:15, 1336:1, 1336:8, 1336:24, 1337:2, 1337:18, 1338:5, 1338:8, 1338:11, 1338:13, 1338:16, 1338:18, 1339:3, 1339:9, 1339:25, 1340:3, 1340:5, 1340:7, 1340:10, 1340:15,

1340:24, 1341:1, 1341:5, 1341:10, 1341:13, 1341:18, 1341:20, 1341:23, 1342:2, 1342:9, 1342:15, 1342:19, 1349:12, 1349:14, 1349:23, 1370:12, 1397:21, 1398:1, 1398:8, 1398:16, 1398:23, 1399:2, 1399:7, 1399:12, 1416:25, 1417:4, 1417:6, 1417:9, 1417:12, 1417:14, 1465:8
**Court** [36] - 1322:15, 1323:1, 1323:10, 1323:20, 1324:12, 1324:17, 1325:3, 1325:8, 1326:3, 1332:8, 1334:10, 1334:21, 1336:6, 1336:11, 1336:15, 1336:17, 1336:23, 1337:13, 1337:20, 1337:24, 1342:5, 1342:24, 1345:4, 1349:10, 1367:18, 1368:15, 1369:2, 1370:18, 1394:15, 1398:20, 1438:14, 1438:22, 1440:17, 1455:23, 1464:24, 1465:16
**court** [10] - 1318:25, 1339:18, 1367:4, 1367:22, 1368:7, 1368:22, 1369:16, 1390:4, 1445:16
**Court's** [5] - 1329:23, 1344:22, 1394:8, 1438:13, 1457:20
**courtroom** [11] - 1342:18, 1367:25, 1369:11, 1370:24, 1392:19, 1396:22, 1398:2, 1398:6, 1399:11, 1401:22, 1465:15
**cover** [9] - 1324:23, 1328:3, 1331:13, 1337:3, 1353:6, 1436:24, 1456:14, 1456:20, 1457:25
**coverage** [1] - 1353:1
**covered** [5] - 1352:22, 1353:13, 1354:3, 1425:18, 1441:3
**covers** [7] - 1338:22,

1352:19, 1353:7, 1353:15, 1353:25, 1396:7, 1396:8
**Crawford** [1] - 1319:5
**created** [1] - 1372:23
**credentialed** [1] - 1448:6
**credibility** [9] - 1337:9, 1387:4, 1387:10, 1387:21, 1416:7, 1418:4, 1419:9, 1457:4, 1457:15
**credible** [3] - 1416:16, 1416:17, 1455:6
**credit** [5] - 1377:15, 1377:17, 1377:18, 1377:21
**credited** [1] - 1364:3
**critical** [5] - 1429:9, 1439:25, 1441:10, 1443:19, 1454:9
**criticized** [1] - 1456:2
**cross** [4] - 1390:16, 1418:12, 1445:24, 1463:15
**cross-examination** [3] - 1390:16, 1418:12, 1445:24
**cross-examined** [1] - 1463:15
**CRR** [2] - 1318:22, 1466:9
**CRS** [1] - 1405:21
**Cruz** [4] - 1321:5, 1341:21, 1417:6, 1417:10
**curative** [3] - 1322:14, 1322:17, 1339:21
**cure** [1] - 1371:16
**current** [5] - 1363:10, 1422:16, 1423:12, 1432:8, 1432:18
**customary** [3] - 1363:24, 1391:13, 1391:16
**cut** [4] - 1442:25, 1459:22, 1459:23, 1460:10
**cuts** [2] - 1442:21, 1460:3
**cutting** [1] - 1442:17
**cytokine** [2] - 1404:15, 1428:18

**D**

**damage** [1] - 1350:8
**damages** [29] - 1322:1, 1323:18,

1326:25, 1339:13, 1348:1, 1349:2, 1349:6, 1349:18, 1350:2, 1350:6, 1354:25, 1359:22, 1359:23, 1360:3, 1360:5, 1360:7, 1360:10, 1360:11, 1360:15, 1360:16, 1360:19, 1360:21, 1360:23, 1360:25, 1361:15, 1365:2, 1365:21, 1405:24, 1409:3
**Dane** [6] - 1319:18, 1328:2, 1329:10, 1333:9, 1417:1, 1465:8
**DANE** [43] - 1321:18, 1321:22, 1326:8, 1326:16, 1326:19, 1327:15, 1328:5, 1328:8, 1328:10, 1329:14, 1330:23, 1331:2, 1331:5, 1331:7, 1331:18, 1331:21, 1331:25, 1333:7, 1333:15, 1333:20, 1334:6, 1334:15, 1335:1, 1336:25, 1339:1, 1339:4, 1341:4, 1341:9, 1341:16, 1341:19, 1341:21, 1341:25, 1342:7, 1342:11, 1349:9, 1349:13, 1349:21, 1398:13, 1398:21, 1417:2, 1417:7, 1417:13, 1417:15
**Dash** [11] - 1377:25, 1378:11, 1378:18, 1378:22, 1379:16, 1379:24, 1380:7, 1380:9, 1388:13, 1416:9, 1416:11
**Dash's** [1] - 1388:15
**data** [2] - 1408:18, 1428:16
**date** [14] - 1339:14, 1351:8, 1359:17, 1361:18, 1361:20, 1365:25, 1366:6, 1369:10, 1408:21, 1410:8, 1410:16, 1410:25, 1412:25, 1443:23
**dated** [1] - 1422:21
**dates** [2] - 1384:21, 1386:22

**DAY** [3] - 1319:8, 1319:10, 1319:13
**days** [2] - 1404:11, 1428:23
**dead** [1] - 1419:20
**deal** [6] - 1372:13, 1374:11, 1391:19, 1392:6, 1437:23, 1442:2
**death** [2] - 1428:3, 1430:21
**deaths** [15] - 1403:21, 1404:1, 1404:2, 1416:15, 1427:3, 1427:10, 1428:2, 1428:5, 1428:10, 1428:13, 1429:23, 1430:15, 1431:5, 1450:22
**December** [3] - 1318:15, 1384:15, 1466:9
**decide** [24] - 1321:23, 1326:22, 1326:25, 1343:20, 1345:5, 1345:8, 1346:1, 1346:3, 1348:14, 1348:18, 1349:2, 1349:18, 1350:2, 1350:7, 1352:15, 1368:6, 1369:20, 1372:19, 1379:1, 1387:13, 1404:21, 1416:1
**decided** [11] - 1321:24, 1328:3, 1336:18, 1367:21, 1425:6, 1425:8, 1431:21, 1442:14, 1442:16, 1454:18, 1454:19
**decides** [1] - 1382:4
**deciding** [4] - 1344:2, 1344:9, 1345:7, 1355:2
**decision** [10] - 1350:8, 1351:12, 1354:24, 1370:1, 1370:4, 1384:14, 1402:11, 1402:17, 1402:18, 1415:3
**decisions** [1] - 1352:15
**declaration** [6] - 1381:14, 1381:16, 1381:21, 1402:4, 1418:15, 1456:3
**declarations** [1] - 1391:9
**deceased** [1] -

1364:23
**Defendant** [2] - 1318:9, 1319:16
**defendant** [7] - 1322:14, 1348:9, 1389:22, 1392:24, 1393:20, 1395:17, 1415:24
**defendant's** [9] - 1322:11, 1323:2, 1323:4, 1323:10, 1323:21, 1325:12, 1325:13, 1325:15, 1365:5
**defendants** [7] - 1321:17, 1322:13, 1322:22, 1323:12, 1324:7, 1325:24, 1336:25
**defense** [12] - 1341:4, 1347:12, 1347:14, 1347:20, 1385:15, 1385:22, 1392:21, 1393:13, 1393:17, 1400:16, 1403:16, 1415:7
**defenses** [7] - 1321:24, 1327:1, 1356:14, 1387:2, 1400:18, 1437:1, 1453:9
**define** [4] - 1436:10, 1454:14, 1454:18, 1454:19
**defined** [2] - 1335:20, 1462:23
**defines** [8] - 1338:21, 1352:18, 1449:14, 1449:15, 1454:23, 1464:23, 1464:25, 1465:2
**definition** [6] - 1325:1, 1325:17, 1339:14, 1352:10, 1429:22, 1457:20
**degrees** [1] - 1389:23
**delay** [3] - 1326:12, 1335:18, 1342:25
**deleted** [2] - 1422:12, 1438:1
**deleting** [1] - 1323:5
**deliberate** [2] - 1339:19, 1354:15
**deliberately** [2] - 1346:4, 1387:13
**deliberating** [1] - 1421:14
**deliberation** [1] - 1369:7
**deliberations** [9] -

1343:8, 1343:14, 1366:14, 1368:16, 1369:1, 1369:9, 1369:13, 1369:15, 1446:4
**demand** [1] - 1435:16
**demonstrate** [1] - 1358:1
**demonstration** [1] - 1373:10
**demonstratives** [5] - 1341:14, 1341:15, 1341:17, 1346:14, 1346:18
**denied** [2] - 1368:8, 1398:17
**dependent** [10] - 1338:22, 1353:11, 1353:18, 1353:22, 1353:23, 1353:24, 1353:25, 1354:2, 1354:4
**deposition** [8] - 1377:3, 1381:8, 1381:10, 1388:5, 1389:11, 1389:18, 1419:6, 1431:8
**depositions** [1] - 1391:8
**derivative** [1] - 1363:6
**described** [5] - 1358:8, 1424:13, 1431:11, 1445:25
**describes** [4] - 1350:17, 1351:18, 1446:7, 1446:9
**describing** [3] - 1445:2, 1445:13, 1464:6
**description** [15] - 1339:12, 1356:13, 1357:24, 1357:25, 1358:1, 1358:5, 1358:9, 1358:18, 1358:21, 1375:10, 1385:23, 1400:18, 1401:1, 1402:19, 1415:6
**deserves** [3] - 1346:13, 1346:20, 1347:1
**design** [2] - 1382:24, 1414:2
**design-around** [1] - 1382:24
**designed** [1] - 1362:22
**designing** [1] - 1356:3
**desired** [1] - 1364:13
**despite** [1] - 1428:10

**detail** [2] - 1381:12, 1397:14
**detailed** [1] - 1381:7
**details** [2] - 1372:3, 1372:5
**detection** [1] - 1409:19
**determination** [9] - 1362:9, 1365:20, 1398:19, 1398:24, 1418:16, 1432:14, 1448:7, 1455:6, 1455:10
**determine** [9] - 1350:16, 1353:14, 1353:24, 1354:8, 1354:23, 1360:2, 1361:14, 1432:15, 1448:20
**determined** [3] - 1355:13, 1427:13, 1440:24
**determines** [2] - 1458:10, 1458:20
**determining** [4] - 1354:19, 1359:5, 1362:5, 1365:7
**develop** [1] - 1425:8
**developed** [3] - 1423:24, 1441:2, 1441:13
**developing** [2] - 1423:12, 1425:9
**development** [1] - 1425:7
**device** [1] - 1352:21
**devices** [2] - 1363:13, 1367:12
**Diaz** [2] - 1466:9, 1466:10
**DIAZ** [1] - 1318:22
**Dickinson** [1] - 1390:8
**dictionaries** [1] - 1367:8
**died** [1] - 1427:23
**Diego** [1] - 1320:4
**differ** [2] - 1344:16, 1396:5
**difference** [5] - 1377:9, 1410:1, 1423:15, 1439:20, 1442:12
**differences** [7] - 1346:1, 1365:16, 1409:14, 1422:22, 1431:16, 1431:17
**different** [41] - 1323:24, 1334:17, 1345:22, 1347:8, 1361:24, 1372:6,

1377:22, 1379:25, 1382:11, 1384:2, 1384:4, 1390:13, 1391:9, 1401:18, 1402:8, 1403:13, 1406:17, 1421:1, 1421:25, 1422:18, 1423:10, 1423:19, 1426:5, 1430:5, 1433:18, 1437:22, 1438:10, 1438:11, 1443:3, 1450:5, 1452:22, 1454:4, 1454:7, 1454:8, 1454:11, 1458:23, 1461:4, 1463:13
**differentiated** [1] - 1422:25
**differentiator** [2] - 1422:23, 1425:21
**differently** [1] - 1345:25
**differs** [1] - 1346:2
**difficult** [1] - 1448:6
**difficulties** [1] - 1432:21
**diligently** [2] - 1343:1, 1369:17
**direct** [3] - 1328:22, 1378:24, 1458:20
**directly** [4] - 1380:2, 1388:11, 1389:7, 1416:10
**director** [2] - 1395:1, 1395:15
**disadvantage** [2] - 1394:17, 1394:18
**disadvantages** [2] - 1383:16, 1405:20
**disagree** [1] - 1401:6
**disappointment** [1] - 1431:11
**discard** [1] - 1401:17
**discharged** [1] - 1369:5
**discipline** [1] - 1355:23
**disclosed** [2] - 1358:12, 1453:3
**discloses** [1] - 1359:12
**disclosure** [2] - 1402:12, 1446:12
**disconnect** [1] - 1429:7
**discovered** [2] - 1393:8
**discuss** [9] - 1321:12, 1329:9, 1329:17, 1347:16, 1367:3,

1378:23, 1398:3, 1399:21, 1465:11
**discussed** [10] - 1321:19, 1326:2, 1332:18, 1367:11, 1367:13, 1369:22, 1373:23, 1375:14, 1453:4, 1465:9
**discussing** [3] - 1347:8, 1366:13, 1366:18
**discussion** [6] - 1321:4, 1370:3, 1379:19, 1379:23, 1431:12, 1454:21
**discussions** [2] - 1333:13, 1379:25
**disease** [1] - 1424:22, 1429:13
**disgruntled** [2] - 1420:3, 1435:24
**dishonest** [1] - 1450:18
**dishonestly** [1] - 1457:6
**dishwasher** [1] - 1403:7
**dislikes** [1] - 1343:19
**disparaged** [1] - 1450:17
**dispositive** [1] - 1364:19
**dispute** [4] - 1325:9, 1338:8, 1350:10, 1451:25
**disregard** [1] - 1344:23
**distinct** [1] - 1365:3
**distinctly** [1] - 1379:24
**distinguished** [1] - 1364:3
**distracted** [1] - 1342:3
**distraction** [1] - 1335:19
**DISTRICT** [3] - 1318:1, 1318:2, 1318:3
**divisible** [4] - 1462:4, 1462:5, 1462:8, 1463:1
**DIVISION** [1] - 1318:2
**DNA** [3] - 1356:3, 1453:7, 1454:16
**doctors** [1] - 1371:16
**document** [7] - 1379:5, 1383:16, 1389:4, 1411:15, 1422:21, 1433:10, 1462:3
**Document** [6] -

1332:6, 1332:12, 1336:7, 1336:20, 1338:1, 1338:7
**documentation** [3] - 1376:11, 1405:15, 1413:11
**documents** [13] - 1346:16, 1351:4, 1377:2, 1377:5, 1380:1, 1381:7, 1383:18, 1385:21, 1385:25, 1386:14, 1386:18, 1407:8, 1422:21
**dog** [2] - 1392:1, 1457:16
**dollars** [4] - 1391:21, 1409:22, 1413:3, 1413:18
**domain** [4] - 1420:16, 1422:23, 1446:7
**domains** [2] - 1377:11, 1377:12
**done** [10] - 1343:24, 1371:8, 1371:22, 1408:9, 1412:15, 1423:10, 1442:6, 1443:8, 1443:10, 1451:5
**dose** [1] - 1371:14
**double** [1] - 1414:2
**doubt** [3] - 1396:25, 1459:22, 1460:4
**down** [8] - 1410:8, 1410:24, 1419:8, 1421:13, 1427:24, 1428:13, 1429:1, 1431:14
**dr** [1] - 1388:23
**Dr** [288] - 1371:12, 1371:18, 1371:19, 1371:21, 1371:22, 1372:5, 1372:7, 1372:10, 1372:12, 1372:16, 1373:10, 1373:11, 1373:17, 1373:19, 1373:23, 1373:24, 1374:6, 1374:16, 1374:19, 1374:23, 1374:24, 1375:2, 1375:5, 1375:8, 1375:10, 1375:11, 1375:12, 1375:13, 1375:14, 1375:16, 1375:17, 1375:19, 1375:21, 1375:22, 1375:23, 1375:25, 1376:2, 1376:5, 1376:6, 1376:7, 1376:12,

1376:15, 1376:17, 1376:18, 1377:8, 1377:13, 1377:14, 1377:15, 1377:20, 1377:21, 1377:25, 1378:1, 1378:3, 1378:11, 1378:13, 1378:15, 1378:18, 1378:22, 1379:2, 1379:4, 1379:7, 1379:10, 1379:15, 1379:16, 1379:18, 1379:22, 1379:24, 1380:1, 1380:2, 1380:4, 1380:6, 1380:7, 1380:9, 1380:14, 1380:23, 1381:5, 1381:14, 1381:15, 1381:20, 1381:21, 1381:25, 1382:1, 1382:19, 1382:20, 1383:1, 1383:5, 1383:20, 1385:10, 1385:11, 1387:22, 1387:23, 1388:2, 1388:7, 1388:12, 1388:13, 1388:15, 1388:18, 1389:8, 1389:15, 1390:24, 1391:18, 1391:25, 1392:16, 1393:2, 1395:18, 1396:11, 1396:20, 1397:3, 1399:21, 1400:8, 1400:9, 1400:11, 1400:13, 1400:22, 1400:23, 1400:24, 1401:3, 1401:9, 1401:15, 1401:17, 1401:19, 1401:21, 1401:23, 1401:24, 1402:3, 1402:7, 1402:9, 1402:22, 1402:23, 1402:24, 1403:2, 1403:3, 1403:10, 1403:12, 1403:25, 1406:5, 1406:14, 1406:18, 1407:19, 1409:9, 1409:11, 1416:8, 1416:9, 1416:11, 1416:13, 1416:18, 1418:7, 1418:8, 1418:16, 1420:9, 1420:17, 1421:19, 1421:24, 1423:2, 1423:9, 1424:10, 1424:16, 1425:3, 1425:16, 1426:21, 1427:2, 1427:8, 1427:12,

1428:21, 1429:1, 1429:10, 1429:18, 1429:20, 1429:21, 1429:23, 1430:9, 1430:12, 1430:18, 1431:9, 1432:3, 1432:6, 1432:10, 1432:11, 1432:13, 1432:20, 1433:14, 1433:15, 1435:9, 1440:3, 1440:13, 1440:20, 1440:21, 1442:11, 1442:24, 1443:11, 1443:12, 1443:13, 1443:15, 1444:4, 1444:5, 1444:6, 1444:7, 1444:8, 1444:18, 1444:21, 1445:7, 1445:13, 1445:24, 1446:19, 1447:15, 1448:12, 1448:13, 1450:7, 1450:9, 1450:13, 1450:15, 1450:17, 1450:20, 1451:2, 1452:12, 1452:13, 1452:14, 1452:15, 1452:16, 1452:18, 1452:19, 1452:25, 1453:1, 1453:15, 1453:16, 1453:17, 1453:18, 1453:19, 1453:24, 1454:1, 1454:18, 1454:25, 1455:5, 1455:9, 1455:11, 1455:12, 1455:13, 1455:25, 1456:11, 1456:14, 1456:15, 1456:18, 1456:22, 1457:3, 1457:5, 1457:9, 1457:14, 1458:17, 1458:25, 1459:1, 1459:11, 1459:15, 1460:17, 1460:22, 1461:10, 1462:4, 1463:15, 1463:17, 1463:20, 1463:21, 1463:24, 1463:25, 1465:3
**dramatically** [2] - 1374:11, 1410:13
**dramatics** [1] - 1420:2
**dropout** [1] - 1403:7
**dropped** [1] - 1382:18
**Drs** [1] - 1375:22
**drug** [8] - 1371:14, 1372:24, 1372:25, 1373:3, 1373:11, 1392:15, 1449:18

**dual** [3] - 1424:17, 1425:12, 1450:24
**Dulac** [3] - 1407:25, 1408:10, 1412:10
**duration** [1] - 1363:7
**during** [19] - 1325:21, 1335:12, 1335:14, 1335:20, 1335:23, 1337:11, 1341:24, 1343:14, 1356:11, 1366:3, 1366:14, 1367:13, 1368:16, 1386:24, 1398:3, 1398:25, 1402:11, 1416:22, 1465:11
**duty** [5] - 1337:6, 1339:19, 1343:11, 1343:15, 1344:19
**DX1054** [1] - 1446:9
**DX20** [1] - 1421:2
**DX2004** [1] - 1446:9
**DX2061** [1] - 1421:12
**DX2149** [1] - 1451:18
**DX573** [1] - 1433:11

---

# E

**e-mail** [10] - 1366:19, 1373:16, 1374:24, 1375:5, 1376:22, 1379:10, 1383:19, 1385:17, 1453:13, 1453:15
**e-mails** [7] - 1376:24, 1385:17, 1386:15, 1456:12
**eager** [2] - 1379:12
**earliest** [2] - 1410:8, 1434:5
**early** [12] - 1342:10, 1409:8, 1409:19, 1410:1, 1410:3, 1410:12, 1410:23, 1411:11, 1412:20, 1416:14, 1430:1, 1432:13
**earn** [1] - 1413:3
**earned** [1] - 1366:7
**easier** [3] - 1342:13, 1427:19, 1427:20
**easy** [4] - 1330:9, 1403:5, 1425:25
**economic** [1] - 1365:18
**Ed** [2] - 1407:25, 1412:10
**edema** [5] - 1405:11, 1429:25, 1430:13, 1430:22, 1431:7
**education** [2] -

1355:17, 1387:9
**educational** [1] - 1383:5
**Edward** [1] - 1319:18
**effect** [5] - 1363:2, 1370:5, 1390:11, 1429:3, 1462:15
**effectively** [1] - 1412:19
**effects** [3] - 1428:17, 1428:18, 1429:1
**efficacy** [2] - 1405:15, 1405:16
**eight** [1] - 1419:7
**either** [11] - 1327:18, 1328:5, 1342:4, 1355:23, 1359:25, 1361:17, 1404:12, 1425:13, 1447:9, 1460:24
**EI** [1] - 1320:3
**elect** [1] - 1369:13
**electronic** [1] - 1366:19
**element** [8] - 1326:2, 1352:7, 1406:13, 1420:17, 1422:3, 1436:19, 1436:24, 1442:7
**elements** [4] - 1322:24, 1353:3, 1353:8, 1364:4
**eligible** [1] - 1435:10
**Elizabeth** [1] - 1319:6
**embodiment** [1] - 1363:16
**embodying** [1] - 1364:15
**emphasized** [2] - 1323:18, 1442:11
**employee** [2] - 1457:11
**employees** [2] - 1374:9, 1453:13
**employer** [1] - 1366:25
**enable** [1] - 1358:23
**enablement** [11] - 1339:12, 1356:14, 1359:1, 1359:21, 1385:2, 1385:7, 1385:8, 1385:22, 1400:18, 1400:19, 1414:21
**enabling** [5] - 1359:2, 1359:16, 1402:10, 1402:12, 1402:18
**encode** [6] - 1438:3, 1438:6, 1438:19, 1438:25, 1446:16,

1462:12
**encoded** [7] -
1351:25, 1438:17,
1438:23, 1440:18,
1447:21, 1450:12,
1455:20
**encodes** [2] -
1438:21, 1455:22
**encoding** [3] - 1352:6,
1447:1, 1457:22
**encourage** [2] -
1398:17, 1410:22
**end** [17] - 1351:18,
1372:19, 1373:12,
1379:3, 1379:18,
1380:3, 1382:3,
1404:11, 1433:20,
1438:17, 1461:5,
1462:10, 1462:14,
1462:21, 1462:25,
1464:16
**ended** [1] - 1411:12
**enormous** [1] - 1397:7
**entered** [8] - 1325:14,
1361:11, 1366:6,
1374:7, 1398:24,
1410:2, 1440:13,
1440:23
**entering** [3] - 1362:2,
1374:9, 1455:14
**entire** [6] - 1368:13,
1371:2, 1395:22,
1395:24, 1400:15,
1406:12
**entirely** [1] - 1424:7
**entities** [1] - 1411:8
**entitled** [2] - 1360:21,
1368:5
**entity** [1] - 1374:5
**entrenched** [1] -
1383:10
**equal** [4] - 1387:11,
1415:9, 1415:10,
1415:17
**equally** [1] - 1416:16
**equivalent** [1] -
1404:6
**error** [41] - 1356:22,
1357:2, 1357:3,
1357:4, 1357:7,
1392:12, 1394:10,
1394:11, 1400:13,
1441:18, 1441:19,
1441:23, 1442:3,
1443:17, 1447:20,
1448:10, 1448:20,
1449:1, 1449:5,
1449:8, 1450:2,
1452:6, 1458:12,
1458:15, 1458:18,

1458:19, 1459:8,
1459:9, 1459:10,
1460:12, 1460:13,
1460:14, 1460:23,
1461:3, 1461:13,
1461:22, 1462:1
**errors** [13] - 1351:9,
1351:11, 1356:15,
1356:16, 1356:19,
1356:24, 1394:24,
1460:16, 1461:1,
1461:8, 1461:9,
1461:20
**essential** [1] - 1429:9
**established** [6] -
1347:15, 1347:21,
1362:12, 1362:19,
1363:9, 1394:21
**estimated** [3] -
1366:3, 1407:8,
1407:24
**estimates** [1] - 1407:7
**estimating** [1] -
1407:13
**et** [1] - 1318:5
**evaluating** [1] -
1415:15
**evaluation** [2] -
1365:21, 1414:12
**evening** [1] - 1321:7
**event** [3] - 1345:24,
1360:9, 1412:5
**events** [1] - 1404:16
**eventually** [2] -
1373:4, 1464:19
**evidence** [123] -
1325:14, 1325:25,
1326:23, 1328:4,
1329:21, 1337:7,
1337:8, 1337:10,
1339:17, 1343:11,
1343:16, 1343:21,
1343:25, 1344:2,
1344:4, 1344:8,
1344:9, 1344:12,
1344:15, 1344:19,
1344:24, 1344:25,
1345:2, 1345:3,
1345:5, 1345:6,
1345:16, 1345:18,
1346:10, 1346:15,
1346:17, 1346:18,
1346:20, 1346:22,
1346:23, 1346:24,
1347:1, 1347:3,
1347:4, 1347:11,
1347:13, 1347:17,
1347:19, 1348:17,
1348:23, 1349:7,
1350:7, 1354:11,

1355:6, 1356:4,
1356:8, 1357:14,
1358:16, 1359:19,
1359:25, 1363:21,
1364:20, 1365:8,
1365:14, 1365:24,
1366:4, 1366:10,
1367:21, 1369:22,
1370:6, 1373:13,
1375:4, 1381:15,
1385:12, 1386:25,
1391:12, 1393:7,
1393:15, 1393:19,
1393:22, 1393:25,
1395:3, 1395:6,
1395:13, 1395:17,
1396:4, 1399:19,
1401:8, 1402:25,
1403:18, 1406:19,
1406:25, 1407:2,
1407:3, 1407:20,
1408:13, 1413:23,
1414:7, 1414:9,
1414:10, 1414:12,
1414:17, 1414:18,
1414:23, 1415:1,
1415:6, 1415:7,
1415:9, 1415:21,
1416:17, 1419:13,
1420:6, 1420:11,
1421:11, 1431:20,
1431:21, 1445:8,
1447:20, 1448:15,
1450:5, 1451:3,
1451:18, 1455:24,
1458:20, 1458:23
**Evidence** [1] -
1344:21
**evident** [9] - 1357:4,
1376:23, 1394:11,
1400:13, 1441:20,
1441:23, 1441:24,
1448:13, 1461:22
**exact** [11] - 1358:10,
1372:5, 1396:21,
1405:13, 1419:6,
1421:8, 1430:16,
1442:15, 1443:18,
1451:16
**exactly** [4] - 1374:15,
1375:15, 1408:5,
1430:11
**examination** [9] -
1324:11, 1350:19,
1350:23, 1390:16,
1402:21, 1418:12,
1418:19, 1445:24,
1461:24
**examined** [5] -
1440:22, 1444:14,

1456:7, 1460:22,
1463:15
**examiner** [8] -
1350:15, 1350:20,
1350:24, 1351:3,
1351:5, 1402:10,
1402:15, 1402:20
**example** [11] -
1325:25, 1354:14,
1373:15, 1393:19,
1416:12, 1449:17,
1450:15, 1455:3,
1463:18, 1464:6
**examples** [9] -
1359:13, 1450:4,
1450:5, 1450:8,
1454:11, 1463:8,
1463:10, 1463:22,
1464:12
**except** [4] - 1366:13,
1368:20, 1368:22,
1458:6
**exception** [1] -
1330:22
**excessive** [2] - 1359:5
**Exchange** [2] -
1390:17, 1390:23
**exchange** [1] - 1361:3
**exchanged** [2] -
1341:14, 1341:16
**excluded** [1] -
1344:22
**exclusive** [1] -
1362:15
**exclusivity** [1] -
1436:6
**excuse** [2] - 1403:16,
1440:8
**excused** [1] - 1367:16
**excuses** [1] - 1392:9
**executives** [1] -
1404:23
**exhibit** [2] - 1401:11,
1431:22
**exhibits** [4] - 1344:4,
1344:8, 1421:2,
1421:13
**exist** [3] - 1373:6,
1435:4, 1460:7
**existed** [1] - 1437:10
**existing** [1] - 1363:4
**expect** [3] - 1411:23,
1413:3, 1435:16
**expectation** [2] -
1401:5, 1401:13
**expected** [1] - 1411:15
**expenses** [2] -
1411:19, 1411:20
**experience** [4] -
1355:17, 1355:23,

1408:1, 1429:8
**experienced** [1] -
1430:20
**experimentation** [7] -
1358:25, 1359:5,
1359:6, 1359:10,
1359:11, 1385:9
**expert** [21] - 1371:6,
1383:14, 1385:18,
1388:23, 1389:7,
1390:25, 1391:1,
1391:9, 1399:21,
1401:8, 1401:9,
1401:15, 1401:16,
1412:10, 1412:14,
1415:20, 1415:21,
1448:2, 1448:3,
1450:9, 1457:12
**experts** [16] - 1364:7,
1384:24, 1386:12,
1391:24, 1409:2,
1415:9, 1415:16,
1416:13, 1416:19,
1448:1, 1448:8,
1450:6, 1451:3,
1458:6, 1458:8,
1458:9
**expiration** [3] -
1407:10, 1407:15,
1408:21
**expires** [1] - 1357:22,
1394:16
**explain** [8] - 1346:16,
1351:19, 1352:18,
1409:25, 1418:1,
1429:23, 1450:13,
1450:21
**explained** [4] -
1374:1, 1424:20,
1424:24, 1449:4
**exploit** [2] - 1392:23,
1397:10
**exposed** [2] -
1366:11, 1368:14
**express** [2] - 1426:7,
1458:9
**expressed** [1] -
1381:12
**expression** [1] -
1424:3
**expressly** [1] -
1322:23, 1359:2
**extent** [3] - 1337:22,
1363:6, 1363:20
**extremely** [3] -
1323:19, 1417:21,
1426:14

# F

**fabulous** [1] - 1419:25
**face** [1] - 1459:6
**Facebook** [1] - 1366:21
**facility** [2] - 1434:1, 1434:3
**fact** [23] - 1327:7, 1346:10, 1370:25, 1371:24, 1374:15, 1386:4, 1386:25, 1392:2, 1393:8, 1398:22, 1401:24, 1409:12, 1411:5, 1412:18, 1415:16, 1418:15, 1422:22, 1422:24, 1424:10, 1434:20, 1445:9, 1445:13
**factor** [4] - 1323:15, 1323:16, 1323:19, 1364:19
**factors** [8] - 1339:15, 1345:19, 1359:7, 1362:8, 1364:21, 1364:22, 1365:5, 1427:13
**facts** [14] - 1343:15, 1343:16, 1344:3, 1344:4, 1344:5, 1344:10, 1344:15, 1345:7, 1362:6, 1365:25, 1400:1, 1413:1, 1419:13, 1426:23
**factual** [1] - 1458:11
**failed** [7] - 1382:8, 1382:16, 1382:24, 1420:6, 1429:11, 1430:15, 1436:2
**fails** [1] - 1359:21
**failure** [1] - 1403:18
**fair** [2] - 1368:5, 1368:8
**fairly** [1] - 1452:23
**fairness** [1] - 1368:12
**faith** [1] - 1354:16
**fall** [3] - 1329:1, 1353:6, 1440:14
**false** [2] - 1418:15, 1456:3
**family** [1] - 1366:24
**far** [3] - 1383:20, 1396:23, 1425:7
**Farrell** [2] - 1320:5, 1445:23
**fashion** [1] - 1373:6
**faster** [1] - 1405:8
**fatal** [1] - 1405:11

**fatalities** [4] - 1427:22, 1430:1, 1430:20, 1431:13
**favor** [7] - 1384:15, 1394:1, 1413:25, 1414:11, 1414:14, 1415:1, 1423:1
**favorable** [2] - 1448:3, 1448:4
**favored** [1] - 1415:7
**FCRR** [1] - 1318:22
**FDA** [15] - 1410:18, 1422:17, 1424:2, 1426:16, 1426:19, 1427:12, 1430:5, 1431:4, 1431:6, 1432:9, 1433:8, 1434:2, 1450:23, 1450:25
**features** [4] - 1364:6, 1365:4, 1403:4, 1403:11
**February** [1] - 1434:6
**federal** [1] - 1323:19
**Federal** [1] - 1318:22
**fell** [4] - 1440:11, 1441:3, 1441:7, 1441:13
**fellow** [4] - 1366:13, 1369:22, 1377:15, 1403:6
**felt** [4] - 1336:14, 1431:15, 1431:16, 1457:7
**fence** [6] - 1436:12, 1436:13, 1441:3, 1441:6, 1449:15, 1449:16
**few** [7] - 1325:19, 1334:8, 1408:20, 1416:6, 1428:5, 1428:23, 1429:3
**fewer** [1] - 1452:25
**field** [7] - 1355:15, 1358:6, 1358:23, 1359:4, 1359:12, 1359:14, 1359:15
**fight** [1] - 1457:16
**figure** [9] - 1397:3, 1397:4, 1427:15, 1427:21, 1438:20, 1443:21, 1447:13, 1447:25, 1448:5
**figured** [3] - 1426:13, 1426:15, 1426:18
**file** [12] - 1350:13, 1350:22, 1384:13, 1390:22, 1395:25, 1432:8, 1442:2, 1442:21, 1444:12,

1444:13, 1449:22, 1461:15
**filed** [25] - 1322:12, 1324:8, 1350:24, 1356:4, 1358:3, 1358:7, 1358:12, 1358:15, 1358:21, 1359:18, 1377:1, 1377:6, 1380:17, 1381:6, 1381:9, 1382:22, 1433:3, 1437:11, 1444:25, 1445:1, 1445:11, 1445:15, 1448:16, 1459:16, 1461:13
**files** [4] - 1350:14, 1381:1, 1381:24, 1461:7
**filing** [7] - 1390:4, 1390:17, 1432:23, 1433:1, 1433:6, 1443:20, 1445:5
**filings** [1] - 1321:11
**fill** [2] - 1413:22, 1413:24
**final** [11] - 1332:24, 1334:5, 1337:3, 1340:12, 1340:13, 1340:16, 1340:17, 1342:23, 1384:14
**finalize** [1] - 1333:25
**finally** [1] - 1380:3
**financial** [3] - 1360:8, 1390:8, 1419:16
**financing** [1] - 1397:2
**fine** [7] - 1328:11, 1333:7, 1333:8, 1335:21, 1335:25, 1370:10, 1436:22
**finger** [1] - 1403:17
**Finney** [2] - 1420:22, 1420:25
**firm** [4] - 1392:2, 1392:3, 1396:20, 1396:22
**firms** [1] - 1396:15
**first** [72] - 1321:13, 1325:11, 1328:23, 1334:20, 1339:2, 1347:10, 1347:22, 1349:9, 1359:18, 1361:8, 1368:24, 1370:13, 1371:13, 1371:14, 1372:25, 1373:10, 1377:5, 1383:2, 1383:7, 1383:10, 1383:12, 1383:15, 1383:18, 1383:19, 1383:21, 1383:24, 1384:11,

1392:14, 1393:13, 1395:11, 1398:14, 1403:19, 1403:22, 1404:19, 1404:20, 1404:22, 1404:25, 1405:6, 1406:7, 1407:11, 1411:9, 1414:5, 1414:9, 1414:15, 1414:19, 1417:16, 1423:21, 1423:24, 1437:3, 1437:17, 1437:24, 1439:21, 1439:23, 1440:1, 1440:3, 1440:4, 1441:21, 1444:18, 1445:3, 1445:8, 1446:2, 1446:14, 1446:16, 1450:15, 1451:23, 1452:10, 1455:3, 1462:18, 1463:4
**first-mover** [2] - 1383:15, 1383:19
**FISH** [2] - 1320:2, 1320:5
**fits** [1] - 1436:20
**five** [5] - 1374:9, 1403:21, 1410:24, 1427:3, 1430:22
**fix** [3] - 1424:4, 1441:23, 1449:9
**flagrant** [1] - 1354:16
**flesh** [1] - 1420:5
**Floor** [2] - 1319:9, 1319:20
**Flower** [1] - 1319:9
**flu** [1] - 1428:23
**flu-like** [1] - 1428:23
**flurry** [1] - 1342:24
**flying** [1] - 1396:13
**focus** [2] - 1414:9, 1427:25
**focused** [3] - 1383:7, 1404:18, 1459:23
**focuses** [1] - 1378:17
**folks** [5] - 1371:6, 1392:17, 1392:25, 1403:23, 1404:18
**follow** [7] - 1327:25, 1337:6, 1342:14, 1343:17, 1355:1, 1368:9, 1368:10
**followed** [1] - 1370:13
**following** [7] - 1337:5, 1343:8, 1351:22, 1359:6, 1381:25, 1414:23, 1422:8
**follows** [3] - 1351:24, 1352:1, 1463:6
**footing** [1] - 1387:12

**foregoing** [1] - 1466:2
**forget** [1] - 1345:23
**form** [13] - 1321:14, 1339:15, 1360:25, 1366:22, 1369:6, 1369:9, 1397:9, 1413:20, 1413:22, 1414:1, 1414:15, 1414:24, 1415:25
**formal** [4] - 1377:1, 1377:2, 1388:18, 1394:21
**formed** [1] - 1446:11
**former** [1] - 1457:11
**forms** [1] - 1366:22
**formulation** [3] - 1449:18, 1449:19
**forth** [5] - 1351:5, 1352:19, 1352:20, 1352:25, 1353:12
**forward** [3] - 1326:6, 1392:22, 1403:20
**four** [12] - 1327:20, 1374:8, 1410:8, 1410:24, 1434:15, 1437:14, 1437:18, 1437:24, 1437:25, 1445:8, 1456:23
**fourth** [4] - 1383:3, 1432:24, 1433:7, 1438:2
**frankly** [2] - 1327:25, 1423:4
**free** [3] - 1326:13, 1343:6, 1343:7
**freely** [1] - 1377:18
**friends** [1] - 1377:17
**front** [4] - 1324:16, 1342:13, 1378:1, 1405:12
**fruition** [1] - 1384:18
**full** [11] - 1357:5, 1357:8, 1358:22, 1358:24, 1372:20, 1391:10, 1394:12, 1401:1, 1440:10, 1453:3, 1456:15
**full-time** [1] - 1391:10
**fully** [1] - 1369:22
**funding** [1] - 1392:7
**funny** [1] - 1396:4
**fusion** [1] - 1462:6
**future** [1] - 1410:10

# G

**gain** [1] - 1367:25
**game** [3] - 1329:23, 1383:21, 1418:9
**Garcia** [5] - 1388:23,

1389:8, 1389:15, 1401:19, 1402:9

**Garcia's** [1] - 1401:3

**Garth** [1] - 1319:18

**gauge** [1] - 1457:4

**Geers** [1] - 1319:11

**generalities** [1] - 1376:14

**generally** [1] - 1355:17

**generated** [1] - 1351:4

**generation** [6] - 1423:24, 1424:12, 1424:17, 1424:19, 1425:9, 1425:12

**generator** [1] - 1363:5

**genesis** [2] - 1376:12, 1388:3

**gentleman** [1] - 1412:15

**gentlemen** [5] - 1370:19, 1397:23, 1399:17, 1416:20, 1417:15

**Georgia** [1] - 1323:15

**Gilbert** [11] - 1423:2, 1427:8, 1427:12, 1429:20, 1429:21, 1429:23, 1430:9, 1430:12, 1432:11, 1433:14, 1433:15

**Gilead** [13] - 1370:25, 1371:1, 1371:5, 1390:10, 1390:19, 1391:1, 1391:18, 1392:6, 1396:19, 1407:2, 1407:5, 1408:19, 1413:2

**given** [16] - 1321:6, 1321:9, 1325:4, 1325:8, 1325:14, 1332:7, 1336:6, 1336:11, 1336:21, 1337:5, 1342:7, 1366:11, 1391:8, 1419:7, 1428:22, 1453:19

**glad** [1] - 1374:25

**glossaries** [2] - 1335:11

**glossary** [14] - 1324:17, 1324:18, 1324:23, 1324:25, 1325:8, 1325:10, 1325:12, 1325:16, 1326:5, 1335:4, 1335:22, 1337:21, 1337:22, 1338:4

**gobbledygook** [1] - 1390:21

**Gold** [6] - 1374:17, 1374:21, 1383:9, 1384:17, 1407:7, 1413:11

**gold** [3] - 1374:17, 1374:18, 1374:19

**Goldilocks** [1] - 1436:17

**government** [1] - 1451:1

**Government** [1] - 1374:3

**grade** [1] - 1434:14

**Grail** [1] - 1409:19

**Grand** [1] - 1319:20

**grant** [7] - 1323:2, 1323:10, 1323:21, 1324:12, 1336:17, 1336:18, 1364:18

**granted** [8] - 1322:10, 1322:11, 1336:6, 1337:20, 1350:11, 1372:20, 1386:6, 1386:21

**granting** [2] - 1362:21, 1381:4

**grants** [2] - 1351:13, 1380:25

**Gratzinger** [1] - 1319:19

**great** [4] - 1337:21, 1404:8, 1405:22, 1435:6

**greater** [1] - 1411:3

**greatest** [2] - 1372:11, 1372:16

**greedy** [1] - 1420:3

**green** [3] - 1388:24, 1401:25, 1413:7

**Greg** [1] - 1378:13

**grew** [1] - 1377:16

**gross** [2] - 1407:9, 1411:21

**ground** [2] - 1415:5, 1444:12

**grounds** [1] - 1356:12

**group** [1] - 1404:24

**grow** [3] - 1426:3, 1426:6, 1426:10

**guess** [9] - 1323:23, 1324:5, 1387:4, 1394:22, 1417:16, 1433:22, 1437:22, 1451:13, 1465:1

**guidance** [2] - 1329:24, 1359:9

**guide** [1] - 1343:8

**guise** [1] - 1436:2

**guy** [2] - 1389:21, 1456:13

# H

**half** [11] - 1389:2, 1391:8, 1391:11, 1398:14, 1411:25, 1432:25, 1433:2, 1437:14, 1455:15, 1456:23

**hand** [5] - 1346:6, 1387:17, 1399:24, 1409:15, 1421:3

**handed** [3] - 1334:21, 1335:4, 1336:5

**Hans** [1] - 1409:17

**happy** [3] - 1330:10, 1342:4, 1397:24

**harassing** [1] - 1456:5

**hard** [5] - 1327:25, 1371:13, 1404:24, 1443:21, 1448:19

**hard-working** [1] - 1404:24

**harm** [2] - 1407:19, 1413:9

**head** [5] - 1409:17, 1409:21, 1448:19, 1464:5

**head-to-head** [1] - 1409:21

**heading** [1] - 1322:1

**health** [1] - 1403:24

**healthcare** [1] - 1435:23

**hear** [22] - 1325:6, 1345:13, 1367:17, 1372:12, 1372:24, 1373:24, 1374:25, 1381:2, 1381:3, 1385:4, 1385:14, 1386:2, 1386:7, 1386:10, 1400:8, 1406:18, 1406:25, 1419:4, 1419:5, 1434:11, 1434:23, 1437:19

**heard** [87] - 1324:13, 1327:22, 1343:10, 1345:4, 1356:4, 1370:21, 1370:25, 1371:4, 1371:5, 1371:8, 1372:10, 1372:22, 1373:11, 1373:12, 1373:20, 1374:13, 1374:16, 1375:12, 1376:7, 1377:14, 1377:24, 1379:23, 1384:3, 1384:24, 1385:18, 1385:24, 1386:12, 1389:24, 1391:14,

1391:17, 1393:6, 1393:7, 1393:10, 1393:11, 1394:14, 1395:5, 1400:8, 1400:12, 1401:8, 1401:23, 1403:20, 1403:22, 1404:17, 1405:3, 1405:24, 1406:5, 1406:16, 1407:2, 1407:3, 1407:5, 1407:25, 1408:10, 1408:13, 1409:17, 1412:10, 1418:14, 1420:8, 1420:13, 1422:4, 1422:11, 1423:16, 1424:10, 1425:22, 1426:16, 1428:17, 1428:21, 1430:18, 1431:8, 1432:2, 1435:9, 1435:14, 1438:4, 1438:18, 1440:20, 1440:21, 1444:4, 1445:23, 1451:6, 1451:15, 1452:12, 1453:12, 1454:1, 1454:21, 1457:3, 1460:22

**hearing** [4] - 1321:3, 1321:7, 1420:11, 1443:7

**heavier** [1] - 1394:4

**Heinrich** [1] - 1319:5

**HEINRICH** [7] - 1328:12, 1328:17, 1328:20, 1328:23, 1328:25, 1329:8, 1329:11

**held** [4] - 1321:7, 1390:24, 1437:8, 1437:9

**hell** [1] - 1443:8

**help** [3] - 1344:14, 1346:16, 1347:2

**high** [8] - 1403:7, 1411:13, 1413:15, 1413:17, 1417:16, 1426:14, 1434:14

**high-grade** [1] - 1434:14

**higher** [6] - 1407:13, 1407:14, 1407:16, 1414:22, 1415:5

**highest** [1] - 1405:16

**highlighted** [2] - 1437:17, 1439:13

**highlights** [1] - 1380:24

**highly** [5] - 1325:22, 1347:20, 1355:10,

1424:1, 1448:6

**himself** [5] - 1378:15, 1388:11, 1391:25, 1420:19, 1459:15

**hindsight** [2] - 1365:21, 1449:5

**hired** [5] - 1384:24, 1385:19, 1396:19, 1396:21, 1401:8

**history** [11] - 1351:6, 1351:7, 1351:13, 1357:10, 1395:25, 1396:1, 1400:15, 1445:2, 1447:9, 1459:6

**hold** [10] - 1391:25, 1427:12, 1428:3, 1428:4, 1428:6, 1428:11, 1429:4, 1429:5, 1429:6, 1430:24

**honest** [2] - 1370:5, 1419:10

**Honor** [45] - 1321:18, 1322:8, 1324:1, 1324:13, 1325:7, 1325:14, 1326:8, 1326:17, 1327:17, 1329:15, 1330:23, 1332:2, 1332:5, 1333:15, 1333:20, 1334:6, 1335:1, 1335:4, 1335:14, 1335:21, 1336:4, 1337:1, 1337:16, 1338:15, 1339:2, 1339:20, 1340:23, 1340:25, 1341:8, 1341:9, 1341:17, 1341:25, 1342:4, 1342:11, 1349:9, 1349:13, 1349:21, 1370:11, 1397:24, 1398:13, 1399:6, 1399:16, 1417:2, 1417:8, 1417:13

**honor** [2] - 1387:3, 1387:16

**HONORABLE** [1] - 1318:3

**hope** [6] - 1392:18, 1414:13, 1414:24, 1415:8, 1415:15, 1434:13

**hoped** [1] - 1326:8

**hopefully** [3] - 1329:13, 1334:24, 1340:16

**hopes** [2] - 1392:19, 1396:25

**horizon** [1] - 1372:2
**hour** [7] - 1343:1, 1389:2, 1391:2, 1391:16, 1392:5, 1396:13
**hours** [4] - 1341:6, 1341:11, 1391:5, 1399:5
**HU** [1] - 1424:14
**HU19** [4] - 1382:17, 1424:13, 1425:5, 1425:6
**huge** [1] - 1407:23
**hugely** [1] - 1426:23
**human** [7] - 1377:19, 1387:9, 1392:22, 1394:23, 1424:14, 1424:15, 1454:16
**hundreds** [2] - 1371:9, 1419:22
**hunt** [1] - 1392:1
**hurt** [1] - 1323:20
**hypothetical** [19] - 1323:7, 1339:14, 1361:6, 1361:16, 1361:18, 1362:2, 1365:12, 1365:22, 1366:1, 1366:3, 1366:7, 1405:25, 1408:3, 1409:1, 1409:15, 1410:15, 1410:25, 1412:17, 1435:13
**hypothetically** [1] - 1365:16

**I**

**ID** [17] - 1352:1, 1395:20, 1422:5, 1422:6, 1437:17, 1438:17, 1438:18, 1438:23, 1440:18, 1442:16, 1442:23, 1452:3, 1454:20, 1455:20, 1455:21, 1461:16, 1463:6
**idea** [7] - 1425:3, 1425:4, 1425:5, 1426:20, 1446:20, 1447:17
**identification** [1] - 1452:3
**identified** [1] - 1461:23
**identify** [1] - 1357:7
**ignore** [3] - 1346:9, 1387:20, 1452:6
**ii** [3] - 1331:10, 1331:15, 1339:7

**II** [2] - 1410:20, 1432:14
**III** [3] - 1321:22, 1322:4, 1410:20
**Illinois** [1] - 1319:14
**illustrate** [1] - 1346:22
**images** [1] - 1420:14
**imagine** [1] - 1342:21
**immediately** [5] - 1367:4, 1368:15, 1403:24, 1450:23, 1450:25
**immune** [1] - 1355:25
**immunology** [1] - 1355:21
**impact** [3] - 1407:22, 1407:23, 1408:22
**impartial** [1] - 1368:6
**implied** [1] - 1358:14
**importance** [1] - 1342:22
**important** [33] - 1323:19, 1346:5, 1346:12, 1368:9, 1369:23, 1370:22, 1370:23, 1371:4, 1371:7, 1372:17, 1374:25, 1380:23, 1387:14, 1402:5, 1408:14, 1419:17, 1423:17, 1426:23, 1427:7, 1436:5, 1439:7, 1440:2, 1442:20, 1443:2, 1443:10, 1443:19, 1448:17, 1456:6, 1456:16, 1456:24, 1459:17
**importing** [2] - 1325:21, 1348:2
**improper** [2] - 1344:20, 1368:1
**improvements** [1] - 1364:6
**impugned** [1] - 1418:8
**impugning** [1] - 1453:12
**inaccurate** [1] - 1368:2
**inadequate** [2] - 1356:13, 1357:24
**inadvertently** [1] - 1349:10
**INC** [2] - 1318:5, 1318:8
**incentive** [1] - 1388:1
**incidences** [1] - 1430:20
**inclined** [3] - 1324:12, 1325:11, 1336:23

**include** [8] - 1321:10, 1322:10, 1322:23, 1323:20, 1323:21, 1362:9, 1366:4, 1405:20
**included** [3] - 1322:16, 1322:17, 1332:23
**includes** [6] - 1322:25, 1338:24, 1361:25, 1366:17, 1413:6, 1446:13
**including** [8] - 1324:10, 1357:9, 1366:20, 1367:15, 1369:2, 1383:19, 1408:12, 1428:21
**inclusion** [1] - 1460:12
**income** [1] - 1413:2
**incompetent** [1] - 1418:6
**incomplete** [1] - 1368:2
**inconsistencies** [1] - 1464:21
**inconsistency** [2] - 1326:17, 1454:6
**incorporate** [2] - 1442:14, 1442:16
**incorporated** [1] - 1447:10
**incorporates** [1] - 1353:22
**incorrect** [3] - 1326:21, 1327:1, 1400:7
**incorrectly** [1] - 1442:2
**increased** [2] - 1364:23, 1431:7
**incredible** [2] - 1371:5, 1434:18
**incredibly** [1] - 1392:14
**indeed** [1] - 1409:11
**independent** [14] - 1338:22, 1353:11, 1353:14, 1353:16, 1371:6, 1390:25, 1391:24, 1392:1, 1396:12, 1396:14, 1396:23
**indicate** [1] - 1459:13
**indicates** [1] - 1430:8
**indication** [1] - 1352:12
**individuals** [1] - 1355:18
**industry** [1] - 1424:1

**influenced** [4] - 1343:19, 1344:21, 1347:6, 1368:2
**information** [23] - 1338:3, 1346:22, 1351:2, 1359:3, 1366:2, 1366:12, 1368:1, 1368:3, 1368:7, 1368:14, 1371:25, 1374:2, 1374:3, 1386:19, 1400:23, 1402:9, 1418:11, 1419:16, 1427:14, 1427:21, 1444:1, 1456:18, 1456:19
**informed** [2] - 1399:2, 1401:1
**informs** [1] - 1350:20
**infringe** [11] - 1327:5, 1382:10, 1385:16, 1389:25, 1439:4, 1439:6, 1439:11, 1439:14, 1439:20, 1439:22, 1440:5
**infringed** [5] - 1327:10, 1331:17, 1331:18, 1354:12, 1361:13
**infringement** [45] - 1321:23, 1321:25, 1327:3, 1327:7, 1328:14, 1328:18, 1329:5, 1333:16, 1334:18, 1338:23, 1348:4, 1348:15, 1349:4, 1349:20, 1350:4, 1350:7, 1354:8, 1354:10, 1354:17, 1354:20, 1354:23, 1354:25, 1357:18, 1357:19, 1360:4, 1360:6, 1360:9, 1360:24, 1361:19, 1362:8, 1364:10, 1366:5, 1373:14, 1382:1, 1382:2, 1383:3, 1383:4, 1385:4, 1386:20, 1390:1, 1390:2, 1390:4, 1390:7, 1394:20, 1414:8
**infringer** [4] - 1360:13, 1363:20, 1364:6, 1364:9
**infringes** [11] - 1331:11, 1331:19, 1331:20, 1339:8, 1348:9, 1349:1,

1349:17, 1350:1, 1354:7, 1381:14, 1383:22
**infringing** [3] - 1348:1, 1361:8, 1381:20
**initial** [2] - 1427:10
**injunction** [1] - 1325:18
**innate** [1] - 1387:9
**inordinate** [1] - 1418:24
**inquiry** [1] - 1370:10
**insert** [1] - 1426:6
**inspected** [1] - 1434:2
**inspection** [1] - 1434:6
**Instagram** [1] - 1366:21
**instances** [2] - 1447:8, 1458:22
**instead** [8] - 1331:22, 1336:23, 1384:5, 1424:25, 1425:8, 1457:25, 1458:1, 1458:2
**Institute** [1] - 1374:2
**institutes** [1] - 1403:24
**institution** [1] - 1453:20
**instruct** [3] - 1343:11, 1355:1, 1359:22
**instructed** [4] - 1344:5, 1344:23, 1345:1, 1441:16
**instructing** [1] - 1359:23
**instruction** [57] - 1322:15, 1322:17, 1322:18, 1322:19, 1322:21, 1322:23, 1323:2, 1323:3, 1323:5, 1323:11, 1323:12, 1323:13, 1324:1, 1324:4, 1324:5, 1324:9, 1324:10, 1324:16, 1325:2, 1325:6, 1326:4, 1326:19, 1327:8, 1328:18, 1329:6, 1329:13, 1330:22, 1330:24, 1332:6, 1332:10, 1332:13, 1332:20, 1332:25, 1333:16, 1333:19, 1333:22, 1334:2, 1334:8, 1334:17, 1336:8, 1336:12, 1336:15,

1337:1, 1337:6, 1337:7, 1337:8, 1337:25, 1338:20, 1338:21, 1339:21, 1339:23, 1340:19, 1394:8, 1394:14

**instructions** [25] - 1321:4, 1321:6, 1321:8, 1321:9, 1322:16, 1323:14, 1326:17, 1333:25, 1336:14, 1337:3, 1337:5, 1340:16, 1341:2, 1342:8, 1343:5, 1343:6, 1343:7, 1343:9, 1343:12, 1343:23, 1347:7, 1366:10, 1370:7, 1393:7, 1438:14

**integrity** [1] - 1455:7

**intellectual** [5] - 1376:3, 1392:25, 1409:23, 1436:11, 1441:12

**intended** [3] - 1344:14, 1395:4, 1442:24

**intentional** [3] - 1399:23, 1400:7, 1400:9

**intentionally** [3] - 1354:12, 1400:6, 1412:5

**inter** [4] - 1339:22, 1340:6, 1356:6, 1380:18

**Inter** [1] - 1340:7

**interact** [1] - 1387:11

**interacts** [1] - 1352:7

**interest** [3] - 1345:15, 1375:1, 1378:4

**interested** [4] - 1376:11, 1378:6, 1397:11, 1451:7

**interesting** [7] - 1385:3, 1388:22, 1389:20, 1401:7, 1452:11, 1458:5, 1460:17

**interests** [1] - 1323:6

**internal** [7] - 1376:24, 1383:17, 1405:15, 1407:8, 1411:15, 1413:11, 1422:21

**internally** [2] - 1373:24, 1382:14

**Internet** [3] - 1366:20, 1367:8, 1367:11

**interpret** [1] - 1344:15

**interpretation** [4] - 1338:20, 1351:21, 1352:11, 1425:18

**interpreted** [1] - 1351:22

**interrupt** [2] - 1398:21, 1419:2

**interrupted** [1] - 1418:1

**intrinsic** [1] - 1390:14

**introduce** [1] - 1384:16

**introduced** [2] - 1386:23, 1410:17

**invalid** [72] - 1321:25, 1326:24, 1326:25, 1327:2, 1327:5, 1327:6, 1327:10, 1327:13, 1327:16, 1327:19, 1327:20, 1328:7, 1328:11, 1329:3, 1329:4, 1331:8, 1331:9, 1331:11, 1331:15, 1331:17, 1339:6, 1339:8, 1348:7, 1348:8, 1348:12, 1348:13, 1348:20, 1348:21, 1348:25, 1349:1, 1349:22, 1349:25, 1350:1, 1352:14, 1354:6, 1354:7, 1355:4, 1355:5, 1355:7, 1355:11, 1357:13, 1357:23, 1358:17, 1358:20, 1359:20, 1360:1, 1360:2, 1384:7, 1385:6, 1386:5, 1386:8, 1386:18, 1387:1, 1389:1, 1392:10, 1392:11, 1393:6, 1397:17, 1397:19, 1400:17, 1414:18, 1414:24, 1437:5, 1437:6, 1437:7, 1439:5, 1439:17, 1439:20, 1458:6, 1458:8, 1458:11, 1458:21

**invalidate** [9] - 1380:14, 1380:19, 1381:24, 1382:8, 1382:23, 1384:25, 1385:1, 1393:14, 1394:6

**invalidated** [1] - 1393:6

**invalidity** [10] -

1321:24, 1322:19, 1348:21, 1348:22, 1352:15, 1355:8, 1355:12, 1385:23, 1414:20, 1415:5

**invent** [1] - 1420:18

**invention** [40] - 1325:20, 1350:17, 1355:15, 1355:18, 1355:19, 1356:9, 1357:25, 1358:2, 1358:9, 1358:19, 1358:22, 1358:24, 1359:4, 1359:8, 1359:13, 1361:4, 1362:21, 1363:4, 1363:15, 1363:18, 1363:19, 1363:21, 1363:25, 1364:3, 1364:15, 1370:22, 1372:15, 1372:20, 1372:23, 1385:8, 1385:14, 1395:5, 1400:20, 1402:14, 1403:2, 1443:19, 1449:13, 1449:17, 1456:24

**inventions** [1] - 1364:1

**inventor** [2] - 1358:2, 1363:1

**inventors** [1] - 1431:10

**investigation** [2] - 1367:25, 1431:23

**investigations** [1] - 1367:9

**investment** [1] - 1409:22

**investor** [1] - 1457:2

**invoiced** [1] - 1391:20

**involve** [1] - 1432:6

**involved** [4] - 1351:23, 1367:1, 1367:15, 1387:24

**involves** [4] - 1350:10, 1352:14, 1366:13, 1423:20

**involving** [1] - 1432:12

**IP** [4] - 1379:14, 1379:16, 1380:7, 1388:13

**IPR** [12] - 1322:15, 1356:6, 1356:11, 1381:1, 1381:4, 1381:6, 1381:8, 1381:16, 1384:14, 1389:5, 1402:4

**IRELL** [1] - 1319:4

**irrelevant** [1] - 1454:22

**isoleucine** [8] - 1352:5, 1438:6, 1439:24, 1452:7, 1452:20, 1458:1, 1464:13, 1465:4

**issue** [19] - 1322:22, 1324:23, 1326:1, 1326:5, 1326:10, 1328:25, 1329:18, 1333:2, 1356:20, 1359:24, 1378:18, 1395:1, 1436:3, 1437:3, 1439:6, 1439:25, 1441:8, 1450:24, 1458:20

**issued** [23] - 1351:1, 1351:9, 1352:1, 1356:19, 1357:13, 1357:15, 1357:20, 1383:25, 1386:9, 1395:14, 1397:15, 1437:9, 1437:15, 1437:16, 1446:18, 1447:14, 1449:13, 1457:1, 1457:22, 1459:2, 1461:6, 1461:17, 1461:19

**issues** [13] - 1342:23, 1342:24, 1351:8, 1352:14, 1356:15, 1357:16, 1366:12, 1398:13, 1405:19, 1418:3, 1434:12, 1448:1

**item** [3] - 1381:19, 1415:25

**items** [4] - 1336:14, 1363:5, 1404:15, 1407:1

**itself** [6] - 1353:18, 1391:19, 1423:12, 1430:18, 1447:11, 1459:2

## J

**Jakabovits** [6] - 1375:22, 1376:7, 1379:4, 1379:10, 1379:18, 1380:4

**JAMES** [1] - 1318:3

**January** [1] - 1460:22

**JCAR15** [2] - 1403:19, 1429:8

**JCAR17** [11] - 1404:4, 1404:5, 1404:7, 1405:9, 1422:16, 1428:17, 1432:21,

1433:12, 1433:14, 1434:8, 1435:20

**Jeffrey** [1] - 1319:19

**JEFFRIES** [30] - 1322:8, 1323:9, 1325:7, 1325:13, 1326:7, 1327:23, 1329:18, 1332:2, 1332:4, 1332:11, 1332:17, 1332:21, 1333:1, 1333:4, 1333:6, 1333:9, 1333:23, 1335:8, 1335:17, 1335:25, 1336:4, 1336:10, 1337:16, 1337:19, 1338:6, 1338:10, 1338:12, 1340:9, 1340:23, 1341:3

**Jeffries** [5] - 1319:8, 1322:7, 1326:14, 1327:21, 1335:15

**jeopardizes** [1] - 1368:11

**job** [4] - 1348:14, 1351:19, 1373:3, 1403:8

**John** [2] - 1319:13, 1320:5

**JONES** [3] - 1319:8, 1319:10, 1319:13

**judge** [3] - 1351:19, 1387:10, 1391:23

**JUDGE** [1] - 1318:3

**judged** [1] - 1359:17

**judges** [1] - 1387:3

**July** [1] - 1428:4

**jump** [1] - 1419:7

**June** [2] - 1422:21, 1428:2

**Junghans** [19] - 1390:24, 1399:21, 1403:25, 1416:13, 1448:13, 1450:7, 1450:9, 1450:13, 1450:15, 1450:17, 1450:20, 1451:2, 1452:14, 1452:15, 1458:25, 1462:4, 1463:15, 1463:20, 1463:24

**Juno** [97] - 1321:1, 1321:15, 1330:20, 1340:15, 1347:25, 1348:3, 1348:14, 1348:16, 1349:2, 1349:5, 1349:19, 1350:3, 1350:5, 1360:3, 1360:6, 1360:7, 1360:12,

1360:14, 1360:16, 1360:18, 1360:20, 1364:24, 1371:7, 1372:18, 1381:12, 1381:23, 1398:8, 1403:17, 1403:19, 1403:23, 1404:9, 1404:18, 1405:2, 1405:10, 1407:17, 1407:20, 1407:22, 1407:24, 1408:2, 1408:8, 1408:11, 1408:22, 1408:23, 1409:18, 1410:2, 1411:6, 1411:16, 1411:25, 1412:8, 1412:18, 1413:7, 1413:9, 1413:23, 1413:25, 1414:14, 1415:1, 1415:8, 1415:19, 1416:3, 1416:19, 1419:23, 1419:24, 1422:22, 1423:4, 1423:12, 1423:16, 1426:17, 1427:1, 1427:4, 1428:13, 1428:14, 1428:16, 1429:6, 1429:7, 1431:1, 1431:2, 1431:13, 1432:5, 1432:8, 1432:21, 1432:23, 1433:8, 1433:13, 1433:15, 1434:7, 1434:19, 1434:21, 1435:17, 1435:19, 1435:24, 1436:2, 1459:11, 1459:13

**JUNO** [1] - 1318:5

**Juno's** [4] - 1404:12, 1422:16, 1422:21, 1432:18

**juror** [9] - 1324:18, 1324:23, 1326:9, 1329:19, 1341:22, 1368:11, 1369:8, 1369:14

**JUROR** [1] - 1417:5

**juror's** [1] - 1368:14

**jurors** [12] - 1324:20, 1334:4, 1335:6, 1342:6, 1347:6, 1366:14, 1367:16, 1369:18, 1369:23, 1370:4, 1370:23, 1417:2

**JURY** [1] - 1318:13

**jury** [58] - 1321:3, 1321:4, 1321:6, 1321:14, 1321:22,

---

1322:15, 1324:17, 1324:24, 1325:5, 1325:12, 1325:23, 1326:4, 1326:9, 1326:19, 1329:4, 1330:8, 1330:10, 1335:12, 1335:23, 1337:7, 1341:1, 1341:24, 1342:2, 1342:9, 1342:15, 1342:16, 1342:17, 1342:18, 1342:19, 1342:21, 1343:10, 1343:13, 1352:15, 1367:2, 1368:6, 1368:19, 1368:21, 1369:3, 1369:13, 1369:15, 1370:7, 1370:8, 1370:19, 1392:12, 1393:7, 1397:24, 1398:5, 1398:6, 1398:10, 1398:25, 1399:10, 1399:11, 1399:12, 1417:24, 1438:14, 1465:10, 1465:14, 1465:15

**justice** [3] - 1393:24, 1414:11

---

## K

**keep** [8] - 1360:11, 1388:6, 1393:13, 1428:14, 1440:2, 1447:3, 1448:19, 1461:20

**kept** [2] - 1387:23, 1459:16

**Kettering** [61] - 1321:15, 1322:10, 1347:25, 1348:4, 1348:15, 1348:16, 1349:3, 1349:5, 1349:19, 1350:3, 1350:5, 1360:4, 1360:6, 1360:7, 1360:12, 1360:14, 1360:16, 1360:18, 1360:21, 1364:25, 1371:7, 1371:21, 1372:14, 1372:18, 1376:25, 1377:10, 1378:9, 1379:8, 1379:20, 1380:5, 1380:16, 1381:12, 1381:23, 1384:15, 1392:17, 1392:25, 1393:9, 1394:18, 1395:7, 1407:17, 1409:7, 1410:2,

---

1412:7, 1412:19, 1413:25, 1414:14, 1415:1, 1415:8, 1415:18, 1416:3, 1416:19, 1431:12, 1431:15, 1432:5, 1437:8, 1440:15, 1448:10, 1456:13, 1456:23, 1456:25, 1461:23

**Kettering/Juno** [1] - 1409:5

**key** [5] - 1373:1, 1405:20, 1406:13, 1408:18, 1413:1

**kidding** [1] - 1399:9

**kids** [3] - 1387:5, 1387:6, 1387:7

**kill** [3] - 1373:1, 1392:12, 1393:1

**kind** [6] - 1384:20, 1389:16, 1392:20, 1444:11, 1448:18, 1449:23

**kinds** [2] - 1356:18, 1410:7

**KITE** [1] - 1318:8

**Kite** [165] - 1321:2, 1326:22, 1327:10, 1328:3, 1331:11, 1331:17, 1331:20, 1339:8, 1348:1, 1348:6, 1348:11, 1348:12, 1348:19, 1348:21, 1349:1, 1349:17, 1350:1, 1354:7, 1354:12, 1354:17, 1355:2, 1355:5, 1355:10, 1356:4, 1357:12, 1357:14, 1358:16, 1359:19, 1359:24, 1361:7, 1361:21, 1362:1, 1364:24, 1365:13, 1365:17, 1366:7, 1370:13, 1370:14, 1371:1, 1371:2, 1371:5, 1372:13, 1373:13, 1374:6, 1374:7, 1374:14, 1375:17, 1375:19, 1375:22, 1376:16, 1376:19, 1376:24, 1377:23, 1378:2, 1380:4, 1380:10, 1380:17, 1380:23, 1381:14, 1381:19, 1381:20, 1381:23, 1382:5, 1382:7, 1382:14,

---

1382:19, 1383:13, 1383:14, 1383:22, 1383:23, 1384:12, 1384:23, 1384:25, 1385:14, 1386:7, 1386:12, 1386:14, 1386:16, 1386:25, 1387:1, 1388:23, 1389:4, 1389:5, 1389:24, 1390:8, 1390:24, 1391:1, 1391:15, 1392:5, 1392:8, 1392:11, 1392:24, 1394:19, 1395:17, 1396:13, 1396:15, 1396:19, 1396:22, 1397:10, 1398:8, 1399:21, 1400:11, 1400:17, 1401:8, 1401:9, 1401:17, 1403:1, 1403:16, 1403:18, 1404:7, 1405:3, 1405:15, 1406:7, 1406:14, 1406:17, 1406:23, 1407:1, 1407:8, 1407:20, 1407:21, 1408:21, 1411:14, 1411:15, 1411:18, 1412:1, 1413:2, 1413:12, 1414:16, 1414:22, 1415:11, 1415:22, 1415:24, 1416:13, 1420:5, 1421:18, 1423:6, 1423:18, 1423:25, 1424:5, 1424:6, 1424:14, 1425:5, 1425:9, 1426:13, 1428:25, 1429:1, 1429:4, 1430:18, 1434:21, 1435:11, 1435:18, 1436:1, 1440:12, 1440:23, 1441:2, 1453:12, 1455:8, 1455:13, 1457:6, 1457:11, 1457:12

**Kite's** [30] - 1348:3, 1348:4, 1348:15, 1349:3, 1349:20, 1350:3, 1354:8, 1354:10, 1354:14, 1354:17, 1354:20, 1354:21, 1362:4, 1374:11, 1374:13, 1374:20, 1381:6, 1386:19, 1386:21, 1388:16, 1389:24, 1392:2, 1407:7, 1411:1, 1411:3,

---

1411:17, 1414:7, 1418:5, 1438:10, 1453:12

**Kite-like** [1] - 1397:10

**knowledge** [2] - 1354:21, 1356:1

**known** [5] - 1347:10, 1347:16, 1359:1, 1362:7, 1372:7

**knows** [5] - 1376:20, 1424:3, 1434:6, 1436:11, 1463:24

**Komanduri** [1] - 1435:9

**KTEC19** [2] - 1383:10, 1422:25

**KYMRIAH** [5] - 1422:18, 1429:4, 1429:19, 1430:3, 1431:22

---

## L

**lab** [4] - 1403:5, 1403:8, 1432:3, 1456:15

**label** [4] - 1405:14, 1430:3, 1430:8, 1431:22

**laboratory** [2] - 1355:24, 1356:2

**ladies** [5] - 1370:18, 1397:23, 1399:17, 1416:20, 1417:15

**lady** [2] - 1393:24, 1414:11

**language** [7] - 1323:1, 1323:6, 1324:10, 1351:20, 1351:23, 1352:11, 1438:15

**large** [2] - 1389:6, 1416:7

**last** [13] - 1321:3, 1321:11, 1326:20, 1332:12, 1332:15, 1332:17, 1336:13, 1349:10, 1432:24, 1457:17, 1462:25, 1463:5

**late** [9] - 1329:23, 1410:1, 1410:13, 1410:15, 1410:24, 1411:2, 1411:11, 1412:13, 1427:6

**late-stage** [1] - 1412:13

**launch** [1] - 1394:20

**law** [17] - 1343:11, 1343:16, 1343:17, 1353:2, 1367:14,

1392:2, 1392:3, 1393:3, 1393:5, 1394:3, 1396:15, 1396:19, 1396:22, 1402:17, 1406:1, 1414:2
**Law** [14] - 1319:4, 1319:5, 1319:5, 1319:6, 1319:8, 1319:11, 1319:13, 1319:18, 1319:18, 1319:19, 1319:19, 1319:20, 1320:3, 1320:5
**lawsuit** [2] - 1377:1, 1377:5
**lawyer** [3] - 1388:16, 1396:19, 1418:24
**lawyering** [1] - 1418:20
**lawyers** [20] - 1342:22, 1344:5, 1344:11, 1344:12, 1344:16, 1344:18, 1367:16, 1368:24, 1390:6, 1391:14, 1392:4, 1396:15, 1396:17, 1396:19, 1396:21, 1414:2, 1418:20, 1456:3
**lead** [1] - 1432:5
**learn** [5] - 1367:10, 1387:5, 1387:6
**learned** [3] - 1372:11, 1377:7, 1455:12
**learning** [1] - 1376:11
**least** [7] - 1325:8, 1326:24, 1354:13, 1355:23, 1375:19, 1375:20, 1456:9
**least"..** [1] - 1327:14
**leave** [2] - 1398:11, 1464:14
**led** [2] - 1431:16, 1432:4
**left** [5] - 1399:24, 1412:3, 1413:7, 1436:13, 1464:15
**left-hand** [1] - 1399:24
**legal** [4] - 1342:23, 1342:24, 1381:7, 1424:7
**lengthy** [2] - 1325:3, 1338:19
**less** [4] - 1360:10, 1391:21, 1408:16, 1413:1
**letter** [1] - 1381:23
**letters** [1] - 1396:2
**letting** [1] - 1378:9

**leukemia** [4] - 1429:13, 1429:17, 1429:19, 1430:19
**level** [4] - 1355:16, 1359:14, 1387:8, 1416:16
**liar** [2] - 1418:6, 1443:6
**license** [41] - 1361:4, 1361:5, 1361:11, 1362:2, 1362:15, 1363:8, 1364:14, 1364:18, 1365:11, 1365:12, 1365:15, 1365:17, 1365:23, 1366:5, 1372:15, 1377:24, 1378:2, 1379:2, 1379:8, 1379:12, 1379:21, 1380:4, 1380:10, 1380:12, 1382:22, 1383:23, 1383:24, 1384:6, 1384:8, 1384:12, 1386:21, 1397:9, 1397:16, 1397:18, 1397:19, 1409:6, 1410:12, 1410:13, 1411:2, 1411:5, 1435:16
**licensee** [5] - 1362:24, 1363:3, 1364:9, 1364:13, 1435:15
**licensees** [1] - 1362:13
**licenses** [5] - 1362:21, 1365:16, 1408:2, 1411:4, 1412:11
**licensing** [8] - 1362:11, 1362:21, 1378:7, 1379:16, 1379:23, 1379:25, 1380:7, 1388:13
**licensor** [6] - 1362:23, 1363:4, 1363:17, 1364:8, 1435:16
**licensor's** [1] - 1362:19
**lie** [1] - 1418:18
**life** [6] - 1372:12, 1372:16, 1373:20, 1373:25, 1387:9, 1419:3
**lifted** [1] - 1428:4
**light** [1] - 1345:18
**likely** [6] - 1347:14, 1355:10, 1360:16, 1406:9, 1427:13, 1455:10
**limit** [1] - 1442:9
**limitation** [3] - 1353:9,

1390:5, 1439:18
**limitations** [2] - 1353:3, 1381:18
**limited** [4] - 1345:1, 1345:2, 1365:25, 1366:21
**line** [6] - 1328:22, 1328:23, 1349:12, 1362:25, 1410:8, 1410:24
**lines** [2] - 1325:19, 1371:11
**linkedin** [1] - 1366:22
**list** [1] - 1344:10
**listen** [1] - 1367:5
**listened** [1] - 1369:23
**listing** [6] - 1395:21, 1396:2, 1440:22, 1462:1, 1463:6, 1464:17
**listings** [1] - 1451:21
**literally** [1] - 1398:11
**literature** [1] - 1356:1
**litigation** [4] - 1375:4, 1406:21, 1411:6, 1451:5
**littered** [1] - 1383:18
**live** [2] - 1429:3, 1434:16
**lives** [4] - 1419:20, 1434:20, 1434:22, 1457:13
**living** [10] - 1371:13, 1371:14, 1372:23, 1372:25, 1373:2, 1373:11, 1377:16, 1391:2, 1392:15, 1426:1
**LLP** [2] - 1319:4, 1319:17
**logical** [1] - 1328:13
**Lonza** [2] - 1433:24
**look** [39] - 1327:24, 1328:1, 1353:13, 1353:25, 1370:24, 1379:11, 1379:12, 1384:19, 1385:11, 1395:20, 1396:3, 1396:4, 1401:25, 1404:6, 1409:5, 1409:19, 1411:14, 1413:5, 1414:25, 1417:19, 1421:13, 1422:8, 1428:1, 1431:23, 1431:24, 1438:16, 1444:9, 1445:1, 1447:15, 1450:13, 1451:15, 1451:22, 1452:5, 1453:10, 1454:9,

1462:22, 1464:2, 1464:3, 1465:1
**looked** [14] - 1407:19, 1418:22, 1438:14, 1447:4, 1450:10, 1450:14, 1451:7, 1451:9, 1451:12, 1452:14, 1455:21, 1458:23, 1459:2, 1465:7
**looking** [11] - 1326:19, 1379:5, 1386:3, 1406:11, 1410:7, 1412:9, 1438:20, 1452:20, 1459:5, 1460:2, 1464:15
**looks** [1] - 1375:5
**Los** [5] - 1318:14, 1318:23, 1319:7, 1319:9, 1319:21
**lose** [1] - 1419:17
**lost** [2] - 1382:5, 1434:21
**low** [1] - 1430:20
**lower** [5] - 1393:18, 1399:24, 1404:17, 1407:12, 1410:13
**lunch** [1] - 1399:18
**lymphodepletion** [1] - 1426:8
**lymphoma** [1] - 1429:14
**lysine** [42] - 1352:3, 1438:4, 1438:24, 1438:25, 1439:1, 1439:4, 1439:9, 1439:10, 1439:21, 1440:19, 1440:25, 1441:7, 1446:2, 1446:17, 1447:1, 1447:22, 1450:12, 1451:24, 1452:1, 1452:6, 1452:10, 1452:16, 1452:20, 1455:22, 1456:21, 1457:10, 1457:23, 1458:2, 1458:14, 1458:15, 1459:20, 1462:16, 1462:19, 1463:4, 1464:24, 1465:2

# M

**M.D** [1] - 1355:21
**Maclain** [1] - 1319:5
**magic** [1] - 1420:9
**magical** [1] - 1460:1
**mail** [10] - 1366:19, 1373:16, 1374:24,

1375:5, 1376:22, 1379:10, 1383:19, 1385:17, 1453:13, 1453:15
**mails** [7] - 1376:24, 1385:17, 1386:15, 1456:12
**main** [1] - 1392:21, 1427:25
**maintain** [1] - 1362:20
**major** [3] - 1406:7, 1423:7, 1429:7
**majority** [1] - 1428:24
**malicious** [1] - 1354:15
**management** [1] - 1453:13
**MANELLA** [1] - 1319:4
**manner** [2] - 1345:14, 1381:22
**manufacture** [3] - 1364:14, 1425:25, 1426:1
**manufactured** [1] - 1362:17
**manufacturing** [12] - 1364:5, 1404:8, 1405:7, 1406:24, 1425:22, 1425:23, 1426:17, 1426:23, 1431:3, 1431:6, 1433:22, 1435:4
**manuscript** [1] - 1461:2
**march** [1] - 1386:22
**margin** [5] - 1411:14, 1411:22, 1411:25, 1412:4, 1412:6
**Margo** [3] - 1421:12, 1421:14, 1421:18
**mark** [1] - 1415:8
**marked** [1] - 1324:5
**market** [13] - 1365:6, 1403:18, 1404:19, 1404:22, 1408:14, 1410:5, 1419:19, 1422:19, 1427:6, 1435:1, 1435:5, 1435:21
**marketing** [1] - 1362:19, 1365:5
**marketplace** [1] - 1374:12
**marks** [2] - 1399:24, 1401:11
**Marr** [1] - 1444:19
**marshal** [2] - 1368:18, 1369:10
**master's** [1] - 1355:21
**match** [1] - 1325:24

matched [1] - 1381:19
materials [1] - 1367:9
mathematical [1] - 1360:19
matter [5] - 1367:4, 1387:8, 1415:19, 1463:2, 1466:3
matters [2] - 1394:23, 1419:14
mean [4] - 1374:17, 1374:18, 1413:23, 1414:4
meaning [4] - 1351:20, 1352:8, 1352:10, 1384:5
means [12] - 1343:20, 1347:13, 1347:19, 1366:19, 1390:6, 1397:1, 1431:11, 1437:7, 1439:4, 1449:14, 1460:15, 1463:9
meant [5] - 1360:12, 1374:19, 1381:3, 1445:17
measure [1] - 1359:22
mechanisms [1] - 1360:23
medal [1] - 1374:18
media [4] - 1366:23, 1366:25, 1367:5, 1367:18
medical [4] - 1423:3, 1423:14, 1423:15, 1455:7
meet [5] - 1326:14, 1350:25, 1378:20, 1387:11, 1396:18
meeting [1] - 1450:18
meetings [6] - 1392:3, 1392:4, 1396:15, 1396:16, 1396:17
meets [7] - 1353:4, 1354:2, 1390:5, 1394:25, 1402:19, 1436:10, 1439:17
member [4] - 1368:19, 1368:21, 1369:13, 1374:2
members [4] - 1343:10, 1366:25, 1449:13, 1456:17
Memorial [2] - 1377:9, 1379:8
memory [5] - 1344:17, 1345:14, 1347:4, 1347:5, 1379:25
mention [4] - 1395:5, 1416:6, 1416:18, 1447:8

mentioned [5] - 1351:16, 1409:20, 1421:15, 1436:4, 1436:15
mentor [2] - 1387:25, 1388:10
mere [1] - 1396:20
merely [1] - 1354:17
meritorious [1] - 1327:22
merits [1] - 1366:17
message [1] - 1379:13
messaging [1] - 1366:19
met [8] - 1353:12, 1356:21, 1385:7, 1395:13, 1415:11, 1415:23, 1415:24
metes [1] - 1449:12
method [1] - 1352:21
Michael [1] - 1405:19
Michalik [1] - 1319:13
Michel [1] - 1374:24
microphone [1] - 1324:21
mid [1] - 1433:10
mid-2019 [2] - 1433:9, 1433:13
middle [1] - 1423:11
midway [1] - 1390:3
might [25] - 1329:25, 1331:23, 1372:1, 1389:1, 1389:20, 1396:5, 1397:8, 1403:6, 1410:11, 1411:13, 1411:23, 1418:21, 1419:6, 1424:24, 1427:17, 1428:12, 1432:15, 1433:8, 1442:20, 1442:21, 1452:23, 1455:8, 1463:4, 1464:20, 1464:21
million [18] - 1374:22, 1391:6, 1391:21, 1406:5, 1407:16, 1412:19, 1412:23, 1412:25, 1413:5, 1413:13, 1413:15, 1413:16, 1416:2, 1434:22, 1435:18
millions [3] - 1373:7, 1373:8
mind [5] - 1360:11, 1364:23, 1383:8, 1393:13, 1440:2
minor [3] - 1331:21, 1356:24, 1441:19
minute [2] - 1376:1, 1440:21

minutes [6] - 1329:14, 1396:16, 1399:3, 1399:5, 1399:8, 1408:20
misidentification [1] - 1461:10
misleading [1] - 1368:3
misrepresentation [1] - 1398:22
missed [1] - 1332:9
missing [1] - 1358:13
mistake [12] - 1384:20, 1392:22, 1393:3, 1395:8, 1395:10, 1399:22, 1400:5, 1400:6, 1447:2, 1448:23, 1462:2
mistakes [1] - 1345:23
mistrial [1] - 1368:12
misunderstanding [1] - 1334:7
mix [1] - 1461:6
mix-up [1] - 1461:6
model [1] - 1390:14
modes [1] - 1363:13
modification [8] - 1322:10, 1322:11, 1327:22, 1334:3, 1334:9, 1337:12, 1339:3
modifications [3] - 1330:21, 1332:24, 1340:20
modified [6] - 1322:23, 1323:3, 1323:5, 1326:4, 1338:25, 1339:1
modify [2] - 1324:8, 1330:24
modifying [1] - 1329:6
module [1] - 1433:21
molecular [1] - 1355:22
molecule [10] - 1422:2, 1425:20, 1438:5, 1442:15, 1453:3, 1453:5, 1453:6, 1459:24, 1460:5, 1460:7
moment [7] - 1328:1, 1334:13, 1336:22, 1409:25, 1413:24, 1443:16, 1452:12
moments [1] - 1334:8
money [10] - 1326:25, 1348:1, 1349:2, 1349:18, 1350:2, 1360:3, 1371:5,

1397:1, 1397:7, 1434:12
monopoly [2] - 1362:20, 1362:22
month [3] - 1384:17
months [7] - 1391:20, 1419:7, 1428:5, 1429:3, 1433:4, 1434:15, 1457:17
Morgan [1] - 1319:4
morning [8] - 1332:18, 1333:12, 1333:13, 1336:7, 1336:17, 1337:24, 1342:25, 1416:20
most [15] - 1325:16, 1333:5, 1334:21, 1377:16, 1377:19, 1393:16, 1393:23, 1408:14, 1419:12, 1426:1, 1442:20, 1443:19, 1447:25, 1456:23, 1457:15
motivated [1] - 1427:5
mouth [1] - 1418:2
move [3] - 1326:6, 1326:14
moved [2] - 1322:3, 1441:5
mover [7] - 1383:8, 1383:10, 1383:12, 1383:15, 1383:19, 1404:20, 1404:22
MR [59] - 1321:18, 1321:22, 1326:8, 1326:16, 1326:19, 1327:15, 1328:5, 1328:8, 1328:10, 1328:12, 1328:17, 1328:20, 1328:23, 1328:25, 1329:8, 1329:11, 1329:14, 1330:23, 1331:2, 1331:5, 1331:7, 1331:18, 1331:21, 1331:25, 1333:7, 1333:15, 1333:20, 1334:6, 1334:15, 1335:1, 1336:25, 1339:1, 1339:4, 1341:4, 1341:8, 1341:9, 1341:12, 1341:16, 1341:19, 1341:21, 1341:25, 1342:4, 1342:7, 1342:11, 1349:9, 1349:13, 1349:21, 1370:10, 1370:18, 1397:23, 1398:13, 1398:21, 1399:6,

1399:8, 1399:16, 1417:2, 1417:7, 1417:13, 1417:15
MS [48] - 1322:8, 1323:9, 1324:1, 1324:13, 1324:15, 1324:22, 1325:7, 1325:13, 1326:7, 1327:23, 1329:18, 1330:3, 1330:5, 1330:16, 1332:2, 1332:4, 1332:11, 1332:17, 1332:21, 1333:1, 1333:4, 1333:6, 1333:9, 1333:23, 1335:3, 1335:8, 1335:14, 1335:17, 1335:21, 1335:25, 1336:4, 1336:10, 1337:16, 1337:19, 1338:6, 1338:10, 1338:12, 1338:14, 1338:17, 1339:20, 1340:2, 1340:4, 1340:6, 1340:8, 1340:9, 1340:23, 1340:25, 1341:3
MSK [2] - 1377:9, 1410:2
multiple [4] - 1390:1, 1396:15, 1445:21, 1461:11
MUNGER [1] - 1319:17
must [39] - 1343:17, 1343:18, 1343:20, 1344:24, 1345:2, 1347:13, 1347:19, 1347:24, 1348:16, 1348:21, 1350:13, 1353:12, 1354:7, 1354:11, 1354:20, 1355:1, 1355:5, 1355:10, 1357:14, 1358:16, 1359:19, 1360:2, 1360:5, 1360:19, 1361:10, 1361:11, 1365:2, 1365:15, 1366:9, 1366:11, 1367:3, 1369:18, 1369:20, 1390:19, 1394:6, 1415:14, 1449:1, 1457:25, 1458:1

### N

name [3] - 1383:21, 1423:22, 1444:19
named [2] - 1383:9,

1392:16
**names** [1] - 1416:18
**narrative** [1] - 1429:8
**narrow** [2] - 1389:6, 1436:24
**narrower** [1] - 1352:24
**national** [1] - 1403:24
**National** [1] - 1374:2
**natural** [1] - 1426:11
**naturally** [1] - 1373:6
**nature** [5] - 1356:24, 1359:14, 1361:9, 1362:15, 1363:15
**NCI** [12] - 1372:13, 1373:18, 1374:7, 1374:10, 1374:14, 1376:10, 1382:17, 1382:21, 1400:24, 1403:1, 1441:2, 1455:14
**necessarily** [4] - 1336:21, 1346:11, 1358:14, 1365:24
**necessary** [6] - 1353:13, 1353:25, 1359:10, 1359:11, 1368:16
**need** [21] - 1321:11, 1326:25, 1327:23, 1333:21, 1333:25, 1334:12, 1336:22, 1348:18, 1349:2, 1349:18, 1350:2, 1358:11, 1365:11, 1370:9, 1398:19, 1398:20, 1417:12, 1441:7, 1457:13, 1462:5, 1462:8
**needed** [4] - 1336:14, 1378:2, 1380:10, 1425:8
**needs** [8] - 1325:18, 1332:23, 1338:25, 1339:1, 1351:20, 1434:1, 1442:6, 1462:7
**negative** [3] - 1407:22, 1407:23, 1408:22
**negatives** [3] - 1327:24, 1414:2
**negotiated** [3] - 1365:12, 1365:17, 1412:11
**negotiating** [1] - 1408:1
**negotiation** [21] - 1323:7, 1339:14, 1361:6, 1361:9, 1361:15, 1361:16, 1361:18, 1361:20,

1365:24, 1366:1, 1366:4, 1366:7, 1405:25, 1408:4, 1408:5, 1409:1, 1409:15, 1410:15, 1410:25, 1435:14
**negotiations** [2] - 1365:23, 1412:16
**net** [1] - 1408:20
**neurotoxicity** [3] - 1404:16, 1405:21, 1428:19
**never** [12] - 1374:1, 1382:20, 1389:9, 1389:12, 1389:15, 1389:18, 1410:23, 1429:4, 1445:17, 1460:18, 1464:16
**nevertheless** [1] - 1365:23
**new** [9] - 1333:13, 1336:1, 1337:17, 1337:25, 1358:4, 1422:1, 1424:9, 1436:22, 1442:8
**New** [4] - 1319:12, 1373:18, 1388:19
**newly** [2] - 1332:11, 1336:18
**newly-submitted** [1] - 1336:18
**news** [1] - 1367:5
**next** [8] - 1322:5, 1378:22, 1393:12, 1400:16, 1403:16, 1414:21, 1433:1, 1438:5
**nice** [1] - 1389:21
**night** [6] - 1321:11, 1332:12, 1332:16, 1332:17, 1336:13, 1371:13
**NIH** [1] - 1450:19
**NO:6** [17] - 1352:1, 1395:20, 1422:5, 1422:6, 1437:17, 1438:18, 1438:23, 1440:18, 1442:17, 1442:23, 1452:4, 1454:20, 1455:20, 1455:21, 1461:17, 1463:6
**nobody** [4] - 1442:6, 1456:22, 1456:25
**noncontroversial** [1] - 1330:9
**none** [6] - 1345:10, 1391:17, 1410:23, 1457:24, 1459:8, 1460:25

**nonexclusive** [1] - 1362:16
**noninfringing** [1] - 1366:8
**nonpatented** [2] - 1363:5, 1364:4
**nonrestricted** [1] - 1362:16
**normal** [2] - 1402:20, 1417:25
**normally** [1] - 1365:1
**nose** [1] - 1375:6
**note** [3] - 1341:13, 1368:17, 1416:3
**notebook** [3] - 1329:22, 1330:8, 1422:8
**notebooks** [18] - 1324:19, 1324:23, 1326:9, 1329:19, 1329:20, 1329:21, 1330:14, 1335:12, 1341:22, 1342:3, 1342:6, 1342:7, 1342:10, 1342:16, 1417:3, 1417:4, 1417:8, 1417:12
**notes** [7] - 1337:11, 1343:5, 1343:6, 1347:2, 1347:3, 1347:4, 1347:6
**nothing** [6] - 1374:5, 1406:10, 1436:22, 1449:20, 1451:4, 1460:1
**notice** [8] - 1395:5, 1413:1, 1442:21, 1442:22, 1449:12, 1456:22, 1456:25, 1463:23
**noticed** [2] - 1399:24, 1456:23
**notify** [1] - 1368:15
**Novartis** [6] - 1411:6, 1411:7, 1426:15, 1426:17, 1430:15, 1430:16
**Novartis'** [1] - 1422:19
**November** [1] - 1437:10
**nucleotide** [28] - 1352:6, 1422:7, 1422:9, 1422:10, 1437:20, 1437:23, 1443:18, 1443:25, 1444:2, 1444:20, 1445:3, 1445:14, 1445:25, 1446:9, 1446:14, 1446:25, 1450:11, 1451:13,

1451:16, 1454:3, 1454:5, 1455:1, 1457:9, 1457:22, 1459:17, 1459:18, 1461:21
**nucleotides** [16] - 1437:18, 1438:1, 1438:2, 1438:5, 1438:19, 1443:1, 1445:8, 1445:9, 1446:8, 1451:22, 1452:3, 1454:10, 1454:20, 1460:7, 1460:10, 1464:4
**number** [41] - 1322:19, 1322:23, 1323:3, 1323:5, 1323:11, 1323:19, 1324:2, 1324:4, 1324:9, 1326:19, 1328:18, 1329:7, 1330:22, 1332:13, 1332:20, 1332:25, 1334:8, 1337:6, 1337:7, 1337:8, 1338:20, 1338:21, 1339:21, 1342:22, 1346:11, 1379:11, 1401:11, 1404:7, 1405:3, 1405:6, 1405:7, 1407:16, 1409:20, 1411:10, 1413:14, 1413:21, 1455:2, 1460:2, 1461:3
**numbered** [5] - 1322:24, 1336:19, 1351:17, 1384:11
**numbering** [1] - 1336:19
**numbers** [9] - 1334:16, 1413:12, 1416:2, 1422:11, 1431:22, 1437:19, 1437:21, 1444:23
**Numeral** [4] - 1331:8, 1331:10, 1331:14, 1331:15
**NYT** [1] - 1373:18

## O

**oath** [6] - 1343:22, 1367:23, 1368:9, 1376:21, 1377:3, 1388:3
**obey** [1] - 1436:7
**object** [5] - 1322:17, 1336:21, 1344:19, 1398:18, 1398:20

**objected** [3] - 1322:24, 1323:14, 1325:4
**objecting** [1] - 1341:19
**objection** [8] - 1321:16, 1321:17, 1323:15, 1336:25, 1340:9, 1344:21, 1398:17, 1398:24
**objections** [4] - 1322:12, 1338:14, 1338:16, 1344:18
**observed** [1] - 1431:18
**obtain** [2] - 1350:13, 1364:13
**obtained** [3] - 1332:14, 1338:1, 1453:20
**obtaining** [1] - 1356:16
**obvious** [7] - 1356:10, 1444:2, 1445:6, 1447:22, 1449:1, 1449:5, 1449:8
**obviously** [7] - 1446:25, 1447:3, 1452:6, 1456:17, 1457:24, 1460:8, 1464:18
**obviousness** [2] - 1356:12, 1380:20
**occasionally** [1] - 1351:9
**occasions** [1] - 1418:21
**occur** [1] - 1357:19
**occurred** [4] - 1354:22, 1360:9, 1365:25, 1374:1
**October** [4] - 1361:21, 1384:16, 1419:19, 1433:20
**odd** [1] - 1443:25
**OF** [3] - 1318:2, 1318:12, 1319:1
**offering** [2] - 1325:20, 1348:3
**Office** [4] - 1350:12, 1356:8, 1372:21, 1395:16
**office** [31] - 1325:25, 1356:6, 1356:17, 1356:19, 1357:16, 1378:12, 1378:14, 1379:20, 1380:19, 1380:25, 1381:2, 1381:13, 1381:17, 1382:4, 1382:6,

1382:23, 1384:10, 1384:14, 1386:7, 1393:10, 1393:11, 1394:20, 1394:25, 1395:7, 1395:12, 1396:1, 1401:10, 1444:15, 1448:23, 1462:2, 1464:10

**officer** [5] - 1390:9, 1421:19, 1423:3, 1423:14, 1455:7

**Official** [1] - 1318:22

**official** [4] - 1382:22, 1390:4, 1395:24, 1405:14

**officially** [1] - 1395:10

**often** [3] - 1345:23, 1347:7, 1353:2

**old** [4] - 1363:13, 1401:19, 1402:1, 1442:5

**OLSON** [1] - 1319:17

**once** [3] - 1334:4, 1404:2, 1430:6

**one** [97] - 1321:18, 1322:20, 1326:2, 1326:16, 1326:17, 1326:24, 1328:19, 1332:11, 1332:14, 1334:13, 1334:18, 1336:23, 1337:3, 1338:1, 1338:24, 1339:10, 1339:20, 1340:12, 1350:13, 1352:13, 1354:13, 1355:23, 1356:18, 1356:22, 1362:1, 1364:19, 1368:18, 1369:13, 1371:12, 1377:24, 1380:25, 1384:25, 1391:21, 1392:3, 1393:3, 1393:11, 1393:25, 1401:1, 1401:15, 1403:21, 1404:9, 1405:1, 1405:7, 1406:17, 1407:23, 1409:15, 1414:5, 1418:5, 1418:7, 1419:8, 1419:17, 1423:9, 1423:13, 1423:20, 1423:21, 1424:9, 1424:19, 1424:23, 1424:25, 1427:17, 1427:19, 1429:10, 1430:12, 1430:21, 1431:1, 1431:9, 1431:25, 1432:19, 1433:21, 1433:22, 1433:23,

1436:9, 1436:20, 1436:23, 1444:5, 1444:14, 1447:8, 1448:2, 1448:14, 1449:15, 1450:8, 1451:2, 1452:11, 1452:13, 1454:12, 1457:15, 1458:5, 1459:12, 1460:6, 1460:23, 1462:8, 1462:14, 1462:15, 1463:14

**ones** [4] - 1325:23, 1438:3, 1454:4, 1454:25

**ongoing** [1] - 1430:23

**open** [1] - 1368:22

**opening** [5] - 1344:13, 1388:16, 1389:24, 1421:16, 1436:4

**operating** [2] - 1407:9, 1413:2

**opinion** [10] - 1343:25, 1364:7, 1370:2, 1389:1, 1396:5, 1401:16, 1401:18, 1448:2, 1448:4, 1458:9

**opinions** [2] - 1415:20, 1448:8

**opportunity** [5] - 1340:18, 1343:4, 1345:12, 1370:14, 1370:15

**oppose** [1] - 1323:8

**opposed** [1] - 1416:17

**opposing** [1] - 1334:11

**opposite** [1] - 1400:8

**option** [1] - 1419:21

**options** [1] - 1435:3

**order** [7] - 1318:25, 1323:24, 1340:22, 1346:15, 1351:1, 1353:12, 1365:13

**ordered** [5] - 1334:4, 1336:18, 1343:2, 1367:3, 1465:10

**ordinary** [15] - 1322:20, 1339:11, 1352:8, 1352:10, 1355:14, 1355:16, 1355:20, 1357:5, 1357:6, 1358:6, 1358:13, 1358:23, 1359:3, 1359:15, 1394:12

**origin** [1] - 1376:10

**original** [18] - 1323:5, 1358:6, 1359:17,

1402:11, 1422:6, 1424:6, 1438:10, 1438:12, 1438:22, 1439:4, 1440:7, 1440:16, 1440:17, 1443:20, 1444:25, 1445:5, 1452:4, 1459:19

**originally** [7] - 1352:1, 1358:12, 1358:15, 1358:21, 1395:7, 1445:11, 1445:19

**originally-filed** [1] - 1445:11

**originated** [1] - 1388:3

**OTERO** [1] - 1318:3

**otherwise** [4] - 1322:6, 1326:13, 1369:4, 1389:21

**outcome** [2] - 1345:15, 1409:1

**outcomes** [3] - 1423:7, 1423:15, 1431:17

**outpatient** [1] - 1405:22

**outset** [2] - 1330:6, 1377:22

**outside** [8] - 1367:25, 1368:14, 1386:25, 1408:13, 1408:24, 1436:13, 1441:3, 1441:11

**overall** [2] - 1404:4, 1404:12

**overlap** [1] - 1338:2

**overlapping** [1] - 1334:16

**overlaps** [1] - 1337:21

**overly** [1] - 1347:5

**overtime** [2] - 1391:3, 1391:5

**owe** [1] - 1388:17

**owes** [1] - 1373:18

**own** [13] - 1347:4, 1353:24, 1367:10, 1369:25, 1373:5, 1375:18, 1387:6, 1403:9, 1435:25, 1449:11, 1451:12, 1455:6, 1455:9

**owned** [1] - 1363:17

**owner** [3] - 1357:17, 1357:20, 1394:15

**owns** [1] - 1408:2

---

**P**

---

**P28z** [1] - 1464:3

**Pacific** [1] - 1323:16

**page** [5] - 1336:3, 1341:15, 1431:25, 1433:11

**page-0023-24** [1] - 1451:19

**pages** [2] - 1329:24, 1451:18

**paid** [19] - 1362:1, 1362:13, 1365:9, 1371:5, 1386:12, 1388:23, 1389:7, 1389:21, 1391:20, 1392:5, 1396:13, 1411:16, 1411:20, 1412:19, 1417:20, 1418:6, 1418:18, 1443:6, 1455:25

**paper** [7] - 1372:4, 1375:9, 1375:10, 1385:11, 1400:23, 1453:4, 1453:9

**paragraph** [2] - 1326:20, 1349:10

**paren** [5] - 1331:7, 1339:5, 1339:6, 1339:7

**parens** [2] - 1331:14, 1331:15

**parenthesis** [1] - 1331:9

**parents** [1] - 1377:18

**part** [34] - 1321:17, 1340:9, 1345:9, 1346:8, 1351:12, 1351:15, 1372:22, 1373:2, 1375:10, 1376:18, 1376:20, 1382:2, 1387:19, 1388:24, 1394:8, 1396:9, 1401:25, 1408:15, 1416:7, 1420:13, 1420:21, 1420:25, 1421:6, 1422:1, 1422:3, 1423:11, 1426:1, 1441:21, 1441:22, 1447:9, 1456:24, 1462:6, 1462:8

**partes** [5] - 1339:22, 1340:6, 1340:7, 1356:6, 1380:18

**participate** [2] - 1378:9, 1378:16

**particular** [9] - 1325:16, 1363:24, 1364:14, 1372:4, 1401:11, 1402:16, 1422:14, 1425:21, 1459:21

**particularly** [2] -

**page** [5] - 1336:3, 1341:15, 1431:25, 1433:11

**1386:5, 1429:25**

**parties** [23] - 1321:10, 1330:5, 1330:21, 1330:23, 1334:3, 1334:22, 1334:24, 1342:20, 1348:7, 1361:10, 1361:12, 1361:20, 1362:7, 1365:9, 1365:19, 1365:22, 1366:2, 1366:6, 1367:15, 1368:5, 1368:8, 1399:13, 1405:25

**parties'** [1] - 1323:6

**partnership** [2] - 1396:25, 1397:1

**parts** [5] - 1395:21, 1420:15, 1433:17, 1436:16, 1436:18

**party** [12] - 1321:2, 1347:11, 1347:13, 1347:18, 1347:19, 1356:7, 1359:24, 1361:17, 1392:1, 1411:3, 1418:9, 1457:12

**party's** [2] - 1347:8, 1367:20

**pass** [1] - 1373:4

**passage** [1] - 1394:17

**passed** [4] - 1321:5, 1341:24, 1372:9, 1403:21

**patent** [322] - 1321:25, 1324:10, 1324:19, 1324:24, 1325:17, 1325:22, 1330:7, 1331:11, 1331:16, 1332:14, 1333:22, 1334:2, 1335:22, 1336:9, 1338:1, 1339:8, 1342:12, 1342:13, 1348:2, 1348:7, 1348:10, 1348:20, 1350:1, 1350:11, 1350:13, 1350:15, 1350:19, 1350:22, 1350:25, 1351:1, 1351:5, 1351:8, 1351:13, 1351:15, 1351:17, 1351:18, 1351:23, 1352:16, 1352:23, 1353:1, 1353:2, 1353:10, 1353:15, 1354:7, 1354:12, 1354:13, 1354:18, 1355:4, 1355:9, 1355:13, 1356:5, 1356:9, 1356:11,

1356:15, 1356:17, 1356:19, 1357:5, 1357:8, 1357:9, 1357:13, 1357:16, 1357:17, 1357:20, 1357:21, 1357:23, 1358:3, 1358:7, 1358:8, 1358:12, 1358:14, 1358:17, 1358:20, 1359:2, 1359:9, 1359:12, 1359:15, 1359:16, 1359:18, 1359:20, 1360:2, 1360:24, 1361:12, 1362:2, 1362:11, 1362:14, 1362:20, 1363:7, 1363:15, 1365:10, 1372:20, 1373:10, 1376:3, 1378:2, 1378:6, 1378:8, 1378:23, 1379:2, 1379:9, 1379:13, 1379:23, 1380:5, 1380:11, 1380:14, 1380:16, 1380:19, 1380:25, 1381:2, 1381:13, 1381:16, 1381:18, 1381:24, 1382:4, 1382:5, 1382:6, 1382:16, 1382:23, 1383:24, 1384:1, 1384:6, 1384:7, 1384:10, 1384:12, 1384:14, 1385:1, 1385:6, 1386:5, 1386:6, 1386:22, 1387:1, 1388:18, 1388:25, 1389:1, 1389:2, 1389:6, 1389:25, 1390:6, 1392:10, 1392:12, 1392:14, 1393:1, 1393:6, 1393:10, 1393:11, 1393:13, 1393:14, 1393:15, 1394:3, 1394:15, 1394:16, 1394:20, 1394:25, 1395:6, 1395:12, 1395:19, 1395:22, 1395:23, 1396:1, 1396:6, 1397:8, 1397:9, 1397:11, 1397:12, 1397:17, 1400:14, 1400:17, 1400:21, 1400:25, 1401:10, 1402:10, 1402:11, 1402:12, 1402:15, 1402:18, 1402:19, 1407:4,

1407:10, 1407:15, 1408:2, 1408:21, 1409:6, 1414:8, 1414:24, 1420:15, 1420:24, 1421:5, 1421:6, 1421:19, 1425:14, 1425:15, 1425:19, 1431:10, 1432:10, 1435:25, 1436:3, 1436:4, 1436:5, 1436:16, 1436:25, 1437:5, 1437:8, 1437:9, 1437:13, 1437:14, 1437:16, 1438:11, 1438:12, 1438:16, 1438:22, 1439:4, 1439:6, 1440:5, 1440:7, 1440:11, 1440:14, 1440:22, 1441:4, 1441:8, 1441:9, 1441:10, 1441:14, 1441:18, 1442:3, 1442:18, 1442:20, 1442:21, 1444:3, 1444:6, 1444:7, 1444:8, 1444:11, 1444:15, 1444:23, 1444:25, 1445:11, 1445:15, 1446:6, 1446:12, 1446:13, 1446:15, 1446:18, 1446:21, 1447:6, 1447:11, 1447:14, 1447:18, 1447:20, 1448:1, 1448:23, 1449:7, 1449:11, 1449:14, 1449:20, 1449:21, 1450:10, 1450:14, 1450:15, 1451:9, 1451:17, 1451:19, 1452:4, 1454:13, 1454:14, 1454:23, 1455:13, 1455:15, 1455:18, 1456:13, 1456:19, 1456:20, 1457:1, 1457:10, 1457:22, 1458:12, 1459:1, 1459:2, 1459:5, 1459:6, 1459:7, 1459:16, 1459:19, 1460:13, 1460:20, 1461:2, 1461:6, 1461:14, 1461:17, 1461:18, 1461:19, 1461:24, 1462:2, 1463:11, 1463:18, 1463:20, 1463:25, 1464:2, 1464:7, 1464:9,

1464:10, 1464:12, 1464:22, 1464:23, 1464:25, 1465:1

**Patent** [4] - 1350:12, 1356:7, 1372:21, 1395:16

**patent's** [1] - 1351:19

**patent-in-suit** [2] - 1362:11, 1362:14

**patentable** [2] - 1350:16, 1350:21

**patented** [5] - 1363:2, 1363:12, 1364:15, 1365:3, 1407:1

**patentee** [6] - 1351:10, 1356:15, 1356:22, 1356:23, 1364:17, 1448:23

**patents** [9] - 1335:22, 1350:11, 1351:9, 1356:19, 1362:14, 1363:10, 1421:20, 1422:9, 1432:20

**path** [1] - 1384:22

**patience** [1] - 1417:17

**patient** [5] - 1424:24, 1425:1, 1426:9, 1428:8, 1431:1

**patient's** [3] - 1373:5, 1426:4, 1426:11

**patients** [36] - 1378:15, 1403:21, 1404:1, 1404:7, 1404:9, 1405:1, 1405:3, 1405:5, 1410:22, 1419:21, 1427:3, 1427:7, 1427:22, 1427:23, 1428:22, 1429:2, 1429:13, 1429:24, 1430:1, 1430:4, 1430:11, 1430:22, 1434:13, 1434:15, 1434:23, 1435:2, 1435:7, 1435:8, 1435:10, 1435:19, 1435:20, 1440:3, 1440:7

**pause** [3] - 1448:17, 1452:11, 1463:14

**Pause** [1] - 1399:1

**pay** [9] - 1364:16, 1364:24, 1391:16, 1397:7, 1408:7, 1408:16, 1410:10, 1413:18, 1435:15

**paying** [1] - 1391:1

**payment** [18] - 1361:2, 1361:5, 1362:5, 1406:4, 1407:18,

1408:8, 1408:9, 1408:11, 1408:12, 1408:17, 1408:23, 1409:4, 1409:10, 1412:20, 1412:22, 1413:7, 1413:8, 1413:19

**PDX40.5** [1] - 1444:17

**pediatric** [7] - 1429:20, 1429:22, 1430:4, 1430:7, 1430:9

**peer** [3] - 1446:10, 1460:21, 1460:23

**peer-review** [1] - 1446:10

**peer-reviewed** [2] - 1460:21, 1460:23

**people** [29] - 1345:23, 1345:24, 1365:1, 1366:25, 1367:15, 1376:25, 1378:8, 1379:11, 1383:14, 1387:11, 1390:6, 1393:9, 1393:23, 1403:21, 1404:24, 1409:22, 1417:25, 1419:23, 1421:25, 1423:10, 1428:14, 1431:12, 1434:12, 1443:9, 1448:15, 1452:20, 1454:7, 1457:19

**people's** [1] - 1419:20

**peppercorn** [1] - 1415:13

**per** [1] - 1392:5

**percent** [24] - 1406:6, 1408:11, 1411:12, 1411:13, 1411:16, 1411:17, 1411:19, 1411:20, 1411:24, 1412:2, 1412:6, 1412:9, 1412:12, 1412:23, 1412:24, 1416:5, 1434:17, 1449:19, 1449:21, 1449:24

**percentage** [2] - 1404:17, 1416:4

**perfect** [1] - 1324:3

**perfectly** [1] - 1365:11

**perhaps** [7] - 1324:1, 1325:16, 1342:7, 1372:11, 1372:16, 1373:25, 1411:25

**period** [4] - 1386:24, 1416:22, 1436:7, 1446:22

**permission** [1] -

1372:15

**permitted** [4] - 1428:8, 1441:9, 1441:17, 1450:21

**person** [27] - 1355:14, 1355:16, 1355:20, 1356:10, 1357:4, 1357:6, 1358:6, 1358:13, 1358:23, 1359:3, 1366:18, 1373:20, 1376:1, 1392:20, 1394:12, 1398:4, 1400:20, 1401:4, 1401:12, 1402:13, 1418:25, 1448:24, 1464:15, 1464:25, 1465:5, 1465:12

**personal** [1] - 1343:19

**personally** [4] - 1374:20, 1374:21, 1389:8, 1389:11

**persons** [1] - 1450:5

**perspective** [3] - 1322:19, 1339:10, 1355:14

**persuade** [7] - 1347:13, 1347:19, 1349:5, 1350:5, 1355:6, 1355:10, 1360:14

**persuades** [1] - 1370:3

**Peter** [1] - 1319:19

**petition** [6] - 1381:2, 1381:3, 1381:6, 1381:9, 1381:24, 1395:1

**Ph.D** [1] - 1355:21

**Ph.D.s** [1] - 1386:16

**PHARMA** [1] - 1318:8

**Pharma** [2] - 1372:13, 1377:23

**Pharma's** [2] - 1375:17, 1376:19

**phase** [5] - 1410:20, 1432:13, 1432:14

**phone** [2] - 1366:18, 1375:8

**phrase** [2] - 1349:21, 1438:16

**physicians** [2] - 1405:23, 1410:21

**picked** [1] - 1460:2

**picks** [1] - 1449:6

**piece** [1] - 1455:24

**pieces** [1] - 1421:11

**pill** [1] - 1425:24

**pills** [1] - 1425:24

**pipeline** [1] - 1406:20

pity [3] - 1373:16, 1373:21, 1373:22
place [11] - 1361:7, 1367:11, 1367:13, 1407:11, 1434:7, 1444:2, 1446:19, 1464:12, 1464:14, 1464:18, 1465:3
placed [3] - 1323:24, 1324:4, 1340:20
placeholder [1] - 1444:12
plain [2] - 1352:8, 1352:10
plainly [1] - 1380:9
plaintiff [9] - 1324:8, 1354:19, 1370:13, 1370:14, 1393:16, 1393:20, 1393:21, 1394:1, 1394:2
plaintiffs [26] - 1321:13, 1321:14, 1321:19, 1322:13, 1322:16, 1322:24, 1323:8, 1323:14, 1324:9, 1325:1, 1326:4, 1335:25, 1354:11, 1361:3, 1361:7, 1362:10, 1364:9, 1365:13, 1365:17, 1414:6, 1414:12, 1451:11, 1451:15, 1452:17, 1455:5, 1460:11
Plaintiffs [2] - 1318:6, 1319:2
plaintiffs' [7] - 1322:9, 1325:3, 1330:6, 1332:19, 1334:1, 1337:25, 1354:12
planet [1] - 1377:15
planned [2] - 1422:22, 1423:1
planning [4] - 1383:17, 1432:23, 1433:1, 1433:6
plans [3] - 1375:18, 1432:8
pleasant [1] - 1431:12
plenty [2] - 1377:13, 1377:20
plus [1] - 1408:11
pocket [2] - 1411:17, 1418:13
point [15] - 1329:20, 1377:6, 1378:14, 1379:6, 1380:15, 1388:12, 1392:14, 1397:6, 1406:7, 1409:5, 1447:13,

1448:17, 1454:9, 1458:4, 1463:16
pointed [6] - 1372:3, 1372:7, 1395:18, 1400:22, 1413:1, 1453:2
points [4] - 1387:21, 1403:17, 1406:23, 1408:18
policy [1] - 1362:19
polite [1] - 1375:5
polymer [1] - 1352:6
popularity [1] - 1363:11
population [1] - 1430:17
portion [7] - 1341:10, 1363:23, 1364:2, 1442:12, 1442:15, 1445:3
position [7] - 1360:8, 1365:6, 1379:22, 1381:12, 1411:3, 1435:17, 1435:22
positions [1] - 1438:24
possessed [1] - 1355:17
possession [1] - 1358:2
possibility [2] - 1371:15, 1383:2
possible [8] - 1326:10, 1326:11, 1367:19, 1374:12, 1408:8, 1408:9, 1410:8, 1417:7
potential [3] - 1379:20, 1396:25, 1457:2
potentially [2] - 1379:8, 1397:7
pound [1] - 1420:5
precisely [1] - 1442:17
precision [1] - 1360:19
preclinical [2] - 1406:24, 1410:19
predated [1] - 1421:19
predictability [1] - 1359:14
prefer [1] - 1335:17
preference [1] - 1335:15
preferred [1] - 1361:17
prejudice [1] - 1345:16
prejudices [1] - 1343:19

prejudicial [1] - 1325:22
prepare [1] - 1426:9
prepared [1] - 1369:6
preponderance [11] - 1347:11, 1347:12, 1348:17, 1349:6, 1350:6, 1354:11, 1393:18, 1393:21, 1414:7, 1414:9, 1415:10
prescribe [1] - 1410:22
present [9] - 1321:2, 1330:20, 1341:6, 1342:20, 1353:9, 1398:9, 1399:13
presentation [1] - 1380:24
presented [6] - 1337:19, 1337:20, 1359:9, 1364:20, 1367:22, 1368:7
preserve [1] - 1362:22
preside [1] - 1369:14
presiding [3] - 1369:8, 1369:14
press [2] - 1366:25, 1389:6
presumed [2] - 1393:14, 1394:5
pretty [6] - 1379:16, 1388:22, 1391:2, 1435:22, 1444:1, 1445:5
prevent [1] - 1325:19
previous [2] - 1433:10, 1460:6
previously [1] - 1347:25
price [1] - 1363:23
primary [7] - 1420:16, 1421:4, 1421:22, 1436:18, 1436:20, 1451:10, 1454:15
primers [18] - 1372:4, 1375:15, 1385:12, 1451:15, 1452:7, 1452:8, 1453:2, 1453:10, 1454:2, 1454:3, 1454:11, 1454:15, 1454:19, 1454:22, 1454:24, 1462:23, 1462:24
principles [1] - 1407:6
probable [1] - 1347:20
probative [1] - 1363:21
problem [8] - 1385:10, 1385:12, 1385:13,

1400:24, 1402:25, 1403:1, 1405:13, 1440:16
problematic [2] - 1325:16, 1442:1
problems [6] - 1325:15, 1403:19, 1405:21, 1426:17, 1431:2, 1433:23
procedure [3] - 1394:21, 1426:8, 1441:15
procedures [2] - 1426:5, 1434:3
proceed [1] - 1322:5
proceeding [3] - 1382:23, 1389:5, 1401:10
PROCEEDINGS [1] - 1318:12
proceedings [6] - 1368:12, 1381:13, 1381:16, 1399:1, 1402:11, 1466:3
process [14] - 1353:4, 1353:8, 1353:9, 1364:5, 1367:24, 1368:4, 1368:13, 1380:18, 1381:1, 1394:21, 1417:23, 1431:3, 1432:22, 1441:12
produced [1] - 1363:17
product [31] - 1348:3, 1353:4, 1353:8, 1353:9, 1354:1, 1362:17, 1363:9, 1371:1, 1371:3, 1374:4, 1374:7, 1382:10, 1382:13, 1382:17, 1382:25, 1383:11, 1384:16, 1404:10, 1405:2, 1406:12, 1406:15, 1408:19, 1410:5, 1410:17, 1410:22, 1419:24, 1423:22, 1431:22, 1434:19, 1438:10
production [1] - 1431:16
products [3] - 1363:3, 1365:4, 1422:24
profile [1] - 1429:3
profit [8] - 1363:23, 1364:16, 1411:14, 1411:18, 1411:21, 1411:25, 1412:4, 1412:6

profitability [1] - 1363:9
profits [5] - 1364:2, 1366:7, 1407:9, 1407:10, 1408:20
prognosis [1] - 1434:15
program [2] - 1362:20, 1397:22
programs [1] - 1367:12
project [4] - 1383:9, 1392:18, 1397:2, 1424:13
Project [6] - 1374:17, 1374:21, 1383:9, 1384:17, 1407:7, 1413:11
projected [1] - 1407:21, 1408:22
projection [1] - 1411:20
projects [1] - 1406:17
promoter [1] - 1363:1
promoting [1] - 1363:3
proof [16] - 1335:18, 1337:11, 1339:10, 1339:13, 1347:8, 1347:9, 1347:10, 1347:16, 1347:17, 1393:17, 1394:4, 1405:8, 1414:22, 1415:5, 1415:10, 1415:22
proofreading [1] - 1335:8
propel [1] - 1372:1
proper [1] - 1459:5
property [7] - 1363:12, 1376:4, 1392:25, 1409:24, 1423:7, 1436:11, 1441:12
proportionality [1] - 1413:14
proposal [3] - 1324:8, 1325:4, 1330:6
propose [2] - 1321:14, 1329:6
proposed [11] - 1321:10, 1321:12, 1322:9, 1322:11, 1325:24, 1328:1, 1332:6, 1332:11, 1332:19, 1337:25, 1339:3
proposition [1] - 1364:13
proprietary [1] - 1456:18

prosecution [12] -
1351:6, 1351:13,
1351:19, 1357:10,
1395:25, 1400:15,
1445:2, 1446:15,
1447:9, 1449:20,
1459:6
protect [3] - 1367:20,
1428:7, 1456:10
protection [2] -
1456:4, 1456:6
protein [1] - 1462:6
prove [20] - 1327:17,
1327:18, 1327:19,
1347:24, 1348:16,
1348:21, 1354:11,
1355:4, 1355:8,
1356:9, 1357:14,
1358:16, 1359:19,
1360:19, 1360:20,
1362:11, 1393:16,
1393:17, 1393:21
proved [1] - 1344:6
proven [10] - 1326:22,
1327:6, 1327:15,
1328:4, 1354:19,
1355:2, 1359:25,
1414:7, 1414:16,
1414:22
provide [10] - 1326:4,
1334:4, 1334:23,
1336:2, 1342:10,
1342:15, 1356:7,
1397:1, 1431:4,
1449:12
provided [16] -
1321:5, 1330:14,
1332:8, 1333:11,
1333:12, 1334:2,
1335:12, 1340:17,
1343:7, 1352:9,
1374:4, 1407:20,
1440:12, 1451:19,
1452:9, 1465:13
providing [1] - 1374:1
proving [3] - 1347:12,
1347:18, 1362:11
provisional [4] -
1444:11, 1444:17,
1446:13, 1461:14
prudent [3] - 1364:12,
1364:17, 1365:1
PTO [4] - 1350:12,
1350:14, 1350:15,
1351:13
PTO's [1] - 1351:12
public [7] - 1351:7,
1436:11, 1449:12,
1449:13, 1455:16,
1456:17, 1463:23

publically [1] -
1390:19
publically-traded [1] -
1390:19
publication [13] -
1444:3, 1444:4,
1444:10, 1444:22,
1445:12, 1447:5,
1450:14, 1452:9,
1452:21, 1458:25,
1460:21, 1464:20
publications [2] -
1440:4, 1461:12
published [4] -
1420:25, 1446:10,
1446:21, 1461:18
publishes [1] - 1375:9
pudding [1] - 1445:9
pulled [1] - 1461:24
pulls [1] - 1378:22
punish [2] - 1360:13,
1436:1
purpose [5] - 1345:1,
1345:2, 1345:3,
1357:25, 1374:10
purposes [3] - 1392:9,
1406:1, 1422:8
pursue [2] - 1397:16,
1406:22
pursuing [1] - 1396:24
put [20] - 1330:9,
1360:7, 1393:25,
1399:25, 1416:1,
1418:2, 1421:25,
1424:12, 1427:11,
1428:3, 1428:6,
1429:4, 1429:5,
1429:6, 1430:23,
1438:15, 1439:12,
1444:12, 1445:22,
1461:17
putting [3] - 1392:21,
1420:4, 1447:3
PX002 [1] - 1462:20
PX1059 [1] - 1431:24
PX2.10 [1] - 1445:1
PX274 [1] - 1431:22
PX40 [1] - 1446:11
PX41 [1] - 1446:13

Q

Quackenbush [7] -
1400:13, 1416:18,
1448:12, 1450:7,
1454:1, 1454:25,
1460:22
Quackenbush's [1] -
1445:24
qualification [1] -

1402:2
qualified [2] - 1364:7,
1401:15
quarter [2] - 1432:24,
1433:7
QUESTION [2] -
1388:6, 1396:6
questioning [1] -
1419:1
questions [10] -
1322:2, 1322:5,
1322:6, 1344:18,
1371:20, 1371:23,
1379:4, 1413:21,
1414:5, 1419:6
quickly [4] - 1326:13,
1330:13, 1374:12,
1426:15
quite [7] - 1325:3,
1410:4, 1410:10,
1412:13, 1418:1,
1423:4, 1452:23
quote [4] - 1323:6,
1388:17, 1399:24,
1401:11

R

radiation [2] -
1371:11, 1434:14
ramp [1] - 1407:12
ramp-up [1] - 1407:12
range [6] - 1430:11,
1440:10, 1454:10,
1455:22, 1460:5,
1460:12
ranged [1] - 1411:14
Rao [2] - 1391:18,
1409:11
rare [1] - 1448:14
rascal [1] - 1443:6
Raskin [1] - 1378:13
rate [16] - 1362:3,
1362:6, 1365:8,
1391:12, 1391:14,
1391:17, 1404:5,
1404:6, 1404:12,
1404:13, 1406:6,
1411:12, 1412:7,
1412:9, 1412:24,
1426:14
rates [2] - 1362:13,
1412:13
rather [3] - 1335:14,
1424:8, 1424:19
RCE [6] - 1324:23,
1350:23, 1462:18,
1462:21, 1464:7
re [1] - 1357:8
Rea [1] - 1395:15

reach [6] - 1326:15,
1329:4, 1364:12,
1369:17, 1369:24,
1370:6
reached [5] - 1330:23,
1335:3, 1335:5,
1369:4, 1369:7
reaching [1] - 1344:7
read [25] - 1322:4,
1322:15, 1328:3,
1331:2, 1333:17,
1334:9, 1334:19,
1339:4, 1341:2,
1343:4, 1343:21,
1343:23, 1349:11,
1367:5, 1367:17,
1381:21, 1395:18,
1395:22, 1395:24,
1437:17, 1446:3,
1448:22, 1454:7,
1457:21, 1462:20
read" [1] - 1340:5
readily [2] - 1428:22,
1458:16
reading [8] - 1333:9,
1335:18, 1349:9,
1358:6, 1370:7,
1397:11, 1397:12,
1397:13
reads [5] - 1328:14,
1328:20, 1381:25,
1400:21, 1464:23
ready [5] - 1341:1,
1342:1, 1369:11,
1398:9, 1411:1
Real [1] - 1320:3
real [17] - 1397:20,
1400:19, 1408:4,
1408:16, 1408:25,
1412:16, 1412:18,
1413:19, 1419:3,
1429:8, 1448:15,
1450:5, 1455:24,
1458:22, 1465:6
reality [1] - 1435:23
realizable [1] - 1364:2
realize [1] - 1334:15
realized [1] - 1457:9
realizes [1] - 1429:7
really [21] - 1391:24,
1396:12, 1396:14,
1404:14, 1404:18,
1406:12, 1410:10,
1411:21, 1418:17,
1419:10, 1419:13,
1423:14, 1427:6,
1428:11, 1434:24,
1441:7, 1442:8,
1443:24, 1449:6,
1450:20, 1461:8

rears [1] - 1464:4
reason [13] - 1337:23,
1375:20, 1424:5,
1424:18, 1424:21,
1430:14, 1433:15,
1443:25, 1459:21,
1460:4, 1461:4,
1461:16, 1463:19
reasonable [25] -
1339:11, 1339:13,
1339:15, 1339:16,
1339:22, 1360:10,
1360:20, 1360:25,
1361:2, 1361:5,
1361:23, 1361:25,
1364:16, 1365:19,
1373:20, 1391:13,
1401:4, 1401:13,
1406:3, 1406:22,
1411:23, 1413:13,
1445:10
reasonableness [1] -
1345:17
reasonably [2] -
1361:10, 1364:11
reasons [3] - 1372:17,
1410:11, 1431:2
reassembled [2] -
1342:19, 1399:12
rebuttal [1] - 1341:11
receive [1] - 1435:5
received [8] - 1337:10,
1344:8, 1344:25,
1345:6, 1361:21,
1362:10, 1366:3,
1366:10
recent [2] - 1333:5,
1334:21
receptor [2] - 1426:7,
1442:13
recess [7] - 1330:17,
1330:18, 1330:19,
1340:13, 1340:14,
1398:7, 1465:16
recite [1] - 1353:19
recognize [2] -
1372:20, 1393:4
recognized [1] -
1358:8
recognizes [2] -
1393:5, 1394:3
recollection [1] -
1379:5
recombinant [1] -
1356:3
record [13] - 1321:1,
1333:18, 1334:19,
1340:15, 1340:21,
1357:5, 1357:9,
1373:17, 1394:13,

1446:3, 1455:16, 1459:7, 1466:3
**records** [1] - 1346:16
**red** [1] - 1412:4
**Redwood** [1] - 1320:6
**reengineered** [1] - 1373:6
**reengineering** [1] - 1426:3
**refer** [1] - 1347:7
**reference** [3] - 1325:17, 1367:8, 1447:10
**referenced** [1] - 1447:10
**references** [1] - 1321:15
**referred** [8] - 1353:22, 1395:18, 1424:13, 1431:25, 1433:10, 1442:16, 1444:5, 1450:11
**referring** [9] - 1332:10, 1334:17, 1342:12, 1349:12, 1373:17, 1379:9, 1395:9, 1399:20, 1459:16
**refers** [4] - 1353:19, 1353:23, 1354:1, 1354:3
**reflect** [2] - 1463:7, 1463:12
**reflected** [7] - 1332:12, 1334:9, 1336:12, 1336:16, 1337:25, 1409:16, 1445:8
**refractory** [1] - 1435:2
**refreshed** [1] - 1379:6
**regard** [1] - 1424:11
**regarding** [14] - 1321:4, 1321:7, 1322:15, 1323:2, 1323:4, 1323:11, 1323:13, 1324:11, 1333:13, 1336:8, 1343:25, 1352:12, 1352:15, 1398:14
**regardless** [1] - 1321:23
**region** [31] - 1421:3, 1421:4, 1421:6, 1421:22, 1422:2, 1422:18, 1423:4, 1423:11, 1423:13, 1423:18, 1425:13, 1436:18, 1436:19, 1436:20, 1436:23, 1442:5, 1442:13,

1442:25, 1445:3, 1445:14, 1451:10, 1451:11, 1451:17, 1451:25, 1452:21, 1454:16, 1454:17, 1459:17, 1459:20
**regulated** [1] - 1424:1
**regulations** [1] - 1410:20
**regulatory** [1] - 1432:22
**reinfuse** [1] - 1426:4
**reinfused** [1] - 1426:10
**reinject** [1] - 1426:4
**rejected** [1] - 1382:7
**relapse** [2] - 1424:24, 1425:2
**relapsed** [1] - 1435:2
**related** [3] - 1355:22, 1356:1, 1356:2
**relating** [1] - 1350:10
**relationship** [1] - 1362:23
**relatively** [2] - 1330:9, 1425:25
**release** [3] - 1389:6, 1404:15, 1428:18
**relevant** [2] - 1326:1, 1365:24
**reliable** [1] - 1456:1
**rely** [3] - 1347:4, 1365:14, 1449:13
**remainder** [1] - 1353:17
**remaining** [1] - 1411:18
**remains** [2] - 1338:9, 1428:16
**remember** [19] - 1344:16, 1345:24, 1345:25, 1347:3, 1368:8, 1369:2, 1376:8, 1379:4, 1380:9, 1385:7, 1385:10, 1390:10, 1397:8, 1402:15, 1416:14, 1429:15, 1434:11, 1435:13, 1443:21
**remembers** [1] - 1378:1
**remind** [3] - 1366:11, 1397:21, 1437:24
**reminded** [1] - 1436:16
**reminder** [1] - 1416:2
**remission** [1] - 1434:17
**remote** [1] - 1360:21

**remove** [3] - 1338:5, 1338:6, 1338:9
**removed** [2] - 1325:18, 1410:18
**removing** [1] - 1373:15
**rendering** [1] - 1401:16
**renumbered** [1] - 1332:14
**repeat** [2] - 1461:13, 1461:15
**repeated** [2] - 1447:2, 1461:11
**repeatedly** [2] - 1442:11, 1446:17
**repetitive** [2] - 1322:25, 1323:1
**replace** [2] - 1338:6, 1338:9
**replacing** [1] - 1321:14
**report** [6] - 1367:4, 1367:18, 1404:2, 1404:3, 1431:4, 1431:24
**reported** [5] - 1403:23, 1431:6, 1450:22, 1450:25, 1451:1
**Reporter** [1] - 1318:22
**REPORTER'S** [1] - 1318:12
**reporting** [2] - 1450:19, 1450:24
**reports** [1] - 1391:9
**represent** [1] - 1435:15
**representatives** [1] - 1321:2
**represented** [2] - 1323:7, 1392:2
**representing** [2] - 1396:22, 1464:10
**request** [25] - 1322:25, 1323:2, 1323:4, 1323:11, 1323:12, 1323:21, 1324:11, 1324:12, 1329:23, 1334:1, 1335:11, 1335:24, 1337:12, 1338:5, 1350:22, 1351:10, 1351:11, 1351:12, 1351:14, 1398:16, 1407:17, 1412:2, 1413:6, 1461:23
**requested** [8] - 1321:10, 1322:14, 1322:22, 1324:7, 1324:9, 1330:21,

1340:20, 1412:7
**requesting** [2] - 1416:4, 1416:5
**requests** [2] - 1377:1, 1377:2, 1394:21
**require** [4] - 1368:13, 1458:13, 1458:14, 1458:15
**required** [5] - 1359:6, 1360:18, 1375:9, 1390:18, 1440:9
**requirement** [13] - 1323:17, 1358:1, 1358:5, 1358:11, 1358:14, 1359:1, 1359:21, 1385:2, 1385:7, 1385:8, 1402:19, 1441:24, 1450:19
**requirements** [14] - 1350:25, 1352:19, 1352:20, 1352:21, 1352:25, 1353:2, 1353:5, 1353:12, 1353:19, 1353:20, 1353:22, 1353:24, 1354:2, 1450:24
**requires** [2] - 1409:10, 1426:5, 1456:21
**research** [6] - 1355:24, 1367:7, 1367:14, 1367:24, 1371:9, 1372:2
**reserve** [1] - 1341:10
**resolve** [4] - 1326:10, 1326:13, 1330:18, 1428:24
**resources** [1] - 1374:8
**respect** [12] - 1325:10, 1325:13, 1329:19, 1362:17, 1407:2, 1408:25, 1443:11, 1443:12, 1443:13, 1443:15
**respond** [1] - 1367:3
**responded** [1] - 1322:13
**responding** [1] - 1388:19
**response** [5] - 1336:13, 1404:4, 1404:6, 1404:12, 1404:13
**responsible** [6] - 1376:1, 1377:24, 1380:13, 1384:22, 1423:7, 1427:4
**responsibly** [1] - 1382:9
**rest** [6] - 1328:11,

1346:9, 1387:20, 1411:17, 1421:9, 1465:13
**restricted** [1] - 1362:16
**restrictions** [3] - 1368:11, 1453:7, 1453:21
**result** [4] - 1361:14, 1368:13, 1375:4, 1404:11
**resulted** [2] - 1361:6, 1361:16
**results** [2] - 1363:14, 1459:19
**resume** [1] - 1428:8
**resumed** [2] - 1427:16, 1427:23
**retained** [3] - 1450:6, 1451:3, 1457:12
**retaining** [1] - 1456:2
**retired** [2] - 1398:6, 1465:15
**return** [3] - 1339:18, 1369:11, 1398:1
**returned** [2] - 1342:18, 1399:11
**revenue** [1] - 1407:22
**revenues** [3] - 1362:4, 1407:12, 1407:13
**review** [16] - 1335:4, 1336:22, 1337:14, 1339:22, 1340:6, 1340:7, 1340:18, 1347:2, 1356:6, 1380:18, 1381:8, 1413:22, 1428:7, 1433:8, 1446:10
**reviewed** [4] - 1381:6, 1455:17, 1460:21, 1460:23
**reviewing** [4] - 1357:5, 1357:8, 1381:7, 1394:12
**reviews** [2] - 1350:15, 1356:19
**revised** [5] - 1332:6, 1333:3, 1333:11, 1334:24, 1336:13
**revision** [1] - 1340:12
**revisions** [2] - 1333:14, 1340:20
**Ribas** [4] - 1373:15, 1375:21, 1453:14, 1453:24
**Richard** [1] - 1390:24
**RICHARDSON** [2] - 1320:2, 1320:5
**right-hand** [1] - 1421:3

**rights** [11] - 1365:9, 1365:10, 1367:20, 1372:21, 1376:4, 1392:25, 1397:8, 1408:24, 1436:3, 1436:4, 1436:5

**rise** [5] - 1329:1, 1342:17, 1398:5, 1399:10, 1465:14

**risk** [2] - 1429:25, 1431:7

**risks** [1] - 1364:5

**road** [1] - 1383:3

**roadblocks** [1] - 1410:7

**roads** [3] - 1382:9, 1383:2, 1406:2

**Roberts** [3] - 1421:12, 1421:14, 1421:18

**ROCKET** [7] - 1427:3, 1428:14, 1429:24, 1431:5, 1431:13, 1431:14, 1432:7

**role** [1] - 1361:14

**rolling** [1] - 1433:16

**Roman** [9] - 1321:22, 1322:3, 1331:7, 1331:10, 1331:14, 1331:15, 1339:5, 1339:7, 1349:11

**room** [3] - 1343:13, 1366:20, 1378:21

**root** [1] - 1431:23

**Rosenberg** [41] - 1371:18, 1372:12, 1373:16, 1373:17, 1374:23, 1374:24, 1375:2, 1375:5, 1375:8, 1375:12, 1375:13, 1375:14, 1375:24, 1376:2, 1376:5, 1376:12, 1377:9, 1377:14, 1377:20, 1382:20, 1383:1, 1385:10, 1387:23, 1388:2, 1388:7, 1400:9, 1400:23, 1400:24, 1402:7, 1402:24, 1440:3, 1440:13, 1444:5, 1444:7, 1444:8, 1452:13, 1452:16, 1453:1, 1453:17, 1453:19

**Rosenberg's** [1] - 1375:19

**roughly** [1] - 1405:4

**routine** [4] - 1359:11, 1401:19, 1403:4, 1403:5

**row** [1] - 1378:1

**royalties** [1] - 1362:10

**royalty** [36] - 1339:11, 1339:13, 1339:15, 1339:16, 1339:17, 1360:10, 1361:1, 1361:2, 1361:5, 1361:16, 1361:23, 1361:25, 1362:3, 1362:6, 1362:12, 1364:16, 1364:23, 1365:8, 1365:19, 1406:3, 1406:6, 1408:11, 1409:4, 1409:10, 1411:12, 1411:23, 1412:7, 1412:9, 1412:12, 1412:23, 1412:24, 1413:6, 1413:9, 1416:4

**royalty/comparability** [1] - 1339:23

**RPR** [2] - 1318:22, 1466:9

**rule** [2] - 1395:23, 1398:20

**ruled** [1] - 1332:5

**Rules** [1] - 1344:20

**rules** [7] - 1355:1, 1367:20, 1368:9, 1368:10, 1436:6, 1436:8, 1436:9

**ruling** [1] - 1344:22

**run** [1] - 1416:14

**running** [14] - 1362:3, 1362:6, 1365:7, 1386:16, 1406:6, 1408:11, 1409:4, 1409:10, 1412:7, 1412:23, 1413:6, 1413:9, 1416:4

**Ryan** [2] - 1406:5, 1407:19

## S

**Sadelain** [72] - 1371:12, 1371:19, 1371:21, 1371:22, 1372:7, 1372:10, 1373:19, 1373:24, 1374:24, 1375:8, 1375:13, 1375:23, 1377:15, 1377:21, 1378:15, 1378:23, 1379:2, 1379:22, 1380:11, 1382:4, 1385:11, 1392:16, 1393:2, 1395:19,

1396:6, 1400:8, 1400:11, 1400:22, 1401:21, 1402:10, 1402:22, 1403:12, 1416:9, 1416:11, 1420:17, 1421:24, 1423:9, 1428:21, 1429:18, 1430:9, 1431:9, 1432:3, 1442:11, 1442:24, 1443:11, 1443:15, 1444:4, 1444:6, 1444:18, 1444:21, 1445:7, 1445:13, 1445:24, 1447:15, 1452:12, 1452:18, 1452:25, 1453:1, 1453:15, 1453:16, 1453:18, 1454:18, 1456:14, 1456:15, 1456:18, 1456:22, 1459:15, 1460:17, 1461:10, 1463:17, 1463:21, 1463:25

**Sadelain's** [33] - 1372:5, 1372:16, 1373:10, 1374:23, 1375:2, 1375:10, 1375:11, 1375:13, 1375:17, 1376:6, 1376:18, 1400:25, 1402:7, 1403:2, 1406:14, 1406:18, 1420:9, 1421:20, 1426:21, 1427:2, 1429:10, 1432:6, 1432:10, 1432:13, 1432:20, 1446:19, 1452:13, 1452:19, 1453:24, 1455:13, 1463:21, 1465:3

**safe** [1] - 1434:3

**safer** [1] - 1405:9

**safety** [13] - 1383:18, 1404:15, 1404:19, 1404:25, 1405:15, 1405:16, 1405:19, 1405:23, 1427:5, 1427:25, 1428:8

**sale** [2] - 1348:3, 1362:4

**sales** [9] - 1362:4, 1363:3, 1363:5, 1363:6, 1404:25, 1407:12, 1408:12, 1412:20, 1412:24

**sample** [1] - 1377:7

**San** [1] - 1320:4

**Sarah** [1] - 1319:11

**sat** [1] - 1370:23

**satisfied** [1] - 1358:5

**satisfies** [1] - 1352:21

**satisfy** [1] - 1359:21

**sauce** [3] - 1420:10, 1422:15, 1426:21

**saving** [3] - 1420:10, 1434:20, 1434:22

**saw** [17] - 1376:7, 1380:22, 1385:16, 1390:3, 1395:7, 1395:8, 1405:6, 1418:7, 1418:8, 1418:11, 1428:16, 1434:16, 1445:9, 1446:12, 1450:20, 1455:5, 1455:21

**scale** [1] - 1394:1

**scales** [2] - 1393:24, 1415:12

**scFv** [13] - 1388:23, 1389:9, 1389:12, 1401:5, 1401:25, 1420:17, 1421:7, 1421:23, 1424:15, 1436:19, 1436:25, 1442:8, 1442:10

**scFv-based** [2] - 1389:9, 1389:12

**scFvs** [8] - 1372:6, 1372:8, 1401:19, 1402:8, 1403:3, 1403:9, 1403:10, 1403:13

**school** [1] - 1403:7

**Schuetz** [18] - 1391:25, 1396:11, 1396:20, 1397:3, 1418:8, 1418:16, 1455:9, 1455:11, 1455:25, 1456:11, 1457:3, 1457:5, 1457:9, 1457:14, 1458:17, 1459:1, 1459:11

**science** [2] - 1355:21, 1374:18

**scientific** [2] - 1356:1, 1421:19

**scientist** [6] - 1371:19, 1372:1, 1377:15, 1378:16, 1420:22

**scientists** [7] - 1371:10, 1371:16, 1371:22, 1371:24, 1409:23, 1454:11, 1465:6

**scope** [15] - 1353:7, 1357:3, 1358:24, 1359:8, 1362:15,

1389:7, 1394:11, 1401:2, 1437:9, 1440:14, 1440:16, 1440:17, 1441:8, 1441:13, 1441:18

**screwed** [1] - 1449:23

**search** [2] - 1367:12, 1367:13

**searching** [1] - 1367:8

**seat** [2] - 1342:21, 1399:14

**second** [22] - 1322:22, 1328:19, 1333:11, 1334:10, 1347:16, 1370:15, 1401:7, 1419:14, 1422:3, 1424:11, 1424:16, 1424:18, 1425:4, 1425:9, 1425:12, 1438:2, 1441:22, 1448:18, 1453:11, 1455:3, 1463:14, 1465:1

**secret** [3] - 1420:10, 1422:15, 1426:21

**Securities** [2] - 1390:17, 1390:22

**see** [40] - 1323:23, 1323:24, 1324:3, 1330:18, 1332:7, 1332:9, 1340:12, 1345:13, 1345:24, 1374:23, 1375:21, 1385:17, 1386:14, 1386:20, 1388:20, 1390:25, 1399:23, 1404:4, 1413:13, 1414:6, 1421:2, 1421:3, 1421:4, 1421:5, 1421:21, 1422:4, 1433:5, 1442:23, 1444:19, 1444:23, 1445:2, 1445:4, 1447:15, 1449:7, 1456:21, 1457:1, 1464:3, 1464:20, 1464:21

**seeing** [4] - 1379:5, 1456:6, 1464:15, 1464:16

**seek** [1] - 1348:1

**seeking** [1] - 1432:19

**seem** [2] - 1418:2, 1462:19

**segment** [1] - 1445:19

**selected** [1] - 1352:7

**selectively** [1] - 1439:13

**self** [1] - 1376:23

**self-evident** [1] -

1376:23

**sell** [3] - 1325:20, 1361:4, 1364:14

**selling** [5] - 1325:20, 1348:3, 1361:22, 1363:2, 1363:23

**send** [3] - 1368:17, 1368:23, 1379:13

**senior** [1] - 1404:23

**sense** [9] - 1329:20, 1337:3, 1340:11, 1387:10, 1392:13, 1397:20, 1402:24, 1415:2, 1449:11

**sent** [5] - 1343:13, 1375:23, 1381:23, 1442:2

**sentence** [6] - 1327:24, 1334:20, 1339:2, 1349:9, 1352:20, 1463:5

**sentences** [1] - 1351:17

**separate** [2] - 1329:22, 1356:4

**September** [2] - 1433:20, 1460:20

**SEQ** [3] - 1351:25, 1395:20, 1442:16

**Sequence** [13] - 1422:5, 1422:6, 1437:17, 1438:17, 1438:18, 1438:23, 1440:18, 1442:23, 1454:20, 1455:20, 1455:21, 1461:16, 1463:6

**sequence** [76] - 1351:25, 1372:5, 1374:15, 1384:2, 1384:4, 1384:11, 1386:10, 1395:21, 1396:9, 1397:4, 1397:5, 1400:7, 1421:9, 1422:14, 1436:21, 1438:10, 1438:11, 1438:15, 1438:17, 1438:21, 1439:8, 1440:18, 1440:22, 1443:2, 1443:18, 1443:25, 1444:3, 1445:17, 1446:1, 1446:2, 1446:9, 1446:16, 1446:21, 1446:25, 1447:3, 1447:21, 1447:22, 1450:11, 1451:16, 1451:20, 1451:21, 1452:2, 1452:3, 1452:9,

1454:5, 1454:14, 1454:23, 1454:24, 1455:1, 1455:2, 1455:18, 1455:20, 1456:16, 1457:10, 1457:21, 1457:23, 1458:24, 1459:17, 1459:19, 1460:3, 1461:5, 1461:11, 1462:1, 1462:3, 1462:25, 1463:5, 1463:13, 1463:17, 1464:1, 1464:11, 1464:17, 1464:23

**sequences** [3] - 1437:23, 1454:3, 1454:8

**series** [1] - 1396:2

**serious** [1] - 1405:11

**serve** [1] - 1369:15

**service** [2] - 1367:2, 1370:20

**services** [1] - 1391:1

**serving** [1] - 1370:23

**session** [1] - 1345:5

**set** [17] - 1332:7, 1333:3, 1333:5, 1333:11, 1333:12, 1333:13, 1333:25, 1334:5, 1334:10, 1334:21, 1334:24, 1335:19, 1340:16, 1340:17, 1352:19, 1370:9, 1454:4

**sets** [4] - 1334:17, 1352:19, 1352:20, 1353:11

**setting** [2] - 1352:24, 1405:22

**seventh** [1] - 1391:18

**several** [8] - 1352:23, 1361:23, 1391:20, 1392:4, 1396:24, 1420:14, 1453:14

**shaded** [1] - 1452:1

**shall** [1] - 1369:17

**share** [4] - 1372:1, 1376:23, 1403:3, 1403:10

**shareholders** [1] - 1374:20

**Shear** [1] - 1320:3

**shift** [1] - 1389:22

**shock** [3] - 1372:11, 1372:16, 1373:25

**shocked** [1] - 1372:12

**short** [1] - 1330:18

**shorter** [1] - 1338:2

**shortly** [2] - 1366:6, 1440:23

**show** [5] - 1354:10, 1383:16, 1413:22, 1426:20, 1439:15

**showed** [5] - 1408:20, 1430:3, 1439:13, 1444:21, 1453:13

**showing** [1] - 1444:24

**shown** [5] - 1346:15, 1348:15, 1348:19, 1420:6, 1453:24

**shows** [1] - 1378:22

**shut** [3] - 1427:24, 1428:13, 1431:14

**side** [23] - 1321:5, 1340:18, 1341:6, 1341:16, 1341:19, 1347:24, 1393:25, 1406:9, 1409:11, 1415:4, 1421:3, 1428:16, 1428:18, 1429:1, 1429:3, 1436:12, 1436:13, 1443:6, 1448:2, 1448:3, 1449:15, 1449:16

**side's** [1] - 1347:22

**sides** [9] - 1329:25, 1333:12, 1340:17, 1360:24, 1361:24, 1377:1, 1398:18, 1411:1, 1414:10

**sight** [1] - 1419:17

**sign** [3] - 1369:10, 1418:15, 1456:3

**signal** [1] - 1377:11

**signaled** [1] - 1373:4

**signaling** [10] - 1377:10, 1420:16, 1421:4, 1421:22, 1436:18, 1436:19, 1436:20, 1446:7, 1451:10, 1454:16

**signed** [4] - 1368:18, 1368:20, 1395:14, 1402:3

**significant** [2] - 1364:6, 1447:19

**significantly** [1] - 1405:9

**similar** [3] - 1363:14, 1365:10, 1377:10

**similarly** [1] - 1446:8

**simple** [2] - 1425:24

**simplify** [1] - 1330:3

**simply** [2] - 1370:4, 1370:6

**single** [12] - 1352:20, 1371:1, 1371:2, 1371:14, 1385:14, 1385:17, 1386:10,

1401:13, 1406:17, 1408:19, 1418:5, 1447:8

**single-chain** [1] - 1401:13

**sisters** [1] - 1377:18

**sitting** [2] - 1377:25, 1417:18

**situation** [4] - 1327:11, 1376:15, 1418:24, 1450:21

**six** [3] - 1391:22, 1404:1, 1457:17

**size** [1] - 1365:6

**skill** [26] - 1322:20, 1339:11, 1355:14, 1355:16, 1355:20, 1356:10, 1357:5, 1357:6, 1358:6, 1358:13, 1358:23, 1359:3, 1359:15, 1394:12, 1400:20, 1402:13, 1447:12, 1447:23, 1448:11, 1448:21, 1448:24, 1450:6, 1457:20, 1460:1, 1464:25, 1465:5

**skilled** [6] - 1401:4, 1401:12, 1441:20, 1457:19, 1458:16, 1458:17

**slide** [4] - 1424:13, 1439:12, 1439:13, 1459:11

**slightly** [5] - 1394:1, 1404:5, 1405:8, 1414:11

**Sloan** [62] - 1321:15, 1322:10, 1347:25, 1348:4, 1348:14, 1348:16, 1349:3, 1349:5, 1349:19, 1350:3, 1350:5, 1360:3, 1360:6, 1360:7, 1360:12, 1360:14, 1360:16, 1360:18, 1360:20, 1364:24, 1371:7, 1371:21, 1372:14, 1372:18, 1376:25, 1377:9, 1378:8, 1379:8, 1379:20, 1380:5, 1380:16, 1381:11, 1381:23, 1384:15, 1392:17, 1392:25, 1393:9, 1394:18, 1395:7, 1407:17, 1409:5, 1409:7, 1410:2,

1412:7, 1412:19, 1413:25, 1414:14, 1415:1, 1415:8, 1415:18, 1416:3, 1416:19, 1431:12, 1431:15, 1432:5, 1437:7, 1440:15, 1448:10, 1456:13, 1456:22, 1456:25, 1461:23

**slower** [1] - 1405:8

**small** [6] - 1331:7, 1331:10, 1339:5, 1339:6, 1349:11, 1413:21

**Snapchat** [1] - 1366:22

**sneeze** [1] - 1428:19

**so-called** [3] - 1371:6, 1385:18, 1391:24

**social** [1] - 1366:22

**socially** [2] - 1387:24, 1388:9

**sold** [2] - 1362:18, 1423:23

**soldiers** [2] - 1373:3, 1373:5

**solely** [2] - 1343:20, 1345:6

**someone** [21] - 1371:25, 1373:21, 1376:2, 1376:3, 1381:1, 1386:16, 1387:7, 1389:20, 1393:17, 1401:17, 1402:15, 1410:9, 1419:7, 1420:21, 1447:7, 1447:12, 1455:4, 1457:5, 1457:7, 1458:16, 1458:17

**sometime** [2] - 1433:9

**sometimes** [7] - 1345:20, 1345:21, 1350:12, 1350:23, 1399:19, 1424:22, 1448:19

**somewhere** [2] - 1433:3, 1434:20

**soon** [3] - 1330:12, 1367:18, 1393:8

**sorry** [9] - 1324:8, 1324:22, 1328:17, 1331:20, 1334:6, 1339:25, 1392:23, 1433:2, 1458:14

**sort** [4] - 1420:9, 1420:21, 1442:19, 1449:3

**sound** [3] - 1413:15,

1413:16
**sounds** [1] - 1411:13
**source** [1] - 1392:7
**South** [2] - 1319:9, 1319:20
**special** [3] - 1362:22, 1407:1, 1442:18
**specialty** [1] - 1363:2
**specific** [5] - 1359:13, 1396:9, 1399:25, 1422:2, 1443:1
**specifically** [4] - 1352:7, 1358:11, 1389:14, 1423:11
**specification** [2] - 1350:17, 1357:9
**specifics** [1] - 1376:13
**specified** [1] - 1439:7, 1439:9
**speculative** [1] - 1360:22
**spend** [2] - 1409:25, 1419:12
**spent** [1] - 1396:24
**spin** [1] - 1429:9
**spokesperson** [1] - 1369:15
**sponsor** [1] - 1432:5
**stage** [13] - 1409:8, 1410:1, 1410:3, 1410:12, 1410:14, 1410:16, 1410:23, 1410:24, 1411:2, 1411:10, 1412:13, 1412:21
**stake** [2] - 1418:9, 1444:12
**stand** [11] - 1372:10, 1374:10, 1378:4, 1379:24, 1407:25, 1412:14, 1418:22, 1429:21, 1449:11, 1450:20, 1456:9
**standard** [4] - 1393:18, 1394:7, 1395:13, 1414:10
**standards** [1] - 1394:25
**standing** [2] - 1418:25, 1419:1
**stands** [2] - 1369:3, 1424:14
**Stanek** [1] - 1395:15
**Stars** [1] - 1319:6
**start** [12] - 1330:12, 1349:14, 1349:23, 1368:13, 1369:12, 1370:12, 1370:13, 1417:13, 1452:7, 1458:1, 1459:25,

1463:11
**started** [14] - 1366:5, 1384:5, 1395:9, 1403:9, 1416:20, 1433:19, 1440:19, 1440:24, 1447:22, 1451:14, 1459:24, 1459:25, 1463:10, 1463:12
**starting** [7] - 1352:2, 1352:5, 1409:5, 1437:2, 1438:24, 1445:14, 1458:2
**starts** [6] - 1381:1, 1445:5, 1447:1, 1452:19, 1452:21, 1459:20
**state** [1] - 1359:3
**statement** [7] - 1322:1, 1327:11, 1379:17, 1388:16, 1388:17, 1453:23, 1462:19
**statements** [5] - 1344:11, 1344:13, 1383:19, 1390:20, 1418:15
**States** [17] - 1325:21, 1350:11, 1368:18, 1372:21, 1374:3, 1382:4, 1384:14, 1390:18, 1390:22, 1395:12, 1395:16, 1408:13, 1408:14, 1408:16, 1408:24
**STATES** [1] - 1318:1
**statistics** [1] - 1434:17
**stay** [3] - 1333:24, 1411:17, 1463:3
**stem** [1] - 1434:14
**step** [1] - 1419:14
**steroids** [1] - 1428:22
**Steve** [2] - 1373:16, 1375:24
**Steven** [1] - 1371:18
**still** [23] - 1327:16, 1334:12, 1335:18, 1338:14, 1339:1, 1382:9, 1383:1, 1384:11, 1386:21, 1395:6, 1397:16, 1397:17, 1397:19, 1423:18, 1424:6, 1428:14, 1432:3, 1432:12, 1437:13, 1443:22, 1447:14, 1447:17, 1464:9
**stipulation** [2] - 1390:3, 1439:16
**stolen** [1] - 1382:11

**stop** [7] - 1322:6, 1382:11, 1397:24, 1462:11, 1462:24, 1465:9
**story** [2] - 1403:6, 1436:16
**strange** [1] - 1417:23
**strategic** [2] - 1396:25, 1397:1
**strategies** [1] - 1356:3
**Street** [4] - 1318:23, 1319:9, 1319:11, 1320:6
**stricken** [1] - 1344:23
**strikes** [1] - 1382:25
**string** [1] - 1373:16
**strive** [1] - 1369:17
**strong** [1] - 1379:17
**structural** [2] - 1403:4, 1403:11
**structure** [3] - 1409:3, 1420:18, 1421:20
**studies** [7] - 1427:16, 1428:9, 1429:6, 1430:19, 1430:23, 1432:3, 1432:6
**study** [10] - 1385:17, 1403:21, 1427:3, 1427:9, 1427:11, 1427:23, 1428:6, 1429:4, 1429:11
**stuff** [3] - 1419:3, 1419:15, 1426:12
**style** [2] - 1418:19
**subject** [2] - 1394:23, 1415:19
**submission** [1] - 1433:16
**submit** [6] - 1324:18, 1324:22, 1351:2, 1433:17, 1457:15, 1461:5
**submitted** [10] - 1321:11, 1321:13, 1324:17, 1336:13, 1336:18, 1381:16, 1391:8, 1391:9, 1400:6, 1433:22
**submitting** [1] - 1433:13
**subpoenaing** [1] - 1377:4
**subsequent** [1] - 1445:20
**subtle** [2] - 1448:18, 1463:16
**succeed** [1] - 1420:4
**succeeded** [1] - 1420:5
**succeeding** [1] -

1436:1
**success** [4] - 1363:10, 1401:5, 1401:13, 1426:14
**successful** [1] - 1429:11
**sudden** [1] - 1441:6
**suffer** [2] - 1425:2, 1427:22
**suffered** [2] - 1360:17, 1431:5
**sufficiently** [2] - 1358:22, 1426:10
**suggest** [5] - 1384:1, 1413:24, 1438:9, 1439:14, 1462:18
**suggested** [1] - 1455:25
**suggesting** [3] - 1359:23, 1427:5, 1450:18
**suggestion** [1] - 1455:8
**suit** [2] - 1362:11, 1362:14
**Suite** [2] - 1319:6, 1320:6
**Sullivan** [3] - 1406:5, 1407:19, 1409:9
**summaries** [6] - 1337:9, 1337:10, 1346:14, 1346:17, 1346:21, 1346:23
**summary** [5] - 1326:20, 1337:13, 1347:22, 1406:4, 1412:22
**summer** [1] - 1441:5
**sums** [1] - 1371:5
**sun** [1] - 1387:25
**super** [1] - 1459:16
**supplier** [1] - 1433:24
**support** [1] - 1388:25
**supporting** [1] - 1385:22
**supports** [3] - 1346:19, 1346:25, 1414:18
**supposed** [10] - 1332:22, 1418:5, 1435:14, 1447:20, 1449:11, 1458:12, 1458:19, 1461:13, 1461:20, 1465:4
**suppress** [1] - 1424:22
**surgery** [1] - 1371:11
**surprising** [1] - 1378:19
**susceptible** [1] -

1430:12
**suspended** [1] - 1427:11
**swelling** [1] - 1430:1
**switch** [1] - 1425:6
**sworn** [1] - 1344:3
**sympathize** [1] - 1437:18
**sympathy** [1] - 1343:20
**symptoms** [1] - 1428:23
**syndrome** [2] - 1404:16, 1428:18
**syntactical** [1] - 1331:22
**system** [4] - 1417:21, 1436:5, 1436:6, 1436:14

## T

**T-cell** [3] - 1356:2, 1373:3, 1426:7
**T-cells** [6] - 1355:25, 1373:1, 1426:2, 1426:7, 1426:9, 1426:11
**target** [3] - 1352:8, 1424:15, 1425:4
**targeting** [3] - 1424:17, 1424:25, 1425:12
**targets** [2] - 1424:18, 1424:20
**TCR** [3] - 1355:24, 1355:25, 1401:14
**TCRs** [1] - 1355:25
**teach** [1] - 1402:13
**technical** [4] - 1390:11, 1394:23, 1419:15, 1434:11
**technically** [1] - 1423:21
**technician** [1] - 1403:5
**techniques** [1] - 1356:2
**technologies** [2] - 1365:10, 1365:18
**technology** [13] - 1356:8, 1365:3, 1378:5, 1378:12, 1378:13, 1379:9, 1382:10, 1382:11, 1382:12, 1401:19, 1402:16, 1408:5, 1413:19
**teenagers** [1] - 1387:5
**tending** [1] - 1362:11

tent [1] - 1375:6
Teresa [1] - 1395:15
term [6] - 1325:22,
1326:2, 1351:25,
1352:1, 1352:4,
1363:7
terminal [2] - 1419:21,
1429:2
terminated [1] -
1382:14
terminology [1] -
1421:1
terms [15] - 1323:17,
1325:23, 1330:13,
1335:19, 1341:5,
1341:15, 1352:6,
1352:9, 1362:16,
1365:17, 1369:3,
1404:25, 1409:23,
1413:13, 1423:15
territory [2] - 1362:17,
1362:25
test [2] - 1322:24,
1361:15
tested [2] - 1367:24,
1368:3
testified [40] -
1345:13, 1346:4,
1346:7, 1373:12,
1387:14, 1387:18,
1388:5, 1391:18,
1396:16, 1399:22,
1403:3, 1405:19,
1409:18, 1412:12,
1416:10, 1416:13,
1424:16, 1425:3,
1425:16, 1427:8,
1427:12, 1429:2,
1432:11, 1433:15,
1433:19, 1440:21,
1443:14, 1445:16,
1446:20, 1450:25,
1453:18, 1454:25,
1455:12, 1455:17,
1456:11, 1456:24,
1458:5, 1458:17,
1459:25, 1462:4
testifies [2] - 1388:3,
1443:5
testify [11] - 1346:11,
1385:19, 1386:13,
1403:23, 1421:17,
1430:18, 1435:9,
1450:22, 1457:3,
1457:16, 1458:8
testifying [3] -
1345:14, 1412:10,
1457:6
testimony [47] -
1344:3, 1344:8,

1344:22, 1345:8,
1345:11, 1345:17,
1345:18, 1346:1,
1346:2, 1346:13,
1346:24, 1364:7,
1367:23, 1370:25,
1372:22, 1372:24,
1374:13, 1375:4,
1377:2, 1378:25,
1379:3, 1384:3,
1384:24, 1385:24,
1386:2, 1388:15,
1391:7, 1393:10,
1395:19, 1399:23,
1400:3, 1401:3,
1401:21, 1402:23,
1403:12, 1403:20,
1404:17, 1405:18,
1406:16, 1428:18,
1429:16, 1430:2,
1431:8, 1438:19,
1453:25, 1463:21
testing [4] - 1403:4,
1440:3, 1440:6,
1440:7
tests [1] - 1430:21
text [3] - 1366:19,
1395:23, 1400:15
THE [111] - 1321:1,
1321:21, 1322:7,
1322:9, 1323:10,
1324:3, 1324:14,
1324:21, 1325:11,
1326:3, 1326:12,
1326:18, 1327:12,
1327:21, 1328:2,
1328:7, 1328:9,
1328:16, 1328:19,
1328:22, 1328:24,
1329:6, 1329:9,
1329:12, 1329:16,
1330:2, 1330:4,
1330:12, 1330:17,
1330:20, 1330:25,
1331:4, 1331:6,
1331:13, 1331:20,
1331:24, 1332:1,
1332:3, 1332:10,
1332:15, 1332:20,
1332:22, 1333:3,
1333:5, 1333:8,
1333:10, 1333:19,
1333:21, 1333:24,
1334:13, 1334:23,
1335:2, 1335:7,
1335:10, 1335:15,
1336:1, 1336:8,
1336:24, 1337:2,
1337:18, 1338:5,
1338:8, 1338:11,
1338:13, 1338:16,

1338:18, 1339:3,
1339:9, 1339:25,
1340:3, 1340:5,
1340:7, 1340:10,
1340:15, 1340:24,
1341:1, 1341:5,
1341:10, 1341:13,
1341:18, 1341:20,
1341:23, 1342:1,
1342:2, 1342:9,
1342:15, 1342:17,
1342:19, 1349:12,
1349:14, 1349:23,
1370:12, 1397:21,
1398:1, 1398:5,
1398:8, 1398:16,
1398:23, 1399:2,
1399:7, 1399:10,
1399:12, 1416:25,
1417:4, 1417:6,
1417:9, 1417:11,
1417:12, 1417:14,
1465:8, 1465:14
THERAPEUTICS [1] -
1318:5
therapies [17] -
1355:24, 1408:24,
1412:12, 1412:13,
1420:10, 1422:16,
1423:8, 1423:24,
1424:5, 1425:9,
1425:21, 1425:23,
1426:22, 1426:24,
1432:9, 1434:1,
1435:8
therapy [28] - 1348:9,
1371:11, 1390:5,
1419:25, 1420:4,
1422:15, 1422:17,
1422:19, 1423:13,
1425:1, 1425:12,
1425:13, 1426:1,
1426:19, 1427:2,
1429:6, 1429:11,
1429:17, 1432:16,
1432:18, 1434:10,
1434:25, 1435:4,
1435:5, 1435:11,
1435:20, 1435:21,
1435:25
thereafter [1] -
1357:18
therefore [2] -
1346:19, 1346:25
Thereupon [8] -
1330:19, 1340:14,
1342:18, 1398:6,
1398:7, 1399:11,
1465:15, 1465:16
they've [2] - 1321:24,

1332:13
thinking [3] - 1385:3,
1433:2, 1455:13
third [11] - 1334:24,
1392:1, 1415:4,
1418:9, 1428:2,
1428:3, 1432:24,
1433:6, 1438:2,
1455:24, 1457:12
Thomas [2] - 1373:11,
1381:14
thousands [2] -
1419:22, 1434:22
threat [1] - 1405:17
three [35] - 1371:10,
1372:22, 1376:18,
1376:20, 1380:24,
1382:25, 1383:2,
1387:1, 1403:25,
1416:15, 1420:13,
1420:15, 1420:21,
1420:25, 1421:8,
1422:1, 1427:10,
1428:2, 1436:17,
1438:3, 1438:5,
1438:24, 1450:4,
1455:15, 1457:19,
1458:22, 1459:8,
1462:4, 1462:6,
1462:8, 1463:1,
1465:6
three-part [7] -
1372:22, 1376:18,
1376:20, 1420:13,
1420:21, 1420:25,
1422:1
threshold [1] -
1448:25
throat [1] - 1419:8
throughout [6] -
1377:25, 1384:22,
1416:22, 1417:18,
1423:3, 1446:15
throw [1] - 1424:8
tied [1] - 1412:20
timeline [2] - 1383:23,
1445:22
timing [1] - 1339:17
tipped [1] - 1415:12
tips [1] - 1394:1
title [2] - 1339:22,
1340:3
titled [1] - 1466:3
today [12] - 1324:20,
1329:22, 1336:22,
1340:21, 1343:3,
1376:20, 1377:19,
1387:2, 1408:2,
1428:16, 1439:6,
1453:18

together [4] - 1329:2,
1330:9, 1421:25,
1445:22
tolerable [1] - 1429:4
TOLLES [1] - 1319:17
tomorrow [2] -
1465:10, 1465:13
Toni [1] - 1453:14
took [8] - 1343:22,
1347:3, 1376:2,
1381:12, 1381:18,
1451:9, 1451:16,
1452:8
total [1] - 1407:12
totally [2] - 1390:13,
1461:3
totals [1] - 1407:14
touch [4] - 1387:23,
1388:6, 1450:16,
1453:11
touching [1] - 1367:17
tougher [1] - 1429:13
toward [1] - 1373:12
toxicities [1] -
1431:17
traded [1] - 1390:19
Trademark [4] -
1350:12, 1356:7,
1372:21, 1395:16
trademark [1] - 1356:5
trained [2] - 1402:16
training [1] - 1355:17
transcript [2] - 1400:1,
1466:2
TRANSCRIPT [1] -
1318:12
transcripts [1] -
1318:25
transfer [3] - 1378:5,
1378:12, 1378:13
transmembrane [1] -
1446:7
transplants [1] -
1434:14
travel [1] - 1382:9
treat [7] - 1378:15,
1429:14, 1435:1,
1435:7, 1435:8,
1435:11, 1443:9
treatable [1] - 1428:22
treated [2] - 1418:11,
1429:13
treating [1] - 1371:15,
1419:24
treatment [2] -
1390:12, 1392:15
trial [48] - 1325:23,
1325:24, 1329:25,
1337:11, 1345:6,
1346:22, 1367:1,

1367:13, 1367:24, 1368:3, 1368:5, 1368:8, 1368:13, 1373:12, 1374:8, 1377:25, 1380:14, 1380:17, 1381:10, 1387:22, 1388:1, 1388:12, 1388:17, 1388:19, 1389:8, 1390:3, 1390:21, 1392:9, 1399:25, 1402:23, 1405:20, 1415:16, 1416:14, 1416:22, 1417:18, 1420:1, 1423:3, 1428:15, 1429:24, 1431:5, 1431:13, 1431:14, 1432:7, 1443:16, 1450:23, 1452:25, 1453:18, 1457:8

**TRIAL** [1] - 1318:13

**trials** [12] - 1378:10, 1378:16, 1384:13, 1406:24, 1410:6, 1410:19, 1423:19, 1424:11, 1432:12, 1432:14, 1432:17, 1445:21

**tricky** [1] - 1424:22

**tried** [17] - 1378:3, 1379:2, 1380:2, 1382:8, 1382:13, 1382:24, 1383:13, 1383:24, 1383:25, 1391:25, 1395:10, 1396:11, 1404:1, 1427:1, 1439:2, 1443:21, 1460:12

**tries** [1] - 1383:23

**true** [11] - 1346:9, 1378:11, 1387:19, 1403:25, 1419:5, 1420:7, 1420:11, 1432:2, 1439:15, 1439:18, 1453:17

**trust** [3] - 1455:5, 1455:9, 1457:4

**truth** [6] - 1346:7, 1367:23, 1373:21, 1387:18, 1402:5, 1415:19

**truthful** [1] - 1390:20

**try** [12] - 1330:10, 1343:1, 1367:10, 1380:13, 1381:24, 1384:12, 1385:1, 1417:25, 1419:12, 1428:25, 1442:1, 1448:5

**trying** [17] - 1364:11, 1378:5, 1378:14, 1382:15, 1384:6, 1384:8, 1386:21, 1393:4, 1401:16, 1409:19, 1422:17, 1430:14, 1438:9, 1438:20, 1443:9, 1447:13, 1447:25

**Tuan** [1] - 1319:6

**turn** [4] - 1367:18, 1416:25, 1432:18, 1436:3

**turned** [1] - 1374:4

**twice** [1] - 1325:6

**Twitter** [1] - 1366:21

**two** [35] - 1322:5, 1333:2, 1341:6, 1341:11, 1345:24, 1347:8, 1353:10, 1355:23, 1357:3, 1361:25, 1362:3, 1378:25, 1383:14, 1396:15, 1399:2, 1399:5, 1405:4, 1406:7, 1409:20, 1411:8, 1414:10, 1415:9, 1424:20, 1424:25, 1427:10, 1427:23, 1433:2, 1434:9, 1434:10, 1434:12, 1435:12, 1448:8, 1452:20, 1454:7

**type** [5] - 1425:4, 1430:25, 1431:1, 1435:11, 1456:10

**types** [4] - 1353:10, 1355:25, 1406:25, 1420:14

**typically** [1] - 1448:1

**typographical** [5] - 1356:24, 1357:2, 1394:10, 1394:24, 1441:19

## U

**U.S** [2] - 1318:3, 1380:25

**ultimately** [2] - 1372:18, 1447:12

**unanimous** [4] - 1369:4, 1369:8, 1369:19, 1369:24

**uncertain** [2] - 1410:9, 1410:10

**uncertainties** [1] - 1410:18

**unclear** [1] - 1410:4

**uncomfortable** [1] - 1457:8

**under** [14] - 1325:17, 1344:20, 1362:22, 1363:10, 1366:4, 1375:6, 1376:21, 1377:3, 1387:25, 1388:3, 1409:12, 1425:18, 1436:2, 1457:20

**underlying** [3] - 1346:18, 1346:20, 1347:1

**understood** [5] - 1379:7, 1381:11, 1440:25, 1450:2, 1450:10

**undue** [2] - 1358:24, 1385:9

**unfair** [1] - 1418:2

**unfortunate** [1] - 1450:22

**unfortunately** [2] - 1430:21, 1435:3

**unhappy** [2] - 1377:14, 1377:20

**UNITED** [1] - 1318:1

**United** [17] - 1325:20, 1325:21, 1350:10, 1350:11, 1368:17, 1372:21, 1374:3, 1382:3, 1384:13, 1390:18, 1390:22, 1395:12, 1395:16, 1408:13, 1408:14, 1408:15, 1408:24

**unless** [3] - 1428:9, 1435:17, 1450:1

**unlike** [1] - 1403:22

**unnecessary** [1] - 1323:1

**unpatented** [1] - 1365:4

**unprovoked** [1] - 1381:22

**untrue** [1] - 1346:1

**untruthfully** [4] - 1346:4, 1346:7, 1387:14, 1387:18

**unwilling** [1] - 1370:2

**up** [43] - 1322:3, 1329:12, 1351:6, 1370:9, 1371:10, 1371:13, 1371:19, 1372:18, 1377:16, 1378:22, 1378:25, 1380:1, 1382:6, 1383:13, 1390:12, 1391:23, 1398:14, 1401:18, 1403:14,

1404:25, 1405:12, 1407:12, 1411:12, 1412:6, 1413:25, 1414:19, 1416:1, 1418:23, 1418:25, 1419:1, 1420:21, 1422:1, 1424:12, 1437:11, 1438:15, 1439:12, 1445:1, 1449:6, 1449:24, 1454:7, 1454:12, 1461:6

**updated** [1] - 1321:13

**upfront** [19] - 1362:1, 1362:5, 1365:7, 1406:4, 1407:18, 1408:8, 1408:10, 1408:12, 1408:17, 1408:23, 1409:4, 1409:9, 1412:20, 1412:22, 1413:6, 1413:7, 1413:8, 1413:18, 1413:19

**usage** [1] - 1366:5

**users** [1] - 1405:12

**uses** [6] - 1406:18, 1422:17, 1422:19, 1425:13, 1425:16, 1446:8

**usual** [1] - 1391:16

**utility** [2] - 1363:12, 1444:13, 1461:15

## V

**valid** [11] - 1349:16, 1349:17, 1357:11, 1361:12, 1393:14, 1394:6, 1400:12, 1436:25, 1443:23, 1448:9, 1458:8

**validity** [1] - 1329:1

**valuable** [9] - 1375:17, 1392:12, 1392:14, 1392:24, 1393:1, 1397:13, 1413:18, 1417:21, 1418:10

**valuation** [3] - 1390:10, 1390:11, 1390:14

**value** [8] - 1363:4, 1363:21, 1365:3, 1379:14, 1390:13, 1397:12, 1406:11, 1413:10

**valued** [3] - 1371:1, 1407:5, 1408:19

**various** [3] - 1360:23, 1410:7, 1432:4

**vast** [1] - 1428:24

**vector** [1] - 1433:25

**verdict** [15] - 1321:14, 1339:18, 1343:25, 1344:7, 1366:9, 1368:2, 1369:4, 1369:6, 1369:8, 1369:9, 1369:18, 1369:24, 1370:6, 1413:20, 1415:25

**verify** [1] - 1446:4

**version** [5] - 1325:12, 1325:14, 1325:15, 1336:13, 1337:1

**versions** [1] - 1345:22

**versus** [1] - 1398:8

**Vesey** [1] - 1319:11

**via** [2] - 1366:19

**videotape** [1] - 1431:8

**view** [8] - 1352:12, 1367:11, 1367:12, 1367:13, 1392:14, 1415:21, 1443:3, 1460:15

**views** [2] - 1369:23, 1389:22

**VII** [1] - 1318:13

**Vincent** [1] - 1319:18

**violates** [1] - 1368:11

**viral** [1] - 1433:25

**virus** [1] - 1426:6

**visit** [1] - 1367:10

**void** [1] - 1363:6

**VOLUME** [1] - 1318:13

**voluntarily** [1] - 1364:11

**vote** [1] - 1369:3

**voted** [1] - 1405:16

**vs** [2] - 1318:7, 1321:1

## W

**Wacker** [1] - 1319:14

**wait** [1] - 1376:1

**waiting** [1] - 1369:1

**walk** [1] - 1387:9

**wanton** [1] - 1354:15

**wants** [8] - 1371:25, 1378:23, 1392:24, 1396:5, 1404:7, 1405:10, 1408:7, 1420:4

**watch** [1] - 1367:5

**ways** [4] - 1361:24, 1388:6, 1409:20, 1436:16

**weapon** [1] - 1436:1

**website** [1] - 1366:20

**Wednesday** [1] - 1318:15

**week** [3] - 1391:4,

1391:5
**weeks** [2] - 1391:5, 1428:4
**weight** [5] - 1346:10, 1346:13, 1346:20, 1347:1, 1370:5
**Weinberger** [1] - 1319:19
**Weiss** [1] - 1319:8
**well-known** [1] - 1372:7
**well-qualified** [1] - 1401:15
**Wells** [1] - 1319:5
**West** [2] - 1318:23, 1319:14
**WESTERN** [1] - 1318:2
**whatsoever** [2] - 1374:8, 1385:13
**whisper** [1] - 1371:16
**whole** [4] - 1376:8, 1417:21, 1451:25, 1462:7
**willful** [22] - 1321:23, 1327:7, 1328:13, 1328:18, 1329:4, 1333:16, 1334:18, 1338:23, 1348:5, 1348:15, 1350:7, 1354:9, 1354:10, 1354:17, 1354:20, 1354:23, 1373:13, 1382:2, 1383:4, 1385:3, 1386:19, 1414:9
**willfully** [1] - 1383:22
**willfulness** [2] - 1348:16, 1350:9
**William** [1] - 1320:3
**willing** [7] - 1364:15, 1364:18, 1364:24, 1364:25, 1410:10, 1413:18, 1435:15
**win** [3] - 1347:24, 1359:24, 1394:2
**wish** [3] - 1327:21, 1347:2, 1418:23
**withstanding** [1] - 1463:25
**witness** [29] - 1344:3, 1345:9, 1345:11, 1345:13, 1345:20, 1346:3, 1346:6, 1385:14, 1386:5, 1386:7, 1386:11, 1387:13, 1387:15, 1387:17, 1396:12, 1396:23, 1412:14, 1415:18, 1418:14,

1419:2, 1419:9, 1419:10, 1425:22, 1456:1, 1456:8, 1457:8, 1459:12, 1459:14
**witness'** [6] - 1345:14, 1345:15, 1345:16, 1345:17, 1345:18
**witnesses** [36] - 1329:24, 1337:9, 1344:12, 1345:22, 1346:11, 1346:12, 1367:15, 1367:22, 1371:6, 1377:3, 1378:25, 1383:13, 1385:5, 1385:19, 1385:21, 1385:24, 1386:13, 1386:25, 1406:7, 1415:16, 1415:18, 1415:22, 1418:5, 1418:7, 1418:22, 1419:4, 1443:4, 1443:8, 1443:14, 1453:23, 1456:8, 1457:14, 1458:23, 1459:13
**wonder** [1] - 1452:23
**wonderful** [1] - 1383:5
**word** [6] - 1328:5, 1331:3, 1349:11, 1371:18, 1419:8, 1430:5
**worded** [2] - 1326:21, 1414:1
**wording** [1] - 1333:16
**words** [9] - 1331:9, 1352:19, 1353:7, 1355:8, 1357:6, 1357:19, 1358:10, 1418:1, 1455:19
**works** [3] - 1374:3, 1391:4, 1407:25
**world** [17] - 1389:5, 1397:20, 1400:19, 1408:14, 1408:15, 1408:16, 1408:25, 1412:16, 1412:18, 1413:19, 1429:8, 1443:9, 1448:15, 1450:5, 1455:24, 1458:22, 1465:6
**wow** [2] - 1411:13, 1418:23
**write** [3] - 1421:13, 1456:12, 1461:2
**writing** [7] - 1350:20, 1366:18, 1368:20, 1368:22, 1401:16, 1414:18, 1415:2
**written** [12] - 1327:8,

1339:12, 1356:13, 1357:24, 1358:1, 1358:5, 1358:18, 1385:23, 1400:18, 1401:1, 1402:19, 1415:6
**wrongful** [1] - 1354:16
**wrongly** [1] - 1357:13
**wrote** [2] - 1444:9, 1461:1
**www. amydiazfedreporter .com** [1] - 1318:25

## X

**Xs** [1] - 1415:2

## Y

**year** [17] - 1380:24, 1380:25, 1391:5, 1391:6, 1391:7, 1391:10, 1391:11, 1404:2, 1407:23, 1413:10, 1432:24, 1432:25, 1433:10, 1433:20, 1433:21, 1457:17
**years** [28] - 1355:23, 1371:9, 1371:23, 1375:7, 1385:6, 1385:15, 1392:6, 1393:9, 1394:17, 1396:24, 1405:4, 1407:11, 1410:8, 1410:9, 1410:24, 1411:11, 1433:2, 1434:9, 1434:10, 1434:13, 1435:12, 1437:15, 1445:14, 1446:23, 1455:15, 1456:23, 1459:15
**yelled** [1] - 1434:12
**YESCARTA** [42] - 1348:3, 1361:22, 1362:4, 1371:1, 1371:2, 1383:11, 1384:16, 1386:22, 1388:17, 1390:5, 1404:5, 1405:10, 1405:12, 1405:14, 1405:20, 1405:22, 1406:19, 1406:23, 1407:6, 1408:19, 1410:16, 1413:10, 1419:18, 1419:19, 1419:22, 1419:24, 1422:25, 1423:21, 1423:22, 1425:7, 1428:17, 1429:14,

1434:9, 1434:16, 1434:20, 1434:22, 1434:25, 1435:6, 1436:24, 1438:25, 1439:17
**YESCARTA's** [3] - 1348:9, 1394:20, 1405:18
**yesterday** [9] - 1321:7, 1322:16, 1336:11, 1340:21, 1376:8, 1379:3, 1379:19, 1380:3, 1401:23
**York** [4] - 1319:12, 1373:18, 1388:20
**YOUNG** [18] - 1324:1, 1324:13, 1324:15, 1324:22, 1330:3, 1330:5, 1330:16, 1335:3, 1335:14, 1335:21, 1338:14, 1338:17, 1339:20, 1340:2, 1340:4, 1340:6, 1340:8, 1340:25
**young** [2] - 1340:24, 1430:10
**Young** [2] - 1319:20, 1340:22
**yourself** [7] - 1369:20, 1385:4, 1401:14, 1404:21, 1446:24, 1456:5, 1465:12
**yourselves** [1] - 1398:4
**YouTube** [1] - 1366:21

## Z

**zeta** [5] - 1421:3, 1421:21, 1442:5, 1454:16
**ZUMA-1** [2] - 1406:16, 1406:19