1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3     HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5

JUNO THERAPEUTICS, INC., et al., )
6                                 )
            Plaintiffs,           )
7                                 )
                 vs.              )
8                                 )   2:17-CV-7639-SJO
KITE PHARMA, INC.,                )
9                                 )
            Defendant.            )
10    _____)

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              JURY TRIAL VOLUME VIII

15              Los Angeles, California

16          Thursday, December 12, 2019

17

18

19    _____

20

21

22              AMY DIAZ, RPR, CRR, FCRR
                Federal Official Reporter
23              350 West 1st Street, #4455
                Los Angeles, CA 90012
24

25          Please order court transcripts here:
                www.amydiazfedreporter.com

1    APPEARANCES OF COUNSEL:

2

     For the Plaintiffs:
3

4                IRELL & MANELLA LLP
                 By:  Morgan Chu, Attorney at Law
5                     Alan Heinrich, Attorney at Law
                      Crawford Maclain Wells, Attorney at Law
6                     Elizabeth Tuan, Attorney at Law
                 1800 Avenue of the Stars, Suite 900
7                Los Angeles, California 90067

8                JONES DAY
                 By:  Andrea Weiss Jeffries, Attorney at Law
9                555 South Flower Street, 50th Floor
                 Los Angeles, California 90071
10

                 JONES DAY
11               By:  Sarah Geers, Attorney at Law
                 250 Vesey Street
12               New York, New York 10281

13               JONES DAY
                 By:  John Michalik, Attorney at Law
14               77 West Wacker
                 Chicago, Illinois 60601
15

16

     For Defendant:
17

                 MUNGER TOLLES & OLSON LLP
18               By:  Garth Vincent, Attorney at Law
                      Edward Dane, Attorney at Law
19                    Jeffrey Weinberger, Attorney at Law
                      Peter Gratzinger, Attorney at Law
20                    Blanca Young, Attorney at Law
                 355 South Grand Avenue, 35th Floor
21               Los Angeles, California 90071

22

23

24

25

                 AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    Appearances continued:

2

3                    FISH & RICHARDSON
                     By:  William Shear, Attorney at Law
                     12390 El Camino Real
4                    San Diego, California 92130

5                    FISH & RICHARDSON
                     By:  John Farrell, Attorney at Law
6                    500 Arguello Street, Suite 500
                     Redwood City, California 94063
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  We are back on Juno vs. Kite.  We have

2      counsel present, and the jury is not.  I have been informed

3      that all of the jurors have now arrived.

4           We have a new pleading that has been filed.  It's

5      Kite's request for a curative instruction pursuant to 35 USC

6      298.  It looks like it was filed approximately about 6:00

7      this morning.  So I have read and considered the instruction

8      separate and apart from the claim that Mr. Chu may have made

9      an inappropriate argument to the jury.

10          If we put that aside, the instruction that's

11     requested seems to be an instruction that is based on 35 USC

12     298, and it seems to take exactly the language from that

13     section, and the question is would it be appropriate from

14     plaintiffs' perspective to give this instruction.  It doesn't

15     appear that there would be any prejudice to the plaintiff.

16     This may have been an instruction that the Court would have

17     considered at the -- if offered prior to the Court's giving

18     the closing instructions.

19          MS. JEFFRIES:  No -- well, Your Honor, we would

20     object to it, and we don't think it's an appropriate

21     instruction.  Certainly not every statement of the law would

22     be an appropriate instruction.  And the problem here is that

23     they do have this advice of counsel, which we've talked to

24     the Court about, but they have not disclosed it to us, so

25     they have maintained privilege over it.  So this is not a

```
1    case where that instruction we would believe would be
2    appropriate.
3         Mr. Chu's comments in opening were entirely
4    appropriate.  In Mr. Dane's -- in closing, I'm sorry.  In
5    Mr. Dane's opening, he injected this issue of good faith into
6    the case.  He said at the transcript at page 202, lines 15
7    through 17, "For the reasons that I have explained, Kite has
8    a very -- has very, very good reasons for believing that it
9    does not infringe these claims."  And all Mr. Chu was doing
10   was pointing out that there's no evidence to support that
11   supposed good faith belief.
12        THE COURT:  So let's put aside Mr. Chu's argument.
13   The Patent Act as states, the -- as referenced by Kite, "The
14   failure of an infringer to obtain the advice of counsel with
15   respect to any allegedly infringed patent, or the failure of
16   the infringer to present such evidence to the Court or jury,
17   may not be used to prove that the accused infringer willfully
18   infringed."  And the requested instruction is language taken
19   directly from the statute.
20        MS. JEFFRIES:  Yes, Your Honor, it is, but we have
21   not asserted that they have failed to provide evidence of
22   legal advice.
23        So if this -- this would be an instruction to be
24   given if we were to argue they say they have a good faith
25   belief, but they have given you no opinion of counsel.  They
```

1     have not shown you any legal advice that they relied on.  We

2     have specifically not put that in to stay clear of 298,

3     because we believe that is the law.

4            So this would suggest -- this would weigh in favor

5     of the defendant as we would see it, because we didn't inject

6     that into the case.  The only issue is is there a factual

7     basis for saying that there was a good faith belief.  There

8     has been absolutely no evidence of that.  This would suggest

9     that there might be, because maybe there is an advice of

10    counsel somewhere.

11           THE COURT:  Okay.  So the matter will be taken under

12    submission.  The Court will consider it, and we are going to

13    move on with argument of counsel.

14           Yes, Mr. Dane?

15           MR. DANE:  Would you like to hear from me, Your

16    Honor, on this?

17           THE COURT:  Other than the pleading here?  Is there

18    more to add?

19           MR. DANE:  Just very briefly.

20           THE COURT:  Okay.  Please.

21           MR. DANE:  Just two points, Your Honor.  With regard

22    to Ms. Jeffries' first comment that the instruction would be

23    inappropriate because the statutory provision talks about the

24    failure to obtain advice of counsel, and they know that we

25    did obtain advice of counsel from our assertion of privilege,

1    we took that language out.  So that's not language that we're

2    giving.  We are giving the relevant part of it, which is the

3    failure of us to present the advice is what we can present.

4    So we specifically dealt with that issue.

5           Second of all, the particular statements that were

6    made by Mr. Chu, they are creating a clear implication that

7    the fact witnesses could not testify as to the basis for

8    these defenses.  They didn't testify and, therefore, it

9    should be inferred there weren't any.  Of course, they

10   couldn't testify to the basis of the defenses because we

11   would have waived our privilege.  If they said we have

12   consulted with counsel, we understood we had good defenses,

13   we opened the door and we waive our privilege.  So we do

14   think it's an appropriate instruction.

15           THE COURT:  One final comment.

16           MS. JEFFRIES:  Sure.  I'll take two if I can get

17   two, but one is that this is a problem because it's only a

18   part of the statute, it's not the full statute.  This is a

19   problem that I was just raising, we never injected advice of

20   counsel into the case.  And, two, as the Court knows, in

21   these cases, in many, many cases, fact witnesses do testify.

22   They are sophisticated witnesses who review patents all the

23   time, and they do testify that they've looked at the patent,

24   they have -- they believed it to be invalid.  Commonly

25   happens in patent infringement cases.  That is exactly what

1    Mr. Chu was getting at.  And that statute would be

2    inappropriate to read because it creates a false impression

3    that there is a legal advice, and we -- it is legal advice

4    that we have not been able -- and we have not been able to

5    probe it or do anything with it.

6            THE COURT:  So it will be taken under consideration.

7    And if the Court gives it, it will be at the conclusion of

8    all argument.  Okay?

9            MS. JEFFRIES:  Thank you.

10           THE COURT:  Let's bring the jury out.  And Mr. Dane,

11   I think you have 30 minutes left, but how much time do you

12   need?  A little bit more?

13           MR. DANE:  A little bit more, Your Honor, about

14   45 minutes, and I promise I'll get done by then.

15           THE COURT:  Okay.

16           MR. DANE:  Thank you.

17           THE COURT:  And Mr. Chu, it looks like you've used

18   an hour and 22 minutes.  So do you need additional time also?

19           MR. CHU:  I would like the same additional time.

20           THE COURT:  Okay.

21           MR. CHU:  Thank you.

22           THE CLERK:  Are we ready?

23           THE COURT:  Yes.

24           THE CLERK:  All rise for the jury, please.

25               (Thereupon, the jury returned to the courtroom.)

1          THE COURT:  Okay.  We have all the jurors

2    reassembled, and the parties are here.  Would counsel please

3    have a seat.  We continue with the argument of counsel.  And

4    turn it back to Mr. Dane.

5          MR. DANE:  Good morning.

6          So I was -- I was talking yesterday when we left off

7    about the certificate of correction issue.  And we have heard

8    from the plaintiffs that this was an obvious error, obvious

9    clerical error, and it was all clear because of this thing

10   called the request for continued examination that they filed

11   with the patent office.

12          Now, just to remind ourselves where we were

13   yesterday, the patent without the correction, the Court has

14   construed it, the relevant and key portion of the claim, the

15   amino acid sequence encoded by Sequence ID NO:6, that covered

16   amino acids 113 to 220 of CD28, was not in Dr. Rosenberg's

17   construct at the time that he made it, it was not in the

18   construct when he collaborated with Kite, and Kite began

19   working with him.

20          And this matches the meaning of the claim term, it

21   matches the original sequence listing that was submitted when

22   the patent was originally filed.

23          So how about this request for continued examination?

24   Well, when you get a patent, when you want to look up a

25   patent, this is the patent you have in your binder, this is

1   the patent, this is how thick it is.  It's a good size, about

2   20 pages or so.  The prosecution history that you've heard

3   about, this is the prosecution history.  It is hundreds and

4   thousands of pages.  And you have that as Exhibit 2, the full

5   prosecution history.

6         And they suggest that someone would have reviewed

7   that prosecution history, those thousands of pages, and would

8   have figured out this obvious mistake.  And we saw yesterday

9   that you go through that prosecution history, and there are

10  many, many references to the sequence being -- beginning with

11  336.  And when it begins with 336, that means it encodes for

12  the amino acid lysine.  And it references for publications by

13  Dr. Sadelain that say that, and it references other patents

14  that say that.  And so someone would see reviewing -- if they

15  reviewed these thousands of pages, they would see that 336

16  comes up again and again.  And in the patent itself -- if I

17  could ask Shannon to please help me with this.

18        So this is the patent, and we see that even after

19  not only the request for continued examination, even after

20  the certificate of correction, part of the patent still

21  includes this sequence.  Column 7 still mentions 336, which

22  was Dr. Sadelain's favorite beginning nucleotide in all these

23  other documents.

24        And so the other thing that is in the patent is

25  Sequence ID NO:11.  And Sequence ID NO:11 gives an amino acid

1    sequence.  This was not changed in the RCE.  This was not

2    changed in the certificate of correction.  And guess what?

3    That amino acid sequence here, it's 113 to 220 of CD28, and

4    what does it start with?  It starts with lysine.  They never

5    submitted a new sequence that only has the sequence beginning

6    with ILE, with isoleucine.  And they have tried to say that

7    these sequence listings are not really important.  They are

8    very important.  Because the regulations of the patent office

9    require that when you claim an amino acid sequence or a

10   nucleotide sequence, you must include this thing called the

11   sequence listing.

12       Patent applications that contain disclosures of

13   nucleotides or amino acid sequence, it must contain as a

14   separate part of the disclosure a paper copy disclosing the

15   nucleotide and/or amino acid sequences, and those are called

16   sequence listings.  This is how you define for someone of

17   skill in the art what you mean when you claim an amino acid

18   sequence or a nucleotide sequence.

19       And it says that here, and this is in DX964, and

20   page 002, "When the description or claims of the patent

21   discuss a sequence that is set forth in the sequence listing,

22   reference must be made by this sequence ID number."

23       So everybody knows this is how when you want to

24   define your claims by an amino acid sequence or a nucleotide

25   sequence, you put the sequence listing in the patent, and

1      that's why that Sequence ID NO:11 is there, which has the

2      precise amino acid sequence beginning not with isoleucine,

3      but with lysine.  And they didn't correct that in the

4      certificate of correction.

5              So what about the certificate of correction?

6      Because remember when someone of skill in the art is looking

7      at this patent trying to determine if it has an obvious

8      error, they don't have the certificate of correction in front

9      of them because that's the requirement, the obvious error has

10     to be apparent for the certificate of correction to be

11     permitted.

12             So you have to evaluate it without looking at what

13     is said in the certificate of correction.

14             And Mr. Bales, if you could put up the certificate

15     of correction.

16             So this is at -- you can't see the page number here,

17     but it's PX2.726.  And what they told the patent office, they

18     said the changes in the sequence include some change to

19     Sequence ID NO:4, but the deletion of the first four bases

20     that's at CAAA from Sequence ID NO:6, which when that's

21     included encodes for lysine, we've deleted that to provide

22     consistency with the other information provided in the

23     application.  Consistency.

24             But we just saw it's not consistent with column 7,

25     because column 7 still says 336.  And it's not consistent

1    with Sequence ID NO:11, because Sequence ID NO:11 still

2    includes lysine as the first amino acid.

3            And when they said this, you know what they didn't

4    say?  They didn't tell the patent office, you know, we've

5    actually been describing our sequence as beginning with 336

6    for years and years, and all these different articles and

7    applications.  They didn't say, you know, the effect of this

8    change, it's going to be to expand the scope of our patent so

9    that it now covers a sequence that another scientist,

10   Dr. Rosenberg, is working on, which it didn't cover up until

11   now.  They didn't tell the patent office that.

12           So this is not the type of clearly-evident error,

13   error of minor character or clerical or typographical error

14   that you're permitted to make.

15           Showing you an example of what is.  This is in

16   evidence as DX239C, and this is at 0059.  This was

17   Dr. Bot's -- sorry.  Sorry, I gave you the wrong exhibit

18   number.  It's 239 -- it is 239C-59.  This is from Dr. Bot's

19   patent that he got on his lymphodepletion conditioning

20   process.  Look at what that corrects.  Okay.  CAR-T was

21   written as CART, it should have a dash.  With A, had the

22   letter A together, wasn't separated.  Errors of minor

23   character, typos, that's what certificate of corrections are

24   about.  Not expanding the scope of a patent in this way on an

25   ambiguous prosecution history record where someone has

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    repeatedly said that their invention actually does include

2    that lysine, and then suddenly last minute wants to change

3    their mind when the last official submission that they made

4    to the patent office doubled down on the fact that they

5    wanted to start with 336, and included the same opening

6    nucleotide that they had said time and time again was the

7    right one.  That's the record that the person of skill in the

8    art would be reviewing in determining whether or not this was

9    an obvious error, whether they should look at this and think

10   I am going to second guess what the issued patent means.  We

11   know the issued patent, when it originally issued, starts

12   with lysine.  And they're saying someone of skill in the art

13   would look at that issued patent, which we know begins with

14   lysine, and say, I'm going to look through these thousands of

15   pages, that's not what they meant.  They said it over and

16   over again.  They said it in the beginning, they said at the

17   end, but they must have really meant something else, it must

18   be a mistake.  That's not what they would conclude.

19          And this is not -- there are rules, as I said, about

20   getting a patent.  And this is not an issue where you may

21   think, well, you know, shouldn't you give them a pass on

22   this?  It is -- Dr. Sadelain did a lot of work.  Well,

23   there's an important public notice purpose of a patent that

24   is critical to the whole process.  And if this really was an

25   obvious error, it should have been corrected.  And

1    Dr. Sadelain admitted this patent that he says is so

2    critical, this incredible invention, where the most important

3    thing was cutting at that amino acid 114 at isoleucine, that

4    was the discovery he made, he didn't check it when the patent

5    came out to see if it got that right.

6         And his patent lawyer didn't check it to see if she

7    got that right, because that's not exciting reading.

8         Well, it may not be exciting reading, but you can't

9    be that negligent about your patent and then go after

10   somebody else who was working on something at the time you

11   had the original patent, that wasn't covered, that invested

12   in that, and then sue them for $750 million.  That is not

13   fair and that is not true to the rules of the patent system.

14        Okay.  Now let me turn to a different topic.  And

15   we've had -- we had limited time to present this case, so I

16   wish I had more, I really wish I had more, and I have limited

17   time to argue.  So on the 112 issues, I'm going to be fairly

18   brief.  You heard the testimony of Dr. Garcia on that,

19   hopefully you recall that testimony, but I just want to touch

20   on a couple of issues.  And with the 112 issues, these are

21   two defenses that we raised, lack of adequate written

22   description, and lack of adequate enablement.  And the

23   written description, the written description is the notion

24   that you have to fairly describe what it is you invented.

25        And here we have that this is a construct that has

1    these three parts.  Has the primary signaling region, the

2    costimulatory signaling region, and it has this binding

3    element.  And the part that was not adequately disclosed was

4    the binding element, the scFv.  Because if you remember early

5    in my opening, we have these, the DNA, again, this is a

6    patent that's about DNA, about amino acids, there was a

7    disclosure for the primary signaling domain of both the amino

8    acids and the DNA.  That was done correctly.  And we spent a

9    lot of time on the second part, CD28, Sequence ID NO:6 gave

10   us the nucleotides for Sequence ID NO:6, and Sequence ID

11   NO:11 gave us the amino acids for Sequence ID NO:6.  So for

12   both of those, there was a disclosure, someone could look at

13   it, they could understand what this protein was in terms of

14   its amino acid sequence.

15        But as I mentioned in the opening, they didn't do

16   that for the scFv, for SJ25C.  They didn't give the amino

17   acids.  And Dr. Sadelain admitted that.  He admitted that

18   there's no disclosure in the patent of the amino acid

19   sequence.

20        The only disclosure of the scFv that they made is in

21   this paragraph where they just refer to it.  They say, we use

22   the cell line.  But we know -- we know from Dr. Sadelain's

23   testimony that that was -- SJ25 was something he got from

24   another institution, and he was under a restriction, he said,

25   so that he couldn't share it with Dr. Rosenberg and he

1    couldn't give it to anybody else.  So what are the ways that

2    Dr. Sadelain could have disclosed this scFv so somebody would

3    understand what it was?  Well, there are a couple.

4            One of them, there's a provision that specifically

5    addresses this in the patent rules.  Biological inventions

6    are different.  You know, mechanical invention, you can

7    describe ropes and pulleys and levers, and people understand

8    what that is pretty easy.  Talking about new biological

9    inventions, genes, it's all about DNA, well, you can't really

10   kind of verbally describe what that is because you combine

11   DNA.

12           So it acknowledges that when the invention involves

13   a biological material, and words alone cannot sufficiently

14   describe how to make and use the invention in a reproducible

15   manner, access to the biological material may be necessary

16   for the satisfaction of these very statutory requirements

17   that our defenses are based on, section 112 of the patent

18   code.  And there's a provision, there's -- they're a

19   public -- it's like a bank where you can deposit the thing

20   that you made so that it's available so that scientists can

21   access it, it's reproducible.  So that they can take it and

22   they can figure out the sequence on their own.  That's

23   something Dr. Sadelain could do.  He said he didn't know

24   about that procedure when he testified on the stand.

25           And the other thing he could do, of course, is he

1     could have just disclosed the amino acid sequence, and he

2     didn't do that.

3          So all of this that we heard from Dr. Brocker when

4     he's talking about, well, there were other scFvs out there,

5     and, you know, people knew about -- that is not what he made.

6     He made one CAR for CD19, and he testified to that, too.

7     It's the only one he made was the one with SJ25C1, and he

8     didn't tell people what SJ25C1 was.

9          Okay.  Was there a way for people to figure out what

10    SJ25C1 was?  Well, the evidence is there was one publication

11    in existence at the time of the patent that provided the

12    amino acid sequence of SJ25C1.  Now, written description,

13    supposed to be in the four corners of the patent, you are

14    supposed to tell people in the patent.  But let's say

15    somebody went and they found that publication and they tried

16    to figure it out.  Well, what did we learn in this case?  The

17    article that contained the sequence called Bejcek.  And the

18    Bejcek article was something that Dr. Brentjens found.  And

19    when he was using the scFv that he and Dr. Sadelain were

20    working on, he looked up Bejcek, and he detests, you notice

21    there were some differences in the amino acids in the

22    published Bejcek article and the scFv that he was using.  So

23    he tried to make a construct using Bejcek.  And as he

24    testified, Bejcek, the official publication, the only thing

25    people in the public could have looked up and tried to find

1    to understand the amino acid sequence, had it wrong.  Had it

2    wrong.  And so when he tried to make this receptor using

3    Bejcek, it didn't work.  He could not get any signal at all.

4         And these are his notebook pages.  And this is

5    DX731.  And his handwriting is almost as bad as mine, and

6    it's a little hard to read, but at the top there, it says,

7    "Bejcek, et al., published sequence."  And you can see -- so

8    these here are the actual -- the nucleotides that encode for

9    the amino acids.  And you can see the ones in yellow, those

10   are in Bejcek, but they are not in this 19Z1, which was the

11   construct that he had made.  There are at least here three

12   differences in this part of the important, the variable

13   region, that's the part of the scFv that actually binds to

14   the target.

15        And this work was done well before the patent was

16   filed, but we know that the same differences carried over

17   into the actual sequence that was used for the scFv that was

18   in the patented construct.

19        And we know that because of the information at

20   DX766.  This is the information that Dr. Sadelain provided to

21   Dr. Schuetz.  And if we compare that, these nucleotides, to

22   the ones that Dr. Brentjens years earlier had tested against

23   the Bejcek published scFv, we see the same differences.  We

24   see that there are missing groups of codons, meaning there

25   were extra.  Here there were two extra amino acids in the

1    published sequence that were not in what Dr. Sadelain was

2    doing.

3             But they didn't tell anybody about that.  They

4    didn't disclose that in the patent.  So if someone tried to

5    use this published scFv, they wouldn't have gotten what

6    Dr. Sadelain had.  And you can't do that.  You can't

7    essentially keep part of your invention a trade secret.  Keep

8    it away from the public.  And then say you want to get patent

9    rights over that portion of your invention.

10            And you've heard from Dr. Garcia that there are huge

11   differences between different scFvs that bind to CD19.  Just

12   compare the one that's in YESCARTA, which is called FMC63,

13   compared to SJ25C1, the similarities are less than 50 percent

14   for the heavy chain variable region and only about 50 percent

15   for the light chain variable region.  And that's a very, very

16   low overlap.  So in other words, even if you were able to

17   figure out the amino acids in these variable regions, the

18   parts that bind to the target for SJ25C1, it's not going to

19   tell you what FMC63 is, it's not going to tell you what

20   another CD19 scFv would have.  And, in fact, as you saw in

21   Dr. Garcia's testimony, there is much more similarity between

22   the SJ25C1 scFv to scFvs that bind to completely different

23   targets, like this Borrelia surface protein and white spot

24   virus protein and a guinea pig protein than there are to the

25   YESCARTA scFv.

1           So let me turn to the second -- so there was an

2      adequate disclosure of the invention.  There was disclosure

3      of two of the three parts, inadequate disclosure of the third

4      part, and they can't do that.  They can't keep part of their

5      invention a trade secret and then say but we're going to

6      patent it.  We haven't disclosed to you exactly what it is,

7      but we are going to patent it and say we own it.

8           The second way the inventors failed to meet their

9      end of the bargain is the enablement requirement.  Let me

10     just start with the predictability part of that.  You've

11     heard many of the experts in the case, in fact all of them,

12     say that at this time CAR technology was at its infancy.  We

13     heard that from Dr. Sadelain, it was when he was working on

14     the '190 patent and filed it, it was the birth of the CAR-T

15     field.  Dr. Brentjens said the understanding at the time of

16     publication that he testified about, which was around the

17     time of the patent, the rules that governed CAR activity were

18     not deciphered and he said they still aren't, even today.

19          You heard Dr. Frohlich testify that there weren't

20     any ways to predict from a particular amino acid sequence how

21     a binder, you know, binder is the binding element, the scFv,

22     whether it was going to work.  He said the rules by which you

23     can predict which particular CAR is going to work have not

24     been entirely worked out.  Whether it's the binder or the

25     other features, I can't specify.

1    And Dr. Junghans testified that it was an adventure

2    working on CAR-Ts, because things had to be developed by

3    trial and error.  The rules weren't so predictable that if

4    you do it once, people know how to do it in other contexts

5    and other types of proteins or binders.

6    And Dr. Garcia also testified that in 2002, there

7    really wasn't a field of CAR-T technology, it was in its

8    infancy.

9    But then look at what Dr. Sadelain claimed in his

10   patent.  So two of the claims, Claims 3 and 9, are super

11   broad.  We've heard that the only CARs that Dr. Sadelain made

12   at the time he filed his patent, one was to CD19, that's what

13   the focus of this case is on, because CD19 is the target for

14   blood cancer cells.

15   The other was something called PSMA.  We haven't

16   really heard much about that, but it's a prostate cancer

17   cell.

18   But he said that his invention covered these CARs

19   for any selected target.  And then in the patent, he

20   explained what that selected target was, could be prostate

21   cancer, breast cancer, neuroblastomas, melanomas, he said

22   basically anything.

23   Now, we're here in court 18 years later after the

24   patent was filed.  Now, did you hear any testimony about

25   brain cancer CAR-T being developed by Dr. Sadelain?  Or by

1    anybody?  Or liver cancer CAR-T, or skin cancer CAR-T, or

2    bone cancer CAR-T, or colon cancer CAR-T, or kidney cancer

3    CAR-T?  No.  But he claimed that he invented all of it.

4         Curing cancer is one of hardest things that science

5    has faced in this and the last century.  It is not easy.  And

6    at the very infancy of a new therapy, he did not invent

7    CAR-Ts that could work with any target.

8         And I asked him -- yeah.  Got one slide out of place

9    there.  So I asked him, um, now, there have been -- and let

10   me just explain for a moment.  So there is a distinction

11   between the blood cancers and these other types of cancers

12   which are generally called solid tumor cancers.  So leukemia

13   is a cancer that it's in the blood, and it's sort of loose.

14   There's -- it's even easier to develop CAR-T for that than

15   for the solid tumors, and Dr. Sadelain acknowledged that.  So

16   for the solid tumors, I asked him, there have been a number

17   of different targets that have been proposed for them in the

18   past 10 or 15 years, I'm talking about the time after the

19   patent, and he said yeah, it's easy to propose.  But here in

20   2019 when I asked him scientists still have to -- they still

21   need to identify suitable targets for CAR-Ts and cancers such

22   as protein cancer, breast cancer, glioblastoma, and he says,

23   yes, there are some targets that are under clinical

24   investigation, and I guess we will see how good they prove to

25   be or not to be.  That's 2019.  He didn't invent CAR-Ts for

1    these other therapies in 2002.  He wasn't entitled to claim

2    having invented CAR-Ts for all these other therapies.  He got

3    greedy, and he claimed too broadly.  And those claims are

4    invalid.  He should have focused on what he did do, CD19 and

5    PSMA at most.

6         And we've seen that with regard to generally

7    developing -- switch to a slightly different topic on this

8    enablement issue.  Um, and again, let me show you the --

9    actually, I am switching topics now.

10        So on enablement, the issue of enablement requires

11   that when you have a claim in a patent, you have to enable

12   someone to make and use the full scope of the claim.  That's

13   why the breadth of the claims is so important.  So if there

14   were a claim that was specifically for a CD19 CAR, we have

15   two claims that relate to CD19 CARs, for those claims, you're

16   thinking, did you do enough to teach people about CD19 CARs?

17   Well, we'll get to that in a second.

18        But the other claims that I showed you, the ones for

19   all the targets for cancers, clearly those were not enabled.

20   Because he hadn't done the work.  He hadn't made any CAR-Ts

21   for all these other targets, and we are here 17 years later,

22   and scientists still haven't solved the problem of how do you

23   make a CAR-T therapy for solid tumor cancers.  It's still

24   evading scientists.  And you have no evidence of that having

25   been solved.

1    So the other way in which the other claims --

2    turning to the CD19 claims.  Now, these at least, the target

3    is not the issue, because the target is specified to be CD19,

4    that's the one he worked on.  That's the one in the blood

5    cells.  But those have another problem.  And the problem with

6    those, you heard Dr. Garcia testify, that there can be

7    millions and billions of scFvs that can bind to CD19.  And

8    the only way to make them is to -- through trial and error

9    and through screening and to do a lot of work.  Basically,

10   you have to do your own invention to make these other scFvs,

11   but again, Dr. Sadelain claimed this all as his own.

12   And among the types of scFvs, there are -- there are

13   mouse scFvs, that's what Dr. Sadelain made.  He made a murine

14   antibody.  But there are other types of scFvs.  There are

15   ones that are humanized, so they're sort of part usually

16   mouse, part human, and then there are fully human.  And you

17   heard from Dr. Bot a little bit about why the fully human --

18   fully human scFvs, part of Kite's new next generation

19   strategy, if it's fully human, then the body is less likely

20   to reject it.  If it's mouse, you have a possibility it might

21   get rejected because the body identifies it as foreign.  But

22   if it's fully human, the body says, okay, that's human, I can

23   deal with that.

24   Well, Dr. Frohlich testified that years after the

25   patent was filed, he was trying to develop these fully human

1    CD19 scFvs, and he couldn't do it.  He had a problem with it.

2    He said we had trouble developing those binders, and

3    ultimately we decided to stop using this particular platform

4    for developing those binders.  But there are -- and then that

5    was -- you saw some testimony from Dr. Garcia that they

6    screened some that they found suitable.  They wound up with,

7    I think, five that they found as suitable candidates, but

8    they started with -- I forget what the number was, millions,

9    but it was a huge number that they started to get down to the

10   five.  They had to do all this trial and error work to get

11   there.  Dr. Sadelain didn't do that.  He didn't invent that,

12   he didn't invent those human scFvs, and he testified here

13   that he hadn't begun working on human scFvs himself until

14   2009.  That's seven years after he files his patent.  And he

15   can't claim an invention for things that he did not invent.

16          Now, the one thing you've heard is the defendants

17   have said, well, we know that it was easy to make the

18   invention because Dr. Rosenberg made his CAR construct, and

19   first Mr. Chu said, um, something suggesting that we know

20   that Dr. Rosenberg did it easily, but then I think he backed

21   off of that and said, or at least there's no evidence that he

22   didn't.  The second is correct.  There's no -- also no

23   evidence that he did do it easily.  There's no evidence of

24   what Dr. Rosenberg did.

25          We know that his publication is two years after the

1    conversation with Dr. Sadelain.  That's all we know.  We

2    don't know how much experimentation it took him, we don't

3    know how much time it took him to make his CARs.  We don't

4    know how many different scFvs he tried, we don't know how

5    many failures he had.  We don't know the skill level of the

6    people that he had making these scFvs.  We don't know any of

7    this information.

8          So because the claims are far broader than what

9    Dr. Sadelain invented, they fail the enablement requirement.

10          Okay.  Shifting topics again.  Speaking quickly

11   about this notion of willful infringement.  And I want to

12   start with all this business about Dr. Rosenberg supposedly

13   copying Dr. Sadelain's construct after this conversation that

14   they had.  Now, that conversation, remember, that was in

15   2007.  There was no patent.  There was no reason for

16   Dr. Rosenberg to understand that there would be a patent,

17   because Dr. Sadelain didn't tell him that he had filed a

18   patent.

19          He didn't say anything about trying the patent, what

20   was in his then five-year-old paper that he referred

21   Dr. Rosenberg to.  And Dr. Rosenberg did not make the CAR-T

22   that's described in that paper.  Something important to

23   remember.  He didn't use the same scFv.  He used a different

24   one than the one that Dr. Sadelain made, because remember

25   that's the one that Dr. Sadelain was maintaining as a trade

secret.  That was SJ25C1.  So he didn't give it to Rosenberg,
and he didn't disclose what it was in the patent.

So there's absolutely nothing that Dr. Rosenberg did
that was wrong.  And Dr. Rosenberg hardly hid what he was
doing, because when he did publish his paper, he cited to
Dr. Sadelain.  It wasn't like he was trying to keep it a
secret that he had used some information from Dr. Sadelain.
He disclosed that.  And he wasn't doing what Dr. Sadelain had
done.  He had not made the same CAR-T.

And remember, Dr. Rosenberg's construct, even when
Dr. Sadelain got his patent, it wasn't covered by the patent.
So there was nothing for Dr. Rosenberg to feel was a problem.

Second, all these discussions between Dr. Belldegrun
and Sloan Kettering in 2013.  That's much ado about nothing,
and I'll explain why.

So Dr. Dash said that Kite first approached Sloan
Kettering for a license, he said in March 2013.  Now, again,
the timing is important.  March 2013, they had a patent, the
patent didn't cover what Dr. Rosenberg was doing, it didn't
cover what Kite was working on.  So there is no reason that
Kite would need a patent to the -- to -- license to the '190
patent.

And at the time, there's also no evidence that there
actually was a meeting in March 2013, despite other than
Dr. Dash saying that there were some discussions.  There was

1      no meeting.

2              Dr. Dash, in fact, testified that Kite was

3      approached by a company that had a relationship with Sloan

4      Kettering to see if Kite was interested in their technology.

5      She didn't even respond to that correspondence because she

6      wasn't interested.

7              And we also know that earlier than that, 2012,

8      Dr. Bot had analyzed the '190 patent.  And he had went over

9      this yesterday.  He had concluded correctly that it -- that

10     CD28 sequence for the patent began with lysine.  And, of

11     course, Dr. Rosenberg's construct that Kite was working with

12     Dr. Rosenberg with around that time began -- did not begin

13     with lysine, and so it was not covered by the patent.

14             Okay.  So how about the discussions later in the

15     fall of 2013?  The September 23rd meeting with Dr. Dash and

16     the October 23rd follow-up e-mails, this was after the COC

17     was filed.  Now, Dr. Belldegrun testified that he was not

18     aware of the COC at the time of that meeting, and the COC

19     would not be something you would necessarily know about.  You

20     would have to go back and look up the patent again and look

21     up the patent file.

22             And we know that from Dr. Sadelain, that in the

23     meeting in 2013, there was no discussion of patents.  And

24     Kite was working with Dr. Rosenberg at the time, and

25     Dr. Sadelain said that he learned about the collaboration

1    between Kite and Dr. Rosenberg from press releases.  So he

2    knew they were collaborating, but he didn't say anything

3    about the patent.  And Dr. Belldegrun didn't say anything

4    about the patent to him.

5          And yet they're saying that this was about a

6    specific discussion to license the '190 patent.

7    Dr. Belldegrun also testified he wasn't the CEO of the

8    company, he doesn't negotiate licenses, that's not his job.

9    And there's no evidence that the actual CEO of the company,

10   Dr. Jakabovits, ever had any discussions about licensing the

11   patent with Sloan Kettering.

12         And although you've heard the testimony from

13   Dr. Dash, you haven't seen a single document of Sloan

14   Kettering that reflects any discussions between the parties

15   about the '190 patent, you haven't seen a single document

16   that has proposed license terms, a single term sheet, any

17   document that shows a confidential disclosure agreement

18   between the parties, which would be necessary before they

19   would have discussions.  And we've seen e-mails from

20   Dr. Dash's boss at Sloan Kettering, Greg Raskin, but we never

21   saw a single document from Dr. Dash to Dr. Raskin talking

22   about Kite wanting to license the '190 patent, and Dr. Raskin

23   didn't testify here at trial.

24         So I would submit to you that the testimony about

25   whether there were specific discussions about licensing the

1      '190 patent are just not correct.

2            The last thing I want to talk about is the IPR, the

3      so-called unprovoked attack on the '190 patent.  You've got

4      an instruction that has nothing to do with the defenses in

5      this case.  It's a different type of challenge that you can

6      bring to a patent.  And it's been called, you know,

7      unprovoked attack.  As if Kite, which was -- had not been

8      acquired by Gilead at the time, it was still a small company,

9      that they ganged up on poor little defenseless Juno.  Well,

10     you're sitting here today, and you can realize how absurd

11     that is.  They're suing us for $750 million.  And they

12     changed their patent, so that what used to not cover what we

13     did now covers what we did, and Kite's not stupid.  Kite knew

14     that they would use this as a weapon against us.  They had

15     failed in developing a CAR-T therapy, so they're going to

16     take it out on us.  And so Kite did what it's legally

17     permitted to do.  It had arguments that it said it didn't

18     think the patent should have been issued in the first place

19     because of these obviousness defenses, and Kite's entitled to

20     do that.  That's not any evidence of willful behavior.

21           And lastly -- oh, go back for a second about the

22     communications between Kite and -- Kite and Sloan Kettering.

23     After those -- after Sloan Kettering said we're really not

24     interested, we are in discussions with somebody else, look at

25     the e-mails that came up about that.  And you'll see this is

1    in Exhibit PX15, and Dr. Belldegrun said, well, looks like

2    it's not worth our time talking to them.  We should show

3    Dr. Sadelain that he missed a good opportunity.  And

4    Dr. Belldegrun -- Dr. Jakabovits said, yeah, they probably

5    don't want to work with us, because they know that we won't

6    be able to pursue two different CARs.  She didn't say the

7    same CAR.  Different CARs.  She said two different CARs.

8    That's not a showing of a belief in infringement and copying

9    what they're doing.  It's a belief that showing that there

10   were differences.

11          And lastly, the date for determining willful

12   infringement is not any of these 13 -- 2013, 2014 dates, it's

13   October of 2017.  By that time, Dr. Belldegrun is gone,

14   Dr. Jakabovits is gone, Kite has been acquired by Gilead.

15   Gilead was the company that had to make the decision, having

16   bought Kite a month earlier, do we proceed?  We have this --

17   we have FDA approval for a therapy that will save lives

18   immediately of people who will otherwise die in a few months.

19   Do we do that?  Do we release it?  And do we defend ourselves

20   if Juno comes after us, or do we back off and do we start all

21   over again, do something else?  There's no evidence that

22   Gilead acted willfully in deciding to go forward and save

23   lives and defend against Juno.

24          Okay.  So for all the reasons I've stated, there

25   shouldn't be any damages in this case.  But I will talk

1    briefly about damages.

2           Now, your jury instruction form is going to show

3    that the damages in this case is very important.  They are

4    only for the period up through trial.  So a year and a half

5    or so.  Two years.  So a period from October 2017 to

6    December 2019.  A period during which Juno had no product,

7    and you've heard from their expert that Juno wants to get a

8    verdict and then ask for more money after trial, will have

9    the right to ask for more money after trial.

10          So a license you've heard is very much like a lease.

11   And you must consider differences between other licenses and

12   the hypothetically-negotiated license between the plaintiffs

13   and Kite when you're doing your analysis.

14          So it's like when you buy or sell a house.  You look

15   at comparable houses.  You don't sell a shack and look at the

16   cost of a mansion.  And you also have to think about all the

17   things that go into CAR-T therapy.  And we've heard about all

18   of these things that add to the value of the CAR-T therapy.

19   It's not just the construct.  It's all of these other things,

20   getting FDA approval, the manufacturing process, clinical

21   know-how, clinical trials.  All of these things add value.

22          And your royalty award, you have an instruction from

23   the Court, it must take into account all of these

24   contributors to value, which Dr. Sullivan didn't do.  He

25   basically gave all of the value to this patent.  And the real

1      world agreements, this is the most important and relevant

2      evidence in this case, we know what people have licensed this

3      technology for.  These are the only licenses that the experts

4      in this case have viewed as comparable.  And you see the

5      royalty rates.  They range from 2.5 percent to 27.25 percent.

6      And the Juno to Novartis one is really instructive, because

7      all of this about we wouldn't license to a competitor, Juno

8      licensed to a competitor.  Novartis sells KYMRIAH.  Novartis

9      sells KYMRIAH because it got a license from Juno.  So when

10     you think about the amounts they are asking for from us, and

11     you compare them to the ones they agreed to for Novartis,

12     it's completely disproportionate.

13             And Dr. Sullivan admitted that the only licenses

14     that were the comparable agreements were the ones I just

15     showed you.  Only those three.

16             So let me turn now to the testimony of our expert,

17     Dr. Rao, and in their broadside attack on every one of our

18     witnesses as paid off or liars, um, they included Dr. Rao,

19     which is incredibly shocking, because Dr. Rao has been hired

20     by Mr. Chu's firm, Dr. Rao has been hired by Ms. Jeffries'

21     firm, Dr. Rao has been hired by Celgene, who was the parent

22     of Juno, and Dr. Rao has been hired by Bristol-Myers, who is

23     the parent now of Celgene.

24             He's done work for all of these.

25             MR. CHU:  Objection, Your Honor, motion to strike.

1          MR. DANE:  It's in evidence, Your Honor.

2          MR. CHU:  There is a MIL on this.

3          THE COURT:  The objection is overruled.  Again,

4    argument of counsel is not evidence in the case.

5          MR. DANE:  But if you check the evidence of

6    Dr. Rao's testimony, you'll see that that is in evidence.

7          Now, I guess Dr. Rao is okay when he's working for

8    any of them, but he's suddenly just making things up when

9    he's testifying for us.  And Dr. Rao has been a consultant,

10   as he testified, for 19 out of 20 of the top pharmaceutical

11   companies.  He's incredibly respected.

12         And he explained what would be a reasonable royalty

13   in this case.  And it's actually higher than any of the

14   comparable licenses that he and Mr. Sullivan -- Dr. Sullivan

15   looked at.  And he got there by adjusting the circumstances

16   of the hypothetical negotiation.  He didn't do what Dr.

17   Sullivan did, um, he didn't do these crazy multiplications

18   that's really hard to follow.  And he did, on the other hand,

19   try to get the smallest possible number just to counter Dr.

20   Sullivan's ridiculous high possible number.  He gave an

21   honest analysis.  And you know how you can tell that?

22   Because if you remember his cross, the only point of cross

23   was this absurd argument that he's biased because he's

24   getting paid, when everybody on the other side respects him

25   and has used him on their own.  They didn't challenge his

1       actual analysis.

2               Now, as Dr. Rao explained, a reasonable royalty

3       would be no more than 10.3 percent.  This is actually

4       overcompensating Juno because it starts with the license from

5       Sloan Kettering to Juno that also included other

6       consideration.  It included all of that valuable know-how

7       that Dr. Sadelain testified that he provided to Juno, the

8       clinical study, how to manufacture the cells, which he told

9       Juno how to do.  Setting up the labs, all of that stuff that

10      is critical, getting the IND, which is getting approval from

11      the FDA to do clinical studies, all of that was provided,

12      it's not patented, but it was all provided to Juno as part of

13      this same agreement that had that 7.25 percent royalty.

14      Here, the only thing we get is the right to use the license,

15      we don't get the rest of that.  So it's very generous for him

16      to include that.

17              For the upfront payment, he used the $88 million

18      that potentially could have been paid over the whole term of

19      the Novartis license, which was the highest real world number

20      that we saw, and then he prorated it, because, as I said,

21      we're only talking about two years for a patent that goes all

22      the way to 2024.  And that's proper to prorate it because of

23      the limited period of damages.

24              Just like you would pay less rent if you're only

25      renting for a year than for five years, here he prorated it

1    to match the actual license period.  And so that comes out to

2    $7.3 million, and with the 10.3 percent royalty for our

3    sales, which are $604 million, which are not disputed, the

4    royalty comes out to $62 million for a total of $69.7

5    million.

6         Now, what are the plaintiffs asking for?  It is just

7    crazy.  Our net sales for these two years, $603 million,

8    you've heard about how important all these other things are

9    than the patent.  You've heard about how even Juno doesn't

10   think the costimulatory molecule really matters that much in

11   terms of the clinical results.  And they want every single

12   dollar that we made, plus another $149 million.  That's what

13   these big pharmaceutical companies controlling this case

14   want.

15        Now, the hypothetical negotiation is supposed to

16   assume rational business people on both sides of the table.

17   And as Dr. Rao explained, no rational person would ever agree

18   to this.  If this were -- had to be paid, you couldn't bring

19   YESCARTA to the market.

20        A couple of the other numbers that you saw, these

21   are all irrelevant.  Mr. Chu put them up there to show you

22   really, really large numbers, so that you will think, oh,

23   these are really, really large numbers so the amount they're

24   asking for isn't all that bad.  The $6.2 billion that Kite

25   allocated just for YESCARTA that he showed you, well, that

1     was over 18 years.  We're talking about a two-year period.

2     The document that he pointed to refers to 18 years and we're

3     talking about a two-year license, and as -- as Andy Dickinson

4     testified, that was for much more than just the CAR

5     construct, because it's talking about all the next generation

6     products that Kite plans to develop.

7               THE COURT:  Mr. Dane, you're well over the

8     45 minutes.

9               MR. DANE:  Okay.

10              THE COURT:  So please conclude.

11              MR. DANE:  Thank you, Your Honor.

12              So with the last numbers, I will just say, all of

13    these are irrelevant.  The $1.3 billion of annual harms, that

14    was based on hypothetical future sales, not harms through

15    trial.  The amount that Celgene paid for Juno was payments to

16    purchase part of Juno.  And Project Gold, billion dollars of

17    projected profits is -- is completely irrelevant because we

18    are not making any money.  We have not made any money on the

19    product, the therapy, through 2019.  And so he's, again,

20    using projections that go far beyond the term.

21              So let me just finish with regard to the verdict

22    form.  And what we would ask you.  It's just going back.

23    This is what we would submit is a very, very generous

24    reasonable royalty in this case, which is a total of

25    $69.7 million, which includes a 10.34 percent royalty and the

1    prorated upfront payment.  On the verdict form, we don't

2    think you should have to worry about damages, because there

3    is no liability.

4           On the certificate of correction issue, we would ask

5    that you find that we have proven by clear and convincing

6    evidence that the certificate of correction is invalid.  If

7    you find that, you don't have to then determine damages.

8           Similarly on enablement, we would find -- we would

9    ask that you find that Kite has proven that both Claims 3 and

10   9, those are the broader claims, and Claims 5 and 11, those

11   are the claims to the CD19 CARs, are not adequately enabled

12   for the reasons that I have indicated.  And that they lack

13   adequate written description for willful infringement, we

14   would ask that you find, based on the evidence, that Kite is

15   not a willful infringer.  And importantly, you cannot

16   willfully infringe an invalid patent, and were there

17   legitimate bases for -- for invalidity.

18          And lastly, for damages, if you do not agree with us

19   on those issues, we believe that the highest amount of

20   damages that is reasonable is the amount here upfront payment

21   of $7.3 million and running royalty of 10.3 percent.

22          I will not have a further opportunity to talk.  This

23   is the last time I get to talk to you.  Mr. Chu gets the last

24   word.  I just want to thank you again so much for your

25   attention in this case.  On behalf of me and my team, on

1      behalf of Kite Pharma, thank you very much for your service.

2                     THE COURT:  Thank you, Mr. Dane.  And back to

3      Mr. Chu.

4                     MR. CHU:  Just a moment to allow the cleanup, Your

5      Honor.

6                     Good morning, ladies and gentlemen.  I'm going to

7      first start with a few points on damages mentioned by defense

8      counsel.

9                     He said just now that they are not making any money.

10     The truth is that they had to account for executive payouts.

11     So for example, they reduced their profits by payouts to

12     executives, and you've heard some evidence about how big

13     those numbers were.

14                    Opposing counsel said, well, this is just two years.

15     That's true for the reasonable running royalty, and you'll be

16     asked for a percentage.  You don't have to fill in a dollar

17     amount, just what the percentage is for the running royalty.

18     And the amount of sales are not in dispute, that percentage

19     will be applied by the Court.

20                    But the basic hypothetical negotiation is, what

21     would parties in this industry negotiating about CARs have

22     structured?  And there's a lot of evidence that the structure

23     would have been an upfront royalty.  For example, you heard

24     Ed Dulac say there was an upfront royalty payment from

25     Celgene to Juno for sales outside the United States of a

1    billion dollars.

2              Now, the upfront royalty in that instance, as well

3    as the upfront royalty in this case is not for two years,

4    it's for the entire life of the patent.

5              Opposing counsel also showed you some reference to

6    accounting language after the 6.2 billion.  It roughly said,

7    things are going to be amortized over 18 years.  I don't

8    recall that Dr. Rao ever said anything about that.  It's a

9    way in which accountants are required to treat certain

10   things, particularly on an acquisition.  And the important

11   point to note is that if that was important, it would have

12   been brought to your attention by Dr. Rao.

13             Yesterday and a little bit today, opposing counsel

14   said saving lives, saving lives, that is what we do, that is

15   important.  I believe that is a distraction that opposing

16   counsel is trying to use to distract you from the key issues.

17   The key issues here are willful infringement.  Whether there

18   is clear and convincing evidence that the patent office made

19   a big mistake on enablement and written description when the

20   '190 patent was first issued, or a big mistake when the

21   patent office decided to correct a clerical error.

22             And of course, the last issue is the amount of a

23   reasonable royalty that should be applied.  Everyone is in

24   favor of saving lives.  Sloan Kettering, going back to 1884

25   as a nonprofit institution, has been in favor of saving

1    lives.  So, too, with Dr. Dash, Dr. Sadelain, and everyone

2    else who works at the nonprofit Sloan Kettering.  Kite and

3    Gilead, they are for-profit corporations.  There is nothing

4    especially evil for that, but to suggest that they are just

5    in the business of saving lives is not a full statement of

6    what their corporate purpose is, which is to maximize profits

7    for shareholders.

8           This case is about the amount of a reasonable

9    royalty.  The issues before you have nothing at all to stop

10   Kite, Gilead, or anyone else from saving lives.  We applaud

11   anyone, whether it's the parties in this case or other

12   companies, in doing that.

13          The issue is what's a reasonable royalty for using

14   the benefits of Dr. Sadelain's patent.

15          Now, what I would like to do is to go to some of the

16   issues that were discussed by opposing counsel.  You will see

17   some of the evidence of Kite's willful infringement.  By

18   July 2013, the PTO had granted a certificate of correction.

19   And from that date on, there could be no doubt about the

20   sequence of amino acids starting at 114.  So even if there

21   could be doubt before that, by then, there's no doubt.  And

22   these other events took place, and then finally they

23   introduced four years later after any doubt was removed about

24   what sequence was covered, they introduced the infringing

25   product without changing its CAR.

1              So they decided to infringe.  And the law, I

2     suppose, permits them to make that decision, but the law also

3     says you have to pay a reasonable royalty for doing that.

4              So let's talk a little bit about credibility.  In

5     Kite's closing argument yesterday, counsel said, I'm going to

6     try and spend most of my time talking about the evidence.

7     And then right after that, you see quotes of what he said,

8     "Take its pound of flesh, greedy and disgruntled competitor."

9     Well, I don't think Sloan Kettering is a greedy and

10    disgruntled competitor, bullied by lawyers, jump down the

11    throat.  I don't recall people being yelled at.

12             So let's look at some of the other statements by

13    counsel in opening statement.  You heard from plaintiffs that

14    this was something that Dr. Rosenberg copied from

15    Dr. Sadelain.  That's not true.  You're in the position to

16    judge Dr. Sadelain's credibility overall.

17             Here's what Dr. Sadelain said in his call with

18    Dr. Rosenberg, "Among other things, I pointed him to another

19    scFv previously published in the literature, and indicated to

20    him that he could follow the recipe."  He was being helpful

21    to fellow scientist, Dr. Rosenberg.

22             And Dr. Sadelain also testified that Dr. Rosenberg

23    was being very insisting.  He wanted to know more

24    information, exactly how we had constructed the CAR.

25             Now, Kite had three witnesses dispute the

1        first-mover advantage.  They said, well, it's not really

2        important.  But they didn't show you any documents.  And the

3        documents that Kite has focus on the first-mover advantage.

4        It's up to you to decide whether to trust what people are

5        saying at trial when it's to their advantage without any

6        backup documentation, and the actual documents that Kite

7        created before there was this litigation.

8             At trial, Dr. Schuetz made this accusation that some

9        Juno lawyers asked him to sign an affidavit.  I don't think

10       that was true because he had to admit he was never sent,

11       never given any piece of paper that he was asked to sign by

12       any Juno lawyer.

13            Kite's lawyer didn't want to hear about the Finney

14       paper.  You might not remember this because Dr. Brocker was

15       on the stand, Kite's lawyer said look at the Finney paper,

16       and then he said, well, now, put it aside.  He said, look at

17       the Finney paper, now put it aside, we're not going to ask

18       you any questions about it.

19            But the fact is that there is evidence here in the

20       IPR final decision, none of Finney's construct, including the

21       MYPPPY motif, we are unpersuaded that Finney's data can bear

22       the weight of Kite's arguments, and we agree with Sloan and

23       credit the testimony of Dr. Brocker.  You can see in the

24       evidence that this IPR proceeding is before three patent

25       judges, and it was a unanimous decision of all three.  And we

1        have the exact citation for this portion of it.  Dr. Brocker

2        testified that the Sadelain patent is the basis for the

3        living drug, and that has never been shown by Finney.

4                Did Kite introduce any testimony from Dr. Finney or

5        have anyone else testify about that in a focused cogent

6        manner?

7                At the beginning of opening statement, one of the

8        first people you were introduced to by opposing counsel was

9        Dr. Margo Roberts.  There were a lot of promises about what

10       she was going to testify to, that she was a senior executive,

11       she was a premier scientist, she had experience with CAR-T

12       therapy, and it went on and on.  But she didn't come to

13       testify.

14               Dr. Brocker said the Roberts patent, that's

15       Dr. Margo Roberts' patent, never made it to the clinics.  It

16       basically didn't work.  And again, it was their decision,

17       Kite's counsel's decision, despite their promises in opening

18       statement, not to bring Dr. Roberts to trial.

19               Kite in closing argument yesterday said in the

20       summer of 2013, they moved the fence.  The fact of the matter

21       is here's the closing instruction from the Court.  The time

22       of the alleged infringement began in October 18, 2017.  So

23       let's suppose we accept the fact the fence was moved, we do

24       politely disagree, it was just the correction of a clerical

25       error, but at least for the four years before they introduced

1    the product and had the first act of infringement, they knew

2    exactly where the fence was.

3           Let's look at the Kite defenses.  First on the

4    certificate of correction.  Kite must persuade you by clear

5    and convincing evidence.  And they basically have to argue

6    that the people in the patent office do not know how to apply

7    their own rules.  And that was the thrust of a lot of

8    opposing counsel's argument today, that they're showing you

9    some internal regulations, they showed you quotes from the

10   manual of patent examining procedure, and things like that,

11   to suggest that the people who are career professionals at

12   the United States Patent Office don't follow their own

13   regulations.  And they're making that argument up without any

14   evidence.  They're just trying to say they had to make a

15   mistake.

16          There was a clerical mistake.  It wasn't made by the

17   patent office.  It was made by people on the Sloan Kettering

18   side.  It was a clerical mistake, and that was carefully

19   examined by the patent office in issuing the certificate of

20   correction.

21          Now, I want to talk about some of the key evidence

22   on the COC.  The first thing that is most important is to

23   find out what do the patent claims call out expressly.  Do

24   they address nucleotides, specific nucleotides, nucleotides

25   by certain names or whatever?  Or do the claims call out

1    amino acids?

2         So let's look at Claim 1.  And the other claims

3    include this part of Claim 1.  The other claims are dependent

4    claims so they include this.  And when it comes to the

5    sequence, you can see Claim 1.  And if you have your copies

6    of the patent, you can look at the very back of the patent.

7         The very back probably is the certificate of

8    correction.  And then there's a page before it that has at

9    the top column 25.  Do you see that?  So look at Claim 1, and

10   where it says "amino acid sequence encoded by SEQ ID NO:6."

11   That's Claim 1 is in bold 1, and what I just read is before

12   the beginning of Claim 2.  So that's important.  What is

13   being called out is an amino acid sequence, not nucleotides

14   or anything else.  That's very important.

15        And then the question then is if you look at the

16   patent specification as originally filed, as granted by the

17   patent office, with no change to it, there is exactly one

18   place in the detailed specification that calls out the amino

19   acid sequence.

20        The numbers at the very top of the page are column

21   numbers.  If you go to column 4, very top, it's the

22   right-hand column, and then there are line numbers down the

23   middle separating the two columns.

24        So go to column 4 at the very top, and then you will

25   see a 25 about a third of the way down the columns.  Does

1    everyone see that?  Okay.  This is where in the patent

2    specification the inventors called out, you'll see, quote,

3    "amino acids 114-220."  Do you see that?  That is the place

4    where they said what we are patenting is that amino acid

5    sequence that begins at 114.  That's a direct reference to

6    the Claim 1, which says the amino acid sequence encoded by

7    SEQ ID NO:6, because you can see it's about three lines down,

8    so it's about line 28, it says, "The full sequence of this

9    region is set forth in SEQ ID NO:6."

10            So column 4, line 25 shows that SEQ ID NO:6 starts

11   with 114, and that's what's claimed by Claim 1.  And because

12   the other claims incorporate what is in Claim 1, that's what

13   they made clear to the public at large with the original

14   patent filing, with the patent as issued before the

15   certificate of correction, and the patent as is today after

16   the certificate of correction.

17            There is no place in that entire specification where

18   the numbers 113 or 113 through 220 appear.  No place.  We

19   would agree that there was a clerical error.  And most of

20   opposing counsel's argument yesterday, in showing you

21   nucleotides and all of those details, basically pointed out

22   something about which there is no disagreement.  There was a

23   clerical error made.  There were some discrepancies.  And

24   people being human beings didn't notice it at first, but it

25   was identified a number of years later, long before Kite got

1       even close to introducing their product, and then a day

2       later, Sloan Kettering took immediate action to correct it,

3       asked -- pointing out in detail what should be corrected and

4       how it should be corrected.

5               So here's the part of the specification at column 4

6       that I referred you to.  The fact the patent never stated the

7       sequence starts at 113.  And you heard from Dr. Quackenbush,

8       there was a clearly-evident error.  It was a set of

9       typographical errors that had occurred with SEQ ID NO:6, in

10      particular, nucleotides that had to be changed.

11              He also said the primers which scientists use are

12      creating bookmarks to see what is there.

13              Now, I want to also say that I heard opposing

14      counsel say, well, that prosecution history is really thick.

15      Well, the law is to interpret the patent, you have to read

16      the prosecution history.  You can't say, well, it's thick, so

17      I'm not going to read it.  It's not thousands and thousands

18      of pages.  It is hundreds of pages.  But the requirement is

19      to interpret the patent, the law says and His Honor's jury

20      instructions say on the certificate of correction issues, you

21      have to look at the entire prosecution history.

22              Dr. Quackenbush also said, in essence, you can go

23      online, you can find it, and things are bookmarked.  It's not

24      as if you have a big stack of hay and you are looking for a

25      needle.  Of course things are organized so you can find, any

1    member of the public could find what they are looking for.

2    So you can find a lot of the information with a few

3    keystrokes.

4         Kite also made some arguments in closing about

5    nucleotide segments, but the primers were ignored.  So here

6    in the Sadelain paper, these are the primers that amplify 114

7    to 220.  That, in fact, we would infer is what Dr. Rosenberg

8    looked at because he would trust the primers, because you can

9    test them out pretty quickly in a laboratory.

10        Dr. Sadelain said the first position in that primer

11   would correspond exactly to amino acid 114.

12        Kite also made what we think are misleading

13   nucleotide arguments, which ignore primers with the Krause

14   patent application.  Again, the primers in that patent

15   application amplify 114 to 220.  The same with the Krause

16   paper, 114 to 220.

17        And here is the request for continued examination.

18   Now, let's step back for a moment.

19        We agree that there was a mistake that was

20   discovered.  So that someone reading it might say, hum, I'm

21   not sure, because there are some discrepancies.  That is not

22   a matter in dispute.

23        But there can't be any dispute that once the folks

24   at Sloan Kettering were alerted about the mistake, A, they

25   took action immediately, and B, they called out to the patent

1     office exactly what the change would be -- would be and

2     someone reading the request for reexamination, which

3     basically says we made a mistake, there's a clerical error,

4     and it should be 114 to 220, and here are the details, and

5     here is everything about it.  There can be no mistaking that.

6             So when opposing counsel says, well, there are a lot

7     of pages to find, you can find the request for reexamination

8     very, very quickly.  And, of course, you would want to go

9     look at that.  And there it says in black and white, this is

10    the mistake, this is the correction we want to make.  It's

11    not a big haystack.

12            So here is the closing instruction 9A:  "An RCE may

13    be filed after the examiner finds the application and claims

14    meet the requirements for a patent, but before the patent is

15    actually issued, in order for the applicant to submit

16    additional information to be considered by the examiner."

17            And this was a clearly-evident record, as testified

18    to by Dr. Quackenbush.

19            And he said the certificate of correction

20    corresponds exactly to the requested corrections in the RCE,

21    so that should be starting at 114.

22            Kite's closing argument yesterday, he said, the test

23    was, it's what would somebody who just picks up a patent,

24    what would they think?  That was a misstatement of the law,

25    because here's the Court's jury instruction.  What should be

1    reviewed is the full patent record, not just pick up the

2    patent and what you would think.  The full patent record

3    includes the patent claims, the specification, and the

4    prosecution history.  And he was trying to argue to you that

5    you shouldn't look at the prosecution history despite the

6    fact that that's the law.

7           Here's what happened, you've heard this from

8    Dr. Quackenbush.  So papers are filed for the RCE, and it's

9    got the right sequence listing.  Then some electronic

10   formatting stuff goes wrong, it's the patent office computer,

11   it doesn't even look at the content of what you're trying to

12   file.  It's just looking at the format.  And the patent

13   office rejects it and says, change the formatting, there's

14   some reason it's being rejected.  So it's submitted again.

15   So it's resubmission number one.  So that's really the second

16   submission.  And that's perfect in all respects.  And then

17   there is another formatting error.  And then they submit

18   again, it's the third submission, or the second resubmission.

19   And that's where the error creeps back in.  That's where the

20   clerical mistake is there.  And then the patent issues.  And

21   then, of course, later it's recognized, and then there is a

22   certificate of correction.

23           Dr. Junghans testified to the following:

24           "QUESTION:  The constructs tested in reference in

25   this specification, like YESCARTA, do not have amino acid 13

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1        of CD28 lysine."

2                That's the specification of the patent.  He's asked

3        about the patent.

4                "ANSWER:  Yeah, I would accept that."

5                And in Kite's closing argument in contrast, the

6        reason he said yes is not because of what the patent says,

7        and then he had some explanation for it.  Dr. Junghans was

8        making a direct admission on this score during his testimony.

9                Now, opposing counsel also argued what he called

10       real world evidence.  They referred to Dr. Bot.  We are not

11       attacking Dr. Bot as a human being or a scientist.  But as

12       you know, in order to interpret the patent, you have to read

13       the full prosecution history.  And he should know that.  He

14       deals with patents all the time.  And he admitted he did not

15       read the patent or the prosecution history in coming to the

16       conclusion that it's something different than 114.  So he

17       wasn't following standard operating procedure.

18               Dr. Junghans, it's the same thing.  When he

19       testified about his personal real world experience, he

20       admitted he didn't read the patent or the prosecution history

21       even though he deals with patents all the time.  He has his

22       own patents.  He knows the basic rules on how to interpret a

23       patent, and he was breaking those rules.  And then he went

24       and assumed that a mistake was intentional.

25               And Dr. Schuetz, he was hired by Kite's lawyers, and

1    what is interesting is the core of his testimony was that he

2    looked at the patent and was sort of puzzled.  He said, in

3    effect, I couldn't figure this out, and he called it to the

4    attention of the people at Sloan Kettering.  So that was a

5    good thing, because once it was called to the attention of

6    the people at Sloan Kettering, they acted immediately.

7            Now, Dr. Junghans had not read the Sadelain patent

8    before he was hired, so his real world evidence isn't very

9    important.  He hadn't read the prosecution history.  And he

10   disregarded the primers in the Sadelain paper.

11           You just heard some argument about SEQ ID NO:11.  I

12   think it's really hard to understand what it is.  SEQ ID

13   NO:11 is never mentioned in the text of the patent.  The text

14   we were looking at before, such as in column 4, it's never

15   called out in any fashion whatsoever.  It's never called out

16   as a part of Claim 1.  And SEQ ID NO:6 is called out in the

17   patent starting with 114.

18           As you know, you are judges of credibility.  You are

19   really good judges of credibility if you've lived on the face

20   of this planet for some number of years, and you can decide

21   for yourself who is more credible.

22           Let's go to invalidity with enablement and written

23   description.  Again, we do not believe the evidence is clear

24   and convincing that the patent examiners trained in the

25   specific technology and the law made a big mistake.  They are

1        required to look at the application and make sure it meets

2        the requirements of written description and enablement.

3        There is no rejection at any time based on those grounds, and

4        they followed normal operating procedures.

5                Now, Dr. Garcia, who is Kite's expert, said the --

6        said in response to questions about, at the top of the slide,

7        whether the binding element, the scFv, was new, he said no.

8        So let's look at the evidence from other people.

9        Dr. Sadelain said yes.  Dr. Brocker said yes.  Dr. Belldegrun

10       said yes.  Dr. Abken, Kite's earlier expert in this area,

11       said yes.  And Kite's lawyer yesterday in closing argument

12       said yes.  And I'll show you each of those items.

13               My colleague, Mr. Heinrich, was just making sure I

14       was absolutely precise.  They all said it was old, not --

15       they weren't there yet.

16               Okay.  So let me show you that evidence.  This is

17       Dr. Sadelain's testimony.  "ScFvs have been around since the

18       '80s."

19               Dr. Brocker, "ScFvs have been around for more than a

20       decade, nearly 15 years."

21               This is Dr. Belldegrun, "The scFv portion, the green

22       portion, well-known going back to the '80s?  Yes.  And it was

23       pretty easy for any scientist to look up scFvs?  Yes."

24               So this is Dr. Abken's, Kite's former IPR expert,

25       "By 2002, a skilled person would have had a reasonable

1    expectation of success in using an scFv as a component of a

2    CAR."

3              And Kite's lawyer yesterday in closing argument said

4    the binding element, the scFv, that wasn't new.  Now, he was

5    making the argument because he was making the argument that

6    the invention is only the particular portion of CD28, but

7    it's the entire CAR, the entire three-part CAR, but in trying

8    to make the CD28 argument, he was admitting that the scFv

9    wasn't new.

10             So, again, there is a credibility contest.  You can

11   be the judge.  Dr. Garcia, I'm sure he's an expert in many

12   areas, but he was not a CAR expert.  And keep in mind he was

13   a Kite replacement expert.  Kite lawyers had hired Dr. Abken

14   earlier, and then they decided to replace him.

15             Dr. Brocker, he's an expert in the area.  And he was

16   used in different proceedings and gave testimony in different

17   proceedings.  No need to swap him out for a new expert.

18             Dr. Sadelain's 2007 call with Dr. Rosenberg.  What I

19   heard in closing argument from opposing counsel was some

20   attempt to try and question what was really communicated, but

21   as we've said, Dr. Sadelain pointed out in the call with

22   Dr. Rosenberg that he was being pointed to another scFv.

23             There was attack on Juno.  The basic thrust was Juno

24   is a failure.  We've already talked about JCAR15.  But let's

25   look at some key evidence, some of which we haven't looked at

1        even though these documents are in evidence.

2                These are documents that relate to Kite's

3        manufacturing.  In fact, the manufacturing process comes from

4        the NCI.  You can see that in DX191, the top quote, and you

5        can see that in DX182.  They were optimizing the proven NCI

6        process.  So opposing counsel in argument would leave you

7        with the impression that this much wanted Kite-created

8        manufacturing process was pretty special.  No, it was an old

9        process called bulk manufacturing.

10               So bulk manufacturing, there is a sample from the

11       patient's blood, and that sample is used, is collected, and

12       then scientists would say amplified, but it's being used to

13       create more and more cells that will naturally grow and

14       divide.

15               It's quicker and it's easier than the second

16       generation process.  Juno has a second generation

17       manufacturing process.  They get some cells from the patient

18       and they separate out those cells to create killer T-cells

19       separate from helper T-cells and separate from other cells.

20               And what is the advantage?  Here Dr. Gilbert

21       testified to it.  "Bulk manufacturing just takes the entire

22       mixture, whereas the second generation manufacturing is

23       better, it's more specific, it's easier to optimize for both

24       types of T-cells, and then a dose can be given with a precise

25       controlled ratio."

1           Now, it's harder to do it, it's more expensive, and

2      it can take a little bit more time.  So why would they do it?

3      Because of safety.  It's a controlled dose.  And you've heard

4      testimony about too much dose of this, too much -- little

5      dose of that.  That is what they are doing.

6           Now, Kite's counsel downplayed the problems with

7      safety.  Cytokine release syndrome and neurotoxicity are

8      readily treatable.  But here, from a YESCARTA label, if

9      something is equal to or greater than grade 3, it can be a

10     big problem.  These are regulatory grades for safety

11     problems.  And they are recognizing this in their own

12     documentation.

13          And Dr. Gilbert said, Kite's lymphodepletion

14     requires more chemotherapy.  They use a higher dose.  It's

15     safer to use a lower effective dose.  That makes sense to all

16     of us.  You want a dose that is effective and to have as

17     little as possible to be effective.  And there was no

18     contrary testimony to what Dr. Gilbert said.

19          So here is the key -- let me just check on a number.

20     A clerical error crept into the slide.  So I wanted to be

21     sure to correct it.  On the first row under JCAR17, it should

22     not be 0 percent, it's 2 percent.

23          But you can see the lower percentage is better, and

24     JCAR17 is much better than Kite's YESCARTA for severe

25     cytokine release syndrome and severe neurotoxicity events.

1    These are really bad events.  It's not just a little bit of a

2    headache.  Depending on where a patient is and how bad it is,

3    it might be rushing a patient to a hospital, an emergency

4    room, or something else.  It can lead to death, these safety

5    problems.  Some patients will experience these, and then in

6    time, properly treated, it will pass.  But it's very serious.

7          Now, look at the number of patients.  274 Juno has

8    treated and tested.  We heard some testimony that related to

9    saving lives that over two years about 1,700-plus patients

10   have been treated by Kite.  So that is something over 800,

11   something over 850 per year on average.  That is good.  We

12   think that is good.

13         But here, with JCAR17 alone, not counting any of the

14   patients who were treated with -- successfully treated with

15   JCAR15, we see they have treated 274 patients.  And to do

16   that treatment, they have got to make the drug.  They've got

17   to use their manufacturing.

18         So they were using their manufacturing that they are

19   going to be using when it's officially approved by the FDA.

20   The turnaround time is plenty good enough to treat the

21   patient successfully, and they have got great results with

22   respect to efficacy.

23         Kite's argument in closing about side effects,

24   quote, "In a few days, these flu-like symptoms or the

25   confusion -- or the confusion in the vast majority of the

1    cases resolved."  But here is the truth:  It can lead to

2    cardiac arrythmias, cardiac arrest, cardiac failure, and a

3    whole bunch of other things.  So they are trying to downplay

4    the safety, because that was their cost in the quality of

5    patient care by being first to market.

6           And here is the label for YESCARTA, "Fatal and

7    serious cases of cerebral edema have occurred in patients

8    treated with YESCARTA."  That label, according to the Food

9    and Drug Administration, has to be completely truthful that

10   they have had patients die with their product as approved.

11          The Sadelain patent construct was not abandoned.

12   You see here the testimony of Dr. Mark Gilbert confirming

13   that.

14          Patients do have options besides Kite treatments

15   with YESCARTA.  You've already saw that Juno has had 274

16   patients being treated.  And Dr. Mark Gilbert testified

17   hundreds of trials have actually been initiated for patients.

18   And you can have many, many patients in each of those trials.

19   So if you have 100 trials and you have 100 patients and each

20   of those trials, that is 10,000 patients, so that is five

21   times the amount of patients, the number of patients that

22   Kite has treated.

23          So they are trying to argue they are the only game

24   in town, but there are a lot of other trials being conducted

25   successfully and getting good remission rates, complete

1   remission rates of 50 percent or more.

2          Safety is paramount to Juno.  They moved quickly to

3   put on clinical hold an earlier study.  They are not taking

4   shortcuts.

5          Oh, there was this dispute about this type of

6   leukemia called ALL, about whether pediatric did or didn't

7   include adults.  Let me just say, I think you understand that

8   there are two kinds of leukemia:  One that the scientists and

9   physicians called pediatric, which can affect someone

10  starting at age four, mostly starting at about that age

11  Dr. Gilbert testified to, but the patient may live on to,

12  say, age 25 and doctors called that pediatric.  Enough said

13  on that subject.

14         Let's go to damages.  So this is Dr. Rao's

15  testimony.  This is Dr. Rao's testimony trying to attack

16  Dr. Sullivan's royalty rate.  But this slide is to show you

17  what the difference is.

18         Dr. Rao did make that first adjustment, although he

19  used different numbers for the difference in agreement

20  between Sloan Kettering and Juno versus Juno and a

21  competitor, Novartis.  So both experts said that adjustment

22  should be made, although they had different numbers.

23         But what is very telling is Dr. Rao did not make

24  adjustment number two, an adjustment for the late stage when

25  the hypothetical negotiation takes place.  So just as a

1       reminder, if you are three or four years away from

2       introducing a product that may or may not be introduced, the

3       cost is going to be much lower, the cost of a license.

4       Because it may end up being worthless.

5              But if you already got FDA approval and that day,

6       which is the day of the hypothetical negotiation, you need a

7       patent license, understandably, the cost of that license is

8       going to be higher.

9              If we are following the law, we use the date of the

10      hypothetical negotiation, which is the date of the first

11      infringement, which was when the product was first

12      introduced, and, therefore, that second adjustment must be

13      made.  So a big difference between the two experts is that

14      Dr. Rao did not make that second adjustment, which is

15      directly contrary to fact testimony you heard here from

16      numbers of witnesses, indeed, witnesses on both sides.

17             Dr. Sullivan adjusts the running royalty for the key

18      differences.  He adjusts it including for the late stage.

19      And let's look at the four agreements that Dr. Rao looks at.

20      First one with Juno, it's between collaborators, not

21      competitors, it's early stage.  Second agreement with

22      St. Jude Children's Hospital, same thing, collaborators, not

23      competitors, early stage.

24             Juno and Novartis, it's a litigation settlement, but

25      it's still early stage.  There is a difference between an

1   amicable agreement without litigation and a litigation

2   settlement.  So you are being asked to decide the reasonable

3   royalty between competitors, not collaborators.

4           So one way you can think about it, people are

5   head-to-head competitors and one is using the technology of

6   the other, the person who holds the technology, in this case

7   the rights to the '190 patent, would say, wait, I'm not going

8   to give you a low royalty rate, it's got to be higher because

9   you are competing directly against me.  And it happens all

10  the time in the real world.  So the agreement you are looking

11  at is between competitors, and it's late stage, it's the day

12  of the first infringement.

13          Dr. Rao ignores that late stage technologies cost

14  more.  He basically made no adjustment for late stage.

15  Dr. Dash testified on the subject.  She handles patent

16  licenses for Sloan Kettering, and she would make the late

17  stage adjustment.  Ed Dulac, you heard him testify, he would

18  also make the late stage adjustment and has in over a hundred

19  different licenses.  And even Dr. Bot from Kite testified on

20  this subject that there should be a late stage adjustment.

21          So these are relevant numbers.  Yes, this is

22  YESCARTA's net sales on the left-hand side, and it is lower

23  than Dr. Sullivan's reasonable royalty.  But remember, the

24  biggest part of that reasonable royalty is for the entire

25  life of the patent until the patent expires, not just for two

1      years.

2              Kite's expert wants you to ignore internal Kite

3      documents.  He didn't spend much time on it.  He poo-pooed an

4      internal Kite document that wasn't created for this

5      litigation when they were trying to project their operating

6      profits from 2017 to 2024, which is the expiration year of

7      the '190 patent.  And that internal document showed that they

8      expect total operating profits, not the revenues, but the

9      profits, which are going to be less than the revenues after

10     all the costs are accounted for, to be $7.1 billion.

11             So looking at that, you can see that the

12     $752 million request is, in fact, a reasonable royalty.

13             Kite ignored actual MSK/Juno upfront payments.  He

14     was basically trying to say it was maybe $16.7 million.  But

15     the real world evidence, and you heard it from Dr. Dash, is

16     that Juno as an upfront payment, which include milestones,

17     has actually paid out $150 million.  That is real dollars.

18     We cannot understand how Dr. Rao says it's maybe 16.7 million

19     when in the real world it was about 150 million.

20             Dr. Rao gives Kite a better deal than Juno got in

21     2013.  So on the left-hand side, you can see Juno is paying

22     or has paid 150 million with a collaborator for an early

23     stage deal.  And Dr. Rao wants to argue for a $69 million

24     reasonable royalty between competitors at the very latest

25     stage when the costs should be higher in a hypothetical or

1    real negotiation.

2            So in conclusion, we believe the evidence shows that

3    Kite's infringement was willful.

4            You are the judges of credibility in this case of

5    these witnesses on the slide and of the experts and others.

6    You are the judges of Kite's excuses or defenses.  And,

7    again, you heard testimony from competing experts.  Remember

8    that even if you found them about equal and equally

9    believable, that is not enough to meet the heavy burden of

10   clear and convincing evidence to conclude that the patent

11   office made a big mistake.

12           Let me say one other thing about whether the patent

13   office made a big mistake.  I referred to it a little bit

14   earlier this morning about the inter partes review.  The

15   final written decision, which is in evidence, there were

16   three patent judges deciding issues there, and they were

17   deciding issues that related to --

18           MR. DANE:  Objection, Your Honor.

19           MR. CHU:  It's in evidence, Your Honor.

20           THE COURT:  Grounds?

21           MR. DANE:  This is the subject of the in limine and

22   now Mr. Chu --

23           THE COURT:  The objection is overruled.

24           MR. CHU:  There were arguments that were being made

25   by the parties, including Kite, about pieces of prior art,

1    Krause and Finney, about the specific sequences there.  And

2    either party in an IPR proceeding can make arguments about

3    claim construction, whether the '190 patent, which was the

4    subject of the IPR proceeding should be interpreted to start

5    at 113 or 114.  And you can see from the decision itself,

6    it's apparent that Kite made no argument before the three

7    patent judges, who really know the technology and the law,

8    that the '190 patent sequence for SEQ ID:6 started at 113.

9           MR. DANE:  Objection, Your Honor.  This misstates

10   the law.

11          THE COURT:  Overruled.

12          MR. CHU:  And then you've heard testimony from both

13   sides about damages.  And I think it is very telling that

14   Gilead, who would like the damages to be as low as possible,

15   when they had to comply with accounting principles, concluded

16   that YESCARTA, the single product, not the entire company,

17   the single product, was worth 6.2 billion.

18          You have been an attentive jury.  It is difficult

19   technology.  Obviously you are not going to become a

20   scientist in about a week or so, but you do have the innate

21   ability, as any other human being does, to judge the

22   credibility of witnesses, the credibility of the position of

23   the parties.

24          At the beginning of this case, and at the beginning

25   of closing, I said this is a very important case.  I've

1    already stated some of the key reasons why it's important to

2    the folks at Sloan Kettering and the work that they do.  But

3    it's important and has far greater significance.

4         The United States is recognized as having the best

5    intellectual property system in the world.  That is why we

6    attract and retain the best scientists in the world.  We have

7    many that are born here, grow up here, but we have the best

8    scientists who come here from India and China and Germany and

9    Great Britain and South America, from Russia and around the

10   world.  Sometimes they come first to be an undergraduate or

11   to be in graduate school, and they want to stay on, and they

12   do stay on.  And they work for the companies that are on both

13   sides of this case.

14        And they are here because we have this fantastic

15   patent system where if you come up with a new invention, to

16   encourage new inventions, the inventors should be allowed a

17   reasonable royalty.  It was so important that our founding

18   fathers over 200 years ago put into our Constitution a

19   particular provision that said we are going to have patent

20   laws, and we are going to have patent laws to encourage

21   innovation.

22        And so the world will take note of how you decide

23   this case, because if the folks at Sloan Kettering and their

24   patent is not recognized, despite the careful examination by

25   the patent office where the patent office looked at this

1    patent three times, the first time it was granted by a patent

2    examiner, another time through the IPR proceeding where there

3    were three trained patent judges looking at issues relative

4    to the validity of the patent, and the third time when the

5    patent office looked at the certificate of correction.

6             If this patent is invalid or is to be recognized for

7    an amount of money that is a drop in the bucket for Kite and

8    the profits of 7.1 billion they expect, then it will reduce

9    the incentive of inventors to come here, stay here, do their

10   research, and where the Constitution was intended to

11   encourage patents and invention.  It will lessen it.

12            You saw there were a lot of people during the course

13   of this trial in the courtroom.  Obviously some were working

14   directly on the case, but there were others as well, because

15   they are watching what happens in this case.

16            This is an important case.  And I trust when you

17   deliberate, you will deliberate with an open mind, look

18   carefully at the evidence, and decide what you think is a

19   reasonable royalty.

20            Thank you very much, ladies and gentlemen.

21            THE COURT:  Thank you, Mr. Chu.  That concludes the

22   argument of counsel.  And now the case is going to be

23   submitted to the jury for your deliberation.  The goal here

24   is to reach a verdict.  I think everyone understands that the

25   last thing everyone wants to do is to try the case again.  So

1      they are looking to this jury to resolve the major disputes

2      in the case.

3              You start your jury deliberation by electing your

4      foreperson.  So I would suggest that you take a little bit of

5      time to determine who that person should be.  It should be a

6      person who is going to make sure that everyone's voice is

7      heard, that all of the evidence is considered, and the goal

8      of reaching a verdict, if you can reach a verdict in the

9      case, is achieved.

10             You are going to have the jury instructions, a copy

11     for each of you to guide you in terms of your deliberation.

12     You are going to have the verdict form.  Those are the

13     questions you are going to be asked to answer.  And then you

14     are going to have exhibits received into evidence.

15             And with that, let me have Mr. Cruz swear the

16     bailiff, please.

17             THE CLERK:  Would you please come forward to the

18     lectern.

19             MR. DANE:  Excuse me, Your Honor.  There was a

20     matter of an instruction.

21             THE COURT:  Yes.  I've considered it, and I'm going

22     to rule after the jury is placed in the jury room.

23             (Bailiff sworn.)

24             THE CLERK:  Thank you, sir.  For the record, would

25     you please state your name and spell your last name.

```
 1              THE BAILIFF:  David Williams, W-I-L-L-I-A-M-S.

 2              THE COURT:  So, again, you start that process by

 3    electing your foreperson.  The jury is going to be provided

 4    lunch today.  You can continue your deliberations if all of

 5    you are together during that lunchtime period.  You can

 6    continue to discuss the case.  Any time someone takes a break

 7    or any time you are on a break, you cannot discuss the case

 8    amongst yourself or with any other person.

 9              And with that, Mr. Cruz and the bailiff will lead

10    you into the jury room.  We are doing an in-chambers holiday

11    lunch today, so from approximately 12:15 to about 1:30, we

12    will not be here.  So if you have -- I will not be here.  If

13    you have a note, you can provide it to the bailiff and -- who

14    will provide it to Mr. Cruz.  And if I receive a note, it

15    will generally be shared with counsel so that we can provide

16    a response.  Thank you.

17              THE CLERK:  Ladies and gentlemen, please bring your

18    notebooks with you.  And do they take -- Your Honor, are they

19    taking the extra notebook provided by counsel?

20              THE COURT:  Agreed that the notebook should be taken

21    into the jury room?  Yes?

22              MR. DANE:  Yes, Your Honor.

23              MR. CHU:  Yes, Your Honor.

24              THE COURT:  Thank you.

25              THE CLERK:  Ladies and gentlemen, please, I'll meet
```

1        you in the jury room.

2                    (Thereupon, the jury retired from the courtroom at

3        10:34 a.m.)

4                    THE COURT:   There is some -- please have a seat.

5        There is one final matter, defendant's request for a curative

6        instruction.   The Court has carefully considered the

7        pleading, and based on the references to Mr. Chu's statements

8        placed in the pleading, the Court would conclude that it

9        cannot be inferred from Mr. Chu's statements that he was

10       suggesting to the jury that Kite should be found to have

11       willfully infringed because it did not present advice of its

12       lawyers that it had defenses under section 112 or 255.   So

13       that is the Court's ruling.   The request for a curative

14       instruction is denied.

15               I want to make sure that the lawyers have reviewed

16       the exhibits to be given to the jury that should be placed in

17       the jury room.   And that hopefully was done yesterday,

18       Mr. Cruz?

19                   THE CLERK:   Yesterday or the day before.   It was

20       done, though.

21                   THE COURT:   Mr. Dane and Mr. Chu, have you reviewed

22       the exhibits to make sure that the exhibits received into

23       evidence are the only exhibits to be given to the jury?

24                   MR. CHU:   I'm advised that people on both sides

25       physically reviewed them.

1        THE COURT:  Mr. Dane?

2        MR. DANE:  I believe that we have reviewed them,

3   Your Honor.

4        If I can just state one further objection for the

5   record.

6        THE COURT:  Yes.  Yeah, please.

7        MR. DANE:  Mr. Chu stated in his closing argument

8   something that is untrue and inconsistent with this Court's

9   ruling in its claim construction order, that in the IPR

10  proceeding, the issue of the certificate of correction could

11  have been raised as the Court ruled there, "A petitioner

12  cannot challenge the validity of the certificate of

13  correction during an IPR proceeding.  A patent can only be

14  challenged during an IPR on grounds of anticipation and

15  obviousness."

16       And Mr. Chu incorrectly stated that in claim

17  construction in the IPR proceeding, we could have challenged

18  the certificate of correction, and that is untrue and was a

19  false statement that was allowed to be heard by the jury.

20       MR. CHU:  Here are the facts:  In any IPR

21  proceeding, claim construction can be raised.  I believe at

22  the beginning of the proceeding initiated by Kite, claim

23  construction questions were raised.  And in the final written

24  decision there is about a paragraph, half a page, where the

25  conclusion of the three patent judges is they decided not to

1    do any further claim construction.

2         It's pretty easy to see from that because they say

3    there wasn't argument in the response, that would have been

4    the Sloan Kettering response or the reply that would have

5    been the reply by Kite.  So it's pretty easy to see that the

6    initial pleading did raise it, and judges needed to decide

7    it.

8         It is true that they could have, and it is

9    frequently done, raised any question about claim

10   construction, including Claim 1 and the series of sequences.

11   And it's very clear from the review of the final written

12   decision that a lot of the argument has to do with the

13   various sequences in the pieces of prior art.

14        THE COURT:  Mr. Dane, one final comment.  I think

15   enough has been said.  Your objection has been stated and

16   placed on the record and is preserved.

17        MR. DANE:  Thank you, Your Honor.

18        THE COURT:  Let's get back to the exhibits.  I want

19   to make sure that we start that deliberation process quickly.

20   The jury is going to be waiting for the exhibits, the jury

21   instructions, and the verdict form.  So they have to be

22   approved by both sides.

23        MR. CHU:  The exhibits are approved by us, but my

24   colleague, Mr. Heinrich, wants to raise an issue about the

25   verdict form.

1          MR. HEINRICH:  Your Honor, so it appears that a

2     change was made -- the best as we can tell a change was made

3     to the verdict form in the final iteration that was not

4     discussed yesterday.  There was a change that was discussed

5     and our understanding was that was the only change to the

6     verdict form.

7          But in the damages section, under section 5A, it

8     appears that -- well, there was additional language added in

9     the final iteration to say, "to cover only damages through

10    trial."

11         And there are different competing positions of the

12    parties.  Evidence has been presented to the jury from Kite

13    that that is the appropriate time period.  There is evidence

14    in the record that we've introduced that that is not the

15    appropriate time period.

16         So we would submit that the verdict form should

17    revert to the prior version where the parenthetical is not

18    included.

19         MR. DANE:  Your Honor, we were aware of that being

20    in the form.  That was what I argued from.  I told the jury

21    that that was the form.  They can't change it now after I

22    made that argument.  It's another misstatement by Mr. Chu.

23    But there are only a number of those that I can challenge at

24    a time.

25         But that is what the verdict form said.  That is

 1    what I argued from.  And what is what they have heard.

 2              THE COURT:  So the -- I think the -- Mr. Heinrich,

 3    the verdict form that you were referring to was the old

 4    version of the verdict form and not the one that the Court

 5    intended to provide the jury.  The Court -- the one that the

 6    Court intended to provide the jury would exclude the language

 7    that you are concerned about.

 8              MR. HEINRICH:  It will exclude that language?

 9              THE COURT:  Yes.

10              MR. HEINRICH:  Okay.  Very good.  Thank you.

11              THE COURT:  Exhibits, verdict forms, and --

12              MR. DANE:  We didn't get notice of that change, Your

13    Honor, and I argued to the jury based on the form that we

14    had.

15              MR. HEINRICH:  We argued based on --

16              THE COURT:  Enough said.  Verdict form, exhibits,

17    and jury instructions, I just want to make sure that they

18    have been reviewed by counsel.

19              MR. CHU:  I'm advised that our side has reviewed all

20    three, Your Honor.

21              THE COURT:  Okay.  So they are agreed to by Juno.

22              MR. DANE:  And exhibits are agreed to subject to our

23    previous objections.  We would ask the Court if it could

24    please provide us with the actual final verdict form instead

25    of the one that we were provided with previously.

1      THE COURT:  Apparently what happened is the staff

2   for -- I'm not sure whether it was staffs for both sides or

3   staff for Kite only asked Mr. Cruz for a copy of a verdict

4   form.  Mr. Cruz provided a copy of the verdict form.  The

5   copy that he provided to staff was not the verdict form that

6   the Court intended to give to the jury.

7      So that is what occurred here.  And that verdict

8   form was provided to Mr. Dane, and it was used during his

9   argument.  So I think that is the record.  It wasn't the one

10   that the Court intended to give.

11      Anything further?  Anything further?

12      MR. CHU:  No, Your Honor.

13      THE COURT:  Okay.  Please remain on call to

14   Mr. Cruz.  He'll work the -- the relationship in terms of

15   where you have to be and how much time you need to be from

16   the Court to come back in time so that we can handle

17   questions from the jury.  So just work with Mr. Cruz on that.

18   And we'll see what happens.

19      MR. CHU:  Thank you very much, Your Honor.

20      THE CLERK:  The Court is in recess.

21      (Thereupon, there was a brief recess.)

22      THE COURT:  Okay.  We are back on Juno.  Sorry to

23   bring the counsel back.  One final review regarding the jury

24   verdict form that is going to be provided to the jury.  The

25   verdict form to be provided to the jury removes on the second

1    to the last page under the Roman Numeral IV, damages, the

2    reference to "cover only damages incurred through trial,"

3    which is consistent, I believe, with the Court's ruling when

4    we discussed the jury verdict form on the record previously.

5         So apparently a mistake was made.  A version of

6    the -- of an old iteration was provided to staff for Kite,

7    and Mr. Dane used that during argument.  I do not see any

8    prejudice to the defendants.

9         MR. DANE:  Your Honor, it was also provided to

10   counsel for Juno.  It was provided to both sides.  And we

11   would move for a mistrial based upon the Court having

12   provided the incorrect verdict form from which I argued,

13   which is extremely prejudicial.  We would also move for a

14   mistrial based upon the Court allowing Mr. Chu to argue the

15   claim construction was an issue in the IPR, which it

16   absolutely was not.  So we move for a mistrial on both of

17   those grounds.

18        THE COURT:  Okay.  Mr. Dane, you used the verdict

19   form without clearing it first with the Court.  So I just

20   want to make sure that that is clear.

21        And this -- the verdict form that is being given to

22   the jury today is the verdict form that was initially

23   approved by the jury on the record -- by the Court on the

24   record.  So all of this was discussed.  I think it's an

25   oversight.  It's a minor error.  I do not see any prejudice

1          to your client.

2                    MR. DANE:  We respectfully disagree, Your Honor.

3          And we would ask for your motion -- your ruling on the motion

4          for a new trial -- for a mistrial.

5                    THE COURT:  The motion is denied.

6                    MR. DANE:  Thank you.

7                    THE COURT:  And do we have -- have we reviewed the

8          jury instructions?  The jury instructions, Mr. Cruz, have

9          they reviewed?

10                   THE CLERK:  I believe they have been, Your Honor.

11                   THE COURT:  Jury instructions, I want to make sure

12         each packet of instructions has been reviewed.

13                   MR. HEINRICH:  Yes, Your Honor.

14                   THE COURT:  Ms. Young?

15                   MS. YOUNG:  Yes, Your Honor, and obviously subject

16         to the objections that we've already --

17                   THE COURT:  Yes, all your objections to the

18         instructions are preserved for the record.  Thank you very

19         much.  Okay.  Sorry to bring you back.

20                   (Thereupon, there was a brief recess.)

21                   THE COURT:  Okay.  We are back on the record on Juno

22         versus Kite.  We have counsel present.

23                   THE CLERK:  I forgot, I accidentally shut off the

24         machine.

25                   THE COURT:  We are waiting for our system to

1    reactivate.

2           The counsel is present, the jury is not.  Jury Note

3    Number 1 at 12:15.  "What is unanimous means?" question mark.

4    "We need a specific answer;" semicolon, "all must arrived to

5    the same decision or by majority?"  So the note has been

6    shared with counsel, and do you wish to comment?

7           MR. CHU:  We are very close with a one-word

8    difference.  We, on behalf of plaintiffs, would suggest "all

9    must agree and consent to the answer to each question."

10          THE COURT:  So "all must agree and consent to the

11   answer to each question"?

12          MR. CHU:  That's correct.  And the one difference is

13   to add a second "each" in place of the word "the."  So

14   defendant would argue in favor of "all must agree and consent

15   to each answer to each question."  And at least speaking for

16   the plaintiffs, we're just fine to have the Court make a

17   decision without argument.

18          THE COURT:  I think that the defendant's version is

19   probably the better of the two.

20          MR. CHU:  Thank you.

21          THE COURT:  Okay.

22          THE CLERK:  Would you like the jury?

23          THE COURT:  Yes, Ms. Young?

24          MS. YOUNG:  One thing just so that we have a clear

25   record, we have asked the other side to exchange the slides

1    that were used in closing argument, just so that it's clear

2    what each party was using in light of the motion that

3    Mr. Dane made earlier today.

4              THE COURT:  Okay.  Thank you.

5              MS. YOUNG:  We would ask that that be ordered if --

6              THE COURT:  Yeah, let's handle the jury issues

7    first.

8              MS. YOUNG:  Okay.

9              MR. DANE:  Your Honor, could I ask one question of

10   the Court?

11             THE COURT:  Yes.

12             MR. DANE:  Does the Court have regular hours for how

13   long the jury will be deliberating?

14             THE COURT:  We'll -- it will be reasonable.  I'll

15   keep the jury here later if they wish to remain.

16             MR. DANE:  Okay.  Thank you.

17             THE CLERK:  All rise for the jury, please.

18             (Thereupon, the jury returned to the courtroom.)

19             THE COURT:  We have the jury reassembled.  I'm

20   sorry, the jury reassembled with counsel -- and with counsel

21   present.  Please have a seat.

22             Jury Note Number 1 reads as follows:  The question

23   was submitted at 12:15, the question is, "What is unanimous

24   means?" question mark, "we need a specific answer;"

25   semicolon, "all must arrived to the same decision or by

1      majority?" question mark.  Signed by the jury foreperson.

2      May I have the foreperson identify themselves, please, for

3      the record?  Would you state your name?

4              A JUROR:  My name is Crescencio Ancheta, Jr.

5              THE COURT:  Thank you.  And so the answer to the

6      question is all must agree and consent to each answer to each

7      question.  All must agree and consent to each answer to each

8      question.  Thank you.

9              A JUROR:  Yeah, we understand.

10             THE COURT:  And with that, I'll ask the jury to

11     continue deliberations.  Thank you.

12             THE CLERK:  All rise.

13             (Thereupon, the jury retired from the courtroom.)

14             THE COURT:  Okay.  Please have a seat.  So there is

15     a request now for, I think, counsel or the parties for both

16     sides to share and exchange demonstratives used in argument.

17             MR. CHU:  Before trial, counsel had an agreement

18     that we would not share demonstratives for closing.  It was

19     as simple as that.  It wasn't that we would not share in

20     advance of closing and would share after closing.  So we

21     think we should stick with our original agreement.

22             THE COURT:  Okay.  So I'm interpreting that to mean

23     that the lawyers agreed that the demonstratives would not be

24     exchanged prior to closing, but now going forward, I think

25     it's important to have a clear record of what was used during

1    all portions of the trial, so the Court would order both

2    sides to exchange demonstrative slides.

3              MR. DANE:  Thank you, Your Honor.

4              MR. CHU:  Thank you, Your Honor.

5              THE COURT:  Thank you.  And with that, I think we'll

6    just wait for another jury question or a verdict hopefully.

7              (Thereupon, there was a brief recess.)

8              THE COURT:  We are back on the record on Juno versus

9    Kite, we have counsel present.  The jury has asked through

10   the bailiff and Mr. Cruz to be excused and return tomorrow so

11   they can start fresh.  Before we -- I intend to reinstruct

12   the jury on the issue of not having any contact or

13   communication with anyone about the case.

14             So this is instruction number 26, we will re-read

15   again to the jury.  And then we have the proposed second

16   amended final pretrial conference, I think this is the last

17   amended proposed pretrial conference order, and I think it

18   should issue.  Any comments before it issues?  None?

19             MR. CHU: No comments, we agree.

20             THE COURT:  Okay.  It will issue.  And then if we

21   could bring the jury out, please.

22             THE CLERK:  All rise for the jury, please.

23             (Thereupon, the jury returned to the courtroom.)

24             THE COURT:  Okay.  The jury has reassembled, we have

25   counsel present.  Please have a seat.  The jury has asked to

1    be excused to return tomorrow fresh, and that will be

2    granted.

3              I want to re-read an instruction for the jury.  Just

4    to remind you, I remind you that you must not be exposed to

5    any other information about the case or the issues it

6    involves, except for discussing the case with your fellow

7    jurors and only during deliberations.

8              Do not communicate with anyone in any way, and do

9    not let anyone else communicate with you in any way about the

10   merits of the case, or anything to do with it.  This includes

11   discussing the case in person, in writing, by phone or

12   electronic means, via e-mail, text messaging, or any Internet

13   chat room, blog, website or application, including but not

14   limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

15   Snapchat or any other forms of social media.

16             This applies to communicating with your family

17   members, your employer, the media or press, and the people

18   involved in the trial.  If you are asked or approached in any

19   way about your jury service or anything about this case, you

20   must respond that you have been ordered not to discuss the

21   case or the matter and to report that contact to the Court.

22             Do not read, watch, listen to any news media

23   accounts or commentary about the case or anything to do it.

24   Do not do any research, such as consulting dictionaries or

25   the Internet or any other reference materials, and do not

1       make any investigation or in any other way try to learn about

2       the case on your own.  Do not visit or view any place

3       discussed in this case.  Do not use any Internet programs or

4       devices to search for or view any place discussed during the

5       trial.

6                Also, do not do any research about this case, the

7       law or the people involved, including the parties, the

8       witnesses, or the lawyers until you have been excused as

9       jurors.

10               If you happen to read or hear anything touching on

11      this case in the media, turn away and report it to the Court

12      as soon as possible.

13               Again, these rules protect each party's right to

14      have the case decided only on the evidence and presented here

15      in court.  Witnesses here in court take an oath to tell the

16      truth, and the accuracy of their testimony is tested through

17      the trial process.

18               If you do any research or investigation outside this

19      courtroom or gain any information through improper

20      communications, then your verdict may be influenced by

21      inaccurate, incomplete, misleading information that has not

22      been tested by the trial process.

23               So each of the parties is entitled to a fair trial

24      by an impartial jury, and if you decide the case based on

25      information not presented in court, you will have denied the

1      parties a fair trial.

2             Remember, you have taken an oath to follow the

3      rules, and it is very important that you follow the rules.  A

4      juror who violates these restrictions jeopardizes the

5      fairness of these proceedings.  A mistrial could result that

6      would require the entire process to start over.  If a juror

7      is exposed to any outside information, please notify the

8      Court immediately.

9             And with that, the jury would be excused.  And

10     please return tomorrow at 8:30.

11            Just for the jury's and counsel, tomorrow I have an

12     off-site meeting from, I would say 10:30 to 12:30.  So I will

13     be here in the morning and then come back immediately after

14     the meeting.

15            Thank you very much.  You are excused.

16            THE CLERK:  All rise for the jury, please.

17            (Thereupon, the jury retired from the courtroom at

18     3:54 PM.)

19            THE COURT:  Okay.  With that, I think we are

20     adjourned.

21            One final comment, it's -- I think the jury has been

22     excused, so it's not too late to try to resolve the case

23     between and amongst the parties.  I would encourage continued

24     discussions, and hopefully you can reach some resolution.

25            Thank you.

1       MR. DANE: Thank you, Your Honor.

2       MR. CHU: Thank you, Your Honor.

3       (Thereupon, the Court was in recess.)

4                    *****     *****     *****

5

6    I certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-titled matter.

8

9

10

11   ---------------------------

12

13   Amy C. Diaz, RPR, CRR              December 12, 2019

14   S/  Amy Diaz

15

16

17

18

19

20

21

22

23

24

25

## #

**#4455** [1] - 1467:23

## $

**$149** [1] - 1503:12
**$150** [1] - 1530:17
**$603** [1] - 1503:7
**$604** [1] - 1503:3
**$62** [1] - 1503:4
**$69** [1] - 1530:23
**$750** [2] - 1481:12, 1497:11
**$752** [1] - 1530:12
**$88** [1] - 1502:17

## '

**'190** [13] - 1487:14, 1494:21, 1495:8, 1496:6, 1496:15, 1496:22, 1497:1, 1497:3, 1507:20, 1529:7, 1530:7, 1532:3, 1532:8
**'80s** [2] - 1521:18, 1521:22

## 0

**0** [1] - 1524:22
**002** [1] - 1477:20
**0059** [1] - 1479:16

## 1

**1** [13] - 1513:2, 1513:3, 1513:5, 1513:9, 1513:11, 1514:6, 1514:11, 1514:12, 1520:16, 1539:10, 1545:3, 1546:22
**1,700-plus** [1] - 1525:9
**1.3** [1] - 1504:13
**10** [1] - 1489:18
**10,000** [1] - 1526:20
**10.3** [3] - 1502:3, 1503:2, 1505:21
**10.34** [1] - 1504:25
**100** [2] - 1526:19
**10281** [1] - 1468:12
**10:30** [1] - 1551:12
**10:34** [1] - 1537:3
**11** [1] - 1505:10
**112** [4] - 1481:17, 1481:20, 1483:17, 1537:12
**113** [7] - 1475:16,

1477:3, 1514:18, 1515:7, 1532:5, 1532:8
**114** [13] - 1481:3, 1508:20, 1514:5, 1514:11, 1516:6, 1516:11, 1516:15, 1516:16, 1517:4, 1517:21, 1519:16, 1520:17, 1532:5
**114-220** [1] - 1514:3
**12** [2] - 1467:15, 1552:13
**12390** [1] - 1469:3
**12:15** [3] - 1536:11, 1545:3, 1546:23
**12:30** [1] - 1551:12
**13** [2] - 1498:12, 1518:25
**15** [3] - 1471:6, 1489:18, 1521:20
**150** [2] - 1530:19, 1530:22
**16.7** [2] - 1530:14, 1530:18
**17** [2] - 1471:7, 1490:21
**18** [5] - 1488:23, 1504:1, 1504:2, 1507:7, 1511:22
**1800** [1] - 1468:6
**1884** [1] - 1507:24
**19** [1] - 1501:10
**19Z1** [1] - 1485:10
**1:30** [1] - 1536:11
**1st** [1] - 1467:23

## 2

**2** [3] - 1476:4, 1513:12, 1524:22
**2.5** [1] - 1500:5
**20** [2] - 1476:2, 1501:10
**200** [1] - 1533:18
**2002** [3] - 1488:6, 1490:1, 1521:25
**2007** [2] - 1493:15, 1522:18
**2009** [1] - 1492:14
**2012** [1] - 1495:7
**2013** [10] - 1494:14, 1494:17, 1494:18, 1494:24, 1495:15, 1495:23, 1498:12, 1508:18, 1511:20, 1530:21
**2014** [1] - 1498:12
**2017** [4] - 1498:13, 1499:5, 1511:22,

1530:6
**2019** [6] - 1467:15, 1489:20, 1489:25, 1499:6, 1504:19, 1552:13
**202** [1] - 1471:6
**2024** [2] - 1502:22, 1530:6
**22** [1] - 1474:18
**220** [7] - 1475:16, 1477:3, 1514:18, 1516:7, 1516:15, 1516:16, 1517:4
**239** [1] - 1479:18
**239C-59** [1] - 1479:18
**23rd** [2] - 1495:15, 1495:16
**25** [4] - 1513:9, 1513:25, 1514:10, 1527:12
**250** [1] - 1468:11
**255** [1] - 1537:12
**26** [1] - 1548:14
**27.25** [1] - 1500:5
**274** [3] - 1525:7, 1525:15, 1526:15
**28** [1] - 1514:8
**298** [3] - 1470:6, 1470:12, 1472:2
**2:17-CV-7639-SJO** [1] - 1467:8

## 3

**3** [3] - 1488:10, 1505:9, 1524:9
**30** [1] - 1474:11
**336** [7] - 1476:11, 1476:15, 1476:21, 1478:25, 1479:5, 1480:5
**35** [2] - 1470:5, 1470:11
**350** [1] - 1467:23
**355** [1] - 1468:20
**35th** [1] - 1468:20
**3:54** [1] - 1551:18

## 4

**4** [5] - 1513:21, 1513:24, 1514:10, 1515:5, 1520:14
**45** [2] - 1474:14, 1504:8

## 5

**5** [1] - 1505:10
**50** [3] - 1486:13,

1486:14, 1527:1
**500** [2] - 1469:6
**50th** [1] - 1468:9
**555** [1] - 1468:9
**5A** [1] - 1540:7

## 6

**6.2** [1] - 1503:24, 1507:6, 1532:17
**60601** [1] - 1468:14
**69.7** [2] - 1503:4, 1504:25
**6:00** [1] - 1470:6

## 7

**7** [3] - 1476:21, 1478:24, 1478:25
**7.1** [2] - 1530:10, 1534:8
**7.25** [1] - 1502:13
**7.3** [2] - 1503:2, 1505:21
**77** [1] - 1468:14

## 8

**800** [1] - 1525:10
**850** [1] - 1525:11
**8:30** [1] - 1551:10

## 9

**9** [2] - 1488:10, 1505:10
**900** [1] - 1468:6
**90012** [1] - 1467:23
**90067** [1] - 1468:7
**90071** [2] - 1468:9, 1468:21
**92130** [1] - 1469:4
**94063** [1] - 1469:6
**9A** [1] - 1517:12

## A

**a.m** [1] - 1537:3
**abandoned** [1] - 1526:11
**ability** [1] - 1532:21
**Abken** [2] - 1521:10, 1522:13
**Abken's** [1] - 1521:24
**able** [4] - 1474:4, 1486:16, 1498:6
**above-titled** [1] - 1552:7
**absolutely** [4] - 1472:8, 1494:3,

1521:14, 1543:16
**absurd** [2] - 1497:10, 1501:23
**accept** [2] - 1511:23, 1519:4
**access** [2] - 1483:15, 1483:21
**accidentally** [1] - 1544:23
**according** [1] - 1526:8
**account** [2] - 1499:23, 1506:10
**accountants** [1] - 1507:9
**accounted** [1] - 1530:10
**accounting** [2] - 1507:6, 1532:15
**accounts** [1] - 1549:23
**accuracy** [1] - 1550:16
**accusation** [1] - 1510:8
**accused** [1] - 1471:17
**achieved** [1] - 1535:9
**acid** [25] - 1475:15, 1476:12, 1476:25, 1477:3, 1477:9, 1477:13, 1477:15, 1477:17, 1477:24, 1478:2, 1479:2, 1481:3, 1482:14, 1482:18, 1484:1, 1484:12, 1485:1, 1487:20, 1513:10, 1513:13, 1513:19, 1514:4, 1514:6, 1516:11, 1518:25
**acids** [12] - 1475:16, 1482:6, 1482:8, 1482:11, 1482:17, 1484:21, 1485:9, 1485:25, 1486:17, 1508:20, 1513:1, 1514:3
**acknowledged** [1] - 1489:15
**acknowledges** [1] - 1483:12
**acquired** [2] - 1497:8, 1498:14
**acquisition** [1] - 1507:10
**act** [2] - 1471:13, 1512:1
**acted** [2] - 1498:22, 1520:6
**action** [2] - 1515:2, 1516:25
**activity** [1] - 1487:17

**actual** [8] - 1485:8, 1485:17, 1496:9, 1502:1, 1503:1, 1510:6, 1530:13, 1541:24
**add** [4] - 1472:18, 1499:18, 1499:21, 1545:13
**added** [1] - 1540:8
**additional** [4] - 1474:18, 1474:19, 1517:16, 1540:8
**address** [1] - 1512:24
**addresses** [1] - 1483:5
**adequate** [4] - 1481:21, 1481:22, 1487:2, 1505:13
**adequately** [2] - 1482:3, 1505:11
**adjourned** [1] - 1551:20
**adjusting** [1] - 1501:15
**adjustment** [10] - 1527:18, 1527:21, 1527:24, 1528:12, 1528:14, 1529:14, 1529:17, 1529:18, 1529:20
**adjusts** [2] - 1528:17, 1528:18
**Administration** [1] - 1526:9
**admission** [1] - 1519:8
**admit** [1] - 1510:10
**admitted** [6] - 1481:1, 1482:17, 1500:13, 1519:14, 1519:20
**admitting** [1] - 1522:8
**ado** [1] - 1494:14
**adults** [1] - 1527:7
**advance** [1] - 1547:20
**advantage** [4] - 1510:1, 1510:3, 1510:5, 1523:20
**adventure** [1] - 1488:1
**advice** [12] - 1470:23, 1471:14, 1471:22, 1472:1, 1472:9, 1472:24, 1472:25, 1473:3, 1473:19, 1474:3, 1537:11
**advised** [2] - 1537:24, 1541:19
**affect** [1] - 1527:9
**affidavit** [1] - 1470:1
**age** [3] - 1527:10, 1527:12

**ago** [1] - 1533:18
**agree** [11] - 1503:17, 1505:18, 1510:22, 1514:19, 1516:19, 1545:9, 1545:10, 1545:14, 1547:6, 1547:7, 1548:19
**agreed** [5] - 1500:11, 1536:20, 1541:21, 1541:22, 1547:23
**agreement** [8] - 1496:17, 1502:13, 1527:19, 1528:21, 1529:1, 1529:10, 1547:17, 1547:21
**agreements** [3] - 1500:1, 1500:14, 1528:19
**al** [2] - 1467:5, 1485:7
**Alan** [1] - 1468:5
**alerted** [1] - 1516:24
**ALL** [1] - 1527:6
**alleged** [1] - 1511:22
**allegedly** [1] - 1471:15
**allocated** [1] - 1503:25
**allow** [1] - 1506:4
**allowed** [2] - 1533:16, 1538:19
**allowing** [1] - 1543:14
**almost** [1] - 1485:5
**alone** [2] - 1483:13, 1525:13
**ambiguous** [1] - 1479:25
**amended** [2] - 1548:16, 1548:17
**America** [1] - 1533:9
**amicable** [1] - 1529:1
**amino** [37] - 1475:15, 1475:16, 1476:12, 1476:25, 1477:3, 1477:9, 1477:13, 1477:15, 1477:17, 1477:24, 1478:2, 1479:2, 1481:3, 1482:6, 1482:7, 1482:11, 1482:14, 1482:16, 1482:18, 1484:1, 1484:12, 1484:21, 1485:1, 1485:9, 1485:25, 1486:17, 1487:20, 1508:20, 1513:1, 1513:10, 1513:13, 1513:18, 1514:3, 1514:4, 1514:6, 1516:11, 1518:25
**amortized** [1] - 1507:7
**amount** [10] - 1503:23,

1504:15, 1505:19, 1505:20, 1506:17, 1506:18, 1507:22, 1508:8, 1526:21, 1534:7
**amounts** [1] - 1500:10
**amplified** [1] - 1523:12
**amplify** [2] - 1516:6, 1516:15
**Amy** [2] - 1552:13, 1552:14
**AMY** [1] - 1467:22
**analysis** [3] - 1499:13, 1501:21, 1502:1
**analyzed** [1] - 1495:8
**Ancheta** [1] - 1547:4
**Andrea** [1] - 1468:8
**Andy** [1] - 1504:3
**Angeles** [5] - 1467:14, 1467:23, 1468:7, 1468:9, 1468:21
**annual** [1] - 1504:22
**answer** [9] - 1535:13, 1545:4, 1545:9, 1545:11, 1545:15, 1546:24, 1547:5, 1547:6, 1547:7
**ANSWER** [1] - 1519:4
**antibody** [1] - 1491:14
**anticipation** [1] - 1538:14
**apart** [1] - 1470:8
**apparent** [2] - 1478:10, 1532:6
**appear** [2] - 1470:15, 1514:18
**APPEARANCES** [1] - 1468:1
**Appearances** [1] - 1469:1
**applaud** [1] - 1508:10
**applicant** [1] - 1517:15
**application** [6] - 1478:23, 1516:14, 1516:15, 1517:13, 1521:1, 1549:13
**applications** [2] - 1477:12, 1479:7
**applied** [2] - 1506:19, 1507:23
**applies** [1] - 1549:16
**apply** [1] - 1512:6
**approached** [3] - 1494:16, 1495:3, 1549:18
**appropriate** [4] - 1470:13, 1470:20, 1470:22, 1471:2,

1471:4, 1473:14, 1540:13, 1540:15
**approval** [4] - 1498:17, 1499:20, 1502:10, 1528:5
**approved** [5] - 1525:19, 1526:10, 1539:22, 1539:23, 1543:23
**area** [2] - 1521:10, 1522:15
**areas** [1] - 1522:12
**argue** [4] - 1471:24, 1481:17, 1512:5, 1518:4, 1526:23, 1530:23, 1543:14, 1545:14
**argued** [6] - 1519:9, 1540:20, 1541:1, 1541:13, 1541:15, 1543:12
**Arguello** [1] - 1469:6
**argument** [34] - 1470:9, 1471:12, 1472:13, 1474:8, 1475:3, 1501:4, 1501:23, 1509:5, 1511:19, 1512:8, 1512:13, 1514:20, 1517:22, 1519:5, 1520:11, 1521:11, 1522:3, 1522:5, 1522:8, 1522:19, 1523:6, 1525:23, 1532:6, 1534:22, 1538:7, 1539:3, 1539:12, 1540:22, 1542:9, 1543:7, 1545:17, 1546:1, 1547:16
**arguments** [6] - 1497:17, 1510:22, 1516:4, 1516:13, 1531:24, 1532:2
**arrest** [1] - 1526:2
**arrived** [3] - 1470:3, 1545:4, 1546:25
**arrythmias** [1] - 1526:2
**art** [6] - 1477:17, 1478:6, 1480:8, 1480:12, 1531:25, 1539:13
**article** [3] - 1484:17, 1484:18, 1484:22
**articles** [1] - 1479:6
**aside** [4] - 1470:10, 1471:12, 1510:16, 1510:17
**asserted** [1] - 1471:21

**assertion** [1] - 1472:25
**assume** [1] - 1503:16
**assumed** [1] - 1519:24
**attack** [5] - 1497:3, 1497:7, 1500:17, 1522:23, 1527:15
**attacking** [1] - 1519:11
**attempt** [1] - 1522:20
**attention** [4] - 1505:25, 1507:12, 1520:4, 1520:5
**attentive** [1] - 1532:18
**Attorney** [14] - 1468:4, 1468:5, 1468:5, 1468:6, 1468:8, 1468:11, 1468:13, 1468:18, 1468:18, 1468:19, 1468:19, 1468:20, 1469:3, 1469:5
**attract** [1] - 1533:6
**available** [1] - 1483:20
**Avenue** [2] - 1468:6, 1468:20
**average** [1] - 1525:11
**award** [2] - 1499:22
**aware** [2] - 1495:18, 1540:19

## B

**backed** [1] - 1492:20
**backup** [1] - 1510:6
**bad** [4] - 1485:5, 1503:24, 1525:1, 1525:2
**bailiff** [5] - 1535:16, 1535:23, 1536:9, 1536:13, 1548:10
**BAILIFF** [1] - 1536:1
**bales** [1] - 1478:14
**bank** [1] - 1483:19
**bargain** [1] - 1487:9
**based** [11] - 1470:11, 1483:17, 1504:14, 1505:14, 1521:3, 1537:7, 1541:13, 1541:15, 1543:11, 1543:14, 1550:24
**bases** [2] - 1478:19, 1505:17
**basic** [3] - 1506:20, 1519:22, 1522:23
**basis** [4] - 1472:7, 1473:7, 1473:10, 1511:2
**bear** [1] - 1510:21
**become** [1] - 1532:19

began [4] - 1475:18, 1495:10, 1495:12, 1511:22
begin [1] - 1495:12
beginning [11] - 1476:10, 1476:22, 1477:5, 1478:2, 1479:5, 1480:16, 1511:7, 1513:12, 1532:24, 1538:22
begins [3] - 1476:11, 1480:13, 1514:5
begun [1] - 1492:13
behalf [3] - 1505:25, 1506:1, 1545:8
behavior [1] - 1497:20
beings [1] - 1514:24
Bejcek [10] - 1484:17, 1484:18, 1484:20, 1484:22, 1484:23, 1484:24, 1485:3, 1485:7, 1485:10, 1485:23
belief [5] - 1471:11, 1471:25, 1472:7, 1498:8, 1498:9
believable [1] - 1531:9
Belldegrun [9] - 1494:13, 1495:17, 1496:3, 1496:7, 1498:1, 1498:4, 1498:13, 1521:9, 1521:21
benefits [1] - 1508:14
best [4] - 1533:4, 1533:6, 1533:7, 1540:2
better [5] - 1523:23, 1524:23, 1524:24, 1530:20, 1545:19
between [18] - 1486:11, 1486:21, 1489:11, 1494:13, 1496:1, 1496:14, 1496:18, 1497:22, 1499:11, 1499:12, 1527:20, 1528:13, 1528:20, 1528:25, 1529:3, 1529:11, 1530:24, 1551:23
beyond [1] - 1504:20
biased [1] - 1501:23
big [11] - 1503:13, 1506:12, 1507:19, 1507:20, 1515:24, 1517:11, 1520:25, 1524:10, 1528:13, 1531:11, 1531:13
biggest [1] - 1529:24
billion [8] - 1503:24,

1504:13, 1504:16, 1507:1, 1507:6, 1530:10, 1532:17, 1534:8
billions [1] - 1491:7
bind [4] - 1486:11, 1486:18, 1486:22, 1491:7
binder [4] - 1475:25, 1487:21, 1487:24
binders [3] - 1488:5, 1492:2, 1492:4
binding [5] - 1482:2, 1482:4, 1487:21, 1521:7, 1522:4
binds [1] - 1485:13
biological [4] - 1483:5, 1483:8, 1483:13, 1483:15
birth [1] - 1487:14
bit [9] - 1474:12, 1474:13, 1491:17, 1507:13, 1509:4, 1524:2, 1525:1, 1531:13, 1535:4
black [1] - 1517:9
Blanca [1] - 1468:20
blog [1] - 1549:13
blood [5] - 1488:14, 1489:11, 1489:13, 1491:4, 1523:11
body [3] - 1491:19, 1491:21, 1491:22
bold [1] - 1513:11
bone [1] - 1489:2
bookmarked [1] - 1515:23
bookmarks [1] - 1515:12
born [1] - 1533:7
Borrelia [1] - 1486:23
boss [1] - 1496:20
Bot [5] - 1491:17, 1495:8, 1519:10, 1519:11, 1529:19
Bot's [2] - 1479:17, 1479:18
bought [1] - 1498:16
brain [1] - 1488:25
breadth [1] - 1490:13
break [2] - 1536:6, 1536:7
breaking [1] - 1519:23
breast [2] - 1488:21, 1489:22
Brentjens [3] - 1484:18, 1485:22, 1487:15
brief [4] - 1481:18, 1542:21, 1544:20,

1548:7
briefly [2] - 1472:19, 1499:1
bring [8] - 1474:10, 1497:6, 1503:18, 1511:18, 1536:17, 1542:23, 1544:19, 1548:21
Bristol [1] - 1500:22
Bristol-Myers [1] - 1500:22
Britain [1] - 1533:9
broad [1] - 1488:11
broader [2] - 1493:8, 1505:10
broadly [1] - 1490:3
broadside [1] - 1500:17
Brocker [8] - 1484:3, 1510:14, 1510:23, 1511:1, 1511:14, 1521:9, 1521:19, 1522:15
brought [1] - 1507:12
bucket [1] - 1534:7
bulk [3] - 1523:9, 1523:10, 1523:21
bullied [1] - 1509:10
bunch [1] - 1526:3
burden [1] - 1531:9
business [3] - 1493:12, 1503:16, 1508:5
buy [1] - 1499:14

# C

CA [1] - 1467:23
CAAA [1] - 1478:20
CALIFORNIA [1] - 1467:2
California [6] - 1467:14, 1468:7, 1468:9, 1468:21, 1469:4, 1469:6
Camino [1] - 1469:3
cancer [14] - 1488:14, 1488:16, 1488:21, 1488:25, 1489:1, 1489:2, 1489:4, 1489:13, 1489:22
cancers [6] - 1489:11, 1489:12, 1489:21, 1490:19, 1490:23
candidates [1] - 1492:7
cannot [6] - 1483:13, 1505:15, 1530:18, 1536:7, 1537:9, 1538:12

CAR [37] - 1479:20, 1484:6, 1487:12, 1487:14, 1487:17, 1487:23, 1488:2, 1488:7, 1488:25, 1489:1, 1489:2, 1489:3, 1489:7, 1489:14, 1489:21, 1489:25, 1490:2, 1490:14, 1490:20, 1490:23, 1492:18, 1493:21, 1494:9, 1497:15, 1498:7, 1499:17, 1499:18, 1504:4, 1508:25, 1509:24, 1511:11, 1522:2, 1522:7, 1522:12
CAR-T [17] - 1479:20, 1487:14, 1488:7, 1488:25, 1489:1, 1489:2, 1489:3, 1489:14, 1490:23, 1493:21, 1494:9, 1497:15, 1499:17, 1499:18, 1511:11
CAR-Ts [6] - 1488:2, 1489:7, 1489:21, 1489:25, 1490:2, 1490:20
cardiac [3] - 1526:2
care [1] - 1526:5
career [1] - 1512:11
careful [1] - 1533:24
carefully [3] - 1512:18, 1534:18, 1537:6
carried [1] - 1485:16
CARs [10] - 1488:11, 1488:18, 1490:15, 1490:16, 1493:3, 1498:6, 1498:7, 1505:11, 1506:21
CART [1] - 1479:21
case [51] - 1471:1, 1471:6, 1472:6, 1473:20, 1481:15, 1484:16, 1487:11, 1488:13, 1497:5, 1498:25, 1499:3, 1500:2, 1500:4, 1501:4, 1501:13, 1503:13, 1504:24, 1505:25, 1507:3, 1508:8, 1508:11, 1529:6, 1531:4, 1532:24, 1532:25, 1533:13, 1533:23, 1534:14, 1534:15, 1534:16, 1534:22,

1534:25, 1535:2, 1535:9, 1536:6, 1536:7, 1548:13, 1549:5, 1549:6, 1549:10, 1549:11, 1549:19, 1549:21, 1549:23, 1550:2, 1550:3, 1550:6, 1550:11, 1550:14, 1550:24, 1551:22
cases [5] - 1473:21, 1473:25, 1526:1, 1526:7
CD19 [14] - 1484:6, 1486:11, 1486:20, 1488:12, 1488:13, 1490:4, 1490:14, 1490:15, 1490:16, 1491:2, 1491:3, 1491:7, 1492:1, 1505:11
CD28 [7] - 1475:16, 1477:3, 1482:9, 1495:10, 1519:1, 1522:6, 1522:8
Celgene [4] - 1500:21, 1500:23, 1504:15, 1506:25
cell [2] - 1482:22, 1488:17
cells [10] - 1488:14, 1491:5, 1502:8, 1523:13, 1523:17, 1523:18, 1523:19, 1523:24
CENTRAL [1] - 1467:2
century [1] - 1489:5
CEO [2] - 1496:7, 1496:9
cerebral [1] - 1526:7
certain [2] - 1507:9, 1512:25
certainly [1] - 1470:21
certificate [25] - 1475:7, 1476:20, 1477:2, 1478:4, 1478:5, 1478:8, 1478:10, 1478:13, 1478:14, 1479:23, 1505:4, 1505:6, 1508:18, 1512:4, 1512:19, 1513:7, 1514:15, 1514:16, 1515:20, 1517:19, 1518:22, 1534:5, 1538:10, 1538:12, 1538:18
certify [1] - 1552:6
chain [2] - 1486:14, 1486:15

challenge [4] - 1497:5, 1501:25, 1538:12, 1540:23
challenged [2] - 1538:14, 1538:17
chambers [1] - 1536:10
change [12] - 1478:18, 1479:8, 1480:2, 1513:17, 1517:1, 1518:13, 1540:2, 1540:4, 1540:5, 1540:21, 1541:12
changed [4] - 1477:1, 1477:2, 1497:12, 1515:10
changes [1] - 1478:18
changing [1] - 1508:25
character [2] - 1479:13, 1479:23
chat [1] - 1549:13
check [4] - 1481:4, 1481:6, 1501:5, 1524:19
chemotherapy [1] - 1524:14
Chicago [1] - 1468:14
children's [1] - 1528:22
China [1] - 1533:8
CHU [22] - 1474:19, 1474:21, 1500:25, 1501:2, 1506:4, 1531:19, 1531:24, 1532:12, 1536:23, 1537:24, 1538:20, 1539:23, 1541:19, 1542:12, 1542:19, 1545:7, 1545:12, 1545:20, 1547:17, 1548:4, 1548:19, 1552:2
Chu [17] - 1468:4, 1470:8, 1471:9, 1473:6, 1474:1, 1474:17, 1492:19, 1503:21, 1505:23, 1506:3, 1531:22, 1534:21, 1537:21, 1538:7, 1538:16, 1540:22, 1543:14
Chu's [5] - 1471:3, 1471:12, 1500:20, 1537:7, 1537:9
circumstances [1] - 1501:15
citation [1] - 1511:1
cited [1] - 1494:5
City [1] - 1469:6

Claim [8] - 1513:3, 1513:5, 1513:9, 1513:11, 1514:6, 1514:11, 1514:12, 1520:16
claim [21] - 1470:8, 1475:14, 1475:20, 1477:9, 1477:17, 1490:1, 1490:11, 1490:12, 1490:14, 1492:15, 1513:2, 1513:12, 1532:3, 1538:9, 1538:16, 1538:21, 1538:22, 1539:1, 1539:9, 1539:10, 1543:15
claimed [5] - 1488:9, 1489:3, 1490:3, 1491:11, 1514:11
claims [25] - 1471:9, 1477:20, 1477:24, 1488:10, 1490:3, 1490:13, 1490:15, 1490:18, 1491:1, 1491:2, 1493:8, 1505:9, 1505:10, 1505:11, 1512:23, 1512:25, 1513:2, 1513:3, 1513:4, 1514:12, 1517:13, 1518:3
cleanup [1] - 1506:4
clear [14] - 1472:2, 1473:6, 1475:9, 1505:5, 1507:18, 1512:4, 1514:13, 1520:23, 1531:10, 1539:11, 1543:20, 1545:24, 1546:1, 1547:25
clearing [1] - 1543:19
clearly [4] - 1479:12, 1490:19, 1515:8, 1517:17
clearly-evident [3] - 1479:12, 1515:8, 1517:17
clerical [11] - 1475:9, 1479:13, 1507:21, 1511:24, 1512:16, 1512:18, 1514:19, 1514:23, 1517:3, 1518:20, 1524:20
CLERK [15] - 1474:22, 1474:24, 1535:17, 1535:24, 1536:17, 1536:25, 1537:19, 1542:20, 1544:10, 1544:23, 1545:22, 1546:17, 1547:12,

1548:22, 1551:16
client [1] - 1544:1
clinical [7] - 1489:23, 1499:20, 1499:21, 1502:8, 1502:11, 1503:11, 1527:3
clinics [1] - 1511:15
close [2] - 1515:1, 1545:7
closing [20] - 1470:18, 1471:4, 1509:5, 1511:19, 1511:21, 1516:4, 1517:12, 1517:22, 1519:5, 1521:11, 1522:3, 1522:19, 1525:23, 1532:25, 1538:7, 1546:1, 1547:18, 1547:20, 1547:24
COC [4] - 1495:16, 1495:18, 1512:22
code [1] - 1483:18
codons [1] - 1485:24
cogent [1] - 1511:5
collaborated [1] - 1475:18
collaborating [1] - 1496:2
collaboration [1] - 1495:25
collaborator [1] - 1530:22
collaborators [3] - 1528:20, 1528:22, 1529:3
colleague [2] - 1521:13, 1539:24
collected [1] - 1523:11
colon [1] - 1489:2
column [11] - 1476:21, 1478:24, 1478:25, 1513:9, 1513:20, 1513:21, 1513:22, 1513:24, 1514:10, 1515:5, 1520:14
columns [2] - 1513:23, 1513:25
combine [1] - 1483:10
coming [1] - 1519:15
comment [5] - 1472:22, 1473:15, 1539:14, 1545:6, 1551:21
commentary [1] - 1549:23
comments [3] - 1471:3, 1548:18, 1548:19
commonly [1] -

1473:24
communicate [2] - 1549:8, 1549:9
communicated [1] - 1522:20
communicating [1] - 1549:16
communication [1] - 1548:13
communications [2] - 1497:22, 1550:20
companies [4] - 1501:11, 1503:13, 1508:12, 1533:12
company [6] - 1495:3, 1496:8, 1496:9, 1497:8, 1498:15, 1532:16
comparable [4] - 1499:15, 1500:4, 1500:14, 1501:14
compare [3] - 1485:21, 1486:12, 1500:11
compared [1] - 1486:13
competing [3] - 1529:9, 1531:7, 1540:11
competitor [5] - 1500:7, 1500:8, 1509:8, 1509:10, 1527:21
competitors [6] - 1528:21, 1528:23, 1529:3, 1529:5, 1529:11, 1530:24
complete [1] - 1526:25
completely [4] - 1486:22, 1500:12, 1504:17, 1526:9
comply [1] - 1532:15
component [1] - 1522:1
computer [1] - 1518:10
concerned [1] - 1541:7
conclude [4] - 1480:18, 1504:10, 1531:10, 1537:8
concluded [2] - 1495:9, 1532:15
concludes [1] - 1534:21
conclusion [4] - 1474:7, 1519:16, 1531:2, 1538:25
conditioning [1] -

1479:19
conducted [1] - 1526:24
conference [2] - 1548:16, 1548:17
confidential [1] - 1496:17
confirming [1] - 1526:12
confusion [2] - 1525:25
consent [5] - 1545:9, 1545:10, 1546:14, 1547:6, 1547:7
consider [2] - 1472:12, 1499:11
consideration [2] - 1474:6, 1502:6
considered [6] - 1470:7, 1470:17, 1517:16, 1535:7, 1535:21, 1537:6
consistency [2] - 1478:22, 1478:23
consistent [3] - 1478:24, 1478:25, 1543:3
Constitution [2] - 1533:18, 1534:10
construct [14] - 1475:17, 1475:18, 1481:25, 1484:23, 1485:11, 1485:18, 1492:18, 1493:13, 1494:10, 1495:11, 1499:19, 1504:5, 1510:20, 1526:11
constructed [1] - 1509:24
construction [8] - 1532:3, 1538:9, 1538:17, 1538:21, 1538:23, 1539:1, 1539:10, 1543:15
constructs [1] - 1518:24
construed [1] - 1475:14
consultant [1] - 1501:9
consulted [1] - 1473:12
consulting [1] - 1549:24
contact [2] - 1548:12, 1549:21
contain [2] - 1477:12, 1477:13
contained [1] - 1484:17

content [1] - 1518:11
contest [1] - 1522:10
contexts [1] - 1488:4
continue [4] - 1475:3, 1536:4, 1536:6, 1547:11
continued [6] - 1469:1, 1475:10, 1475:23, 1476:19, 1516:17, 1551:23
contrary [2] - 1524:18, 1528:15
contrast [1] - 1519:5
contributors [1] - 1499:24
controlled [2] - 1523:25, 1524:3
controlling [1] - 1503:13
conversation [3] - 1493:1, 1493:13, 1493:14
convincing [5] - 1505:5, 1507:18, 1512:5, 1520:24, 1531:10
copied [1] - 1509:14
copies [1] - 1513:5
copy [5] - 1477:14, 1535:10, 1542:3, 1542:4, 1542:5
copying [2] - 1493:13, 1498:8
core [1] - 1520:1
corners [1] - 1484:13
corporate [1] - 1508:6
corporations [1] - 1508:3
correct [8] - 1478:3, 1492:22, 1497:1, 1507:21, 1515:2, 1524:21, 1545:12, 1552:6
corrected [3] - 1480:25, 1515:3, 1515:4
correction [27] - 1475:7, 1475:13, 1476:20, 1477:2, 1478:4, 1478:5, 1478:8, 1478:10, 1478:13, 1478:15, 1505:4, 1505:6, 1508:18, 1511:24, 1512:4, 1512:20, 1513:8, 1514:15, 1514:16, 1515:20, 1517:10, 1517:19, 1518:22, 1534:5, 1538:10, 1538:13,

1538:18
corrections [2] - 1479:23, 1517:20
correctly [2] - 1482:8, 1495:9
corrects [1] - 1479:20
correspond [1] - 1516:11
correspondence [1] - 1495:5
corresponds [1] - 1517:20
cost [5] - 1499:16, 1526:4, 1528:3, 1528:7, 1529:13
costimulatory [2] - 1482:2, 1503:10
costs [2] - 1530:10, 1530:25
COUNSEL [1] - 1468:1
counsel [44] - 1470:2, 1470:23, 1471:14, 1471:25, 1472:10, 1472:13, 1472:24, 1472:25, 1473:12, 1473:20, 1475:2, 1475:3, 1501:4, 1506:8, 1506:14, 1507:5, 1507:13, 1507:16, 1508:16, 1509:5, 1509:13, 1511:8, 1515:14, 1517:6, 1519:9, 1522:19, 1523:6, 1524:6, 1534:22, 1536:15, 1536:19, 1541:18, 1542:23, 1543:10, 1544:22, 1545:2, 1545:6, 1546:20, 1547:15, 1547:17, 1548:9, 1548:25, 1551:11
counsel's [3] - 1511:17, 1512:8, 1514:20
counter [1] - 1501:19
counting [1] - 1525:13
couple [3] - 1481:20, 1483:3, 1503:20
course [8] - 1473:9, 1483:25, 1495:11, 1507:22, 1515:25, 1517:8, 1518:21, 1534:12
Court [33] - 1470:16, 1470:24, 1471:16, 1472:12, 1473:20, 1474:7, 1475:13, 1499:23, 1506:19,

1511:21, 1537:6, 1537:8, 1538:11, 1541:4, 1541:5, 1541:6, 1541:23, 1542:6, 1542:10, 1542:16, 1542:20, 1543:11, 1543:14, 1543:19, 1543:23, 1545:16, 1546:10, 1546:12, 1548:1, 1549:21, 1550:11, 1551:8, 1552:3
COURT [66] - 1467:1, 1470:1, 1471:12, 1472:11, 1472:17, 1472:20, 1473:15, 1474:6, 1474:10, 1474:15, 1474:17, 1474:20, 1474:23, 1475:1, 1501:3, 1504:7, 1504:10, 1506:2, 1531:20, 1531:23, 1532:11, 1534:21, 1535:21, 1536:2, 1536:20, 1536:24, 1537:4, 1537:21, 1538:1, 1538:6, 1539:14, 1539:18, 1541:2, 1541:9, 1541:11, 1541:16, 1541:21, 1542:1, 1542:13, 1542:22, 1543:18, 1544:5, 1544:7, 1544:11, 1544:14, 1544:17, 1544:21, 1544:25, 1545:10, 1545:13, 1545:23, 1546:4, 1546:6, 1546:14, 1546:19, 1547:5, 1547:10, 1547:14, 1547:22, 1548:5, 1548:8, 1548:20, 1548:24, 1551:19
court [5] - 1467:25, 1488:23, 1550:15, 1550:25
court's [1] - 1538:8
Court's [4] - 1470:17, 1517:25, 1537:13, 1543:3
courtroom [8] - 1474:25, 1534:13, 1537:2, 1546:18, 1547:13, 1548:23, 1550:19, 1551:17
cover [6] - 1479:10, 1494:19, 1494:20,

1497:12, 1540:9, 1543:2
covered [6] - 1475:15, 1481:11, 1488:18, 1494:11, 1495:13, 1508:24
covers [2] - 1479:9, 1497:13
Crawford [1] - 1468:5
crazy [2] - 1501:17, 1503:7
create [2] - 1523:13, 1523:18
created [3] - 1510:7, 1523:7, 1530:4
creates [1] - 1474:2
creating [2] - 1473:6, 1515:12
credibility [8] - 1509:4, 1509:16, 1520:18, 1520:19, 1522:10, 1531:4, 1532:22
credible [1] - 1520:21
credit [1] - 1510:23
creeps [1] - 1518:19
crept [1] - 1524:20
Crescencio [1] - 1547:4
critical [3] - 1480:24, 1481:2, 1502:10
cross [2] - 1501:22
CRR [2] - 1467:22, 1552:13
Cruz [10] - 1535:15, 1536:9, 1536:14, 1537:18, 1542:3, 1542:4, 1542:14, 1542:17, 1544:8, 1548:10
curative [3] - 1470:5, 1537:5, 1537:13
curing [1] - 1489:4
cutting [1] - 1481:3
cytokine [2] - 1524:7, 1524:25

## D

damages [16] - 1498:25, 1499:1, 1499:3, 1502:23, 1505:2, 1505:7, 1505:18, 1505:20, 1506:7, 1527:14, 1532:13, 1532:14, 1540:7, 1540:9, 1543:1, 1543:2
DANE [29] - 1472:15, 1472:19, 1472:21,

1474:13, 1474:16, 1475:5, 1501:1, 1501:5, 1504:9, 1504:11, 1531:18, 1531:21, 1532:9, 1535:19, 1536:22, 1538:2, 1538:7, 1539:17, 1540:19, 1541:12, 1541:22, 1543:9, 1544:2, 1544:6, 1546:9, 1546:12, 1546:16, 1548:3, 1552:1
Dane [13] - 1468:18, 1472:14, 1474:10, 1475:4, 1504:7, 1506:2, 1537:21, 1538:1, 1539:14, 1542:8, 1543:7, 1543:18, 1546:3
Dane's [2] - 1471:4, 1471:5
dash [1] - 1479:21
Dash [9] - 1494:16, 1494:25, 1495:2, 1495:15, 1496:13, 1496:21, 1508:1, 1529:15, 1530:15
Dash's [1] - 1496:20
data [1] - 1510:21
date [4] - 1498:11, 1508:19, 1528:9, 1528:10
dates [1] - 1498:12
David [3] - 1536:1
DAY [3] - 1468:8, 1468:10, 1468:13
days [1] - 1525:24
deal [3] - 1491:23, 1530:20, 1530:23
deals [2] - 1519:14, 1519:21
dealt [1] - 1473:4
death [1] - 1525:4
decade [1] - 1521:20
December [3] - 1467:15, 1499:6, 1552:13
decide [7] - 1510:4, 1520:20, 1529:2, 1533:22, 1534:18, 1539:6, 1550:24
decided [6] - 1492:3, 1507:21, 1509:1, 1522:14, 1538:25, 1550:14
deciding [3] - 1498:22, 1531:16, 1531:17
deciphered [1] -

1487:18
**decision** [13] - 1498:15, 1509:2, 1510:20, 1510:25, 1511:16, 1511:17, 1531:15, 1532:5, 1538:24, 1539:12, 1545:5, 1545:17, 1546:25
**defend** [2] - 1498:19, 1498:23
**defendant** [2] - 1472:5, 1545:14
**Defendant** [2] - 1467:9, 1468:16
**defendant's** [2] - 1537:5, 1545:18
**defendants** [2] - 1492:16, 1543:8
**defense** [1] - 1506:7
**defenseless** [1] - 1497:9
**defenses** [10] - 1473:8, 1473:10, 1473:12, 1481:21, 1483:17, 1497:4, 1497:19, 1512:3, 1531:6, 1537:12
**define** [2] - 1477:16, 1477:24
**deleted** [1] - 1478:21
**deletion** [1] - 1478:19
**deliberate** [2] - 1534:17
**deliberating** [1] - 1546:13
**deliberation** [4] - 1534:23, 1535:3, 1535:11, 1539:19
**deliberations** [3] - 1536:4, 1547:11, 1549:7
**demonstrative** [1] - 1548:2
**demonstratives** [3] - 1547:16, 1547:18, 1547:23
**denied** [3] - 1537:14, 1544:5, 1550:25
**dependent** [1] - 1513:3
**deposit** [1] - 1483:19
**describe** [4] - 1481:24, 1483:7, 1483:10, 1483:14
**described** [1] - 1493:22
**describing** [1] - 1479:5
**description** [9] -

1477:20, 1481:22, 1481:23, 1484:12, 1505:13, 1507:19, 1520:23, 1521:2
**despite** [4] - 1494:24, 1511:17, 1518:5, 1533:24
**detail** [1] - 1515:3
**detailed** [1] - 1513:18
**details** [2] - 1514:21, 1517:4
**determine** [3] - 1478:7, 1505:7, 1535:5
**determining** [2] - 1480:8, 1498:11
**detests** [1] - 1484:20
**develop** [3] - 1489:14, 1491:25, 1504:6
**developed** [2] - 1488:2, 1488:25
**developing** [4] - 1490:7, 1492:2, 1492:4, 1497:15
**devices** [1] - 1550:4
**DIAZ** [1] - 1467:22
**Diaz** [2] - 1552:13, 1552:14
**Dickinson** [1] - 1504:3
**dictionaries** [1] - 1549:24
**die** [2] - 1498:18, 1526:10
**Diego** [1] - 1469:4
**difference** [6] - 1527:17, 1527:19, 1528:13, 1528:25, 1545:8, 1545:12
**differences** [8] - 1484:21, 1485:12, 1485:16, 1485:23, 1486:11, 1498:10, 1499:11, 1528:18
**different** [20] - 1479:6, 1481:14, 1483:6, 1486:11, 1486:22, 1489:17, 1490:7, 1493:4, 1493:23, 1497:5, 1498:6, 1498:7, 1519:16, 1522:16, 1527:19, 1527:22, 1529:19, 1540:11
**difficult** [1] - 1532:18
**direct** [2] - 1514:5, 1519:8
**directly** [4] - 1471:19, 1528:15, 1529:9, 1534:14
**disagree** [2] -

1511:24, 1544:2
**disagreement** [1] - 1514:22
**disclose** [2] - 1486:4, 1494:2
**disclosed** [6] - 1470:24, 1482:3, 1483:2, 1484:1, 1487:6, 1494:8
**disclosing** [1] - 1477:14
**disclosure** [9] - 1477:14, 1482:7, 1482:12, 1482:18, 1482:20, 1487:2, 1487:3, 1496:17
**disclosures** [1] - 1477:12
**discovered** [1] - 1516:20
**discovery** [1] - 1481:4
**discrepancies** [2] - 1514:23, 1516:21
**discuss** [4] - 1477:21, 1536:6, 1536:7, 1549:20
**discussed** [7] - 1508:16, 1540:4, 1543:4, 1543:24, 1550:3, 1550:4
**discussing** [2] - 1549:6, 1549:11
**discussion** [2] - 1495:23, 1496:6
**discussions** [9] - 1494:13, 1494:25, 1495:14, 1496:10, 1496:14, 1496:19, 1496:25, 1497:24, 1551:24
**disgruntled** [2] - 1509:8, 1509:10
**disproportionate** [1] - 1500:12
**dispute** [5] - 1506:18, 1509:25, 1516:22, 1516:23, 1527:5
**disputed** [1] - 1503:3
**disputes** [1] - 1535:1
**disregarded** [1] - 1520:10
**distinction** [1] - 1489:10
**distract** [1] - 1507:16
**distraction** [1] - 1507:15
**DISTRICT** [3] - 1467:1, 1467:2, 1467:3
**divide** [1] - 1523:14
**DIVISION** [1] - 1467:2

**DNA** [5] - 1482:5, 1482:6, 1482:8, 1483:9, 1483:11
**doctors** [1] - 1527:12
**document** [7] - 1496:13, 1496:15, 1496:17, 1496:21, 1504:2, 1530:4, 1530:7
**documentation** [2] - 1510:6, 1524:12
**documents** [7] - 1476:23, 1510:2, 1510:3, 1510:6, 1523:1, 1523:2, 1530:3
**dollar** [2] - 1503:12, 1506:16
**dollars** [3] - 1504:16, 1507:1, 1530:17
**domain** [1] - 1482:7
**done** [9] - 1474:14, 1482:8, 1485:15, 1490:20, 1494:9, 1500:24, 1537:17, 1537:20, 1539:9
**door** [1] - 1473:13
**dose** [7] - 1523:24, 1524:3, 1524:4, 1524:5, 1524:14, 1524:15, 1524:16
**doubled** [1] - 1480:4
**doubt** [4] - 1508:19, 1508:21, 1508:23
**down** [6] - 1480:4, 1492:9, 1509:10, 1513:22, 1513:25, 1514:7
**downplay** [1] - 1526:3
**downplayed** [1] - 1524:6
**Dr** [179] - 1475:16, 1476:13, 1476:22, 1479:10, 1479:17, 1479:18, 1480:22, 1481:1, 1481:18, 1482:17, 1482:22, 1482:25, 1483:2, 1483:23, 1484:3, 1484:18, 1484:19, 1485:20, 1485:21, 1485:22, 1486:1, 1486:6, 1486:10, 1486:21, 1487:13, 1487:15, 1487:19, 1488:1, 1488:6, 1488:9, 1488:11, 1488:25, 1489:15, 1491:6, 1491:11, 1491:13, 1491:17,

1491:24, 1492:5, 1492:11, 1492:18, 1492:20, 1492:24, 1493:1, 1493:9, 1493:12, 1493:13, 1493:16, 1493:17, 1493:21, 1493:24, 1493:25, 1494:3, 1494:4, 1494:6, 1494:7, 1494:8, 1494:10, 1494:11, 1494:12, 1494:13, 1494:16, 1494:19, 1494:25, 1495:2, 1495:8, 1495:11, 1495:12, 1495:15, 1495:17, 1495:22, 1495:24, 1495:25, 1496:1, 1496:3, 1496:7, 1496:10, 1496:13, 1496:20, 1496:21, 1496:22, 1498:1, 1498:3, 1498:4, 1498:13, 1498:14, 1499:24, 1500:13, 1500:17, 1500:18, 1500:19, 1500:20, 1500:21, 1500:22, 1501:6, 1501:7, 1501:9, 1501:14, 1501:16, 1501:19, 1502:2, 1502:7, 1503:17, 1507:8, 1507:12, 1508:1, 1508:14, 1509:14, 1509:15, 1509:16, 1509:17, 1509:18, 1509:21, 1509:22, 1510:8, 1510:14, 1510:23, 1511:1, 1511:4, 1511:9, 1511:14, 1511:15, 1511:18, 1515:7, 1515:22, 1516:7, 1516:10, 1517:18, 1518:8, 1518:23, 1519:7, 1519:10, 1519:11, 1519:18, 1519:25, 1520:7, 1521:5, 1521:9, 1521:10, 1521:17, 1521:19, 1521:21, 1521:24, 1522:11, 1522:13, 1522:15, 1522:18, 1522:21, 1522:22, 1523:20, 1524:13, 1524:18, 1526:12, 1526:16, 1527:11, 1527:14, 1527:15, 1527:16, 1527:18,

7

1527:23, 1528:14,
1528:17, 1528:19,
1529:13, 1529:15,
1529:19, 1529:23,
1530:15, 1530:18,
1530:20, 1530:23
drop [1] - 1534:7
drug [2] - 1511:3,
1525:16
Drug [1] - 1526:9
Dulac [2] - 1506:24,
1529:17
during [4] - 1499:6,
1519:8, 1534:12,
1536:5, 1538:13,
1538:14, 1542:8,
1543:7, 1547:25,
1549:7, 1550:4
DX182 [1] - 1523:5
DX191 [1] - 1523:4
DX239C [1] - 1479:16
DX731 [1] - 1485:5
DX766 [1] - 1485:20
DX964 [1] - 1477:19

### E

e-mail [1] - 1549:12
e-mails [3] - 1495:16,
1496:19, 1497:25
early [5] - 1482:4,
1528:21, 1528:23,
1528:25, 1530:22
easier [1] - 1489:14,
1523:15, 1523:23
easily [2] - 1492:20,
1492:23
easy [7] - 1483:8,
1489:5, 1489:19,
1492:17, 1521:23,
1539:2, 1539:5
Ed [2] - 1506:24,
1529:17
edema [1] - 1526:7
Edward [1] - 1468:18
effect [2] - 1479:7,
1520:3
effective [3] - 1524:15,
1524:16, 1524:17
effects [1] - 1525:23
efficacy [1] - 1525:22
either [1] - 1532:2
El [1] - 1469:3
electing [2] - 1535:3,
1536:3
electronic [2] -
1518:9, 1549:12
element [5] - 1482:3,
1482:4, 1487:21,
1521:7, 1522:4

Elizabeth [1] - 1468:6
emergency [1] -
1525:3
employer [1] -
1549:17
enable [1] - 1490:11
enabled [2] - 1490:19,
1505:11
enablement [10] -
1481:22, 1487:9,
1490:8, 1490:10,
1493:9, 1505:8,
1507:19, 1520:22,
1521:2
encode [1] - 1485:8
encoded [3] -
1475:15, 1513:10,
1514:6
encodes [2] -
1476:11, 1478:21
encourage [4] -
1533:16, 1533:20,
1534:11, 1551:23
end [3] - 1480:17,
1487:9, 1528:4
entire [9] - 1507:4,
1514:17, 1515:21,
1522:7, 1523:21,
1529:24, 1532:16,
1551:6
entirely [2] - 1471:3,
1487:24
entitled [3] - 1490:1,
1497:19, 1550:23
equal [2] - 1524:9,
1531:8
equally [1] - 1531:8
error [22] - 1475:8,
1475:9, 1478:8,
1478:9, 1479:12,
1479:13, 1480:9,
1480:25, 1488:3,
1491:8, 1492:10,
1507:21, 1511:25,
1514:19, 1514:23,
1515:8, 1517:3,
1518:17, 1518:19,
1524:20, 1543:25
errors [2] - 1479:22,
1515:9
especially [1] - 1508:4
essence [1] - 1515:22
essentially [1] -
1486:7
et [2] - 1467:5, 1485:7
evading [1] - 1490:24
evaluate [1] - 1478:12
events [3] - 1508:22,
1524:25, 1525:1
evidence [50] -

1471:10, 1471:16,
1471:21, 1472:8,
1479:16, 1484:10,
1490:24, 1492:21,
1492:23, 1494:23,
1496:9, 1497:20,
1498:21, 1500:2,
1501:1, 1501:4,
1501:5, 1501:6,
1505:6, 1505:14,
1506:12, 1506:22,
1507:18, 1508:17,
1509:6, 1510:19,
1510:24, 1512:5,
1512:14, 1512:21,
1519:10, 1520:8,
1520:23, 1521:8,
1521:16, 1522:25,
1523:1, 1530:15,
1531:2, 1531:10,
1531:15, 1531:19,
1534:18, 1535:7,
1535:14, 1537:23,
1540:12, 1540:13,
1550:14
evident [3] - 1479:12,
1515:8, 1517:17
evil [1] - 1508:4
exact [1] - 1511:1
exactly [9] - 1470:12,
1473:25, 1487:6,
1509:24, 1512:2,
1513:17, 1516:11,
1517:1, 1517:20
examination [5] -
1475:10, 1475:23,
1476:19, 1516:17,
1533:24
examined [1] -
1512:19
examiner [3] -
1517:13, 1517:16,
1534:2
examiners [1] -
1520:24
examining [1] -
1512:10
example [3] - 1479:15,
1506:11, 1506:23
except [1] - 1549:6
exchange [3] -
1545:25, 1547:16,
1548:2
exchanged [1] -
1547:24
exciting [2] - 1481:7,
1481:8
exclude [2] - 1541:6,
1541:8
excuse [1] - 1535:19

excused [6] - 1548:10,
1549:1, 1550:8,
1551:9, 1551:15,
1551:22
excuses [1] - 1531:6
executive [2] -
1506:10, 1511:10
executives [1] -
1506:12
Exhibit [1] - 1476:4
exhibit [2] - 1479:17,
1498:1
exhibits [11] -
1535:14, 1537:16,
1537:22, 1537:23,
1539:18, 1539:20,
1539:23, 1541:11,
1541:16, 1541:22
existence [1] -
1484:11
expand [1] - 1479:8
expanding [1] -
1479:24
expect [2] - 1530:8,
1534:8
expectation [1] -
1522:1
expensive [1] - 1524:1
experience [3] -
1511:11, 1519:19,
1525:5
experimentation [1] -
1493:2
expert [11] - 1499:7,
1500:16, 1521:5,
1521:10, 1521:24,
1522:11, 1522:12,
1522:13, 1522:15,
1522:17, 1530:2
experts [6] - 1487:11,
1500:3, 1527:21,
1528:13, 1531:5,
1531:7
expiration [1] - 1530:6
expires [1] - 1529:25
explain [2] - 1489:10,
1494:15
explained [5] -
1471:7, 1488:20,
1501:12, 1502:2,
1503:17
explanation [1] -
1519:7
exposed [2] - 1549:4,
1551:7
expressly [1] -
1512:23
extra [3] - 1485:25,
1536:19
extremely [1] -

1543:13

### F

face [1] - 1520:19
Facebook [1] -
1549:14
faced [1] - 1489:5
fact [15] - 1473:7,
1473:21, 1480:4,
1486:20, 1487:11,
1495:2, 1510:19,
1511:20, 1511:23,
1515:6, 1516:7,
1518:6, 1523:3,
1528:15, 1530:12
facts [1] - 1538:20
factual [1] - 1472:6
fail [1] - 1493:9
failed [3] - 1471:21,
1487:8, 1497:15
failure [6] - 1471:14,
1471:15, 1472:24,
1473:3, 1522:24,
1526:2
failures [1] - 1493:5
fair [3] - 1481:13,
1550:23, 1551:1
fairly [2] - 1481:17,
1481:24
fairness [1] - 1551:5
faith [4] - 1471:5,
1471:11, 1471:24,
1472:7
fall [1] - 1495:15
false [2] - 1474:2,
1538:19
family [1] - 1549:16
fantastic [1] - 1533:14
far [3] - 1493:8,
1504:20, 1533:3
Farrell [1] - 1469:5
fashion [1] - 1512:15
fatal [1] - 1526:6
fathers [1] - 1533:18
favor [4] - 1472:4,
1507:24, 1507:25,
1545:14
favorite [1] - 1476:22
FCRR [1] - 1467:22
FDA [5] - 1498:17,
1499:20, 1502:11,
1525:19, 1528:5
features [1] - 1487:25
Federal [1] - 1467:22
fellow [2] - 1509:21,
1549:6
fence [3] - 1511:20,
1511:23, 1512:2
few [4] - 1498:18,

1506:7, 1516:2, 1525:24
**field** [2] - 1487:15, 1488:7
**figure** [5] - 1483:22, 1484:9, 1484:16, 1486:17, 1520:3
**figured** [1] - 1476:8
**file** [2] - 1495:21, 1518:12
**filed** [14] - 1470:4, 1470:6, 1475:10, 1475:22, 1485:16, 1487:14, 1488:12, 1488:24, 1491:25, 1493:17, 1495:17, 1513:16, 1517:13, 1518:8
**files** [1] - 1492:14
**filing** [1] - 1514:14
**fill** [1] - 1506:16
**final** [13] - 1473:15, 1510:20, 1531:15, 1537:5, 1538:23, 1539:11, 1539:14, 1540:3, 1540:9, 1541:24, 1542:23, 1548:16, 1551:21
**finally** [1] - 1508:22
**fine** [1] - 1545:16
**finish** [1] - 1504:21
**Finney** [6] - 1510:13, 1510:15, 1510:17, 1511:3, 1511:4, 1532:1
**Finney's** [2] - 1510:20, 1510:21
**firm** [2] - 1500:20, 1500:21
**first** [27] - 1472:22, 1478:19, 1479:2, 1492:19, 1494:16, 1497:18, 1506:7, 1507:20, 1510:1, 1510:3, 1511:8, 1512:1, 1512:3, 1512:22, 1514:24, 1516:10, 1524:21, 1526:5, 1527:18, 1528:10, 1528:11, 1528:20, 1529:12, 1533:10, 1534:1, 1543:19, 1546:4
**first-mover** [2] - 1510:1, 1510:3
**FISH** [2] - 1469:2, 1469:5
**five** [5] - 1492:7, 1492:10, 1493:20, 1502:25, 1526:20

**five-year-old** [1] - 1493:20
**flesh** [1] - 1509:8
**Floor** [2] - 1468:9, 1468:20
**Flower** [1] - 1468:9
**flu** [1] - 1525:24
**flu-like** [1] - 1525:24
**FMC63** [2] - 1486:12, 1486:19
**focus** [2] - 1488:13, 1510:3
**focused** [1] - 1490:4, 1511:5
**folks** [3] - 1516:23, 1533:2, 1533:23
**follow** [6] - 1495:16, 1501:18, 1509:20, 1512:12, 1551:2, 1551:3
**follow-up** [1] - 1495:16
**followed** [1] - 1521:4
**following** [3] - 1518:23, 1519:17, 1528:9
**follows** [1] - 1546:22
**Food** [1] - 1526:8
**for-profit** [1] - 1508:3
**foregoing** [1] - 1552:6
**foreign** [1] - 1491:21
**foreperson** [4] - 1535:4, 1536:3, 1547:1, 1547:2
**forget** [1] - 1492:8
**forgot** [1] - 1544:23
**form** [28] - 1499:2, 1504:22, 1505:1, 1535:12, 1539:21, 1539:25, 1540:3, 1540:6, 1540:16, 1540:20, 1540:21, 1540:25, 1541:3, 1541:4, 1541:13, 1541:16, 1541:24, 1542:4, 1542:5, 1542:8, 1542:24, 1542:25, 1543:4, 1543:12, 1543:19, 1543:21, 1543:22
**format** [1] - 1518:12
**formatting** [3] - 1518:10, 1518:13, 1518:17
**former** [1] - 1521:24
**forms** [2] - 1541:11, 1549:15
**forth** [2] - 1477:21, 1514:9
**forward** [3] - 1498:22,

1535:17, 1547:24
**founding** [1] - 1533:17
**four** [7] - 1478:19, 1484:13, 1508:23, 1511:25, 1527:10, 1528:1, 1528:19
**frequently** [1] - 1539:9
**fresh** [2] - 1548:11, 1549:1
**Frohlich** [2] - 1487:19, 1491:24
**front** [1] - 1478:8
**full** [8] - 1473:18, 1476:4, 1490:12, 1508:5, 1514:8, 1518:1, 1518:2, 1519:13
**fully** [6] - 1491:16, 1491:17, 1491:18, 1491:19, 1491:22, 1491:25
**future** [1] - 1504:14

## G

**gain** [1] - 1550:19
**game** [1] - 1526:23
**ganged** [1] - 1497:9
**Garcia** [7] - 1481:18, 1486:10, 1488:6, 1491:6, 1492:5, 1521:5, 1522:11
**Garcia's** [1] - 1486:21
**Garth** [1] - 1468:18
**Geers** [1] - 1468:11
**generally** [3] - 1489:12, 1490:6, 1536:15
**generation** [5] - 1491:18, 1504:5, 1523:16, 1523:22
**generous** [2] - 1502:15, 1504:23
**genes** [1] - 1483:9
**gentlemen** [4] - 1506:6, 1534:20, 1536:17, 1536:25
**Germany** [1] - 1533:8
**Gilbert** [6] - 1523:20, 1524:13, 1524:18, 1526:12, 1526:16, 1527:11
**Gilead** [7] - 1497:8, 1498:14, 1498:15, 1498:22, 1508:3, 1508:10, 1532:14
**given** [7] - 1471:24, 1471:25, 1510:11, 1523:24, 1537:16, 1537:23, 1543:21

**glioblastoma** [1] - 1489:22
**goal** [2] - 1534:23, 1535:7
**Gold** [1] - 1504:16
**governed** [1] - 1487:17
**grade** [1] - 1524:9
**grades** [1] - 1524:10
**graduate** [1] - 1533:11
**Grand** [1] - 1468:20
**granted** [4] - 1508:18, 1513:16, 1534:1, 1549:2
**Gratzinger** [1] - 1468:19
**great** [1] - 1525:21
**Great** [1] - 1533:9
**greater** [2] - 1524:9, 1533:3
**greedy** [3] - 1490:3, 1509:8, 1509:9
**green** [1] - 1521:21
**Greg** [1] - 1496:20
**grounds** [4] - 1521:3, 1531:20, 1538:14, 1543:17
**groups** [2] - 1485:24
**grow** [2] - 1523:13, 1533:7
**guess** [4] - 1477:2, 1480:10, 1489:24, 1501:7
**guide** [1] - 1535:11
**guinea** [1] - 1486:24

## H

**half** [2] - 1499:4, 1538:24
**hand** [4] - 1501:18, 1513:22, 1529:22, 1530:21
**handle** [2] - 1542:16, 1546:6
**handles** [1] - 1529:15
**handwriting** [1] - 1485:5
**hard** [3] - 1485:6, 1501:18, 1520:12
**harder** [1] - 1524:1
**hardest** [1] - 1489:4
**hardly** [1] - 1494:4
**harms** [2] - 1504:13, 1504:14
**hay** [1] - 1515:24
**haystack** [1] - 1517:11
**head** [2] - 1529:5
**head-to-head** [1] - 1529:5

**headache** [1] - 1525:2
**hear** [4] - 1472:15, 1488:24, 1510:13, 1550:10
**heard** [37] - 1475:7, 1476:2, 1481:18, 1484:3, 1486:10, 1487:11, 1487:13, 1487:19, 1488:11, 1488:16, 1491:6, 1491:17, 1492:16, 1496:12, 1499:7, 1499:10, 1499:17, 1503:8, 1503:9, 1506:12, 1506:23, 1509:13, 1515:7, 1515:13, 1518:7, 1520:11, 1522:19, 1524:3, 1525:8, 1528:15, 1529:17, 1530:15, 1531:7, 1532:12, 1535:7, 1538:19, 1541:1
**heavy** [2] - 1486:14, 1531:9
**Heinrich** [4] - 1468:5, 1521:13, 1539:24, 1541:2
**HEINRICH** [5] - 1540:1, 1541:8, 1541:10, 1541:15, 1544:13
**help** [1] - 1476:17
**helper** [1] - 1523:19
**helpful** [1] - 1509:20
**hid** [1] - 1494:4
**high** [1] - 1501:20
**higher** [5] - 1501:13, 1524:14, 1528:8, 1529:8, 1530:25
**highest** [2] - 1502:19, 1505:19
**himself** [1] - 1492:13
**hired** [7] - 1500:19, 1500:20, 1500:21, 1500:22, 1519:25, 1520:8, 1522:13
**history** [15] - 1476:2, 1476:3, 1476:5, 1476:7, 1476:9, 1479:25, 1515:14, 1515:16, 1515:21, 1518:4, 1518:5, 1519:13, 1519:15, 1519:20, 1520:9
**hold** [1] - 1527:3
**holds** [1] - 1529:6
**holiday** [1] - 1536:10
**honest** [1] - 1501:21
**Honor** [33] - 1470:19,

1471:20, 1472:16, 1472:21, 1474:13, 1500:25, 1501:1, 1504:11, 1506:5, 1531:18, 1531:19, 1532:9, 1535:19, 1536:18, 1536:22, 1536:23, 1538:3, 1539:17, 1540:1, 1540:19, 1541:13, 1541:20, 1542:12, 1542:19, 1543:9, 1544:2, 1544:10, 1544:13, 1544:15, 1548:3, 1548:4, 1552:1, 1552:2

**honor** [1] - 1546:9

**honor's** [1] - 1515:19

**HONORABLE** [1] - 1467:3

**hopefully** [4] - 1481:19, 1537:17, 1548:6, 1551:24

**hospital** [2] - 1525:3, 1528:22

**hour** [1] - 1474:18

**hours** [1] - 1546:12

**house** [1] - 1499:14

**houses** [1] - 1499:15

**huge** [2] - 1486:10, 1492:9

**hum** [1] - 1516:20

**human** [13] - 1491:16, 1491:17, 1491:18, 1491:19, 1491:22, 1491:25, 1492:12, 1492:13, 1514:24, 1519:11, 1532:21

**humanized** [1] - 1491:15

**hundred** [1] - 1529:18

**hundreds** [3] - 1476:3, 1515:18, 1526:17

**hypothetical** [8] - 1501:16, 1503:15, 1504:14, 1506:20, 1527:25, 1528:6, 1528:10, 1530:25

**hypothetically** [1] - 1499:12

**hypothetically-negotiated** [1] - 1499:12

**I**

**ID** [21] - 1475:15, 1476:25, 1477:22, 1478:1, 1478:19, 1478:20, 1479:1,

1482:9, 1482:10, 1482:11, 1513:10, 1514:7, 1514:9, 1514:10, 1515:9, 1520:11, 1520:12, 1520:16

**ID:6** [1] - 1532:8

**identified** [1] - 1514:25

**identifies** [1] - 1491:21

**identify** [2] - 1489:21, 1547:2

**ignore** [2] - 1516:13, 1530:2

**ignored** [2] - 1516:5, 1530:13

**ignores** [1] - 1529:13

**ILE** [1] - 1477:6

**Illinois** [1] - 1468:14

**immediate** [1] - 1515:2

**immediately** [5] - 1498:18, 1516:25, 1520:6, 1551:8, 1551:13

**impartial** [1] - 1550:24

**implication** [1] - 1473:6

**important** [26] - 1477:7, 1477:8, 1480:23, 1481:2, 1485:12, 1490:13, 1493:22, 1494:18, 1499:3, 1500:1, 1503:8, 1507:10, 1507:11, 1507:15, 1510:2, 1512:22, 1513:12, 1513:14, 1520:9, 1532:25, 1533:1, 1533:3, 1533:17, 1534:16, 1547:25, 1551:3

**importantly** [1] - 1505:15

**impression** [2] - 1474:2, 1523:7

**improper** [1] - 1550:19

**in-chambers** [1] - 1536:10

**inaccurate** [1] - 1550:21

**inadequate** [1] - 1487:3

**inappropriate** [3] - 1470:9, 1472:23, 1474:2

**INC** [2] - 1467:5, 1467:8

**incentive** [1] - 1534:9

**include** [8] - 1477:10, 1478:18, 1480:1, 1502:16, 1513:3, 1513:4, 1527:7, 1530:16

**included** [6] - 1478:21, 1480:5, 1500:18, 1502:5, 1502:6, 1540:18

**includes** [5] - 1476:21, 1479:2, 1504:25, 1518:3, 1549:10

**including** [6] - 1510:20, 1528:18, 1531:25, 1539:10, 1549:13, 1550:7

**incomplete** [1] - 1550:21

**inconsistent** [1] - 1538:8

**incorporate** [1] - 1514:12

**incorrect** [1] - 1543:12

**incorrectly** [1] - 1538:16

**incredible** [1] - 1481:2

**incredibly** [2] - 1500:19, 1501:11

**incurred** [1] - 1543:2

**IND** [1] - 1502:10

**indeed** [1] - 1528:16

**India** [1] - 1533:8

**indicated** [2] - 1505:12, 1509:19

**industry** [1] - 1506:21

**infancy** [3] - 1487:12, 1488:8, 1489:6

**infer** [1] - 1516:7

**inferred** [2] - 1473:9, 1537:9

**influenced** [1] - 1550:20

**information** [13] - 1478:22, 1485:19, 1485:20, 1493:7, 1494:7, 1509:24, 1516:2, 1517:16, 1549:5, 1550:19, 1550:21, 1550:25, 1551:7

**informed** [1] - 1470:2

**infringe** [3] - 1471:9, 1505:16, 1509:1

**infringed** [3] - 1471:15, 1471:18, 1537:11

**infringement** [12] - 1473:25, 1493:11, 1498:8, 1498:12,

1505:13, 1507:17, 1508:17, 1511:22, 1512:1, 1528:11, 1529:12, 1531:3

**infringer** [4] - 1471:14, 1471:16, 1471:17, 1505:15

**infringing** [1] - 1508:24

**initial** [1] - 1539:6

**initiated** [2] - 1526:17, 1538:22

**inject** [1] - 1472:5

**injected** [2] - 1471:3, 1473:19

**innate** [1] - 1532:20

**innovation** [1] - 1533:21

**insisting** [1] - 1509:23

**Instagram** [1] - 1549:14

**instance** [1] - 1507:2

**instead** [1] - 1541:24

**institution** [2] - 1482:24, 1507:25

**instruction** [24] - 1470:5, 1470:7, 1470:10, 1470:11, 1470:14, 1470:16, 1470:21, 1470:22, 1471:1, 1471:18, 1471:23, 1472:22, 1473:14, 1497:4, 1499:2, 1499:22, 1511:21, 1517:12, 1517:25, 1535:20, 1537:6, 1537:14, 1548:14, 1549:3

**instructions** [10] - 1470:18, 1515:20, 1535:10, 1539:21, 1541:17, 1544:8, 1544:11, 1544:12, 1544:18

**instructive** [1] - 1500:6

**intellectual** [1] - 1533:5

**intend** [1] - 1548:11

**intended** [5] - 1534:10, 1541:5, 1541:6, 1542:6, 1542:10

**intentional** [1] - 1519:24

**inter** [1] - 1531:14

**interested** [3] - 1495:4, 1495:6, 1497:24

**interesting** [1] -

1520:1

**internal** [4] - 1512:9, 1530:2, 1530:4, 1530:7

**Internet** [3] - 1549:12, 1549:25, 1550:3

**interpret** [4] - 1515:15, 1515:19, 1519:12, 1519:22

**interpreted** [1] - 1532:4

**interpreting** [1] - 1547:22

**introduce** [1] - 1511:4

**introduced** [7] - 1508:23, 1508:24, 1511:8, 1511:25, 1528:2, 1528:12, 1540:14

**introducing** [2] - 1515:1, 1528:2

**invalid** [5] - 1473:24, 1490:4, 1505:6, 1505:16, 1534:6

**invalidity** [2] - 1505:17, 1520:22

**invent** [5] - 1489:6, 1489:25, 1492:11, 1492:12, 1492:15

**invented** [4] - 1481:24, 1489:3, 1490:2, 1493:9

**invention** [16] - 1480:1, 1481:2, 1483:6, 1483:12, 1483:14, 1486:7, 1486:9, 1487:2, 1487:5, 1488:18, 1491:10, 1492:15, 1492:18, 1522:6, 1533:15, 1534:11

**inventions** [3] - 1483:5, 1483:9, 1533:16

**inventors** [4] - 1487:8, 1514:2, 1533:16, 1534:9

**invested** [1] - 1481:11

**investigation** [3] - 1489:24, 1550:1, 1550:18

**involved** [2] - 1549:18, 1550:7

**involves** [2] - 1483:12, 1549:6

**IPR** [13] - 1497:2, 1510:20, 1510:24, 1521:24, 1532:2, 1532:4, 1534:2, 1538:9, 1538:13,

1538:14, 1538:17, 1538:20, 1543:15
**IRELL** [1] - 1468:4
**irrelevant** [3] - 1503:21, 1504:13, 1504:17
**isoleucine** [3] - 1477:6, 1478:2, 1481:3
**issue** [17] - 1471:5, 1472:6, 1473:4, 1475:7, 1480:20, 1490:8, 1490:10, 1491:3, 1505:4, 1507:22, 1508:13, 1538:10, 1539:24, 1543:15, 1548:12, 1548:18, 1548:20
**issued** [8] - 1480:10, 1480:11, 1480:13, 1497:18, 1507:20, 1514:14, 1517:15
**issuegs** [1] - 1548:18
**issues** [15] - 1481:17, 1481:20, 1505:19, 1507:16, 1507:17, 1508:9, 1508:16, 1515:20, 1518:20, 1531:16, 1531:17, 1534:3, 1546:6, 1549:5
**issuing** [1] - 1512:19
**items** [1] - 1521:12
**iteration** [3] - 1540:3, 1540:9, 1543:6
**itself** [2] - 1476:16, 1532:5
**IV** [1] - 1543:1

## J

**Jakabovits** [3] - 1496:10, 1498:4, 1498:14
**JAMES** [1] - 1467:3
**JCAR15** [2] - 1522:24, 1525:15
**JCAR17** [3] - 1524:21, 1524:24, 1525:13
**Jeffrey** [1] - 1468:19
**JEFFRIES** [4] - 1470:19, 1471:20, 1473:16, 1474:9
**Jeffries** [1] - 1468:8
**Jeffries'** [2] - 1472:22, 1500:20
**jeopardizes** [1] - 1551:4
**job** [1] - 1496:8
**John** [2] - 1468:13,

1469:5
**JONES** [3] - 1468:8, 1468:10, 1468:13
**Jr** [1] - 1547:4
**Jude** [1] - 1528:22
**judge** [3] - 1509:16, 1522:11, 1532:21
**JUDGE** [1] - 1467:3
**judges** [10] - 1510:25, 1520:18, 1520:19, 1531:4, 1531:6, 1531:16, 1532:7, 1534:3, 1538:25, 1539:6
**July** [1] - 1508:18
**jump** [1] - 1509:10
**Junghans** [5] - 1488:1, 1518:23, 1519:7, 1519:18, 1520:7
**JUNO** [1] - 1467:5
**Juno** [39] - 1470:1, 1497:9, 1498:20, 1498:23, 1499:6, 1499:7, 1500:6, 1500:7, 1500:9, 1500:22, 1502:4, 1502:5, 1502:7, 1502:9, 1502:12, 1503:9, 1504:15, 1504:16, 1506:25, 1510:9, 1510:12, 1522:23, 1523:16, 1525:7, 1526:15, 1527:2, 1527:20, 1528:20, 1528:24, 1530:16, 1530:20, 1530:21, 1541:21, 1542:22, 1543:10, 1544:21, 1548:8
**juror** [2] - 1551:4, 1551:6
**JUROR** [2] - 1547:4, 1547:9
**jurors** [4] - 1470:3, 1475:1, 1549:7, 1550:9
**JURY** [1] - 1467:13
**jury** [75] - 1470:2, 1470:9, 1471:16, 1474:10, 1474:24, 1474:25, 1499:2, 1515:19, 1517:25, 1532:18, 1534:23, 1535:1, 1535:3, 1535:10, 1535:22, 1536:3, 1536:10, 1536:21, 1537:1, 1537:2, 1537:10, 1537:16, 1537:17,

1537:23, 1538:19, 1539:20, 1540:12, 1540:20, 1541:5, 1541:6, 1541:13, 1541:17, 1542:6, 1542:17, 1542:23, 1542:24, 1542:25, 1543:4, 1543:22, 1543:23, 1544:8, 1544:11, 1545:2, 1545:22, 1546:6, 1546:13, 1546:15, 1546:17, 1546:18, 1546:19, 1546:20, 1546:22, 1547:1, 1547:10, 1547:13, 1548:6, 1548:9, 1548:12, 1548:15, 1548:21, 1548:22, 1548:23, 1548:24, 1548:25, 1549:3, 1549:19, 1550:24, 1551:9, 1551:16, 1551:17, 1551:21
**jury's** [1] - 1551:11

## K

**keep** [6] - 1486:7, 1487:4, 1494:6, 1522:12, 1546:15
**Kettering** [22] - 1494:14, 1494:17, 1495:4, 1496:11, 1496:14, 1496:20, 1497:22, 1497:23, 1502:5, 1507:24, 1508:2, 1509:9, 1512:17, 1515:2, 1516:24, 1520:4, 1520:6, 1527:20, 1529:16, 1533:2, 1533:23, 1539:4
**Kite-created** [1] - 1523:7
**know-how** [2] - 1499:21, 1502:6
**known** [1] - 1521:22
**knows** [3] - 1473:20, 1477:23, 1519:22
**Krause** [3] - 1516:13, 1516:15, 1532:1
**KYMRIAH** [2] - 1500:8, 1500:9

## L

**label** [3] - 1524:8, 1526:6, 1526:8
**laboratory** [1] - 1516:9
**labs** [1] - 1502:9
**lack** [3] - 1481:21, 1481:22, 1505:12
**ladies** [4] - 1506:6,

1496:1, 1496:22, 1497:7, 1497:13, 1497:16, 1497:22, 1498:14, 1498:16, 1499:13, 1503:24, 1504:6, 1505:9, 1505:14, 1506:1, 1508:2, 1508:10, 1509:25, 1510:3, 1510:6, 1511:4, 1511:19, 1512:3, 1512:4, 1514:25, 1516:4, 1516:12, 1522:13, 1523:7, 1525:10, 1526:14, 1526:22, 1529:19, 1530:2, 1530:4, 1530:13, 1530:20, 1531:25, 1532:6, 1534:7, 1537:10, 1538:22, 1539:5, 1540:12, 1542:3, 1543:6, 1544:22, 1548:9
**KITE** [1] - 1467:8
**Kite's** [26] - 1470:5, 1491:18, 1497:13, 1497:19, 1508:17, 1509:5, 1510:13, 1510:15, 1510:22, 1511:17, 1517:22, 1519:5, 1519:25, 1521:5, 1521:10, 1521:11, 1521:24, 1522:3, 1523:2, 1524:6, 1524:13, 1524:24, 1525:23, 1530:2, 1531:3, 1531:6
**Kite-created** [1] - 1523:7
**know-how** [2] - 1499:21, 1502:6
**known** [1] - 1521:22
**knows** [3] - 1473:20, 1477:23, 1519:22
**Krause** [3] - 1516:13, 1516:15, 1532:1
**KYMRIAH** [2] - 1500:8, 1500:9

1534:20, 1536:17, 1536:25
**language** [8] - 1470:12, 1471:18, 1473:1, 1507:6, 1540:8, 1541:6, 1541:8
**large** [2] - 1503:22, 1503:23, 1514:13
**last** [12] - 1480:2, 1480:3, 1489:5, 1497:2, 1504:12, 1505:23, 1507:22, 1534:25, 1535:25, 1543:1, 1548:16
**lastly** [3] - 1497:21, 1498:11, 1505:18
**late** [9] - 1527:24, 1528:18, 1529:11, 1529:13, 1529:14, 1529:16, 1529:18, 1529:20, 1551:22
**latest** [1] - 1530:24
**law** [13] - 1470:21, 1472:3, 1509:1, 1509:2, 1515:15, 1515:19, 1517:24, 1518:6, 1520:25, 1528:9, 1532:7, 1532:10, 1550:7
**Law** [14] - 1468:4, 1468:5, 1468:5, 1468:6, 1468:8, 1468:11, 1468:13, 1468:18, 1468:18, 1468:19, 1468:19, 1468:20, 1469:3, 1469:5
**laws** [2] - 1533:20
**lawyer** [6] - 1481:6, 1510:12, 1510:13, 1510:15, 1521:11, 1522:3
**lawyers** [8] - 1509:10, 1510:9, 1519:25, 1522:13, 1537:12, 1537:15, 1547:23, 1550:8
**lead** [3] - 1525:4, 1526:1, 1536:9
**learn** [2] - 1484:16, 1550:1
**learned** [1] - 1495:25
**lease** [1] - 1499:10
**least** [5] - 1485:11, 1491:2, 1492:21, 1511:25, 1545:15
**leave** [1] - 1523:6
**lectern** [1] - 1535:18
**left** [4] - 1474:11,

1475:6, 1529:22, 1530:21
**left-hand** [2] - 1529:22, 1530:21
**legal** [4] - 1471:22, 1472:1, 1474:3
**legally** [1] - 1497:16
**legitimate** [1] - 1505:17
**less** [4] - 1486:13, 1491:19, 1502:24, 1530:9
**lessen** [1] - 1534:11
**letter** [1] - 1479:22
**leukemia** [3] - 1489:12, 1527:6, 1527:8
**level** [1] - 1493:5
**levers** [1] - 1483:7
**liability** [1] - 1505:3
**liars** [1] - 1500:18
**license** [17] - 1494:17, 1494:21, 1496:6, 1496:16, 1496:22, 1499:10, 1499:12, 1500:7, 1500:9, 1502:4, 1502:14, 1502:19, 1503:1, 1504:3, 1528:3, 1528:7
**licensed** [2] - 1500:2, 1500:8
**licenses** [7] - 1496:8, 1499:11, 1500:3, 1500:13, 1501:14, 1529:16, 1529:17
**licensing** [2] - 1496:10, 1496:12
**life** [2] - 1507:4, 1529:25
**light** [2] - 1486:15, 1546:2
**likely** [1] - 1491:19
**limine** [1] - 1531:21
**limited** [4] - 1481:15, 1481:16, 1502:23, 1549:14
**line** [4] - 1482:22, 1513:22, 1514:8, 1514:10
**lines** [2] - 1471:6, 1514:7
**LinkedIn** [1] - 1549:14
**listen** [1] - 1549:22
**listing** [5] - 1475:21, 1477:11, 1477:21, 1477:25, 1518:9
**listings** [2] - 1477:7, 1477:16
**literature** [1] - 1509:19

**litigation** [5] - 1510:7, 1528:24, 1529:1, 1530:5
**live** [1] - 1527:11
**lived** [1] - 1520:19
**liver** [1] - 1489:1
**lives** [9] - 1498:17, 1498:23, 1507:14, 1507:24, 1508:1, 1508:5, 1508:10, 1525:9
**living** [1] - 1511:3
**LLP** [2] - 1468:4, 1468:17
**look** [31] - 1475:24, 1479:20, 1480:9, 1480:13, 1480:14, 1482:12, 1488:9, 1495:20, 1497:24, 1499:14, 1499:15, 1509:12, 1510:15, 1510:16, 1512:3, 1513:2, 1513:6, 1513:9, 1513:15, 1515:21, 1517:9, 1518:5, 1518:11, 1521:1, 1521:8, 1521:23, 1522:25, 1525:7, 1528:19, 1534:17
**looked** [9] - 1473:23, 1484:20, 1484:25, 1501:15, 1516:8, 1520:2, 1522:25, 1533:25, 1534:5
**looking** [10] - 1478:6, 1478:12, 1515:24, 1516:1, 1518:12, 1520:14, 1529:10, 1530:11, 1534:3, 1535:1
**looks** [4] - 1470:6, 1474:17, 1498:1, 1528:19
**loose** [1] - 1489:13
**Los** [5] - 1467:14, 1467:23, 1468:7, 1468:9, 1468:21
**low** [3] - 1486:16, 1529:8, 1532:14
**lower** [4] - 1524:15, 1524:23, 1528:3, 1529:22
**lunch** [2] - 1536:4, 1536:11
**lunchtime** [1] - 1536:5
**lymphodepletion** [2] - 1479:19, 1524:13
**lysine** [11] - 1476:12, 1477:4, 1478:3,

1478:21, 1479:2, 1480:2, 1480:12, 1480:14, 1495:10, 1495:13, 1519:1

# M

**machine** [1] - 1544:24
**Maclain** [1] - 1468:5
**mail** [1] - 1549:12
**mails** [3] - 1495:16, 1496:19, 1497:25
**maintained** [1] - 1470:25
**maintaining** [1] - 1493:25
**major** [1] - 1535:1
**majority** [3] - 1525:25, 1545:5, 1547:1
**MANELLA** [1] - 1468:4
**manner** [2] - 1483:15, 1511:6
**mansion** [1] - 1499:16
**manual** [1] - 1512:10
**manufacture** [1] - 1502:8
**manufacturing** [11] - 1499:20, 1523:3, 1523:8, 1523:9, 1523:10, 1523:17, 1523:21, 1523:22, 1525:17, 1525:18
**March** [3] - 1494:17, 1494:18, 1494:24
**Margo** [2] - 1511:9, 1511:15
**Mark** [2] - 1526:12, 1526:16
**mark** [3] - 1545:3, 1546:24, 1547:1
**market** [2] - 1503:19, 1526:5
**match** [1] - 1503:1
**matches** [2] - 1475:20, 1475:21
**material** [2] - 1483:13, 1483:15
**materials** [1] - 1549:25
**matter** [7] - 1472:11, 1511:20, 1516:22, 1535:20, 1537:5, 1549:21, 1552:7
**matters** [1] - 1503:10
**maximize** [1] - 1508:6
**mean** [2] - 1477:17, 1547:22
**meaning** [2] - 1475:20, 1485:24
**means** [5] - 1476:11,

1480:10, 1545:3, 1546:24, 1549:12
**meant** [2] - 1480:15, 1480:17
**mechanical** [1] - 1483:6
**media** [4] - 1549:15, 1549:17, 1549:22, 1550:11
**meet** [4] - 1487:8, 1517:14, 1531:9, 1536:25
**meeting** [7] - 1494:24, 1495:1, 1495:15, 1495:18, 1495:23, 1551:12, 1551:14
**meets** [1] - 1521:1
**melanomas** [1] - 1488:21
**member** [1] - 1516:1
**members** [1] - 1549:17
**mentioned** [3] - 1482:15, 1506:7, 1520:13
**mentions** [1] - 1476:21
**merits** [1] - 1549:10
**messaging** [1] - 1549:12
**Michalik** [1] - 1468:13
**middle** [1] - 1513:23
**might** [5] - 1472:9, 1491:20, 1510:14, 1516:20, 1525:3
**MIL** [1] - 1501:2
**milestones** [1] - 1530:16
**million** [18] - 1481:12, 1497:11, 1502:17, 1503:2, 1503:3, 1503:4, 1503:5, 1503:7, 1503:12, 1504:25, 1505:21, 1530:12, 1530:14, 1530:17, 1530:18, 1530:19, 1530:22, 1530:23
**millions** [2] - 1491:7, 1492:8
**mind** [3] - 1480:3, 1522:12, 1534:17
**mine** [1] - 1485:5
**minor** [3] - 1479:13, 1479:22, 1543:25
**minute** [1] - 1480:2
**minutes** [4] - 1474:11, 1474:14, 1474:18, 1504:8
**misleading** [2] -

1516:12, 1550:21
**missed** [1] - 1498:3
**missing** [1] - 1485:24
**misstatement** [2] - 1517:24, 1540:22
**misstates** [1] - 1532:9
**mistake** [17] - 1476:8, 1480:18, 1507:19, 1507:20, 1512:15, 1512:16, 1512:18, 1516:19, 1516:24, 1517:3, 1517:10, 1518:20, 1519:24, 1520:25, 1531:11, 1531:13, 1543:5
**mistaking** [1] - 1517:5
**mistrial** [5] - 1543:11, 1543:14, 1543:16, 1544:4, 1551:5
**mixture** [1] - 1523:22
**molecule** [1] - 1503:10
**moment** [3] - 1489:10, 1506:4, 1516:18
**money** [6] - 1499:8, 1499:9, 1504:18, 1506:9, 1534:7
**month** [1] - 1498:16
**months** [1] - 1498:18
**Morgan** [1] - 1468:4
**morning** [5] - 1470:7, 1475:5, 1506:6, 1531:14, 1551:13
**most** [6] - 1481:2, 1490:5, 1500:1, 1509:6, 1512:22, 1514:19
**mostly** [1] - 1527:10
**motif** [1] - 1510:21
**motion** [5] - 1500:25, 1544:3, 1544:5, 1546:2
**mouse** [3] - 1491:13, 1491:16, 1491:20
**move** [4] - 1472:13, 1543:11, 1543:13, 1543:16
**moved** [3] - 1511:20, 1511:23, 1527:2
**mover** [2] - 1510:1, 1510:3
**MR** [56] - 1472:15, 1472:19, 1472:21, 1474:13, 1474:16, 1474:19, 1474:21, 1475:5, 1500:25, 1501:1, 1501:2, 1501:5, 1504:9, 1504:11, 1506:4, 1531:18, 1531:19,

1531:21, 1531:24, 1532:9, 1532:12, 1535:19, 1536:22, 1536:23, 1537:24, 1538:2, 1538:7, 1538:20, 1539:17, 1539:23, 1540:1, 1540:19, 1541:8, 1541:10, 1541:12, 1541:15, 1541:19, 1541:22, 1542:12, 1542:19, 1543:9, 1544:2, 1544:6, 1544:13, 1545:7, 1545:12, 1545:20, 1546:9, 1546:12, 1546:16, 1547:17, 1548:3, 1548:4, 1548:19, 1552:1, 1552:2

**MS** [8] - 1470:19, 1471:20, 1473:16, 1474:9, 1544:15, 1545:24, 1546:5, 1546:8

**MSK/Juno** [1] - 1530:13

**multiplications** [1] - 1501:17

**MUNGER** [1] - 1468:17

**murine** - 1491:13

**must** [18] - 1477:10, 1477:13, 1477:22, 1480:17, 1499:11, 1499:23, 1512:4, 1528:12, 1545:4, 1545:9, 1545:10, 1545:14, 1546:25, 1547:6, 1547:7, 1549:4, 1549:20

**Myers** [1] - 1500:22

**MYPPPY** [1] - 1510:21

---

**N**

**name** [4] - 1535:25, 1547:3, 1547:4

**names** [1] - 1512:25

**naturally** [1] - 1523:13

**NCI** [2] - 1523:4, 1523:5

**nearly** [1] - 1521:20

**necessarily** [1] - 1495:19

**necessary** [2] - 1483:15, 1496:18

**need** [9] - 1474:12, 1474:18, 1489:21, 1494:21, 1522:17,

1528:6, 1542:15, 1545:4, 1546:24

**needed** [1] - 1539:6

**needle** [1] - 1515:25

**negligent** [1] - 1481:9

**negotiate** [1] - 1496:8

**negotiated** [1] - 1499:12

**negotiating** [1] - 1506:21

**negotiation** [7] - 1501:16, 1503:15, 1506:20, 1527:25, 1528:6, 1528:10, 1531:1

**net** [2] - 1503:7, 1529:22

**neuroblastomas** [1] - 1488:21

**neurotoxicity** [2] - 1524:7, 1524:25

**never** [11] - 1473:19, 1477:4, 1496:20, 1510:10, 1510:11, 1511:3, 1511:15, 1515:6, 1520:13, 1520:14, 1520:15

**New** [2] - 1468:12

**new** [12] - 1470:4, 1477:5, 1483:8, 1489:6, 1491:18, 1521:7, 1522:4, 1522:9, 1522:17, 1533:15, 1533:16, 1544:4

**news** [1] - 1549:22

**next** [2] - 1491:18, 1504:5

**NO:11** [8] - 1476:25, 1478:1, 1479:1, 1482:11, 1520:11, 1520:13

**NO:4** [1] - 1478:19

**NO:6** [11] - 1475:15, 1478:20, 1482:9, 1482:10, 1482:11, 1513:10, 1514:7, 1514:9, 1514:10, 1515:9, 1520:16

**none** [2] - 1510:20, 1548:18

**nonprofit** [2] - 1507:25, 1508:2

**normal** [1] - 1521:4

**note** [7] - 1507:11, 1533:22, 1536:13, 1536:14, 1545:2, 1545:5, 1546:22

**notebook** [3] - 1485:4, 1536:19, 1536:20

**notebooks** [1] - 1536:18

**nothing** [6] - 1494:3, 1494:12, 1494:14, 1497:4, 1508:3, 1508:9

**notice** [4] - 1480:23, 1484:20, 1514:24, 1541:12

**notify** [1] - 1551:7

**notion** [2] - 1481:23, 1493:11

**Novartis** [7] - 1500:6, 1500:8, 1500:11, 1502:19, 1527:21, 1528:24

**nucleotide** [8] - 1476:22, 1477:10, 1477:15, 1477:18, 1477:24, 1480:6, 1516:5, 1516:13

**nucleotides** [10] - 1477:13, 1482:10, 1485:8, 1485:21, 1512:24, 1513:13, 1514:21, 1515:10

**number** [20] - 1477:22, 1478:16, 1479:18, 1489:16, 1492:8, 1492:9, 1501:19, 1501:20, 1502:19, 1514:25, 1518:15, 1520:20, 1524:19, 1525:7, 1526:21, 1527:24, 1540:23, 1545:3, 1546:22, 1548:14

**numbers** [13] - 1503:20, 1503:22, 1503:23, 1504:12, 1506:13, 1513:20, 1513:21, 1513:22, 1514:18, 1527:19, 1527:22, 1528:16, 1529:21

**Numeral** [1] - 1543:1

---

**O**

**oath** [2] - 1550:15, 1551:2

**object** [1] - 1470:20

**objection** [7] - 1500:25, 1501:3, 1531:18, 1531:23, 1532:9, 1538:4, 1539:15

**objections** [3] - 1541:23, 1544:16, 1544:17

**obtain** [3] - 1471:14, 1472:24, 1472:25

**obvious** [7] - 1475:8, 1476:8, 1478:7, 1478:9, 1480:9, 1480:25

**obviously** [3] - 1532:19, 1534:13, 1544:15

**obviousness** [2] - 1497:19, 1538:15

**occurred** [3] - 1515:9, 1526:7, 1542:7

**October** [4] - 1495:16, 1498:13, 1499:5, 1511:22

**OF** [3] - 1467:2, 1467:12, 1468:1

**off-site** [1] - 1551:12

**offered** [1] - 1470:17

**office** [21] - 1475:11, 1477:8, 1478:17, 1479:4, 1479:11, 1480:4, 1507:18, 1507:21, 1512:6, 1512:12, 1512:17, 1512:19, 1513:17, 1517:1, 1518:10, 1518:13, 1531:11, 1531:13, 1533:25, 1534:5

**official** [2] - 1480:3, 1484:24

**Official** [1] - 1467:22

**officially** [1] - 1525:19

**old** [5] - 1493:20, 1521:14, 1523:8, 1541:3, 1543:6

**OLSON** [1] - 1468:17

**once** [3] - 1488:4, 1516:23, 1520:5

**one** [41] - 1473:15, 1473:17, 1480:7, 1483:4, 1484:6, 1484:7, 1484:10, 1486:12, 1488:12, 1489:4, 1489:8, 1491:4, 1492:16, 1493:24, 1493:25, 1500:6, 1500:17, 1511:7, 1513:17, 1518:15, 1527:8, 1528:20, 1529:4, 1529:5, 1531:12, 1537:5, 1538:4, 1539:14, 1541:4, 1541:5, 1541:25, 1542:9, 1542:23, 1545:7, 1545:12, 1545:24, 1546:9,

1551:21

**one-word** [1] - 1545:7

**ones** [4] - 1485:9, 1485:22, 1490:18, 1491:15, 1500:11, 1500:14

**online** [1] - 1515:23

**open** [1] - 1534:17

**opened** [1] - 1473:13

**opening** [8] - 1471:3, 1471:5, 1480:5, 1482:5, 1482:15, 1509:13, 1511:7, 1511:17

**operating** [4] - 1519:17, 1521:4, 1530:5, 1530:8

**opinion** [1] - 1471:25

**opportunity** [2] - 1498:3, 1505:22

**opposing** [1] - 1506:14, 1507:5, 1507:13, 1507:15, 1508:16, 1511:8, 1512:8, 1514:20, 1515:13, 1517:6, 1519:9, 1522:19, 1523:6

**optimize** [1] - 1523:23

**optimizing** [1] - 1523:5

**options** [1] - 1526:14

**order** [6] - 1467:25, 1517:15, 1519:12, 1538:9, 1548:1, 1548:17

**ordered** [2] - 1546:5, 1549:20

**organized** [1] - 1515:25

**original** [4] - 1475:21, 1481:11, 1514:13, 1547:21

**originally** [3] - 1475:22, 1480:11, 1513:16

**OTERO** [1] - 1467:3

**otherwise** [1] - 1498:18

**ourselves** [2] - 1475:12, 1498:19

**outside** [3] - 1506:25, 1550:18, 1551:7

**overall** [1] - 1509:16

**overcompensating** [1] - 1502:4

**overlap** [1] - 1486:16

**overruled** [3] - 1501:3, 1531:23, 1532:11

**oversight** [1] -

1543:25
**own** [10] - 1483:22, 1487:7, 1491:10, 1491:11, 1501:25, 1512:7, 1512:12, 1519:22, 1524:11, 1550:2

**P**

**packet** [1] - 1544:12
**page** [7] - 1471:6, 1477:20, 1478:16, 1513:8, 1513:20, 1538:24, 1543:1
**pages** [9] - 1476:2, 1476:4, 1476:7, 1476:15, 1480:15, 1485:4, 1515:18, 1517:7
**paid** [7] - 1500:18, 1501:24, 1502:18, 1503:18, 1504:15, 1530:17, 1530:22
**paper** [11] - 1477:14, 1493:20, 1493:22, 1494:5, 1510:11, 1510:14, 1510:15, 1510:17, 1516:6, 1516:16, 1520:10
**papers** [1] - 1518:8
**paragraph** [2] - 1482:21, 1518:24
**paramount** [1] - 1527:2
**parent** [2] - 1500:21, 1500:23
**parenthetical** [1] - 1540:17
**part** [22] - 1473:2, 1473:18, 1476:20, 1477:14, 1482:3, 1482:9, 1485:12, 1485:13, 1486:7, 1487:4, 1487:10, 1491:15, 1491:16, 1491:18, 1502:12, 1504:16, 1513:3, 1515:5, 1520:16, 1522:7, 1529:24
**partes** [1] - 1531:14
**particular** [7] - 1473:5, 1487:20, 1487:23, 1492:3, 1515:10, 1522:6, 1533:19
**particularly** [1] - 1507:10
**parties** [13] - 1475:2, 1496:14, 1496:18, 1506:21, 1508:11,

1531:25, 1532:23, 1540:12, 1547:15, 1550:7, 1550:23, 1551:1, 1551:23
**parts** [3] - 1482:1, 1486:18, 1487:3
**party** [2] - 1532:2, 1546:2
**party's** [1] - 1550:13
**pass** [2] - 1480:21, 1525:6
**past** [1] - 1489:18
**patent** [169] - 1471:13, 1471:15, 1473:23, 1473:25, 1475:11, 1475:13, 1475:22, 1475:24, 1475:25, 1476:1, 1476:16, 1476:18, 1476:20, 1476:24, 1477:8, 1477:12, 1477:20, 1477:25, 1478:7, 1478:17, 1479:4, 1479:8, 1479:11, 1479:19, 1479:24, 1480:4, 1480:10, 1480:11, 1480:13, 1480:20, 1480:23, 1481:1, 1481:4, 1481:6, 1481:9, 1481:11, 1481:13, 1482:6, 1482:18, 1483:5, 1483:17, 1484:11, 1484:13, 1484:14, 1485:15, 1486:4, 1486:8, 1487:6, 1487:7, 1487:14, 1487:17, 1488:10, 1488:12, 1488:19, 1488:24, 1489:19, 1490:11, 1491:25, 1492:14, 1493:15, 1493:16, 1493:18, 1493:19, 1494:2, 1494:11, 1494:18, 1494:19, 1494:21, 1494:22, 1495:8, 1495:10, 1495:13, 1495:20, 1495:21, 1496:3, 1496:4, 1496:6, 1496:11, 1496:15, 1496:22, 1497:1, 1497:3, 1497:6, 1497:12, 1497:18, 1499:25, 1502:21, 1503:9, 1505:16, 1507:4, 1507:18, 1507:20, 1507:21, 1508:14, 1510:24,

1511:2, 1511:14, 1511:15, 1512:6, 1512:10, 1512:12, 1512:17, 1512:19, 1512:23, 1513:6, 1513:16, 1513:17, 1514:1, 1514:14, 1514:15, 1515:6, 1515:15, 1515:19, 1516:14, 1516:25, 1517:14, 1517:23, 1518:1, 1518:2, 1518:3, 1518:10, 1518:12, 1518:20, 1519:2, 1519:3, 1519:6, 1519:12, 1519:15, 1519:20, 1519:23, 1520:2, 1520:7, 1520:13, 1520:17, 1520:24, 1526:11, 1528:7, 1529:7, 1529:15, 1529:25, 1530:7, 1531:10, 1531:12, 1531:16, 1532:3, 1532:7, 1532:8, 1533:15, 1533:19, 1533:20, 1533:24, 1533:25, 1534:1, 1534:3, 1534:4, 1534:5, 1534:6, 1538:13, 1538:25
**patented** [2] - 1485:18, 1502:12
**patenting** [1] - 1514:4
**patents** [7] - 1473:22, 1476:13, 1495:23, 1519:14, 1519:21, 1519:22, 1534:11
**patient** [6] - 1523:17, 1525:2, 1525:3, 1525:21, 1526:5, 1527:11
**patient's** [1] - 1523:11
**patients** [15] - 1525:5, 1525:7, 1525:9, 1525:14, 1525:15, 1526:7, 1526:10, 1526:14, 1526:16, 1526:17, 1526:18, 1526:19, 1526:20, 1526:21
**pay** [2] - 1502:24, 1509:3
**paying** [1] - 1530:21
**payment** [5] - 1502:17, 1505:1, 1505:20, 1506:24, 1530:16
**payments** [2] -

1504:15, 1530:13
**payouts** [2] - 1506:10, 1506:11
**pediatric** [3] - 1527:6, 1527:9, 1527:12
**people** [27] - 1483:7, 1484:5, 1484:8, 1484:9, 1484:14, 1484:25, 1488:4, 1490:16, 1493:6, 1498:18, 1500:2, 1503:16, 1509:11, 1510:4, 1511:8, 1512:6, 1512:11, 1512:17, 1514:24, 1520:4, 1520:6, 1521:8, 1529:4, 1534:12, 1537:24, 1549:17, 1550:7
**per** [1] - 1525:11
**percent** [12] - 1486:13, 1486:14, 1500:5, 1502:3, 1502:13, 1503:2, 1504:25, 1505:21, 1524:22, 1527:1
**percentage** [4] - 1506:16, 1506:17, 1506:18, 1524:23
**perfect** [1] - 1518:16
**period** [9] - 1499:4, 1499:5, 1499:6, 1502:23, 1503:1, 1504:1, 1536:5, 1540:13, 1540:15
**permits** [1] - 1509:2
**permitted** [3] - 1478:11, 1479:14, 1497:17
**person** [8] - 1480:7, 1503:17, 1521:25, 1529:6, 1535:5, 1535:6, 1536:8, 1549:11
**personal** [1] - 1519:19
**perspective** [1] - 1470:14
**persuade** [1] - 1512:4
Peter [1] - 1468:19
**petitioner** [1] - 1538:11
**PHARMA** [1] - 1467:8
**Pharma** [1] - 1506:1
**pharmaceutical** [2] - 1501:10, 1503:13
**phone** [1] - 1549:11
**physically** [1] - 1537:25
**physicians** [1] - 1527:9

**pick** [1] - 1518:1
**picks** [1] - 1517:23
**piece** [1] - 1510:11
**pieces** [2] - 1531:25, 1539:13
**pig** [1] - 1486:24
**place** [11] - 1489:8, 1497:18, 1508:22, 1513:18, 1514:3, 1514:17, 1514:18, 1527:25, 1545:13, 1550:2, 1550:4
**placed** [4] - 1535:22, 1537:8, 1537:16, 1539:16
**plaintiff** [1] - 1470:15
**Plaintiffs** [2] - 1467:6, 1468:2
**plaintiffs** [6] - 1475:8, 1499:12, 1503:6, 1509:13, 1545:8, 1545:16
**plaintiffs'** [1] - 1470:14
**planet** [1] - 1520:20
**plans** [1] - 1504:6
**platform** [1] - 1492:3
**pleading** [5] - 1470:4, 1472:17, 1537:7, 1537:8, 1539:6
**plenty** [1] - 1525:20
**plus** [1] - 1503:12
**PM** [1] - 1551:18
**point** [2] - 1501:22, 1507:11
**pointed** [5] - 1504:2, 1509:18, 1514:21, 1522:21, 1522:22
**pointing** [2] - 1471:10, 1515:3
**points** [2] - 1472:21, 1506:7
**politely** [1] - 1511:24
**poo** [1] - 1530:3
**poo-pooed** [1] - 1530:3
**pooed** [1] - 1530:3
**poor** [1] - 1497:9
**portion** [6] - 1475:14, 1486:9, 1511:1, 1521:21, 1521:22, 1522:6
**portions** [1] - 1548:1
**position** [3] - 1509:15, 1516:10, 1532:22
**positions** [1] - 1540:11
**possibility** [1] - 1491:20
**possible** [5] -

1501:19, 1501:20, 1524:17, 1532:14, 1550:12
**potentially** [1] - 1502:18
**pound** [1] - 1509:8
**precise** [3] - 1478:2, 1521:14, 1523:24
**predict** [2] - 1487:20, 1487:23
**predictability** [1] - 1487:10
**predictable** [1] - 1488:3
**prejudice** [3] - 1470:15, 1543:8, 1543:25
**prejudicial** [1] - 1543:13
**premier** [1] - 1511:11
**present** [11] - 1470:2, 1471:16, 1473:3, 1481:15, 1537:11, 1544:22, 1545:2, 1546:21, 1548:9, 1548:25
**presented** [3] - 1540:12, 1550:14, 1550:25
**preserved** [2] - 1539:16, 1544:18
**press** [2] - 1496:1, 1549:17
**pretrial** [2] - 1548:16, 1548:17
**pretty** [6] - 1483:8, 1516:9, 1521:23, 1523:8, 1539:2, 1539:5
**previous** [1] - 1541:23
**previously** [3] - 1509:19, 1541:25, 1543:4
**primary** [2] - 1482:1, 1482:7
**primer** [1] - 1516:10
**primers** [7] - 1515:11, 1516:5, 1516:6, 1516:8, 1516:13, 1516:14, 1520:10
**principles** [1] - 1532:15
**privilege** [4] - 1470:25, 1472:25, 1473:11, 1473:13
**probe** [1] - 1474:5
**problem** [9] - 1470:22, 1473:17, 1473:19, 1490:22, 1491:5, 1492:1, 1494:12,

1524:10
**problems** [3] - 1524:6, 1524:11, 1525:5
**procedure** [3] - 1483:24, 1512:10, 1519:17
**procedures** [1] - 1521:4
**proceed** [1] - 1498:16
**proceeding** [9] - 1510:24, 1532:2, 1532:4, 1534:2, 1538:10, 1538:13, 1538:17, 1538:21, 1538:22
**proceedings** [4] - 1522:16, 1522:17, 1551:5, 1552:7
**PROCEEDINGS** [1] - 1467:12
**process** [14] - 1479:20, 1480:24, 1499:20, 1523:3, 1523:6, 1523:8, 1523:9, 1523:16, 1523:17, 1536:2, 1539:19, 1550:17, 1550:22, 1551:6
**product** [10] - 1499:6, 1504:19, 1508:25, 1512:1, 1515:1, 1526:10, 1528:2, 1528:11, 1532:16, 1532:17
**products** [1] - 1504:6
**professionals** [1] - 1512:11
**profit** [1] - 1508:3
**profits** [7] - 1504:17, 1506:11, 1508:6, 1530:6, 1530:8, 1530:9, 1534:8
**programs** [1] - 1550:3
**project** [1] - 1530:5
**Project** [1] - 1504:16
**projected** [1] - 1504:17
**projections** [1] - 1504:20
**promise** [1] - 1474:14
**promises** [2] - 1511:9, 1511:17
**proper** [1] - 1502:22
**properly** [1] - 1525:6
**property** [1] - 1525:6
**propose** [1] - 1489:19
**proposed** [4] - 1489:17, 1496:16, 1548:15, 1548:17
**prorate** [1] - 1502:22

**prorated** [3] - 1502:20, 1502:25, 1505:1
**prosecution** [15] - 1476:2, 1476:3, 1476:5, 1476:7, 1476:9, 1479:25, 1515:14, 1515:16, 1515:21, 1518:4, 1518:5, 1519:13, 1519:15, 1519:20, 1520:9
**prostate** [2] - 1488:16, 1488:20
**protect** [1] - 1550:13
**protein** [5] - 1482:13, 1486:23, 1486:24, 1489:22
**proteins** [1] - 1488:5
**prove** [2] - 1471:17, 1489:24
**proven** [3] - 1505:5, 1505:9, 1523:5
**provide** [8] - 1471:21, 1478:21, 1536:13, 1536:14, 1536:15, 1541:5, 1541:6, 1541:24
**provided** [18] - 1478:22, 1484:11, 1485:20, 1502:7, 1502:11, 1502:12, 1536:3, 1536:19, 1541:25, 1542:4, 1542:5, 1542:8, 1542:24, 1542:25, 1543:6, 1543:9, 1543:10, 1543:12
**provision** [4] - 1472:23, 1483:4, 1483:18, 1533:19
**PSMA** [2] - 1488:15, 1490:5
**PTO** [1] - 1508:18
**public** [6] - 1480:23, 1483:19, 1484:25, 1486:8, 1514:13, 1516:1
**publication** [5] - 1484:10, 1484:15, 1484:24, 1487:16, 1492:25
**publications** [1] - 1476:12
**publish** [1] - 1494:5
**published** [6] - 1484:22, 1485:7, 1485:23, 1486:1, 1486:5, 1509:19
**pulleys** [1] - 1483:7
**purchase** [1] -

1504:16
**purpose** [2] - 1480:23, 1508:6
**pursuant** [1] - 1470:5
**pursue** [1] - 1498:6
**put** [10] - 1470:10, 1471:12, 1472:2, 1477:25, 1478:14, 1503:21, 1510:16, 1510:17, 1527:3, 1533:18
**puzzled** [1] - 1520:2
**PX15** [1] - 1498:1
**PX2.726** [1] - 1478:17

## Q

**Quackenbush** [4] - 1515:7, 1515:22, 1517:18, 1518:8
**quality** [1] - 1526:4
**QUESTION** [1] - 1518:24
**questions** [5] - 1510:18, 1521:6, 1535:13, 1538:23, 1542:17
**quicker** [1] - 1523:15
**quickly** [5] - 1493:10, 1516:9, 1517:8, 1527:2, 1539:19
**quote** [3] - 1514:2, 1523:4, 1525:24
**quotes** [2] - 1509:7, 1512:9

## R

**raise** [2] - 1539:6, 1539:24
**raised** [5] - 1481:21, 1538:11, 1538:21, 1538:23, 1539:9
**raising** [1] - 1473:19
**range** [1] - 1500:5
**Rao** [20] - 1500:17, 1500:18, 1500:19, 1500:20, 1500:21, 1500:22, 1501:7, 1501:9, 1502:2, 1503:17, 1507:8, 1507:12, 1527:18, 1527:23, 1528:14, 1528:19, 1529:13, 1530:18, 1530:20, 1530:23
**Rao's** [3] - 1501:6, 1527:14, 1527:15
**Raskin** [3] - 1496:20, 1496:21, 1496:22

**rate** [2] - 1527:16, 1529:8
**rates** [3] - 1500:5, 1526:25, 1527:1
**ratio** [1] - 1523:25
**rational** [2] - 1503:16, 1503:17
**RCE** [4] - 1477:1, 1517:12, 1517:20, 1518:8
**re** [2] - 1548:14, 1549:3
**re-read** [2] - 1548:14, 1549:3
**reach** [3] - 1534:24, 1535:8, 1551:24
**reaching** [1] - 1535:8
**reactivate** [1] - 1545:1
**read** [15] - 1470:7, 1474:2, 1485:6, 1513:11, 1515:15, 1515:17, 1519:12, 1519:15, 1519:20, 1520:7, 1520:9, 1548:14, 1549:3, 1549:22, 1550:10
**readily** [1] - 1524:8
**reading** [4] - 1481:7, 1481:8, 1516:20, 1517:2
**reads** [1] - 1546:22
**ready** [1] - 1474:22
**real** [10] - 1499:25, 1502:19, 1519:10, 1519:19, 1520:8, 1529:10, 1530:15, 1530:17, 1530:19, 1531:1
**Real** [1] - 1469:3
**realize** [1] - 1497:10
**really** [23] - 1477:7, 1480:17, 1480:24, 1481:16, 1483:9, 1488:7, 1488:16, 1497:23, 1500:6, 1501:18, 1503:10, 1503:22, 1503:23, 1510:1, 1515:14, 1518:15, 1520:12, 1520:19, 1522:20, 1525:1, 1532:7
**reason** [4] - 1493:15, 1494:20, 1518:14, 1519:6
**reasonable** [18] - 1501:12, 1502:2, 1504:24, 1505:20, 1506:15, 1507:23, 1508:8, 1508:13, 1509:3, 1521:25,

1529:2, 1529:23, 1529:24, 1530:12, 1530:24, 1533:17, 1534:19, 1546:14

**reasons** [5] - 1471:7, 1471:8, 1498:24, 1505:12, 1533:1

**reassembled** [4] - 1475:2, 1546:19, 1546:20, 1548:24

**receive** [1] - 1536:14

**received** [2] - 1535:14, 1537:22

**receptor** [1] - 1485:2

**recess** [5] - 1542:20, 1542:21, 1544:20, 1548:7, 1552:3

**recipe** [1] - 1509:20

**recognized** [4] - 1518:21, 1533:4, 1533:24, 1534:6

**recognizing** [1] - 1524:11

**record** [20] - 1479:25, 1480:7, 1517:17, 1518:1, 1518:2, 1535:24, 1538:5, 1539:16, 1540:14, 1542:9, 1543:4, 1543:23, 1543:24, 1544:18, 1544:21, 1545:25, 1547:3, 1547:25, 1548:8, 1552:7

**reduce** [1] - 1534:8

**reduced** [1] - 1506:11

**Redwood** [1] - 1469:6

**reexamination** [2] - 1517:2, 1517:7

**refer** [1] - 1482:21

**reference** [6] - 1477:22, 1507:5, 1514:5, 1518:24, 1543:2, 1549:25

**referenced** [1] - 1471:13

**references** [4] - 1476:10, 1476:12, 1476:13, 1537:7

**referred** [4] - 1493:20, 1515:6, 1519:10, 1531:13

**referring** [1] - 1541:3

**refers** [1] - 1504:2

**reflects** [1] - 1496:14

**regard** [3] - 1472:21, 1490:6, 1504:21

**regarding** [1] - 1542:23

**region** [6] - 1482:1,

1482:2, 1485:13, 1486:14, 1486:15, 1514:9

**regions** [1] - 1486:17

**regular** [1] - 1546:12

**regulations** [3] - 1477:8, 1512:9, 1512:13

**regulatory** [1] - 1524:10

**reinstruct** [1] - 1548:11

**reject** [1] - 1491:20

**rejected** [2] - 1491:21, 1518:14

**rejection** [1] - 1521:3

**rejects** [1] - 1518:13

**relate** [2] - 1490:15, 1523:2

**related** [2] - 1525:8, 1531:17

**relationship** [2] - 1495:3, 1542:14

**relative** [1] - 1534:3

**release** [3] - 1498:19, 1524:7, 1524:25

**releases** [1] - 1496:1

**relevant** [4] - 1473:2, 1475:14, 1500:1, 1529:21

**relied** [1] - 1472:1

**remain** [2] - 1542:13, 1546:15

**remember** [11] - 1478:6, 1482:4, 1493:14, 1493:23, 1493:24, 1494:10, 1501:22, 1510:14, 1529:23, 1531:7, 1551:2

**remind** [3] - 1475:12, 1549:4

**reminder** [1] - 1528:1

**remission** [2] - 1526:25, 1527:1

**removed** [1] - 1508:23

**removes** [1] - 1542:25

**rent** [1] - 1502:24

**renting** [1] - 1502:25

**repeatedly** [1] - 1480:1

**replace** [1] - 1522:14

**replacement** [1] - 1522:13

**reply** [2] - 1539:4, 1539:5

**report** [2] - 1549:21, 1550:11

**Reporter** [1] - 1467:22

**REPORTER'S** [1] -

1467:12

**reproducible** [1] - 1483:14, 1483:21

**request** [11] - 1470:5, 1475:10, 1475:23, 1476:19, 1516:17, 1517:2, 1517:7, 1530:12, 1537:5, 1537:13, 1547:15

**requested** [3] - 1470:11, 1471:18, 1517:20

**require** [1] - 1477:9, 1551:6

**required** [2] - 1507:9, 1521:1

**requirement** [4] - 1478:9, 1487:9, 1493:9, 1515:18

**requirements** [3] - 1483:16, 1517:14, 1521:2

**requires** [2] - 1490:10, 1524:14

**research** [4] - 1534:10, 1549:24, 1550:6, 1550:18

**resolution** [1] - 1551:24

**resolve** [2] - 1535:1, 1551:22

**resolved** [1] - 1526:1

**respect** [2] - 1471:15, 1525:22

**respected** [1] - 1501:11

**respectfully** [1] - 1544:2

**respects** [2] - 1501:24, 1518:16

**respond** [2] - 1495:5, 1549:20

**response** [4] - 1521:6, 1536:16, 1539:3, 1539:4

**rest** [1] - 1502:15

**restriction** [1] - 1482:24

**restrictions** [1] - 1551:4

**resubmission** [2] - 1518:15, 1518:18

**result** [1] - 1551:5

**results** [2] - 1503:11, 1525:21

**retain** [1] - 1533:6

**retired** [3] - 1537:2, 1547:13, 1551:17

**return** [3] - 1548:10, 1549:1, 1551:10

**returned** [3] - 1474:25, 1546:18, 1548:23

**revenues** [2] - 1530:8, 1530:9

**revert** [1] - 1540:17

**review** [4] - 1473:22, 1531:14, 1539:11, 1542:23

**reviewed** [12] - 1476:6, 1476:15, 1518:1, 1537:15, 1537:21, 1537:25, 1538:2, 1541:18, 1541:19, 1544:7, 1544:9, 1544:12

**reviewing** [2] - 1476:14, 1480:8

**RICHARDSON** [2] - 1469:2, 1469:5

**ridiculous** [1] - 1501:20

**right-hand** [1] - 1513:22

**rights** [2] - 1486:9, 1529:7

**rise** [5] - 1474:24, 1546:17, 1547:12, 1548:22, 1551:16

**Roberts** [3] - 1511:9, 1511:14, 1511:18

**Roberts'** [1] - 1511:15

**Roman** [1] - 1543:1

**room** [7] - 1525:4, 1535:22, 1536:10, 1536:21, 1537:1, 1537:17, 1549:13

**ropes** [1] - 1483:7

**Rosenberg** [24] - 1479:10, 1482:25, 1492:18, 1492:20, 1492:24, 1493:12, 1493:16, 1493:21, 1494:1, 1494:3, 1494:4, 1494:12, 1494:19, 1495:12, 1495:24, 1496:1, 1509:14, 1509:18, 1509:21, 1509:22, 1516:7, 1522:18, 1522:22

**Rosenberg's** [3] - 1475:16, 1494:10, 1495:11

**roughly** [1] - 1507:6

**row** [1] - 1524:21

**royalty** [30] - 1499:22, 1500:5, 1501:12, 1502:2, 1502:13, 1503:2, 1503:4, 1504:24, 1504:25,

1505:1, 1506:15, 1506:17, 1506:23, 1506:24, 1507:2, 1507:3, 1507:23, 1508:9, 1508:13, 1509:3, 1527:16, 1528:17, 1529:3, 1529:8, 1529:23, 1529:24, 1530:12, 1530:24, 1533:17, 1534:19

**RPR** [2] - 1467:22, 1552:13

**rule** [1] - 1535:22

**ruled** [1] - 1538:11

**rules** [12] - 1480:19, 1481:13, 1483:5, 1487:17, 1487:22, 1488:3, 1512:7, 1519:22, 1519:23, 1550:13, 1551:3

**ruling** [4] - 1537:13, 1538:9, 1543:3, 1544:3

**running** [4] - 1505:21, 1506:15, 1506:17, 1528:17

**rushing** [1] - 1525:3

**Russia** [1] - 1533:9

## S

**Sadelain** [43] - 1476:13, 1480:22, 1481:1, 1482:17, 1483:2, 1483:23, 1484:19, 1485:20, 1486:1, 1486:6, 1487:13, 1488:9, 1488:11, 1488:25, 1489:15, 1491:11, 1491:13, 1492:11, 1493:1, 1493:9, 1493:17, 1493:24, 1493:25, 1494:6, 1494:7, 1494:8, 1494:11, 1495:22, 1495:25, 1498:3, 1502:7, 1508:1, 1509:15, 1509:17, 1509:22, 1511:2, 1516:6, 1516:10, 1520:7, 1520:10, 1521:9, 1522:21, 1526:11

**Sadelain's** [7] - 1476:22, 1482:22, 1493:13, 1508:14, 1509:16, 1521:17, 1522:18

**safer** [1] - 1524:15
**safety** [6] - 1524:3,
1524:7, 1524:10,
1525:4, 1526:4,
1527:2
**sales** [6] - 1503:3,
1503:7, 1504:14,
1506:18, 1506:25,
1529:22
**sample** [2] - 1523:10,
1523:11
**San** [1] - 1469:4
**Sarah** [1] - 1468:11
**satisfaction** [1] -
1483:16
**save** [2] - 1498:17,
1498:22
**saving** [7] - 1507:14,
1507:24, 1507:25,
1508:5, 1508:10,
1525:9
**saw** [9] - 1476:8,
1478:24, 1486:20,
1492:5, 1496:21,
1502:20, 1503:17,
1526:15, 1534:12
**scFv** [22] - 1482:4,
1482:16, 1482:20,
1483:2, 1484:19,
1484:22, 1485:13,
1485:17, 1485:23,
1486:5, 1486:20,
1486:22, 1486:25,
1487:21, 1493:23,
1509:19, 1521:7,
1521:21, 1522:1,
1522:4, 1522:8,
1522:22
**scFvs** [17] - 1484:4,
1486:11, 1486:22,
1491:7, 1491:10,
1491:12, 1491:13,
1491:14, 1491:18,
1492:1, 1492:12,
1492:13, 1493:4,
1493:6, 1521:17,
1521:19, 1521:23
**school** [1] - 1533:11
**Schuetz** [3] - 1485:21,
1510:8, 1519:25
**science** [1] - 1489:4
**scientist** [6] - 1479:9,
1509:21, 1511:11,
1519:11, 1521:23,
1532:20
**scientists** [9] -
1483:20, 1489:20,
1490:22, 1490:24,
1515:11, 1523:12,
1527:8, 1533:6,

1533:8
**scope** [3] - 1479:8,
1479:24, 1490:12
**score** [1] - 1519:8
**screened** [1] - 1492:6
**screening** [1] - 1491:9
**search** [1] - 1550:4
**seat** [5] - 1475:3,
1537:4, 1546:21,
1547:14, 1548:25
**second** [20] - 1473:5,
1480:10, 1482:9,
1487:1, 1487:8,
1490:17, 1492:22,
1494:13, 1497:21,
1518:15, 1518:18,
1523:15, 1523:16,
1523:22, 1528:12,
1528:14, 1528:21,
1542:25, 1545:13,
1548:15
**secret** [4] - 1486:7,
1487:5, 1494:1,
1494:7
**section** [5] - 1470:13,
1483:17, 1537:12,
1540:7
**see** [40] - 1472:5,
1476:14, 1476:15,
1476:18, 1478:16,
1481:5, 1481:6,
1485:7, 1485:9,
1485:23, 1485:24,
1489:24, 1495:4,
1497:25, 1500:4,
1501:6, 1508:16,
1509:7, 1510:23,
1513:5, 1513:9,
1513:25, 1514:1,
1514:2, 1514:3,
1514:7, 1515:12,
1523:4, 1523:5,
1524:23, 1525:15,
1526:12, 1530:11,
1530:21, 1532:5,
1539:2, 1539:5,
1542:18, 1543:7,
1543:25
**segments** [1] - 1516:5
**selected** [2] - 1488:19,
1488:20
**sell** [2] - 1499:14,
1499:15
**sells** [2] - 1500:8,
1500:9
**semicolon** [2] -
1545:4, 1546:25
**senior** [1] - 1511:10
**sense** [1] - 1524:15
**sent** [1] - 1510:10

**separate** [5] - 1470:8,
1477:14, 1523:18,
1523:19
**separated** [1] -
1479:22
**separating** [1] -
1513:23
**September** [1] -
1495:15
**SEQ** [9] - 1513:10,
1514:7, 1514:9,
1514:10, 1515:9,
1520:11, 1520:12,
1520:16, 1532:8
**sequence** [51] -
1475:15, 1475:21,
1476:10, 1476:21,
1476:25, 1477:1,
1477:3, 1477:5,
1477:7, 1477:9,
1477:10, 1477:11,
1477:13, 1477:16,
1477:18, 1477:21,
1477:22, 1477:24,
1477:25, 1478:2,
1478:18, 1479:5,
1479:9, 1482:14,
1482:19, 1483:22,
1484:1, 1484:12,
1484:17, 1485:1,
1485:7, 1485:17,
1486:1, 1487:20,
1495:10, 1508:20,
1508:24, 1513:5,
1513:10, 1513:13,
1513:19, 1514:5,
1514:6, 1514:8,
1515:7, 1518:9,
1532:8
**Sequence** [11] -
1475:15, 1476:25,
1478:1, 1478:19,
1478:20, 1479:1,
1482:9, 1482:10,
1482:11
**sequences** [4] -
1477:15, 1532:1,
1539:10, 1539:13
**series** [1] - 1539:10
**serious** [3] - 1525:6,
1526:7
**service** [2] - 1506:1,
1549:19
**set** [3] - 1477:21,
1514:9, 1515:8
**setting** [1] - 1502:9
**settlement** [2] -
1528:24, 1529:2
**seven** [1] - 1492:14
**severe** [2] - 1524:24,

1524:25
**shack** [1] - 1499:15
**Shannon** [1] - 1476:17
**share** [5] - 1482:25,
1547:16, 1547:18,
1547:19, 1547:20
**shared** [2] - 1536:15,
1545:6
**shareholders** [1] -
1508:7
**Shear** [1] - 1469:3
**sheet** [1] - 1496:16
**shifting** [1] - 1493:10
**shocking** [1] -
1500:19
**shortcuts** [1] - 1527:4
**show** [8] - 1490:8,
1498:2, 1499:2,
1503:21, 1510:2,
1521:12, 1521:16,
1527:16
**showed** [6] - 1490:18,
1500:15, 1503:25,
1507:5, 1512:9,
1530:7
**showing** [5] -
1479:15, 1498:8,
1498:9, 1512:8,
1514:20
**shown** [2] - 1472:1,
1511:3
**shows** [3] - 1496:17,
1514:10, 1531:2
**shut** [1] - 1544:23
**side** [7] - 1501:24,
1512:18, 1525:23,
1529:22, 1530:21,
1541:19, 1545:25
**sides** [10] - 1503:16,
1528:16, 1532:13,
1533:13, 1537:24,
1539:22, 1542:2,
1543:10, 1547:16,
1548:2
**sign** [2] - 1510:9,
1510:11
**signal** [1] - 1485:3
**signaling** [3] - 1482:1,
1482:2, 1482:7
**signed** [1] - 1547:1
**significance** [1] -
1533:3
**similarities** [1] -
1486:13
**similarity** [1] -
1486:21
**similarly** [1] - 1505:8
**simple** [1] - 1547:19
**single** [7] - 1496:13,
1496:15, 1496:16,

1496:21, 1503:11,
1532:16, 1532:17
**site** [1] - 1551:12
**sitting** [1] - 1497:10
**size** [1] - 1476:1
**SJ25** [1] - 1482:23
**SJ25C** [1] - 1482:16
**SJ25C1** [8] - 1484:7,
1484:8, 1484:10,
1484:12, 1486:13,
1486:18, 1486:22,
1494:1
**skill** [5] - 1477:17,
1478:6, 1480:7,
1480:12, 1493:5
**skilled** [1] - 1521:25
**skin** [1] - 1489:1
**slide** [5] - 1489:8,
1521:6, 1524:20,
1527:16, 1531:5
**slides** [2] - 1545:25,
1548:2
**slightly** [1] - 1490:7
**Sloan** [23] - 1494:14,
1494:16, 1495:3,
1496:11, 1496:13,
1496:20, 1497:22,
1497:23, 1502:5,
1507:24, 1508:2,
1509:9, 1510:22,
1512:17, 1515:2,
1516:24, 1520:4,
1520:6, 1527:20,
1529:16, 1533:2,
1533:23, 1539:4
**small** [1] - 1497:8
**smallest** [1] - 1501:19
**Snapchat** [1] -
1549:15
**so-called** [1] - 1497:3
**social** [1] - 1549:15
**solid** [4] - 1489:12,
1489:15, 1489:16,
1490:23
**solved** [2] - 1490:22,
1490:25
**someone** [13] -
1476:6, 1476:14,
1477:16, 1478:6,
1479:25, 1480:12,
1482:12, 1486:4,
1490:12, 1516:20,
1517:2, 1527:9,
1536:6
**sometimes** [1] -
1533:10
**somewhere** [1] -
1472:10
**soon** [1] - 1550:12
**sophisticated** [1] -

1473:22
**sorry** [6] - 1471:4, 1479:17, 1542:22, 1544:19, 1546:20
**sort** [3] - 1489:13, 1491:15, 1520:2
**South** [3] - 1468:9, 1468:20, 1533:9
**speaking** [2] - 1493:10, 1545:15
**special** [1] - 1523:8
**specific** [8] - 1496:6, 1496:25, 1512:24, 1520:25, 1523:23, 1532:1, 1545:4, 1546:24
**specifically** [4] - 1472:2, 1473:4, 1483:4, 1490:14
**specification** [8] - 1513:16, 1513:18, 1514:2, 1514:17, 1515:5, 1518:3, 1518:25, 1519:2
**specified** [1] - 1491:3
**specify** [1] - 1487:25
**spell** [1] - 1535:25
**spend** [2] - 1509:6, 1530:3
**spent** [1] - 1482:8
**spot** [1] - 1486:23
**St** [1] - 1528:22
**stack** [1] - 1515:24
**staff** [4] - 1542:1, 1542:3, 1542:5, 1543:6
**staffs** [1] - 1542:2
**stage** [13] - 1527:24, 1528:18, 1528:21, 1528:23, 1528:25, 1529:11, 1529:13, 1529:14, 1529:17, 1529:18, 1529:20, 1530:23, 1530:25
**stand** [2] - 1483:24, 1510:15
**standard** [1] - 1519:17
**Stars** [1] - 1468:6
**start** [12] - 1477:4, 1480:5, 1487:10, 1493:12, 1498:20, 1506:7, 1532:4, 1535:3, 1536:2, 1539:19, 1548:11, 1551:6
**started** [3] - 1492:8, 1492:9, 1532:8
**starting** [5] - 1508:20, 1517:21, 1520:17, 1527:10

**starts** [5] - 1477:4, 1480:11, 1502:4, 1514:10, 1515:7
**state** [3] - 1535:25, 1538:4, 1547:3
**statement** [6] - 1470:21, 1508:5, 1509:13, 1511:7, 1511:18, 1538:19
**statements** [4] - 1473:5, 1509:12, 1537:7, 1537:9
**states** [1] - 1471:13
**States** [3] - 1506:25, 1512:12, 1533:4
**STATES** [1] - 1467:1
**statute** [4] - 1471:19, 1473:18, 1474:1
**statutory** [2] - 1472:23, 1483:16
**stay** [4] - 1472:2, 1533:11, 1533:12, 1534:9
**step** [1] - 1516:18
**stick** [1] - 1547:21
**still** [11] - 1476:20, 1476:21, 1478:25, 1479:1, 1487:18, 1489:20, 1490:22, 1490:23, 1497:8, 1528:25
**stop** [2] - 1492:3, 1508:9
**strategy** [1] - 1491:19
**Street** [4] - 1467:23, 1468:9, 1468:11, 1469:6
**strike** [1] - 1500:25
**structure** [1] - 1506:22
**structured** [1] - 1506:22
**studies** [1] - 1502:11
**study** [2] - 1502:8, 1527:3
**stuff** [2] - 1502:9, 1518:10
**stupid** [1] - 1497:13
**subject** [7] - 1527:13, 1529:15, 1529:20, 1531:21, 1532:4, 1541:22, 1544:15
**submission** [4] - 1472:12, 1480:3, 1518:16, 1518:18
**submit** [5] - 1496:24, 1504:23, 1517:15, 1518:17, 1540:16
**submitted** [5] - 1475:21, 1477:5, 1518:14, 1534:23,

1546:23
**success** [1] - 1522:1
**successfully** [3] - 1525:14, 1525:21, 1526:25
**suddenly** [2] - 1480:2, 1501:8
**sue** [1] - 1481:12
**sufficiently** [1] - 1483:13
**suggest** [7] - 1472:4, 1472:8, 1476:6, 1508:4, 1512:11, 1535:4, 1545:8
**suggesting** [2] - 1492:19, 1537:10
**suing** [1] - 1497:11
**suitable** [3] - 1489:21, 1492:6, 1492:7
**Suite** [2] - 1468:6, 1469:6
**Sullivan** [6] - 1499:24, 1500:13, 1501:14, 1501:17, 1528:17
**Sullivan's** [3] - 1501:20, 1527:16, 1529:23
**summer** [1] - 1511:20
**super** [1] - 1488:10
**support** [1] - 1471:10
**suppose** [2] - 1509:2, 1511:23
**supposed** [4] - 1471:11, 1484:13, 1484:14, 1503:15
**supposedly** [1] - 1493:12
**surface** [1] - 1486:23
**swap** [1] - 1522:17
**swear** [1] - 1535:15
**switch** [1] - 1490:7
**switching** [1] - 1490:9
**sworn** [1] - 1535:23
**symptoms** [1] - 1525:24
**syndrome** [2] - 1524:7, 1524:25
**system** [4] - 1481:13, 1533:5, 1533:15, 1544:25

---

## T

**T-cells** [3] - 1523:18, 1523:19, 1523:24
**table** [1] - 1503:16
**talks** [1] - 1472:23
**target** [8] - 1485:14, 1486:18, 1488:13, 1488:19, 1488:20,

1489:7, 1491:2, 1491:3
**targets** [6] - 1486:23, 1489:17, 1489:21, 1489:23, 1490:19, 1490:21
**teach** [1] - 1490:16
**team** [1] - 1505:25
**technologies** [1] - 1529:13
**technology** [9] - 1487:12, 1488:7, 1495:4, 1500:3, 1520:25, 1529:5, 1529:6, 1532:7, 1532:19
**term** [4] - 1475:20, 1496:16, 1502:18, 1504:20
**terms** [5] - 1482:13, 1496:16, 1503:11, 1535:11, 1542:14
**test** [2] - 1516:9, 1517:22
**tested** [5] - 1485:22, 1518:24, 1525:8, 1550:16, 1550:22
**testified** [24] - 1483:24, 1484:6, 1484:24, 1487:16, 1488:1, 1488:6, 1491:24, 1492:12, 1495:2, 1495:17, 1496:7, 1501:10, 1502:7, 1504:4, 1509:22, 1511:2, 1517:17, 1518:23, 1519:19, 1523:21, 1526:16, 1527:11, 1529:15, 1529:19
**testify** [12] - 1473:7, 1473:8, 1473:10, 1473:21, 1473:23, 1487:19, 1491:6, 1496:23, 1511:5, 1511:10, 1511:13, 1529:17
**testifying** [1] - 1501:9
**testimony** [26] - 1481:18, 1481:19, 1482:23, 1486:21, 1488:24, 1492:5, 1496:12, 1496:24, 1500:16, 1501:6, 1510:23, 1511:4, 1519:8, 1520:1, 1521:17, 1522:16, 1524:4, 1524:18, 1525:8, 1526:12, 1527:15, 1528:15,

1531:7, 1532:12, 1550:16
**text** [3] - 1520:13, 1549:12
**THE** [81] - 1470:1, 1471:12, 1472:11, 1472:17, 1472:20, 1473:15, 1474:6, 1474:10, 1474:15, 1474:17, 1474:20, 1474:22, 1474:23, 1474:24, 1475:1, 1501:3, 1504:7, 1504:10, 1506:2, 1531:20, 1531:23, 1532:11, 1534:21, 1535:17, 1535:21, 1535:24, 1536:1, 1536:2, 1536:17, 1536:20, 1536:24, 1536:25, 1537:4, 1537:19, 1537:21, 1538:1, 1538:6, 1539:14, 1539:18, 1541:2, 1541:9, 1541:11, 1541:16, 1541:21, 1542:1, 1542:13, 1542:20, 1542:22, 1543:18, 1544:5, 1544:7, 1544:10, 1544:11, 1544:14, 1544:17, 1544:21, 1544:23, 1544:25, 1545:10, 1545:18, 1545:21, 1545:22, 1545:23, 1546:4, 1546:6, 1546:11, 1546:14, 1546:17, 1546:19, 1547:5, 1547:10, 1547:12, 1547:14, 1547:22, 1548:5, 1548:8, 1548:20, 1548:22, 1548:24, 1551:16, 1551:19
**themselves** [1] - 1547:2
**THERAPEUTICS** [1] - 1467:5
**therapies** [2] - 1490:1, 1490:2
**therapy** [8] - 1489:6, 1490:23, 1497:15, 1498:17, 1499:17, 1499:18, 1504:19, 1511:12
**therefore** [2] - 1473:8, 1528:12
**Thereupon** [10] - 1474:25, 1537:2,

1542:21, 1544:20,
1546:18, 1547:13,
1548:7, 1548:23,
1551:17, 1552:3
**they've** [2] - 1473:23,
1525:16
**thick** [3] - 1476:1,
1515:14, 1515:16
**thinking** [1] - 1490:16
**third** [4] - 1487:3,
1513:25, 1518:18,
1534:4
**thousands** [6] -
1476:4, 1476:7,
1476:15, 1480:14,
1515:17
**three** [16] - 1482:1,
1485:11, 1487:3,
1500:15, 1509:25,
1510:24, 1510:25,
1514:7, 1522:7,
1528:1, 1531:16,
1532:6, 1534:1,
1534:3, 1538:25,
1541:20
**three-part** [1] - 1522:7
**throat** [1] - 1509:11
**thrust** [2] - 1512:7,
1522:23
**Thursday** [1] -
1467:15
**timing** [1] - 1494:18
**titled** [1] - 1552:7
**today** [9] - 1487:18,
1497:10, 1507:13,
1512:8, 1514:15,
1536:4, 1536:11,
1543:22, 1546:3
**together** [2] - 1479:22,
1536:5
**TOLLES** [1] - 1468:17
**tomorrow** [4] -
1548:10, 1549:1,
1551:10, 1551:11
**took** [6] - 1473:1,
1493:2, 1493:3,
1508:22, 1515:2,
1516:25
**top** [8] - 1485:6,
1501:10, 1513:9,
1513:20, 1513:21,
1513:24, 1521:6,
1523:4
**topic** [2] - 1481:14,
1490:7
**topics** [2] - 1490:9,
1493:10
**total** [3] - 1503:4,
1504:24, 1530:8
**touch** [1] - 1481:19

**touching** [1] - 1550:10
**town** [1] - 1526:24
**trade** [3] - 1486:7,
1487:5, 1493:25
**trained** [2] - 1520:24,
1534:3
**transcript** [2] - 1471:6,
1552:6
**TRANSCRIPT** [1] -
1467:12
**transcripts** [1] -
1467:25
**treat** [2] - 1507:9,
1525:20
**treatable** [1] - 1524:8
**treated** [9] - 1525:6,
1525:8, 1525:10,
1525:14, 1525:15,
1526:8, 1526:16,
1526:22
**treatment** [1] -
1525:16
**treatments** [1] -
1526:14
**trial** [23] - 1488:3,
1491:8, 1492:10,
1496:23, 1499:4,
1499:8, 1499:9,
1504:15, 1510:5,
1510:8, 1511:18,
1534:13, 1540:10,
1543:2, 1544:4,
1547:17, 1548:1,
1549:18, 1550:5,
1550:17, 1550:22,
1550:23, 1551:1
**TRIAL** [1] - 1467:13
**trials** [6] - 1499:21,
1526:17, 1526:18,
1526:19, 1526:20,
1526:24
**tried** [7] - 1477:6,
1484:15, 1484:23,
1484:25, 1485:2,
1486:4, 1493:4
**trouble** [1] - 1492:2
**true** [5] - 1481:13,
1506:15, 1509:15,
1510:10, 1539:8
**trust** [3] - 1510:4,
1516:8, 1534:16
**truth** [3] - 1506:10,
1526:1, 1550:16
**truthful** [1] - 1526:9
**try** [6] - 1501:19,
1509:6, 1522:20,
1534:25, 1550:1,
1551:22
**trying** [14] - 1478:7,
1491:25, 1493:19,

1494:6, 1507:16,
1512:14, 1518:4,
1518:11, 1522:7,
1526:3, 1526:23,
1527:15, 1530:5,
1530:14
**Ts** [6] - 1488:2,
1489:7, 1489:21,
1489:25, 1490:2,
1490:20
**Tuan** [1] - 1468:6
**tumor** [2] - 1489:12,
1490:23
**tumors** [2] - 1489:15,
1489:16
**turn** [5] - 1475:4,
1481:14, 1487:1,
1500:16, 1550:11
**turnaround** [1] -
1525:20
**turning** [1] - 1491:2
**Twitter** [1] - 1549:14
**two** [26] - 1472:21,
1473:16, 1473:17,
1473:20, 1481:21,
1485:25, 1487:3,
1488:10, 1490:15,
1492:25, 1498:6,
1498:7, 1499:5,
1502:21, 1503:7,
1504:1, 1504:3,
1506:14, 1507:3,
1513:23, 1525:9,
1527:8, 1527:24,
1528:13, 1529:25,
1545:19
**two-year** [2] - 1504:1,
1504:3
**type** [3] - 1479:12,
1497:5, 1527:5
**types** [5] - 1488:5,
1489:11, 1491:12,
1491:14, 1523:24
**typographical** [2] -
1479:13, 1515:9
**typos** [1] - 1479:23

## U

**U.S** [1] - 1467:3
**ultimately** [1] - 1492:3
**unanimous** [3] -
1510:25, 1545:3,
1546:23
**under** [8] - 1472:11,
1474:6, 1482:24,
1489:23, 1524:21,
1537:12, 1540:7,
1543:1
**undergraduate** [1] -

1533:10
**understandably** [1] -
1528:7
**understood** [1] -
1473:12
**United** [3] - 1506:25,
1512:12, 1533:4
**UNITED** [1] - 1467:1
**unpersuaded** [1] -
1510:21
**unprovoked** [2] -
1497:3, 1497:7
**untrue** [2] - 1538:8,
1538:18
**up** [24] - 1475:24,
1476:16, 1478:14,
1479:10, 1484:20,
1484:25, 1492:6,
1495:16, 1495:20,
1495:21, 1497:9,
1497:25, 1499:4,
1501:8, 1502:9,
1503:21, 1510:4,
1512:13, 1517:23,
1518:1, 1521:23,
1528:4, 1533:7,
1533:15
**upfront** [9] - 1502:17,
1505:1, 1505:20,
1506:23, 1506:24,
1507:2, 1507:3,
1530:13, 1530:16
**USC** [2] - 1470:5,
1470:11

## V

**validity** [2] - 1534:4,
1538:12
**valuable** [1] - 1502:6
**value** [4] - 1499:18,
1499:21, 1499:24,
1499:25
**variable** [4] - 1485:12,
1486:14, 1486:15,
1486:17
**various** [1] - 1539:13
**vast** [1] - 1525:25
**verbally** [1] - 1483:10
**verdict** [31] - 1499:8,
1504:21, 1505:1,
1534:24, 1535:8,
1535:12, 1539:21,
1539:25, 1540:3,
1540:6, 1540:16,
1540:25, 1541:3,
1541:4, 1541:11,
1541:16, 1541:24,
1542:3, 1542:4,
1542:5, 1542:7,

1542:24, 1542:25,
1543:4, 1543:12,
1543:18, 1543:21,
1543:22, 1548:6,
1550:20
**version** [4] - 1540:17,
1541:4, 1543:5,
1545:18
**versus** [1] - 1527:20,
1544:22, 1548:8
**Vesey** [1] - 1468:11
**via** [1] - 1549:12
**view** [2] - 1550:2,
1550:4
**viewed** [1] - 1500:4
**VIII** [1] - 1467:13
**Vincent** [1] - 1468:18
**violates** [1] - 1551:4
**virus** [1] - 1486:24
**visit** [1] - 1550:2
**voice** [1] - 1535:6
**VOLUME** [1] - 1467:13
**vs** [2] - 1467:7, 1470:1

## W

**W-I-L-L-I-A-M-S** [1] -
1536:1
**Wacker** [1] - 1468:14
**wait** [2] - 1529:7,
1548:6
**waiting** [2] - 1539:20,
1544:25
**waive** [1] - 1473:13
**waived** [1] - 1473:11
**wants** [6] - 1480:2,
1499:7, 1530:2,
1530:23, 1534:25,
1539:24
**watch** [1] - 1549:22
**watching** [1] -
1534:15
**ways** [2] - 1483:1,
1487:20
**weapon** [1] - 1497:14
**website** [1] - 1549:13
**week** [1] - 1532:20
**weigh** [1] - 1472:4
**weight** [1] - 1510:22
**Weinberger** [1] -
1468:19
**Weiss** [1] - 1468:8
**well-known** [1] -
1521:22
**Wells** [1] - 1468:5
**West** [2] - 1467:23,
1468:14
**WESTERN** [1] -
1467:2
**whatsoever** [1] -

1520:15
**whereas** [1] - 1523:22
**white** [2] - 1486:23, 1517:9
**whole** [3] - 1480:24, 1502:18, 1526:3
**willful** [8] - 1493:11, 1497:20, 1498:11, 1505:13, 1505:15, 1507:17, 1508:17, 1531:3
**willfully** [4] - 1471:17, 1498:22, 1505:16, 1537:11
**William** [1] - 1469:3
**Williams** [1] - 1536:1
**wish** [4] - 1481:16, 1545:6, 1546:15
**witnesses** [11] - 1473:7, 1473:21, 1473:22, 1500:18, 1509:25, 1528:16, 1531:5, 1532:22, 1550:8, 1550:15
**word** [3] - 1505:24, 1545:7, 1545:13
**words** [2] - 1483:13, 1486:16
**works** [1] - 1508:2
**world** [12] - 1500:1, 1502:19, 1519:10, 1519:19, 1520:8, 1529:10, 1530:15, 1530:19, 1533:5, 1533:6, 1533:10, 1533:22
**worry** [1] - 1505:2
**worth** [2] - 1498:2, 1532:17
**worthless** [1] - 1528:4
**wound** [1] - 1492:6
**writing** [1] - 1549:11
**written** [12] - 1479:21, 1481:21, 1481:23, 1484:12, 1505:13, 1507:19, 1520:22, 1521:2, 1531:15, 1538:23, 1539:11
**www. amydiazfedreporter .com** [1] - 1467:25

## Y

**year** [7] - 1493:20, 1499:4, 1502:25, 1504:1, 1504:3, 1525:11, 1530:6
**years** [27] - 1479:6, 1485:22, 1488:23,

1489:18, 1490:21, 1491:24, 1492:14, 1492:25, 1499:5, 1502:21, 1502:25, 1503:7, 1504:1, 1504:2, 1506:14, 1507:3, 1507:7, 1508:23, 1511:25, 1514:25, 1520:20, 1521:20, 1525:9, 1528:1, 1530:1, 1533:18
**yelled** [1] - 1509:11
**yellow** [1] - 1485:9
**YESCARTA** [11] - 1486:12, 1486:25, 1503:19, 1503:25, 1518:25, 1524:8, 1524:24, 1526:6, 1526:8, 1526:15, 1532:16
**YESCARTA's** [1] - 1529:22
**yesterday** [14] - 1475:6, 1475:13, 1476:8, 1495:9, 1507:13, 1509:5, 1511:19, 1514:20, 1517:22, 1521:11, 1522:3, 1537:17, 1537:19, 1540:4
**York** [2] - 1468:12
**young** [2] - 1544:14, 1545:23
**Young** [1] - 1468:20
**YOUNG** [4] - 1544:15, 1545:24, 1546:5, 1546:8
**yourself** [2] - 1520:21, 1536:8
**YouTube** [1] - 1549:14