1                     UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5

6    JUNO THERAPEUTICS, INC., et al., )
                                      )
7             Plaintiffs,             )
                                      )
              vs.                     )
8                                     )   2:17-CV-7639-SJO
     KITE PHARMA, INC.,               )
9                                     )
              Defendant.              )
10   _____)

11

12

13               REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                      JURY TRIAL VOLUME V

15                   Los Angeles, California

16                   Monday, December 9, 2019

17

18

19        _____

20

21

22                  AMY DIAZ, RPR, CRR, FCRR
                    Federal Official Reporter
23                  350 West 1st Street, #4455
                    Los Angeles, CA 90012

24

25              Please order court transcripts here:
                    www.amydiazfedreporter.com

1     APPEARANCES OF COUNSEL:

2

      For the Plaintiffs:

3

4                     IRELL & MANELLA LLP
                      By:  Morgan Chu, Attorney at Law
5                          Alan Heinrich, Attorney at Law
                           Crawford Maclain Wells, Attorney at Law
6                          Elizabeth Tuan, Attorney at Law
                      1800 Avenue of the Stars, Suite 900
7                     Los Angeles, California 90067

8                     JONES DAY
                      By:  Andrea Weiss Jeffries, Attorney at Law
9                     555 South Flower Street, 50th Floor
                      Los Angeles, California 90071
10
                      JONES DAY
11                    By:  Sarah Geers, Attorney at Law
                      250 Vesey Street
12                    New York, New York 10281

13                    JONES DAY
                      By:  John Michalik, Attorney at Law
14                    77 West Wacker
                      Chicago, Illinois 60601
15

16
      For Defendant:
17
                      MUNGER TOLLES & OLSON LLP
18                    By:  Garth Vincent, Attorney at Law
                           Edward Dane, Attorney at Law
19                         Jeffrey Weinberger, Attorney at Law
                           Peter Gratzinger, Attorney at Law
20                         Blanca Young, Attorney at Law
                      355 South Grand Avenue, 35th Floor
21                    Los Angeles, California 90071

22

23

24

25

1        Appearances continued:

2

3                    FISH & RICHARDSON
                     By:  William Shear, Attorney at Law
                     12390 El Camino Real
4                    San Diego, California 92130

5                    FISH & RICHARDSON
                     By:  John Farrell, Attorney at Law
6                    500 Arguello Street, Suite 500
                     Redwood City, California 94063

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT:  We are back on the record on Juno v.
 2       Kite.  We have Dr. Sullivan in the witness chair and all
 3       counsel present and the parties.
 4                    We are about to bring the jury out.  I understand
 5       there is a matter that the lawyers wish to address before the
 6       jury is brought out; is that correct?
 7                    MS. JEFFRIES:  Yes, Your Honor.
 8                    THE COURT:  Go ahead.
 9                    MS. JEFFRIES:  Your Honor, shortly -- I believe
10       immediately following Dr. Sullivan's testimony, which we
11       anticipate will be concluded very shortly here, the defendant
12       intends to play some deposition testimony.  We have
13       objections to each of the -- some objections to each of the
14       deponents.
15                    With respect to the first one, I believe they intend
16       to play Marina Larson, MSK's patent attorney.  We filed
17       objections to exclude that testimony as irrelevant and
18       prejudicial under 402 and 403.
19                    And then we also had objections to certain
20       components of the other two deponents who Kite intends to
21       play.
22                    THE COURT:  Okay.  Who wishes to address the issue
23       regarding Ms. Larson?
24                    MS. JEFFRIES:  And for Your Honor's reference, the
25       document we filed with respect to the Larson deposition is
```

1          Document 487, which sets forth our objections.

2                    THE COURT:  Yes.  Go ahead, Ms. Young.

3                    MS. YOUNG:  Good morning, Your Honor.

4               We are requesting to play about three minutes of Dr.

5     Larson's deposition testimony.  She's the patent prosecutor

6     who filed the certificate of correction.  And an important

7     issue in this case is that the error was not the fault of the

8     Patent and Trademark Office, and she establishes that fact,

9     which brings this case within the legal framework of Section

10    255.

11              And she also was a witness who had direct contact

12    with the people at Sloan Kettering, who are people of skill

13    in the art.  And she will testify in the deposition

14    designations that no one brought this issue to her attention

15    when she was prosecuting the patent.  And of course the care

16    with which the plaintiffs have handled a patent that they

17    claim is so extremely important is at issue in this case, and

18    her testimony is relevant to that.

19              In addition, she has a statement at the end of her

20    testimony that she had no idea whatsoever about why the error

21    came to people's attention in 2013.  And that is relevant to

22    show that this error actually is a much bigger deal than the

23    plaintiffs are making it out to be.

24              We heard Tom Schuetz testify that he had a

25    conversation with Marina Larson in which she told him to go

1    have a glass of wine after the error was discovered.

2            So for all of those reasons, this should come in.

3    That is the -- the objection that the plaintiff has made is

4    that she is not a person of skill in the art.  That will be

5    very clear to the jury.  The very first part of her testimony

6    says as much.

7            THE COURT:  I have reviewed Exhibit 1, which is the

8    pertinent portions of Ms. Larson's testimony that the

9    defendant wishes to read.  The Court is going to overrule the

10   objection and allow the testimony to be read to the jury.  It

11   certainly adds background and context as to how the error

12   occurred.  And it's important to the case.

13           MS. YOUNG:  Thank you, Your Honor.

14           MS. JEFFRIES:  All right.  Thank you, Your Honor.

15           We call --

16           THE COURT:  Let me put Ms. Larson -- let's see.

17   Yes.

18           MS. JEFFRIES:  And then, Your Honor, with respect to

19   the two other witnesses, my colleague, John Michalik, will

20   address those.

21           MR. MICHALIK:  Good morning, Your Honor.  John

22   Michalik on behalf of the plaintiffs.  This is the paper that

23   was filed this morning regarding Dr. Brentjens and the

24   Frohlich testimony that is being designated for play today.

25           In terms of the Brentjens testimony, we have

1    objections to only a few short passages that are, in the

2    first instance, speculative where the testimony is being

3    offered.  In a pleading last week, the plaintiffs -- or that

4    Kite identified Dr. Brentjens as relevant to 112 issues, but

5    the testimony that is being proffered is not for 112

6    purposes, and is, in fact, admittedly speculative in his own

7    testimony.  And we think that that is irrelevant.

8              And then the second set of testimony -- second

9    passage of testimony identified in our paper this morning

10   gets into questions about fatal toxicities, which we think

11   crosses the line on your ruling on the MIL earlier in the

12   case regarding the JCAR015 deaths issue.

13             THE COURT:  So let's -- I guess, let's start with --

14             MR. MICHALIK:  Your Honor, one thing I should add is

15   that Dr. --

16             THE COURT:  Let's start with Brentjens.  So as I

17   understand it, the -- let's see.  So in reference to

18   Brentjens again, your objection?

19             MR. MICHALIK:  Yes.  He is -- the testimony being

20   offered at passages 219, line 23, to 220, line 04, and 220,

21   line 07, to 222, line 12 are speculative.  It's about matters

22   related to Juno, and Dr. Brentjens lacks personal knowledge

23   of those.  He's not a Juno employee and never was.  He's an

24   inventor on the '190 patent.  And the testimony being offered

25   is about Juno's work on JCAR015.

1          And the second passage beginning at -- my apologies.

2     The previous passage was 220, line 07, to 221, line 11.  And

3     then beginning at 220, line 12, through 223, line 16 are

4     questions related that were asked by counsel regarding fatal

5     toxicities, which gets into the JCAR015 deaths MIL.

6          THE COURT:  Mr. Dane?

7          MR. DANE:  Thank you, Your Honor.

8          The reason for the designation of this portion of

9     the testimony is simply for the purpose of establishing the

10    importance of manufacturing with regard to the success of a

11    CAR-T therapy.

12         In this testimony, Dr. Brentjens is noting that the

13    production can have significant effect on whether there might

14    be problems such as toxicities.  And given that it has been a

15    major issue in this case as to how important is the construct

16    by itself, how important is the way that it's made, we think

17    that this is relevant testimony for that reason.

18         With regard to the term "fatal toxicities," that

19    does not run afoul of the Court's MIL.  We've had questioning

20    like that in the trial already.  These were fatal toxicities.

21    There's no pejorative language; there is nothing like

22    "killing people" or the things that the Court said should be

23    removed.

24         One proposal I would make, Your Honor, to minimize

25    this -- the amount of this testimony, would be we could -- we

1      could cut the testimony so that it begins only at page 222 at

2      6 through 223, 16.  That gets across the point I was making

3      about Dr. Brentjens saying that how you produce these cells

4      can be very important, and it eliminates some of his more

5      expansive earlier testimony.

6            THE COURT:  So you would propose reading 222 at 6

7      through 223 at 16?

8            MR. DANE:  Yes, Your Honor.

9            THE COURT:  Counsel wish to be heard on that

10     request?

11           MR. MICHALIK:  The question beginning at 222, line 6

12     still has the question about fatal toxicities, so it

13     raises -- introduces the same issue raised in our motion.

14           THE COURT:  Okay.  The objection is going to be

15     overruled.

16           MR. MICHALIK:  Your Honor, we had one other item

17     related to that filing this morning regarding exhibits.  I

18     don't know if you want to take them up now or as plaintiffs

19     seek to introduce them through the testimony.

20           MR. DANE:  Your Honor, on that, I haven't had a

21     chance to talk with Mr. Michalik.

22              As to two of the objections as to two of the

23     exhibits, I can make that very easy.  DX826 and DX1739, we

24     will not attempt to offer either of those exhibits at this

25     time through these witnesses.

```
1          The only other objection is with regard to the

2     LinkedIn profile of Mr. Frohlich.  The reason -- I'll just

3     explain, Your Honor, the reason we wanted to put that in.  In

4     a case like this where there are such serious limitations on

5     time and, in my past experience, counsel have been

6     accommodating when there is a noncontroversial-type of

7     exhibit, that you can get it into evidence, and you don't

8     have to spend time laying foundation, because that obviously

9     takes up testimony time and that's at a premium.

10         So the reason we were designating that is it is

11    Mr. Frohlich's LinkedIn profile, and we thought it was

12    noncontroversial, just so that his educational background and

13    training and his titles are before the jury.

14         THE COURT:  And he's the former VP of strategy for

15    Juno; is that correct?

16         MR. DANE:  That's my understanding, Your Honor.

17         THE COURT:  Any objection to the LinkedIn?

18         MR. MICHALIK:  Your Honor, he was -- the exhibit is

19    being offered in response to counter-designation testimony

20    that we've introduced that says he doesn't know the substance

21    of the testimony -- know much about the science or the

22    testimony that he is testifying about or that they have

23    designated.

24         And so what they're trying to do is overcome our

25    counter-designations without taking the time to lay the
```

1          foundation for the exhibit they want to introduce.

2                    THE COURT:  Okay.  I guess the designations

3          regarding Frohlich can be read, the exhibit itself.  The

4          Court will sustain the objection.

5                    Have we covered all of the ones that we need to

6          cover before we bring the jury out?

7                    MR. MICHALIK:  Thank you, Your Honor.  That's it for

8          the filing this morning.

9                    MR. DANE:  The only thing, Your Honor, on that, is

10         what we have been hoping to avoid through just putting in a

11         noncontroversial document.  But we had earlier made some

12         designations from Mr. Frohlich which would lay the foundation

13         for his expertise and background.

14                    So we would -- and the plaintiffs are aware of those

15         designations, and we would just put them back into what we

16         play from him.

17                    THE COURT:  Request will be granted.

18                    MR. HEINRICH:  One last matter, Your Honor.  We

19         filed a request --

20                    MR. MICHALIK:  We withdraw our objection to the

21         exhibit if they lay the foundation, Your Honor.

22                    THE COURT:  Okay.  Then thank you.

23                    MR. HEINRICH:  So we filed a request this morning --

24         it's Document 523 -- to read a portion of defendant's damages

25         contentions.  We don't -- I don't think we need to do this

1    now, but I just wanted to raise that.

2              THE COURT:  Okay.  Let's hold off on that.  And

3    let's get the jury going.

4              THE CLERK:  Ready, Your Honor?

5              THE COURT:  Yes.

6              THE CLERK:  Okay.  All rise for the jury, please.

7              (Thereupon, the jury returned to the courtroom.)

8              THE COURT:  We have our jury reassembled, and we

9    have counsel present.  And we are back on the record in Juno

10   v. Kite.

11             You can imagine, over the weekend, there were

12   several additional issues presented to the Court, so we were

13   using this morning to address those new issues that have been

14   presented.

15             That being said, the lawyers for both sides have

16   been extremely professional in terms of alerting the Court as

17   to when issues are going to be presented.  It's a complex

18   case, and this is expected.  And with that, please have a

19   seat.

20             THE CLERK:  Good morning, sir.

21             Sir, for the record, you are reminded you are still

22   under oath.  Please state your name and spell your last name.

23             THE WITNESS:  Ryan Sullivan, S-u-l-l-i-v-a-n.

24             THE CLERK:  Thank you, sir.

25             THE COURT:  Your witness.

SULLIVAN - CROSS

1           MR. WEINBERGER:  Thank you, Your Honor.

2           I'll be brief, but may I have a document handed up

3    to the witness and to the clerk and to opposing counsel?

4           THE COURT:  Yes, please.

5           Is it in the exhibit list?

6           MR. WEINBERGER:  Yes, Your Honor.  It's DX43.

7                CROSS-EXAMINATION (continued)

8    BY MR. WEINBERGER:

9     Q. Dr. Sullivan, you testified on Friday that Juno had

10   licensed a patent to Novartis which it had obtained from

11   St. Jude somewhat earlier.

12          You recall that?

13    A. Yes, I do.

14    Q. And could you look at DX43 and tell me if this document

15   is the patent that was the subject of those licenses.

16    A. Yes.

17    Q. Okay.

18          MR. WEINBERGER:  Nothing further -- oh, we would

19   move the admission of DX43 into evidence, Your Honor.

20          MR. HEINRICH:  No objection.

21          THE COURT:  DX43 is received.

22          (DX43 received in evidence.)

23          That's it?

24          MR. WEINBERGER:  That's it, Your Honor.

25          THE COURT:  Okay.  Thank you.

SULLIVAN - REDIRECT

1           Redirect.

2               MR. HEINRICH:  Good morning, ladies and gentlemen.

3                       REDIRECT-EXAMINATION

4      BY MR HEINRICH:

5       Q. Good morning, Dr. Sullivan.

6               So Dr. Sullivan, during your cross-examination on

7      Friday, counsel showed you a slide with a few of the license

8      agreements you considered as part of your analysis in that

9      case -- in this case.

10              Do you recall that?

11      A. Yes, I do.

12      Q. And counsel suggested that your rate was sort of out of

13     line with the rates in those three other agreements?

14      A. Yes, that was a suggestion.

15              MR. HEINRICH:  So could we please pull up --

16      Q. So I would like to ask you to explain why you are

17     proposing a higher rate in the Juno/Kite hypothetical license

18     than in the first three license agreements we see here.

19      A. Yes.  So the primary agreement here for the starting

20     point of the market approach is the Sloan Kettering/Juno

21     agreement.  This is the agreement for the very technology

22     that is at issue here, the '190 Sadelain patent.  It was

23     between collaborators and specified a royalty rate of

24     7.25 percent.

25              Both Kite's expert, Dr. Rao, and myself, we both

SULLIVAN - REDIRECT

1    agree that that is the appropriate starting point.  And we

2    both agree that there should be upward adjustments to that

3    royalty rate.  And, in fact, because the agreement specifies

4    that 7.25 percent would be payable to Sloan Kettering, any

5    rate below 7.25 percent would mean that Juno would be losing

6    money by licensing the '190 patent to Kite.

7            The second agreement, the St. Jude Children's

8    Research Hospital agreement, specifies a royalty rate of

9    2.5 percent.  But this agreement was at very early stages,

10   with a research institution, not with a competitor.  And it

11   also was at an earlier stage, such that there were no

12   clinical trials performed by St. Jude in contrast to Sloan

13   Kettering who had already been performing clinical trials

14   with regards to the Sadelain construct.

15           The Juno/Novartis agreement specifies a rate of

16   4.75 percent.  This is also at relatively early stages.  And

17   importantly, it is a settlement of litigation.  That means

18   it's a compromise.  In contrast, at the hypothetical

19   negotiation, we are required to assume that both parties --

20   all of the parties to the hypothetical negotiation assume and

21   believe that the patent is valid and infringed.

22           And that's very different than what was occurring

23   with the Novartis settlement.

24           And finally, at the hypothetical negotiation.  This

25   occurs at a time when there is a fully commercialized

SULLIVAN - REDIRECT

1    product.  It's going to be launched into the marketplace

2    right in the space of 3LDLBCL, which is the same indication

3    for the lead product candidate for Juno.

4     Q. Now, counsel also asked you some questions on Friday

5    about the success payments in the Juno/MSK agreement.  Why

6    did you value those success payments at the hypothetical

7    negotiation based on increases in Kite's stock?

8     A. The success payments are fundamental to the agreement.

9    They are what allowed the agreement to be entered into

10   between Sloan Kettering and Juno.

11          As an economist, I perform my work in the context of

12   the law.  And the statute provides that the reasonable

13   royalty is compensation for the infringer's use of the

14   technology.  So that's for Kite's use of the technology.

15          And here, the use of the '190 Sadelain construct is

16   what allowed Kite to commercialize their product to obtain a

17   first-mover advantage and, as a result, be able to have the

18   increase and the value of their company that they did.

19          And in fact, the valuation that Gilead placed on

20   YESCARTA alone -- the amount of $6.2 billion that we were

21   referencing last week -- that amount alone is more than

22   sufficient to trigger the full $150 million success payment,

23   which requires a 30-fold increase in stock value.

24          And just YESCARTA alone satisfies that requirement.

25    Q. So Dr. Sullivan, can you remind the jury what your

SULLIVAN - REDIRECT

1    damages opinion is?

2     A. Yes.  So I determined that the upfront payment would be

3    $585 million.  This amount itself is less than what Kite

4    projected the value for just the first-mover advantage. And

5    in that sense, I view that as reasonable.

6              Secondly, I determined that an appropriate royalty

7    rate is 27.6 percent.  This is far less than the profit

8    margins that were projected by Kite just before the

9    hypothetical negotiation where they used those projections to

10   determine whether or not to be acquired.  This was from their

11   Project Gold analysis.

12             Importantly, those profit margins are for YESCARTA

13   specifically, not for the company as a whole.  And the reason

14   that's important is that there are other profit margins that

15   are lower than the -- those that are in Project Gold; but

16   those reflect other products, failed products, failed

17   alternatives, and attempts.  So those would not be as

18   relevant.

19             When applying the 27.6 percent to the sales base,

20   that provides running royalties of 167 million.  Putting the

21   upfront together with running royalties results in an overall

22   reasonable royalty of $752 million.

23    Q. And why is that reasonable?

24    A. Although it is a lot of money, in my view it is

25   conservative.  As part of the statute, the reasonable royalty

SULLIVAN - REDIRECT

1    is the floor.  As you may recall, damages should be no less

2    than a reasonable royalty.

3            Here, at the hypothetical negotiation, Kite had

4    already expended all of its options to avoid licensing the

5    patent.  The patent and YESCARTA was projected, just during

6    the life of the patent, to have profits that would be in

7    excess of $7 billion.  The valuation that Gilead placed on

8    YESCARTA was $6.2 billion.  And the '190 Sadelain construct

9    was, and is, the basis for all of Kite's pipeline and all of

10   their CAR-T business.

11           MR. HEINRICH:  Thank you very much, Mr. Sullivan.

12           THE COURT:  Thank you, Mr. Heinrich.

13           Mr. Weinberger?

14           MR. WEINBERGER:  No questions.

15           THE COURT:  Thank you, Dr. Sullivan.

16           THE WITNESS:  Thank you.

17           THE COURT:  Next?  Do we have additional witnesses

18   or testimony to be played?

19           MR. HEINRICH:  We do not have additional witnesses

20   at this time, Your Honor.

21           THE COURT:  Defense?

22           MS. YOUNG:  Your Honor, we would call our first

23   witness, Krishna Komanduri.  Dr. Krishna Komanduri.

24           THE COURT:  So has the plaintiff rested?

25           MR. CHU:  No, Your Honor.  For example, as an

KOMANDURI - DIRECT

1    accommodation to the defense side, we moved a witness -- or

2    two witnesses to the rebuttal part of our case, and there are

3    a few other loose ends.  So that's why we haven't rested.

4              THE COURT:  Okay.  Thank you.

5              THE CLERK:  Good morning, sir.  Would you please

6    come forward.

7              THE WITNESS:  Yes.

8              THE CLERK:  Please stop there and raise your right

9    hand to be sworn.

10             THEREUPON:  DR. KRISHNA KOMANDURI,

11              Called in these proceedings and being first duly

12   sworn testifies as follows:

13             THE CLERK:  Thank you, sir.  Would you please be

14   seated.

15             Sir, for the record, would you please state your

16   name and then spell your last name.

17             THE WITNESS:  Sure.  My first name is Krishna.  And

18   the last name is Komanduri, K-o-m-a-n-d-u-r-i.

19             THE CLERK:  Thank you.

20                       DIRECT EXAMINATION

21   BY MS. YOUNG:

22    Q. Good morning, Dr. Komanduri.

23    A. Good morning.

24    Q. Dr. Komanduri, please tell the jury what you do for a

25    living.

KOMANDURI - DIRECT

1    A. Sure.  I'm professor of medicine and chief of the

2    division of transplantation and cellular therapy at the

3    University of Miami Sylvester Cancer Center.

4    Q. So do you treat cancer patients?

5    A. I do.  I treat cancer patients myself, and I'm

6    responsible for all of the aspects of a program that does

7    stem cell transplants, bone marrow transplants, and cellular

8    immunotherapy for cancer patients.

9    Q. Do you also do research in the field?

10    A. I do.  I've been doing clinical research, and I have a

11    laboratory that does T-cell immunology for more than

12    20 years.

13    Q. Over the course of your career, how many cancer patients

14    have you treated?

15    A. It's certainly thousands with blood cancers, which we've

16    heard about or are the subject of the discussion today.  I've

17    also treated many hundreds of patients with lymphomas,

18    including diffuse large B-cell lymphoma.

19    Q. And have you treated patients with CAR-T cell therapies?

20    A. I have.  Our site at the University of Miami was one of

21    the leading contributors to patients in the ZUMA-1 trial that

22    led to the FDA approval of YESCARTA.

23    Q. And we've also heard about Kymriah, made by Novartis.

24         Have you treated patients or has your center treated

25    patients with Kymriah?

KOMANDURI - DIRECT

1     A. I have.  And our center does treat patients with Kymriah

2     as well.

3     Q. Have you published about CAR-T cell therapies?

4     A. I have.  I've published a number of articles, and I was a

5     coauthor on the *New England Journal of Medicine* study that

6     reported the results of the ZUMA-1 trial which led to the

7     approval of YESCARTA.

8     Q. Is the *New England Journal of Medicine* an important

9     journal in your field?

10    A. Yes.  Some would say it's the most important clinical

11    journal.

12    Q. And have you acted as a scientific advisor to companies

13    that are developing CAR-T cell therapies?

14    A. I have.  Due to my long clinical, scientific expertise, I

15    have been asked to act as an advisor to Kite, to Novartis, to

16    Juno, and to other companies that are developing novel

17    therapies.

18    Q. And have you testified in court before?

19    A. Never.

20         MS. YOUNG:  We would move PX0870 into evidence.

21    It's his biographical sketch.

22         THE COURT:  Is it PX or DX?

23         MS. YOUNG:  PX.

24         THE COURT:  It's received.

25         (PX0870 received in evidence.)

KOMANDURI - DIRECT

1          MS. YOUNG:  And if we could publish that, please.

2     Q. Is this a biographical sketch that has more detail about

3     your professional and educational background?

4     A. Yes, it is.

5     Q. Now, Dr. Komanduri, what disease is YESCARTA used to

6     treat?

7     A. So as we've heard, it's used to treat lymphoma -- which

8     is a cancer of the lymph nodes -- and in particular, diffuse

9     large B-cell lymphoma, which is a lymphoma for which about

10    25,000 people in the United States are diagnosed with each

11    year.

12    Q. Is that an aggressive form of the disease?

13    A. It is.  It's one of the most aggressive forms of

14    lymphoma.

15    Q. Now, prior to CAR-T cell therapies, what was the standard

16    of care for treating patients with this disease?

17    A. So as we've heard, the standard of care at initial

18    diagnosis is combinations of chemotherapy -- typically four

19    drugs -- along with an antibody therapy.

20          And fortunately, 40 to 80 percent of the patients,

21    depending on risk factors, can actually be cured with that

22    therapy.  But a large fraction of those patients can relapse.

23    And in which case they receive what we've heard is called

24    salvage therapy, which typically means kind of cocktails of

25    other chemotherapy drugs.  Sometimes radiation to shrink the

KOMANDURI - DIRECT

 1   disease locally.

 2          Patients who respond to salvage therapy very often

 3   then need high doses of chemotherapy and what we call a stem

 4   cell or bone marrow transplant.

 5   Q. What does the outlook look like for patients like that?

 6   A. So if you respond to all those things, things can be

 7   decent.  But if you fail to respond -- that is, you relapse

 8   after successful initial therapy or you don't respond at

 9   all -- you fall into a category called relapsed or refractory

10   lymphoma, which we have heard is the subject of how these

11   therapies are applied.  And for those patients, the prognosis

12   is really dismal.

13   Q. And have you prepared some slides to help illustrate your

14   testimony?

15   A. I have.  And --

16   Q. Let's take a look at your first slide.

17          MS. YOUNG:  Will you pull that up, Mr. Bales.

18   A. Yes, so this slide demonstrates, really, what happens if

19   you have relapsed or refractory lymphoma and you are now

20   exposed to what we call salvage therapy.  Typically less than

21   one in 16 patients will have what we call a complete

22   response.  And a complete response means that the disease

23   becomes undetectable in the body; that they are in -- that

24   their disease goes completely away, at least for a time.

25          If you don't have a complete response to salvage

KOMANDURI - DIRECT

1    therapy, almost all of those patients will die, and typically

2    in weeks or months.

3                THE COURT:  And if you could just identify the

4    exhibits.

5                MS. YOUNG:  Yes, this is --

6                THE COURT:  105?

7                MS. YOUNG:  -- defense demonstrative 105.

8                THE COURT:  Thank you.

9                MS. YOUNG:  And we'll move to defense demonstrative

10   106.

11   Q. So has YESCARTA improved outcomes for these patients?

12   A. Yes.  For a match group of patients similar to the ones

13   on the slide beforehand, the complete response is -- in the

14   ZUMA-1 trial, were really remarkable.  More than half of

15   patients had a complete response.

16               So rather than, you know, less than one in 16, more

17   than one in two patients had their disease go completely

18   away.  And importantly, most of those patients are actually

19   cured with YESCARTA.

20   Q. And you have been talking about results from the ZUMA-1

21   clinical trial.  Based on your experience, are results in the

22   real world similar?

23   A. Yes.  And that is important, because many times in

24   clinical trials a selected group of patients is treated.  And

25   as you move to clinical approvals, you'll often have many

KOMANDURI - DIRECT

1    individuals who wouldn't have qualified for the trials, and

2    results drop off.

3           But I think -- I don't want to say to our surprise,

4    but we are very fortunate that despite the fact that half of

5    the patients being treated now would not have qualified for

6    the ZUMA-1 trial, the response rates and complete response

7    rates are really about the same.

8    Q. Now, we've heard about some potentially serious side

9    effects with YESCARTA.

10          Can those be managed?

11   A. In the vast majority of patients, they can.  And with

12   interventions like the drug tocilizumab that we've heard

13   about, those responses can -- or those interventions can

14   cause patients to return to normal within days, or typically

15   a week or two.

16   Q. Doctor, in your opinion do the benefits of YESCARTA

17   outweigh the risks?

18   A. Absolutely, given the terrible prognosis of these

19   patients before CAR-T therapies.

20   Q. Now, as a cancer doctor, what do you see as the factors

21   that drive YESCARTA's therapeutic value?

22   A. So I think the most important thing for all of us is

23   efficacy; how well does the therapy work and is it safe

24   enough in that context, given the terrible prognosis that

25   these patients have.

KOMANDURI - DIRECT

1          But beyond that, manufacturing is a critical factor

2     because we have to have a product to be able to treat the

3     patient.  And there are two aspects of manufacturing that are

4     critical.

5     Q. And let's go to your next slide, DDX111.

6          What are those two aspects?

7     A. So the critical factors, in my view, are the speed and

8     the success rate of manufacturing.  As we've talked about,

9     these are patients with a very poor prognosis and an

10    aggressive disease that can increase over days.  And

11    therefore, we want, when we collect cells from a patient, to

12    receive cells to be available back to the center for

13    potential infusion very quickly.

14         The second thing, of course, is that if we collect

15    cells from a patient and intend to use the therapy, we want

16    to know that we're going to get a product back.  And that is

17    the success rate referred to on the right of this slide.

18    Q. Do you know whether others in your field share your views

19    about the importance of speed and success rate?

20         MR. HEINRICH:  Objection, hearsay.

21         THE COURT:  Overruled.

22         THE WITNESS:  So as an expert participating in

23    multiple discussions, it's my view that both speed and

24    success rate are critical.  It's shared by experts, and it's

25    something that all of the companies I have advised in this

KOMANDURI - DIRECT

1      space are focused on.

2       Q. Let's go to your next slide, DDX112.

3           What has your experience been like with YESCARTA in

4      terms of how quickly and reliably Kite is able to turn the

5      product around?

6       A. So both in the clinical trial setting and the real world

7      setting, Kite is I think clearly the industry leader here.

8      This slide depicts what the turnaround time was in the ZUMA-1

9      study.  It was a median from the time that the cells were

10     collected from the patient and then manufactured and returned

11     back to the center, 17 days, which is actually very good.

12          And the manufacturing success rate I think surprised

13     us and was 99 percent in the context of the clinical trial.

14      Q. And in your experience, how does YESCARTA compare to

15     other CAR-T cell therapies in terms of how quickly and

16     successfully the product can be turned around?

17      A. It's very significantly better at this time.

18          MS. YOUNG:  We would now move PX1188 into evidence.

19     I believe there is no objection to it.

20          THE COURT:  Any objection?

21          MR. HEINRICH:  No objection.

22          THE COURT:  1188 is received.

23          (PX1188 received in evidence.)

24          MS. YOUNG:  Mr. Bales, can we please put that on the

25     screen?

KOMANDURI - DIRECT

1      Q. So have you seen recent data on turnaround times and

2      success rates for JCAR017, the product that Juno currently

3      has in development?

4      A. Yes.  The American Study of Hematology meeting, which is

5      the main scientific meeting for our field, is going on right

6      now.  And on Saturday, two days ago, one of my colleagues,

7      Dr. Jeremy Abramson, who's at Harvard, presented results of a

8      study where 342 patients were intended to be treated with

9      liso-cel, and liso-cel is the name for JCAR017 as it moves

10     toward potential approval.

11          What this abstract or scientific presentation shows

12     is that of the 342 patients that they intended to treat, 268

13     of those patients received the liso-cel product.  33 patients

14     did not receive liso-cel because they died, presumably prior

15     to the time that they could receive liso-cel.

16          It also illustrates that 24 of the 268 patients who

17     received liso-cel received what is termed a nonconforming

18     product, which means that it didn't meet the specification

19     that the manufacturer intended to reach.  And that's about

20     9 percent of the 268 patients.

21          It also states that in their optimized manufacturing

22     process, the median time from leukapheresis -- which is the

23     cell collection I talked about -- to cell availability was

24     24 days, or about a week longer than what we reported in the

25     ZUMA-1 study.

KOMANDURI - DIRECT

1    Q. So I want to shift gears a little bit and talk about

2    Kymriah, which is made by Novartis now.

3         Your center has treated patients with Kymriah; is

4    that right?

5    A. That's correct.

6    Q. And you mentioned you're a scientific advisor to

7    Novartis?

8    A. Yes.

9    Q. Do you consider Novartis to be serious about developing

10   and supplying CAR-T cell therapies?

11   A. Absolutely.

12   Q. Why is that?

13   A. Well, Novartis was actually a leading developer of cell

14   therapies.  They partnered initially with Dr. Carl June at

15   the University of Pennsylvania who's really a leading figure

16   in the field.  And they made a large agreement there.

17        They have had Phase I, Phase II, and Phase III

18   trials.  Importantly, they have received approval for Kymriah

19   in two indications:  In pediatric and young adult patients

20   with acute lymphoblastic leukemia and in diffuse large B-cell

21   lymphoma, the same indication that we discussed that YESCARTA

22   has approved.

23        And they continue to be I think a very formidable

24   force.  They are a very large company with a deep commitment

25   to cell therapy.

KOMANDURI - DIRECT

1    Q. Were they perceived as serious about CAR-T cell therapy

2    in October of 2017?

3    A. Yes.

4    Q. Were they perceived as serious about CAR-T cell therapy

5    in April of 2015?

6    A. Yes.

7    Q. Now, we've heard a little bit in this trial about

8    something called a first-mover or even a second-mover

9    advantage.

10          How much does it matter to you, as a physician,

11   which therapy is on the market first?

12   A. So to me, it does not matter.  So --

13   Q. Why not?

14   A. So cell therapy is a completely different field, as we've

15   heard multiple times.  And in my experience, with more than

16   20 years of cell therapy experience, therapies that can be

17   replaced by either a safe or a more effective therapy will be

18   replaced.

19          For example, we stopped doing autologous transplants

20   for some patients for whom now CAR-T cell therapies are

21   better.  So we're always looking for the most efficacious or

22   safe products.

23          So I think that for a number of reasons, what we

24   want are -- you know, is not the first product in the field

25   but the best option for our patients who will gladly move to

KOMANDURI - DIRECT

1    another therapy if it exists.

2    Q. Do you know if others in the field share your view?

3    A. Yes.  I've had this discussion with others.  And, again,

4    I think it's commonly perceived that we will do what's best

5    for our patients.

6         MS. YOUNG:  Can we please put up DDX123?  And move

7    over to there.

8    Q. Is there a shortage of patients for CAR-T cell therapies?

9    A. Sadly, no.  As I mentioned in the beginning, 25,000

10   patients get diagnosed with diffuse large B-cell lymphoma

11   each year.  About 8,000 of those patients have unfortunately

12   relapsed or refractory disease.  And we've heard that Kite's

13   forecasted numbers of patients treated is less than 1800

14   patients over two years; so around 900 patients, again, a

15   year.

16        So Kite's manufacturing capacity, as I understand it

17   through my preparation for this trial, is about 4,000 doses a

18   year.  So that means that even if Kite were to fill each of

19   its manufacturing slots, there would still be 4,000 patients

20   that it could not treat each year.

21   Q. Are there any benefits that a company might enjoy by

22   coming to market later?

23   A. Surprisingly, yes.  So I think that we've heard that this

24   is a dramatic and different new therapy that required all

25   kinds of different approaches.

KOMANDURI - DIRECT

1    For example, we had to educate all of our staff,

2    nurses, and physicians about how to manage this completely

3    new therapy.  We had to develop cellular therapy.  We had to

4    collect cells that go off to a manufacturer, which is

5    unusual, and come back.  We had to deal with all the

6    regulatory aspects.  And there are a number of other issues,

7    including financial issues, that were completely new to the

8    field because this was the first cell therapy approved for

9    lymphoma.

10    So Kite had to work with all of us to prepare our

11    centers for, you know, delivering this very complex therapy

12    in the real world.  And the analogy that I've used is it's a

13    bit like they had to build a highway.  And now that they have

14    built it and our centers are safely administering this

15    therapy to a large number of patients, others can come in

16    with doing less work and more rapidly onboard our sites.

17    Q. In the FDA approves Juno's JCAR017 product, will you

18    onboard it to your cancer center?

19    A. Absolutely.  In fact, we are already working together

20    with Celgene, the parent of Juno, to deliver this therapy if

21    and when it becomes available.  And I -- we will onboard any

22    approved cell therapy, because we want the most options for

23    our patients.

24    Q. Are doctors more or less open to using CAR-T cell

25    therapies since YESCARTA has been on the market?

KOMANDURI - DIRECT

1      A. I believe that they're more open to using CAR-T cell

2      therapies.  As we've heard, and in my career, immunotherapy

3      was always something that we viewed as a pipe dream.  In

4      2015, we had had case reports that were dramatic case reports

5      that gave us some optimism; but no one knew if, in a large

6      clinical trial across sites, this could really be done.

7              And when these multicenter sites opened and trials

8      opened, we had optimism, but we didn't know if it was

9      possible.

10             As we've heard, many of us who were involved in the

11     ROCKET trial and in the field, when that trial, you know, hit

12     the difficulties that it did and was closed, we wondered if

13     these therapies, which we hoped would be very promising,

14     would actually reach patients.

15             Fortunately, roughly a year later, we had the

16     success of the ZUMA-1 trial.  We also had the success of the

17     JULIET trial by Novartis, and that led to the new England

18     Journal of Medicine papers of both studies and the FDA

19     approvals.  And then all of us recognized that this is a

20     therapy that could fulfill the hope that we hoped it would of

21     providing a novel and completely different way of treating

22     cancers.

23     Q. Doctor, if you were unable to offer YESCARTA to patients,

24     what effect would that have?

25     A. So I told you that this is a therapy with -- you know,

KOMANDURI - CROSS

1     that's used in patients with a very dismal prognosis.  If I

2     could not use YESCARTA in patients with lymphoma, there

3     simply would be more deaths due to this terrible disease.

4              MS. YOUNG:  Thank you.  I have nothing further.

5              THE COURT:  Thank you, Ms. Young.

6              Mr. Heinrich?

7              For those in the galley, I recognize the chairs are

8     pretty comfortable, but they are reserved for security.

9              Your witness.

10                           CROSS-EXAMINATION

11    BY MR. HEINRICH:

12     Q. Good morning, Dr. Komanduri.

13     A. Good morning again.

14     Q. Now, you didn't provide the jury with an opinion that

15    Kite isn't using Dr. Sadelain's patented CAR, correct?

16     A. There's a double negative there, but can you -- I did not

17    comment on the CAR construct.

18     Q. Thank you.

19              Because that is not something that you looked at in

20    this case, whether Kite is using Dr. Sadelain's patented CAR,

21    correct?

22     A. I was asked to --

23     Q. Can you answer that?

24     A. Yes, I did not address that issue.

25     Q. Now, you personally have never done the years of research

KOMANDURI - CROSS

1      to develop a brand-new CAR like Dr. Sadelain did, correct?

2       A. I have not developed a CAR.

3       Q. And I want to just talk about the last point -- oh, one

4      other question.  So you mentioned that the most important

5      demand driver, from the physician's standpoint, for CAR-T

6      therapy is efficacy, correct?

7       A. In my view, yes.

8       Q. You agree that without the CAR, there would be no CAR-T

9      therapy; is that fair?

10      A. Without a CAR, you don't have a CAR-T therapy, yes.

11      Q. So, you had some testimony about first to market, right?

12      A. Yes.

13      Q. Now, you were here Friday in court when Dr. Sullivan

14     testified?

15      A. I was.

16          MR. HEINRICH:  So let's pull up Exhibit 78 and go to

17     78.5.

18      Q. Do you recall Dr. Sullivan's testimony about a

19     question-and-answer document that was prepared for Gilead's

20     chief executive officer in connection with Gilead's

21     acquisition of Kite?

22      A. Yes.  I hadn't seen it before then, but I recall seeing

23     this the other day.

24      Q. And one of the questions that the Gilead team prepared

25     Gilead's chief executive officer for was, why was Gilead

KOMANDURI - CROSS

1    buying Kite and not Juno.

2          Do you remember that?

3    A. Um, I guess.  Not exactly, but...

4    Q. Well, it's right here on the screen.

5    A. No, no, I'm not denying it.

6    Q. And the first answer given was first-mover advantage --

7    that Kite had the first-mover advantage, correct?

8    A. I can see the slide, yes.

9    Q. And that was in reference to Gilead's purchase of Kite in

10   which Gilead valued YESCARTA -- just YESCARTA alone at

11   $6.2 billion?

12   A. Um, I'm not -- I don't recall exactly how this was

13   presented, but I'm not -- I'm seeing -- I see the slide, and

14   I presume that what you are telling me is true.

15          MR. HEINRICH:  Thank you very much.

16          THE COURT:  Any questions?

17          MS. YOUNG:  No redirect.

18          THE COURT:  Thank you, Doctor.

19          THE WITNESS:  Thank you.

20          THE COURT:  Next?

21          Next witness.

22          MR. VINCENT:  Your Honor, Kite calls Michael Amoroso

23   to the stand.

24          THE COURT:  We need your appearance.

25          MR. VINCENT:  Garth Vincent, Hunger Tolles.

AMOROSO - DIRECT

```
 1              THE COURT:  Thank you.
 2              THE CLERK:  Good morning, sir.  Would you please
 3      raise your right hand to be sworn.
 4              THEREUPON:  MICHAEL AMOROSO,
 5      Called in these proceedings and being first duly sworn
 6      testifies as follows:
 7              THE CLERK:  Thank you.  Would you please be seated.
 8              THE WITNESS:  Good morning.
 9              THE CLERK:  Thank you, sir.  Sir, for the record,
10      would you please state your name and then spell your last
11      name.
12              THE WITNESS:  Sure.  Michael Amoroso, A-m-o-r-o-s-o.
13              THE COURT:  Your witness.
14                      DIRECT EXAMINATION
15      BY MR. VINCENT:
16      Q. Mr. Amoroso, what is your current employment?
17      A. I am the SVP, senior vice president, at Kite of worldwide
18      commercial cell therapy.
19      Q. And how long have you been in that position?
20      A. I have been in that position since August of 2018.
21      Q. And what are your responsibilities?
22      A. My responsibilities include anything around
23      operationalizing, or once a product goes through clinical
24      development and is approved, anything about operationalizing
25      it and bringing it --
```

AMOROSO - DIRECT

1          THE COURT:  Slow it down, please.

2          THE WITNESS:  Sure.

3          So anything around operationalizing, bringing it to

4    market.  So that would entail things like marketing strategy,

5    what type of patients our products will be used in, speaking

6    with customers, understanding insights, garnering analytics,

7    anything operational.  So setting up sites and training where

8    we will be giving our products, as well as working with

9    governments around the world for reimbursement for products.

10    Q. And how long have you worked in the pharmaceutical

11    industry?

12    A. Approximately 20 years.  Formally starting in 2001.

13    Q. And what made you want to pursue that as a career?

14    A. It started in my own family.  So my mother's been sick

15    with multiple sclerosis my whole life, and my father passed

16    of cancer when I was 18.

17    Q. What positions did you hold in the pharmaceutical

18    industry before you joined Kite?

19    A. I have held various positions across Aventis,

20    Sanofi-Aventis after acquisition, Celgene, Eisai, across

21    commercial roles of increasing scope and responsibilities.

22    So sales, marketing, indirectly market access, anything

23    related to commercial affairs.  Again, operationalizing after

24    clinical development, bringing it to patients.

25    Q. In what therapeutic areas?

AMOROSO - DIRECT

1    A. Therapeutic areas have been very numerous, so anything

2    from diabetes to women's healthcare, respiratory, rheumatoid

3    arthritis, and the majority of my time spent very

4    specifically in cancer; oncology.

5    Q. You mentioned Celgene.

6        What was the last position you held at Celgene?

7    A. Sure.  At Celgene I was a -- the worldwide head of global

8    CAR-T programs.

9    Q. And during what time were you Celgene's commercial head

10   for CAR-T programs?

11   A. I believe the timeframe was around the July 2016 to

12   September of 2017.

13   Q. And what was the relationship between Celgene and Juno at

14   that time?

15   A. Celgene and Juno were partners.  They had a partnership

16   on commercializing and codeveloping CD19 CAR-Ts.  So anything

17   for a B-cell malignancy on the CD19 antigen.

18   Q. Was there any kind of geographical division?

19   A. There was.  So in the original deal at that time when I

20   was working with them, Juno had North American rights,

21   meaning they would have revenue rights for the U.S. and

22   Canada.  We would always share the development globally, all

23   programs.  And the revenue rights for Celgene would be X

24   North America.

25   Q. What were the CAR-T programs for which you had

AMOROSO - DIRECT

1    responsibility at Celgene?

2     A. Yeah.  The two primary programs would be JCAR015, which

3    is a drug and asset, the first.  And JCAR017 was our second.

4     Q. And what was your role as Celgene's commercial head for

5    JCAR015 and JCAR017?

6     A. So similar to what we talked about, I was the commercial

7    head worldwide, so I would be responsible at working with

8    Juno very closely as a partner in globalizing the

9    commercialization of these assets.  So, again, the marketing

10   of the products, what we called the positioning of the

11   product, what would be the exact specific patient type as per

12   label, getting any of the marketing materials for education

13   through our sales folks, garnering insights and analytics,

14   lots of work we call ad boards, working with some of the top

15   thought leaders in the world, physicians.

16             THE COURT:  Slow it down, please.  Everything that

17   is being said is being taken down, transcribed.

18             THE WITNESS:  Thank you, sir.

19    Q. And how did you collaborate with Juno to do that?

20    A. We would work with Juno very closely.  So we would have,

21   you know, daily, multiple time weekly phone calls, e-mails,

22   in-person meetings, live customer meetings together.  We

23   would partner on kind -- the market analytics expenditures or

24   generating insights.  Some of the market research we do for

25   customers.

AMOROSO - DIRECT

1          We work together for competitive simulations where

2     we're getting ready to go into a market space, and we look at

3     the landscape of some of the competitive products, things

4     around reimbursement.  So anything around the commercial

5     activities to bring it to patients.

6     Q. And did you sit on any Celgene/Juno joint committees or

7     boards?

8     A. Yeah.  Two other roles were around the governance of the

9     relationship.  So first would be the joint commercialization

10    committee where myself and a Juno partner would be the lead

11    on strategic decisions around the marketing, some of the

12    things we talked about in the operational activities that

13    would be after you had a label approval.

14          And then we sat also, myself and a Juno partner, on

15    a clinical development or, as we called them, project teams,

16    specifically for JCAR015 and 17, where we give insights

17    during the clinical development; things that will be really

18    important for regulatory approvals, things -- more so

19    around -- from regulatory approval to reimbursement approvals

20    around the world.

21    Q. And what was the geographic scope of the market

22    information that you and your Juno colleagues shared and

23    discussed?

24    A. So globally, right?  So the clinical development was we

25    co-owned the expenditures worldwide.  So, you know, clinical

AMOROSO - DIRECT

1    development was all the markets in the world together.  And

2    then we would share, while Juno had the North America rights

3    and while Celgene had the X North America rights, having one

4    brand equity of a product, having it mean something

5    consistently, things that you would do to set price in one

6    market.

7          These things would have carryover to other markets,

8    so we shared everything globally; U.S., Europe, Canada, a

9    little bit of Japan.

10   Q. Could you tell the jury what JCAR015 was?

11   A. Yeah.  JCAR015 was our first-in-class CAR-T construct

12   asset.  It was a CD28 construct, the science behind it.  And

13   it was meant -- it was intended to be our first to market in

14   adult acute lymphoblastic leukemia, or adult ALL.

15   Q. What happened with JCAR015?

16   A. The JCAR015 program was paused and ultimately

17   terminated -- I think it was in early '17 -- during the

18   clinical development phase, because we had some

19   safety-related patient deaths.

20   Q. And what was JCAR017?

21   A. JCAR017 would have been our second product to market.  It

22   was what -- our strategy there was a best-in-class asset.  It

23   was meant to actually replace JCAR015, if JCAR015 wasn't

24   stopped.  It was a 4-1BB construct, and it was targeting

25   B-cell malignancies with CD19 antigens.

AMOROSO - DIRECT

1              So the largest marketplace would be what we call

2      DLBCL, or diffuse large B-cell lymphoma, as well as some of

3      the areas we discussed, adult ALL, pediatric ALL, CLL, some

4      of the other CD19-targeted hematologic malignancies.

5      Q. Why did you refer to it as your best-in-class product?

6      A. Yeah.  So the thought process was the science -- you

7      know, I'm not a PhD, but the science behind it was a 4-1BB

8      construct.  There would be a certain way you would

9      manufacture and extract certain T-cells, ratios that would

10     add to a product profile that would have better efficacy and

11     better safety and ultimately, hopefully, a faster turnaround

12     time to patients.

13             That's the manufacturing, because you're making each

14     product from the patient's cells, and the patients are dying.

15     Time is of the essence.

16     Q. Did you ever believe JCAR017 would be first to market in

17     DLBCL?

18     A. No.  We know that Kite and Novartis had quite a head

19     start on us in the clinical development phase.  The trials

20     needed to get, you know, regulatory, for example, FDA

21     approvals.

22     Q. During your time as Celgene's commercial lead for JCAR015

23     and JCAR017, who did you consider to be your primary

24     competitors?

25     A. Yeah.  So the leading CAR-T companies who were in front

AMOROSO - DIRECT

1    of us, that would be Novartis and Kite.

2    Q. Did you ever view Novartis as a lesser competitor?

3    A. No.  Actually, the opposite.  Novartis was also -- like

4    JCAR017, was a 4-1BB construct.  And at the time, our

5    hypothesis was that would be a better construct leading to

6    better efficacy and safety than the CD28 constructs.

7    Q. Were there any other reasons why you viewed Novartis as,

8    if anything, the stronger competitor?

9    A. Well, yeah.  I think, you know, when we looked at Kite,

10   Kite was a startup, they had limited resources, they hadn't

11   been in the space for a long period of time.  Novartis was a

12   very well established pharma company.  They had been in the

13   cancer and oncology space for a long time, very credible.

14   They had inordinate amounts of resources.  So we did view --

15   and they had the 4-1BB construct.

16            What was part of our strategy, we thought that would

17   lead to a safety profile -- and we assumed theirs would,

18   too -- that would allow us to give a 4-1BB, JCAR017 or,

19   Novartis' construct, Kymriah, in a wider setting to patients

20   because it was safer, wouldn't only have to be administered

21   in the hospital.

22   Q. Were you aware of some period where rumors or questions

23   were raised about Novartis' commitment to the CAR-T space?

24   A. Yes.  During the market preparation time, I think there

25   was reorganizations at Novartis when they broke out CAR-T on

AMOROSO - DIRECT

1    its own, when they brought it back into overall Novartis.

2    And there was some speculation of, you know, how committed

3    they were to being in the cell therapy space.

4    Q. Did that change your view at all about Novartis being a

5    stronger competitor?

6    A. No, it didn't, because Novartis's lead product, Kymriah,

7    had already at the time I believe filed a BLA for pediatric

8    ALL.  In fact, it was the first approved CAR-T anywhere in

9    the world, in the US.  And we knew they announced their

10   intention to be shortly behind Kite, second to market with

11   Kymriah, in diffuse large B-cell lymphoma.

12          So that didn't change our preparations in preparing

13   for Kymriah, Novartis' product.

14   Q. During your time as Celgene's commercial lead for JCAR015

15   and JCAR017, do you recall anyone from Juno or Celgene ever

16   suggesting that Novartis was a lesser competitor than Kite?

17   A. No, it was the opposite.

18   Q. Now, shifting to your current position today as head of

19   worldwide commercial at Kite, are you familiar with the

20   factors that go into providing a successful CAR-T therapy?

21   A. Yes, I believe I am.

22   Q. And how so?

23   A. Well, the CAR-T, or the cell therapy, landscape is

24   relatively newer in commercialization of pharma.  I have been

25   in the space for about -- since 2016.  I have worked in the

AMOROSO - DIRECT

1    space across two and -- two partners and two main companies I

2    worked at.  So Celgene; I worked at Juno, a cell therapy

3    company; and Bluebird, a cell therapy company.  And then

4    obviously I've had the opportunity over the last year and a

5    half to operationalize cell therapy CAR-T at Kite.

6    Q. And what are the factors that go into providing a

7    successful CAR-T therapy?

8    A. Yeah, so I think there's numerous factors, things like

9    can you make the product, first and foremost.  These patients

10   are dying, time is of the essence.  So we call that

11   manufacturing success or turnaround time.

12        Obviously something we call our therapeutic index,

13   the efficacy and safety of the product.

14        (Reporter clarification.)

15   A. Again, things like manufacturing, therapeutic index,

16   which means the safety and efficacy of a product.  Things

17   like services and operations; your team's able to get

18   hospitals right now where we get these products ready to be

19   trained and certified to be able to give the products.  And

20   cost.

21   Q. What are the most important factors?

22   A. The most important factors -- and I think we've heard

23   this loud and clear from our customers over the last two

24   years that YESCARTA for Kite has been in the marketplace --

25   first and foremost, you are generating a product for each

1    patient from their cells.

2         These patients are dying.  Time is of the essence.

3    They have a median survival of around six months, so you need

4    to be able to make the product, perpetuate the sales in the

5    lab, and get them fast back to the patient.  So I would say

6    overall manufacturing.  We refer to that as turnaround time

7    and success rate.

8         Efficacy.  Of course you want to give a product so

9    that it would work.  Safe enough to give the product in the

10   adverse of management.  These are the top features that drive

11   choice by our physicians.

12   Q. How important is which product came to market first in

13   terms of physicians selecting a CAR-T therapy?

14   A. Yeah, first to market is nice.  Nice to have.  But it's

15   not as important as, again, best in class.  So we need to

16   make sure you have the fastest turnaround time, the best

17   manufacturing success, that you have the best efficacy or

18   safety.

19        We do lots of market research testing, when new

20   products are coming into a space.  And "first" only maintains

21   its share if the products coming in next aren't any better.

22   But if they are better for the patient -- safer, more

23   efficacious, faster -- then there's absolutely a replacement

24   of which product is selected.

25   Q. What is Kite's current manufacturing turnaround time and

AMOROSO - DIRECT

1    success rate for YESCARTA?

2     A. Yeah.  So Kite's turnaround time -- and, again, that

3    means taking a patient's cells, bringing them back to be

4    manufactured, and then having them ready, as we call,

5    released to send back to the doctor and patient -- is 16 days

6    in the commercial world.  And the success rate, which is you

7    take the cells and can you grow them back when in the

8    manufacturing facility to make a viable product to send

9    back -- is 99 percent success rate.

10     Q. How does that compare to the results Kite recorded

11    earlier during its clinical trials?

12     A. Yeah, the pivotal trial known as ZUMA-1 for Kite, the

13    results are very consistent.

14     Q. Is that remarkable?

15     A. I do think it's remarkable, because there's other

16    companies that have had a lot of trouble doing this.  And

17    when you look at a clinical trial, a controlled setting, you

18    have a hundred patients in a very controlled environment.

19    YESCARTA has been given to somewhere between 1700 to 2,000

20    patients around the market of the world -- markets of the

21    world right now.

22          And when you scale it up, it makes it much more

23    difficult.  So to maintain that same manufacturing success

24    rate and the turnaround time to the patient I think is quite

25    remarkable.

AMOROSO - CROSS

1    Q. How about JCAR017's manufacturing turnaround time and

2    success rate?

3    A. I'm not aware of a manufacturing success rate or

4    turnaround time for JCAR017, because it's not yet an approved

5    product; it's in clinical development.

6    Q. Who is currently the market leader in CAR-T therapies?

7    A. Market leader, if judged by utilization, since commercial

8    launch, is absolutely Kite Pharm.

9    Q. And, finally, to what do you attribute that success?

10   A. I think first and foremost -- and we've heard this from

11   our customers over the last two years, since launch in '17 --

12   Kite can reliable manufacture and make the product and get it

13   to these patients in dire need.  We've also heard that we

14   have an efficacy and safety profile that has a chance to save

15   patient's lives.  We also have some wonderful people in our

16   company, who work with our customers very closely, and have

17   really helped operationalize this new modal of treatment.

18             MR. VINCENT:  No further questions.

19             THE COURT:  Thank you, Mr. Vincent.

20                        CROSS-EXAMINATION

21   BY MR. WELLS:

22   Q. Good morning, sir.

23   A. Good morning.

24   Q. You've never worked for Juno, correct?

25   A. Correct.

AMOROSO - CROSS

1    Q. And at Celgene, you were head of Celgene's global CAR-T

2    commercial program for just over a year; is that right?

3    A. Yes.

4    Q. And during that time, Celgene did not have U.S. rights to

5    JCAR017, correct?

6    A. Yes.

7    Q. And for that reason, you were not involved in developing

8    commercial assumptions for JCAR017 in the United States,

9    correct?

10   A. I would say the answer to that is no.

11   Q. If I could read from your deposition.  At pages 110,

12   lines 12 through 19.

13           MR. VINCENT:  What page?

14           MR. WELLS:  110, lines 12 through 19.

15           THE WITNESS:  Should I be looking at something, sir?

16           MR. WELLS:  No.  We're waiting to see if there's an

17   objection.

18           THE WITNESS:  Thank you.

19           MR. WELLS:  12 through 19.

20           MR. VINCENT:  That's fine.

21   Q. In your binder, there should be, at the first tab, a

22   copy --

23           THE COURT:  Let's just read it please.

24   Q. Question: As part of your commercial planning

25   responsibilities or analysis of this Celgene/Juno

AMOROSO - CROSS

1   partnership, were you involved at all in developing

2   commercial assumptions for JCAR017 in the United States?

3          Answer:  No.  Not in the United States, because that

4   partnership only occurred after I left.  We were just X U.S.

5          Was that truthful testimony when you provided it at

6   your deposition?

7   A. Yes, it was.  I think my interpretation --

8   Q. Thank you, sir.

9          Now, you've testified about JCAR015 and concerns

10  regarding the ROCKET trial, correct?

11  A. Yes.

12  Q. And you would agree that Celgene had two options at the

13  time.  On the one hand, they could dissolve the Juno

14  relationship; and on the other hand, they can go further into

15  that relationship with Juno and actually buy them, correct?

16  A. Yes.

17  Q. And despite any concerns that you testified about,

18  Celgene did not back out of the relationship with Juno; is

19  that right?

20  A. Yes.

21  Q. And in fact, they actually bought Juno, correct?

22  A. Obviously, yes.  After I was gone, they bought Juno.

23  Q. Thank you, sir.

24          Now, I want to turn to the development of JCAR017.

25          When you were at Celgene, you felt confident that

AMOROSO - CROSS

1    JCAR017 would have a safety advantage over YESCARTA, correct?

2     A. We believed it would have --

3     Q. Can you answer that question fairly yes or no?

4     A. Yes.

5     Q. And the answer is yes?

6     A. Yes.

7     Q. And you personally believed when you were at Celgene that

8    JCAR017 would be a best-in-class CAR-T therapy, correct?

9     A. Yes.

10    Q. Now, turning to YESCARTA safety issues, cytokine release

11   syndrome and neurotoxicity are key disadvantages of YESCARTA,

12   correct?

13    A. I would -- disadvantages versus what, sir?  Can you

14   clarify.

15    Q. Disadvantages versus the other -- other CAR-T therapies

16   that are coming to market.

17    A. I would not agree with that comment, sir.

18    Q. Let me read from your deposition at pages 43, 22 through

19   44, 12.

20          THE COURT:  Mr. Vincent, any objection?

21          MR. VINCENT:  No.

22    Q. It says here, under the key insights, the fourth bullet

23   point, Key disadvantages of YESCARTA:  CRS and neurotoxicity,

24   inability to use in the outpatient setting, lower level of

25   patient support with -- compared with Kymriah.

AMOROSO - CROSS

1            Answer:  Yes.

2            And are those, in fact, regarded as the key

3    disadvantages of YESCARTA?

4            These are qualitatively what we hear most often,

5    correct, yes.  And again, from physicians, from our

6    customers.

7            Was that testimony accurate when you provided it at

8    deposition?

9    A. Yes, but out of context.

10   Q. All right.  Thank you.

11   A. Okay.

12   Q. Now, I would like to discuss Novartis briefly.

13           Novartis has had manufacturing problems with

14   Kymriah, correct?

15   A. Anecdotally, that's what we hear from investor relations,

16   in the street, yes, and customers.

17   Q. And Novartis has been having those manufacturing problems

18   with its CAR-T product for a number of years, correct?

19   A. I would say that's accurate, yes.

20   Q. And in your direct testimony, you mentioned Novartis had

21   a reorganization regarding its personnel for CAR-T.  But, in

22   fact, Novartis had a dedicated cell therapy division that

23   they disbanded at one point, correct?

24   A. I can't intelligently speak to Novartis's

25   reorganization --

1      Q. Okay.  Thank you.

2              If I could read from your deposition at page 23,

3      line 25 through 24, 3.

4              THE COURT:  No objection?  Read, please.

5              MR. WELLS:  Are you objecting?

6              MR. VINCENT:  Not to interrupt the witness.

7      Q. Question: Do you understand that at one point Novartis

8      had a dedicated cell therapy division that they disbanded?

9              Answer:  I do.

10             Was that testimony correct when you provided it?

11     A. Yeah, I think that's correct, sir.

12     Q. Thank you.

13     A. I don't know what "dedicated" necessarily means, but --

14     Q. You answered my question.

15     A. Okay.  Thank you.

16             MR. WELLS:  No further questions, Your Honor.

17             THE COURT:  Mr. Vincent?

18             MR. VINCENT:  No further questions.

19             THE COURT:  Thank you.

20             Thank you for your testimony.

21             THE WITNESS:  Thank you.

22             THE COURT:  Next?

23             MR. DANE:  Your Honor, next we would play some

24     excerpts from the video deposition of Marina Larson, who is

25     the prosecuting attorney who prosecuted the '190 patent.

 1             (Thereupon, the video was played.)

 2             MR. DANE:  Thank you, Your Honor, that concludes the

 3    video clip.

 4             THE COURT:  Thank you.

 5             MR. DANE:  And Kite would next call Dr. Richard

 6    Junghans.

 7             THE COURT:  Get the witness some water.

 8             THE CLERK:  Yes.  Stand up and raise your right hand

 9    to be sworn.

10             THEREUPON:  RICHARD JUNGHANS,

11        Called in the proceedings and being first duly sworn

12    testifies as follows:

13             THE CLERK:  For the record, would you please state

14    your name and then spell your last name.

15             THE WITNESS:  My name is Richard Junghans.  The last

16    name is spelled J-u-n-g-h-a-n-s.

17             THE CLERK:  Thank you.

18             MR. SHEAR:  Good morning, Your Honor, ladies and

19    gentlemen of the jury.  My name is Chad Shear of Fish &

20    Richardson representing Kite.

21                        DIRECT EXAMINATION

22    BY MR. SHEAR:

23     Q. Dr. Junghans, what do you do for a living?

24     A. I'm a medical oncologist.  I treat cancer patients.  I

25    also engage in cancer research and recently set up a small

JUNGHANS - DIRECT

1    biotech company to use immunotherapy in patients.

2      Q. Doctor, I referred to you as doctor.

3            Do you have an M.D. and a Ph.D.?

4      A. Yes, I do.

5      Q. How long have you been working in the cancer field?

6      A. 30 or so years.

7      Q. Just to cut to the chase, Dr. Junghans, did you review

8    the validity of the certificate of correction that was filed

9    for the '190 patent?

10     A. I did.

11     Q. And what did you conclude?

12     A. I concluded that it was not valid.

13     Q. In simple terms, could you explain why?

14     A. Two reasons:  One, the certificate of correction

15   broadened the scope of the claims; and secondly, the alleged

16   error would not have been apparent to any person of skill in

17   the art in any kind of readily determined way.

18     Q. Okay.  Dr. Junghans, I would like to talk briefly about

19   your background that enables you to offer such an opinion.

20            If you could turn in the binder that was handed to

21   you to PX0867.

22     A. Yup.

23     Q. Is that your resume or some people call it CV?

24     A. Yes, it is.

25     Q. How many pages is it?

JUNGHANS - DIRECT

1     A. 17.

2              MR. SHEAR:  Your Honor, we would move PX0867 into

3     evidence.

4              MR. CHU:  No objection.

5              THE COURT:  Received.

6              (PX0867 received in evidence.)

7     Q. Now, Dr. Junghans, if the jury wanted to look for

8     themselves, does your CV contain a summary of your academic

9     and professional accomplishments, achievements over the last

10    five decades?

11    A. Yes.

12    Q. Now that your CV is in evidence, could you just list for

13    the jury the schools that you attended and the degrees that

14    you earned?

15    A. For undergraduate, I attended Harvard College where I

16    received a bachelor's degree, magna cum laude in biophysics

17    and chemistry.  From there, I went to the University of

18    California, Berkeley, where I pursued a Ph.D. in molecular

19    biology and virology.  From there, I went to California

20    Institute of Technology up in Pasadena in the department of

21    chemistry and chemical engineering where I studied genetics

22    and retroviruses and also learned molecular engineering

23    techniques, also called cloning.  From there, I went to Roche

24    Institute of Molecular Biology, where I continued doing

25    molecular genetic analysis of viruses.

JUNGHANS - DIRECT

1          My research is getting more and more clinically

2     oriented, and I felt as though I wanted to participate in

3     however my discoveries got translated into helping people.

4     So I undertook medical training and went to the University of

5     Miami where I got an M.D. in the Ph.D.-to-M.D. program.

6          From there, I went to Georgetown University Hospital

7     for an internship and residency in internal medicine and also

8     undertook hematology fellowship training.

9          From there, finally, I went to the National Cancer

10    Institute at the National Institutes of Health in Bethesda,

11    Maryland, where I completed a clinical oncology fellowship

12    and immunology training.

13    Q. Now, Dr. Junghans, I would like to focus from that

14    background that you just discussed on the portion dealing

15    with CARs.  How long have you been working with CARs?

16    A. 20-plus years.

17    Q. Over the last 20 years, have you made CARs?

18    A. Oh, yes.

19    Q. And have you put any of those CARs into clinic?

20    A. Yes, yes, we have.  In 1998, we did -- infused our first

21    patient with the first-generation CAR-T cell preparation.  In

22    2007, we were the first in the country, and I guess the

23    world, to infuse a second-generation CAR-T into patients.

24         And then in 2008, we were the first in the world to

25    include -- to do lymphodepletion preconditioning with CAR-T

JUNGHANS - DIRECT

1    therapy together.  And we've done other trials since then.

2     Q. Now, Dr. Junghans, big picture, what was your takeaway

3    from that 20-plus years of experience working with CARs?

4     A. It was an adventure.  It was a lot of trial and error, a

5    lot of hypothesis testing.  It was new, which meant there

6    were going to be frustrations, but it was also exciting to be

7    involved in something that I really felt was going to be the

8    future.  And in the end, when something worked there was a

9    lot of joy to go around.

10    Q. Dr. Junghans, did you help prepare a set of slides to

11    assist the jury in understanding your testimony today?

12    A. I did.

13         MR. SHEAR:  Put those up.  And let me jump straight

14    to Slide DX203.

15    Q. Dr. Junghans, the jury has heard quite a bit about a

16    change that was made to Sequence ID NO:6.

17         Could you explain the change?

18    A. Yeah, I'll be glad to.  So on the left is the original

19    SEQ ID 6.  And this is a DNA sequence, and it is a central

20    part of how you make a chimeric antigen receptor.

21         So the specification states, beginning

22    Nucleotide 336 to 663 as being information from which to

23    infer what amino acids needed to be in the CAR.  The chain

24    SEQ ID 6 purports to remove the first four nucleotides of

25    this and the last three, and so that it would begin at

JUNGHANS - DIRECT

1    nucleotide 340 and end at 660.

2          Of these changes, only the change at the front, from

3    336 to 660 -- I'm sorry, from 336 to 340 is of consequence.

4    And my focus, henceforth, will be on this region.

5    Q. Dr. Junghans, I would like to -- the jury has heard a lot

6    about the science of CARs over the last week.  I would like

7    focus your testimony with respect to the technology on an

8    issue arising out of original SEQ ID NO:6.

9          Could you -- looking at the next slide, could you

10   explain to the jury how you go from a nucleotide sequence to

11   an amino acid sequence?

12   A. So keep in mind that the claims indicate the amino acid

13   sequence made by SEQ ID 6, so I'm just going to show you here

14   how that happens.

15         So SEQ ID 6 begins with 336 and goes on.  You see in

16   this lower level, you have a DNA sequence that begins that

17   SEQ ID 6.  And you will see that all of these bases or

18   nucleotides are either A, C, G, or T.

19         Now, there's 20 amino acids, so the way that the

20   body got around the few number of nucleotides and the large

21   number of amino acids was to put together clusters of three.

22   And in the first cluster of three, we see AAA, and that is

23   the -- those are the instructions that are presented for

24   generating the first amino acid.  And the first amino acid is

25   lysine made by that.

JUNGHANS - DIRECT

1         The second codon encodes ATT and encodes isoleucine.

2    The third codon encodes glutamate or glutamic acid.  And the

3    fourth codon encodes valine.

4         And you will see the three -- the four of these

5    strung together are the beginning of a protein sequence.  And

6    you can make it as long as you want; it's all under direction

7    of the DNA.

8    Q. And Dr. Junghans, just so that we're clear, why are the

9    amino acids strung across the top numbered beginning with

10    113?

11    A. So the CD28 protein is actually 220 amino acids long.

12    But the portion that is incorporated -- or that we're

13    directed to incorporate into the CAR sequence is just a

14    portion of this.  And that goes from 113 to 220.  And I've

15    shown here SEQ ID 6 and what it makes in terms of amino

16    acids.

17    Q. Dr. Junghans, I would like now to focus on the ultimate

18    opinions, expert opinions that you are offering in this case.

19    And if we look at DDX205, is this the legal standard that you

20    applied?

21    A. Yes.  The legal standard, as I understand, for a

22    certificate of correction to be invalid, one, the corrected

23    claims are broader than the original claims; and, two, the

24    presence of a clerical or typographical error or how to

25    correct that error is not clearly evident to a person of

1    skill in the art.  In other words, I should be able to see,

2    just looking at it, that there is a problem.

3    Q. Dr. Junghans, in performing your analysis for this case,

4    did you follow the Court's claim construction?

5    A. I did.

6    Q. And did you conduct your analysis from the perspective of

7    a person of ordinary skill in the art?

8    A. I did.

9    Q. If we could turn to DDX206.  Doctor, could you tell the

10   jury the definition of a person of ordinary skill in the art

11   that you applied?

12   A. Yes.  A person of skill in the art would be an M.D. or an

13   Ph.D. in immunology, biochemistry, cell biology, molecular

14   biology or related discipline, and at least two years of

15   experience in conducting laboratory research on chimeric TCR

16   therapies, TCRs, T-cells or other types of immune cells.  It

17   would be a person with knowledge of T-cell biology and

18   knowledge of and skills related to molecular biology

19   techniques useful in immunology research.

20           To be a person with knowledge of the techniques and

21   strategies used in designing and using chimeric TCRs, it

22   would be a person with knowledge of the invivo and invitro

23   assays used to test the function of chimeric TCRs.

24           Finally, this person may have worked as part of a

25   multidisciplinary team and drawn upon not only on his or her

JUNGHANS - DIRECT

1    own skills but also taken advantage of certain specialized

2    skills of others in the team; e.g., to solve a particular

3    problem.

4    Q. Now, Dr. Junghans, in performing your work on this case,

5    did you also review the definitions of a person of ordinary

6    skill in the art that Juno's experts used?

7    A. Yes, I did.

8    Q. And would your opinion change in any way if their

9    definition was used instead of yours?

10   A. Not at all.

11   Q. Given that you are someone of extraordinary skill,

12   someone who has far more experience than the person of

13   ordinary skill, how were you able to apply -- excuse me.

14           How were you able to conduct your analysis from the

15   perspective of a person of ordinary skill?

16   A. That's fairly straightforward.  I have trained many M.D.s

17   and Ph.D.s through their postdoctoral fellowships, and any of

18   a number of them would meet the criteria of person of

19   ordinary skill based on experience and training.

20   Q. Dr. Junghans, in reaching your opinions offered in this

21   case, did you review both the '190 patent, as well as its

22   prosecution history?

23   A. I did.

24   Q. Let's talk about each of those in turn.  And let's first

25   talk about the '190 patent, which is in evidence as PX1.

JUNGHANS - DIRECT

1              First question for you, Dr. Junghans, did you

2      analyze each of the asserted claims -- Claims 3, 5, 9 and

3      11 -- of the '190 patent?

4       A. I did.

5       Q. And do each of those claims require the limitations of

6      Claim 1?

7       A. Yes, they do.

8       Q. We look at Claim 1 on DDX207 -- and it's at PX1.23 -- do

9      each of the asserted claims require the language in green,

10     The amino acid sequence encoded by SEQ ID NO:6?

11      A. Yes, they all require the amino acid sequence encoded by

12     SEQ ID 6.

13      Q. I would like to turn to Sequence ID NO:6, as it was

14     published with the patent when the patent was issued in

15     November of 2008.  And that is at DDX208, Dr. Junghans.

16             First question, what nucleotide did SEQ ID NO:6

17     begin with when the patent was issued?

18      A. Just to remind the jury, so this is part of the diagram

19     we saw before.  So just so you don't think this is different.

20     This begins with Nucleotides 336.

21      Q. And, Doctor, as we just saw with Claim 1, Claim 1 said,

22     The amino acid sequence encoded by SEQ ID NO:6.

23             Is the amino acid sequence encoded by SEQ ID NO:6 at

24     the time the patent issued listed anywhere on the patent?

25      A. Yes.  In Sequence I.D. Number 11.

JUNGHANS - DIRECT

1    Q. Let's look at Sequence I.D. Number 11.  It's at DDX209.

2    And for the record, it's at PX1 bridging pages 19 and 20.

3         What amino acid does Sequence I.D. Number 11 begin

4    with?

5    A. SEQ ID 11 begins with Amino Acid 113, which is a lysine.

6    Q. Dr. Junghans, I would like to take you back a moment to

7    when the patent was filed, 2002, 2003 timeframe.  At that

8    point in time, did there exist software applications that

9    could be used to analyze nucleotide sequences like SEQ ID

10   NO:6?

11   A. Yes, several.

12   Q. And as part of your work in this case, did you use one of

13   those software applications to analyze Sequence ID NO:6 as it

14   issued in the patent?

15   A. Yes.  I used the BLAST software.

16   Q. What was the result -- well, before we get to the result,

17   let me just ask you:  When you entered Sequence ID NO:6 into

18   the BLAST software, how many errors did you get?

19   A. No errors came up.

20   Q. What was the result that you obtained from the software?

21   A. The result that I obtained from the software was

22   basically confirming that SEQ ID 11 would be generated by

23   that program -- would be generated by SEQ ID 6.

24   Q. Dr. Junghans, if you could turn your attention to DDX210

25   on the screen now, and explain to the jury what this is.

JUNGHANS - DIRECT

1    A. This is a computer output from the BLAST software

2    program.  And what you do with this is you enter a DNA

3    sequence, and then it will translate it into a protein

4    sequence.  And where it says Query, that's the output from

5    the DNA sequence from SEQ ID 6 when we put it in.

6          And you will see that begins KIEV.  Well, that's --

7    K is a single-letter abbreviation for lysine.  So, and then

8    you will see that the comparison is to CD28, and you will see

9    that it comes up with CD28 sequence in the third line, which

10   goes from 113 to 220 for the amino acid sequence.

11   Q. Dr. Junghans, is the result that you obtained from using

12   the BLAST software to analyze Sequence ID NO:6, is it the

13   same as or different than Sequence I.D. Number 11 in the

14   patent?

15   A. It's identical.

16   Q. Let's move now and talk a little bit more about another

17   section of the patent.  And specifically, I would like to

18   move to column 7, lines 51 through 56 of PX1 and talk about

19   the nucleotide sequence that is discussed there.

20         Dr. Junghans, if you look at DDX211, what nucleotide

21   sequence is described at column 7?

22   A. Nucleotides 336 to 660.

23   Q. Below that, beginning at, it looks to be about lines 53,

24   there's reference to some primers.  And they are listed as

25   SEQ ID NO:4 and SEQ ID NO:5.

JUNGHANS - DIRECT

1          Did you see that?

2     A. Yes.

3     Q. Okay.  Did you consider those primers in reaching your

4     opinions in this case?

5     A. I did.  But they weren't important to my perception of

6     the case.

7     Q. Why do you say they weren't important to your perception

8     of the case?

9     A. Well, to make a CAR, you have to decide what parts of

10    different proteins you're going to put together -- to string

11    together to make the desired functions.

12          And I'm instructed by this to a part of the CD28

13    molecule that other investigators found works pretty well in

14    the context of making a CAR.  So a person of skill in the art

15    is going to look at the sequence and say, That's the

16    important part.

17          It turns out that there's 100 different ways to use

18    different primers.  Primers are things in PCR that go

19    together to rebuild what's in between.  But there's hundreds

20    of ways that you can use different primers.  And a person of

21    skill in the art wouldn't really need to think about someone

22    else's primers.  We all design our own.  We have different

23    cloning strategies.  And therefore, these are not specified

24    in the claims, and they're really not going to help me to

25    decide which part I'm going to put in.  That has already been

JUNGHANS - DIRECT

1    set.

2            The part I'm going to put in is 336 to 660.

3    Q. Dr. Junghans, I would like to take a look at another

4    section of the patent and the nucleotide sequence that's

5    listed there.  So column 4 of PX1, lines 18 through 33, what

6    nucleotide sequence is discussed in column 4?

7    A. In column 4, we see an example with nucleotides 340 to

8    663.

9    Q. And what amino acid sequence would nucleotides 340 to 663

10   encode?

11   A. This would encode a slightly smaller fragment with amino

12   acids 114 to 220.

13   Q. A moment ago, Dr. Junghans, you were talking about

14   Sequence ID NO:6 at the time that the patent issued, and you

15   stated that it began with Nucleotide 336.  Is the fact that

16   column 4 lists nucleotide 340 consistent or inconsistent with

17   your opinions that you are offering in this case?

18   A. Um, it's consistent.  It's an example that's given, and

19   it specifies that the full sequence is SEQ ID 6.  And clearly

20   the full sequence SEQ ID 6 is larger than this, so I see this

21   just as a subset.

22   Q. Dr. Junghans, I would like to switch gears a little bit.

23   We've talked about the patent.  I would like to now talk

24   about the prosecution history, which I believe you testified

25   that you reviewed.

JUNGHANS - DIRECT

1              As part of that review, did you review the

2        provisional patent application?

3         A. I did.

4              MR. SHEAR:  Okay.  And for the record, the

5        provisional patent application is PX41, which we would move

6        into evidence.

7              MR. CHU:  No objection.

8         Q. Now, Dr. Junghans --

9              THE COURT:  It's received.

10              (PX41 received in evidence.)

11              MR. SHEAR:  Thank you, Your Honor.

12        Q. The provisional patent application attaches a paper to

13        it, correct?

14        A. Yes.

15        Q. Have you reviewed that paper?

16        A. I have.

17        Q. And so we're all on the same page, what's the name of

18        that paper?

19        A. This paper has been referred to as the Sadelain paper

20        previously.

21        Q. Okay.  And had you, Doctor -- in fact, were you familiar

22        with the Sadelain paper prior to this case?

23        A. Yes, I was.

24        Q. Could you explain to the jury -- we are going to put

25        up -- we are going to put up the Sadelain paper as it's part

1      of the provisional patent application at PX41.8, and it's on

2      our slide DDX214.

3              Could you explain to the jury the nucleotide

4      sequence that the Sadelain paper is telling a person of skill

5      in the art to use?

6      A. So to make their CAR, they instructed to use

7      Nucleotides 336 to 660 of CD28.

8      Q. Dr. Junghans, the amino acid sequence, if you recall back

9      to Claim 1, Claim 1 says the amino acid sequence encoded by

10     SEQ ID NO:6.

11             What would the amino acid sequence be or what --

12     what would the amino acid sequence be that is encoded by

13     Nucleotides 336 to 660?

14     A. Those would be Amino Acids 113 to 220.

15     Q. And if you could remind us all, where is that found in

16     the patent?

17     A. In SEQ ID:11.

18     Q. Now, Dr. Junghans, as part of your review of the

19     prosecution history, did you also review the utility

20     application?

21     A. I did.

22     Q. Did the utility application include a Sequence ID NO:6?

23     A. Yes, it did.

24     Q. This is at PX2 already in evidence, PX2.41.

25             Dr. Junghans, what did nucleotide -- what was the

JUNGHANS - DIRECT

1    first nucleotide in Sequence ID NO:6 as it was filed as part

2    of the utility application in May of 2003?

3    A. Once again, SEQ ID 6 begins with Nucleotide 336.

4    Q. Looking at Sequence ID NO:6 as it was originally filed as

5    part of the utility application, what amino acid sequence

6    does this encode?

7    A. This encodes amino acid sequence beginning with lysine at

8    113.

9    Q. That amino acid sequence, was that included in the

10   utility application?

11   A. Yes, it was.

12   Q. Where?

13   A. SEQ ID:11.

14            MR. SHEAR:  Let's put that up.  That's on DDX216.

15   And for the record, it's PX2.43.

16   Q. Dr. Junghans, a moment ago you stated that SEQ ID Number

17   11 is the amino acid sequence that's encoded by SEQ ID

18   Number 6.  Here's the question for you:  SEQ ID Number 11 as

19   it was filed in May -- on May 28th, 2003, has that changed at

20   all from back when it was filed in 2003 up until today?

21   A. Um, no, it hasn't changed.  It's been consistent

22   throughout all phases of the application.

23   Q. So there has been no change to --

24   A. No, it's begun with lysine at Amino Acid 113.

25   Q. Now, Dr. Junghans, a moment ago, as part of Ms. Larson's

JUNGHANS - DIRECT

1    deposition transcript, we heard about a request for a

2    continued examination.  And I would like to talk about that

3    now.

4            Did you review the request for continued -- excuse

5    me.  Did you review the request for continued examination in

6    reaching your opinions?

7     A. I did.

8            MR. SHEAR:  And let's put that up.  It's at PX2.630.

9    In our slide it's DDX217.

10    Q. The request for continued examination and the highlighted

11    portion says that there's an error that's occurred in the

12    presentation of Sequence ID NO:6.  If we could look at the

13    next slide, Dr. Junghans, could you explain what the

14    applicant stated the error was?

15    A. So the changes proposed to SEQ ID 6 were to remove the

16    first four nucleotides and begin at 340, and to remove the

17    last three nucleotides and end at 660, as I had discussed

18    previously.

19    Q. Dr. Junghans, did the applicant offer any reasons for

20    making these changes?

21    A. Um, yes.

22    Q. Did you agree with them?

23    A. No.

24    Q. Why?

25    A. They were scientifically implausible.

JUNGHANS - DIRECT

1    Q. Let's take a look at the stated reasons in the requests

2    for continued examination.  It's on our slide DDX219, and

3    it's in the record at PX2.603.

4            The first sentence -- the first paragraph, rather,

5    if we could focus on the first paragraph, SEQ ID NO:6 cannot

6    be a coding sequence since it is not an even multiple of 3.

7            Do you agree with that?

8    A. No.

9    Q. Why not?

10   A. So here they want to say because it didn't come out an

11   even number of codons that it couldn't possibly be a correct

12   sequence, and it should be thrown out.

13           As you saw from the BLAST analysis that I did, and

14   as one can do manually, that having something that is not an

15   even multiple of 3 does not prevent you from determining what

16   the amino acids are that are going to be encoded by that

17   sequence.

18   Q. Dr. Junghans, the first paragraph on the screen ends

19   with, The applicant representing that a person skilled in the

20   art would recognize that an error exists in the disclosure of

21   Sequence ID NO:6.

22           Do you agree with that?

23   A. No, I reject that notion.  I'm skilled in the art, and it

24   didn't cause me any pause whatsoever.

25           Think of it this way:  If you are making a chimeric

JUNGHANS - DIRECT

1   protein, you've got a 5 from one part, you've got 7 from

2   another part, neither is divisible by 3.  You put them

3   together, 5 plus 7, you get 12, divisible by 3.  And that is

4   exactly how we think about making these.

5    Q. Dr. Junghans, I would like you to direct your attention

6   now to the second paragraph on the page.  And it begins with,

7   The specification also states that the portion of the CD28

8   employed is that which is amplified by the primer numbers SEQ

9   IDs Numbers 4 and 5.

10          Dr. Junghans, if you used those primers, SEQ IDs

11  Number 4 and SEQ IDs Number 5, how long would the nucleotide

12  sequence be that you would get?

13   A. 322 bases.

14   Q. Is 322 bases an even multiple of 3?

15   A. No, it is not.

16   Q. How does -- how does that impact your view of what is

17  stated in the first paragraph?

18   A. This just shows that by even the modification that there

19  is still the one plus three X.  In other words, the -- this

20  strategy incorporates what is called a not-1 restriction

21  site, and it's eight bases which are used to help with the

22  cloning.

23          And because of that, you add eight bases, you have

24  to add 1 -- that plus 1 you see there -- that adds 1, puts

25  everything in phase, and you get a perfect reading through

JUNGHANS - DIRECT

1    the CD28 domain.

2            So that happened with the SEQ ID 6, and it also

3    happens with this product with the primers that they want to

4    substitute, which will generate a sequence that they specify.

5    They have to -- their strategy requires that it cannot be

6    divisible by 3, the product that is created; otherwise, a

7    messed-up protein.

8    Q. Now, Dr. Junghans, later in the prosecution, the

9    applicant ultimately submitted a substitute paper copy of the

10   sequence.

11           Did you review that paper copy?

12   A. I do.

13   Q. Let's look at the document.  It's DDX220.  PX2.662.

14           It states, The applicants are filing with this

15   response a substitute computer-readable form and a substitute

16   paper copy of the sequence listing for this application.

17           Dr. Junghans, what was the nucleotide sequence of

18   the substitute sequence listing?

19   A. It was the same as the original SEQ ID 6.

20   Q. What nucleotide did that begin with?

21   A. 336.

22   Q. Now, Dr. Junghans, after having reviewed the patent and

23   the prosecution history of the '190 patent, looking at

24   DDX221, could you explain to the jury ultimately what your

25   expert opinion is with respect to the validity of the

JUNGHANS - DIRECT

1      certificate of correction?

2       A. I conclude that the certificate of correction is invalid

3      for the following two reasons:  The corrected claims are

4      broader than the original, and the alleged error or how to

5      fix it was not clearly evident to a person of skill in the

6      art.

7       Q. Now, Dr. Junghans, one last little thing to talk about.

8      You mentioned a moment ago when we were talking about the

9      Sadelain paper, you mentioned that you had read that prior to

10     this case.

11          Dr. Junghans, had you actually -- or have you

12     actually ever used the Sadelain paper to make a CAR?

13      A. Yes.

14      Q. Did you use the whole paper or did you just make a

15     portion of a CAR?

16      A. Did I use the whole?

17      Q. That was a terrible question, I'm sorry.  Let me ask it a

18     little differently.

19          Did you use the teachings in the Sadelain paper to

20     make the amino acid sequence of CD28 that is disclosed in the

21     paper?

22      A. Yes, I did.

23      Q. When you did that work, what amino acid sequence did you

24     get?

25      A. I used the Amino Acid Sequence 113 to 220 as inferred

JUNGHANS - DIRECT

1    from Nucleotides 336 to 660, which was the information given

2    in that patent.

3    Q. And that work was done --

4    A. I mean, in that paper.  Sorry.

5    Q. I apologize.

6         Was that -- that work was done before this case,

7    right?

8    A. Yes.  Well before.

9    Q. Did you --

10   A. 2002.

11   Q. Did you ultimately file a patent application on your CAR

12   that used that portion of CD28 that you learned from the

13   Sadelain paper?

14   A. Yes, I did.

15   Q. Dr. Junghans, if you look in your binder that is in front

16   of you, DX2149C --

17   A. Yes, I have it.

18   Q. -- are you the listed inventor on that patent?

19   A. Yup.

20        MR. SHEAR:  Your Honor, at this point we would move

21   DX2149C into evidence.

22        THE COURT:  Any objection?

23        MR. CHU:  No objection.

24        THE COURT:  2149C is received.  Thank you.

25        (DX2149C received.)

JUNGHANS - DIRECT

1    Q. And Dr. Junghans, let's put up a portion of your patent.

2    It's at DDX222.  And for the record, it's DX2149, page 23

3    bridging to page 24.

4         Could you explain to the jury what's on the screen?

5    A. What's on the screen is the amino acid sequence actually

6    for the combined CD28 and CD3~.  So these are joined

7    together.

8         But the highlighted region is CD28, sequence, which

9    was incorporated into this CAR.  This CAR was for treating

10   HIV.  And it begins with Amino Acid 113 and ends with Amino

11   Acid 220, the first amino acid being lysine as I showed you

12   when I was demonstrating how to make amino acids.

13   Q. Dr. Junghans, the work that is described in your patent,

14   consistent or inconsistent with the opinions that you are

15   offering here today?

16   A. It's consistent.  And I would amplify that if I saw

17   anything in the Sadelain specification of the nucleotides to

18   use that was some kind of error -- I know enough about this

19   stuff -- if there was some kind of error, I would have picked

20   it up, and I certainly would not have invested the time and

21   manpower and resources to make this molecule -- which

22   functions quite well, by the way.  I would not have invested

23   those resources if I looked at it and there was any sign of

24   error in that sequence.

25         MR. SHEAR:  Your Honor, we pass the witness.

JUNGHANS - CROSS

1           THE COURT:  Okay.  Let's take the noon recess.  It's

2      12:45, so let's start again at 1:45.

3           THE CLERK:  All rise for the jury, please.

4           THE COURT:  I'm sorry, it's 11:45, let's start at

5      12:45.

6           (Thereupon, the jury retired from the courtroom.)

7           (Thereupon, there was a lunch recess.)

8           THE COURT:  We are about to bring the jury in.  I

9      see a few more binders have been placed up here.

10          (Thereupon, the jury returned to the courtroom.)

11          THE COURT:  Okay.  The jury is reassembled with

12     counsel present, the parties present.  Please have a seat.

13          Cross-examination by Mr. Chu.

14          MR. CHU:  Thank you very much, Your Honor.

15          Good afternoon to the ladies and gentlemen of the

16     jury.

17                       CROSS-EXAMINATION

18     BY MR. CHU:

19      Q. And Doctor, good afternoon to you.

20      A. Good afternoon.

21      Q. In your direct examination, you talked about your long

22     history doing CAR research, but you neglected to share that

23     you conducted a study where 50 percent of the patients died;

24     three out of six of the patients died.

25          Is that correct, yes or no?

JUNGHANS - CROSS

1    A. No.

2    Q. You did not report that you conducted a study where three

3    out of six patients died.  Is it correct that you did a study

4    where three out of six patients died?  Is that correct?

5    A. Not quite.

6    Q. Is it correct that it was widely reported in newspapers

7    such as the Washington Post, the New York Times, the Boston

8    Globe, that three of your first six patients died?  Is that

9    correct; that was widely reported?

10   A. Yes.

11   Q. And you were required to report those deaths immediately

12   to National Institutes of Health; and, instead, you decided

13   to hide that information, and you did not report those deaths

14   in a prompt manner?  Is that correct, yes or no?

15   A. I disagree.

16   Q. Sir, were you criticized by National Institutes of Health

17   by violating the federal regulations --

18   A. No, I was not.

19   Q. Excuse me.  Let me finish the question.

20       By not reporting the deaths promptly from the point

21   of view of the federal regulators, was it correct that the

22   federal regulators were unhappy that you did not promptly

23   report those deaths?

24   A. I disagree.

25   Q. Well, I'm not asking whether you agree or disagree.  Are

JUNGHANS - CROSS

1   you saying that the federal regulators were quite happy that

2   you didn't report the deaths in a prompt manner?

3   A. No.

4   Q. So in fact, the federal committee that oversaw gene

5   therapy at the time stated that they had no chance to

6   question your privately held views or share the information

7   about the deaths with other scientists because you did not

8   report the deaths or illnesses to the National Institutes of

9   Health.

10       In general, you did understand that the people at

11  the National Institutes of Health were not happy with your

12  lack of prompt reporting; is that correct?  You understood

13  they were unhappy?

14  A. That is not correct.

15  Q. So, sir, you had worked previously at the National

16  Institutes of Health, correct?

17  A. Correct.

18  Q. And is it your view that the NIH said that they were just

19  fine with your not reporting those deaths in a prompt manner

20  and complying fully with the federal regulations?

21  A. No.  And there were many of us who didn't understand it.

22  Q. Oh.  Doctor, you're saying you didn't report it because

23  from your point of view you did not understand that those

24  federal regulations applied?  That's what you're saying

25  today, correct?

JUNGHANS - CROSS

1     A. I'm saying as far as I knew --

2     Q. Sir, can you answer that fairly yes or no?

3     A. Yes.  Correct.

4     Q. At the time you were teaching as an assistant professor

5     at Harvard, correct?

6     A. Yes.

7     Q. And you were also working at a Harvard teaching hospital,

8     Beth Israel hospital, correct?

9     A. Yes.

10    Q. And at the time when this all came to light, you decided

11    that you were going to blame Beth Israel Hospital; is that

12    correct?

13    A. No.

14    Q. Sir, did you testify in this case under oath that at that

15    time Beth Israel was in the midst of its own political

16    problems?  Did you testify to that effect in this case under

17    oath, yes or no?

18    A. I believe it was financial.

19    Q. So the answer is yes.

20         Can you answer the following question:  And you

21    pointed the finger at Beth Israel in this case and blamed

22    them because you said, Oh, they were losing hundreds of

23    millions of dollars a year.

24         That was your testimony; is that correct, sir?

25    A. Um, no.

JUNGHANS - CROSS

1    Q. I'm going to read from your deposition -- well, let me

2    just see if this matches your recollection of what you

3    testified to:  And at this time Beth Israel was in the midst

4    of its own political problems and losing a hundred million

5    dollars a year and questioning whether it was going to

6    survive.

7             You said that in your deposition, correct?  Yes or

8    no?

9    A. Yes.

10   Q. And while you were at Harvard, you were never proposed

11   for promotion to tenure, correct?

12   A. Correct.

13   Q. And you withdrew completely from the Harvard faculty,

14   correct?

15   A. Yes.

16   Q. And you withdrew from Beth Israel Hospital as well,

17   correct?

18   A. Correct.

19   Q. And then you went to another hospital.  I think it was

20   Roger Williams; is that correct?

21   A. Correct.

22   Q. In this case, before you began to do work being paid by

23   Kite or Gilead, you had never read the prosecution history of

24   the '190 patent, correct?

25   A. Correct.

JUNGHANS - CROSS

1    Q. And before you were being paid to work on this case, in

2    fact you never even read the Sadelain '190 patent, correct?

3    A. Correct.

4    Q. Earlier this morning, you testified you got this program

5    BLAST.  And you decided to run it on a particular sequence

6    that you saw in the '190 patent, correct?

7    A. Correct.

8    Q. Did you run the BLAST program on the request for

9    continuing examination, which is part of the official record

10   before the patent office?

11   A. No.

12   Q. Now, you understand that a certificate of correction

13   involves a clerical or a typographical mistake, correct?

14   A. Yes.

15   Q. And you understand that the United States patent office

16   determined that there was a clerical or typographical mistake

17   in the Sadelain patent as originally issued, correct?

18   A. Yes.

19   Q. Now, let me read you something about the standard to be

20   applied and see if you agree with it:  Whenever a mistake of

21   a clerical or a typographical nature or of minor character

22   which was not the fault of the Patent and Trademark Office

23   appears in a patent and a showing has been made that such a

24   mistake occurred in good faith, the director may issue a

25   certificate of correction.

977

JUNGHANS - CROSS

1          You applied that analysis to your work in this case,

2     correct?

3     A. Yes.

4     Q. So good faith is a factor in determining whether a

5     certificate of correction is appropriate, correct?

6     A. Correct.

7     Q. You have no opinion that Dr. Sadelain acted in bad faith,

8     correct?

9          MR. SHEAR:  Objection, 402, 403.

10          THE COURT:  Overruled.

11          THE WITNESS:  I have no opinion.

12     Q. In fact, with everything you saw and heard, including

13     sitting here in court listening to Dr. Sadelain's testimony,

14     you would agree, so far as you know, he was at all times

15     acting in good faith, correct?

16     A. I have no way of characterizing it.

17     Q. So Dr. Dash is here in the courtroom, in the first row.

18     Do you have any reason to believe that at any time in

19     connection with the Sadelain '190 patent she was acting in

20     bad faith?  Can you point to any evidence that suggests to

21     you she was acting in bad faith?

22     A. I have no evidence either way.

23     Q. And the same, Mark Gilbert who is sitting in the front

24     row here, who is also representing Juno.  Your opinion is you

25     just can't say one way or the other whether he was acting in

JUNGHANS - CROSS

1    good faith or bad faith?

2     A. That's correct.

3          MR. SHEAR:  Objection, Your Honor, 402, 403.  No

4    foundation.

5          THE COURT:  I'm sorry, I didn't hear the last part.

6          MR. SHEAR:  I'm sorry.  There's no foundation that

7    they were involved in the patent.

8          THE COURT:  It will be sustained on 403 and being

9    argumentative.

10    Q. So with respect to other people at Sloan Kettering --

11   Dr. Raskin and other people that you've heard about while

12   you've been in this trial -- you have no evidence that they

13   were acting in bad faith; is that correct?

14         MR. SHEAR:  Same objection, Your Honor.

15         THE COURT:  Same ruling.

16    Q. Now, you were making an assumption in your analysis that

17   the applicants intentionally submitted the original incorrect

18   sequence listing rather than the sequence listing that they

19   corrected in the requests for continuing examination.  Is

20   that correct?

21    A. Yes.

22    Q. That was the assumption you made, right?

23    A. Yes.

24    Q. Yes or no?

25    A. Yes.  Yes.

JUNGHANS - CROSS

1      Q. You do understand that the actual CAR construct, that

2      that -- Dr. Sadelain was using at Sloan Kettering was using

3      Amino Acids 114 to 120; is that correct?

4              MR. SHEAR:  Objection, 402, 403.

5              THE COURT:  Overruled.

6      Q. Excuse me.  114 to 220?

7      A. That's my understanding, yes.

8      Q. And from your work, is it correct that all the

9      experimental data in the Sadelain '190 patent was from CARs

10     that used Amino Acids 114 to 220?

11     A. Um, that I can't attest to.

12             MR. CHU:  I would like to put up on the screen the

13     doctor's rebuttal report at paragraph 110.  And if you could

14     highlight and just blow up the portion lines 11 through 13.

15             THE COURT:  Is this a marked exhibit?

16             MR. CHU:  Um, it -- I don't think it was separately

17     marked.  It is the official rebuttal report of the doctor,

18     and we are just showing that one three-line portion.

19             THE COURT:  Yes, sir?

20             MR. SHEAR:  Your Honor, this is -- it's not

21     evidence.  And would be for impeachment only.

22             THE COURT:  Yes, he's using it for impeachment.

23             MR. CHU:  Okay.  Could we show that?

24     Q. Let me read it to you, Doctor.  This is from your expert

25     report.  Quote, The constructs tested and referenced in this

JUNGHANS - CROSS

1    specification like YESCARTA do not have Amino Acid 113 of

2    CD28 lysine.

3            That's your view, correct?

4    A. Yeah, I would accept that.

5    Q. So it is true that all of the experimental data, to your

6    knowledge, that are in the Sadelain patent itself was from

7    CARs that used Amino Acids 114 to 220, correct?  Can you

8    answer that yes or no?

9    A. I'm trying.

10   Q. Let me ask you it differently.  None of them, to the best

11   of your knowledge, started with Amino Acid Number 113; is

12   that correct?

13   A. To the best of my knowledge.

14   Q. Now, you know from this case that Dr. Sadelain had a call

15   with Dr. Rosenberg at NCI, and Dr. Sadelain told him details

16   about Dr. Sadelain's invention.  And he pointed him to some

17   documents.

18           You've heard that while you have been sitting in

19   court, correct?

20   A. Yes.

21           MR. SHEAR:  Objection, 402, 403.

22           THE COURT:  Overruled.

23   Q. And it's your understanding that after Dr. Sadelain

24   passed on to Dr. Rosenberg Dr. Sadelain's invention, that

25   Dr. Rosenberg worked on a CAR that did not use 113 but used

JUNGHANS - CROSS

1   114 to 220, correct?

2    A. Correct.

3    Q. I'm sorry?

4    A. Yes, correct.  Sorry.

5    Q. And that all of the other people at NCI -- Dr.

6   Kochenderfer and others who worked with Dr. Rosenberg -- also

7   used the amino acid sequence that was only 114 to 220,

8   correct?

9    A. Correct.

10    Q. And Kite only used 114 to 220, correct?

11    A. Correct.

12    Q. And when Kite applied to the FDA, they were using 114 to

13   220?

14    A. Correct.

15    Q. And Kite's product YESCARTA copied that aspect because it

16   also uses 114 to 220, correct?

17    A. Correct.

18    Q. When did you come to trial here in Los Angeles?  You live

19   in the Boston area or someplace else?

20    A. I live in the Boston area.

21    Q. And when did you come to Los Angeles?

22    A. Um, Sunday.

23    Q. Of this past Sunday or a week ago?

24    A. A week ago Sunday, sorry.

25    Q. And your work in this case actually started about a year

JUNGHANS - CROSS

1    and a half ago, by the summer of 2018; is that correct?

2    A. Sounds right.

3    Q. And in addition to your testimony here today, you

4    submitted two different expert reports, correct?

5    A. Correct.

6    Q. And two declarations, correct?

7    A. Correct.

8    Q. And you also were prepared for and sat for two different

9    days of deposition, correct?

10   A. Yes.

11   Q. And Kite and Gilead are paying $1,900 per hour; is that

12   correct?

13   A. Slightly less.

14   Q. They are paying $1,900 for your services; is that

15   correct?

16   A. Correct.

17   Q. And you said "slightly less" because you actually only

18   received $1,750, correct?

19   A. I wouldn't say "only," but yes.

20   Q. And the other $150 an hour goes to a consultant who had

21   to find you for this case, correct?

22   A. A consultant who found me.

23   Q. So let me just use the 1900.  For a 40-hour week -- you

24   have been here slightly more than a week -- that's 76,000 a

25   week.  You understand that?

JUNGHANS - REDIRECT

1    A. Yes.  Yes.

2              MR. CHU:  May I have a moment, Your Honor?

3              THE COURT:  Yes.

4              (Pause in proceedings.)

5              MR. CHU:  Thank you, Doctor.

6              THE COURT:  Mr. Shear?

7              MR. SHEAR:  Thank you, Your Honor.

8                        REDIRECT-EXAMINATION

9    BY MR. SHEAR:

10   Q. Dr. Junghans, a couple of questions for you.  Mr. Chu

11   talked about a clinical trial that you did involving the NIH.

12             Do you remember that?

13   A. Yes.

14   Q. And, in fact, I think the word that he used was that he

15   said you were trying to hide something from the NIH.

16             Do you recall those questions?

17   A. Yeah, I do.

18   Q. Now, Dr. Junghans, let's put the NIH aside for one

19   second.  Any time there's an adverse event, you are aware

20   that that has to be reported to the FDA, right?

21   A. Yes.  I always did that.

22   Q. And you reported every adverse event of those clinical

23   trials immediately, correct?

24   A. I did.

25   Q. Now, this reporting to the NIH, what was the common

JUNGHANS - REDIRECT

1    practice back then about reporting things to the NIH?

2              MR. CHU:  Objection, Your Honor.  Lack of

3    foundation, beyond the scope of his report.

4              THE COURT:  Lay some foundation, and I'll entertain

5    another objection.

6              MR. SHEAR:  Sure.

7    Q. Dr. Junghans, in conducting those clinical trials, were

8    they, in part, funded by the NIH?

9    A. Yes.

10   Q. Were there were reporting requirements to the NIH in

11   addition to the FDA?

12   A. The reporting requirements were in addition to the FDA,

13   yes.

14   Q. Can you describe how you reported adverse events to the

15   NIH as a result of the clinical trials that you were doing

16   back then with their funding?

17   A. Yeah.  At that time there was a -- FDA requirements to

18   reporting had been in place.  And what -- the new gene

19   therapy protocols meant huge documents were being produced

20   about reporting.  We did annual reporting for the NIH --

21             MR. CHU:  Objection, Your Honor.  If I heard the

22   question correctly, this is beyond the scope of the question.

23             THE COURT:  Ask the next question, please.

24             MR. SHEAR:  Sure.

25   Q. Dr. Junghans, how did you report the adverse events from

JUNGHANS - REDIRECT

1      the clinical trials to the NIH?

2       A. Um, I was reporting them annually, as I thought we needed

3      to.  But then I heard a report that --

4                  MR. CHU:  Objection, beyond the scope.

5                  THE COURT:  Sustained.

6                  Ask the next question.

7                  MR. SHEAR:  Sure.

8       Q. Dr. Junghans --

9                  MR. CHU:  Move to strike.

10                 THE COURT:  Motion granted.

11      Q. Dr. Junghans, when did you provide reports of adverse

12      events to the NIH?  Just the when.

13      A. As soon as I heard that there had been a lapse among many

14      investigators, and I reported --

15                 MR. CHU:  Objection, Your Honor.

16                 THE WITNESS:  -- very quickly --

17                 MR. CHU:  It's hearsay, it's relevance, it's 403.

18                 THE COURT:  Yes, and it's beyond the scope of the

19      question, so the objections are sustained, and the jury is

20      ordered to disregard.

21                 MR. CHU:  Thank you.

22                 MR. SHEAR:  Fair enough.

23      Q. Judge -- sorry.  Dr. Junghans -- make sure I'm speaking

24      to the correct person.

25                 Dr. Junghans, the clinical trials that Mr. Chu was

JUNGHANS - REDIRECT

1    asking you about, when did those take place?

2    A. In 1999.  1998 to 2000.

3    Q. Since then, have you received additional funding to

4    conduct clinical trials by the NIH?

5    A. About $8 million worth.

6    Q. Now, let's move on to a different topic.  Mr. Chu asked

7    you a number of questions about testimony that had been

8    offered in this court with respect to Mr. -- Dr. Sadelain and

9    his CAR.

10            Do you recall those questions?

11   A. Yes.

12   Q. Okay.  He also referenced evidence that had been adduced

13   during this trial regarding Dr. Sadelain's CAR.

14            Do you recall that?

15   A. Yes.

16   Q. Specifically, he referenced Amino Acid Sequence 114

17   through 220.

18            Do you recall that?

19   A. Yes.

20   Q. The information, the evidence that Mr. Chu was pointing

21   to you, specifically Dr. Sadelain's testimony in this

22   courtroom about the construct that he was using, that is

23   outside of the patent and the prosecution history, right?

24   A. Yes.

25   Q. Now, your cross-examination, Dr. Junghans, ended with a

JUNGHANS - RECROSS

1     discussion of the hourly fee that you are charging.

2           Let me ask you this:  Are the opinions that you are

3     offering in this courtroom today in any way contingent on the

4     money that you're charging?

5      A. Absolutely not.

6           MR. SHEAR:  Thank you, Dr. Junghans.

7           THE COURT:  Your witness.

8           MR. CHU:  Thank you, Your Honor.

9                     RECROSS-EXAMINATION

10    BY MR. CHU:

11     Q. Doctor, if I heard you correctly, I think you just said

12    that 114 to 220 was outside of the patents in the prosecution

13    history.  Correct?

14     A. No.

15     Q. So, in fact, in the original patent as filed, as it was

16    issued, it had 114 to 220, correct?

17     A. Um, it had an example of --

18     Q. Sir, can you answer that yes or no?  It expressly called

19    out 114 to 220, correct?

20     A. It is mentioned, yes.

21     Q. And in no place in the patent as originally applied for,

22    as originally issued, and finally, with the certificate of

23    correction, no place do you see the numbers for the amino

24    acid sequence being 113 to 220, correct?  Is that correct,

25    sir?

JUNGHANS - REDIRECT

1    A. Um, SEQ ID:11 --

2    Q. Sir, can you answer my question fairly yes or no?  I'll

3    simplify it.

4         113 does not appear anywhere in the original

5    application, the patent as finally issued, and the entire

6    patent including the certificate of correction?  113, that

7    number, never appears, referring to amino acids, correct?

8    A. SEQ ID:11 --

9    Q. Sir, can you answer that yes or no?  Is it correct that

10   113 does not appear in the patent?  Can you fairly answer

11   that yes or no?  If you can't, I'll understand.

12   A. It may not be typed up 113 --

13   Q. Sir, is it fair that the number 113 does not appear in

14   the patent application, the patent as originally issued, or

15   the final patent including the certificate of correction?

16   113 does not appear, correct?

17   A. It's not explicit.

18             THE COURT:  Mr. Shear.

19             MR. SHEAR:  Just one brief topic, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. SHEAR:

22   Q. Dr. Junghans, do you have in your direct examination

23   binder a copy of the '190 patent?

24   A. I do.

25   Q. Mr. Chu was just asking you if 113 ever appeared in the

JUNGHANS - REDIRECT

1    patent.  And I believe the jurors have in their juror

2    notebooks a copy of the patent.

3           Could you tell the jury where they can find the

4    amino acid sequence in the patent that is encoded by SEQ ID

5    NO:6?

6     A. Yes.  If you go to the back of the patent -- we can do

7    this while we're doing it if you want.  Um, go to the back of

8    the patent, and then move forward.  You will see that there

9    is column numbers.  And we get to the Column Number 17, going

10   over to 19 -- these are pages 19 through 20 -- you will see

11   SEQ ID:11, beginning on the 19th page and continuing to the

12   20th page.  And you see the SEQ ID:11, which we've

13   referenced, because of lysine, isoleucine, glutamate, valine

14   exactly as we described.

15          MR. SHEAR:  No further questions, Your Honor.

16          MR. CHU:  No further questions.

17          THE COURT:  Doctor, thank you for your testimony.

18          THE WITNESS:  Thank you.

19          THE COURT:  Next witness.

20          MR. DANE:  Thank you, Your Honor.  Next Kite has two

21   video designations to play.  The first is from Renier

22   Brentjens, who is one of the inventors of the '190 patent.

23   Just to place this in context, this testimony will be mainly

24   having to do with SJ25C1 -- which the jury may recall is the

25   scFv that is identified in the '190 patent as the CD19

1    scFv -- and a short portion relating to JCAR015.

2                   (Thereupon, the video was played.)

3                   MR. DANE:  And, Your Honor, in connection with that

4    testimony, we would move into evidence DX546 and DX731.  And

5    I believe there is no objection to those.

6                   MR. HEINRICH:  No objection.

7                   THE COURT:  Did you say 731?

8                   MR. DANE:  Yes, Your Honor, DX731.

9                   THE COURT:  DX546 and 731 are received.

10                  (DX546 and DX731 were received.)

11                  MR. DANE:  And the next video clip is from Mark

12   Frohlich who is the executive vice president.

13                  (Thereupon, the video was played.)

14                  MR. DANE:  And that concludes that video clip, Your

15   Honor, in connection with Mr. Frohlich's testimony.  We would

16   also move into evidence DX356, DX503 and DX1884, as to which

17   I understand there is no objection.

18                  MR. HEINRICH:  No objection.

19                  MR. DANE:  And at this time, Kite would call its

20   next witness, who is Dr. Christopher Garcia.

21                  THE COURT:  So 356, 803 and 1884 are received.

22                  MR. DANE:  Thank you, Your Honor.

23                  THE CLERK:  503 or 803?

24                  THE COURT:  803.  Is it 803 or 503?

25                  MR. DANE:  It is 503, Your Honor.

GARCIA - DIRECT

1              THE COURT:  Thank you.

2              MR. DANE:  356, 503, and 1884.

3              (DX356, DX503 and DX1884 received in evidence.)

4              THE COURT:  Thank you.

5              THE CLERK:  Good afternoon, sir.  Would you please

6    raise your right hand to be sworn.

7              THEREUPON:  CHRISTOPHER GARCIA,

8    Called in these proceedings and being first duly sworn

9    testifies as follows:

10             THE CLERK:  Thank you, sir.  Would you please be

11   seated.

12             Sir, for the record, would you please state your

13   name and then spell your last name.

14             THE WITNESS:  My name is Chris Garcia, G-a-r-c-i-a.

15             THE CLERK:  Thank you, sir.

16             THE COURT:  Your witness.  Good afternoon, Your

17   Honor, members of the jury, Geoff Biegler of Fish &

18   Richardson on behalf of Kite.

19                       DIRECT EXAMINATION

20   BY MR. BIEGLER:

21    Q. Dr. Garcia, what do you do for a living?

22    A. I'm a professor at Stanford University.  My lab study is

23   immunology and structural biology.

24    Q. Do you have an opinion as to whether the claims of the

25   '190 patent meet the written description and enablement

GARCIA - DIRECT

1      requirements?

2       A. I do.

3       Q. Big picture, what were your conclusions?

4       A. That the claims of the patent do not meet the written

5      description and enablement requirements.

6       Q. You said you were a professor of immunology and

7      structural biology.

8              In simple terms, what is immunology?

9       A. Immunology is the study of the immune system.

10      Q. And what is structural biology?

11      A. Structural biology is the study of the shapes and

12     structures of proteins.

13      Q. What does that have to do with immunology?

14      A. Because in the immune system, the shapes and the

15     structures of the molecules dictates their functions.

16      Q. Now, how long have you been at Stanford for?

17      A. 20 years.

18      Q. And if you can turn in your binder to DX1896.

19      A. Yes.

20      Q. Is DX1896 a copy of your resume?

21      A. Yes, it is.

22             MR. BIEGLER:  Your Honor, I would move DX1896 into

23     evidence.

24             MR. CHU:  No objection.

25             THE COURT:  Received.  Thank you.

GARCIA - DIRECT

1            (DX1896 received in evidence.)

2     Q. Did you also prepare a slide presentation to aid the jury

3     in understanding your testimony?

4     A. I did.

5            MR. BIEGLER:  And if we can go to DDX302.

6     Q. Can you briefly tell the jury about the educational

7     background that got you to be a professor at Stanford?

8     A. Yes.  I got my BS in biochemistry at Tulane University, a

9     Ph.D. in biophysics at Johns Hopkins University.  I did a

10    postdoctoral fellowship at Genentech, a biotech company.  And

11    then The Scripps Research Institute, also in the areas of

12    structural immunology.  And I started my lab at Stanford in

13    these areas in the year -- in the end of 1999.

14    Q. Do you have a lab at Stanford?

15    A. I do.

16    Q. Do you study scFvs in your lab?

17    A. We do.

18    Q. And how long have you been making scFvs for?

19    A. I began making scFvs in graduate school around 1989.  So

20    about 30 years.

21    Q. Over that time, how many different scFvs have you worked

22    with?

23    A. Probably over 100.

24    Q. Do you study CARs in your lab?

25    A. Yes, we do.

GARCIA - DIRECT

1    Q. And how long have you been working on CARs for in your

2    lab?

3    A. We started working on CAR technology about five years

4    ago.

5    Q. What work do you do outside of your position at Stanford

6    on CARs?

7    A. I have started three companies in the area of

8    immunotherapy, two of them are working on CAR-related

9    technologies.

10   Q. How knowledgeable do you consider yourself on CAR

11   technology?

12   A. Very knowledgeable.

13   Q. And why is that?

14   A. Well, all the areas that I have trained in and my lab

15   does research in -- such as antibody engineering, T-cells,

16   immunotherapy -- are all the ingredients that go into the CAR

17   technology.

18   Q. So before we get into the science, could you explain to

19   the jury at a high level the reasons that, in your opinion,

20   the patent does not meet the written description requirement?

21   A. So I feel the patent reaches more of an open-ended

22   research project, and that it claims a huge number of

23   molecules, but there is not a complete description of one.

24   And that one that is -- that is claimed is not representative

25   of scFvs to CD19.  And there is nothing in that example that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GARCIA - DIRECT

1    has a common structural element with another scFvs to CD19.

2     Q. Could you also explain the basic reasons why the patent,

3    in your opinion, does not meet the enablement requirement?

4     A. Well, again, a huge number of molecules are claimed, but

5    in a field that was so early at the time, the patent provides

6    very little guidance for how to practice those claims.  And

7    so really it becomes a matter of a lot of trial and error

8    experimentation to actually practice the inventions.

9     Q. Before we get into more detail about your opinions, I

10   want to ask you some questions about the science you need to

11   understand to understand your opinions.

12          First of all, have you analyzed the technology based

13   on what is known today or as of the May 28th, 2002, priority

14   date?

15    A. 2002.

16    Q. And what perspective did you use when you analyzed the

17   technology?

18    A. What is known as the person of ordinary skill.

19    Q. And if we go to DDX303, does this reflect your definition

20   of a person of skill in the art in this field in 2002?

21    A. It does.

22    Q. Is this the same definition we saw Dr. Junghans put up

23   earlier?

24    A. Yes.

25    Q. And do you agree with it?

GARCIA - DIRECT

1     A. I agree.

2     Q. So we've heard a lot about CARs in the past week.  But

3     can you tell the jury and in your own words what a CAR is?

4     A. A CAR is a synthetic, engineered T-cell receptor.

5     Q. And turning to DDX304, how do CARs find cancer cells?

6     A. Well, the CAR expressed on the T-cell has a scFv antibody

7     that seeks out a target on the cancer cell that is not

8     expressed on a healthy cell.  When the scFv binds, that

9     binding event is communicated to the T-cell, and the T-cell

10    kills the cancer cell.

11    Q. Why is the binding region important?

12    A. Because that defines the specificity of the CAR, and it

13    also is the conduit through which the binding event is

14    relayed to the T-cell.

15    Q. And what types of binding regions are used in the CARs

16    developed by the parties here?

17    A. ScFvs.

18    Q. And very simply, what is an scFv?

19    A. It's an engineered fragment of an antibody.

20    Q. And that begs the question, what is an antibody?

21    A. So the antibody is the basic building block of our immune

22    system that it uses to recognize foreign invaders.

23    Q. So with reference to DDX305, what parts of an antibody

24    are used in an scFv?

25    A. Um, small fragments from the heavy and light chains.

GARCIA - DIRECT

1    Q. And how are those joined?

2    A. Well, they are joined differently than they are in the

3    antibody.  They have to be linked together through a

4    synthetic linker that an experimenter has to make.

5    Q. Turning to DDX306, we see a simple structure of an scFv.

6          What are scFvs actually made of?

7    A. They are made of amino acids.

8    Q. And how many amino acids are in a typical scFv?

9    A. Approximately 250 amino acids.

10   Q. Now, in reality, do the amino acids exist in sort of

11   straight lines like we see in the slide?

12   A. No, they don't.  In reality, they fold up into very

13   complicated structures.  And what I'm showing you here is the

14   actual three-dimensional structure of an scFv that we

15   determined in my lab.

16         And as you can see, it has a very intricate,

17   complicated spaghetti-like fold to it that nature makes very

18   specific to scFvs.

19   Q. How do the exact amino acids used for each of the circles

20   we see in the middle of the slide affect the more complex

21   structure we see on the right?

22   A. The amino acid sequence exquisitely determines the shape

23   of the three-dimensional structure you see on the right.  And

24   even single changes in the amino acids can result in shape

25   changes to the scFv.

GARCIA - DIRECT

1    Q. And why is that shape important?

2    A. Because the shape of the scFv, the binding region, has to

3    be perfectly complementary to the target to make a good

4    interaction and bind.  If the amino acid changes that shape,

5    it can prevent the scFv from folding and binding to the

6    target.

7    Q. To give a little context, why is that important to your

8    opinions here?

9    A. Well, because there is a vast diversity of scFv in heavy

10   and light chain sequences, and there is no way to know from

11   the sequence of a heavy and light chain if it's going to fold

12   properly and bind to its target.  That can only be determined

13   by experiment.

14   Q. So Dr. Garcia, I want to walk the jury through how a

15   person of skill in the art in 2002 could make a CAR using an

16   scFv.

17            First of all, have you ever produced CARs with

18   scFv-binding portions in your lab?

19   A. Yes, we have.

20   Q. Did you say in your deposition that you had not made a

21   CAR with an scFv-binding portion?

22   A. Yes, I did.

23   Q. What did you mean by that?

24   A. At the time, my understanding of the question is whether

25   we had designed new scFv CARs, which we have not.  We have

GARCIA - DIRECT

1    used and modified scFv CARs that others have developed.

2     Q. What types of CARs have you designed?

3     A. Um, CARs using different kinds of binding modules, in

4    addition to scFvs.

5     Q. Okay.  So turning to DDX307, what is the first thing a

6    person of skill in the art in 2002 would have to decide to

7    make an scFv that binds to a target?

8     A. Well, you have to know the target, what is a target

9    expressed on a cancer cell that would be a good target for a

10   CAR.

11         MR. BIEGLER:  And for the record, in DDX307, we have

12   PX001, which is already admitted at column 436 to 45.

13    Q. What types of targets does the patent discuss in the text

14   you have excerpted here?

15    A. Well, it claims any target.

16    Q. How many could that be in 2002?

17    A. Could be thousands.

18    Q. So how would you go about selecting a target in 2002?

19    A. Well, it has to be validated experimentally as being

20   selected to the cancer cell.  So it's the first difficulty of

21   this problem.

22    Q. How difficult was it in the 2002 timeframe?

23    A. Very difficult.  There were very few targets known.

24    Q. Turning to DDX308.  After you pick a target, what is the

25   first thing you need to design an scFv?

GARCIA - DIRECT

1    A. Well, you need the antibody heavy and light chains that

2    will bind to that target.

3    Q. And how could you go about identifying those heavy and

4    light chains in 2002?

5    A. Through a couple of means.  One, to the left I'm showing

6    an example where you might read a publication or you see the

7    antibody you want, and there might be a sequence or you could

8    request it from the authors of the paper.  If that is not

9    available, then you have to make your own antibody.

10   Q. How could you make your own antibody in 2002?

11   A. Well, that was a long, cumbersome process where

12   antibodies were made in mice -- as they still are

13   generally -- where you have to immunize the mice with your

14   target and then go through a process of encouraging the mouse

15   to make cells that make antibodies to that target and then

16   isolating those cells.

17   Q. So whether you identified heavy and light chains by

18   making your own antibody or looking at the literature, what

19   information would you need about those heavy and light

20   chains?

21   A. You need their amino acid sequences so that you can

22   reconstruct the scFv.

23   Q. How would you get the sequence if you made your own

24   antibody?

25   A. Well, because of the chemistry of proteins, it's too

GARCIA - DIRECT

1    difficult to just read the sequence from the antibody protein

2    itself.  It sounds counterintuitive, but you have to clone

3    the antibody gene to go backwards to the DNA sequence and

4    then read the DNA sequence, and that will then encode for the

5    amino acids of the protein.  So you have to go back to go

6    forward.

7    Q. You didn't mention having a physical sample of antibody

8    as a good starting point for an scFv.  Why not?

9    A. Well, for the same reason.  The protein itself, it's too

10   difficult to read the amino acid sequence you need for the

11   scFv directly from the protein.  You have to clone the gene,

12   which means reading the DNA.

13   Q. Turning to DDX309.  Once you select the heavy and light

14   chains you want to work with, can you make one scFv or more

15   than one scFv?

16   A. Well, there's a whole myriad of design choices one has to

17   make to design an scFv.  And I'm showing you here some of

18   them.  To the left, one has the heavy and light chain

19   sequences one has to design on the boundary you are going to

20   use to make your scFv fragment.

21        And there is no standard rules for this.  There are

22   a lot of options there.

23        And then once you design on boundaries, then you

24   have to link the heavy and light chains together with a

25   synthetic piece of protein called a linker, which is a little

GARCIA - DIRECT

1    string of amino acids that stitches together the two chains.

2            Now, those linkers can be different sequence links,

3    they can be different amino acid compositions, different

4    structures.  There were no rules for this.  And the linker,

5    you also had to make the choice of whether the heavy or the

6    light chain went first.  You had two options.

7            So collectively between these different design

8    choices, you had a lot of variables, balls in the air at the

9    same time that you had to work with.

10   Q. How could all of these design choices affect the function

11   of the scFv?

12   A. Well, some give you functional scFvs, and others don't.

13   There is no way to know.

14   Q. And why does that matter to your opinions here today?

15   A. Well, it just shows the unpredictability of this process

16   and that you essentially had to try all of these

17   trial-and-error combinations to find the right combinations.

18   Q. So once you designed -- you made these design choices for

19   your scFv, what do you have to do next?

20   A. Well, you have to ask, does it bind to its target?

21   Q. How do you do that?

22   A. Well, there are various kinds of binding assays one can

23   do and -- and to determine if it's functional.

24   Q. So after all this work, would you expect that an scFv

25   that you made from a known antibody would grab onto its

GARCIA - DIRECT

1    target?

2     A. You have no way of knowing.  You have to make the

3    molecule and test.

4     Q. Sorry.  Why not?

5     A. Because you have to make the molecule and test.  There

6    are no -- from a fundamental standpoint, there are no

7    physical rules that govern whether a given amino acid

8    sequence will fold the way you want it to, nor tell you what

9    it's binding to.  You have to test it.

10     Q. You told us earlier you were making scFvs for something

11    like 25 years.

12              How successful have you been personally?

13     A. I've looked back, and I think we have probably managed to

14    make about 25 percent functional scFvs starting with heavy

15    and light chain sequences.

16     Q. What happened the other 75 percent of the time?

17     A. They didn't bind to their targets or they didn't express.

18     Q. And based on your experience from selecting a target to

19    choosing a design to testing, how long could that take a

20    person of skill in the art in 2002?

21     A. Depending on where along this process we've talked about

22    what is.  It could be from six months to over a year.

23     Q. How would that timeframe change if the target was CD19?

24     A. It wouldn't change.

25     Q. Have you seen publications that support your opinions on

GARCIA - DIRECT

1    the challenges of designing and making scFvs?

2    A. Yes.

3    Q. I would ask you to turn in your binder to DX0881.

4         Is this one of the articles you relied on in forming

5    your opinions?

6    A. Yes.

7         MR. BIEGLER:  I would ask to move DX0881 into

8    evidence.  I understand there is no objections.

9         MR. CHU:  No objection.

10        THE COURT:  Received.

11        (DX0881 received in evidence.)

12   Q. Turning to DDX310, I believe you have excerpted some of

13   the texts from that article?

14   A. Yes.

15   Q. And who was the first author of this publication?

16   A. Bejcek.

17   Q. And when was this article published?

18   A. 1995.

19   Q. How many scFvs did Bejcek try to make?

20   A. They attempted to make three, and they say they were able

21   to make one that bound -- that showed any ability to bind to

22   CD19.

23   Q. So only one out of three worked?

24   A. Correct.

25   Q. What does this paper tell you about the predictability of

GARCIA - DIRECT

1   scFvs?

2    A. Well, on the next highlighted part of the abstract, it

3   says, The development of scFvs with proper folding and high

4   binding infinity remains empiric.  So the rules are not

5   known, and it's -- put in my own words, empiric, it's a

6   trial-and-error process.

7    Q. Why does that matter to your opinions?

8    A. Well, again, it goes towards the lack of predictability

9   of making functional scFvs and the amount of trial and error,

10  experimentation one would have to do.

11   Q. In total, how many CD19-specific scFvs are you aware of

12  that had been published by 2002?

13   A. I think four or five.

14   Q. And let's turn to DDX311.  Once you have an scFv that

15  actually works, how do you then make a CAR with it?

16   A. Well, you have to then link the scFv to the CAR.  And

17  that is done through another spacer region.  That's another

18  linker kind of sequence.

19   Q. And what's the leader that we see referred to?

20   A. The leader is another peptide which is important for the

21  folding of the scFv to get out of the cell.

22        So both the leader and the spacer, there is a myriad

23  of possibilities, and there is really no rules that predict

24  which ones are going to work and which ones won't.

25   Q. How many options were there for spacer sequences and

GARCIA - DIRECT

1    leader sequences in 2002?

2     A. Very -- many options.  Only a few were known.  And with

3    leaders, there were even more options.

4     Q. Turning to DDX312, after you've made your design choices

5    for the CAR, what is next?

6     A. Well, you have to get the CAR into the T-cell and make

7    the CAR a T-cell.

8     Q. And once you've actually grown these cells, what do you

9    do then?

10     A. Well, you have to see if that scFv is functional and able

11    to recognize its target.

12     Q. And referring to DDX313, what are we seeing here?

13     A. Well, on the top we have an scFv connected to a CAR that

14    is folded properly and is able to productively recognize the

15    cancer cell, communicate the signal to the signaling domains,

16    and kill the cancer cell.

17     Q. What do we see at the bottom?

18     A. In the bottom, the scFv is not folded correctly.  And

19    because it's not the right shape to be complementary to the

20    target, it can't bind the target or kill the cancer cell.

21     Q. Before you tested the CAR, would you have any expectation

22    that it would actually bind to the target that the scFv was

23    directed to?

24     A. You have no way of knowing.  There are no metrics which

25    would tell you the answer before doing the experiment.

GARCIA - DIRECT

1    Q. Is that true even if you used an scFv that had already

2    been published?

3    A. Yes.

4    Q. And why not?

5    A. Well, when you make an scFv by itself, it folds in a

6    different way than when you make it when it's connected to

7    the CAR.  So now it's linked to something.  And that can

8    change the folding properties so that a functional scFv by

9    itself may be nonfunctional in the context of a CAR.

10   Q. You said earlier the process of making and testing an

11   scFv could take six months to over a year, somewhere around

12   there.

13         How much more time could it take to make and test a

14   CAR with that scFv in 2002?

15   A. It -- it could be months to well over a year.

16   Q. In 2002, how well developed was CAR technology?

17   A. It wasn't a field yet.  It was at its infancy.  Only a

18   few investigators were working on it, and there were only a

19   few publications around.

20   Q. And why does it matter to your opinions that the field

21   was new and unpredictable?

22   A. Because the patent provides very little guidance.  There

23   is very little for the experimenter.  There is very little

24   body of work out there published to fall back on.  So the

25   patent needs to provide a lot of guidance to the

GARCIA - DIRECT

1    experimenter.

2    Q. Now that we've talked about the science a little bit, I

3    want to turn to your opinions.

4          Did you conduct an analysis of the validity of the

5    asserted claims of the '190 patent under the legal doctrines

6    of written description and enablement?

7    A. I did.

8    Q. And first off, did you analyze each of Asserted Claims 3,

9    5, 9, and 11 of the '190 patent in your written description

10   and enablement analysis?

11   A. I did.

12   Q. With reference to DDX314, can you explain at a high level

13   what your opinions are?

14   A. Well, the -- for written description, the patent does not

15   show the inventors possessed the full scope of the asserted

16   claims at the time they filed the patent.  And it is not

17   enabled because the patent does not teach how to make and use

18   the full scope of the asserted claims without undue

19   experimentation.

20   Q. Do those reasons reflect your high-level understanding of

21   the legal requirements for written description and

22   enablement?

23   A. Yes, they do.

24   Q. And turning to DDX315, which, for the record, has

25   excerpts from PX001.23, which is in evidence, did you group

GARCIA - DIRECT

1    the claims for your analysis?

2     A. I did.

3     Q. Can you explain what we see in the slide?

4     A. Yeah, so Claims 3 and 9 claim single-chain antibodies to

5    any target.  Claims 5 and 11 narrow that, so that it's

6    single-chain antibodies to CD19 target.

7     Q. Let's start with the claims to any target.

8            How many different scFvs could that claim include?

9     A. Millions or billions.

10    Q. How did you get to that number?

11    A. Well, the antibody heavy chain has approximately billions

12   of possible sequences.  The light chain has approximately

13   millions.  And so when you put them together, you multiply

14   those numbers together and you come up with millions of

15   billions of possible scFv sequences.

16    Q. Does the -- in Claim 1 we see some language, some

17   functional language about specifically interacting with a

18   selected target.

19            Do you see that?

20    A. Yes.

21    Q. What does that tell you about the structure of the scFv

22   besides that it's an scFv?

23    A. It doesn't tell you anything.  Because knowledge of the

24   target tells you nothing about the structure or the sequence

25   of the antibody that will bind to that target.

GARCIA - DIRECT

1    Q. Now, turning to the CD19 claims, how does the language

2    "binds to CD19" inform the structure of the scFv?

3    A. Again, it doesn't tell you anything about the structure

4    or sequence.

5    Q. How many of the millions of billions of potential scFvs

6    would you actually expect to bind to CD19?

7    A. It would be many fewer, but it would still be a very

8    large number.

9    Q. How could you figure out how many it is?

10   A. Well, you would have to do an experiment where you tested

11   a very large number of scFvs and found out how many bound to

12   CD19.

13   Q. Okay.  So let's turn to your opinion that the '190 patent

14   does not meet the written description requirement.

15        To start, does the '190 patent disclose the scFv

16   used in Kite's YESCARTA product?

17   A. No, it does not.

18   Q. What information was published about the scFv used in

19   Kite's YESCARTA product before 2002?

20   A. So there is one paragraph in the patent, Example 7, which

21   has a very general description of one of the scFvs to CD19.

22   Q. Is that the one in the YESCARTA product?

23   A. No, that one is not.

24   Q. So my question is what information was published about

25   the scFv in YESCARTA before 2002?

GARCIA - DIRECT

1    A. Well, the scFv was not published, but the sequence --
2    there were sequences of the heavy and light chain that were
3    published.
4    Q. So the exact scFv used in the YESCARTA product was not
5    published before 2002?
6    A. No.
7    Q. So in your opinion, what is the standard way for somebody
8    in your field to describe an scFv?
9    A. You have to give the whole sequence of the entire scFv to
10   know what it is.
11   Q. Why?
12   A. Because that is the code.  That is the identity of the
13   scFv.
14   Q. Does the '190 patent have a section that includes
15   sequence listings?
16   A. Yes.
17   Q. Did you find any sequences for any scFvs?
18   A. No.
19   Q. Turning to DDX316 -- which for the record has text from
20   PX001 at dot 16 -- did you find any examples in the patent
21   about a CD19 scFv?
22   A. Yes.  Example 7 is a paragraph from the patent which
23   alludes to a hybridoma cell line SJ25C1.
24   Q. What's a hybridoma cell line?
25   A. The hybridoma is the cell from the mouse that's the

GARCIA - DIRECT

1    little -- that's the antibody-producing factory; where you

2    get the antibody from.

3    Q. What does this language in Example 7 tell a person of

4    skill in the art about the structure of the actual scFv?

5    A. It tells you nothing.  It tells you the code name of a

6    cell line.

7    Q. And is Kite's YESCARTA product made from this SJ25C1

8    hybridoma cell line referenced in the patent?

9    A. No.

10   Q. Now, could a person of skill in the art get access to

11   this SJ25C1 cell line in 2002?

12   A. I found no place in the patent where it tells the

13   experimenter how to obtain the cell line.

14   Q. How do you understand that the inventors got access to

15   it?

16   A. Um, they, um, got it directly through an agreement with

17   another institution.

18   Q. Now, did the Bejcek article that we looked at earlier,

19   did that include a sequence for the heavy and light chains of

20   the SJ25C1 antibody?

21   A. Yes, it did.

22   Q. And was that the correct sequence?

23   A. It was not.

24   Q. How do you know that?

25   A. Well, as we just saw one of the inventors testify, they

GARCIA - DIRECT

1   ultimately determined that the published sequence was

2   incorrect.

3    Q. And what do you understand happened when Dr. Brentjens

4   tried to use the scFv described in the Bejcek paper in a CAR?

5    A. It was not functional.

6    Q. Where is this error from the published sequence of SJ25C1

7   disclosed in the patent?

8    A. It's not disclosed.

9    Q. Okay.  And turning to DDX317.

10         You've highlighted some additional text from Example

11  7 of the patent here?

12   A. Yes.

13   Q. What does that tell you?

14   A. So here a linker -- the linker region is described that

15  connects the two chains, and that's what that is.

16   Q. What other information would you need to know what scFv

17  the inventors actually made?

18   A. Well, you need to know where it's connected to the heavy

19  and light chains, what's the boundary on the other side.  And

20  you also need to know whether the light or heavy chain was

21  first or second.

22   Q. So turning to DDX318, is it your opinion that there is no

23  way to know from the '190 patent what CD19 scFv the inventors

24  actually made?

25   A. There is no way to figure it out.

GARCIA - DIRECT

1    Q. Now, turning to DDX319.  Even if we knew what the

2    inventors made, in your opinion, would that adequately

3    describe the breadth of what they claimed?

4    A. No, because it's one scFv.  And one scFv is not

5    representative of the enormous number and variety of

6    different scFvs that bind to CD19.

7    Q. Was there a second reason?

8    A. That the patent does not disclose common structural

9    features for scFvs that bind to CD19, such that an

10   experimenter could see these features in other sequences and

11   know that they bound to CD19.  There is nothing there to

12   earmark a CD19 scFv.

13   Q. Does the '190 patent identify any common structural

14   features for CD19 scFvs?

15   A. It does not.

16   Q. Had the structure of the target, the CD19 antigen, been

17   determined as of 2002?

18   A. No.

19   Q. Turning to DDX320.  I want to ask you about the first

20   reason you stated which was that example was not

21   representative.

22         What did you mean by "not representative"?

23   A. Well, the -- let's say the scFv and the patent was the

24   red spot, all those other scFvs are gray spots that have

25   unrelated sequences, um, that scFv doesn't adequately

GARCIA - DIRECT

1   represent the whole scope of molecules that are claimed in

2   the patent.

3    Q. Turning to DDX321, what are some of the differences in

4   CD19 scFvs?

5    A. So here is a partial list of all the different ways that

6   scFvs can differ from each other.  They have highly variable

7   sequences.  Their orders of heavy and light are different.

8   They have different linkers, as we talked about; different

9   linker lengths, sequences, structures.  Different binding

10  affinities, meaning strengths of binding.  You can have

11  strong and weak binders.  They bind to different epitopes of

12  CD19.

13         So an epitope is a part of the region of CD19 that

14  the antibody actually sees and grabs.  And then finally, they

15  can be made from different species.  So in contemplating

16  practicing these inventions, the experimenter would have to

17  sort through all of these variables to find the right

18  combination.

19   Q. What description does the '190 patent provide about these

20  types of differences?

21   A. It doesn't provide any.

22   Q. The last one you mentioned, Made from different species,

23  what species is the scFv discussed in the patent made from?

24   A. Mouse.

25   Q. And does the patent describe scFvs made from any other

GARCIA - DIRECT

1        source?

2         A. It does not.

3         Q. I want to focus on a few of these.  So first you said

4        that they have highly variable sequences.

5                 What work did you do to determine that?

6         A. So I did some comparative analysis using computer

7        programs and alignment tools of CD19 scFv sequences to each

8        other and to different antibodies to ask, How similar are

9        they?

10        Q. If you could turn to DX2160 in your binder, please.

11        A. Say that again.

12        Q. DX2160, please.

13        A. Okay.

14        Q. And what is DX2160?

15        A. This is a data package that I generated analyzing the

16       sequence of the SJ25C1 against other antibody sequences.

17        Q. Does this document summarize sequences from underlying

18       publications you looked at?

19        A. Yes.

20        Q. And do the underlying documents inform the knowledge of a

21       person of skill in the art?

22        A. Yes.

23             MR. BIEGLER:  Your Honor, I move DX2160 into

24       evidence.

25             MR. CHU:  We object.  It's beyond the scope of the

GARCIA - DIRECT

1    report, relevance, 403, foundation.

2              THE COURT:  The Court will reserve ruling, coming

3    back to that.

4     Q. Big picture, Dr. Garcia, what did you conclude after

5    comparing CD19-specific scFvs?

6     A. That their sequences are highly diverse.  And, in fact,

7    the sequences between different scFvs to CD19 are even more

8    different than CD19 scFvs compared to other antibodies that

9    bind to completely different targets.

10    Q. I understand you prepared a few slides to summarize some

11   of your comparisons.  If we can turn first to DDX322, what do

12   we see here?

13    A. What I've done here is I've aligned the heavy chain of

14   the patent CD19 scFv on top and underneath the YESCARTA heavy

15   chain.  And on the bottom, I have done the same for the light

16   chains.

17              And now what I've done here is gray out the residues

18   that are different, the amino acids that are different, and

19   maintained the amino acids that are bold.  And they're green

20   squares underneath indicating "identical."

21              And through this type of analysis, I calculated that

22   the heavy chains are 39 percent similar, and the light chains

23   are 53 percent similar.

24    Q. In your experience, Dr. Garcia, is that a high degree of

25   similarity or a low degree of similarity?

GARCIA - DIRECT

1    A. Low.

2    Q. Okay.  Let's turn to DDX323.

3              What comparison are we seeing here?

4    A. So here, I've narrowed down this analysis to just the

5    sequences of the loops of the scFv that -- the actual touch

6    points, with CD19, the actual fingertips of the scFv.  And

7    those are called CDR loops.

8              And I have aligned the CDR loops of the patent CD19

9    scFv with YESCARTA for the light and heavy chains.  And as

10   you can see, there are only a couple amino acids that are the

11   same.  They are essentially entirely different, which means

12   that they are binding to CD19 in very different ways.

13   Q. And why are the CDRs so important?

14   A. Because those are the actual touch points, and the

15   chemistry of that interaction dictates the shape of the loops

16   that bind.

17   Q. Let's turn -- actually, let's go back.

18             Could you state for the record how many similar

19   amino acids there are in the heavy and light chain when

20   comparing the YESCARTA scFv and the SJ25C1 scFv?

21   A. Well, on the heavy chain there appear to be five out of,

22   I don't know, 30 something.  And in the light chain, there

23   appear to be nine out of maybe 35 or 40.

24   Q. Turning to DDX324, what comparison are we seeing here?

25   A. So here, instead of comparing the patent scFv, in

GARCIA - DIRECT

1    addition to comparing the patent scFv to YESCARTA on the

2    bottom, with the numbers I just showed you earlier, I'm

3    comparing it to antibody sequences that see completely

4    different targets than CD19.

5           As you can see, the antibody scFv is more similar to

6    antibody sequences that don't even bind to CD19 than it is to

7    an antibody that does bind to CD19.  And what that really

8    does is highlight the lack of predictability that these amino

9    acid sequences give you in identifying CD19-binding scFvs.

10   Q. How similar was an scFv that binds to the -- I guess the

11   borealis surface protein compared to SJ25C1?

12   A. Um, approximately 80 percent for the light chain and

13   72 percent for the heavy chain.

14   Q. And how about the white spot virus protein?

15   A. 80 percent and 67 percent.  And 85 percent and 71 percent

16   for the guinea pig C5 protein.

17   Q. And how does that compare to the YESCARTA scFv?

18   A. Those sequences are much more similar to the patent scFv

19   than the YESCARTA, which is 53 percent and 39 percent.

20   Q. So what did you conclude relevant to your written

21   description opinion from all these sequence comparisons?

22   A. That the patent scFv is not representative of the vast

23   diversity of CD19 scFv sequences that bind to CD19.

24   Q. Okay.  Turning to DDX325, another difference you

25   mentioned was in binding strength.

GARCIA - DIRECT

1           Can you explain that?

2      A. Yes.  So affinity or binding strength is an important

3      property of scFvs.  And we know from published work that the

4      patent scFv, SJ25C1 on the left, has a very weak binding

5      strength, whereas the YESCARTA has a very strong binding

6      strength.

7           Now, different scFvs combined all across the

8      spectrum of weak to strong, and there is no way of knowing

9      whether they are strong or weak binders based on the

10     sequences or any other properties of the scFv, other than

11     doing an experiment.

12     Q. You also said that CD19 scFvs differ in the epitope that

13     they bind to?

14     A. Yes.

15     Q. Can you explain that?

16     A. Yes.  So the part, the shape on the CD19 that the scFv

17     docks down on and grabs is going to be different for

18     different scFvs.  And here again, there is no way to know

19     which part or epitope it's going to bind to.

20     Q. Were the epitopes of the CD19 antigen published in 2002?

21     A. No.

22     Q. And based on your review of the sequences of the YESCARTA

23     scFv and the SJ25C1 scFv mentioned in the patent, would you

24     expect them to bind to the same epitope or different

25     epitopes?

GARCIA - DIRECT

1     A. Different.

2     Q. Have you seen work done by Juno in determining the

3     epitope that CD19 scFvs bind to?

4     A. Yes, I have.

5     Q. If you could turn in your binder to DX0342, please.

6     A. Okay.

7     Q. And what is this document?

8     A. This is a document from a company called Pepscan that

9     Juno commissioned to map the epitopes that scFvs to CD19 bind

10    to.

11    Q. Did you rely on this document in forming your expert

12    opinion?

13    A. Yes, I did.

14          MR. BIEGLER:  Your Honor, we would ask to move

15    DX0342 in evidence.

16          MR. CHU:  Objection, MIL Number 2, foundation,

17    relevance, 403.

18          THE COURT:  The -- going back to DX2160, the

19    objection on beyond the scope, relevance and 403 is

20    overruled.  And DX2160 is received.

21          And the Court will review the objection just

22    recently entered.  So I'll reserve.

23          (DX2160 received in evidence.)

24          MR. BIEGLER:  Your Honor, given that he relied on

25    it, may I publish it for the jury.

GARCIA - DIRECT

1        THE COURT:  Which?

2        MR. BIEGLER:  Sorry.  DX0342.

3        THE COURT:  I have to review it.

4   Q. What did you conclude based on your review of DX0342?

5   A. Well, after reading the report, in the back there is a

6   conclusion where the -- this company, after doing the

7   experiments, concluded that the antibodies FMC63, which is a

8   part of the YESCARTA product, and JCAR015, which is the Juno

9   product, recognize nonoverlapping epitopes.

10  Q. So given all of these differences in CD19 scFvs that we

11  have discussed, in your opinion can the choice of a CD19 scFv

12  affect how the claimed CAR constructs work?

13  A. They make all the difference in the world.  One scFv can

14  work, and another one won't.

15  Q. Why would the scFv affect CAR function?

16  A. Because it's the conduit, it's the binder to the target,

17  and it's the conduit that has to relay that binding event to

18  the signaling domains.  And if that isn't right, the CAR is

19  not going to work.

20  Q. And what is your basis for that opinion?

21  A. Well, there is ample published literature out there

22  showing that different scFvs across all these different kind

23  of properties we've talked about -- affinity, epitope,

24  etcetera -- can have highly variable effects on CAR function.

25  Q. If you could turn to the skinny binder you have up there.

GARCIA - DIRECT

1    And do you see in there DX0386, DX0954, and DX0252?

2     A. Yes, I do.

3     Q. And I'll give you a second, but are those three of the

4    papers you just referred to?

5     A. Yes, they are.  They are papers by Jensen, June and Wu.

6     Q. And do those papers reflect the knowledge of a person of

7    skill in the art?

8     A. Yes, they do.

9     Q. Did you rely on them in forming your opinions?

10     A. I did.

11          MR. BIEGLER:  Your Honor, we would move in DX036,

12    DX0954, and DX0252.

13          MR. CHU:  Just a moment, Your Honor.

14          THE COURT:  The objection to DX0342 is sustained.

15          MR. CHU:  On the last three exhibits, no objection.

16          THE COURT:  DX386, did you say, 9954, and 252?

17          MR. BIEGLER:  Correct, Your Honor.

18          THE COURT:  All received.

19          (DX0386, DX9954 and DX0252 received in evidence.)

20     Q. What did you conclude from your review of those papers?

21     A. Well, they highlight the lack of predictability of the

22    scFv in the function of a CAR and the fact that the rules are

23    still being worked out even today.

24     Q. So we have been focused on the CD19 claims in your

25    written description opinions on that.

GARCIA - DIRECT

1           Are your written description opinions the same for

2     Claims 3 and 9 as they are for Claims 5 and 11?

3      A. Yes, they are.

4      Q. What other scFvs does the '190 patent discuss for targets

5     other than CD19?  And I'm going to refer you to DDX328.

6      A. It mentions one other scFv, termed J5, derived from the

7     J591 hybridoma.

8           MR. BIEGLER:  And for the record, this is text from

9     PX001 at 14.

10     Q. What information does this text on the screen provide

11    about this J591 scFv?

12     A. Well, it's to a different target, and it really doesn't

13    provide any information other than Citation Number 18, which

14    is a publication that originally made the antibody.

15     Q. Does the patent provide a sequence for the PSMA scFv?

16     A. It does not.

17     Q. Could a person of skill in the art figure out what scFv

18    the inventors actually made that's referenced here?

19     A. I don't see how.

20     Q. So we've gone through a lot.  Just to summarize for the

21    jury, after your entire analysis, why did you conclude that

22    the asserted claims of the '190 patent are invalid for lack

23    of written description?

24     A. Claims are very broad, the patent does not adequately

25    describe the scFv portion of CARs that the inventors made,

GARCIA - DIRECT

1    the scFvs discussed in the patent are not representative of

2    the vast number and variety of scFvs in the claimed CARs, and

3    the patent does not identify structural features common to

4    scFvs that bind to a particular target.

5     Q. Okay.  I want to turn now to your opinion on enablement.

6    And with reference to DDX330, to reorient everybody, what did

7    you conclude after finishing your enablement analysis of the

8    asserted claims?

9     A. These claims -- 3, 5, 9, 11 -- are invalid because they

10   are not enabled.  The patent does not teach the experimenter

11   how to make and use the full scope of the asserted claims

12   without undue experimentation.

13    Q. What does the patent say is the intended use of the

14   claimed CAR constructs?

15    A. To bind to the target, communicate that binding event to

16   the signaling domains, and activate Signal 1 and Signal 2.

17    Q. Turning to DDX331, are these the factors that you

18   considered in your enablement analysis?

19    A. They are.

20    Q. What do you understand these factors are called?

21    A. These are legal terms called the Wands factors, which are

22   requirements for enablements in patents.

23    Q. Did you consider these factors as of the '190 patent's

24   filing date in 2002?

25    A. I did.

GARCIA - DIRECT

1    Q. And in your opinion -- sorry.  Is your opinion on

2    enablement the same for all of the asserted claims?

3    A. Yes.

4    Q. So I want to kind of start backwards here.  And starting

5    with Factor 8, the breadth of the claims, is your analysis

6    any different than what we discussed for written description?

7    A. No.

8    Q. In sum, what is it?

9    A. Well, the claims are too broad.  They are claiming

10   everything.

11   Q. Turning to Factors 4 through 7, the nature of the

12   invention, state of the prior art, the relative skill of

13   those in the art, and the predictability or unpredictability

14   of the art, how do your opinions on these factors compare to

15   what you provided earlier for written description?

16   A. The same.  The field was so early that the patent was far

17   too short on guidance to the person of ordinary skill to

18   practice the invention.

19   Q. On Factors 2 and 3, the amount of direction or guidance

20   presented in the presence or absence of working examples, how

21   much guidance does the '190 patent provide on how to make and

22   use the claimed invention?

23   A. Very little guidance.

24   Q. So turning to DDX332, what guidance does the patent

25   provide on how to make scFvs beyond what we've already

GARCIA - DIRECT

1    discussed today?

2     A. Well, it provides a very generic kind of cookbook recipe

3    from a paper called Orlandi for cloning the heavy and light

4    chains.  I have used the Orlando -- Orlandi primers back in

5    1989, and they didn't work on many of the antibodies that I

6    tried to clone.

7     Q. Let's discuss -- the final consideration that you listed

8    was the amount of trial and error necessary.  What work would

9    a person of skill in the art need to do to make a CAR

10   according to the patent with an scFv to a particular target?

11    A. Um, well, you would have to go through all the different

12   variables that I have discussed previously, in combination

13   with each other, in a trial-and-error basis, in a hunt for

14   the winners that bound the target.

15    Q. For any of the CARs you made through that process, would

16   you know if it would bind a CD19 or another target?

17    A. You would have no idea without testing.

18    Q. How about if it would give you Signal 1 or Signal 2?

19    A. No idea.

20    Q. Have you seen work done by Juno that shows how much

21   experimentation it takes to make a new CD19 scFv and use it

22   in a CAR?

23    A. I have.

24    Q. If you turn to DX0936 in your binder.  Is this a

25   publication that includes authors from Juno?

GARCIA - DIRECT

1    A. Yes.

2    Q. And did you rely on this document in forming your expert

3    opinion?

4    A. I did.

5          MR. BIEGLER:  We would move DX0936 into evidence.

6          MR. CHU:  No objection.

7          THE COURT:  936 is received.

8    Q. So turning to DDX333, I believe you have excerpted some

9    of the text from this article; is that correct?

10   A. Yes.

11   Q. If we look at the text, does it tell you how many

12   potential scFvs the Sotomayor authors started with?

13   A. Well, their initial basket, or collection, of scFvs that

14   they started was 10 to the 9th different sequences, so that's

15   a billion sequences.

16   Q. And ultimately how many scFvs did they find had elevated

17   levels of binding in CD19?

18   A. So what they did was they took these billion sequences,

19   and they sifted them for those that bound to CD19.  And out

20   of that billion, they got 60 clones.

21   Q. And then how many did they identify as potential

22   candidates for inclusion in a CAR?

23   A. Three.

24   Q. Did you hear Dr. Frohlich in his deposition testimony say

25   that it took months, if not years, to do this work?

GARCIA - DIRECT

1    A. Yes.

2    Q. Okay.  So to wrap up, Dr. Garcia, in light of all of the

3    WANDS factors that you considered, what did you conclude on

4    enablement?

5    A. It's not met.  The claims are extremely broad, compounded

6    by this being a very unpredictable, early field without a

7    body of knowledge to fall back on.  There was minimal

8    guidance provided by the patent.  And what that really all

9    adds up to is the experimenter is just left with a lot of

10   variables to try trial-and-error experimentation and find the

11   winners by chance.

12   Q. How many of the WANDS factors actually led you to the

13   conclusion that the patent was enabled?

14   A. None of them.

15          MR. BIEGLER:  Thank you, Doctor.

16          Pass the witness.

17          THE COURT:  We're going to take the afternoon

18   recess.  Please return back to the court at a quarter to the

19   hour.  Do not discuss the case amongst yourselves or any

20   other person, please.

21          THE CLERK:  All rise for the jury, please.

22          (Thereupon, the jury retired from the courtroom.)

23          (Thereupon, there was a brief recess.)

24          MS. JEFFRIES:  Your Honor?  Before you call --

25          THE COURT:  One minute, please.

GARCIA - CROSS

1           MS. JEFFRIES:  Okay.

2           THE COURT:  Yes.  I'm sorry.

3           MS. JEFFRIES:  We do have an issue that we need to

4    address before the next witness, so I don't know if now would

5    be a good time.

6           THE COURT:  No, let's continue.

7           MS. JEFFRIES:  All right.

8           THE CLERK:  Okay.  All rise for the jury, please.

9           (Thereupon, the jury returned to the courtroom.)

10          THE COURT:  The jury is reassembled with counsel

11   present and the parties.  And we continue with the

12   examination of Dr. Garcia.

13          MR. CHU:  Thank you very much, Your Honor.

14                        CROSS-EXAMINATION

15   BY MR. CHU:

16   Q. Good afternoon, Doctor.

17   A. Good afternoon.

18   Q. You are testifying about enablement and written

19   description, correct?

20   A. Correct.

21   Q. And the basic rule of enablement is that the patent has

22   to allow one to make and use the invention without undue

23   experimentation, correct?

24   A. That is my understanding.

25   Q. And with written description, the basic rule is the

GARCIA - CROSS

 1   specification of a patent must describe the claimed

 2   invention, correct?

 3    A. Correct.

 4    Q. Now, Dr. Rosenberg at NCI called Dr. Sadelain and wanted

 5   to know more about Dr. Sadelain's work.

 6            You're aware of that, correct?

 7            MR. BIEGLER:  Objection, 402, 403.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  I've heard some mention of that during

10   the course of the trial.  I don't know details about those

11   conversations.

12    Q. So Dr. Sadelain, according to what has been put into

13   evidence, pointed Dr. Rosenberg to a 2002 Sadelain paper.

14            Do you recall that, generally?

15    A. Um, if that's what he said, I'll agree with that.

16    Q. And that paper later became the basis for this Sadelain

17   patent application, correct?

18    A. Well, basis, um, it's --

19    Q. You heard testimony to that effect?

20    A. There -- the paper was highly related to the patent, yes.

21    Q. And you didn't mention in any of your testimony to the

22   jury that Dr. Rosenberg had any difficulty on making and

23   using the Sadelain invention without undue experimentation,

24   correct?  You made no mention of that?

25    A. He wasn't trying to do that --

GARCIA - CROSS

1    Q. Sir, can you answer it fairly yes or no?  You made no

2    mention of that in your testimony this afternoon, yes or no?

3    You did not mention that Dr. Rosenberg had any difficulty

4    making and using the Sadelain invention without undue

5    experimentation, you made no mention of that, correct?

6    A. As you are asking the question, I can't --

7    Q. Sir --

8    A. -- answer that question.

9    Q. You can't answer it yes or no?

10          You know there was a Dr. Kochenderfer, also at NCI?

11   A. Yes.

12   Q. And today in your testimony to the ladies and gentlemen

13   of the jury, you didn't say anything along the lines that

14   Dr. Kochenderfer had some difficulty in making and using the

15   Sadelain invention without undue experimentation, correct?

16   A. I don't know that they have ever --

17   Q. Sir, can you --

18   A. -- seen the patent.

19   Q. -- fairly answer the question yes or no?

20   A. Well --

21   Q. All I'm asking is whether you said anything to the jury

22   about Dr. Kochenderfer.

23          You didn't; is that correct?

24   A. I've said nothing to the jury about Dr. --

25   Q. Thank you.

GARCIA - CROSS

1    A. -- Kochenderfer or Rosenberg.

2    Q. And you said nothing to the jury about whether

3    Dr. Sadelain had any difficulty understanding the written

4    description of what was disclosed in the Sadelain paper or

5    the Sadelain patent; that's correct?  You made no mention of

6    that to the jury?

7    A. I did not touch on those subjects.

8    Q. Thank you.

9         And the same is true with respect to

10   Dr. Kochenderfer at NCI, correct?

11   A. Correct.

12   Q. You said maybe half an hour ago that the claims of the

13   '190 patent are very broad?

14   A. Yes.

15   Q. In fact, you went further.  You said that they are

16   extremely broad claims?

17   A. Yes.

18   Q. Would you say that your opinion with respect to

19   enablement and written description might be different if the

20   claims were properly interpreted to have a narrow scope

21   instead of an extremely broad scope, correct?  Your opinions

22   might be different?

23   A. That is a hypothetical.  I can't engage in that.

24   Q. Are you aware that the Kite corporation has taken the

25   exact opposite position in public statements?

GARCIA - CROSS

1      A. In --

2      Q. I'm just asking whether you are aware or not, Doctor.

3      A. I don't agree.

4      Q. Okay.  I would like to call up Exhibit 1170.  And this

5      is --

6              MR. CHU:  I would like to offer in evidence 1170,

7      which is a public statement from Kite Pharma.

8              THE COURT:  Let me find it first.  One second.

9              Any objection to 1170?

10             MR. DANE:  We weren't given a binder, Your Honor, so

11     we just got that.  We have it now, Mr. Chu.

12             MR. CHU:  I'll show it to you.  You did get a

13     binder.

14             MR. DANE:  Five seconds ago we got it, Mr. Chu.

15     Thank you.

16             MR. BIEGLER:  402, 403, objection.

17             THE COURT:  I have it as a Kite statement; is that

18     correct?

19             MR. CHU:  Yes.

20             THE COURT:  The objection is overruled.

21             (Exhibit 1170 received in evidence.)

22             MR. CHU:  Okay.  I would like to call it up on the

23     screen, highlight the title for the moment.  And then what I

24     want to -- you can take that down.  Go to the second

25     paragraph, and the third line down where it says, The IPR was

GARCIA - CROSS

1   named at, and where the words "narrow scope" appear.

2   Q. It reads -- this Kite Pharma statement reads, in part,

3   that the '190 patent has a narrow scope.

4            Do you see that?

5   A. I do.

6   Q. Thank you.

7   A. This was a different legal matter.

8   Q. Sir, you have answered the question.  Move to strike.

9            THE COURT:  Motion granted.

10           THE WITNESS:  Sorry.

11  Q. Do you agree that by 2002, the methods of -- let me back

12  up for a moment.

13           You were discussing 2002 because part of your

14  opinion relies on focusing on that year, correct?

15  A. Yes.

16  Q. Would you agree that by 2002, methods and techniques used

17  to create nucleic acid polymers, encoding chimeric TCRs were

18  well-known, standard techniques that were commonly applied by

19  those in the field?

20  A. They have been published, but I wouldn't say that they

21  were well-known.

22  Q. Okay.  I would like to call your -- let me ask this:  Are

23  you familiar with a Dr. Abkin, A-b-k-i-n?

24  A. I am.

25  Q. And you know that Dr. Abkin was a technical expert

GARCIA - CROSS

1    witness for Kite in relation to proceedings between Kite and

2    Juno?

3     A. I believe he was testifying on a different legal matter.

4     Q. The answer to my question was yes.

5          He was an expert witness on behalf of Kite in the

6    dispute between Juno and Kite, correct?

7     A. On a different legal matter.

8     Q. Okay.  Now, I would like to call up -- I would like to --

9    let me do this in a skinny way.

10         MR. CHU:  If it's acceptable to opposing counsel,

11   I'm going to call up PX304.79.  And I say "skinny" because I

12   don't think it's necessary to offer the entire document in

13   evidence.

14         MR. BIEGLER:  Did you say 304?

15         MR. CHU:  Yes.

16         MR. BIEGLER:  I don't have any of these documents.

17         MR. CHU:  Sorry.  Apologies.

18         MR. BIEGLER:  What paragraph?

19         MR. CHU:  It's dot 79.  My apologies.

20         MR. BIEGLER:  No objection.

21         (Exhibit PX304.79 received in evidence.)

22    Q. So what I would like to do is to highlight that portion

23   of page dot 79 that starts with the word "Methods."  And this

24   is Dr. Abkin's report.  Quote, Methods and techniques used to

25   create nucleic acid polymers, encoding chimeric TCRs were

GARCIA - CROSS

1    well-known standard techniques, such as molecular cloning and

2    PRC amplification techniques that were commonly applied by

3    those in the field, end quote.

4         So let me ask you another question.  You would agree

5    that by 2002 a skilled person would have had a reasonable

6    expectation of success in using a scFv as a component of a

7    CAR, correct?

8     A. I disagree.

9         MR. CHU:  I would like to call up Dr. Abkin's

10   declaration at page 89.  Paragraph 125.

11        THE COURT:  Page --

12        MR. CHU:  It's dot 89, paragraph 125, the first

13   three lines.

14    Q. Quote, A skilled person also would have had a reasonable

15   expectation of success in using a single-chain antibody, such

16   as an scFv.  As a component in a chimeric TCR, scFvs have

17   been successfully used, and then it goes on.

18        You would agree that other publications generally

19   known in the art showed success in using scFvs as binding

20   elements in CARs.  Would you agree with that?

21        MR. BIEGLER:  Objection, as to the last Q and A.

22   There was no question about this text, and we would move to

23   strike it.

24        MR. CHU:  Um, I quoted from it and asked the

25   doctor --

GARCIA - CROSS

1          THE COURT:  The motion --

2          MR. CHU:  -- he said, I disagree.

3          THE COURT:  The motion to strike is denied.

4     Q. On to a new question, Doctor.

5          You would agree that other publications generally

6     known in the art showed success in using scFvs as binding

7     elements in CARs, correct?

8     A. There were a few isolated publications --

9     Q. Can you answer that yes or no?

10    A. -- isolated publications --

11    Q. Can you answer that yes or no?

12    A. Can you restate the question?

13    Q. You would agree that other publications generally known

14    in the art showed success in using scFvs as binding elements

15    in CARs.  Are you able to answer that yes or no?

16    A. I can answer the question, but I have to quantify

17    "other."

18    Q. Well --

19    A. Sorry.

20    Q. Excuse me, sir.  Your answer I think so far is that

21    you're not able to answer that yes or no; is that correct?

22    A. Correct.

23         MR. CHU:  So let's call up Dr. Abkin's expert report

24    in this litigation between Kite and Juno at page 89.

25    Q. And a little bit later down there, it says, scFvs have

GARCIA - CROSS

1    been successfully used.  It's right there, third line.  Third

2    line, yep.  Oops, I shouldn't have put my finger on it.  You

3    see here -- whoops.  There it is.

4           Quote, scFvs have been successfully used as the

5    binding element in Krause and Finney.  Similarly, other

6    publications generally known in the art also showed success

7    in using scFvs as binding elements in chimeric TCRs, end

8    quote.

9           Generally speaking, you are familiar with the Krause

10   reference?

11    A. Generally, yes.

12    Q. And you're also generally familiar with the Finney

13   reference as well; is that correct?

14    A. Generally, yes.

15           MR. BIEGLER:  Counsel, is this in evidence?

16           MR. CHU:  I just said no objection about three or

17   four questions ago.

18           THE COURT:  Yeah.  What is -- you direct yourself to

19   the Court.

20           MR. CHU:  Oh, I'm sorry.  You are right, Your Honor.

21           MR. BIEGLER:  Objection.  I'm not sure if this is in

22   evidence.

23           THE COURT:  It's in evidence.

24           MR. BIEGLER:  Thank you.

25           MR. CHU:  My apologies, Your Honor.

GARCIA - CROSS

1    Q. A new question.

2              In your testimony earlier today, you discussed a

3    lack of data or information in the Sadelain patent, correct?

4    A. Yes.

5    Q. But you really don't know one way or the other what data

6    may or may not be required for patent as a legal matter,

7    correct?

8    A. I'm not an expert on the legal nuances.

9    Q. So you don't know one way or the other what data may or

10   may not be required for a patent as a legal matter, despite

11   your testimony earlier today, correct?

12   A. I don't completely agree with that statement.

13   Q. I would like to read your deposition testimony at

14   page 188, lines 4 through 6.

15             THE COURT:  Let counsel find it, please.

16             MR. CHU:  Yes.

17             MR. BIEGLER:  No objection.

18   Q. Question:  So data may or may not be required as a legal

19   matter.  You don't know one way or the other?

20             Answer:  That's correct.

21             Now, earlier today you told the ladies and gentlemen

22   of the jury, in general, about your experience with CARs and

23   scFvs, right?

24   A. Yes.

25   Q. And you submitted an expert report in this case in April

GARCIA - CROSS

1    of 2019, correct?

2     A. Yes.

3     Q. Did you say yes?  I'm sorry?

4     A. Yes.

5     Q. Thank you.  And you were submitting that report and

6    stating that you were an expert in connection with CARs and

7    scFv bindings, correct?

8     A. Yes.

9     Q. At the time you submitted your final report in April of

10   this year, when you were saying that you were an expert, you

11   have never made a CAR construct that uses an scFv binding,

12   correct?

13    A. That's not correct.

14    Q. The fact is you never made a CAR construct that used an

15   scFv at the time you submitted your report and gave your

16   deposition?

17    A. A new CAR.  I've used existing CARs.

18    Q. Sir -- oh.  I would like to read your deposition

19   testimony.  Page 58, lines 9 to 11.

20        MR. BIEGLER:  No objection.

21    Q. Question:  Have you ever made a CAR construct that uses

22   an scFv as an extracellular domain?

23        Answer:  No.

24        As of the time of your expert report and your

25   deposition, you personally have never even attempted to make

GARCIA - CROSS

1    an scFv-based CAR, correct?

2     A. Can you point me to the line?

3     Q. I'm not pointing you, I'm just asking you straight up.

4     A. Can you ask the question again?

5     Q. As of the time of -- your expert report was submitted

6    and/or the time of your deposition, you personally have never

7    even attempted to make an scFv-based CAR; is that correct?

8     A. No, it's not.

9     Q. I would like to read your deposition testimony, page 139,

10   line 24, through 140, line 1.

11           MR. BIEGLER:  Can you say the lines one more time.

12           MR. CHU:  139, line 24, through 140, line 1.

13           MR. BIEGLER:  No objection.

14    Q. Question:  You personally have never even attempted to

15   make an scFv-based CAR, correct?

16           Answer:  Not specifically a CAR.

17           Prior to 2018, you had never constructed any kind of

18   CAR at all, correct?

19    A. I would like to answer the question.

20    Q. Can you answer that fairly yes or no?

21    A. We started --

22    Q. Sir, can you fairly answer that yes or no?

23    A. That's not correct.

24    Q. Excuse me?

25    A. That's not correct.

GARCIA - CROSS

1    Q. I would like to read your transcript at page 58, lines 12

2    through 14.

3            MR. BIEGLER:  No objection.

4    Q. Question:  And prior to 2018, you had never constructed

5    any CAR construct, right?

6            Answer:  That's correct.

7            And as of the time of your final report, you had

8    never made an anti-CD19 scFv for CAR construct, correct?

9    A. We had not constructed new --

10   Q. Can you answer that yes or no, sir?  As of the time of

11   your final expert report, you have never made an anti-CD19

12   scFv for CAR construct, correct?  Can you answer that fairly

13   yes or no?

14   A. We've made other CARs.

15   Q. Sir --

16           MR. CHU:  I move to strike.

17   A. The way you are asking the question makes it

18   impossible --

19           THE COURT:  Doctor, if you cannot answer the

20   question, just tell the jury you cannot.

21           THE WITNESS:  Okay.  I cannot answer that question.

22           MR. CHU:  And I move to strike the prior answer.

23           THE COURT:  The motion will be granted.

24           THE WITNESS:  Sorry.

25   Q. I would like to read your deposition testimony 63 --

GARCIA - CROSS

1    page 63, at lines 11 through 13.

2              MR. BIEGLER:  No objection.

3    Q. Question:  Have you ever made an scFv for inclusion in a

4    CAR construct?

5              Answer:  No.

6              Doctor, at the beginning of your deposition, you

7    were advised that if you didn't understand the question, you

8    could ask for clarification; is that correct?

9    A. Yes.

10   Q. You don't know whether there are any common recognizable

11   features that all anti-CD19 scFvs share, correct?

12   A. I don't.

13   Q. You can't say one way or the other that there are no

14   common structural features among scFvs against CD19, correct?

15   A. I don't know if there are.

16   Q. You have never published any papers on scFvs in CAR

17   constructs, correct?

18   A. I have published papers --

19   Q. Sir, can you fairly answer that yes or no?

20   A. To the extent that I understand the question --

21   Q. Can you -- go ahead.

22   A. -- I don't agree with it.

23   Q. Can you fairly answer it yes or no?

24   A. Can you ask the question again?

25   Q. Yes.

GARCIA - CROSS

1          You have never published any papers on scFvs and CAR

2     constructs, correct?

3          Can you answer that yes or no, Doctor?

4     A. I published a paper on --

5     Q. Sir, can you answer it yes or no?

6     A. I don't -- the answer is no.

7     Q. I would like to read your deposition transcript at

8     page 63, lines 14 through 16.

9          MR. BIEGLER:  No objection.

10    Q. Question:  Have you ever published any papers on scFvs in

11    the context of CAR constructs?

12          Answer:  No.

13          As of the time of your expert report, you have never

14    studied different scFvs and compared them in the context of a

15    CAR construct; is that correct?  Can you answer that fairly

16    yes or no?

17    A. That's correct.

18    Q. And as of the time of your expert report, you had never

19    developed any antibodies to CD19, correct?

20    A. That's correct.

21    Q. As of the time of your expert report, you had never

22    published on any antibodies to CD19, correct?

23          Can you fairly answer that yes or no?

24    A. That's correct.

25    Q. In the time period you were talking about, the 2002/2003

GARCIA - REDIRECT

1    time period, in that time period, you hadn't done any

2    CAR-specific work in the 2002/2003 time period, correct?

3    A. Correct.

4              MR. CHU:  No further questions.

5              THE COURT:  Redirect?

6                        REDIRECT-EXAMINATION

7    BY MR. BIEGLER:

8    Q. Just a few questions, Dr. Garcia.  You were asked

9    questions about Dr. Rosenberg and Dr. Kochenderfer's effort

10   to make a CAR construct.

11              Do you remember that?

12   A. Yes.

13   Q. Have you seen any information in this trial about the

14   amount of experimental effort that those individuals extended

15   to make a CAR?

16   A. I have not.

17   Q. Do you know how long it took Dr. Rosenberg to make his

18   CAR?

19   A. I don't know.

20   Q. Do you know what techniques Dr. Rosenberg used?

21   A. No idea.

22   Q. Do you know if he had to try multiple different scFvs in

23   order to get a successful CAR?

24   A. I don't.

25   Q. Do you know whether Dr. Rosenberg ran into any challenges

GARCIA - REDIRECT

1    in making his CAR?

2     A. No.

3     Q. And has Juno provided any of that information at this

4    trial that you've seen?

5     A. No.

6              MR. BIEGLER:  If -- Mr. Bales, if we could pull up

7    PX1170.

8     Q. Do you recall being asked some questions about PX1170?

9     A. Yes.

10    Q. First question, do you know the date of this press

11   release?

12    A. December 16th.

13    Q. Do you know --

14    A. Sorry, 2016.

15    Q. Do you know if that was before or after the Court

16   construed the claims in this case?

17    A. I can't recall.

18              MR. BIEGLER:  If you go to the sentence that Mr. Chu

19   was directing you to -- right there -- the IPR was aimed at

20   invalidating the '190 patent.  Do you see that, Mr. Bales?

21   Second paragraph, second sentence.

22              And if you could highlight the full sentence,

23   please.

24    Q. What part of the CAR does this press release reference

25   after suggesting that it has a narrow claim scope?

GARCIA - REDIRECT

1    A. The CD8 costimulatory domain.

2    Q. And is that SEQ ID 6?

3    A. Yes.

4    Q. Is there any mention here of the scFv?

5    A. No.

6    Q. Last, you were asked whether you were aware if there were

7    any common structural features among CD19 scFvs, and I think

8    you said you weren't sure, right?

9    A. Yes.

10   Q. Is there any information in the patent about common

11   structural features for CD19?

12   A. No.

13           MR. BIEGLER:  That's all.  Thank you.

14           THE COURT:  Any recross?

15           MR. CHU:  No further questions, Your Honor.

16           THE COURT:  Thank you, Doctor, for your testimony.

17           THE WITNESS:  Thank you.

18           THE COURT:  And I'll see counsel at side bar

19   regarding -- the next witness is?

20           MR. DANE:  Andrew Sullivan, Your Honor.  I'm sorry,

21   Andrew Dickinson.

22           (At the bench.)

23           THE COURT:  What's the issue?

24           MS. JEFFRIES:  The issue is they intend to use two

25   exhibits with the next witness.  Those exhibits we believe

DICKINSON - DIRECT

1    open the door to the $11.9 billion number that you've so far

2    kept out.

3            So the issue is that this witness is going to talk

4    about, based on these exhibits -- and these exhibits are from

5    the time period when Gilead was looking at the acquisition of

6    Kite overall, the entire company.

7            So the exhibits talk about issues well beyond

8    YESCARTA, what -- there's profit and loss statements, there's

9    presentations to the board of directors, which goes to the

10   full value of the 11.9 billion.

11           So if this witness is allowed to talk about that,

12   then I think we are entitled to --

13           THE COURT:  It's a little premature.  So let's see

14   if the door is opened.

15           MS. JEFFRIES:  Understood.  I just wanted to make

16   sure the Court was aware before.  And I've talked to counsel

17   about that so we don't --

18           MR. FARRELL:  I assume the Court will listen to

19   testimony and see if it opens the door or whether --

20           THE COURT:  It doesn't.

21           MR. FARRELL:  Thank you.  I figured as much, Your

22   Honor.

23           MS. JEFFRIES:  Thank you.

24           THE COURT:  Yes.

25           (In open court:)

                            DICKINSON - DIRECT

1                    THE COURT:  We have our next witness.

2                    MR. DANE:  Kite calls Andrew Dickinson as its next

3      witness, Your Honor.

4                    MR. FARRELL:  Kind of a traffic jam there.

5                    THE CLERK:  Sir, this way, please.

6                    Sir, would you please raise your right hand to be

7      sworn.

8                    THEREUPON:  ANDREW DICKINSON,

9      Called in these proceedings and being first duly sworn

10     testifies as follows:

11                   THE CLERK:  Thank you, sir.  Would you please be

12     seated.

13                   THE WITNESS:  Up here?

14                   THE CLERK:  Yes, walk around, please.  Thank you.

15                   Sir, for the record, would you please state your

16     name and spell your last name.

17                   THE WITNESS:  Yes.  My name is Andrew Dickinson.  My

18     last name is spelled D-i-c-k-i-n-s-o-n.

19                   THE COURT:  One moment while we receive the binders.

20                   Thank you.

21                   Your witness.

22                   MR. FARRELL:  Thank you.  Good afternoon, Your

23     Honor.  John Farrell on behalf of defendant.  May it please

24     the Court.

25

DICKINSON - DIRECT

1                              DIRECT EXAMINATION

2    BY MR. FARRELL:

3     Q. Mr. Dickinson, what do you do for a living?

4     A. I am the chief financial officer at Gilead.

5     Q. And how long have you been working at Gilead Sciences?

6     A. I have worked at Gilead for three years.

7     Q. Now, before becoming chief financial officer, were you

8    involved in Gilead's decision to acquire Kite?

9     A. Yes, I was.

10    Q. How so?

11    A. At that time I ran the corporate development team at

12   Gilead, and we oversaw the transaction for the company.

13    Q. Now, before having that job at Gilead, how many years of

14   experience did you have with negotiating licenses,

15   partnerships, and acquisitions?

16    A. Approximately 20 years.

17    Q. And how many license deals or negotiations have you been

18   involved with in your career?

19    A. Hundreds.

20    Q. I want to discuss first the lens through which Gilead

21   looked at the Kite acquisition, okay?

22    A. Sure.

23    Q. How does Gilead view itself?

24    A. Gilead is a company that develops really important

25   therapies for patients that have deadly diseases, so we think

DICKINSON - DIRECT

1    of ourselves as a cure company.

2     Q. And when you say "a cure company," what does that mean in

3    terms of what kind of view you take about projects and

4    acquisitions?

5     A. We strive to follow science that will ultimately lead to

6    cures for patients; not just chronic treatment of their

7    therapies or of their disease, but actually develop something

8    that has curative potential.

9     Q. And can you give me one example of this cure company

10    approach?

11     A. Sure.  I mean, I think there's two great examples with

12    Gilead.  I mean, first in HIV, Gilead is the company that has

13    developed therapies that, although we're not yet at a cure,

14    have taken what was a death sentence decades ago and have

15    made it a manageable, chronic disease.

16            And then maybe a better example is in hepatitis C,

17    which is a virus that infects people's livers and leads to

18    severe liver damage and liver cancer over time, we actually

19    developed curative regimens.

20     Q. Now, did Gilead view its acquisition of Kite through this

21    lens of being a cure company looking for a cure?

22     A. Yes, we did.

23     Q. Okay.  And what does that mean in terms of the timeline

24    approach that Gilead was evaluating this effort at?

25     A. We look at opportunities over a very long timeline.  So

                              DICKINSON - DIRECT

 1    we are willing to invest in platforms and technologies that

 2    will take a long time to develop if we see real curative

 3    potential.

 4      Q. Now, did you see real curative potential in this CAR-T

 5    therapy that Kite had?

 6      A. Yes, we did.

 7      Q. And what kind of timeline were you considering when

 8    Gilead was looking at Kite?

 9      A. We were thinking of this as a platform technology that

10    would develop over a 20- to 30-year timeframe.

11      Q. Now, over time -- in the initial years, how did Gilead

12    evaluate how it would be doing with this project?

13      A. We knew that we would lose money for a long time.  We

14    were going to have to invest in it with the hope that we

15    could stay ahead of other competitors in the field.

16      Q. Now, assuming that Gilead was able to do that, what was

17    Gilead's plan in terms of a profit margin in the later years,

18    though?

19      A. We expected that we would make close to an industry

20    standard profit margin, which is 30 to 40 percent.

21      Q. Okay.  So let's talk about Gilead's evaluation of Kite

22    and the risks involved, okay?

23      A. Sure.

24      Q. Okay.  Now, you oversaw Gilead's effort in analyzing and

25    evaluating Kite and the CAR-T field?

DICKINSON - DIRECT

1    A. I did, yes.

2    Q. Was there a name for this project?

3    A. Yeah.  We called it Project Dodgers.

4    Q. As a Giants fan, I'm not happy.

5         How long did you and your team spend evaluating and

6    analyzing Kite and the CAR-T field prior to deciding to

7    acquire Kite?

8    A. We started seriously looking at the CAR-T field in

9    January of 2017.  We signed the acquisition agreement in late

10   August.  So well over six months of looking not only at Kite

11   but at the entire field.

12   Q. Now, in terms of looking at the entire -- what work were

13   you doing in terms of trying to evaluate the field as well as

14   Kite?

15   A. Well, I mean, first of all you are learning about the

16   technology.  You're talking to the companies in the space,

17   you're talking to investors in the space, you're talking to

18   physicians who have been using some of these treatments.  We

19   are talking to payers.

20        So you're doing a lot -- it takes a lot of time.

21   This is such a complicated therapy and was such a new area

22   that it took a long time to really understand the market and

23   develop our point of view over time.

24        And from the beginning to the end, you know, it took

25   us -- it was a lot of work to really understand the

DICKINSON - DIRECT

1    complexities of this market and then ultimately come to a

2    view on how we thought it was going to play out over time.

3        Q. And I take it you looked at Kite internal documents and

4    Kite projections and evaluations as well?

5        A. We did.

6        Q. Did you take those at face value?

7        A. No.

8        Q. And why not?

9        A. Well, for two reasons.  One, Kite was a relatively small

10   company at the time, and their internal analyses didn't have

11   the same rigor behind them that we believed ours did in terms

12   of the interviews that we had done with physicians, payers,

13   others.  So we tend to rely, as most buyers in our sector do,

14   on our own analysis, not on Kite's.

15           And secondly, any time a company is being sold in

16   our sector, they tend to present the most optimistic case.

17   So you can't take it at face value.

18       Q. How many other companies did you talk to besides Kite in

19   learning about the field?

20       A. Dozens.

21       Q. Okay.  Now, given all the work you and Gilead were doing

22   in this analysis, what was the view that Gilead had now of

23   the CAR-T therapy at that time?

24       A. I mean, the view then and the view today are the same.

25   It's a very -- it's an industry that is in its infancy.  It

DICKINSON - DIRECT

1    has incredible potential for patients; but it's going to take

2    years, probably decades, to develop, just like the antibody

3    industry did or the protein industry did in our sector.  And

4    there is a lot of risk involved.

5           So high-risk, long-term investment, but really

6    significant potential for patients.

7    Q. In simple terms, what's the risk about it?  What's the

8    risk?

9    A. So this is -- it's a unique risk here versus other

10   pharmaceutical products.  So any time you are dealing with

11   something that looks like it has the potential to cure

12   patients -- and there is so many companies developing

13   something -- that any time, if it's -- because it's a

14   one-time treatment, if you are a physician, you are going to

15   use the best treatment that's available at that time.

16          So it's unlike the rest of the pharmaceutical market

17   where typically if you are put on a drug, as long as you are

18   doing well, your doctor is not going to take you off of it.

19   Here, you have a one-time chance to take a treatment,

20   typically.  There are some exceptions, but it's generally

21   viewed as something that is going to be a one-time chance to

22   save your life, essentially.  So you're always going to use

23   the best treatment available.

24          Which is exactly what happened in our HCV markets.

25   You see that people can develop something, and their entire

DICKINSON - DIRECT

1    business can go away overnight if someone develops a better

2    product.

3    Q. And so given that risk, what was Gilead's long-term view

4    of what they would have to do to be successful with this,

5    I'll call, franchise?

6    A. I think our view -- and again, consistent with everyone

7    in the market, I think everyone in this market --

8              THE WITNESS:  Oh.  Slow down.  Sorry.

9    Q. Yes.

10   A. Our view was that you have to continue to innovate to

11   stay ahead of the field.  So there is no way that you can

12   model this scenario out; but you understand that over

13   20 years, you have to continue to develop better, safer, more

14   efficacious products.  And if someone else does, they will

15   take the entire market or most of the market.

16   Q. And I've heard the phrase multigenerational.  Is that

17   what you're talking about?  Multigenerational products?

18   A. Yes.  Yeah.

19   Q. And now, indeed, what are the kind of -- what kind of

20   improvements would Gilead be thinking about in terms of the

21   product that constructed itself?  Would that change?

22   A. Yes, the construct could change for sure.  There's all

23   different portions of the construct that can change.

24   Q. Okay.  And did you and your diligence team prepare a

25   PowerPoint presentation to give to the board of directors

DICKINSON - DIRECT

1    that describe this strategy you're talking about, this

2    long-term strategy?

3      A. Yes.

4      Q. And about when would that have been in terms of 2017?

5      A. Well, I think we had a number of those presentations, but

6    the one that was most important and that we relied on was

7    middle of August, if I remember; a week or so before we

8    signed the acquisition.

9      Q. And this would have a title in it; is that correct?

10     A. Yes.

11     Q. And would the title include the word Project Dodgers?

12     A. Yes, absolutely.

13     Q. Okay.

14         MR. FARRELL:  Your Honor, we have had premarked

15   DX -- I'm sorry, yes, DX2011.

16     Q. And I think you have that in front of you in a binder, if

17   you could look at that, please.

18     A. Okay.  Got it.

19     Q. And this bears the title Project Dodgers, Board of

20   Directors Discussion Materials, and bears a date,

21   August 27th, 2017.

22         What is DX2011?

23     A. This was the final set of discussion materials that we

24   put together for a board meeting before we approved moving

25   forward with the transaction.

DICKINSON - DIRECT

 1    Q. And does this contain the strategy you were talking about

 2    to the jury just now?

 3    A. Yes.

 4              MR. FARRELL:  Move DX2011 into evidence, Your Honor.

 5              THE COURT:  Objection?

 6              MS. JEFFRIES:  Objections for the reasons stated at

 7    side bar, Your Honor.  And we do believe that that is

 8    occurring now.

 9              THE COURT:  So what are the grounds?  I'm not sure

10    what the grounds are.  So state your grounds.

11              MS. JEFFRIES:  Well, we just believe this is opening

12    the door to some information.  But that's the objection.  No

13    other objection.

14              THE COURT:  Then there is no -- no stated grounds.

15    So DX2011 is received.

16              (DX2011 received in evidence.)

17    Q. Now, as part of its due diligence, did Gilead evaluate

18    whether Kite had any competitive advantages over the

19    then-competitors?

20    A. Yes, absolutely.

21    Q. And at the time you were thinking about acquiring Kite,

22    who were the competitors Gilead was looking at?

23    A. Well, in the space, there were dozens and dozens, if not

24    hundreds, of competitors.  But there were two competitors

25    that had late-stage products.  There's a pharmaceutical

DICKINSON - DIRECT

1    company called Novartis and then Juno Therapeutics, a smaller

2    company in Seattle.

3    Q. And what was the fundamental advantage that Gilead

4    thought Kite had?

5    A. Kite had a completely differentiated manufacturing

6    system, from our perspective.  So, again, when you think

7    about a -- the manufacturing system that Kite had developed

8    was more predictable.  So if you gave yourselves, as a

9    patient, you knew that they were likely to come back a couple

10   of weeks later with the new gene as part of them, so that the

11   treatment was something that you were likely to receive.

12        Again, these are patients that are going to die in a

13   matter of weeks or months.  These are patients that have very

14   late-stage disease.  So the assurance that your cells are

15   going to make it through manufacturing and come back is

16   incredibly important.  So they had faster manufacturing, and

17   the manufacturing success rate was much higher than their

18   competitors'.

19   Q. Now, I think there has been comments about if you don't

20   have the construct, you don't have the CAR-T therapy.

21        If you don't have the manufacturing process, do you

22   have the CAR-T therapy?

23   A. No.  There's dozens of things that if you don't have, you

24   don't have this CAR-T therapy.

25   Q. Now, you were -- we have been talking about Gilead saw

DICKINSON - DIRECT

1    the need to improve second- and third-generation products to

2    be successful long-term here.

3            Would that include improving the manufacturing

4    process?

5     A. Yes, absolutely.

6     Q. Can you give me an example --

7     A. Sure.

8     Q. -- if you would like to improve it?

9     A. Yeah.  I mean, the time of manufacturing is the biggest

10   thing.  Right now it takes anywhere from 14 to 20 days to

11   manufacture these cells to do everything that you need to do

12   to them before you can ship them back to the patient.  So if

13   you can shorten that significantly, it will have a huge

14   benefit for patients.

15           So there's a lot of things in manufacturing you can

16   do, but that's the general concept.

17    Q. Now, we've been hearing a lot about first-mover

18   advantage.  When Gilead was looking at Kite, recognizing

19   that -- Kite would have a first-mover advantage by being

20   first into the market?

21    A. Yeah.  By definition, yes.

22    Q. Okay.  The other question I have is, did Gilead see that

23   first-mover advantage then resulting in securing a larger

24   share of the market over time years later?

25    A. No.  I mean, I think that we thought that the first-mover

DICKINSON - DIRECT

1    advantage, if there was any, would be brief in nature.

2    Again, there is no way of modeling how the market would

3    change over time, so that was a challenge for us and for

4    everyone, because the difference of this market.

5              But we expected there to be some potential

6    advantage, but it was likely to be short-lived.

7    Q. Now, did you and your team prepare a PowerPoint

8    presentation again for Gilead's board describing these

9    assessment of Kite's competitive advantages and other

10   factors?

11   A. Yes, we did.

12   Q. This also been around the timeframe of August 2017?

13   A. Correct.

14   Q. And would this title also include the phrase Project

15   Dodgers?

16   A. Yes.

17             MR. FARRELL:  Your Honor, we have had premarked

18   DX0125, which is a cover e-mail with attached PowerPoint

19   presentation which is entitled Project Dodgers and bears the

20   date August 17th, 2017.

21   Q. Do you have that in front of you --

22   A. I do.

23   Q. -- in your binder?

24             My question is, Mr. Dickinson, what is DX0125?

25   A. This was the diligence -- the due diligence briefing

                          DICKINSON - DIRECT

1     materials that we prepared for our leadership team and for

2     our board of directors.

3              MR. FARRELL:  Move DX0125 into evidence, Your Honor.

4              THE COURT:  Any objection?

5              MS. JEFFRIES:  No objection.

6              (DX0125 received in evidence.)

7     Q. I want to turn --

8              THE COURT:  It's received.

9              MR. FARRELL:  Thank you, Your Honor.  Sorry.

10    Q. I want to turn to a number that I think we've heard in

11    the courtroom here of $6.2 billion.

12             Are you familiar with this $6.2 billion valuation

13    that was in an SEC filing?

14    A. Yes, I am.

15    Q. Okay.  You were in charge of the -- evaluating this

16    project.  Was that Gilead's evaluation of what YESCARTA was

17    worth?

18    A. No.

19    Q. Okay.  Well, what was Gilead evaluating in determining

20    what the worth was?

21    A. So we built an intrinsic model of the overall opportunity

22    in this area with the generations that we talked about.  So

23    YESCARTA was the first of five generations that we modeled

24    out.  And we expected the other generations to start coming

25    into the market in the early 2020s.  It was either 2020 or

DICKINSON - DIRECT

1   2021 -- I think 2021 at the latest.

2   Q. So where does the $6.2 billion valuation come from?

3   A. So that's a technical accounting treatment that comes

4   later, well after the acquisition, where our accountants come

5   up with an accounting value that's totally different than an

6   intrinsic valuation model that we did for the deal that we

7   reviewed from our board.  It's a technical accounting

8   valuation that is not tied to intrinsic value.

9   Q. I want to talk to you about upfront payments and royalty

10  rates.

11  A. Sure.

12  Q. As part of your evaluation of Kite, you had become

13  familiar with the CAR-T field and the various companies and

14  licenses going on?

15  A. Yes, absolutely.

16  Q. How common in the CAR-T field were big, upfront payments

17  at the time?  Say, like over a hundred million dollars.

18  A. Well, you have to distinguish between payments for

19  products and payments for components of products.

20  Q. Let me rephrase the question.

21       How common were big, upfront payments for a license

22  of an individual component of CAR-T therapy?

23  A. I wasn't aware of any.

24  Q. What about royalty rates for a license for a single

25  component of the CAR-T therapy?  Were you aware of royalty

DICKINSON - DIRECT

1    rates in excess of 20 percent?

2    A. No.  They're --

3    Q. Well, why wasn't that happening?

4    A. Because, again, these are unique products.  Where you

5    have, you know, dozens, if not hundreds, of technologies

6    coming together to create these cells from the beginning of

7    the processing to the end.  All of those or any portion of

8    those could require you to take an IP license from another

9    party if you decide that the party has valid IP.

10         So as a result, companies in this sector tend to pay

11   very low royalty rates on each individual component.  Because

12   if you paid a big royalty, then you couldn't afford to make

13   the product; it wasn't going to be profitable.

14   Q. Now, the jury has heard about this deal that Celgene had

15   with Juno in 2015.

16         You're familiar with that deal?

17   A. I am, yes.

18   Q. Is that the same kind of arrangement as licensing a

19   single-component CAR-T therapy?

20   A. No.  It's a completely different deal.

21   Q. How so?

22   A. It was a deal that related to products.  I think it was

23   actually, if I remember correctly, multiple products where

24   Celgene got rights to those products that were already

25   developed or in development outside of the United States.

DICKINSON - DIRECT

1    And Celgene also made a huge equity investment in Juno.  So

2    this is apples and oranges, or apples and something that's

3    not a fruit.

4    Q. All right.  You've told us that the CAR-T field is risky,

5    you have to take a long-term view, there's risks that your

6    product could go away like this if a better -- different

7    product comes out there.

8         How confident are you that Gilead, nevertheless, can

9    do this, can accomplish what you see?

10   A. We have great people, and we have the resources to

11   continue to develop the technology.  The -- and the

12   commitment to doing it.  We think that what we're doing is

13   incredibly important for patients.  And because of that, we

14   are committed to moving forward.  I mean, there's risk,

15   there's real risk.

16   Q. What happens, though, if those real risks turn out to be

17   too big even for Gilead?  Is this now a mistake by Gilead to

18   have done this?

19        MS. JEFFRIES:  Objection, Your Honor.  He's now

20   offering expert testimony.

21        THE COURT:  Overruled.

22        THE WITNESS:  Look, at the end of the day, if

23   someone out-innovates us, we will have -- you know, we will

24   have cured thousands of people of cancer, it looks like.  So

25   the power of this technology is incredible.

DICKINSON - CROSS

1              So whether it's a commercial success is part of it.

2       But what's more important to us is that we're investing in a

3       technology that really is making a difference for patients.

4       And it will -- it is today, and it will continue to.

5              MR. FARRELL:  Thank you.

6              THE COURT:  Cross, Ms. Jeffries?

7              And I would just for -- just to provide some

8       guidance, I would remind counsel for both sides of my

9       December 3rd, 2019 order regarding certain motions in limine.

10      The order still remains.

11             MS. JEFFRIES:  All right.

12                          CROSS-EXAMINATION

13      BY MS. JEFFRIES:

14       Q. Good afternoon, Mr. Dickinson.

15       A. Good afternoon.

16       Q. Gilead is one of the largest pharmaceutical companies in

17      the world; is that right?

18       A. Yes.

19       Q. Gilead is a publically traded company?

20       A. Yes.

21       Q. As a publically traded company, Gilead has certain

22      obligations under the securities laws of the United States,

23      correct?

24       A. Yes.

25       Q. These obligations require Gilead to file a Form 10K each

DICKINSON - CROSS

1     year with the Securities and Exchange Commission?

2      A. That's correct.

3      Q. Gilead has a team of people who work on its 10K filings?

4      A. Yup.

5      Q. That team includes lawyers and accountants?

6      A. Yes.

7      Q. Gilead takes care to ensure that the statements in its

8     10K statements are truthful and accurate; is that right?

9      A. Yes, absolutely.

10     Q. All right.  Let's take a look at Gilead's 10K statement

11    from 2017, which is already in evidence in a very thinly -- a

12    thin version, redacted version, PX72.

13            Do you have that in front of you, sir?

14     A. Let me just open -- yes, I do.

15     Q. Okay.  If you turn to PX72.81, you see a statement in the

16    middle of the page?

17     A. I do.

18     Q. We'll put that on the screen.  It says, In October 2017,

19    upon FDA approval of YESCARTA for the treatment of adult

20    patients with relapsed or refractory DLBCL after two or more

21    lines of systemic therapy, 6,200 million of the purchased IP

22    R&D was reclassified as a finite-lived, intangible asset.

23            Do you see that?

24     A. Yes, I do.

25     Q. Is 6,200 million the same thing as 6.2 billion?

DICKINSON - CROSS

1    A. It is, yes.

2    Q. And that amount, 6.2 billion, was classified by Gilead's

3    accountants as a Gilead asset upon approval of YESCARTA by

4    the FDA, correct?

5    A. Yes.

6    Q. Now, you claimed on direct examination that the

7    6.2 billion was for more than just the CAR construct in

8    YESCARTA, didn't you?

9    A. Yeah, it absolutely is.

10   Q. And I found that really interesting, because do you

11   remember when I took your deposition in April of this year in

12   2019?

13   A. I do, yes.

14   Q. And at the time of your deposition, you didn't say any of

15   that, did you, when I asked you about the $6.2 billion then?

16        MR. FARRELL:  Objection, assumes a fact in evidence

17   that she asked about it.

18        THE COURT:  Yeah, sustained.

19   Q. All right.  Well, at your deposition, didn't you, sir,

20   agree that the statement that we're just looking at here on

21   the screen was referring to the fact that upon regulatory

22   approval of YESCARTA, $6.2 billion of the purchased IP R&D

23   was reclassified as an asset on the books of Gilead.  Did you

24   agree with that at your deposition, sir?

25   A. Honestly, I know we talked about this at the deposition.

DICKINSON - CROSS

1    I don't remember what I agreed to.  But the statement --

2     Q. Okay.  Well, why don't we go to your deposition then and

3    take a look.

4     A. Okay.  Great.

5     Q. Page 163, lines 6 to 13.  And then it goes on to say,

6    referring to this 10K statement, Upon approval, we --

7              MR. FARRELL:  Wait.

8              THE COURT:  Identify the page and then the lines

9    that you wish to read from.

10             MS. JEFFRIES:  163, lines 6 to 13.

11             THE COURT:  Okay.  Thank you.

12             THE WITNESS:  Is this it?  In my binder?

13     Q. It's in the front part of the initial binder that your

14    counsel gave you.

15             MR. FARRELL:  Your Honor, no objection to reading

16    those pages -- those lines, that page and line.

17             THE COURT:  Go ahead.

18     Q. So that's referring to the fact that -- Question:  So

19    that's referring to the fact that upon regulatory approval of

20    YESCARTA, 6.2 billion of the purchased IP R&D was

21    reclassified as an asset on the books of Gilead, right?

22             The witness.  Answer:  Yeah.  I mean, I would guess

23    that's what they mean.  But I didn't write it.

24             Now, at the time of your deposition, you said you

25    guessed that -- you would guess that's what they mean because

DICKINSON - CROSS

1    you didn't write it.  But here today you offered a lot of

2    information about what that $6.2 billion meant; isn't that

3    right?

4     A. Yes.

5     Q. Since then, since the time of your deposition in April,

6    you have talked to people to find out a way to be able to say

7    that the $6.2 billion includes aspects of YESCARTA, other

8    than the CAR constructs, right?

9              MR. FARRELL:  Objection, argumentative as phrased.

10             THE COURT:  Sustained.

11    Q. And so here in court, you're talking about manufacturing

12   YESCARTA, right?

13    A. Yes.

14    Q. And you would agree with me, wouldn't you, Mr. Dickinson,

15   that a CAR-T therapy involves at least two essential

16   components, a CAR and a T-cell, right?

17    A. I would say that it requires dozens of --

18    Q. Do you agree with me?  Does it involve a CAR -- does

19   CAR-T therapy involve a CAR and a T-cell?

20    A. Well --

21    Q. Yes or no, please, sir.

22    A. Your question was two essential components.

23    Q. This is now my question.  Does CAR-T therapy involve a

24   CAR and a T-cell?

25    A. Yes.

DICKINSON - CROSS

1     Q. And the word YESCARTA, that's the name of Kite's product,

2    now Gilead's product, right?

3     A. Yes.

4     Q. "Yes," "CAR," "T," is where YESCARTA comes from, right?

5     A. Yes.

6     Q. And the Kite manufacturing process you talked about on

7    your direct examination is the overall process, right, for

8    making the CAR, inserting that CAR into a patient's T-cells,

9    and delivering the CAR-T cells to a patient, right?

10    A. Yeah, and there is one step --

11         MS. JEFFRIES:  Thank you, sir.  I have nothing

12    further.

13         MR. FARRELL:  No questions, Your Honor.

14         THE COURT:  Thank you for your time.

15         THE WITNESS:  Thank you.

16         THE COURT:  Next witness.

17         MR. DANE:  Your Honor, Kite would next call Mohan

18    Rao.

19         THE COURT:  Dr. Rao, would you come forward, please.

20         THE CLERK:  Good afternoon, sir.  Thank you.

21         THEREUPON:  MOHAN RAO,

22    Called in these proceedings and being first duly sworn

23    testifies as follows:

24         THE CLERK:  Thank you, sir.  Would you please be

25    seated.

RAO - DIRECT

1            Sir, for the record, would you please state your

2      name and spell your last name.

3            THE WITNESS:  Mohan Rao.  Last name is R-a-o.

4            THE CLERK:  Would you do me a favor and spell your

5      first name.

6            THE WITNESS:  M-o-h-a-n.

7            THE CLERK:  Thank you.

8            THE COURT:  Your witness.

9                        DIRECT EXAMINATION

10     BY MR. VINCENT:

11      Q. Dr. Rao, would you briefly introduce yourself to the

12     Court?

13      A. Hello, good afternoon.  I am the chief executive officer

14     for Epsilon Economics.  I'm an economist.  And I'm also the

15     chief executive officer for Expression Therapeutics, which is

16     a biotechnology company based in Atlanta.

17      Q. Would you give the jury an overview of your professional

18     career?

19      A. My professional career actually started in Los Angeles.

20     I first received an undergraduate degree in engineering from

21     the University of Michigan.  And then I went on to University

22     of Colorado where I received masters degrees in economics and

23     in international relations.  And I received a Ph.D. from

24     there.

25            And then I went on to Harvard University for a

RAO - DIRECT

1    doctoral fellowship, which is where I completed my

2    dissertation.  And then my first job from there was actually

3    as a professor at UCLA where I was for a number of years.

4    And then now I live in Chicago and teach at Northwestern

5    University.  I teach corporate finance and financial

6    economics.  And as I mentioned, I'm also involved with

7    Expression Therapeutics.

8    Q. And what kinds of products does Expression Therapeutics

9    develop?

10   A. Expression Therapeutics is a gene therapy company.  And

11   we have a number of different products, gene therapies or

12   cures, that are aimed at hemophilia, which is a deadly

13   bleeding disorder, and then different types of cancer.  One

14   of our lead products is for neuroblastoma, which is one of

15   the leading killers of children under 5.  It's a deadly

16   cancer.

17          We have also CAR-T therapies for lymphoma and

18   leukemia and some devastating immune disorders, rare ones

19   that afflict babies.  One of them has a long name called

20   hemophagocytic lymphohistiocytosis.  There is no cure for it

21   right now, so we're trying to develop cures for that.

22   Q. How do those products relate to a product like YESCARTA?

23   A. Our CAR-T therapies, our oncology therapies are very

24   similar to what has been under discussion for YESCARTA and

25   other products through this trial.  The key differences are

RAO - DIRECT

1    we have developed a technology platform called gamma-delta

2    T-cells.  And then we also developed a technology that does

3    not make use of the costims like CD28 or 4-1BB, we use

4    something called a nonsignaling CAR or a NSSCAR for short.

5    Q. As part of your work with Expression Therapeutics, have

6    you negotiated patent license agreements?

7    A. Yes.  I've negotiated a number of patent license

8    agreements for gene therapies, both from academic research

9    centers into Expression Therapeutics, and then from

10   Expression Therapeutics to other biotechnology or

11   pharmaceutical companies.  And I have also negotiated

12   collaboration agreements, as opposed to just simply patent

13   licenses, with other academic institutions, as well as

14   biotechnology companies.

15           And in all of those, I am the negotiator, and then

16   the licenses go under my signature for Expression

17   Therapeutics.

18   Q. Are you a member of any professional organizations?

19   A. Yes.  I'm a member of the American Society of Gene and

20   Cell Therapy, which is a leading professional organization

21   involving gene therapies.  I'm also a member of the Licensing

22   Executive Society, which is a leading professional

23   organization for patent valuation and transactions.  And they

24   actually have a series of courses that professionals --

25   licensing professionals and companies take, such as

RAO - DIRECT

1    pharmaceutical companies.  And I developed their advanced

2    valuation course that's taught to licensing professionals.

3    Q. And have you published anything in the area of patent

4    valuation and licensing?

5    A. Um, I have a number of articles, but probably the most

6    relevant is I'm the author of Valuing Intellectual Property

7    and Licensing Transactions in the Licensing Journal, which is

8    one of the primary journals, as you would expect, for patent

9    licensing.

10   Q. Do you serve on any boards?

11   A. Um, of relevance, I serve on the board of directors of

12   the Children's Hospital of Chicago, which is one of the

13   leading pediatric medical centers in the world.  I also serve

14   on the board of directors of the Children's Research

15   Institute, which is one of the premier pediatric medical

16   research institute in the country.  And these are kind of

17   similar to MSKCC and SKI in their relationship.

18          MR. VINCENT:  Your Honor, at this time we would move

19   Dr. Rao's CV, DX2214, into evidence.

20          THE COURT:  It is received.

21          (DX2214 received in evidence.)

22   Q. Dr. Rao, have you brought with you some slides to help

23   explain your analysis here today?

24   A. I did.

25          MR. VINCENT:  Your Honor, permission to display

RAO - DIRECT

1        DX -- DDX403.

2                    THE COURT:  Has it already been received?

3                    MR. VINCENT:  No.

4                    THE COURT:  Any objection to --

5                    MR. HEINRICH:  No objection.

6                    THE COURT:  DX -- is it 403, did you say?

7                    MR. VINCENT:  Yes.

8                    THE COURT:  It's received.

9                    MR. VINCENT:  DDX403.

10                   (DDX403 received in evidence.)

11                   THE COURT:  I'm sorry.  It's a demonstrative.  You

12       may publish.

13                   MR. VINCENT:  All right.

14        Q. Dr. Rao, let's start with Dr. Sullivan's opinion.

15                   Were you here for Dr. Sullivan's testimony?

16        A. Yes, I was.

17        Q. And what is your understanding of Dr. Sullivan's opinion?

18        A. Dr. Sullivan opines that the reasonable royalty for the

19        '190 patent in this matter is $752 million.  It's comprised

20        of two components:  One is an upfront payment that is

21        approximately $586 million, and ongoing royalties based on a

22        27.6 percent royalty rate that is approximately $167 million.

23        Q. And do you agree with Dr. Sullivan?

24        A. No, I do not.

25        Q. Why not?

RAO - DIRECT

1    A. It's actually pretty easy to see why not.  There is one

2    figure, one financial figure that is not in dispute in this

3    trial, and that is the blue bar that you see on the left

4    here.  And those are the revenues, or sales, of YESCARTA from

5    the time of its launch in October of 2017 through today,

6    through September of 2019.

7         And so those are $604 million, approximately.  Those

8    are revenues; those are not profits on YESCARTA.

9         On the right I have, in the red bar, Dr. Sullivan's

10   reasonable royalty opinion, which is 752.4 million.  So in

11   other words, his reasonable royalty opinion would take away

12   100 percent of the sales or revenues on YESCARTA from Kite or

13   Gilead and transfer them to the plaintiffs.  And in addition,

14   he says it's reasonable to transfer $152.4 million.

15        And that is before deducting any of the costs that

16   would be incurred by Kite or Gilead in order to actually

17   manufacture the YESCARTA therapy.

18        I have been doing licensing transactions for a long

19   time.  I have never seen anything like this.  This is not

20   economically rational that any company would be involved in

21   licensing something like this.

22   Q. Why do you believe Dr. Sullivan's opinion is

23   fundamentally wrong?

24   A. That is correct.

25   Q. And why is that?  What are the reasons?

RAO - DIRECT

1    A. The entire reason for negotiating a license is so that it

2    is beneficial to both parties.  If I'm negotiating a license

3    where I have to pay not 100 percent of my profits -- which

4    itself would be a show stopper -- but 100 percent of my

5    revenues, then it means not only am I not making any money

6    from the license, I'm actually, for every sale I make, I'm

7    making a loss, because I'm providing more to the licensor.

8          That would not be a rational business transaction

9    you would see in the real world.  And as a result, you would

10   never expect to see such a transaction in the real world.

11   Q. Do Dr. Sullivan's opinions account for Kite's own

12   contributions to YESCARTA?

13   A. In fact, that is the fundamental starting point where --

14   where his view is essentially the '190 patent is the active

15   ingredient, to use his term; and, therefore, drives all of

16   the demand and the value for YESCARTA.

17          In reality, from somebody who has been trying to

18   develop gene therapies for a while, they require hundreds of

19   contributions, both scientific, technological in terms of

20   engineering manufacturing and so on.  And so usually

21   something like the construct, while important, is a small

22   component of the overall therapy.

23   Q. Is it consistent with real-world license agreements?

24   A. It's not.  In fact, as I'll discuss, and as he -- as

25   Dr. Sullivan has discussed some of the license agreements, it

RAO - DIRECT

1    is far removed from any of the financial terms that we see in

2    real-world license agreements involving these constructs.

3        Q. Now, before we get to your analysis, do you make any

4    assumptions about the '190 patent?

5        A. Yes.  There is one assumption I make, which is the same

6    assumption that Dr. Sullivan makes, which is the patent, the

7    '190 patent is valid and infringed, because it is only if it

8    is valid and infringed would there be any damages.

9            And if there is no liability against Kite, there

10   would be no damages.

11       Q. Now, what is a reasonable royalty?

12       A. A reasonable royalty is essentially like a rent in return

13   for use of some asset, in this case the asset being a patent.

14       Q. Why is it called a reasonable royalty?

15       A. If somebody were to negotiate a license agreement in the

16   real world, we just call it a royalty.  The reason it is

17   called reasonable royalty is because what we know is the two

18   parties involved in this litigation have not negotiated the

19   license in the real world.  So what we are trying to do is

20   figure out had they negotiated the license, what would have

21   been a reasonable royalty that Kite and Gilead, as the

22   licensees, would have paid the plaintiffs.

23       Q. And how do you calculate a reasonable royalty?

24       A. The courts actually provide us a framework to do that.

25   And that framework is called a hypothetical negotiation.

RAO - DIRECT

1   Q. And what is it that you assume for purposes of the

2   hypothetical negotiation here?

3   A. So the first thing we have to assume is that these

4   parties are at the table in the hypothetical negotiation.  In

5   this case, I was asked to assume that on one side the parties

6   would be Kite and Gilead, and then on the other side of the

7   table they would be SKI and Juno.

8        So you need these two parties in this hypothetical

9   negotiation because the real one hasn't happened.  That is

10  the first assumption.

11       There are two other important assumptions in the

12  hypothetical negotiation compared to a normal business

13  negotiation.  The first of those is, when I negotiate patent

14  agreements, I do not have all of the information.  I have

15  only the information that is either publically available or

16  what I know from my understanding of the value of the

17  technology from my interactions in the business.

18       In a hypothetical negotiation, we assume that

19  everybody knows everything.  In other words, we assume that

20  both parties have access to each other's license agreements,

21  what they have already negotiated.  We also assumed that they

22  have access to each other's projections, not just

23  prospectively at the time of the hypothetical negotiation,

24  but even subsequently as the world actually turned out.

25            And the reason for that is we are trying to

RAO - DIRECT

1    determine a reasonable royalty; in other words, taking all

2    the information into account, what would be a reasonable

3    royalty.  It's not designed to provide one side or the other

4    a windfall because they made a wrong projection or things

5    like that.  And so that's sort of the second critical

6    assumption.

7            The third assumption is when we negotiate real-world

8    licenses, we negotiate them through the end of the patent

9    life, typically.  In a hypothetical negotiation, the horizon

10   is from the time of the negotiation, which is usually the --

11   around the date of infringement, through the time of trial.

12           So in the present case, the hypothetical negotiation

13   would be from October of 2017, when YESCARTA launched,

14   through today, essentially this week, is what our horizon is

15   as opposed to through end of the patent, which is 2024.

16    Q. And you said earlier that you believed Dr. Sullivan's

17   opinion is fundamentally flawed and failed to account for

18   Kite's contributions.

19           What do you mean by that?

20    A. YESCARTA therapy is a complex therapy.  Any gene therapy

21   is a complex therapy.  And there are lots and lots of

22   components to it.

23           Many products, complex products, require lots of

24   contributions.  Think of something like a computer.  A

25   computer has to have a CPU from a company like Intel, without

RAO - DIRECT

1      which there is nothing.  It has to have a operating system,

2      such as Microsoft Windows, without which there is no

3      computer; there's nothing you can do with it.  It has to have

4      an input device, like a keyboard.  It has to have a display

5      device so we can actually see what we are typing in and what

6      the computer shows us.  Has to have storage.  Has to have,

7      today, Internet connectivity, Wifi and so on.

8              In addition to that, if you think of a company like

9      Dell, it has to have the scientific staff, the engineering

10     staff.  It has to have manufacturing capability.  It has to

11     have managerial capability, marketing capability, operational

12     capability, long supply chains, worldwide supply chains with

13     suppliers to provide the components.

14             And then to be able to assemble all of those, it has

15     to have relationships with retailers.  It has to have

16     marketing, advertising, branding all of that.

17             So there is a lot it brings together.  So which

18     means even something like an Intel chip or the Microsoft

19     operating system only has a small portion; it's value is a

20     small portion of the total value of the computer.

21             So if you have a $1,500 or $2,000 computer, I know

22     from prior work, Intel's chip is only about $100 to $150.

23     The Microsoft operating system is about $70.  And so even

24     critical systems, without which there is no computer, cannot

25     take up a huge portion of the total profits, because then it

RAO - DIRECT

1    would not be viable for a company like Dell to bring that to

2    market.

3                  Similarly, the YESCARTA therapy has hundreds of

4    steps involved in its manufacture.  And so as a result, any

5    one component can only have a small apportioned value to the

6    total profits.  It cannot take up most of the profits because

7    then the product would not be commercially viable.

8    Q. Did you prepare a slide showing these contributions?

9    A. I did.

10   Q. Can you tell us what this is?

11   A. So what I've done is summarize just some of the key

12   elements of the YESCARTA therapy.  It starts with the CAR-T

13   DNA.  That would be where the '190 patent potentially could

14   fit, and is alleged to fit.

15                 But then just having a CAR-T therapy is not the same

16   as having a commercial product.  You have to undertake

17   several years of preclinical research.  In addition to the

18   preclinical research, once you are successful, you have to

19   actually develop a manufacturing capability to be able to get

20   into clinical trials in humans.

21                 Once you have that, you apply to the FDA just to be

22   able to conduct clinical trials.  Once you get their

23   approval -- something known as an investigational new drug

24   application approval -- then you have to conduct many stages

25   of clinical trials.  If you are successful in clinical

RAO - DIRECT

1      trials, then you have to develop clinical know-how in the

2      clinical trial, such as dosing, the conditioning regime such

3      as lymphodepletion that you've heard here, how to deal with

4      adverse effects such as the cytokine release syndrome that

5      has come up here.

6              Once you are successful through all that and you

7      convince the FDA on the efficacy and safety of the product,

8      then you have to have FDA approval, something called a

9      biologic license application.  Once that is successful, then

10     now you have to get into commercial manufacturing, which is

11     different than clinical manufacturing.

12             Commercial manufacturing standards often are much

13     more stringent.  So you need to be able to do that.

14             And then you have to have relationships with

15     treatment centers, trained physicians, and to be able to give

16     your therapy.  And then of course you have to make continuous

17     improvements to the therapy; it's not like a one shot.  It's

18     not like what you often think of as a small pill, what is

19     called a small molecule for treating arthritis or cholesterol

20     or so, this is -- it's an evolving process.

21             So that whole process of what is called rain to

22     rain, or apheresis, extracting blood to infusion with the

23     product is actually a fairly complex process of which '190

24     patent fits into a sliver of it.

25       Q. Does access to the '190 patent guarantee a successful

RAO - DIRECT

1    therapy?

2     A. Um, it does not.  In fact, here we actually have

3    evidence -- we don't need to guess this.  Juno's JCAR015

4    product, I understand is based on the '190 patent.  In fact,

5    what's unique there is that they had access to the inventor

6    of the '190 patent, Dr. Sadelain.  They had all of the

7    collaboration and the know-how from MSKCC and SKI, because

8    Juno and MSKCC had a collaboration agreement.  And so that

9    all the benefits of the people who actually invented the

10   patent.

11           And despite that, because of patient deaths, the FDA

12   put them on clinical hold.  And in turn, they ended up

13   terminating the product, the JCAR015 product.

14           So what we know is that merely access to the '190

15   patent does not allow you to manufacture a

16   commercially-viable product.

17           In fact, even when it comes to the next product,

18   JCAR017, I understand Juno has had numerous manufacturing

19   difficulties, both in being able to qualify its vector

20   manufacturing supplier, as well as in being able to get

21   stable manufacturing and then a quick turnaround time,

22   because these are critically ill patients.

23           So just merely having access to a patent is not

24   sufficient.  It may be necessary, but it's not sufficient.

25   You have to have many, many other components to make the

RAO - DIRECT

1     therapy possible.

2      Q. Now, another reason you explained that Dr. Sullivan's

3     analysis is wrong is that it is not consistent with

4     real-world license agreements.

5           Why do economists use real-world license agreements?

6      A. We use real-world license agreements because often

7     comparable licenses, for similar technologies, may be a good

8     way to figure out what the market value is, what value market

9     places on those technologies.

10          It's not dissimilar to how we figure out the value

11    of a house.  If I'm interested in purchasing a house, what we

12    typically do is we would look for comparable houses in a

13    similar neighborhood and maybe make some adjustments, but

14    essentially use that as a basis.

15          And there is nothing actually special about patent

16    valuation.  A valuation of any asset for economists is

17    similar.  And patents are valued in the same way that other

18    assets such as houses are valued.

19     Q. What other agreements do that you think are informative

20    in this case?

21     A. There are at least three that are the most informative.

22    In fact, you have seen all of these through Dr. Sullivan.

23    The first of course is the MSKCC Juno agreement, because that

24    is an agreement that includes the '190 patent.  It has many

25    other things in it, but it includes the '190 patent.  So it's

RAO - DIRECT

1    a good starting point.

2            We also have two agreements that are for a

3    comparable technology.  4-1BB costim -- that you have seen

4    sometimes referred to as a best-in-class costim -- that Juno

5    is using for its JCAR017 product.

6            And so there we have a license from St. Jude, which

7    is a research institution, into Juno.  And then we also have

8    the same patent license from Juno to Novartis.  So these are

9    good places actually to start for our comparable license

10   analysis.

11   Q. Let's start with the agreement between MSKCC and Juno.

12           What are the key features of that agreement?

13   A. So that agreement has three components to it.  The first

14   is a royalty rate.  And the royalty rate ranges from

15   something like 2 percent all the way up to a maximum of

16   7.25 percent.

17           It also has several -- it has other patent and

18   patent applications as part of this agreement, in addition to

19   the '190 patent.  And it also has know-how.  And, in fact,

20   when there is no patent claim, because it was licensed at the

21   time of a patent application, when there is no patent claim,

22   half of the value of the maximum royalty rate, 7.25, is for

23   know how.  So 3.625 percent of that is for know-how.

24           It also has an upfront payment of $6.9 million and

25   then potential milestone payments of $9.75 million.  So this

RAO - DIRECT

1     is the starting point for my analysis.

2      Q. Is the '190 patent listed in the agreement?

3      A. It is.  As I indicated, it is one of other patent and

4     patent applications and the know-how that is listed as part

5     of the agreement.

6      Q. What's the next agreement you found to be informative?

7      A. The next one I looked at was the agreement between

8     St. Jude and Juno for the 4-1BB costim.  So this one has a

9     royalty rate of 2.5 percent.  It has an upfront payment of

10    25 million.  And then it has potential milestone payments of

11    62.5 million, but with some additional complications such as

12    if -- actually, let me just stop there, and I'll pick it up

13    on the next slide.

14     Q. Are there any other agreements you found informative?

15     A. So the next one is the license to the same technology,

16    the 4-1BB costim, that was licensed by Juno to Novartis.  And

17    so this is the outbound license from Juno.  So this now has a

18    royalty rate that is stepped up to 5.59 percent.  It has an

19    upfront payment of 12.25 million.  And then potential

20    milestone payments of 75.75 million.

21          But with some further complications, such as if Juno

22    were to come into the marketplace, then it can -- and

23    Novartis can claw back some of the milestone payments that it

24    may make Juno as part of this license agreement.

25     Q. And for context, have you seen evidence of how Juno

RAO - DIRECT

1    thought about the 4-1BB technology in 2015?

2     A. So 2015, at the time of the negotiation and this license

3    agreement between Juno and Novartis, Juno was already

4    expecting 4-1BB to be its best-in-class technology.  Whereas

5    the CD28, that's part of the '190 patent is the first in

6    class.  So it's sort of what allows them to get into the

7    market.  But as we saw, it subsequently failed.  And then

8    4-1BB is the best in class.

9          So in other words, what it is licensing to Novartis

10   is its best-in-class technology, the same thing that it uses,

11   I understand, in the JCAR017 product that it intends to bring

12   to market.

13    Q. Did Kite have any license agreements?

14    A. Um, Kite had at least two CAR-T license agreements I'm

15   familiar with.  One is with a company called Cabaret, and the

16   other is with the National Cancer Institute.  And they both

17   have royalty rates ranging from ███████████████████████.

18    Q. Is that -- and is it unusual for a biotech company to

19   license technology from the government?

20    A. No.  In fact, the government, like many of these research

21   institutions, has expertise in early-stage development, but

22   it doesn't have the capability to commercialize like

23   biotechnology companies can do.  And therefore, it often will

24   license to biotech companies.

25          In fact, Juno, for one of its products, JCAR018, has

RAO - DIRECT

1    a license that originated with the National Cancer Institute

2    and then subsequently was acquired by -- the license was

3    acquired by Juno.

4    Q. How do the terms of these real-world license agreements

5    compare to Dr. Sullivan's opinion?

6    A. So if you look at the ones that we just discussed -- and

7    these are the same ones that he uses as well -- we see that

8    MSKCC royalty is 7.25 percent, St. Jude to Juno is 2.5, and

9    Juno to Novartis is 5.59.

10          Dr. Sullivan's royalty rate is 27.6, so it's far

11   removed from those.  If you see the upfront payments are

12   6.9 million, 25 and 12.25.  His upfront payment is

13   585.8 million.

14          Even if you include all of the milestones as if they

15   happened, you know, the highest milestone is 88 million.  His

16   total compared to his upfront payment is 585.8 million.

17          And so as you can see, his are not consistent with

18   what we see with this real-world license agreements.  And

19   there is one feature that's very important with these license

20   agreements.  If you look at the first one, MSKCC license

21   agreement, has a royalty rate of 7.25 percent, but a lower

22   upfront payment, 6.9.

23          If you look at the next one, St. Jude to Juno, it

24   has a lower royalty rate, 2.5 percent, but a higher upfront

25   payment, 25 million.

                              RAO - DIRECT

 1            And that's because typically when somebody is taking

 2     a license, there is a certain amount they want to pay.  And

 3     that can be structured either as a high royalty or a lower

 4     royalty and a higher or lower upfront payment.  In other

 5     words, you can't increase both of them to get the higher

 6     total value; the value remains the same, but those can be

 7     adjusted.

 8            But in any case, as you can see his royalty rates

 9     are far removed from the comparable license agreements.

10     Q. How does Dr. Sullivan get from these mid-to-low-range

11     royalty rates to 27.6 royalty?

12     A. He makes two adjustments.  The first one, as you heard

13     him describe, is what he calls a CAR-T developer adjustment.

14     And that is an adjustment he's making to go from a research

15     institution to a biotechnology company like Juno.  And then

16     from there -- from Juno to another biotechnology company,

17     Novartis.  And so that is his first adjustment.

18            The second adjustment is what he calls a Kite

19     competition adjustment.  And his view is that Kite is it a

20     more formidable competitor than Novartis is; so as a result,

21     he takes the Novartis agreement and then increases that to

22     account for what he thinks is Kite's competition.

23            But overall, the effect is he quadruples the terms

24     that he sees in the MSKCC license based on his two

25     adjustments.

RAO - DIRECT

1    Q. What is wrong with that?

2    A. Well, the first thing, actually, it's easy to see with

3    the competitive competition adjustment.  We have the two

4    costims.  The 4-1BB costim is on the top, and that is what

5    Kite has -- or that's what Juno has licensed to Novartis.

6    And then at the bottom, we have the CD28.  That would be what

7    would be in both Juno's JCAR015 product and then in Kite's

8    product, the YESCARTA product for the DLBCL indication.

9          So the first thing we see is that the CD28 has

10   already been terminated by the time of the hypothetical

11   negotiation, which is the start of this blue bar in

12   October 2017.  And of course Juno is not -- and I have a

13   vertical bar here for today, essentially the date of trial.

14   And Juno is not competing with either Novartis or Kite during

15   this period for sales.

16         Juno potentially, I understand, could enter no

17   sooner than 2020.  So it's later, it's beyond trial.

18         So this idea that there is any competition for sales

19   with either Kite or Novartis is not consistent with facts.

20   So that is the first thing that's wrong with it.

21         The second, of course, is that we are looking for

22   the -- the indication that YESCARTA has to date is for DLBCL;

23   its third-line DLBCL.  And so if Juno were to enter in 2020,

24   by the time it has already licensed its best-in-class

25   technology to Novartis -- so Novartis came in in May of 2018

1    with DLBCL.

2              And Novartis is not only one of the largest global

3    pharmaceutical companies, it is also the leader in gene

4    therapy in that it has three products in gene therapy.

5    Nobody else does.  It has a product called Zolgensma and --

6    for a debilitating disease called -- for muscular atrophy,

7    spinal muscular atrophy.

8              It also has the indication for pediatric ALL that

9    you have heard before.  And then of course DLBCL.  So it has

10   three products.

11             So to think that Novartis with the same technology

12   as Juno, the 4-1BB costim, is a less formidable competitor is

13   not consistent with facts either.

14    Q. How does Dr. Sullivan --

15             THE COURT:  Let's end it for this evening.  Please

16   return tomorrow at 8:30.  We will continue with the trial.

17             During your absence do not discuss the case amongst

18   yourselves or any other person, please.

19             THE CLERK:  All rise for the jury, please.

20             (Thereupon, the jury retired from the courtroom.)

21             THE COURT:  We have plaintiffs at 9.2 -- plaintiffs

22   at 9.2, and defendant at 10.1.

23             MR. DANE:  Excuse me, Your Honor, since --

24             THE CLERK:  Do you want this on the record?

25             THE COURT:  We'll discuss it tomorrow.

1    (Thereupon, the Court was in recess.)

2                    *****     *****     *****

3

4    I certify that the foregoing is a correct transcript from the

5    record of proceedings in the above-titled matter.

6

7

8

9    ---------------------------

10

11   Amy C. Diaz, RPR, CRR            December 9, 2019

12   S/  Amy Diaz

13

14    CROSS-EXAMINATION                                905

15    BY MR. WEINBERGER                                905

16    DX43                                             905

17    REDIRECT-EXAMINATION                             906

18    BY MR HEINRICH

19    DR. KRISHNA KOMANDURI                            911

20    DIRECT EXAMINATION                               911

21    BY MS. YOUNG

22    PX0870                                           913

23    PX1188                                           919

24    CROSS-EXAMINATION                                926

25    BY MR. HEINRICH

| | | |
|---|---|---|
| 1 | MICHAEL AMOROSO | 929 |
| 2 | DIRECT EXAMINATION | 929 |
| 3 | BY MR. VINCENT | |
| 4 | CROSS-EXAMINATION | 941 |
| 5 | BY MR. WELLS | |
| 6 | RICHARD JUNGHANS | 947 |
| 7 | DIRECT EXAMINATION | 947 |
| 8 | BY MR. SHEAR | |
| 9 | PX0867 | 949 |
| 10 | PX41 received | 961 |
| 11 | DX2149C | 969 |
| 12 | CROSS-EXAMINATION | 971 |
| 13 | BY MR. CHU | |
| 14 | REDIRECT-EXAMINATION | 983 |
| 15 | BY MR. SHEAR | |
| 16 | RECROSS-EXAMINATION | 987 |
| 17 | BY MR. CHU | |
| 18 | REDIRECT EXAMINATION | 988 |
| 19 | BY MR. SHEAR | |
| 20 | DX546 and DX731 | 990 |
| 21 | DX356, DX503 and DX1884 | 991 |
| 22 | CHRISTOPHER GARCIA | 991 |
| 23 | DIRECT EXAMINATION | 991 |
| 24 | BY MR. BIEGLER | |
| 25 | DX1896 | 993 |

| | | |
|---|---|---|
| 1 | DX0881 | 1004 |
| 2 | DX2160 | 1021 |
| 3 | DX0386, DX9954 and DX0252 | 1023 |
| 4 | CROSS-EXAMINATION | 1030 |
| 5 | BY MR. CHU | |
| 6 | Exhibit 1170 | 1034 |
| 7 | Exhibit PX304.79 | 1036 |
| 8 | REDIRECT-EXAMINATION | 1046 |
| 9 | BY MR. BIEGLER | |
| 10 | ANDREW DICKINSON | 1050 |
| 11 | DIRECT EXAMINATION | 1051 |
| 12 | BY MR. FARRELL | |
| 13 | DX2011 | 1059 |
| 14 | DX0125 | 1063 |
| 15 | CROSS-EXAMINATION | 1067 |
| 16 | BY MS. JEFFRIES | |
| 17 | MOHAN RAO | 1072 |
| 18 | DIRECT EXAMINATION | 1073 |
| 19 | BY MR. VINCENT | |
| 20 | DX2214 | 1076 |
| 21 | DDX403 | 1077 |
| 22 | | |
| 23 | | |
| 24 | 43 | 905 |
| 25 | | 905 |

```
 1      PX0870                                             913

 2                                                         913

 3      1188                                               919

 4                                                         919

 5      PX0867                                             949

 6                                                         949

 7      PX41                                               961

 8                                                         961

 9      DX2149C                                            969

10                                                         969

11      DX1896                                             992

12                                                         992

13      DX0881                                            1004

14                                                        1004

15      DX2160                                            1021

16                                                        1021

17      936                                               1028

18                                                        1028

19      DX2011                                            1059

20                                                        1059

21      DX0125                                            1063

22                                                        1063

23

24

25
```

RAO - DIRECT

## #

**#4455** [1] - 893:23

## $

**$1,500** [1] - 1083:21
**$1,750** [1] - 982:18
**$1,900** [2] - 982:11, 982:14
**$100** [1] - 1083:22
**$150** [3] - 908:22, 982:20, 1083:22
**$167** [1] - 1077:22
**$2,000** [1] - 1083:21
**$585** [1] - 909:3
**$586** [1] - 1077:21
**$604** [1] - 1078:7
**$70** [1] - 1083:23
**$752** [2] - 909:22, 1077:19
**$9.75** [1] - 1088:25

## '

**'17** [2] - 934:17, 941:11
**'190** [50] - 899:24, 906:22, 907:6, 908:15, 910:8, 946:25, 948:9, 955:21, 955:25, 956:3, 967:23, 975:24, 976:2, 976:6, 977:19, 979:9, 988:23, 989:22, 989:25, 991:25, 1008:5, 1008:9, 1010:13, 1010:15, 1011:14, 1013:23, 1014:13, 1015:19, 1024:4, 1024:22, 1025:23, 1026:21, 1033:13, 1035:3, 1047:20, 1077:19, 1079:14, 1080:4, 1080:7, 1084:13, 1085:23, 1085:25, 1086:4, 1086:6, 1086:14, 1087:24, 1087:25, 1088:19, 1089:2, 1090:5

## 0

**04** [1] - 899:20
**07** [2] - 899:21, 900:2

## 1

**1** [15] - 898:7, 956:6, 956:8, 956:21, 962:9, 966:24, 1009:16, 1025:16, 1027:18, 1042:10, 1042:12
**10** [1] - 1028:14
**10.1** [1] - 1094:22
**100** [5] - 959:17, 993:23, 1078:12, 1079:3, 1079:4
**1004** [3] - 1097:2, 1098:14, 1098:15
**1021** [3] - 1097:3, 1098:16, 1098:17
**1023** [1] - 1097:4
**1028** [2] - 1098:18, 1098:19
**10281** [1] - 894:12
**1030** [1] - 1097:5
**1034** [1] - 1097:7
**1036** [1] - 1097:8
**1046** [1] - 1097:9
**105** [2] - 916:6, 916:7
**1050** [1] - 1097:11
**1051** [1] - 1097:12
**1059** [3] - 1097:14, 1098:20, 1098:21
**106** [1] - 916:10
**1063** [3] - 1097:15, 1098:22, 1098:23
**1067** [1] - 1097:16
**1072** [1] - 1097:18
**1073** [1] - 1097:19
**1076** [1] - 1097:21
**1077** [1] - 1097:22
**10K** [5] - 1067:25, 1068:3, 1068:8, 1068:10, 1070:6
**11** [17] - 900:2, 956:3, 956:25, 957:1, 957:3, 957:5, 957:22, 958:13, 963:17, 963:18, 979:14, 1008:9, 1009:5, 1024:2, 1025:9, 1041:19, 1044:1
**11.9** [2] - 1049:1, 1049:10
**110** [3] - 942:11, 942:14, 979:13
**112** [2] - 899:4, 899:5
**113** [20] - 953:10, 953:14, 957:5, 958:10, 962:14, 963:8, 963:24, 968:25, 970:10,
**114** [14] - 960:12, 979:3, 979:6, 979:10, 980:7, 981:1, 981:7, 981:10, 981:12, 981:16, 986:16, 987:12, 987:16, 987:19
**1170** [5] - 1034:4, 1034:6, 1034:9, 1034:21, 1097:7
**1188** [2] - 919:22, 1098:4
**11:45** [1] - 971:4
**12** [8] - 899:21, 900:3, 942:12, 942:14, 942:19, 944:19, 966:3, 1043:1
**12.25** [2] - 1089:19, 1091:12
**120** [1] - 979:3
**12390** [1] - 895:3
**125** [2] - 1037:10, 1037:12
**12:45** [2] - 971:2, 971:5
**13** [4] - 979:14, 1044:1, 1070:5, 1070:10
**139** [2] - 1042:9, 1042:12
**14** [4] - 1024:9, 1043:2, 1045:8, 1061:10
**140** [2] - 1042:10, 1042:12
**152.4** [1] - 1078:14
**16** [8] - 900:3, 901:2, 901:7, 915:21, 916:16, 940:5, 1011:20, 1045:8
**163** [2] - 1070:5, 1070:10
**167** [1] - 909:20
**16th** [1] - 1047:12
**17** [4] - 919:11, 933:16, 949:1, 989:9
**1700** [1] - 940:19
**17th** [1] - 1062:20
**18** [3] - 930:16, 960:5, 1024:13
**1800** [2] - 894:6, 923:13
**188** [1] - 1040:14

**1884** [2] - 990:21, 991:2
**19** [6] - 942:12, 942:14, 942:19, 957:2, 989:10
**1900** [1] - 982:23
**1989** [2] - 993:19, 1027:5
**1995** [1] - 1004:18
**1998** [2] - 950:20, 986:2
**1999** [2] - 986:2, 993:13
**19th** [1] - 989:11
**1:45** [1] - 971:2
**1st** [1] - 893:23

## 2

**2** [5] - 1021:16, 1025:16, 1026:19, 1027:18, 1088:15
**2,000** [1] - 940:19
**2.5** [4] - 907:9, 1089:9, 1091:8, 1091:24
**20** [13] - 912:12, 922:16, 930:12, 950:17, 952:19, 957:2, 989:10, 992:17, 1051:16, 1053:10, 1057:13, 1061:10, 1065:1
**20-plus** [2] - 950:16, 951:3
**2000** [1] - 986:2
**2001** [1] - 930:12
**2002** [29] - 957:7, 969:10, 995:13, 995:15, 995:20, 998:15, 999:6, 999:16, 999:18, 999:22, 1000:4, 1000:10, 1003:20, 1005:12, 1006:1, 1007:14, 1007:16, 1010:19, 1010:25, 1011:5, 1012:11, 1014:17, 1020:20, 1025:24, 1031:13, 1035:11, 1035:13, 1035:16, 1037:5
**2002/2003** [2] - 1045:25, 1046:2
**2003** [4] - 957:7, 963:2, 963:19, 963:20
**2007** [1] - 950:22
**2008** [2] - 950:24, 956:15
**2013** [1] - 897:21

**2015** [5] - 922:5, 925:4, 1065:15, 1090:1, 1090:2
**2016** [3] - 931:11, 937:25, 1047:14
**2017** [12] - 922:2, 931:12, 1054:9, 1058:4, 1058:21, 1062:12, 1062:20, 1068:11, 1068:18, 1078:5, 1082:13, 1093:12
**2018** [5] - 929:20, 982:1, 1042:17, 1043:4, 1093:25
**2019** [6] - 893:15, 1041:1, 1067:9, 1069:12, 1078:6, 1095:11
**2020** [3] - 1063:25, 1093:17, 1093:23
**2020s** [1] - 1063:25
**2021** [2] - 1064:1
**2024** [1] - 1082:15
**20th** [1] - 989:12
**2149C** [1] - 969:24
**219** [1] - 899:20
**22** [1] - 944:18
**220** [24] - 899:20, 900:2, 900:3, 953:11, 953:14, 958:10, 960:12, 962:14, 968:25, 970:11, 979:6, 979:10, 980:7, 981:1, 981:7, 981:10, 981:13, 981:16, 986:17, 987:12, 987:16, 987:19, 987:24
**221** [1] - 900:2
**222** [4] - 899:21, 901:1, 901:6, 901:11
**223** [3] - 900:3, 901:2, 901:7
**23** [3] - 899:20, 946:2, 970:2
**24** [6] - 920:16, 920:24, 946:3, 970:3, 1042:10, 1042:12
**25** [6] - 946:3, 1003:11, 1003:14, 1089:10, 1091:12, 1091:25
**25,000** [2] - 914:10, 923:9
**250** [2] - 894:11, 997:9
**252** [1] - 1023:16
**255** [1] - 897:10

RAO - DIRECT

**268** [3] - 920:12, 920:16, 920:20
**27.6** [5] - 909:7, 909:19, 1077:22, 1091:10, 1092:11
**27th** [1] - 1058:21
**28th** [2] - 963:19, 995:13
**2:17-CV-7639-SJO** [1] - 893:8

## 3

**3** [13] - 946:3, 956:2, 965:6, 965:15, 966:2, 966:3, 966:14, 967:6, 1008:8, 1009:4, 1024:2, 1025:9, 1026:19
**3.625** [1] - 1088:23
**30** [4] - 948:6, 993:20, 1018:22, 1053:20
**30-fold** [1] - 908:23
**30-year** [1] - 1053:10
**304** [1] - 1036:14
**322** [2] - 966:13, 966:14
**33** [2] - 920:13, 960:5
**336** [13] - 951:22, 952:3, 952:15, 956:20, 958:22, 960:2, 960:15, 962:7, 962:13, 963:3, 967:21, 969:1
**340** [6] - 952:1, 952:3, 960:7, 960:9, 960:16, 964:16
**342** [2] - 920:8, 920:12
**35** [1] - 1018:23
**350** [1] - 893:23
**355** [1] - 894:20
**356** [2] - 990:21, 991:2
**35th** [1] - 894:20
**39** [2] - 1017:22, 1019:19
**3LDLBCL** [1] - 908:2
**3rd** [1] - 1067:9

## 4

**4** [9] - 960:5, 960:6, 960:7, 960:16, 966:9, 966:11, 1026:11, 1040:14, ▮▮▮▮
**4,000** [2] - 923:17, 923:19
**4-1BB** [14] - 934:24, 935:7, 936:4,

936:15, 936:18, 1075:3, 1088:3, 1089:8, 1089:16, 1090:1, 1090:4, 1090:8, 1093:4, 1094:12
**4.25** [1] - ▮▮▮▮
**4.75** [1] - 907:16
**40** [3] - 914:20, 1018:23, 1053:20
**40-hour** [1] - 982:23
**402** [7] - 896:18, 977:9, 978:3, 979:4, 980:21, 1031:7, 1034:16
**403** [13] - 896:18, 977:9, 978:3, 978:8, 979:4, 980:21, 985:17, 1017:1, 1021:17, 1021:19, 1031:7, 1034:16, 1077:6
**43** [2] - 944:18, 1097:25
**436** [1] - 999:12
**44** [1] - 944:19
**45** [1] - 999:12
**487** [1] - 897:1

## 5

**5** [10] - 956:2, 966:1, 966:3, 966:9, 966:11, 1008:9, 1009:5, 1024:2, 1025:9, 1074:15
**5.59** [2] - 1089:18, 1091:9
**50** [1] - 971:23
**500** [2] - 895:6
**503** [4] - 990:23, 990:24, 990:25, 991:2
**50th** [1] - 894:9
**51** [1] - 958:18
**523** [1] - 903:24
**53** [3] - 958:23, 1017:23, 1019:19
**555** [1] - 894:9
**56** [1] - 958:18
**58** [2] - 1041:19, 1043:1
**585.8** [2] - 1091:13, 1091:16

## 6

**6** [23] - 901:2, 901:6, 901:11, 951:19, 951:24, 952:13,

952:15, 952:17, 953:15, 956:12, 957:23, 958:5, 960:19, 960:20, 963:3, 963:18, 964:15, 967:2, 967:19, 1040:14, 1048:2, 1070:5, 1070:10
**6,200** [2] - 1068:21, 1068:25
**6.2** [14] - 908:20, 910:8, 928:11, 1063:11, 1063:12, 1064:2, 1068:25, 1069:2, 1069:7, 1069:15, 1069:22, 1070:20, 1071:2, 1071:7
**6.9** [3] - 1088:24, 1091:12, 1091:22
**60** [1] - 1028:20
**60601** [1] - 894:14
**62.5** [1] - 1089:11
**63** [3] - 1043:25, 1044:1, 1045:8
**660** [8] - 952:1, 952:3, 958:22, 960:2, 962:7, 962:13, 964:17, 969:1
**663** [3] - 951:22, 960:8, 960:9
**67** [1] - 1019:15

## 7

**7** [10] - 910:7, 958:18, 958:21, 966:1, 966:3, 1010:20, 1011:22, 1012:3, 1013:11, 1026:11
**7.25** [7] - 906:24, 907:4, 907:5, 1088:16, 1088:22, 1091:8, 1091:21
**71** [1] - 1019:15
**72** [1] - 1019:13
**731** [2] - 990:7, 990:9
**75** [1] - 1003:16
**75.75** [1] - 1089:20
**752.4** [1] - 1078:10
**76,000** [1] - 982:24
**77** [1] - 894:14
**78** [1] - 927:16
**78.5** [1] - 927:17
**79** [2] - 1036:19, 1036:23

## 8

**8** [2] - 986:5, 1026:5
**8,000** [1] - 923:11
**80** [3] - 914:20, 1019:12, 1019:15
**803** [4] - 990:21, 990:23, 990:24
**85** [1] - 1019:15
**88** [1] - 1091:15
**89** [3] - 1037:10, 1037:12, 1038:24
**8:30** [1] - 1094:16

## 9

**9** [9] - 893:15, 920:20, 956:2, 1008:9, 1009:4, 1024:2, 1025:9, 1041:19, 1095:11
**9.2** [1] - 1094:21, 1094:22
**900** [2] - 894:6, 923:14
**90012** [1] - 893:23
**90067** [1] - 894:7
**90071** [2] - 894:9, 894:21
**905** [1] - 1095:14, 1095:15, 1095:16, 1097:25, 1098:1
**906** [1] - 1095:17
**911** [2] - 1095:19, 1095:20
**913** [2] - 1095:22, 1098:2, 1098:3
**919** [3] - 1095:23, 1098:4, 1098:5
**92130** [1] - 895:4
**926** [1] - 1095:24
**929** [2] - 1096:1, 1096:3
**936** [2] - 1028:7, 1098:18
**94063** [1] - 895:6
**941** [1] - 1096:5
**947** [2] - 1096:7, 1096:8
**949** [3] - 1096:10, 1098:6, 1098:7
**961** [3] - 1096:11, 1098:8, 1098:9
**969** [3] - 1096:12, 1098:10, 1098:11
**971** [1] - 1096:13
**983** [1] - 1096:15
**987** [1] - 1096:17
**988** [1] - 1096:19
**99** [2] - 919:13, 940:9
**990** [1] - 1096:21

**991** [3] - 1096:22, 1096:23, 1096:24
**992** [2] - 1098:12, 1098:13
**993** [1] - 1097:1
**9954** [1] - 1023:16
**9th** [1] - 1028:14

## A

**A-m-o-r-o-s-o** [1] - 929:12
**AAA** [1] - 952:22
**abbreviation** [1] - 958:7
**ability** [1] - 1004:21
**abkin** [2] - 1035:23, 1035:25
**ABKIN** [1] - 1035:23
**Abkin's** [3] - 1036:24, 1037:9, 1038:23
**able** [23] - 908:17, 918:2, 919:4, 938:17, 938:19, 939:4, 954:1, 955:13, 955:14, 1004:20, 1006:10, 1006:14, 1038:15, 1038:21, 1053:16, 1071:6, 1083:14, 1084:19, 1084:22, 1085:13, 1085:15, 1086:19, 1086:20
**above-titled** [1] - 1095:5
**Abramson** [1] - 920:7
**absence** [2] - 1026:20, 1094:17
**absolutely** [12] - 917:18, 921:11, 924:19, 939:23, 941:8, 987:5, 1058:12, 1059:20, 1061:5, 1064:15, 1068:9, 1069:9
**abstract** [2] - 920:11, 1005:2
**academic** [3] - 949:8, 1075:8, 1075:13
**accept** [1] - 980:4
**acceptable** [1] - 1036:10
**access** [9] - 930:22, 1012:10, 1012:14, 1081:20, 1081:22, 1085:25, 1086:5, 1086:14, 1086:23
**accommodating** [1] - 902:6
**accommodation** [1] -

RAO - DIRECT

911:1

**accomplish** [1] - 1066:9

**accomplishments** [1] - 949:9

**according** [2] - 1027:10, 1031:12

**account** [4] - 1079:11, 1082:2, 1082:17, 1092:22

**accountants** [3] - 1064:4, 1068:5, 1069:3

**accounting** [3] - 1064:3, 1064:5, 1064:7

**accurate** [3] - 945:7, 945:19, 1068:8

**achievements** [1] - 949:9

**acid** [36] - 952:11, 952:12, 952:24, 953:2, 956:10, 956:11, 956:22, 956:23, 957:3, 958:10, 960:9, 962:8, 962:9, 962:11, 962:12, 963:5, 963:7, 963:9, 963:17, 968:20, 968:23, 970:5, 970:11, 981:7, 987:24, 989:4, 997:22, 998:4, 1000:21, 1001:10, 1002:3, 1003:7, 1019:9, 1035:17, 1036:25

**Acid** [8] - 957:5, 963:24, 968:25, 970:10, 970:11, 980:1, 980:11, 986:16

**Acids** [4] - 962:14, 979:3, 979:10, 980:7

**acids** [22] - 951:23, 952:19, 952:21, 953:9, 953:11, 953:16, 960:12, 965:16, 970:12, 988:7, 997:7, 997:8, 997:9, 997:10, 997:19, 997:24, 1001:5, 1002:1, 1017:18, 1017:19, 1018:10, 1018:19

**acquire** [2] - 1051:8, 1054:7

**acquired** [3] - 909:10, 1091:2, 1091:3

**acquiring** [1] - 1059:21

**acquisition** [8] - 927:21, 930:20, 1049:5, 1051:21, 1052:20, 1054:9, 1058:8, 1064:4

**acquisitions** [2] - 1051:15, 1052:4

**act** [1] - 913:15

**acted** [2] - 913:12, 977:7

**acting** [5] - 977:15, 977:19, 977:21, 977:25, 978:13

**activate** [1] - 1025:16

**active** [1] - 1079:14

**activities** [2] - 933:5, 933:12

**actual** [6] - 979:1, 997:14, 1012:4, 1018:5, 1018:6, 1018:14

**acute** [2] - 921:20, 934:14

**ad** [1] - 932:14

**add** [4] - 899:14, 935:10, 966:23, 966:24

**addition** [10] - 897:19, 982:3, 984:11, 984:12, 999:4, 1019:1, 1078:13, 1083:8, 1084:17, 1088:18

**additional** [6] - 904:12, 910:17, 910:19, 986:3, 1013:10, 1089:11

**address** [6] - 896:5, 896:22, 898:20, 904:13, 926:24, 1030:4

**adds** [3] - 898:11, 966:24, 1029:9

**adduced** [1] - 986:12

**adequately** [3] - 1014:2, 1014:25, 1024:24

**adjusted** [1] - 1092:7

**adjustment** [6] - 1092:13, 1092:14, 1092:17, 1092:18, 1092:19, 1093:3

**adjustments** [4] - 907:2, 1087:13, 1092:12, 1092:25

**administered** [1] - 936:20

**administering** [1] -

924:14

**admission** [1] - 905:19

**admitted** [1] - 999:12

**admittedly** [1] - 899:6

**adult** [5] - 921:19, 934:14, 935:3, 1068:19

**advanced** [1] - 1076:1

**advantage** [13] - 908:17, 909:4, 922:9, 928:6, 928:7, 944:1, 955:1, 1060:3, 1061:18, 1061:19, 1061:23, 1062:1, 1062:6

**advantages** [2] - 1059:18, 1062:9

**adventure** [1] - 951:4

**adverse** [7] - 939:10, 983:19, 983:22, 984:14, 984:25, 985:11, 1085:4

**advertising** [1] - 1083:16

**advised** [2] - 918:25, 1044:7

**advisor** [2] - 913:12, 913:15, 921:6

**affairs** [1] - 930:23

**affect** [4] - 997:20, 1002:10, 1022:12, 1022:15

**affinities** [1] - 1015:10

**affinity** [2] - 1020:2, 1022:23

**afflict** [1] - 1074:19

**afford** [1] - 1065:12

**afoul** [1] - 900:19

**afternoon** [14] - 971:15, 971:19, 971:20, 991:5, 991:16, 1029:17, 1030:16, 1030:17, 1032:2, 1050:22, 1067:14, 1067:15, 1072:20, 1073:13

**aggressive** [3] - 914:12, 914:13, 918:10

**ago** [13] - 920:6, 960:13, 963:16, 963:25, 968:8, 981:23, 981:24, 982:1, 994:4, 1033:12, 1034:14, 1039:17, 1052:14

**agree** [29] - 907:1, 907:2, 927:8, 943:12, 944:17,

964:22, 965:7, 965:22, 972:25, 976:20, 977:14, 995:25, 996:1, 1031:15, 1034:3, 1035:11, 1035:16, 1037:4, 1037:18, 1037:20, 1038:5, 1038:13, 1040:12, 1044:22, 1069:20, 1069:24, 1071:14, 1071:18, 1077:23

**agreed** [1] - 1070:1

**agreement** [30] - 906:19, 906:21, 907:3, 907:7, 907:8, 907:9, 907:15, 908:5, 908:8, 908:9, 921:16, 1012:16, 1054:9, 1080:15, 1086:8, 1087:23, 1087:24, 1088:11, 1088:12, 1088:13, 1088:18, 1089:2, 1089:5, 1089:6, 1089:7, 1089:24, 1090:3, 1091:21, 1092:21

**agreements** [23] - 906:8, 906:13, 906:18, 1075:6, 1075:8, 1075:12, 1079:23, 1079:25, 1080:2, 1081:14, 1081:20, 1087:4, 1087:5, 1087:6, 1087:19, 1088:2, 1089:14, 1090:13, 1090:14, 1091:4, 1091:18, 1091:20, 1092:9

**ahead** [6] - 896:8, 897:2, 1044:21, 1053:15, 1057:11, 1070:17

**aid** [1] - 993:2

**aimed** [2] - 1047:19, 1074:12

**air** [1] - 1002:8

**al** [1] - 893:5

**Alan** [1] - 894:5

**alerting** [1] - 904:16

**aligned** [2] - 1017:13, 1018:8

**alignment** [1] - 1016:7

**ALL** [5] - 934:14, 935:3, 937:8, 1094:8

**alleged** [3] - 948:15, 968:4, 1084:14

**allow** [4] - 898:10,

936:18, 1030:22, 1086:15

**allowed** [3] - 908:9, 908:16, 1049:11

**allows** [1] - 1090:6

**alludes** [1] - 1011:23

**almost** [1] - 916:1

**alone** [4] - 908:20, 908:21, 908:24, 928:10

**alternatives** [1] - 909:17

**America** [3] - 931:24, 934:2, 934:3

**American** [3] - 920:4, 931:20, 1075:19

**Amino** [12] - 957:5, 962:14, 963:24, 968:25, 970:10, 979:3, 979:10, 980:1, 980:7, 980:11, 986:16

**amino** [55] - 951:23, 952:11, 952:12, 952:19, 952:21, 952:24, 953:9, 953:11, 953:15, 956:10, 956:11, 956:22, 956:23, 957:3, 958:10, 960:9, 960:11, 962:8, 962:9, 962:11, 962:12, 963:5, 963:7, 963:9, 963:17, 965:16, 968:20, 968:23, 970:5, 970:11, 970:12, 981:7, 987:23, 988:7, 989:4, 997:7, 997:8, 997:9, 997:10, 997:19, 997:22, 997:24, 998:4, 1000:21, 1001:5, 1001:10, 1002:1, 1002:3, 1003:7, 1017:18, 1017:19, 1018:10, 1018:19, 1019:8

**Amoroso** [3] - 928:22, 929:12, 929:16

**AMOROSO** [2] - 929:4, 1096:2

**amount** [10] - 900:25, 908:20, 908:21, 909:3, 1005:9, 1026:19, 1027:8, 1046:14, 1069:2, 1092:2

**amounts** [1] - 936:14

RAO - DIRECT

**ample** [1] - 1022:21
**amplification** [1] - 1037:2
**amplified** [1] - 966:8
**amplify** [1] - 970:16
**AMY** [1] - 893:22
**Amy** [2] - 1095:11, 1095:12
**analogy** [1] - 924:12
**analyses** [1] - 1055:10
**analysis** [27] - 906:8, 909:11, 942:25, 949:25, 954:3, 954:6, 955:14, 965:13, 977:1, 978:16, 1008:4, 1008:10, 1009:1, 1016:6, 1017:21, 1018:4, 1024:21, 1025:7, 1025:18, 1026:5, 1055:14, 1055:22, 1076:23, 1080:3, 1087:3, 1088:10, 1089:1
**analytics** [3] - 930:6, 932:13, 932:23
**analyze** [5] - 956:2, 957:9, 957:13, 958:12, 1008:8
**analyzed** [2] - 995:12, 995:16
**analyzing** [3] - 1016:15, 1053:24, 1054:6
**Andrea** [1] - 894:8
**Andrew** [4] - 1048:20, 1048:21, 1050:2, 1050:17
**ANDREW** [1] - 1050:8
**anecdotally** [1] - 945:15
**Angeles** [8] - 893:14, 893:23, 894:7, 894:9, 894:21, 981:18, 981:21, 1073:19
**announced** [1] - 937:9
**annual** [1] - 984:20
**annually** [1] - 985:2
**answer** [51] - 926:23, 927:19, 928:6, 942:10, 943:3, 944:3, 944:5, 945:1, 946:9, 974:2, 974:19, 974:20, 980:8, 987:18, 988:2, 988:9, 988:10, 1006:25, 1032:1, 1032:8, 1032:9, 1032:19,

1036:4, 1038:9, 1038:11, 1038:15, 1038:16, 1038:20, 1038:21, 1040:20, 1041:23, 1042:16, 1042:19, 1042:20, 1042:22, 1043:6, 1043:10, 1043:12, 1043:19, 1043:21, 1043:22, 1044:5, 1044:19, 1044:23, 1045:3, 1045:5, 1045:6, 1045:12, 1045:15, 1045:23, 1070:22
**answered** [2] - 946:14, 1035:8
**anti** [3] - 1043:8, 1043:11, 1044:11
**anti-CD19** [3] - 1043:8, 1043:11, 1044:11
**antibodies** [1] - 1000:12, 1000:15, 1009:4, 1009:6, 1016:8, 1017:8, 1022:7, 1027:5, 1045:19, 1045:22
**antibody** [32] - 914:19, 994:15, 996:6, 996:19, 996:20, 996:21, 996:23, 997:3, 1000:1, 1000:7, 1000:9, 1000:10, 1000:18, 1000:24, 1001:1, 1001:3, 1001:7, 1002:25, 1009:11, 1009:25, 1012:1, 1012:2, 1012:20, 1015:14, 1016:16, 1019:3, 1019:5, 1019:6, 1019:7, 1024:14, 1037:15, 1056:2
**antibody-producing** [1] - 1012:1
**anticipate** [1] - 896:11
**antigen** [4] - 931:17, 951:20, 1014:16, 1020:20
**antigens** [1] - 934:25
**apheresis** [1] - 1085:22
**apologies** [4] - 900:1, 1036:17, 1036:19, 1039:25
**apologize** [1] - 969:5
**apparent** [1] - 948:16
**appear** [7] - 988:4,

988:10, 988:13, 988:16, 1018:21, 1018:23, 1035:1
**appearance** [1] - 928:24
**Appearances** [1] - 895:1
**APPEARANCES** [1] - 894:1
**appeared** [1] - 988:25
**apples** [2] - 1066:2
**applicant** [4] - 964:14, 964:19, 965:19, 967:9
**applicants** [2] - 967:14, 978:17
**application** [18] - 961:2, 961:5, 961:12, 962:1, 962:20, 962:22, 963:2, 963:5, 963:10, 963:22, 967:16, 969:11, 988:5, 988:14, 1031:17, 1084:24, 1085:9, 1088:21
**applications** [4] - 957:8, 957:13, 1088:18, 1089:4
**applied** [10] - 915:11, 953:20, 954:11, 973:24, 976:20, 977:1, 981:12, 987:21, 1035:18, 1037:2
**apply** [2] - 955:13, 1084:21
**applying** [1] - 909:19
**apportioned** [1] - 1084:5
**approach** [3] - 906:20, 1052:10, 1052:24
**approaches** [1] - 923:25
**appropriate** [3] - 907:1, 909:6, 977:5
**approval** [14] - 912:22, 913:7, 920:10, 921:18, 933:13, 933:19, 1068:19, 1069:3, 1069:22, 1070:6, 1070:19, 1084:23, 1084:24, 1085:8
**approvals** [5] - 916:25, 925:19, 933:18, 933:19, 935:21
**approved** [7] - 921:22, 924:8, 924:22,

929:24, 937:8, 941:4, 1058:24
**approves** [1] - 924:17
**April** [5] - 922:5, 1040:25, 1041:9, 1069:11, 1071:5
**area** [6] - 981:19, 981:20, 994:7, 1054:21, 1063:22, 1076:3
**areas** [6] - 930:25, 931:1, 935:3, 993:11, 993:13, 994:14
**Arguello** [1] - 895:6
**argumentative** [2] - 978:9, 1071:9
**arising** [1] - 952:8
**arrangement** [1] - 1065:18
**art** [31] - 897:13, 898:4, 948:17, 954:1, 954:7, 954:10, 954:12, 955:6, 959:14, 959:21, 962:5, 965:20, 965:23, 968:6, 995:20, 998:15, 999:6, 1003:20, 1012:4, 1012:10, 1016:21, 1023:7, 1024:17, 1026:12, 1026:13, 1026:14, 1027:9, 1037:19, 1038:6, 1038:14, 1039:6
**arthritis** [2] - 931:3, 1085:19
**article** [4] - 1004:13, 1004:17, 1012:18, 1028:9
**articles** [3] - 913:4, 1004:4, 1076:5
**aside** [1] - 983:18
**aspect** [1] - 981:15
**aspects** [5] - 912:6, 918:3, 918:6, 924:6, 1071:7
**assays** [2] - 954:23, 1002:22
**assemble** [1] - 1083:14
**asserted** [9] - 956:2, 956:9, 1008:5, 1008:15, 1008:18, 1024:22, 1025:8, 1025:11, 1026:2
**Asserted** [1] - 1008:8
**assessment** [1] - 1062:9

**asset** [10] - 932:3, 934:12, 934:22, 1068:22, 1069:3, 1069:23, 1070:21, 1080:13, 1087:16
**assets** [2] - 932:9, 1087:18
**assist** [1] - 951:11
**assistant** [1] - 974:4
**assume** [8] - 907:19, 907:20, 1049:18, 1081:1, 1081:3, 1081:5, 1081:18, 1081:19
**assumed** [2] - 936:17, 1081:21
**assumes** [1] - 1069:16
**assuming** [1] - 1053:16
**assumption** [7] - 978:16, 978:22, 1080:5, 1080:6, 1081:10, 1082:6, 1082:7
**assumptions** [4] - 942:8, 943:2, 1080:4, 1081:11
**assurance** [1] - 1060:14
**Atlanta** [1] - 1073:16
**atrophy** [2] - 1094:6, 1094:7
**ATT** [1] - 953:1
**attached** [1] - 1062:18
**attaches** [1] - 961:12
**attempt** [1] - 901:24
**attempted** [4] - 1004:20, 1041:25, 1042:7, 1042:14
**attempts** [1] - 909:17
**attended** [2] - 949:13, 949:15
**attention** [4] - 897:14, 897:21, 957:24, 966:5
**attest** [1] - 979:11
**attorney** [2] - 896:16, 946:25
**Attorney** [14] - 894:4, 894:5, 894:5, 894:6, 894:8, 894:11, 894:13, 894:18, 894:18, 894:19, 894:20, 895:3, 895:5
**attribute** [1] - 941:9
**August** [6] - 929:20, 1054:10, 1058:7, 1058:21, 1062:12, 1062:20

RAO - DIRECT

**author** [2] - 1004:15, 1076:6
**authors** [3] - 1000:8, 1027:25, 1028:12
**autologous** [1] - 922:19
**availability** [1] - 920:23
**available** [6] - 918:12, 924:21, 1000:9, 1056:15, 1056:23, 1081:15
**Aventis** [2] - 930:19, 930:20
**Avenue** - 894:6, 894:20
**avoid** [2] - 903:10, 910:4
**aware** [12] - 903:14, 936:22, 941:3, 983:19, 1005:11, 1031:6, 1033:24, 1034:2, 1048:6, 1049:16, 1064:23, 1064:25

## B

**B-cell** [8] - 912:18, 914:9, 921:20, 923:10, 931:17, 934:25, 935:2, 937:11
**babies** [1] - 1074:19
**bachelor's** [1] - 949:16
**background** [7] - 898:11, 902:12, 903:13, 914:3, 948:19, 950:14, 993:7
**backwards** [2] - 1001:3, 1026:4
**bad** [5] - 977:7, 977:20, 977:21, 978:1, 978:13
**bales** [3] - 919:24, 1047:6, 1047:20
**Bales** [1] - 915:17
**balls** [1] - 1002:8
**bar** [6] - 1048:18, 1059:7, 1078:3, 1078:9, 1093:11, 1093:13
**base** [1] - 909:19
**based** [16] - 908:7, 916:21, 955:19, 995:12, 1003:18, 1020:9, 1020:22, 1022:4, 1042:1,

1042:7, 1042:15, 1049:4, 1073:16, 1077:21, 1086:4, 1092:24
**bases** [5] - 952:17, 966:13, 966:14, 966:21, 966:23
**basic** [4] - 995:2, 996:21, 1030:21, 1030:25
**basis** [6] - 910:9, 1022:20, 1027:13, 1031:16, 1031:18, 1087:14
**basket** [1] - 1028:13
**bears** [3] - 1058:19, 1058:20, 1062:19
**became** [1] - 1031:16
**become** [1] - 1064:12
**becomes** [3] - 915:23, 924:21, 995:7
**becoming** [1] - 1051:7
**beforehand** [1] - 916:13
**began** [3] - 960:15, 975:22, 993:19
**begin** [5] - 951:25, 956:17, 957:3, 964:16, 967:20
**beginning** [13] - 900:1, 900:3, 901:11, 923:9, 951:21, 953:5, 953:9, 958:23, 963:7, 989:11, 1044:6, 1054:24, 1065:6
**begins** [9] - 901:1, 952:15, 952:16, 956:20, 957:5, 958:6, 963:3, 966:6, 970:10
**begs** [1] - 996:20
**begun** [1] - 963:24
**behalf** [4] - 898:22, 991:18, 1036:5, 1050:23
**behind** [4] - 934:12, 935:7, 937:10, 1055:11
**Bejcek** [4] - 1004:16, 1004:19, 1012:18, 1013:4
**below** [2] - 907:5, 958:23
**bench** [1] - 1048:22
**beneficial** [1] - 1079:2
**benefit** [1] - 1061:14
**benefits** [3] - 917:16, 923:21, 1086:9

**Berkeley** [1] - 949:18
**best** [17] - 922:25, 923:4, 934:22, 935:5, 939:15, 939:16, 939:17, 944:8, 980:10, 980:13, 1056:15, 1056:23, 1088:4, 1090:4, 1090:8, 1090:10, 1093:24
**best-in-class** [7] - 934:22, 935:5, 944:8, 1088:4, 1090:4, 1090:10, 1093:24
**Beth** [6] - 974:8, 974:11, 974:15, 974:21, 975:3, 975:16
**Bethesda** [1] - 950:10
**better** [12] - 919:17, 922:21, 935:10, 935:11, 936:5, 936:6, 939:21, 939:22, 1052:16, 1057:1, 1057:13, 1066:6
**between** [14] - 906:23, 908:10, 931:13, 940:19, 959:19, 1002:7, 1017:7, 1036:1, 1036:6, 1038:24, 1064:18, 1088:11, 1089:7, 1090:3
**beyond** [10] - 918:1, 984:3, 984:22, 985:4, 985:18, 1016:25, 1021:19, 1026:25, 1049:7, 1093:17
**Biegler** [1] - 991:17
**BIEGLER** [37] - 991:20, 992:22, 993:5, 999:11, 1004:7, 1016:23, 1021:14, 1021:24, 1022:2, 1023:11, 1023:17, 1024:8, 1028:5, 1029:15, 1031:7, 1034:16, 1036:14, 1036:16, 1036:18, 1036:20, 1037:21, 1039:15, 1039:21, 1039:24, 1040:17, 1041:20, 1042:11, 1042:13, 1043:3, 1044:2, 1045:9, 1046:7, 1047:6, 1047:18,

1048:13, 1096:25, 1097:10
**big** [7] - 951:2, 992:3, 1017:4, 1064:16, 1064:21, 1065:12, 1066:17
**bigger** [1] - 897:22
**biggest** [1] - 1061:9
**billion** [20] - 908:20, 910:7, 910:8, 928:11, 1028:15, 1028:18, 1028:20, 1049:1, 1049:10, 1063:11, 1063:12, 1064:2, 1068:25, 1069:2, 1069:7, 1069:15, 1069:22, 1070:20, 1071:2, 1071:7
**billions** [4] - 1009:9, 1009:11, 1009:15, 1010:5
**bind** [26] - 998:4, 998:12, 1000:2, 1002:20, 1003:17, 1004:21, 1006:20, 1006:22, 1009:25, 1010:6, 1014:6, 1014:9, 1015:11, 1017:9, 1018:16, 1019:6, 1019:7, 1019:23, 1020:13, 1020:19, 1020:24, 1021:3, 1021:9, 1025:4, 1025:15, 1027:16
**binder** [17] - 942:21, 948:20, 969:15, 988:23, 992:18, 1004:3, 1016:10, 1021:5, 1022:16, 1022:25, 1027:24, 1034:10, 1034:13, 1058:16, 1062:23, 1070:12, 1070:13
**binders** [4] - 971:9, 1015:11, 1020:9, 1050:19
**binding** [28] - 996:9, 996:11, 996:13, 996:15, 998:2, 998:5, 998:18, 998:21, 999:3, 1002:22, 1003:9, 1005:4, 1015:9, 1015:10, 1018:12, 1019:25, 1020:2, 1020:4, 1020:5, 1022:17, 1025:15, 1028:17, 1037:19,

1038:6, 1038:14, 1039:5, 1039:7, 1041:11
**bindings** [1] - 1041:7
**binds** [4] - 996:8, 999:7, 1010:2, 1019:10
**biochemistry** [2] - 954:13, 993:8
**biographical** [2] - 913:21, 914:2
**biologic** [1] - 1085:9
**biology** [9] - 949:19, 954:13, 954:14, 954:17, 954:18, 991:23, 992:7, 992:10, 992:11
**Biology** [1] - 949:24
**biophysics** [2] - 949:16, 993:9
**biotech** [4] - 948:1, 993:10, 1090:18, 1090:24
**biotechnology** [6] - 1073:16, 1075:10, 1075:14, 1090:23, 1092:15, 1092:16
**bit** [9] - 921:1, 922:7, 924:13, 934:9, 951:15, 958:16, 960:22, 1008:2, 1038:25
**BLA** [1] - 937:7
**blame** [1] - 974:11
**blamed** [1] - 974:21
**Blanca** [1] - 894:20
**BLAST** [7] - 957:15, 957:18, 958:1, 958:12, 965:13, 976:5, 976:8
**bleeding** [1] - 1074:13
**block** [1] - 996:21
**blood** [2] - 912:15, 1085:22
**blow** [1] - 979:14
**blue** [2] - 1078:3, 1093:11
**Bluebird** [1] - 938:3
**Board** [1] - 1058:19
**board** [8] - 1049:9, 1057:25, 1058:24, 1062:8, 1063:2, 1064:7, 1076:11, 1076:14
**boards** [3] - 932:14, 933:7, 1076:10
**body** [4] - 915:23, 952:20, 1007:24, 1029:7
**bold** [1] - 1017:19

RAO - DIRECT

**bone** [2] - 912:7, 915:4
**books** [2] - 1069:23, 1070:21
**borealis** [1] - 1019:11
**Boston** [3] - 972:7, 981:19, 981:20
**bottom** [5] - 1006:17, 1006:18, 1017:15, 1019:2, 1093:6
**bought** [2] - 943:21, 943:22
**bound** [5] - 1004:21, 1010:11, 1014:11, 1027:14, 1028:19
**boundaries** [1] - 1001:23
**boundary** [2] - 1001:19, 1013:19
**box** [1] - 1096:1
**brand** [2] - 927:1, 934:4
**brand-new** [1] - 927:1
**branding** [1] - 1083:16
**breadth** [2] - 1014:3, 1026:5
**Brentjens** [10] - 898:23, 898:25, 899:4, 899:16, 899:18, 899:22, 900:12, 901:3, 989:22, 1013:3
**bridging** [2] - 957:2, 970:3
**brief** [4] - 905:2, 988:19, 1029:23, 1062:1
**briefing** [1] - 1062:25
**briefly** [4] - 945:12, 948:18, 993:6, 1073:11
**bring** [6] - 896:4, 903:6, 933:5, 971:8, 1084:1, 1090:11
**bringing** [4] - 929:25, 930:3, 930:24, 940:3
**brings** [2] - 897:9, 1083:17
**broad** [6] - 1024:14, 1026:9, 1029:5, 1033:13, 1033:16, 1033:21
**broadened** [1] - 948:15
**broader** [2] - 953:23, 968:4
**broke** [1] - 936:25
**brought** [4] - 896:6, 897:14, 937:1, 1076:22

**BS** [1] - 993:8
**build** [1] - 924:13
**building** [1] - 996:21
**built** [2] - 924:14, 1063:21
**bullet** [1] - 944:22
**business** [5] - 910:10, 1057:1, 1079:8, 1081:12, 1081:17
**but..** [1] - 928:3
**buy** [1] - 943:15
**buyers** [1] - 1055:13
**buying** [1] - 928:1
**BY** [34] - 905:8, 906:4, 911:21, 926:11, 929:15, 941:21, 947:22, 971:18, 983:9, 987:10, 988:21, 991:20, 1030:15, 1046:7, 1051:2, 1067:13, 1073:10, 1095:15, 1095:18, 1095:21, 1095:25, 1096:4, 1096:6, 1096:9, 1096:14, 1096:16, 1096:18, 1096:20, 1096:25, 1097:6, 1097:10, 1097:13, 1097:17, 1097:20

**C**

**C5** [1] - 1019:16
**CA** [1] - 893:23
**Cabaret** [1] - 1090:15
**calculate** [1] - 1080:23
**calculated** [1] - 1017:21
**CALIFORNIA** [1] - 893:2
**California** [8] - 893:14, 894:7, 894:9, 894:21, 895:4, 895:6, 949:18, 949:19
**Camino** [1] - 895:3
**Canada** [2] - 931:22, 934:8
**Cancer** [4] - 912:3, 950:9, 1090:16, 1091:1
**cancer** [25] - 912:4, 912:5, 912:8, 912:13, 914:8, 917:20, 924:18, 930:16, 931:4, 936:13, 947:24, 947:25, 948:5, 996:5, 996:7,
996:10, 999:9, 999:20, 1006:15, 1006:16, 1006:20, 1052:18, 1066:24, 1074:13, 1074:16
**cancers** [2] - 912:15, 925:22
**candidate** [1] - 908:3
**candidates** [1] - 1028:22
**cannot** [7] - 965:5, 967:5, 1043:19, 1043:20, 1043:21, 1083:24, 1084:6
**capability** [6] - 1083:10, 1083:11, 1083:12, 1084:19, 1090:22
**capacity** [1] - 923:16
**CAR** [154] - 900:11, 910:10, 912:19, 913:3, 913:13, 914:15, 917:19, 919:15, 921:10, 922:1, 922:4, 922:20, 923:8, 924:24, 925:1, 926:15, 926:17, 926:20, 927:1, 927:2, 927:5, 927:8, 927:10, 931:8, 931:10, 931:16, 931:25, 934:11, 935:25, 936:23, 936:25, 937:8, 937:20, 937:23, 938:5, 938:7, 939:13, 941:6, 942:1, 944:8, 944:15, 945:18, 945:21, 950:21, 950:23, 950:25, 951:23, 953:13, 959:9, 959:14, 962:6, 968:12, 968:15, 969:11, 970:9, 971:22, 979:1, 980:25, 986:9, 986:13, 994:3, 994:8, 994:10, 994:16, 996:3, 996:4, 996:6, 996:12, 998:15, 998:21, 999:10, 1005:15, 1005:16, 1006:5, 1006:6, 1006:7, 1006:13, 1006:21, 1007:7, 1007:9, 1007:14, 1007:16, 1013:4,
1022:12, 1022:15, 1022:18, 1022:24, 1023:22, 1025:14, 1027:9, 1027:22, 1028:22, 1037:7, 1041:11, 1041:14, 1041:17, 1041:21, 1042:1, 1042:7, 1042:15, 1042:16, 1042:18, 1043:5, 1043:8, 1043:12, 1044:4, 1044:16, 1045:1, 1045:11, 1045:15, 1046:2, 1046:10, 1046:15, 1046:18, 1046:23, 1047:1, 1047:24, 1053:4, 1053:25, 1054:6, 1054:8, 1055:23, 1060:20, 1060:22, 1060:24, 1064:13, 1064:16, 1064:22, 1065:19, 1066:4, 1069:7, 1071:8, 1071:15, 1071:16, 1071:18, 1071:19, 1071:23, 1071:24, 1072:4, 1072:8, 1072:9, 1074:17, 1074:23, 1075:4, 1084:12, 1084:15, 1090:14, 1092:13
**CAR-related** [1] - 994:8
**CAR-specific** [1] - 1046:2
**CAR-T** [64] - 900:11, 910:10, 912:19, 913:3, 913:13, 914:15, 917:19, 919:15, 921:10, 922:1, 922:4, 922:20, 923:8, 924:24, 925:1, 927:5, 927:8, 927:10, 931:8, 931:10, 931:25, 934:11, 935:25, 936:23, 936:25, 937:8, 937:20, 937:23, 938:5, 938:7, 939:13, 941:6, 942:1, 944:8, 944:15, 945:18, 945:21, 950:21, 950:23, 950:25, 1053:4, 1053:25, 1054:6, 1054:8, 1055:23, 1060:20, 1060:22, 1060:24,

**1064:13, 1064:16, 1064:22, 1064:25, 1065:19, 1066:4, 1071:15, 1071:19, 1071:23, 1072:9, 1074:17, 1074:23, 1084:12, 1084:15, 1090:14, 1092:13
**CAR-Ts** [1] - 931:16
**care** [4] - 897:15, 914:16, 914:17, 1068:7
**career** [4] - 912:13, 925:2, 930:13, 1051:18, 1073:18, 1073:19
**Carl** [1] - 921:14
**carryover** [1] - 934:7
**CARs** [29] - 950:15, 950:17, 950:19, 951:3, 952:6, 979:9, 980:7, 993:24, 994:1, 994:6, 996:2, 996:5, 996:15, 998:17, 998:25, 999:1, 999:2, 999:3, 1024:25, 1025:2, 1027:15, 1037:20, 1038:7, 1038:15, 1040:22, 1041:6, 1041:17, 1043:14
**case** [46] - 897:7, 897:9, 897:17, 898:12, 899:12, 900:15, 902:4, 904:18, 906:9, 911:2, 914:23, 925:4, 926:20, 953:18, 954:3, 955:4, 955:21, 957:12, 959:4, 959:6, 959:8, 960:17, 961:22, 968:10, 969:6, 974:14, 974:16, 974:21, 975:22, 976:1, 977:1, 980:14, 981:25, 982:21, 1029:19, 1040:25, 1047:16, 1055:16, 1080:13, 1081:5, 1082:12, 1087:20, 1092:8, 1094:17
**category** [1] - 915:9
**CD19** [58] - 931:16, 931:17, 934:25, 989:25, 994:25, 995:1, 1003:23, 1004:22, 1009:6,

RAO - DIRECT

1010:1, 1010:2, 1010:6, 1010:12, 1010:21, 1011:21, 1013:23, 1014:6, 1014:9, 1014:11, 1014:12, 1014:14, 1014:16, 1015:4, 1015:12, 1015:13, 1016:7, 1017:7, 1017:8, 1017:14, 1018:6, 1018:8, 1018:12, 1019:4, 1019:6, 1019:7, 1019:23, 1020:12, 1020:16, 1020:20, 1021:3, 1021:9, 1022:10, 1022:11, 1023:24, 1024:5, 1027:16, 1027:21, 1028:17, 1028:19, 1043:8, 1043:11, 1044:11, 1044:14, 1045:19, 1045:22, 1048:7, 1048:11

**CD19-binding** [1] - 1019:9

**CD19-specific** [2] - 1005:11, 1017:5

**CD19-targeted** [1] - 935:4

**CD28** [18] - 934:12, 936:6, 953:11, 958:8, 958:9, 959:12, 962:7, 966:7, 967:1, 968:20, 969:12, 970:6, 970:8, 980:2, 1075:3, 1090:5, 1093:6, 1093:9

**CD3~** [1] - 970:6

**CD8** [1] - 1048:1

**CDR** [2] - 1018:7, 1018:8

**CDRs** [1] - 1018:13

**cel** [6] - 920:9, 920:13, 920:14, 920:15, 920:17

**Celgene** [21] - 924:20, 930:20, 931:5, 931:6, 931:7, 931:13, 931:15, 931:23, 932:1, 934:3, 937:15, 938:2, 942:1, 942:4, 943:12, 943:18, 943:25, 944:7, 1065:14, 1065:24, 1066:1

**Celgene's** [5] - 931:9, 932:4, 935:22,

937:14, 942:1

**Celgene/Juno** [2] - 933:6, 942:25

**Cell** [1] - 1075:20

**cell** [68] - 912:7, 912:11, 912:18, 912:19, 913:3, 913:13, 914:9, 914:15, 915:4, 919:15, 920:23, 921:10, 921:13, 921:20, 921:25, 922:1, 922:4, 922:14, 922:16, 922:20, 923:8, 923:10, 924:8, 924:22, 924:24, 925:1, 929:18, 931:17, 934:25, 935:2, 937:3, 937:11, 937:23, 938:2, 938:3, 938:5, 945:22, 946:8, 950:21, 954:13, 954:17, 996:4, 996:6, 996:7, 996:8, 996:9, 996:10, 996:14, 999:9, 999:20, 1005:21, 1006:6, 1006:7, 1006:15, 1006:16, 1006:20, 1011:23, 1011:24, 1011:25, 1012:6, 1012:8, 1012:11, 1012:13, 1071:16, 1071:19, 1071:24

**cells** [24] - 901:3, 918:11, 918:12, 918:15, 919:9, 924:4, 935:9, 935:14, 939:1, 940:3, 940:7, 954:16, 994:15, 996:5, 1000:15, 1000:16, 1006:8, 1060:14, 1061:11, 1065:6, 1072:8, 1072:9, 1075:2

**cellular** [3] - 912:2, 912:7, 924:3

**center** [6] - 912:24, 913:1, 918:12, 919:11, 921:3, 924:18

**Center** [1] - 912:3

**centers** [5] - 924:11, 924:14, 1075:9, 1076:13, 1085:15

**central** [1] - 951:19

**CENTRAL** [1] - 893:2

**certain** [7] - 896:19, 935:8, 935:9, 955:1, 1067:9, 1067:21, 1092:2

**certainly** [3] - 898:11, 912:15, 970:20

**certificate** [12] - 897:6, 948:8, 948:14, 953:22, 968:1, 968:2, 976:12, 976:25, 977:5, 987:22, 988:6, 988:15

**certified** [1] - 938:19

**certify** [1] - 1095:4

**Chad** [1] - 947:19

**chain** [20] - 951:23, 998:10, 998:11, 1001:18, 1002:6, 1003:15, 1009:4, 1009:6, 1009:11, 1009:12, 1011:2, 1013:20, 1017:13, 1017:15, 1018:19, 1018:21, 1018:22, 1019:12, 1019:13, 1037:15

**chains** [18] - 996:25, 1000:1, 1000:4, 1000:17, 1000:20, 1001:14, 1001:24, 1002:1, 1012:19, 1013:15, 1013:19, 1017:16, 1017:22, 1018:9, 1027:4, 1083:12

**chair** [1] - 896:2

**chairs** [1] - 926:7

**challenge** [1] - 1062:3

**challenges** [2] - 1004:1, 1046:25

**chance** [6] - 901:21, 941:14, 973:5, 1029:11, 1056:19, 1056:21

**change** [14] - 937:4, 937:12, 951:16, 951:17, 952:2, 955:8, 963:23, 1003:23, 1003:24, 1007:8, 1057:21, 1057:22, 1057:23, 1062:3

**changed** [2] - 963:19, 963:21

**changes** [6] - 952:2, 964:15, 964:20, 997:24, 997:25, 998:4

**character** [1] - 976:21

**characterizing** [1] - 977:16

**charge** [1] - 1063:15

**charging** [2] - 987:1, 987:4

**chase** [1] - 948:7

**chemical** [1] - 949:21

**chemistry** [4] - 949:17, 949:21, 1000:25, 1018:15

**chemotherapy** [3] - 914:18, 914:25, 915:3

**Chicago** [3] - 894:14, 1074:4, 1076:12

**chief** [7] - 912:1, 927:20, 927:25, 1051:4, 1051:7, 1073:13, 1073:15

**children** [1] - 1074:15

**Children's** [3] - 907:7, 1076:12, 1076:14

**chimeric** [9] - 951:20, 954:15, 954:21, 954:23, 965:25, 1035:17, 1036:25, 1037:16, 1039:7

**chip** [2] - 1083:18, 1083:22

**choice** [3] - 939:11, 1002:5, 1022:11

**choices** [5] - 1001:16, 1002:8, 1002:10, 1002:18, 1006:4

**cholesterol** [1] - 1085:19

**choosing** [1] - 1003:19

**Chris** [1] - 991:14

**Christopher** [1] - 990:20

**CHRISTOPHER** [2] - 991:7, 1096:23

**chronic** [2] - 1052:6, 1052:15

**Chu** [10] - 894:4, 971:13, 983:10, 985:25, 986:6, 986:20, 988:25, 1034:11, 1034:14, 1047:18

**CHU** [55] - 910:25, 949:4, 961:7, 969:23, 971:14, 971:18, 979:12, 979:16, 979:23, 983:2, 983:5, 984:2, 984:21, 985:4, 985:9, 985:15,

985:17, 985:21, 987:8, 987:10, 989:16, 992:24, 1004:9, 1016:25, 1021:16, 1023:13, 1023:15, 1028:6, 1030:13, 1030:15, 1034:6, 1034:12, 1034:19, 1034:22, 1036:10, 1036:15, 1036:17, 1036:19, 1037:9, 1037:12, 1037:24, 1038:2, 1038:23, 1039:16, 1039:20, 1039:25, 1040:16, 1042:12, 1043:16, 1043:22, 1046:4, 1048:15, 1096:14, 1096:18, 1097:6

**circles** [1] - 997:19

**Citation** [1] - 1024:13

**City** [1] - 895:6

**claim** [7] - 897:17, 954:4, 1009:4, 1009:8, 1047:25, 1088:20, 1088:21

**Claim** [7] - 956:6, 956:8, 956:21, 962:9, 1009:16

**claimed** [10] - 994:24, 995:4, 1014:3, 1015:1, 1022:12, 1025:2, 1025:14, 1026:22, 1031:1, 1069:6

**claiming** [1] - 1026:9

**claims** [34] - 948:15, 952:12, 953:23, 956:2, 956:5, 956:9, 959:24, 968:3, 991:24, 992:4, 994:22, 995:6, 999:15, 1008:5, 1008:16, 1008:18, 1009:1, 1009:7, 1010:1, 1023:24, 1024:22, 1024:24, 1025:8, 1025:9, 1025:11, 1026:2, 1026:5, 1026:9, 1029:5, 1033:12, 1033:16, 1033:20, 1047:16

**Claims** [6] - 956:2, 1008:8, 1009:4, 1009:5, 1024:2

**clarification** [2] - 938:14, 1044:8

**clarify** [1] - 944:14

RAO - DIRECT

**class** [11] - 934:11, 934:22, 935:5, 939:15, 944:8, 1088:4, 1090:4, 1090:6, 1090:8, 1090:10, 1093:24
**classified** [1] - 1069:2
**claw** [1] - 1089:23
**clear** [3] - 898:5, 938:23, 953:8
**clearly** [4] - 919:7, 953:25, 960:19, 968:5
**clerical** [4] - 953:24, 976:13, 976:16, 976:21
**CLERK** [30] - 904:4, 904:6, 904:20, 904:24, 911:5, 911:8, 911:13, 911:19, 929:2, 929:7, 929:9, 947:8, 947:13, 947:17, 971:3, 990:23, 991:5, 991:10, 991:15, 1029:21, 1030:8, 1050:5, 1050:11, 1050:14, 1072:20, 1072:24, 1073:4, 1073:7, 1094:19, 1094:24
**clerk** [1] - 905:3
**clinic** [1] - 950:19
**clinical** [38] - 907:12, 907:13, 912:10, 913:10, 913:14, 916:21, 916:24, 916:25, 919:6, 919:13, 925:6, 929:23, 930:24, 933:15, 933:17, 933:24, 933:25, 934:18, 935:19, 940:11, 940:17, 941:5, 950:11, 983:11, 983:22, 984:7, 984:15, 985:1, 985:25, 986:4, 1084:20, 1084:22, 1084:25, 1085:1, 1085:2, 1085:11, 1086:12
**clinically** [1] - 950:1
**clip** [3] - 947:3, 990:11, 990:14
**CLL** [1] - 935:3
**clone** [3] - 1001:2, 1001:11, 1027:6
**clones** [1] - 1028:20
**cloning** [5] - 949:23,

959:23, 966:22, 1027:3, 1037:1
**close** [1] - 1053:19
**closed** [1] - 925:12
**closely** [3] - 932:8, 932:20, 941:16
**cluster** [1] - 952:22
**clusters** [1] - 952:21
**co** [1] - 933:25
**co-owned** [1] - 933:25
**coauthor** [1] - 913:5
**cocktails** [1] - 914:24
**code** [2] - 1011:12, 1012:5
**codeveloping** [1] - 931:16
**coding** [1] - 965:6
**codon** [3] - 953:1, 953:2, 953:3
**codons** [1] - 965:11
**collaborate** [1] - 932:19
**collaboration** [3] - 1075:12, 1086:7, 1086:8
**collaborators** [1] - 906:23
**colleague** [1] - 898:19
**colleagues** [2] - 920:6, 933:22
**collect** [3] - 918:11, 918:14, 924:4
**collected** [1] - 919:10
**collection** [2] - 920:23, 1028:13
**collectively** [1] - 1002:7
**College** [1] - 949:15
**Colorado** [1] - 1073:22
**Column** [1] - 989:9
**column** [8] - 958:18, 958:21, 960:5, 960:6, 960:7, 960:16, 989:9, 999:12
**combination** [2] - 1015:18, 1027:12
**combinations** [3] - 914:18, 1002:17
**combined** [2] - 970:6, 1020:7
**comfortable** [1] - 926:8
**coming** [7] - 923:22, 939:20, 939:21, 944:16, 1017:2, 1063:24, 1065:6
**comment** [2] - 926:17, 944:17

**comments** [1] - 1060:19
**commercial** [20] - 929:18, 930:21, 930:23, 931:9, 932:4, 932:6, 933:4, 935:22, 937:14, 937:19, 940:6, 941:7, 942:2, 942:8, 942:24, 943:2, 1067:1, 1084:16, 1085:10, 1085:12
**commercialization** [3] - 932:9, 933:9, 937:24
**commercialize** [2] - 908:16, 1090:22
**commercialized** [1] - 907:25
**commercializing** [1] - 931:16
**commercially** [2] - 1084:7, 1086:16
**commercially-viable** [1] - 1086:16
**Commission** [1] - 1068:1
**commissioned** [1] - 1021:9
**commitment** [3] - 921:24, 936:23, 1066:12
**committed** [2] - 937:2, 1066:14
**committee** [2] - 933:10, 973:4
**committees** [1] - 933:6
**common** [11] - 983:25, 995:1, 1014:8, 1014:13, 1025:3, 1044:10, 1044:14, 1048:7, 1048:10, 1064:16, 1064:21
**commonly** [3] - 923:4, 1035:18, 1037:2
**communicate** [2] - 1006:15, 1025:15
**communicated** [1] - 996:9
**companies** [20] - 913:12, 913:16, 918:25, 935:25, 938:1, 940:16, 994:7, 1054:16, 1055:18, 1056:12, 1064:13, 1065:10, 1067:16, 1075:11, 1075:14, 1075:25, 1076:1, 1090:23,

1090:24, 1094:3
**company** [36] - 908:18, 908:13, 921:24, 923:21, 936:12, 938:3, 941:16, 948:1, 993:10, 1021:8, 1022:6, 1049:6, 1051:12, 1051:24, 1052:1, 1052:2, 1052:9, 1052:12, 1052:21, 1055:10, 1055:15, 1060:1, 1060:2, 1067:19, 1067:21, 1073:16, 1074:10, 1078:20, 1082:25, 1083:8, 1084:1, 1090:15, 1090:18, 1092:15, 1092:16
**comparable** [5] - 1087:7, 1087:12, 1088:3, 1088:9, 1092:9
**comparative** [1] - 1016:6
**compare** [5] - 919:14, 940:10, 1019:17, 1026:14, 1091:5
**compared** [6] - 944:25, 1017:8, 1019:11, 1045:14, 1081:12, 1091:16
**comparing** [5] - 1017:5, 1018:20, 1018:25, 1019:1, 1019:3
**comparison** [3] - 958:8, 1018:3, 1018:24
**comparisons** [2] - 1017:11, 1019:21
**compensation** [1] - 908:13
**competing** [1] - 1093:14
**competition** [4] - 1092:19, 1092:22, 1093:3, 1093:18
**competitive** [5] - 933:1, 933:3, 1059:18, 1062:9, 1093:3
**competitor** [7] - 907:10, 936:2, 936:8, 937:5, 937:16, 1092:20, 1094:12
**competitors** [6] - 935:24, 1053:15,

1059:19, 1059:22, 1059:24
**competitors'** [1] - 1060:18
**complementary** [2] - 998:3, 1006:19
**complete** [7] - 915:21, 915:22, 915:25, 916:13, 916:15, 917:6, 994:23
**completed** [2] - 950:11, 1074:1
**completely** [12] - 915:24, 916:17, 922:14, 924:2, 924:7, 925:21, 975:13, 1017:9, 1019:3, 1040:12, 1060:5, 1065:20
**complex** [7] - 904:17, 924:11, 997:20, 1082:20, 1082:21, 1082:23, 1085:23
**complexities** [1] - 1055:1
**complicated** [3] - 997:13, 997:17, 1054:21
**complications** [2] - 1089:11, 1089:21
**complying** [1] - 973:20
**component** [8] - 1037:6, 1037:16, 1064:22, 1064:25, 1065:11, 1065:19, 1079:22, 1084:5
**components** [9] - 896:20, 1064:19, 1071:16, 1071:22, 1077:20, 1082:22, 1083:13, 1086:25, 1088:13
**compositions** [1] - 1002:3
**compounded** [1] - 1029:5
**comprised** [1] - 1077:19
**compromise** [1] - 907:18
**computer** [10] - 958:1, 967:15, 1016:6, 1082:24, 1082:25, 1083:3, 1083:6, 1083:20, 1083:21, 1083:24
**computer-readable** [1] - 967:15
**concept** [1] - 1061:16

RAO - DIRECT

concerns [2] - 943:9, 943:17
conclude [9] - 948:11, 968:2, 1017:4, 1019:20, 1022:4, 1023:20, 1024:21, 1025:7, 1029:3
concluded [3] - 896:11, 948:12, 1022:7
concludes [2] - 947:2, 990:14
conclusion [2] - 1022:6, 1029:13
conclusions [1] - 992:3
conditioning [1] - 1085:2
conduct [6] - 954:6, 955:14, 986:4, 1008:4, 1084:22, 1084:24
conducted [2] - 971:23, 972:2
conducting [2] - 954:15, 984:7
conduit [3] - 996:13, 1022:16, 1022:17
confident [2] - 943:25, 1066:8
confirming [1] - 957:22
connected [3] - 1006:13, 1007:6, 1013:18
connection [5] - 927:20, 977:19, 990:3, 990:15, 1041:6
connectivity [1] - 1083:7
connects [1] - 1013:15
consequence [1] - 952:3
conservative [1] - 909:25
consider [5] - 921:9, 935:23, 959:3, 994:10, 1025:23
consideration [1] - 1027:7
considered [3] - 906:8, 1025:18, 1029:3
considering [1] - 1053:7
consistent [12] - 940:13, 960:16, 960:18, 963:21,

970:14, 970:16, 1057:6, 1079:23, 1087:3, 1091:17, 1093:19, 1094:13
consistently [1] - 934:5
construct [29] - 900:15, 907:14, 908:15, 910:8, 926:17, 934:11, 934:12, 934:24, 935:8, 936:4, 936:5, 936:15, 936:19, 979:1, 986:22, 1041:11, 1041:14, 1041:21, 1043:5, 1043:8, 1043:12, 1044:4, 1045:15, 1046:10, 1057:22, 1057:23, 1060:20, 1069:7, 1079:21
constructed [4] - 1042:17, 1043:4, 1043:9, 1057:21
construction [1] - 954:4
constructs [9] - 936:6, 979:25, 1022:12, 1025:14, 1044:17, 1045:2, 1045:11, 1071:8, 1080:2
construed [1] - 1047:16
consultant [2] - 982:20, 982:22
contact [1] - 897:11
contain [2] - 949:8, 1059:1
contemplating [1] - 1015:15
contentions [1] - 903:25
context [12] - 898:11, 908:11, 917:24, 919:13, 945:9, 959:14, 989:23, 998:7, 1007:9, 1045:11, 1045:14, 1089:25
contingent [1] - 987:3
continue [8] - 921:23, 1030:6, 1030:11, 1057:10, 1057:13, 1066:11, 1067:4, 1094:16
continued [8] - 895:1, 905:7, 949:24, 964:2, 964:4, 964:5, 964:10, 965:2
continuing [3] - 976:9,

978:19, 989:11
continuous [1] - 1085:16
contrast [2] - 907:12, 907:18
contributions [5] - 1079:12, 1079:19, 1082:18, 1082:24, 1084:8
contributors [1] - 912:21
controlled [2] - 940:17, 940:18
conversation [1] - 897:25
conversations [1] - 1031:11
convince [1] - 1085:7
cookbook [1] - 1027:2
copied [1] - 981:15
copy [7] - 942:22, 967:9, 967:11, 967:16, 988:23, 989:2, 992:20
corporate [2] - 1051:11, 1074:5
corporation [1] - 1033:24
correct [169] - 896:6, 902:15, 921:5, 926:15, 926:21, 927:1, 927:6, 928:7, 941:24, 941:25, 942:5, 942:9, 943:10, 943:15, 943:21, 944:1, 944:8, 944:12, 945:5, 945:14, 945:18, 945:23, 946:10, 946:11, 953:25, 961:13, 965:11, 971:25, 972:3, 972:4, 972:6, 972:9, 972:14, 972:21, 973:12, 973:14, 973:16, 973:17, 973:25, 974:3, 974:5, 974:8, 974:12, 974:24, 975:7, 975:11, 975:12, 975:14, 975:17, 975:18, 975:20, 975:21, 975:24, 975:25, 976:2, 976:3, 976:6, 976:7, 976:13, 976:17, 977:2, 977:5, 977:6, 977:8, 977:15, 978:2, 978:13, 978:20,

979:3, 979:8, 980:3, 980:7, 980:12, 980:19, 981:1, 981:2, 981:4, 981:8, 981:9, 981:10, 981:11, 981:14, 981:16, 981:17, 982:1, 982:4, 982:5, 982:6, 982:7, 982:9, 982:12, 982:15, 982:16, 982:18, 982:21, 983:23, 985:24, 987:13, 987:16, 987:19, 987:24, 988:7, 988:9, 988:16, 1004:24, 1012:22, 1023:17, 1028:9, 1030:19, 1030:20, 1030:23, 1031:2, 1031:3, 1031:6, 1031:17, 1031:24, 1032:5, 1032:15, 1032:23, 1033:5, 1033:10, 1033:11, 1033:21, 1034:18, 1035:14, 1036:6, 1037:7, 1038:7, 1038:21, 1038:22, 1039:13, 1040:3, 1040:7, 1040:11, 1040:20, 1041:1, 1041:7, 1041:12, 1041:13, 1042:1, 1042:7, 1042:15, 1042:18, 1042:23, 1042:25, 1043:6, 1043:8, 1043:12, 1044:8, 1044:11, 1044:14, 1044:17, 1045:2, 1045:15, 1045:17, 1045:19, 1045:20, 1045:22, 1045:24, 1046:2, 1046:3, 1058:9, 1062:13, 1067:23, 1068:2, 1069:4, 1078:24, 1095:4
corrected [3] - 953:22, 968:3, 978:19
correction [12] - 897:6, 948:8, 948:14, 953:22, 968:1, 968:2, 976:12, 976:25, 977:5, 987:23, 988:6, 988:15
correctly [4] - 984:22, 987:11, 1006:18, 1065:23
cost [1] - 938:20

costim [6] - 1088:3, 1088:4, 1089:8, 1089:16, 1093:4, 1094:12
costims [2] - 1075:3, 1093:4
costimulatory [1] - 1048:1
costs [1] - 1078:15
counsel [18] - 896:3, 900:4, 901:9, 902:5, 904:9, 905:3, 906:7, 906:12, 908:4, 971:12, 1030:10, 1036:10, 1039:15, 1040:15, 1048:18, 1049:16, 1067:8, 1070:14
COUNSEL [1] - 894:1
counter [2] - 902:19, 902:25
counter-designation [1] - 902:19
counter-designations [1] - 902:25
counterintuitive [1] - 1001:2
country [2] - 950:22, 1076:16
couple [4] - 983:10, 1000:5, 1018:10, 1060:9
course [11] - 897:15, 912:13, 918:14, 939:8, 1031:10, 1076:2, 1085:16, 1087:23, 1093:12, 1093:21, 1094:9
courses [1] - 1075:24
Court [14] - 898:9, 900:22, 903:4, 904:12, 904:16, 1017:2, 1021:21, 1039:19, 1047:15, 1049:16, 1049:18, 1050:24, 1073:12, 1095:1
COURT [155] - 893:1, 896:1, 896:8, 896:22, 897:2, 898:7, 898:16, 899:13, 899:16, 900:6, 901:6, 901:9, 901:14, 902:14, 902:17, 903:2, 903:17, 903:22, 904:2, 904:5, 904:8, 904:25, 905:4, 905:21, 905:25,

RAO - DIRECT

910:12, 910:15, 910:17, 910:21, 910:24, 911:4, 913:22, 913:24, 916:3, 916:6, 916:8, 918:21, 919:20, 919:22, 926:5, 928:16, 928:18, 928:20, 928:24, 929:1, 929:13, 930:1, 932:16, 941:19, 942:23, 944:20, 946:4, 946:17, 946:19, 946:22, 947:4, 947:7, 949:5, 961:9, 969:22, 969:24, 971:1, 971:4, 971:8, 971:11, 977:10, 978:5, 978:8, 978:15, 979:5, 979:15, 979:19, 979:22, 980:22, 983:3, 983:6, 984:4, 984:23, 985:5, 985:10, 985:18, 987:7, 988:18, 989:17, 989:19, 990:7, 990:9, 990:21, 990:24, 991:1, 991:4, 991:16, 992:25, 1004:10, 1017:2, 1021:18, 1022:1, 1022:3, 1023:14, 1023:16, 1023:18, 1028:7, 1029:17, 1029:25, 1030:2, 1030:6, 1030:10, 1031:8, 1034:8, 1034:17, 1034:20, 1035:9, 1037:11, 1038:1, 1038:3, 1039:18, 1039:23, 1040:15, 1043:19, 1043:23, 1046:5, 1048:14, 1048:16, 1048:18, 1048:23, 1049:13, 1049:20, 1049:24, 1050:1, 1050:19, 1059:5, 1059:9, 1059:14, 1063:4, 1063:8, 1066:21, 1067:6, 1069:18, 1070:8, 1070:11, 1070:17, 1071:10, 1072:14, 1072:16, 1072:19, 1073:8, 1076:20, 1077:2, 1077:4, 1077:6, 1077:8,

1077:11, 1094:15, 1094:21, 1094:25
**court** [9] - 893:25, 913:18, 927:13, 977:13, 980:19, 986:8, 1029:18, 1049:25, 1071:11
**Court's** [2] - 900:19, 954:4
**courtroom** [10] - 904:7, 971:6, 971:10, 977:17, 986:22, 987:3, 1029:22, 1030:9, 1063:11, 1094:20
**cover** [2] - 903:6, 1062:18
**covered** [1] - 903:5
**CPU** [1] - 1082:25
**Crawford** [1] - 894:5
**create** [3] - 1035:17, 1036:25, 1065:6
**created** [1] - 967:6
**credible** [1] - 936:13
**criteria** [1] - 955:18
**critical** [6] - 918:1, 918:4, 918:7, 918:24, 1082:5, 1083:24
**critically** [1] - 1086:22
**criticized** [1] - 972:16
**cross** [4] - 906:6, 971:13, 986:25, 1067:6
**CROSS** [12] - 905:7, 926:10, 941:20, 971:17, 1030:14, 1067:12, 1095:14, 1095:24, 1096:5, 1096:13, 1097:5, 1097:16
**cross-examination** [3] - 906:6, 971:13, 986:25
**CROSS-EXAMINATION** [12] - 905:7, 926:10, 941:20, 971:17, 1030:14, 1067:12, 1095:14, 1095:24, 1096:5, 1096:13, 1097:5, 1097:16
**crosses** [1] - 899:11
**CRR** [2] - 893:22, 1095:11
**CRS** [1] - 944:23
**cum** [1] - 949:16
**cumbersome** [1] - 1000:11

**curative** [4] - 1052:8, 1052:19, 1053:2, 1053:4
**cure** [8] - 1052:1, 1052:2, 1052:9, 1052:13, 1052:21, 1056:11, 1074:20
**cured** [3] - 914:21, 916:19, 1066:24
**cures** [3] - 1052:6, 1074:12, 1074:21
**current** [3] - 929:16, 937:18, 939:25
**customer** [1] - 932:22
**customers** [7] - 930:6, 932:25, 938:23, 941:11, 941:16, 945:6, 945:16
**cut** [2] - 901:1, 948:7
**CV** [4] - 948:23, 949:8, 949:12, 1076:19
**cytokine** [2] - 944:10, 1085:4

# D

**D-i-c-k-i-n-s-o-n** [1] - 1050:18
**daily** [1] - 932:21
**damage** [1] - 1052:18
**damages** [5] - 903:24, 909:1, 910:1, 1080:8, 1080:10
**Dane** [2] - 894:18, 900:6
**DANE** [23] - 900:7, 901:8, 901:20, 902:16, 903:9, 946:23, 947:2, 947:5, 989:20, 990:3, 990:8, 990:11, 990:14, 990:19, 990:22, 990:25, 991:2, 1034:10, 1034:14, 1048:20, 1050:2, 1072:17, 1094:23
**Dash** [1] - 977:17
**data** [8] - 920:1, 979:9, 980:5, 1016:15, 1040:3, 1040:5, 1040:9, 1040:18
**date** [8] - 995:14, 1025:24, 1047:10, 1058:20, 1062:20, 1082:11, 1093:13, 1093:22
**DAY** [3] - 894:8, 894:10, 894:13
**days** [8] - 917:14,

918:10, 919:11, 920:6, 920:24, 940:5, 982:9, 1061:10
**DDX111** [1] - 918:5
**DDX112** [1] - 919:2
**DDX123** [1] - 923:6
**DDX205** [1] - 953:19
**DDX206** [1] - 954:9
**DDX207** [1] - 956:8
**DDX208** [1] - 956:15
**DDX209** [1] - 957:1
**DDX210** [1] - 957:24
**DDX211** [1] - 958:20
**DDX214** [1] - 962:2
**DDX216** [1] - 963:14
**DDX217** [1] - 964:9
**DDX219** [1] - 965:2
**DDX220** [1] - 967:13
**DDX221** [1] - 967:24
**DDX222** [1] - 970:2
**DDX302** [1] - 993:5
**DDX303** [1] - 995:19
**DDX304** [1] - 996:5
**DDX305** [1] - 996:23
**DDX306** [1] - 997:5
**DDX307** [2] - 999:5, 999:11
**DDX308** [1] - 999:24
**DDX309** [1] - 1001:13
**DDX310** [1] - 1004:12
**DDX311** [1] - 1005:14
**DDX312** [1] - 1006:4
**DDX313** [1] - 1006:12
**DDX314** [1] - 1008:12
**DDX315** [1] - 1008:24
**DDX316** [1] - 1011:19
**DDX317** [1] - 1013:9
**DDX318** [1] - 1013:22
**DDX319** [1] - 1014:1
**DDX320** [1] - 1014:19
**DDX321** [1] - 1015:3
**DDX322** [1] - 1017:11
**DDX323** [1] - 1018:2
**DDX324** [1] - 1018:24
**DDX325** [1] - 1019:24
**DDX328** [1] - 1024:5
**DDX330** [1] - 1025:6
**DDX331** [1] - 1025:17
**DDX332** [1] - 1026:24
**DDX333** [1] - 1028:8
**DDX403** [4] - 1077:1, 1077:9, 1077:10, 1097:22
**deadly** [3] - 1051:25, 1074:12, 1074:15
**deal** [9] - 897:22, 924:5, 931:19, 1064:6, 1065:14,

1065:16, 1065:20, 1065:22, 1085:3
**dealing** [1] - 950:14, 1056:10
**deals** [1] - 1051:17
**death** [1] - 1052:14
**deaths** [13] - 899:12, 900:5, 926:3, 934:19, 972:11, 972:13, 972:20, 972:23, 973:2, 973:7, 973:8, 973:19, 1086:11
**debilitating** [1] - 1094:6
**decades** [3] - 949:10, 1052:14, 1056:2
**December** [4] - 893:15, 1047:12, 1067:9, 1095:11
**decent** [1] - 915:7
**decide** [4] - 959:9, 959:25, 999:6, 1065:9
**decided** [3] - 972:12, 974:10, 976:5
**deciding** [1] - 1054:6
**decision** [1] - 1051:8
**decisions** [1] - 933:11
**declaration** [1] - 1037:10
**declarations** [1] - 982:6
**dedicated** [3] - 945:22, 946:8, 946:13
**deducting** [1] - 1078:15
**deep** [1] - 921:24
**Defendant** [2] - 893:9, 894:16
**defendant** [4] - 896:11, 898:9, 1050:23, 1094:22
**defendant's** [1] - 903:24
**defense** [4] - 910:21, 911:1, 916:7, 916:9
**defines** [1] - 996:12
**definition** [5] - 954:10, 955:9, 995:19, 995:22, 1061:21
**definitions** [1] - 955:5
**degree** [1] - 949:16, 1017:24, 1017:25, 1073:20
**degrees** [2] - 949:13, 1073:22
**deliver** [1] - 924:20
**delivering** [2] -

RAO - DIRECT

924:11, 1072:9
**Dell** [2] - 1083:9, 1084:1
**delta** [1] - 1075:1
**demand** [2] - 927:5, 1079:16
**demonstrates** [1] - 915:18
**demonstrating** [1] - 970:12
**demonstrative** [3] - 916:7, 916:9, 1077:11
**denied** [1] - 1038:3
**denying** [1] - 928:5
**department** [1] - 949:20
**depicts** [1] - 919:8
**deponents** [2] - 896:14, 896:20
**deposition** [33] - 896:12, 896:25, 897:5, 897:13, 942:11, 943:6, 944:18, 945:8, 946:2, 946:24, 964:1, 975:1, 975:7, 982:9, 998:20, 1028:24, 1040:13, 1041:16, 1041:18, 1041:25, 1042:6, 1042:9, 1043:25, 1044:6, 1045:7, 1069:11, 1069:14, 1069:19, 1069:24, 1069:25, 1070:2, 1070:24, 1071:5
**derived** [1] - 1024:6
**describe** [8] - 984:14, 1011:8, 1014:3, 1015:25, 1024:25, 1031:1, 1058:1, 1092:13
**described** [5] - 958:21, 970:13, 989:14, 1013:4, 1013:14
**describing** [1] - 1062:8
**description** [21] - 991:25, 992:5, 994:20, 994:23, 1008:6, 1008:9, 1008:14, 1008:21, 1010:14, 1010:21, 1015:19, 1019:21, 1023:25, 1024:1, 1024:23, 1026:6, 1026:15, 1030:19, 1030:25, 1033:4,

1033:19
**design** [11] - 959:22, 999:25, 1001:16, 1001:17, 1001:19, 1001:23, 1002:7, 1002:10, 1002:18, 1003:19, 1006:4
**designated** [2] - 898:24, 902:23
**designating** [1] - 902:10
**designation** [2] - 900:8, 902:19
**designations** [6] - 897:14, 902:25, 903:2, 903:12, 903:15, 989:21
**designed** [4] - 998:25, 999:2, 1002:18, 1082:3
**designing** [2] - 954:21, 1004:1
**desired** [1] - 959:11
**despite** [4] - 917:4, 943:17, 1040:10, 1086:11
**detail** [2] - 914:2, 995:9
**details** [2] - 980:15, 1031:10
**determine** [4] - 909:10, 1002:23, 1016:5, 1082:1
**determined** [8] - 909:2, 909:6, 948:17, 976:16, 997:15, 998:12, 1013:1, 1014:17
**determines** [1] - 997:22
**determining** [4] - 965:15, 977:4, 1021:2, 1063:19
**devastating** [1] - 1074:18
**develop** [15] - 924:3, 927:1, 1052:7, 1053:2, 1053:10, 1054:23, 1056:2, 1056:25, 1057:13, 1066:11, 1074:9, 1074:21, 1079:18, 1084:19, 1085:1
**developed** [12] - 927:2, 996:16, 999:1, 1007:16, 1045:19, 1052:13, 1052:19, 1060:7, 1065:25, 1075:1, 1075:2, 1076:1

**developer** [2] - 921:13, 1092:13
**developing** [6] - 913:13, 913:16, 921:9, 942:7, 943:1, 1056:12
**development** [16] - 920:3, 929:24, 930:24, 931:22, 933:15, 933:17, 933:24, 934:1, 934:18, 935:19, 941:5, 943:24, 1005:3, 1051:11, 1065:25, 1090:21
**develops** [2] - 1051:24, 1057:1
**device** [2] - 1083:4, 1083:5
**diabetes** [1] - 931:2
**diagnosed** [2] - 914:10, 923:10
**diagnosis** [1] - 914:18
**diagram** [1] - 956:18
**Diaz** [2] - 1095:11, 1095:12
**DIAZ** [1] - 893:22
**Dickinson** [7] - 1048:21, 1050:2, 1050:17, 1051:3, 1062:24, 1067:14, 1071:14
**DICKINSON** [1] - 1050:8, 1097:11
**dictates** [2] - 992:15, 1018:15
**die** [2] - 916:1, 1060:12
**died** [6] - 920:14, 971:23, 971:24, 972:3, 972:4, 972:8
**Diego** [1] - 895:4
**differ** [2] - 1015:6, 1020:12
**difference** [4] - 1019:24, 1022:13, 1062:4, 1067:3
**differences** [4] - 1015:3, 1015:20, 1022:10, 1074:25
**different** [66] - 907:22, 922:14, 923:24, 923:25, 925:21, 956:19, 958:13, 959:10, 959:17, 959:18, 959:20, 959:22, 982:4, 982:8, 986:6, 993:21, 999:3, 1002:3, 1002:3,

1002:7, 1007:6, 1009:8, 1014:6, 1015:5, 1015:7, 1015:8, 1015:9, 1015:11, 1015:15, 1015:22, 1016:8, 1017:7, 1017:8, 1017:9, 1017:18, 1018:11, 1018:12, 1019:4, 1020:7, 1020:17, 1020:18, 1020:24, 1021:1, 1022:22, 1024:12, 1026:6, 1027:11, 1028:14, 1033:19, 1033:22, 1035:7, 1036:3, 1036:7, 1045:14, 1046:22, 1057:23, 1064:5, 1065:20, 1066:6, 1074:11, 1074:13, 1085:11
**differentiated** [1] - 1060:5
**differently** [3] - 968:18, 980:10, 997:2
**difficult** [5] - 940:23, 999:22, 999:23, 1001:1, 1001:10
**difficulties** [2] - 925:12, 1086:19
**difficulty** [5] - 999:20, 1031:22, 1032:3, 1032:14, 1033:3
**diffuse** [6] - 912:18, 914:8, 921:20, 923:10, 935:2, 937:11
**diligence** [4] - 1057:24, 1059:17, 1062:25
**dimensional** [2] - 997:14, 997:23
**dire** [1] - 941:13
**DIRECT** [12] - 911:20, 929:14, 947:21, 991:19, 1051:1, 1073:9, 1095:20, 1096:3, 1096:8, 1096:24, 1097:12, 1097:19
**direct** [8] - 897:11, 945:20, 966:5, 971:21, 988:22, 1039:18, 1069:6, 1072:7
**directed** [2] - 953:13, 1006:23
**directing** [1] - 1047:19

**direction** [2] - 953:6, 1026:19
**directly** [2] - 1001:11, 1012:16
**director** [1] - 976:24
**Directors** [1] - 1058:20
**directors** [5] - 1049:9, 1057:25, 1063:2, 1076:11, 1076:14
**disadvantages** [5] - 944:11, 944:13, 944:15, 944:23, 945:3
**disagree** [5] - 972:15, 972:24, 972:25, 1037:8, 1038:2
**disbanded** [2] - 945:23, 946:8
**discipline** [1] - 954:14
**disclose** [2] - 1010:15, 1014:8
**disclosed** [4] - 968:20, 1013:7, 1013:8, 1033:4
**disclosure** [1] - 965:20
**discovered** [1] - 898:1
**discoveries** [1] - 950:3
**discuss** [9] - 945:12, 999:13, 1024:4, 1027:7, 1029:19, 1051:20, 1079:24, 1094:17, 1094:25
**discussed** [16] - 921:21, 933:23, 935:3, 950:14, 958:19, 960:6, 964:17, 1015:23, 1022:11, 1025:1, 1026:6, 1027:1, 1027:12, 1040:2, 1079:25, 1091:6
**discussing** [1] - 1035:13
**discussion** [5] - 912:16, 923:3, 987:1, 1058:23, 1074:24
**Discussion** [1] - 1058:20
**discussions** [1] - 918:23
**disease** [14] - 914:5, 914:12, 914:16, 915:1, 915:22, 915:24, 916:17, 918:10, 923:12, 926:3, 1052:7,

RAO - DIRECT

diseases [1] - 1051:25
dismal [2] - 915:12, 926:1
disorder [1] - 1074:13
disorders [1] - 1074:18
display [2] - 1076:25, 1083:4
dispute [2] - 1036:6, 1078:2
disregard [1] - 985:20
dissertation [1] - 1074:2
dissimilar [1] - 1087:10
dissolve [1] - 943:13
distinguish [1] - 1064:18
DISTRICT [3] - 893:1, 893:2, 893:3
diverse [1] - 1017:6
diversity [2] - 998:9, 1019:23
divisible [3] - 966:2, 966:3, 967:6
division [4] - 912:2, 931:18, 945:22, 946:8
DIVISION [1] - 893:2
DLBCL [8] - 935:2, 935:17, 1068:20, 1093:8, 1093:22, 1093:23, 1094:1, 1094:9
DNA [9] - 951:19, 952:16, 953:7, 958:2, 958:5, 1001:3, 1001:4, 1001:12, 1084:13
docks [1] - 1020:17
Doctor [13] - 928:18, 954:9, 956:21, 961:21, 971:19, 979:24, 983:5, 1029:15, 1030:16, 1034:2, 1038:4, 1045:3, 1048:16
doctor [14] - 917:16, 917:20, 925:23, 940:5, 948:2, 973:22, 979:17, 987:11, 989:17, 1037:25, 1043:19, 1044:6, 1056:18
doctor's [1] - 979:13
doctoral [1] - 1074:1
doctors [1] - 924:24
doctrines [1] - 1008:5

document [12] - 896:25, 903:11, 905:2, 905:14, 927:19, 967:13, 1016:17, 1021:7, 1021:8, 1021:11, 1028:2, 1036:12
Document [2] - 897:1, 903:24
documents [5] - 980:17, 984:19, 1016:20, 1036:16, 1055:3
Dodgers [5] - 1054:3, 1058:11, 1058:19, 1062:15, 1062:19
dollars [3] - 974:23, 975:5, 1064:17
domain [3] - 967:1, 1041:22, 1048:1
domains [3] - 1006:15, 1022:18, 1025:16
done [15] - 925:6, 926:25, 951:1, 969:3, 969:6, 1005:17, 1017:13, 1017:15, 1017:17, 1021:2, 1027:20, 1046:1, 1055:12, 1066:18, 1084:11
door [4] - 1049:1, 1049:14, 1049:19, 1059:12
doses [2] - 915:3, 923:17
dosing [1] - 1085:2
dot [4] - 1011:20, 1036:19, 1036:23, 1037:12
double [1] - 926:16
down [9] - 930:1, 932:16, 932:17, 1018:4, 1020:17, 1034:24, 1034:25, 1038:25, 1057:8
dozens [6] - 1055:20, 1059:23, 1060:23, 1065:5, 1071:17
Dr [153] - 896:2, 896:10, 897:4, 898:23, 899:4, 899:15, 899:22, 900:12, 901:3, 905:9, 906:5, 906:6, 906:25, 908:25, 910:15, 910:23, 911:22, 911:24, 914:5, 920:7, 921:14, 926:12,

926:15, 926:20, 927:1, 927:13, 927:18, 947:5, 948:7, 948:18, 949:7, 950:13, 951:2, 951:10, 951:15, 952:5, 953:8, 953:17, 954:3, 955:4, 955:20, 956:1, 956:15, 957:6, 957:24, 958:11, 958:20, 960:3, 960:13, 960:22, 961:8, 962:8, 962:18, 962:25, 963:16, 963:25, 964:13, 964:19, 965:18, 966:5, 966:10, 967:8, 967:17, 967:22, 968:7, 968:11, 969:15, 970:1, 970:13, 977:7, 977:13, 977:17, 978:11, 979:2, 980:14, 980:15, 980:16, 980:23, 980:24, 980:25, 981:5, 981:6, 983:10, 983:18, 984:7, 984:25, 985:8, 985:11, 985:23, 986:8, 986:13, 986:21, 986:25, 987:6, 988:22, 990:20, 995:22, 998:14, 1013:3, 1017:4, 1017:24, 1028:24, 1029:2, 1030:12, 1031:4, 1031:5, 1031:12, 1031:13, 1031:22, 1032:3, 1032:10, 1032:14, 1032:22, 1032:24, 1033:3, 1033:10, 1035:23, 1035:25, 1036:24, 1037:9, 1038:23, 1046:8, 1046:9, 1046:17, 1046:20, 1046:25, 1072:19, 1073:11, 1076:19, 1076:22, 1077:14, 1077:15, 1077:17, 1077:18, 1077:23, 1078:9, 1078:22, 1079:11, 1079:25, 1080:6, 1082:16, 1086:6, 1087:2, 1087:22,

1091:5, 1091:10, 1092:10, 1094:14
dr [3] - 947:23, 985:25, 991:21
DR [2] - 911:10, 1095:19
dramatic [2] - 923:24, 925:4
drawn [1] - 954:25
dream [1] - 925:3
drive [2] - 917:21, 939:10
driver [1] - 927:5
drives [1] - 1079:15
drop [1] - 917:2
drug [4] - 917:12, 932:3, 1056:17, 1084:23
drugs [2] - 914:19, 914:25
due [4] - 913:14, 926:3, 1059:17, 1062:25
duly [6] - 911:11, 929:5, 947:11, 991:8, 1050:9, 1072:22
during [14] - 906:6, 910:5, 931:9, 933:17, 934:17, 935:22, 936:24, 937:14, 940:11, 942:4, 986:13, 1031:9, 1093:14, 1094:17
DX [4] - 913:22, 1058:15, 1077:1, 1077:6
DX0125 [6] - 1062:18, 1062:24, 1063:3, 1063:6, 1097:15, 1098:22
DX0252 [4] - 1023:1, 1023:12, 1023:19, 1097:4
DX0342 [5] - 1021:5, 1021:15, 1022:2, 1022:4, 1023:14
DX036 [1] - 1023:11
DX0386 [3] - 1023:1, 1023:19, 1097:4
DX0881 [5] - 1004:3, 1004:7, 1004:11, 1097:2, 1098:14
DX0936 [2] - 1027:24, 1028:5
DX0954 [2] - 1023:1, 1023:12
DX1739 [1] - 901:23
DX1884 [3] - 990:16,

991:3, 1096:22
DX1896 [6] - 992:18, 992:20, 992:22, 993:1, 1097:1, 1098:12
DX2011 [7] - 1058:15, 1058:22, 1059:4, 1059:15, 1059:16, 1097:14, 1098:20
DX203 [1] - 951:14
DX2149 [1] - 970:2
DX2149C [5] - 969:16, 969:21, 969:25, 1096:12, 1098:10
DX2160 [9] - 1016:10, 1016:12, 1016:14, 1016:23, 1021:18, 1021:20, 1021:23, 1097:3, 1098:16
DX2214 [3] - 1076:19, 1076:21, 1097:21
DX356 [3] - 990:16, 991:3, 1096:22
DX386 [1] - 1023:16
DX43 [6] - 905:6, 905:14, 905:19, 905:21, 905:22, 1095:16
DX503 [3] - 990:16, 991:3, 1096:22
DX546 [4] - 990:4, 990:9, 990:10, 1096:21
DX731 [4] - 990:4, 990:8, 990:10, 1096:21
DX826 [1] - 901:23
DX9954 [2] - 1023:19, 1097:4
dying [3] - 935:14, 938:10, 939:2

**E**

e-mail [1] - 1062:18
e-mails [1] - 932:21
e.g [1] - 955:2
early [8] - 907:9, 907:16, 934:17, 995:5, 1026:16, 1029:6, 1063:25, 1090:21
early-stage [1] - 1090:21
earmark [1] - 1014:12
earned [1] - 949:14
easy [3] - 901:23, 1078:1, 1093:2
economically [1] - 1078:20

RAO - DIRECT

**Economics** [1] - 1073:14
**economics** [2] - 1073:22, 1074:6
**economist** [2] - 908:11, 1073:14
**economists** [2] - 1087:5, 1087:16
**educate** [1] - 924:1
**education** [1] - 932:12
**educational** [3] - 902:12, 914:3, 993:6
**Edward** [1] - 894:18
**effect** [5] - 900:13, 925:24, 974:16, 1031:19, 1092:23
**effective** [1] - 922:17
**effects** [3] - 917:9, 1022:24, 1085:4
**efficacious** [3] - 922:21, 939:23, 1057:14
**efficacy** [10] - 917:23, 927:6, 935:10, 936:6, 938:13, 938:16, 939:8, 939:17, 941:14, 1085:7
**effort** [4] - 1046:9, 1046:14, 1052:24, 1053:24
**eight** [2] - 966:21, 966:23
**Eisai** [1] - 930:20
**either** [10] - 901:24, 922:17, 952:18, 977:22, 1063:25, 1081:15, 1092:3, 1093:14, 1093:19, 1094:13
**EI** [1] - 895:3
**element** [2] - 995:1, 1039:5
**elements** [5] - 1037:20, 1038:7, 1038:14, 1039:7, 1084:12
**elevated** [1] - 1028:16
**eliminates** [1] - 901:4
**Elizabeth** [1] - 894:6
**empiric** [2] - 1005:4, 1005:5
**employed** [1] - 966:8
**employee** [1] - 899:23
**employment** [1] - 929:16
**enabled** [3] - 1008:17, 1025:10, 1029:13
**enablement** [14] - 991:25, 992:5,

995:3, 1008:6, 1008:10, 1008:22, 1025:5, 1025:7, 1025:18, 1026:2, 1029:4, 1030:18, 1030:21, 1033:19
**enablements** [1] - 1025:22
**enables** [1] - 948:19
**encode** [4] - 960:10, 960:11, 963:6, 1001:4
**encoded** [9] - 956:10, 956:11, 956:22, 956:23, 962:9, 962:12, 963:17, 965:16, 989:4
**encodes** [5] - 953:1, 953:2, 953:3, 963:7
**encoding** [2] - 1035:17, 1036:25
**encouraging** [1] - 1000:14
**end** [13] - 897:19, 951:8, 952:1, 964:17, 993:13, 1037:3, 1039:7, 1054:24, 1065:7, 1066:22, 1082:8, 1082:15, 1094:15
**ended** [3] - 986:25, 994:21, 1086:12
**ends** [3] - 911:3, 965:18, 970:10
**engage** [2] - 947:25, 1033:23
**engineered** [2] - 996:4, 996:19
**engineering** [6] - 949:21, 949:22, 994:15, 1073:20, 1079:20, 1083:9
**England** [3] - 913:5, 913:8, 925:17
**enjoy** [1] - 923:21
**enormous** [1] - 1014:5
**ensure** [1] - 1068:7
**entail** [1] - 930:4
**enter** [2] - 958:2, 1093:16, 1093:23
**entered** [3] - 908:9, 957:17, 1021:22
**entertain** [1] - 984:4
**entire** [10] - 988:5, 1011:9, 1024:21, 1036:12, 1049:6, 1054:11, 1054:12, 1056:25, 1057:15, 1079:1
**entirely** [1] - 1018:11

**entitled** [2] - 1049:12, 1062:19
**environment** [1] - 940:18
**epitope** [6] - 1015:13, 1020:12, 1020:19, 1020:24, 1021:3, 1022:23
**epitopes** [5] - 1015:11, 1020:20, 1020:25, 1021:9, 1022:9
**Epsilon** [1] - 1073:14
**equity** [2] - 934:4, 1066:1
**error** [24] - 897:7, 897:20, 897:22, 898:1, 898:11, 948:16, 951:4, 953:24, 953:25, 964:11, 964:14, 965:20, 968:4, 970:18, 970:19, 970:24, 995:7, 1002:17, 1005:6, 1005:9, 1013:6, 1027:8, 1027:13, 1029:10
**errors** [2] - 957:18, 957:19
**essence** [3] - 935:15, 938:10, 939:2
**essential** [2] - 1071:15, 1071:22
**essentially** [8] - 1002:16, 1018:11, 1056:22, 1079:14, 1080:12, 1082:14, 1087:14, 1093:13
**established** [1] - 936:12
**establishes** [1] - 897:8
**establishing** [1] - 900:9
**et** [1] - 893:5
**etcetera** [1] - 1022:24
**Europe** [1] - 934:8
**evaluate** [3] - 1053:12, 1054:13, 1059:17
**evaluating** [5] - 1052:24, 1053:25, 1054:5, 1063:15, 1063:19
**evaluation** [3] - 1053:21, 1063:16, 1064:12
**evaluations** [1] - 1055:4
**evening** [1] - 1094:15

**event** [6] - 983:19, 983:22, 996:9, 996:13, 1022:17, 1025:15
**events** [3] - 984:14, 984:25, 985:12
**evidence** [53] - 902:7, 905:19, 905:22, 913:20, 913:25, 919:18, 919:23, 949:3, 949:6, 949:12, 955:25, 961:6, 961:10, 962:24, 969:21, 977:20, 977:22, 978:12, 979:21, 986:12, 986:20, 990:4, 990:16, 991:3, 992:23, 993:1, 1004:8, 1004:11, 1008:25, 1016:24, 1021:15, 1021:23, 1023:19, 1028:5, 1031:13, 1034:6, 1034:21, 1036:13, 1036:21, 1039:15, 1039:22, 1039:23, 1059:4, 1059:16, 1063:3, 1063:6, 1068:11, 1069:16, 1076:19, 1076:21, 1077:10, 1086:3, 1089:25
**evident** [2] - 953:25, 968:5
**evolving** [1] - 1085:20
**exact** [4] - 932:11, 997:19, 1011:4, 1033:25
**exactly** [5] - 928:3, 928:12, 966:4, 989:14, 1056:24
**EXAMINATION** [34] - 905:7, 906:3, 911:20, 926:10, 929:14, 941:20, 947:21, 971:17, 983:8, 987:9, 988:20, 991:19, 1030:14, 1046:6, 1051:1, 1067:12, 1073:9, 1095:14, 1095:17, 1095:20, 1095:24, 1096:3, 1096:5, 1096:8, 1096:13, 1096:15, 1096:17, 1096:19, 1096:24, 1097:5, 1097:9, 1097:12, 1097:16, 1097:19

**examination** [14] - 906:6, 964:2, 964:5, 964:10, 966:2, 971:13, 971:21, 976:9, 978:19, 986:25, 988:22, 1030:12, 1069:6, 1072:7
**Example** [3] - 1010:20, 1012:3, 1013:10
**example** [14] - 910:25, 922:19, 924:1, 935:20, 960:7, 960:18, 987:17, 994:25, 1000:6, 1011:22, 1014:20, 1052:9, 1052:16, 1061:6
**examples** [3] - 1011:20, 1026:20, 1052:11
**exceptions** [1] - 1056:20
**excerpted** [3] - 999:14, 1004:12, 1028:8
**excerpts** [2] - 946:24, 1008:25
**excess** [2] - 910:7, 1065:1
**Exchange** [1] - 1068:1
**exciting** [1] - 951:6
**exclude** [1] - 896:17
**excuse** [7] - 955:13, 964:4, 972:19, 979:6, 1038:20, 1042:24, 1094:23
**Executive** [1] - 1075:22
**executive** [5] - 927:20, 927:25, 990:12, 1073:13, 1073:15
**Exhibit** [7] - 898:7, 927:16, 1034:4, 1034:21, 1036:21, 1097:7, 1097:8
**exhibit** [7] - 902:7, 902:18, 903:1, 903:3, 903:21, 905:5, 979:15
**exhibits** [10] - 901:17, 901:23, 901:24, 916:4, 1023:15, 1048:25, 1049:4, 1049:7
**exist** [2] - 957:8, 997:10
**existing** [1] - 1041:17
**exists** [2] - 923:1,

RAO - DIRECT

965:20
**expansive** [1] - 901:5
**expect** [5] - 1002:24, 1010:6, 1020:24, 1076:8, 1079:10
**expectation** [3] - 1006:21, 1037:6, 1037:15
**expected** [4] - 904:18, 1053:19, 1062:5, 1063:24
**expecting** [1] - 1090:4
**expended** [1] - 910:4
**expenditures** [2] - 932:23, 933:25
**experience** [14] - 902:5, 916:21, 919:3, 919:14, 922:15, 922:16, 951:3, 954:15, 955:12, 955:19, 1003:18, 1017:24, 1040:22, 1051:14
**experiment** [4] - 998:13, 1006:25, 1010:10, 1020:11
**experimental** [3] - 979:9, 980:5, 1046:14
**experimentally** [1] - 999:19
**experimentation** [10] - 995:8, 1005:10, 1008:19, 1025:12, 1027:21, 1029:10, 1030:23, 1031:23, 1032:5, 1032:15
**experimenter** [8] - 997:4, 1007:23, 1008:1, 1012:13, 1014:10, 1015:16, 1025:10, 1029:9
**experiments** [1] - 1022:7
**expert** [22] - 906:25, 918:22, 953:18, 967:25, 979:24, 982:4, 1021:11, 1028:2, 1035:25, 1036:5, 1038:23, 1040:8, 1040:25, 1041:6, 1041:10, 1041:24, 1042:5, 1043:11, 1045:13, 1045:18, 1045:21, 1066:20
**expertise** [3] - 903:13, 913:14, 1090:21
**experts** [2] - 918:24, 955:6

**explain** [18] - 902:3, 906:16, 948:13, 951:17, 952:10, 957:25, 961:24, 962:3, 964:13, 967:24, 970:4, 994:18, 995:2, 1008:12, 1009:3, 1020:1, 1020:15, 1076:23
**explained** [1] - 1087:2
**explicit** [1] - 988:17
**exposed** [1] - 915:20
**express** [1] - 1003:17
**expressed** [3] - 996:6, 996:8, 999:9
**Expression** [8] - 1073:15, 1074:7, 1074:8, 1074:10, 1075:5, 1075:9, 1075:10, 1075:16
**expressly** [1] - 987:18
**exquisitely** [1] - 997:22
**extended** [1] - 1046:14
**extent** [1] - 1044:20
**extracellular** [1] - 1041:22
**extract** [1] - 935:9
**extracting** [1] - 1085:22
**extraordinary** [1] - 955:11
**extremely** [5] - 897:17, 904:16, 1029:5, 1033:16, 1033:21

---

# F

**face** [2] - 1055:6, 1055:17
**facility** [1] - 940:8
**fact** [34] - 897:8, 899:6, 907:3, 908:19, 917:4, 924:19, 937:8, 943:21, 945:2, 945:22, 960:15, 961:21, 973:4, 976:2, 977:12, 983:14, 987:15, 1017:6, 1023:22, 1033:15, 1041:14, 1069:16, 1069:21, 1070:18, 1070:19, 1079:13, 1079:24, 1086:2, 1086:4, 1086:17, 1087:22,

1088:19, 1090:20, 1090:25
**factor** [2] - 918:1, 977:4
**Factor** [1] - 1026:5
**factors** [16] - 914:21, 917:20, 918:7, 937:20, 938:6, 938:8, 938:21, 938:22, 1025:17, 1025:20, 1025:21, 1025:23, 1026:14, 1029:3, 1029:12, 1062:10
**Factors** [2] - 1026:11, 1026:19
**factory** [1] - 1012:1
**facts** [2] - 1093:19, 1094:13
**faculty** [1] - 975:13
**fail** [1] - 915:7
**failed** [4] - 909:16, 1082:17, 1090:7
**fair** [3] - 927:9, 985:22, 988:13
**fairly** [15] - 944:3, 955:16, 974:2, 988:2, 988:10, 1032:1, 1032:19, 1042:20, 1042:22, 1043:12, 1044:19, 1044:23, 1045:15, 1045:23, 1085:23
**faith** [9] - 976:24, 977:4, 977:7, 977:15, 977:20, 977:21, 978:1, 978:13
**fall** [3] - 915:9, 1007:24, 1029:7
**familiar** [9] - 937:19, 961:21, 1035:23, 1039:9, 1039:12, 1063:12, 1064:13, 1065:16, 1090:15
**family** [1] - 930:14
**fan** [1] - 1054:4
**far** [10] - 909:7, 955:12, 974:1, 977:14, 1026:16, 1038:20, 1049:1, 1080:1, 1091:10, 1092:9
**FARRELL** [17] - 1049:18, 1049:21, 1050:4, 1050:22, 1051:2, 1058:14, 1059:4, 1062:17, 1063:3, 1063:9, 1067:5, 1069:16,

1070:7, 1070:15, 1071:9, 1072:13, 1097:13
**Farrell** [2] - 895:5, 1050:23
**fast** [1] - 939:5
**faster** [3] - 935:11, 939:23, 1060:16
**fastest** [1] - 939:16
**fatal** [5] - 899:10, 900:4, 900:18, 900:20, 901:12
**father** [1] - 930:15
**fault** [2] - 897:7, 976:22
**favor** [1] - 1073:4
**FCRR** [1] - 893:22
**FDA** [15] - 912:22, 924:17, 925:18, 935:20, 981:12, 983:20, 984:11, 984:12, 984:17, 1068:19, 1069:4, 1084:21, 1085:7, 1085:8, 1086:11
**feature** [1] - 1091:19
**features** [10] - 939:10, 1014:9, 1014:10, 1014:14, 1025:3, 1044:11, 1044:14, 1048:7, 1048:11, 1088:12
**federal** [7] - 972:17, 972:21, 972:22, 973:1, 973:4, 973:20, 973:24
**Federal** [1] - 893:22
**fee** [1] - 987:1
**fellowship** [4] - 950:8, 950:11, 993:10, 1074:1
**fellowships** [1] - 955:17
**felt** [3] - 943:25, 950:2, 951:7
**few** [13] - 899:1, 906:7, 911:3, 952:20, 971:9, 999:23, 1006:2, 1007:18, 1007:19, 1016:3, 1017:10, 1038:8, 1046:8
**fewer** [1] - 1010:7
**field** [31] - 912:9, 913:9, 918:18, 920:5, 921:16, 922:14, 922:24, 923:2, 924:8, 925:11, 948:5, 995:5, 995:20,

1007:17, 1007:20, 1011:8, 1026:16, 1029:6, 1035:19, 1037:3, 1053:15, 1053:25, 1054:6, 1054:8, 1054:11, 1054:13, 1055:19, 1057:11, 1064:13, 1064:16, 1066:4
**figure** [9] - 921:15, 1010:9, 1013:25, 1024:17, 1078:2, 1080:20, 1087:8, 1087:10
**figured** [1] - 1049:21
**file** [2] - 969:11, 1067:25
**filed** [15] - 896:16, 896:25, 897:6, 898:23, 903:19, 903:23, 937:7, 948:8, 957:7, 963:1, 963:4, 963:19, 963:20, 987:15, 1008:16
**filing** [5] - 901:17, 903:8, 967:14, 1025:24, 1063:13
**filings** [1] - 1068:3
**fill** [2] - 923:18, 1096:1
**fill-in** [1] - 1096:1
**final** [6] - 988:15, 1027:7, 1041:9, 1043:7, 1043:11, 1058:23
**finally** [7] - 907:24, 941:9, 950:9, 954:24, 987:22, 988:5, 1015:14
**finance** [1] - 1074:5
**financial** [7] - 924:7, 974:18, 1051:4, 1051:7, 1074:5, 1078:2, 1080:1
**fine** [2] - 942:20, 973:19
**finger** [2] - 974:21, 1039:2
**fingertips** [1] - 1018:6
**finish** [1] - 972:19
**finishing** [1] - 1025:7
**finite** [1] - 1068:22
**finite-lived** [1] - 1068:22
**Finney** [2] - 1039:5, 1039:12
**first** [97] - 896:15, 898:5, 899:2, 906:18, 908:17, 909:4, 910:22,

RAO - DIRECT

911:11, 911:17,
915:16, 922:8,
922:11, 922:24,
924:8, 927:11,
928:6, 928:7, 929:5,
932:3, 933:9,
934:11, 934:13,
935:16, 937:8,
938:9, 938:25,
939:12, 939:14,
939:20, 941:10,
942:21, 947:11,
950:20, 950:21,
950:22, 950:24,
951:24, 952:22,
952:24, 955:24,
956:1, 956:16,
963:1, 964:16,
965:4, 965:5,
965:18, 966:17,
970:11, 972:8,
977:17, 989:21,
991:8, 995:12,
998:17, 999:5,
999:20, 999:25,
1002:6, 1004:15,
1008:8, 1013:21,
1014:19, 1016:3,
1017:11, 1034:8,
1037:12, 1047:10,
1050:9, 1051:20,
1052:12, 1054:15,
1061:17, 1061:19,
1061:20, 1061:23,
1061:25, 1063:23,
1072:22, 1073:5,
1073:20, 1074:2,
1081:3, 1081:10,
1081:13, 1087:23,
1088:13, 1090:5,
1091:20, 1092:12,
1092:17, 1093:2,
1093:9, 1093:20
**first-generation** [1] -
950:21
**first-in-class** [1] -
934:11
**first-mover** [9] -
908:17, 909:4,
922:8, 928:6, 928:7,
1061:17, 1061:19,
1061:23, 1061:25
**FISH** [2] - 895:2, 895:5
**Fish** [2] - 947:19,
991:17
**fit** [2] - 1084:14
**fits** [1] - 1085:24
**five** [6] - 949:10,
994:3, 1005:13,
1018:21, 1034:14,

1063:23
**fix** [1] - 968:5
**flawed** [1] - 1082:17
**floor** [1] - 910:1
**Floor** [2] - 894:9,
894:20
**Flower** [1] - 894:9
**FMC63** [1] - 1022:7
**focus** [6] - 950:13,
952:4, 952:7,
953:17, 965:5,
1016:3
**focused** [2] - 919:1,
1023:24
**focusing** [1] - 1035:14
**fold** [4] - 997:12,
997:17, 998:11,
1003:8
**folded** [2] - 1006:14,
1006:18
**folding** [4] - 998:5,
1005:3, 1005:21,
1007:8
**folds** [1] - 1007:5
**folks** [1] - 932:13
**follow** [2] - 954:4,
1052:5
**following** [3] - 896:10,
968:3, 974:20
**follows** [6] - 911:12,
929:6, 947:12,
991:9, 1050:10,
1072:23
**force** [1] - 921:24
**forecasted** [1] -
923:13
**foregoing** [1] - 1095:4
**foreign** [1] - 996:22
**foremost** [3] - 938:9,
938:25, 941:10
**Form** [1] - 1067:25
**form** [2] - 914:12,
967:15
**formally** [1] - 930:12
**former** [1] - 902:14
**formidable** [3] -
921:23, 1092:20,
1094:12
**forming** [4] - 1004:4,
1021:11, 1023:9,
1028:2
**forms** [1] - 914:13
**forth** [1] - 897:1
**fortunate** [1] - 917:4
**fortunately** [2] -
914:20, 925:15
**forward** [6] - 911:6,
989:8, 1001:6,
1058:25, 1066:14,
1072:19

**foundation** [10] -
902:8, 903:1,
903:12, 903:21,
978:4, 978:6, 984:3,
984:4, 1017:1,
1021:16
**four** [6] - 914:18,
951:24, 953:4,
964:16, 1005:13,
1039:17
**fourth** [2] - 944:22,
953:3
**fraction** [1] - 914:22
**fragment** [3] - 960:11,
996:19, 1001:20
**fragments** [1] - 996:25
**framework** [3] - 897:9,
1080:24, 1080:25
**franchise** [1] - 1057:5
**Friday** [4] - 905:9,
906:7, 908:4, 927:13
**Frohlich** [4] - 898:24,
902:2, 903:3,
903:12, 990:12,
1028:24
**Frohlich's** [2] -
902:11, 990:15
**front** [8] - 935:25,
952:2, 969:15,
977:23, 1058:16,
1062:21, 1068:13,
1070:13
**fruit** [1] - 1066:3
**frustrations** [1] -
951:6
**fulfill** [1] - 925:20
**full** [8] - 908:22,
960:19, 960:20,
1008:15, 1008:18,
1025:11, 1047:22,
1049:10
**fully** [2] - 907:25,
973:20
**function** [5] - 954:23,
1002:10, 1022:15,
1022:24, 1023:22
**functional** [8] -
1002:12, 1002:23,
1003:14, 1005:9,
1006:10, 1007:8,
1009:17, 1013:5
**functions** [3] - 959:11,
970:22, 992:15
**fundamental** [4] -
908:8, 1003:6,
1060:3, 1079:13
**fundamentally** [2] -
1078:23, 1082:17
**funded** [1] - 984:8
**funding** [2] - 984:16,

986:3
**future** [1] - 951:8

# G

**G-a-r-c-i-a** [1] - 991:14
**galley** [1] - 926:7
**gamma** [1] - 1075:1
**gamma-delta** [1] -
1075:1
**Garcia** [9] - 990:20,
991:14, 991:21,
998:14, 1017:4,
1017:24, 1029:2,
1030:12, 1046:8
**GARCIA** [1] - 991:7
**GARCindexlA** [1] -
1096:23
**garnering** [2] - 930:6,
932:13
**Garth** [2] - 894:18,
928:25
**gears** [2] - 921:1,
960:22
**Geers** [1] - 894:11
**gene** [13] - 973:4,
984:18, 1001:3,
1001:11, 1060:10,
1074:10, 1074:11,
1075:8, 1075:21,
1079:18, 1082:20,
1094:3, 1094:4
**Gene** [1] - 1075:19
**Genentech** [1] -
993:10
**general** [4] - 973:10,
1010:21, 1040:22,
1061:16
**generally** [11] -
1000:13, 1031:14,
1037:18, 1038:5,
1038:13, 1039:6,
1039:9, 1039:11,
1039:12, 1039:14,
1056:20
**generate** [1] - 967:4
**generated** [3] -
957:22, 957:23,
1016:15
**generating** [3] -
932:24, 938:25,
952:24
**generation** [3] -
950:21, 950:23,
1061:1
**generations** [3] -
1063:22, 1063:23,
1063:24
**generic** [1] - 1027:2
**genetic** [1] - 949:25

**genetics** [1] - 949:21
**gentlemen** [5] - 906:2,
947:19, 971:15,
1032:12, 1040:21
**Geoff** [1] - 991:17
**geographic** [1] -
933:21
**geographical** [1] -
931:18
**Georgetown** [1] -
950:6
**Giants** [1] - 1054:4
**Gilbert** [1] - 977:23
**Gilead** [49] - 908:19,
910:7, 927:24,
927:25, 928:10,
975:23, 982:11,
1049:5, 1051:4,
1051:5, 1051:6,
1051:12, 1051:13,
1051:20, 1051:23,
1051:24, 1052:12,
1052:20, 1052:24,
1053:8, 1053:11,
1053:16, 1055:21,
1055:22, 1057:20,
1059:17, 1059:22,
1060:3, 1060:25,
1061:18, 1061:22,
1063:19, 1066:8,
1066:17, 1067:16,
1067:19, 1067:21,
1067:25, 1068:3,
1068:7, 1069:3,
1069:23, 1070:21,
1078:13, 1078:16,
1080:21, 1081:6
**Gilead's** [14] - 927:19,
927:20, 927:25,
928:9, 1051:8,
1053:17, 1053:21,
1053:24, 1057:3,
1062:8, 1063:16,
1068:10, 1069:2,
1072:2
**given** [14] - 900:14,
917:18, 917:24,
928:6, 940:19,
955:11, 960:18,
969:1, 1003:7,
1021:24, 1022:10,
1034:10, 1055:21,
1057:3
**glad** [1] - 951:18
**gladly** [1] - 922:25
**glass** [1] - 898:1
**global** [3] - 931:7,
942:1, 1094:2
**globalizing** [1] - 932:8
**globally** [3] - 931:22,

RAO - DIRECT

933:24, 934:8
**Globe** [1] - 972:8
**glutamate** [2] - 953:2, 989:13
**glutamic** [1] - 953:2
**Gold** [2] - 909:11, 909:15
**govern** [1] - 1003:7
**governance** [1] - 933:8
**government** [2] - 1090:19, 1090:20
**governments** [1] - 930:9
**grab** [1] - 1002:25
**grabs** [2] - 1015:14, 1020:17
**graduate** [1] - 993:19
**Grand** [1] - 894:20
**granted** [4] - 903:17, 985:10, 1035:9, 1043:23
**Gratzinger** [1] - 894:19
**gray** [2] - 1014:24, 1017:17
**great** [3] - 1052:11, 1066:10, 1070:4
**green** [2] - 956:9, 1017:19
**grounds** [4] - 1059:9, 1059:10, 1059:14
**group** [3] - 916:12, 916:24, 1008:25
**grow** [1] - 940:7
**grown** [1] - 1006:8
**guarantee** [1] - 1085:25
**guess** [6] - 899:13, 903:2, 928:3, 950:22, 1019:10, 1070:22, 1070:25, 1086:3
**guessed** [1] - 1070:25
**guidance** [10] - 995:6, 1007:22, 1007:25, 1026:17, 1026:19, 1026:21, 1026:23, 1026:24, 1029:8, 1067:8
**guinea** [1] - 1019:16

## H

**half** [6] - 916:14, 917:4, 938:5, 982:1, 1033:12, 1088:22
**hand** [7] - 911:9, 929:3, 943:13, 943:14, 947:8,

991:6, 1050:6
**handed** [2] - 905:2, 948:20
**handled** [1] - 897:16
**happy** [3] - 973:1, 973:11, 1054:4
**Harvard** [7] - 920:7, 949:15, 974:5, 974:7, 975:10, 975:13, 1073:25
**HCV** [1] - 1056:24
**head** [7] - 931:7, 931:9, 932:4, 932:7, 935:18, 937:18, 942:1
**Health** [6] - 950:10, 972:12, 972:16, 973:9, 973:11, 973:16
**healthcare** [1] - 931:2
**healthy** [1] - 996:8
**hear** [4] - 945:4, 945:15, 978:5, 1028:24
**heard** [38] - 897:24, 901:9, 912:16, 912:23, 914:7, 914:17, 914:23, 915:10, 917:8, 917:12, 922:7, 922:15, 923:12, 923:23, 925:2, 925:10, 938:22, 941:10, 941:13, 951:15, 952:5, 964:1, 977:12, 978:11, 980:18, 984:21, 985:3, 985:13, 987:11, 996:2, 1031:9, 1031:19, 1057:16, 1063:10, 1065:14, 1085:3, 1092:12, 1094:9
**hearing** [1] - 1061:17
**hearsay** [2] - 918:20, 985:17
**heavy** [26] - 996:25, 998:9, 998:11, 1000:1, 1000:3, 1000:17, 1000:19, 1001:13, 1001:18, 1001:24, 1002:5, 1003:14, 1009:11, 1011:2, 1012:19, 1013:18, 1013:20, 1015:7, 1017:13, 1017:14, 1017:22, 1018:9, 1018:19, 1018:21, 1019:13,

1027:3
**HEINRICH** [18] - 903:18, 903:23, 905:20, 906:2, 906:4, 906:15, 910:11, 910:19, 918:20, 919:21, 926:11, 927:16, 928:15, 990:6, 990:18, 1077:5, 1095:18, 1095:25
**Heinrich** [3] - 894:5, 910:12, 926:6
**held** [3] - 930:19, 931:6, 973:6
**hello** [1] - 1073:13
**help** [5] - 915:13, 951:10, 959:24, 966:21, 1076:22
**helped** [1] - 941:17
**helping** [1] - 950:3
**hematologic** [1] - 935:4
**Hematology** [1] - 920:4
**hematology** [1] - 950:8
**hemophagocytic** [1] - 1074:20
**hemophilia** [1] - 1074:12
**henceforth** [1] - 952:4
**hepatitis** [1] - 1052:16
**hide** [2] - 972:13, 983:15
**high** [8] - 915:3, 994:19, 1005:3, 1008:12, 1008:20, 1017:24, 1056:5, 1092:3
**high-level** [1] - 1008:20
**high-risk** [1] - 1056:5
**higher** [5] - 906:17, 1060:17, 1091:24, 1092:4, 1092:5
**highest** [1] - 1091:15
**highlight** [9] - 979:14, 1019:8, 1023:21, 1034:23, 1036:22, 1047:22
**highlighted** [4] - 964:10, 970:8, 1005:2, 1013:10
**highly** [5] - 1015:6, 1016:4, 1017:6, 1022:24, 1031:20
**highway** [1] - 924:13
**history** [8] - 955:22, 960:24, 962:19,

967:23, 971:22, 975:23, 986:23, 987:13
**hit** [1] - 925:11
**HIV** [2] - 970:10, 1052:12
**hold** [3] - 904:2, 930:17, 1086:12
**honestly** [1] - 1069:25
**Honor** [86] - 896:7, 896:9, 897:3, 898:13, 898:14, 898:18, 898:21, 899:14, 900:7, 900:24, 901:8, 901:16, 901:20, 902:3, 902:16, 902:18, 903:7, 903:9, 903:18, 903:21, 904:4, 905:1, 905:6, 905:19, 905:24, 910:20, 910:22, 910:25, 928:22, 946:16, 946:23, 947:2, 947:18, 949:2, 961:11, 969:20, 970:25, 971:14, 978:3, 978:14, 979:20, 983:2, 983:7, 984:2, 984:21, 985:15, 987:8, 988:19, 989:15, 989:20, 990:3, 990:8, 990:15, 990:22, 990:25, 991:17, 992:22, 1016:23, 1021:14, 1021:24, 1023:11, 1023:13, 1023:17, 1029:24, 1030:13, 1034:10, 1039:20, 1039:25, 1048:15, 1048:20, 1049:22, 1050:3, 1050:23, 1058:14, 1059:4, 1059:7, 1062:17, 1063:3, 1063:9, 1066:19, 1070:15, 1072:13, 1072:17, 1076:18, 1076:25, 1094:23
**Honor's** [1] - 896:24
**HONORABLE** [1] - 893:3
**hope** [2] - 925:20, 1053:14
**hoped** [2] - 925:13, 925:20
**hopefully** [1] - 935:11

**hoping** [1] - 903:10
**Hopkins** [1] - 993:9
**horizon** [2] - 1082:9, 1082:14
**hospital** [4] - 936:21, 974:7, 974:8, 975:19
**Hospital** [5] - 907:8, 950:6, 974:11, 975:16, 1076:12
**hospitals** [1] - 938:18
**hour** [4] - 912:1, 982:20, 1029:19, 1033:12
**hourly** [1] - 987:1
**house** [2] - 1087:11
**houses** [2] - 1087:12, 1087:18
**huge** [6] - 984:19, 994:22, 995:4, 1061:13, 1066:1, 1083:25
**humans** [1] - 1084:20
**hundred** [3] - 940:18, 975:4, 1064:17
**hundreds** [8] - 912:17, 959:19, 974:22, 1051:19, 1059:24, 1065:5, 1079:18, 1084:3
**Hunger** [1] - 928:25
**hunt** [1] - 1027:13
**hybridoma** [5] - 1011:23, 1011:24, 1011:25, 1012:8, 1024:7
**hypothesis** [2] - 936:5, 951:5
**hypothetical** [18] - 906:17, 907:18, 907:20, 907:24, 908:6, 909:9, 910:3, 1033:23, 1080:25, 1081:2, 1081:4, 1081:8, 1081:12, 1081:18, 1081:23, 1082:9, 1082:12, 1093:10

## I

**I.D** [4] - 956:25, 957:1, 957:3, 958:13
**ID** [43] - 951:16, 951:19, 951:24, 952:8, 952:13, 952:15, 952:17, 953:15, 956:10, 956:12, 956:13, 956:16, 956:22, 956:23, 957:5,

RAO - DIRECT

957:9, 957:13,
957:17, 957:22,
957:23, 958:5,
958:12, 958:25,
960:14, 960:19,
960:20, 962:10,
962:22, 963:1,
963:3, 963:4,
963:16, 963:17,
963:18, 964:12,
964:15, 965:5,
965:21, 967:2,
967:19, 989:4,
1048:2
**ID:11** [6] - 962:17,
963:13, 988:1,
988:8, 989:11,
989:12
**idea** [5] - 897:20,
1027:17, 1027:19,
1046:21, 1093:18
**identical** [2] - 958:15,
1017:20
**identified** [4] - 899:4,
899:9, 989:25,
1000:17
**identify** [5] - 916:3,
1014:13, 1025:3,
1028:21, 1070:8
**identifying** [2] -
1000:3, 1019:9
**identity** [1] - 1011:12
**IDs** [3] - 966:9,
966:10, 966:11
**II** [1] - 921:17
**III** [1] - 921:17
**ill** [1] - 1086:22
**Illinois** [1] - 894:14
**illnesses** [1] - 973:8
**illustrate** [1] - 915:13
**illustrates** [1] - 920:16
**imagine** [1] - 904:11
**immediately** [3] -
896:10, 972:11,
983:23
**immune** [5] - 954:16,
992:9, 992:14,
996:21, 1074:18
**immunize** [1] -
1000:13
**immunology** [10] -
912:11, 950:12,
954:13, 954:19,
991:23, 992:6,
992:8, 992:9,
992:13, 993:12
**immunotherapy** [5] -
912:8, 925:2, 948:1,
994:8, 994:16
**impact** [1] - 966:16

**impeachment** [2] -
979:21, 979:22
**implausible** [1] -
964:25
**importance** [2] -
900:10, 918:19
**important** [34] - 897:6,
897:17, 898:12,
900:15, 900:16,
901:4, 909:14,
913:8, 913:10,
916:23, 917:22,
927:4, 933:18,
938:21, 938:22,
939:12, 939:15,
959:5, 959:7,
959:16, 996:11,
998:1, 998:7,
1005:20, 1018:13,
1020:2, 1051:24,
1058:6, 1060:16,
1066:13, 1067:2,
1079:21, 1081:11,
1091:19
**importantly** [4] -
907:17, 909:12,
916:18, 921:18
**impossible** [1] -
1043:18
**improve** [2] - 1061:1,
1061:8
**improved** [1] - 916:11
**improvements** [2] -
1057:20, 1085:17
**improving** [1] - 1061:3
**in-person** [1] - 932:22
**inability** [1] - 944:24
**INC** [2] - 893:5, 893:8
**include** [9] - 929:22,
950:25, 962:22,
1009:8, 1012:19,
1058:11, 1061:3,
1062:14, 1091:14
**included** [1] - 963:9
**includes** [6] -
1011:14, 1027:25,
1068:5, 1071:7,
1087:24, 1087:25
**including** [5] - 912:18,
924:7, 977:12,
988:6, 988:15
**inclusion** [2] -
1028:22, 1044:3
**inconsistent** [2] -
960:16, 970:14
**incorporate** [1] -
953:13
**incorporated** [2] -
953:12, 970:9
**incorporates** [1] -

966:20
**incorrect** [2] - 978:17,
1013:2
**increase** [4] - 908:18,
908:23, 918:10,
1092:5
**increases** [2] - 908:7,
1092:21
**increasing** [1] -
930:21
**incredible** [2] -
1056:1, 1066:25
**incredibly** [2] -
1060:16, 1066:13
**incurred** [1] - 1078:16
**indeed** [1] - 1057:19
**index** [2] - 938:12,
938:15
**indexANDREW** [1] -
1097:11
**indexingMICHAEL** [1]
- 1096:2
**indicate** [1] - 952:12
**indicated** [1] - 1089:3
**indicating** [1] -
1017:20
**indication** [5] - 908:2,
921:21, 1093:8,
1093:22, 1094:8
**indications** [1] -
921:19
**indirectly** [1] - 930:22
**individual** [2] -
1064:22, 1065:11
**individuals** [2] -
917:1, 1046:14
**industry** [7] - 919:7,
930:11, 930:18,
1053:19, 1055:25,
1056:3
**infancy** [1] - 1007:17,
1055:25
**infects** [1] - 1052:17
**infer** [1] - 951:23
**inferred** [1] - 968:25
**infinity** [1] - 1005:4
**inform** [2] - 1010:2,
1016:20
**information** [21] -
933:22, 951:22,
969:1, 972:13,
973:6, 986:20,
1000:19, 1010:18,
1010:24, 1013:16,
1024:10, 1024:13,
1040:3, 1046:13,
1047:3, 1048:10,
1059:12, 1071:2,
1081:14, 1081:15,
1082:2

**informative** [4] -
1087:19, 1087:21,
1089:6, 1089:14
**infringed** [3] - 907:21,
1080:7, 1080:8
**infringement** [1] -
1082:11
**infringer's** [1] - 908:13
**infuse** [1] - 950:23
**infused** [1] - 950:20
**infusion** [2] - 918:13,
1085:22
**ingredient** [1] -
1079:15
**ingredients** [1] -
994:16
**initial** [5] - 914:17,
915:8, 1028:13,
1053:11, 1070:13
**innovate** [1] - 1057:10
**innovates** [1] -
1066:23
**inordinate** [1] - 936:14
**input** [1] - 1083:4
**inserting** [1] - 1072:8
**insights** [5] - 930:6,
932:13, 932:24,
933:16, 944:22
**instance** [1] - 899:2
**instead** [4] - 955:9,
972:12, 1018:25,
1033:21
**institute** [1] - 1076:16
**Institute** [7] - 949:20,
949:24, 950:10,
993:11, 1076:15,
1090:16, 1091:1
**Institutes** [6] - 950:10,
972:12, 972:16,
973:8, 973:11,
973:16
**institution** [4] -
907:10, 1012:17,
1088:7, 1092:15
**institutions** [2] -
1075:13, 1090:21
**instructed** [2] -
959:12, 962:6
**instructions** [1] -
952:23
**intangible** [1] -
1068:22
**Intel** [2] - 1082:25,
1083:18
**Intel's** [1] - 1083:22
**Intellectual** [1] -
1076:6
**intelligently** [1] -
945:24
**intend** [3] - 896:15,

918:15, 1048:24
**intended** [5] - 920:8,
920:12, 920:19,
934:13, 1025:13
**intends** [3] - 896:12,
896:20, 1090:11
**intention** [1] - 937:10
**intentionally** [1] -
978:17
**interacting** [1] -
1009:17
**interaction** [2] - 998:4,
1018:15
**interactions** [1] -
1081:17
**interested** [1] -
1087:11
**interesting** [1] -
1069:10
**internal** [1] - 950:7,
1055:3, 1055:10
**international** [1] -
1073:23
**Internet** [1] - 1083:7
**internship** [1] - 950:7
**interpretation** [1] -
943:7
**interpreted** [1] -
1033:20
**interrupt** [1] - 946:6
**interventions** [2] -
917:12, 917:13
**interviews** [1] -
1055:12
**intricate** [1] - 997:16
**intrinsic** [3] - 1063:21,
1064:6, 1064:8
**introduce** [3] - 901:19,
903:1, 1073:11
**introduced** [1] -
902:20
**introduces** [1] -
901:13
**invaders** [1] - 996:22
**invalid** [4] - 953:22,
968:2, 1024:22,
1025:9
**invalidating** [1] -
1047:20
**invented** [1] - 1086:9
**invention** [10] -
980:16, 980:24,
1026:12, 1026:18,
1026:22, 1030:22,
1031:2, 1031:23,
1032:4, 1032:15
**inventions** [2] - 995:8,
1015:16
**inventor** [3] - 899:24,
969:18, 1086:5

RAO - DIRECT

**inventors** [9] - 989:22,
1008:15, 1012:14,
1012:25, 1013:17,
1013:23, 1014:2,
1024:18, 1024:25
**invest** [2] - 1053:1,
1053:14
**invested** [2] - 970:20,
970:22
**investigational** [1] -
1084:23
**investigators** [3] -
959:13, 985:14,
1007:18
**investing** [1] - 1067:2
**investment** [2] -
1056:5, 1066:1
**investor** [1] - 945:15
**investors** [1] -
1054:17
**invitro** [1] - 954:22
**invivo** [1] - 954:22
**involve** [3] - 1071:18,
1071:19, 1071:23
**involved** [13] - 925:10,
942:7, 943:1, 951:7,
978:7, 1051:8,
1051:18, 1053:22,
1056:4, 1074:6,
1078:20, 1080:18,
1084:4
**involves** [2] - 976:13,
1071:15
**involving** [3] - 983:11,
1075:21, 1080:2
**IP** [5] - 1065:8, 1065:9,
1068:21, 1069:22,
1070:20
**IPR** [2] - 1034:25,
1047:19
**IRELL** [1] - 894:4
**irrelevant** [2] - 896:17,
899:7
**isolated** [2] - 1038:8,
1038:10
**isolating** [1] - 1000:16
**isoleucine** [2] - 953:1,
989:13
**Israel** [6] - 974:8,
974:11, 974:15,
974:21, 975:3,
975:16
**issue** [15] - 896:22,
897:7, 897:14,
897:17, 899:12,
900:15, 901:13,
906:22, 926:24,
952:8, 976:24,
1030:3, 1048:23,
1048:24, 1049:3

**issued** [10] - 956:14,
956:17, 956:24,
957:14, 960:14,
976:17, 987:16,
987:22, 988:5,
988:14
**issues** [8] - 899:4,
904:12, 904:13,
904:17, 924:6,
924:7, 944:10,
1049:7
**item** [1] - 901:16
**itself** [11] - 900:16,
903:3, 909:3, 980:6,
1001:2, 1001:9,
1007:5, 1007:9,
1051:23, 1057:21,
1079:4

## J

**J-u-n-g-h-a-n-s** [1] -
947:16
**J5** [1] - 1024:6
**J591** [2] - 1024:7,
1024:11
**jam** [1] - 1050:4
**JAMES** [1] - 893:3
**January** [1] - 1054:9
**Japan** [1] - 934:9
**JCAR015** [20] -
899:12, 899:25,
900:5, 932:2, 932:5,
933:16, 934:10,
934:11, 934:15,
934:16, 934:23,
935:22, 937:14,
943:9, 990:1,
1022:8, 1086:3,
1086:13, 1093:7
**JCAR017** [22] - 920:2,
920:9, 924:17,
932:3, 932:5,
934:20, 934:21,
935:16, 935:23,
936:4, 936:18,
937:15, 941:4,
942:5, 942:8, 943:2,
943:24, 944:1,
944:8, 1086:18,
1088:5, 1090:11
**JCAR017's** [1] - 941:1
**JCAR018** [1] -
1090:25
**Jeffrey** [1] - 894:19
**JEFFRIES** [21] -
896:7, 896:9,
896:24, 898:14,
898:18, 1029:24,
1030:1, 1030:3,

1030:7, 1048:24,
1049:15, 1049:23,
1059:6, 1059:11,
1063:5, 1066:19,
1067:11, 1067:13,
1070:10, 1072:11,
1097:17
**Jeffries** [2] - 894:8,
1067:6
**Jensen** [1] - 1023:5
**Jeremy** [1] - 920:7
**job** [2] - 1051:13,
1074:2
**John** [5] - 894:13,
895:5, 898:19,
898:21, 1050:23
**Johns** [1] - 993:9
**joined** [4] - 930:18,
970:6, 997:1, 997:2
**joint** [2] - 933:6, 933:9
**JONES** [3] - 894:8,
894:10, 894:13
**Journal** [4] - 913:5,
913:8, 925:18,
1076:7
**journal** [2] - 913:9,
913:11
**journals** [1] - 1076:8
**joy** [1] - 951:9
**Jude** [7] - 905:11,
907:7, 907:12,
1088:6, 1089:8,
1091:8, 1091:23
**judge** [1] - 985:23
**JUDGE** [1] - 893:3
**judged** [1] - 941:7
**JULIET** [1] - 925:17
**July** [1] - 931:11
**jump** [1] - 951:13
**June** [2] - 921:14,
1054:25
**Junghans** [56] - 947:6,
947:15, 947:23,
948:7, 948:18,
949:7, 950:13,
951:2, 951:10,
951:15, 952:5,
953:8, 953:17,
954:3, 955:4,
955:20, 956:1,
956:15, 957:6,
957:24, 958:11,
958:20, 960:3,
960:13, 960:22,
961:8, 962:8,
962:18, 962:25,
963:16, 963:25,
964:13, 964:19,
965:18, 966:5,
966:10, 967:8,

967:17, 967:22,
968:7, 968:11,
969:15, 970:1,
970:13, 983:10,
983:18, 984:7,
984:25, 985:8,
985:11, 985:23,
985:25, 986:25,
987:6, 988:22,
995:22
**JUNGHANS** [2] -
947:10, 1096:7
**JUNO** [1] - 893:3
**Juno** [73] - 896:1,
899:22, 899:23,
902:15, 904:9,
905:9, 907:5, 908:3,
908:10, 913:16,
920:2, 924:20,
928:1, 931:13,
931:15, 931:20,
932:8, 932:19,
932:20, 933:10,
933:14, 933:22,
934:2, 937:15,
938:2, 941:24,
943:13, 943:15,
943:18, 943:21,
943:22, 977:24,
1021:2, 1021:9,
1022:8, 1027:20,
1027:25, 1036:2,
1036:6, 1038:24,
1047:3, 1060:1,
1065:15, 1066:1,
1081:7, 1086:8,
1086:18, 1087:23,
1088:4, 1088:7,
1088:8, 1088:11,
1089:8, 1089:16,
1089:17, 1089:21,
1089:24, 1089:25,
1090:3, 1090:25,
1091:3, 1091:8,
1091:9, 1091:23,
1092:15, 1092:16,
1093:5, 1093:12,
1093:14, 1093:16,
1093:23, 1094:12
**Juno's** [5] - 899:25,
924:17, 955:6,
1086:3, 1093:7
**Juno/Kite** [1] - 906:17
**Juno/MSK** [1] - 908:5
**Juno/Novartis** [1] -
907:15
**juror** [1] - 989:1
**jurors** [1] - 989:1
**jury** [63] - 896:4,
896:6, 898:5,

898:10, 902:13,
903:6, 904:3, 904:6,
904:7, 904:8,
908:25, 911:24,
926:14, 934:10,
947:19, 949:7,
949:13, 951:11,
951:15, 952:5,
952:10, 954:10,
956:18, 957:25,
961:24, 962:3,
967:24, 970:4,
971:3, 971:6, 971:8,
971:10, 971:11,
971:16, 985:19,
989:3, 989:24,
991:17, 993:2,
993:6, 994:19,
996:3, 998:14,
1021:25, 1024:21,
1029:21, 1029:22,
1030:8, 1030:9,
1030:10, 1031:22,
1032:13, 1032:21,
1032:24, 1033:2,
1033:6, 1040:22,
1043:20, 1059:2,
1065:14, 1073:17,
1094:19, 1094:20
**JURY** [1] - 893:13

## K

**K-o-m-a-n-d-u-r-i** [1] -
911:18
**keep** [1] - 952:12
**kept** [1] - 1049:2
**Kettering** [6] - 897:12,
907:4, 907:13,
908:10, 978:10,
979:2
**Kettering/Juno** [1] -
906:20
**key** [6] - 944:11,
944:22, 945:2,
1074:25, 1084:11,
1088:12
**Key** [1] - 944:23
**keyboard** [1] - 1083:4
**KIEV** [1] - 958:6
**kill** [2] - 1006:16,
1006:20
**killers** [1] - 1074:15
**killing** [1] - 900:22
**kills** [1] - 996:10
**kind** [18] - 914:24,
931:18, 932:23,
948:17, 970:18,
970:19, 1005:18,
1022:22, 1026:4,

RAO - DIRECT

1027:2, 1042:17,
1050:4, 1052:3,
1053:7, 1057:19,
1065:18, 1076:16
**kinds** [4] - 923:25,
999:3, 1002:22,
1074:8
**KITE** [1] - 893:8
**Kite** [93] - 896:2,
896:20, 899:4,
904:10, 907:6,
908:16, 909:3,
909:8, 910:3,
913:15, 919:4,
919:7, 923:18,
924:10, 926:15,
926:20, 927:21,
928:1, 928:7, 928:9,
928:22, 929:17,
930:18, 935:18,
936:1, 936:9,
936:10, 937:10,
937:16, 937:19,
938:5, 938:24,
940:10, 940:12,
941:8, 941:12,
947:5, 947:20,
975:23, 981:10,
981:12, 982:11,
989:20, 990:19,
991:18, 1033:24,
1034:7, 1034:17,
1035:2, 1036:1,
1036:5, 1036:6,
1038:24, 1049:6,
1050:2, 1051:8,
1051:21, 1052:20,
1053:5, 1053:8,
1053:21, 1053:25,
1054:6, 1054:7,
1054:10, 1054:14,
1055:3, 1055:4,
1055:9, 1055:18,
1059:18, 1059:21,
1060:4, 1060:5,
1060:7, 1061:18,
1061:19, 1064:12,
1072:6, 1072:17,
1078:12, 1078:16,
1080:9, 1080:21,
1081:6, 1090:13,
1090:14, 1092:18,
1092:19, 1093:5,
1093:14, 1093:19
**Kite's** [19] - 906:25,
908:7, 908:14,
910:9, 923:12,
923:16, 939:25,
940:2, 981:15,
1010:16, 1010:19,
1012:7, 1055:14,

1062:9, 1072:1,
1079:11, 1082:18,
1092:22, 1093:7
**know-how** [5] -
1085:1, 1086:7,
1088:19, 1088:23,
1089:4
**knowing** [2] - 1003:2,
1006:24, 1020:8
**knowledge** [12] -
899:22, 954:17,
954:18, 954:20,
954:22, 980:6,
980:11, 980:13,
1009:23, 1016:20,
1023:6, 1029:7
**knowledgeable** [2] -
994:10, 994:12
**known** [15] - 940:12,
995:13, 995:18,
999:23, 1002:25,
1005:5, 1006:2,
1035:18, 1035:21,
1037:1, 1037:19,
1038:6, 1038:13,
1039:6, 1084:23
**knows** [1] - 1081:19
**Kochenderfer** [6] -
981:6, 1032:10,
1032:14, 1032:22,
1033:1, 1033:10
**Kochenderfer's** [1] -
1046:9
**Komanduri** [7] -
910:23, 911:18,
911:22, 911:24,
914:5, 926:12
**KOMANDURI** [2] -
911:10, 1095:19
**Krause** [2] - 1039:5,
1039:9
**Krishna** [3] - 910:23,
911:17
**KRISHNA** [2] - 911:10,
1095:19
**Kymriah** [12] - 912:23,
912:25, 913:1,
921:2, 921:3,
921:18, 936:19,
937:6, 937:11,
937:13, 944:25,
945:14

## L

**lab** [10] - 939:5,
991:22, 993:12,
993:14, 993:16,
993:24, 994:2,
994:14, 997:15,

998:18
**label** [2] - 932:12,
933:13
**laboratory** [2] -
912:11, 954:15
**lack** [7] - 973:12,
984:2, 1005:8,
1019:8, 1023:21,
1024:22, 1040:3
**lacks** [1] - 899:22
**ladies** [5] - 906:2,
947:18, 971:15,
1032:12, 1040:21
**landscape** [2] - 933:3,
937:23
**language** [6] - 900:21,
956:9, 1009:16,
1009:17, 1010:1,
1012:3
**lapse** [1] - 985:13
**large** [14] - 912:18,
914:9, 914:22,
921:16, 921:20,
921:24, 923:10,
924:15, 925:5,
935:2, 937:11,
952:20, 1010:8,
1010:11
**larger** [2] - 960:20,
1061:23
**largest** [3] - 935:1,
1067:16, 1094:2
**Larson** [6] - 896:16,
896:23, 896:25,
897:25, 898:16,
946:24
**Larson's** [3] - 897:5,
898:8, 963:25
**last** [30] - 899:3,
903:18, 904:22,
908:21, 911:16,
911:18, 927:3,
929:10, 931:6,
938:4, 938:23,
941:11, 947:14,
947:15, 949:9,
950:17, 951:25,
952:6, 964:17,
968:7, 978:5,
991:13, 1015:22,
1023:15, 1037:21,
1048:6, 1050:16,
1050:18, 1073:2,
1073:3
**late** [3] - 1054:9,
1059:25, 1060:14
**late-stage** [2] -
1059:25, 1060:14
**latest** [1] - 1064:1
**laude** [1] - 949:16

**launch** [3] - 941:8,
941:11, 1078:5
**launched** [2] - 908:1,
1082:13
**Law** [14] - 894:4,
894:5, 894:5, 894:6,
894:8, 894:11,
894:13, 894:18,
894:18, 894:19,
894:19, 894:20,
895:3, 895:5
**law** [1] - 908:12
**laws** [1] - 1067:22
**lawyers** [3] - 896:5,
904:15, 1068:5
**lay** [4] - 902:25,
903:12, 903:21,
984:4
**laying** [1] - 902:8
**lead** [8] - 908:3,
933:10, 935:22,
936:17, 937:6,
937:14, 1052:5,
1074:14
**leader** [8] - 919:7,
941:6, 941:7,
1005:19, 1005:20,
1005:22, 1006:1,
1094:3
**leaders** [2] - 932:15,
1006:3
**leadership** [1] -
1063:1
**leading** [9] - 912:21,
921:13, 921:15,
935:25, 936:5,
1074:15, 1075:20,
1075:22, 1076:13
**leads** [1] - 1052:17
**learned** [2] - 949:22,
969:12
**learning** [2] - 1054:15,
1055:19
**least** [5] - 915:24,
954:14, 1071:15,
1087:21, 1090:14
**led** [4] - 912:22, 913:6,
925:17, 1029:12
**left** [7] - 943:4, 951:18,
1000:5, 1001:18,
1020:4, 1029:9,
1078:3
**legal** [13] - 897:9,
953:19, 953:21,
1008:5, 1008:21,
1025:21, 1035:7,
1036:3, 1036:7,
1040:6, 1040:8,
1040:10, 1040:18
**lengths** [1] - 1015:9

**lens** [2] - 1051:20,
1052:21
**less** [11] - 909:3,
909:7, 910:1,
915:20, 916:16,
923:13, 924:16,
924:24, 982:13,
982:17, 1094:12
**lesser** [2] - 936:2,
937:16
**letter** [1] - 958:7
**leukapheresis** [1] -
920:22
**leukemia** [3] - 921:20,
934:14, 1074:18
**level** [5] - 944:24,
952:16, 994:19,
1008:12, 1008:20
**levels** [1] - 1028:17
**liability** [1] - 1080:9
**license** [43] - 906:7,
906:17, 906:18,
1051:17, 1064:21,
1064:24, 1065:8,
1075:6, 1075:7,
1079:1, 1079:2,
1079:6, 1079:23,
1079:25, 1080:2,
1080:15, 1080:19,
1080:20, 1081:20,
1085:9, 1087:4,
1087:5, 1087:6,
1088:6, 1088:8,
1088:9, 1089:15,
1089:17, 1089:24,
1090:2, 1090:13,
1090:14, 1090:19,
1090:24, 1091:1,
1091:2, 1091:4,
1091:18, 1091:19,
1091:20, 1092:2,
1092:9, 1092:24
**licensed** [5] - 905:10,
1088:20, 1089:16,
1093:5, 1093:24
**licensees** [1] -
1080:22
**licenses** [7] - 905:15,
1051:14, 1064:14,
1075:13, 1075:16,
1082:8, 1087:7
**licensing** [10] - 907:6,
910:4, 1065:18,
1075:25, 1076:2,
1076:4, 1076:9,
1078:18, 1078:21,
1090:9
**Licensing** [3] -
1075:21, 1076:7
**licensor** [1] - 1079:7

RAO - DIRECT

**life** [4] - 910:6, 930:15, 1056:22, 1082:9
**light** [27] - 974:10, 996:25, 998:10, 998:11, 1000:1, 1000:4, 1000:17, 1000:19, 1001:13, 1001:18, 1001:24, 1002:6, 1003:15, 1009:12, 1011:2, 1012:19, 1013:19, 1013:20, 1015:7, 1017:15, 1017:22, 1018:9, 1018:19, 1018:22, 1019:12, 1027:3, 1029:2
**likely** [3] - 1060:9, 1060:11, 1062:6
**limine** [1] - 1067:9
**limitations** [2] - 902:4, 956:5
**limited** [1] - 936:10
**line** [30] - 899:11, 899:20, 899:21, 900:2, 900:3, 901:11, 906:13, 946:3, 958:9, 979:18, 1011:23, 1011:24, 1012:6, 1012:8, 1012:11, 1012:13, 1034:25, 1039:1, 1039:2, 1042:2, 1042:10, 1042:12, 1070:16, 1093:23
**lines** [20] - 942:12, 942:14, 958:18, 958:23, 960:5, 979:14, 997:11, 1032:13, 1037:13, 1040:14, 1041:19, 1042:11, 1043:1, 1044:1, 1045:8, 1068:21, 1070:5, 1070:8, 1070:10, 1070:16
**link** [2] - 1001:24, 1005:16
**linked** [2] - 997:3, 1007:7
**LinkedIn** [3] - 902:2, 902:11, 902:17
**linker** [7] - 997:4, 1001:25, 1002:4, 1005:18, 1013:14, 1015:9
**linkers** [2] - 1002:2, 1015:8
**links** [1] - 1002:2
**liso** [6] - 920:9,

920:13, 920:14, 920:15, 920:17
**liso-cel** [6] - 920:9, 920:13, 920:14, 920:15, 920:17
**list** [3] - 905:5, 949:12, 1015:5
**listed** [7] - 956:24, 958:24, 960:5, 969:18, 1027:7, 1089:2, 1089:4
**listen** [1] - 1049:18
**listening** [1] - 977:13
**listing** [4] - 967:16, 967:18, 978:18
**listings** [1] - 1011:15
**lists** [1] - 960:16
**literature** [2] - 1000:18, 1022:21
**litigation** [3] - 907:17, 1038:24, 1080:18
**live** [4] - 932:22, 981:18, 981:20, 1074:4
**lived** [2] - 1062:6, 1068:22
**liver** [2] - 1052:18
**livers** [1] - 1052:17
**lives** [1] - 941:15
**living** [4] - 911:25, 947:23, 991:21, 1051:3
**LLP** [2] - 894:4, 894:17
**locally** [1] - 915:1
**long-term** [5] - 1056:5, 1057:3, 1058:2, 1061:2, 1066:5
**look** [26] - 905:14, 915:5, 915:16, 933:2, 940:17, 949:7, 953:19, 956:8, 957:1, 958:20, 959:15, 960:3, 964:12, 965:1, 967:13, 969:15, 1028:11, 1052:25, 1058:17, 1066:22, 1068:10, 1070:3, 1087:12, 1091:6, 1091:20, 1091:23
**looked** [9] - 926:19, 936:9, 970:23, 1003:13, 1012:18, 1016:18, 1051:21, 1055:3, 1089:7
**looking** [17] - 922:21, 942:15, 952:9,

954:2, 963:4, 967:23, 1000:18, 1049:5, 1052:21, 1053:8, 1054:8, 1054:10, 1054:12, 1059:22, 1061:18, 1069:20, 1093:21
**looks** [3] - 958:23, 1056:11, 1066:24
**loops** [4] - 1018:5, 1018:7, 1018:8, 1018:15
**loose** [1] - 911:3
**Los** [8] - 893:14, 893:23, 894:7, 894:9, 894:21, 981:18, 981:21, 1073:19
**lose** [1] - 1053:13
**losing** [3] - 907:5, 974:22, 975:4
**loss** [2] - 1049:8, 1079:7
**loud** [1] - 938:23
**low** [4] - 1017:25, 1018:1, 1065:11, 1092:10
**lower** [7] - 909:15, 944:24, 952:16, 1091:21, 1091:24, 1092:3, 1092:4
**lunch** [1] - 971:7
**lymph** [1] - 914:8
**lymphoblastic** [2] - 921:20, 934:14
**lymphodepletion** [2] - 950:25, 1085:3
**lymphohistiocytosis** [1] - 1074:20
**lymphoma** [14] - 912:18, 914:7, 914:9, 914:14, 915:10, 915:19, 921:21, 923:10, 924:9, 926:2, 935:2, 937:11, 1074:17
**lymphomas** [1] - 912:17
**lysine** [8] - 952:25, 957:5, 958:7, 963:7, 963:24, 970:11, 980:2, 989:13

## M

**m-o-h-a-n** [1] - 1073:6
**M.D** [3] - 948:3, 950:5, 954:12
**M.D.s** [1] - 955:16
**Maclain** [1] - 894:5

**magna** [1] - 949:16
**mail** [1] - 1062:18
**mails** [1] - 932:21
**main** [2] - 920:5, 938:1
**maintain** [1] - 940:23
**maintained** [1] - 1017:19
**maintains** [1] - 939:20
**major** [1] - 900:15
**majority** [2] - 917:11, 931:3
**malignancies** [2] - 934:25, 935:4
**malignancy** [1] - 931:17
**manage** [1] - 924:2
**manageable** [1] - 1052:15
**managed** [2] - 917:10, 1003:13
**management** [1] - 939:10
**managerial** [1] - 1083:11
**MANELLA** [1] - 894:4
**manner** [3] - 972:14, 973:2, 973:19
**manpower** [1] - 970:21
**manually** [1] - 965:14
**manufacture** [6] - 935:9, 941:12, 1061:11, 1078:17, 1084:4, 1086:15
**manufactured** [2] - 919:10, 940:4
**manufacturer** [2] - 920:19, 924:4
**manufacturing** [40] - 900:10, 918:1, 918:3, 918:8, 919:12, 920:21, 923:16, 923:19, 935:13, 938:11, 938:15, 939:6, 939:17, 939:25, 940:8, 940:23, 941:1, 941:3, 945:13, 945:17, 1060:5, 1060:7, 1060:15, 1060:16, 1060:17, 1060:21, 1061:3, 1061:9, 1061:15, 1071:11, 1072:6, 1079:20, 1083:10, 1084:19, 1085:10, 1085:11, 1085:12, 1086:18, 1086:20, 1086:21
**map** [1] - 1021:9

**margin** [2] - 1053:17, 1053:20
**margins** [3] - 909:8, 909:12, 909:14
**Marina** [3] - 896:16, 897:25, 946:24
**mark** [1] - 1096:2
**Mark** [2] - 977:23, 990:11
**marked** [2] - 979:15, 979:17
**market** [41] - 906:20, 922:11, 923:22, 924:25, 927:11, 930:4, 930:22, 932:23, 932:24, 933:2, 933:21, 934:6, 934:13, 934:21, 935:16, 936:24, 937:10, 939:12, 939:14, 939:19, 940:20, 941:6, 941:7, 944:16, 1054:22, 1055:1, 1056:16, 1057:7, 1057:15, 1061:20, 1061:24, 1062:2, 1062:4, 1063:25, 1084:2, 1087:8, 1090:7, 1090:12
**marketing** [7] - 930:4, 930:22, 932:9, 932:12, 933:11, 1083:11, 1083:16
**marketplace** [4] - 908:1, 935:1, 938:24, 1089:22
**markets** [4] - 934:1, 934:7, 940:20, 1056:24
**marrow** [2] - 912:7, 915:4
**Maryland** [1] - 950:11
**masters** [1] - 1073:22
**match** [1] - 916:12
**matches** [1] - 975:2
**Materials** [1] - 1058:20
**materials** [3] - 932:12, 1058:23, 1063:1
**matter** [17] - 896:5, 903:18, 922:10, 922:12, 995:7, 1002:14, 1005:7, 1007:20, 1035:7, 1036:3, 1036:7, 1040:6, 1040:10, 1040:19, 1060:13, 1077:19, 1095:5
**matters** [1] - 899:21

RAO - DIRECT

**maximum** [2] - 1088:15, 1088:22
**mean** [18] - 907:5, 934:4, 969:4, 998:23, 1014:22, 1052:2, 1052:11, 1052:12, 1052:23, 1054:15, 1055:24, 1061:9, 1061:25, 1066:14, 1070:22, 1070:23, 1070:25, 1082:19
**meaning** [2] - 931:21, 1015:10
**means** [13] - 907:17, 914:24, 915:22, 920:18, 923:18, 938:16, 940:3, 946:13, 1000:5, 1001:12, 1018:11, 1079:5, 1083:18
**meant** [5] - 934:13, 934:23, 951:5, 984:19, 1071:2
**median** [3] - 919:9, 920:22, 939:3
**medical** [4] - 947:24, 950:4, 1076:13, 1076:15
**medicine** [2] - 912:1, 950:7
**Medicine** [3] - 913:5, 913:8, 925:18
**meet** [7] - 920:18, 955:18, 991:25, 992:4, 994:20, 995:3, 1010:14
**meeting** [3] - 920:4, 920:5, 1058:24
**meetings** [2] - 932:22
**member** [3] - 1075:18, 1075:19, 1075:21
**members** [1] - 991:17
**mention** [9] - 1001:7, 1031:9, 1031:21, 1031:24, 1032:2, 1032:3, 1032:5, 1033:5, 1048:4
**mentioned** [12] - 921:6, 923:9, 927:4, 931:5, 945:20, 968:8, 968:9, 987:20, 1015:22, 1019:25, 1020:23, 1074:6
**mentions** [1] - 1024:6
**merely** [2] - 1086:14, 1086:23
**messed** [1] - 967:7
**messed-up** [1] - 967:7

**met** [1] - 1029:5
**methods** [2] - 1035:11, 1035:16
**Methods** [2] - 1036:23, 1036:24
**metrics** [1] - 1006:24
**Miami** [3] - 912:3, 912:20, 950:5
**mice** [2] - 1000:12, 1000:13
**Michael** [2] - 928:22, 929:12
**MICHAEL** [1] - 929:4
**Michalik** [4] - 894:13, 898:19, 898:22, 901:21
**MICHALIK** [8] - 898:21, 899:14, 899:19, 901:11, 901:16, 902:18, 903:7, 903:20
**Michigan** [1] - 1073:21
**Microsoft** [3] - 1083:2, 1083:18, 1083:23
**mid** [1] - 1092:10
**mid-to-low-range** [1] - 1092:10
**middle** [3] - 997:20, 1058:7, 1068:16
**midst** [2] - 974:15, 975:3
**might** [6] - 900:13, 923:21, 1000:6, 1000:7, 1033:19, 1033:22
**MIL** [4] - 899:11, 900:5, 900:19, 1021:16
**milestone** [5] - 1088:25, 1089:10, 1089:20, 1089:23, 1091:15
**milestones** [1] - 1091:14
**million** [26] - 908:22, 909:3, 909:20, 909:22, 975:4, 986:5, 1064:17, 1068:21, 1068:25, 1077:19, 1077:21, 1077:22, 1078:7, 1078:10, 1078:14, 1088:24, 1088:25, 1089:10, 1089:11, 1089:19, 1089:20, 1091:12, 1091:13, 1091:15, 1091:16, 1091:25
**millions** [5] - 974:23,

1009:9, 1009:13, 1009:14, 1010:5
**mind** [1] - 952:12
**minimal** [1] - 1029:7
**minimize** [1] - 900:24
**minor** [1] - 976:21
**minute** [1] - 1029:25
**minutes** [1] - 897:4
**mistake** [5] - 976:13, 976:16, 976:20, 976:24, 1066:17
**modal** [1] - 941:17
**model** [3] - 1057:12, 1063:21, 1064:6
**modeled** [1] - 1063:23
**modeling** [1] - 1062:2
**modification** [1] - 966:18
**modified** [1] - 999:1
**modules** [1] - 999:3
**Mohan** [2] - 1072:17, 1073:3
**MOHAN** [2] - 1072:21, 1097:18
**molecular** [6] - 949:18, 949:22, 949:25, 954:13, 954:18, 1037:1
**Molecular** [1] - 949:24
**molecule** [5] - 959:13, 970:21, 1003:3, 1003:5, 1085:19
**molecules** [4] - 992:15, 994:23, 995:4, 1015:1
**moment** [10] - 957:6, 960:13, 963:16, 963:25, 968:8, 983:2, 1023:13, 1034:23, 1035:12, 1050:19
**Monday** [1] - 893:15
**money** [5] - 907:6, 909:24, 987:4, 1053:13, 1079:5
**months** [8] - 916:2, 939:3, 1003:22, 1007:11, 1007:15, 1028:25, 1054:10, 1060:13
**Morgan** [1] - 894:4
**morning** [22] - 897:3, 898:21, 898:23, 899:9, 901:17, 903:8, 903:23, 904:13, 904:20, 906:2, 906:5, 911:5, 911:22, 911:23, 926:12, 926:13, 929:2, 929:8,

941:22, 941:23, 947:18, 976:4
**most** [17] - 913:10, 914:13, 916:18, 917:22, 922:21, 924:22, 927:4, 938:21, 938:22, 945:4, 1055:13, 1055:16, 1057:15, 1058:6, 1076:5, 1084:6, 1087:21
**mother's** [1] - 930:14
**motion** [9] - 901:13, 985:10, 1035:9, 1038:1, 1038:3, 1043:23
**motions** [1] - 1067:9
**mouse** [3] - 1000:14, 1011:25, 1015:24
**move** [30] - 905:19, 913:20, 916:9, 916:25, 919:18, 922:25, 923:6, 949:2, 958:16, 958:18, 961:5, 969:20, 985:9, 986:6, 989:8, 990:4, 990:16, 992:22, 1004:7, 1016:23, 1021:14, 1023:11, 1028:5, 1035:8, 1037:22, 1043:16, 1043:22, 1059:4, 1063:3, 1076:18
**moved** [1] - 911:1
**mover** [10] - 908:17, 909:4, 922:8, 928:6, 928:7, 1061:17, 1061:19, 1061:23, 1061:25
**moves** [1] - 920:9
**moving** [2] - 1058:24, 1066:14
**MR** [220] - 898:21, 899:14, 899:19, 900:7, 901:8, 901:11, 901:16, 901:20, 902:16, 902:18, 903:7, 903:9, 903:18, 903:20, 903:23, 905:1, 905:6, 905:8, 905:18, 905:20, 905:24, 906:2, 906:4, 906:15, 910:11, 910:14, 910:19, 910:25, 918:20, 919:21, 926:11, 927:16, 928:15, 928:22,

928:25, 929:15, 941:18, 941:21, 942:13, 942:14, 942:16, 942:19, 942:20, 944:21, 946:5, 946:6, 946:16, 946:18, 946:23, 947:2, 947:5, 947:18, 947:22, 949:2, 949:4, 951:13, 961:4, 961:7, 961:11, 963:14, 964:8, 969:20, 969:23, 970:25, 971:14, 971:18, 977:9, 978:3, 978:6, 978:14, 979:4, 979:12, 979:16, 979:20, 979:23, 980:21, 983:2, 983:5, 983:7, 983:9, 984:2, 984:6, 984:21, 984:24, 985:4, 985:7, 985:9, 985:15, 985:17, 985:21, 985:22, 987:6, 987:8, 987:10, 988:19, 988:21, 989:15, 989:16, 989:20, 990:3, 990:6, 990:8, 990:11, 990:14, 990:18, 990:19, 990:22, 990:25, 991:2, 991:20, 992:22, 992:24, 993:5, 999:11, 1004:7, 1004:9, 1016:23, 1016:25, 1021:14, 1021:16, 1021:24, 1022:2, 1023:11, 1023:13, 1023:15, 1023:17, 1024:8, 1028:5, 1028:6, 1029:15, 1030:13, 1030:15, 1031:7, 1034:6, 1034:10, 1034:12, 1034:14, 1034:16, 1034:19, 1034:22, 1036:10, 1036:14, 1036:15, 1036:16, 1036:17, 1036:18, 1036:19, 1036:20, 1037:9, 1037:12, 1037:21, 1037:24, 1038:2, 1038:23, 1039:15, 1039:16, 1039:20, 1039:21, 1039:24, 1039:25,

RAO - DIRECT

1040:16, 1040:17, 1041:20, 1042:11, 1042:12, 1042:13, 1043:3, 1043:16, 1043:22, 1044:2, 1045:9, 1046:4, 1046:7, 1047:6, 1047:18, 1048:13, 1048:15, 1048:20, 1049:18, 1049:21, 1050:2, 1050:4, 1050:22, 1051:2, 1058:14, 1059:4, 1062:17, 1063:3, 1063:9, 1067:5, 1069:16, 1070:7, 1070:15, 1071:9, 1072:13, 1072:17, 1073:10, 1076:18, 1076:25, 1077:3, 1077:5, 1077:7, 1077:9, 1077:13, 1094:23, 1095:15, 1095:18, 1095:25, 1096:4, 1096:6, 1096:9, 1096:14, 1096:16, 1096:18, 1096:20, 1096:25, 1097:6, 1097:10, 1097:13, 1097:20

**MS** [38] - 896:7, 896:9, 896:24, 897:3, 898:13, 898:14, 898:18, 910:22, 911:21, 913:20, 913:23, 914:1, 915:17, 916:5, 916:7, 916:9, 919:18, 919:24, 923:6, 926:4, 928:17, 1029:24, 1030:1, 1030:3, 1030:7, 1048:24, 1049:15, 1049:23, 1059:6, 1059:11, 1063:5, 1066:19, 1067:11, 1067:13, 1070:10, 1072:11, 1095:21, 1097:17

**MSK's** [1] - 896:16

**MSKCC** [8] - 1076:17, 1086:7, 1086:8, 1087:23, 1088:11, 1091:8, 1091:20, 1092:24

**multicenter** [1] - 925:7

**multidisciplinary** [1] - 954:25

**multigenerational** [2] - 1057:16, 1057:17

**multiple** [9] - 918:23, 922:15, 930:15, 932:21, 965:6, 965:15, 966:14, 1046:22, 1065:23

**multiply** [1] - 1009:13

**MUNGER** [1] - 894:17

**muscular** [2] - 1094:6, 1094:7

**must** [1] - 1031:1

**myriad** [2] - 1001:16, 1005:22

## N

**name** [30] - 904:22, 911:16, 911:17, 911:18, 920:9, 929:10, 929:11, 947:14, 947:15, 947:16, 947:19, 961:17, 991:13, 991:14, 1012:5, 1050:16, 1050:17, 1050:18, 1054:2, 1072:1, 1073:2, 1073:3, 1073:5, 1074:19

**named** [1] - 1035:1

**narrow** [5] - 1009:5, 1033:20, 1035:1, 1035:3, 1047:25

**narrowed** [1] - 1018:4

**National** [9] - 950:9, 950:10, 972:12, 972:16, 973:8, 973:11, 973:15, 1090:16, 1091:1

**nature** [4] - 976:21, 997:17, 1026:11, 1062:1

**NCI** [5] - 980:15, 981:5, 1031:4, 1032:10, 1033:10

**necessarily** [1] - 946:13

**necessary** [3] - 1027:8, 1036:12, 1086:24

**need** [24] - 903:5, 903:25, 915:3, 928:24, 939:3, 939:15, 941:13, 959:21, 995:10, 999:25, 1000:1, 1000:19, 1000:21, 1001:10, 1013:16, 1013:18, 1013:20, 1027:9, 1030:3, 1061:1, 1061:11,

**needed** [2] - 935:20, 951:23, 985:2

**needs** [1] - 1007:25

**negative** [1] - 926:16

**neglected** [1] - 971:22

**negotiate** [4] - 1080:15, 1081:13, 1082:7, 1082:8

**negotiated** [6] - 1075:6, 1075:7, 1075:11, 1080:18, 1080:20, 1081:21

**negotiating** [3] - 1051:14, 1079:1, 1079:2

**negotiation** [19] - 907:19, 907:20, 907:24, 908:7, 909:9, 910:3, 1080:25, 1081:2, 1081:4, 1081:9, 1081:12, 1081:13, 1081:18, 1081:23, 1082:9, 1082:10, 1082:12, 1090:2, 1093:11

**negotiations** [1] - 1051:17

**negotiator** [1] - 1075:15

**neighborhood** [1] - 1087:13

**neuroblastoma** [1] - 1074:14

**neurotoxicity** [2] - 944:11, 944:23

**never** [24] - 899:23, 913:19, 926:25, 941:24, 975:10, 975:23, 976:2, 988:7, 1041:11, 1041:14, 1041:25, 1042:6, 1042:14, 1042:17, 1043:4, 1043:8, 1043:11, 1044:16, 1045:1, 1045:13, 1045:18, 1045:21, 1078:19, 1079:10

**nevertheless** [1] - 1066:8

**new** [21] - 904:13, 923:24, 924:3, 924:7, 925:17, 927:1, 939:19, 941:17, 951:5, 984:18, 998:25, 1007:21, 1027:21,

1081:8, 1085:13, 1086:3

**needed** [2] - 935:20, 951:23, 985:2

1038:4, 1040:1, 1041:17, 1043:9, 1054:21, 1060:10, 1084:23, 1096:2

**New** [5] - 894:12, 913:5, 913:8, 972:7

**newer** [1] - 937:24

**newspapers** [1] - 972:6

**next** [33] - 910:17, 918:5, 919:2, 928:20, 928:21, 939:21, 946:22, 946:23, 947:5, 952:9, 964:13, 984:23, 985:6, 989:19, 989:20, 990:11, 990:20, 1002:19, 1005:2, 1006:5, 1030:4, 1048:19, 1048:25, 1050:1, 1050:2, 1072:16, 1072:17, 1086:17, 1089:6, 1089:7, 1089:13, 1089:15, 1091:23

**nice** [2] - 939:14

**NIH** [13] - 973:18, 983:11, 983:15, 983:18, 983:25, 984:1, 984:8, 984:10, 984:15, 984:20, 985:1, 985:12, 986:4

**nine** [1] - 1018:23

**NO:4** [1] - 958:25

**NO:5** [1] - 958:25

**NO:6** [20] - 951:16, 952:8, 956:10, 956:13, 956:16, 956:22, 956:23, 957:10, 957:13, 957:17, 958:12, 960:14, 962:10, 962:22, 963:1, 963:4, 964:12, 965:5, 965:21, 989:5

**nobody** [1] - 1094:5

**nodes** [1] - 914:8

**nonconforming** [1] - 920:17

**noncontroversial** [3] - 902:6, 902:12, 903:11

**noncontroversial-type** [1] - 902:6

**none** [2] - 980:10, 1029:14

**nonfunctional** [1] - 1007:9

**nonoverlapping** [1] - 1022:9

**nonsignaling** [1] - 1075:4

**noon** [1] - 971:1

**normal** [2] - 917:14, 1081:12

**North** [1] - 931:20, 931:24, 934:2, 934:3

**Northwestern** [1] - 1074:4

**not-1** [1] - 966:20

**notebooks** [1] - 989:2

**nothing** [13] - 900:21, 905:18, 926:4, 994:25, 1009:24, 1012:5, 1014:11, 1032:24, 1033:2, 1072:11, 1083:1, 1083:3, 1087:15

**noting** [1] - 900:12

**notion** [1] - 965:23

**Novartis** [42] - 905:10, 907:23, 912:23, 913:15, 921:2, 921:7, 921:9, 921:13, 925:17, 935:18, 936:1, 936:2, 936:3, 936:7, 936:11, 936:25, 937:1, 937:4, 937:16, 945:12, 945:13, 945:17, 945:20, 945:22, 946:7, 1060:1, 1088:8, 1089:16, 1089:23, 1090:3, 1090:9, 1091:9, 1092:17, 1092:20, 1092:21, 1093:5, 1093:14, 1093:19, 1093:25, 1094:2, 1094:11

**Novartis'** [3] - 936:19, 936:23, 937:13

**Novartis's** [2] - 937:6, 945:24

**novel** [2] - 913:16, 925:21

**November** [1] - 956:15

**NSSCAR** [1] - 1075:4

**nuances** [1] - 1040:8

**nucleic** [2] - 1035:17, 1036:25

**Nucleotide** [3] - 951:22, 960:15, 963:3

**nucleotide** [15] - 952:1, 952:10, 956:16, 957:9,

RAO - DIRECT

958:19, 958:20,
960:4, 960:6,
960:16, 962:3,
962:25, 963:1,
966:11, 967:17,
967:20
**Nucleotides** [4] -
956:20, 962:7,
962:13, 969:1
**nucleotides** [9] -
951:24, 952:18,
952:20, 958:22,
960:7, 960:9,
964:16, 964:17,
970:17
**Number** [13] - 956:25,
957:1, 957:3,
958:13, 963:16,
963:18, 966:11,
980:11, 989:9,
1021:16, 1024:13
**number** [26] - 913:4,
922:23, 924:6,
924:15, 945:18,
952:20, 952:21,
955:18, 965:11,
986:7, 988:7,
988:13, 994:22,
995:4, 1009:10,
1010:8, 1010:11,
1014:5, 1025:2,
1049:1, 1058:5,
1063:10, 1074:3,
1074:11, 1075:7,
1076:5
**numbered** [1] - 953:9
**Numbers** [1] - 966:9
**numbers** [6] - 923:13,
966:8, 987:23,
989:9, 1009:14,
1019:2
**numerous** [3] - 931:1,
938:8, 1086:18
**nurses** [1] - 924:2

**O**

**oath** [3] - 904:22,
974:14, 974:17
**object** [1] - 1016:25
**objecting** [1] - 946:5
**objection** [67] - 898:3,
898:10, 899:18,
901:14, 902:1,
902:17, 903:4,
903:20, 905:20,
918:20, 919:19,
919:20, 919:21,
942:17, 944:20,
946:4, 949:4, 961:7,

969:22, 969:23,
977:9, 978:3,
978:14, 979:4,
980:21, 984:2,
984:5, 984:21,
985:4, 985:15,
990:5, 990:6,
990:17, 990:18,
992:24, 1004:9,
1021:16, 1021:19,
1021:21, 1023:14,
1023:15, 1028:6,
1031:7, 1034:9,
1034:16, 1034:20,
1036:20, 1037:21,
1039:16, 1039:21,
1040:17, 1041:20,
1042:13, 1043:3,
1044:2, 1045:9,
1059:5, 1059:12,
1059:13, 1063:4,
1063:5, 1066:19,
1069:16, 1070:15,
1071:9, 1077:4,
1077:5
**objections** [10] -
896:13, 896:17,
896:19, 897:1,
899:1, 901:22,
985:19, 1004:8,
1059:6
**obligations** [2] -
1067:22, 1067:25
**obtain** [2] - 908:16,
1012:13
**obtained** [4] - 905:10,
957:20, 957:21,
1055:16
**obviously** [4] - 902:8,
938:4, 938:12,
943:22
**occurred** [4] - 898:12,
943:4, 964:11,
976:24
**occurring** [2] -
907:22, 1059:8
**occurs** [1] - 907:25
**October** [5] - 922:2,
1068:18, 1078:5,
1082:13, 1093:12
**OF** [3] - 893:2, 893:12,
894:1
**offer** [6] - 901:24,
925:23, 948:19,
964:19, 1034:6,
1036:12
**offered** [7] - 899:3,
899:20, 899:24,
902:19, 955:20,
986:8, 1071:1

**offering** [5] - 953:18,
960:17, 970:15,
987:3, 1066:20
**Office** [2] - 897:8,
976:22
**office** [2] - 976:10,
976:15
**officer** [6] - 927:20,
927:25, 1051:4,
1051:7, 1073:13,
1073:15
**Official** [1] - 893:22
**official** [2] - 976:9,
979:17
**often** [7] - 915:2,
916:25, 945:4,
1085:12, 1085:18,
1087:6, 1090:23
**OLSON** [1] - 894:17
**onboard** [3] - 924:16,
924:18, 924:21
**once** [12] - 929:23,
963:3, 1001:13,
1001:23, 1002:18,
1005:14, 1006:8,
1084:18, 1084:21,
1084:22, 1085:6,
1085:9
**oncologist** [1] -
947:24
**oncology** [4] - 931:4,
936:13, 950:11,
1074:23
**one** [99] - 896:15,
897:14, 899:14,
900:24, 901:16,
903:18, 912:20,
914:13, 915:21,
916:16, 916:17,
920:6, 925:5, 927:3,
927:24, 934:3,
934:5, 943:13,
945:23, 946:7,
948:14, 953:22,
957:12, 965:14,
966:1, 966:19,
968:7, 977:25,
979:18, 983:18,
988:19, 989:22,
994:23, 994:24,
1000:5, 1001:14,
1001:15, 1001:16,
1001:18, 1001:19,
1002:22, 1004:4,
1004:21, 1004:23,
1005:10, 1010:20,
1010:21, 1010:22,
1010:23, 1012:25,
1014:4, 1015:22,
1022:13, 1022:14,

1024:6, 1029:25,
1030:22, 1034:8,
1040:5, 1040:9,
1040:19, 1042:11,
1044:13, 1050:19,
1052:9, 1055:9,
1056:14, 1056:19,
1056:21, 1058:6,
1067:16, 1072:10,
1074:13, 1074:14,
1074:19, 1076:8,
1076:12, 1076:15,
1077:20, 1078:1,
1078:2, 1080:5,
1081:5, 1081:9,
1082:3, 1084:5,
1085:17, 1089:3,
1089:7, 1089:8,
1089:15, 1090:15,
1090:25, 1091:19,
1091:20, 1091:23,
1092:12, 1094:2
**one-time** [3] -
1056:14, 1056:19,
1056:21
**ones** [7] - 903:5,
916:12, 1005:24,
1074:18, 1091:6,
1091:7
**ongoing** [1] - 1077:21
**oops** [1] - 1039:2
**open** [6] - 924:24,
925:1, 994:21,
1049:1, 1049:25,
1068:14
**open-ended** [1] -
994:21
**opened** [3] - 925:7,
925:8, 1049:14
**opening** [1] - 1059:11
**opens** [1] - 1049:19
**operating** [3] - 1083:1,
1083:19, 1083:23
**operational** [3] -
930:7, 933:12,
1083:11
**operationalize** [2] -
938:5, 941:17
**operationalizing** [4] -
929:23, 929:24,
930:3, 930:23
**operations** [1] -
938:17
**opines** [1] - 1077:18
**opinion** [33] - 909:1,
917:16, 926:14,
948:19, 955:8,
967:25, 977:7,
977:11, 977:24,
991:24, 994:19,

995:3, 1010:13,
1011:7, 1013:22,
1014:2, 1019:21,
1021:12, 1022:11,
1022:20, 1025:3,
1026:1, 1028:3,
1033:18, 1035:14,
1077:14, 1077:17,
1078:10, 1078:11,
1078:22, 1082:17,
1091:5
**opinions** [24] -
953:18, 955:20,
959:4, 960:17,
964:6, 970:14,
987:2, 995:9,
995:11, 998:8,
1002:14, 1003:25,
1004:5, 1005:7,
1007:20, 1008:3,
1008:13, 1023:9,
1023:25, 1024:1,
1026:14, 1033:21,
1079:11
**opportunities** [1] -
1052:25
**opportunity** [2] -
938:4, 1063:21
**opposed** [2] -
1075:12, 1082:15
**opposing** [2] - 905:3,
1036:10
**opposite** [3] - 936:3,
937:17, 1033:25
**optimism** [2] - 925:5,
925:8
**optimistic** [1] -
1055:16
**optimized** [1] - 920:21
**option** [1] - 922:25
**options** [8] - 910:4,
924:22, 943:12,
1001:22, 1002:6,
1005:25, 1006:2,
1006:3
**oranges** [1] - 1066:2
**order** [5] - 893:25,
1046:23, 1067:9,
1067:10, 1078:16
**ordered** [1] - 985:20
**orders** [1] - 1015:7
**ordinary** [8] - 954:7,
954:10, 955:5,
955:13, 955:15,
955:19, 995:18,
1026:17
**organization** [2] -
1075:20, 1075:23
**organizations** [1] -
1075:18

RAO - DIRECT

oriented [1] - 950:2
original [9] - 931:19, 951:18, 952:8, 953:23, 967:19, 968:4, 978:17, 987:15, 988:4
originally [6] - 963:4, 976:17, 987:21, 987:22, 988:14, 1024:14
originated [1] - 1091:1
Orlandi [2] - 1027:3, 1027:4
Orlando [1] - 1027:4
OTERO [1] - 893:3
otherwise [1] - 967:6
ourselves [1] - 1052:1
out-innovates [1] - 1066:23
outbound [1] - 1089:17
outcomes [1] - 916:11
outlook [1] - 915:5
outpatient [1] - 944:24
output [2] - 958:1, 958:4
outside [4] - 986:23, 987:12, 994:5, 1065:25
outweigh [1] - 917:17
overall [8] - 909:21, 937:1, 939:6, 1049:6, 1063:21, 1072:7, 1079:22, 1092:23
overcome [1] - 902:24
overnight [1] - 1057:1
overrule [1] - 898:9
overruled [9] - 901:15, 918:21, 977:10, 979:5, 980:22, 1021:20, 1031:8, 1034:20, 1066:21
oversaw [3] - 973:4, 1051:12, 1053:24
overview [1] - 1073:17
own [15] - 899:6, 930:14, 937:1, 955:1, 959:22, 974:15, 975:4, 996:3, 1000:9, 1000:10, 1000:18, 1000:23, 1005:5, 1055:14, 1079:11
owned [1] - 933:25

**P**

package [1] - 1016:15
page [23] - 901:1,

942:13, 946:2, 961:17, 966:6, 970:2, 970:3, 989:11, 989:12, 1036:23, 1037:10, 1037:11, 1038:24, 1040:14, 1041:19, 1042:9, 1043:1, 1044:1, 1045:8, 1068:16, 1070:5, 1070:8, 1070:16
pages [6] - 942:11, 944:18, 948:25, 957:2, 989:10, 1070:16
paid [4] - 975:22, 976:1, 1065:12, 1080:22
paper [29] - 898:22, 899:9, 961:12, 961:15, 961:18, 961:19, 961:22, 961:25, 962:4, 967:9, 967:11, 967:16, 968:9, 968:12, 968:14, 968:19, 968:21, 969:4, 969:13, 1000:8, 1004:25, 1013:4, 1027:3, 1031:13, 1031:16, 1031:20, 1033:4, 1045:4
papers [9] - 925:18, 1023:4, 1023:5, 1023:6, 1023:20, 1044:16, 1044:18, 1045:1, 1045:10
paragraph [13] - 965:4, 965:5, 965:18, 966:6, 966:17, 979:13, 1010:20, 1011:22, 1034:25, 1036:18, 1037:10, 1037:12, 1047:21
parent [1] - 924:20
part [43] - 898:5, 906:8, 909:25, 911:2, 936:16, 942:24, 951:20, 954:24, 956:18, 957:12, 959:12, 959:16, 959:25, 960:2, 961:1, 961:25, 962:18, 963:1, 963:5, 963:25, 966:1, 966:2, 976:9, 978:5, 984:8, 1005:2,

1015:13, 1020:16, 1020:19, 1022:8, 1035:2, 1035:13, 1047:24, 1059:17, 1060:10, 1064:12, 1067:1, 1070:13, 1075:5, 1088:18, 1089:4, 1089:24, 1090:5
partial [1] - 1015:5
participate [1] - 950:2
participating [1] - 918:22
particular [5] - 914:8, 955:2, 976:5, 1025:4, 1027:10
parties [12] - 896:3, 907:19, 907:20, 971:12, 996:16, 1030:11, 1079:2, 1080:18, 1081:4, 1081:5, 1081:8, 1081:20
partner [4] - 932:8, 932:23, 933:10, 933:14
partnered [1] - 921:14
partners [2] - 931:15, 938:1
partnership [3] - 931:15, 943:1, 943:4
partnerships [1] - 1051:15
parts [2] - 959:9, 996:23
party [2] - 1065:9
Pasadena [1] - 949:20
pass [2] - 970:25, 1029:16
passage [3] - 899:9, 900:1, 900:2
passages [2] - 899:1, 899:20
passed [2] - 930:15, 980:24
past [3] - 902:5, 981:23, 996:2
patent [174] - 896:16, 897:5, 897:15, 897:16, 899:24, 905:10, 905:15, 906:22, 907:6, 907:21, 910:5, 910:6, 946:25, 948:9, 955:21, 955:25, 956:3, 956:14, 956:17, 956:24, 957:7, 957:14, 958:14, 958:17, 960:4,

960:14, 960:23, 961:2, 961:5, 961:12, 962:1, 962:16, 967:22, 967:23, 969:2, 969:11, 969:18, 970:1, 970:13, 975:24, 976:2, 976:6, 976:10, 976:15, 976:17, 976:23, 977:19, 978:7, 979:9, 980:6, 986:23, 987:15, 987:21, 988:5, 988:6, 988:10, 988:14, 988:15, 988:23, 989:1, 989:2, 989:4, 989:6, 989:8, 989:22, 989:25, 991:25, 992:4, 994:20, 994:21, 995:2, 995:5, 999:13, 1007:22, 1007:25, 1008:5, 1008:9, 1008:14, 1008:16, 1008:17, 1010:13, 1010:15, 1010:20, 1011:14, 1011:20, 1011:22, 1012:8, 1012:12, 1013:7, 1013:11, 1013:23, 1014:8, 1014:13, 1014:23, 1015:2, 1015:19, 1015:23, 1015:25, 1017:14, 1018:8, 1018:25, 1019:1, 1019:18, 1019:22, 1020:4, 1020:23, 1024:4, 1024:15, 1024:22, 1024:24, 1025:1, 1025:3, 1025:10, 1025:13, 1026:16, 1026:21, 1026:24, 1027:10, 1029:8, 1029:13, 1030:21, 1031:1, 1031:17, 1031:20, 1032:18, 1033:5, 1033:13, 1035:3, 1040:3, 1040:6, 1040:10, 1047:20, 1048:10, 1075:6, 1075:7, 1075:12, 1075:23, 1076:3, 1076:8, 1077:19, 1079:14, 1080:4, 1080:6, 1080:7, 1080:13, 1081:13, 1082:8, 1082:15, 1084:13,

1085:24, 1085:25, 1086:4, 1086:6, 1086:10, 1086:15, 1086:23, 1087:15, 1087:24, 1087:25, 1088:8, 1088:17, 1088:18, 1088:19, 1088:20, 1088:21, 1089:2, 1089:3, 1089:4, 1090:5
Patent [2] - 897:8, 976:22
patent's [1] - 1025:23
patented [2] - 926:15, 926:20
patents [3] - 987:12, 1025:22, 1087:17
patient [17] - 918:3, 918:11, 918:15, 919:10, 932:11, 934:19, 939:1, 939:5, 939:22, 940:5, 940:24, 944:25, 950:21, 1060:9, 1061:12, 1072:9, 1086:11
patient's [4] - 935:14, 940:3, 941:15, 1072:8
patients [6] - 912:4, 912:5, 912:8, 912:13, 912:17, 912:19, 912:21, 912:24, 912:25, 913:1, 914:16, 914:20, 914:22, 915:2, 915:5, 915:11, 915:21, 916:1, 916:11, 916:12, 916:15, 916:17, 916:18, 916:24, 917:5, 917:11, 917:14, 917:19, 917:25, 918:9, 920:8, 920:12, 920:13, 920:16, 920:20, 921:3, 921:19, 922:20, 922:25, 923:5, 923:8, 923:10, 923:11, 923:13, 923:14, 923:19, 924:15, 924:23, 925:14, 925:23, 926:1, 926:2, 930:5, 930:24, 933:3, 935:12, 935:14, 936:19, 938:9, 939:2, 940:18,

940:20, 941:13, 947:24, 948:1, 950:23, 971:23, 971:24, 972:3, 972:4, 972:8, 1051:25, 1052:6, 1056:1, 1056:6, 1056:12, 1060:12, 1060:13, 1061:14, 1066:13, 1067:3, 1068:20, 1086:22
**Pause** - 983:4
**pause** [1] - 965:24
**paused** [1] - 934:16
**pay** [3] - 1065:10, 1079:3, 1092:2
**payable** [1] - 907:4
**payers** [2] - 1054:19, 1055:12
**paying** [2] - 982:11, 982:14
**payment** [11] - 908:22, 909:2, 1077:20, 1088:24, 1089:9, 1089:19, 1091:12, 1091:16, 1091:22, 1091:25, 1092:4
**payments** [13] - 908:5, 908:6, 908:8, 1064:9, 1064:16, 1064:18, 1064:19, 1064:21, 1088:25, 1089:10, 1089:20, 1089:23, 1091:11
**PCR** [1] - 959:18
**pediatric** [6] - 921:19, 935:3, 937:7, 1076:13, 1076:15, 1094:8
**pejorative** [1] - 900:21
**Pennsylvania** [1] - 921:15
**people** [17] - 897:12, 900:22, 914:10, 941:15, 948:23, 950:3, 973:10, 978:10, 978:11, 981:5, 1056:25, 1066:10, 1066:24, 1068:3, 1071:6, 1086:9
**people's** [2] - 897:21, 1052:17
**Pepscan** [1] - 1021:8
**peptide** [1] - 1005:20
**per** [2] - 932:11, 982:11
**perceived** [3] - 922:1, 922:4, 923:4
**percent** [40] - 906:24,

907:4, 907:5, 907:9, 907:16, 909:7, 909:19, 914:20, 919:13, 920:20, 940:9, 971:23, 1003:14, 1003:16, 1017:22, 1017:23, 1019:12, 1019:13, 1019:15, 1019:19, 1053:20, 1065:1, 1077:22, 1078:12, 1079:3, 1079:4, 1088:15, 1088:16, 1088:23, 1089:9, 1089:18, 1090:17, 1091:8, 1091:21, 1091:24
**perception** [2] - 959:5, 959:7
**perfect** [1] - 966:25
**perfectly** [1] - 998:3
**perform** [1] - 908:11
**performed** [1] - 907:12
**performing** [3] - 907:13, 954:3, 955:4
**period** [8] - 936:11, 936:22, 1045:25, 1046:1, 1046:2, 1049:5, 1093:15
**permission** [1] - 1076:25
**perpetuate** [1] - 939:4
**person** [37] - 898:4, 932:22, 948:16, 953:25, 954:7, 954:10, 954:12, 954:17, 954:20, 954:22, 954:24, 955:5, 955:12, 955:15, 955:18, 959:14, 959:20, 962:4, 965:19, 968:5, 985:24, 995:18, 995:20, 998:15, 999:6, 1003:20, 1012:3, 1012:10, 1016:21, 1023:6, 1024:17, 1026:17, 1027:9, 1029:20, 1037:5, 1037:14, 1094:18
**personal** [1] - 899:22
**personally** [6] - 926:25, 944:7, 1003:12, 1041:25, 1042:6, 1042:14
**personnel** [1] - 945:21
**perspective** [4] - 954:6, 955:15,

995:16, 1060:6
**pertinent** [1] - 898:8
**Peter** [1] - 894:19
**Ph.D** [5] - 948:3, 949:18, 954:13, 993:9, 1073:23
**Ph.D.-to-M.D** [1] - 950:5
**Ph.D.s** [1] - 955:17
**Pharm** [1] - 941:8
**Pharma** [2] - 1034:7, 1035:2
**pharma** [2] - 936:12, 937:24
**PHARMA** [1] - 893:8
**pharmaceutical** [9] - 930:10, 930:17, 1056:10, 1056:16, 1059:25, 1067:16, 1075:11, 1076:1, 1094:3
**Phase** [3] - 921:17
**phase** [3] - 934:18, 935:19, 966:25
**phases** [1] - 963:22
**PhD** [1] - 935:7
**phone** [1] - 932:21
**phrase** [2] - 1057:16, 1062:14
**phrased** [1] - 1071:9
**physical** [2] - 1001:7, 1003:7
**physician** [2] - 922:10, 1056:14
**physician's** [1] - 927:5
**physicians** [8] - 924:2, 932:15, 939:11, 939:13, 945:5, 1054:18, 1055:12, 1085:15
**pick** [2] - 999:24, 1089:12
**picked** [1] - 970:19
**picture** [3] - 951:2, 992:3, 1017:4
**piece** [1] - 1001:25
**pig** [1] - 1019:16
**pill** [1] - 1085:18
**pipe** [1] - 925:3
**pipeline** [1] - 910:9
**pivotal** [1] - 940:12
**place** [6] - 984:18, 986:1, 987:21, 987:23, 989:23, 1012:12
**placed** [2] - 908:19, 910:7, 971:9
**places** [1] - 1087:9, 1088:9
**plaintiff** [2] - 898:3,

910:24
**plaintiffs** [10] - 897:16, 897:23, 898:22, 899:3, 901:18, 903:14, 1078:13, 1080:22, 1094:21
**Plaintiffs** [2] - 893:6, 894:2
**plan** [1] - 1053:17
**planning** [1] - 942:24
**platform** [2] - 1053:9, 1075:1
**platforms** [1] - 1053:1
**play** [9] - 896:12, 896:16, 896:21, 897:4, 898:24, 903:16, 946:23, 989:21, 1055:2
**played** [4] - 910:18, 947:1, 990:2, 990:13
**pleading** [1] - 899:3
**plus** [3] - 966:3, 966:19, 966:24
**point** [18] - 901:2, 906:20, 907:1, 927:3, 944:23, 945:23, 946:7, 957:8, 969:20, 972:20, 973:23, 977:20, 1001:8, 1042:2, 1054:23, 1079:13, 1088:1, 1089:1
**pointed** [3] - 974:21, 980:16, 1031:13
**pointing** [2] - 986:20, 1042:3
**points** [2] - 1018:6, 1018:14
**political** [2] - 974:15, 975:4
**polymers** [2] - 1035:17, 1036:25
**poor** [1] - 918:9
**portion** [20] - 900:8, 903:24, 950:14, 953:12, 953:14, 964:11, 966:7, 968:15, 969:12, 970:1, 979:14, 979:18, 990:1, 998:21, 1024:25, 1036:22, 1065:7, 1083:19, 1083:20, 1083:25
**portions** [3] - 898:8, 998:18, 1057:23
**position** [6] - 929:19, 929:20, 931:6, 937:18, 994:5,

1033:25
**positioning** [1] - 932:10
**positions** [2] - 930:17, 930:19
**possessed** [1] - 1008:15
**possibilities** [1] - 1005:23
**possible** [4] - 925:9, 1009:12, 1009:15, 1087:1
**possibly** [1] - 965:11
**Post** [1] - 972:7
**postdoctoral** [2] - 955:17, 993:10
**potential** [15] - 918:13, 920:10, 1010:5, 1028:12, 1028:21, 1052:8, 1053:3, 1053:4, 1056:1, 1056:6, 1056:11, 1062:5, 1088:25, 1089:10, 1089:19
**potentially** [3] - 917:8, 1084:13, 1093:16
**power** [1] - 1066:25
**PowerPoint** [3] - 1057:25, 1062:7, 1062:18
**practice** [4] - 984:1, 995:6, 995:8, 1026:18
**practicing** [1] - 1015:16
**PRC** [1] - 1037:2
**preclinical** [2] - 1084:17, 1084:18
**preconditioning** [1] - 950:25
**predict** [1] - 1005:23
**predictability** [5] - 1004:25, 1005:8, 1019:8, 1023:21, 1026:13
**predictable** [1] - 1060:8
**prejudicial** [1] - 896:18
**premarked** [2] - 1058:14, 1062:17
**premature** [1] - 1049:13
**premier** [1] - 1076:15
**premium** [1] - 902:9
**preparation** [3] - 923:17, 936:24, 950:21
**preparations** [1] - 937:12

RAO - DIRECT

prepare [6] - 924:10, 951:10, 993:2, 1057:24, 1062:7, 1084:8
prepared [6] - 915:13, 927:19, 927:24, 982:8, 1017:10, 1063:1
preparing [1] - 937:12
presence [2] - 953:24, 1026:20
present [7] - 896:3, 904:9, 971:12, 1030:11, 1055:16, 1082:12
presentation [6] - 920:11, 964:12, 993:2, 1057:25, 1062:8, 1062:19
presentations [2] - 1049:9, 1058:5
presented [7] - 904:12, 904:14, 904:17, 920:7, 928:13, 952:23, 1026:20
president [2] - 929:17, 990:12
press [2] - 1047:10, 1047:24
presumably [1] - 920:14
presume [1] - 928:14
pretty [3] - 926:8, 959:13, 1078:1
prevent [2] - 965:15, 998:5
previous [1] - 900:2
previously [4] - 961:20, 964:18, 973:15, 1027:12
price [1] - 934:5
primary [4] - 906:19, 932:2, 935:23, 1076:8
primer [1] - 966:8
primers [9] - 958:24, 959:3, 959:18, 959:20, 959:22, 966:10, 967:3, 1027:4
priority [1] - 995:13
privately [1] - 973:6
problem [3] - 954:2, 955:3, 999:21
problems [5] - 900:14, 945:13, 945:17, 974:16, 975:4
PROCEEDINGS [1] - 893:12

proceedings [9] - 911:11, 929:5, 947:11, 983:4, 991:8, 1036:1, 1050:9, 1072:22, 1095:5
process [16] - 920:22, 935:6, 1000:11, 1000:14, 1002:15, 1003:21, 1005:6, 1007:10, 1027:15, 1060:21, 1061:4, 1072:6, 1072:7, 1085:20, 1085:21, 1085:23
processing [1] - 1065:7
produce [1] - 901:3
produced [2] - 984:19, 998:17
producing [1] - 1012:1
product [67] - 908:1, 908:3, 908:16, 918:2, 918:16, 919:5, 919:16, 920:2, 920:13, 920:18, 922:24, 924:17, 929:23, 932:11, 934:4, 934:21, 935:5, 935:10, 935:14, 937:6, 937:13, 938:9, 938:13, 938:16, 938:25, 939:4, 939:8, 939:9, 939:12, 939:24, 940:8, 941:5, 941:12, 945:18, 967:3, 967:6, 981:15, 1010:16, 1010:19, 1010:22, 1011:4, 1012:7, 1022:8, 1022:9, 1057:2, 1057:21, 1065:13, 1066:6, 1066:7, 1072:1, 1072:2, 1074:22, 1084:7, 1084:16, 1085:7, 1085:23, 1086:4, 1086:13, 1086:16, 1086:17, 1088:5, 1090:11, 1093:7, 1093:8, 1094:5
production [1] - 900:13
productively [1] - 1006:14
products [33] -

909:16, 922:22, 930:5, 930:8, 930:9, 932:10, 933:3, 938:18, 938:19, 939:20, 939:21, 1056:10, 1057:14, 1057:17, 1059:25, 1061:1, 1064:19, 1065:4, 1065:22, 1065:23, 1065:24, 1074:8, 1074:11, 1074:14, 1074:22, 1074:25, 1082:23, 1090:25, 1094:4, 1094:10
professional [8] - 904:16, 914:3, 949:9, 1073:17, 1073:19, 1075:18, 1075:20, 1075:22
professionals [3] - 1075:24, 1075:25, 1076:2
professor [6] - 912:1, 974:4, 991:22, 992:6, 993:7, 1074:3
proffered [1] - 899:5
profile [5] - 902:2, 902:11, 935:10, 936:17, 941:14
profit [6] - 909:7, 909:12, 909:14, 1049:8, 1053:17, 1053:20
profitable [1] - 1065:13
profits [6] - 910:6, 1078:8, 1079:3, 1083:25, 1084:6
prognosis [5] - 915:11, 917:18, 917:24, 918:9, 926:1
program [8] - 912:6, 934:16, 942:2, 950:5, 957:23, 958:2, 976:4, 976:8
programs [6] - 931:8, 931:10, 931:23, 931:25, 932:2, 1076:7
project [5] - 933:15, 994:22, 1053:12, 1054:2, 1063:16
Project [7] - 909:11, 909:15, 1054:3, 1058:11, 1058:19, 1062:14, 1062:19
projected [3] - 909:4, 909:8, 910:5
projection [1] - 1082:4

projections [3] - 909:9, 1055:4, 1081:22
projects [1] - 1052:3
promising [1] - 925:13
promotion [1] - 975:11
prompt [4] - 972:14, 973:2, 973:12, 973:19
promptly [2] - 972:20, 972:22
proper [1] - 1005:3
properly [3] - 998:12, 1006:14, 1033:20
properties [3] - 1007:8, 1020:10, 1022:23
property [1] - 1020:3
Property [1] - 1076:6
proposal [1] - 900:24
propose [1] - 901:6
proposed [2] - 964:15, 975:10
proposing [1] - 906:17
prosecuted [1] - 946:25
prosecuting [2] - 897:15, 946:25
prosecution [8] - 955:22, 960:24, 962:19, 967:8, 967:23, 975:23, 986:23, 987:12
prosecutor [1] - 897:5
prospectively [1] - 1081:23
protein [14] - 953:5, 953:11, 958:3, 966:1, 967:7, 1001:1, 1001:5, 1001:9, 1001:11, 1001:25, 1019:11, 1019:14, 1019:16, 1056:3
proteins [3] - 959:10, 992:12, 1000:25
protocols [1] - 984:19
provide [14] - 926:14, 985:11, 1007:25, 1015:19, 1015:21, 1024:10, 1024:13, 1024:15, 1026:21, 1026:25, 1067:7, 1080:24, 1082:3, 1083:13
provided [6] - 943:5, 945:7, 946:10, 1026:15, 1029:8,

1047:3
provides [5] - 908:12, 909:20, 995:5, 1007:22, 1027:2
providing [4] - 925:21, 937:20, 938:6, 1079:7
provisional [4] - 961:2, 961:5, 961:12, 962:1
PSMA [1] - 1024:15
public [2] - 1033:25, 1034:7
publically [3] - 1067:19, 1067:21, 1081:15
publication [4] - 1000:6, 1004:15, 1024:14, 1027:25
publications [9] - 1003:25, 1007:19, 1016:18, 1037:18, 1038:5, 1038:8, 1038:10, 1038:13, 1039:6
publish [3] - 914:1, 1021:25, 1077:12
published [25] - 913:3, 913:4, 956:14, 1004:17, 1005:12, 1007:2, 1007:24, 1010:18, 1010:24, 1011:1, 1011:3, 1011:5, 1013:1, 1013:6, 1020:3, 1020:20, 1022:21, 1035:20, 1044:16, 1044:18, 1045:1, 1045:4, 1045:10, 1045:22, 1076:3
pull [4] - 906:15, 915:17, 927:16, 1047:6
purchase [1] - 928:9
purchased [3] - 1068:21, 1069:22, 1070:20
purchasing [1] - 1087:11
purports [1] - 951:24
purpose [1] - 900:9
purposes [2] - 899:6, 1081:1
pursue [1] - 930:13
pursued [1] - 949:18
put [29] - 898:16, 902:3, 903:15, 919:24, 923:6, 950:19, 951:13,

RAO - DIRECT

952:21, 958:5, 959:10, 959:25, 960:2, 961:24, 961:25, 963:14, 964:8, 966:2, 970:1, 979:12, 983:18, 995:22, 1005:5, 1009:13, 1031:12, 1039:2, 1056:17, 1058:24, 1068:18, 1086:12

**puts** [1] - 966:24

**putting** [2] - 903:10, 909:20

**PX** [2] - 913:22, 913:23

**PX001** [3] - 999:12, 1011:20, 1024:9

**PX001.23** [1] - 1008:25

**PX0867** [5] - 948:21, 949:2, 949:6, 1096:10, 1098:6

**PX0870** [4] - 913:20, 913:25, 1095:22, 1098:2

**PX1** [4] - 955:25, 957:2, 958:18, 960:5

**PX1.23** [1] - 956:8

**PX1170** [2] - 1047:7, 1047:8

**PX1188** [3] - 919:18, 919:23, 1095:23

**PX2** [1] - 962:24

**PX2.41** [1] - 962:24

**PX2.43** [1] - 963:15

**PX2.603** [1] - 965:3

**PX2.630** [1] - 964:8

**PX2.662** [1] - 967:13

**PX304.79** [3] - 1036:11, 1036:21, 1097:8

**PX41** [4] - 961:5, 961:10, 1096:11, 1098:8

**PX41.8** [1] - 962:1

**PX72** [1] - 1068:12

**PX72.81** [1] - 1068:15

**Q**

**quadruples** [1] - 1092:23

**qualified** [2] - 917:1, 917:5

**qualify** [1] - 1086:19

**qualitatively** [1] - 945:4

**quantify** [1] - 1038:16

**quarter** [1] - 1029:18

**Query** [1] - 958:4

**question-and-answer** [1] - 927:19

**questioning** [2] - 900:19, 975:5

**questions** [24] - 899:10, 900:4, 908:4, 910:14, 927:24, 928:16, 936:22, 941:18, 946:16, 946:18, 983:10, 983:16, 986:7, 986:10, 989:15, 989:16, 995:10, 1039:17, 1046:4, 1046:8, 1046:9, 1047:8, 1048:15, 1072:13

**quick** [1] - 1086:21

**quickly** [4] - 918:13, 919:4, 919:15, 985:16

**quite** [6] - 935:18, 940:24, 951:15, 970:22, 972:5, 973:1

**quote** [6] - 979:25, 1036:24, 1037:3, 1037:14, 1039:4, 1039:8

**quoted** [1] - 1037:24

**R**

**R&D** [3] - 1068:22, 1069:22, 1070:20

**R-a-o** [1] - 1073:3

**radiation** [1] - 914:25

**rain** [2] - 1085:21, 1085:22

**raise** [6] - 904:1, 911:8, 929:3, 947:8, 991:6, 1050:6

**raised** [2] - 901:13, 936:23

**raises** [1] - 901:13

**ran** [2] - 1046:25, 1051:11

**range** [1] - 1092:10

**ranges** [1] - 1088:14

**ranging** [1] - 1090:17

**Rao** [7] - 906:25, 1072:18, 1072:19, 1073:3, 1073:11, 1076:22, 1077:14

**RAO** [2] - 1072:21, 1097:18

**Rao's** [1] - 1076:19

**rapidly** [1] - 924:16

**rare** [1] - 1074:18

**Raskin** [1] - 978:11

**rate** [30] - 906:12, 906:17, 906:23, 907:3, 907:5, 907:8, 907:15, 909:7, 918:8, 918:17, 918:19, 918:24, 919:12, 939:7, 940:1, 940:6, 940:9, 940:24, 941:2, 941:3, 1060:17, 1077:22, 1088:14, 1088:22, 1089:9, 1089:18, 1091:10, 1091:21, 1091:24

**rates** [11] - 906:13, 917:6, 917:7, 920:2, 1064:10, 1064:24, 1065:1, 1065:11, 1090:17, 1092:8, 1092:11

**rather** [3] - 916:16, 965:4, 978:18

**rational** [2] - 1078:20, 1079:8

**ratios** [1] - 935:9

**reach** [2] - 920:19, 925:14

**reaches** [1] - 994:21

**reaching** [3] - 955:20, 959:3, 964:6

**read** [26] - 898:9, 898:10, 903:3, 903:24, 942:11, 942:23, 944:18, 946:2, 946:4, 968:9, 975:1, 975:23, 976:2, 976:19, 979:24, 1000:6, 1001:1, 1001:4, 1001:10, 1040:13, 1041:18, 1042:9, 1043:1, 1043:25, 1045:7, 1070:9

**readable** [1] - 967:15

**readily** [1] - 948:17

**reading** [5] - 901:6, 966:25, 1001:12, 1022:5, 1070:15

**reads** [2] - 1035:2

**ready** [4] - 904:4, 933:2, 938:18, 940:4

**Real** [1] - 895:3

**real** [20] - 916:22, 919:6, 924:12, 1053:2, 1053:4, 1066:15, 1066:16, 1079:9, 1079:10, 1079:23, 1080:2, 1080:16, 1080:19, 1081:9, 1082:7,

1087:4, 1087:5, 1087:6, 1091:4, 1091:18

**real-world** [8] - 1079:23, 1080:2, 1082:7, 1087:4, 1087:5, 1087:6, 1091:4, 1091:18

**reality** [3] - 997:10, 997:12, 1079:17

**really** [23] - 915:12, 915:18, 916:14, 917:7, 921:15, 925:6, 933:17, 941:17, 951:7, 959:21, 959:24, 995:7, 1005:23, 1019:7, 1024:12, 1029:8, 1040:5, 1051:24, 1054:22, 1054:25, 1056:5, 1067:3, 1069:10

**reason** [15] - 900:8, 900:17, 902:2, 902:3, 902:10, 909:13, 942:7, 977:18, 1001:9, 1014:7, 1014:20, 1079:1, 1080:16, 1081:25, 1087:2

**reasonable** [20] - 908:12, 909:5, 909:22, 909:23, 909:25, 910:2, 1037:5, 1037:14, 1077:18, 1078:10, 1078:11, 1078:14, 1080:11, 1080:12, 1080:14, 1080:17, 1080:21, 1080:23, 1082:1, 1082:2

**reasons** [13] - 898:2, 922:23, 936:7, 948:14, 964:19, 965:1, 968:3, 994:19, 995:2, 1008:20, 1055:9, 1059:6, 1078:25

**reassembled** [3] - 904:8, 971:11, 1030:10

**rebuild** [1] - 959:19

**rebuttal** [3] - 911:2, 979:13, 979:17

**receive** [6] - 914:23, 918:12, 920:14, 920:15, 1050:19, 1060:11

**received** [47] - 905:21, 905:22, 913:24,

913:25, 919:22, 919:23, 920:13, 920:17, 921:18, 949:5, 949:6, 949:16, 961:9, 961:10, 969:24, 969:25, 982:18, 986:3, 990:9, 990:10, 990:21, 991:3, 992:25, 993:1, 1004:10, 1004:11, 1021:20, 1021:23, 1023:18, 1023:19, 1028:7, 1034:21, 1036:21, 1059:15, 1059:16, 1063:6, 1063:8, 1073:20, 1073:22, 1073:23, 1076:20, 1076:21, 1077:2, 1077:8, 1077:10, 1096:11

**recent** [1] - 920:1

**recently** [2] - 947:25, 1021:22

**receptor** [2] - 951:20, 996:4

**recess** [5] - 971:1, 971:7, 1029:18, 1029:23, 1095:1

**recipe** [1] - 1027:2

**reclassified** [3] - 1068:22, 1069:23, 1070:21

**recognizable** [1] - 1044:10

**recognize** [6] - 926:7, 965:20, 996:22, 1006:11, 1006:14, 1022:9

**recognized** [1] - 925:19

**recognizing** [1] - 1061:18

**recollection** [1] - 975:2

**reconstruct** [1] - 1000:22

**record** [22] - 896:1, 904:9, 904:21, 911:15, 929:9, 947:13, 957:2, 961:4, 963:15, 965:3, 970:2, 976:9, 991:12, 999:11, 1008:24, 1011:19, 1018:18, 1024:8, 1050:15, 1073:1, 1094:24, 1095:5

**recorded** [1] - 940:10

RAO - DIRECT

**recross** [1] - 1048:14
**RECROSS** [2] - 987:9, 1096:17
**RECROSS-EXAMINATION** [2] - 987:9, 1096:17
**red** [2] - 1014:24, 1078:9
**redacted** [1] - 1068:12
**redirect** [3] - 906:1, 928:17, 1046:5
**REDIRECT** [8] - 906:3, 983:8, 988:20, 1046:6, 1095:17, 1096:15, 1096:19, 1097:9
**REDIRECT-EXAMINATION** [6] - 906:3, 983:8, 1046:6, 1095:17, 1096:15, 1097:9
**Redwood** [1] - 895:6
**refer** [3] - 935:5, 939:6, 1024:5
**reference** [10] - 896:24, 899:17, 928:9, 958:24, 996:23, 1008:12, 1025:6, 1039:10, 1039:13, 1047:24
**referenced** [6] - 979:25, 986:12, 986:16, 989:13, 1012:8, 1024:18
**referencing** [1] - 908:21
**referred** [6] - 918:17, 948:2, 961:19, 1005:19, 1023:4, 1088:4
**referring** [6] - 988:7, 1006:12, 1069:21, 1070:6, 1070:18, 1070:19
**reflect** [4] - 909:16, 995:19, 1008:20, 1023:6
**refractory** [4] - 915:9, 915:19, 923:12, 1068:20
**regard** [3] - 900:10, 900:18, 902:1
**regarded** [1] - 945:2
**regarding** [11] - 896:23, 898:23, 899:12, 900:4, 901:17, 903:3, 943:10, 945:21, 986:13, 1048:19, 1067:9

**regards** [1] - 907:14
**regime** [1] - 1085:2
**regimens** [1] - 1052:19
**region** [7] - 952:4, 970:8, 996:11, 998:2, 1005:17, 1013:14, 1015:13
**regions** [1] - 996:15
**regulations** [3] - 972:17, 973:20, 973:24
**regulators** [3] - 972:21, 972:22, 973:1
**regulatory** [6] - 924:6, 933:18, 933:19, 935:20, 1069:21, 1070:19
**reimbursement** [3] - 930:9, 933:4, 933:19
**reject** [1] - 965:23
**relapse** [2] - 914:22, 915:7
**relapsed** [4] - 915:9, 915:19, 923:12, 1068:20
**relate** [1] - 1074:22
**related** [10] - 899:22, 900:4, 901:17, 930:23, 934:19, 954:14, 954:18, 994:8, 1031:20, 1065:22
**relating** [1] - 990:1
**relation** [1] - 1036:1
**relations** [2] - 945:15, 1073:23
**relationship** [6] - 931:13, 933:9, 943:14, 943:15, 943:18, 1076:17
**relationships** [2] - 1083:15, 1085:14
**relative** [1] - 1026:12
**relatively** [3] - 907:16, 937:24, 1055:9
**relay** [1] - 1022:17
**relayed** [1] - 996:14
**release** [4] - 944:10, 1047:11, 1047:24, 1085:4
**released** [1] - 940:5
**relevance** [5] - 985:17, 1017:1, 1021:17, 1021:19, 1076:11
**relevant** [7] - 897:18, 897:21, 899:4, 900:17, 909:18, 1019:20, 1076:6

**reliable** [1] - 941:12
**reliably** [1] - 919:4
**relied** [3] - 1004:4, 1021:24, 1058:6
**relies** [1] - 1035:14
**rely** [4] - 1021:11, 1023:9, 1028:2, 1055:13
**remains** [3] - 1005:4, 1067:10, 1092:6
**remarkable** [4] - 916:14, 940:14, 940:15, 940:25
**remember** [7] - 928:2, 983:12, 1046:11, 1058:7, 1065:23, 1069:11, 1070:1
**remind** [4] - 908:25, 956:18, 962:15, 1067:8
**reminded** [1] - 904:21
**remove** [3] - 951:24, 964:15, 964:16
**removed** [4] - 900:23, 1080:1, 1091:11, 1092:9
**Renier** [1] - 989:21
**rent** [1] - 1080:12
**reorganization** [2] - 945:21, 945:25
**reorganizations** [1] - 936:25
**reorient** [1] - 1025:6
**rephrase** [1] - 1064:20
**replace** [1] - 934:23
**replaced** [2] - 922:17, 922:18
**replacement** [1] - 939:23
**report** [28] - 972:2, 972:11, 972:13, 972:23, 973:2, 973:8, 973:22, 979:13, 979:17, 979:25, 984:3, 984:25, 985:3, 1017:1, 1022:5, 1036:24, 1038:23, 1040:25, 1041:5, 1041:9, 1041:15, 1041:24, 1042:5, 1043:7, 1043:11, 1045:13, 1045:18, 1045:21
**reported** [8] - 913:6, 920:24, 972:6, 972:9, 983:20, 983:22, 984:14, 985:14
**Reporter** [1] - 893:22

**reporter** [1] - 938:14
**REPORTER'S** [1] - 893:12
**reporting** [11] - 972:20, 973:12, 973:19, 983:25, 984:1, 984:10, 984:12, 984:18, 984:20, 985:2
**reports** [4] - 925:4, 982:4, 985:11
**represent** [1] - 1015:1
**representative** [6] - 994:24, 1014:5, 1014:21, 1014:22, 1019:22, 1025:1
**representing** [3] - 947:20, 965:19, 977:24
**request** [10] - 901:10, 903:17, 903:19, 903:23, 964:1, 964:4, 964:5, 964:10, 976:8, 1000:8
**requesting** [1] - 897:4
**requests** [2] - 965:1, 978:19
**require** [7] - 956:5, 956:9, 956:11, 1065:8, 1067:25, 1079:18, 1082:23
**required** [6] - 907:19, 923:24, 972:11, 1040:6, 1040:10, 1040:18
**requirement** [4] - 908:24, 994:20, 995:3, 1010:14
**requirements** [7] - 984:10, 984:12, 984:17, 992:1, 992:5, 1008:21, 1025:22
**requires** [3] - 908:23, 967:5, 1071:17
**Research** [3] - 907:8, 993:11, 1076:14
**research** [20] - 907:10, 912:9, 912:10, 926:25, 932:24, 939:19, 947:25, 950:1, 954:15, 954:19, 971:22, 994:15, 994:22, 1075:8, 1076:16, 1084:17, 1084:18, 1088:7, 1090:20, 1092:14
**reserve** [2] - 1017:2,

1021:22
**reserved** [1] - 926:8
**residency** [1] - 950:7
**residues** [1] - 1017:17
**resources** [5] - 936:10, 936:14, 970:21, 970:23, 1066:10
**respect** [9] - 896:15, 896:25, 898:18, 952:7, 967:25, 978:10, 986:8, 1033:9, 1033:18
**respiratory** [1] - 931:2
**respond** [4] - 915:2, 915:6, 915:7, 915:8
**response** [9] - 902:19, 915:22, 915:25, 916:13, 916:15, 917:6, 967:15
**responses** [1] - 917:13
**responsibilities** [4] - 929:21, 929:22, 930:21, 942:25
**responsibility** [1] - 932:1
**responsible** [2] - 912:6, 932:7
**rest** [1] - 1056:16
**restate** [1] - 1038:12
**rested** [2] - 910:24, 911:3
**restriction** [1] - 966:20
**result** [12] - 908:17, 957:16, 957:20, 957:21, 958:11, 984:15, 997:24, 1065:10, 1079:9, 1084:4, 1092:20
**resulting** [1] - 1061:23
**results** [8] - 909:21, 913:6, 916:20, 916:21, 917:2, 920:7, 940:10, 940:13
**resume** [2] - 948:23, 992:20
**retailers** [1] - 1083:15
**retired** [3] - 971:6, 1029:22, 1094:20
**retroviruses** [1] - 949:22
**return** [4] - 917:14, 1029:18, 1080:12, 1094:16
**returned** [4] - 904:7, 919:10, 971:10, 1030:9
**revenue** [2] - 931:21,

RAO - DIRECT

931:23
**revenues** [4] - 1078:4, 1078:8, 1078:12, 1079:5
**review** [15] - 948:7, 955:5, 955:21, 961:1, 962:18, 962:19, 964:4, 964:5, 967:11, 1020:22, 1021:21, 1022:3, 1022:4, 1023:20
**reviewed** [5] - 898:7, 960:25, 961:15, 967:22, 1064:7
**rheumatoid** [1] - 931:2
**Richard** [2] - 947:5, 947:15
**RICHARD** [1] - 947:10
**RICHARDSON** [2] - 895:2, 895:5
**Richardson** [2] - 947:20, 991:18
**rights** [7] - 931:20, 931:21, 931:23, 934:2, 934:3, 942:4, 1065:24
**rigor** [1] - 1055:11
**RIindex** [1] - 1096:7
**rise** [5] - 904:6, 971:3, 1029:21, 1030:8, 1094:19
**risk** [9] - 914:21, 1056:4, 1056:5, 1056:7, 1056:8, 1056:9, 1057:3, 1066:14, 1066:15
**risks** [4] - 917:17, 1053:22, 1066:5, 1066:16
**risky** [1] - 1066:4
**Roche** [1] - 949:23
**ROCKET** [2] - 925:11, 943:10
**Roger** [1] - 975:20
**role** [1] - 932:4
**roles** [2] - 930:21, 933:8
**Rosenberg** [13] - 980:15, 980:24, 980:25, 981:6, 1031:4, 1031:13, 1031:22, 1032:3, 1033:1, 1046:9, 1046:17, 1046:20, 1046:25
**roughly** [1] - 925:15
**row** [2] - 977:17, 977:24

**royalties** [3] - 909:20, 909:21, 1077:21
**royalty** [41] - 906:23, 907:3, 907:8, 908:13, 909:6, 909:22, 909:25, 910:2, 1064:9, 1064:24, 1064:25, 1065:11, 1065:12, 1077:18, 1077:22, 1078:10, 1078:11, 1080:11, 1080:12, 1080:14, 1080:16, 1080:17, 1080:21, 1080:23, 1082:1, 1082:3, 1088:14, 1088:22, 1089:9, 1089:18, 1090:17, 1091:8, 1091:10, 1091:21, 1091:24, 1092:3, 1092:4, 1092:8, 1092:11
**RPR** [2] - 893:22, 1095:11
**rule** [2] - 1030:21, 1030:25
**rules** [6] - 1001:21, 1002:4, 1003:7, 1005:4, 1005:23, 1023:22
**ruling** [3] - 899:11, 978:15, 1017:2
**rumors** [1] - 936:22
**run** [3] - 900:19, 976:5, 976:8
**running** [2] - 909:20, 909:21
**Ryan** [1] - 904:23

**S**

**S-u-l-l-i-v-a-n** [1] - 904:23
**Sadelain** [37] - 906:22, 907:14, 908:15, 910:8, 927:1, 961:19, 961:22, 961:25, 962:4, 968:9, 968:12, 968:19, 969:13, 970:17, 976:2, 976:17, 977:7, 977:19, 979:2, 979:9, 980:6, 980:14, 980:15, 980:23, 986:8, 1031:4, 1031:12, 1031:13, 1031:16, 1031:23, 1032:4, 1032:15, 1033:3,

1033:4, 1033:5, 1040:3, 1086:6
**Sadelain's** [8] - 926:15, 926:20, 977:13, 980:16, 980:24, 986:13, 986:21, 1031:5
**sadly** [1] - 923:9
**safe** [4] - 917:23, 922:17, 922:22, 939:9
**safely** [1] - 924:14
**safer** [3] - 936:20, 939:22, 1057:13
**safety** [11] - 934:19, 935:11, 936:6, 936:17, 938:13, 938:16, 939:18, 941:14, 944:1, 944:10, 1085:7
**safety-related** [1] - 934:19
**sale** [1] - 1079:6
**sales** [8] - 909:19, 930:22, 932:13, 939:4, 1078:4, 1078:12, 1093:15, 1093:18
**salvage** [4] - 914:24, 915:2, 915:20, 915:25
**sample** [1] - 1001:7
**San** [1] - 895:4
**Sanofi** [1] - 930:20
**Sanofi-Aventis** [1] - 930:20
**Sarah** [1] - 894:11
**sat** [2] - 933:14, 982:8
**satisfies** [1] - 908:24
**Saturday** [1] - 920:6
**save** [2] - 941:14, 1056:22
**saw** [10] - 956:19, 956:21, 965:13, 970:16, 976:6, 977:12, 995:22, 1012:25, 1060:25, 1090:7
**scale** [1] - 940:22
**scenario** [1] - 1057:12
**scFv** [109] - 989:25, 990:1, 996:6, 996:8, 996:18, 996:24, 997:5, 997:8, 997:14, 997:25, 998:2, 998:5, 998:9, 998:16, 998:18, 998:21, 998:25, 999:1, 999:7, 999:25, 1000:22,

1001:8, 1001:11, 1001:14, 1001:15, 1001:17, 1001:20, 1002:11, 1002:19, 1002:24, 1005:14, 1005:16, 1005:21, 1006:10, 1006:13, 1006:18, 1006:22, 1007:1, 1007:5, 1007:8, 1007:11, 1007:14, 1009:15, 1009:21, 1009:22, 1010:2, 1010:15, 1010:18, 1010:25, 1011:1, 1011:4, 1011:8, 1011:9, 1011:13, 1011:21, 1012:4, 1013:4, 1013:16, 1013:23, 1014:4, 1014:12, 1014:23, 1014:25, 1015:23, 1016:7, 1017:14, 1018:5, 1018:6, 1018:9, 1018:20, 1018:25, 1019:1, 1019:5, 1019:10, 1019:17, 1019:18, 1019:22, 1019:23, 1020:4, 1020:10, 1020:16, 1020:23, 1022:11, 1022:13, 1022:15, 1023:22, 1024:6, 1024:11, 1024:15, 1024:17, 1024:25, 1027:10, 1027:21, 1037:6, 1037:16, 1041:7, 1041:11, 1041:15, 1041:22, 1042:1, 1042:7, 1042:15, 1043:8, 1043:12, 1044:3, 1048:4
**scFv-based** [3] - 1042:1, 1042:7, 1042:15
**scFv-binding** [2] - 998:18, 998:21
**scFvs** [67] - 993:16, 993:18, 993:19, 993:21, 994:25, 995:1, 996:17, 997:6, 997:18, 999:4, 1002:12, 1003:10, 1003:14, 1004:1, 1004:19, 1005:1, 1005:3, 1005:9, 1005:11, 1009:8, 1010:5, 1010:11, 1010:21, 1011:17, 1014:6,

1014:9, 1014:14, 1014:24, 1015:4, 1015:6, 1015:25, 1017:5, 1017:7, 1017:8, 1019:9, 1020:3, 1020:7, 1020:12, 1020:18, 1021:3, 1021:9, 1022:10, 1022:22, 1024:4, 1025:1, 1025:2, 1025:4, 1026:25, 1028:12, 1028:13, 1028:16, 1037:16, 1037:19, 1038:6, 1038:14, 1038:25, 1039:4, 1039:7, 1040:23, 1044:11, 1044:14, 1044:16, 1045:1, 1045:10, 1045:14, 1046:22, 1048:7
**school** [1] - 993:19
**schools** [1] - 949:13
**Schuetz** [1] - 897:24
**science** [9] - 902:21, 934:12, 935:6, 935:7, 952:6, 994:18, 995:10, 1008:2, 1052:5
**Sciences** [1] - 1051:5
**scientific** [7] - 913:12, 913:14, 920:5, 920:11, 921:6, 1079:19, 1083:9
**scientifically** [1] - 964:25
**scientists** [1] - 973:7
**sclerosis** [1] - 930:15
**scope** [18] - 930:21, 933:21, 948:15, 984:3, 984:22, 985:4, 985:18, 1008:15, 1008:18, 1015:1, 1016:25, 1021:19, 1025:11, 1033:20, 1033:21, 1035:1, 1035:3, 1047:25
**screen** [11] - 919:25, 928:4, 957:25, 965:18, 970:4, 970:5, 979:12, 1024:10, 1034:23, 1068:18, 1069:21
**Scripps** [1] - 993:11
**seat** [2] - 904:19, 971:12
**seated** [5] - 911:14, 929:7, 991:11, 1050:12, 1072:25

RAO - DIRECT

**Seattle** [1] - 1060:2
**SEC** [1] - 1063:13
**second** [24] - 899:8, 900:1, 907:7, 918:14, 922:8, 932:3, 934:21, 937:10, 950:23, 953:1, 966:6, 983:19, 1013:21, 1014:7, 1023:3, 1034:8, 1034:24, 1047:21, 1061:1, 1082:5, 1092:18, 1093:21
**second-generation** [1] - 950:23
**second-mover** [1] - 922:8
**secondly** [3] - 909:6, 948:15, 1055:15
**seconds** [1] - 1034:14
**Section** [1] - 897:9
**section** [3] - 958:17, 960:4, 1011:14
**sector** [4] - 1055:13, 1055:16, 1056:3, 1065:10
**securing** [1] - 1061:23
**securities** [1] - 1067:22
**Securities** [1] - 1068:1
**security** [1] - 926:8
**see** [72] - 898:16, 899:17, 906:18, 917:20, 928:8, 928:13, 942:16, 952:15, 952:17, 952:22, 953:4, 954:1, 958:6, 958:8, 959:1, 960:7, 960:20, 966:24, 971:9, 975:2, 976:20, 987:23, 989:8, 989:10, 989:12, 997:5, 997:11, 997:16, 997:20, 997:21, 997:23, 1000:6, 1005:19, 1006:10, 1006:17, 1009:3, 1009:16, 1009:19, 1014:10, 1017:12, 1018:10, 1019:3, 1019:5, 1023:1, 1024:19, 1035:4, 1039:3, 1047:20, 1048:18, 1049:13, 1049:19, 1053:2, 1053:4, 1056:25, 1061:22, 1066:9,

1068:15, 1068:23, 1078:1, 1078:3, 1079:9, 1079:10, 1080:1, 1083:5, 1091:7, 1091:11, 1091:17, 1091:18, 1092:8, 1093:2, 1093:9
**seeing** [5] - 927:22, 928:13, 1006:12, 1018:3, 1018:24
**seek** [1] - 901:19
**seeks** [1] - 996:7
**sees** [2] - 1015:14, 1092:24
**select** [1] - 1001:13
**selected** [4] - 916:24, 939:24, 999:20, 1009:18
**selecting** [3] - 939:13, 999:18, 1003:18
**send** [2] - 940:5, 940:8
**senior** [1] - 929:17
**sense** [1] - 909:5
**sentence** [5] - 965:4, 1047:18, 1047:21, 1047:22, 1052:14
**separately** [1] - 979:16
**September** [2] - 931:12, 1078:6
**SEQ** [41] - 951:19, 951:24, 952:8, 952:13, 952:15, 952:17, 953:15, 956:10, 956:12, 956:16, 956:22, 956:23, 957:5, 957:9, 957:22, 957:23, 958:5, 958:25, 960:19, 960:20, 962:10, 962:17, 963:3, 963:13, 963:16, 963:17, 963:18, 964:15, 965:5, 966:8, 966:10, 966:11, 967:2, 967:19, 988:1, 988:8, 989:4, 989:11, 989:12, 1048:2
**Sequence** [17] - 951:16, 956:13, 956:25, 957:1, 957:3, 957:13, 957:17, 958:12, 958:13, 960:14, 962:22, 963:1, 963:4, 964:12,

965:21, 968:25, 986:16
**sequence** [76] - 951:19, 952:10, 952:11, 952:13, 952:16, 953:5, 953:13, 956:10, 956:11, 956:22, 956:23, 958:3, 958:4, 958:5, 958:9, 958:10, 958:19, 958:21, 959:15, 960:4, 960:6, 960:9, 960:19, 960:20, 962:4, 962:8, 962:9, 962:11, 962:12, 963:5, 963:7, 963:9, 963:17, 965:6, 965:12, 965:17, 966:12, 967:4, 967:10, 967:16, 967:17, 967:18, 968:20, 968:23, 970:5, 970:8, 970:24, 976:5, 978:18, 981:7, 987:24, 989:4, 997:22, 998:11, 1000:7, 1000:23, 1001:1, 1001:3, 1001:4, 1001:10, 1002:2, 1003:8, 1005:18, 1009:24, 1010:4, 1011:1, 1011:9, 1011:15, 1012:19, 1012:22, 1013:1, 1013:6, 1016:16, 1019:21, 1024:15
**sequences** [32] - 957:9, 998:10, 1000:21, 1001:19, 1003:15, 1005:25, 1006:1, 1009:12, 1009:15, 1011:2, 1011:17, 1014:10, 1014:25, 1015:7, 1015:9, 1016:4, 1016:7, 1016:16, 1016:17, 1017:6, 1017:7, 1018:5, 1019:3, 1019:6, 1019:9, 1019:18, 1019:23, 1020:10, 1020:22, 1028:14, 1028:15, 1028:18
**series** [1] - 1075:24
**serious** [5] - 902:4, 917:8, 921:9, 922:1, 922:4

**seriously** [1] - 1054:8
**serve** [3] - 1076:10, 1076:11, 1076:13
**services** [2] - 938:17, 982:14
**set** [6] - 899:8, 934:5, 947:25, 951:10, 960:1, 1058:23
**sets** [1] - 897:1
**setting** [6] - 919:6, 919:7, 930:7, 936:19, 940:17, 944:24
**settlement** [2] - 907:17, 907:23
**several** [4] - 904:12, 957:11, 1084:17, 1088:17
**severe** [1] - 1052:18
**shape** [8] - 997:22, 997:24, 998:1, 998:2, 998:4, 1006:19, 1018:15, 1020:16
**shapes** [2] - 992:11, 992:14
**share** [9] - 918:18, 923:2, 931:22, 934:2, 939:21, 971:22, 973:6, 1044:11, 1061:24
**shared** [3] - 918:24, 933:22, 934:8
**Shear** [3] - 895:3, 947:19, 988:18
**SHEAR** [30] - 947:18, 947:22, 949:2, 951:13, 961:4, 961:11, 963:14, 964:8, 969:20, 970:25, 977:9, 978:3, 978:6, 978:14, 979:4, 979:20, 980:21, 983:7, 983:9, 984:6, 984:24, 985:7, 985:22, 987:6, 988:19, 988:21, 989:15, 1096:9, 1096:16, 1096:20
**shear** [1] - 983:6
**shift** [1] - 921:1
**shifting** [1] - 937:18
**ship** [1] - 1061:12
**short** [5] - 899:1, 990:1, 1026:17, 1062:6, 1075:4
**short-lived** [1] - 1062:6
**shortage** [1] - 923:8

**shorten** [1] - 1061:13
**shortly** [3] - 896:9, 896:11, 937:10
**shot** [1] - 1085:17
**show** [6] - 897:22, 952:13, 979:23, 1008:15, 1034:12, 1079:4
**showed** [8] - 906:7, 970:11, 1004:21, 1019:2, 1037:19, 1038:6, 1038:14, 1039:6
**showing** [7] - 976:23, 979:18, 997:13, 1000:5, 1001:17, 1022:22, 1084:8
**shown** [1] - 953:15
**shows** [5] - 920:11, 966:18, 1002:15, 1027:20, 1083:6
**shrink** [1] - 914:25
**sick** [1] - 930:14
**side** [8] - 911:1, 917:8, 1013:19, 1048:18, 1059:7, 1081:5, 1081:6, 1082:3
**sides** [2] - 904:15, 1067:8
**sifted** [1] - 1028:19
**sign** [1] - 970:23
**Signal** [4] - 1025:16, 1027:18
**signal** [1] - 1006:15
**signaling** [3] - 1006:15, 1022:18, 1025:16
**signature** [1] - 1075:16
**signed** [2] - 1054:9, 1058:8
**significant** [2] - 900:13, 1056:6
**significantly** [2] - 919:17, 1061:13
**similar** [15] - 916:12, 916:22, 932:6, 1016:8, 1017:22, 1017:23, 1018:18, 1019:5, 1019:10, 1019:18, 1074:24, 1076:17, 1087:7, 1087:13, 1087:17
**similarity** [2] - 1017:25
**similarly** [2] - 1039:5, 1084:3
**simple** [4] - 948:13, 992:8, 997:5, 1056:7
**simplify** [1] - 988:3

RAO - DIRECT

**simply** [4] - 900:9, 926:3, 996:18, 1075:12

**simulations** [1] - 933:1

**single** [7] - 958:7, 997:24, 1009:4, 1009:6, 1037:15, 1064:24, 1065:19

**single-chain** [3] - 1009:4, 1009:6, 1037:15

**single-component** [1] - 1065:19

**single-letter** [1] - 958:7

**sit** [1] - 933:6

**site** [2] - 912:20, 966:21

**sites** [4] - 924:16, 925:6, 925:7, 930:7

**sitting** [3] - 977:13, 977:23, 980:18

**six** [8] - 939:3, 971:24, 972:3, 972:4, 972:8, 1003:22, 1007:11, 1054:10

**SJ25C1** [11] - 989:24, 1011:23, 1012:7, 1012:11, 1012:20, 1013:6, 1016:16, 1018:20, 1019:11, 1020:4, 1020:23

**sketch** [2] - 913:21, 914:2

**SKI** [3] - 1076:17, 1081:7, 1086:7

**skill** [29] - 897:12, 898:4, 948:16, 954:1, 954:7, 954:10, 954:12, 955:6, 955:11, 955:13, 955:15, 955:19, 959:14, 959:21, 962:4, 968:5, 995:18, 995:20, 998:15, 999:6, 1003:20, 1012:4, 1012:10, 1016:21, 1023:7, 1024:17, 1026:12, 1026:17, 1027:9

**skilled** [4] - 965:19, 965:23, 1037:5, 1037:14

**skills** [3] - 954:18, 955:1, 955:2

**skinny** [3] - 1022:25, 1036:9, 1036:11

**Slide** [1] - 951:14

**slide** [21] - 906:7, 915:16, 915:18, 916:13, 918:5, 918:17, 919:2, 919:8, 928:8, 928:13, 952:9, 962:2, 964:9, 964:13, 965:2, 993:2, 997:11, 997:20, 1009:3, 1084:8, 1089:13

**slides** [4] - 915:13, 951:10, 1017:10, 1076:22

**slightly** [4] - 960:11, 982:13, 982:17, 982:24

**sliver** [1] - 1085:24

**Sloan** [7] - 897:12, 906:20, 907:4, 907:12, 908:10, 978:10, 979:2

**slots** [1] - 923:19

**slow** [3] - 930:1, 932:16, 1057:8

**small** [4] - 947:25, 996:25, 1055:9, 1079:21, 1083:19, 1083:20, 1084:5, 1085:18, 1085:19

**smaller** [2] - 960:11, 1060:1

**Society** [2] - 1075:19, 1075:22

**software** [8] - 957:8, 957:13, 957:15, 957:18, 957:20, 957:21, 958:1, 958:12

**sold** [1] - 1055:15

**solve** [1] - 955:2

**someone** [6] - 955:11, 955:12, 959:21, 1057:1, 1057:14, 1066:23

**someplace** [1] - 981:19

**sometimes** [2] - 914:25, 1088:4

**somewhat** [1] - 905:11

**somewhere** [2] - 940:19, 1007:11

**soon** [1] - 985:13

**sooner** [1] - 1093:17

**sorry** [26] - 952:3, 968:17, 969:4, 971:4, 978:5, 978:6, 981:3, 981:4, 981:24, 985:23,

918:19, 918:23

**spell** [8] - 904:22, 911:16, 929:10, 947:14, 991:13, 1050:16, 1073:2, 1073:4

**spelled** [2] - 947:16, 1050:18

**spend** [2] - 902:8, 1054:5

**spent** [1] - 931:3

**spinal** [1] - 1094:7

**spot** [2] - 1014:24, 1019:14

**spots** [1] - 1014:24

**squares** [1] - 1017:20

**St** [7] - 905:11, 907:7, 907:12, 1088:6, 1089:8, 1091:8, 1091:23

**stable** [1] - 1086:21

**staff** [3] - 924:1, 1083:9, 1083:10

**stage** [4] - 907:11, 1059:25, 1060:14, 1090:21

**stages** [3] - 907:9, 907:16, 1084:24

**stand** [2] - 928:23, 947:8

**standard** [10] - 914:15, 914:17, 953:19, 953:21, 976:19, 1001:21, 1011:7, 1035:18, 1037:1, 1053:20

**standards** [1] - 1085:12

**standpoint** [2] - 927:5, 1003:6

**Stanford** [6] - 991:22, 992:16, 993:7, 993:12, 993:14, 994:5

**Stars** [1] - 894:6

**start** [13] - 899:13, 899:16, 935:19, 971:2, 971:4, 1009:7, 1010:15, 1026:4, 1063:24, 1077:14, 1088:9, 1088:11, 1093:11

**started** [11] - 930:14, 980:11, 981:25, 993:12, 994:3, 994:7, 1028:12, 1028:14, 1042:21, 1054:8, 1073:19

**starting** [9] - 906:19, 907:1, 930:12,

1001:8, 1003:14, 1026:4, 1079:13, 1088:1, 1089:1

**starts** [2] - 1036:23, 1084:12

**startup** [1] - 936:10

**state** [10] - 904:22, 911:15, 929:10, 947:13, 991:12, 1018:18, 1026:12, 1050:15, 1059:10, 1073:1

**statement** [10] - 897:19, 1034:7, 1034:17, 1035:2, 1040:12, 1068:10, 1068:15, 1069:20, 1070:1, 1070:6

**statements** [4] - 1033:25, 1049:8, 1068:7, 1068:8

**states** [4] - 920:21, 951:21, 966:7, 967:14

**STATES** [1] - 893:1

**States** [7] - 914:10, 942:8, 943:2, 943:3, 976:15, 1065:25, 1067:22

**stating** [1] - 1041:6

**statute** [2] - 908:12, 909:25

**stay** [2] - 1053:15, 1057:11

**stem** [2] - 912:7, 915:3

**step** [1] - 1072:10

**stepped** [1] - 1089:18

**steps** [1] - 1084:4

**still** [8] - 901:12, 904:21, 923:19, 966:19, 1000:12, 1010:7, 1023:23, 1067:10

**stitches** [1] - 1002:1

**stock** [2] - 908:7, 908:23

**stop** [2] - 911:8, 1089:12

**stopped** [2] - 922:19, 934:24

**stopper** [1] - 1079:4

**storage** [1] - 1083:6

**straight** [3] - 951:13, 997:11, 1042:3

**straightforward** [1] - 955:16

**strategic** [1] - 933:11

**strategies** [2] - 954:21, 959:23

**strategy** [9] - 902:14,

**slide** [21] - 906:7, ... **sort** [5] - 906:12, 997:10, 1015:17, 1082:5, 1090:6

**Sotomayor** [1] - 1028:12

**sounds** [2] - 982:2, 1001:2

**source** [1] - 1016:1

**South** [2] - 894:9, 894:20

**space** [13] - 908:2, 919:1, 933:2, 936:11, 936:13, 936:23, 937:3, 937:25, 938:1, 939:20, 1054:16, 1054:17, 1059:23

**spacer** [3] - 1005:17, 1005:22, 1005:25

**spaghetti** [1] - 997:17

**spaghetti-like** [1] - 997:17

**speaking** [3] - 930:5, 985:23, 1039:9

**special** [1] - 1087:15

**specialized** [1] - 955:1

**species** [3] - 1015:15, 1015:22, 1015:23

**specific** [3] - 932:11, 997:18, 1046:2

**specifically** [8] - 909:13, 931:4, 933:16, 958:17, 986:16, 986:21, 1009:17, 1042:16

**specification** [6] - 920:18, 951:21, 966:7, 970:17, 980:1, 1031:1

**specificity** [1] - 996:12

**specified** [2] - 906:23, 959:23

**specifies** [4] - 907:3, 907:8, 907:15, 960:19

**specify** [1] - 967:4

**spectrum** [1] - 1020:8

**speculation** [1] - 937:2

**speculative** [3] - 899:2, 899:6, 899:21

**speed** [3] - 918:7,

RAO - DIRECT

930:4, 934:22, 936:16, 966:20, 967:5, 1058:1, 1058:2, 1059:1
**street** [1] - 945:16
**Street** [4] - 893:23, 894:9, 894:11, 895:6
**strength** [4] - 1019:25, 1020:2, 1020:5, 1020:6
**strengths** [1] - 1015:10
**strike** [6] - 985:9, 1035:8, 1037:23, 1038:3, 1043:16, 1043:22
**string** [2] - 959:10, 1002:1
**stringent** [1] - 1085:13
**strive** [1] - 1052:5
**strong** [4] - 1015:11, 1020:5, 1020:8, 1020:9
**stronger** [2] - 936:8, 937:5
**structural** [12] - 991:23, 992:7, 992:10, 992:11, 993:12, 995:1, 1014:8, 1014:13, 1025:3, 1044:14, 1048:7, 1048:11
**structure** [10] - 997:5, 997:14, 997:21, 997:23, 1009:21, 1009:24, 1010:2, 1010:3, 1012:4, 1014:16
**structured** [1] - 1092:3
**structures** [5] - 992:12, 992:15, 997:13, 1002:4, 1015:9
**strung** [2] - 953:5, 953:9
**studied** [2] - 949:21, 1045:14
**studies** [1] - 925:18
**Study** [1] - 920:4
**study** [12] - 913:5, 919:9, 920:8, 920:25, 971:23, 972:2, 972:3, 991:22, 992:9, 992:11, 993:16, 993:24
**stuff** [1] - 970:19
**subject** [3] - 905:15, 912:16, 915:10

**subjects** [1] - 1033:7
**submitted** [7] - 967:9, 978:17, 982:4, 1040:25, 1041:9, 1041:15, 1042:5
**submitting** [1] - 1041:5
**subsequently** [3] - 1081:24, 1090:7, 1091:2
**subset** [1] - 960:21
**substance** [1] - 902:20
**substitute** [5] - 967:4, 967:9, 967:15, 967:18
**success** [31] - 900:10, 908:5, 908:6, 908:8, 908:22, 918:8, 918:17, 918:19, 918:24, 919:12, 920:2, 925:16, 938:11, 939:7, 939:17, 940:1, 940:6, 940:9, 940:23, 941:2, 941:3, 941:9, 1037:6, 1037:15, 1037:19, 1038:6, 1038:14, 1039:6, 1060:17, 1067:1
**successful** [12] - 915:8, 937:20, 938:7, 1003:12, 1046:23, 1057:4, 1061:2, 1084:18, 1084:25, 1085:6, 1085:9, 1085:25
**successfully** [4] - 919:16, 1037:17, 1039:1, 1039:4
**sufficient** [3] - 908:22, 1086:24
**suggested** [1] - 906:12
**suggesting** [2] - 937:16, 1047:25
**suggestion** [1] - 906:14
**suggests** [1] - 977:20
**Suite** [2] - 894:6, 895:6
**Sullivan** [17] - 896:2, 904:23, 905:9, 906:5, 906:6, 908:25, 910:11, 910:15, 927:13, 1048:20, 1077:18, 1077:23, 1079:25, 1080:6, 1087:22,

1092:10, 1094:14
**Sullivan's** [12] - 896:10, 927:18, 1077:14, 1077:15, 1077:17, 1078:9, 1078:22, 1079:11, 1082:16, 1087:2, 1091:5, 1091:10
**sum** [1] - 1026:8
**summarize** [4] - 1016:17, 1017:10, 1024:20, 1084:11
**summary** [1] - 949:8
**summer** [1] - 982:1
**Sunday** [3] - 981:22, 981:23, 981:24
**supplier** [1] - 1086:20
**suppliers** [1] - 1083:13
**supply** [2] - 1083:12
**supplying** [1] - 921:10
**support** [2] - 944:25, 1003:25
**surface** [1] - 1019:11
**surprise** [1] - 917:3
**surprised** [1] - 919:12
**surprisingly** [1] - 923:23
**survival** [1] - 939:3
**survive** [1] - 975:6
**sustain** [1] - 903:4
**sustained** [6] - 978:8, 985:5, 985:19, 1023:14, 1069:18, 1071:10
**SVP** [1] - 929:17
**switch** [1] - 960:22
**sworn** [11] - 911:9, 911:12, 929:3, 929:5, 947:9, 947:11, 991:6, 991:8, 1050:7, 1050:9, 1072:22
**Sylvester** [1] - 912:3
**syndrome** [2] - 944:11, 1085:4
**synthetic** [3] - 996:4, 997:4, 1001:25
**system** [8] - 992:9, 992:14, 996:22, 1060:6, 1060:7, 1083:1, 1083:19, 1083:23
**systemic** [1] - 1068:21
**systems** [1] - 1083:24

**T**

**T-cell** [12] - 912:11, 954:17, 996:4,

996:6, 996:9, 996:14, 1006:6, 1006:7, 1071:16, 1071:19, 1071:24
**T-cells** [5] - 935:9, 954:16, 994:15, 1072:8, 1075:2
**tab** [1] - 942:21
**table** [2] - 1081:4, 1081:7
**takeaway** [1] - 951:2
**target** [36] - 996:7, 998:3, 998:6, 998:12, 999:7, 999:8, 999:9, 999:15, 999:18, 999:24, 1000:2, 1000:14, 1000:15, 1002:20, 1003:1, 1003:18, 1003:23, 1006:11, 1006:20, 1006:22, 1009:5, 1009:6, 1009:7, 1009:18, 1009:24, 1009:25, 1014:16, 1022:16, 1024:12, 1025:4, 1025:15, 1027:10, 1027:14, 1027:16
**targeting** [1] - 934:24
**targets** [6] - 999:13, 999:23, 1003:17, 1017:9, 1019:4, 1024:4
**taught** [1] - 1076:2
**TCR** [2] - 954:15, 1037:16
**TCRs** [6] - 954:16, 954:21, 954:23, 1035:17, 1036:25, 1039:7
**teach** [4] - 1008:17, 1025:10, 1074:4, 1074:5
**teaching** [2] - 974:4, 974:7
**teachings** [1] - 968:19
**team** [10] - 927:24, 954:25, 955:2, 1051:11, 1054:5, 1057:24, 1062:7, 1063:1, 1068:3, 1068:5
**team's** [1] - 938:17
**teams** [1] - 933:15
**technical** [3] - 1035:25, 1064:3, 1064:7
**techniques** [9] - 949:23, 954:19,

954:20, 1035:16, 1035:18, 1036:24, 1037:1, 1037:2, 1046:20
**technological** [1] - 1079:19
**technologies** [5] - 994:9, 1053:1, 1065:5, 1087:7, 1087:9
**technology** [26] - 906:21, 908:14, 952:7, 994:3, 994:11, 994:17, 995:12, 995:17, 1007:16, 1053:9, 1054:16, 1066:11, 1066:25, 1067:3, 1075:1, 1075:2, 1081:17, 1088:3, 1089:15, 1090:1, 1090:4, 1090:10, 1090:19, 1093:25, 1094:11
**Technology** [1] - 949:20
**tend** [3] - 1055:13, 1055:16, 1065:10
**tenure** [1] - 975:11
**term** [7] - 900:18, 1056:5, 1057:3, 1058:2, 1061:2, 1066:5, 1079:15
**termed** [2] - 920:17, 1024:6
**terminated** [2] - 934:17, 1093:10
**terminating** [1] - 1086:13
**terms** [22] - 898:25, 904:16, 919:4, 919:15, 939:13, 948:13, 953:15, 992:8, 1025:21, 1052:3, 1052:23, 1053:17, 1054:12, 1054:13, 1055:11, 1056:7, 1057:20, 1058:4, 1079:19, 1080:1, 1091:4, 1092:23
**terrible** [4] - 917:18, 917:24, 926:3, 968:17
**test** [5] - 954:23, 1003:3, 1003:5, 1003:9, 1007:13
**tested** [2] - 979:25, 1006:21, 1010:10
**testified** [8] - 905:9,

RAO - DIRECT

913:18, 927:14, 943:9, 943:17, 960:24, 975:3, 976:4
**testifies** [6] - 911:12, 929:6, 947:12, 991:9, 1050:10, 1072:23
**testify** [5] - 897:13, 897:24, 974:14, 974:16, 1012:25
**testifying** [3] - 902:22, 1030:18, 1036:3
**testimony** [65] - 896:10, 896:12, 896:17, 897:5, 897:18, 897:20, 898:5, 898:8, 898:10, 898:24, 898:25, 899:2, 899:5, 899:7, 899:8, 899:9, 899:19, 899:24, 900:9, 900:12, 900:17, 900:25, 901:1, 901:5, 901:19, 902:9, 902:19, 902:21, 902:22, 910:18, 915:14, 927:11, 927:18, 943:5, 945:7, 945:20, 946:10, 946:20, 951:11, 952:7, 974:24, 977:13, 982:3, 986:7, 986:21, 989:17, 989:23, 990:4, 990:15, 993:3, 1028:24, 1031:19, 1031:21, 1032:2, 1032:12, 1040:2, 1040:11, 1040:13, 1041:19, 1042:9, 1043:25, 1048:16, 1049:19, 1066:20, 1077:15
**testing** [5] - 939:19, 951:5, 1003:19, 1007:10, 1027:17
**text** [8] - 999:13, 1011:19, 1013:10, 1024:8, 1024:10, 1028:9, 1028:11, 1037:22
**texts** [1] - 1004:13
**THE** [215] - 896:1, 896:8, 896:22, 897:2, 898:7, 898:16, 899:13, 899:16, 900:6, 901:6, 901:9,

901:14, 902:14, 902:17, 903:2, 903:17, 903:22, 904:2, 904:4, 904:5, 904:6, 904:8, 904:20, 904:23, 904:24, 904:25, 905:4, 905:21, 905:25, 910:12, 910:15, 910:16, 910:17, 910:21, 910:24, 911:4, 911:5, 911:7, 911:8, 911:13, 911:17, 911:19, 913:22, 913:24, 916:3, 916:6, 916:8, 918:21, 918:22, 919:20, 919:22, 926:5, 928:16, 928:18, 928:19, 928:20, 928:24, 929:1, 929:2, 929:7, 929:8, 929:9, 929:12, 929:13, 930:1, 930:2, 932:16, 932:18, 941:19, 942:15, 942:18, 942:23, 944:20, 946:4, 946:17, 946:19, 946:21, 946:22, 947:4, 947:7, 947:8, 947:13, 947:15, 947:17, 949:5, 961:9, 969:22, 969:24, 971:1, 971:3, 971:4, 971:8, 971:11, 977:10, 977:11, 978:5, 978:8, 978:15, 979:5, 979:15, 979:19, 979:22, 980:22, 983:3, 983:6, 984:4, 984:23, 985:5, 985:10, 985:16, 985:18, 987:7, 988:18, 989:17, 989:18, 989:19, 990:7, 990:9, 990:21, 990:23, 990:24, 991:1, 991:4, 991:5, 991:10, 991:14, 991:15, 991:16, 992:25, 1004:10, 1017:2, 1021:18, 1022:1, 1022:3, 1023:14, 1023:16, 1023:18, 1028:7,

1029:17, 1029:21, 1029:25, 1030:2, 1030:6, 1030:8, 1030:10, 1031:8, 1031:9, 1034:8, 1034:17, 1034:20, 1035:9, 1035:10, 1037:11, 1038:1, 1038:3, 1039:18, 1039:23, 1040:15, 1043:19, 1043:21, 1043:23, 1043:24, 1046:5, 1048:14, 1048:16, 1048:17, 1048:18, 1048:23, 1049:13, 1049:20, 1049:24, 1050:1, 1050:5, 1050:11, 1050:13, 1050:14, 1050:17, 1050:19, 1057:8, 1059:5, 1059:9, 1059:14, 1063:4, 1063:8, 1066:21, 1066:22, 1067:6, 1069:18, 1070:8, 1070:11, 1070:12, 1070:17, 1071:10, 1072:14, 1072:15, 1072:16, 1072:19, 1072:20, 1072:24, 1073:3, 1073:4, 1073:6, 1073:7, 1073:8, 1076:20, 1077:2, 1077:4, 1077:6, 1077:8, 1077:11, 1094:15, 1094:19, 1094:21, 1094:24, 1094:25
**theirs** [1] - 936:17
**themselves** [1] - 949:8
**then-competitors** [1] - 1059:19
**therapeutic** [5] - 917:21, 930:25, 931:1, 938:12, 938:15
**THERAPEUTICS** [1] - 893:5
**Therapeutics** [9] - 1060:1, 1073:15, 1074:7, 1074:8, 1074:10, 1075:5, 1075:9, 1075:10, 1075:17
**therapies** [29] - 912:19, 913:3, 913:13, 913:17, 914:15, 915:11, 917:19, 919:15,

921:10, 921:14, 922:16, 922:20, 923:8, 924:25, 925:2, 925:13, 941:6, 944:15, 954:16, 1051:25, 1052:7, 1052:13, 1074:11, 1074:17, 1074:23, 1075:8, 1075:21, 1079:18
**Therapy** [1] - 1075:20
**therapy** [76] - 900:11, 912:2, 914:19, 914:22, 914:24, 915:2, 915:8, 915:20, 916:1, 917:23, 918:15, 921:25, 922:1, 922:4, 922:11, 922:14, 922:16, 922:17, 923:1, 923:24, 924:3, 924:8, 924:11, 924:15, 924:20, 924:22, 925:20, 925:25, 927:6, 927:9, 927:10, 929:18, 937:3, 937:20, 937:23, 938:2, 938:3, 938:5, 938:7, 939:13, 944:8, 945:22, 946:8, 951:1, 973:5, 984:19, 1053:5, 1054:21, 1055:23, 1060:20, 1060:22, 1060:24, 1064:22, 1064:25, 1065:19, 1068:21, 1071:15, 1071:19, 1071:23, 1074:10, 1078:17, 1079:22, 1082:20, 1082:21, 1084:3, 1084:12, 1084:15, 1085:16, 1085:17, 1086:1, 1087:1, 1094:4
**therefore** [4] - 918:11, 959:23, 1079:15, 1090:23
**Thereupon** [12] - 904:7, 947:1, 971:6, 971:7, 971:10, 990:2, 990:13, 1029:22, 1029:23, 1030:9, 1094:20, 1095:1
**THEREUPON** [6] - 911:10, 929:4, 947:10, 991:7,

1050:8, 1072:21
**thin** [1] - 1068:12
**thinking** [3] - 1053:9, 1057:20, 1059:21
**thinks** [1] - 1092:22
**thinly** [1] - 1068:11
**third** [8] - 953:2, 958:9, 1034:25, 1039:1, 1061:1, 1082:7, 1093:23
**third-generation** [1] - 1061:1
**third-line** [1] - 1093:23
**thousands** [3] - 912:15, 999:17, 1066:24
**three** [29] - 897:4, 906:13, 906:18, 951:25, 952:21, 952:22, 953:4, 964:17, 966:19, 971:24, 972:2, 972:4, 972:8, 979:18, 994:7, 997:14, 997:23, 1004:20, 1004:23, 1023:3, 1023:15, 1028:23, 1037:13, 1039:16, 1051:6, 1087:21, 1088:13, 1094:4, 1094:10
**three-dimensional** [2] - 997:14, 997:23
**three-line** [1] - 979:18
**throughout** [1] - 963:22
**thrown** [1] - 965:12
**tied** [1] - 1064:8
**timeframe** [6] - 931:11, 957:7, 999:22, 1003:23, 1053:10, 1062:12
**timeline** [3] - 1052:23, 1052:25, 1053:7
**title** [5] - 1034:23, 1058:9, 1058:11, 1058:19, 1062:14
**titled** [1] - 1095:5
**titles** [1] - 902:13
**tocilizumab** [1] - 917:12
**today** [25] - 898:24, 912:16, 937:18, 951:11, 963:20, 970:15, 973:25, 982:3, 987:3, 995:13, 1002:14, 1023:23, 1027:1, 1032:12, 1040:2, 1040:11, 1040:21,

RAO - DIRECT

1055:24, 1067:4,
1071:1, 1076:23,
1078:5, 1082:14,
1083:7, 1093:13
**together** [21] - 909:21,
924:19, 932:22,
933:1, 934:1, 951:1,
952:21, 953:5,
959:10, 959:11,
959:19, 966:3,
970:7, 997:3,
1001:24, 1002:1,
1009:13, 1009:14,
1058:24, 1065:6,
1083:17
**TOLLES** [1] - 894:17
**Tolles** [1] - 928:25
**Tom** [1] - 897:24
**tomorrow** [2] -
1094:16, 1094:25
**took** [6] - 1028:18,
1028:25, 1046:17,
1054:22, 1054:24,
1069:11
**tools** [1] - 1016:7
**top** [6] - 932:14,
939:10, 953:9,
1006:13, 1017:14,
1093:4
**topic** [2] - 986:6,
988:19
**total** [6] - 1005:11,
1083:20, 1083:25,
1084:6, 1091:16,
1092:6
**totally** [1] - 1064:5
**touch** [3] - 1018:5,
1018:14, 1033:7
**toward** [1] - 920:10
**towards** [1] - 1005:8
**toxicities** [6] - 899:10,
900:5, 900:14,
900:18, 900:20,
901:12
**traded** [2] - 1067:19,
1067:21
**Trademark** [2] - 897:8,
976:22
**traffic** [1] - 1050:4
**trained** [4] - 938:19,
955:16, 994:14,
1085:15
**training** [6] - 902:13,
930:7, 950:4, 950:8,
950:12, 955:19
**transaction** [4] -
1051:12, 1058:25,
1079:8, 1079:10
**transactions** [2] -
1075:23, 1078:18

**Transactions** [1] -
1076:7
**transcribed** [1] -
932:17
**transcript** [4] - 964:1,
1043:1, 1045:7,
1095:4
**TRANSCRIPT** [1] -
893:12
**transcripts** [1] -
893:25
**transfer** [2] - 1078:13,
1078:14
**translate** [1] - 958:3
**translated** [1] - 950:3
**transplant** [1] - 915:4
**transplantation** [1] -
912:2
**transplants** [3] -
912:7, 922:19
**treat** [9] - 912:4,
912:5, 913:1, 914:6,
914:7, 918:2,
920:12, 923:20,
947:24
**treated** [10] - 912:14,
912:17, 912:19,
912:24, 916:24,
917:5, 920:8, 921:3,
923:13
**treating** [4] - 914:16,
925:21, 970:9,
1085:19
**treatment** [10] -
941:17, 1052:6,
1056:14, 1056:15,
1056:19, 1056:23,
1060:11, 1064:3,
1068:19, 1085:15
**treatments** [1] -
1054:18
**trial** [40] - 900:20,
912:21, 913:6,
916:14, 916:21,
917:6, 919:6,
919:13, 922:7,
923:17, 925:6,
925:11, 925:16,
925:17, 940:12,
940:17, 943:10,
951:4, 978:12,
981:18, 983:11,
986:13, 995:7,
1002:17, 1005:6,
1005:9, 1027:8,
1027:13, 1029:10,
1031:10, 1046:13,
1047:4, 1074:25,
1078:3, 1082:11,
1085:2, 1093:13,

1093:17, 1094:16
**TRIAL** [1] - 893:13
**trial-and-error** [4] -
1002:17, 1005:6,
1027:13, 1029:10
**trials** [19] - 907:12,
907:13, 916:24,
917:1, 921:18,
925:7, 935:19,
940:11, 951:1,
983:23, 984:7,
984:15, 985:1,
985:25, 986:4,
1084:20, 1084:22,
1084:25, 1085:1
**tried** [2] - 1013:4,
1027:6
**trigger** [1] - 908:22
**trouble** [1] - 940:16
**true** [4] - 928:14,
980:5, 1007:1,
1033:9
**truthful** [2] - 943:5,
1068:8
**try** [4] - 1002:16,
1004:19, 1029:10,
1046:22
**trying** [9] - 902:24,
980:9, 983:15,
1031:25, 1054:13,
1074:21, 1079:17,
1080:19, 1081:25
**Ts** [1] - 931:16
**Tuan** [1] - 894:6
**Tulane** [1] - 993:8
**turn** [25] - 919:4,
943:24, 948:20,
954:9, 955:24,
956:13, 957:24,
992:18, 1004:3,
1005:14, 1008:3,
1010:13, 1016:10,
1017:11, 1018:2,
1018:17, 1021:5,
1022:25, 1025:5,
1027:24, 1063:7,
1063:10, 1066:16,
1068:15, 1086:12
**turnaround** [12] -
919:8, 920:1,
935:11, 938:11,
939:6, 939:16,
939:25, 940:2,
940:24, 941:1,
941:4, 1086:21
**turned** [2] - 919:16,
1081:24
**turning** [22] - 944:10,
996:5, 997:5, 999:5,
999:24, 1001:13,

1004:12, 1006:4,
1008:24, 1010:1,
1011:19, 1013:9,
1013:22, 1014:1,
1014:19, 1015:3,
1018:24, 1019:24,
1025:17, 1026:11,
1026:24, 1028:8
**turns** [1] - 959:17
**two** [48] - 896:20,
898:19, 901:22,
911:2, 916:17,
917:15, 918:3,
918:6, 920:6,
921:19, 923:14,
932:2, 933:8, 938:1,
938:23, 941:11,
943:12, 948:14,
953:23, 954:14,
968:3, 982:4, 982:6,
982:8, 989:20,
994:8, 1002:1,
1002:6, 1013:15,
1048:24, 1052:11,
1055:9, 1059:24,
1068:20, 1071:15,
1071:22, 1077:20,
1080:17, 1081:8,
1081:11, 1088:2,
1090:14, 1092:12,
1092:24, 1093:3
**type** [4] - 902:6, 930:5,
932:11, 1017:21
**typed** [1] - 988:12
**types** [6] - 954:16,
996:15, 999:2,
999:13, 1015:20,
1074:13
**typical** [1] - 997:8
**typically** [10] - 914:18,
914:24, 915:20,
916:1, 917:14,
1056:17, 1056:20,
1082:9, 1087:12,
1092:1
**typing** [1] - 1083:5
**typographical** [4] -
953:24, 976:13,
976:16, 976:21

---

## U

**U.S** [5] - 893:3,
931:21, 934:8,
942:4, 943:4
**UCLA** [1] - 1074:3
**ultimate** [1] - 953:17
**ultimately** [9] -
934:16, 935:11,
967:9, 967:24,

969:11, 1013:1,
1028:16, 1052:5,
1055:1
**unable** [1] - 925:23
**under** [11] - 896:18,
904:22, 944:22,
953:6, 974:14,
974:16, 1008:5,
1067:22, 1074:15,
1074:24, 1075:16
**undergraduate** [2] -
949:15, 1073:20
**underlying** [2] -
1016:17, 1016:20
**underneath** [2] -
1017:14, 1017:20
**understood** [2] -
973:12, 1049:15
**undertake** [1] -
1084:16
**undertook** [2] - 950:4,
950:8
**undetectable** [1] -
915:23
**undue** [6] - 1008:18,
1025:12, 1030:22,
1031:23, 1032:4,
1032:15
**unfortunately** [1] -
923:11
**unhappy** [2] - 972:22,
973:13
**unique** [3] - 1056:9,
1065:4, 1086:5
**UNITED** [1] - 893:1
**United** [7] - 914:10,
942:8, 943:2, 943:3,
976:15, 1065:25,
1067:22
**University** [13] -
912:3, 912:20,
921:15, 949:17,
950:4, 950:6,
991:22, 993:8,
993:9, 1073:21,
1073:25, 1074:5
**unlike** [1] - 1056:16
**unpredictability** [2] -
1002:15, 1026:13
**unpredictable** [2] -
1007:21, 1029:6
**unrelated** [1] -
1014:25
**unusual** [2] - 924:5,
1090:18
**up** [51] - 901:18,
902:9, 905:2,
906:15, 915:17,
923:6, 927:16,
930:7, 940:22,

RAO - DIRECT

947:8, 947:25,
949:20, 951:13,
957:19, 958:9,
961:25, 963:14,
963:20, 964:8,
967:7, 970:1,
970:20, 971:9,
979:12, 979:14,
988:12, 995:22,
997:12, 1009:14,
1022:25, 1029:2,
1029:9, 1034:4,
1034:22, 1035:12,
1036:8, 1036:11,
1037:9, 1038:23,
1042:3, 1047:6,
1050:13, 1064:5,
1083:25, 1084:6,
1085:5, 1086:12,
1088:15, 1089:12,
1089:18
**upfront** [15] - 909:2,
909:21, 1064:9,
1064:16, 1064:21,
1077:20, 1088:24,
1089:9, 1089:19,
1091:11, 1091:12,
1091:16, 1091:22,
1091:24, 1092:4
**upward** [1] - 907:2
**US** [1] - 937:9
**useful** [1] - 954:19
**uses** [6] - 981:16,
996:22, 1041:11,
1041:21, 1090:10,
1091:7
**utility** [5] - 962:19,
962:22, 963:2,
963:5, 963:10
**utilization** [1] - 941:7

## V

**valid** [5] - 907:21,
948:12, 1065:9,
1080:7, 1080:8
**validated** [1] - 999:19
**validity** [3] - 948:8,
967:25, 1008:4
**valine** [2] - 953:3,
989:13
**valuation** [11] -
908:19, 910:7,
1063:12, 1064:2,
1064:6, 1064:8,
1075:23, 1076:2,
1076:4, 1087:16
**value** [21] - 908:6,
908:18, 908:23,
909:4, 917:21,

1049:10, 1055:6,
1055:17, 1064:5,
1064:8, 1079:16,
1081:16, 1083:19,
1083:20, 1084:5,
1087:8, 1087:10,
1088:22, 1092:6
**valued** [3] - 928:10,
1087:17, 1087:18
**Valuing** [1] - 1076:6
**variable** [3] - 1015:6,
1016:4, 1022:24
**variables** [4] - 1002:8,
1015:17, 1027:12,
1029:10
**variety** [2] - 1014:5,
1025:2
**various** [3] - 930:19,
1002:22, 1064:13
**vast** [4] - 917:11,
998:9, 1019:22,
1025:2
**vector** [1] - 1086:19
**version** [2] - 1068:12
**versus** [3] - 944:13,
944:15, 1056:9
**vertical** [1] - 1093:13
**Vesey** [1] - 894:11
**viable** [4] - 940:8,
1084:1, 1084:7,
1086:16
**vice** [2] - 929:17,
990:12
**video** [8] - 946:24,
947:1, 947:3,
989:21, 990:2,
990:11, 990:13,
990:14
**view** [28] - 909:5,
909:24, 918:7,
918:23, 923:2,
927:7, 936:2,
936:14, 937:4,
966:16, 972:21,
973:18, 973:23,
980:3, 1051:23,
1052:3, 1052:20,
1054:23, 1055:2,
1055:22, 1055:24,
1057:3, 1057:6,
1057:10, 1066:5,
1079:14, 1092:19
**viewed** [3] - 925:3,
936:7, 1056:21
**views** [2] - 918:18,
973:6
**VINCENT** [18] -
928:22, 928:25,
929:15, 941:18,
942:13, 942:20,

944:21, 946:6,
946:18, 1073:10,
1076:18, 1076:25,
1077:3, 1077:7,
1077:9, 1077:13,
1096:4, 1097:20
**Vincent** [5] - 894:18,
928:25, 941:19,
944:20, 946:17
**violating** [1] - 972:17
**virology** [1] - 949:19
**virus** [2] - 1019:14,
1052:17
**viruses** [1] - 949:25
**VOLUME** [1] - 893:13
**VP** [1] - 902:14
**vs** [1] - 893:7

## W

**Wacker** [1] - 894:14
**wait** [1] - 1070:7
**waiting** [1] - 942:16
**walk** [2] - 998:14,
1050:14
**WANDS** [2] - 1029:3,
1029:12
**Wands** [1] - 1025:21
**Washington** [1] -
972:7
**water** [1] - 947:7
**ways** [4] - 959:17,
959:20, 1015:5,
1018:12
**weak** [4] - 1015:11,
1020:4, 1020:8,
1020:9
**week** [13] - 899:3,
908:21, 917:15,
920:24, 952:6,
981:23, 981:24,
982:23, 982:24,
982:25, 996:2,
1058:7, 1082:14
**weekend** [1] - 904:11
**weekly** [1] - 932:21
**weeks** [3] - 916:2,
1060:10, 1060:13
**Weinberger** [2] -
894:19, 910:13
**WEINBERGER** [7] -
905:1, 905:6, 905:8,
905:18, 905:24,
910:14, 1095:15
**Weiss** [1] - 894:8
**well-known** [3] -
1035:18, 1035:21,
1037:1
**WELLS** [7] - 941:21,
942:14, 942:16,

942:19, 946:5,
946:16, 1096:6
**Wells** [1] - 894:5
**West** [2] - 893:23,
894:14
**WESTERN** [1] - 893:2
**whatsoever** [2] -
897:20, 965:24
**whereas** [2] - 1020:5,
1090:4
**white** [1] - 1019:14
**whole** [8] - 909:13,
930:15, 968:14,
968:16, 1001:16,
1011:9, 1015:1,
1085:21
**whoops** [1] - 1039:3
**widely** [2] - 972:6,
972:9
**wider** [1] - 936:19
**Wifi** [1] - 1083:7
**William** [1] - 895:3
**Williams** [1] - 975:20
**willing** [1] - 1053:1
**windfall** [1] - 1082:4
**Windows** [1] - 1083:2
**wine** [1] - 898:1
**winners** [2] - 1027:14,
1029:11
**wish** [3] - 896:5,
901:9, 1070:9
**wishes** [2] - 896:22,
898:9
**withdraw** [1] - 903:20
**withdrew** [2] - 975:13,
975:16
**witness** [30] - 896:2,
897:11, 904:25,
905:3, 910:23,
911:1, 926:9,
928:21, 929:13,
946:6, 947:7,
970:25, 987:7,
989:19, 990:20,
991:16, 1029:16,
1030:4, 1036:1,
1036:5, 1048:19,
1048:25, 1049:3,
1049:11, 1050:1,
1050:3, 1050:21,
1070:22, 1072:16,
1073:8
**WITNESS** [31] -
904:23, 910:16,
911:7, 911:17,
918:22, 928:19,
929:8, 929:12,
930:2, 932:18,
942:15, 942:18,
946:21, 947:15,

977:11, 985:16,
989:18, 991:14,
1031:9, 1035:10,
1043:21, 1043:24,
1048:17, 1050:13,
1050:17, 1057:8,
1066:22, 1070:12,
1072:15, 1073:3,
1073:6
**witnessCHARD** [1] -
1096:7
**witnesses** [6] -
898:19, 901:25,
910:17, 910:19,
911:2, 1096:2
**women's** [1] - 931:2
**wondered** [1] - 925:12
**wonderful** [1] - 941:15
**word** [4] - 983:14,
1036:23, 1058:11,
1072:1
**words** [10] - 954:1,
966:19, 996:3,
1005:5, 1035:1,
1078:11, 1081:19,
1082:1, 1090:9,
1092:5
**works** [2] - 959:13,
1005:15
**world** [29] - 916:22,
919:6, 924:12,
930:9, 932:15,
933:20, 934:1,
937:9, 940:6,
940:20, 940:21,
950:23, 950:24,
1022:13, 1067:17,
1076:13, 1079:9,
1079:10, 1079:23,
1080:2, 1080:16,
1080:19, 1081:24,
1082:7, 1087:4,
1087:5, 1087:6,
1091:4, 1091:18
**worldwide** [6] -
929:17, 931:7,
932:7, 933:25,
937:19, 1083:12
**worth** [3] - 986:5,
1063:17, 1063:20
**wrap** [1] - 1029:2
**write** [2] - 1070:23,
1071:1
**written** [18] - 991:25,
992:4, 994:20,
1008:6, 1008:9,
1008:14, 1008:21,
1010:14, 1019:20,
1023:25, 1024:1,
1024:23, 1026:6,

RAO - DIRECT

1026:15, 1030:18,
1030:25, 1033:3,
1033:19
**Wu** [1] - 1023:5
**www.
amydiazfedreporter
.com** [1] - 893:25

## Y

**year** [19] - 914:11,
923:11, 923:15,
923:18, 923:20,
925:15, 938:4,
942:2, 974:23,
975:5, 981:25,
993:13, 1003:22,
1007:11, 1007:15,
1035:14, 1041:10,
1068:1, 1069:11
**years** [28] - 912:12,
922:16, 923:14,
926:25, 930:12,
938:24, 941:11,
945:18, 948:6,
950:16, 950:17,
951:3, 954:14,
992:17, 993:20,
994:3, 1003:11,
1028:25, 1051:6,
1051:13, 1051:16,
1053:11, 1053:17,
1056:2, 1057:13,
1061:24, 1074:3,
1084:17
**YESCARTA** [71] -
908:20, 908:24,
909:12, 910:5,
910:8, 912:22,
913:7, 914:5,
916:11, 916:19,
917:9, 917:16,
919:3, 919:14,
921:21, 924:25,
925:23, 926:2,
928:10, 938:24,
940:1, 940:19,
944:1, 944:10,
944:11, 944:23,
945:3, 980:1,
981:15, 1010:16,
1010:19, 1010:22,
1010:25, 1011:4,
1012:7, 1017:14,
1018:9, 1018:20,
1019:1, 1019:17,
1019:19, 1020:5,
1020:22, 1022:8,
1049:8, 1063:16,
1063:23, 1068:19,
1069:3, 1069:8,

1069:22, 1070:20,
1071:7, 1071:12,
1072:1, 1072:4,
1074:22, 1074:24,
1078:4, 1078:8,
1078:12, 1078:17,
1079:12, 1079:16,
1082:13, 1082:20,
1084:3, 1084:12,
1093:8, 1093:22
**YESCARTA's** [1] -
917:21
**York** [3] - 894:12,
972:7
**young** [3] - 897:2,
921:19, 926:5
**Young** [1] - 894:20
**YOUNG** [17] - 897:3,
898:13, 910:22,
911:21, 913:20,
913:23, 914:1,
915:17, 916:5,
916:7, 916:9,
919:18, 919:24,
923:6, 926:4,
928:17, 1095:21
**yourself** [3] - 994:10,
1039:18, 1073:11
**yourselves** [3] -
1029:19, 1060:8,
1094:18
**Yup** [3] - 948:22,
969:19, 1068:4

## Z

**Zolgensma** [1] -
1094:5
**ZUMA-1** [9] - 912:21,
913:6, 916:14,
916:20, 917:6,
919:8, 920:25,
925:16, 940:12