Morgan Chu (SBN 70446)
mchu@irell.com
Alan J. Heinrich (SBN 212782)
aheinrich@irell.com
C. Maclain Wells (SBN 221609)
mwells@irell.com
Elizabeth C. Tuan (SBN 295020)
etuan@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199

Andrea W. Jeffries (SBN 183408)
ajeffries@jonesday.com
Luke J. Burton (SBN 301247)
lburton@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539

*[List of counsel continues on next page]*

*Attorneys for Plaintiffs*
JUNO THERAPEUTICS, INC., MEMORIAL
SLOAN KETTERING CANCER CENTER,
and SLOAN KETTERING INSTITUTE FOR
CANCER RESEARCH

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| JUNO THERAPEUTICS, INC., *et al.*, | Case No. 2:17-cv-07639-SJO-KSx |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION** |
| v. | |
| KITE PHARMA, INC., | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | Hon. S. James Otero<br>Place:    Courtroom 10C |

1    Rebecca Carson (SBN 254105)
     rcarson@irell.com
2    Ingrid M. H. Petersen (SBN 313927)
     ipetersen@irell.com
3    IRELL & MANELLA LLP
     840 Newport Center Drive, Suite 400
4    Newport Beach, CA 92660
     Telephone:   (949) 760-0991
5    Facsimile:    (949) 760-5200

6
     Christopher J. Harnett (*Pro Hac Vice*)
7    charnett@jonesday.com
     Sarah A. Geers (*Pro Hac Vice*)
8    sgeers@jonesday.com
     Kevin V. McCarthy (*Pro Hac Vice*)
9    kmccarthy@jonesday.com
     JONES DAY
10   250 Vesey Street
     New York, NY 10281-1047
11   Telephone:   (212) 326-3939
     Facsimile:    (212) 755-7306
12
13   Jennifer L. Swize (*Pro Hac Vice*)
     jswize@jonesday.com
14   JONES DAY
     51 Louisiana Avenue, N.W.
15   Washington, DC 20001-2113
     Telephone:  (202) 879-3939
16   Facsimile:  (202) 626-1700

17   John M. Michalik (*Pro Hac Vice*)
     jmichalik@jonesday.com
18   JONES DAY
     77 West Wacker Drive, Suite 3500
19   Chicago, IL 60601-1692
     Telephone:  (312) 782-3939
20   Facsimile:  (312) 782-8585

21
     *Attorneys for Plaintiffs*
22   JUNO THERAPEUTICS, INC., MEMORIAL
     SLOAN KETTERING CANCER CENTER,
23   and SLOAN KETTERING INSTITUTE FOR
     CANCER RESEARCH
24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................... 1

PROCEDURAL BACKGROUND ......................................................... 3

ARGUMENT ........................................................................................... 4

I.    The Court Should Award Damages On The Jury Verdict For Kite's
      Infringement Through December 12, 2019 ....................................... 4

II.   The Court Should Award Plaintiffs Pre-Judgment Interest At The
      Prime Rate ........................................................................................ 5

III.  The Court Should Award Enhanced Damages In The Same Amount As
      The Jury's Damages Award ............................................................. 7

      A.    Kite And Its Collaborators Copied And Have Long Used
            Dr. Sadelain's CAR Backbone In The Face Of A Known Risk Of
            Infringement (*Read* Factors One and Six) ............................. 9

      B.    Kite Lacked Any Good-Faith Belief Of Non-Infringement Or
            Invalidity, And Took No Meaningful Remedial Action (*Read*
            Factors Two And Seven)....................................................... 14

      C.    Kite's Motivation To Harm Juno Supports Enhancement (*Read*
            Factor Eight)........................................................................ 15

      D.    The Case Was Not Close (*Read* Factor Five) ...................... 16

      E.    Kite's Litigation Misconduct Supports Enhancement (*Read*
            Factor Three)....................................................................... 17

      F.    Kite/Gilead's Financial Size And Condition Favor Enhancement
            (*Read* Factor Four) ............................................................ 23

      G.    Kite/Gilead Tried To Conceal Its Misconduct (*Read* Factor Nine)..... 24

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

- i -

# TABLE OF CONTENTS
(continued)

**Page**

IV.    The Court Should Award Ongoing Royalties Of At Least 33.1% To
       Account For Changed Circumstances ............................................................ 26

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

Page

CASES

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*,
   No. 07-cv-8108, 2018 WL 6190604 (C.D. Cal. Nov. 4, 2018) ............................ 16

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 12-cv-630, 2014 WL 6687122 (N.D. Cal. Nov. 25, 2014) .......................... 27

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
   No. 14-cv-62369, 2017 WL 7732873 (S.D. Fla. Jan. 3, 2017), *aff'd*,
   876 F.3d 1350 (Fed. Cir. 2017) .................................................................... 25, 28

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc*,
   198 F. Supp. 3d 1343 (S.D. Fla. 2016), *aff'd*, 876 F.3d 1350 (Fed.
   Cir. 2017). .......................................................................................................... 25

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
   377 U.S. 476 (1964) ............................................................................................ 7

*Barry v. Medtronic, Inc.*,
   250 F. Supp. 3d 107 (E.D. Tex. 2017) ............................................................. 13

*Beatrice Foods Co. v. New England Printing & Lithographing Co.*,
   923 F.2d 1576 (Fed. Cir. 1991) ..................................................................... 5, 30

*Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*,
   No. 07-cv-894, 2012 WL 12845892 (S.D. Cal. Aug. 26, 2012) ........................ 23

*CSX Transp., Inc. v. Hensley*,
   556 U.S. 838 (2009) ............................................................................................ 8

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
   340 F. Supp. 3d 1004 (C.D. Cal. 2018) ............................................................ 27

*Energy Transp. Grp. v. William Demant Holding A/S*,
   697 F.3d 1342 (Fed. Cir. 2012) .......................................................................... 5

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

- iii -

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008) .................................................................. 3, 26

*Fractus, S.A. v. Samsung Elecs.*,
    876 F. Supp. 2d 802 (N.D. Tex. 2012) ........................................ 22

*Fujifilm Corp. v. Motorola Mobility LLC*,
    182 F. Supp. 3d 1014 (N.D. Cal. 2002) ........................................ 6

*Gen. Motors Corp. v. Devex Corp.*,
    461 U.S. 648 (1983) ..................................................................... 5

*Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*,
    300 F. Supp. 3d 610 (D. Del. 2018) ........................................ 6, 26

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    136 S. Ct. 1923 (2016) .......................................... 4, 7, 8, 15

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs Co.*,
    203 F. Supp. 3d 755 (E.D. Tex. 2016) ........................................ 22

*Innovention Toys LLC v. MGA Entm't*,
    No. 07-cv-6510, 2017 WL 3206687 (E.D. La. Mar. 8, 2017) .............. 25

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
    No. 06-cv-2182, 2012 WL 12507656 (D. Ariz. July 23, 2012) .............. 23, 24

*Internet Machines v. Alienware Corp.*,
    No. 10-cv-23, 2013 WL 4056282 (E.D. Tex. June 19, 2013) .............. 29

*Johns Hopkins Univ. v. Cellpro*,
    978 F. Supp. 184 (D. Del. 1997) ........................................ 24

*Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*,
    No. 14-cv-2864, 2018 WL 3730404 (N.D. Cal. Aug. 6, 2018) .............. 6

*King Instruments Corp. v. Perego*,
    65 F.3d 941 (Fed. Cir. 1995) ........................................ 7

*Liqwd, Inc. v. L'Oréal USA, Inc.*,
    No. 17-cv-14, 2019 WL 6840353 (D. Del. Dec. 16, 2019) .............. 22

*Mass Engineered Design, Inc. v. Planar Sys., Inc.*,
No. 16-cv-1510, 2018 WL 6059375 (D. Or. Nov. 19, 2018)..........................5, 28

*Mondis Tech Ltd. v. Chimei Innolux Corp.*,
822 F. Supp. 2d 639 (E.D. Tex. 2011) ..............................................................28

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
313 F. Supp. 2d 361 (D. Del. 2004) ...................................................................9

*Opticurrent, LLC v. Power Integrations, Inc.*,
No. 17-cv-3597, 2019 WL 2389150 (N.D. Cal. June 5, 2019)......................5, 6

*Paice LLC v. Toyota Motor Corp.*,
504 F.3d 1293 (Fed. Cir. 2007) ........................................................................27

*Paice LLC v. Toyota Motor Corp.*,
609 F. Supp. 2d 620 (E.D. Tex. 2009) ..............................................................28

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
No. 09-cv-5235, 2017 WL 130236 (N.D. Cal. Jan. 13, 2017)..........................23

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992), *abrogated on other grounds by
Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir.
1995) (en banc).........................................................................................passim

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*,
707 F. Supp. 2d 737 (N.D. Ohio 2010) ...............................................23, 25, 26

*SSL Servs., LLC v. Citrix Sys., Inc.*,
769 F.3d 1073 (Fed. Cir. 2014) ..........................................................................5

*Stryker Corp. v. Zimmer, Inc.*,
No. 10-cv-1223, 2017 WL 4286412 (W.D. Mich. July 12, 2017)...............26, 30

*Syntrix Biosystems, Inc. v. Illumina, Inc.*,
No. 10-cv-5870, 2013 WL 3089448 (W.D. Wash. June 18, 2013) ....................30

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
No. 04-cv-876, 2014 WL 1457797 (D. Del. Apr. 14, 2014)..........................28, 29

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

- v -

*Thermolife Int'l, LLC v. Myogenix Corp.*,
No. 13-cv-651, 2018 WL 325025 (S.D. Cal. Jan. 8, 2018).....................6

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
939 F.2d 1540 (Fed. Cir. 1991) ..................................................6

*W.R. Grace & Co. v. Intercat, Inc.*,
60 F. Supp. 2d 316 (D. Del. 1999) ...........................................6

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ..........................................4, 8

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
837 F.3d 1358 (Fed. Cir. 2016), *rev'd on other grounds*, 138 S. Ct.
2129 (2018).................................................................7

*Whirlpool Corp. v. TST Water, LLC*,
No. 15-cv-1528, 2018 WL 1536874 (E.D. Tex. Mar. 29, 2018) .......................17

*XY, LLC v. Trans Ova Genetics*,
890 F.3d 1282 (Fed. Cir. 2018) ..........................................27

STATUTES

28 U.S.C. § 1961.............................................................6

35 U.S.C. § 112.........................................................4, 15, 16

35 U.S.C. § 283.......................................................3, 27, 30

35 U.S.C. § 284......................................................passim

35 U.S.C. § 285.............................................................3

OTHER AUTHORITIES

J. Gregory Sidak, *Ongoing Royalties for Patent Infringement*, 24 Tex.
Intell. Prop. L.J. 161, 175 (2016) .......................................28

Local Rule 58-7 .............................................................6

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

- vi -

SUSPECTS

Section 112 ....................................................................................................... 4, 15, 16

*Arctic Cat Inc. v. Bombardier Recreational Products, Inc,*
    198 F. Supp. 3d 1343 (S.D. Fla. 2016), *aff'd*, 876 F.3d 1350 (Fed.
    Cir. 2017). ......................................................................................................... 25

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

- vii -

# INTRODUCTION

The jury in this case ruled decisively and completely in favor of Plaintiffs.  It found that Kite/Gilead willfully infringed the '190 Patent, awarded the damages Plaintiffs requested, and rejected each and every one of Kite's defenses.  The record amply supports the jury's conclusions.  But this was no ordinary commercial dispute.  Kite's financial incentive to infringe was so great that, having failed in its efforts to license or invalidate the '190 Patent, it just plowed ahead and infringed anyway.  The evidence of willful infringement was, as a consequence, overwhelming.

As the record makes clear, Kite knew (or, at best for Kite, was willfully blind to the fact) that it was building its CAR-T business on the intellectual property of another—Kite's collaborators at the National Cancer Institute ("NCI") had obtained the construct that formed the backbone of Yescarta® from Dr. Michel Sadelain, the '190 Patent inventor.  The record also shows that, long before Kite began its clinical trials, it recognized its need for a license to the '190 Patent, making repeated overtures to Sloan Kettering.  Indeed, Kite admitted its licensing efforts early in the case in its damages contentions.  Yet when Kite failed to obtain a license, it nonetheless proceeded to pursue its copied construct.  So too when its attempt to avoid liability via a different route also failed—its unsuccessful *inter partes* review proceeding challenging the '190 Patent as obvious—Kite pressed on full speed ahead to market.  The evidence shows exactly why:  Getting to market first with its copied CAR construct in disregard of Plaintiffs' patent rights allowed Kite to turn its "Project Gold" into actual gold, selling itself to Gilead for $11.9 billion, $6.2 billion of which was attributed by Gilead to FDA approval of just the *first* Yescarta® indication.  This egregious misconduct is precisely the type of behavior warranting enhanced, punitive damages under Section 284 of the Patent Act.

Kite's misconduct continued throughout trial, where Kite proceeded to generate heat and confusion to divert from its intentional, highly profitable corporate strategy of using Dr. Sadelain's invention to get to market first.  Through testimony elicited

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-1-

from Dr. Arie Belldegrun, Kite's founder and former CEO and Executive Chairman, Kite sought to portray its communications with Sloan Kettering's *technology licensing* office as being simply in pursuit of clinical trial patients and not a license. The jury clearly rejected this false account.  But Kite and its witnesses did not give up.  Dr. Aya Jakobovits, Kite's then-CEO, bobbed and weaved when asked about Kite's licensing efforts, and only finally admitted the obvious truth when directly confronted with Kite's contentions acknowledging its licensing efforts.

Kite's presentation of its defenses at trial likewise sought to sow confusion about their unmeritorious nature and distract from Kite's willful infringement.  For its central, certificate of correction ("CoC") defense, Kite took a number of indefensible tacks, including misrepresenting its relationship with its purported "real-world," "independent third party" witness, Dr. Thomas Schuetz.  As Kite was ultimately forced to reveal, Dr. Schuetz and Gilead had long been in discussions regarding a potential deal that included teleconferences involving Kite/Gilead's key trial witnesses, Kite's first Chief Scientific Officer Dr. Adrian Bot and Gilead's CFO Andrew Dickinson; Kite's lawyers and Dr. Schuetz discussed the '190 Patent in depth numerous times; and by trial, when Dr. Schuetz had retained Kite's lawyers to represent him personally, Dr. Schuetz and Kite nonetheless presented his testimony to the jury as that of an "independent third party."  Kite also went beyond merely hard-fought litigation by fostering a theory, which even Dr. Schuetz had to repudiate on cross-examination, that Plaintiffs had tried to coerce him into signing a false affidavit.  On top of all this, during trial, Kite piled filing after filing on the Court and Plaintiffs, regurgitating arguments already ruled on.

Enhancing damages under 35 U.S.C. § 284 prevents willful infringers like Kite from being no worse off than they would have been if they had properly obtained a license in the first place.  Accordingly, to punish and deter sharp commercial and litigation practices like those exhibited by Kite and its lawyers, courts treble, or otherwise meaningfully enhance, compensatory damages in order to advance the

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-2-

Patent Act's punitive and deterrent purposes.  Plaintiffs here request the Court to impose punitive, enhanced damages in the same amount as the jury's verdict.  Such a 1:1 ratio of actual to punitive damages has been recognized by the Supreme Court as "reasonable" for merely reckless behavior, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 510-11 (2008), and is more than justified by Kite/Gilead's intentional, commercially noxious behavior here.  Indeed, this "exceptional case" of willful infringement and litigation misconduct would warrant attorneys' fees, *see* 35 U.S.C. § 285; to streamline matters and given the overlapping evidence, however, Plaintiffs forgo a fee request and limit their request to enhancement under Section 284.

In this consolidated motion, Plaintiffs also seek other relief warranted under the Patent Act that is necessary to make Plaintiffs whole.  In relation to compensatory damages through trial under the jury's verdict, the Court should award past damages of ████████ for Kite's pre-verdict infringement, *i.e.*, the jury's award of a $585 million upfront payment and royalties of 27.6% on Kite's revenues through December 12, 2019.  The Court should also award pre-judgment interest on that amount, as expressly contemplated by Section 284.

Finally, the Court should order Kite to pay Plaintiffs an ongoing royalty rate for Kite's continued infringement under Section 283.  Kite, now an adjudicated willful infringer, has continued its willful infringement unabated.  The undisputed willfulness of Kite's ongoing infringement, together with changed economic circumstances including the increased competition between Kite and Juno, calls for an ongoing royalty rate of at least 33.1% (at least 20% more than the jury's pre-verdict infringement rate).

A proposed judgment setting forth Plaintiffs' requested relief is submitted concurrently herewith.

## PROCEDURAL BACKGROUND

In October 2017, on the eve of Kite's infringement of the '190 Patent, Plaintiffs filed this suit.  Dkt. No. 1.  After the Court construed the claims, and specifically to

avoid facing a motion for summary judgment of infringement, Kite admitted, as it had to, that its Yescarta® therapy meets all limitations of the asserted claims as corrected by the CoC.  Dkt. No. 223.  Instead, as its defenses, Kite argued that the CoC was invalid and that the claims were invalid under Section 112.

The case proceeded to trial from December 3 to December 13.  In its verdict, the nine-member jury unanimously rejected Kite's CoC and Section 112 defenses, found that Kite willfully infringed, and awarded reasonable-royalty damages consisting of (1) a $585,000,000 upfront payment; and (2) a 27.6% royalty on Kite's revenues through trial.  Dkt. No. 593.  The Court deferred entry of judgment and directed the parties to file post-trial motions by January 21, 2020.  Dkt. No. 639.

## ARGUMENT

Each of Plaintiffs' requests in this motion is governed by the preponderance of the evidence standard, which is more than satisfied here.  *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1339 (Fed. Cir. 2016) (enhanced damages); *see generally Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1934 (2016).

## I.     THE COURT SHOULD AWARD DAMAGES ON THE JURY VERDICT FOR KITE'S INFRINGEMENT THROUGH DECEMBER 12, 2019

The Court should award Plaintiffs damages of ▮▮▮▮▮▮ for Kite's infringement through December 12, 2019, as provided for by the jury's verdict.  The jury determined that Kite owed Plaintiffs a $585 million upfront payment and a running royalty rate of 27.6% on "Yescarta® revenues through trial."  Dkt. No. 593 at 4 (jury question 5(b)).  At the time of the jury's December 13, 2019 verdict, Kite had disclosed sales information only through September 30, 2019 (totaling $603,650,765, *see* Dkt. No. 583 at 4).  Kite has since disclosed net Yescarta® revenues from October 1, 2019 to December 12, 2019, of ▮▮▮▮▮▮, Ex. 1 (Updated revenues),[1] for total

---

[1] Cites to Ex. __ are to exhibits attached to the declaration of Andrea W. Jeffries, filed concurrently herewith.

-4-

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

1  revenues through trial of ████████. Accordingly, the total amount of the jury's

2  damages award is the upfront payment plus 27.6% of Kite's total revenues through

3  trial, for a total of ████████. *See Mass Engineered Design, Inc. v. Planar Sys.,*

4  *Inc.*, No. 16-cv-1510, 2018 WL 6059375, at *6 (D. Or. Nov. 19, 2018) (specifying

5  the total damages award through trial, based on updated revenue information).

6  **II.    THE COURT SHOULD AWARD PLAINTIFFS PRE-JUDGMENT**

7  **INTEREST AT THE PRIME RATE**

8       The Court should also order Kite to pay pre-judgment interest on the jury's

9  award at the prime rate compounded quarterly.  Pre-judgment interest is needed to

10 fully compensate Plaintiffs for Kite's infringement.  The Patent Act specifically

11 provides that a patent owner is entitled to damages "together with interest and costs

12 as fixed by the court."  35 U.S.C. § 284.  For that reason, an "award of pre-judgment

13 interest is the rule, not the exception."  *Energy Transp. Grp. v. William Demant*

14 *Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012) (internal quotation marks omitted);

15 *see also Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983)

16 ("[P]rejudgment interest should be awarded . . . absent some justification for

17 withholding such an award.").  Pre-judgment interest applies to all compensatory

18 portions of the judgment.  *See Beatrice Foods Co. v. New England Printing &*

19 *Lithographing Co.*, 923 F.2d 1576, 1580 (Fed. Cir. 1991).  To be clear, however,

20 Plaintiffs are not seeking pre-judgment interest on the Court's enhancement award.

21      "The purpose of prejudgment interest is to place the patentee in as good a

22 position as he would have been had the infringer paid a reasonable royalty rather than

23 infringe."  *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1094 (Fed. Cir. 2014).

24 As courts recognize, "the prime rate is the most accurate estimate" in patent cases

25 because it represents "the rate charged by banks to its most credit-worthy customers."

26 *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-cv-3597, 2019 WL 2389150, at

27 *19 (N.D. Cal. June 5, 2019) (internal quotation marks omitted).  Thus, district courts,

28 both in California and elsewhere, commonly award pre-judgment interest at the prime

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-5-

1   rate in patent cases. *E.g.*, *id.* at \*1; *Johnstech Int'l Corp. v. JF Microtechnology SDN*
2   *BHD*, No. 14-cv-2864, 2018 WL 3730404, at \*1 (N.D. Cal. Aug. 6, 2018); *Green*
3   *Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 627 (D.
4   Del. 2018); *Thermolife Int'l, LLC v. Myogenix Corp.*, No. 13-cv-651, 2018 WL
5   325025, at \*15 (S.D. Cal. Jan. 8, 2018); *Fujifilm Corp. v. Motorola Mobility LLC*,
6   182 F. Supp. 3d 1014, 1042 (N.D. Cal. 2002).   The Federal Circuit has likewise
7   approved use of the prime rate, even where the patent owner has not shown that it
8   borrowed at that rate or a higher rate. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d
9   1540, 1545 (Fed. Cir. 1991).

10   Quarterly compounding is also common. *E.g.*, *Opticurrent*, 2019 WL 2389150,
11   at \*21; *Green Mountain Glass*, 300 F. Supp. 3d at 628; *Thermolife*, 2018 WL 325025,
12   at \*15; *Fujifilm Corp.*, 182 F. Supp. 3d at 1043-44.   Moreover, quarterly compounding
13   aligns well with the quarterly sales data provided by Kite in this case.

14   Plaintiffs therefore respectfully request that the Court award pre-judgment
15   interest at the prime rate, with quarterly compounding, and measuring quarterly sales
16   as occurring at the midpoint of the quarter. *Cf. W.R. Grace & Co. v. Intercat, Inc.*, 60
17   F. Supp. 2d 316, 332 (D. Del. 1999) (applying the prime rate with compounding and
18   a mid-period convention). As explained in Dr. Sullivan's supplemental post-trial
19   declaration accompanying this submission, this approach yields pre-judgment interest
20   of ███████ as of the end of 2019, with interest continuing to accrue at ███████
21   per day through the first quarter of 2020. Ex. 2 (Sullivan Decl. ¶¶ 4-5).   For example,
22   as of February 24, 2020 (the date briefing on post-trial motions will be complete), the
23   amount of pre-judgment interest accrued will be ███████.[2]

24

25

26   [2] Under 28 U.S.C. § 1961, Plaintiffs are entitled to post-judgment interest on
27   the entire amount of the judgment.   Plaintiffs have concurrently submitted a Local
     Rule 58-7 memorandum specifying the manner of computing post-judgment interest
28   and have also concurrently submitted a proposed final judgment.

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-6-

## III. THE COURT SHOULD AWARD ENHANCED DAMAGES IN THE SAME AMOUNT AS THE JURY'S DAMAGES AWARD

Under 35 U.S.C. § 284, "the court may increase damages up to three times the amount found or assessed."  The touchstone for punitive enhancement of patent damages is the overall egregiousness of the infringer's conduct:  Enhancement is "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," *i.e.*, behavior that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo*, 136 S. Ct. at 1932; *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 508 (1964) (a patent owner "could, in a case of willful or bad-faith infringement recover punitive or 'increased' damages under the [Patent Act's] trebling provision"). This form of punishment is "as old as U.S. patent law," *Halo*, 136 S. Ct. at 1928, and prevents infringement from being a "heads-I-win, tails-you-lose" choice, whereby even a caught infringer pays no more than the reasonable royalty it would have paid to properly license the technology in the first place. *King Instruments Corp. v. Perego*, 65 F.3d 941, 951 n.6 (Fed. Cir. 1995).  Kite's egregious, willful infringement warrants a punitive award in the same amount as the compensatory award, ██████████.

The jury's unanimous finding that Kite willfully infringed the '190 Patent, Dkt. No. 593 at 4, and the evidence underlying that finding, are together sufficient to justify enhancement, without more.  "[S]ubjective willfulness alone—*i.e.*, proof that the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer—can support an award of enhanced damages." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (internal quotation marks and citation omitted), *rev'd on other grounds*, 138 S. Ct. 2129 (2018).

Here, the jury found "that Kite knew of Plaintiffs' patent and intentionally infringed at least one asserted claim of the patent."  Dkt. No. 591 at 15; Tr. 1354:11-

13.[3]  The jury thus found Kite's infringement "intentiona[l]," not merely reckless (*i.e.*, it did not find willfulness "merely because Kite knew about the patent without more"). Dkt. No. 591 at 15; Tr. 1354:14-18; *see CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) (jury is presumed to have followed the Court's instructions).

Intentional infringement is the most severe, reprehensible conduct on the spectrum of patent infringement, and it merits a significant penalty in order to deter the infringer, and other future companies, from such conduct.  The mountain of evidence supporting the jury's willfulness finding shows that Kite's behavior— "deliberate, malicious, wanton, consciously wrongful, flagrant, or in bad faith," Dkt. No. 591 at 15; Tr. 1354:15-16—demands a meaningful enhancement.

The "egregious infringement behavior" inquiry, *Halo*, 136 S. Ct. at 1932, is informed by the factors laid out by the Federal Circuit in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992), *abrogated on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc).  The *Read* factors, which are appropriately applied to evaluate the egregiousness of the defendant's conduct, *see WBIP*, 829 F.3d at 1325, 1342 (upholding an enhancement under the *Read* factors), overwhelmingly support enhancement here:

> (1) "whether the infringer deliberately copied the ideas or design of another";
>
> (2) "whether the infringer . . . formed a good-faith belief that [the patent] was invalid or that it was not infringed";
>
> (3) "the infringer's behavior as a party to the litigation";
>
> (4) the infringer's "size and financial condition";
>
> (5) the "[c]loseness of the case";
>
> (6) the "[d]uration" of the infringer's "misconduct";
>
> (7) any "[r]emedial action" taken by the infringer;

---

[3] All citations to "Tr." are to the revised Trial Transcript submitted in January 2020 and reflecting the parties' errata.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-8-

1    (8) the infringer's "[m]otivation for harm"; and

2    (9) whether the infringer "attempted to conceal its misconduct."

3    *Read*, 970 F.2d at 827.  As the Federal Circuit has recognized, the "[u]se of these

4    factors in patent cases is in line with punitive damages considerations in other tort

5    contexts." *Id.* at 827-28.

6         In assessing enhancement, the Court may consider evidence not available to the

7    jury.  Indeed, certain *Read* factors, such as litigation behavior and the closeness of the

8    case, turn largely on evidence the jury could not have considered.  *See nCUBE Corp.*

9    *v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 388-89 (D. Del. 2004) (citing *Advanced*

10   *Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1311 (Fed. Cir. 2001)).

11        *All* the *Read* factors, not to mention the overall egregiousness of Kite's conduct,

12   demonstrate the need for additional, punitive sanctions.  The reasonable royalty

13   awarded by the jury does no more than make Kite pay for the license it should have

14   obtained in the first place.  If Kite is not required to pay a significant penalty, both it

15   and future infringers will know that intentional infringement is a no-lose proposition.

16   **A.   Kite And Its Collaborators Copied And Have Long Used**
17   **Dr. Sadelain's CAR Backbone In The Face Of A Known Risk Of Infringement (*Read* Factors One and Six)**

18        Kite's longstanding copying of Plaintiffs' technology and awareness of the risk

19   of infringement support enhancement in this case.  To begin, Kite has long been aware

20   that its scientific collaborators copied the claimed "backbone" of Dr. Sadelain's

21   CAR—*i.e.*, the CD28 costimulatory region and CD3ζ chain, which are "key for [the]

22   potency and safety" of the therapy in question, Ex. 3 (PX13 at 1 (internal Kite email)),

23   and which form the essence of Dr. Sadelain's invention as reflected in the claims of

24   the '190 Patent.  In uncontroverted testimony, Dr. Sadelain explained how, in 2007,

25   Dr. Rosenberg, an NCI scientist, reached out to him for information about his

26   research.  Dr. Rosenberg was "very insisting" about "either obtaining the CAR" that

27   Dr. Sadelain intended to use in clinical trials, or "knowing exactly how

28   [Dr. Sadelain's team] had constructed it."   Tr. 251:10-253:15.   In response,

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

1    Dr. Sadelain pointed Dr. Rosenberg to a paper from Dr. Sadelain's lab that disclosed
2    the "backbone," as well as to a paper from another lab that disclosed a publicly
3    available CD19 scFv.  Tr. 253:16-255:10.  When, two years later, Dr. Rosenberg
4    published a paper describing his CD19 CAR, he cited the paper by Dr. Sadelain's lab
5    to which Dr. Sadelain had directed him.  Tr. 255:15-256:24, 257:4-13; *see* Ex. 4
6    (PX39 at 2 & n.41).  Then, in 2010, when Dr. Rosenberg published a case report about
7    using the CAR in a patient, the portion of CD28 he described with reference to a Gen
8    Bank sequence corresponded to amino acids 114-220—the exact portion shared by
9    Dr. Sadelain in 2007, and disclosed in the '190 Patent.  Tr. 259:16-262:21; Ex. 5
10   (PX718 at 1 (article)); *see* Ex. 6 (PX1185 (Gen Bank sequence)).

11       Extensive evidence demonstrated that Kite understood the links between
12   Dr. Sadelain's work and Dr. Rosenberg's, well ahead of choosing to commercialize
13   Yescarta®.  Shortly after Kite entered into a cooperative research and development
14   agreement ("CRADA") with NCI in 2012 regarding Dr. Rosenberg's CAR, *see* Ex. 7
15   (PX648 at 21, 23); Tr. 515:4-9, 517:12-18, Dr. Antoni Ribas, a member of Kite's
16   scientific advisory board, sent an email to Dr. Belldegrun and others at Kite, reporting
17   that he had "chatted with Michel Sadelain about Kite and his CD19 patents" and
18   learned that Dr. Sadelain had "sent his CD19 CAR backbone to Steve Rosenberg *who*
19   *seems to have used the CD28-CD3zeta signaling part* and changed the antibody
20   binding parts."  Ex. 8 (PX140 at 2-3 (emphasis added)); *see* Tr. 551:20-553:3.  "[Y]ou
21   can see how creative [Dr. Sadelain] has been in the CAR field," Dr. Ribas continued,
22   "and how valuable is his research for our plans."  Ex. 8 (PX140 at 3); *see* Tr. 553:14-
23   19.  At trial, Dr. Belldegrun admitted he agreed with Dr. Ribas that "Dr. Sadelain's
24   work was very valuable for Kite Pharma's plans."  Tr. 553:20-22.

25       Kite and its principals were not merely aware that Dr. Rosenberg openly
26   credited Dr. Sadelain with being instrumental in developing the CAR that was the
27   subject of the 2012 CRADA; rather, Kite bemoaned it internally for the potential
28   negative consequences to its business.  When the *New York Times* ran a front-page

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-10-

story about Dr. Rosenberg and his work in which Dr. Rosenberg acknowledged the role Dr. Sadelain's foundational research played, Kite was irritated. Dr. Ribas complained,"[i]t is a pity that [Dr. Rosenberg] goes on record at the NYT that the NCI CD19 CAR 'owes a lot' to Michel Sadelain," and Dr. Belldegrun emphatically concurred: "We agree and discussed it internally!![ ]it has also implications for other aspect[s of the] business." Ex. 9 (PX28 at 1).

Kite was also aware, no later than 2013, that Sloan Kettering was conducting CD19 trials using Dr. Sadelain's backbone—the same one Dr. Rosenberg had copied. In March of that year, Dr. Bot, Kite's Chief Scientific Officer, sent an email to Dr. Belldegrun and others at Kite summarizing an "[i]mportant paper just published by [Memorial Sloan Kettering Cancer Center] with CD19-CAR." Ex. 3 (PX13 at 2). Dr. Bot noted that "[t]heir construct has also CD28-CD3zeta signaling domains." *Id.* Dr. Belldegrun responded to Dr. Bot only, asking "[w]hat is the difference between Rosenberg and MSK construct?? Anything significant??" *Id.* Dr. Bot replied that the two constructs used the "[s]ame signaling domains, which is key for potency and safety," that the constructs were "[v]ery similar," and that, while they used "[d]ifferent antibodies," "both are good." *Id.* at 1. *See generally* Tr. 525:19-530:7.

It is hardly surprising that, in possession of the above information, Kite repeatedly attempted to license the '190 Patent in 2013. Dr. Yashodhara Dash—who works in Sloan Kettering's Office of Technology Development and served as the lead licensing negotiator for the '190 Patent—testified that "a number of people from Kite contacted us" about licensing the '190 Patent, beginning in the spring of 2013 (right around the time of Dr. Bot's email, and before the CoC issued). Tr. 349:17-19, 355:8-19; Ex. 3 (PX13 at 1); Ex. 10 (PX14 at 2). Dr. Dash explained that the contacts from Kite included first "a member of their scientific advisory board," "then an investor in Kite, and then the founder of Kite, Dr. Arie Belldegrun." Tr. 355:8-14.

Several months later, in September 2013 (*after* the CoC issued), Dr. Belldegrun again reached out to Dr. Dash and "was quite persistent in wanting to set up a meeting

about the Sadelain patent." Tr. 356:25-358:12; *see* Ex. 11 (PX773 at 1).  Although Dr. Dash had told Dr. Belldegrun that she could not meet on a particular day and that there were no conference rooms available, he showed up anyway, pulling a chair up next to Dr. Dash in her cubicle.  Tr. 358:10-23.  At this memorable meeting, Dr. Dash and Dr. Belldegrun discussed Kite's interest in licensing the '190 Patent.  Tr. 358:24-359:17.  As Dr. Dash recounted, Dr. Belldegrun told her at that meeting that "Kite, his company, needed a license to the Sadelain patent," and argued (unsuccessfully) that Sloan Kettering needed a license to a separate patent to which Kite held an exclusive license.  Tr. 359:2-9.  Dr. Belldegrun even asked for (but did not secure) a confidentiality agreement so that licensing discussions could continue.  Tr. 360:1-6.  In fact, Dr. Belldegrun "contacted [the licensing office] many times after that" because "[h]e wanted to get this confidentiality agreement in place."  Tr. 361:6-10.

By October, Dr. Belldegrun's licensing efforts had progressed to contacting Dr. Dash's supervisor in Sloan Kettering's licensing office, Dr. Greg Raskin, beginning with an introductory email from one of Kite's investors that referenced Kite's "interest[] in collaborating/licensing from MSK some of your related programs."  Ex. 12 (PX782 at 3); Tr. 361:11-363:5.  Dr. Belldegrun and Dr. Raskin did eventually meet in person in November 2013.  Tr. 364:5-19.[4]  Although Kite never obtained a license to the '190 Patent, it proceeded with Yescarta®.

Kite further demonstrated its awareness that commercializing Yescarta® would risk infringement when, with its Yescarta® clinical trials ongoing in 2015, Tr. 640:7-11 (Bot), Kite petitioned the United States Patent Office to institute an IPR of the '190 Patent with the goal of invalidating it on obviousness grounds.  Tr. 613:16-614:11

---

[4] As discussed in greater detail below, Dr. Belldegrun's testimony that he was not seeking a license on behalf of Kite was patently false.  He was contradicted not only by Dr. Dash and the email introduction to Dr. Raskin, but also by Kite's then-CEO, Dr. Aya Jakobovits, Tr. 1232:18-21, 1245:19-1246:3.  And, as the Court will recall, Kite itself represented in its damages contentions that it sought a license to the '190 Patent.  *See* Dkt. No. 523-3 at 7, 32.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-12-

(Belldegrun); *see* Ex. 13 (PX2 at 779-809).  Dr. Belldegrun admitted that "Kite filed the IPR petition completely unprovoked by anyone from Sloan Kettering or Juno." Tr. 615:2-4.  Nonetheless, after the Patent Office initiated Kite's requested IPR in 2016, Dr. Belldegrun touted the IPR to Kite's board of directors as one the company's three "highlights" of the year.  Tr. 618:12-619:4; Ex. 14 (PX1013 at 4).  Kite has never offered an explanation as to why this development would have been so important unless it believed itself at serious risk of infringing the '190 Patent.

In fact, during the course of the IPR proceeding, Dr. Belldegrun was directly confronted with evidence that commercialization of Yescarta® would constitute infringement.  Plaintiffs' IPR expert, Dr. Thomas Brocker, submitted a declaration from which Kite learned in no uncertain terms that Plaintiffs believed Dr. Rosenberg had copied from Dr. Sadelain's CAR the backbone Kite would use in Yescarta®.  *See* Ex. 15 (PX26 at 137, 141, 149); Tr. 621:2-623:8.  When, in December 2016, the Patent Office rejected Kite's IPR arguments in a Final Written Decision, Ex. 14 (PX2 at 779-809), which the Federal Circuit summarily affirmed, Kite did not change course.  Instead, it proceeded with its plans to commercialize Yescarta®, knowing that such commercialization would infringe the '190 Patent.[5]

Kite's longstanding (since at least 2012), knowing copying of Plaintiffs' technology supports enhancement under *Read* factors one (copying) and six (length of misconduct).  *See Read*, 970 F.2d at 827.  Indeed, because the first *Read* factor is satisfied even by evidence of "recklessness towards copying," *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 112 (E.D. Tex. 2017), the direct and uncontroverted evidence of copying in this case—and the jury's finding of intentional, willful infringement—compels enhancement all the more.

---

[5] The fact that Dr. Belldegrun was not "surprised by the [P]atent [O]ffice's decision upholding the patentability of all claims of the [']190 Patent," Ex. 16 (Belldegrun Dep. 142:10-13), is yet further evidence that Kite was keenly aware of its risk of infringement liability.

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-13-

**B.**   **Kite Lacked Any Good-Faith Belief Of Non-Infringement Or Invalidity, And Took No Meaningful Remedial Action (*Read* Factors Two And Seven)**

Kite presented *no* evidence of any good-faith belief of non-infringement or invalidity to the jury (and it asserted privilege to shield its counsel's pre-litigation evaluations from both the Court and Plaintiffs).  Indeed, the record contains no evidence that, when infringement began in October 2017, anyone at Kite held a good-faith belief either that Yescarta® did not infringe the '190 Patent, or that the '190 Patent was invalid.  To the contrary, the record contains copious evidence that Kite knew it risked infringement, yet it proceeded nonetheless.

Kite's lack of good-faith effort to avoid infringement starts with how it obtained its infringing CAR construct in the first place.  Despite repeated, direct indications that Dr. Rosenberg had copied the claimed backbone of Dr. Sadelain's CAR, Dr. Belldegrun and everyone else at Kite refrained from raising the issue with Dr. Rosenberg or anyone in his lab.  *E.g.*, Tr. 553:4-13 (Dr. Belldegrun not asking after Dr. Ribas reported on his conversation with Dr. Sadelain); Tr. 681:5-683:13 (Dr. Bot not asking at any point, including after seeing Dr. Ribas's email).  Kite's avoidance of this issue with NCI is especially stark given the close working relationships between Kite employees and Dr. Rosenberg and his colleagues.  For example, Dr. Belldegrun views Dr. Rosenberg as a mentor and has kept in close touch with him since studying under him at NCI in the 1980s.  Tr. 549:25-551:9.  And Dr. Bot admitted to having hundreds of conversations with Dr. Rosenberg and his colleagues, Tr. 679:6-16, and Dr. Bot and Dr. Rosenberg were even named as co-inventors on a patent filed during this timeframe, Ex. 17 (DX239c at 1).  Moreover, despite ample evidence of copying, Dr. Belldegrun admitted he never asked Dr. Rosenberg to change his construct to avoid infringement.  *See* Tr. 520:2-16.

Kite barreled ahead.  By the time infringement began in October 2017, Kite had even more reason to proceed with caution, yet it did not.  By then, the Patent Office had issued a Final Written Decision rejecting Kite's IPR obviousness arguments.  Ex.

13 (PX2 at 779-809).  And Kite conceded in this case that Yescarta® literally infringes the '190 Patent, subject to its CoC invalidity defense.  Dkt. No. 223.

In short, notwithstanding its counsel's bald assertion in opening statement that Kite had a good-faith belief in its infringement defenses, Tr. 202:15-16, Kite presented no such evidence.  Kite submitted no testimony or documentary evidence suggesting anyone at Kite had a good-faith belief that the CoC was invalid, or that the '190 Patent claims were invalid under Section 112 (Kite's other invalidity defense at trial)—let alone any testimony suggesting that any Kite decision-maker relied on such a belief in beginning or continuing the infringing activity.

The Supreme Court has held that defenses of this sort, contrived after the fact for litigation purposes and without any evidence that the infringer itself held the view in good faith when infringement began, are irrelevant to enhancement:  "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement is objectively reckless."  *Halo*, 136 S. Ct. at 1933.  That is because "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct," and a contrary rule would improperly permit "someone who plunders a patent— infringing it without any reason to suppose his conduct is arguably defensible" to "escape any comeuppance under § 284 solely on the strength of his attorney's ingenuity."  *Id.*  The focus is therefore on whether the defendant had a good-faith belief of non-infringement or invalidity at the time of first infringement, and whether, facing likely infringement, the defendant took any meaningful remedial action.  Here, Kite had no good-faith belief, and took no meaningful remedial action, and thus *Read* factors two and seven support enhancement.

## C. Kite's Motivation To Harm Juno Supports Enhancement (*Read* Factor Eight)

Kite's goal of obtaining a competitive advantage specifically at Juno's expense—a goal it could achieve only through infringement—further favors

enhancement.  Kite and Juno are longstanding competitors.  *See, e.g.*, Ex. 18 (PX16 at 1 (internal Kite email from 2014 observing that "the competition is heating up" and that Kite and Juno "are now being grouped, compared, and evaluated side by side")). Both companies had long attempted to be first to market, or, at the least, to make it to market before the other.  Internal Kite documents confirm that Kite saw this first mover advantage as sizable and persistent.  *Id.* at 1 (internal Kite email from Dr. Belldegrun stating that "being first is the name of the game for us!!!!"); Ex. 19 (PX29 at 7 (Kite document reporting that the "first mover advantage is expected to be 5-10 percentage points after 10 years")); *see also* Ex. 20 (PX240 at 11-12 (Gilead executive stating on a post-acquisition earnings call "I do think first mover is very important with this area")).  Indeed, an internal Gilead document answering the question "Why Kite instead of Juno?" listed as the first bullet point Kite's putative "**First mover** advantage."  Ex. 21 (PX78 at 5 (emphasis in original)).

The nature of a first-mover advantage makes this form of Kite's competition with Juno zero-sum.  As Dr. Ryan Sullivan, Plaintiffs' damages expert, explained at trial, "[e]vidence demonstrates and even economics and basic common sense that when Kite has the first-mover advantage and they receive those benefits, there is a reciprocal harm to Juno from being second or being behind Kite and further behind." Tr. 776:9-13.  Kite's motivation to get to market first, ahead of Juno, thus supports enhancement.  After all, where, as here, the parties are "direct competitors in a relatively small market," "infringement by a direct competitor . . . militates in favor of enhanced damages."  *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, No. 07-cv-8108, 2018 WL 6190604, at *32 (C.D. Cal. Nov. 4, 2018).

### D.    The Case Was Not Close (*Read* Factor Five)

The nine-member jury in this case returned a unanimous verdict accepting all of Plaintiffs' arguments and rejecting all of Kite's.  In particular, it rejected Kite's CoC and Section 112 invalidity defenses.  Kite stipulated to literal infringement of all asserted claims as corrected by the presumptively valid CoC.  Dkt. No. 223.  The jury

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-16-

rejected Kite's arguments for non-willfulness and affirmatively found Kite's
infringement willful.  And it found Dr. Sullivan's damages calculation credible and
convincing, rejecting that of Kite's damages expert, Dr. Mohan Rao.  Plaintiffs'
decisive victory—supported by credible, straight-shooting witnesses and the great
weight of evidence—demonstrates that this case was not close.  *Cf. Whirlpool Corp.
v. TST Water, LLC*, No. 15-cv-1528, 2018 WL 1536874, at *7 (E.D. Tex. Mar. 29,
2018) (a finding for plaintiffs on liability and an award of 90% of the requested
damages showed case was not close).

## E.   Kite's Litigation Misconduct Supports Enhancement (*Read* Factor Three)

Kite's conduct during litigation—and especially during and immediately
before trial—was exceptional and egregious.  Kite elicited false, misleading, and often
incredible testimony, concealed important information, and unreasonably and
vexatiously multiplied the proceedings.

To begin, Kite knowingly elicited false trial testimony from Dr. Belldegrun that
Kite had no interest in licensing the '190 Patent, but instead was interested only in
running clinical trials at Sloan Kettering.  *E.g.*, Tr. 559:12-561:1.  Dr. Belldegrun's
implausible testimony was not credible to anyone who witnessed it first-hand, and it
directly conflicted with (1) testimony from Dr. Dash that Dr. Belldegrun specifically
sought a license to the '190 Patent, and did *not* ask her about clinical trials when he
sought her out for a meeting in her cubicle in 2013, *e.g.*, Tr. 349:17-19, 355:8-19,
361:3-5; (2) the specific mention of licensing in the email from a Kite investor
introducing Dr. Belldegrun to Dr. Raskin, Ex. 12 (PX782 at 3); (3) the fact that Kite
did not begin its own clinical trials until long after Dr. Belldegrun met with Dr. Dash
and Dr. Raskin in 2013, *see* Tr. 640:7-11 (Dr. Bot testifying that Kite's clinical trials
began in late 2014 or early 2015); and (4) testimony from Dr. Jakobovits, who, after
meeting with counsel for Kite/Gilead to prepare for her trial testimony, initially
responded evasively when asked about licensing, Tr. 12210-13, 1232:8-1233:13,

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-17-

1239:8-1241:16, but then eventually had to admit that she remembered learning that the meeting in question had in fact concerned licensing, after her recollection was refreshed by the damages contentions Kite's counsel filed early in this case. Those contentions expressly admitted: "[T]he parties here engaged in preliminary licensing discussions as early as 2013," and "Kite sought out a collaborative relationship with MSKCC, *including a potential license* to its intellectual property." Dkt. No. 523-3 at 7, 32 (emphasis added); Tr. 1245:19-1246:3. Indeed, it was facially preposterous for Kite to elicit from Dr. Belldegrun his insistence that his repeated contacts with Dr. Dash and Dr. Raskin, who worked in Sloan Kettering's *technology licensing* office, were solely to discuss access to *patients* for clinical trials—a subject not even within their area of responsibility. *See* Tr. 344:18-346:20.

Dr. Belldegrun also implausibly denied that he had any concern about the '190 Patent before this lawsuit. Tr. 517:19-21. That claim flies in the face of Kite's behavior, including its attempts to license and invalidate the patent. It also conflicts with Dr. Belldegrun's description of the institution of the IPR as one of the top three highlights of Kite's year (even though Dr. Belldegrun purportedly couldn't recall whether he had so described the IPR, even when confronted with the document in which he had done just that, Tr. 617:10-12, 618:21-23; Ex. 14 (PX1013)). Similarly, Dr. Belldegrun implausibly denied that "Kite wanted to beat Juno in the race to clinical approval" in order to obtain first-mover advantage. Tr. 503:14-16.[6]

Kite's misconduct with respect to Dr. Thomas Schuetz was also egregious. As the Court is aware, Kite obscured its intent to call Dr. Schuetz, leading to the need to depose him the Sunday morning before trial. *See generally* Dkt. No. 445-4 (11/26/19 Tr. 56:6-60:16). Despite claiming to be an "independent third party" witness,

---

[6] Dr. Belldegrun's dishonesty also encompassed other matters. For example, he also contradicted his own sworn deposition testimony numerous times. *See* Tr. 512:15-513:9 (whether he acted as the sole negotiator of Kite's sale to Gilead); Tr. 550:19-551:9 (the closeness of his relationship with Dr. Rosenberg).

Dr. Schuetz had substantial ties to Kite and Gilead, including that his company had been seeking a strategic partnership with Gilead for "many years" (and may again seek one); that he had a consulting agreement with Kite's counsel, paid for by Kite or Gilead; that Kite's counsel represented him in this case, again paid for by Kite or Gilead; and that he had met with Kite's counsel several times to discuss the '190 Patent. Tr. 843:10-844:1, 864:10-24, 865:17-24, 866:4-867:25; Ex. 22 (Schuetz Dep. 13:8-22, 15:14-19). Indeed, at his deposition, Kite's counsel instructed Dr. Schuetz not to answer several questions on grounds of attorney-client privilege, including one question asking why he, as an "independent third party" witness, required representation by counsel to one of the parties. Ex. 22 (Schuetz Dep. 17:22-22:16).

At trial, Dr. Schuetz remained undeterred and continued to claim "independent third party" status, insisting that he was providing his own neutral review of the patent from 2013. Tr. 863:3-5. Even after that charade collapsed and Dr. Schuetz was forced to admit, in front of the jury, that he had retained Kite's counsel, *see* Tr. 865:5-24, Kite's counsel persisted in arguing in closing that Dr. Schuetz was the witness "with the most credibility" because "[h]e has no dog in this fight." Tr. 1457:13-16.

Kite also elicited highly misleading trial testimony from Dr. Schuetz regarding his interactions with Plaintiffs' counsel earlier in the case. In Dr. Schuetz's telling on direct examination, Plaintiffs' counsel "asked me to sign an affidavit where I would attest that I had not reviewed the prosecution history of this patent, and I told them that I could not do that because that wasn't true." Tr. 862:10-20. This misleading portrayal improperly implied Plaintiffs' counsel had presented Dr. Schuetz with an affidavit they knew was false and pressured him to sign it. Indeed, Kite's counsel later emphasized this implication of wrongdoing by asking Dr. Schuetz, if "any lawyers for *Kite* ask[ed him] to sign an affidavit stating something that wasn't true." Tr. 888:10-12 (emphasis added). But in fact, there was no proposed affidavit given to Dr. Schuetz by Plaintiffs' counsel. As Dr. Schuetz was forced to admit on cross-examination, he was "never sent, never given any piece of paper that [he was] asked

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-19-

to sign by any Juno lawyer." Tr. 890:11-20.  Despite this admission, Kite's counsel returned to this point in closing argument, again misleadingly implying that Plaintiffs' counsel had "ask[ed Dr. Schuetz] to sign a false declaration." Tr. 1456:2-3.

Kite's litigation misconduct extended even more broadly.  Throughout the two-week trial in this case, Kite engaged in actions that forced Plaintiffs and the Court to expend time and resources addressing repetitive requests for relief and arguments from Kite that were unjustified.  For example, Kite repetitively sought relief on issues—such as evidentiary questions relating to Dr. Bot's homology analysis—without even attempting to meet the stringent reconsideration standard, requiring Plaintiffs and the Court to expend significant and unnecessary time during the critical trial period.  *See, e.g.*, Tr. 1105:5-1108:8 (Court rejecting one of Kite's serial unsuccessful attempts to put Dr. Bot's homology analysis before the jury); *see also, e.g.*, Dkt. No. 524 at 2-4 (explaining how Kite's request to introduce dicta from the Court's claim construction order, *see* Dkt. No. 512-1, was inconsistent with multiple prior rulings, but never mentioned—let alone met—the standard for reconsideration).

Kite's repeated filings regarding Plaintiffs' damages case provide another example.  *See* Dkt. No. 489 at 1 (Kite's motion for relief from what it inaccurately termed an "end run around the Court's damages related *Daubert* Order" (capitalization altered)); Dkt. No. 498 (Kite's motion to somehow exclude fact testimony relevant to damages under the Court's *Daubert* Order); Dkt. No. 500 at 2 (Kite's motion to exclude a demonstrative exhibit on the bizarre ground that the Court's *Daubert* Order precluded any testimony that a reasonable royalty would take the form of an upfront payment plus a running royalty, even though Kite's own damages expert offered this same royalty structure).  Even after Plaintiffs disclosed a revised upfront damages figure in accord with the Court's *Daubert* Order, *see* Dkt. No. 501 at 3, Kite (incorrectly) objected, insisting that the figure contradicted the Court's *Daubert* ruling.  *See* Tr. 749:6-753:19.  The Court overruled the objection, specifically stating that "Dr. Sullivan may testify as to those numbers." Tr. 755:12-

15.  After Dr. Sullivan did so, Kite followed up with yet another motion—this time seeking to strike Dr. Sullivan's testimony and admit Kite's rebuttal evidence.  *See* Dkt. No. 527.  The Court denied that motion, too.  Tr. 1112:25-1115:4.

As yet another example, Kite affirmatively misused its strategic choices regarding the good-faith defense that can be available to accused willful infringers but was not available to Kite here.  This began at the start of trial, when Kite represented to the jury during its opening statement that "Kite has very, very good reasons for believing that it does not infringe these claims," Tr. 202:15-176, even though Kite knew at the time that it had no evidence to prove this.  Since early in this case, Kite has claimed privilege over all advice of counsel relating to the infringement allegations in this case, *see* Dkt. No. 284-1 at 3-4, and chose not to waive or rely on that attorney advice.  And, Kite was well aware that  it had no non-attorney evidence to offer at trial to support its "very, very good reasons" assertion.  For instance, it had no evidence it could offer of any Kite scientist evaluating whether Kite's CAR might infringe the '190 Patent as corrected.  And then, at the end of trial, when Plaintiffs pointed out in closing argument that Kite had not followed through with its promise, Kite attempted to cast itself as somehow prejudiced, improperly using its attorney-client privilege as a sword, and accused *Plaintiffs* of wrongdoing.  *See* Dkt. No. 574 (Kite's request for a curative instruction); Dkt. No. 584 at 2 (Court's denial).

To top it off, Kite attempted to take advantage of the Court staff's inadvertent transmission of the wrong verdict form to Kite's counsel the night before closing arguments (in response to Kite's counsel's email request).  That version included certain language requested by Kite regarding the damages question that, the record clearly reflects, the parties had extensively discussed and that the Court had rejected. *See, e.g.*, Tr. 1312:3-1314:9, 1321:13-1322:11.  Nonetheless, in its closing argument, Kite used that erroneous form, even depicting it in its prepared slide presentation, and then presented a motion for mistrial based on supposed jury confusion engendered by its *own* duplicitous conduct.  *See* Tr. 1540:1-1542:10, 1542:22-1544:5.

1    Kite's litigation conduct—and in particular in the lead-up to and at trial—is
2    precisely the type of behavior courts have relied on in enhancing damages.   The
3    enhancement in *Fractus, S.A. v. Samsung Electronics Co.*, 876 F. Supp. 2d 802 (N.D.
4    Tex. 2012), is particularly instructive with respect to Kite's handling of
5    Drs. Belldegrun and Schuetz.   There, as here, the defendant's unreasonable behavior
6    with respect to two witnesses favored enhancement.   *See id.* at 839-41, 848-51.

7    In *Fractus*, just as Kite did with Dr. Schuetz here, the defendant tardily
8    indicated an intent to call a witness previously listed only on its "may call" list,
9    necessitating the scheduling of a last-minute deposition. *Id.* at 839-40.   The defendant
10   then disclosed documents indicating that it had previously retained this putative fact
11   witness as a consulting expert.   Although the deposition was eventually canceled, and
12   the witness did not testify at trial, the court concluded that the defendant had
13   "misrepresented its relationship" with this witness, and that the defendant's "handling
14   of" this witness counseled significantly in favor of enhancement.   *Id.* at 849, 851.
15   Kite's behavior here was even worse, because Kite portrayed Dr. Schuetz at trial as
16   "independent," even though he was not, and perpetuated the misrepresentation that
17   Plaintiffs' counsel had presented a false affidavit to Dr. Schuetz.

18   Another defense witness in *Fractus* "was fast and loose with his testimony,"
19   further warranting enhancement.   876 F. Supp. 2d at 850.   "Fast and loose" would be
20   an overly generous—even euphemistic—characterization of the false testimony Kite
21   elicited from Dr. Belldegrun that he met with Dr. Dash regarding only access to
22   patients, and from Dr. Schuetz regarding his communications with Plaintiffs' counsel.
23   *See also Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs Co.*, 203 F. Supp.
24   3d 755, 764 (E.D. Tex. 2016) (defendants' "multiple material misrepresentations
25   under oath" supported enhancement).

26   Kite's actions in unreasonably and vexatiously multiplying the proceedings
27   provide additional support for Plaintiffs' requested enhancement.   For example, in
28   *Liqwd, Inc. v. L'Oréal USA, Inc.*, No. 17-cv-14, 2019 WL 6840353, at *6 (D. Del.

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

Dec. 16, 2019), the court found that this *Read* factor favored plaintiff where "[t]he briefs and filings filed by the defendants were often excessive and duplicative."  The court in *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, No. 06-cv-2182, 2012 WL 12507656, at *8 (D. Ariz. July 23, 2012), found similarly where the defendant "presented the same arguments many times, requiring duplicative effort by opposing counsel and the Court" and "also presented far-fetched arguments with seemingly no support in the evidence."  *See also Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 752 (N.D. Ohio 2010) ("Defendants pursued a course of conduct that had the effect of unduly burdening the Court with unnecessary matters and prolonging the litigation.").

In sum, Kite's misconduct throughout the course of this litigation—a factor the jury could not have considered in its willfulness determination—provides additional reason to impose a substantial enhancement sanction upon Kite.

### F.    Kite/Gilead's Financial Size And Condition Favor Enhancement (*Read* Factor Four)

Kite/Gilead's large size and financial standing also support the requested enhancement.   Gilead purchased Kite, now a wholly owned subsidiary, for approximately $12 billion shortly before Yescarta® went on the market.  *See* Ex. 23 (November 7, 2017 Gilead Form 10-Q at 25).  In such circumstances, it is Gilead's overall financial condition, not Kite's, and not any Yescarta®-specific consideration, that is relevant. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 09-cv-5235, 2017 WL 130236, at *1 n.2, *4 (N.D. Cal. Jan. 13, 2017) (financial condition of larger acquiring company "weighs in favor of a higher amount" of enhanced damages); *Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*, No. 07-cv-894, 2012 WL 12845892, at *2 (S.D. Cal. Aug. 26, 2012) ("this factor weighs in favor of an award of enhanced damages" based on size of large acquiring company even though the acquisition did not occur until "nearly three years into the litigation").

There is no question that Gilead, which directed this litigation, has substantial

financial resources warranting—indeed, necessitating—a meaningful enhancement. Gilead's total assets are nearly $60 billion, including $9 billion in "[c]ash and cash equivalents."  Ex. 24 (November 5, 2019 Gilead Form 10-Q at 2).  Its market capitalization is over $79 billion.  And its total revenues in the third quarter of 2019 alone were over $5.6 billion.  *Id.* at 3.  Where, as here, the infringer has substantial financial resources and is in no danger of having its operations impaired by an award of enhanced damages, the amount of enhancement should be sufficiently meaningful to send a message that sharp practices will not be countenanced.  This *Read* factor accordingly supports enhancement.  *Cf. Integrated Tech. Corp*, 2012 WL 12507656, at *8 (infringer's "well over one hundred million dollars in cash . . . weighs in favor of enhanced damages"); *Johns Hopkins Univ. v. Cellpro*, 978 F. Supp. 184, 195 (D. Del. 1997) ("Punishing a larger company in a stronger financial condition may call for higher damages, where a lower number may be equally effective in punishing a smaller company.").

### G. Kite/Gilead Tried To Conceal Its Misconduct (*Read* Factor Nine)

Finally, Kite's attempts to conceal its wrongful conduct further support enhancement.  First, Dr. Belldegrun's false and misleading testimony on licensing and other matters attempted to conceal the willfulness of Kite's infringement.  Moreover, Kite's "internal[]" discussions of disappointment in Dr. Rosenberg's public statements that NCI's CD19 research "owes a lot to" Dr. Sadelain, *see* Ex. 9 (PX28 at 1), reflect that Kite wanted to claim independent development, contrary to the true facts.  These attempts have not ceased even with the jury's unanimous verdict of willful infringement and rejection of all of Kite's defenses.  If anything, Kite and Gilead are unrepentant:  Almost immediately after the verdict, Kite/Gilead asserted to numerous press outlets that "Kite independently developed Yescarta." *E.g.*, Ex. 25 (article containing statement).  As the record of unmitigated copying of Dr. Sadelain's work demonstrates, Kite/Gilead knows otherwise.

* * *

For all of these reasons, including Kite's egregious, willful infringement and the fact that all nine *Read* factors support a sizable punitive enhancement of damages, the Court should award enhanced, punitive damages equal to the jury's compensatory award.  Cases in which courts have awarded the same or even greater enhancement to punish less egregious conduct demonstrate the reasonable nature of Plaintiffs' request.  In *Arctic Cat Inc. v. Bombardier Recreational Products, Inc.*, the court awarded the full punitive trebling of damages permitted by the Patent Act.  198 F. Supp. 3d 1343 (S.D. Fla. 2016), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017).  There, the Court focused particularly on the defendant's knowledge of the patent at issue, its surreptitious efforts to license it through a third party, and its "disingenuous at best" attempts to claim a good-faith belief in non-infringement or invalidity.  *Id.* at 1348-51.  Similarly, here, Kite had undisputed knowledge of the '190 Patent; Dr. Belldegrun tried to license it, then lied at trial about trying to do so; and Kite's counsel stated in opening—unsupported by any later evidence—that it had "very good reasons" to believe in its non-infringement defense.  Indeed, the circumstances here present an even stronger case for enhancement than *Arctic Cat*, where the Federal Circuit affirmed the district court's award of treble damages.  *See* 876 F.3d 1350, 1371-72.  While Kite's litigation misconduct in this case was extensive and egregious, the court in *Arctic Cat* trebled damages despite its conclusion that the Plaintiffs' claims of litigation misconduct were "far-fetched."  *Arctic Cat*, 198 F. Supp. 3d at 1351; *see also id.* at 1353 (eighth *Read* factor did "not weigh significantly in either direction" in *Arctic Cat*) *cf. Innovention Toys LLC v. MGA Entm't*, No. 07-cv-6510, 2017 WL 3206687, at *2-4 (E.D. La. Mar. 8, 2017) (trebling damages even though the ninth *Read* factor did not support enhancement).

Similarly supportive of Plaintiffs' request is *Saint-Gobain Autover USA, Inc. v. Xinyi Glass North America, Inc.*, 707 F. Supp. 2d 737 (N.D. Ohio 2010), in which the court imposed a punitive enhancement in the same amount as the damages verdict. The court relied primarily on "[t]he deliberate nature of [the defendants'] copying

actions, with the obvious intent to undermine [the plaintiffs'] position in the marketplace, coupled with [the defendants'] inadequate investigation." *Id.* at 755-756. Those same factors support enhancement here—Kite's copying was deliberate, it was motivated by an attempt to harm Juno by getting to market first, and Kite has presented no evidence that it relied on any investigation or good-faith belief in non-infringement or invalidity. Significantly, the *Saint-Gobain* court imposed a punitive enhancement in the same amount as the actual-damages award despite finding the *Read* factors "split between those that favor an increase and those that do not," *see id.* at 755; the *Read* factors here *all* support enhanced, punitive damages. *See also Stryker Corp. v. Zimmer, Inc.*, No. 10-cv-1223, 2017 WL 4286412, at *3-6 (W.D. Mich. July 12, 2017) (*trebling* damages even though "perhaps more egregious cases exist" because "the test is not whether this case is the worst possible that can be imagined," and because the defendant's "conduct was more egregious than most").

An award of enhanced damages that duplicates the jury's damages award, as requested by Plaintiffs, is necessary to punish and deter egregious conduct like Kite's. Shortly after acquiring Kite for $11.9 billion, Gilead identified Yescarta®—which was completely dependent on the copied technology—as being worth $6.2 billion based on its first FDA approval for a single indication. Ex. 26 (PX72 at 2). Indeed, Dr. Belldegrun—a single individual—*alone* made $660 million from the sale of Kite to Gilead, just weeks before Yescarta® went on the market. Tr. 511:3-6. Against that backdrop, Plaintiffs' request for enhanced, punitive damages in the amount of the jury's compensatory damages does no more than reflect the importance of the technology Kite plundered and the severity of its misconduct. Such a 1:1 ratio of actual to punitive awards is "not too low" for knowing, intentional misconduct of the sort Kite has been found to have engaged in. *See Exxon Shipping*, 554 U.S. at 511.

## IV. THE COURT SHOULD AWARD ONGOING ROYALTIES OF AT LEAST 33.1% TO ACCOUNT FOR CHANGED CIRCUMSTANCES

Kite's continued infringement in selling its Yescarta® therapy after the jury's

verdict also warrants relief in the form of an ongoing royalty rate of at least 33.1%—*i.e.*, approximately 20% more than the rate found by the jury for pre-verdict infringement—for ongoing sales of Yescarta® and any other therapy using the same infringing CAR.  This rate is justified by changed circumstances since the first hypothetical negotiation in October 2017 that favor Plaintiffs.

Ongoing royalties are needed to "prevent the violation of any right secured by patent" because Plaintiffs are not seeking an injunction against the ongoing infringement.  35 U.S.C. § 283; *see Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007) (recognizing judicial authority under Section 283 "to assess a reasonable royalty in light of the ongoing infringement").  "[T]he Federal Circuit has indicated that a prevailing patentee should receive compensation for any continuing infringement."  *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-cv-630, 2014 WL 6687122, at *9 (N.D. Cal. Nov. 25, 2014) (citing *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378-79 (Fed. Cir. 2010)).

"[W]hen calculating an ongoing royalty rate, the district court should consider the 'change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability.'"  *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018) (quoting *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008)).  Among other things, "there is a fundamental difference between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement" because "[w]hen patent claims are held to be not invalid and infringed, this amounts to a substantial shift in the bargaining position" in favor of the patent owner.  *XY, LLC*, 890 F.3d at 1297 (internal quotation marks omitted); *see EcoServices, LLC v. Certified Aviation Servs., LLC*, 340 F. Supp. 3d 1004, 1028 (C.D. Cal. 2018) (In determining an ongoing royalty, "the rate the jury adopted is significant as a starting point," but the court may not simply adopt the jury's rate "without considering the impact of changed circumstances.") (internal quotation marks omitted).  Whereas the initial hypothetical negotiation assumed only that the

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-27-

claims were valid and infringed, post-verdict infringement is necessarily willful. *Mondis Tech Ltd. v. Chimei Innolux Corp.*, 822 F. Supp. 2d 639, 651 (E.D. Tex. 2011) ("[A]bsent unusual circumstances, a defendant's continued infringement after it is an adjudicated infringer is willful—even before appeal."); *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 626 (E.D. Tex. 2009) (rebuking infringer for failing to take into account that "a new lawsuit by [the patent owner for continued infringement] would likely result in treble damages and could be considered an exceptional case").

It is thus unsurprising that courts most often award ongoing royalties at a rate above the rate determined by the jury. *See Telcordia Techs., Inc. v. Cisco Sys., Inc.*, No. 04-cv-876, 2014 WL 1457797, at *4 & n.8 (D. Del. Apr. 14, 2014) (collecting cases for the proposition that "courts frequently impose a post-verdict ongoing royalty rate that is higher than the reasonable royalty found at trial for past infringement"). Indeed, in one study of ongoing royalty awards between 2007 and 2015, the ongoing royalty rate was higher than the jury's rate in more than two thirds of the cases studied. J. Gregory Sidak, *Ongoing Royalties for Patent Infringement*, 24 Tex. Intell. Prop. L.J. 161, 175 (2016). In the remaining cases, the ongoing royalty rate was the same as the rate determined by the jury; in none did it decrease. *Id.*; *see also Arctic Cat Inc. v. Bombardier Recreational Prods, Inc.*, No. 14-cv-62369, 2017 WL 7732873, at *2 (S.D. Fla. Jan. 3, 2017) ("jury's reasonable rate for past damages sets the floor for the determination of an ongoing royalty rate"), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017). More recent cases show a similar pattern. *E.g.*, *Mass Engineered Design*, 2018 WL 6059375, at *3-6 (increasing ongoing royalty rate by 22% above the pre-verdict rate).

In this case, as in most, there is no reason for Kite to pay less for its ongoing infringement than the jury assessed for its past infringement, and substantial reason for it to pay more. In particular, Plaintiffs' requested increase in the ongoing royalty rate is amply justified by changed circumstances since the parties' initial hypothetical negotiation in October 2017. First, the jury's verdict itself renders Kite an adjudicated infringer and makes Kite's continued infringement all the more egregious. Kite's

indisputable exposure to punitive remedies for its ongoing willful infringement, including treble damages and attorneys' fees, thus warrants a higher rate going forward. *See Internet Machines v. Alienware Corp.*, No. 10-cv-23, 2013 WL 4056282, at \*20-21 (E.D. Tex. June 19, 2013) (increasing jury's royalty rate by 50% for ongoing royalties to account for willfulness of post-verdict infringement).

Second, economic circumstances have changed since the first hypothetical negotiation in October 2017. On December 18, 2019, Bristol-Myers Squibb ("BMS"), Juno's ultimate corporate parent, announced the submission of a biologics license application ("BLA") for JCAR017 for relapsed/refractory large B-cell non-Hodgkin lymphoma, including diffuse large B-cell lymphoma, *see* Ex. 27 (BMS Press Release), solidifying the intention and expectation of direct competition with Kite and Yescarta®, which is also approved for these indications. Moreover, on December 11, 2019, Gilead announced that Kite had submitted a BLA for a CAR-T therapy to treat relapsed/refractory mantle cell lymphoma ("MCL"). Ex. 28 (Gilead Press Release). This therapy, KTE-X19, uses the same construct that infringes the '190 Patent. *See* Ex. 29 (Wiezorek Dep. 26:21-27:6). BMS is testing JCAR017 for MCL indications, Ex. 30 (ClinicalTrials.gov Information), and would expect to compete with Kite/Gilead in this market as well. The further progress of JCAR017 and Kite's BLA application to treat MCL were not taken into consideration in the competition adjustments made by Dr. Sullivan with regard to compensation for pre-verdict infringement, *see* Ex. 2 (Sullivan Decl. ¶ 9), and support a higher ongoing rate than found by the jury.

Accordingly, Kite's continuing, post-verdict infringement and changed economic circumstances justify Plaintiffs' requested increase for the ongoing royalty rate. Precedent demonstrates the reasonable and conservative nature of Plaintiffs' request for a running royalty rate of at least 33.1%. In cases involving less compelling circumstances, courts have assessed substantially larger increases for ongoing infringement. *E.g.*, *Telcordia*, 2014 WL 1457797, at \*4 (increasing the jury's rate by

approximately 95% for ongoing infringement); *Syntrix Biosystems, Inc. v. Illumina, Inc.*, No. 10-cv-5870, 2013 WL 3089448, at *2 (W.D. Wash. June 18, 2013) (same, by 33%). Plaintiffs' request for a modest increase, to at least 33.1% for post-verdict sales of Yescarta® or other therapies using the same infringing construct through the '190 Patent's August 28, 2024 expiration date, is therefore proper.[7] At a minimum, an ongoing royalty at the 27.6% rate found by the jury is necessary.[8]

## CONCLUSION

The Court should (1) award Plaintiffs ███████ on the jury verdict for Kite's infringement from October 18, 2017 through December 12, 2019; (2) grant pre-judgment interest at the prime rate, compounded quarterly; (3) grant enhanced, punitive damages in the amount of the jury's damages award; and (4) grant ongoing royalties through the life of the '190 Patent at a rate of at least 33.1%. The Court should accordingly enter the attached proposed judgment.

---

[7] As set forth in Plaintiffs' proposed judgment, Plaintiffs respectfully suggest that the Court order Kite to regularly disclose to Plaintiffs its quarterly net revenues for Yescarta® and all other therapies using the '190 Patent, *e.g.*, by the second Monday following the end of each quarter, and wire Plaintiffs a corresponding royalty payment by that same date; Plaintiffs further request that the Court order the parties to submit proposed terms for inspection and reporting.

[8] Should the Court treat Kite's post-verdict/pre-judgment infringing sales as "supplemental damages" under Section 284, rather than, as this brief proposes, part of ongoing royalties awarded under Section 283, that alternate approach would increase the amount subject to enhancement and pre-judgment interest. *See Stryker*, 2017 WL 4286412, at *6 (enhancement applies to Section 284 damages, including supplemental damages); *Beatrice Foods Co*, 923 F.2d at 1580 (pre-judgment interest applies to compensatory portions of the award). Under that alternate approach, Kite would need to specify its revenues through the date of the judgment once judgment is entered. Accordingly, Plaintiffs respectfully request that, if that alternate approach is used, the Court order Kite to produce updated revenue figures through the date of judgment within seven days of the judgment, after which Plaintiffs would submit a revised proposed form of judgment.

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

-30-

1

2    Dated:  January 21, 2020              Respectfully submitted,

3                                          By:    /s/ *Andrea W. Jeffries*

4                                          Andrea W. Jeffries (SBN 183408)
                                           Luke J. Burton (SBN 301247)
5                                          JONES DAY
                                           555 South Flower Street, Fiftieth Floor
6                                          Los Angeles, CA 90071
                                           Telephone:  (213) 489-3939
7                                          Facsimile:   (213) 243-2539

8                                          Morgan Chu (SBN 70446)
                                           Alan J. Heinrich (SBN 212782)
                                           C. Maclain Wells (SBN 221609)
9                                          Elizabeth C. Tuan (SBN 295020)
                                           IRELL & MANELLA LLP
10                                         1800 Avenue of the Stars, Suite 900
                                           Los Angeles, California 90067-4276
11                                         Telephone:  (310) 277-1010
                                           Facsimile:   (310) 203-7199

12                                         Rebecca Carson (SBN 254105)
                                           Ingrid M. H. Petersen (SBN 313927)
13                                         IRELL & MANELLA LLP
                                           840 Newport Center Drive, Suite 400
14                                         Newport Beach, CA 92660
                                           Telephone:  (949) 760-0991
15                                         Facsimile:   (949) 760-5200

16                                         Christopher J. Harnett (*Pro Hac Vice*)
                                           Sarah A. Geers (*Pro Hac Vice*)
17                                         Kevin V. McCarthy (*Pro Hac Vice*)
                                           JONES DAY
18                                         250 Vesey Street
                                           New York, NY 10281-1047
19                                         Telephone:  (212) 326-3939
                                           Facsimile:   (212) 755-7306

20                                         Jennifer L. Swize (*Pro Hac Vice*)
                                           JONES DAY
21                                         51 Louisiana Avenue, N.W.
                                           Washington, DC 20001-2113
22                                         Telephone:  (202) 879-3939
                                           Facsimile:   (202) 626-1700

23                                         John M. Michalik (*Pro Hac Vice*)
                                           JONES DAY
24                                         77 West Wacker Drive, Suite 3500
                                           Chicago, IL 60601-1692
25                                         Telephone:  (312) 782-3939
                                           Facsimile:   (312) 782-8585

26                                         *Attorneys for Plaintiffs*
                                           *Juno Therapeutics, Inc., Memorial Sloan*
27                                         *Kettering Cancer Center, and Sloan Kettering*
                                           *Institute for Cancer Research*
28

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx

1

## CERTIFICATE OF SERVICE

2       A copy of the foregoing document was electronically filed with the Court this

3  21st day of January, 2020.  Notice of this filing will be sent by operation of the Court's

4  electronic filing system.  Parties may access this filing through the Court's system.

5                                      */s/ Andrea W. Jeffries*

6                                     Andrea W. Jeffries

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION
Case No. 2:17-cv-07639-SJO-KSx