JEFFREY I. WEINBERGER (State Bar No. 56214)
jeffrey.weinberger@mto.com
TED DANE (State Bar No. 143195)
ted.dane@mto.com
GARTH T. VINCENT (State Bar No. 146574)
garth.vincent@mto.com
BLANCA F. YOUNG (State Bar No. 217533)
blanca.young@mto.com
PETER E. GRATZINGER (State Bar No. 228764)
peter.gratzinger@mto.com
ADAM R. LAWTON (State Bar No. 252546)
adam.lawton@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

W. CHAD SHEAR (State Bar No. 230602)
shear@fr.com
GEOFFREY D. BIEGLER (State Bar No. 290040)
biegler@fr.com
MEGAN A. CHACON (State Bar No. 304912)
chacon@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Attorneys for Defendant-Counterclaimant
KITE PHARMA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JUNO THERAPEUTICS, INC., SLOAN KETTERING INSTITUTE FOR CANCER RESEARCH,<br><br>Plaintiffs,<br><br>vs.<br><br>KITE PHARMA, INC.,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:17-cv-7639-SJO-KS<br><br>**DEFENDANT KITE PHARMA, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B) AND/OR A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59**<br><br>Judge:  Hon. S. James Otero<br>Crtrm.:  10C |

1   To all parties and their respective counsel:

2   PLEASE TAKE NOTICE THAT, pursuant to Federal Rule of Civil Procedure

3   50(b), Defendant Kite Pharma, Inc. ("Kite") will and hereby does renew its motions

4   for judgment as a matter of law. In the alternative, Kite moves for a new trial on all

5   issues pursuant to Federal Rule of Civil Procedure 59.

6   Kite moves for judgment as a matter of law of no liability because:

7   • Each asserted claim of U.S. Patent No. 7,446,190 is invalid under 35
    U.S.C. § 112, ¶ 1, for lack of adequate written description;

8
9   • Each asserted claim of the '190 patent is invalid under 35 U.S.C. § 112,
    ¶ 1, for lack of enablement; and

10  • The certificate of correction to the '190 patent is invalid under 35 U.S.C.
    § 255, and, as a result, Kite does not infringe and has not infringed any
11  asserted claim.

12  Further, Kite moves for judgment as a matter of law on the issue of willfulness,

13  and for judgment as a matter of law regarding damages because the jury's award of a

14  $585 million upfront payment and 27.6% running royalty rate is not supported by

15  sufficient, legally permissible evidence. It is based on a flawed expert analysis that

16  failed properly to apportion for or value the incremental contributions of the '190

17  patent to YESCARTA®, and that was not supported by the evidence, including real-

18  world comparable license agreements.

19  Alternatively, Kite moves for a new trial because, among other reasons, the

20  verdict was against the clear weight of the evidence, the jury's award was excessive,

21  the jury was not properly instructed on the law applicable to the written description

22  requirement, and errors and Plaintiffs' misconduct tainted the verdict. The same

23  grounds supporting JMOL on damages also warrant a new trial. Furthermore, Kite's

24  receipt of the incorrect verdict form prior to closing arguments was unduly prejudicial.

25  And Plaintiffs' presentation of evidence and testimony resulted in an unfair trial for

26  Kite, including by prejudicially skewing upward the damages numbers presented to

27  the jury.

28

---

1    This Motion is based on this notice of motion and motion, the accompanying

2 Memorandum of Points and Authorities, and on all the records, documents, pleadings,

3 and papers on file or to be filed in this action, arguments of counsel, and any other

4 matters that may properly come before the Court for its consideration. This motion is

5 made following the conference pursuant to Local Rule 7-3, which took place on

6 January 14, 2020. Gratzinger Decl. ¶ 2.

7

8 DATED: January 21, 2020          MUNGER, TOLLES & OLSON LLP

9

10                                 By:    _____/s/ Ted Dane_____

11                                        Ted Dane
                                   Attorneys for Defendant-Counterclaimant
12                                 KITE PHARMA, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

Introduction ....................................................................................................... 1

Argument ........................................................................................................... 1

I.    Crediting All Disputed Facts in Plaintiffs' Favor, the Claims Lack Written Description as a Matter of Law ........................................................ 1

    A.    The '190 patent claims a broad, functionally-defined genus ................. 3

    B.    The patent's technological field was nascent and unpredictable ............ 3

    C.    In light of the claims' breadth and the field's nascence, the '190 patent does not adequately describe the invention ................................. 4

    D.    Dr. Brocker's testimony is legally irrelevant because he applied the wrong legal standard ...................................................................... 9

II.    Crediting All Disputed Facts in Plaintiffs' Favor, the Asserted Claims Are Not Enabled as a Matter of Law ............................................................ 10

III.    The Court Should Enter JMOL that the CoC Is Invalid as a Matter of Law and, Therefore, Kite Does Not Infringe ................................................. 14

    A.    The specification as issued is ambiguous as to the existence or correction of an error ........................................................................... 15

    B.    The prosecution history is also ambiguous as to the existence or correction of an error ........................................................................... 17

    C.    Plaintiffs' evidence did not create a genuine dispute of material fact .......................................................................................................... 20

IV.    Plaintiffs Adduced No Evidence that Kite Launched YESCARTA® Without Any Good-Faith Defense ................................................................ 24

V.    Sullivan's Proposed Damages, Which Were Adopted by the Jury, Violated Legal Principles and Were Not Supported by Sufficient Facts ........ 24

    A.    Sullivan's damages opinion ................................................................. 25

    B.    The Side Letter's stock success fee was not a proper basis for the jury's upfront payment and was not apportioned .................................. 26

    C.    Sullivan's running royalty violated apportionment principles ............. 30

    D.    Sullivan's "adjustments" lack sufficient basis ..................................... 31

    E.    There was no basis to nearly quadruple the stock success fee ............. 32

    F.    No comparable licenses support the damages award ........................... 33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>
## (Continued)

**Page(s)**

VI.   A New Trial is Warranted ................................................................. 35

    A.   Kite's receipt of the incorrect special verdict form prior to closing argument warrants a new trial ................................................. 35

    B.   Kite was prejudiced by Sullivan's testimony inconsistent with his disclosed opinions and contrary to the *Daubert* ruling ........................ 38

    C.   Plaintiffs' reliance on large, irrelevant figures as anchors was misleading, confusing, and unfairly prejudicial ..................................... 40

    D.   The written description instruction provided to the jury was fundamentally flawed .......................................................................... 43

    E.   Plaintiffs misled the jury about the *inter parte*s review ...................... 45

    F.   Plaintiffs improperly relied on the exclusion of evidence ................... 47

    G.   The time limit prejudiced Kite ............................................................ 48

    H.   The cumulative prejudice warrants a new trial ................................... 49

Conclusion ................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
759 F.3d 1285 (Fed. Cir. 2014) ........................................................................*passim*

*In re Alonso*,
545 F.3d 1015 (Fed. Cir. 2008) ................................................................... 8, 9

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017) .............................................................. 44, 45

*Anheuser-Busch, Inc. v. National Beverage Distributors*,
69 F.3d 337 (9th Cir. 1995) .............................................................................. 35

*Applied Medical Resources Corp. v. United States Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006) ...................................................................... 29

*Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ..............................................*passim*

*Billups-Rothenberg, Inc. v. Associated Regional & University
Pathologists, Inc.*, 642 F.3d 1031 (Fed. Cir. 2011) ................................ 44

*Boston Scientific Corp. v. Johnson & Johnson*,
647 F.3d 1353 (Fed. Cir. 2011) ................................................................ 10, 44

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................................................ 15

*Carnegie Mellon University v. Hoffmann-La Roche Inc.*,
541 F.3d 1115 (Fed. Cir. 2008) ................................................................... 7, 43

*Celeritas Technologies, Ltd. v. Rockwell International Corp.*,
150 F.3d 1354 (Fed. Cir. 1998) ...................................................................... 25

*Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac
Solutions P.C.*, 482 F.3d 1347 (Fed. Cir. 2007) ................................ 14, 15

*Centocor Ortho Biotech, Inc. v. Abbott Laboratories*,
636 F.3d 1341 (Fed. Cir. 2011) ................................................................... 7, 9

*Crawford v. City of Bakersfield*,
944 F.3d 1070 (9th Cir. 2019) ........................................................... 35, 46, 49

*CSIRO v. Cisco Systems, Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ...................................................................... 28

*D Three Enterprises, LLC v. SunModo Corp.*,
890 F.3d 1042 (Fed. Cir. 2018) ...................................................................... 44

*Del Mar Avionics v. Quinton Instruments*,
836 F.2d 1320 (Fed. Cir. 1987) ...................................................................... 18

-iii-

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*,
  2020 WL 130439 (Fed. Cir. Jan. 13, 2020) .............................................. 44

*Ericsson, Inc. v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ............................................... 27, 43

*Exmark Manufacturing Co. v. Briggs & Stratton Power Products
  Group, LLC*, 879 F.3d 1332 (Fed. Cir. 2018) ..................................... 24

*Experience Hendrix, L.L.C. v. Hendrixlicensing.com Ltd.*,
  762 F.3d 829 (9th Cir. 2014) ..................................................... 35

*Globefill Inc. v. Elements Spirits, Inc.*,
  640 F. App'x 682 (9th Cir. 2016) ............................................... 48

*Goeddel v. Sugano*,
  617 F.3d 1350 (Fed. Cir. 2010) ................................................... 6

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
  136 S. Ct. 1923 (2016) ............................................................ 24

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  645 F.3d 1336 (Fed. Cir. 2011) .................................................. 44

*ICU Medical, Inc. v. Alaris Medical Systems, Inc.*,
  2007 WL 8081360 (C.D. Cal. 2007), *aff'd*, 558 F.3d 1368 (Fed. Cir.
  2009) ............................................................................. 18

*Idenix Pharmaceuticals LLC v. Gilead Sciences Inc.*,
  941 F.3d 1149 (Fed. Cir. 2019) ............................................ *passim*

*Innogenetics, N.V. v. Abbott Laboratories*,
  512 F.3d 1363 (Fed. Cir. 2008) .............................................. 38, 39

*Intellectual Ventures I, v. Canon Inc.*,
  104 F. Supp. 3d 629 (D. Del. 2015) ............................................. 47

*Jerden v. Amstutz*,
  430 F.3d 1231 (9th Cir. 2005) ................................................... 49

*Knorr-Bremse v. Dana Corp.*,
  383 F.3d 1337 (Fed. Cir. 2004) ................................................. 48

*Koninklijke Philips N.V. v. Zoll Lifecor Corp.*,
  2017 WL 9509938 (W.D. Pa. May 12, 2017) ...................................... 43

*Landes Construction Co. v. Royal Bank of Canada*,
  833 F.2d 1365 (9th Cir. 1987) .............................................. 35, 36

1

**TABLE OF AUTHORITIES**
(Continued)

2

<u>Page</u>

3

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
  694 F.3d 51 (Fed. Cir. 2012) ....................................................31, 34, 42

*Linn v. United Plant Guard Workers,*
  383 U.S. 53 (1966) ................................................................................35

*Lucent Technologies, Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009) ......................................................25, 31

*McKnight v. General Motors Corp.,*
  908 F.2d 104 (7th Cir. 1990) ................................................................48

*McMillan v. Weeks Marine, Inc.,*
  478 F. Supp. 2d 651 (D. Del. 2007) .....................................................38

*Medtronic, Inc. v. Catalyst Research Corp.,*
  547 F. Supp. 401 (D. Minn. 1982) .......................................................43

*Mendenhall v. Cedarapids,*
  5 F.3d 1557 (Fed. Cir. 1993) ...............................................................46

*Meyer Intellectual Properties Ltd. v. Bodum, Inc.,*
  690 F.3d 1354 (Fed. Cir. 2012) ...........................................................49

*Mondis Technologies Ltd v. LG Electronics, Inc.,*
  407 F. Supp. 3d 482 (D.N.J. 2019) ......................................................42

*Monotype Corp. v. International Typeface Corp.,*
  43 F.3d 443 (9th Cir. 1994) .................................................................48

*Montgomery Ward & Co. v. Duncan,*
  311 U.S. 243 (1940) .............................................................................35

*Murphy v. City of Long Beach,*
  914 F.2d 183 (9th Cir. 1990) ...............................................................35

*New Railhead Manufacturing, LLC v. Vermeer Manufacturing Co.,*
  298 F.3d 1290 (Fed. Cir. 2002) ...........................................................10

*Noelle v. Lederman,*
  355 F.3d 1343 (Fed. Cir. 2004) .............................................................9

*Power Integrations, Inc. v. Fairchild Semiconductor International,*
  *Inc.,* 894 F.3d 1258 (Fed. Cir. 2018) .............................................25, 42

*Pullman's Palace-Car Co. v. Central Transportation Co.,*
  171 U.S. 138 (1898) .............................................................................29

*Regents of the University of California v. Eli Lilly & Co.,*
  119 F.3d 1559 (Fed. Cir. 1997) ......................................................6, 7, 9

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ....................................................................27, 34

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ...............................................................................32

*Ruvalcaba v. City of Los Angeles*,
   167 F.3d 514 (9th Cir. 1999) .................................................................................35

*Skidmore v. Led Zeppelin*,
   905 F.3d 1116 (9th Cir. 2018), *reh'g en banc granted on other
   grounds*, 925 F.3d 999 (9th Cir. 2019) ................................................................49

*SRI International, Inc. v. Cisco Systems Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019) .............................................................................47

*Stop Staring! Designs v. Tatyana, LLC*,
   625 F. App'x 328 (9th Cir. 2015) ..........................................................................38

*Superior Fireplace Co. v. Majestic Products Co.*,
   270 F.3d 1358 (Fed. Cir. 2001) ...............................................................14, 15, 23

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .......................................................................25, 42

*United States v. Alcantara-Castillo*,
   788 F.3d 1186 (9th Cir. 2015) ...............................................................................47

*United States v. Frederick*,
   78 F.3d 1370 (9th Cir. 1996) .................................................................................49

*VirnetX, Inc. v. Cisco Systems, Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) .............................................................................25

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ...............................................................................11

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) .................................................................................34

*Wordtech Systems, Inc v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) .............................................................................34

*Wyeth & Cordis Corp. v. Abbott Laboratories*,
   720 F.3d 1380 (Fed. Cir. 2013) .......................................................10, 11, 12, 14

**FEDERAL STATUTES**

35 U.S.C. § 251(d) ......................................................................................................21

KITE'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL

# TABLE OF AUTHORITIES
## (Continued)

**Page**

35 U.S.C. § 271(e)(1) ................................................................... 29

35 U.S.C. § 298 ................................................................... 47, 48

35 U.S.C. § 311(b) ................................................................... 45

### FEDERAL REGULATIONS

37 C.F.R. § 1.821(c) ................................................................... 16, 21, 22

37 C.F.R. § 1.823 ................................................................... 20

### FEDERAL RULES

Fed. R. Civ. P. 59(a) ................................................................... 35

KITE'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL

<u>**INTRODUCTION**</u>

The Court should enter JMOL of no liability for three independent reasons: as a matter of law, each asserted claim (i) is invalid for lack of adequate written description; (ii) is invalid for lack of enablement; and (iii) is not infringed because the certificate of correction is invalid. Separately, the Court should enter JMOL of no willful infringement because Plaintiffs adduced no relevant evidence on that issue, as well as JMOL on damages because the jury's award violated the requirement of apportionment and lacked any basis in admissible evidence.

Alternatively, the Court should order a new trial on some or all issues. The bases for new trial include that: (i) the jury instruction regarding the written description requirement did not correctly state the legal standard; (ii) the Court's change to the special verdict form after closing arguments unfairly prejudiced Kite; (iii) Plaintiffs' presentation of irrelevant, unapportioned dollar amounts prejudicially skewed the damages evidence; (iv) Plaintiffs misled the jury about the significance (or lack thereof) of the *inter partes* review; (v) Plaintiffs unfairly argued that the jury could infer willfulness because Kite witnesses did not testify to their belief in Kite's liability defenses, after the Court prohibited Kite from eliciting such testimony; and (vi) the unreasonably short time limit for trial prejudiced Kite.

<u>**ARGUMENT**</u>

**I.    Crediting All Disputed Facts in Plaintiffs' Favor, the Claims Lack Written Description as a Matter of Law**

The '190 patent fatally claims more than Dr. Sadelain invented. The patent discloses exactly two CARs; the only two that Dr. Sadelain had made at the time of filing. Tr. 287:25-288:14, 290:8-24. One targets PSMA, the other CD19. *Id*.; Tr. 245:15-246:2. And, even for those two, the patent does not disclose a full DNA or amino acid sequence or otherwise adequately describe them.

Had Dr. Sadelain claimed only what he actually invented, there would be no case—YESCARTA® is different than what Dr. Sadelain made. Instead, he claimed

-1-

much more. So much more that Juno's expert, Dr. Brocker, could not even guess how many CARs fall within the claims. Tr. 1277:25-1279:20. Dr. Sadelain's claims functionally cover everything that binds to any "selected target" (Claims 3 and 9) or to CD19 (Claims 5 and 11). But because Dr. Sadelain had not invented more than the two CARs, he was unable to describe anything close to the scope of what he claimed.

The written description requirement "plays a vital role in curtailing claims . . . that have not been invented, and thus cannot be described." *Ariad Pharm., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1352 (Fed. Cir. 2010) (*en banc*). Genus claims that functionally claim a desired result, like those here, are so suspect that the Federal Circuit has stated that they are "inherently vulnerable to invalidity challenge for lack of written description support, especially in technology fields that are highly unpredictable." *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014). Because of these concerns, the Federal Circuit has set forth a specific test to satisfy the written description requirement, a standard that the '190 patent's specification simply cannot satisfy. Adequate description of a genus requires "disclosure of either [1] a representative number of species falling within the scope of the genus or [2] structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Ariad*, 598 F.3d at 1350-51. The level of detail required to meet this standard "varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id*. JMOL for lack of written description must be granted if the disclosure is absent based on "an objective inquiry into the four corners of the specification from the perspective of a [POSITA]." *Id*.

The asserted claims lack written description as a matter of law because (1) they functionally claim a vast number of species; (2) the field was new and unpredictable at the time of invention; and, with that context, (3) the patent does not disclose either (a) a representative number of the claimed species, or (b) structural features common to the claimed species so that a skilled artisan can "visualize or recognize" them.

### A.    The '190 patent claims a broad, functionally-defined genus

There is no dispute that the asserted claims cover an enormous number of functionally-identified CAR constructs. Two of the asserted claims are so broad that they sweep in CARs that bind to any target, derived from any source, and that might treat any disease. Tr. 1008:24-1009:6, 1276:14-1277:3; PX1.23. Dr. Garcia testified that all of the claims structurally encompass CARs with "millions of billions" of different scFvs. Tr. 1009:7-1010:12. Dr. Brocker found the number of CARs they covered incalculable; he could not say "how many potential CAR constructs fall within the scope of the claims." Tr. at 1278:2-179:20. Per Dr. Brocker, it would be "pure speculation" whether the claims would encompass a thousand, a million, or more different CARs. *Id.* The undisputed facts could only lead a reasonable jury to conclude that the claims include a very large number of potential CARs.

### B.    The patent's technological field was nascent and unpredictable

There is also no dispute that the CAR-T field was new and unpredictable at the time the patent was filed. Dr. Sadelain referred to the time of the invention as the "birth of the field," Tr. 299:18-21, when "most people [were] incredulous about the potential of this approach." Tr. 258:7-259:8; *see also* Tr. 233:2-234:17, 336:6-337:13. Drs. Sadelain and Brentjens testified about the difficulty of just selecting a disease target, a task that one "could write an entire book about." Tr. 310:21-311:4, 312:8-14, 314:4-316:6; Dkt. 646-4 at 147:24-149:5. Dr. Sadelain admitted that suitable targets for most solid tumor cancers (all of which are captured by claims 3 and 9) were not identified in 2002 and still are not today. Tr. 310:21-311:3, 314:4-316:24. Dr. Sadelain also admitted that one could not predict without testing whether fusion proteins, such as CARs, would function. Tr. 310:21-311:4; *see also* Dkt. 646-4 at 76:5-77:3; Dkt. 646-5 at 61:1-9. Dr. Brocker testified that prior to 2002, he and others, had tried and failed to create a successful CAR-T. Tr. 1249:4-1252:9, 1287:19-1288:2. And, even today, eighteen years later, FDA has only approved two CAR-T therapies, neither of which belongs to Juno. Tr. 465:5-7, 514:21-23, 921:1-25. Kite's experts agreed that the field remains

KITE'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL

1   unpredictable even today. Tr. 950:13-951:9 (Junghans); Tr. 995:2-8, 997:5-1008:1,

2   1022:10-1023:23 (Garcia). As Dr. Sadelain aptly wrote in 2003, the field at that time

3   was no more than "a fertile ground for future investigation." DX826-0009.

4          The use of scFvs in CARs was also unpredictable. *See* Tr. 999:5-1007:19;

5   PX1032.10; DX881.5; Dkt. 646-5 at 41:16-42:6. Drs. Brocker and Sadelain admitted

6   that prior attempts to use scFvs in CARs had met with little success. Tr. 231:22-234:1,

7   1249:4-1250:21, 1261:5-1261:7. Specific to the CD19 claims, both parties' experts

8   agreed that only a few CD19-specific scFvs (generally, not in a working CAR) had

9   been published prior to the priority date of the patent. Tr. 1005:11-13, 1264:14-1265:6.

10  One of the few papers describing CD19 scFvs showed that only one out of three had

11  "any ability to bind." Tr. 1004:3-24; DX881.5. And Dr. Brentjens recounted how

12  changing just three amino acids in the scFv portion of a CD19 CAR rendered it "not

13  functional as a receptor." Dkt. 646-4 at 32:6-42:24. As an example of that

14  unpredictability, fifteen years after the patent was filed, Juno spent months, if not years,

15  using the then existing technology to test a billion scFvs to find those that bound to

16  CD19, only 60 did, and only 3 were worth further work. Tr. at 1027:20-1029:1; Dkt.

17  646-5 at 31:9-40:9; DX503; DX936.

18         **C.    In light of the claims' breadth and the field's nascence, the '190 patent
           does not adequately describe the invention**

19
20         The patent's sparse disclosure does not supply the requisite "representative

21  number of species" or "common structural features" to adequately describe its broad

    genus claims in this new and unpredictable field. *Ariad*, 598 F.3d at 1350.
22
23         **1.    The two examples in the patent are not representative of claims
                   that potentially encompass billions**

24         At filing, Dr. Sadelain had made only two CARs, one directed to PSMA, one to

25  CD19. Tr. 287:25-288:14, 290:8-24. The specification includes only these two CARs

26  and, even for those two, provides little information. This paltry disclosure does not

27  adequately describe the two CARs, no less a genus of potentially billions.

28         ***First***, the specification provides incomplete and insufficient information about

-4-

the two examples. *See Ariad*, 598 F.3d at 1352 ("It is the specification itself that must demonstrate possession."). The patent claims DNA sequences that encode the amino acids that make up Dr. Sadelain's CARs. Despite that, there was no dispute that the specification does not disclose a DNA or amino acid sequence for a single scFv. Tr. 1256:13-15 (Brocker); Tr. 289:10-13, 290:10-291:8 (Sadelain); Tr. 1011:14-18, 1024:15-16 (Garcia). For the CD19 scFv, the patent states only that the scFv is made from a "hybridoma" that produces antibodies called "SJ25C1." PX1.16. This provides no information about the amino acid sequence of the scFv or the DNA sequence that encodes it. Tr. 1011:7-1012:6. The specification also lacks any other type of information—such as the order of the heavy and light chains, binding affinity, or target epitope—that might help a POSITA identify or understand the properties of the two exemplary scFvs. Tr. 1014:19-1015:21, 291:9-293:6.

**Second**, even if one (improperly) looked outside the specification, a POSITA could not identify the scFvs used by Dr. Sadelain. The only published scFv made from the "SJ25C1" hybridoma was in a paper by Bejcek. DX881. But Dr. Sadelain did not use the Bejcek scFv. Dkt. 646-4 at 32:6-42:24; Tr. 1012:18-1013:8 (Garcia); DX731.10-48; DX2160.1. And, as learned through discovery, the inventors determined that the Bejcek sequence was incorrect and the scFv did not result in a working CAR. Dkt. 646-4 at 32:6-42:24; Tr. 1012:18-1013:8 (Garcia); DX731.10-48; DX2160.1. None of this is explained in the patent. The inventors also did not deposit a sample of their scFvs so the public could access them.[1] MPEP § 2402. Dr. Garcia thus testified unrebutted that "there is no way to figure . . . out" what scFvs Dr. Sadelain used in his CARs. Tr. 1011:7-1013:25, 1024:4-19.

This sparse disclosure does not sufficiently describe a biological construct. Claims to DNA "require[] a kind of specificity usually achieved by means of recitation

---

[1] Dr. Sadelain got the scFv from another institution under a confidentiality restriction. Tr. 253:12-254:9, 288:5-14. It would thus be unavailable to a POSITA.

of the sequence of nucleotides that make up the []DNA." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566-69 (Fed. Cir. 1997); *Goeddel v. Sugano*, 617 F.3d 1350, 1354, 1356-57 (Fed. Cir. 2010) (application disclosing 187 amino acids of precursor protein did not adequately describe 166 amino acid sequence of mature protein contained within precursor sequence).

**Third**, even putting aside the deficiencies in their disclosure, the two example CARs are not representative of the billions of diverse claimed CAR constructs. Even for the theoretically narrower CD19 claims, a POSITA comparing the SJ25C1 scFv published in Bejcek to other claimed CD19-specific scFvs (discovered both before and after the patent's filing) would find that they have very different amino acid sequences, ranging from 39% to 87% similar to Bejcek's scFv. Tr. 1014:19-1018:23; DX2160.04. In contrast, Bejcek's SJ25C1 scFv is 67% to 85% similar to three scFvs that bind to different targets. Tr. 1018:24-1019:23. In other words, the patent's CD19 scFv is more structurally similar to scFvs *for entirely different targets* than to other claimed CD19 scFvs. Further complicating the claimed structures, it is undisputed that scFvs falling within the claims can use a variety of different linkers and can connect the heavy and light chains in different orders. Tr. 1001:13-1002:17. The scFvs can also be derived from any source, including human scFvs—a class Dr. Brocker admitted was "extremely difficult" to make, as evidenced by Juno's own attempts to develop one, and that Dr. Sadelain did not work on until 2009. Tr. 1027:20-1029:1; Tr. 1276:14-1277:8 (Brocker); Tr. 298:18-299:7 (Sadelain); *see also* Tr. 1015:22-1016:2 (Garcia); Dkt. 646-5 at 31:9-40:9; DX503; DX936. Also undisputed was that the claimed scFvs possess significant functional variety, including a wide range of binding affinities (*i.e.*, strength) and target epitopes (*i.e.*, the specific part of a target that an scFv binds to). Tr. 1015:3-1015:21, 1019:24-1020:19 (Garcia). The '190 patent specification discusses none of this.

Numerous Federal Circuit cases have found that claims to such diverse biological genera lack written description. *See, e.g.*, *Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941

F.3d 1149, 1163-65 (Fed. Cir. 2019) (reversing denial of JMOL of no written description for a genus of nucleoside compounds despite the specification disclosing thousands of embodiments); *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348-51 (Fed. Cir. 2011) (reversing denial of JMOL of no written description for broad genera of antibodies); *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1125-27 (Fed. Cir. 2008) (written description lacking for broad genus of recombinant plasmids encoding DNA polymerase from any bacterial source); *Lilly*, 119 F.3d at 1566-69 (written description lacking for claims encompassing broad genera of cDNAs encoding insulin).

The *AbbVie* case is on point. *AbbVie* involved a patent claiming a broad class of human antibodies based on their binding characteristics. 759 F.3d at 1302. The specification in *AbbVie* disclosed 300 different antibodies with a range of binding affinities *and* included their amino acid sequences. *Id.* at 1291. Because the claims were so broad, the accused antibody was covered by the claims but was very different from what the inventors had actually invented. It shared only 50% sequence similarity to the disclosed antibodies, had different CDR regions, and bound to a different epitope. *Id.* at 1300. And, "antibodies with 80% sequence similarity to [one of the disclosed antibodies] could bind to completely different antigens . . . , thus illustrating the significant structural differences between [the accused antibody] and the [disclosed] antibodies and the unpredictability of the field of invention." *Id.* The Federal Circuit concluded there was "no evidence" showing "any described antibody [was] structurally similar to, and thus representative of," the accused product, which was one member of the claimed genus. *Id.* at 1301.

The '190 patent provides only two examples—far less than the 300 antibodies disclosed in *AbbVie*—and does not disclose a complete DNA or amino acid sequence for even one example. And, similar to *AbbVie*, the unrebutted testimony at trial was that species encompassed by the broad claims are very different than what the inventors described in the specification. The YESCARTA® scFv, which is not described in the

patent (Tr. 292:6-21), and the SJ25C1 scFv (as published in Bejcek) have less than 50% overall amino acid sequence similarity and just over 25% similarity in the CDR regions important for target binding. Tr. 1010:15-17, 1016:3-1018:23; DX2160.2-4; Dkt. 646-5 at 31:9-40:9; DX503.6. The YESCARTA® scFv also functions differently than an SJ25C1-derived scFv, having a different binding affinity and binding to a different epitope of CD19. Tr. 1019:24-1022:9m 291:9-294:23; DX884.06. Like in *AbbVie*, the evidence shows that scFvs that bind to targets other than CD19, like the guinea pig C5 protein, have more structural similarity to the published SJ25C1 scFv than to the scFv used in YESCARTA®. Tr. 1016:3-1019:23; DX2160.8. In short, like in *AbbVie*, the scFvs discussed in the patent are not representative of the claimed genus because the YESCARTA® scFv and other species that fall within the broad claims are so structurally and functionally different.

Dr. Brocker's only response was that all scFvs "do the same thing"—bind to a target—and thus one example is representative of all. Tr. 1253:6-1254:4, 1266:2-1267:11. The Federal Circuit has rejected such simplistic reasoning as a matter of law. *See, e.g.*, *In re Alonso*, 545 F.3d 1015 at 1021-22 (Fed. Cir. 2008) (disclosure of single antibody insufficient to describe broad genus of antibodies where the "specification teaches nothing about the structure, epitope characterization, binding affinity, specificity, or pharmacological properties common to the large family of antibodies implicated by the method"). Moreover, Dr. Brocker's testimony simply ignores the fact that a large number of scFvs fail to bind to a desired target.

Based on this evidence, no reasonable jury could find that the two examples in the patent are representative of the full scope of each asserted claim.

### 2. The specification does not disclose common structural features sufficient to allow a POSITA to "visualize or recognize" the members of the genus

The '190 patent also fails to disclose common structural features sufficient to allow a POSITA to visualize or recognize the members of the genus. Juno offered no testimony that the patent identified features common to scFvs that bind to CD19, let

alone the broader genus encompassing any "selected target," and Dr. Garcia said it did not. Tr. 1014:1-18, 1024:20-1025:4 (Garcia). Dr. Brocker admitted that the '190 patent does not teach a correlation between scFv structure and the function of binding to a particular target. Tr. 1277:11-23. Dr. Brocker could only point to the general features of *all* scFvs, namely that they include the variable regions of an antibody joined by a linker. Tr. 1259:13-1260:14. But, these high-level common features of generic scFvs do not tell a POSITA whether the scFv binds to CD19, to some other target, or no target at all. Tr. at 1009:16-1010:12, 1014:1-18, 1024:20-1025:4. As Dr. Brocker admitted, the "common structural features" that he identified are common to "all scFvs," whether they bind to CD19 *or* not. Tr. 1281:10-19.

As a matter of law, such testimony is insufficient. A patentee can establish adequate written description through "common structural features" only where the "structural features commonly possessed by members of the genus [] *distinguish them from others*." *Lilly*, 119 F.3d at 1568 (emphasis added). For that reason, numerous Federal Circuit cases have found lack of written description for antibody-related claims despite having the "common structural features" of antibodies (and scFvs) described by Dr. Brocker. *See, e.g.*, *Alonso*, 545 F.3d 1022 n.10 (rejecting assertion that a "well-known correlation between human antibody structure and antibody function" is sufficient to meet the written description requirements); *see also AbbVie*, 759 F.3d at 1292; *Centocor*, 636 F.3d at 1346; *Noelle v. Lederman*, 355 F.3d 1343, 1345-46 (Fed. Cir. 2004) (all finding inadequate written description for functional claims directed to genera of antibodies). Dr. Brocker's "common structural features" do not distinguish scFvs that bind to different targets, and thus are legally irrelevant.

### D. Dr. Brocker's testimony is legally irrelevant because he applied the wrong legal standard

Dr. Brocker also made at least two errors in his written description analysis that make his testimony legally erroneous and thus insufficient to support a jury verdict.

*First*, Dr. Brocker formed his written description opinion based on the incorrect

proposition that the scFv portion was "not part of [the claimed] invention." Tr. 1256:13-25. Of course, the asserted claims claim DNAs that encode a CAR with a CD3ζ portion, a CD28 portion, *and* an scFv portion. PX1.23 (claims 3, 5, 9, 11). Without the scFv portion, the CAR would not bind to anything, and the CAR would not function. Tr. 996:2-22. The scFv must be described sufficiently—the test for written description "is the same whether the claim is to a novel compound or a novel combination of known elements [and] [t]he test is the same whether the claim element is essential or auxiliary to the invention." *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1365 (Fed. Cir. 2011). And Dr. Sadelain conceded that "binding"—one function of the scFv in a CAR—"is integral to CAR function." Tr. 294:23-296:15.

*Second*, Dr. Brocker improperly conflated the written description and enablement requirements. In summarizing his written description opinion, he twice said it was based on being able to make the claimed CAR constructs. Tr. 1256:6-12 ("[E]xample 7 . . . gives you a description of what should be in this CAR-T cell receptor and *how to make it. . . . [I]t would enable you to make it yourself*.") (emphasis added). This analysis is legally flawed. Written description and enablement are distinct requirements. *Ariad*, 598 F.3d at 1351; s*ee New Railhead Mfg., LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294-95 (Fed. Cir. 2002) (rejecting testimony that improperly "conflate[d] the concepts of written description and enablement").

## II.   Crediting All Disputed Facts in Plaintiffs' Favor, the Asserted Claims Are Not Enabled as a Matter of Law

The claims are also invalid for lack of enablement. Enablement is a question of law. *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). "Claims are not enabled when, at the effective filing date of the patent, [a POSITA] could not practice their full scope without undue experimentation." *Id.* at 1384. The relevant factors for this inquiry are: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative

1    skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the

2    breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

3        The '190 patent fails to enable the full scope of the claims as a matter of law

4    because it is undisputed that (1) the art was nascent and unpredictable; (2) the claims'

5    structural limitations cover either an untold number or "millions of billions" of

6    constructs; (3) a significantly smaller number of those constructs bind to a particular

7    target, but the patent offers no guidance as to which do and no not; and (4) the effective

8    constructs must be discovered via screening. Where, as here, a POSITA must screen a

9    large number of compounds to find the active species, the full scope of the claims is

10   not enabled as a matter of law. *Idenix*, 941 F.3d at 1159-61 (affirming JMOL reversing

11   jury verdict finding adequate enablement); *Wyeth*, 720 F.3d at 1386.

12       In *Wyeth*, the Federal Circuit affirmed summary judgment of no enablement for

13   claims to a method of treatment by administering an "effective amount" of a genus of

14   compounds. 720 F.3d at 1382. The specification disclosed efficacy data for one species.

15   *Id*. The court also accepted that: (1) a POSITA would have known that four related

16   prior art compounds were also effective; (2) "tens of thousands" of additional

17   compounds could be effective but would have to be screened; and (3) "[a POSITA]

18   could routinely use the assays disclosed . . . to determine . . . [the] effects in candidate

19   compounds." *Id*. at 1384-85. Despite these facts, the court rejected Wyeth's argument

20   that the claims were enabled because a POSITA "could routinely determine whether a

21   candidate [was effective] using the assays disclosed in the specification." *Id*. at 1384.

22   [T]he court stated: "The remaining question is whether having to synthesize and screen

23   each of at least tens of thousands of candidate compounds constitutes undue

24   experimentation. We hold that it does." *Id*. at 1385.

25       In *Idenix*, the Federal Circuit affirmed JMOL that claims reciting a method for

26   treating hepatitis C by administering an effective amount of a 2'-methyl-up nucleoside

27   were not enabled. 941 F.3d at 1154. The claims covered a genus of nucleosides—with

28   any chemical moiety at a particular position—that the court found included at least

"many, many thousands" of candidate compounds. *Id.* at 1155-57. The key question was "whether a [POSITA] would know, without undue experimentation, which 2'-methyl-up nucleosides would be effective for treating HCV." *Id.* at 1156. Although the jury "could have found that the synthesis of an individual compound was largely routine" (*Id.* at 1160), the "immense breadth of screening required to determine which 2'-methyl-up nucleosides are effective against HCV can only be described as undue experimentation." *Id.* at 1162.

The facts here—as described below by Juno's own witnesses—are directly analogous to *Wyeth* and *Idenix*. Lack of enablement is the necessary conclusion.

The field was new and unpredictable: It is undisputed that the field was new and unpredictable at the time the patent was filed. *See supra* Section I.B. Dr. Sadelain's admissions about the nascence of the field are analogous to expert admissions in *Idenix*. *Compare* Tr. 298:18-21, 310:21-311:4 (Sadelain testifying that time of filing was the "birth of the field" and that testing required to determined CAR function) *with* 941 F.3d at 1159 (expert admitted that field was "in its infancy" and "you don't know whether or not a nucleoside will have activity against HCV until you make it and test it").

The number of scFvs and CARs to be synthesized and screened is very large: The asserted claims encompass a huge number of constructs, either incalculable or "millions of billions." *See supra* Sections I.A., I.C. Dr. Garcia provided further undisputed testimony that a much smaller (but still very large) number of scFvs would bind to a particular target like CD19. Tr. 1010:1-8. The "millions of billions" of potential candidate constructs that a POSITA would need to be synthesize and screen to identify those that bound and functioned are more than *Wyeth* or *Idenix*.

Juno's evidence showed no more than a screening plan for identifying functional CARs: The specification provides no more than a research plan. For the two exemplary constructs of the '190 patent, the specification includes some test results which purport to show binding to the target and activation of signals 1 and 2. PX1.14-16(7:43-11:34). Besides those two (insufficiently disclosed) examples, the patent provides no

information on which scFvs will meet the functional limitations when incorporated into the claimed CAR.

To find scFvs that bind to a target, a POSITA would have to synthesize and test them. The '190 patent specification proposes a method for making an scFv by cloning the heavy and light chains of an antibody, making an scFv, and then incorporating the scFv into the rest of the claimed CAR. Tr. 1262:9-1263:21. This assumes that a POSITA has the sequence of an antibody or the DNA that encodes it to start with. *Id.*; Tr. 998:14-1002:13. Even then, this is only a starting point, and the number of potential antibodies is vast. To make some scFvs, a POSITA would need to make an antibody to the target of choice, a complicated and labor intensive effort on its own. *Id*. After synthesizing an scFv, it was undisputed that testing would be required to determine (1) if the scFv bound and, if it did, (2) if the resulting CAR bound and functioned. The patent identifies tests that the inventors performed to determine if a CAR bound and functioned. PX1.14-16(7:43-11:34). Dr. Sadelain testified that one could not predict without testing whether CARs would function. Tr. 310:21-311:4. And Dr. Garcia described tests used to determine if an scFv bound and if a CAR with that scFv bound and functioned. Tr. 999:5-1007:15, 1027:7-19.

Juno provided no testimony on the effort that this process would take in the 2002 time frame. Dr. Garcia's unrebutted testimony was that making and testing a single functional scFv could take from six months to a year, and a CAR incorporating that scFv could then take from months to well over a year more. Tr. 1003:10-24, 1007:10-15. He also explained his success rate in making functional scFvs was about 25%. Tr. 1003:10-17. At this rate, the time and effort it would take to make even a small fraction of the claimed compounds would be undue.

Juno's effort to create a human scFv for CD19 is exemplary. As explained above, using present day technology (not that available in 2002), Juno screened a billion scFvs to identify three candidates for use in a CAR. *See supra* Section I.B. This work took months if not years. Dkt. 646-5 at 39:9-40:5.

Even if the synthesis and testing was so easy that a "dishwasher" could do it (Tr. 1264:1-13 (Brocker)), the mere fact that those steps are required, for claims covering a large number of compounds in an unpredictable field, means that the full claim scope is not enabled. *Idenix*, 941 F.3d at 1163 ("A reasonable jury could only have concluded that there were at least many, many thousands of candidate compounds, many of which would require synthesis and each of which would require screening. That constitutes undue experimentation."). A patent that provides merely "a starting point" and an invitation "to engage in an iterative, trial-and-error process to practice the claimed invention," lacks enablement. *Wyeth*, 720 F.3d at 1386.

## III. The Court Should Enter JMOL that the CoC Is Invalid as a Matter of Law and, Therefore, Kite Does Not Infringe

The CoC is invalid if: "(1) the corrected claims are broader than the original claims; and (2) the presence of the clerical or typographical error, or how to correct that error, is not clearly evident." *Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols. P.C.*, 482 F.3d 1347, 1353 (Fed. Cir. 2007).

The first element is a question of law, which the Court decided in Kite's favor pretrial. Dkt. 246 at 6; Dkt. 100 at 17. The second element is to be decided based on "'the contents of the file of the patent sought to be corrected,'" *i.e.*, the "specification, drawings, and prosecution history." *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1372-73 (Fed. Cir. 2001). It entails a determination from the perspective of a POSITA, *Cent. Admixture*, 482 F.3d at 1353-54, not an inquiry into the patentee's or PTO's intent or the inventors' good faith, *Superior*, 270 F.3d at 1375. Broadening corrections under § 255 are not available "where it is apparent that a mistake has been made, but it is unclear what the mistake is"—as with a mistake that "create[s] inconsistent terms, but leave[s] unclear which of the conflicting terms is in error." *Id.* at 1370. In that circumstance, "it is not evident to the reader of the public record how to appropriately correct [such] mistakes." *Id.* A broadening correction is permitted only when a mistake is "immediately apparent and leave[s] no doubt as to what the mistake

is." *Id.*

Although the second element is an issue of fact, judgment as a matter of law is warranted when the material facts are undisputed. *See Cent. Admixture*, 482 F.3d at 1355. The mere existence of conflicting expert opinions does not preclude JMOL. *See, e.g., id.* at 1355 n.6; *Ariad*, 598 F.3d at 1355-58. Testimony contradicting "indisputable record facts . . . cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

Here, there were no material factual disputes for the jury to resolve, and no reasonable jury could have found the CoC valid. The intrinsic record viewed as a whole shows—at most—that a POSITA would see that one of two possible costimulatory sequences was claimed but would not know which was intended when the patent issued. *Superior*, 270 F.3d at 1370 (correction is invalid when "inconsistent terms . . . leave unclear which of the conflicting terms is in error"). Because the CoC is invalid, the claims read as they did before the CoC, *id.* at 1367, covering the nucleotide sequence of CD28 encoding amino acids 113-220. Because the CD28 region in YESCARTA® contains "exactly" amino acids 114-220, not 113-220, the product does not infringe as a matter of law. Tr. 259:16-262:4 (Sadelain); Tr. 662:20-24 (Bot); PX1185.

### A.  The specification as issued is ambiguous as to the existence or correction of an error

The originally issued claims did not contain an obvious mistake on their face, such as a misspelling or nonsensical term. Original SEQ ID NO:6 listed nucleotides 336-663 of CD28, beginning with "caaa." PX1.18; Tr. 1177:19-24, 1194:15-1195:1 (Quackenbush). Per the Court's claim construction, original SEQ ID NO:6 encodes amino acids 113-220 of CD28, starting with lysine (K). Dkt. 100 at 17. The amino acid sequence encoded by original SEQ ID NO:6 is part of the natural CD28 protein. Tr. 1147:9-10, 1148:2-3 (Quackenbush). It is the amino acid sequence obtained when original SEQ ID NO:6 is translated using the BLAST software. Tr. 957:6-958:15 (Junghans). No evidence at trial showed that the original claims, claiming amino acids

113-220, were nonsensical or nonfunctional.

Any disclosed sequence in a patent "must" be in the sequence listing. 37 C.F.R. § 1.821(c). But even apart from the sequence listing, nothing in the rest of the patent's specification or cited publications unambiguously indicate that the patent covered a different amino acid sequence. To the contrary, those sources describe multiple different CD28 nucleotide sequences, some encoding amino acids starting at 113, consistent with original SEQ ID NO:6, and others encoding amino acids starting at 114.

### Disclosures of amino acid sequences beginning with amino acid 113

*First*, column 7 of the specification describes the CD28 DNA sequence in one embodiment of the invention as containing "nucleotides *336*-660 of CD28," which encodes amino acids 113-220. PX1.14(7:52-53); Tr. 283:19-22 (Sadelain).

*Second*, Dr. Sadelain authored and published several documents—cited or incorporated by reference in the patent—that describe CD28 sequences beginning with nucleotide 336 and, accordingly, encoding amino acids beginning with 113. A 1997 patent application, cited at PX1.11(1:66-67), describes "CD28 cDNA spanning nucleotides *336* to *663*." DX2004-596. The peer-reviewed 1998 Krause article, cited at PX1.17(13:13-16), likewise describes the "sequence extending from nucleotide *336* to *663*." DX1054-2. The 2002 Maher article, which was published in a peer-reviewed journal and then included in the provisional patent application, describes "nucleotides *336*-660 of CD28." PX40.5; PX41.8; Tr. 1188:14-1191:17 (Quackenbush). None of the coauthors or peer reviewers of these documents ever suggested that the reference to a CD28 nucleotide sequence starting at 336 was an error.

*Third*, SEQ ID NO:11 lists amino acids *113*-220 of CD28. PX1.19-.20; Tr. 956:23-957:5 (Junghans). No sequence in the sequence listing, either before or after the CoC, lists only amino acids 114-220 of CD28. PX1.17-.23.

### Disclosures of amino acid sequences beginning with amino acid 114

The specification's other disclosures of amino acid sequences starting at 114 did not show that there was a clearly evident error with a clearly evident correction.

-16-

Column 4 describes "one embodiment" in which "the CD28 portion suitably includes . . . the portion of CD28 cDNA spanning nucleotides 340 to 663, including the stop codon (amino acids 114-220 of Seq. ID No. 10). . . . The full sequence of this region is set forth in Seq. ID No: 6." PX1.12(4:21-28). The nucleotide sequence ending at 663 (*i.e.*, "including the stop codon") is consistent with original SEQ ID NO:6 but inconsistent with the CoC. Further, the language that the CD28 portion "includes" nucleotides 340-663 and amino acids 114-220 is consistent with original SEQ ID NO:6, *i.e.*, the subset of nucleotides 336-663 encoding amino acids 113-220. *See* Dkt. 100 at 12 (concluding that "a POSITA might arrive at this understanding").

Column 7, besides describing nucleotide range 336-660, discloses primers that amplify a 322-nucleotide DNA sequence encoding amino acids 114-220. PX1.14(7:52-56); Tr. 966:5-13; *see also* Dkt. 87-1, ¶¶ 88-90 (showing primer alignment). Nothing in column 7 indicates which of the two sequences is right. However, the 322-nucleotide primer-amplified sequence is inconsistent with the CoC's SEQ ID NO:6, which lists 321 nucleotides.

## B.   The prosecution history is also ambiguous as to the existence or correction of an error

As the Court found, the file history likewise reveals "ambiguity" that "would require a POSITA to guess at the applicants' intent." Dkt. 100 at 15; *see* Tr. 852:22-853:6 (Schuetz). The patentee submitted sequence listings on five occasions, three of which listed SEQ ID NO:6 as nucleotides 336-663, while two listed it as 340-660.

In the <u>first two submissions</u>, SEQ ID NO:6 listed nucleotides 336-663. PX2.40-.48 (May 28, 2003); PX2.57-.68 (Oct. 1, 2003).

The patentee then submitted a <u>third sequence</u> that listed nucleotides 340-660, together with an RCE stating that the previous listings contained "an error." PX2.598-.616 (Sept. 4, 2007). However, the scientific explanations the patentee provided did not indicate a clear error with regard to SEQ ID NO:6.

*First*, contrary to the RCE's assertion, the length of SEQ ID NO:6 need not be

-17-

divisible by three. The Court already rejected that argument by Plaintiffs in the claim construction order. Dkt. 100 at 12-13 ("[b]ecause the entire TCR is made up of amino acids, it is the nucleotide sequence of the entire TCR chain that must be divisible by three—not the individual components"). That "prior finding[] and the claim construction based thereon are the law of the case" and "are not available for redetermination." *Del Mar Avionics v. Quinton Instruments*, 836 F.2d 1320, 1324 (Fed. Cir. 1987); *see, e.g.*, *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 2007 WL 8081360, at *12 (C.D. Cal. 2007) (jury not legally permitted to credit arguments that "logically or syntactically contradict[]" the Court's "expressed reasoning that lead to [its] constructions"), *aff'd*, 558 F.3d 1368 (Fed. Cir. 2009). Dr. Junghans explained in unrebutted testimony that, because each portion of the construct was to be fused to other portions to make up the CAR, a POSITA would not expect that any single portion had to be divisible by three. Tr. 965:1-966:4; *accord* Tr. 851:10-19 (Schuetz). Corroborating that testimony, and refuting Sloan-Kettering's statements in the RCE, the costimulatory nucleotide sequence for Dr. Sadelain's own clinical construct, which Sloan-Kettering did not provide to the PTO, was 322 nucleotides—a number not divisible by three. DX766-4; Tr. 847:8-848:9 (Schuetz). Even the primers disclosed in the patent specification for amplifying the costimulatory signaling region, which Plaintiffs argued disclose the relevant DNA sequence, amplify a sequence of 322 nucleotides, as Dr. Junghans explained in unrebutted testimony. Tr. 966:5-13; *see also* Dkt. 87-1, ¶¶ 88-90 (showing primer alignment).

  *Second*, the stop codon in the sequence did not suggest any error in the beginning of the amino acid range. The stop codon is "at the end" of the nucleotide sequence; it is irrelevant to whether the first encoded amino acid is correct. Tr. 1163:1-4 (Quackenbush); Tr. 850:15-20 (Schuetz). It does not code for an amino acid, Tr. 273:23-25 (Sadelain), and so does not affect the meaning of the claim term, which is "the amino acid sequence encoded by SEQ ID NO:6." Moreover, the specification, even after the CoC, describes a portion of CD28 DNA in one embodiment as ending

-18-

with nucleotide 663 and "including the stop codon." PX1.12(4:24-25) .

*Third*, the RCE's assertion that the amino acid sequence encoded by the amplification product of the primers in the specification was different from the sequence encoded by original SEQ ID NO:6 merely identified an inconsistency in the amino acid ranges disclosed by the sequence listing and by the primers. It did not clearly convey that the latter as opposed to the former was correct, particularly given that the claims refer to SEQ ID NO:6, which provides the encoding nucleotide sequence, not SEQ ID NO:4 or NO:5, which list the primers. Further, Dr. Sadelain's prior publications, incorporated by reference as described earlier, consistently disclosed that the costimulatory region in the construct he developed began with nucleotide 336, the initial nucleotide in the original SEQ ID NO:6.

*Fourth*, the RCE's statement that the requested corrections made the claimed construct conform to the construct used in all of the inventors' examples is contradicted by the patent itself. At the time the RCE was filed, the specification described the costimulatory region of a construct in one example as beginning with nucleotide 336, and thus amino acid lysine, not nucleotide 340. PX1.14(7:52-53). Nor did the patentee amend this disclosure in the RCE (or in the CoC).

After the Patent Office rejected the sequence listing accompanying the RCE for a formal defect, the patentee submitted a fourth sequence listing, which also listed nucleotides 340-660. PX2.628-.644 (Nov. 15, 2007).

After another rejection based on a formal defect, the patentee made a fifth submission in April 2008, containing two documents each reverting to the original sequence, 336-663. This was accompanied by a cover letter instructing the examiner to "insert the paper copy in the application *in place of* the previously filed sequence listing," which was the listing containing nucleotides 340-660. PX2.662-.686 (Apr. 16, 2008) (emphasis added). The April 2008 sequence listings were not copies of previously filed listings, but were *newly generated documents* that the patentee created in response to the Patent Office's Notice to Comply. This is apparent from the fact that

the Notice had required that field <213> be changed from "4-1BB zeta fusion primer," which appeared in all prior submitted sequence listings (PX2.47; PX2.67; PX2.615; PX2.643), to "artificial." PX2.650.[2] Both April 2008 sequence listings made this change (PX2.667; PX2.679), while reintroducing the 336-663 nucleotide listing for SEQ ID NO:6. PX2.672; PX2.685.

### C.    Plaintiffs' evidence did not create a genuine dispute of material fact

The foregoing facts are in the intrinsic record and uncontroverted. Plaintiffs largely ignored them. Instead, they asked Kite's expert, Dr. Junghans, about collateral issues, such as patient deaths in clinical studies in the 1990s, whether witnesses acted in bad faith, and his understanding gained only in this litigation of which construct Dr. Sadelain actually used to generate his data. *E.g.*, Tr. 971:21-974:13, 976:19-980:13. None of that is legally relevant to whether an error and its correction were clearly evident to a POSITA. These questions involve objective assessments of the public record, not whether the inventor acted in "good faith" or what he used in his nonpublic experiments. The relevant facts establish that, from filing through patent issuance, the intrinsic record reflected, at most, continuing inconsistencies about whether the claimed DNA encoded an amino acid sequence that began with amino acid 113 or 114 (and if the latter, what nucleotides to use to encode them).

The purported mistake was only discovered from information *outside* the record, confirming the mistake was not clearly evident from the intrinsic record. In 2013, before the CoC, Dr. Schuetz, an M.D.-Ph.D. scientist performing due diligence on Sloan-Kettering, asked Dr. Sadelain to send the complete sequence for the CD19 CAR that Sloan-Kettering was using in the clinic. DX766; Tr. 334:7-10 (Sadelain); Tr. 841:20-842:12, 842:25-843:4, 844:22-847:2 (Schuetz). Dr. Sadelain sent the complete sequence, which was confidential information that did not appear in the patent. Dr.

---

[2] Under 37 C.F.R. § 1.823, field <213> must contain the organism from which the sequence came, using the organism's scientific name, "unknown," or "artificial."

Schuetz determined that the amino acid sequence encoded by SEQ ID NO:6 in the patent began with lysine—exactly as the Court found at claim construction—whereas the CD28 amino acid sequence in Sloan-Kettering's clinical construct did not. PX1304.2; PX1305.1; PX1306.1; Tr. 848:25-850:25, 855:21-856:12, 875:4-17, 881:5-11 (Schuetz). A year earlier, Dr. Bot at Kite had also determined that the amino acid sequence encoded by SEQ ID NO:6 began with lysine. Tr. 659:12-662:24.

Dr. Schuetz was able to find a problem with the '190 patent only because he received Dr. Sadelain's confidential information. Dr. Schuetz shared his findings on June 12, 2013. PX1305; PX1306; Tr. 855:5-858:15 (Schuetz). Not until after those conversations did the patentee—which was time-barred from seeking a broadening reissue, *see* 35 U.S.C. § 251(d)—request the CoC. PX2.719-.733.

### 1. Evidence and arguments that disregarded the inconsistent parts of the intrinsic record cannot sustain the verdict

An expert's gloss on cherry-picked excerpts from the intrinsic record is not a sufficient evidentiary basis for a reasonable jury to conclude that the CoC is valid. Ironically, while Plaintiffs' expert Dr. Quackenbush faulted Dr. Junghans for supposedly looking at only part of the relevant evidence, exactly the opposite is true. Dr. Quackenbush focused on those disclosures in the intrinsic documents that supported his opinion that the patent clearly was "intended" and the inventors "wanted" to cover amino acids 114-220. Tr. 1150:25-1151:1, 1157:20. He simply gave no import to the disclosures of amino acids 113-220 that were inconsistent with his opinion:

- He ignored that column 4 still includes the stop codon in describing SEQ ID NO:6.
- He ignored that the specification still describes Example 1 as having used a nucleotide sequence that encodes amino acid 113.
- He ignored the papers incorporated by reference describing Dr. Sadelain's sequence as starting with nucleotide 336 (and thus amino acid 113, lysine).
- He treated the sequence listings as though they are not part of the patent. Tr. 1151:22-25 ("there are essentially two documents; one is the patent itself, and the other is the second file called the sequence listing"). In fact, the sequence listings are the part of the specification where a patentee must disclose any nucleotides or amino acids it wishes to claim. 37 C.F.R. § 1.821(c); *id.* § 1.77(b)(13) (sequence listing is part of the specification).

-21-

- He claimed that SEQ ID NO:11, which lists amino acids 113-220 of CD28, "isn't relevant and shouldn't be considered." Tr. 1159:19-25. He again ignored the PTO's requirement that a patent "*must* contain" a sequence listing of any claimed amino acid. 37 C.F.R. § 1.821(c) (emphasis added).

Dr. Quackenbush's opinions also contradicted the prosecution history. He speculated that when Sloan-Kettering submitted the sequence listing that ended up in the issued patent, the attorney "grabbed the wrong file, the old file, and submitted it." Tr. 1153:6-1154:19 (resubmission of the "original file" was "exactly what happened"). In fact, the final submitted listing could not have been the "old" or "original" file because it included changes that had never appeared in any of the previously submitted listings. *See supra* pp. 19-20. That final sequence listing submission made the issued patent consistent with the description in column 7 and Dr. Sadelain's prior publications (including the Maher article that the patentee had identified as basis for the patent) of a costimulatory nucleotide sequence beginning with nucleotide 336.

### 2. Evidence to which a POSITA would not have had access is not legally relevant

Finally, Plaintiffs relied on evidence to which a POSITA reviewing the intrinsic record would not have had access, and which thus is legally irrelevant.

First, they made much of the fact that all of the CARs Dr. Sadelain worked on used a construct beginning with amino acid 114, not amino acid 113. *See, e.g.*, Tr. 1147:9-13 (Quackenbush) ("The question we should be asking ourselves is what is the right piece of CD28 . . . that Dr. Sadelain used in the experiments that he did."). The experts only learned that fact, however, from Dr. Sadelain's during litigation, which is not part of the intrinsic record. A POSITA reading the inconsistent disclosures of that intrinsic record would not know have had access to Dr. Sadelain's litigation testimony.

Second, Plaintiffs pointed to Dr. Rosenberg's having made a costimulatory region containing amino acids 114-220 based on the Maher article that was the basis for the patent filing. Tr. 253:19-254:9, 254:16-19 (Sadelain). That article, however, like the rest of the intrinsic evidence, contained inconsistencies: it disclosed a CD28 nucleotide sequence beginning with 336, which codes for amino acids starting with 113

(lysine), and a forward primer that amplified a DNA sequence coding for amino acids beginning with 114 (isoleucine). Whereas Dr. Sadelain specifically directed Dr. Rosenberg to use *the primers* disclosed in that article, Dr. Junghans, without the benefit of this extrinsic guidance, years before this litigation, made a CAR using *the specified nucleotide 336-660 range* from the same paper, and obtained a construct starting with amino acid 113 (lysine). Tr. 968:7-970:24; DX2149c-23 to -24. The claims of the patent define the claimed costimulatory sequence by the amino acid range encoded by the nucleotide sequence Dr. Junghans used, *not* by the primers Dr. Sadelain testified he told Dr. Rosenberg to use. Dkt. 100 at 14 ("the disclosure of specific primers" is "insufficient to rebut the express definition in the sequence listing"); Tr. 852:5-11 (Schuetz); *compare* PX1.23(26:29-44) (defining the primary signaling CD3 zeta-chain portion for claims 7-12 as an amplification product of specified primers).

\*                    \*                    \*

In sum, notwithstanding the RCE, the specification continued to describe embodiments consistent with original SEQ ID NO:6 and inconsistent with post-CoC SEQ ID NO:6, including: (1) repeated references to a sequence beginning with nucleotide 336; (2) column 4's description of SEQ ID NO:6 as including the stop codon; and (3) SEQ ID NO:11, listing amino acids 113-220. The intrinsic record created, at most, ambiguity about whether the costimulatory region of the invention began with amino acid 113 (lysine) or 114 (isoleucine). Dkt. 100 at 16 ("it is unreasonable to expect a POSITA to make each of the[] assumptions" needed to arrive at the CoC's definition of SEQ ID NO:6). Moreover, the Court considered and rejected most of the arguments Plaintiffs presented in its claim construction findings. The Court's findings were only confirmed by the relevant evidence at trial. When a patent uses inconsistent terms and the intrinsic record does not clarify which of the inconsistencies is in error, a broadening certificate of correction is invalid as a matter of law. *Superior*, 270 F.3d at 1370. The Court should enter JMOL that the CoC is invalid and, thus, Kite does not infringe.

## IV. Plaintiffs Adduced No Evidence that Kite Launched YESCARTA® Without Any Good-Faith Defense

"Willfulness" considers an accused infringer's "state of mind *at the time of accused infringement*." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018) (emphasis added). Plaintiffs thus had the burden of proving that Kite "intentional[ly] or knowing[ly]" launched YESCARTA® on October 18, 2017 with "no doubts about its validity or any notion of a defense." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932-33 (2016).

Plaintiffs did not meet that burden. Their arguments about willfulness focused on (i) Kite's not introducing evidence from fact witnesses expressing their belief that Kite did not infringe; (ii) Dr. Sadelain's communication with Dr. Rosenberg before the patent even issued; (iii) brief discussions between Drs. Dash and Belldegrun in 2014; and (iv) Kite's filing of an IPR in 2015. Tr. 251:10-262:21, 355:8-365:5, 613:13-625:4, 1386:7-1387:2.

The first consideration does not suggest willfulness, as Kite was not permitted to introduce fact witness testimony relating to its belief of noninfringement, because it had maintained privilege over the legal advice it received. *See infra* p. 47. The last three events, meanwhile, all took place years before Gilead acquired Kite and decided to launch YESCARTA®. Plaintiffs produced no evidence that Gilead launched YESCARTA® years later with "no doubts about [the '190 patent's] validity or any notion of a defense." *Halo*, 136 S. Ct. at 1932. To the contrary, Plaintiffs sued Kite immediately upon YESCARTA®'s launch, and in response, Kite promptly raised the very same defenses that it presented at trial, including its CoC defense, which left this Court with "misgivings" as to the validity of the CoC. Dkt. 246 at 7. No evidence at trial suggested that Kite lacked a good-faith belief in these defenses or that they lacked reasonable merit. *See Exmark*, 879 F.3d at 1353 (defendant may rely on objective reasonableness of its defenses).

## V. Sullivan's Proposed Damages, Which Were Adopted by the Jury, Violated Legal Principles and Were Not Supported by Sufficient Facts

It is Plaintiffs' burden to prove that substantial evidence supports the damages award. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). On JMOL, the Court "must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Id.* at 1336.

The jury's award, which is many times higher than any comparable license, is not supported by substantial evidence. It is based on a flawed expert analysis that, *inter alia*, failed properly to apportion for the incremental contributions of the '190 patent to YESCARTA®. The Federal Circuit has repeatedly reversed large jury awards that are not apportioned "to reflect only the value of the patented feature." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 894 F.3d 1258, 1270 (Fed. Cir. 2018); *see, e.g.*, *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326, 1329 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Plaintiffs presented no legally or factually sufficient basis for damages, and the only proper award is the one that Kite's expert Dr. Mohan Rao would have offered at trial but for the Court's *Daubert* Order.[3] To the extent the Court does not grant JMOL, the same arguments warrant a new trial on damages. *See* Part VI.

## A. Sullivan's damages opinion

The jury awarded Plaintiffs the exact amounts that their damages expert, Dr. Ryan Sullivan, proposed at trial, and thus "implicitly accepted [his] methodology." *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1359 (Fed. Cir. 1998).

Sullivan testified that his damages opinion was based on a license agreement between Juno and MSK ("MSK License"), which has a royalty rate of up to 7.25%, an upfront payment of $6.9 million, and potential milestone payments of $3.35 million

---

[3] The Court precluded Rao from offering his opinion that a 3.625% royalty rate would be appropriate because the hypothetical licensor was SKI (which would render a 7.25% sublicensing floor under the MSK License inapplicable), and from offering any apportioned royalty rate below 7.25%. Dkt. 473 at 11. Kite contends that this was error warranting a new trial on damages, and expressly preserves the issue for appeal.

through a first approval. DX1795, ¶¶ 4.1, 4.2.1. Sullivan testified that this was the only comparable agreement, with two other agreements—the St. Jude-Juno License ("St. Jude License"), PX401, and Juno-Novartis License ("Novartis License"), PX928— useful as "relative amounts." Tr. 801:6-17.

The basis for Sullivan's upfront payment, however, was **_not_** the $6.9 million upfront payment in the MSK License, which he did not use in his analysis. Instead, he used the maximum potential Juno stock appreciation "success fee" of $150 million found in a 2013 Side Letter Agreement ("Side Letter") between Juno and MSK, combined with the $3.35 million of potential milestone payments from the MSK License. Tr. 784:16-785:16, 786:3-5; PX241. Sullivan inflated the royalty rate, success fee, *and* milestone payments by a total factor of 3.82, which he opined was necessary to account for differences between the MSK-Juno agreements and the hypothetical license, to arrive at the numbers accepted by the jury: a $585 million upfront payment and a running royalty of 27.6% of net YESCARTA® sales. Tr. 795:4-21.

### B. The Side Letter's stock success fee was not a proper basis for the jury's upfront payment and was not apportioned

Of Sullivan's $585 million "upfront payment," 98% derives from his use of the Side Letter's potential $150 million success fee.[4] Under the Side Letter, the $150 million fee would be triggered if *Juno's* stock price increased 30-fold. PX241. Sullivan offered two insufficient justifications for using this fee: (1) it was a part of the MSK/Juno agreements; and (2) it was "triggered" as of the time of the hypothetical negotiation through "the increasing value of *Kite's* Series A stock." Tr. 785:7-19 (emphasis added). For multiple reasons, Sullivan's use of the Juno stock success fee was improper as a matter of law.

***First***, there is no foundation for Sullivan's assumption that the success fee was directly tied to use of the '190 patent, or would be part of the hypothetical license in an

---

[4] $150 million × 3.82 = $573 million. The remaining 2% ($3.3 million × 3.82 = $12 million) came from milestone payments in the MSK License to Juno.

arms-length negotiation focused solely on a license to that patent. The triggers for the Juno success fee did not depend on any use of the '190 patent. The Side Letter reflects a broad collaboration between an academic institution and a startup, not a bare patent license between publicly traded companies. Rao's unrebutted testimony was that success fees based on stock price are used when, as in the MSK-Juno relationship, "there is an extensive collaboration," not for bare patent licensing "between mature pharmaceutical companies." Tr. 1117:12-1118:5. And, in fact, SKI collaborated with Juno to develop and pursue regulatory approval for JCAR015. Tr. 266:14-267:6, 316:25-324:13 (Sadelain). Plaintiffs introduced no evidence explaining the Juno stock success fee or tying it to the '190 patent, while acknowledging a "major difference" between the hypothetical negotiation and the MSK agreements "between collaborators." Tr. 778:23-779:2 (Sullivan); *see* Tr. 349:4-16 (Dash) (MSK licenses "as a collaborator rather than a competitor"). Even MSK's negotiator for the Juno collaboration testified that the potential success fee was "a unique type of payment." Tr. 368:6-15 (Dash). Meanwhile, the sole competitor license that Sullivan relied on— the Novartis License (PX928)—did not include any fee based on equity appreciation.

Sullivan did not explain why competing companies would agree to a success fee based on the appreciation of the competitor's stock. He also did not explain why he ignored the *actual* upfront payment in the MSK License in favor of the Side Letter's stock success fee. In short, there was no basis for the jury to conclude that the Side Letter was comparable or that its terms were reasonable to include in the hypothetical license. *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872-73 (Fed. Cir. 2010) (vacating award based on insufficiently comparable agreements).

**Second**, even accepting, contrary to the evidence, that a stock success fee was appropriately added to the hypothetical license, Sullivan made no attempt to explain what portion of that compensation should be allocated to '190 patent rights, as required by Federal Circuit law. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (testimony relying on licenses "must account" for distinguishing facts

such as additional intellectual property conveyed in the license).

The MSK License, in addition to purporting to license the '190 patent, licensed five other patent families comprising numerous patents and applications, as well as extensive, "extremely valuable" know-how. Tr. 322:1-3 (Sadelain); *see also id.* at 834:5-836:2 (Sullivan) (conceding know-how was "very valuable"); DX2093 at Ex. A, Ex. B (listing patents and know-how). The "Royalty for Know-How Rights Alone" was half of the overall 7.25% royalty rate. PX924.13 at 4.2.2. Moreover, as noted above, the Side Letter conveyed Juno's stock success fee to MSK as part of a broad-ranging collaborative relationship, whereas the hypothetical license would have been a naked license to a single patent. *See* PX241.1. Sullivan's unapportioned allocation of the entire success fee to the '190 patent is unsupported by the evidence and ignores legal requirements for calculating patent damages.

**Third**, Sullivan fundamentally altered the consideration in the Side Letter without factual or legal basis. The Side Letter's potential success fee ranged in possible values from $0 to $150 million, depending on Juno's stock appreciation. Tr. 784:20-785:6; PX241.23. The expected value of this consideration at the time of the agreement thus depended on the parties' expectations about Juno's future appreciation. It is undisputed that Juno's auditors assigned the potential success fee a "*de minimis*" value, in other words, "negligible for what Juno would likely pay." Tr. 1118:19-1119:4 (Rao).

Using comparable licenses is "typically reliable" because "the parties are constrained by the market's actual valuation." *CSIRO v. Cisco Sys., Inc*., 809 F.3d 1295, 1303 (Fed. Cir. 2015). But Sullivan did not use the "market's actual valuation," which the evidence showed was *de minimis.* Instead, he made two changes that fundamentally altered the value of the bargain. First, he substituted the appreciation of *Kite's* stock for the appreciation of Juno's stock. *See* Tr. 785:12-16. Expectations about stock appreciation, however, are not fungible from one company to another, any more than stock itself is fungible from one company to another. None of the factors tied to the $150 million figure—Juno's initial share price, range of offerings, likelihood of 30-fold

growth, or impact of that growth on Juno's overall capitalization —is transferable to Kite. As the Court previously recognized, use of *Kite's* stock price instead of Juno's "without accounting for other factors" is unreliable. Dkt. 473 at 8. Sullivan could not reliably substitute Kite's stock appreciation for Juno's to calculate the success fee.

Sullivan's second alteration changed the time for valuing the "success fee," from its *ex ante* value when granted, which was *de minimis*, to an *ex post* value far exceeding the fee actually realized. *See* Tr. 806:7-10, 807:15-19 (Sullivan). That was also incorrect, as the "market's actual valuation" reflected in the Side Letter would have been discounted for the likelihood that the payment would never be made. Just because Juno would have agreed to pay up to $150 million in stock success fees when it believed (correctly) that the triggering condition would never materialize does not mean Kite would have agreed to pay the same when the payment was a foregone conclusion.

**Fourth,** the success fee improperly treated appreciation of Kite stock as reflecting use of the '190 patent. *See Pullman's Palace-Car Co. v. Cent. Transp. Co.*, 171 U.S. 138, 154 (1898) (increase in stock price "not a proper measure of the value of [company] property"). The period of appreciation used by Sullivan compensated Plaintiffs for Kite's research and regulatory activities prior to the date of the hypothetical negotiation, and for which no license was required.[5] Plaintiffs' failure to tie the success fee to any period for which Kite required a license violated the rule that "a reasonable royalty determination . . . must relate to the time infringement occurred." *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006).

Moreover, the undisputed evidence showed that, after the hypothetical negotiation date, YESCARTA®'s and Kite's value were driven by numerous factors apart from the patented construct, including Kite's successful clinical trials,

---

[5] "It shall not be an act of infringement" to engage in the premarketing development Kite undertook before October 2017. 35 U.S.C. § 271(e)(1).

commercially viable manufacturing platform, lymphodepletion regimen, and physician outreach. *See, e.g.*, 769:5-11, 816:21-23 (Sullivan) (no commercialized product without "other contributors to YESCARTA," including clinical protocols, manufacturing, administration, and lymphodepletion); 1060:3-18 (Dickinson) (Kite's "fundamental advantage" was "a completely differentiated manufacturing system"); Tr. 650:25-651:3 (Bot); 923:21-924:16 (Komanduri).

It was also undisputed that Kite's enterprise value was driven substantially by future, non-infringing therapies that would "develop over a 20-30 year timeframe." Tr. 1053:7-15 (Dickinson). Gilead projections in 2017 assumed that by 2020, revenues from therapies using non-infringing constructs would begin replacing the "first generation" product using the accused construct. DX2011c-8 (Board of Directors materials for Kite acquisition showing multi-generation revenue forecast); *id.* at DX2011c-6 (identifying "second generation" product as "human anti-CD19" in trials at NCI); Tr. 665:1-668:18 (Bot) (second generation product does not use amino acids 114-220 of CD28). And by 2024, when the patent expires, all revenues are non-infringing.

No reasonable jury could therefore find that a 30-fold appreciation in Kite's stock price prior to 2017 derived entirely from infringing the '190 patent. That conclusion is underscored by evidence that Juno tried to commercialize the patent but never appreciated that much. Tr. 806:7-10, 807:15-19 (Sullivan) ("Juno stock price never . . . triggered that $150 million payment"). Juno's failed efforts to commercialize the '190 patent underscore the critical importance of Kite's independent contributions discussed above. *See, e.g.*, Tr. 419:5-10, 423:22-424:21 (Gilbert) (Juno halted clinical trial of JCAR015, which used the '190 patent, after patient deaths related to lymphodepletion and manufacturing); 493:6:13 (Juno manufacturing facility still not ready for FDA inspection). Sullivan's unapportioned attribution of Kite's entire stock appreciation to the incremental contributions of the '190 patent was contrary to law.

**C.    Sullivan's running royalty violated apportionment principles**

The 27.6% royalty, applied to the value of the entire YESCARTA® therapy, also violates the apportionment requirement. Sullivan admitted that Kite made contributions separate from the patent, such as the "manufacturing processes, and administration, and lymphodepletion." Tr. 769:5-11, 818:11-15. Yet his only basis for opining that he had separated out the value of all other contributors was that the CAR construct is essential to YESCARTA®. *Id.* at 769:11-15 ("[W]ithout the CAR construct, there isn't anything to manufacture . . . ."). That one aspect of a multi-faceted product is "essential," however, is not enough to disregard other contributions. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) (to use "entire market value" as royalty base, it is not enough to show that patented feature is "valuable, important, or even essential"); *see also Lucent*, 580 F.3d at 1322 (crediting "non-patented elements, such as 'the manufacturing process, business risks, or significant features or improvements added'"). Sullivan performed no analysis to value other "essential" inputs such as manufacturing and clinical know-how in determining his royalty. Sullivan also departed wildly from the incremental value of CAR-T constructs indicated by the comparable licenses. There was no evidentiary basis for the jury to conclude Sullivan's royalty—nearly quadruple the unapportioned MSK royalty—reflected the incremental contribution of the '190 patent to the entire therapy.

### D.  Sullivan's "adjustments" lack sufficient basis

Sullivan's near-quadrupling of his starting values was unreliable, and cannot be substantial evidence supporting the jury award. For his first adjustment, Sullivan illogically opined that because Juno was able to obtain a 2.25% markup when it sublicensed the St. Jude patent to Novartis (4.75% − 2.5% = 2.25%), it could obtain a 6.5% markup when it would supposedly license the MSK patent to Kite (7.25% × 0.9 = 6.5%), as well as nearly double the upfront payment. *See* Tr. 787:21-788:11.

Sullivan's second "Kite Competition" adjustment (which, alone, nearly triples his royalties), is also illogical and lacks evidentiary support. Sullivan used a 2016 Juno spreadsheet assuming a future three-player market and calculated Juno's supposed

additional revenue absent Novartis, and a different 2017 Juno spreadsheet also assuming a future three-player market, and calculated Juno's supposed additional revenue absent Kite. Tr. 793:18-794:2. From this he concluded that Juno would have expected to lose three times more revenue from licensing Kite than Novartis. *See id*. This conclusion was unreliable and not supported by evidence. Sullivan did not speak to anyone at Juno about the spreadsheets he used as the baseline for his calculation, and no Juno witness offered any foundation for or explanation of them. Tr. 833:18-23. Sullivan's assumptions about the proportion of Kite's or Novartis's sales that Juno would expect to make and be able to manufacture in the absence of either competitor similarly lacked any factual foundation from a Juno witness. Sullivan simply assumed without evidence all of the factors from which courts allow experts to conclude that a a competitor caused lost profits. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). Contrary to Sullivan's unsupported assumptions, the former Head of CAR-T Programs at Celgene (who worked with Juno in developing CAR-T therapies) testified that Celgene expected Novartis to be a stronger competitor than Kite given Novartis's use of a "better" CAR-T construct, larger size and resources, and reputation. Tr. 936:2-21, 937:14-17 (Amoroso). Yet, Sullivan opined that a reasonable royalty to Kite would be more than five times greater that paid by Novartis. *See* PX928.8.

Finally, regardless of the applicable damages period, Sullivan used this adjustment based on supposed competitive harm *after* Juno anticipated entering the market, but asked the jury to apply it to a royalty base *before* Juno entered the market or even anticipated doing so. *See* Tr. 487:12-19 (Gilbert) (Juno anticipated potential launch in mid-2019). Thus, no reasonable juror could have concluded the Kite Competition adjustment does not overcompensate Juno.

### E. There was no basis to nearly quadruple the stock success fee

As applied to the success fee, Sullivan's upward adjustments were unfounded for additional reasons. Sullivan claimed his adjustments made the 2013 MSK-Juno relationship comparable to the 2017 hypothetical license. Tr. 780:2-18 (first adjustment

to "get[] us to 2015," then "second adjustment to get us to Kite and Juno in 2017 at the hypothetical negotiation"). But he had already "adjusted" the value of the potential stock success fee, from *de minimis* in 2013 to $150 million in 2017, by assuming the licensee's success in solving all the technological hurdles to developing a successful CAR T therapy. No additional "adjustments" were appropriate to make the fee "comparable" to a hypothetical license in 2017.

Further, there was no factual basis for inflating the already-excessive $150 million success fee. Sullivan made his first adjustment because the royalty rate in the 2015 Novartis License was approximately double the rate in the 2013 St. Jude License. Tr. 787:6-788:11. But neither license included stock success fees, so there was no evidentiary support for doubling such fees. PX401; PX928. Likewise, Sullivan testified that his second adjustment was necessary because Novartis in 2015 posed less of a competitive threat than Kite in 2017. Tr. 790:11-791:13. But there was no evidence that a reasonable hypothetical negotiator would charge a higher stock "success fee" to a bigger competitor (or, in fact, to any competitor). The quadrupling of the stock success fee had no basis in any evidence presented at trial.

### F.    No comparable licenses support the damages award

No comparable licenses in evidence support the damages verdict. Sullivan testified that the only comparable license was the MSK License, and that the only other licenses relevant to the reasonable royalty were Juno's agreements with St. Jude and Novartis. Tr. 801:13-17. In those licenses, the upfront payments, even when potential milestone payments for multiple approvals are included, are, at most, in the tens of millions of dollars. The royalties range up to 7.25%—not remotely in the range of Sullivan's respective upfront payment and royalty.

| License | Running Royalty | Upfront Payment | Upfront Payment Plus Potential Milestones |
|---|---|---|---|
| MSK (2013) | Up to **7.25%** (PX924.12-13) | **$6.9M** (PX924.12) | **$16.65M** through two or more approvals (PX924.15-16) |
| St. Jude (2013) | **2.5%** | **$25M** | **$87.5M** through two approvals |

| | (PX401.28) | (PX401.28) | (PX401.29-30) |
|---|---|---|---|
| Novartis (2015) | **4.75%** (PX928.8) | **$12.25M** (PX928.8) | **$88M** through two approvals (PX928.9-10) |

The Novartis License is a compelling comparable because it is between two CAR-T competitors, closest in time to the hypothetical negotiation, for a patent covering a CAR-T construct. *See* PX928. Specifically, the license covers the 4-1BB construct Novartis uses in its approved Kymriah® therapy, and that Juno uses in its JCAR017 candidate. Tr. 821:18-822:9 (Sullivan); *see also* Tr. 934:20-935:15 (Amoroso) (JCAR017 "was a best-in-class asset"); Tr. 936:2-6 ("[O]ur hypothesis was that [4-1BB] would be a better construct leading to better efficacy and safety than the CD28 constructs"); Tr. 739:5-24 (Bishop) (4-1BB was point of differentiation for Juno). Sullivan discounted the comparability of this license because it was part of a settlement. Tr. 821:8-17. But sometimes the "most reliable license in [the] record [arises] out of litigation." *ResQNet*, 594 F.3d at 872. This is such a case, as the Novartis License was much more similar to the hypothetical negotiation on both counts upon which Sullivan based his drastic "adjustments" to the MSK License: the 2013 date and the non-competitor relationship between MSK and Juno. Tr. 778:5-780:18. No reasonable juror could conclude that the hypothetical negotiation would have resulted in a royalty more than five times greater than what another competitor paid for a highly comparable patent just two years earlier. Sullivan's excessive departure from every comparable license makes his opinions "out of line with economic reality," and the jury award lacks sufficient legal and factual basis. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31-33 (Fed. Cir. 2012) (insufficient evidence to support royalty that was "a multiple of the average license amounts presented"); *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) ("a past royalty range of 3-12% fails to explain a 26.3% hypothetically negotiated rate"). "[A]ctual licensing evidence . . . is highly probative of the patented invention's economic value in the marketplace," and a royalty theory that "cannot be reconciled" with real-world licenses lacks evidentiary support. *LaserDynamics*, 694 F.3d at 80.

-34-

## VI.    A New Trial is Warranted

The Court may grant a new trial "on all or some of the issues" where "the verdict is against the weight of the evidence," the "damages are excessive," or "for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); Fed. R. Civ. P. 59(a). This encompasses trial error, attorney misconduct, and "erroneous jury instructions, as well as the failure to give adequate instructions." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). In considering a motion for a new trial, the Court "is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix, L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

The liability verdict contravened the clear weight of the evidence for the reasons discussed already. Likewise, as discussed, the damages award—one of the largest patent verdicts in history—was against the clear weight of the evidence of comparable licenses and the contributions of the single patented component to Kite's money-losing cancer therapy.[6] *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65-66 (1966) ("If the amount of damages awarded is excessive, it is the duty of the trial judge to require a remittitur or a new trial."). Equally troubling, error and Plaintiffs' misconduct recurred throughout trial. Because these errors "tainted the verdict," *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019), and "the flavor of misconduct . . . sufficiently permeated [the] entire proceeding," *Anheuser-Busch, Inc. v. Nat'l Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995), a new trial should issue.

### A.    Kite's receipt of the incorrect special verdict form prior to closing argument warrants a new trial

District courts "shall disclose at least the substance of special interrogatories

---

[6] The verdict is listed as the seventh-largest patent jury award ever, according to Docket Navigator. Gratzinger Decl. ¶ 3. Gilead's 2017 projections, which were too optimistic, projected operating losses through 2021. DX2011c-0010.

before closing arguments have been completed." *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 522 (9th Cir. 1999); *see also Landes Const. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1374 (9th Cir. 1987) ("The form of the [special] verdict should be decided before closing argument so that counsel may structure their arguments … accordingly."). "The failure to follow this practice may constitute reversible error." *Landes*, 833 F.2d at 1374. The special verdict form provided to Kite just before closing, and around which Kite structured its argument, was not the form given to the jury. The error and resulting prejudice to Kite can only be cured with a new trial.

### 1. Kite requested, received, and argued from a special verdict form limited to past damages

On December 10, 2019, after the close of evidence and before closing arguments, Kite asked the Court for a special verdict form indicating that the damages period would be only through trial. Tr. 1312:2-1313:1. Kite's request was based on Sullivan's disclosed damages opinion that Juno was not seeking compensation for "any type of future anticipated harm," and the Court's prior ruling that he would be held to that opinion. *See* Dkt. 473 (*Daubert* Order) at 7. The Court took Kite's request under submission. Tr. 1313:2-1314:12.

The next day, shortly before the jury was charged, the Courtroom Deputy Clerk handed all counsel hard copies of the closing jury instructions and verdict form. Young Aff. ¶¶ 7, 8. As Kite had requested, the verdict form specified that the damages period for the upfront payment extended only through trial. *Id.* ¶ 7. Juno's counsel did not object to this aspect of the form prior to closing.

In closing, Kite showed the jury the verdict form that it had received from the Court, highlighting the language indicating that the jury was only to award damages through the date of trial. *See* Young Aff. Ex. 4 at DDX-747 (showing highlighted excerpt of proposed verdict form). Kite argued that Sullivan's proposed royalty was excessive, "crazy," and "[ir]rational" in view of the two-year damages term specified on the form and Kite's net sales during that term, together with the fact that Juno did

KITE'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL

not even have a product during the damages period. Tr. 1499:2-13, 1502:17-1504:6. Kite asked the jury to disregard the big numbers that Juno had pointed to because "we're only talking about a two-year period" and the numbers "go far beyond the term." *Id.* at 1504:1-20. Kite asked the jury to award, at most, Rao's prorated upfront payment of $7.3 million, arguing that it is "proper to prorate it because of the limited period of damages," and that it is "the highest amount of damages that is reasonable." *Id.* at 1502:22-23; 1505:18-21. Kite made no argument as to the proper upfront payment if the damages period were not limited through trial. *See id.*

After closings, the Court gave the parties a hard copy of the verdict form that, *again*, specified that the damages term for the upfront payment extended only through trial. Odell Aff. ¶ 3-4. Only then did Plaintiffs ask to revise the term for the upfront payment reflected in the form. Tr. 1540:1-18. In response, the Court stated that the verdict form from which Kite had argued was different from "the one that the Court intended to provide to the jury." *Id.* at 1541:4-5. The Court then gave the jury a verdict form for an upfront payment with no limitation to past damages. Young Aff. ¶ 12.

### 2. The Court's substitution of a different special verdict form after closing arguments prejudiced Kite

The prejudice to Kite is clear. Kite promised the jury a special verdict form that would be limited to past damages, and on that basis asked the jury to award an upfront payment of $7.3 million. When the jury did not receive the verdict form Kite promised, it unsurprisingly rejected Kite's number. Kite had no opportunity to advocate any number that corresponded to the interrogatory the jury was charged to answer. For example, Kite could have advocated for the $88 million upfront payment that Rao calculated for a license through expiration, but did not do so in light of the verdict form.

The error also infected Kite's criticisms of Plaintiffs' damages. For example, with the correct special verdict form, Kite would not have focused on revenues through trial but rather that Sullivan's royalty eliminated almost all of Gilead's long-term expected profit. *See* Tr. 1053:16-20 (Dickinson) (after a period of losses, expected

profit margins of 30%-40%). The error also tarnished Kite's credibility.

**B.    Kite was prejudiced by Sullivan's testimony inconsistent with his disclosed opinions and contrary to the *Daubert* ruling**

A new trial is also warranted based on Plaintiffs' prejudicial introduction of opinion testimony about future harms that was not disclosed in Sullivan's report, in flagrant disregard of the Court's *Daubert* Order and Plaintiffs' discovery obligations. *See Stop Staring! Designs v. Tatyana, LLC*, 625 F. App'x 328, 330 (9th Cir. 2015) ("[A] new trial is appropriate where improper expert testimony affected the verdict."); *McMillan v. Weeks Marine, Inc.*, 478 F. Supp. 2d 651, 659-60 (D. Del. 2007) (ordering a new trial where expert testimony went beyond the scope of expert report).

**1.    Sullivan's disclosed opinions were limited to past damages**

Until the eve of trial, Plaintiffs were seeking only past damages. Sullivan's May 17, 2019 expert report stated that his upfront fee "does not reflect compensation for any type of future anticipated harm." Dkt. 311-1 ¶¶ 54, 169, 350. And Plaintiffs reserved the right to seek injunctive relief, which was inconsistent with compensation for future sales. *Innogenetics, N.V. v. Abbott Labs*., 512 F.3d 1363, 1380 (Fed. Cir. 2008) (injunctive relief unavailable where Plaintiffs obtained a "market entry fee" that compensated for future sales, because Plaintiffs could not then claim harm from continuing sales); Dkt. 484 (12/4/19 Second Amended Complaint) at 18 (seeking "[a]n order permanently enjoining Kite from further infringement"). Sullivan testified in deposition that there was no inconsistency between his upfront award and future lost profits or injunctive relief. Dkt. 311-5 at 108:8-110:18. Thus, Plaintiffs' election of remedies and their choice to cabin Sullivan's award to past damages was clear.

But once Kite moved to exclude Sullivan's opinions (Dkt. 270; Dkt. 309), Plaintiffs tried to rewrite them. They pivoted to saying that Sullivan's upfront payment *would* preclude injunctive relief, and that it covered "the full remaining term of the patent." Dkt. 321 at 1. The Court correctly rejected this "late attempt to rewrite Dr. Sullivan's report [with respect to the upfront payment damages period] on the eve of

trial," recognizing that the last-minute change was "prejudicial to [Kite]." Dkt. 473 (*Daubert* Order) at 7. The Court limited Sullivan to his disclosed opinion that his upfront payment is for "harms realized at the hypothetical negotiation, not compensation for any type of future anticipated harm." *Id.*

### 2. Sullivan offered confusing, contradictory, and improper opinions that were previously undisclosed

Sullivan's opinions continued to morph at trial. While he paid lip service to the Court's order limiting him to his disclosed opinions, his testimony went far beyond that. On direct, Sullivan testified that his $585 million *upfront payment* was for "financial harms and benefits that are realized at the time of the hypothetical negotiation." Tr. 798:20-23. But on cross, Sullivan acknowledged that his 9-figure upfront payment necessarily "applies throughout the term" of the '190 patent, and thus, 2024. *Id.* 810:5-6. Kite promptly moved to strike that testimony but that motion was denied. Dkt. 527 at 1; Tr. 798:6-11.

If, contrary to Sullivan's disclosed opinions, the upfront payment applies "throughout the term," it should preclude any post-trial relief. *See Innogenetics*, 512 F.3d at 1380. But Sullivan's testimony about the prospect of future compensation was self-contradictory. For example, when pressed on whether his royalty would leave Kite with uncertainty about how much more it may have to pay in lost profits if Juno entered the market, Sullivan said that his proposed royalty would provide the parties with "certainty and resolution." Tr. 815:5-11. Yet elsewhere, he claimed that the result of the hypothetical negotiation would leave Kite with the risk of additional damages to compensate for future lost profits. Tr. 812:9-813:9, 815:12-15. Kite would not obtain "certainty and resolution" in the hypothetical license if, as Sullivan opined, Plaintiffs could receive all of the bargained-for compensation and still sue Kite for lost profits as soon as Juno launches a product.

It would be nonsensical for parties to negotiate a one-time deal with an upfront payment to eliminate future uncertainty, yet still be exposed to additional claims if lost

profits turn out to be more than anticipated harm. *See* Dkt. 311-1 (Sullivan Rep.) ¶ 155; Dkt. 313-4 (Rao Rep.) ¶¶ 21, 190 (no dispute among experts that parties are ultimately negotiating total expected value of a license). Sullivan's conflicting opinions about whether or not his proposed royalty fully compensates for future harms are confusing and irreconcilable. They should not have been offered to the jury, and provide an improper basis for the award.

### 3.    Sullivan's trial testimony prejudiced Kite

The Court's *Daubert* Order recognized that allowing Sullivan to alter his damages opinions on the eve of trial would prejudice Kite. Dkt. 473. The Court was correct. Kite spent the prior two years developing fact and expert discovery in preparation for a trial on past damages. Had Kite understood that it would be defending itself against a claim for compensation for use of the '190 patent through 2024, Kite would have developed and tried an entirely different damages case.

To take one example, Kite would have developed and introduced additional evidence and argument that, as of the hypothetical negotiation date, it anticipated having non-infringing constructs available well before 2024. As discussed in Part V.B, Gilead projected that revenues from therapies using improved, non-infringing constructs would begin replacing revenues from the "first generation" YESCARTA® product using the accused construct by 2020. Kite could have prepared fact and expert witnesses to further develop and explain these facts, but did not do so, understanding the relevant timeframe to be through the end of 2019.

Kite should not have had to defend itself against a previously undisclosed and fundamentally different damages theory midway through an extremely compressed trial with nearly $1 billion at issue. The prejudice to Kite warrants a new trial.

### C.    Plaintiffs' reliance on large, irrelevant figures as anchors was misleading, confusing, and unfairly prejudicial

A new trial is also warranted because Plaintiffs' closing argument asked the jury to adopt Sullivan's proposed royalties based on large and misleading anchor numbers.

-40-

Before trial, Kite suspected that Plaintiffs would try to rely on such anchors to make Sullivan's royalty look "reasonable" in comparison, and asked the Court to exclude them. Dkt. 309 (MIL No. 1 Opening Br.) at 12. The Court recognized the prejudicial impact of presenting such large figures and excluded all but one. Dkt. 473 at 9. Nonetheless, at trial, Plaintiffs found other irrelevant nine-figure values to show the jury for the same improper and misleading purpose that Kite had previously raised.

Plaintiffs' closing argument repeatedly asked the jury to adopt Sullivan's proposed royalties based on large numbers that Sullivan did not use in his comparable license methodology to calculate damages: (a) $7.1 billion projected profits through patent term; (b) $6.2 billion alleged "value" of YESCARTA®;[7] (c) $1.3 billion projected annual "negative impact" to Juno; (d) $1 billion supposed "upfront payment" from Celgene-Juno Agreement; and (e) 20-30% royalty rates that were purportedly "common" for late stage technologies. *See* Tr. 1370:25-1371:3, 1407:5-1409:1, 1411:13-1413:19, 1506:23-1508:1, 1530:7-12, 1532:12-17, 1534:6-11. These are all irrelevant, unapportioned amounts.

The $7.1 billion in profits projected by Kite and the $6.2 billion figure in Gilead's SEC statements are not apportioned to the incremental contribution of the '190 patent. Furthermore, the latter figure reflected value over a period of <u>eighteen years</u>, more than a decade past the '190 patent's expiration. *Id*. at 1063:12-1064:1, 1069:6-9 (Dickinson); PX72.81 (stating value "amortized over an estimated useful life of 18 years").

Sullivan testified that $1.3 billion was an estimate of Kite's future impact on Juno's annual revenue, based on Juno's hypothetical sales if it enters the market. Tr. 793:9-794:2. Plaintiffs nonetheless incorrectly argued that this figure was evidence that Kite would have a $1.3 billion "negative impact" on Juno "in 2017 alone"—a year in which Juno had zero sales to lose. *Id.* at 1407:19-24. This highly speculative number,

---

[7] Kite's motion *in limine* to exclude this figure was denied. Dkt. 473 at 9. This error also supports Kite's motion for a new trial and is a basis for appeal.

1   which Sullivan only used in passing for a different purpose, was highly misleading.

2       The supposed "$1 billion upfront payment" that Mr. Dulac said Celgene paid to

3   Juno, consisted of an $849.8 million purchase of Juno stock, as well as a $150 million

4   payment for a research and collaboration agreement. Dkt. 311 (Sullivan Report) at

5   Attach B-1 pp. 21-22; *see also* Tr. 1064:21-1066:3 (Dickinson) (Celgene-Juno deal

6   involved a "huge equity investment"). There is no evidence that this agreement bore

7   sufficient similarity to the circumstances of this case to inform the hypothetical

8   negotiation, and no expert relied on it. Similarly, Plaintiffs' reliance on Dulac's citation

9   to 20-30% royalty rates as "not uncommon" for late stage technologies was irrelevant,

10  as it was not tied to any license, let alone evidence of comparability. The jury should

11  not have been encouraged to focus on data points that the experts agree should not be

12  used. *See* Dkt. 653-1 (Kite's Objections to Dulac) at 1-2; *LaserDynamics*, 694 F.3d at

13  80 (holding that reliance on irrelevant patent licensing programs to the exclusion of

14  comparable licenses "simply [had] no place in th[e] case" where it served no purpose

15  other than to "to increase the reasonable royalty rate above rates more clearly linked to

16  the economic demand for the claimed technology"). By contrast, the Court *excluded*

17  evidence, relied upon by Rao, that Juno's and Celgene's financial projections projected

18  a maximum $50 million upfront payment and 10% pre-launch royalty rate for the '190

19  patent. Dkt. 473 at 12. This was error and further supports a new trial.

20      The use of unapportioned numbers as "checks" on the "reasonableness" of a

21  damages award is grounds for a new trial, even in view of instructions for the jury to

22  apportion for the incremental value of the patent. *Uniloc USA, Inc. v. Microsoft Corp.*,

23  632 F.3d 1292, 1321 (Fed. Cir. 2011). Where, as here, plaintiffs "repeatedly

24  emphasize[]" large, unapportioned values and do "not particularly take care to avoid

25  skewing the damages horizon for the jury," it is "possible, even probable, that

26  [Plaintiffs'] overall approach . . . skew[ed] the damages horizon for the jury" and was

27  prejudicial. *Mondis Tech. Ltd v. LG Elecs., Inc.*, 407 F. Supp. 3d 482, 496-97 (D.N.J.

28  2019) (citing *Power Integrations*, 894 F.3d at 1270) (whether or not it affected the

verdict, plaintiff's repeated emphasis on entire $10 billion market value of accused television warranted new trial on $75 million award); *see also Uniloc*, 632 F.3d at 1320-21 (affirming new trial where an unapportioned "check" in the form of a "$19 billion cat was never put back into the bag"); *Ericsson*, 773 F.3d at 1226 ("[C]are must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product."); *Koninklijke Philips N.V. v. Zoll Lifecor Corp.*, 2017 WL 9509938, at *54 (W.D. Pa. May 12, 2017) ("[A] jury may be misled . . . [by] a jury argument that the 'market value' of the 'entire' product commercialized is some large number (for example $ 500 million), and thus a small percentage . . . must therefore be 'reasonable.'"); *Medtronic, Inc. v. Catalyst Research Corp.*, 547 F. Supp. 401, 414-15 (D. Minn. 1982) (admission of exhibits without any apportionment and emphasis on large profits required a new trial).

Here, Plaintiffs made clear that their purpose in parading these huge numbers in front of the jury was to "skew the damages horizon" so that Sullivan's exorbitant and unfounded damages numbers would seem "reasonable" by comparison. *See, e.g.*, Tr. 1407:5-1409:1 (Plaintiffs' closing) (arguing these numbers are "key data points" and "real anchors in the real world" as to what "hypothetical negotiation outcome would have been"); 1414:15-19 (Plaintiffs' damages "may sound high" but "this is an area where companies like Celgene are willing to pay a billion dollars upfront"). The jury's unblinking acceptance of Sullivan's huge, nonsensical damages figures shows that Kite was in fact prejudiced by these tactics, and warrants a new trial.

### D. The written description instruction provided to the jury was fundamentally flawed

A new trial should be granted because the jury instruction on written description failed to fairly and correctly cover the legal standard for written description of genus claims.

Genus claims present unique issues in assessing written description. *Ariad*, 598 F.3d at 1352. The patent cannot merely describe one embodiment, but must describe

-43-

1   the "full scope" of the claim. *Id.*; *Carnegie,* 541 F.3d at 1126. Accordingly, "a sufficient

2   description of a genus . . . requires the disclosure of either a representative number of

3   species falling within the scope of the genus or structural features common to the

4   members of the genus so that one of skill in the art can 'visualize or recognize' the

5   members of the genus." *Ariad*, 598 F.3d at 1350.

6        This longstanding rule has only become more firmly entrenched in the roughly

7   ten years since the *Ariad* decision. *See, e.g.*, *Idenix*, 941 F.3d at 1164; *D Three Enters.,*

8   *LLC v. SunModo Corp.*, 890 F.3d 1042, 1047 (Fed. Cir. 2018); *Amgen Inc. v. Sanofi*,

9   872 F.3d 1367, 1373 (Fed. Cir. 2017); *AbbVie*, 759 F.3d at 1299; *Bos. Sci.*, 647 F.3d at

10  1363; *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1352 (Fed. Cir. 2011);

11  *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031,

12  1037 (Fed. Cir. 2011).

13       The Court's instruction on written description here was legally inadequate

14  because it did not correctly reflect these legal standards. Although the Court's

15  instruction followed a model instruction for written description, model instructions on

16  issues of patent law are not entitled to any "special status" when they "have not been

17  endorsed or approved" the Federal Circuit. *See Eko Brands, LLC v. Adrian Rivera*

18  *Maynez Enterprises, Inc.*, 2020 WL 130439, at *6 (Fed. Cir. Jan. 13, 2020). The

19  instruction used by the Court is inadequate for a case involving genus claims. It referred

20  to "the invention" in the singular, did not include the word "genus" or explain that the

21  specification must describe the "full scope" of the claims. The instruction also did not

22  include the *Ariad* standard laid out above for analyzing written description of genus

23  claims or any additional explanation, such as that set forth in Kite's proposed

24  instruction. *See* Dkt. 372 at 92-93. In short, the Court did not instruct the jury on the

25  law needed to assess written description for the asserted genus claims.

26       The Court's instruction unfairly prejudiced Kite because it invited the jury to

27  ignore that the '190 patent does not adequately describe the full scope of each asserted

28  genus claim. Kite presented clear and convincing evidence that the patent does not meet

-44-

any of the legal standards for genus claims, including that the patent does not disclose representative species or common structural features. *See supra* Section I. But the instruction did not explain how the jury was to assess this evidence—or even that it must be considered. Under the Court's instruction, the jury was free to forgo the required analysis of whether the asserted genus claims were adequately described and instead improperly find in favor of Juno by merely concluding that the specification had the same words as found in the claim or superficially described a single embodiment. Because the instruction was incorrect and prejudicial to Kite, this Court should order a new trial on Kite's written description defense. *See Amgen*, 872 F.3d at 1375-79 (remanding for new trial because district court improperly instructed jury on written description).

## E.   Plaintiffs misled the jury about the *inter partes* review

In an IPR, a party "cannot challenge the validity of [a] certificate of correction," Dkt. 100 at 16, or seek to invalidate a patent for lack of adequate written description or non-enablement. 35 U.S.C. § 311(b). The IPR thus had no bearing on Kite's defenses but presented a grave danger of misleading a lay jury. *See* Dkt. 272, 357. In seeking relief, Kite predicted that Plaintiffs otherwise "will dwell on the IPR and its outcome throughout trial, suggesting something nefarious in Kite's exercising its legal right to file. . . [an] IPR . . . and implying that the decision undermines Kite's liability defenses." Dkt. 357 at 1. Over Kite's repeated objections, *see, e.g.*, Dkt. 272; Tr. 619:7-8, 619:17, 621:22-24, 623:23-24, 624:11, 1531:18, 1532:9-10, 1538:7-19, 1543:9-17, Plaintiffs did precisely that.

During trial, the Court allowed "testimony and evidence regarding *the filing* of the petition" because it "arguably" could rebut the "suggest[ion]"—elicited during Plaintiffs' cross examination—"that the '190 patent was not important to Kite or to [Dr. Belldegrun]." Tr. 604:12-17; *see also* 605:25-606:1 ("The Court: . . . . And the focus is *the filing* of the IPR, and how that can be interpreted . . . ." (emphases added)). This alone was error, but it was compounded when Plaintiffs then exceeded the Court's

allowance and used the IPR to mislead the jury that they would be second-guessing the decision of "three patent judges."

During Plaintiffs' examination of Dr. Belldegrun (to which Kite objected), Plaintiffs stressed that "three patent judges" had, after "careful consideration of arguments from both sides," already "decided that all of the claims that were challenged by Kite were affirmed and none of the challenged claims were invalidated." Tr. 619:2-6, 13-19. Then, in their rebuttal closing—when Kite had no opportunity to respond—Plaintiffs repeatedly invoked the PTAB's decision over Kite's objections, prompting a mistrial motion, Tr. 1531:18, 1532:9-10, 1538:7-19, 1543:9-17. They told the jury that "three patent judges" had already resolved "related" issues, and that "*the world will take note of how you decide this case*" because "there were three trained patent judges looking at issues relative to the validity of the patent." Tr. 1531:14-17, 1533:22-1534:5 (emphasis added); *see also, e.g.*, Tr. 1510:24-25 ("[T]his IPR proceeding is before three patent judges, and it was a unanimous decision of all three."); Tr. 1382:3-6 ("Kite lost on every argument that they brought up before the patent office."). And they speciously argued that Kite must have known its CoC defense lacked merit because "Kite made no argument before the three patent judges, who really know the technology and the law, that the '190 patent sequence for SEQ ID:6 started at 113." Tr. 1531:24-1532:8. In fact, because "a petitioner cannot challenge the validity of [a] certificate of correction during an IPR," Dkt. 100 at 1, "for purposes of [an IPR] proceeding[,] . . . the corrected version of [the] claim . . . has the same effect and operation in law as if the same had been originally issued in such corrected form." Ex. 1 at 3-4. Kite was therefore required in the IPR to treat the patent as corrected by the CoC.

Presenting a jury in a patent case with a prior judge's decision presents a "very high" risk of prejudice, *Mendenhall v. Cedarapids*, 5 F.3d 1557, 1575 (Fed. Cir. 1993). That prejudice was magnified when Plaintiffs used the IPR not simply for impeachment but to deliberately misled the jury about the issues addressed in the IPR and invite them to substitute the "three patent judges'" decision for their own. *See, e.g., Crawford*, 944

F.3d at 1080 (finding prejudice based on a party's exploitation of error in closing because "closing argument matters a great deal" (citation omitted)). The short curative instruction delivered before closing could not dispel the persistent misdirection that followed—nor could it have possibly anticipated Plaintiffs' late-breaking claim construction argument. Tr. 1531:24-1532:8; *see, e.g.*, *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1198 (9th Cir. 2015) (reversing for new trial because prejudice was "not fully remedied by the district court's minimal curative instruction").

### F.   Plaintiffs improperly relied on the exclusion of evidence

Along with the IPR, Plaintiffs improperly relied on their own exclusion of evidence. Because Kite maintained privilege in this case, § 298 prohibited Plaintiffs from using any "failure [by Kite] to obtain the advice of counsel with respect to any allegedly infringed patent, or . . . to present such advice to the court or jury . . . to prove that [Kite] willfully infringed the patent." 35 U.S.C. § 298; *SRI Int'l, Inc. v. Cisco Sys. Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019) (§ 298 renders advice-of-counsel evidence "legally irrelevant"). Plaintiffs convinced the Court to preclude Kite from presenting even non-attorney evidence of good faith, such as Dr. Bot's homology analysis, arguing that offering such evidence "would open the door to questions about the advice of counsel that Kite has obtained, but claimed privilege over," Dkt. 488 at 2 (Plaintiffs' Objection Reply), and would be inconsistent with"[t]he protection granted by 35 U.S.C. § 298." Dkt. 458 at 2; *see* Dkt. 284-1 at 8 (same).

Having prevented Kite from offering non-attorney evidence of good faith because of "its assertion of attorney-client privilege," Dkt. 284-1 at 8, Plaintiffs then urged the jury to infer that Kite was a willful infringer precisely because it had not presented "any document" or "fact witness say[ing] that patent is invalid, or . . . that they believed the certificate of correction was invalid." Tr. 1386:4-8, 14-18; Tr. 1386:24-1387:2 (criticizing Kite for not presenting a "fact witnesses . . . that the '190 patent is invalid for those three defenses"). It is highly improper to ask the Court to exclude evidence only to then turn around and exploit the absence of such evidence in

front of the jury. *See, e.g.*, *Intellectual Ventures I, v. Canon Inc.*, 104 F. Supp. 3d 629, 659 (D. Del. 2015) (granting a new trial where "at [party's] urging, the scope of [the opponent's] trial presentation [was] limited by the court[]" only to have that party exploit the absence of evidence in closing).

Worse, by urging the jury to draw an inference against Kite for not presenting evidence that this Court determined it could not without waiving privilege, Plaintiffs contravened § 298 and a long line of authorities. *See, e.g.*, *Knorr-Bremse v. Dana Corp.*, 383 F.3d 1337, 1340-41 (Fed. Cir. 2004) (fact-finder cannot draw adverse inference from refusal to offer privileged evidence). Although Kite objected to this improper argument and requested a curative instruction, the Court denied even that limited relief. Tr. 1537:13-14; *see, e.g.*, *Globefill Inc. v. Elements Spirits, Inc.*, 640 F. App'x 682, 684 (9th Cir. 2016) (reversing district court's denial of a new trial motion where counsel improperly relied on excluded evidence in closing).

### G.    The time limit prejudiced Kite

Kite was also prejudiced by insufficient time. The Ninth Circuit "disapprove[s] of rigid hour limits on trials," *Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994), because "turn[ing] a federal trial into a relay race is to sacrifice too much of one good—accuracy of factual determination—to obtain another," *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 115 (7th Cir. 1990) (Posner, J.).

Faced with a $750 million demand, Kite had only 11.7 hours to present evidence on a wide range of issues: the complex science underlying CAR-T therapy; the state of the art at the time of the invention; the unpredictability of CAR, antibody, and scFv technology; the scientific and historical facts relevant to validity of the certificate of correction; the many non-patent-related contributors to a successful CAR therapy; and the terms and circumstances of comparable licenses and the factors relating to a reasonable royalty. Because Kite bore the burden of persuasion by clear and convincing evidence on its three liability defenses, the prejudice of the inadequate trial time fell disproportionately upon Kite. As explained in Kite's offer of proof, Dkt. 543 at 4-9, the

time limits forced Kite to drop or truncate the testimony of numerous witnesses and prevented Kite from developing key aspects of its case.

Criticizing a similarly meager 10-hour time allotment in a "complex" copyright case, the Ninth Circuit recently ordered the district court at retrial to "ensure that each side has adequate time to present its witnesses and arguments." *Skidmore v. Led Zeppelin*, 905 F.3d 1116, 1137 (9th Cir. 2018), *reh'g en banc granted on other grounds*, 925 F.3d 999 (9th Cir. 2019). A new trial is warranted here for the same reason.

### H.    The cumulative prejudice warrants a new trial

Because "a jury reaches its verdict in light of the evidence as a whole, it makes no sense to try to analyze errors in artificial isolation." *Jerden v. Amstutz*, 430 F.3d 1231, 1241 (9th Cir. 2005) (citation omitted); *see also Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1377 (Fed. Cir. 2012) (granting a new trial for cumulative error). So where, as here, multiple errors occurred during trial, a court must grant a new trial as long as "the cumulative effect of the errors was prejudicial." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *Jerden*, 430 F.3d at 1241.

*First*, misconduct and error pervaded the trial, from the introduction of irrelevant and prejudicial evidence; to Plaintiffs' presentation of a procedurally improper, legally flawed, and factually deficient damages case; to inadequate jury instructions; to Plaintiffs' improper closing; to the verdict form being corrected after Kite relied on it in closing.

*Second*, none of these errors was minor. Each affected a "central component" of the case—closing arguments, jury instructions, and damages—making "the likelihood of prejudice . . . difficult to overcome." *Crawford*, 944 F.3d at 1079.

*Third*, these errors were not harmless. The Federal Circuit has invalidated analogous antibody claims for lack of written description or enablement. On Kite's CoC defense, even without the testimony of Drs. Bot and Schuetz, the Court "expressed its own misgivings regarding the clarity of the purported error." Dkt. 246 at 7. In contrast, Plaintiffs offered no new evidence at trial showing that the error or its resolution was

clearly evident. Meanwhile, Plaintiffs sought damages vastly exceeding any comparable license: Even before apportionment, Plaintiffs' royalty rate surpasses the *highest* comparable royalty rate by more than **400%**, and their upfront payment exceeds competitor Novartis's upfront payment by at least **600%**.

If the Court does not grant JMOL, Kite should at least have the opportunity to defend itself in a new trial untainted by the pervasive errors that occurred here.

### CONCLUSION

The Court should enter JMOL or grant a new trial for the reasons above.

DATED: January 21, 2020                    MUNGER, TOLLES & OLSON LLP


By:      /s/ *Ted Dane*
Ted Dane
Attorneys for Defendant-Counterclaimant
KITE PHARMA, INC.