Morgan Chu (SBN 70446)
mchu@irell.com
Alan J. Heinrich (SBN 212782)
aheinrich@irell.com
C. Maclain Wells (SBN 221609)
mwells@irell.com
Elizabeth C. Tuan (SBN 295020)
etuan@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199

Andrea W. Jeffries (SBN 183408)
ajeffries@jonesday.com
Luke J. Burton (SBN 301247)
lburton@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539

*[List of counsel continues on next page]*

*Attorneys for Plaintiffs*
JUNO THERAPEUTICS, INC., MEMORIAL
SLOAN KETTERING CANCER CENTER,
and SLOAN KETTERING INSTITUTE FOR
CANCER RESEARCH

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| JUNO THERAPEUTICS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KITE PHARMA, INC.,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:17-cv-07639-SJO-KSx<br><br>**PLAINTIFFS' CORRECTED OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL**<br><br>Hon. S. James Otero<br>Place:    Courtroom 10C |

Rebecca Carson (SBN 254105)
rcarson@irell.com
Ingrid M. H. Petersen (SBN 313927)
ipetersen@irell.com
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone:   (949) 760-0991
Facsimile:   (949) 760-5200

Sarah A. Geers (*Pro Hac Vice*)
sgeers@jonesday.com
Kevin V. McCarthy (*Pro Hac Vice*)
kmccarthy@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone:   (212) 326-3939
Facsimile:   (212) 755-7306

Jennifer L. Swize (*Pro Hac Vice*)
jswize@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700

John M. Michalik (*Pro Hac Vice*)
jmichalik@jonesday.com
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

*Attorneys for Plaintiffs*
JUNO THERAPEUTICS, INC., MEMORIAL
SLOAN KETTERING CANCER CENTER,
and SLOAN KETTERING INSTITUTE FOR
CANCER RESEARCH

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 1

I.    KITE'S JMOL MOTION SHOULD BE DENIED ............................ 1

    A.    Kite's Argument On Written Description Should Be Rejected ............ 2

        1.    Kite Does Not Dispute That The Patent Discloses The Inventive Aspect Of Its Claims—The Sadelain CAR Backbone ............................................................................ 3

        2.    The Record Supports The Jury's Finding That The Inventors Had Possession Of The Claimed Invention ................ 4

            a.    scFvs Were Well-Known In The Art ................................ 5

            b.    *Capon v. Eshhar* Underscores The Jury's Finding .......... 8

        3.    No Jury Had To (Or Could) Accept Kite's Premise That The Claims Are Directed To A "Purely Functional Genus" ....... 9

        4.    Even If Kite's "*Ariad* Test" Were Relevant, It Is Met Here ..... 10

        5.    Dr. Brocker Did Not Apply The Wrong Test ........................... 14

    B.    Kite's Argument On Enablement Should Be Rejected ....................... 15

    C.    Kite's Argument On The CoC Should Be Rejected ......................... 18

        1.    The Full Intrinsic Record And Dr. Quackenbush's Testimony Gave The Jury Ample Reason To Reject Kite's CoC Defense ...................................................................... 18

        2.    Kite's Contrary Arguments Are Forfeited, Meritless, Or Both ...................................................................................... 20

            a.    Neither The Inclusion of Erroneous Nucleotides Nor Extraneous SEQ ID NO:11 Required The Jury To Find In Kite's Favor ...................................................... 20

            b.    Kite's Challenges To The RCE's Remarks Are Forfeited, Beside The Point, And Meritless ................... 23

            c.    Kite's Criticisms of Dr. Quackenbush Are Forfeited And Meritless ................................................................ 24

            d.    Kite's Supposed "Real-World" Examples Are Irrelevant ...................................................................... 27

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL
Case No. 2:17-cv-07639-SJO-KSx

- i -

**TABLE OF CONTENTS**
(continued)

Page

D. Kite's Argument On Willfulness Should Be Rejected ........................ 28

E. Kite's Argument On Damages Should Be Rejected ........................... 30

1. Dr. Sullivan's Comparable-License Analysis Was Proper ....... 30

2. Dr. Sullivan's Adjustments Appropriately Accounted For The Differences Between The MSK/Juno Agreement And The Hypothetical Negotiation ..................................... 34

3. The Jury Properly Apportioned The Value Of The '190 Patent ................................................................. 36

II. KITE'S NEW TRIAL MOTION SHOULD BE DENIED ............................. 38

A. Kite's Verdict-Form Arguments Should Be Rejected ........................ 38

B. Kite's Damages Arguments Should Be Rejected ............................... 41

1. Dr. Sullivan's Testimony Did Not Prejudice Kite .................... 41

2. The Economic Data Points Were Highly Relevant To A Proper Damages Analysis ........................................... 42

C. Kite's Jury-Instruction Argument Should Be Rejected ..................... 43

D. Kite's IPR Arguments Should Be Rejected ........................................ 46

E. Kite's Good-Faith Belief And § 298 Arguments Should Be Rejected ................................................................................. 48

F. Kite's Time-Limit Argument Should Be Rejected ............................. 49

G. Kite's Cumulative-Prejudice Argument Should Be Rejected ........... 50

CONCLUSION ...................................................................................... 50

- ii -

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL
Case No. 2:17-cv-07639-SJO-KSx

## <u>TABLE OF AUTHORITIES</u>

**Page**

Cᴀꜱᴇꜱ

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
   759 F.3d 1285 (Fed. Cir. 2014) ...................................................... 10, 11

*Amgen Inc. v. Sanofi*,
   872 F.3d 1367 (Fed. Cir. 2017) .......................................................... 46

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) (en banc) ...................................... *passim*

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
   406 F.3d 1365 (Fed. Cir. 2005) ...................................................... 19, 25

*Biodex Corp. v. Loredan Biomedical, Inc.*,
   946 F.2d 850 (Fed. Cir. 1991) ............................................................ 44

*Capon v. Eshhar*,
   418 F.3d 1349 (Fed. Cir. 2005) ...................................................... *passim*

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
   541 F.3d 1115 (Fed. Cir. 2008) ............................................................ 8

*Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
   482 F.3d 1347 (Fed. Cir. 2007) .......................................................... 18

*Centocor Ortho Biotech, Inc. v. Abbott Labs.*,
   636 F.3d 1341 (Fed. Cir. 2011) .......................................................... 10

*Cephalon, Inc. v. Watson Pharm., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013) .......................................................... 17

*Chiron Corp. v. Genentech, Inc.*,
   363 F.3d 1247 (Fed. Cir. 2004) ................................................ 4, 5, 6, 16

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*,
   809 F.3d 1295 (Fed. Cir. 2015) ...................................................... 33, 37

*Cubist Pharm., Inc. v. Hospira, Inc.*,
    805 F.3d 1112 (Fed. Cir. 2015) ................................................................. 18

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
    232 F.3d 1258 (9th Cir. 2000) ................................................................. 47

*Duro-Last, Inc. v. Custom Seal, Inc.*,
    321 F.3d 1098 (Fed. Cir. 2003) .................................................................. 1

*EEOC v. Go Daddy Software, Inc.*,
    581 F.3d 951 (9th Cir. 2009) ..................................................................... 1

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*,
    946 F.3d 1367 (Fed. Cir. 2020) ............................................................... 45

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
    276 F. Supp. 3d 629 (E.D. Tex. 2017), *aff'd*, 739 F. App'x 643 (Fed.
    Cir. 2018) .............................................................................................. 11

*Ericsson Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ............................................................... 34

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018) ............................................................... 30

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
    348 F. Supp. 3d 907 (D. Neb. 2018) ........................................................ 30

*Falkner v. Inglis*,
    448 F.3d 1357 (Fed. Cir. 2006) ................................................................. 8

*FDIC v. Lugli*,
    813 F.2d 1030 (9th Cir. 1987) ................................................................. 44

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ........................................................ 43

*Gilbrook v. City of Westminster*,
    177 F.3d 839 (9th Cir. 1999) ................................................................... 45

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW
TRIAL Case No. 2:17-cv-07639-SJO-KSx

- iv -

*Globefill Inc. v. Elements Spirits, Inc.*,
    640 F. App'x 682 (9th Cir. 2016) ........................................................................ 49

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    136 S. Ct. 1923 (2016) ...................................................................................... 28

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ........................................................................ 48

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .......................................................................... 1

*Idenix Pharm. LLC v. Gilead Scis. Inc.*,
    941 F.3d 1149 (Fed. Cir. 2019) ...................................................................... 17

*In re Alonso*,
    545 F.3d 1015 (Fed. Cir. 2008) ...................................................................... 10

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) .......................................................................... 50

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988) ........................................................................ 15

*Jenkins v. Union Pac. R.R. Co.*,
    22 F.3d 206 (9th Cir. 1994) ............................................................................ 45

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .......................................................................... 36

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ...................................................................... 36

*Marbled Murrelet v. Babbitt*,
    83 F.3d 1060 (9th Cir. 1996) .......................................................................... 42

*Mendenhall v. Cedarapids, Inc.*,
    5 F.3d 1557 (Fed. Cir. 1993) .......................................................................... 48

*Mentor H/S, Inc. v. Med. Device Alliance*,
    244 F.3d 1365 (Fed. Cir. 2001) ........................................................................ 1

*Monotype Corp. v. Int'l Typeface Corp.,*
  43 F.3d 443 (9th Cir. 1994) ................................................................... 49

*Ohler v. United States,*
  529 U.S. 753 (2000) ............................................................................... 46

*Passantino v. J&J Consumer Prods., Inc.,*
  212 F.3d 493 (9th Cir. 2000) ................................................................. 38

*Polara Eng'g Inc. v. Campbell Co.,*
  894 F.3d 1339 (Fed. Cir. 2018) ....................................................... 28, 29

*Regents of Univ. Cal. v. Eli Lilly & Co.,*
  119 F.3d 1559 (Fed. Cir. 1997) ............................................................. 10

*Ruvalcaba v City of Los Angeles,*
  167 F.3d 514 (9th Cir. 1999) ........................................................... 40, 41

*Skidmore v. Led Zeppelin,*
  905 F.3d 1116 (9th Cir. 2018), *vacated on grant of reh'g en banc on*
  *other grounds,* 925 F.3d 999 (9th Cir. 2019) ...................................... 50

*Sulzer Textil A.G. v. Picanol N.V,*
  358 F.3d 1356 (Fed. Cir. 2004) ............................................................. 44

*Torres v. City of Los Angeles,*
  548 F.3d 1197 (9th Cir. 2008) ................................................................. 1

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors*
  *USA, Inc.,*
  617 F.3d 1296 (Fed. Cir. 2010) ............................................................. 16

*Uniloc USA, Inc. v. Microsoft Corp.,*
  632 F.3d 1292 (Fed. Cir. 2011) ............................................................. 43

*United States v. Espinosa,*
  827 F.2d 604 (9th Cir. 1987) ................................................................. 14

*Versata Software, Inc. v. SAP Am., Inc.,*
  717 F.3d 1255 (Fed. Cir. 2013) ............................................................. 34

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2017) .............................................................. 29

*Weatherford Int'l Inc. v. Halliburton Energy Servs., Inc.*,
   No. 09-cv-261, 2011 WL 888290 (E.D. Tex. Mar. 14, 2011) ............................ 20

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
   837 F.3d 1358 (Fed. Cir. 2016), *rev'd on other grounds*, 138 S. Ct.
   2129 (2018)......................................................................................... 28

*Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) .............................................................. 36

*Wyeth & Cordis Corp. v. Abbott Labs.*,
   720 F.3d 1380 (Fed. Cir. 2013) .............................................................. 18

**STATUTES**

35 U.S.C. § 112.............................................................................*passim*

35 U.S.C. § 298................................................................................ 48, 49

**OTHER AUTHORITIES**

9 Moore's Federal Practice—Civil § 51.12 (2019) .................................... 43

11 Wright & Miller, Federal Practice & Procedure § 2805 (3d ed. 2002)............... 42

37 C.F.R. § 1.821 ................................................................................ 26

Fed. R. Civ. P. 50................................................................................*passim*

Fed. R. Civ. P. 51................................................................................ 45

Fed. R. Evid. 401 ................................................................................ 29

Fed. R. Evid. 403 ................................................................................ 29

**INTRODUCTION**

Kite had a fair trial.  Its latest motion just seeks a do-over.  An attentive jury heard the evidence, assessed witness credibility, and rendered a verdict finding that Kite willfully infringes the '190 Patent and presented no meritorious invalidity defense, and that Plaintiffs were entitled to a proper sum of damages for Kite's multi-billion dollar infringement gambit.  The record provides no reason for this Court or another jury to supplant this jury's fact-finding.  Kite's arguments disrespect the jury, the trial evidence it heard, and Kite's own burdens.  Its motion should be denied.

**ARGUMENT**

**I.    KITE'S JMOL MOTION SHOULD BE DENIED**

To overturn the jury's verdict as a matter of law, Kite must show that the jury had no "legally sufficient evidentiary basis to find" as it did, Fed. R. Civ. P. 50(a)(1), *i.e.*, that "no reasonable juror could find in [Plaintiffs'] favor." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008).  JMOL motions are viewed through the lens of the applicable standard of proof, and "[c]ourts grant JMOL for the party bearing the burden of proof only in extreme cases," where that party, by its standard of proof, "has established its case by evidence that the jury would not be at liberty to disbelieve." *Mentor H/S, Inc. v. Med. Device Alliance*, 244 F.3d 1365, 1375 (Fed. Cir. 2001).  Moreover*,* "[t]he evidence must be viewed in the light most favorable to" the non-movant, "and all reasonable inferences must be drawn in" the non-movant's favor.  *Torres*, 548 F.3d at 1205-06 (internal quotation marks omitted).

Rule 50(b) JMOL arguments are limited to those raised in a Rule 50(a) motion. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 845 (Fed. Cir. 2010); *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (Ninth Circuit law in accord).  The Seventh Amendment, in fact, makes it "constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL." *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107 (Fed. Cir. 2003).

## A.   Kite's Argument On Written Description Should Be Rejected

Written description is "a question of fact" that asks whether the patent "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351, 1354 (Fed. Cir. 2010) (en banc).  The description required "varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.* at 1351; *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005) (varies "with the scientific and technologic knowledge already in existence").  To overcome the presumption of validity, *see Ariad*, 598 F.3d at 1354, and further establish, after trial, that it is entitled to JMOL, Kite would have to demonstrate that the evidence is not only clear and convincing, but also undisputed.

Kite's arguments, which fixate on the binding element—scFvs ("single chain variable fragments")—do not, and cannot, meet its burden. *See* Dkt. No. 659 at 1-10. The record establishes that scFvs were old and a well-known component of CARs, going back to first-generation CARs that were described in the literature years before the '190 Patent.  In fact, the Federal Circuit has already found that scFvs as a CAR component were well-known as early as 1995. *See Capon*, 418 F.3d at 1359-60.  The jury here was similarly entitled to find that the '190 Patent's description of its second-generation CAR backbone, along with the examples in the specification and a POSITA's knowledge of using scFvs in CARs, demonstrated possession of the invention.  Indeed, the '190 Patent discloses working embodiments of CARs using its CAR backbone with two known scFvs directed to very different cell types: an scFv directed to the prostate-specific membrane antigen ("PSMA"), which is expressed on prostate cells, and an scFv directed to CD19, which is expressed on B-cells.  Ex. 6 (PX1 at 5:21-32, 10:64-11:34).[1]

---

[1] Citations to Ex. ___ are to exhibits attached to the declaration of Andrea W. Jeffries, filed concurrently herewith.

-2-

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL
Case No. 2:17-cv-07639-SJO-KSx

1.      **Kite Does Not Dispute That The Patent Discloses The Inventive Aspect Of Its Claims—The Sadelain CAR Backbone**

The '190 Patent discloses a novel combination of known elements, building on the CAR prior art.  All CARs include at least two parts—an intracellular signaling domain and an extracellular binding element.  *E.g.*, Tr. 232:22-233:22, 284:4-7, 286:5-11, (Sadelain), 1249:16-1250:1 (Brocker); Ex. 7 (PDX1.9).

The trial record demonstrated that the '190 Patent's CAR was the world's first "living drug," by virtue of the particular two-part "backbone" designed by Dr. Sadelain and his team.  Tr. 236:23-237:3 (Sadelain), 1251:14-1252:10, 1253:24-1254:4, 1266:3-13 (Brocker).  As Dr. Brocker explained, the crux of the invention was "the Sadelain backbone, that's the signaling portion containing this CD28 and the zeta chain."  Tr. 1254:20-23.  For the first time, this backbone allowed T-cells "to undergo repeated rounds of antigen-dependent stimulation and expansion."  Ex. 6 (PX1 at 5:58-61); *see* Tr. 235:1-237:12 (Sadelain), 1252:3-10, 1266:3-13 (Brocker). This means that Dr. Sadelain's CAR "not only kills but divides," creating "an army of T-cells that go on to kill more tumor cells" while treating the patient with a single dose.  Tr. 236:24-237:12 (Sadelain).  "Under the same conditions," the prior art CARs failed to "proliferate."  Ex. 6 (PX1 at 6:6-8).

As with all CARs, claims 3, 5, 9, and 11 of the '190 Patent (the "asserted claims") include "a binding element," specifically, an scFv, that attaches the CAR to the target of interest.  Tr. 235:21-236:3 (Sadelain).  As Dr. Brocker explained, "the role of an scFv in a CAR is just to bind to the antigen."  Tr. 1253:25-1254:4; *see also* Tr. 1266:3-13.  The "important" work of transmitting "a signal into the T-cell" and "giving rise to this concept of living drug" was done by "the backbone that had been designed by Dr. Sadelain," the specific "CD28 region together with the zeta chain." Tr. 1253:25-1254:4, 1266:3-13 (Brocker).

Claim 1, from which the four asserted claims depend, is representative of the claimed three-part CAR.  It recites "[a] nucleic acid polymer encoding a chimeric T

1   cell receptor, said chimeric T cell receptor comprising" three parts:  the two-part

2   backbone comprising "a zeta chain portion comprising the intracellular domain of

3   human CD3 ζ chain" along with "a costimulatory signaling region" (comprising a

4   portion of CD28), and a third part, "a binding element that specifically interacts with

5   a selected target," which is limited to an scFv in the asserted claims.  Ex. 6 (PX1 at

6   claims).  Both sides' trial graphics depicted the claimed three-part CAR similarly, and

7   consistent with the depiction of CARs in the field.  *See, e.g.*, Ex. 8 (DDX-602 (Kite's

8   closing demonstratives)); Ex. 9 (DDX-304 (Dr. Garcia's demonstratives)); Exs. 10-

9   11 (PDX13.10, PDX13.2 (Plaintiffs' opening and closing demonstratives)).

10       The '190 Patent unquestionably describes the two-part backbone in clear terms.

11   It provides comprehensive textual descriptions of the two parts as well as the exact

12   nucleic acid sequences encoding each, and also provides information on how to link

13   all three parts of the claimed CAR together.  Ex. 6 (PX1 at 4:12-17, 4:21-28, SEQ ID

14   NO:3 & SEQ ID NO:6 (col. 15), 5:29-30, 6:10-49, 7:52-63, 8:12-17, CoC).  The

15   patent also discloses the preferred order of the two backbone parts, with CD28

16   proximate to the scFv, as required by the claims.  *Id.* at 6:14-17; 25:30-26:47 (claims).

### 2.   The Record Supports The Jury's Finding That The Inventors Had Possession Of The Claimed Invention

18

19       Kite directs its arguments to the third part of the claimed CARs—scFvs—

20   arguing that the patent disclosure is insufficient and that it would be "improper[]" for

21   the POSITA to look "outside" the patent.  Dkt. No. 659 at 5.  Critically, Kite

22   disregards the nature of the claims, the state of the art in the context of the claims, the

23   factual nature of evaluating a patent for adequate written description, and prior

24   Federal Circuit precedent directly on point.  *See*, *e.g.*, *Capon*, 418 F.3d 1349.  By the

25   filing date of the '190 Patent, scFvs were routine and well-known in the CAR field,

26   and it is foundational law that "a patentee preferably omits from the disclosure any

27   routine technology that is well known at the time of application."  *Chiron Corp. v.*

28   *Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004).  The jury was entitled to find

1  that scFv technology was "within the knowledge of an ordinarily skilled artisan,"

2  *id.*—here, an artisan with very high skill, *see* Tr. 1303:12-14, 1355:20-1356:3

3  (agreed-upon POSITA definition)—and did not have to be again spelled out in the

4  '190 Patent.  As the *en banc* Federal Circuit held in *Ariad*, the "supply of prior art

5  knowledge" can supplement patent disclosure to show possession.  598 F.3d at 1358.

### a. scFvs Were Well-Known In The Art

7  Though not their burden, Plaintiffs presented substantial evidence that, as of

8  the '190 Patent's 2002 filing date, scFvs as a CAR component were well within the

9  POSITA's knowledge.  Indeed, by this second generation of CARs, this technology

10  was already "old."  Tr. 1261:9-14 (Brocker); *see* Tr. 232:23-233:22 (Sadelain),

11  1249:16-1250:1 (Brocker); *see also* Exs. 12-13 (PX1017 & PX1029).

12  scFvs had been known and made since at least 1988, when two papers described

13  the process for producing them.  Tr. 1260:16-20 (Brocker).  Dr. Sadelain testified that

14  "scFvs have been around since the '80s," and that "[t]he engineering of these

15  particular proteins was by then well established."  Tr. 232:7-9.  The very first CAR

16  patents and publications quickly followed suit; dating back to the early 1990s, CARs

17  employed scFvs as binding elements.  *See, e.g.*, Ex. 14 (PX707 at 1, 4 (Brocker 1993

18  article)); Ex. 15 (PX1011 at 1 (Brocker 1995 article)).  Plaintiffs' expert, Dr. Brocker,

19  confirmed this.  Tr. 1254:6-19, 1256:14-1257:1, 1260:16-20, 1261:6-8.  In fact, he

20  was the lead author of a 1993 paper that reported on one of the earliest (first-

21  generation) CARs, which explained that it "used a single-chain (Fv)" for the binding

22  element.  Ex. 14 (PX707 at 1).  Indeed, Dr. Brocker's 1993 paper noted the

23  interchangeability of scFvs as a key feature of CAR design.  Ex. 14 (PX707 at 4 ("The

24  anti-human CD3 specificity used in our experiments can be easily exchanged with Fv

25  of other desired specificities derived from any existing mAb [antibody]."")); *see also*

26  Ex. 16 (PX304 at 89 (Dr. Abken, Kite's expert in the IPR, citing Krause and Finney

27  publications from 1998 showing "scFvs had been successfully used as the binding

28  element in" CARs)); Exs. 17-18 (DX1054 & DX20 (Krause and Finney

-5-

1   publications)).   Moreover, as far back as the 1989 Orlandi paper, the literature
2   revealed that scFvs had "a very similar structure," Tr. 1263:4-15; *see* Ex. 19
3   (PX1041), as Dr. Brocker repeatedly confirmed.  Tr. 1278:3-8, 1281:12-20.

4          So, too, were techniques for producing scFvs for selected antigens "known at
5   the filing date" of the '190 Patent.   Tr. 1262:7-9 (Brocker).   As Dr. Sadelain
6   explained, the Orlandi method disclosed in the '190 Patent was a "cookbook" to make
7   any desired scFv.  Tr. 337:14-338:11; *see also* Tr. 1026:24-1027:6 (Dr. Garcia also
8   describing Orlandi as a "cookbook").   But it did not require a chef to follow that
9   cookbook.  A dishwasher in Dr. Brocker's lab successfully used Orlandi's method in
10  1993 to make an scFv that Dr. Brocker then used in his research.  Tr. 1264:2-14.  Even
11  Kite's expert, Dr. Garcia, while trying to portray the process of making an scFv
12  specific to a selected antigen as arduous, described each of the steps for how a scientist
13  would have done so in a manner that tracks the method described in the '190 Patent.
14  Tr. 999:5-1003:24, 1011:24-1012:2.  That is the epitome of "routine technology that
15  is well known at the time of application" that need not be repeated in a patent, which
16  is written for ordinary artisans, not jurists or lawyers. *See Chiron*, 363 F.3d at 1254.

17         CD19-specific scFvs (to which claims 5 and 11 are limited) were particularly
18  well-known in the art, as even Kite's witnesses recognized.  Although Dr. Belldegrun
19  tried to deny it, Tr. 531:13-19, he ultimately conceded that the CD19 scFvs used both
20  by Sloan Kettering ("SKI") and Kite "were well-known *because the scientists could*
21  *just look it up in the literature, and those scFv different choices were decades old*."
22  Tr. 533:6-11 (emphasis added).  Dr. Brocker likewise confirmed that several CD19-
23  specific scFvs were known in the art by 2002.  Tr. 1264:15-1265:1 (citing Exs. 20-23
24  (PX106, PX107, PX706, PX1032)), 1278:1-8 ("plenty" of scFvs could be made with
25  CD19 as the selected target).  It is unsurprising, then, that Yescarta® employs a CD19
26  scFv known by 1997, Tr. 1268:17-1269:3 (Brocker), and that Kite scientist Dr. Bot
27  noted that while the scFvs of the Sadelain and Rosenberg CARs were different, "both
28  are good." Ex. 24 (PX13 at 1); Tr. 1265:9-18 (Brocker).

1    Proof positive that scFv CAR technology was well-established long before the
2    '190 Patent:  Kite's former Chief Scientific Officer, Dr. Margo Roberts, is the named
3    inventor on a patent with a 1995 priority date claiming a CAR construct comprising
4    a "single-chain antibody or portions or modifications thereof containing ligand
5    binding activity"—without any mention of DNA or amino acid sequences, or other
6    permutations such as linkers, for the scFvs meeting that element.  *See* Ex. 25 (DX2061
7    ('149 Patent at 31:54-56)).  Kite cannot reasonably demand from the '190 Patent the
8    kinds of routine and well-established science that its own, earlier patent omitted.

9    The '190 Patent reflects this well-known state of the art when it refers to
10   "*[k]nown binding elements* used in chimeric TCR's" that "are generally useful in the
11   present invention," Ex. 6 (PX1 at 4:45-51 (emphasis added) (including examples)),
12   and that "[t]he binding elements used in the invention are suitably antibodies that
13   recognize a selected target," *id.* at 4:52-53; *see also id.* at 11:12-22 (construction of a
14   CD19-specific scFv).  Despite the longstanding and routine knowledge of scFvs in
15   the art, the patent nevertheless provides examples of scFvs that can be used in the
16   invention, *id.* at 5:21-32, 10:64-11:34 (describing working examples of CARs with
17   scFvs directed to PSMA and CD19), and references one of several well-known ways
18   to create an scFv for a selected target, *id.* at 4:55-5:5.  It explains that the desired
19   antibodies "may be cloned from the V region genes of a hybridoma specific for a
20   desired target," and that the "production of such hybridomas has become routine, and
21   the procedure will not be repeated here."  *Id.* at 4:55-58.  The specification then
22   references the Orlandi technique for making a desired scFv.  *Id.* at 4:58-5:5.  Real-
23   world evidence shows that POSITAs could and did readily visualize the three-part
24   CAR claimed in the patent.  *See* Ex. 26 (PX317 at 3 (Kite BLA showing three-part
25   CAR utilizing scFv for binding)); Exs. 8-9 (DDX-304 & DDX-602 (Kite
26   demonstratives showing generic three-part CARs including binding elements)).  In
27   the face of all of this evidence, Kite's argument that there is clear, convincing, and
28   undisputed evidence that could lead the jury only to a conclusion of invalidity falls

flat.  The jury reasonably found that the patent adequately describes, and shows the inventors' possession of, the invention of the '190 Patent.

### b. *Capon v. Eshhar* Underscores The Jury's Finding

Federal Circuit precedent, omitted (or studiously avoided) by Kite, underscores the jury's unassailable finding.  In *Capon*, a seminal case specifically addressing CAR technology, the Federal Circuit recognized that, as of 1995—years before the '190 Patent's priority date of 2002—scFvs were a well-known component of CARs that did not need to be detailed in a CAR patent specification.  418 F.3d 1439.  Subsequent Federal Circuit cases reiterate this point.  *See Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1126 (Fed. Cir. 2008) (citing *Capon* in observing that "the prior art contained 'extensive knowledge of the nucleotide structure of the various immune-related segments of DNA'"); *Falkner v. Inglis*, 448 F.3d 1357, 1368 (Fed. Cir. 2006) (citing *Capon* in observing that adequate written description "does not require either the recitation or incorporation by reference (where permitted) of such genes and sequences" where "accessible literature sources clearly provided" them).

*Capon* arose out of an interference (priority-of-invention) proceeding involving competing patents/applications to an early two-part CAR.  *See* 418 F.3d at 1351-52 (claimed combination of a "cytoplasmic, transmembrane, and extracellular domains of a lymphocyte signaling protein" and a generic "single-chain variable ('scFv') domain of an antibody").[2]  Even back then, it was reversible error to "require a re-

---

[2] Kite has licenses to patents in the same lineage as both of the Capon patents and the Eshhar application at issue in *Capon v. Eshhar*—and has publicly touted its rights to those patents—making its omission of that decision even more egregious.  For example, Kite licensed U.S. Patent No. 6,319,494 ("the '494 Patent"), which claims priority to one of the patents at issue in *Capon*.  *See* 418 F.3d at 1351 (identifying a Capon patent at issue as U.S. Patent No. 5,359,046); Ex. 27 at 1 ('494 Patent is a continuation-in-part of the '046 patent).  In 2016, Kite issued a press release trumpeting its success in opposing a validity challenge to the '494 Patent, "developed by Kite's Senior Vice President of Discovery Research, Margo Roberts, Ph.D. and colleagues . . . which covers . . . modified T cells that contain single chain variable

description of what was already known" about scFv technology. *Id.* at 1357-58. As both parties explained, and the Federal Circuit credited, "the principle of forming chimeric genes from selected segments of DNA was known, as well as their methods of identifying, selecting, and combining the desired segments." *Id.* at 1355 (noting, specifically as to scFvs, "over 785 mouse antibody DNA light chains and 1,327 mouse antibody DNA heavy chains were known and published as early as 1991"). As the record here made clear, this science was all the more established nearly ten years later.

*Capon*'s direct applicability to this case was confirmed during prosecution, when it was used to overcome the same written description objection Kite makes here. The examiner faulted the '190 Patent specification for not defining "binding element" and for disclosing "only a single species (i.e. antibody)." Ex. 29 (PX2 at 524). In response, the applicants pointed to "the recent" Federal Circuit decision "in *Capon v Eshhar*," which "show[ed] the error of the rejection." Ex. 29 (PX2 at 502, 541). The examiner agreed and allowed the patent. Ex. 29 (PX2 at 559 ("Applicant's amendment and arguments have obviated the previous rejection of record.")).

In short, *Capon* underscores that the jury's verdict has substantial support.

### 3. No Jury Had To (Or Could) Accept Kite's Premise That The Claims Are Directed To A "Purely Functional Genus"

Instead of addressing the record evidence showing extensive knowledge in the art regarding scFvs used in CARs as the binding element, or ever acknowledging *Capon*, Kite seeks to shoehorn the '190 Patent into Federal Circuit cases that rejected functional genus claims, based on Kite's bald mischaracterization that the asserted claims, by virtue of their scFv element, recite a "broad, functionally-defined genus" or "antibody-related" claims defined by a desired result. Dkt. No. 659 at 3, 9, 13; *see*

---

fragment (scFv) binding elements, and other key CAR-T features." Ex. 28 (PX1170). That same press release also lauds Kite's exclusive license to the patent that issued from the Eshhar application at issue in *Capon*, U.S. Patent No. 7,741,465, "a leading and widely significant patent directed to CAR-T constructs." Ex. 28 (PX1170).

1   *also id.* at 3 (going so far as to say "[t]here is no dispute" that the claims concern

2   "functionally-identified CAR constructs").   Kite is incorrect; unlike the cases on

3   which it relies, the asserted claims here do not claim "diverse biological genera"

4   defined by desired properties or function.  *See, e.g.*, *Ariad*, 598 F.3d at 1340-41

5   (claims directed to any substance that achieved the desired result); *AbbVie*

6   *Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1292 (Fed.

7   Cir. 2014) (claims to all antibodies with particular neutralizing and binding

8   characteristics for a given antigen); *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636

9   F.3d 1341, 1351 (Fed. Cir. 2011) (claims to human antibodies constituted a "wish

10  list" of specific therapeutic properties that such antibodies should have with respect

11  to a particular antigen); *In re Alonso*, 545 F.3d 1015, 1021-22 (Fed. Cir. 2008) (claims

12  covering all therapeutic antibodies to treat a rare cancer where no antigens were

13  described and structure-function correlation argument was waived); *Regents of Univ.*

14  *Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) (claims to "vertebrate

15  insulin cDNA" or "mammalian insulin cDNA" give "only an indication of what the

16  gene does, rather than what it is").   While the asserted claims certainly have function,

17  *i.e.*, "utility" under the patent laws, *see, e.g.*, Tr. 236:23-237:3 (the backbone "not

18  only kills but it divides") (Sadelain), they are *composition claims reciting a three-part*

19  *structure*, which includes a routine structural element—scFvs.   Kite even admits that

20  scFvs (and, for claims 5 and 11, anti-CD19 scFvs) have well-known structural

21  elements (*e.g.*, heavy and light chains, linkers).  Dkt. No. 659 at 6-8.   The claims'

22  mere reference to the well-understood role of the CAR scFv as binding to the CAR's

23  target does not convert the structural claims into "functional claims," as Kite

24  contends.  *E.g.*, Dkt. No. 659 at 2.

25          **4.      Even If Kite's "*Ariad* Test" Were Relevant, It Is Met Here**

26          Kite is also wrong to argue that the claims had to, but did not, meet a "specific

27  test" under *Ariad* for genus claims that "requires" disclosure of either representative

28  species or common structural elements.  Dkt. No. 659 at 2.  As an initial matter, even

-10-

1   if the scFv element warranted calling the asserted claims "genus" claims, there is no

2   special, "specific test" for genus claims.  *See* 35 U.S.C. § 112(a); *Ariad*, 598 F.3d at

3   1352 ("[T]he description requirement does not demand any particular form of

4   disclosure.").  As *Capon* made clear, for this art not even one "complete nucleotide

5   sequence" is required, much less recitation of additional examples or common

6   structural features.  418 F.3d at 1356.  And *Ariad* itself confirms that providing "a

7   precise definition, such as by . . . physical properties, or other properties, of species

8   falling within the genus sufficient to distinguish the genus from other materials," is

9   sufficient.  598 F.3d at 1350.  As shown above, the '190 Patent clearly does that; it

10  defines the three-part CAR structure, including specifically disclosing the sequence

11  of the novel two-part backbone to distinguish it from other CARs.

12        The two-part *Ariad* inquiry that Kite invokes is informative for describing

13  inventions comprising novel compounds or compounds not previously known in the

14  prior art, *not* for components of claimed inventions that are well-known and well-

15  understood.  *See, e.g.*, *Ariad*, 598 F.3d at 1351 (the field of the claimed invention was

16  "primitive and uncertain," and provided "an insufficient supply of prior art

17  knowledge"); *AbbVie*, 759 F.3d at 1292, 1298 (applying *Ariad* to claims directed to a

18  new genus of "rare and difficult to obtain" antibodies).  As Federal Circuit Judge

19  Bryson, sitting by designation in a patent trial, explained in rejecting a similar attempt

20  to transform *Ariad*'s inquiry into a required rule:  "It is often the case that a patent

21  claiming the invention of a new genus, or the use of a new genus, must provide more

22  detail regarding that genus, such as disclosing a number of representative species or

23  a structural feature by which to recognize the new genus."  *Erfindergemeinschaft*

24  *UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 646-48 (E.D. Tex. 2017)

25  (upholding jury verdict of adequate description), *aff'd*, 739 F. App'x 643 (Fed. Cir.

26  2018).  But "when a genus is well understood in the art and not itself the invention

27  but is instead a component of the claim, *background knowledge may provide the*

28  *necessary support for the claim*."  *UroPep*, 276 F. Supp. 3d at 648 (emphasis added).

1  "The Federal Circuit has rejected a rule that at least one representative compound is
2  always needed." *Id.* (citing *Capon*, 418 F.3d at 1356-58).

3      Here, in light of the state of the science, and as *Capon* already made clear, not
4  even one "complete nucleotide sequence" is required, 418 F.3d at 1356, contrary to
5  what Kite contends.  Dkt. No. 659 at 5 (Kite asserting that "there was no dispute that
6  the specification does not disclose a DNA or amino acid sequence for a single scFv").
7  Accordingly, there was no need for the jury to evaluate "representative embodiments"
8  or "common structural features" of the scFv element of the claimed CARs.

9      In any event, even if that *Ariad* formulation were relevant, it would be satisfied
10  here.  The patent discloses common structural features and representative examples
11  of the claimed invention.  First and foremost, it discloses the CAR backbone that was
12  the crux of the invention and must be present in every CAR within the scope of the
13  claims.  *See* Ex. 6 (PX1.18 at SEQ ID NO:3 (CD3ζ), SEQ ID NO:6 (CD28), CoC
14  (correcting SEQ ID NO:6)).  Furthermore, it describes two scFvs successfully used
15  with the backbone, along with additional scFvs, all of which were already known in
16  the art and, like all scFvs, known to have common structural features.  Ex. 6 (PX1 at
17  4:45-5:5, 7:44-45, 11:12-22) (incorporating known binding elements by reference,
18  describing anti-PSMA scFv derived from J591 hybridoma and citing scientific article,
19  describing anti-CD19 scFv derived from SJ25C1 hybridoma using Orlandi technique
20  and describing that technique published in the Proceedings of the National Academy
21  of Sciences); Tr. 1257:13-1260:15 (Dr. Brocker explaining that scFvs, including
22  human or humanized scFvs, share common structural features).  scFvs, including
23  particularly anti-CD19 scFvs, were so well-known and routine that the '190 Patent
24  needed only to refer to them.  Yet, the patent did more than that, and its examples are
25  far more than enough.  *See Ariad*, 598 F.3d at 1351 (no "bright-line rules" governing
26  "the number of species that must be disclosed to describe a genus claim").  And as
27  Dr. Brocker explained, the CD19 scFv disclosed in the patent is representative of
28  scFvs in the context of CARs.  Tr. 1266:14-22.

Kite argues that "the two example CARs are not representative" because scFvs falling within the claims can have different amino acid sequences, linkers, orders, or properties, and that the "genus" of possible scFvs is "vast," counting "millions of billions." Dkt. No. 659 at 3, 6-8. No reasonable jury had to accept this contention. The claims recite scFvs as part of a CAR, not scFvs untethered to any context. Dr. Garcia admitted that he reached his "millions of billions" without regard to the context provided by the '190 Patent—he simply "multipl[ied]" the "possible" heavy-chain and light-chain sequences. Tr. 1009:10-15. This math is wholly disconnected from the way a POSITA understands the scFv element of the asserted claims, and incorrectly focuses on arbitrary "anything is possible" sequences in an acontextual vacuum divorced from the patent. *See* Dkt. No. 659 at 3-9. In fact, Dr. Belldegrun admitted the "different choices" for scFvs "were decades old," Tr. 533:6-11, and both sides' experts referred to the Orlandi "cookbook" for making scFvs. *See* Part I.A.2.a, *supra*. No reasonable jury had to disregard this evidence in favor of Kite's attorney argument that the choices "complicat[e] the claimed structures" or render the patent disclosure inadequate. Dkt. No. 659 at 6.

Indeed, Dr. Garcia did not contend that a POSITA would create a CAR within the claims by starting with the vast potential permutations and combinations of amino acids for any possible scFv chain. Rather, he admitted that a POSITA would start by selecting the target and then, to obtain the scFv, would "immunize the mice with your target and then go through a process of encouraging the mouse to make cells that make antibodies to that target and then isolating those cells." Tr. 1000:10-16. That is exactly how the asserted claims speak to the ordinary artisan—the "binding element . . . specifically interacts with *a selected target*." Ex. 6 (PX1 at claims (emphasis added)). Moreover, as Dr. Garcia further admitted, he has never made a CAR, or even an scFv for use in a CAR. Tr. 1041:9-1043:6, 1044:3-5. By contrast, Dr. Brocker is steeped in the CAR field. He developed one of the first CARs in 1993, and has studied and developed CAR technology since. Tr. 1248:3-5, 1250:7-1252:2,

1252:11-19; Ex. 30 (PX792).  Given Dr. Garcia's irrelevant math, and the fact that he is not a CAR expert, the jury was free to disregard his "millions of billions" testimony as entirely beside the point.  *See United States v. Espinosa*, 827 F.2d 604, 613 & n.4 (9th Cir. 1987) (A jury "may disregard [expert] opinion entirely" if it finds the opinion "not based upon sufficient education and experience" or "sound" reasons, or "outweighed by other evidence.").

Finally, Kite faults claims 3 and 9, which are not limited to CD19 as the target, based on Kite's same unjustifiable focus on scFvs—that claims 3 and 9 cover a purported "vast number of CARs" due to the alleged "vast number" of scFvs that can be used with the targets covered by those claims.  *See* Dkt. No. 659 at 1-3.  But the variation of scFvs has no effect on adequate written description for these claims, either.  As just discussed, the '190 Patent shows possession of the invention—starting with the selected target, making corresponding scFvs, and combining the scFv with the claimed backbone.

### 5. Dr. Brocker Did Not Apply The Wrong Test

Finally, Kite tries to pronounce Dr. Brocker's testimony "legally erroneous" and thus irrelevant.  Dkt. No. 659 at 9-10.  Besides the fact that abundant other evidence supports the jury's verdict, Kite's criticisms are unfounded.

As an initial matter, Kite's argument is forfeited.  Kite's Rule 50(a) motion raised no dispute with Dr. Brocker's testimony.  *See* Dkt. No. 551.  Further, Kite misrepresents the record.  Kite says Dr. Brocker testified that scFvs were "not part of [the claimed] invention"—but the bracketed text is added by Kite.  Dkt. No. 659 at 10.  What Dr. Brocker actually said is that "single-chain Fvs were already known for nearly 15 years, so they were not new, and they were also not part of *this* invention," *i.e.*, the novel backbone.  Tr. 1256:19-22 (emphasis added).  He fully acknowledged that the asserted claims require an scFv.  Tr. 1253:7-18.  Nor did Dr. Brocker somehow conflate written description and enablement when he mentioned both were satisfied—that the patent "gives you a description . . . *and* how to make it" (not

1  *because* it provides how to make it).  Tr. 1256:9-13 (emphasis added).  He clearly

2  applied the two separate standards.  Tr. 1254:24-1255:15.  Besides, facts probative of

3  one issue can be probative of the other, as they are here.  *See Ariad*, 598 F.3d at 1352

4  ("[W]ritten description and enablement often rise and fall together.").

5        **B.**    **Kite's Argument On Enablement Should Be Rejected**

6        Kite bears a similarly heavy burden on its claim of non-enablement—to prevail,

7  it would have to demonstrate that it proved non-enablement by clear, convincing, and

8  undisputed evidence.  Kite comes nowhere close.  Based on the record, including

9  Plaintiffs' own evidence, *see, e.g.*, Tr. 1253:19-1272:11, 1287:20-1288:10 (Brocker),

10  no jury had to find in favor of Kite.

11        As with its written-description arguments, Kite focuses on the number of

12  potential scFvs, Dkt. No. 659 at 10-14, but does so without any attention to the

13  relevant factual inquiries.  Though designated by the Federal Circuit as a legal

14  conclusion, enablement depends on no fewer than eight intensely factual inquiries

15  originating in *In re Wands*, 858 F.2d 731 (Fed. Cir. 1988), and ultimately asks whether

16  a POSITA would have to engage in "undue experimentation" to make and use the

17  invention.  *Id.* at 737; *see also* Dkt. No. 591 at 21 (jury instruction).  Kite's theoretical

18  numbers game is divorced from this inquiry.  The jury was entitled to conclude that

19  Kite failed to meet its burden on *each* of the eight factual questions—most notably,

20  the realities of the science proven up in the trial record (*Wands* factor 5) and the

21  knowledge and skill of the ordinary artisan (*Wands* factor 6).

22        To wit:  Kite asserts as "undisputed" fact that the CAR field was "new and

23  unpredictable" at the time of the '190 Patent.  Dkt. No. 659 at 12.  Dr. Sadelain's

24  highly sought-after CAR backbone was certainly new; indeed, it was groundbreaking.

25  But that is beside the point; Kite does not dispute that the patent explains how to make

26  and use the backbone.  What Kite challenges is making and using scFvs as the binding

27  element in a CAR—a field that was not "new and unpredictable" at all:  CARs with

28  scFvs had been around for years.  *See* Part I.A.2, *supra*; *Capon*, 418 F.3d at 1356*;*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL
Case No. 2:17-cv-07639-SJO-KSx

1   *Chiron*, 363 F.3d at 1254 (A patent "preferably omits" what is well-known in the art).

2        Particularly in light of this prior art, it is irrelevant that, "[t]o find scFvs that

3   bind to a target, a POSITA would have to synthesize and test them."  Dkt. No. 659 at

4   13.  As Dr. Brocker testified, making and testing scFvs for their ability to bind to a

5   selected target is "not more than standard laboratory procedure" that can be followed

6   even by those who lack ordinary skill in the art.  Tr. 1288:4-10, 1264:2-14.  Further,

7   the undisputed evidence is that any scFv capable of binding to a selected target will

8   work with the claimed CAR backbone.  As Dr. Brocker testified, the backbone has

9   worked with every scFv with which it has been tested, and he does not know "a single"

10  scFv that would not work with the Sadelain construct.  Tr. 1288:4-6; *see also, e.g.*,

11  Tr. 1265:24-1266:2 (further testifying that the Sadelain backbone has always worked

12  with any given scFv that can bind to the target), 240:16-22 (Dr. Sadelain testifying

13  that the CAR backbone described in the '190 Patent has been successfully used with

14  scFvs targeting a multitude of antigens), 245:15-246:8 (further testifying that the '190

15  Patent CAR backbone has been used with "[p]robably up to 30" CD19-specific scFvs

16  and all have been successful), 253:12-256:24 (further testifying that he directed

17  Dr. Rosenberg to the FMC63 anti-CD19 scFv and Dr. Rosenberg subsequently

18  achieved success with that scFv), 303:24-304:3 (further testifying that the '190

19  backbone has a "very high likelihood of working" with any given scFv).  While Kite

20  relies on Juno's work to create a human scFv for CD19, Dkt. No. 659 at 13, such

21  efforts do not inform the analysis.  A patent is required only to enable a POSITA to

22  practice the claims without undue experimentation, not to enable development of "the

23  most optimized configuration."  *Transocean Offshore Deepwater Drilling, Inc. v.*

24  *Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1306-07 (Fed. Cir. 2010).

25        Kite invokes Dr. Garcia's testimony that, in his experience, it would take "from

26  six months to over a year" to identify and test an scFv, and that he has succeeded in

27  making functional scFvs 25% of the time.  Tr. 1003:10-24; Dkt. No. 659 at 13.  But

28  such general, *ipse dixit* statements "cannot be enough to constitute clear and

convincing evidence" of lack of enablement.  *See Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1339 (Fed. Cir. 2013) ("Unsubstantiated statements indicating that experimentation would be 'difficult' and 'complicated' are not sufficient.").  In any event, Dr. Garcia's testimony was rebutted by Dr. Brocker and abundant other evidence showing that making and identifying functional scFvs was well within the skill of the ordinary artisan, and thus any dispute was a classic fact question that the jury has now resolved.  "[E]xtensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques."  *Id.* at 1338.

Kite's argument that a POSITA would have to start at sea with "millions of billions" of scFvs and narrow the scope with significant effort, Dkt. No. 659 at 12, is thus not supported—and indeed is contradicted—by the record.  scFvs—used with CARs—were well-known, and skilled artisans had long used the techniques described in the '190 Patent, and similar techniques, to produce scFvs for a selected target.  *See* Part I.A.2, *supra*.  Indeed, the asserted claims expressly require "a binding element that specifically interacts with a selected target," Ex. 6 (PX1 at 4:34-5:5 & claim 1); once the target is selected, a POSITA knows how to identify, synthesize, and clone suitable scFvs, as even Dr. Garcia admitted.  Tr. 1000:13-16; *see also* Part I.A.2.

Kite's cited cases are inapposite.  *See* Dkt. No. 659 at 11-14.  In both, the structural elements of the claims were found to "encompass[] 'millions of compounds made by varying the substituent groups,' while only a 'significantly smaller' subset of those compounds would have the claimed 'functional effects,'" such that screening was required "to determine which" compounds would produce those claimed effects. *Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1162 (Fed. Cir. 2019) (discussing *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013)).  Those facts are not present here, where the novel CAR backbone structural elements are explicitly defined by DNA and the scFv structural element was well-known and long used in the art.  The jury verdict on enablement is well-supported.

### C. Kite's Argument On The CoC Should Be Rejected

Kite's burden to overcome the presumption of validity of the '190 Patent's CoC, is likewise heavy. *Cubist Pharm., Inc. v. Hospira, Inc.*, 805 F.3d 1112, 1118 (Fed. Cir. 2015) (clear and convincing evidentiary burden). Here, the jury was free to find, as it did, that Kite failed to satisfy this burden, *i.e.*, that Kite failed to show by clear and convincing evidence that a POSITA, "reviewing the full patent record including the patent claims, the specification, and the prosecution history," could not "clearly identify the error and tell how it should be corrected." Dkt. No. 591 at 19 (Court's jury instruction). This is "a factual question," *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1354 (Fed. Cir. 2007), as Kite admits. Dkt. No. 659 at 15. Accordingly, based on the jury's finding, the costimulatory signaling region of the asserted claims as corrected comprises amino acids 114-220 of CD28, not amino acids 113-220. The jury resolved this issue against Kite on disputed evidence; there is no basis for disturbing its verdict.[3]

#### 1. The Full Intrinsic Record And Dr. Quackenbush's Testimony Gave The Jury Ample Reason To Reject Kite's CoC Defense

Though it was not Plaintiffs' burden, Plaintiffs presented evidence showing that a POSITA would have understood both that (i) inclusion of the first four nucleotides in SEQ ID NO:6 in the as-issued '190 Patent was an error, and (ii) this error should be corrected by removing those nucleotides (so that SEQ ID NO:6 would begin with

---

[3] Prior to trial, the Court decided an antecedent legal question, holding that the CoC broadened the claims. *See* Dkt. No. 100 at 9, 17 (construing the claim term "the amino acid sequence encoded by SEQ ID NO:6" to mean "Amino Acids 113-220 of CD28 (starting with Lysine (K))" before the CoC and "Amino Acids 114-220 of CD28 (starting with isoleucine (I))" after the CoC); Dkt. No. 246 at 6 (holding that the CoC broadened the claims). Plaintiffs respectfully continue to believe—and expressly preserve for appeal—that the claim term before and after the CoC should be construed the same, to mean "Amino Acids 114-220 of CD28 (starting with isoleucine (I))." On that construction, the CoC would not broaden the claims, and Kite would literally infringe regardless of whether the CoC is valid.

nucleotides att encoding isoleucine, amino acid 114 of CD28). Dr. Quackenbush explained that SKI's Request for Continued Examination ("RCE")—submitted during prosecution of the '190 Patent and thus part of the intrinsic record—specified this precise mistake and correction. *E.g.*, Tr. 1149:7-1152:10; *see* Ex. 29 (PX2 at 601-04). He further explained how the prosecution history demonstrates a POSITA could view the as-issued '190 Patent's ultimate inclusion of the uncorrected SEQ ID NO:6 only as the result of a mistaken file submission that did not nullify the RCE's unambiguous correction. *E.g.*, Tr. 1152:11-1155:18, 1160:9-1161:4, 1167:10-1168:4. And he explained that, consistent with the RCE, the as-issued '190 Patent's specification contained several indications that SEQ ID NO:6 included four erroneous nucleotides at the beginning. *E.g.*, Tr. 1155:19-1159:16, 1161:5-1163:6.

Kite cites no case (because none exists) finding a CoC invalid despite a clear request in the prosecution history for the very correction implemented by the CoC, let alone any case doing so under the stringent JMOL standard. To the contrary, the case law confirms that evidence like Plaintiffs'—a combination of the patent, the prosecution history, and expert testimony—more than suffices to uphold a jury's finding that an error and its correction would be clearly evident to a POSITA. *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1374-75 (Fed. Cir. 2005).

Despite Kite's continued argument that "there were no material factual disputes for a jury to decide," Dkt. No. 659 at 15, the evident nature of the error, and its proper correction, *were* disputed. As the Court recognized at summary judgment, evidence from Dr. Quackenbush—a "person[] skilled in the relevant art"—"present[ed] a clear and genuine dispute of fact" on these issues. Dkt. No. 246 at 7; *see also Weatherford Int'l Inc. v. Halliburton Energy Servs., Inc.*, No. 09-cv-261, 2011 WL 888290, at *3-5 (E.D. Tex. Mar. 14, 2011) (conflicting expert testimony on this question required jury resolution). There is no basis to upset the jury's resolution of these facts.

**2.**   **Kite's Contrary Arguments Are Forfeited, Meritless, Or Both**

**a.**   **Neither The Inclusion of Erroneous Nucleotides Nor Extraneous SEQ ID NO:11 Required The Jury To Find In Kite's Favor**

Kite does not argue (because it cannot) that either the as-issued patent or the prosecution history anywhere explicitly described the amino acid sequence encoded by SEQ ID NO:6 as beginning with "amino acid 113" of CD28.  Kite's own expert conceded that the number 113 appears *nowhere* in the intrinsic record.  Tr. 988:13-17 (Junghans).  Instead, Kite cites scattered references in the patent to nucleotides encoding amino acid 113, and an extraneous sequence in the Sequence Listing that begins with lysine. Dkt. No. 659 at 16.  But these references cannot overcome—let alone clearly, convincingly, and undisputedly—contrary evidence that a POSITA would understand from the full intrinsic record that as-issued SEQ ID NO:6 should be corrected to begin with nucleotides encoding amino acid 114 of CD28 (isoleucine).

Most striking was the RCE.  As Dr. Quackenbush explained, Tr. 1149:7-21, the RCE showed SEQ ID NO:6 with the four extraneous nucleotides at the beginning crossed out in order to correct "an error [that] occurred in the presentation of Seq. ID No. 6." Ex. 29 (PX2 at 603-04).  The RCE further observed that the relevant portion of CD28 was the portion amplified by the primers in SEQ ID NOs: 4 and 5, which "corresponds to the sequence [of amino acids] *starting at position 114*." Ex. 29 (PX2 at 603 (emphasis added)); *see* Tr. 1151:8-18 (Quackenbush).  The RCE explicitly stated that "*the first codon of the amplified portion of the CD28 sequence is att* (which encodes Ile) and thus corresponds to the *sequence starting at position 114*." Ex. 29 (PX2 at 603 (emphasis added)); *see* Exs. 31-32 (PDX12.9 and PDX12.10).  The RCE concluded that "a person skilled in the art would recognize the original Seq ID No. 6 included four (4) erroneous bases at the beginning of the sequence which could not be derived from the stated amplification primer." Ex. 29 (PX2 at 603).  Critically, the RCE explained that the correction was necessary "to correctly reflect the bases corresponding to the amino acid *used in the construct of the examples*," *i.e.*, the CAR

1  construct used in the patent's disclosed experiments.  Ex. 29 (PX2 at 603) (emphasis

2  added); Ex. 6 (PX1 at 7:42-12:6 (the "examples")); *see* Tr. 1150:10-1151:7, 1208:24-

3  1209:8 (Quackenbush); Ex. 31 (PDX12.9).  The jury undoubtedly understood the

4  import of this:  The CAR used in the '190 Patent's experiments had a CD28 region

5  beginning with amino acid 114.  *See* Tr. 1151:3-7 (Quackenbush).

6       Beyond the RCE, Dr. Quackenbush testified that the as-issued '190 Patent itself

7  contained plentiful indications to a POSITA that the four initial nucleotides of as-

8  issued SEQ ID NO:6 were erroneous and should be removed.  For example, column

9  four describes an embodiment of the patent as "includ[ing] the transmembrane and

10 signaling domains of CD28, i.e., the portion of CD28 cDNA spanning nucleotides

11 *340 to 663*, including the stop codon (*amino acids 114-220* of Seq. ID No. 10)."  Ex.

12 6 (PX1 at 4:23-26 (emphasis added)); *see* Tr. 1156:3-10.  In turn, SEQ ID NO:10 "is

13 the complete amino acid sequence for the CD28 molecule."  Tr. 1156:11-16.

14      The '190 Patent's very next sentence specifies that "this portion of CD28"—

15 "this portion" being amino acids 114 to 220—"can be amplified by PCR using the

16 primers of SEQ. ID NO. 4 and 5," and that "the full sequence of this region is set forth

17 in Seq. ID No:6."  Ex. 6 (PX1 at 4:26-28).  As Dr. Quackenbush explained, these

18 primers identified to a POSITA the correct portion of CD28—amino acids 114-220.

19 Tr. 1157:6-1158:13; *see* Ex. 33 (PDX12.17).  Dr. Quackenbush explained that, in

20 determining the correct portion of CD28: "I would use primers, I think most scientists

21 would, because these have been developed and tested in the lab, and we know that

22 they amplify exactly the piece that Dr. Sadelain used" in the experiments described

23 in the '190 Patent.  Tr. 1158:22-1159:4; *see also* Tr. 244:6-245:3, 272:5-273:2

24 (Dr. Sadelain testifying about the importance of primers).  While Dr. Junghans

25 contested the importance of primers to a POSITA, Tr. 958:23-960:1, this was a classic

26 factual dispute on which the jury was free to credit Dr. Quackenbush's testimony.

27      Dr. Quackenbush further testified that:  (i) the number of nucleotides of as-

28 issued SEQ ID NO:6 was not divisible by 3, as a POSITA would expect for a coding

1  sequence, Tr. 1161:5-1162:10; and (ii) as-issued SEQ ID NO:6 was intended to code

2  for the middle of the CAR construct in one example, but contained a stop codon,

3  1162:11-1163:6.  As he explained, these two aspects of SEQ ID NO:6 in the as-issued

4  patent would have led a POSITA to suspect the sequence contained an error and to be

5  especially alert to other evidence of such an error.[4]

6      Kite's argument that the prosecution history is "ambiguous" because it contains

7  five Sequence Listing submissions, three of which contained the erroneous as-issued

8  SEQ ID NO:6, while two contained the corrected version, is also unavailing.  *See* Dkt.

9  No. 659 at 17.  As Dr. Quackenbush testified, the RCE made crystal clear that the first

10  two erroneous submissions, which predated the RCE, contained the mistakes that the

11  RCE corrected.    The prosecution history demonstrates the same for the final

12  submission's mistaken inclusion of the uncorrected version of SEQ ID NO:6.

13      As Dr. Quackenbush explained, a POSITA would understand that SKI's RCE

14  effectively "stopped the process of issuing the patent" when all that remained was for

15  the issue fee to be paid.  Tr. 1149:22-1150:9; *see* Ex. 29 (PX2 at 580-85).  The jury

16  could reasonably credit his testimony that SKI's delay of the issuance of the patent to

17  correct SEQ ID NO:6 showed the importance of the correction, and that a POSITA

18  would understand that SKI would not have reversed course and resubmitted the

19  uncorrected SEQ ID NO:6 without comment had it truly desired to change SEQ ID

20  NO:6 back to the pre-RCE, uncorrected version.  *See* Tr. 1167:21-1168:4.

21      Dr. Quackenbush walked through the prosecution history and showed that, after

22  the submission of the RCE and accompanying Sequence Listing with the corrected

23  version of SEQ ID NO:6, Ex. 29 (PX2 at 609-16), two further Sequence Listings were

24

25      [4] While Kite contends the number of nucleotides in SEQ ID NO:6 need not be

26  divisible by three as long as the number in the CAR construct as a whole is divisible

27  by three, Dkt. No. 659 at 18, Dr. Quackenbush testified, and the jury was entitled to

find, that SEQ ID NO:6 should be divisible by three because it was specifically

28  described as a coding sequence.  Tr. 1161:15-1162:10.

1    submitted in response to formatting rejections by the Patent Office.  Tr. 1153:13-

2    1155:7.  In the last submission, the attorney mistakenly "grabbed the wrong file," *i.e.*,

3    an old version of the Sequence Listing with the uncorrected SEQ ID NO:6, and made

4    the unrelated correction requested by the Patent Office, thereby reintroducing the

5    erroneous sequence for SEQ ID NO 6.  Dr. Quackenbush also observed that this final

6    submission omitted another correction to the Sequence Listing set forth in the RCE—

7    the addition of a single nucleotide in the Sequence Listing for SEQ ID NO:4 to correct

8    a discrepancy between the Sequence Listing and the specification.  Ex. 29 (PX2 at

9    603); Tr. 1160:9-1161:4.   The absence of this plainly warranted correction, to a

10   different sequence, was obviously the product of the mistaken submission of an

11   erroneous Sequence Listing based on an outdated version, *see* Tr. 1160:9-1161:4, and

12   the jury was entitled to so conclude, particularly since Kite has never offered an

13   alternative explanation for the "reversion" with respect to SEQ ID NO:4.[5]

14            **b.    Kite's Challenges To The RCE's Remarks Are
                      Forfeited, Beside The Point, And Meritless**

15

16        Kite spills much ink arguing that the remarks accompanying the RCE's

17   corrections "did not indicate a clear error with respect to SEQ ID NO:6."  Dkt. No.

     659 at 17.  To begin, this argument is forfeited because Kite failed to make it in its
18
     Rule 50(a) motion—that motion never even mentions the RCE.  *See* Dkt. No. 551.
19

20        Forfeiture aside, the argument is a red herring.  Kite misrepresents the legal

21   import of the RCE.  *See* Dkt. No. 659 at 25-27.  The RCE was submitted to correct

22   the mistakes in the patent application about to issue, and contained remarks to confirm

     that the corrections would not add new matter.  *See* Ex. 29 (PX2 at 603).  Kite does
23
     not contend that the RCE was submitted in bad faith, *i.e.*, with any intent to deceive
24

25        [5] Kite observes that the as-issued Sequence Listing included an unrelated

26   change.  Dkt. No. 659 at 19-20, 22.  That in no way undermines a POSITA's

27   conclusion that the nucleotides erroneously included in SEQ ID NO:6 should be

     removed to conform it to the RCE and the correct version of SEQ ID NO: 6 that was
28   twice submitted (with the RCE and again in the following submission).

1  or with any intentionally incorrect assertions.  Dkt. No. 659 at 20 ("good faith" not at

2  issue); *see* Tr. 977:4-978:2 (Junghans).  Thus, the remarks standing alone are not

3  dispositive of what a POSITA would have understood from the full intrinsic record

4  including the full RCE, *e.g.*, its explicit statements that SEQ ID NO:6 contained an

5  error and its explicit depictions and statements for how that error should be corrected.

6  Even if the correctness of the RCE's remarks were relevant to the CoC inquiry

7  (which it is not), at best for Kite that presents fact disputes that the jury implicitly

8  resolved against Kite.  The first two RCE remarks Kite cites mirror the "red flags"

9  Dr. Quackenbush identified in as-issued SEQ ID NO:6: a number of nucleotides not

10  divisible by three, and a stop codon.  At the very least, it was for the jury to decide

11  how a POSITA would view these issues.  Kite next argues that the RCE "merely

12  identified an inconsistency in the amino acid ranges disclosed by the Sequence Listing

13  and the primers," and "did not clearly convey that the latter as opposed to the former

14  was correct."  Dkt. No. 659 at 19.  This argument makes no sense.  The RCE, which

15  is part of the prosecution history, did not "merely identify an inconsistency"—it

16  *resolved* it, confirming that the latter was correct and conforming the former to it.

17  Finally, Kite contests the RCE's statement that the change would conform the claimed

18  construct to the construct used in the examples.  Dkt. No. 659 at 19.  Having admitted

19  that the RCE was submitted in good faith, Kite has no basis to contest this factual

20  statement of the inventors about the experiments described in the patent.

21  <br>
22  ### c.    Kite's Criticisms of Dr. Quackenbush Are Forfeited And Meritless

23  Next, Kite criticizes Dr. Quackenbush's testimony because, Kite says, he

24  ignored portions of the intrinsic record and improperly relied on extrinsic evidence.

25  These criticisms are absent from Kite's Rule 50(a) motion and are therefore forfeited.

26  In fact, Kite's only reference to Dr. Quackenbush in its Rule 50(a) motion was to

27  (misleadingly) *invoke* his testimony.  *See* Dkt. No. 551 at 1.  Regardless, while Kite's

28  criticisms might have been fodder for cross-examination at trial, a reasonable jury was

1    entitled to reject them.  They do not support JMOL.

2        *First*, Kite alleges Dr. Quackenbush ignored that, post-CoC, "column 4 still

3    includes the stop codon in describing SEQ ID NO:6."  Dkt. No. 659 at 21.  Notably,

4    Kite does not explain how this stop codon's continued presence undermines

5    Dr. Quackenbush's testimony.  In any event, a *post*-CoC reference to a stop codon

6    elsewhere in the patent has no effect on whether, *pre*-CoC, the stop codon's presence

7    in SEQ ID NO:6 would have given a POSITA pause about that coding sequence.

8        *Second*, Kite asserts that Dr. Quackenbush ignored the specification's

9    description of one example as using a nucleotide sequence starting with nucleotide

10   336.  Dkt. No. 659 at 21.  But this was simply another instance of the same nucleotide

11   numbering mistake corrected elsewhere.  Indeed, Dr. Junghans arrived at amino acids

12   113-220 only by also disregarding nucleotide 336.   Tr.  1166:4-1167:3

13   (Quackenbush); *see* Ex. 34 (PDX 12.25 (reproducing a defense demonstrative

14   exhibit)).  In short, the parties' experts *agreed* that references in the '190 Patent to

15   nucleotide 336 were mistakes.  Moreover, a CoC can validly correct mistakes even if

16   it leaves other mistakes on the same or similar topics uncorrected.  *See Arthrocare*,

17   406 F.3d at 1375 (CoC that corrected one but not all mistaken instances of "active

18   electrode" to "electrode terminal" was valid).

19       *Third*, Kite claims that Dr. Quackenbush ignored research papers mentioned

20   and incorporated in the '190 Patent that refer to nucleotide sequences beginning with

21   nucleotide 336.  Dkt. No. 659 at 21.  Far from ignoring these papers, Dr. Quackenbush

22   specifically said they were "something to consider."  Tr. 1192:8-21.  He simply found

23   them unpersuasive to a POSITA because they all long predated the RCE, which

24   explained the error and corrected SEQ ID NO:6 to begin with nucleotides att encoding

25   amino acid 114 of CD28, isoleucine.  Tr. 1205:9-23, 1206:20-1207:20; Ex. 29 (PX2

26   at 603-04).  Again, this criticism was, at best for Kite, a proper subject for cross-

27   examination.  It is not an after-the-fact basis for JMOL.

28       *Fourth*, Kite claims Dr. Quackenbush treated the Sequence Listing as though it

1   was not part of the patent.  Dkt. No. 659 at 21.  That is untrue.  Dr. Quackenbush

2   accurately explained that the Sequence Listing begins as a separate document and is

3   "carried through the [patent prosecution] separately," but then is "merged together"

4   with the rest of the patent "when the patent is issued."  Tr. 1151:23-1152:10.

5        *Fifth*, Kite criticizes Dr. Quackenbush's factual conclusion that SEQ ID NO:11

6   "isn't relevant and shouldn't be considered."  *See* Tr. 1159:20-21.  But Kite omits

7   Dr. Quackenbush's reason for this conclusion:  that the sequence was "never

8   referenced" in any other place in the patent.  Tr. 1159:17-1160:8.  Kite cites 37 C.F.R.

9   § 1.821, but fails to explain how that regulation transforms an unreferenced sequence

10  into probative material.  At the least, the jury was entitled to credit Dr. Quackenbush's

11  factual conclusion that SEQ ID NO:11 would not have been relevant to a POSITA

12  because it was not referenced elsewhere in the patent.  *See* Tr. 1159:17-1160:8.

13       *Sixth*, Kite contends that Dr. Quackenbush and Plaintiffs impermissibly relied

14  on extrinsic evidence outside the proper scope of the CoC inquiry.  Kite quotes

15  Dr. Quackenbush as saying "[t]he question we should be asking ourselves is what is

16  the right piece of CD28 . . . that Dr. Sadelain used in the experiments that he did,"

17  Dkt. No. 659 at 22 (ellipsis in Kite's brief), and suggests that Dr. Quackenbush meant

18  the inquiry should look to the content of Dr. Sadelain's experiments outside the

19  confines of the '190 Patent.  Kite's ellipsis is misleading.  The full sentence of this

20  testimony reads:  "The question we should be asking ourselves is what is the right

21  piece of CD28 *that's reflected in the '190 patent*, that Dr. Sadelain used in the

22  experiments that he did."  Tr. 1147:11-14 (emphasis added).  The italicized words,

23  which Kite intentionally omits, show that "Dr. Sadelain's experiments" referenced

24  the experiments "reflected in the '190 Patent."  Tr. 1147:11-14; *See* Tr. 1150:20-

25  1151:2, 1208:24-1209:8 (Dr. Quackenbush explaining that the "construct of the

26  examples" in the RCE means the experiments described in the patent).  And while, as

27  Kite says, Dkt. No. 659 at 22, Plaintiffs noted Dr. Rosenberg's use of primers

28  disclosed by Dr. Sadelain to make a CAR using amino acids 114-220, this evidence

1   only serves to demonstrate that POSITAs—such as Drs. Sadelain and Rosenberg—

2   regularly use primers (and even talk to one another about a sequence by referencing

3   primers), a factual point on which evidence from outside the intrinsic record is proper.

4        In the end, Kite's sundry criticisms of Dr. Quackenbush fail on this record.

5   Even more to the point, though, those critiques—all of which could have been raised

6   in cross-examination anyway—do not detract from the jury's conclusion that Kite

7   failed to make its case of CoC invalidity by clear and convincing evidence.

8            **d.    Kite's   Supposed   "Real-World"   Examples   Are**
             **Irrelevant**

9

10       Finally, Kite claims that "the purported mistake was only discovered from

11   information *outside* the record," meaning information Dr. Schuetz received from

12   Dr. Sadelain.   Dkt. No. 659 at 20 (emphasis in Kite's brief).   This in no way

13   "confirm[s] the mistake was not clearly evident from the intrinsic record," *see* Dkt.

14   No. 659 at 20, as Dr. Schuetz admitted that he did not consult the entire intrinsic

15   record (if he did so at all) until *after* he had already reached his conclusion that there

16   was a mistake.   Tr. 876:11-878:13.   Dr. Schuetz's discernment of an error from

17   outside information does not mean he would not also have discerned an error had he

18   examined the entire intrinsic record, as a proper CoC analysis requires.   In any event,

19   Dr. Schuetz's testimony was biased and tainted by the hours he spent reviewing the

20   prosecution history with Kite's lawyers, and reasonable jurors could have disregarded

21   it on that basis alone.   *See* Tr. 863:3-872:18.   Similarly, Dr. Bot's conclusion that the

22   amino acid sequence encoded by SEQ ID NO:6 began with amino acid 113 is

23   irrelevant because Dr. Bot admitted he did not review the RCE or any other part of

24   the prosecution history in reaching this conclusion.   Tr. 677:4-15.   Kite's reliance on

25   Dr. Junghans making a CAR using amino acids 113-220 of CD28 is likewise beside

26   the point; at the time Dr. Junghans did so, he had not read the '190 Patent, let alone

27   the full intrinsic record.   Tr. 975:22-976:3.

28       In short, the entire intrinsic record, together with Dr. Quackenbush's testimony,

1  which the jury was fully entitled to credit, easily allowed a reasonable jury to conclude

2  that Kite had failed to prove the CoC invalid by clear and convincing evidence.

3  **D.    Kite's Argument On Willfulness Should Be Rejected**

4  Willfulness is defined as "egregious cases of misconduct beyond typical

5  infringement," *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1935 (2016),

6  which can be shown by "proof that the defendant acted despite a risk of infringement

7  that was either known or so obvious that it should have been known to the accused

8  infringer," *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed.

9  Cir. 2016) (interpreting *Halo*), *rev'd on other grounds*, 138 S. Ct. 2129 (2018).

10  Willfulness is a question of fact for the jury to resolve. *Polara Eng'g Inc. v. Campbell

11  Co.*, 894 F.3d 1339, 1353 (Fed. Cir. 2018).   Because the jury found Kite's

12  infringement willful, Kite must show that no reasonable jury could have so concluded.

13  Kite cannot meet that burden.  As Plaintiffs' post-trial brief lays out in detail,

14  the evidence of willfulness is overwhelming. *See* Dkt. No. 657-1 at 9-14.  Kite knew

15  its scientific collaborators copied Dr. Sadelain's backbone, and demonstrated its

16  awareness of the risk of infringement by trying first to license, and then to invalidate,

17  the '190 Patent.  When both maneuvers failed, Kite proceeded to commercialize

18  Yescarta® in 2017 anyway.  Kite offered no evidence of any good-faith belief in non-

19  infringement or invalidity when it began infringing in 2017, let alone that it relied on

20  any such belief in taking its unlicensed actions against the validated '190 Patent.

21  Against this mountain of evidence, Kite raises only cursory arguments. *First*,

22  Kite inaccurately suggests that because willfulness is measured as of the time of

23  infringement,  pre-infringement  conduct—including  its  failed  licensing  and

24  invalidation attempts—are legally irrelevant. *See* Dkt. No. 659 at 24.  That is not the

25  law.  In fact, conduct predating infringement is often the most probative evidence of

26  the infringer's state of mind at the time of infringement. *See Polara*, 894 F.3d at

27  1353-54 (substantial evidence supported jury finding of willfulness where, among

28  other things, the infringer "was aware of the . . . patent prior to developing its"

1  infringing product, and the infringer's president testified that the infringer "developed
2  its [product] to compete with" the patent owner's product).

3      *Second*, Kite incorrectly claims it was "not permitted to introduce fact witness
4  testimony relating to its belief of non-infringement, because it had maintained
5  privilege over the legal advice it received." Dkt. No. 659 at 24, 47.  The Court
6  excluded no testimony solely on that ground.  Kite's only example of excluded
7  evidence related to Dr. Bot's so-called 2012 "homology analysis."  This evidence was
8  so superseded by events over the next five years—including not just the advice of
9  counsel Kite received, but also the issuance of the CoC and Kite's apparent concern
10  about the '190 Patent as demonstrated by its licensing and IPR attempts—that it was
11  irrelevant under Rule 401, or, at least, unduly prejudicial under Rule 403.  Indeed, not
12  once did Kite claim *actual* reliance on Dr. Bot's analysis in conducting its infringing
13  activity starting in 2017.  It was that overall lack of relevance and risk of undue
14  prejudice, not Kite's privilege assertion, that rendered evidence of Dr. Bot's analysis
15  inadmissible as to willfulness.  *See, e.g.*, Dkt. No. 530 at 3 (ruling on motion *in*
16  *limine*); Tr. 654:17-659:12 (sustaining objection to Dr. Bot's "homology analysis").

17      Meanwhile, the Court precluded no other percipient witness testimony on
18  willfulness.  If Kite had any non-attorney evidence of a good-faith belief of non-
19  infringement or invalidity that it had *actually* relied upon in conducting its 2017-and-
20  after infringing activity, surely it would have presented it, and that evidence would
21  likely have been admissible.  But Kite offered none.

22      *Third*, Kite claims that its litigation defenses negate willfulness because it
23  devised those defenses shortly after beginning its infringement.  Kite forfeited any
24  argument of actual reliance on litigation defenses by failing to raise such an argument
25  in its Rule 50(a) motion.  In any event, the argument lacks merit—post-*Halo*, "[p]roof
26  of an objectively reasonable litigation defense to infringement is no longer a defense
27  to willful infringement."  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340-41 (Fed.
28  Cir. 2017).  And Kite offered no evidence of actual reliance.

Kite suggests that *Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018), holds that a "defendant may rely on objective reasonableness of its defenses." Dkt. No. 659 at 24. That is not *Exmark*'s holding at all. *Exmark* repeated *Halo*'s holding that "subjective willfulness . . . intentional or knowing, may warrant enhanced damages," 879 F.3d at 1353 (quoting *Halo*, 136 S. Ct. at 1933), and remanded the case (which was tried pre-*Halo*) for consideration of any evidence that "Briggs had developed any views about the prior art at the time of accused infringement," which would be admissible even though the district court had held this defense objectively unreasonable. *Exmark*, 879 F.3d at 1353. Notably, the Federal Circuit emphasized, "evidence [that] only relates to Briggs' litigation-inspired defenses," would be inadmissible. *Id.* Here, Kite presented no evidence that it had actually developed (or relied on) any views itself—the same reason why on remand the district court in *Exmark* denied a new trial on willfulness. 348 F. Supp. 3d 907, 919 (D. Neb. 2018) ("[T]he Court has not been presented with a shred of evidence that shows [Briggs'] invalidity defense was anything but a litigation-inspired defense.").

### E. Kite's Argument On Damages Should Be Rejected

According to Kite, the record can support only a damages award that is significantly less than the $150 million Juno has paid to date under its license to the '190 Patent (an amount not even accounting for actual sales). Dkt. No. 659 at 24-34. Kite is wrong; the record, including testimony from Kite's own witnesses, supports the jury's rejection of this nonsensical position. Kite's post-trial arguments, which largely track the arguments made in its panoply of pre- and mid-trial motions attacking Dr. Sullivan's testimony, should be rejected.

### 1. Dr. Sullivan's Comparable-License Analysis Was Proper

Kite argues the jury's award "is many times higher than any comparable license" and thus "not supported by substantial evidence." Dkt. No. 659 at 25. Kite is wrong; in both its trial and post-trial submissions, Kite continuously relies on its

misrepresentation of the economic terms of the 2013 MSK/Juno Agreement.  That license is for the patent-at-issue and was considered comparable by both sides' experts.  Tr. 1087:19-1088:1 (Rao), 778:12-18 (Sullivan).  Nonetheless, Kite brushes aside terms of that license providing for success payments of up to $150 million upon entry of the license, and misrepresents other license terms.  Indeed, Kite never acknowledges that Juno has, in fact, already paid approximately $150 million under the license.  Kite's mischaracterization of the most probative license in the record would alone allow a reasonable jury to reject Kite's view of damages and adopt Plaintiffs'.  The jury's award is fully supported by this comparable license.

The MSK/Juno Agreement (via its incorporated Side Letter) provides that Juno must pay SKI up to $150 million based upon a "multiple of initial equity value."  Ex. 35 (PX241 at 23) (capitalization altered); Tr. 784:16-786:5 (Sullivan), 368:6-369:2 (Dash).  As Dr. Dash testified, the payments made to SKI in accordance with Juno's Side Letter obligations were "not tied to the sales of the product," but were intended "to *compensate the institution for access to the technology*," Tr. 366:18-367:6, 368:5-370:4, and thus provided part of the consideration for the MSK/Juno Agreement.  Hans Bishop, Juno's former CEO and lead negotiator and signatory for the MSK/Juno Agreement, testified that the success payments were "an important part of the MSK/Juno agreement," and were intended to provide SKI with upside potential without increasing the equity burden on Juno.  Tr. 726:17-727:12; *see* Tr. 784:16-786:5 (Sullivan) (success payments were "a fundamental component of the agreement").  Substantial evidence supports the jury's application of corresponding success payments in the hypothetical negotiation between Plaintiffs and Kite.

Citing only the testimony of its own damages expert, Kite argues that competitors would not agree to the sort of success payments included in the MSK/Juno Agreement, which purportedly apply only when there is "extensive collaboration."  Dkt. No. 659 at 27.  The nub of Kite's argument is that Kite should have received a *better* economic deal at the hypothetical negotiation with its

competitor Juno on the eve of its commercial launch in 2017 than Juno received from MSK, a collaborator, in 2013. *See* Dkt. No. 659 at 25 & n.3 (arguing that the "only proper award" is the $29.2M that Kite's damages expert "would have offered at trial but for the Court's *Daubert* Order"). The trial record demonstrates, however, that Kite has it backwards—a competitor would pay more, not less, Tr. 349:4-16 (Dash); 713:2-5 (Dulac), 787:21-788:11 (Sullivan), and licenses are more expensive as commercialization approaches, Tr. 348:4-349:2 (Dash), 689:8-12 (Bot), 712:16-7:13:1 (Dulac). The jury was well within its rights to reject Kite's contrary arguments.

Kite also tries to dismiss the success payments as "negligible." Dkt. No. 659 at 28. Not so. The jury heard unrebutted testimony from Dr. Dash that, separate and apart from royalties on sales, SKI has received approximately $150 million from Juno for the license to the '190 Patent, including success payments. Tr. 369:10-21. Kite's argument that "Plaintiffs introduced no evidence explaining the Juno stock success fee or tying it to the '190 patent" is thus plainly wrong. *See* Dkt. No. 659 at 27. And given the later time and different circumstances of the hypothetical negotiation, including the direct competition between Kite and Juno, no jury could view the amount to which Kite would agree for comparable success payments as "negligible."

Kite also rehashes its failed trial argument that Dr. Sullivan wrongly considered the appreciation of Kite's stock in his success payment analysis, on the ground that it was Juno's stock at issue in the MSK/Juno Agreement. *See* Dkt. No. 659 at 28-29. Again, this ignores the different role that Juno has in the hypothetical negotiation versus the Agreement. The success payments are tied to increases in the stock price of *the licensee* (*i.e.*, "10 times, 15 times, and 30 times")—in the actual Agreement, that was Juno; for the hypothetical negotiation, that is Kite. Tr. 804:25-805:6 (Sullivan); Ex. 35 (PX241 at 23). Thus, using the comparable MSK/Juno Agreement for the hypothetical negotiation, the increase in Kite's stock price is the proper benchmark for the success payments because Kite is the licensee. Kite criticizes the use of Kite's stock in this way as analogous to the "stock-swap" that the Court

addressed in its *Daubert* ruling, Dkt. No. 659 at 28-29, but the two are fundamentally different.  The rejected "stock swap" was a substitution of an equity grant in Juno for an equivalent number of shares in Kite, Dkt. No. 473 at 8, whereas here, as the Court already has found, there is no exchange of Juno shares for Kite shares.  Tr. 750:20-753:19 (parties' argument, including Plaintiffs' counsel stating:  "This analysis is not based on translating between Juno and Kite share prices.  The success payments here are just based on a multiple of initial equity increase . . . . But there is no mixing and matching of Juno and Kite share prices."), 755:12-15 ("The Court would overrule the objections of Kite, and Dr. Sullivan may testify as to those numbers.").

Kite also argues that the jury should have apportioned Kite's stock price to the '190 Patent, contending that "[n]o reasonable jury could . . . find that a 30-fold appreciation in Kite's stock price prior to 2017 derived entirely from infringing the '190 Patent."  Dkt. No. 659 at 29-30.  This ignores the comparable license framework, where apportionment is "built in."  *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015); *see infra* Part I.E.3.  The Side Letter provides that the licensee's stock price appreciation triggers the success payments, and does not require that all such appreciation be derived solely from the licensed technology.  Tr. 804:25-805:6 (Sullivan).  In any event, Dr. Sullivan testified that the full $150 million in success payments would have been triggered based solely on the $6.2 billion valuation for Yescarta® at the time of the hypothetical negotiation, even if one ignored Kite's stock price appreciation in excess of that amount.  Tr. 908:4-24 (Sullivan).  And there was a mountain of evidence on the crucial importance of the '190 Patent to Yescarta®.  *See infra* Part I.E.3.[6]

---

[6] Kite also nonsensically argues that "[t]he period of appreciation" in Dr. Sullivan's success payment analysis "compensated Plaintiffs for Kite's research and regulatory activities prior to the date of the hypothetical negotiation, and for which no license was required."  Dkt. No. 659 at 29.  Those activities were directed to a CAR therapy for which Kite tried, but failed, to obtain the necessary patent rights in 2013 or design around thereafter.  They would have no independent value unless

1    Kite's misrepresentation of the terms of the MSK/Juno Agreement, to contend

2    that there is no comparable license supporting the jury's verdict, extends beyond the

3    success payments.  Kite also argues that "half of the overall 7.25% royalty rate" is for

4    know-how rather than patent rights.  Dkt. No. 659 at 28.  Kite is incorrect; the express

5    terms of the MSK/Juno Agreement provide a royalty of 7.25% on products covered

6    by a single claim of the '190 Patent, even if those products do not use any know-how.

7    Ex. 36 (PX924 at 12-13 (Sect. 4.2.1)); Tr. 367:10-368:4 (Dash).  The jury reasonably

8    rejected Kite's damages case, which was grounded on such misrepresentations.

### 2. Dr. Sullivan's Adjustments Appropriately Accounted For The Differences Between The MSK/Juno Agreement And The Hypothetical Negotiation

11    Kite, yet again, challenges Dr. Sullivan's two adjustments to the MSK/Juno

12    2013 Agreement as part of his comparable-license analysis.  *See* Dkt. No. 659 at 31-

13    33.  The Court already rejected these identical challenges in its *Daubert* order, ruling

14    that "Dr. Sullivan's adjustments to account for the circumstances of the hypothetical

15    negotiation are sufficiently reliable to be admitted."  Dkt. No. 559 at 6.  As a

16    preliminary matter, Kite's attempt to relitigate the reliability of Dr. Sullivan's

17    opinions in the context of its JMOL challenge violates Federal Circuit law, which

18    does not permit such challenges "under the guise of sufficiency of the evidence." *See,*

19    *e.g.*, *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013).

20    In any event, neither age nor repetition has improved Kite's argument.  Indeed, the

21    Court already ruled prior to trial that Dr. Sullivan's adjustments are reliable, as they

22    account for differences between the hypothetical negotiation and the MSK/Juno

23    Agreement.  *See Ericsson Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir.

24    2014) (A comparable-license analysis "must account for . . . distinguishing facts.").

25    And the evidence more than adequately supports Dr. Sullivan's adjustments.

---

27    Kite commercialized that therapy, which required a license to the '190 Patent at the
28    2017 hypothetical negotiation.  Dr. Sullivan thus properly took into account the full amount of the success payments, which, as applied to Kite, were triggered as of 2017.

1    Just as it did in its failed *Daubert* motion, Kite complains that Dr. Sullivan's
2  first adjustment, which accounts for the fact that the MSK/Juno Agreement is between
3  collaborators whereas the hypothetical license is between competitors, uses a ratio
4  rather than the flat numeric difference that Kite's expert Dr. Rao sought to use.  Dkt.
5  No. 659 at 31.  Substantial evidence supports Dr. Sullivan's approach.  *See* Tr. 349:4-
6  16 (Dash) (licenses to competitors have higher rates), 506:17-22 (Belldegrun) (Kite
7  and Juno were competitors).  Moreover, Kite cites nothing in the record or law that
8  would compel a reasonable jury to adopt Dr. Rao's analysis over Dr. Sullivan's.

9    Kite then complains about Dr. Sullivan's second adjustment, Dkt. No. 659 at
10  32, but as Dr. Sullivan explained, adjusting based only on the Novartis settlement is
11  insufficient. Tr. 788:25-790:10. The Novartis settlement (which resolved pending
12  litigation between Juno and Novartis on the eve of Juno's IPO) was executed years
13  before Novartis was ready to commercially launch a CAR-T product, and there was
14  no overlap in Juno and Novartis's lead product candidates. *Id.*  Here, by contrast, the
15  hypothetical negotiation took place in October 2017, when Kite received FDA
16  approval and was about to commercially launch Yescarta® to be first to market in the
17  very same indication Juno was pursuing.  *Id.*  Dr. Sullivan thus made his second
18  adjustment by comparing the anticipated economic harms Juno expected from
19  Novartis in 2015 with those it anticipated from Kite in 2017 using the modeling
20  available at the relevant times.  Tr. 793:9-794:2 (Sullivan analysis); Exs. 37-38
21  (PX1247 & PX1248 (Model Summaries)).[7]   Again, the Court already found
22  Dr. Sullivan's second adjustment reliable.  Dkt. No. 559 at 6.  And again, the
23  adjustment is supported by substantial evidence. *See*, *e.g.*, Tr. 348:4-349:2 (Dash),
24

---

25    [7] Kite also offers the bizarre argument that "Sullivan did not speak to anyone
26  at Juno about the spreadsheets" on which he relied, Dkt. No. 659 at 32, even though
   he reviewed deposition testimony about them, Tr. 833:21-834:4.  Contrary to Kite,
27  there was considerable record evidence about the creation, purpose, and reliability of
28  these models.  Tr. 716:4-717:16 (Dulac); 731:5-20 (Bishop); 762:10-22 (Sullivan).

689:6-10 (Bot), 712:16-7:13:1 (Dulac) (all establishing that patent licenses generally cost more the closer the licensed technology is to commercialization); Tr. 455:5-457:4 (Gilbert), 513:21-514:23 (Belldegrun), 718:1-24 (Dulac), 730:3-19 (Bishop); Ex. 39 (PX16 at 1 (Kite: "being the first is the name of the game for us")); Ex. 40 (PX29 (Kite First Mover Advantage Presentation)) (all establishing the significant economic benefits Kite expected to receive from being first to market, which the hypothetical license would have enabled).

Having had its chance to cross-examine Dr. Sullivan regarding his adjustments to the comparable license and to present its own theory in rebuttal, Kite offers no basis to find that the jury *had* to favor Kite's view of the appropriate adjustments over Dr. Sullivan's. Instead, the jury was free to, and did, reject Kite's view.

Finally, Kite's cited cases do not support its motion. *See* Dkt. No. 659 at 34. In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012), the court held that it was improper for an expert to base his opinion on non-comparable licenses, which is not the case here. In *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320-21 (Fed. Cir. 2010), and in *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009), there was little or no expert testimony on how or why the licenses in evidence should be adjusted to support the jury's reasonable royalty. In short, Kite offers no basis on which to grant JMOL on the jury's adoption of Dr. Sullivan's adjustments.

### 3. The Jury Properly Apportioned The Value Of The '190 Patent

Kite also contends that the jury's damages award "violates the apportionment requirement," suggesting that everything other than the '190 Patent CAR is responsible for the success of Yescarta®. Dkt. No. 659 at 31. This argument flies in the face of the evidence detailing the central importance of the '190 Patent to Yescarta®, as well as to Kite's overall business. Certainly, no jury had to accept Kite's contention, which is based on an inapt analogy to licenses for electronic devices having hundreds or thousands of components.

1       To start, Kite's cited cases are (again) far afield.  The Federal Circuit has

2   recognized that in a comparable-license approach, as applied here, apportionment is

3   "built in."  *Commonwealth Sci.*, 809 F.3d at 1303 ("Because the parties' discussions

4   centered on a license rate for the [asserted] patent, this starting point for the district

5   court's analysis already built in apportionment.").  Kite points to a series of inapposite

6   cases addressing multi-component electronic devices or software programs.  *See* Dkt.

7   No. 659 at 25.  Kite cites not a single biotechnology case, and certainly not one where,

8   as here, the product's sole therapeutic agent is covered by the patent at issue and the

9   accused infringer's entire clinical pipeline relies on the claimed therapeutic construct.

10      Nor does the record support Kite's portrayal of the facts.  Kite tried and failed

11  multiple times to develop non-infringing alternatives to the '190 Patent's CAR.  Tr.

12  768:9-21 (Sullivan) (failed KTE-585 and Hu19 constructs).  Even now, nearly seven

13  years after Kite first tried but failed to license the '190 Patent, Kite still has no

14  alternative to the '190 Patent; today, all of Kite's clinical trials continue to use the

15  copied Sadelain backbone.  Tr. 768:22-769:4 (Sullivan); Tr. 683:14-684:13 (Bot)

16  (dual CAR construct "not yet" in clinical trials).  As Kite's own witnesses confirmed,

17  there can be no CAR-T therapy without a CAR.  Tr. 927:8-10 (Kite's expert,

18  Dr. Komanduri, testifying that "[w]ithout a CAR, you don't have a CAR-T therapy");

19  Dkt. No. 646-2 at 6 (Kite's former Chief Commercial Officer testifying at trial via

20  deposition that "[w]ithout [a CAR construct], there isn't anything").

21      Kite touts its lymphodepletion regimen as an important value driver, Dkt. No.

22  659 at 30, but the jury had ample basis to reject that contention.  Juno introduced

23  evidence that Kite's lymphodepletion regimen involves higher doses of

24  chemotherapy, which in turn lead to greater toxicities.  *See* Tr. 448:9-450:19; 454:6-

25  22 (Gilbert).  Kite then points to its manufacturing process as another important value

26  driver.  Dkt. No. 659 at 30.  But the evidence showed that Kite uses a first-generation

27  bulk manufacturing process, as opposed to a next-generation manufacturing process

28  such as Juno's, which allows more control and increased safety.  Tr. 430:20-433:5;

500:5-12 (Gilbert).  And Kite again raises the five patient deaths in the JCAR015 trial, which Kite claims "underscore the critical importance of Kite's independent contributions."  Dkt. No. 659 at 30.  But the jury could have readily attributed those deaths to the fact that the JCAR015 trial was directed to harder-to-treat leukemia patients as opposed to Kite's easier-to-treat lymphoma patients. Tr. 412:3-414:2 (Gilbert).  On this record, the jury could have reasonably concluded that Kite's "independent contributions" add little overall value to Yescarta®.

Kite also claims it was "undisputed that Kite's enterprise value was driven substantially by future, non-infringing therapies that would develop over a 20-30 year timeframe."  Dkt. No. 659 at 30.  At best for Kite, this was disputed.  Kite presented no cogent evidence that it had *any* non-infringing therapies.  Instead, Kite tried and failed multiple times to develop non-infringing alternatives.  *See* p. 37, *supra*.  Once again, Kite cites nothing in the record that would compel a jury to adopt its positions.

## II.   KITE'S NEW TRIAL MOTION SHOULD BE DENIED

To obtain a new trial, Kite must show that the verdict is "contrary to the clear weight of the evidence," based on "false or perjurious evidence," or "a miscarriage of justice."  *Passantino v. J&J Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000).  As shown in Part I and below, Kite has no basis for requesting a new trial.

### A.   Kite's Verdict-Form Arguments Should Be Rejected

Kite's display of the wrong verdict form during its closing argument was entirely of its own doing.  It does not warrant a new trial.  *See* Dkt. No. 659 at 35-38. Consistent with every one of the Court's rulings throughout trial, Kite knew (or should have known) it was using an incorrect version of the verdict form.  Kite repeatedly asked the Court to limit Plaintiffs' evidence and to restrict (both by time period and amount) the upfront payment portion of the reasonable royalty.  *E.g.*, Dkt. Nos. 463, 489, 498, 500, 527; Tr. 750:20-752:4, 753:3-14, 1113:3-1114:12.  Kite also repeatedly requested the language at the root of its verdict form complaint—"(to cover only damages incurred through trial)" in Question 5a.  Tr. 1293:13-18; 1294:25-1295:7;

1309:11-15.  At every turn, the Court entertained arguments from both sides and denied Kite's request.  *E.g.*, Tr. 755:12-15, 1114:13-14.  Indeed, every version of the verdict form Plaintiffs received from the Court prior to the jury deliberating omitted Kite's proposed 5a language.  *See* Jeffries Decl. ¶¶ 3-13.  Before presenting its closing argument, Kite itself had received at least five versions of the verdict form that consistently omitted that language (including two versions sent by Plaintiffs the evening of December 10).  Jeffries Decl. ¶¶ 3-11; Exs. 1, 2; Dkt. No. 554-1 at 3.  Moreover, the Court consistently described on the record all changes to the verdict form (and jury instructions) it would be making.  *E.g.*, Tr. 1321:13-1322:11, 1330:20-1332:4, 1339:20-1340:11.  *Not once* during consideration of Kite's proposed language for Question 5a, or any other time, did the Court state it was adopting that language.

Against this backdrop, it was entirely unreasonable for Kite to think the Court had accepted this oft-rejected language at the very last moment, without any comment by the Court on (or, for that matter, off) the record that it was doing so.  At minimum, Kite was on inquiry notice that the verdict form it used during closing was incorrect.  As the Court stated when Kite moved for a mistrial, "[Kite] used the verdict form without clearing it first with the Court" and "the verdict form that is being given to the jury today is the verdict form that was initially approved . . . by the Court on the record.  So all of this was discussed."  Tr. 1543:18-24.

Moreover, when Plaintiffs used the *correct* version of the verdict form in their closing argument slides on December 11, *see* Ex. 3 (PDX13.138)—which was after Kite claims it received the incorrect form from the Court, but before Kite showed the incorrect form to the jury in its closing—Kite did not object.[8]  Plaintiffs' slide, like all others, was on display to all counsel, on the multiple counsel-table monitors.  Yet Kite remained silent.  *See* Jeffries Decl. ¶¶ 14-15.  Nor did Kite seek clarity from the

---

[8] Contrary to Kite's assertion, *see* Dkt. No. 659 at 36, counsel for Plaintiffs never received an incorrect version of the verdict form prior to closing arguments. *See* Jeffries Decl. ¶¶ 13, 18.

Court before presenting its own closing argument and its incorrect slide. Instead, Kite barreled ahead and then moved for a mistrial *when Plaintiffs pointed out Kite's use of the wrong verdict form*. Tr. 1543:9-17. The Court should not countenance Kite's doubling down on its position now, knowing that its new-trial motion is based on a mistake it should have been (and perhaps was) aware of and could have itself cured.

In any event, there was no prejudice—Kite's claim that it would have presented its damages position differently had it planned its closing around the correct verdict form rings hollow. *See* Dkt. No. 659 at 37. Even as the Court consistently ruled against Kite's requests to restrict the time period and amount of the upfront payment portion of the reasonable royalty, *see* Tr. 750:20-752:4, 753:3-14, 755:12-15, Kite's trial presentation never deviated from its view that the upfront payment should be prorated. Tr. 1082:12-15, 1124:7-11, 1125:11-1127:20 (Dr. Rao testifying that the upfront should be $7.3 million prorated from $88 million). There is no reason to think Kite would have argued any differently in closing argument had it used the correct verdict form. In fact, Kite's closing argument informed the jury that Dr. Rao's $7.3 million upfront payment was calculated by prorating $88 million. Tr. 1502:17-23. Contrary to Kite's suggestion that it had "no opportunity to advocate any number" that did not involve proration, *see* Dkt. No. 659 at 37, the jury was thus plainly aware that Kite believed not only that the jury should prorate and award only $7.3 million, but also that it should award only $88 million if it deemed proration inappropriate.

Kite's cited case, *Ruvalcaba v City of Los Angeles*, 167 F.3d 514 (9th Cir. 1999), is inapt. *Ruvalcaba* holds that relief is warranted only where prejudice results, *id.* at 522-23, and Kite suffered none here. (Indeed, even in the face of a clear procedural error solely attributable to the court—not the case here—*Ruvalcaba* held that there was no prejudice. *Id.*) Here, Kite knew—or, at minimum, should have known—that it was using the wrong form, and Kite had every opportunity to, and did, convey its view throughout trial and in closing that the upfront royalty should be prorated. *See id.* (no prejudice where movant actually made "the arguments he asserts

1   were precluded by the error").  The fact that the verdict form did not *direct* the jury

2   that it *had to* prorate was neither error nor prejudicial to Kite's ability to present its

3   arguments.  Kite's self-inflicted, tactical mistake does not warrant a new trial.

### B.   Kite's Damages Arguments Should Be Rejected

#### 1.   Dr. Sullivan's Testimony Did Not Prejudice Kite

6   Kite's complaints about Dr. Sullivan's testimony are not grounds for a new

7   trial.  *See* Dkt. No. 659 at 38-40.  *First*, Kite argues that Dr. Sullivan's testimony

8   exceeded the scope of his expert report.  The Court has already rejected Kite's

9   argument.  Tr. 748:10-753:19; 755:12-15; 1113:3-1114:14.

10   *Second*, Kite argues that Dr. Sullivan's testimony is somehow inconsistent with

11   his opinion that the upfront payment is for "harms realized at the hypothetical

12   negotiation, not compensation for any type of future harm."  Dkt. No. 659 at 39.  Not

13   so; that is exactly what Dr. Sullivan said at trial.  Tr. 798:13-799:5 (upfront payment

14   "is accounting for the financial harms and benefits that are realized at the time of the

15   hypothetical negotiation").

16   *Third*, Kite's concerns about a possible future claim for lost profits are purely

17   speculative.  Dkt. No. 659 at 39.  Plaintiffs have not sought damages for lost profits.

18   Kite's claim that Dr. Sullivan gave contradictory answers on "the risk of additional

19   damages" is off base.  Dkt. No. 659 at 39.  Kite's ineffective cross-examination

20   confused economic issues regarding the hypothetical negotiation with legal issues

21   regarding the availability of post-trial relief, as Dr. Sullivan explained.  Tr. 814:10-

22   815:15 ("[Y]ou are confusing an outcome of a hypothetical negotiation versus a court

23   action that might result in damages in the face of Kite's actual infringement.").

24   *Fourth*, and finally, any alleged "prejudice" Kite suffered from Dr. Sullivan's

25   trial testimony does not warrant a new trial.  As "one example" of how Dr. Sullivan's

26   trial testimony purportedly prejudiced it, Kite contends it "would have developed and

27   introduced additional evidence and argument that, as of the hypothetical negotiation

28   date, it anticipated having non-infringing constructs available well before 2024."  Dkt.

No. 659 at 40.  In actuality, however, Kite did attempt to develop that evidence—but the evidence was so weak and speculative that Kite scrapped its non-infringing-alternatives theory and declined to present it at trial.  Kite's voluntary withdrawal of its non-infringing-alternatives theory—a theory that, contrary to the statements in its motion, Kite had years to develop in discovery—cannot warrant a new trial.

### 2.  The Economic Data Points Were Highly Relevant To A Proper Damages Analysis

Kite's arguments that evidence of "irrelevant" economic data points warrants a new trial similarly fall short.  Dkt. No. 659 at 40-43.  Most fundamentally, Kite failed to object to the introduction of most of the data points about which it now complains.  In particular, Kite did not object to the introduction of any of the following evidence: (1) Kite's projected $7.1 billion profits for Yescarta® through the patent term, based on Kite's own financial models in place just before the date of the hypothetical negotiation, *see* Ex. 41 (PX156 at 25); Tr. 796:10-797:3 (Sullivan); (2) Juno's projections from 2017 that Kite would have an annual revenue impact of negative $1.3 billion on Juno, *see* Tr. 793:9-794:2 (Sullivan); (3) the $1 billion upfront payment from the Celgene-Juno agreement, Tr. 715:7-19 (Dulac); and (4) 20-30% late-stage royalty rates, Tr. 713:11-714:3 (Dulac).  And though Kite's motion focuses on Plaintiffs' closing argument, Kite likewise posed no objections to counsel's reference to these figures then.  *See* Dkt. No. 659 at 41; Tr. 1370:25-1371:3, 1407:5-1409:1, 1411:13-1413:19, 1506:23-1508:1, 1530:7-12, 1532:12-17, 1534:6-11.  By failing to object, Kite waived its right to seek a new trial based on the introduction of these highly relevant economic data points.  *See, e.g.*, *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) ("By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal."); 11 Wright & Miller, Federal Practice & Procedure § 2805 (3d ed. 2002) ("A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental

1   that gross injustice would result.").

2        Even on the merits, each figure Kite dislikes has clear relevance to the damages

3   analysis in this case, and would have been properly admitted even if Kite had

4   preserved its objections (which, for most, it did not).  For example:

- The $6.2 billion Gilead attributed to Yescarta® and the $7.1 billion it projected in profits for Yescarta® through expiration of the '190 Patent are directly relevant to the value of the '190 Patent to Kite.  The Court denied Kite's motion *in limine* to exclude the $6.2 billion figure "because the amount has a nexus to the accused product."  Dkt. No. 559 at 9.  The same nexus exists for Kite's (un-objected-to) $7.1 billion in projected Yescarta® profits.

- The (un-objected-to) $1.3 billion in negative annual revenue impact on Juno anticipated from Kite's market entry is a well-established consideration.  *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970) (parties to hypothetical negotiation would consider "the anticipated amount of profits that the prospective licensor reasonably thinks he would lose as a result of licensing the patent").

- Mr. Dulac's (un-objected-to) testimony was based on his extensive experience in biotechnology licensing, including as Celgene's then-Vice President of Business Development and Strategy.  Tr. 711:6-8.

14        Yet again, Kite's case law is off base.  For example, Kite relies on *Uniloc USA,*

15  *Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), a software patent case.  The

16  accused feature, which the court termed a "minor patent improvement," indisputably

17  "did not create the basis for customer demand or substantially create the value of the

18  component parts" for Microsoft's multi-feature Office and Windows products.  *Id.* at

19  1318-19.  As a result, the court ruled that Microsoft was entitled to a new trial after

20  the plaintiff emphasized the entire revenue base for Office and Windows.  *Id.* at 1320.

21  This case could hardly be more different.  The evidence establishes that the '190

22  Patent CAR is the sole active ingredient of Yescarta® and that Kite had no alternative

23  CAR for its therapy.  There is thus a close nexus between the value of Yescarta® and

24  the patented technology, as the Court already concluded.  Dkt. No. 559 at 9.

25  **C.    Kite's Jury-Instruction Argument Should Be Rejected**

26        "Litigants have no vested right to the court's wholesale adoption of their

27  proffered instructions, even if the instructions are supported by the evidence and

28  accurately reflect the applicable law."  9 Moore's Federal Practice—Civil § 51.12

1  (2019).  This is uniform federal law, including in both the Federal and Ninth Circuits.

2  *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 853-54 (Fed. Cir. 1991)

3  (same principle as Moore's); *FDIC v. Lugli*, 813 F.2d 1030, 1032 (9th Cir. 1987)

4  (courts are "not required to use the exact words proposed by a party").  To obtain a

5  new trial based on the jury instruction on written description, Kite must show that the

6  instruction was "erroneous" and "prejudicial."  *Sulzer Textil A.G. v. Picanol N.V*, 358

7  F.3d 1356, 1364 (Fed. Cir. 2004).  Kite can establish neither.

8      The instruction given tracked a current model instruction that fairly states the

9  law.  *See* N.D. Cal. Model Patent Instruction B.4.2a (updated 2019); *e.g.*, *Ariad*, 598

10  F.3d at 1355 (The specification must "demonstrate that the patentee was in possession

11  of the invention that is claimed.").  It stated, in relevant part:  "The purpose of the

12  written description requirement is to demonstrate that the inventor was in possession

13  of the invention at the time the application for the patent was filed," and the

14  "requirement is satisfied if a person of ordinary skill in the field reading the original

15  patent application at the time it was filed would have recognized that the patent

16  application described the invention as claimed."  Dkt. No. 591 at 20.  Kite never

17  objected to the model instruction as out of date.

18      Although Kite calls the jury instruction "legally inadequate" for not including

19  what it calls the "*Ariad* standard" for "written description of genus claims," Dkt. No.

20  659 at 43-44, there is no special standard for genus claims (even if the claims here

21  could accurately be labeled as such).  *See* Parts I.A.3 & I.A.4, *supra*.  Kite's objection

22  is nothing more than a complaint that the Court did not charge the jury in the particular

23  language Kite wanted.  That is not error, let alone a basis for a new trial.

24      Under the statute, there is a single written description test.  *See* 35 U.S.C.

25  § 112(a).  Indeed, in discussing genus claims, *Ariad* made clear that "the description

26  requirement does not demand any particular form of disclosure."  598 F.3d at 1352.

27  Rather, "whatever the specific articulation," the inquiry is whether the specification

28  shows that "the patentee was in possession of the invention that is claimed."  *Id.* at

1352, 1355.   Thus, while the Federal Circuit has "permitted" disclosure of
representative examples or common structural features to satisfy written description
for genus claims, *id.* at 1352, there is no separate standard for "genus claims," nor
would one be consistent with the statute.  *See also* Part I.A.4, *supra.*

Kite's proffered "genus" instruction would only have confused the jury.  *No*
witness ever discussed genus claims.  The term "genus" was mentioned only in Kite's
opening statement, *see* Tr. 197:20-200:23, but never again—not by any witness, and
not in closing arguments.  A party may not claim error in the failure to give a specific
instruction where the instructions given properly cover the subject, and no party is
entitled to an instruction that has no "foundation in the evidence." *Jenkins v. Union
Pac. R.R. Co.*, 22 F.3d 206, 210 (9th Cir. 1994).  Moreover, "[b]ecause the district
court has substantial latitude in tailoring jury instructions," a court's preference for
certain wording over other wording is within its broad discretion, unless the court's
wording contains a "misstatement of law." *Gilbrook v. City of Westminster*, 177 F.3d
839, 860 (9th Cir. 1999).  The court did not misstate the law by grounding the written-
description instruction in the (correct) model instruction, nor did it abuse its discretion
by not injecting the term "genus" where it was the subject of no trial testimony.

Kite's further quibbles about the instruction using "invention" (singular) rather
than "inventions" (plural), and not using "full scope," are also unfounded.  Dkt. No.
659 at 44.  Kite never objected on either ground, and does not even try to show plain
error.  *See* Fed. R. Civ. P. 51(d)(2).  In any event, claims set forth an "invention,"
whether they are "genus" claims or otherwise cover multiple embodiments.  *See* 35
U.S.C. § 112(a), (b).  Indeed, Kite's own proposed written-description instruction
used "invention," not "inventions." *See* Dkt. No. 436 at 104.  Nor was there any error
in not using Kite's preferred term "full scope."  As discussed, the instruction clearly
and correctly stated that the disclosure show possession of the invention.

Finally, Kite's cited cases are inapposite.  *See* Dkt. No. 659 at 44-45.  In *Eko
Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*, 946 F.3d 1367 (Fed. Cir.

1  2020), the Federal Circuit disapproved of an instruction not because it was based on

2  a model instruction, but because it "was erroneous." *Id.* at 1378.  And in *Amgen Inc.*

3  *v. Sanofi*, 872 F.3d 1367 (Fed. Cir. 2017), the error was in inviting a finding of

4  adequate written description "merely from a finding of ability to make and use"—an

5  issue not present here. *See id.* at 1376-79.

6  ### D.   Kite's IPR Arguments Should Be Rejected

7  Kite next argues that "Plaintiffs misled the jury about the *inter partes* review."

8  Dkt. No. 659 at 45.  But it was *Kite* who offered the IPR Final Written Decision into

9  evidence, sinking its argument under the doctrine of invited error.  Furthermore,

10  Plaintiffs' explanation of that evidence to the jury was entirely accurate and proper.

11  On the first day of testimony, Kite offered PX2, the complete prosecution

12  history, into evidence.  Tr. 276:19-24.  Plaintiffs did not object, and the exhibit was

13  received.  Tr. 276:25-277:3.  PX2 includes the Final Written Decision in the IPR

14  proceeding.  Ex. 29 (PX2 at 779-809).  By moving the admission of this evidence,

15  Kite is now foreclosed from challenging that admission. *See Ohler v. United States*,

16  529 U.S. 753, 755 (2000) ("Generally, a party introducing evidence cannot complain

17  on appeal that the evidence was erroneously admitted.").  Once that evidence was

18  admitted at Kite's request, and thus available to the jury during deliberations, it was

19  proper for Plaintiffs to explain it and put it in context.  Additionally, the Court

20  recognized the relevance of the IPR and particularly the filing of the petition and the

21  IPR outcome as reflected in the Final Written Decision after Dr. Belldegrun claimed

22  that the '190 Patent was not important.  Tr. 604:15-609:2.

23  Plaintiffs gave the jury entirely accurate information about those materials;

24  none of the statements Kite disputes was inaccurate.  Contrary to Kite's

25  characterization, Plaintiffs did not describe the IPR issues as "related" to the issues in

26  this trial. *See* Dkt. No. 659 at 46.  Rather, after Kite's objection to the word "related"

27  was overruled, Plaintiffs' counsel stated that the "arguments that were being made by

28  the parties, including Kite," in the IPR were "about pieces of prior art"—*i.e.*, a

1   different issue than the jury was being asked to decide.  Tr. 1531:12-1532:1.  The

2   statement that "three trained patent judges look[ed] at issues relative to the validity of

3   the patent" was also accurate.  Tr. 1534:2-4.  And with respect to claim construction,

4   Kite *could have* raised that issue in the IPR.  Indeed, Kite *did* make claim construction

5   arguments, including on the SEQ ID NO:6 claim term.  *See* Ex. 42 (IPR Petition at

6   14-15); *see also* Ex. 43 (Patent Owner's Preliminary Response at 12-13).  But

7   Plaintiffs never told the jury that Section 112 arguments were, or could have been,

8   considered and rejected in the IPR, or that the IPR addressed the validity of the CoC.

9   In any event, Kite's claim of prejudice is baseless.  Kite asked for and received

10  (multiple times) a limiting instruction with respect to the IPR, and argued the point in

11  closing.  During both testimony and jury instructions, the Court specifically told the

12  jury that "[a] patent can only be challenged during an IPR on grounds of anticipation

13  and obviousness, not for a certificate of correction, inadequate written description, or

14  enablement defenses."   Tr. 1220:17-1221:4, 1356:4-14.   Kite highlighted this

15  instruction in closing, emphasizing to the jury as follows:  "You've got an instruction

16  that [the IPR] has nothing to do with the defenses in this case.  It's a different type of

17  challenge that you can bring to a patent."  Tr. 1497:2-6.

18  Again, it was Kite that moved the IPR Final Written Decision into evidence.

19  Despite that, Kite obtained multiple curative instructions, and there is a "strong

20  presumption that the curative instructions given by the district court were followed by

21  the jury."  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000).

22  Thus, the record does not support the conclusion that the jury was confused or

23  misinterpreted Plaintiffs' counsel's remarks in the way Kite's motion insinuates.

24  Further, even putting aside the fact that Plaintiffs' counsel's remarks were entirely

25  appropriate, Kite's arguments come nowhere close to demonstrating that these few

26  snippets out of a lengthy closing argument at the end of a two-week trial caused "the

27  flavor of misconduct [to] sufficiently permeate[] [the] entire proceeding to provide

28  conviction that the jury was influenced by passion and prejudice in reaching its

1  verdict," as a new trial on this ground would require.  *Hemmings v. Tidyman's Inc.*,

2  285 F.3d 1174, 1192 (9th Cir. 2002).[9]

3        **E.**    **Kite's Good-Faith Belief And § 298 Arguments Should Be Rejected**

4       In its opening statement, Kite told the jury that it had "very, very good reasons

5  for believing that it does not infringe these claims."  Tr. 202:15-17.  Plaintiffs did not

6  force Kite's counsel to make this promise to the jury.  Yet Kite failed to live up to its

7  promise, for it provided the jury with no evidence of such "very, very good reasons."

8  Plaintiffs' closing argument appropriately noted this hole in Kite's presentation.  *See*

9  Tr. 1385:21-1386:18.  Kite now offers two reasons why Plaintiffs' argument pointing

10  out Kite's broken promise warrants a new trial.  Both fail.

11       *First*, Kite argues that it was improperly prevented from presenting evidence

12  regarding good faith because it had asserted privilege.  Dkt. No. 659 at 47-48.  Like

13  its JMOL argument on willfulness, *see* Part I.D, *supra*, Kite's premise is mistaken.

14  Kite was not categorically prevented from presenting fact testimony regarding its

15  beliefs in 2017.  Rather, it was precluded from introducing or discussing one particular

16  piece of outdated, irrelevant, and unfairly prejudicial evidence—Dr. Bot's "homology

17  analysis."  That was not error, and even if the evidence had been admitted, it would

18  not have fulfilled Kite's promise of "very, very good reasons for believing that it does

19  not infringe"—Kite itself disclaimed that this "homology analysis" subjectively

20  informed its decision to infringe in 2017 or thereafter.  *See* Dkt. No. 284-1 at 6.

21       *Second*, Kite argues that pointing out the absence of fact testimony ran afoul of

22  35 U.S.C. § 298.  Dkt. No. 659 at 48.  That statute, however, prohibits patentees only

23  from arguing a jury should infer willfulness from an infringer's (1) failure to obtain

24  advice of counsel, or (2) choice to obtain advice of counsel but not present it.

25

26      [9] Kite's citation to *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1575 (Fed.

27  Cir. 1993), is inapposite.  There, the prior proceeding *did* resolve the same issue as the subsequent trial.  Here, by contrast, the limiting instruction addressed any concern

28  that the jury might have believed it was resolving issues considered in the IPR.

Plaintiffs never so much as hinted at either.  As the Court recognized, "it cannot be inferred from Mr. Chu's statements that he was suggesting to the jury that Kite should be found to have willfully infringed because it did not present advice of its lawyers that it had defenses under section 112 or 255."  Tr. 1537:8-12.  Indeed, as Plaintiffs explained (outside the jury's presence), patent cases often feature testimony on good-faith beliefs from sophisticated fact witnesses (*e.g.*, a party's employees) who review patents for non-infringement or invalidity. Tr. 1473:20-1474:1. Plaintiffs' comment that Kite presented no such evidence implies nothing about advice of counsel.[10]

### F.    Kite's Time-Limit Argument Should Be Rejected

"Trial courts have discretion to place reasonable limits on the presentation of evidence," and it is only "rigid hour limits on trial" that are "disapproved of." *Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994).  Even where a party feels the court has discouraged a request for additional time, the party must contemporaneously raise the issue. *Id.* at 451.

Here, the Court imposed no "rigid" limits, and Kite was ultimately satisfied with its time.  From the beginning, the Court emphasized that the time limits were "always subject to some adjustment if something occurs in the course of the trial that should cause the Court to adjust the time allotted for each side."  Ex. 44 (11/26 Tr. 7:3-6).  Indeed, after initially allotting ten hours per side for witness questioning, Ex. 44 (11/26 Tr. 6:25), the Court expanded the time to eleven hours including interim summations (which neither side employed), Dkt. No. 530 at 1.  And the Court made its flexibility and willingness to add time absolutely crystalline on the record.  Tr. 1314:23-1315:4.  Indeed, when the Court asked Kite's counsel "Do you wish another two hours?," Kite's counsel declined, indicating "I think we are all happy to be done."

---

[10] Kite's citation of *Globefill Inc. v. Elements Spirits, Inc.*, 640 F. App'x 682, 684 (9th Cir. 2016), is off point.  Unlike in that case, where the party that prevailed at trial extensively discussed a document not in evidence, Plaintiffs here made only the routine and entirely proper argument that Kite had failed to submit promised evidence.

Tr. 1314:20-21.   The Court's clear flexibility, and Kite's contemporaneous satisfaction with the time it had been allotted, both refute its current "time-limit" argument and distinguish its cited case, *Skidmore v. Led Zeppelin*, 905 F.3d 1116, 1137 (9th Cir. 2018), *vacated on grant of reh'g en banc on other grounds*, 925 F.3d 999 (9th Cir. 2019), where the court imposed "strict" time limits and remained "inflexib[le]" even when a party "ran out of time."[11]

## G.     Kite's Cumulative-Prejudice Argument Should Be Rejected

Kite's "cumulative prejudice" argument, Dkt. No. 659 at 49-50, fails for all of the reasons set forth above—there were no errors to "accumulate."  Moreover, even if errors had occurred, they would have been harmless, and would have had no "cumulative" effect, particularly given that Kite's new trial arguments largely address different legal issues and discrete evidentiary issues that could not demonstrate prejudice to Kite's substantial rights.  *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 1000 (9th Cir. 2006).  Kite had a fair trial.  It does not deserve another.

## CONCLUSION

Kite's motion for JMOL and/or a new trial should be denied.

Dated:  February 10, 2020              Respectfully submitted,


By:  */s/ Andrea W. Jeffries*

Andrea W. Jeffries (SBN 183408)
Luke J. Burton (SBN 301247)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone:  (213) 489-3939
Facsimile:   (213) 243-2539

Morgan Chu (SBN 70446)
Alan J. Heinrich (SBN 212782)
C. Maclain Wells (SBN 221609)
Elizabeth C. Tuan (SBN 295020)

---

[11] Not only did the Court grant Kite additional time for witness questioning, it also *sua sponte* offered Kite additional time for closing arguments, Tr. 1474:10-16, and then allowed Kite's closing to go "well over" that additional time, Tr. 1504:7-10.

IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:  (310) 277-1010
Facsimile:   (310) 203-7199

Rebecca Carson (SBN 254105)
Ingrid M. H. Petersen (SBN 313927)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone:  (949) 760-0991
Facsimile:   (949) 760-5200

Sarah A. Geers (*Pro Hac Vice*)
Kevin V. McCarthy (*Pro Hac Vice*)
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone:  (212) 326-3939
Facsimile:   (212) 755-7306

Jennifer L. Swize (*Pro Hac Vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700

John M. Michalik (*Pro Hac Vice*)
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

*Attorneys for Plaintiffs*
*Juno Therapeutics, Inc., Memorial Sloan Kettering Cancer Center, and Sloan Kettering Institute for Cancer Research*

-51-

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL
Case No. 2:17-cv-07639-SJO-KSx

## **CERTIFICATE OF SERVICE**

A copy of the foregoing document was electronically filed with the Court this 10th day of February, 2020.  Notice of this filing will be sent by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Andrea W. Jeffries*

Andrea W. Jeffries

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT AS A MATTER OF LAW AND/OR A NEW TRIAL
Case No. 2:17-cv-07639-SJO-KSx