**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Priority | ___ |
| Send | ___ |
| Enter | ___ |
| Closed | ___ |
| JS-5/JS-6 | ___ |
| Scan Only | ___ |

**CASE NO.:** <u>2:17-cv-07639 SJO-KS</u>                    **DATE:** <u>April 2, 2020</u>

**TITLE:**       <u>Juno Therapeutics, Inc., et al. v. Kite Pharma, Inc.</u>
========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                    Not Present
Courtroom Clerk                                    Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**       **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                         Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER RE: PLAINTIFFS' CONSOLIDATED POST-TRIAL MOTION** [ECF No. 655]

This matter comes before the Court on Plaintiffs' Juno Therapeutics, Inc. ("Juno") and Sloan Kettering Institute for Cancer Research ("SKI") (collectively, "Plaintiffs") Consolidated Post-Trial Motion ("Motion") filed on January 21, 2020. (Motion, ECF No. 655.[1])  Defendant Kite Pharma, Inc. ("Defendant" or "Kite") filed its Opposition to Plaintiffs' Post-Trial Motion ("Opposition" or "Opp.") on February 10, 2020.  (Opp., ECF No. 672-2.[2])  Plaintiffs filed their Reply in Support of Plaintiffs' Consolidated Post-Trial Motion ("Reply") on February 24, 2020.  (Reply, ECF Nos. 694, 696-2.[3])  Plaintiffs subsequently filed a Notice of Supplemental Authority ("Notice") on March 10, 2020.  (Notice, ECF No. 713.)  Defendant filed a Response ("Response") on March 12, 2020.  (Response, ECF No. 715.)

Plaintiffs also filed a [Proposed] Final Judgment ("Proposed Final Judgment," ECF No. 658[4]) and Local Rule 58-7 Memorandum Regarding Pre- and Post-Judgment Interest ("L.R. 58-7 Memorandum," ECF No. 658-1[5]) on January 21, 2020.  Defendant filed Objections to Plaintiffs' Proposed Final Judgment ("Objections") on February 10, 2020.  (Objections, ECF No. 671.)  Plaintiffs filed their Reply in Support of Proposed Final Judgment ("Final Judgment Reply") on February 24, 2020.  (Final Judgment Reply, ECF No. 695.)

---

[1] Plaintiffs' Memorandum in Support of Plaintiffs' Motion is located at ECF No. 656, and the sealed version is located at ECF No. 685.  Unless otherwise noted, all citations to Plaintiffs' Motion refer to the sealed memorandum, ECF No. 685.

[2] Unless otherwise noted, all citations to Defendant's Opposition refer to the sealed Opposition, at ECF No. 693.

[3] Unless otherwise noted, all citations to Plaintiffs' Reply refer to the sealed Reply, at ECF No. 712.

[4] Unless otherwise noted, all citations to Plaintiffs' Proposed Final Judgment refer to the sealed Proposed Final Judgment, at ECF No. 686.

[5] Unless otherwise noted, all citations to Plaintiffs' L.R. 58-7 Memorandum refer to the sealed L.R. 58-7 Memorandum, at ECF No. 686-1.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE: April 2, 2020**

In setting the post-trial briefing schedule, the Court indicated that it would take the matters under submission following the filing of reply motions.  (Order, ECF No. 639 at 5; *see also* Fed. R. Civ. P. 78(b).)

For the following reasons, the Court **GRANTS-IN-PART** Plaintiffs' Consolidated Post-Trial Motion [ECF No. 655].  Final Judgment to follow.

I.   BACKGROUND

This is a patent infringement action involving U.S. Patent No. 7,446,190 ("the '190 Patent"), titled "Nucleic Acids Encoding Chimeric T Cell Receptors."  The '190 Patent issued on November 4, 2008 and incorporates a provisional application filed on May 28, 2002.  ('190 Patent Caption.)  The claimed invention provides "nucleic acid polymer encoding [] chimeric TCR's [T Cell Receptors] . . . ."  ('190 Patent, col. 2:11-14.)  The chimeric TCRs encoded by the claimed invention "combine, in a single chimeric species, the intracellular domain of CD3 ζ-chain ("zeta chain portion"), a signaling region from a costimulatory protein such as CD28 with a binding element that specifically interacts with a selected target."  ('190 Patent, col. 2:14-18.)  These TCRs are designed to "specifically interact[] with a cellular marker associated with target cells," resulting in the stimulation of a T cell immune response to the target cells.  ('190 Patent, col. 2:30-36.)

Plaintiffs initiated this action on October 18, 2017, alleging that Defendant infringes the '190 Patent through the use, sale, offer for sale, or importation of one of Defendant's immunotherapy treatments, YESCARTA®.  YESCARTA® is described as a "therapy in which a patient's T cells are engineered to express a chimeric antigen receptor (CAR) to target the antigen CD19, a protein expressed on the cell surface of B-cell lymphomas and leukemias, and redirect the T cells to kill cancer cells."  (Second Amended Complaint ("SAC") ¶ 18, ECF No. 484.)  Plaintiffs assert that YESCARTA® infringes the '190 Patent by utilizing nucleic acid polymers encoding chimeric TCRs within the scope of the '190 Patent claims.  (SAC ¶ 26.)  Defendant, in turn, filed counterclaims seeking declaratory judgments of non-infringement and invalidity of the '190 Patent.  (*See generally*, Answer to SAC and Counterclaims, ECF No. 617.)

On December 13, 2019, the jury entered a unanimous verdict in favor of Plaintiffs, finding: (1) Defendant had not proven by clear and convincing evidence that the Certificate of Correction was invalid, (2) Defendant had not proven by clear and convincing evidence that any of claims 3, 5, 9, and 11 of the '190 Patent were invalid for lack of enablement or written description, (3) Plaintiffs proved by a preponderance of the evidence that Defendant's infringement of the corrected claims of the '190 Patent was willful, and (4) Plaintiffs proved by a preponderance of the evidence the damages owed were a $585,000,000 upfront payment, and 27.6% running royalty.  (Redacted Jury Verdict, ECF No. 593.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

Following the jury's return of the verdict, the Court set a post-trial briefing schedule for both parties and deferred entry of judgment.  (Order, ECF No. 639.)

II.  LEGAL STANDARDS

    A.  Prejudgment Interest

In patent cases, "[p]rejudgment interest should ordinarily be awarded absent some justification for withholding such an award."  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1262 (Fed. Cir. 2014) (citing *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1983)).  Prejudgment interest generally runs from the earliest date of infringement of any patent.  *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1315 (Fed. Cir. 2017).  "Courts have discretion to determine the appropriate rate of prejudgment interest to be awarded."  *Deckers Outdoor Corp. v. Superstar Int'l, Inc.*, No. CV 13-0566 AG (PJWx), 2014 WL 12588480, at *2 (C.D. Cal. Aug. 18, 2014) (citations omitted).  Ultimately, prejudgment interest seeks to provide full compensation to the patent owner for "the forgone use of the [royalties] between the time of infringement and the date of judgment."  *Gen. Motors*, 461 U.S. at 656.

    B.  Enhancement

Section 284 of the Patent Act states that "the court may increase . . . damages up to three times the amount found or assessed."  35 U.S.C. § 284.  "Awards of enhanced damages under the Patent Act over the past 180 years establish that they are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016).  Entitlement to enhanced damages must be proven by a preponderance of the evidence.  *Id.* at 1934.

In *Halo*, the Supreme Court rejected the Federal Circuit's test from *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007), for enhanced damages.  *Seagate* had required a determination of willful infringement to award enhanced damages, where willfulness was measured through a two-part test that included an "objective recklessness prong" and a subjective prong.  The Supreme Court found "[t]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless."  *Id.* at 1933.  *Halo* concluded:

       Section 284 allows district courts to punish the full range of culpable behavior.  Yet none of this is to say that enhanced damages ***must*** follow a finding of egregious misconduct.  As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

damages, and in what amount.  Section 284 permits district courts to exercise their discretion in a manner free from the inelastic constraints of the *Seagate* test. Consistent with nearly two centuries of enhanced damages under patent law, however, such punishment should generally be reserved for egregious cases typified by willful misconduct.

*Id.* at 1933-34.  Since then, the Federal Circuit has further clarified that "conduct r[ising] to the level of wanton, malicious, and bad-faith behavior [is] ***required*** for willful infringement."  *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019) (emphasis added).

Regarding the analysis for willful infringement, although the Federal Circuit's "decision in *Read* [is] relevant to an award of enhanced damages, a "district court is not required to discuss the *Read* factors."  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382-83 (Fed. Cir. 2017); *see also Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992).  The *Read* factors are:

     (1) whether the infringer deliberately copied the ideas or design of another;
     (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;
     (3) the infringer's behavior as a party to the litigation;
     (4) defendant's size and financial condition;
     (5) closeness of the case;
     (6) duration of defendant's misconduct;
     (7) remedial action by the defendant;
     (8) defendant's motivation for harm; and
     (9) whether defendant attempted to conceal its misconduct.

*See Read Corp.*, 970 F.2d at 826-27.

//

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

CASE NO.: **2:17-cv-07639 SJO-KS**                    DATE:  **April 2, 2020**

C.  Ongoing Royalty Rate

An ongoing royalty permits an adjudged infringer to continue using a patented invention for a price.  *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 n.13 (Fed. Cir. 2007) (defining an ongoing royalty and distinguishing a compulsory license).  The Federal Circuit has identified 35 U.S.C. § 283, which authorizes "injunctions in accordance with the principles of equity," as statutory authority for awarding ongoing royalties. *See id.* at 1314 (citing § 283); *see also* Mark A. Lemley, The Ongoing Confusion over Ongoing Royalties, 76 Mo. L. Rev. 695, 695-99 (2001) (analyzing authority for ongoing royalties under §§ 283 and 284).  Accordingly, while this remedy involves monetary relief, there is no Seventh Amendment right to a jury trial for ongoing royalties. *See Paice*, 504 F.3d at 1315-16 ("[T]he fact that monetary relief is at issue in this case does not, standing alone, warrant a jury trial.").

The Federal Circuit has held that ongoing royalties are a discretionary remedy.   "There are several types of relief for ongoing infringement that a court can consider: (1) it can grant an injunction; (2) it can order the parties to attempt to negotiate terms for future use of the invention; (3) it can grant an ongoing royalty; or (4) it can exercise its discretion to conclude that no forward-looking relief is appropriate in the circumstances." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 35 (Fed. Cir. 2012).  "Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate."  *Paice*, 504 F.3d at 1314. However, the remedy is not automatic: "awarding an ongoing royalty where 'necessary' to effectuate a remedy, be it for antitrust violations or patent infringement, does not justify the provision of such relief as a matter of course whenever a permanent injunction is not imposed." *Id.* at 1314-15.

Determination of ongoing royalties differs from evaluation of a reasonable royalty during trial because the jury has reached a liability verdict and other economic factors may have changed. "Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty.  Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved."  *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008).   A district court may also consider "additional evidence of changes in the parties' bargaining positions and other economic circumstances that may be of value in determining an appropriate ongoing royalty." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012).  *But see Lemley*, *supra*, at 704-05 ("Juries are already required to assume that the patent is valid and infringed when setting past damages.  There is no reason to think that asking the same question twice should produce different answers in most cases.") (footnotes omitted).

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

**CASE NO.: 2:17-cv-07639 SJO-KS**                              **DATE:  April 2, 2020**

    III.  <u>DISCUSSION</u>

In their Motion, Plaintiffs argue for: (A) jury verdict damages through December 12, 2019 (*i.e.*, through trial); (B) prejudgment interest at the prime rate; (C) enhanced damages; and (D) an award of going royalties.  Each argument is addressed in turn.

        A.  Damages through December 12, 2019

Plaintiffs request damages on the jury verdict to be updated, based on Defendant's subsequently-disclosed revenues from YESCARTA® through the end of trial.  The jury determined Defendant owed Plaintiffs a $585 million upfront payment, with a running royalty rate of 27.6% on YESCARTA® revenues through trial.  (Motion 4.)  Defendant previously disclosed total revenues of $603,650,765 through September 30, 2019.  (*Id.*)  Defendant has since disclosed total revenues of $700,519,932 through December 12, 2019.  (Motion 4-5.)  Based on Defendant's updated revenue information and the jury's upfront payment and running royalty, the updated damage award totals $778,343,501.  (Motion 5.)

Defendant did not respond to Plaintiffs' request directly.  (*See generally* Opp.)

The Court, having received no opposition, updates the jury award to $778,343,501.

        B.  Prejudgment interest at prime rate

Plaintiffs argue the Court should order Defendant to pay pre-judgment interest on the jury's award at the prime rate, compounded quarterly.  (Motion 5.)  First, Plaintiffs argue that courts recognize the prime rate as the most accurate estimate in patent cases, because it represents the rate charged by banks to its most credit-worthy customers.  (*Id.* (citing *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-cv-3597, 2019 WL 2389150, at *19 (N.D. Cal. June 5, 2019)).)  Plaintiffs argue that district courts both inside and outside of California have awarded the prime rate (Motion 5-6 (citing cases)), as well as the Federal Circuit, even where the patent owner has not shown that it borrowed at that rate or a higher rate.  (Motion 6 (citing *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991)).)  Second, Plaintiffs argue quarterly compounding is common (*id.* (citing cases)), and aligns well with the quarterly sales data Defendant provides in this case (*id.*).

Defendant responds that the Treasury bill rate is appropriate for fixing the rate of pre-judgment interest for federal claims, unless the trial judge finds, on substantial evidence, that the equities of a particular case require a different rate.  (Opp. 29.)  The Treasury bill rate accords with sound economics by compensating Plaintiffs for the time value of money, but not investment risk that Plaintiffs did not bear.  (Opp. 29-30 (citing cases).)  Prejudgment interest need not be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: 2:17-cv-07639 SJO-KS                     DATE: April 2, 2020

compounded at all.  (Opp. 30.)  If compounding is ordered, although some courts have ordered annual compounding, Defendant accepts quarterly compounding of prejudgment interest.  (*Id.*)

Plaintiffs reply pre-judgment interest, arising under § 284, is routinely treated as governed by Federal Circuit law.  (Reply 14-15.)  The prime rate is the most accurate estimate of the likely rate a large corporation would be charged by a bank, and the license previously entered into by Juno and Memorial Sloan Kettering ("MSK License") calls for an even higher rate for late royalty payments. (Reply 15.)  The prime rate reflects the cost of borrowing money the patentee should have had, even without any showing that the patent owner actually borrowed at that rate or higher.  (*Id.*)

As a preliminary matter, the Court determines prejudgment interest is warranted.  The Court has not been presented with any justification for withholding prejudgment interest.  Thus, the Court follows the ordinary course and finds prejudgment interest will place Plaintiffs in as good a position as if Defendant had entered into a reasonable royalty agreement in the first place.  *See Gen. Motors Corp.*, 461 U.S. at 655; *see also DDR Holdings, LLC*, 773 F.3d at 1262.

Turning next to the amount of prejudgment interest, the Federal Circuit "has recognized that the district court has substantial discretion . . . ."  *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556 (Fed. Cir. 1984).  "A court may use the prime rate, the prime rate plus a percentage, the United States Treasury Bill ('T-Bill') rate, a state statutory rate, the corporate rate, or whatever rate the court deems appropriate under the circumstances." *Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1042-43 (N.D. Cal. 2016) (citations omitted).

Here, Plaintiffs have not argued that they actually borrowed money at a rate higher than the T-bill rate, or that they did so ***because*** they did not possess the money from a reasonable royalty agreement.  *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (awarding T-bill rate, where the district court determined there was no evidence that plaintiff borrowed money at a higher rate, or that there was a causal connection between the loss of use of money as a result of defendant's infringement and a need to borrow money).  Nor have Plaintiffs argued that the litigation was protracted, or that their poor financial condition required borrowing above the prime rate.  *Uniroyal*, 939 F.2d at 1545 (awarding prime rate where protracted nature of litigation and party's poor financial condition required borrowing above a prime rate).  Although *Uniroyal* holds that evidence that a patentee borrowed money at a higher rate is not necessary to support a prime rate award, *Uniroyal* does not hold that the absence of such evidence still mandates an award at a prime rate.  939 F.2d at 1545.  And although the MSK License lists a higher interest rate for late payments as a penalty, the Court does not find this probative of an interest rate Plaintiffs would have received if affirmatively seeking a loan.  The Court also notes that *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.* is inapposite because the salient issue in that case was the proper date from which to calculate prime interest.  62 Fed. Appx. 322, 334 (Fed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: 2:17-cv-07639 SJO-KS                     DATE:  April 2, 2020

Cir. 2003) (remanding to determine prejudgment interest where district court awarded the prime rate in effect when the order issued in 2002, rather than the interest rate in effect in 1995 when infringement began, which was over double the awarded rate).

In light of the above, the Court awards the Treasury bill rate.[6]  The Court finds this rate most consistent with the evidence and arguments presented in this case.  *See Apple Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100, 1122 (N.D. Cal. 2014) (awarding Treasury bill rate, where although plaintiff submitted a declaration stating it borrowed at rates higher than the Treasury bill rate, plaintiff maintained substantial cash reserves and did not present any evidence it needed to borrow money *because* it was deprived of the damages award).

Thus, the Treasury bill rate, compounded quarterly, is awarded for prejudgment interest, which shall not apply to the enhancement award.

         C.  Enhanced damages

Plaintiffs argue that the Court should award enhanced damages in the same amount as the jury's damages award.  (Motion 7.)  Plaintiffs argue enhancement is a vindictive or punitive sanction designed to prevent a caught infringer from being punished by paying no more than the reasonable royalty it would have paid in the first place.  (*Id.*)  Here, the jury determined that Defendant knew of Plaintiffs' patent and intentionally infringed at least one asserted claim.  (*Id.*)  The supporting evidence demands a meaningful enhancement, as analyzed under the *Read* factors.  (Motion 8.)  Courts have awarded enhancements in the amount of the jury's award for less egregious conduct.  (Motion 25 (citing *Arctic Cat v. Bombardier Recreational Prods., Inc.*, 198 F. Supp. 3d 1343 (S.D. Fla. 2016); *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737 (N.D. Ohio 2010)).)

Defendant responds that Gilead, Defendant's parent company, launched YESCARTA® with knowledge of the '190 Patent and the inevitability that Plaintiffs would sue Defendant for infringement.  (Opp. 1.)  The *Read* factors may be convenient guidelines, but they are not the only factors that may be relevant, and this Court is not bound to apply them.  (Opp. 1-2.)  Defendant further responds that when the alleged misconduct is a cure for a potentially fatal disease, and the damages award is one of the largest ever returned, the additional sanction of enhancement is just not warranted.  (Opp. 2 (citing *Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 703 (D. Del. 2017)).)  Defendant has administered YESCARTA® to over 2,250 terminal cancer patients, and Plaintiffs have not had, and still do not have, an FDA-approved

---

[6] *Opticurrent* awarded the prime rate "as that would likely be the loan rate that [plaintiff,] as a large corporation, would be charged by a bank."  2019 WL 2389150, at *19.  While *Opticurrent* presents a relevant consideration, the Court finds the T-bill rate more appropriate, for the reasons listed.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                         **DATE: April 2, 2020**

CAR-T therapy. (Opp. 2.) Although Novartis has its KYMRIAH® product, it has experienced significant manufacturing problems, and Defendant's and Novartis' combined capacity does not meet the need of eligible patients. (Opp. 2-3.)

Plaintiffs reply enhancement is justified and necessary to punish and deter Defendant's unscrupulous conduct. (Reply 1.) That Defendant's therapy is life-saving does not provide Defendant a pass. (*Id.*) Enhanced damages are appropriate, even in cases involving lifesaving goods. (Reply 1-2 (citing cases).) Defendant had the option of taking a license or designing around the '190 Patent, but chose not to take either option. (Reply 2.)

The Court provides initial analysis pursuant to *Halo*, as clarified by the Federal Circuit in *SRI International*. *See Halo*, 497 F.3d at 1371 (permitting courts to exercise discretion and stating "punishment should generally be reserved for egregious cases typified by willful misconduct"); *see also SRI Int'l*, 930 F.3d at 1309 ("[C]onduct r[ising] to the level of wanton, malicious, and bad-faith behavior [is] ***required*** for willful infringement." (emphasis added)). In doing so, the Court may consider evidence that was not available to the jury. The Court notes it benefits from its experience presiding over this case since its inception in October 2017[7] (including reviewing all filings of the parties throughout the course of the case), and having presided over trial (including personally observing the live testimony of 18 witnesses, and designated testimony of 5 witnesses, in the case).

Based on the benefit of the Court's extensive history and familiarity with the case, the Court notes that in its view, the testimony of Dr. Arie Belldegrun, former CEO of Defendant, was not credible. He testified repeatedly that in 2013, he did ***not*** attempt to license the '190 Patent from SKI. Instead, he insisted that he only sought opportunities for clinical trial testing sites. His testimony was contradicted by Dr. Yashodhara Dash of MSK (the other participant in the meetings, who the Court views as having testified credibly), Dr. Aya Jakobovits, former President of Defendant, and other evidence introduced during trial. The jury's verdict likewise demonstrates that it, as the finder of fact, did not believe Dr. Belldegrun's testimony.

Having discredited Dr. Belldegrun's testimony, the record clearly demonstrates that Defendant, despite believing the '190 Patent to be important in 2013 to the product later released as YESCARTA®, did not obtain a license. Defendant's filing of an IPR against the '190 Patent (and its subsequent labeling of IPR institution as one of the three top highlights for Defendant in 2016), likewise demonstrates the importance of the '190 Patent to Defendant. And yet, following these actions, Defendant admits in its Opposition that it ***sped up*** release of its YESCARTA® therapy to market, despite being fully aware of the '190 Patent and "inevitable" litigation. Now, Defendant points to its defenses asserted ***during*** litigation as justification for its actions ***preceding*** litigation.

---

[7] Order, ECF No. 11.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                              **DATE: April 2, 2020**

Thus, the Court considers the totality of Defendant's actions, where the Court views the following as undisputed: Defendant knew of the Sadelain backbone claimed in the '190 Patent at least as of 2013, attempted aggressively to license the '190 Patent, affirmatively attempted to invalidate the '190 Patent by filing an IPR, then when neither of those steps was successful, chose to accelerate YESCARTA® to market to its own advantage and to Plaintiffs' corresponding detriment, all while knowing that Plaintiffs' assertion of the '190 Patent in this litigation was, by Defendant's own admission, "inevitable." (Opp. 1:7.) The Court finds this behavior rises to the level of wanton, malicious and bad-faith behavior required for willful infringement. *SRI Int'l*, 930 F.3d at 1309.

The Court next addresses Defendant's argument that an enhancement is not warranted because the misconduct resulted in a life-saving therapy. Defendant relies on *Idenix* for the proposition that an additional sanction is not warranted, where the misconduct bears on a life-saving treatment, and the jury's damages award was the largest ever returned in a patent trial. *Idenix*, 271 F. Supp. 3d at 703. While the Court agrees that the misconduct did result in a life-saving treatment that saved lives, and that the jury's damages award is substantial, the *Idenix* court carefully voiced its view that based on its extensive familiarity with the entire course of the case, substantial contrary evidence was presented by defendant. The Court does not observe the same circumstances here, particularly due in large part to Dr. Belldegrun's testimony. Moreover, that a treatment is life-saving does not automatically preclude an award of enhanced damages. *See, e.g.*, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317 (Fed. Cir. 2016) (upholding 50% enhancement for potentially life-saving products).

Thus, the Court weighs the wanton and bad-faith behavior of Defendant in rushing a product to market despite having failed in its licensing and invalidating attempts, against the fact that Defendant's actions have resulted in a life-saving treatment for thousands of terminal cancer patients. The Court in its discretion determines that after weighing the relevant facts, a 50% enhancement is appropriate. While Defendant's flagrant actions cannot be completely pardoned, Defendant's therapy singlehandedly saved the lives of thousands of terminal cancer patients, many of whom otherwise faced a certain death sentence. The immeasurable benefit to the public interest thus warrants mitigation. While the Court's enhancement determination here is dispositive, the Court provides additional analysis of the *Read* factors, which further supports the Court's determination.

1. *Read* Factor 1 – deliberately copied

Plaintiffs argue *Read* Factors 1 and 6 support enhancement. Defendant has long been aware that its collaborators copied Dr. Sadelain's two-part backbone, which forms the essence of Dr. Sadelain's invention in the '190 Patent. (Motion 9.) Dr. Rosenberg, a scientist at the National Cancer Institute ("NCI"), demanded information from Dr. Sadelain, who then directed Dr.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

Rosenberg to a paper disclosing his backbone.  (Motion 9-10.)  Dr. Rosenberg later published a case report describing a sequence corresponding to the portion Dr. Sadelain shared in 2007.  (Motion 10.)  Evidence demonstrated Defendant understood the link between Dr. Rosenberg and Dr. Sadelain, including internal emails.  (Motion 10-11.)  Defendant repeatedly attempted to license the '190 Patent from Plaintiffs, and although unsuccessful, proceed to commercialize YESCARTA® anyway.  (Motion 11-12.)   Defendant subsequently filed an unprovoked IPR challenging the '190 Patent, and as part of the IPR learned that Plaintiffs believed Dr. Rosenberg had copied Dr. Sadelain's CAR.  (Motion 12-13.)  Despite the PTO denying invalidation of the '190 Patent, Defendant proceeded to commercialize YESCARTA®.  (Motion 13.)

Defendant responds that Dr. Rosenberg is a towering figure in the field of immunotherapy, the '190 Patent had not yet issued when he spoke with Dr. Sadelain, and Dr. Sadelain never told Dr. Rosenberg he was seeking patent protection.  (Opp. 3-4.)  Moreover, Dr. Rosenberg (and eventually Defendant) developed a CAR using a different scFv.  (Opp. 4.)  Dr. Rosenberg openly cited Dr. Sadelain's work in two publications, and Defendant understood that the costimulatory regions referenced in the '190 Patent (amino acids 113-220) and NCI (amino acids 114-220) CAR's were different.  (Opp. 4-5.)  The internal emails do not constitute evidence of copying because they discussed what the difference was between Dr. Rosenberg's and MSK's constructs.  (Opp. 5-6.)  Plaintiffs' evidence of Defendant's alleged attempts to license the '190 Patent and the IPR reflect at most Defendant's recognition that Plaintiffs might assert the '190 Patent against it.  (Opp. 6.)

Plaintiffs reply Defendant copied Dr. Sadelain's CAR backbone and continues to perpetuate misconduct to this day.  (Reply 2.)  Factor 1 focuses on whether a defendant copied the ideas of another, regardless of when the patent issued.  (*Id.*)  Defendant does not suggest it or Dr. Rosenberg developed YESCARTA® independently, or that Defendant failed to ask Dr. Rosenberg about the source of his CAR construct.  (Reply 2-3.)  Although Defendant relies on Dr. Bot's 2012 homology analysis, Defendant admitted before trial it did not rely on Dr. Bot's homology analysis after 2012.  (Reply 3.)

The proper inquiry under Factor 1 is not limited to a patent itself, but rather the "ideas or design of another," including the "commercial embodiment, not merely the elements of a patent claim."  *Read*, 970 F.2d at 827.  Defendant does not deny that it deliberately copied the work of Drs. Rosenberg and Sadelain, and instead tries to: distinguish the constructs, and claim that the '190 Patent had not issued when Defendant communicated with Drs. Rosenberg and Sadelain.  Under the proper inquiry, the Court determines that Defendant deliberately copied the ideas later contained in the '190 Patent (*i.e.*, the Sadelain backbone), and that this factor thus weighs in favor of enhancement.

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:** **April 2, 2020**

2. *Read* Factor 2 – good-faith belief

Plaintiffs argue Defendant presented no evidence of good-faith belief of non-infringement or
invalidity to the jury. (Motion 14.)  To the contrary, despite repeated indications Dr. Rosenberg
copied Dr. Sadelain's backbone, Defendant refrained from inquiring, despite having close
working relationships with Dr. Rosenberg.  (*Id.*)  By 2017, the PTO issued the Final Written
Decision ("FWD"), and Defendant conceded that it literally infringes the '190 Patent, subject to
its CoC defense. (Motion 14-15.)  Defendant admitted no testimony or documentary evidence
suggesting Defendant had a good-faith belief of its defenses, or that anyone relied on such a
belief when YESCARTA® launched.  (Motion 15.)  Plaintiffs argue defenses contrived after the
fact for litigation purposes are irrelevant to enhancement because culpability is measured at the
time of the challenged conduct. (*Id.*)

Defendant responds that Plaintiffs ignore Defendant's CoC, written description, and enablement
defenses presented at trial.  (Opp. 18.)   During its opening statement, Defendant's counsel
stated Defendant had very, very good reasons for believing it does not infringe, based on these
three defenses.  (Opp. 18-19.)  Defendant attempted to introduce evidence from Dr. Bot that
prior to the CoC, the '190 Patent did not cover Dr. Rosenberg's construct. (Opp. 19.)  By the
time the CoC issued, Defendant had consulted with attorneys, and Defendant exercised its right
to maintain privilege over those communications.  (*Id.*)  Defendant then could not present further
evidence from fact witnesses as to their subjective beliefs, for fear of waiving that privilege.
(Opp. 19-20.)   The proper legal inquiry is Defendant's good-faith belief at the time of first
infringement. (Opp. 20.)  Here, at that time, Defendant had pursued appeal of the adverse IPR
decision, and asserted the defenses that it tried to the jury. (*Id.*)  Because Defendant maintained
privilege that prevented it from introducing further evidence of its subjective good faith, § 298
prohibits any negative inference being drawn from assertion of privilege, thus this factor should
either weigh against enhancement, or at most, be deemed neutral. (*Id.*)

Plaintiffs reply that Defendant cannot rely on its litigation defenses where it never offered any
evidence that anyone relied on its litigation defenses when it made its decision to knowingly
infringe. (Reply 8.)  Plaintiffs further reply that Defendant cannot rely on its assertion of privilege,
where § 298 says failure to obtain or present advice of counsel may not be used to prove
willfulness.  Defendant submitted no evidence of any type to establish its good-faith belief. (*Id.*)

The proper inquiry under *Read* is "whether the infringer, ***when he knew of the other's patent
protection***, investigated the scope of the patent and formed a good-faith belief that it was invalid
or that it was not infringed." *Read*, 970 F.2d at 827 (emphasis added).  The parties instead focus
on Defendant's good-faith belief at the time of first infringement, which is the relevant inquiry for
determining whether infringement was willful.  But that issue has already been decided, as the
jury entered a verdict of willful infringement.  Instead, the Court notes that Defendant has not

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.:** <u>2:17-cv-07639 SJO-KS</u>                    **DATE:** <u>April 2, 2020</u>

presented evidence of any investigation and good-faith belief of noninfringement or invalidity
when Defendant knew of the '190 Patent.  To the extent Defendant attempts to point to Dr. Bot's
2012 homology analysis as evidence of its good-faith defense, the Court freely considers it and
finds it does not tip the scale.  During the enhancement phase, the Court may consider evidence
and information the jury did not have.  The Court finds that Dr. Bot's homology analysis in 2012
bears little relevance to Defendant's good-faith defense, where it was superseded by Defendant
seeking and receiving advice of counsel.

Even evaluating Defendant's good-faith belief at the time of first infringement, Defendant relies
on its litigation defenses presented at trial.  But the first evidence of Defendant's litigation
defenses appears in its Answer, filed on November 27, 2017.  (Answer, ECF No. 22.)  The
parties agree the date of first infringement is October 2017.  Thus, Defendant still does not
present evidence to show it held those views at the time infringement began, much less that it
relied on its views when it chose to infringe.

Nor does 35 U.S.C. § 298 weigh in Defendant's favor.  Section 298 says that failure of an
infringer to present advice of counsel "may not be used to prove that the accused infringer
willfully infringed the patent . . . ."  As discussed above, the determination that the accused
infringer willfully infringed the patent has already been made.  Now, the proper inquiry under
*Read* is whether Defendant investigated the patent and formed a good-faith belief when it
learned of the '190 Patent.  Even omitting any negative inference (as precluded by § 298 for a
finding of willful infringement), the Court determines that no fact testimony was presented
regarding a good-faith defense.  That Defendant strategically chose to exercise privilege and not
present an advice of counsel opinion did not preclude it from presenting fact testimony.  Thus,
the second factor weighs in favor of enhancement.

3.  *Read* Factor 3 – behavior as a party

Plaintiffs argue that Defendant's litigation misconduct was exceptional and egregious.  (Motion
17.)  Defendant elicited false, misleading, and incredible testimony.  (Motion 17.)  Dr. Belldegrun
testified he contacted Plaintiffs simply to seek clinical trial sites, where evidence demonstrated
his interest in licensing the '190 Patent.  (Motion 17-18.)  Dr. Belldegrun further denied any pre-
suit concern of the '190 Patent, where Defendant had attempted to license the patent and
invalidate the patent.  (Motion 18.)  Dr. Belldegrun further denied Defendant was motivated by a
first-mover advantage.  (*Id.*)  Defendant's intent to call Dr. Schuetz to testify was obscured,
leading to his deposition on the Sunday morning before trial.  (*Id.*)  Dr. Schuetz was further
presented as an independent third-party witness, where he had substantial ties to Defendant
and Gilead, including being represented by Defendant's counsel.  (Motion 19.)  Furthermore,
Defendant filed repetitive motions that forced Plaintiffs and the Court to expend time and
resources addressing repetitive and unjustified requests, including Dr. Bot's homology analysis

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE: April 2, 2020**

and Plaintiffs' damages case.  (Motion 20.)  Defendant affirmatively misrepresented its good-faith defense all while knowing it had no non-attorney evidence to offer at trial, then later claimed prejudice by mischaracterizing its privilege assertion.  (Motion 21.)  Defendant further attempted to take advantage of its own use of an erroneous jury verdict form resulting from its own duplicitous conduct.  (*Id.*)  Defendant's unreasonable handling of witnesses warrants enhancement.  (Motion 22 (citing *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802 (N.D. Tex. 2012)).)  Defendant's unreasonable and vexatious litigation tactics further warrant enhancement.  (Motion 22-23 (citing *Liqwd, Inc. v. L'Oréal USA, Inc.*, No. 17-cv-14, 2019 WL 6840353 (D. Del. Dec. 16, 2019)).)

Defendant responds that its introduction of Dr. Belldegrun's testimony (which conflicted with Dr. Dash's testimony) is not misconduct.  (Opp. 7.)  Dr. Belldegrun's trial testimony tracked his deposition testimony, and Plaintiffs do not cite facts suggesting Dr. Belldegrun's trial testimony was false.  That Dr. Dash's testimony contradicted Dr. Belldegrun's testimony does not show it was false (Dr. Dash likewise was biased, contradictory of her deposition at times, and exaggerated).  (Opp. 8.)  Ms. Champski's third-party hearsay statement that Defendant was interested in licensing from MSK should be afforded less trustworthiness, as she never testified, nor was she deposed.  (Opp. 8-9.)  Dr. Jakobovits did not contradict Dr. Belldegrun, where her recollection was refreshed by a vague email referring to a collaboration/license.  (Opp. 9.)  Defendant's responses to Plaintiffs' damages contentions (which represented the parties had licensing discussions in 2013 and 2014) were preliminary in nature and unverified.  (*Id.*)  And Defendant did in fact pursue other sites for clinical trials over a year before Defendant began its trials.  (Opp. 9-10.)  Dr. Belldegrun only contacted the Office of Technology Development ("OTD") after being referred by Dr. Sadelain.  (Opp. 10.)  Dr. Belldegrun's testimony was corroborated by evidence, and no other documents or witnesses besides Dr. Dash gave a conflicting account.  (Opp. 11.)  And Plaintiffs—not Defendant—elicited allegedly implausible testimony from Dr. Belldegrun.  (*Id.*)  Regarding Dr. Schuetz, the Court already addressed Plaintiffs' arguments regarding his appearance at trial, his communications with Gilead ended months before trial, Dr. Schuetz was reimbursed for his expenses and time away from work, Dr. Schuetz wanted to be represented by Defendant's counsel based on Plaintiffs' counsel's behavior, and Plaintiffs mischaracterize their request for Dr. Schuetz to sign an affidavit stating he had not reviewed the prosecution history for the '190 Patent.  (Opp. 12-14.)  Finally, Defendant's advocacy was reasonable, where zealous advocacy is an ethical responsibility.  (Opp. 14.)  Defendant's requests regarding use of the claim construction order as impeachment, Dr. Bot's homology analysis, Plaintiffs' damages, Dr. Sullivan's demonstratives, its good-faith basis for noninfringement, and verdict form were reasonable and within its rights.  (Opp. 14-17.)

Plaintiffs reply Dr. Belldegrun lied under oath at trial, as demonstrated by Defendant's failure to assert the testimony it elicited was truthful.  (Reply 4.)  Plaintiffs clarify the facts Defendant claims were undisputed from Dr. Belldegrun's testimony.  (*Id.*)  Similarly, internal emails demonstrate

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

**CASE NO.: 2:17-cv-07639 SJO-KS**                           **DATE: April 2, 2020**

Dr. Belldegrun sought a license.  (Reply 5.)  Any writing could have been used to refresh the recollection of Dr. Jakobovits.  (*Id.*)  Defendant's damages contentions are now claimed to be false, and Defendant blames Plaintiffs for Defendant's own failure to investigate, or later supplement, amend, or modify.  (*Id.*)  Although Dr. Dash testified that she was aware of documents referencing clinical trials with licensing for a collaboration with a different entity, those documents having nothing to do with Defendant or Dr. Belldegrun.  (Reply 6.)  Regarding Dr. Schuetz, Defendant mischaracterizes Plaintiffs' counsel's interactions, including Plaintiffs seeking an affidavit, and Dr. Schuetz not being an independent witness where he admitted having consulting and legal services agreements with Defendant's counsel and being paid for by Defendant (and Gilead).  (Reply 6-7.)  Plaintiffs further reply that Defendant kept relitigating issues, even where (contrary to what Defendant claims), the Court provided explanations when it denied Defendant's requests on the record.  (Reply 7.)

The Court does not find that the actions of Defendant or its counsel amount to litigation misconduct.  The Court has already stated its view of Dr. Belldegrun's testimony.  But the Court is not of the view that Defendant's counsel's eliciting testimony from Dr. Belldegrun constituted litigation misconduct, where Defendant was entitled to present its own story and its own version of events.  Likewise for Dr. Schuetz, Defendant was entitled to argue Dr. Schuetz was an independent witness, and Plaintiffs were entitled to elicit biases on cross-examination (as they did).  The Court views Defendant's counsel's conduct as zealous representation of its client. Finally, the Court also finds that Defendant's re-raising of certain issues in different contexts also did not constitute litigation misconduct.  A party may waive certain rights on appeal by not preserving its objections for the record, and the Court does not find that Defendant's behavior was excessive or unwarranted.  The third factor thus weighs in Defendant's favor.

4.  *Read* Factor 4 – size and financial condition

Plaintiffs argue Defendant's large size and financial standing support enhancement, where Gilead purchased Defendant for $12 billion shortly before YESCARTA® went on the market, which warrants a review of Gilead's (not Defendant's) financial condition.  (Motion 23.)  Gilead's total assets are nearly $60 billion, including $9 billion in cash and cash equivalents, its market capitalization is over $79 billion, and its total revenues in the third quarter of 2019 were over $5.6 billion.  (Motion 23-24.)  In light of Gilead's financial condition, the amount of enhancement should be sufficiently meaningful to send a message that such practices will not be countenanced.  (Motion 24.)

Defendant responds Plaintiffs sued Defendant, not Gilead, and Defendant is a comparatively small corporation.  (Opp. 23.)  Defendant's actual revenues through 2019 were $724 million, and

(*Id.*)  Enhancement would

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

therefore be unduly punitive.  (*Id.*)  Plaintiffs' cited authority is distinguishable because it enhanced considerably more modest awards, ranging from $700,000 to $15.5 million.  (Opp. 24.)

Plaintiffs reply Defendant and Gilead function as a single company, and Gilead is responsible for the actions at issue.  (Reply 11.)  Even if the focus were on Defendant, Defendant can sustain the penalty, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ where Dr. Rao's analysis runs only through 2022, and where Dr. Rao does not provide additional information about cost categories.  (Reply 11-12.)  Moreover, the law disregards whether an infringer would be profitable after a reasonable royalty.  (Reply 12.)

The Court finds that consideration of Gilead's size and financial status, as it acquired Defendant before YESCARTA® went on the market, is appropriate.  This is especially so where although Gilead did not become a party to this litigation, Gilead paid for Dr. Schuetz to testify on Defendant's behalf in this litigation, demonstrating its ties to this litigation and to Defendant. Gilead's total assets of nearly $60 billion, and $9 billion in cash and cash equivalents, are substantial and merit an enhancement to send a strong message.  *See, e.g.*, *Johns Hopkins Univ. v. Cellpro*, 978 F. Supp. 184, 195 (D. Del. 1997) ("Punishing a larger company in a stronger financial condition may call for higher damages, where a lower number may be equally effective in punishing a smaller company.").  In fact, within the last few years, a different court similarly determined that Gilead's size and financial condition were large and healthy.  *Idenix*, 271 F. Supp. 3d at 701 (concluding that although Gilead's size and financial condition "as a general matter could support enhancement," they did not in that particular case).

Even considering only the size and financial condition of Defendant, although Defendant is comparatively small when compared to Gilead, the Court finds that revenues of $724 million, and nearly $100 million in revenues from October to December 2019 are significant.

Thus, the Court finds this factor weighs in favor of enhancement.

5.  *Read* Factor 5 – closeness of case

Plaintiffs argue the case was not close, where the nine-member jury returned a unanimous verdict accepting all of Plaintiffs' arguments, and rejecting all of Defendant's arguments.  (Motion 16.)  Specifically, the jury rejected Defendant's CoC and invalidity defenses, Defendant stipulated to literal infringement of claims as corrected by the presumptively-valid CoC, the jury determined Defendant's infringement was willful, and it found Plaintiffs' damages expert credible. (Motion 16-17.)

Defendant responds that the mere fact that Defendant did not prevail does not suggest the case

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                         **DATE:  April 2, 2020**

was not close.  (Opp. 22.)  Defendant asserted a substantial challenge to the CoC.  (Opp. 23.)
When Defendant moved for summary judgment on this issue, the Court acknowledged doubts
about Plaintiffs' position.  (*Id.*)  Plaintiffs offered no new evidence on this point, and Defendant
introduced Dr. Schuetz's testimony, rendering this defense a hotly-contested issue.   (*Id.*)
Defendant also presented substantial written description and enablement defenses, and
Plaintiffs did not even attempt to move for summary judgment on these issues.  (*Id.*)

Plaintiffs reply the jury returned a sweeping, across-the-board verdict, including Plaintiffs'
requested damages in full.  (Reply 10.)  That a case proceeds to trial does not mean the jury's
call was close.  (*Id.* (citing cases).)

The Court finds that although Defendant's failure to prevail on a single issue does not
automatically render a case close, the Court's view of the live testimony, including the
incredibility of Dr. Belldegrun's testimony as noted above, merits a finding that this factor weighs
in Plaintiffs' favor.  Plaintiffs prevailed on every single issue presented to the jury, including a
damages award that, as Defendant noted in its briefing on January 21, 2020, "is listed as the
seventh-largest patent jury award ever, according to Docket Navigator."  (Defendant's Motion
for Judgment as a Matter of Law, ECF No. 659, at 35 n.6.)  Also weighing in Plaintiffs' favor is
the speed with which the jury returned the verdict, where it returned a verdict the morning after
beginning deliberation.  Defendant does not provide any authority concluding that a party's
failure to move for summary judgment on an issue suggests the case was close.  The Court is
unpersuaded by this argument, given the different standards that apply.  Thus, the Court finds
this factor weighs in Plaintiffs' favor.

6.  *Read* Factor 6 – duration of misconduct

As set forth above in Read Factor 1 (*see supra*, Section III.C.1), Plaintiffs argue Defendant's
longstanding (since at least 2012) knowing copying of Plaintiffs' technology supports
enhancement.  (Motion 7-13.)

Defendant responds that its alleged misconduct has been of short duration, where it did not
begin until October 2017, when Defendant launched YESCARTA®.  (Opp. 17-18.)  Defendant
cannot be charged with any misconduct prior to that date, because Kite did not even exist (2007-
2008), the pre-CoC '190 Patent did not cover the CAR Defendant developed (2008-2013), and
Defendant's further development work was exempt from any claim of infringement under the
safe harbor provisions of the Hatch-Waxman Act, 35 U.S.C. § 271(e).  (Opp. 18.)

Plaintiffs reply that the history leading up to infringement is relevant and significant, especially
because Defendant had so many years to change course.  (Reply 3.)  Even if not, Defendant's
2017-to-date actions would suffice, where over the last two years it has shown no signs of

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

ceasing or implementing remedial measures.  (Reply 3-4.)

The jury already determined the CoC is valid, which means the '190 Patent, as originally issued, contained a clearly evident error and solution from the perspective of a POSITA.  Thus, even before issuance of the CoC, Defendant should have been on notice of its misconduct.  However, even evaluating Defendant's actions from 2013 onward, ***after*** the CoC issued, the Court finds Defendant's misconduct was of a lasting duration, as it had many years to develop, test, apply for approval for, and obtain a license to the '190 Patent for, YESCARTA® before its release in 2017.  Even if the safe harbor provision of the Hatch-Waxman Act applied to Defendant's actions before 2017, Defendant's continuing actions post-2017 would weigh in favor of enhancement.

> 7.  *Read* Factor 7 – remedial action

As set forth above in *Read* Factor 2 (*see supra*, Section III.C.2), Plaintiffs argue Defendant's failure to take any remedial steps, despite its lack of good-faith belief of non-infringement or invalidity, supports enhancement.  (Motion 14-15.)

Defendant responds that by June 2013 (when the CoC issued), Dr. Rosenberg had already conducted Phase I clinical trials, and Defendant was in preparation to conduct Phase I/II trials that led to FDA approval for YESCARTA®.  (Opp. 20-21.)  Remedial efforts are not simple and would have required many years of research and development.  (Opp. 21.)  Defendant had to decide whether to: (1) continue developing YESCARTA® and rely on its defenses to an infringement claim, or (2) pull the plug on YESCARTA® and switch to a different construct.  (Opp. 21.)  Defendant in 2014 or 2015 decided to accelerate development of YESCARTA®.  (*Id.*)  Defendant also decided to develop a different CAR construct for its next-generation therapy.  (*Id.*)  Defendant has continued developing its non-infringing construct as part of its next-generation dual-targeting CAR-T therapy.  (*Id.*)

Plaintiffs reply Defendant willfully barreled ahead and infringed, having failed to license or invalidate the '190 Patent.  (Reply 9.)  Defendant's bizarre response showing it took remedial steps is to state that it rushed an infringing product to market, without a license.  (*Id.*)  Plaintiffs argue they have always been open to a reasonable sublicense.  (*Id.*)

The Court understands Defendant's argument to be that remedial steps would simply have been too difficult to take, and Defendant's response was thus to ***speed up*** the date on which it began its infringing behavior.  Such an argument certainly cannot sway this factor in Defendant's favor.  Defendant has not argued that it even attempted to change its product or re-approach Plaintiffs regarding licensing, even where Plaintiffs state they have always been open to a reasonable sublicense.  The Court recognizes that "reasonable" is in the eye of the beholder, but Defendant's failure to put forth any evidence or argument that it even attempted to sublicense

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

the '190 Patent merits a finding that this factor weighs in Plaintiffs' favor.

8.   *Read* Factor 8 – motivation for harm

Plaintiffs argue Defendant's goal of obtaining a competitive advantage at Plaintiffs' expense
supports enhancement.  (Motion 15.)  Plaintiffs and Defendant are longstanding competitors and
each attempted to beat the other to market, as demonstrated by Defendant's internal documents.
(Motion 16.)  Any first-mover advantage to Defendant would create reciprocal harm to Plaintiffs,
as they were direct competitors in a relatively small market.  (*Id.*)

Defendant responds that mere motivation to make a profit does not distinguish this case from
the garden-variety infringement case.  (Opp. 21.)  Defendant's sales have not come at Juno's
expense, as Juno is not on the market.  (Opp. 22.)  Moreover, even Defendant and Novartis
combined cannot treat all eligible patients.  (*Id.*)

Plaintiffs reply Defendant's goal was to get to market first because it believed doing so would
allow it to dominate the market.  (Reply 10.)  Although Defendant argues it and Novartis cannot
serve the entire market, it does not argue that Defendant, Novartis, and Juno combined could
not serve the entire market.  (*Id.*)

The Court finds that Defendant's goal was more than just simply to make a financial profit.  As
the evidence overwhelmingly shows, Defendant raced to get its product to market to benefit from
the "first mover advantage," where it would enter the market early and grab market share, in
order to preclude Plaintiffs from later obtaining that same market share.  And it did so by
improperly using Plaintiffs' patented CAR.  Thus, the benefit conferred to Defendant by its
improper head start was to direct detriment of Plaintiffs.  This is also confirmed by internal
documents, such as a Gilead internal document asking "Why Kite instead of Juno? . . . **First
mover** advantage." Ex. 21 (PX78 at 5 (emphasis in original)).  Thus, even though Plaintiffs have
not yet jointed the market, Defendant's unfair head start was designed to impede Plaintiffs'
progress when they do so.  This factor weighs in Plaintiffs' favor.

9.   *Read* Factor 9 – attempt to conceal

Plaintiffs argue evidence shows Defendant attempted to conceal its wrongful conduct, such as
Dr. Belldegrun's licensing testimony, and Defendant's internal emails regarding Dr. Rosenberg's
public statements acknowledging Dr. Sadelain.  (Motion 24.)  Defendant's attempts continue,
where it continued to assert (after the verdict) to press outlets that Defendant independently
developed YESCARTA®.  (Motion 24.)

Defendant responds that there is no evidence that Defendant tried to conceal its infringing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: 2:17-cv-07639 SJO-KS                          DATE:  April 2, 2020

conduct.  (Opp. 24.)  Dr. Rosenberg published articles disclosing the YESCARTA® construct, gave Dr. Sadelain credit for contributing, and deposited the sequence in Genbank.  (*Id.*)  For the reasons set forth for *Read* Factor 1, Plaintiffs did not identify any false and misleading testimony from Dr. Belldegrun.  (*Id.*; *see supra*, Section III.C.1.)  Defendant's internal reaction to Dr. Rosenberg's statement in a New York Times article crediting Dr. Sadelain did not conceal anything.  (Opp. 24.)  Defendant's post-trial statement of opinion is one Defendant may express. (*Id.*)

Plaintiffs reply improper concealment reaches concealment of misconduct, not just concealment of sales.  (Reply 12.)  Defendant's discussion of Dr. Rosenberg crediting Dr. Sadelain shows Defendant sought to conceal Dr. Sadelain's inventive role, and the law considers unsuccessful concealment still to be concealment.  (*Id.*)

The Court finds that Defendant's internal emails lamenting Dr. Rosenberg's public statements that NCI's research "owe[d] a lot" to Dr. Sadelain do not necessarily constitute an attempt by Defendant to conceal its infringing conduct.  The correspondence certainly demonstrates an attitude consistent with a desire to conceal, but falls short of recognizing any attempt to conceal. While the Court finds that Dr. Belldegrun's testimony, which has been discredited, demonstrates an attempt to conceal the fact that Defendant sought a license to the '190 Patent, ultimately the Court is not persuaded that that testimony falls squarely within *Read* factor 9 (for which *Read* cites authority where a party failed to preserve its record and cooperate at trial).  The Court finds this factor neutral.

Taking all the *Read* factors together, the Court's previous determination is supported by the analysis.  *Read* factors 1, 2, 4, 5, 6, 7, and 8 weigh in favor of enhancement, whereas factor 3 weighs against enhancement, and factor 9 is neutral.  The Court maintains its position that enhancement is proper, and taking into account all of the circumstances regarding enhancement, determines a 50% enhancement proper.

          D.  Ongoing royalties

Plaintiffs argue Defendant's continued infringement warrants an ongoing royalty rate of at least 33.1% (20% more than the jury's rate) for ongoing sales of infringing therapies.  (Motion 26-27.) The increase accounts for the parties' changed circumstances, including that a verdict of no invalidity and infringement amounts to a substantial shift in bargaining position, post-verdict infringement is necessarily willful, and courts frequently impose a post-verdict ongoing royalty rate higher than a reasonable royalty found at trial.  (Motion 27-28.)  One study demonstrated that between 2007 and 2015, the ongoing rate was higher than the jury's in two thirds of the cases studied.  (Motion 28.)  Here, the parties' economic circumstances have changed since October 2017, the date of the hypothetical negotiation.  (Motion 29.)  Specifically, Bristol-Myers

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: 2:17-cv-07639 SJO-KS                    DATE: April 2, 2020

Squibb ("BMS"), Juno's ultimate corporate parent, has announced a biologics license application ("BLA") for JCAR017, including to treat relapsed/refractory mantel cell lymphoma ("MCL"). (*Id.*) Gilead has also announced Defendant submitted a BLA for CAR-T therapy to treat MCL. (*Id.*) Plaintiffs' further progress for JCAR017, as well as Defendant's new BLA, was not previously accounted for in Dr. Sullivan's competition adjustment. (*Id.*) At a minimum, the 27.6% rate found by the jury is necessary. (Motion 30.)

Defendant responds that the 27.6%[8] royalty award is punitive, not apportioned, and unsupported by comparable licenses or other substantial evidence. (Opp. 25.) There is no basis for further increase, where Dr. Sullivan opined the royalty rate applies throughout the patent term, and Plaintiffs' Motion contradicts Dr. Sullivan's testimony. (*Id.*; *see also id.* (citing *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1380 (Fed. Cir. 2008)).) Moreover, the upfront payment precludes injunctive relief, which weighs against an increased royalty. (Opp. 26.) Without the threat of an injunction, the parties' negotiating positions would remain the same—the initial hypothetical negotiation assumes validity and infringement. (Opp. 26.) Courts frequently decline to increase the forward royalty rate found by the jury. (Opp. 26-27 (citing cases).) The Federal Circuit has rejected enhancing ongoing royalties based on willfulness, where an injunction is unavailable. (Opp. 27.) Here, the upfront payment precludes an injunction, and the equities highly disfavor an injunction for a product that fills an unmet need in terminal cancer patients. (Opp. 27-28.) Defendant further responds that a hypothetical negotiation today would lead to a lower royalty: (1) Defendant's actual revenues have been dramatically lower than projections at the hypothetical negotiation, and (2) the hypothetical negotiation assumed Plaintiff would already have launched an approved product by mid-2019, where in fact JCAR017 may now be available in late 2020 at the earliest, translating into a shorter period of competition than originally anticipated. (Opp. 28-29.)

Plaintiffs reply that *Innogenetics* holds an upfront payment compensating through the full term of the patent is inconsistent with an injunction against practicing the patent, but says nothing about the rate of the future royalty. (Reply 13.) Moreover, there is a fundamental difference between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement. Here, a running royalty rate adjusts for revenues lower than projected, because the running royalty takes a percentage of the lower amount. (Reply 14.) Plaintiffs further reply that the imminent entry of JCAR017 requires a higher royalty rate. (*Id.*) Plaintiffs further reply Defendant would agree to a higher royalty rate in 2019, because it now has a greater market share than anticipated in 2017. (*Id.*) Plaintiffs further argue Dr. Sullivan's trial analysis did not account for the mantle cell lymphoma indication, and accounting for it now increases the degree

---

[8] Defendant referred to the "26.7% royalty award," Opp. at 25:4, but the Court assumes this to be a typographical error, as Defendant referred elsewhere in its Opposition to the correct 27.6% royalty, and has not otherwise disputed what the jury awarded.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

CASE NO.: 2:17-cv-07639 SJO-KS                         DATE:  April 2, 2020

of competition.  (*Id.*)

The Court finds that in a post-trial hypothetical negotiation, some factors weigh in favor of a
higher royalty rate.  The jury found the '190 Patent valid and infringed, which strengthens
Plaintiffs' position.  Although a hypothetical negotiation assumes a patent is valid and infringed,
a determination on the merits can strengthen a party's position.  *See ActiveVideo Networks, Inc.
v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1342 (Fed. Cir. 2012) ("When patent claims are held
to be not invalid and infringed, this amounts to a substantial shift in the bargaining position of
the parties." (citations omitted)).  Additionally, Plaintiffs presented evidence that both Plaintiffs
and Defendant have submitted BLAs to treat MCL.  Dr. Sullivan did not account for this fact in
his previous competition adjustment, and if considered, would increase the adjustment as the
parties would be in direct competition to treat MCL.  Finally, *Innogenetics* does not preclude an
increase in royalty rate.  Unlike in *Innogenetics*, Dr. Sullivan did not opine that the market entry
fee was "paid in anticipation of [defendant's] long-term license to sell its products," or that "his
proposed amount of damages was not capped by the date of the jury award."  *Innogenetics*, 512
F.3d at 1380.

However, other factors weigh in favor of a lower royalty rate.  Neither party disputes that
revenues for YESCARTA® have been lower than originally estimated at the time of the
hypothetical negotiation in 2017.  Specifically, while in 2017, Defendant estimated ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  While Plaintiffs argue this is taken into account because
the royalty is a percentage, a smaller revenue can still weigh in favor of a lower royalty rate,
because the resulting margin is smaller.  Additionally, although at the original hypothetical
negotiation, the parties expected Plaintiffs to have already entered the market, Plaintiffs have
yet to do so.  Given the limited term of the patent, Plaintiffs will face competition for a
comparatively shorter time than anticipated in 2017.

After careful consideration of all of the factors, the Court declines to change the royalty rate
awarded by the jury.  The Court emphasizes that in deciding not to change the royalty rate, it
has performed a careful analysis of the parties' changed circumstances, as noted above.
*EcoServices, LLC v. Certified Aviation Servs., LLC*, 340 F. Supp. 3d 1004, 1028 (C.D. Cal. 2018)
("For determining an ongoing post-judgment royalty rate, the rate the jury adopted is significant
as a starting point, but the court cannot simply apply the jury's pre-verdict royalty award to the
post-verdict infringement, without considering the impact of changed circumstances." (citations
omitted)).

Thus, the Court imposes a 27.6% running royalty.  Infringing sales occurring between entry of
the verdict and entry of judgment shall be subject to the running royalty rate, and shall not be
subject to enhancement.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

       E.  Entry of final judgment

Plaintiffs' L.R. 58-7 Memorandum requests pre-judgment interest (*see supra*, Section III.B) and post-judgment interest at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment, computed daily to the date of payment, compounded annually.  (L.R. 58-7 Memorandum 1-2.)

Defendant maintains its objections presented in its Motion for Judgement as a Matter of Law (JMOL, ECF No. 659), reserves its rights to submit additional objections and motions after final judgment, and notes it objected to Plaintiffs' calculation of prejudgment interest (*see supra*, Section III.B).   Defendant further objects to Plaintiffs' proposed accounting and payment procedures as premature, stating if the Court denies Defendant's JMOL, Defendant "will post a supersedeas bond to stay enforcement of the judgment . . . ."  (Objections 1.)

Plaintiffs reply that: (1) prejudgment interest should be calculated using the prime rate (*see supra*, Section III.B); (2) the judgment should include procedures for computing and paying ongoing royalties, as a supersedeas bond does not stay execution until a court approves it; and (3) any subsequent JMOL or new trial motions would be untimely and improper.  (Final Judgment Reply 1.)

The Court finds that the Treasury bill rate is appropriate for pre-judgment interest.  (*See supra*, Section III.B.)  The Court further finds that Defendant not having presented any opposition, post-judgment interest shall be calculated according to Plaintiffs' proposal.

Regarding entry of final judgment, the Court finds it efficient to enter judgment with accounting and payment procedures in place.  Defendant not having presented any opposition, the Court will enter the procedures proposed by Plaintiffs.  The Court will consider any supersedeas bond and corresponding request to stay if and when one is filed.

//

//

//

//

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

**CASE NO.: 2:17-cv-07639 SJO-KS**                    **DATE:  April 2, 2020**

IV. RULING

For the foregoing reasons, the Court **GRANTS-IN-PART** Plaintiffs' Consolidated Post-Trial
Motion [ECF No. 655].  Specifically, the following is held:

(1) Plaintiffs are awarded $778,343,501 on the jury verdict for Defendant's infringement from
October 18, 2017 through December 12, 2019;
(2) The Treasury bill rate, compounded quarterly, is awarded for prejudgment interest, which
shall not apply to the enhancement award;
(3) The damages award is enhanced by 50%; and
(4) A 27.6% running royalty is awarded.

Final Judgment to follow.

IT IS SO ORDERED.